# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIHAD A. HACHEM,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JOHN L. FLANNERY, JAMIE MILLER, AND KEITH S. SHERIN,<br><br>Defendants. | LEAD CASE:  No. 17-CV-8457 (JMF)<br>Hon. Jesse M. Furman<br><br><br>CLASS ACTION<br><br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

Page

I.      NATURE OF THE ACTION ................................................................................. 2

II.     JURISDICTION AND VENUE ........................................................................... 12

III.    PARTIES ............................................................................................................. 12

        A.      Lead Plaintiff ........................................................................................... 12

        B.      Defendants ............................................................................................... 13

IV.     CONTROL PERSON ALLEGATIONS.............................................................. 16

V.      COMPANY BACKGROUND ............................................................................ 18

        A.      GE Capital................................................................................................ 18

        B.      GE Power ................................................................................................. 19

VI.     SUBSTANTIVE ALLEGATIONS ..................................................................... 21

        A.      Background of GE Capital's LTC Insurance Exposure........................... 21

                1.      The Genworth Spin-Off.................................................................. 22

                2.      GE Retained and Reinsured the Worst Blocks of its LTC Business
                        in Connection with the Genworth Spin-off.................................... 24

                3.      ERAC and UFLIC Reinsurance Subsidiaries ................................ 29

                4.      GE Capital's SIFI Designation and the GE Capital Exit Plan ...... 31

                5.      During the Class Period, Members of GE's Board of Directors and
                        GE's Senior Management Oversaw the Adequacy and
                        Effectiveness of GE Capital's Risk Management Functions......... 36

        B.      Defendants Knew or Recklessly Disregarded the Stale Assumptions
                and Inadequate LTC Reserve Situation at GE Capital.............................. 38

        C.      GE Failed to Set Appropriate LTC Reserves in Violation of GAAP
                and SEC Regulations ............................................................................... 52

                1.      Defendants Violated GAAP by Failing to Properly Calculate and
                        Update GE's LTC Reserves............................................................ 59

                        (a)     Summary of LTC Reserve Charges ..................................... 60

|   | (b) | GAAP Applicable to LTC Reserves | 61 |
|---|---|---|---|
|   | (c) | Benefit Reserve Assumptions Are "Locked-In" When Policies Are Issued, but Should Be Unlocked When Assumptions Change | 65 |
| 2. |   | GE Tells Investors that its Claims Experience Was Different from Other LTC Insurers, Until 2017 | 66 |
| 3. |   | Adverse LTC Experience Was Known to Defendants at Least by 2015 | 67 |
|   | (a) | GE's New Disclosures Also Reveal That Adverse LTC Experience Was Systemic Before 2017 | 69 |
| 4. |   | GE Failed to Adequately Increase its LTC Reserves as Trends and Assumptions in the LTC Market Drastically Changed and GE's Peers in the LTC Market Increased Their LTC Reserves | 70 |
|   | (a) | Genworth | 71 |
|   | (b) | Other LTC Insurers Were Reporting Adverse Claims Experience | 73 |
|   | (c) | HHS Study Examines Why Insurers Were Leaving the LTC Market | 74 |
|   | (d) | In 2015, Moody's Assessed the Credit Impact of the Adverse Experience Widely Reported in the LTC Industry | 75 |
|   | (e) | Recent Studies Confirm Adverse Experience in LTC Market | 76 |
| 5. |   | GE's Failure to Record Timely Increases its LTC Reserves Was Exacerbated by its Failure to Disclose the Enormous Exposure in its LTC Portfolio | 76 |
| 6. |   | GE Failed to Provide the Most Basic Disclosures Required by GAAP Regarding its LTC Reserves | 76 |
| 7. |   | GE Failed to Disclose the Risks and Uncertainties Associated With its LTC Exposure in its MD&A | 79 |
| 8. |   | GE Also Improperly Excluded LTC Commitments From its Disclosure of Contractual Obligations | 81 |
| 9. |   | GE Violated Additional GAAP Provisions and SEC Regulations by Failing to Appropriately Account for and Disclose its LTC Reserves | 82 |

        (a)    GE's Accounting Errors Should Result in a Restatement ................... 85

D.    GE's Statutory LTC Reserves Were More Severely Understated than Even its GAAP LTC Reserves ........................................................ 87

    1.    ERAC and UFLIC's Statutory Financial Statements .................................... 87

    2.    An Analysis of Ceding Companies' LTC Experience Forms Reveals Significant Deficiencies in GE's LTC Active Life Reserves and Disabled Life Reserves and Worsening Trends ...................... 91

        (a)    Actual Incurred Claims .................................................... 91

        (b)    GE's Active Life Reserves Were Materially Understated due to Stale Morbidity and Persistency Assumptions ................. 93

        (c)    GE Failed to Properly Update the Projection Assumptions Used in its Annual Asset Adequacy Testing ......................... 94

E.    GE Violated GAAP and Employed Unsustainable Business Practices to Record Revenue and Earnings on its LTSAs and to Conceal the Truth About its Contract Asset Balance ............................. 95

    1.    Background on GE's LTSAs and Contract Assets ....................................... 97

    2.    GE's Unsustainable Reliance on Cumulative Catch-Up Adjustments and its Impact on GE's Contract Asset Balance .................... 100

    3.    The "Black Box" of GE's Contract Assets ................................................ 106

    4.    GE's Accounting for Contract Assets Violated GAAP ............................. 112

        (a)    GE Failed to Implement Adequate Internal Controls to Ensure GAAP was Appropriately Applied to Contract Assets ........... 115

        (b)    GE Used Monetization and Cumulative Catch-up Adjustments to Mask the Declines in the Power Segment and Manipulate GE's Earnings and Cash Flow ......................... 119

        (c)    GE Failed to Provide Adequate Disclosure Regarding Contract Assets ............................................................. 125

F.    Defendants Also Failed to Disclose a Known Trend or Uncertainty at GE ................................................................................................. 132

G.    GE Failed to Maintain Adequate Internal Controls Over its Financial Reporting ..................................................................................... 133

        (a)    GE's SOX 404 Assertions ............................................... 134

        (b)     GE's SOX 302 Certifications.............................................................137

        (c)     GE's "Audit" Personnel Were Not Competent to Assess LTC Reserves ...........................................................................................140

        (d)    Defendants Violated SOX and Relevant SEC Regulations ...............143

VII.    GE'S MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS.........................................................................................145

VIII.   DEFENDANTS' ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING LTC RESERVES AND CONTRACT ASSETS ...................................................150

    A.    Defendants' Statements ...........................................................................150

        1.     Fourth Quarter and Full Year 2014.........................................150

        2.     GE's February 2, 2015 Letter to the Fed ..................................154

        3.     Barclays Industrial Select Conference (February 18, 2015)......155

        4.     GE Capital Investor Meeting (April 10, 2015) ..........................156

        5.     GE Responds to Genworth's LTC Reserve Charges (April 14, 2015) .......................................................................................159

        6.     First Quarter 2015 ..................................................................159

        7.     Annual Shareholders Meeting (April 22, 2015) .........................161

        8.     Electrical Products Group Conference (May 20, 2015)...............162

        9.     Sanford C. Bernstein Strategic Decisions Conference (May 27, 2015) .......................................................................................163

        10.    Second Quarter 2015................................................................164

        11.    Third Quarter 2015 ..................................................................164

        12.    Annual Outlook Investor Meeting (December 16, 2015) ............165

        13.    Fourth Quarter & Full Year 2015 ..............................................165

        14.    Barclays Industrial Select Conference (February 17, 2016).......169

        15.    First Quarter 2016 ..................................................................169

16. Sanford C. Bernstein Strategic Decisions Conference (June 1, 2016) ........................................................................................ 173

17. Second Quarter 2016 .................................................................... 175

18. Third Quarter 2016 ...................................................................... 179

19. Annual Investor Outlook Meeting (December 14, 2016) ............ 181

20. Fourth Quarter & Full Year 2016 ............................................... 183

21. Barclays Industrial Select Conference (February 22, 2017) ...... 188

22. GE Power and Renewable Energy Investor Meeting (March 8, 2017) ............................................................................................. 191

23. JPMorgan Aviation, Transportation & Industrials Conference (March 13, 2017) .......................................................................... 193

24. JPMorgan Aviation, Transportation and Industrials Conference ............... 194

25. First Quarter 2017 ....................................................................... 195

26. Electrical Products Group Conference (May 24, 2017) .............. 201

27. CEO Succession Plan Meeting (June 12, 2017) ......................... 202

B. The Truth Begins to Emerge While Defendants Continue to Mislead the Market ................................................................................... 202

1. July 21, 2017: Results for Second Quarter 2017 (Partial Corrective Disclosure) ..................................................................................... 202

2. July 28, 2017: Q2 2017 Form 10-Q ............................................ 205

3. October 20, 2017: Results for Third Quarter 2017 (Partial Corrective Disclosure) ................................................................. 209

4. October 30, 2017: 3Q 2017 Form 10-Q ...................................... 218

5. November 13-14, 2017: Investor Update and Goldman Sachs Conference (Partial Corrective Disclosure) ................................ 221

IX. ADDITIONAL CORRECTIVE DISCLOSURES ....................................... 228

A. January 16, 2018: Insurance Update (Partial Corrective Disclosure) ................. 228

B. January 24, 2018: Results for Fourth Quarter 2017 and Disclosure of Multi-Faceted SEC Investigation (Corrective Disclosure) ............................. 235

X.     POST-CLASS PERIOD EVENTS ................................................................. 239

XI.    ADDITIONAL SCIENTER ALLEGATIONS .............................................. 246

       A.   The Magnitude of GE's $15 Billion Understatement of its LTC
            Reserves Supports a Strong Inference of Scienter; They Had To See
            It Coming ................................................................................................. 247

       B.   Defendant Flannery Admitted That GE's LTC Experience Was
            Like the Rest of the Industry and That in 2015 The Company "again
            reviewed [its] insurance exposure" but Took No Action to Increase
            its LTC Reserves ..................................................................................... 249

       C.   GE Acknowledged That it is Appropriate to Consider Industry
            Trends and Experience When Analyzing LTC Reserves and That
            Most LTC Insurers Had Adjusted Their Assumptions and Increased
            Reserves Years Before GE ....................................................................... 249

       D.   An Analysis of the Actual Incurred Claims Compared to the
            Expected Incurred Claims for the LTC Insurers Reinsured by GE
            Subsidiaries Shows an Extremely Unfavorable Ratio Since At Least
            2013 ........................................................................................................... 250

       E.   GE Acknowledged That the Company Had Not Previously
            Employed Sufficient Actuarial Staff to Conduct an Adequate
            Review of its LTC Reserves .................................................................... 251

       F.   GE Relied on Billions in Cash From GE Capital to Continue Paying
            its Dividends and Funding its Stock Buyback Program ......................... 252

       G.   The Former CEO of GE Capital "Retired" in the Middle of the LTC
            Reserve Review ........................................................................................ 255

       H.   During the Class Period, GE Selectively Provided Investors with
            Only Positive Information ....................................................................... 256

       I.   Defendants Made Financial Disclosure for GE's LTC and Contract
            Assets Overly Complicated and Vague to Hide the Truth ...................... 256

       J.   Statements by Former GE Employees Corroborate That Defendants
            Knew or Were Reckless in Not Knowing That the Company (i)
            Materially Under-Reserved for its LTC Portfolio and (ii)
            Manipulated Cost and Profitability Estimates in Violation of GAAP ... 258

            1.   FE-1 Was Given Changed Cash Flow Models Without Explanation .......... 258

2.      FE-2 found in 2014 that ERAC's LTC Portfolio Was Under-
        Reserved; Senior Management Agreed Assumptions Needed to be
        Updated; Defendants Knew About Concerns .............................................259

3.      FE-4 Confirmed that GE's LTC Business Was Recognized as a
        "Troublemaking Block of Business" that Nobody Wanted........................261

4.      FE-6 Reported that Senior GE Management Recognized the Risk
        of the LTC Portfolio.................................................................................262

5.      FE-7 Explained How GE Power Services Sold its Future to Hide
        Shortfalls in Current Revenue Projections...................................................263

XII.    CLASS ACTION ALLEGATIONS ...........................................................265

XIII.   PRESUMPTION OF RELIANCE ............................................................267

XIV.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ......................268

XV.     CLAIMS FOR RELIEF ...........................................................................269

COUNT  I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
        Against All Defendants.............................................................................269

COUNT  II For Violation of Section 20(a) of the Exchange Act Against the
        Individual Defendants ..............................................................................270

PRAYER FOR RELIEF ...................................................................................270

JURY DEMAND ...............................................................................................271

## GLOSSARY OF TERMS AND ABBREVIATIONS
## USED IN AMENDED COMPLAINT

| Term | Definition |
|---|---|
| Actual to Expected Incurred Claims | Actual incurred claims as percentage of valuation expected incurred claims. Actual incurred claims represent the present value of claims paid and remaining claims reserve by year of claim incurral. Expected incurred claims represent the expected present value of claims for a given incurral year based on statutory active life reserve morbidity assumptions. |
| Actual to Expected Lives In Force | Actual number of lives inforce as percentage of expected number of lives inforce at the end of the year. The actual number of lives inforce at the end of the year. The expected number of lives inforce at the end of the year is calculated as the actual number of lives inforce at the beginning of the year plus new issue lives less expected deaths and lapses, where expected deaths and expected lapses are based on valuation assumptions. |
| ALR | Active Life Reserves. When an insurer issues new LTC policies it establishes an ALR, which represents the present value of the expected liability for future claims for healthy policyholders who are paying premiums and are not currently on claim. Active Life Reserves are based on actuarial assumptions established at the time the policies are issued or acquired. These assumptions include, but are not limited to: (i) interest or discount rates; (ii) health care experience (including type and cost of care), (iii) morbidity; (iv) mortality, and (v) the length of time a policy will remain in force. Under GAAP, these assumptions are "locked in" when the policy is written, unless the company's reserve margin becomes negative, at which point the reserve is reset to reflect the then-correct best estimate. |
| Assumptions | Actuarial assumptions are used to estimate unknown values based on the methods of actuarial science. Actuarial assumptions are developed using statistical tools such as the correlation of known values to possible outcomes for the unknown value. Typically, complex mathematical and statistical techniques are used in the development of an actuarial assumption. In the context of LTC reserves, an assumption is a function used to estimate an input to a financial model used to value or test the reserves. For example, a common actuarial assumption relates to predicting a person's lifespan, given their age, gender, health conditions and other factors. |
| Benefit Amount (Daily/Monthly) | The maximum amount of money per day or per month that a LTC policy will provide to cover LTC needs. |
| Benefit Period | The minimum period of time (years) coverage lasts. |
| Benefit Utilization Rate | The proportion of contractually available benefits that a policyholder uses while on claim. |

| Term | Definition |
|---|---|
| Ceding Company | An insurance company that transfers a portion, or all, of the risk associated with its insurance portfolio to a reinsurer. |
| CFOA | Cash Flow from Operating Activities |
| Claims Continuance | Includes claimant mortality and recovery |
| Class Period | The Period between January 23, 2015 and January 23, 2018, inclusive. |
| Contract Asset | Assets based on revenues GE books on long-term contracts before it has the cash in hand, for things such as servicing power plants and building complex equipment like gas-power systems. |
| Contract Liability | Billing in excess of revenue. |
| Cost Improvement Assumption a/k/a Utilization Improvement | An LTC assumption in which an insurer assumes that contractually determined benefit inflation under certain polices will rise faster than the cost of care. |
| CSA | Contractual Service Agreements |
| Defendants | General Electric Company, Jeffrey R. Immelt, Jeffrey S. Bornstein, John L. Flannery, Jamie Miller, and Keith S. Sherin |
| Discount Rate | In the context of LTC reserves, the statutory valuation interest rate used to determine the present value of future cash flows such as claims, premium, and expenses. |
| DLR | Disabled life reserves. When a policyholder submits a valid claim, an insurer establishes a DLR representing the insurer's best estimate of the present value of what an insurer expects to pay out on that claim over time. Key inputs include actual known facts about the claims, such as the benefits available and cause of disability of the claim, as well as assumptions derived from historical experience and expected future changes in experience factors. Key assumptions are termination rates (or continuance rates) and utilization rates. |
| Expected Lives in Force | Number of lives Inforce at the beginning of the year, plus the number of new lives from new policies issued, minus the number of expected deaths and the number of expected lapses. In the LTC Experience Form 1, the number of expected deaths and expected lapses are calculated based on ALR assumptions. |
| EPS | Earnings Per Share |
| ERAC | Employers Reassurance Corporation (GE subsidiary) |
| FCF | Free Cash Flow |

| Term | Definition |
|---|---|
| GAAP | Generally Accepted Accounting Principles ("GAAP") comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices.  The SEC has the statutory authority for the promulgation of the GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board (FASB).  The FASB's promulgated standards are generally contained within the FASB Accounting Standards Codification ("ASC"), which are considered to be the highest standards of GAAP. SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures. |
| Incidence Improvement Assumption a/k/a Morbidity Improvement | An LTC Assumption for claim incidence (the rate at which LTC claimants go on claim). This means that it is assumed that policyholders will go on claim later than historical incidence rates would indicate. |
| In force or inforce | All LTC policies are currently paid up and have not lapsed. |
| Lapse Rate | An assumption used to predict the rate at which policies are terminated due to a policyholders' failure to pay the required premium. |
| Lifetime Maximum Benefit | The total pool of money payable for covered LTC services received while insured. |
| LTC | Long-Term Care. The type of care received when someone needs assistance with daily living due to an accident, illness, cognitive impairment or advancing age. Care is provided either in a facility or at home. Long-term care may include a range of formal and informal services for health, personal care and social needs. Often thought of only as nursing home institutionalization, long-term care can be provided both formally, by medical and health professionals, and informally, by personal, unskilled caregivers. |
| LTC Insurance | Long-term care insurance provides defined benefit levels of protection against the cost of long-term care services provided in the insured's home, in assisted living or nursing home facilities. |
| Long-Term Care Services | Services that include medical and non-medical care for people with a chronic illness or disability. Long-term care helps meet health or personal needs. Most long-term care services assists people with Activities of Daily Living, such as dressing, bathing, and using the bathroom. Long-term care can be provided at home, in the community, or in a facility. For purposes of Medicaid eligibility and payment, long-term care services are those provided to an individual who requires a level of care equivalent to that received in a nursing facility. |
| LTSA | Long Term Service Agreements |

| Term | Definition |
|---|---|
| Margin | The LTC margin is the projected future profitability on the policies for which policyholders have not yet made a claim. More specifically, it is the present-day value of the differential between the ALR (the assumptions for which are locked in) and the Company's current best estimate of present-day value of expected future payments relating to those policies. It is in essence a profit margin on outstanding LTC policies. |
| Medicaid | Federal and state-funded program of medical assistance to low-income individuals of all ages. There are income eligibility requirements for Medicaid. |
| Medicare | Federal health insurance program for persons age 65 and over (and certain disabled persons under age 65). Consists of 2 parts: Part A (hospital insurance) and Part B (optional medical insurance which covers physicians' services and outpatient care in part and which requires beneficiaries to pay a monthly premium). |
| Morbidity | An assumption used to predict the rate at which healthy people go on claim and start drawing on their contractually-defined long-term care benefits. Morbidity is principally comprised of three constituent assumptions: (1) claim incidence, (2) claim continuance, and (3) benefit utilization. |
| Mortality | An assumption used to predict the rate at which policyholders pass away. |
| NAIC | National Association of Insurance Commissioners. Membership organization of state insurance commissioners. One of its goals is to promote uniformity of state regulation and legislation related to insurance. |
| Persistency | The volume of business that an insurer is able to retain. This rate can be gauged with the help of "persistency ratio" which is the percentage of an insurer's already written policies remaining in force without lapsing or being replaced by policies of other insurers. |
| Premium | The periodic payment (*e.g.,* monthly, quarterly) required to keep an insurance policy in force. |
| Reinsurance | The practice of insurance carriers ceding risk to other insurers, called reinsurance companies, in order to limit their liability exposure. Reinsurance companies essentially provide insurance to insurance companies. |
| Retrocede | Retrocession is the practice of one reinsurance company providing services to another by insuring the activities of another reinsurance company. |
| Runoff business | In the context of insurance, an insurer that continues to service existing customers, but no longer tries to make new sales. |

| Term | Definition |
|------|------------|
| SAP | Statutory Accounting Principles for Insurance Companies ("SAP") comprise the set of accounting regulations prescribed by the National Association of Insurance Commissioners used for the preparation of an insurance entity's financial statements to be filed with stock insurance regulators. |
| Termination Rate | When used in reference to the DLR, the rate at which LTC claims end due to death or recovery. |
| UFLIC | Union Fidelity Life Insurance Company (GE Subsidiary). |
| Underwriting | The process by which an insurer assesses the risk of insuring a particular applicant for coverage. Risk retention groups also underwrite by assessing the risk of accepting a prospective member. |

Court-appointed Lead Plaintiff Arkansas Teacher Retirement System ("Arkansas Teacher," "ATRS" or "Plaintiff"), by its undersigned counsel, hereby brings this Consolidated Amended Class Action Complaint ("Complaint") against General Electric Company ("GE" or the "Company"), Jeffrey R. Immelt, Jeffrey S. Bornstein, John L. Flannery, Jamie Miller, and Keith S. Sherin (collectively, "Defendants"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") and annual statutory filings by GE and certain of GE's subsidiaries; securities analysts' and credit reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of GE and its subsidiaries, and other persons with knowledge of the matters alleged herein; and consultation with consulting experts in the areas of: (1) accounting, Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS"); (2) Long Term Care ("LTC") Actuarial Science; and (3) damages and loss causation.[1] Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

---

[1] Former employees of GE and its subsidiaries ("FEs") will be identified herein by number (FE-1, FE-2, etc.).  All FEs will be described in the masculine to protect their identities.

## I.   NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the publicly traded securities of GE during the period from January 23, 2015 through January 23, 2018, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), against GE and certain of its current or former senior executives.

2.     GE is a multi-national conglomerate with operations that are organized across various business segments, specifically including: (1) GE Capital Corporation ("GE Capital" or "GECC"), the financial services unit of GE that provides commercial lending and leasing, as well as a range of financial services for commercial aviation, energy, and support for GE's industrial business units; and (2) GE Power, a wholly-owned subsidiary of GE, that builds industrial products including power plants, turbines, and generators.  Founded in 1892, the Company is headquartered in Boston, Massachusetts and trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GE."

3.     Historically, GE has been known as a "dividend stock," and investors looked to the Company for a consistent stream of quarterly dividends.  Before, during, and after the Class Period, Defendants as well as analysts following the Company emphasized the importance of GE's consistent dividends to its investors and to the value placed on GE's securities by the market.  GE has paid out approximately $8 billion in yearly dividends since 2015. Flow-through dividend payments from GE Capital to parent GE have provided the Company with a majority of the cash flow used for dividends paid to its shareholders during this time period. During

much of the Class Period, through the manipulation described below, GE was able to maintain cash flow sufficient to meet its quarterly dividend payments.

4.      GE Capital (through certain of its subsidiaries) historically underwrote and reinsured billions of dollars in long-term care ("LTC") insurance policies between the late 1980s and the early 2000s. This LTC reinsurance business has been in "run-off" mode since 2006 - meaning no new business has been written in over a decade.  Under these LTC policies, GE Capital collects premiums to insure costs associated with assisted living and other related expenses that are not covered by traditional insurance.[2]   GAAP and statutory regulations governing insurance companies such as GE Capital require companies that insure or reinsure LTC policies to collect and review claims experience and other trend data to set appropriate cash reserves for anticipated claims. GAAP and statutory regulations require LTC insurers and reinsurers to review a handful of key factors regularly, including (i) mortality, (ii) morbidity, (iii) lapse rates, (iv) claims experience, and (v) health care costs and to account for these trends in updating cash reserves to fulfill LTC claims.

5.      Since GE's main source of cash for its quarterly dividends and stock buyback program during the Class Period was its subsidiary GE Capital, Defendants devised a scheme whereby they improperly put off, for at least three years, updating the Company's reserve assumptions for the LTC policies the Company had reinsured more than a decade ago.  Despite knowledge of readily apparent information (or at a minimum recklessly ignoring glaring and obvious red flag warnings) including at least: (i) severely deteriorating trends in the LTC market, including rising LTC costs, and massive and repeated charges taken by other LTC insurers after they adjusted assumptions to meet the reality of how many seniors were actually

---

[2] LTC insurance is intended to help defray the cost of home care, assisted living care, adult day care, respite care, hospice care, nursing home care, and other specialized skilled facility care.

using the benefits and living longer than had been expected when these policies were issued more than ten years ago; (ii) GE's own experience during and following the spin-off of Genworth Financial ("Genworth"), including the fact that GE was forced to keep the worst performing LTC policies on its books in order to facilitate the spin-off; (iii) that in November 2014 and February 2015, Genworth materially increased its LTC reserves (in fact, since the 2004 spin-off, Genworth had increased its LTC reserves 9 times for a total of $3.8 billion); (iv) that statutory filings issued by the direct writers of the policies that GE reinsured were consistently showing actual claims experience much worse then what was originally projected; and (v) warnings from GE actuaries and auditors regarding improper model changes and the need to review LTC reserve assumptions, Defendants failed to materially increase the Company's LTC reserves, thereby violating GAAP and statutory insurance regulations. Defendants knew that updating the Company's LTC reserves with actual claims experience and known trends would jeopardize GE's quarterly cash dividends from GE Capital.  Indeed, after the end of the Class Period, Defendants admitted that GE reviewed its legacy LTC book of business in 2015 and decided not to sell it off at that time because they did not want to sell it at a large discount.  Despite this LTC review, Defendants took no action during the Class Period to materially increase GE's LTC reserves.

6.     Further, after GE Capital was designated in 2013 as a nonbank Systematically Important Financial Institution ("SIFI"), which would have required enhanced Federal Reserve Bank ("the Fed" or "FRBNY") scrutiny and increased governance and reporting requirements (including scrutiny of GE's LTC exposure, how it was establishing LTC reserves and how it was auditing its LTC business), GE designed a plan to shrink GE Capital by divesting a number

of its business units.[3]  GE succeeded in this effort, and in 2015 GE Capital was de-designated as

a SIFI.  While the divestiture was spun as a benefit to the Company, Defendants failed to tell the

market that it was still unable to divest its LTC business, which was left behind once again.

With fewer business units, GE Capital's exposure to its LTC business was even more

pronounced.

7.      GE's ability to sustain its dividend and share buyback program was

simultaneously facing additional pressure.  Throughout the Class Period, GE engaged in a

widespread scheme to improperly record revenue and earnings on its portfolio of long-term

contracts, including its long-term services agreements ("LTSAs")—*i.e.,* contracts with

customers to provide servicing and maintenance on customers' assets, such as gas turbines.

Unbeknownst to investors, however, GE's improper accounting for those contracts caused a

significant drain on the Company's industrial Cash Flow From Operating Activities ("CFOA"),

and GE was forced to employ a range of unsustainable techniques to mask that impact.

8.      Specifically, to conceal that GE's Power segment was not generating revenue

organically, GE, in violation of GAAP, strategically renegotiated its existing portfolio of long-

term contracts for no economic purpose other than to accelerate the recording of revenue and

earnings on those contracts. Because GE was recording revenue and earnings, but not actually

receiving the associated cash payment, the Company's Contract Asset balance ballooned during

the Class Period. (Contract Assets reflect the difference between revenue recognized and cash

received).  At the same time, GE's estimates of revenue and costs on these contracts were not

---

[3] In early 2015, GE announced a major restructuring strategy that included: (1) the sale of
substantial GE Capital assets; and (2) a plan to return more than $90 million to GE shareholders
through 2018 through cash dividends, a $50 billion share buyback program, and a share
exchange involving the split-off of Synchrony Financial, GE Capital's North American retail
finance business.

reasonably dependable because GE relied on historical data to make these estimates that were known not to reflect either current information or reasonable projections about the realities of the power market.

9.       To conceal that the Company was accelerating revenue and earnings on its contracts but not collecting cash, Defendants devised an unsustainable scheme to window-dress GE's industrial CFOA. To do so, GE persuaded its customers to agree to accept invoices on contracts earlier in time than necessary for no reason other than so that GE could "factor" (*i.e.*, sell) those invoices (either internally or to third parties) to generate much-needed cash flow. The sole purpose of this practice—which was known internally as "monetization" and developed, in part, by a former employee cited herein—was to conceal that GE was renegotiating contracts solely to boost earnings at the expense of collecting cash payments.

10.      In order to hide its failure to make any meaningful adjustment to the assumptions underlying its LTC reserves and the massive exposure those legacy policies presented to GE and to mask its manipulation of its LTSAs, GE made its periodic financial reporting intentionally opaque.  In fact, Defendants made almost no specific disclosures at all with respect to its LTC exposure during the Class Period. Indeed, until the corrective disclosures, the reserves for LTC were not even reported separately – they were reported under the heading "Life Insurance Benefits."  This failure to provide meaningful disclosure so the market could assess the true risk is, in and of itself, a violation of GAAP.

11.      Defendants also failed to disclose to the market the Company's woefully insufficient internal controls over financial reporting with respect to the Company's LTC business and LTSAs.   For example, former employees of the Company explain that GE used recent college graduates with no audit or actuarial experience to serve in the Company's internal

6

audit function with respect to LTC policies. This meant that GE had no meaningful audit function for this business leading up to and during the beginning of the Class Period.  It is no surprise then that the critical assumptions necessary to accurately calculate reserves for these policies were never updated.

12.     GE's fraud concerning the LTC reserves and the Contract Assets began coming to light through a series of partial public disclosures that began on July 21, 2017, when GE announced that it recently had "adverse claims experience in a portion of our long-term care portfolio" and that it would be required to "assess the adequacy of our premium returns." With respect to GE's Contract Assets, GE revealed on July 21, 2017, that earnings growth caused by LTSA gains was slowing down. In reality, the Company's scheme of fraudulently pulling future revenue forward was running out of gas.

13.     On this news, GE's common stock fell $0.78, or 2.92 percent, to close at $25.91 on July 21, 2017, shedding approximately $6.8 billion in market capital.

14.     In another partial public disclosure that revealed parts of Defendants' fraud, on October 20, 2017, before the market opened, GE announced third quarter 2017 results and held a conference call to discuss the results with analysts.  During the call, GE announced to investors that it had "**recently observed elevated claims experience**" for a portion of the LTC business at GE Capital's legacy insurance business, which represented $12 billion or roughly 50% of GE Capital's insurance reserves.[4] GE stated that as a result, the Company "began a comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claims reserve adequacy test" which GE expected to complete by year end. GE

---

[4] Unless otherwise noted, all emphasis has been added.

further stated that "**until the review was completed," it would defer the decision to pay any additional GE Capital dividends to GE.**

15.     During the October 20, 2017 earnings conference call, details also began to emerge about GE's significant cash flow issues. GE slashed its guidance for 2017 industrial CFOA, a key metric followed by analysts and investors, from an initial range of $12 to $14 billion down to $7 billion, driven largely by sharp declines in GE's Power segment. Jamie Miller, GE's Chief Financial Officer ("CFO"), stated: "Power is the biggest driver on lower volume, higher inventory, and the timing of payments on long-term equipment contracts." Analysts called these reductions "drastic" and found the CFOA miss to be "enormous."  What Defendants failed to fully disclose was that GE's Contract Asset/LTSA accelerated revenue recognition well was drying up. According to a former employee of GE Power, there was only so much revenue GE could pull forward via Defendants' scheme.

16.     On this shocking news, GE's stock price fell more than 6% once the market opened on October 20, 2017. While the price rebounded temporarily leading up to the market close, by the end of the next trading day on October 23, after a number of prominent analysts (including UBS, JP Morgan, and Morgan Stanley) downgraded the stock, the stock price had declined $1.26 or 5.34% from its close immediately preceding the October 20th disclosures and subsequent analysts downgrades.

17.     On November 13, 2017, before the market opened, GE stunned investors by announcing that it was slashing its annual dividend in half.  Later that day, during market hours, GE held its Annual Investor Update and reaffirmed that the dividend was being cut from $0.96 to $0.48 per share. This was only the second time GE had cut its dividend since the Great Depression. The Company stated that its dividend rate was no longer appropriate because its

industrial business did not grow as fast as previously expected. Defendant Flannery further explained that plagued by poor cash flow, GE had been paying out a dividend above its industrial free cash flow for a number of years. Additionally, GE Capital would not be paying a dividend to GE in 2018, stating "**we've been paying a dividend in excess of our free cash flow for a number of years now.**" Defendant Flannery reiterated that the "**dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow** in the next couple of years . . . . So, the single biggest delta, I think is obvious, which is what happened in the Power business."

18.     Jamie Miller further explained that "we're in the middle of an ongoing reserve review at our insurance businesses there. . . And we mentioned to you before that we're not taking a second half GE Capital dividend of about $3 billion. **And as we go through this process, at this point, I do expect the charge to be more than that**. . . ."  Before the market opened on November 14, 2017, several analysts either lowered price targets for GE stock or downgraded the Company's securities. GE also presented at the Goldman Sachs Conference on November 14, 2017, to further discuss this shocking news.

19.     As a result of these stunning revelations about GE's massive dividend cut and anticipated charges of more than $3 billion for its LTC reserves, the Company's common stock price fell $1.47 per share, *or over 7 percent,* to close at $19.02 per share on November 13, 2017. GE's common stock price fell an additional $1.12 per share, *or 5.8 percent*, to close at $17.90 per share on November 14, 2017, *for a two day loss of approximately 12.6 percent*, on extremely heavy volume.  Over $22.4 billion in market losses were caused by these disclosures.

20.     On January 16, 2018, before the market opened, GE announced that the comprehensive review and reserve testing of its legacy LTC reinsurance business had

concluded, and the Company would be required to take a **GAAP charge of $9.5 billion (before-taxes) for the fourth quarter of 2018** on old reinsurance contracts in GE Capital. GE further advised that it would have to set aside **$15 billion in statutory LTC reserves over seven years** and that GE Capital would suspend its dividend to GE for the "**foreseeable future.**" [5] That same day, on a conference call with investors and analysts, Defendant Flannery stated, in part, that "**[c]learly, in hindsight, we underappreciated the risk in [GE's insurance business] book.**" GE also acknowledged that most LTC insurers had experienced greater claims than originally anticipated. But, apparently, GE was the only one in the LTC industry not to timely use that pervasive and prolonged adverse experience to adequately adjust its LTC assumptions and increase its LTC reserves.

21.     Disclosure of this information caused a precipitous drop in the price of GE's common stock which fell approximately 3% on January 16, 2018 and an additional 4.7% on January 17, 2018, *for a total two-day drop of 7.62 percent*, wiping out $7.5 billion in market value.

22.     Analysts covering GE opined that it was likely that GE knew about its LTC problems for a very long time. For example, Scott Davis, an analyst with Melius Research, wrote that it is "**very hard to believe that mysteriously overnight GE found problems they didn't know existed.**" Similarly, Jeff Sprague, an analyst with Vertical Research Partners, reported that "**[i]t's hard to imagine a $15 billion problem materialized in the course of the year**."

23.     Even Warren Buffett, the chairman and chief executive officer of Berkshire Hathaway Inc., nicknamed the Oracle of Omaha, said in an interview with CNBC, that he was

---

[5] The $15 billion in LTC reserves represented roughly 10% of GE's market cap at the time.

"staggered" by the size of the charge GE took on its old LTC portfolio: "Clearly there were mistakes made, and they made mistakes in long-term care ..... The accounting at GE has not been a model at all in recent years...."[6]

24.     On January 24, 2018, during a conference call with investors and analysts, GE announced that the SEC had notified the Company that it would be "investigating [GE's] process leading to the insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long-term service agreements."[7]  On January 24, 2018, the Company also revealed charges to earnings totaling at least $850 million in the fourth quarter of 2017 due to cost overruns on GE Power projects and a write-off for slow-moving and obsolete inventory.  To address the source of the cost overruns and poor execution, the Company had recently adopted stronger internal controls to address its accounting for Contract Assets including "much tighter" underwriting, more attention to pricing, execution, and cost estimating, and a reevaluation of the cash generated by its LTSAs.

25.     On this news, the price of GE's common stock dropped again, by $0.45 to $16.44 per share on January 24, 2018, and continued to decline another $0.26 per share, closing at $16.18 per share on January 25, 2018, losing approximately $6.15 billion in market value.

---

[6] Katherine Chiglinsky, *Buffett Says He Was Staggered by GE's 'Big Time' Finance Lapses*, Bloomberg Markets (February 26, 2018), https://www.bloomberg.com/news/articles/2018-02-26/buffett-says-he-was-staggered-by-general-electric-s-charge

[7] This is not the first time GE has dealt with questions about its accounting. In 2009, the Company settled civil fraud and accounting charges with the SEC for using improper methods to steadily increase its reported earnings to meet or exceed the consensus earnings estimates of analysts and avoid any negative results. GE agreed to pay a $50 million penalty as part of the settlement, a substantial price for smoothing out earnings to remain in the good graces of investors.

26.     By the time the full truth was known to the market through GE's partial disclosures from July 21, 2017 through January 24, 2018, GE had lost an astounding $91.5 billion in market capitalization.

27.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of GE's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

28.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

29.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

30.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conduct business in this District, and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.  GE's stock trades on the NYSE, located within this District.

31.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Lead Plaintiff

32.     Court-appointed Lead Plaintiff ATRS was established in 1937 to provide retirement benefits for the employees of Arkansas' education community and manages

approximately $15 billion in assets.  As set forth in the attached Certification, ATRS purchased

GE securities at artificially inflated prices during the Class Period and suffered damages as a

result of the federal securities law violations and false and/or misleading statements and/or

material omissions alleged herein.

**B.      Defendants**

33.      Defendant GE is incorporated in New York with its headquarters located in

Boston, Massachusetts.  GE is a global digital industrial company with products and services

ranging from aircraft engines, power generation, and oil and gas production equipment to

medical imaging, financing, and industrial products.  GE's common stock trades on the NYSE

under the symbol "GE."  GE and its subsidiaries also issued a large number of notes, bonds and

other securities to the investing public, which are publicly traded.

34.      Defendant Jeffrey R. Immelt ("Immelt") was the Chairman of GE's Board from

September 2001 to October 2, 2017 and the Company's CEO from September 2001 through

August 1, 2017. Immelt also served as a member of the Board of Directors of GE Capital in

2014.  Immelt's total estimated compensation was $21.3 million in 2016 and $33 million in

2015.  While he was employed at GE during the Class Period, Immelt signed GE's annual

reports and quarterly and annual certifications pursuant to the Sarbanes-Oxley Act of 2002

("SOX") stating that the financial information contained in the Company's financial reports was

accurate and disclosed any material changes to GE's internal controls over financial reporting.

During the Class Period, Immelt participated in each of the Company's quarterly earnings

conference calls described herein until his departure on August 1, 2017. Immelt was a direct and

substantial participant in the fraud.

35.      Defendant Jeffrey S. Bornstein ("Bornstein") served as GE's CFO from July 1,

2013 to November 1, 2017. Bornstein also served as a member of the Board of Directors of GE

Capital in 2014. Bornstein's total estimated compensation was $9.9 million in 2016 and $13.3 million in 2015.  Bornstein signed GE's annual reports and quarterly and annual SOX certifications (from the start of the Class Period through the Form 10-Q for the quarter ended September 30, 2017) stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to GE's internal controls over financial reporting. During the Class Period, Bornstein participated in each of the Company's quarterly earnings conference calls described herein until his departure on November 1, 2017. Bornstein was a direct and substantial participant in the fraud.

36.     Defendant John L. Flannery ("Flannery") served as the Company's CEO from August 1, 2017 through the end of the Class Period and as the Company's Chairman from October 2, 2017 through the end of the Class Period.  Flannery previously served as the CEO and President of GE Healthcare Ltd. from October 2014 to June 12, 2017.  Flannery's total estimated compensation for 2017 was $9 million.  Flannery signed GE's SOX certification for the quarter ended September 30, 2017, stating that the financial information contained in the Company's financial report was accurate and disclosed any material changes to GE's internal controls over financial reporting. Flannery participated in the Company's quarterly earnings conference calls for the second and third quarters of 2017 and in GE's Investor Day on November 13, 2017. Flannery was a direct and substantial participant in the fraud from August 1, 2017 through the end of the Class Period.

37.     Defendant Jamie Miller ("Miller") served as the Company's CFO from October 2017 through the end of the Class Period. Miller joined GE in 2008 and previously served as President and CEO of GE Transportation; Vice President, Controller and Chief Accounting Officer; and as GE's Chief Information Officer. Miller is a CPA and was previously a partner at

PricewaterhouseCoopers LLP. Miller participated in the Company's quarterly earnings conference call for the third quarter of 2017 and in GE's Investor Update on November 13, 2017. Miller was a direct and substantial participant in the fraud from November 1, 2017 through the end of the Class Period.

38.     Defendant Keith S. Sherin ("Sherin") served as GE's CFO from December 1998 until July 2013, and served as GE Capital's Chairman and CEO from July 2013 until September 2016. Sherin also served as a member of the Board of Directors of GE Capital in 2014. Sherin's total estimated compensation was $30.4 million in 2016 and $26 million in 2015.  Sherin participated in the Company's quarterly earnings conference calls as CEO of GE Capital during the Class Period until he left GE in September 2016.  During that time, Sherin was a direct and substantial participant in the fraud.

39.     Defendants Immelt, Bornstein, Flannery, Miller and Sherin are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of GE's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

40.     GE and the Individual Defendants are referred to herein, collectively, as "Defendants."

## IV.    CONTROL PERSON ALLEGATIONS

41.     The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

42.     During the Class Period, the Individual Defendants knew or recklessly disregarded that GE's LTC reserves were understated by approximately $10 billion in violation of GAAP and by $15 billion in violation of state statutory regulations, and that the Company was overstating revenues and margins in violation of GAAP on Contract Assets in order to artificially manipulate the Company's quarterly and annual financial results.

43.     The Individual Defendants, as senior executive officers of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected.  The Individual Defendants also had the opportunity to provide the market additional material information that was necessary in order to make the Company's public statements and release of financial information not misleading. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports,

16

releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

44.     The Individual Defendants, because of their positions of control and authority as senior executive officers had access to the adverse, undisclosed information about GE's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

45.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

46.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of GE securities during the Class Period, which included the dissemination of materially false and misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) regarding the fact that (i) GE's LTC reserves were being materially understated by billions of dollars in violation of GAAP and statutory insurance regulations; and (ii) the Company was overstating costs and profitability on

Contract Assets with respect to GE Power's LTSAs, all in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP.  The scheme: (i) deceived the investing public regarding GE's operations and the true value of GE's securities; and (ii) caused Plaintiff and other members of the class to purchase GE securities at artificially inflated prices, which plummeted in value as the truth concerning the magnitude of the understatement of GE's LTC reserves and the manipulation of costs and profitability in the Power segment ultimately became known.

47.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of GE, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V.    COMPANY BACKGROUND

48.    GE is a multi-national conglomerate with operations that are organized across various business segments, including: (1) GE Capital, a wholly-owned subsidiary, the financial services unit of GE; and (2) GE Power, a wholly-owned subsidiary of GE, that builds industrial products including power plants, turbines, and generators.

### A.    GE Capital

49.    GE Capital is GE's financial services unit and provides lending and leasing opportunities to customers in the aviation, energy, and industrial sectors. During the Class Period, flow-through dividends from GE Capital provided GE with a substantial amount of its free cash flow used for dividends and to fund buybacks to GE shareholders.  Indeed, GE Capital paid dividends to GE of approximately $28.4 billion between 2015 and 2017.

50.     With GE Capital, the Company uses the term "Verticals" to represent the GE

Capital businesses, primarily its Vertical financing businesses - GECAS, Energy Financial

Services, Industrial Finance, and run-off insurance activities.

51.     The chart below shows the amount of cash dividends GE Capital funneled to GE

before and during the Class Period and how that cash flow materially contributed to GE's

ability to fund both a stock buyback program which helped keep GE's stock price inflated and

GE's all important dividend to shareholders.

| GE CAPITAL's CONTRIBUTION TO GE's DIVIDENDS AND BUYBACKS ($ figures in Billions) | | | | | |
|---|---|---|---|---|---|
| YEAR | GE CAPITAL'S DIVIDENDS TO GE | GE DIVIDENDS | GE BUYBACKS | TOTAL CASH RETURNED TO GE SHAREHOLDERS | % FROM GE CAPITAL |
| 2013 | $6.0 | $7.8 | $10.2 | $18.0 | 33% |
| 2014 | $3.0 | $8.9 | $2.2 | $11.1 | 27% |
| 2015 | $4.3 | $9.3 | $2.7 | $12.0 | 36% |
| 2016 | $20.1 | $8.5 | $22.6 | $31.1 | 65% |
| 2017 | $4.0 | $8.1 | $3.5 | $11.6 | 34% |

**B.      GE Power**

52.     GE Power, a wholly-owned subsidiary of GE, builds industrial products

including power plants, turbines, and generators.  GE Power serves power generation,

industrial, government and other customers around the world with products and services related

to energy production.  The Company's products and technologies harness resources, such as oil,

gas, coal, diesel, and nuclear to produce electric power and include gas and steam turbines.

53.     GE Power includes a number of divisions that each provides customers different

product and services offerings. The Power Services division delivers maintenance, service, and

upgrade solutions for the GE products, such as gas turbines. GE contracts with customers to

provide servicing and maintenance on those products pursuant to long-term services agreements

(LTSAs). For example, GE Power Services enters into long-term contracts with customers to perform routine maintenance on gas turbines.

54.     GE Power is the largest segment within the Industrial segment of GE's business and is a significant driver of overall revenue. Indeed, the GE Power segment generated $26.8 billion of GE's overall revenue of $123.7 billion in 2016 and $36.0 billion of GE's overall revenue of $122.1 billion in 2017, *representing approximately 30% of GE's total revenue in 2017*.

55.     Despite the fact that demand within the power market became weak beginning in 2009, and continuing throughout the Class Period, GE's earnings in its Power segment remained relatively stable. Indeed, GE reported Power segment profit of $5.4 billion in 2014, $4.5 billion in 2015, and $5.0 billion in 2016. Much of these earnings were driven by revenue GE recorded on its LTSAs within the Power segment—the segment with the largest amount of LTSAs. GE frequently recognized revenue and earnings on its LTSAs before it actually billed, or received cash, from its customers. When GE recognized revenue on LTSAs (and on other long-term contracts in its portfolio) before it billed the customer (that is, before it received cash), GE recorded **Contract Assets** on its balance sheet—*i.e.*, the difference between revenue recognized and cash received. GE's Contract Asset balance ballooned during the Class Period (from $21.2 billion in 2015 to $28.9 billion at the end of 2017), which reflected that GE was recording revenue and earnings but not yet receiving cash on many long-term contracts in its portfolio. Although this allowed the Power segment to contribute significant profit to GE, investors were unaware that the methods used to generate revenue on GE's LTSAs violated GAAP and involved unsustainable business practices.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    Background of GE Capital's LTC Insurance Exposure

56.    LTC insurance is intended to help defray the cost of home care, assisted living care, adult day care, respite care, hospice care, nursing home care, and other specialized skilled facility care required when an individual becomes unable to perform the basic activities of daily living (such as dressing, bathing, eating, toileting, continence, walking, or getting in and out of a bed or chair). These costs are generally not covered by health insurance, Medicare or Medicaid. LTC insurance is purchased by individuals before they become physically or mentally infirm as a way to protect their life savings from the escalating costs of 24-hour health care at the end of their lives.

57.    Insurance companies began marketing and selling LTC insurance in the 1970s. Sales of LTC policies peaked in 2002, when 755,000 policies were sold by 102 insurance companies. By 2009, most of the 102 companies had exited the LTC market (*i.e.*, stopped selling policies), and fewer than 70,000 policies were sold in 2016 by approximately 12 remaining carriers. As explained herein, every major assumption used for pricing the early LTC policies has had significant unfavorable actual experience, including morbidity, cost of care inflation, long-term interest rates, mortality improvement, and lapse rates.

58.    GE Capital historically underwrote and reinsured billions of dollars in LTC policies. Under these policies, GE collects premiums to insure (or reinsure) costs associated with assisted living and other related expenses.  LTC providers hold money in reserves to pay current and future claims on their policies.  As explained below, insurance regulations and GAAP require LTC insurers to hold sufficient cash reserves and book related liabilities for anticipated claims.

59.     As explained herein, the proper level of reserves is based on a handful of key factors including mortality, morbidity, lapse rates, claims experience, and health care costs. GE Capital purportedly regularly reviewed the adequacy of its long-term care reserves.

## 1.     The Genworth Spin-Off

60.     GE was an early pioneer and a dominant issuer of LTC insurance policies in the 1990s and the early 2000s; GE's insurance businesses sold more than 1 million LTC policies. In 2001 GE held over 20% market share of new LTC policies issued.[8]  GE prided itself on never increasing premiums on any in-force LTC policies that it had issued.[9]

61.     In November 2003, GE announced its intention to pursue an initial public offering of a new company named Genworth Financial, Inc. ("Genworth"), which would comprise most of its mortgage insurance and life insurance operations, and included portions of its LTC insurance book.[10]  GE announced that it planned to sell approximately 30% of the equity of the new company in an Initial Public Offering ("IPO"), and expected to reduce its ownership position over the next two years as Genworth transitioned to being a fully independent company.   But as alleged below, GE retained the risk for certain riskier blocks of its LTC insurance policies, which could not be spun off with Genworth.

---

[8] General Electric 2002 Annual Report,
http://www.annualreports.com/HostedData/AnnualReportArchive/g/NYSE_GE_2002.pdf;
Nat'l Health Org. of Life and Health Ins. Guaranty Assocs., *State of the U. S. Long-term Care Insurance Industry*, NOLHGA Presentation to the NAIC (Mar. 30, 2017),
http://www.naic.org/documents/cmte_e_mlwg _related_state_of_ltc_industry.pdf
[9] Rick Miller, *GE spinoff Genworth plans to hold line on prices, Relieves concerns over LTC rate hikes*, Investment News (June 21, 2004),
http://www.investmentnews.com/article/20040621/SUB/406210728/ge-spinoff-genworth-plans-to-hold-line-on-prices
[10] Today, Genworth remains one of the largest providers of LTC insurance.

62.     The Genworth spinoff was part of GE's strategy to exit low-return businesses and to redeploy capital to refocus on higher-growth businesses.  On a December 16, 2003 conference call, Immelt told investors that the strategy was being implemented successfully:

> "A year ago we showed you this chart, okay, in December of '02. It basically described the GE that we thought was going to be higher tech, more service, and higher return financial service business. . . .  We have strengthened our positions at the same time we've redeployed capital. We have exited, or announced the exit, in a substantial portion of our insurance businesses. Some of the low return industrial assets and a runoff mode of the other low return financial service assets. So we've taken a number of moves to really execute on the strategy we talked about a year ago." [11]

63.     On May 25, 2004, GE finalized the initial spin-off and Genworth's common stock began trading on the NYSE.  GE retained approximately 70% of Genworth's equity following the IPO.  GE's public comments at the time were limited to describing how the Genworth IPO, as a whole, affected GE's financial results.

64.     In 2005, GE completed secondary public offerings of Genworth common stock, further reducing its ownership in Genworth.  And in March 2006, GE completed the sale of its remaining 18% investment in Genworth through a secondary public offering of 71 million shares of Class A Common Stock and direct sale to Genworth of 15 million shares of Class B Common Stock.

65.     At a May 18, 2005 conference, Immelt presented the Genworth spinoff as a success for GE's investors and a turning point from the Company's previous woes in the insurance industry:

> "I mean you guys are the smart ones. I'm just a humble business guy. [Laughter]. But look, I think it's the point of context is, look over those three years we grew earnings 5% a year. And it was subpar for us. It wasn't what any of us expected—how much you expect of us. But look we went through the energy

---

[11] GE Annual Business Update and Outlook hosted by Jeffrey Immelt, Thomson Street Events (Dec. 16, 2003) p.4.

transitions. We really just didn't belong where we were in insurance. We got out
I think in as elegant a way as we could. And Genworth is running well and the
balance sheet is great and we feel great about where we are. And that's kind of
behind us now."[12]

**2.    GE Retained and Reinsured the Worst Blocks of its LTC Business in
Connection with the Genworth Spin-off**

66.    While GE sold or spun off most of its reinsurance operations, it retained certain

risks, including the riskiest LTC policies.  According to an April 14, 2015 article, *TheStreet*

reported that "GE hung onto certain insurance businesses, reportedly for fear they would

depress Genworth's valuation, according to an investment banker who covers the insurance

industry but did not advise GE on the Genworth IPO."[13] A January 25, 2018 *Bloomberg* report

echoed those sentiments, reporting that the banks underwriting the 2004 spinoff of Genworth,

including Goldman Sachs Group Inc. and Morgan Stanley, "told GE the share sale could run

into obstacles… Some Genworth businesses were too weak for investors' tastes. GE would need

to backstop them."[14]

67.    Specifically, Immelt agreed to have GE keep the financial risk of a substantial

block of LTC insurance policies for the purpose of making the Genworth spinoff more attractive

to investors.[15]

---

[12] (May 18. 2005 11:30AM) GE - General Electric at The Electrical Products Group of New
York 2005 EPG Conference

[13] Dan Freed, *GE Stuck With $28 Billion Insurance Liability*, TheStreet (Apr. 14, 2015),
https://www.thestreet.com/story/13112319/1/ge-stuck-with-28-billion-insurance-liability--
exclusive.html

[14] Sonali Basak, Catherine Chiglinsky & Rick Clough, *GE's Surprise $15 Billion Shortfall Was
14 Years in Making*, Bloomberg (Jan. 15, 2018 11:28AM),
https://www.bloomberg.com/news/articles/2018-01-25/ge-s-surprise-15-billion-shortfall-was-
14-years-in-the-making

[15] Katherine Chiglinsky, *Why Long-Term Care Insurance Is Bringing GE Down: QuickTake*,
Washington Post (Feb. 2, 2018), https://www.washingtonpost.com/business/why-long-term-
care-insurance-is-bringing-ge-down-quicktake/2018/02/02/7d207c68-081d-11e8-aa61-
f3391373867e_story.html and Aaron Levitt, *GE Capital is Still Plaguing General Electric*

68.     The Prospectus for the Genworth stock offering (the "2004 Genworth Prospectus") explained the arrangement, stating that Genworth was ceding (or surrendering) certain businesses, including LTC policies with aggregate reserves of $1.5 billion, to GE subsidiary Union Fidelity Life Insurance Company ("UFLIC") through reinsurance transactions. According to the 2004 Genworth Prospectus:

> In the Reinsurance Transactions, we [Genworth] will cede to UFLIC [GE subsidiary] the following business:
>
> - All of our liabilities under the in-force structured settlement annuities reflected as policyholder reserves on our U.S. GAAP statement of financial position on December 31, 2003, or reinsured by us under reinsurance agreements in effect prior to January 1, 2004. This business had aggregate reserves of $12.0 billion as of December 31, 2003.
>
> - All of our liabilities under the in-force variable annuity contracts reflected as policyholder reserves on our U.S. GAAP statement of financial position on December 31, 2003, other than our GERA™ product and a limited number of variable annuity products that we no longer offer. UFLIC will also assume any benefit or expense resulting from third party reinsurance that we have on this business. This business had aggregate general account reserves of $2.8 billion as of December 31, 2003.
>
> - *All of our liabilities under the in-force long-term care insurance policies issued by Travelers prior to January 1, 2004 and reinsured by us. This business had aggregate reserves of $1.5 billion as of December 31, 2003.*

69.     Under the Reinsurance Transactions, GE agreed to indemnify Genworth for its liability under its LTC insurance policies for an agreed-upon premium.  And GE agreed to assume those policies because, as the 2004 Genworth Prospectus described it, ***they failed to meet certain "target return thresholds."***[16] Thus, Genworth transferred the financial risks of the riskier LTC blocks right back to GE (via UFLIC):

> Prior to the completion of this offering, we will enter into a number of arrangements with GE governing our separation from GE and a variety of

---

*Company*, Investor Place (Feb. 21, 2018 4:33pm EDT), https://investorplace.com/2018/02/ge-capital-still-plaguing-general-electric-ge/#.WpnCqWrwZ7M

[16] Genworth Prospectus, 2004, at 241.

transition and other matters, including our relationship with GE while GE remains a significant stockholder in our company. These arrangements include several significant reinsurance transactions with Union Fidelity Life Insurance Company, or UFLIC, an indirect, wholly-owned subsidiary of GE. As part of these transactions, we will cede to UFLIC, effective as of January 1, 2004, all of our in-force structured settlement contracts, substantially all of our in-force variable annuity contracts, **and a block of long-term care insurance policies that we reinsured in 2000 from The Travelers Insurance Company, a subsidiary of Citigroup, Inc., which we refer to in this prospectus as Travelers. In the aggregate, these blocks of business do not meet our target return thresholds, and although we remain liable under these contracts and policies as the ceding insurer, the reinsurance transactions will have the effect of transferring the financial results of the reinsured blocks to UFLIC.**

\* \* \*

When we enter into the reinsurance transactions we will transfer investment assets to UFLIC in exchange for the reinsurance recoverable asset from UFLIC and consequently we will not earn investment income on the investment assets transferred.

\* \* \*

Under the reinsurance transactions, we will receive an expense allowance to reimburse us for costs we incur to service the reinsured blocks. Actual costs and expense allowance amounts will be determined by expense studies to be conducted periodically. . . . The reinsurance transactions will be completed and accounted for at book value. . . .

70.     The Company's divestiture of its life and mortgage insurance businesses to Genworth also did not include GE's other principal insurance business, GE Insurance Solutions (formerly known as Employers Reinsurance Corp. or "ERC").  That business also had substantial LTC exposure. Immelt told shareholders at the time of the Genworth spinoff that it was strategically retaining ERC to maximize shareholder value:

We didn't feel like there was a way to do both that and ERC at the same time. And we really think we're in a turn-around cycle in ERC, so that if we wait some time it's going to be a better business. We're going to generate earnings. And we'll continue to make that business better. And we just kept a couple of runoff blocks that are pretty safe earnings, and that's basically how we picked it.[17]

---

[17] GE Investor Meeting, November 19, 2003.

71.     Before completing its partial exit from the insurance business, GE did not give investors any indication that its runoff insurance operations would expose it to significant toxic assets.[18] To the contrary, Immelt told investors that other than ERC, it was only retaining "***a piece of low return, very stable run off block from the [GEFA] portfolio***."[19]

72.     Former employees of GE confirm that the Company was forced to keep the worst blocks of LTC business because neither Genworth nor Swiss Reinsurance Company Ltd. ("Swiss Re") would take the business.

73.     Immelt also assured analysts and investors that its retained reinsurance operations were safe and profitable.  In fact, during the Annual General Electric Outlook Analyst Meeting on December 14, 2004, Immelt confirmed that "[o]n the go forward basis in the reinsurance side, we've continued to improve operations. And when we look at the book of business we've written in the last few years it's profitable. So we continue to drive that business and make it smaller."[20]

74.     Immelt even assured the market that the run-off business was "pric[ed] very diligently" and that it "maintain[ed] strong reserving practices" for its reinsurance business:

> You saw us announce the run off of the life rebook. We are pricing very diligently, and pricing for risk. We've maintained strong reserving practices, and we look to be in good shape there. We really have better market knowledge today than we've ever had before, and a very solid investment portfolio. I haven't changed my mind in terms of how I look at reinsurance for long term in this business. But I think you ought to count on this business being part of GE for the next couple of years. And we're going to run it with excellence.[21]

---

[18] A runoff business is a business that continues to serve existing customers but no longer tries to make new sales.

[19] GE Investor Meeting, November 19, 2003.  General Electric Capital Financial Assurance Holdings, Inc. ("GEFA") was the subsidiary that housed substantially all of the assets that were transferred to Genworth.

[20] Annual GE Outlook Analyst Meeting on December 14, 2004.

[21] GE Investor Meeting, November 19, 2003.

75.     But the LTC business that GE reinsured was a problem from the start.  Not only had GE been advised that certain of its insurance businesses, including its LTC business, would depress Genworth's valuation (which led GE to either keep or agree to reinsure that business), but the State of New York Insurance Department examined the financial condition as of December 31, 2004 of GE Capital Life Assurance Company – one of the entities that had ceded a substantial block of long-term care insurance to UFLIC in connection with the Genworth IPO – and found that its "long-term care business ha[d] sustained continued losses due to the aging of the block and persistency:"[22]

The following ratios, applicable to the accident and health business of the Company, have been extracted from Schedule H for each of the indicated years:

|  | 2002 | 2003 | 2004 |
|---|---|---|---|
| Premiums earned | 100.0% | 100.0% | 100.0% |
| Incurred losses | 109.3% | 116.5% | (228.8)% |
| Commissions | 15.9 | 14.2 | 14.1 |
| Expenses | 13.5 | 12.9 | 20.0 |
|  | 138.7% | 143.6% | (194.7)% |
| Underwriting results | (38.9)% | (43.6)% | 294.7% |

The long-term care business has sustained continued losses due to the aging of the block and persistency.  In 2004, the Company ceded the Travelers block of long-term care business to UFLIC, which resulted in the distortion of the 2004 underwriting results.

76.     In July 2006, the New York Insurance Department found that GE Capital Life Assurance Company's  reserves were based on overly aggressive assumptions and required GE Capital Life Assurance Company to increase its reserves by almost $200 million:

> During the review, ***concerns were raised regarding the lack of conservatism in certain assumptions with respect to the Company's LTC insurance reserves***.  The Company agreed to refine the LTC reserve analysis and to strengthen reserves in a manner acceptable to the Department. ***Toward that end, the***

---

[22] State of N.Y. Ins. Dep't, *Report on the Examination of the GE Capital Life Assurance Co. of N.Y.* (July 31, 2006), http://www.dfs.ny.gov/insurance/exam_rpt/72990c04.pdf, p.14.

*Company established additional LTC reserves in the amount of $184 million as of March 31, 2006.* [23]

77.     In 2006, GE sold off the vast majority of its other insurance operations to Swiss Re, including (1) GE Insurance Solutions for $6.8 billion; and (2) the remaining operations of subsidiary GE Life for $0.9 billion.  But as with Genworth, GE retained the risk for certain blocks of GE Insurance Solutions' LTC policies. According to FE-2, Swiss Re did not want ERC's LTC products in the deal.

78.     Nonetheless, GE stated in its 2008 Form 10-K that as a result of these transactions, it had "*substantially completed" its exit* from the insurance industry:

> In 2006, *we substantially completed our planned exit of the insurance businesses* through the sale of the property and casualty insurance and reinsurance businesses and the European life and health operations of GE Insurance Solutions Corporation (GE Insurance Solutions) and the sale of GE Life, our U.K.-based life insurance operation, to Swiss Reinsurance Company (Swiss Re). . .

79.     In his February 10, 2006 Letter to Stakeholders, Immelt continued to highlight GE's exit from the insurance industry, explaining that it was a way to decrease volatility and accelerate the Company's growth: "Exiting Insurance is important for GE. Our poor performance in insurance has dampened a strong performance by the rest of the Company. I am confident you will now benefit by having a faster-growth, less volatile Company."[24]

### 3.     ERAC and UFLIC Reinsurance Subsidiaries

80.     UFLIC and Employers Reassurance Corporation ("ERAC"), wholly-owned subsidiaries of GE, primarily reinsure closed books of long-duration business such as traditional

---

[23] *Id.*

[24] To date, GE has been unable to sell off GE Capital's remaining $28 billion in insurance liabilities, including reinsurance on LTC policies.

life, LTC, structured settlements and variable annuities.[25] GE maintained risk-based capitalization at a defined minimum level through Capital Maintenance Agreements with ERAC and UFLIC and also provided claims payment guarantees for ERAC and UFLIC.[26]  GE Capital contributed $964 million in capital to ERAC and UFLIC in 2012. No capital contributions were provided by GE from 2013-2015.[27]

81.     A capital contribution was made by GE to ERAC/UFLIC in 2016 in the amount of $419 million, but this information was not included in GE's financial statements, but only in the statutory filings. Moreover, in another example of its opacity, even the statutory filings did not say whether the increase in reserves was for LTC or some other line of insurance.

82.     As mentioned above, effective January 1, 2004, UFLIC entered into several reinsurance contracts with former affiliates which are now part of Genworth. Pursuant to those reinsurance agreements, among other things, UFLIC assumed 100% of a LTC block of business originally ceded from Travelers to Genworth Life Insurance Company ("GLIC") and Genworth Life Insurance Company of NY ("GLICNY") totaling approximately $1.6 billion in reserves.

---

[25] ERAC discontinued writing new business in 2006 and placed its entire in-force book of business into run-off. LTC and mortality reserves make-up ERAC's largest books, representing nearly 90% of the ERAC reserves, and annuities and disability claim reserves comprise the remaining 10%. A.M. Best Credit Report on ERAC, July 2017. UFLIC reinsures a product portfolio of variable annuities, structured settlements and LTC. Approximately $5.8 billion of UFLIC's $18.0 billion of reserves consist of LTC. UFLIC also discontinued writing new business and placed its entire in-force book of business into run-off.

[26] *See* Capital Maintenance Agreement dated as of January 1, 2004 between GECC and UFLIC. https://www.sec.gov/Archives/edgar/data/1156124/000119312504075647/dex23.htm

[27] GE Capital is, through intermediate companies, the parent of ERAC.  ERAC is the parent of UFLIC, and UFLIC is the parent of Heritage Casualty Company.  All of the companies are domiciled in Kansas.  The Kansas Insurance Department is their primary regulator.

83.     The closed books of LTC business at ERAC and UFLIC have generated significant statutory losses in recent years due, in part, to the low interest rates and weakening LTC experience.[28]

84.     Historically, when ERAC and UFLIC have been strained by operating losses, GE has injected enough capital to restore risk-based capitalization to the defined minimal standard. Approximately $1.4 billion of incremental capital has been contributed over a five-year period by GE to these reinsurance subsidiaries to partially mitigate statutory operating losses.[29]

### 4.     GE Capital's SIFI Designation and the GE Capital Exit Plan

85.     In 2013, GE Capital received a nonbank designation as a SIFI subjecting it to Federal Reserve Board ("FRB") supervision, under the Dodd-Frank Wall Street Reform and Consumer Protection Act.[30]

86.     Designation as a "too big to fail" SIFI entity subjected GE Capital to FRB supervision and strict regulatory standards related to capital and liquidity, including the requirement that [GE Capital] shall maintain a supplementary leverage ratio in excess of 4 percent (eSLR) "*in order to avoid restrictions on capital distributions [i.e. dividend payments] and discretionary bonus payments to executive officers*."[31]

87.     On July 24, 2015, the FRB published a final order applying enhanced prudential standards to GE Capital as a nonbank SIFI.[32]  The final order provides for application of these

---

[28] A.M. Best Credit Report on ERAC July 2017, p.11.

[29] A.M. Best Credit Report on ERAC July 2017, p.2.

[30] GE Capital 2015 Resolution Plan Public Section, https://www.fdic.gov/regulations/reform/resplans/plans/gecc-165-1512.pdf

[31] *Id*.

[32] Application of Enhanced Prudential Standards and Reporting Requirements to General Electric Capital Corporation, 80 FR 44111 (July 24, 2015), https://www.federalregister.gov/documents/2015/07/24/2015-18124/application-of-enhanced-prudential-standards-and-reporting-requirements-to-general-electric-capital

enhanced prudential standards in two phases: the first phase requirements were effective

January 1, 2016, and the second phase requirements were to take effect January 1, 2018. The

FRB final order of July 24, 2015, noted that:

> The Board has tailored these standards to reflect [GE Capital's] risk profile and
> its ongoing plan to divest certain assets and business lines and reorganize its
> operations. ***The Board has also deferred application of the enhanced capital,
> liquidity, governance, and reporting provisions until January 1, 2018***.[33]

88.     The FRB final order of July 24, 2015, thus, provided GE with an opportunity to

break-up GE Capital, in an attempt to remove the non-bank SIFI designation, before the January

1, 2018 phase two enhanced prudential requirements would take effect.

89.     On April 10, 2015, the Company announced a plan (the "GE Capital Exit Plan")

to reduce the size of its financial services businesses through the sale of most of the assets of

GE Capital. GE planned to extract $35 billion in dividends from GE Capital from the sale of GE

Capital assets. The Company also announced the split-off of its remaining interest in GE

Capital's North American Retail Finance business, Synchrony Financial. Through this split-off

transaction, GE would retire more than 671 million shares of its stock which would reduce its

outstanding float by 6.6 percent.  The effect of this planned transaction was the equivalent of a

$20.4 billion share repurchase from GE shareholders.

90.     GE asserted that the businesses it retained in the Exit Plan were those that GE

knew best. GE referred to retained businesses as "Verticals." These businesses included

Aviation Services ("Aviation"), Energy Financial Services and Industrial Finance. According to

GE, these businesses relate to the Company's "core industrial domain and other operations."

---

[33] *Id.*

GE's run-off insurance operations, including its LTC business, were included within the retained Verticals.[34]

91.     As noted by the Wall Street Journal, "In the conglomerate's most significant strategic move in years, GE has resolved to part ways with the bulk of GE Capital, the giant finance business that long accounted for around half the company's profits *but whose risks have rattled investors and weighed on its stock*."[35]

92.     In GE's Report on Form 10-K for the year ended December 31, 2015 ("2015 Form 10-K"), GE updated investors on the progress of the GE Capital Exit Plan and the expected payment by GE Capital of approximately $35 billion in dividends to GE from the sale of GE Capital assets pursuant to the plan:

> **THE GE CAPITAL EXIT PLAN**
>
> … **We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets.** As of December 31, 2015, we are ahead of our plan, having signed agreements with buyers for $157 billion of ending net investment (ENI), excluding liquidity of which $104 billion has closed. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, **which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015**. **Combined with cash dividends of $4.3 billion, GE Capital returned about $25 billion to GE in 2015**.
>
> In connection with the GE Capital Exit Plan, we completed a legal reorganization of GE Capital that included a merger of GE Capital into GE, a guarantee by GE of GE Capital debt, and an exchange of $36 billion of GE Capital debt for new GE notes. The result of all these actions reduced GE Capital's total assets by 38% from $501 billion at December 31, 2014 to $312

---

[34] *Id.*

[35] Joann S. Lublin, Dana Mattioli & Ted Mann, *GE Seeks Exit from Banking Business: Company reveals intentions to part with bulk of profitable but risky GE Capital*, Wall Street Journal, (updated Apr. 10, 2015, 6:31 PM ET), https://www.wsj.com/articles/ge-prepared-to-exit-the-bulk-of-ge-capital-1428662109

billion at December 31, 2015. We incurred charges of $22 billion related to these actions.

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016 and are on track to file for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (nonbank SIFI) in early 2016.

93.    On March 31, 2016, GE filed a request to the Financial Stability Oversight Council ("FSOC") for rescission of GE Capital's designation as a nonbank SIFI, after the Company spent close to one year transforming itself into a smaller financial services provider by shedding over half of its assets.

94.    On June 28, 2016, and as a result of the asset sales directed by GE Capital Exit Plan, the FSOC rescinded GE Capital's designation as a nonbank SIFI.  The decision meant the FRB would no longer regulate GE Capital as a nonbank SIFI.

95.    In  GE's Annual Report on Form 10-K for the year ended December 31, 2016 ("2016 Form 10-K"), the Company again updated investors on the progress of the GE Capital Exit Plan and how much in dividends GE Capital had paid and was expected to pay back to GE as a result of the sale of GE Capital assets:

As a result of the GE Capital Exit Plan dispositions, **GE Capital has paid $24.4 billion in dividends to GE in 2015 and 2016 ($4.3 billion and $20.1 billion, respectively). We expect GE Capital to release additional dividends of up to approximately $10 billion through the remainder of the plan**. In January 2017, GE received an additional $2.0 billion of common dividends from GE Capital. As of December 31, 2016, we are ahead of our plan, having signed agreements with buyers for $197 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $190 billion has closed.

As of December 31, 2016, we have substantially completed the dispositions related to the GE Capital Exit Plan. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. . .***The***

*result of all these actions reduced GE Capital's total assets by 63% from $500 billion at December 31, 2014 to $183 billion at December 31, 2016.*

96.     For each of the years ended December 31, 2015, 2016 and 2017, Verticals generated substantially all of GE Capital's reported revenues and profits.[36]  On a combined basis, Verticals reported $1.7 billion and $1.9 billion of earnings, respectively, in fiscal years 2015 and 2016. (*Id.* p.98). Therefore, on a percentage basis, in each of these years, Verticals comprised 13% and 14%, respectively, of GE's Industrial operating earnings plus Vertical earnings (non-GAAP). GE asserted that this earnings measure: (*Id.*)

> [P]rovides management and investors with a useful measure to evaluate the performance of the businesses after the disposition of most of our financial services business.

97.     In fiscal 2017, however, Verticals resulted in a $6.2 billion loss. This loss was substantially driven by the LTC Reserve charges announced on January 16, 2018. The loss reported by Verticals in 2017 flipped this earnings measure from a profit of $2.3 billion to a loss of $3.9 billion.

98.     The liabilities of GE's run-off insurance business represented a significant portion of the Verticals business. The table below summarizes the liabilities of the run-off insurance business, including LTC Reserves, as compared to the total assets reported from all GE Capital businesses in each year:

| $s in billions | 2015 | 2016 | 2017 |
|---|---|---|---|
| Insurance liabilities | $25.7 | $26.1 | $38.1 |
| GE Capital total assets | $316.1 | $187.8 | $156.7 |

99.     Consequently, the activities and related liabilities of the run-off insurance business, and particularly the LTC Reserves, became increasingly prominent over this time period.

---

[36] GE 2017 Form 10-K, p.57.

100.    GE divested other portions of its GE Capital business, the relative significance of

the insurance liabilities, including LTC Reserves, increased significantly.

### 5.    During the Class Period, Members of GE's Board of Directors and GE's Senior Management Oversaw the Adequacy and Effectiveness of GE Capital's Risk Management Functions

101.    GE's Report on Form 10-K for the year ended December 31, 2014 (the "2014

Form 10-K") expressly places risk management of GE and GE Capital (known as "GECC" until

December 3, 2015 when GECC was acquired by GE) at the top levels of the Company

including with the Company's Board of Directors and Senior Management. The 2014 Form 10-

K notes that:

> The GE Board of Directors (Board) has oversight for risk management with a focus on the most significant risks facing the Company, including strategic, operational, financial and legal and compliance risks. At the end of each year, management and the Board jointly develop a list of major risks that GE plans to prioritize in the next year. Throughout the year, the Board and the committees to which it has delegated responsibility dedicate a portion of their meetings to review and discuss specific risk topics in greater detail. Strategic, operational and reputational risks are presented and discussed in the context of the CEO's report on operations to the Board at regularly scheduled Board meetings and at presentations to the Board and its committees by the vice chairmen, GE and GECC Chief Risk Officers (CROs), general counsel and other employees.

> *        *        *

> COMMITTEES

> The Board has delegated responsibility for the oversight of specific risks to Board committees as follows:

> *        *        *

> THE GE RISK COMMITTEE oversees risks related to GE Capital and jointly meets throughout the year with the GECC Board of Directors (GECC Board). The GE Risk Committee also oversees the Company's most critical enterprise risks and how management is mitigating these risks. These risks may be discussed during Risk Committee meetings, as well as full Board updates, Audit Committee updates, and/or during Director business visits.

SENIOR MANAGEMENT

The GE Board's risk oversight process builds upon management's risk assessment and mitigation processes, which include standardized reviews of long-term strategic and operational planning . . . A vice-chairman of GE and GE's CRO are responsible for overseeing and coordinating risk assessment and mitigation on an enterprise-wide basis. They lead the Corporate Risk Function and are responsible for the identification of key business risks, providing for appropriate management of these risks within GE Board guidelines, and enforcement through policies and procedures.

OPERATING REVIEWS

CORPORATE AUDIT STAFF & GE CAPITAL AUDIT are responsible for reviewing the governance, processes, controls and accuracy of GE's and GE Capital's financial and compliance reporting.

        *     *     *

GE CAPITAL ENTERPRISE RISK MANAGEMENT COMMITTEE oversees the implementation of GE Capital's risk appetite, and senior management's establishment of appropriate systems to ensure enterprise risks are effectively identified, measured, monitored, and controlled. Additional information on GE Capital's Enterprise Risk Management Committee can be found in the GE Capital Risk Management and Mitigation section below.

102.    Moreover, during the Class Period, in a February 2, 2015 letter from defendant Sherin, then Vice Chairman of GE and CEO of GE Capital, to Robert Frierson, Secretary Board of Governors of the Federal Reserve System, Sherin detailed, among other things, the responsibilities of *GE's Risk Committee*, formed in 2011, which purportedly had "[u]ltimate responsibility for oversight of GECC's enterprise risks" and which had "established a rigorous meeting and engagement process to oversee GECC effectively and independently."  Sherin described GE's Risk Committee as follows:

*GE Risk Committee*

Ultimate responsibility for oversight of GECC's enterprise risks is currently vested in the GE Risk Committee, whose principal charter is to provide "independent oversight of the Company's wholly-owned subsidiary, General Electric Capital Corporation (GECC), including the adequacy and effectiveness of its risk management and credit review functions." This is the core of what

GECC and GE strongly believe to be a thoughtful and effective protocol for managing GECC's risks while maintaining an informed view of the relationship between GECC and GE.

The GE Risk Committee consists of four eminently qualified and dedicated independent directors who have significant financial services experience and who have successfully led institutions in both the private and public sectors… W. Geoffrey Beattie, John J. Brennan, James E. Rohr, and Mary L. Schapiro….

***The GE Risk Committee has established a rigorous meeting and engagement process to oversee GECC effectively and independently. Its GECC-focused oversight has steadily intensified since the Committee's formation in 2011, with more frequent and more in-depth meetings and other sessions with GECC management. In 2014, the GE Risk Committee convened more than 20 meetings focused on GECC matters***. The GE Risk Committee has added monthly calls with the GECC Chief Risk Officer and senior leadership to allow for more comprehensive risk updates. The annual schedule includes in-depth reviews of each GECC business, site visits to GECC locations and GE Risk Committee exposure to a range of GECC risk and business leaders and other subject matter experts. We anticipate a similar GE Risk Committee schedule during 2015. The meeting schedule is illustrative, but of course captures only a portion of the time that the GE Risk Committee members spend on GECC oversight when also accounting for informal interactions with GECC management, preparation for meetings and review of board reporting and other materials.

103.    As set forth in the February 2, 2015 letter, GE's Risk Committee was made up of four independent directors from GE's board (W. Geoffrey Beattie, John J. Brennan, James E. Rohr, and Mary L. Schapiro) with significant financial services, accounting and risk management experience.

**B.    Defendants Knew or Recklessly Disregarded the Stale Assumptions and Inadequate LTC Reserve Situation at GE Capital**

104.    FE-1 was the former Actuarial Controller at GE Capital – ERAC from July 2015 to September 2016.  FE-1 worked out of the Overland Park, Kansas office and reported to Clark Ramsey, VP and Chief Actuary at ERAC.  FE-1's primary responsibility was governance over experience studies, assumption setting, asset adequacy modeling, and loss recognition modeling.  Model governance involves making sure the assumptions are used properly.  After

FE-1 joined GE Capital, the executives in the ERAC business unit seemed much more interested in "the appearance of model governance" than they were in applying it. FE-1 explained that good actuarial standards/practices are rigid around assumptions as well as putting them in models. According to FE-1, he tried to establish those practices at GE but had a hard time. FE-1 explained that when he was hired, he believed that ERAC was looking to modernize its model and actuarial practices because ERAC had been functioning as an "old school shop" that lacked transparency and was not centralized. However, according to FE-1, once he tried to implement governance, ERAC was not supportive or cooperative. FE-1 said this was not just normal resistance to new ways of doing things. FE-1 noted that immediately upon joining ERAC in July 2015, he realized that he was not a good fit for the culture there.

105.     FE-1 explained the actuarial process at ERAC including the four major business processes: 1) Experience Study Governance, 2) Assumption Governance, 3) Asset Adequacy/Cash Flow Testing, and 4) Loss Recognition Testing. FE-1 advised that the experience study would be presented in the first meeting. At ERAC, each line of business actuary owned their experience study and gathered data from the policies that they were charged with. At ERAC, the LTC Managing Actuary is David Benz.

106.     FE-1 would then initiate a second meeting to discuss assumptions. In the assumptions meeting, the LTC actuary would propose LTC assumptions (to be used that year) for asset adequacy and loss recognition tests. According to FE-1, after the assumptions are set they become the approved assumptions, which are loaded into the liability and asset quality models. At GE Capital during FE-1's tenure, Benz would lock in the assumptions in his model. He would also provide FE-1 with liability cash flows. FE-1 advised that he himself did not model liability cash flows; he just "matched them up with asset models."

107.    According to FE-1, the problems he ran into at ERAC were after the assumption governance phase of the process.  He advised that it was not uncommon at ERAC for the liability cash flows to change and that the Chief Actuary, Ramsey, had the ability to alter approved assumptions for various reasons.  FE-1 went on to say that after the assumption setting phase of the review, he should have been given very detailed reasons and back-up documentation to support assumption changes.  However, in late 2015 (November and December), Ramsey and Benz stopped providing FE-1 with the documentation needed to back-up the changes in assumptions they made during the asset adequacy phase, so FE-1 could not reconcile those changes with the liability cash flow results.  FE-1 recalled that these were "really big changes," especially in December.

108.    According to FE-1, after Thanksgiving 2015, he started to get updated liability cash flow models from Benz "without adequate justification or explanation as to what had changed in the liability cash flow models." According to FE-1, it became a battle between him and Benz.  FE-1 gave the example of benefit utilization changing when he asked for an explanation as to what had changed and the response back would be "oh we met yesterday and decided to change this or that."  FE-1 would then ask for documentation to support the change and he would never get adequate documentation to justify the change.  FE-1 went on to say that instead he started to get iterations of liability cash flow faster than he could process them through his asset adequacy models. He was never able to tell what the overall asset adequacy impact was because he kept getting new updates with very little explanation or justification, "usually none."

109.    FE-1 believed, based on his experiences as a modeler, that Ramsey and Benz were targeting some present value liability cash flows.  FE-1 suspected that Benz and Ramsey

were looking at the liability cash flows and making changes to the liability assumptions; they would then ask FE-1 to run those updated liability cash flows in the asset adequacy process. FE-1 was never given the actual liability assumptions; he was given the results of the liability cash flow model.  When FE-1 asked for the LTC model, Benz and Ramsey would just give him the results, and tell him "we changed utilization or we found something wrong with this particular company so we updated the morbidity rate."  At that point, FE-1 would then take the change in liability cash flow and compare them to previous results to see the difference.  FE-1 said he started receiving "much larger" changes with very little or no justification.  According to FE-1, the changes he started to receive were "so big, I couldn't reconcile them, get comfortable with them."  According to FE-1, if the difference made by the change was over $50 million he would dig deeper into the different line items such as premiums and expenses to understand the change.  FE-1 recounted how there were a couple of instances where the difference was in the hundreds of millions of dollars and he could tell that it was coming directly from claims, which are a result of two assumptions (morbidity, *i.e.*, frequency, and utilization, *i.e.*, what percentage of the total benefit is being used).  When FE-1 pushed back on Benz regarding the changes, Benz explained that the changes had been requested by Ramsey and if FE-1 had questions he should direct them to Ramsey.

110.    Because the changes were "so big" and came without the proper justification, FE-1 went to Ramsey for a verbal justification, but would not get it.  FE-1 further recalled long, closed door sessions between Benz and Ramsey after which FE-1 would get a new iteration of liability cash flow without explanation.  FE-1 suspected that they were altering the assumptions to improve liability cash flow.  When FE-1 realized assumptions were being changed with a

cash flow target in mind, he pushed back hard.  FE-1 advised that he first went to Benz and then

to Ramsey.

111.    During the loss recognition phase in May-June 2016, which followed the asset

adequacy phase, FE-1 did his own independent calculations which uncovered a "loss

recognition event" of around $200 million.  He knew that GE Capital would "need to come up

with" this amount and hold additional GAAP reserves.  FE-1 then presented this to Ramsey and

others.  Ramsey then went up to William Steilen's (ERAC's CFO) office and came back down

hours later showing that they had a $78 million surplus because they changed the way they were

doing loss recognition.  FE-1 recounted how they claimed to be "calculating this in a much

better way."  FE-1 advised this was the final straw for him.  The assumptions introduced during

the loss recognition phase caused him to give his notice within two weeks.

112.    FE-1 informed the executives at ERAC that if anyone from GE Capital asked

him questions about the modeling, his intention was to give them "very truthful answers" that

would disclose his concerns about their methodology. By November 2015, FE-1 realized he was

being excluded from the assumption setting process.  FE-1 expressed his concerns about the

model changes to Ramsey, Steilen, the CEO of ERAC, and to GE's auditors (KPMG).

113.    FE-1 recalled that when he received one of the last iterations of liability cash

flows for LTC from Benz, Benz let FE-1 know that he was "very uncomfortable" with what he

had received from Ramsey.  FE-1 recounted how Benz had written a memo detailing his

concerns because as an actuary, he was required to write a memo if he was ever asked to do

something he was not comfortable with.

114.    According to FE-1, ERAC executives, Ronald Peters (CEO of ERAC), Ramsey,

Benz, and Dale Filsinger (Chief Risk Officer of ERAC), had meetings with the CFO and COO

of GE Capital.  FE-1 recalled GE Capital executives, including Ryan Zanin, Chief Risk Officer,

and, likely, the COO of GE Capital, coming for a site visit to the Overland Park, Kansas office.

FE-1 described the visit as "odd" because C-Level executives tend to be extremely inquisitive

but when Zanin and the COO came they did not ask any questions.  According to FE-1, the top

executives at ERAC may have been under tremendous pressure from GE Capital to prevent the

disclosure that they had been under-reserving for the LTC policies.

116.    FE-1 said that the reason the LTC charge-off was so big is because "this didn't

happen after a year or two, this happened ever since GE spun-off Genworth."  FE-1 said that

over the years GE should have been increasing its reserves based on what the actuaries were

seeing.  In addition to increasing reserves, FE-1 said that GE should have been "pushing capital

down to ERAC."  According to FE-1, this was not happening.

116.    FE-2 was employed by GE from 2006 through January 2017. He was hired by

ERAC and worked as a Valuation Actuary from 2006 – 2012 and worked for GE Capital as

Senior Insurance Audit Specialist from 2012 – 2014.  From 2014 through the end of his tenure

(January 1, 2017), he was the Senior Vice President, SME (subject matter expert) at GE Capital.

FE-2 had seven to eight different supervisors at GE Capital, most recently Kevin McCord, and

ultimately reported to Joseph Pizzuto, former Chief Audit Executive of GE Capital.  McCord,

the current director of Internal Audit for GE Capital's portfolio of insurance companies, also

reported to Pizzuto.

117.    FE-2 reported that in approximately 2012, there was "an emergency need" to

have an expert in insurance for GE Capital.  According to FE-2, the timing of that emergency

coincided with ERAC being placed as a subsidiary under GE Capital.  FE-2 explained that

because of the global SIFI designation looming, GE Capital needed an expert in insurance with

a focus on internal audit.  In 2012, FE-2 was promoted to Senior Insurance Audit Specialist for all of the insurance business at GE Capital.  In that position, he ultimately reported to the Chief Audit Executive of GE Capital.

118.    When FE-2 became the Senior Insurance Audit Specialist in 2012 he identified 140 insurance business units under the GE Capital organization, many of which were not being audited.  FE-2 reported that ERAC was one of the insurance business units that was not being audited.  In addition, FE-2 noted that Corporate Audit Staff ("CAS") had not been auditing many of the insurance business units and did not have the background to properly audit the insurance business.  FE-2 went to the Chief Audit Executive (Christina Selby in 2013) to question her on the lack of insurance business audits.

119.    FE-2 built a plan to begin auditing these previously unaudited insurance entities which spanned the globe.  FE-2 reiterated that he spoke directly with both Pizzuto and Selby about the fact that the various insurance entities had not been audited.  According to FE-2, the Chief Audit Executive (first Selby, and then Pizzuto) reported to the Audit Committee of GE's Board of Directors.  FE-2 confirmed that Selby and Pizzuto also prepared reports for Defendants Sherin (then President of GE Capital and Vice Chairman of GE) and Immelt.

120.    According to FE-2, model risk management was a huge problem at ERAC and at GE Capital overall.  FE-2 described it as a "major failure" from 2012 onward.

121.    In the summer of 2014, FE-2 conducted a financial audit of ERAC with GE's CAS in Overland Park, Kansas, where he identified "well over 50 issues" at ERAC.  He explained that some of the issues were "larger issues" that were going to take a lot more than 90 days ("the audit window") to resolve and thus required post-audit follow-up.  Some of the items FE-2 identified concerned the ERAC legacy LTC insurance portfolio being under-reserved.

FE-2 explained that ERAC should have been updating their assumptions regularly, but in a specific case they had not, and in fact their assumptions were "stale by several years."

122.    According to FE-2, following that summer 2014 audit, ERAC's senior management agreed that the assumptions needed to be updated and that ERAC needed to recalculate their reserves based on the more up-to-date assumptions.  FE-2 described that when he presented ERAC's senior management with his audit findings related to the stale assumptions and inadequate reserves, management's response was "no contest… [we] agree." FE-2 audit findings were then presented to the Chief Audit Executive and to the Managing Director, Audit Executive at GE Capital. The Managing Director, Audit Executive then brought FE-2's findings to the Chief Audit Executive of GE Capital (Pizzuto).

123.    The issues identified during FE-2's insurance business audits also were entered into GE Capital's formal audit system where they were gathered together and presented to GE's Board of Directors and Audit Committee.  FE-2 confirmed that the Audit Committee reviewed all of his audits and that prioritized summaries on particular issues (*i.e.*, model risk, compliance, etc.) were put together for the GE Board.  According to FE-2, Defendants Immelt and Sherin also knew about the model validation concerns because they were systemic throughout the GE Capital organization and had been identified by the Fed.

124.    FE-2's last audit, which occurred in August and September of 2016, involved reserves, including ERAC's reserves.  According to FE-2, the audit examined all elements of the reserves and attempted to see if ERAC had "hit a negative downside."  During that audit FE-2 (and his team) identified issues related to the reserve methodologies and changes to those methodologies.  FE-2 confirmed that his team uncovered and flagged concerns to Clark Ramsey (ERAC's Chief Actuary), Ronald Peters (ERAC's CEO) and Dale Filsinger (ERAC's Chief

Risk Officer). FE-2 confirmed that Filsinger would have had to tell Ryan Zanin, GE Capital's Chief Risk Officer, who was Filsinger's direct supervisor.[37] FE-2 explained that ERAC had a systemic problem when it came to its loss recognition testing.  FE-2 also advised that his team, the Actuarial Controller at GE Capital, and KPMG were "all in agreement" about concerns with loss recognition testing and suggest this was the way of "calling on the carpet" concerns of results being manipulated. He stated that the purpose of loss recognition testing is to see if the insurance portfolios have "the propensity of going negative" and it seemed from his audit that ERAC was trying to "avoid [the] appearance" of ERAC going negative and it was clear that changes needed to be made.  FE-2 gave advice on how to make those changes but he was laid off a few months later and could not follow-up on his concerns.

125.     He explained that during his audit of ERAC's LTC reserves in 2016, he found that there was a lack of back-up for the numbers being used to calculate the reserves.  FE-2 suggested thinking of reserves testing as a financial statement.  What ERAC was doing was akin to putting a number on a financial statement without any explanations, and would lead one to think "where did that come from?"  FE-2 explained that ERAC's numbers for its reserves testing lacked supporting detail and explanations, which meant that the Company could not adequately test the numbers.

126.     FE-2 confirmed that his 2016 loss recognition audit of ERAC was definitely elevated to the executives at GE Capital and GE.  FE-2 noted that loss recognition testing, model validation and economic capital were "required to go up" to GE Capital and GE.  FE-2 confirmed that Peters, Zanin, Immelt, and Sherin were all aware of these issues.  FE-2 reiterated

---

[37] According to FE-2, Zanin was a part of the annual review of LTC policies and was the communication liaison between ERAC and GE Capital.  According to FE-2, Zanin understood the ERAC business.

that GE's Board of Directors also was aware of these issues.  According to FE-2, the Audit

Committee had to validate issues and review with the various businesses the remediation plans.

Further, according to FE-2 during the audit, the issues being identified would "percolate" up to

the business unit (ERAC) and to Pizzuto.

127.   FE-2 advised that KPMG confirmed the concerns related to loss recognition

testing that were raised in an internal GE Capital memo.  FE-2 went on to say that the very

detailed memo written during the August-September 2016 audit was sent to Ramsey and was

also shared with others, including KPMG and FE-2.  According to FE-2, the memo detailed

how the author disagreed with the methodology ERAC was using and questioned ERAC's

process in evaluating reserves.  FE-2 agreed with the author's observations.  FE-2 said that the

memo was "unsettling" and made ERAC look "really bad."

128.   This was a GAAP violation because GE should have charged these deferred

acquisition costs to expense and set-up additional reserves due to a deficiency.  In fact, this is

exactly what GE would disclose, but not until January 16, 2018.

129.   FE-2 further explained that in order to truly calculate the LTC reserves, it is

necessary to look at the underlying paperwork from the direct (or original) writers of the LTC

policies.  According to FE-2, ERAC did not have enough details on the underlying policies.

One problem FE-2 identified in the 2016 audit was that ERAC was not regularly receiving

documentation from the direct writers of the ceded policies, including Genworth.  It was GE's

responsibility (as the reinsurer of the policies) to monitor how many of the policies remained in

force.  FE-2 described the lack of documentation as a "failure." According to FE-2, his audits

were dragging up significant issues that were not easily fixed.  Indeed, his team pulled up

significant issues globally, at ERAC and other businesses involving a multitude of compliance concerns, operational risks and many other issues.

130.    FE-2 confirmed that the "Genworth block" of LTC policies comprised a significant portion of the nearly $10 billion charge.  FE-2 heard, early in his tenure at ERAC, that when GE spun off Genworth, there were individuals at GE that were worried that Genworth would not do well, so they pulled certain LTC policies out of the deal because "they are the bad ones."  FE-2 confirmed that GE wanted to divest the LTC policies to Genworth, but they could not.  According to FE-2, Swiss Re also did not want GE's remaining LTC blocks in ERC when Swiss Re bought the rest of GE's insurance business in 2006.

131.    FE-3 confirmed that he was employed by GE from May 2006 to February 2017 including as the Strategic Initiatives Leader at GE Capital from December 2013 to December 2017.  In that role, FE-3 reported to Sharon Garavel, former VP of the Enterprise Risk Initiative, "Getting to Strong." According to FE-3, Garavel initially reported to Ryan Zanin (Chief Risk Officer) and then to Tom Gentile, former President and COO of GE Capital.  FE-3 advised that as the Strategic Initiatives Leader, he was responsible for Program Management of GE Capital's "Getting to Strong" initiative; this included Risk Management oversight at the corporate GE Capital level with some visibility into GE Capital's legacy insurance business.

132.    According to FE-3, the Federal Reserve came into GE Capital following the SIFI designation. FE-3 advised that the Strategic Initiative also was looking at GE Capital because of its SIFI designation. He went on to say that with the SIFI designation, all of GE Capital's Risk Management, Operations and Finance Processes needed to look more like a bank.  Additionally, since Insurance was one of GE Capital's businesses, Insurance participated in the "Getting to Strong" initiative.  It was FE-3's opinion that "the controls" for the legacy insurance business

48

were "not good."  According to FE-3, the Fed identified deficiencies related to the insurance

business and recommended what "needed to be built out," as well as additional oversight from a

Risk Management perspective.  According to FE-3, there was a lot of feedback from the Fed

during the "Getting to Strong" initiative that GE Capital needed to increase its controls and

presence on the capital side. FE-3 recounted how Joe Pizzuto along with a lot of other external

personnel came in during that time (SIFI designation), which FE-3 suggested was an indication

of "some lack of controls."

133.    FE-3 went on to say that when the Fed came into GE Capital following the SIFI

designation, the Fed "called our baby ugly" and there was a lot of work to do at GE Capital.

134.    FE-3 reported that defendant Immelt was involved in the "Getting to Strong"

initiative.  FE-3's team did quarterly memos to the Fed.  According to FE-3, those memos

"went all the way up to the Board" of Directors of GE, including to Defendant Immelt.

According to FE-3, GE's Board of Directors reviewed those memos every single quarter.  FE-3

knew this because his team was putting together the information for those memos.  FE-3

reiterated that "definitely Immelt" was reviewing the quarterly Fed memos.  The quarterly

reports being sent to the Fed by GE Capital and being reviewed by Immelt and the Board

"definitely" included information about GE's Capital insurance business. FE-3's team pulled

the quarterly reports together and prepared for Defendant Sherin, although internally the reports

were "authored" and signed by Sherin.  It became apparent to FE-3 during the "Getting to

Strong" initiative that GE's culture, at the highest levels, "is one where you don't want to raise

issues."

135.    FE-4 was an Insurance Professional within GE Capital's insurance framework

from before the start of the Class Period until the middle of the Class Period.  In particular, FE-

4, worked on model validation in GE Capital's insurance businesses, including their legacy

LTC portfolios (*e.g.,* the ERAC block, which included the Union Fidelity (UFLIC) block).  FE-

4 confirmed that while GE Capital was under SIFI designation, scrutiny by the Fed of GE

Capital included examination of GE Capital's model validation.

136.    FE-4 also stated that GE did not disclose a lot of information about the legacy

insurance business for many years to Wall Street or the SEC, although there were statutory

filings stating where the legacy insurance business was domiciled.  According to FE-4, the

legacy insurance business was GE Capital's "unwanted" and "troublemaking" block of

business.  He explained that many of the policies in the ERAC/UFLIC blocks dated back to the

mid-1980s.  According to FE-4, at the time when these policies were written, the original policy

writers and industry professionals did not know how to design or price the policies:  "It was all

guess work."

137.    FE-4 also explained that GE Capital sold everything in the ERC portfolio that

they could to Swiss Re and that the policies that stayed with ERAC/UFLIC were the blocks for

which Swiss Re did not like their "long-term unknown nature."  According to FE-4, GE Capital

was "stuck" with these blocks.  FE-4 described the policies GE Capital was left with as "long-

tailed risk stuff" that no one wanted and that was not originally underwritten or priced properly.

FE-4 also said that "the stage at [GE Capital] was set" following the Swiss Re deal and that the

remaining ERAC/UFLIC blocks were always "the blocks that nobody wanted" even many years

ago and that these legacy blocks were "troublemaker blocks" with the highest risk.

138.    FE-5 worked as FP&A Manager for Healthcare Equipment Finance at GE

Capital from March 2010 – July 2014.  From July 2014 – December 2017, he served as CFO of

Healthcare Equipment Finance.  According to FE-5, in both roles, he handled financing for

medical practices, hospitals, medical equipment, medical devices and other related entities.  FE-5 added that as CFO, he was responsible for, among other things, pricing for his business segment. FE-5 advised he first reported to Gregory Cameron, the CFO of GE Capital – Americas, but around nine months into his tenure as CFO of Healthcare Equipment Finance he began reporting to the CFO of Industrial Finance for GE Capital, Jeremy Heaton, who was then replaced by Joel Hamlin.

139.    FE-5 reported that GE "did not like to publicly talk about the insurance business" because "we were out of it" even though everyone knew they were still "dealing with it."  FE-5 reported that Defendants Sherin and Bornstein were dealing with the legacy insurance issues. According to FE-5, Robert Green and Defendants Sherin and Bornstein would each have been involved with  the insurance portfolio, and Bornstein was "heavily involved" with legacy insurance given that he was the CFO of GE Capital before becoming GE's CFO.

140.    FE-6 was an executive at GE Capital from 2014 – 2015.  According to FE-6 an audit team conducted a simple audit on GE Capital's insurance business during his tenure (in 2014 – 2015) and that the audit team had a risk based audit plan going into 2016.  According to FE-6, there were quarterly conference calls led by Ronald Peters and the ERAC executive team with individuals from GE Capital's risk team.  FE-6 said that during those quarterly calls ERAC would discuss the review process which included discussion of assumptions such as mortality and morbidity.

141.    According to FE-6, the audit team began with a simple audit of ERAC to get people exposed to doing audits of that business. This was likely in the first four months of 2015. According to FE-6, concerns about assumptions, loss recognition testing, and model validation were not covered in that audit; they "came later" when KPMG delved more into those areas.

According to FE-6, audit plans for the 2015 simple audit and the planned deeper dive into ERAC's assumptions, model validation, and other risk factors were submitted to Joseph Pizzuto, GE Capital's Chief Audit Executive, and ultimately, GE's Audit Committee which had the final approval authority for the audit plans.

142.    FE-6 stated that the internal consensus amongst senior management, especially Dan Janki ("Janki"), Treasurer of GE, was that there was risk related to the legacy LTC portfolios.  FE-6 explained that policies in the legacy LTC blocks were not being written any longer because of how risky they were.

143.    FE-6 advised that GE held onto certain LTC policies that did not get spun off with Genworth because GE "refused to sell them at such a huge discount."  FE-6 recalled that Janki had said that "his one big mistake was not selling off all the insurance policies and taking the hit at that time."

C.    **GE Failed to Set Appropriate LTC Reserves in Violation of GAAP and SEC Regulations**

144.    Huge problems within the LTC insurance business surfaced in the mid-2000s, and were widely reported in the financial press. Many insurers were forced to scale back benefits because they had misjudged how many people would file claims and how long the policy holders would require benefits. Many insurers were forced to seek regulatory approval for double-digit premium increases on their policyholders, but even then, the funds fell far short of the amounts needed to pay out benefits. For example, MetLife Inc., Prudential Financial Inc., CNA Financial Corp. and Manulife Financial Corp.'s ("Manulife") John Hancock were all forced to dramatically increase premiums in order to make good on their LTC policies. In fact, as discussed *supra*, there are only approximately a dozen companies who still sell LTC policies

today, down from 102 a little over a decade ago. Some LTC insurers were even wound down and placed in receivership.

145.    In 2017, analysts from Credit Suisse projected that the industry-wide gap between LTC insurance claims and reserves may someday surpass $300 billion.[38]

146.    Pricing assumptions in the issuance of LTC policies have changed dramatically, caused by factors such as increased healthcare costs in the U.S., lengthened life expectancy, and lower than expected interest rates.  As a result, MetLife, Prudential, and Unum Group ("Unum"), all incurred significant losses caused by outdated LTC origination assumptions.[39]

147.    Indeed, over the last decade, LTC insurers have taken repeated charges to boost reserves after they had badly underestimated how rapidly medical costs would rise, how many seniors would actually use the benefits and how long elderly policyholders would live, among other miscalculations.[40] In fact, Credit Suisse explained in an April 10, 2017 industry report that all major assumptions priced into early policies turned out to be faulty because:

> [s]ince the sale of the first products in the late 1970s, experience vs. every major assumption factored into pricing LTC policies has turned out to be unfavorable to some degree, including care cost inflation, long-term interest rates morbidity, mortality (improved longevity), and lapse rates. Despite a long period of these factors moving in the wrong direction, many insurers did not seek premium rate increases or adjustments to in force policy benefits *until the early/mid 2000s*.[41]

---

[38] Credit Suisse, U.S. Life Insurance, *A Deep Dive Into Long-Term Care Suggests an Ongoing Source of Pain for the Industry*, April 2017.

[39] On February 3, 2015, Unum, a large LTC provider, also disclosed another charge of approximately $ 700 million to increase its LTC reserves.

[40] Since 2007, other companies have had to take a combined $10.5 billion in pretax earnings to boost reserves for future LTC insurance claims. L. Sciza, The Wall Street Journal, "*Millions Bought Insurance to Cover Retirement Health Costs.  Now They Face an Awful Choice,*" Jan. 7, 2018.

[41] Credit Suisse, U.S. Life Insurance, *A Deep Dive Into Long-Term Care Suggests an Ongoing Source of Pain for the Industry*, April 2017.

148.    Discussions about the adverse claims experience were pervasive in the LTC

industry literature and were the topic of numerous articles in LTC actuarial and industry

publications, professional sessions (*e.g.*, Society of Actuaries), and official government reports.

149.    Genworth, and thus GE, was not immune to this market reality. Indeed, on

November 5, 2014, Genworth  – which is one of the largest LTC insurance providers in the

industry -- publicly disclosed the results of a comprehensive review of its LTC Disabled Life

Reserves (also called claim reserves) which resulted in increased reserves of approximately

$531 million.[42]

150.    Then, on February 10, 2015, Genworth announced an approximately $700

million charge to its LTC Active Life Reserves (also called benefits reserves – reserves for

policyholders not yet on claim).[43] GE had significant exposure to Genworth's LTC liabilities

reinsuring at least $1.6 billion of LTC policies in connection with the Genworth spin-off.[44]

151.    Genworth's LTC woes were a warning sign to the industry (especially GE) that

LTC insurance policies were more toxic than previously thought. In the midst of Genworth's

LTC crisis, GE was asked by *TheStreet* in April 2015 why it still retained exposure to LTC

assets. "GE spokesman Seth Martin declined to comment on why GE isn't selling these assets,

but says they are in runoff.  'We have not written any new policies in several years.'"[45]

---

[42] Disabled Life Reserves (also called claim reserves) are established when a claim is incurred
or is estimated to have been incurred and represents an estimate of the ultimate obligations for
future claim payments and claim adjustment expenses.

[43] In fact, a securities class action lawsuit was commenced against Genworth in 2014 relating to
its failure to inform investors about its inadequate cash reserves on LTC policies.  This lawsuit
ultimately settled in early 2016 for $219 million, at which point, Genworth increased its LTC
reserves by $435 million after an actuarial review.

[44] GE's LTC portfolio contained only older policies written prior to 2006 (the same types of
policies to which Genworth's reserve charges were almost entirely attributed).

[45] Freed, *supra* fn. 13.

152.     Genworth's regulatory filings make clear that GE should have taken heed of the LTC crisis at Genworth, as GE (through indirect subsidiary UFLIC) had massive exposure to the LTC policies it reinsured from Genworth.  Genworth's 2014 Form 10-K, for example, states that "[w]e have several significant reinsurance transactions with Union Fidelity Life Insurance Company ("UFLIC"), an affiliate of our former parent, General Electric Company ("GE"), which results in a significant concentration of reinsurance risk."  Genworth's Form 10-K also set forth Genworth's exposure to its principle reinsurers in its U.S. life insurance business as of December 31, 2014, revealing that **_UFLIC had over 6 times more exposure than Genworth's other reinsurers combined_**:

| (Amounts in millions) | Reinsurance recoverable |
|---|---|
| UFLIC | $ 14,494 |
| RGA Reinsurance Company | 798 |
| Munich American Reassurance Company | 724 |
| Riversource Life Insurance Company | 558 |
| General Re Life Corporation | 311 |

Genworth 2014 Form 10-K

153.     Genworth took an additional LTC charge of $905 million to its LTC Disabled Life Reserves (claim reserves) as of September 30, 2016, following an additional LTC charge for its Active Life Reserves (benefit reserves) in the year ended December 31, 2015.[46]  In total, **Genworth disclosed since 2004 nine changes in estimates related to its LTC portfolio, totaling $3.8 billion**.

154.     Genworth's CFO, Kelly Groh, was quick to distance Genworth from GE on February 7, 2018, when the truth was emerging about GE's LTC reserve practices.  She made it clear that GE set its own assumptions for the UFLIC block and that Genworth has no net economic exposure to the UFLIC block because of the Reinsurance Agreements.

---

[46] _See_ Genworth 2015 10-K.

One last note on LTC. There's been a lot of interest over the last two weeks regarding our exposure on certain assumed LTC blocks that were subsequently reinsured to GE's Union Fidelity Life Insurance Company, or UFLIC, subsidiary. As GE had announced, **GE does have LTC exposure beyond this UFLIC subsidiary as a part of their Employers Reassurance Corporation, or ERAC subsidiary, which was also a part of their reserve increase announced a few weeks ago. GE has assumed the risk on the UFLIC block and sets the assumption.** We have no net economic exposure or liability associated with the UFLIC block. It should also be noted that even within our own LTC business, performance vary significantly depending on issue year, daily benefit amounts, inflation benefit options, underwriting, rate actions implemented and other factors. **The charges GE is taking and the charges Genworth took in 2014 and 2016 illustrate the severity of the issues facing LTC insurers and the need for appropriate and timely premium rate increases or benefit modifications to ensure the adequacy of cash flows and reserves to pay future claims.** [47]

155.     During this time, the LTC market continued to deteriorate and GE's peers in the

LTC market were requesting significant rate increases on their LTC policies including:

- Genworth rate increase requests as high as 48.3%;

- UNUM rate increase requests as high as 91.0%;

- John Hancock rate increase requests as high as 61.6%;

- MetLife rate increase requests as high as 91.7%;

- CNO Financial rate increase requests as high as 35.0%; and

- Ameriprise rate increase requests as high as 42.9%.

156.     In addition to shoring up its LTC reserves from 2014-2016, Genworth, as noted

above, also "has been requesting rate increases on its LTC insurance policies to boost cash

flows and has received about $8 billion in approved rate increases since 2013."  According to

media reports, Genworth "will continue to seek additional annual premium increases from

regulators over the next five to seven years with the intention of adding $8 billion to its future

---

[47] Genworth, Q4 2017 Genworth Earnings Call.

cash flows."[48]  For example, in 2014, Genworth conducted an asset adequacy test and
determined that its loss recognition testing[49] margin,[50] an important indicator of insurer
solvency, had shrunk from $3.2 billion at the end of 2013 to negative ($2.6 billion) at the end of
2014 (a deficit that exceeds GLIC and GLICNY's combined LTC premium revenue from that
year). According to Genworth, the decrease was "driven by changes to assumptions and
methodologies primarily impacting claim termination rates … and benefit utilization rates."

157.    Genworth's problems continue to this day. Genworth's CEO, Thomas
McInerney, said he spends significant time visiting with state regulators to gain approval for
rate increases on LTC policies. GE, having previously owned Genworth, knew or recklessly
disregarded these systemic problems at Genworth, and that the problems permeated the entire
LTC insurance industry.

158.    Similarly, in late 2015 and early 2016, insurer Allianz sought rate increases from
regulators for its LTC policies (some of which GE had reinsured).  Some of those rate increase
requests were denied by regulators further compounding potential risks for GE's LTC reserves.

159.    LTC insurer Manulife did deep dive LTC reviews triennially, in 2010, 2013, and
2016.  Based on the adverse claims experience it identified and worsening LTC trends,
Manulife asked state regulators for rate increases three times between 2010 and 2016, after

---

[48] Cyril Tuohy, *Insurers With LTCi Blocks Draw Distinctions With GE*, insurancenewsnet.com
(Feb. 12, 2018),  https://insurancenewsnet.com/innarticle/insurers-ltci-blocks-draw-distinctions-
ge

[49] Loss recognition testing is an impairment test, mandated by GAAP that requires insurance
companies to recognize reserve deficiencies as they occur. Loss recognition testing is the GAAP
analog to statutory cash flow testing with the exception that, while the present value of future
surplus is the key deficiency metric on a statutory basis, loss recognition is performed using a
gross premium valuation method, which considers, not the ending surplus, but the sum of the
present value of liabilities throughout the projection period of the product being tested.

[50] The loss recognition testing margin is the deficiency metric for loss recognition testing and is
equal to the sum of the present value of liabilities offset by the present value of any profits
throughout the projection period of the product being tested – here, LTC insurance.

finding existing reserves were not large enough to cover its growing claims. Manulife also incurred sizable LTC reserve charges between 2010 and 2016, the latest worth $415 million following a review of its LTC business in 2016.[51]

160.    Although problems associated with LTC underwriting were rampant throughout the industry, and many insurance providers were acting to increase their reserves and policyholder premium payments, GE continued to assure the market that it faced no problems and its LTC portfolio was stable increased its LTC reserves by any material amount throughout the entire Class Period. GE knew or recklessly disregarded, however, that it was not immune from these trends in the LTC market especially because it reinsured the worst of the LTC policies left behind from Genworth.

161.    Moreover, David Benz, Managing Actuary at GE Capital, in "*Searching for Morbidity Improvement in the SOA Experience Database,*" Long-Term Care News, August 2017, acknowledged that GE had access to the "Long-Term Care Intercompany Experience Study- Aggregate Database," which is "the largest source of publicly available insured long-term care experience. As such, it is a great source for [] trend analysis . . . ."[52]

162.    Analysts covering GE have commented that it is likely that GE knew about its problems for some time. As noted below, Scott Davis, an analyst with Melius Research, wrote that it is "**very hard to believe that mysteriously overnight GE found problems they didn't**

---

[51] Jonathan Ratner, *Manulife Financial Corp's long-term care business may result in a big charge*, Financial Post (last updated Apr. 8, 2016),
http://business.financialpost.com/investing/trading-desk/manulife-financial-corps-long-term-care-business-may-result-in-a-big-charge; *Manulife's U.S. arm swept up in GE's 95 billion insurance writedown*, The Globe and Mail (Jan. 16, 2018),
https://www.theglobeandmail.com/report-on-business/streetwise/manulifes-us-arm-swept-up-in-ges-95-billion-insurance-writedown/article37628227/

[52] David Benz, *Searching for Morbidity Improvement in the SOA Experience Database*, Long-term Care News (Issue 45, Aug. 2017),
https://www.soa.org/Library/Newsletters/.../2017/august/ltc-2017-iss45-benz.aspx?

**know existed**." Similarly, Jeff Sprague, an analyst with Vertical Research Partners, opined with

regard to GE that **"[i]t's hard to imagine a $15 billion problem** materialized **in the course of**

**the year**."

1.    **Defendants Violated GAAP by Failing to
Properly Calculate and Update GE's LTC Reserves**

163.    GE filed reports with the SEC pursuant to GAAP in which it reported its overall

financial condition, as well as specific activities pursuant to GAAP in quarterly and annual

sworn statements. GAAP reporting differs from SAP accounting procedures in several ways, in

part because of the audience of GAAP-based reports—which are investors and analysts rather

than regulators.[53] GAAP reports (such as GE's Form 10-K reports) are filed to provide useful

and reliable information for investors and analysts. For this reason, several metrics and

mechanisms differ as between the two accounting procedures, with SAP accounting procedures

generally being more conservative. Nevertheless, each provides important insight into the

insurers' (and parents' and subsidiaries') financial condition.

164.    The American Institute of CPAs ("AICPA") publishes an industry-specific

accounting guide applicable to companies with exposure to LTC insurance (the *Audit and*

*Accounting Guide, Life and Health Insurance Entities* (AAG)). The AAG distinguishes long-

term care insurance contracts as follows: (AAG 1.29)

> Long-term care insurance policies generally have fixed premiums that are
> cancellable by the policyholders but not by the insurance entity, and are
> guaranteed to be renewable.

---

[53] Insurance companies doing business in the United States are required to prepare statutory
financial statements in conformity with Statutory Accounting for Insurance Companies
("SAP"), as set forth in the NAIC Accounting Practices and Procedures ("AP&P") Manual, as
well as state laws, regulation and general administrative rules.  These fundamentals of statutory
accounting for insurance companies are unique and differ from other financial accounting
methods (such as GAAP). This is because insurance contracts, like LTC insurance, involve a
promise to pay which extends years (often decades) into the future.

165.    As discussed above, GE has significant exposure to LTC insurance as a reinsurer of other LTC insurance providers. Specifically, GE has entered into agreements with, and received payments from, insurers (the "ceding entities") in exchange for an obligation to reimburse those insurers for claims paid. (ASC 944-20-05-40) That is, GE assumed all or part of the risk originally undertaken by another insurer. (ASC 944-10-20, Glossary).

166.    ASC 944, Financial Services – Insurance, sets forth GAAP applicable to accounting for LTC obligations. (ASC 944-20-55-13).[54] For reinsurers, a principal objective of ASC 944 is to account for an agreement according to its substance. (ASC 944-20-10-4)[55]

### (a)    Summary of LTC Reserve Charges

167.    In connection with its LTC reinsurance obligations, as of December 31, 2017, GE reported liabilities (LTC Reserves) totaling $26.1 billion. (GE 2017 Form 10-K, p.87).  If GE had presented LTC Reserves on a standalone basis, these reserves would have been GE's sixth largest liability. (GE 2017 Form 10-K, p.124).

168.    GE's LTC liabilities in the fourth quarter of 2017 were substantially higher than in prior periods because, in that period, GE recorded an $8.9 billion charge to increase its LTC Reserves. On an after-tax basis, the LTC Reserve charge was $6.2 billion.

169.    This charge was reported on a GAAP basis. GE's insurance business is a regulated business subject to a statutory accounting framework for establishing its reserves. GE disclosed that the reserve shortfall on the more conservatively calculated statutory basis necessitated GE Capital to contribute $15 billion of capital to its insurance subsidiaries which

---

[54] "A long-term care benefit should be evaluated and accounted for in accordance with paragraphs 944-20-15-20 through 15- 25, 944-40-25-35 through 25-39, 944-40-30-20 through 30-25, 944-40-35-9 through 35-11, 944-40-35-17 through 35-18, and 944-605-30-1 through 30-2."

[55] "A principal objective of the Reinsurance Contracts Subsections of this Subtopic is to account for an agreement with a reinsurer according to its substance."

the state insurance department had allowed to be paid over the next seven years, including $3.5 billion in the first quarter of 2018.

170.  The LTC Reserve charge wiped out GE's entire earnings for fiscal 2017. Indeed, GE 2017 Form 10-K, stated: "Continuing earnings (loss) per share was $(0.68)…driven by…GE Capital insurance-related charges…including $0.71 related to the completion of GE Capital's insurance premium deficiency review…"

171.  As seen in the table below, this charge also erased substantially all of the profits previously reported by GE Capital's "Verticals" segment over the previous four years. Verticals comprised those GE Capital businesses that GE retained after announcing the divestiture of most GE Capital businesses in April 2015. (GE 2015 Form 10-K, p.61).

| Year | Profit – Verticals ($s in billions) |
|---|---|
| 2015 | $1.7 |
| 2016 | $1.9 |
| 2017 | $(6.2) |
| Total | $0.4 |

**(b)    GAAP Applicable to LTC Reserves**

172.  Insurance contracts provide a future benefit to policyholders in exchange for premiums. (AAG, 7.01) When GE recorded premium revenue, GAAP required it to also record a liability associated with the future policy benefits to be paid to policyholders. GE reported this liability as a component of the liability on GE's balance sheet referred to as "Investment contracts, insurance liabilities and insurance annuity benefits." GE recorded the related expense as "Investment contracts, insurance losses and insurance annuity benefits." (GE 2016 Form 10-K, p.133) The following chart summarizes this expense for each year from 2011 to 2017. As a result of the LTC Reserve Charge recorded in the fourth quarter of 2017, the expense reported

in that year was greater than the four prior years on a combined basis: (GE Form 10-Ks, Statement of Earnings).



173.    Based on the information disclosed by GE beginning in the third quarter of 2017 (through partial corrective disclosures), investors began to understand the magnitude of GE's exposure to LTC. The following table summarizes the two different types of LTC liabilities (LTC Reserves) now reflected in GE's financial statements:

| Type of LTC Reserve (GAAP) | Reserve Description | Balance at 9/30/17 | Balance at 12/31/17 |
|---|---|---|---|
| Benefit (ASC 944-40-30-7) | Claims not yet received from policyholders. Calculated as the present value of future benefits to be paid less the present value of future net premiums payable. | $9.0B | $16.5B |

| Type of LTC Reserve (GAAP) | Reserve Description | Balance at 9/30/17 | Balance at 12/31/17 |
|---|---|---|---|
| Claim (ASC 944-40-30-1) | Present value of the amount needed to provide for the estimated ultimate cost of settling claims relating to insured events that have occurred on or before the end of the respective reporting period.[56] | $3.4B | $3.6B |
| Total | | $12.5B | $20.1B |

174.    These reserves address different stages in the lifecycle of LTC claims. First, a

Benefit Reserve (Active Life Reserve) is established for policies in general. Then, when an

insured event occurs, a Claim liability is incurred and the Benefit reserve is released. (AAG

7.01).

175.    Insurance companies have developed valuation models to measure LTC

Reserves: (AAG 7.01):

> This is because the cash inflows (premiums) and cash outflows (benefits,
> expenses and withdrawals) for any large group of contracts can be modeled
> based on the preceding assumptions. Using these models, the ability to estimate

---

[56] ASC 944-40-30-1, "The liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience." *See also*, AAG-LHI, 7.06. *See also*, Statement of Statutory Accounting Principles No. 55, *Unpaid Claims, Losses and Loss Adjustment Expenses* (SSAP 55), ¶ 12. "For each line of business and for all lines of business in the aggregate, management shall record its best estimate of its liabilities for unpaid claims, unpaid losses, and loss/claim adjustment expenses. Because the ultimate settlement of claims (including IBNR for death claims and accident and health claims) is subject to future events, no single claim or loss and loss/claim adjustment expense reserve can be considered accurate with certainty. Management's analysis of the reasonableness of claim or loss and loss/claim adjustment expense reserve estimates shall include an analysis of the amount of variability in the estimate. If, for a particular line of business, management develops its estimate considering a range of claim or loss and loss/claim adjustment expense reserve estimates bounded by a high and a low estimate, management's best estimate of the liability within that range shall be recorded. The high and low ends of the range shall not correspond to an absolute best-and-worst case scenario of ultimate settlements because such estimates may be the result of unlikely assumptions. Management's range shall be realistic and, therefore, shall not include the set of all possible outcomes but only those outcomes that are considered reasonable."

the timing of those cash flows can be reliably measured, and the present value of those cash flows will be less than the sum of the face amounts.

The valuation models focus on five key estimates identified in GAAP to set LTC Reserves:

| Factor | Description | ASC |
|---|---|---|
| Investment Yield | The return realized on the investment of premiums prior to payment of claims. | 944-40-30-10 |
| Mortality | The expected incidence or rate of policyholder death. | 944-40-30-11 |
| Morbidity | The expected incidence or rate of disability of policyholders. | 944-40-30-13 |
| Terminations | The rate policies are not renewed. | 944-40-30-14 |
| Expenses | The expected cost of termination or settlement of the policy. | 944-40-30-15 |

176.     GAAP requires these assumptions to reflect past experience, including GE's own experience. GAAP specifically calls for the use of experience as adjusted for current trends or other factors that would modify past experience. (ASC 944-40-30-1, AAG 7.06 and 7.43). Thus, although GE's LTC Reserves were based upon assumptions about future events, those assumptions must reflect the effects of past conditions and information. (FAS 5 ¶¶ 67-68). GAAP also requires that these assumptions consider the risk that an entity's actual experience will be less favorable than when the contract was issued (AAG-LHI, 7.42):

> The assumptions used in determining benefit liabilities in GAAP financial statements attempt to provide a representationally faithful measure of the benefit, claim, and other contract liabilities, and profits reflecting the economic substance of the underlying contracts. For traditional long-duration insurance contracts described in FASB ASC 944, GAAP assumptions also provide for the risk of adverse deviation, which is the risk that the actual experience will be less favorable than that expected when the contract was issued."

177.     The fact that GE was a reinsurer of LTC obligations did not change GE's obligation to analyze these risks: (ASC 944-40-25-35):

> If a reinsurer assumes an insurance benefit feature, the reinsurer shall assess the significance of mortality and morbidity risk within the reinsurance contract following the guidance in paragraphs 944-20-15-20 through 15-25 regardless of whether there is an account balance.

64

Indeed, as described below, GE's only disclosures concerning its run-off insurance business identified the need to consider these factors in its reserve-setting. (GE 2015 Form 10-K, p.144).[57]

**(c)     Benefit Reserve Assumptions Are "Locked-In" When Policies Are Issued, but Should Be Unlocked When Assumptions Change**

178.     The assumptions employed to compute the Benefit component of LTC Reserves are "locked-in" during the year the related policies were issued (unless a premium deficiency is later identified). (ASC 944-40-20). In other words, GAAP requires the ongoing application of the original liability assumptions in subsequent periods unless a potential reserve deficiency is identified. (ASC 944-40-35-5). Deficiencies occur when policyholder premiums are inadequate to satisfy contract benefits and expenses, as well as enable recoverability of deferred acquisition cost (DAC). (AAG, 7.46, 9.85-.93). If a deficiency exists, a loss is recorded in the current period. (AAG, 7.60).

179.     GAAP required GE to perform deficiency testing when actual experience differed from the originally expected experience for each primary assumption: (AAG 9.88).

> Overall consideration should be given to circumstances indicating that actual experience for a block of business, regardless of the issue year, is significantly different from the originally expected experience for each primary assumption. In circumstances in which actual experience is significantly worse than the originally assumed experience, loss recognition testing is required, using revised assumptions that reflect actual experience and revised estimates of future experience, when appropriate. Significant assumptions generally include mortality, morbidity, persistency, expense levels, and interest rates.

---

[57] "Our run-off insurance activities include providing insurance and reinsurance for life and health risks and providing certain annuity products. Two primary product types are provided: traditional insurance contracts and investment contracts. Insurance contracts are contracts with significant mortality and/or morbidity risks, while investment contracts are contracts without such risks."  GE 2015 Form 10-K, p. 144.

180.    GAAP reflects this requirement so that profits are not front-loaded and losses are recorded when apparent: (AAG 9.92. *See also*, ASC 944-60-25-7 to 9):

> In a number of instances, the liabilities on a particular line of business may not be deficient in the aggregate, but circumstances may be such that profits will be recognized in early years, and losses will be recognized in later years. In such situations, appropriate adjustments should be made to liabilities to eliminate the recognition of losses in later years. Adjustments should always be made when losses first become apparent.

181.    If a deficiency is identified, GAAP requires the liability for future policy benefits to be determined using assumptions revised to consider then-current experience.  (ASC 944-60-30-1 and 944-60-35-5).  As described below, GE utterly failed to assess its LTC Reserve assumptions in consideration of its own experience as well as observed industry experience. Consequently, GE failed to perform appropriate premium deficiency testing on a timely basis, and improperly delayed increasing its LTC Reserves in violation of ASC 944.

**2.      GE Tells Investors that its Claims Experience Was Different from Other LTC Insurers, Until 2017**

182.    On July 21, 2017 (the first partial corrective disclosure), GE revealed that an increase in LTC Reserves could be forthcoming based on recent "adverse claims experience." Defendant Bornstein, reported:

> In the fourth quarter, we will perform our annual cash flow test of our runoff Insurance business. ***We recently have had adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium [benefit] reserves***. We will update you in the fourth quarter.[58]

183.    GE pointed to "***recent***" LTC claims experience that had been "adverse" to explain the timing of this disclosure. GE's assertion simply is not credible, as GE's LTC

---

[58] GE Earnings Tr. 7/21/17, p.9.

business has been in "run-off mode" since 2006. (GE 1/16/18 Insurance Tr. p.3).[59] To credit

GE's claim would mean that GE either (i) unlike any other company in the industry, anticipated

the dramatic increase in the cost of serving LTC claims at least a dozen years ago and reinsured

only those policies that did not experience such a cost increase, or (ii) GE, unlike any other

company in the industry, did not experience a rise in claims and related severity until 2017.

Neither of these claims is remotely plausible. Nevertheless, to address this purported adverse

experience, GE reported:

> In 2017, based on new claims experience studies, we undertook a deeper dive to
> better understand developing trends in claims.[60]

184.    Thus, while the rest of the LTC industry performed deeper dives into their

actuarial assumptions for LTC policies from 2012 to 2016 to assess these same trends, GE

waited until 2017 to perform such an analysis. On January 16, 2018, GE disclosed the outcome

of its "deeper dive." As discussed herein, GE identified an enormous LTC Reserve deficiency

and acknowledged the need to unlock its Benefit reserve to implement current LTC Reserve

assumptions. (GE 2017 Form 10-K, p.88).

### 3.    Adverse LTC Experience Was Known to Defendants by at Least 2015

185.    Plaintiff's investigation has uncovered that GE's reinsurance units have had

deteriorating LTC claims experience since even before the beginning of the Class Period. The

insurance credit rating entity, A.M. Best, provides a summary of its reviews of the financial

performance and annual statutory filings of ERAC and UFLIC, the two GE reinsurance entities

---

[59] "Turning to long-term care portfolio. This business was primarily underwritten in the late '80s
to early 2000s. Our book has been in run-off since 2006 with no new business written in over a
decade."

[60] GE Insurance Update Presentation, Jan. 16, 2018, p.4.

holding the LTC portfolio. The table below summarizes relevant findings by A.M. Best from 2013 through 2017:

| Date | Finding |
|------|---------|
| 6/20/13 | "Offsetting these positive rating factors are ERAC group's **continued operating losses due to reserve strengthening as a result of the low interest rates and business experience associated with its long-term care** and certain other business lines." |
| 6/18/14 | "**Operating results for the long-term care block have been impacted by the continued low interest rate environment and incurred claims experience, which has led to substantial reserve strengthening and net losses.** Although 2013 net income was positive, historical trends have been unfavorable and required significant capital support from the parent." |
| 6/11/15 | "Operating results for these blocks have been **impacted by the continued low interest rate environment and adverse long-term care experience**, which has led to net losses." |
| 7/1/16 | "Historical earnings trends have been negatively affected by reserve strengthening associated with the long-term care and structured settlement businesses. Operating results for these blocks have been impacted by the **continued low interest rate environment and adverse long-term care experience, which has led to net losses**." |
| 7/6/17 | "**Operating results for these blocks have been impacted by the continued low interest rate environment and adverse long-term care experience, which has led to net losses**." |

186.   A.M. Best's comments in 2017 occurred contemporaneous with GE's first disclosure of purported "recent" adverse experience in its LTC business. A.M. Best's 2017 comments repeat, virtually verbatim, its comments from at least 2013 identifying GE's deteriorating experience with its LTC business. In other words, **GE's experience was not unique** from other LTC carriers. Instead, in the same earlier periods that other LTC companies identified, responded to, and disclosed adverse claims experience to investors, GE simply made minor adjustments to its reserves which did not take into account the deteriorating conditions in the market and vast amount of adverse information in its possession.

187.    These ongoing losses by ERAC and UFLIC necessitated substantial capital contributions by GE from the beginning of the Class Period. For example, in its June 26, 2012 report, A.M. Best observed:

> Any future losses will require ongoing capital support in this low interest rate environment. Over the last five years, the ERAC group has received $2.8 billion in capital contributions.

A.M. Best repeated similar commentary regarding the nature and magnitude of capital support provided by GE in each year from 2008 to 2012. Thus, GE and its executives knew of this multi-billion-dollar obligation to stabilize its LTC business and satisfy credit agencies that ERAC and UFLIC were going concerns. Yet, GE failed to provide any disclosure of these obligations to investors and the uncertainties these obligations imposed on GE's capacity to meet its targets prospectively.

### (a)    GE's New Disclosures Also Reveal That Adverse LTC Experience Was Systemic Before 2017

188.    As described herein, GE's financial statements were devoid of information regarding its LTC exposure until the third quarter of 2017. On February 23, 2018, GE filed its 2017 annual financial statements, which for the first time, provided data on its LTC claims-related activity. This new data is summarized in the following table:

| Year | Claims Incurred | Claims Paid |
|------|-----------------|-------------|
| 2015 | $1.8B | $1.7B |
| 2016 | $2.0B | $1.7B |
| 2017 | $2.0B | $1.7B |

189.    This data belies GE's assertion that adverse LTC experience developed in 2017.[61] In fact, GE's incurrence of claims in 2017 was essentially flat with the two prior years.[62]

---

[61] GE reported that the "vast majority" of the paid claims activity related to LTC  policyholders. (GE 2017 Form 10-K, p.152)

4. **GE Failed to Adequately Increase its LTC Reserves as Trends and Assumptions in the LTC Market Drastically Changed and GE's Peers in the LTC Market Increased Their LTC Reserves**

190.     As noted herein, GAAP requires premium deficiency testing to be performed if emerging evidence indicates that locked-in assumptions may not result in LTC Reserves adequate to satisfy policyholder benefits.

191.     GE's 2018 disclosures associate the purported "recent" adverse LTC experience with certain policyholder features. For example, GE identified claims from older policyholders ("…most pronounced for policyholders with higher attained ages…" and "our emerging experience for older claimant ages and later duration policies"). (GE 2017 Form 10-K, p.87). GE also reported the need to reconstruct "future claim cost assumptions." (GE 2017 Form 10-K, p.87). In other words, GE disclosed that claims costs for older policyholders were greater than its prior LTC Reserve assumptions could accommodate.

192.     This was not news. On the contrary, this phenomenon was widely known to the LTC industry much earlier. For example, on January 16, 2018, when GE disclosed the massive charge to its LTC Reserves, it acknowledged: (1/16/18 GE Tr. p.4).

> In general, long-term care policies have proven challenging for the industry…. **Virtually, the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected**.

193.     Even if GE did not consider its own data to be sufficient to develop appropriate LTC Reserve assumptions (which it should have), it should have looked to available industry data. GAAP addresses this issue: (AAG 7.50):

> For accident and health contracts, assumptions may be based on the life insurance entity's own claims experience, or, if its own experience is unavailable or insufficient, **an appropriate basis for claims cost assumptions is industry experience adjusted for the expected experience for a specific coverage**, and

---

[62] It is not possible to assess whether the activity in earlier years was also similar because GE did not provide comparable disclosure in those periods.

the effect of the entity's underwriting practices. **External trend factors, such as economic conditions and medical developments, should also be considered** as they may create higher rates of morbidity by contract duration than are provided in the statutory or industry experience tables.

### (a)    Genworth

194.    The genesis of GE's exposure to LTC stems, in part from the spin-off of Genworth in 2004. *See* Section VI(A). GE continued to have significant exposure to Genworth related to the book of business that was spun-off in 2004.

195.    Indeed, even in 2004, the book retained by GE likely was known to be problematic. For example, in a January 5, 2018 report, Deutsche Bank's John Inch stated: "[W]e believe that the insurance portfolio retained by GE was subpar to the portfolio that comprised the Genworth and Insurance Solutions deals – otherwise why would those exposures not have been included with the insurance business exits?"[63]

196.    On November 5, 2014 Genworth disclosed the completion of a comprehensive review of its claim reserve-setting assumptions. As a result of that review, Genworth updated its assumptions and increased its Claim reserve (Disabled Life Reserve) by $531 million. (Genworth Form 8-K filed November 5, 2014, p. Exhibit 99.2, p. 3). Specifically, Genworth updated its assumption to reflect that **"[C]laimants are staying on claim longer and utilizing more of their available benefits in the aggregate than had previously been assumed in the company's reserve calculations**." *(Id.)* The charge extinguished over three years of Genworth's net operating income for its LTC business.

197.    Soon thereafter, in February 2015, Genworth announced the results of its premium deficiency testing of its benefits reserve (Active Life Reserve). Genworth reported that the application of updated assumptions reduced GAAP margins by $5.4 billion. Genworth

---

[63] Deutsche Bank, 1/5/18.

recorded a charge to earnings of approximately $730 million to increase its Benefits reserve at

that time. Genworth's 2014 financial statements reported:

> During the fourth quarter of 2014, we completed our annual loss recognition
> testing of our long-term care insurance business and made changes to
> assumptions and methodologies primarily impacting claim termination rates,
> most significantly in later-duration claims, and benefit utilization rates."

198.    As with GE in the fourth quarter of 2017, this charge related to LTC Reserves

backing a block of run-off policies. Moody's responded to Genworth's charge noting:

> [T]he acquired block's higher attained age makes claims likelier, with offsetting
> price increases less effective, thereby making it more susceptible to a reserve
> increase.[64]

199.    In 2016, Genworth was forced to again increase its LTC Reserves for virtually

the identical reason:

> As of September 30, 2016, the liability for policy and contract claims increased
> $905 million in our long-term care insurance business largely from the
> **completion of our annual review of assumptions in the third quarter of 2016**
> **which increased reserves by $460 million** and increased reinsurance
> recoverables by $25 million. The increase was also attributable to aging and
> growth of the in-force block and higher severity on new claims in the current
> year."

200.    These Genworth announcements were bright red flags to GE. Not only was its

book of LTC policies comparable to those retained by GE (and on average the Genworth

policies were *less risky*), but GE reinsured the Genworth's LTC policies for which Genworth

would not assume risk. *See* Section VI(A). Nevertheless, while Genworth was increasing LTC

reserves due to higher claims for older policies, GE refused to admit the obvious and made no

comparable increase to its LTC reserves. Notwithstanding, GAAP's requirement to incorporate

industry experience into reserve-setting assumptions, GE now claims that the same effects

---

[64] Moody's Credit Outlook, "*Genworth's Long-Term Care Review Results in Margin*
*Deterioration*," Feb. 16, 2015, p.17.

Genworth encountered beginning in 2014 did not become apparent to GE until at least three years later.

201.     GE's reinsurance exposure to Genworth was massive. Genworth had ceded (*i.e.*, transferred the insurance risk) a huge block of LTC policies to UFLIC, a GE subsidiary."[65] At the end of each of Genworth's 2014, 2015, and 2016 fiscal years, it reported a reinsurance receivable from UFLIC (*i.e.*, GE) exceeding $14 billion. Thus, GE had an enormous risk concentration associated with its reinsurance obligations to Genworth.[66] But GE's financial statements for 2015 and 2016 failed to include any mention of Genworth, much less identify this enormous obligation to a single counterparty.

### (b)     Other LTC Insurers Were Reporting Adverse Claims Experience

202.     Unum Group, formerly a major provider of LTC insurance, discontinued offering individual LTC coverage in 2009 and group LTC coverage in 2012. (Unum 2013 Form 10-K, p.8).

203.     In February 2012, Unum announced that it had "analyzed our reserve assumptions for long-term care in conjunction with our annual loss recognition testing." (*Id.* at

---

[65] Genworth 2016 Form 10-K pp.257-258.

[66] GE ceded a small part of its Genworth liability to another company but analysts reported that the company possessed such limited assets that, in reality, it was not really reinsuring GE's reinsured liabilities. *See* Evercore Report by Thomas Gallagher, CFA dated September 15, 2017, entitled "*Thoughts on GE's Long Term Care Insurance Review and Implications for the Life Insurance Sector*" which states: "We do note that while GE did retrocede about $2b of LTC reserves, most of the reinsurance was to a small life insurance company, 21st Century Life, which has a modest amount of statutory surplus of ~$100m. Thus, we would not view GE's economic exposure as benefitting meaningfully from this contract."  Moreover, as GE stated in its 2016 Form 10-K:  "When insurance affiliates cede insurance risk to third parties, such as reinsurers, they are not relieved of their primary obligation to policyholders. When losses on ceded risks give rise to claims for recovery, we establish allowances for probable losses on such receivables from reinsurers as required. Reinsurance recoverables are included in the caption 'Other receivables' on our Consolidated Statement of Financial Position, and amounted to $2,038 million and $1,880" million at December 31, 2016 and 2015, respectively."

p.34). After considering the then-current interest rate environment, as well as an industry study of long-term care experience, Unum concluded a modification of its LTC Reserve assumptions was required. Specifically, it concluded that policyholders were remaining on claim longer than anticipated and claim costs were higher than anticipated. As a result, it recorded approximately $769 million of charges, primarily to increase its benefits reserve. At the same time, Unum increased its claim reserve approximately $180 million. In doing so, Unum disclosed:

> **Emerging experience indicates a longer life expectancy for our older age, longer duration disabled claimants, which lengthens the time a claimant receives disability benefits**.

204.    Further, in 2013, Unum received approval from its state regulator for a 90% increase in premium rates for its LTC coverage.

205.    Again in its 2014 Form 10-K, Unum disclosed that its review of LTC Reserve assumptions identified a deficiency. As in 2012, Unum disclosed the need to implement new assumptions that reflected the continuing low interest rate environment, as well as the longer periods of time that policyholders were living and increased morbidity. Consequently, Unum recorded an additional $700 million charge to earnings to increase LTC Reserves. Thus, in both 2012 and 2014, Unum performed analyses considering its own experience as well as industry experience, and increased its reserves based on what are the same circumstances that GE claims to have suddenly and unexpectedly emerged in 2017.

**(c)      HHS Study Examines Why Insurers Were Leaving the LTC Market**

206.    In July 2013, the U.S. Department of Health and Human Services ("HHS") published a study entitled "*Exiting the Market: Understanding the Factors Behind Carriers'*

74

*Decision to Leave the Long-Term Care Insurance Market*." ("HHS Study").[67] This study

examined why so many LTC providers were exiting the market. Amongst its observations were:

> Since the late 1990s, **all of these major determinants of premium and
> product profitability have been going in the wrong direction: interest rates
> are significantly lower than what was priced for, voluntary lapse rates are
> lower than for any other insurance product, morbidity is somewhat worse
> than expected and mortality is actually improving**. (HHS Study, vi)

> While there has been variability in cumulative industry claims performance over
> the last decade, recent data suggests that performance is deteriorating. Over the
> past three years, **new incurred claims are 112% higher than what was
> expected**.

*Id.* at vii.

### (d)   In 2015, Moody's Assessed the Credit Impact of the Adverse Experience Widely Reported in the LTC Industry

207.     On February 16, 2015, in response to the numerous earnings charges experienced

by LTC providers, Moody's summarized the state of the LTC industry as follows:

> LTC is a difficult product to price and has historically given trouble to those life
> insurance companies offering it. Genworth is the largest LTC provider and is one
> of a number of insurers whose LTC product has come under pressure. Earlier this
> month, Unum Group (Baa2 stable), which has no GAAP margins on its LTC
> business, took a $698 million pre-tax reserve charge related to its reserve on its
> legacy LTC block, and the charge would have been higher without the
> assumption of future rate increases. **American Financial Group, Inc. (Baa1
> negative) and CNO Financial Group, Inc. (Ba2 positive) each reported
> deterioration on their LTC margins, and like other insurers, relied on rate
> increases to offset the decline**.[68]

Thus, by February 2015, GE should have been on high alert to review and assess the

assumptions it used to develop its LTC Reserves.

---

[67] Marc A. Cohen, Ramandeep Kaur & Bob Darnell, *Exiting the Market: Understanding the
Factors Behind Carriers' Decision to Leave the Long-Term Care Insurance Market*, U.S. Dep't
of Health and Human Services (July 1, 2013),  https://aspe.hhs.gov/report/exiting-market-
understanding-factors-behind-carriers-decision-leave-long-term-care-insurance-market

[68] Moody's Credit Outlook, *Genworth's Long-Term Care Review Results in Margin
Deterioration*, February 16, 2015, p.18.

(e)     **Recent Studies Confirm Adverse Experience in LTC Market**

208.     Another study entitled, "*The State of Long-Term Care Insurance – The Market,*

*Challenge and Future Innovations*" prepared jointly by the NAIC and the Center for Insurance

Policy & Research, in May 2016, reported that "**Most insurers' LTCI policies issued before**

**the mid-2000s have seen adverse experience when compared to their original pricing**

**assumptions**."

209.     In fact, GE recently reported on January 16, 2018 that the "[**n]umber, amount,**

**and size of claims increasing … reflects industry-wide experience with long-term care**

**product**."[69]

**5.     GE's Failure to Timely Record Increases its LTC Reserves Was**
**Exacerbated by its Failure to Disclose the Enormous Exposure in its**
**LTC Portfolio**

210.     GE also violated GAAP and SEC disclosure requirements from at least 2015 to

the third quarter of 2017 by failing to disclose:

- The concentration of risk within its run-off segment to LTC;

- That its LTC business had been sustaining significant and recurring losses;

- That reported financial results could be materially impacted by changes to its
assumptions regarding its LTC Reserves; and

- The uncertainty facing its LTC business in consideration of losses widely
reported by virtually all other companies in the LTC industry.

**6.     GE Failed to Provide the Most Basic Disclosures Required by GAAP**
**Regarding its LTC Reserves**

211.     Until GE's disclosure on July 21, 2017, that a review of its LTC Reserves would

be undertaken, few investors were even aware of GE's exposure to the LTC industry. For

---

[69] GE Insurance Update Presentation, Jan. 16, 2018, p.4.

example, in a January 29, 2018 report, authored by John G. Inch of Deutsche Bank, entitled

"*SEC Enforcement investigation elevates GE risks*," Inch states:

> In turn, the high magnitude of the $9.5bn charge and $15bn cash bill (substantially beyond expectations **for a business likely few were even aware retained such elevated risks**) shocked the market and helped to drive GE's share price lower while widening its credit spreads.

> In addition, recall that **GE didn't begin to flag long-term care insurance issues until mid-2017, well after its former insurance subsidiary Genworth first identified problems with its long-term care portfolio in late 2014. (Emphasis added).**

212.     GE's failure to provide useful disclosure concerning its LTC Reserves violated

GAAP in numerous ways.  First, GAAP required GE to disclose the basis for estimating its

Benefits and Claims reserves.  (ASC 944-40-50-1 and 944-40-50-6 "Insurance entities shall

disclose in their financial statements the methods and assumptions used in estimating the

liability for future policy benefits.").  Ignoring this requirement, GE's total disclosure regarding

its LTC business in its 2015 and 2016 Annual Reports, however, was limited to just two obscure

mentions. First, GE disclosed that it excluded LTC contractual obligations from a cash flow

table included in its MD&A.  Rather than allow a user to understand GE's financial statements,

the exclusion of these obligations suggested any exposure was minimal.

213.     Second, GE's Accounting Principles and Polices in its 2015 and 2016 Form

10-Ks, reported only, "For traditional long-duration insurance contracts, including long-term

care, term, whole life and annuities payable for the life of the annuitant, we report premiums as

earned income when due."

214.     Further, the LTC Reserves GE did record were obscured as components (of

unknown size) of GE's "Life insurance benefits" and "Other" liabilities. (*See e.g.*, GE Form

2016, p.167). The following chart illustrates GE's only quantitative disclosure of these

liabilities from 2011 through 2016:



215.    GE's inclusion of LTC Reserves within its general insurance liabilities without any additional disclosure resulted in investors having no awareness of the elevation of risk associated with these obligations over the prior six years. That is, investors concerned with assessing GE's LTC risk would likely have concluded that GE's exposure was inconsequential because reported liabilities remained stable. As noted above, to investors' surprise, GE first disclosed the magnitude of its LTC Reserves in its third quarter 2017 financial statements when it acknowledged more than $12 billion of then-existing LTC Reserves. The very fact that GE had to announce this demonstrates that prior charts omitted material information about a type of insurance product known to be risky and which was losing massive amounts of money throughout the industry.

216.     In addition, since 2003, the SEC has required separate disclosure concerning

significant accounting estimates. (SEC Release 33-8350). The disclosure is known as the

Critical Accounting Estimates section of periodic financial reports filed with the SEC. Even as

of December 31, 2016, however, GE omitted such disclosure related to its accounting for LTC

Reserves. It was not until the third quarter of 2017 that GE introduced such disclosure. In fact,

at that time, in an acknowledgement of the significance of the disclosure, GE presented its LTC

Reserve-related accounting methods and assumptions first amongst all of its Critical

Accounting Estimates. GE's inexplicable failure to provide this disclosure in earlier periods

violated SEC regulations and imposed a significant barrier to investors seeking to understand

GE's financial statements and related business risks.

### 7.     GE Failed to Disclose the Risks and Uncertainties Associated With its LTC Exposure in its MD&A

217.     In addition to GE's obligation to disclose information about its assumptions and

methods used to set LTC Reserves, GE also had a separate obligation to disclose information

concerning risks and uncertainties relevant to its accounting. Specifically, pursuant to ASC 275-

10-50-1, GE was required to provide information about the following topics in its financial

statements:

      (a)     The nature of its operations;

      (b)     The use of estimates in the preparation of financial statements;

      (c)     Certain significant estimates; and

      (d)     Current vulnerability due to certain concentrations.

Requirements "c" and "d" had particular relevance to GE's LTC Reserves. Pursuant to ASC

275-10-50-6 to 9, GE was required to disclose the nature of the uncertainties surrounding the

significant estimates used to formulate LTC Reserves. GE was also required to disclose that it

was at least reasonably possible that a change in estimate could occur in the near term that may materially change LTC Reserves.

218.    These disclosure requirements supplement those in ASC 450, which likewise required GE to disclose the possible impact of adverse LTC claims experience. GE was required to make such disclosure because there was at least a reasonable possibility of loss beyond its then-existing LTC Reserves. (ASC 450-20-50-3). Thus, GE was required to disclose the nature of the concern and provide an estimate of the range of possible loss, or state that such an estimate was not possible. (ASC 450-20-50-3). In addition, GE's reinsurance obligations, particularly those to Genworth, constituted a vulnerability to concentration. (ASC 275-10-50-16 to 18). GE's financial statements, though, completely omitted this disclosure.

219.    Due to the risk and uncertainty associated with LTC Reserves as evidenced in the industry as well as at GE, SEC Regulations also obligated GE to provide MD&A disclosures. In FR 36, the SEC explained this point as follows:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operation is not reasonably likely to occur.

Disclosure of the adverse LTC experience was therefore required unless GE concluded that a material effect on liquidity, capital resources, or results of operations was not reasonably likely to occur.  In view of the amount of LTC coverage that it provided, and the enormous size of its reserve deficiencies, GE could not have reasonably made such a conclusion.

220.    Despite these requirements throughout the Class Period, GE's first disclosure of the risk associated with its LTC Reserves was in its second quarter 2017 10-Q:

> For us, particular uncertainties that could cause our actual results to be materially different than those expressed in our forward-looking statements include … GE Capital's ability to pay dividends to GE at the planned level, which may be affected by GE Capital's cash flows and earnings, claims and investigations relating to WMC, ***charges that may be required in connection with GE Capital's run-off insurance operations***, and other factors. (emphasis added).[70]

In the third quarter 10-Q, GE acknowledged further uncertainty regarding its LTC Reserve-setting assumptions:

> Significant uncertainties exist in making these best estimate projections for these long-duration insurance contracts that includes consideration of a wide range of possible outcomes…

221.    Thus, GE failed to disclose the uncertainty created by its failure to adequately review LTC Reserve assumptions until 2017.  GE also failed to disclose the known trend that its actual claims experience from at least 2015 onwards demonstrated that its assumptions used to calculate LTC Reserves were inadequate. This is a classic example of a situation in which information known to management about the financial statements should have been disclosed to investors to allow them to see the Company through the eyes of management and assess the likelihood that GE's past performance would be indicative of future performance.

**8.    GE Also Improperly Excluded LTC Commitments From its Disclosure of Contractual Obligations**

222.    SEC Release 33-8182 III.D requires registrants to disclose Contractual Obligations to "provide useful context for investors to assess a registrant's short- and long-term liquidity and capital resources needs and demands." As shown in 2015 and 2016, though, GE impaired the ability of investors to understand its cash flow commitments when it excluded

---

[70] WMC is GE Capital's discontinued subprime mortgage business.

LTC from the "Insurance liabilities" commitment otherwise reported in this disclosure. GE's omission of LTC commitments resulted in a materially more optimistic cash flow picture.

223.    GE's omission of this data ran contrary to the SEC's requirement that the table include "other long-term liabilities reflected on the registrant's balance sheet under GAAP." SEC Release 33-8182 at II.B.4, its final Rule implementing this disclosure requirement, states that the exclusion of commitments would be inconsistent with the objective of the disclosure, which is to enhance disclosure concerning a registrant's contractual payment obligations. Thus, not only did GE fail to report adequate LTC Reserves on its balance sheet, it failed to include the billions of dollars of LTC Reserves it had from its Contractual Obligations disclosure. GE's omission of LTC commitments in its financial statements was at odds with other industry participants. For example, Genworth included LTC commitments in each annual report from at least 2014 onwards.[71]

224.    It was not until February 23, 2018 that GE supplied this disclosure to investors its 2017 Form 10-K.

### 9.    GE Violated Additional GAAP Provisions and SEC Regulations by Failing to Appropriately Account for and Disclose its LTC Reserves

225.    GE's accounting and disclosure regarding its LTC Reserves violated GAAP in a manner that severely departed from the exercise of ordinary diligence in practices of accounting. From at least the first quarter of 2015 through the second quarter of 2017, GE violated at least the following aspects of ASC 944 and the AAG for *Life and Health Insurance Entities*:

---

[71] *E.g.*, Genworth 2014 Form 10-K, p.130 and Genworth 2015 Form 10-K, p.107.

| GAAP Requirement | GE Failure |
| --- | --- |
| ASC 944-40-30-7 requires the Benefit reserve to reflect the future benefits to be paid to policyholders. | GE applied antiquated estimates of the claim costs that would be paid to policyholders, which materially understated the Benefit reserve and artificially delayed the recognition of the LTC Reserve Charge until the fourth quarter of 2017. |
| ASC 944-40-30-1 requires the Claim reserve reflect the cost of settling claims. | GE failed to apply adequate estimates of claim costs to be paid to policyholders, which materially understated the claims until the fourth quarter of 2017. |
| ASC 944-40-30-10 to 16 appropriate estimates should be developed for the five key estimates required to set LTC Reserves. | GE failed to adequately consider its own experience, as well as industry experience, indicating its assumptions were inadequate. |
| ASC 944-40-35-5 and AAG 9.88 required GE to perform testing to ensure that "locked-in" assumptions continued to result in adequate Benefits reserves. In addition, GE was required to increase the Benefits reserve reflecting current assumptions if the Benefits reserve was inadequate. | GE failed to apply assumptions reflective of known conditions in the LTC industry to assess the adequacy of its Benefits reserve. If it had done so, GE would have been forced to increase its Benefits reserve substantially earlier than the fourth quarter of 2017. |
| ASC 944-60-25-7 to 9 and AAG 9.92 required GE to avoid recording profits in early policy years and losses in later years when experience indicates that reserves may be inadequate. Instead, GAAP requires losses to be recorded when such losses first became apparent. | In consideration of the known adverse claims experience, GE should have performed comprehensive reviews of its LTC Reserve-setting assumptions significantly prior to the fourth quarter of 2017. Appropriate reviews would certainly have resulted in charges to earnings experienced prior to 2017. |
| ASC 944-60-30-1 and 944-60-35-5 required GE to implement then-current assumptions to measure the Benefits reserve following the identification of a deficiency. | GE inappropriately continued to apply "locked-in" assumptions, which allowed it to avoid reporting material charges to earnings until 2017. |

226.    These failures caused GE to materially misstate the liabilities referred to as "Investment contracts, insurance liabilities and insurance annuity benefits," and the expenses referred to as "Investment contracts, insurance losses and insurance annuity benefits."  The

chart below demonstrates these false and misleading financial accounts as reported by GE throughout the Class Period.

| (In millions) | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 |
|---|---|---|---|---|---|---|
| Expense: Investment contracts, insurance losses and insurance annuity benefits | $ 616 | $ 660 | $ 676 | $ 653 | $ 642 | $ 776 |
| Liability: Investment contracts, insurance liabilities and insurance annuity benefits | $ 27,622 | $ 26,835 | $ 26,135 | $ 25,692 | $ 26,318 | $ 27,056 |

| (In millions) | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 |
|---|---|---|---|---|---|---|
| Expense: Investment contracts, insurance losses and insurance annuity benefits | $ 684 | $ 695 | $ 634 | $ 657 | $ 617 | $ 10,260 |
| Liability: Investment contracts, insurance liabilities and insurance annuity benefits | $ 27,126 | $ 26,086 | $ 26,301 | $ 26,471 | $ 26,597 | $ 38,136 |

227.    GE also violated GAAP and SEC Regulations by omitting any meaningful disclosure concerning its LTC business, including:

| GAAP and SEC Requirements | GE Failure |
|---|---|
| ASC 944-40-50-1 and 944-40-50-6 required GE to disclose the basis for estimating its LTC Reserves. | GE omitted this information until the third quarter of 2017. |
| SEC Release 33-8350 required GE to disclose accounting estimates that may be material due to subjectivity. | GE failed to identify its accounting for LTC Reserves as a Critical Accounting Estimate until the third quarter of 2017. |
| ASC 275-10-50-1 required GE to disclose the uncertainty involved in its LTC Reserves. | GE failed to provide any meaningful disclosure regarding the uncertainty associated with its LTC Reserves until the second quarter of 2017. |
| ASC 450-20-50-3 and SEC Regulation S-K Item 303 required GE to disclose that it was reasonably possible LTC Reserves may have required an increase. | GE omitted any disclosure of this risk. |
| SEC Release 33-8182 required GE to include its LTC-related cashflow in its Contractual Obligations disclosure. | GE excluded LTC obligations from this disclosure until the fourth quarter of 2017 despite the fact that the nature of these cash flows remained the same. |

Unsurprisingly, the violations of GAAP and SEC Regulations highlighted above and addressed throughout are now the subject of an ongoing SEC investigation of GE's accounting, including its LTC Reserves, first announced on January 24, 2018.

<strong>(a)    GE's Accounting Errors Should Result in a Restatement</strong>

228.    GE accounted for the LTC Reserve Charge as a change in estimate, but it did not restate its previously reported financial statements as a result of the LTC Reserve Charge. To account for such a charge as a change in estimate, however, GAAP requires the charge to be the result of *new information*. ASC 250-10-20 provides: "Changes in accounting estimates result from new information." The information culminating in the LTC Reserve Charge was known from the beginning of the Class Period, and GE's failure to incorporate this information at that time was an error.

229.    ASC Master Glossary provides that: "An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared." Specifically, GE had data available from the beginning of the Class Period that was simply ignored. In these circumstances, GAAP requires GE to restate its previously issued financial statements.

230.    GE's only possible excuse for not restating its previously issued financial statements was that the LTC Reserve Charge was immaterial. Yet, there can be no doubt that the charge GE recorded was material. ASC 250-10-S99 sets forth the SEC's guidance related to accounting materiality, identifying factors that weigh in favor of a conclusion that an item is material, such as whether a misstatement:

- Masked a change in earnings or trends;

- Hides a failure to meet analyst consensus earnings expectations;

85

- Changes reported income into a loss.

231.    GE hid a failure to meet analyst consensus earnings expectations throughout the Class Period.  Specifically, each quarter prior to Q3 2017, GE met earnings expectations only by narrow margins.  The table below shows that had GE properly accounted for its LTC Reserves, the Company would have missed consensus expectations in any of the quarters between Q1 2015 and Q2 2017, inclusive:

| QUARTER | PERIOD ENDING | DATE ANNOUNCED | REPORTED EPS  (a) | CONSENSUS (b) | SURPRISE |
|---------|---------------|----------------|-------------------|---------------|----------|
| Q1 15 | 03/31/15 | 04/17/15 | $0.31 | $0.30 | 3.3% |
| Q2 15 | 06/30/15 | 07/17/15 | $0.28 | $0.28 | 0.0% |
| Q3 15 | 09/30/15 | 10/16/15 | $0.29 | $0.26 | 10.7% |
| Q4 15 | 12/31/15 | 01/22/16 | $0.52 | $0.49 | 5.3% |
| Q1 16 | 03/31/16 | 04/22/16 | $0.21 | $0.19 | 9.4% |
| Q2 16 | 06/30/16 | 07/22/16 | $0.51 | $0.46 | 11.8% |
| Q3 16 | 09/30/16 | 10/21/16 | $0.32 | $0.30 | 6.7% |
| Q4 16 | 12/31/16 | 01/20/17 | $0.46 | $0.46 | 0.0% |
| Q1 17 | 03/31/17 | 04/21/17 | $0.21 | $0.17 | 24.3% |
| Q2 17 | 06/30/17 | 07/21/17 | $0.28 | $0.25 | 11.6% |
| Q3 17 | 09/30/17 | 10/20/17 | $0.29 | $0.50 | -41.4% |
| Q4 17 | 12/31/17 | 01/24/18 | $0.27 | $0.28 | -4.9% |

**(a) Industrial operating + Verticals EPS (non-GAAP) as reported by GE**
**(b) Mean analyst estimates per Bloomberg**

232.    GE's LTC Reserve Charge wiped out GE's entire earnings reported from all other segments. Moreover, the LTC Reserve Charge foreclosed the prospects of GE Capital's dividend payments to GE for years, which has been a vital source of funding for GE's dividend payments to shareholders. Consequently, there can be no dispute that GE's LTC Reserve Charge was material. Thus, GE should have, but failed to, restate its previously issued financial statements to apportion the LTC Reserve Charge to the periods necessary to correct GE's misrepresentation that the LTC Reserve Charge arose exclusively in the fourth quarter of 2017.

**D.    GE's Statutory LTC Reserves Were More Severely Understated than Even its GAAP LTC Reserves**

**1.    ERAC and UFLIC's Statutory Financial Statements**

233.    As regulated insurance businesses, ERAC and UFLIC are subject to a statutory accounting framework for establishing reserves that requires the modification of certain assumptions to reflect moderately adverse conditions and other differences from the reserve calculation under GAAP. As a result of this, ERAC and UFLIC were required each year to prepare and file with their insurance regulators sworn Annual Statements that accurately reported their financial condition. As mentioned, this obligation is independent of any obligations to file reports with the SEC.

234.    Financial condition is evaluated using several key metrics including an evaluation of the insurer's capital and surpluses as well as its loss recognition testing margins. Loss recognition testing compares the Gross Premium Valuation ("GPV") to the Net GAAP Liabilities. Generally, reserves for an insurer's obligations to policyholders are, by far, the insurer's largest liability.  Insurance generally requires three basic types of reserves: unearned premium reserve, Active Life Reserves ("ALR"), and Disabled Life Reserves ("DLR"). Active Life and Disabled Life Reserves form the principal reserves held by insurance companies in connection with LTC policies.

235.    Active Life Reserves (also called future policy benefit reserves) represent the present value of such benefits less the present value of future net premiums and are based on actuarial assumptions established at the time the policies were issued or acquired. These assumptions include, but are not limited to: (i) interest rates or discount rates; (ii) health care experience (including type and cost of care), (iii) morbidity; (iv) mortality, and (v) the length of

time a policy will remain in force. The adequacy of ALR should be evaluated periodically using current assumptions through Cash Flow Testing and Loss Recognition testing.

236.    The purpose of the ALR is essentially to match the expected premium revenue with how the benefit costs are expected to emerge over the life of the policy. For LTC insurance, the benefit costs are expected to increase significantly by the attained age (because utilization increases with age), by duration (as underwriting selection wears off), and due to plan design features such as automatic compound inflation adjustment to benefits.

237.    Disabled Life Reserves (also called claim reserves) are established when a claim is incurred or is estimated to have been incurred and represents an estimate of the ultimate obligations for future claim payments and claim adjustment expenses. Key inputs include actual known facts about the claims, such as the benefits available and cause of disability of the claim, as well as assumptions derived from historical experience and expected future changes in experience factors.  Disabled Life Reserves should be evaluated periodically for potential changes in loss estimates and any changes should be recorded in the period in which they are determined.

238.    The amount of these required reserves is determined by actuarial accounting methods that account for, among other things, expected benefit costs over the life of the policy. Thus, the assumptions used in establishing the expected duration of claims (*i.e.*, the time period from when the claim is first made until the claim terminates) and the expected benefit utilization rate (*i.e.*, how much of the available policy benefits are expected to be used) have a direct and material effect on the amount of required reserves. If the claims' duration assumption is significantly lower than the actual experience, the insurance company's reserves will be

inadequate. Likewise, if the benefit utilization rate assumption understates the actual utilization, reserves will be deficient.

239.    SAP accounting requires insurers to make a good faith estimate of their reserves based on certain enumerated factors.  According to the Insurance Information Institute, "actuarial estimates of the amounts that will be paid on outstanding claims must be made so that profit on the business can be calculated. Insurers estimate claims costs . . . based on their experience. Reserves are adjusted, with a corresponding impact on earnings, in subsequent years as each case develops and more details become known."

240.    A review of annual statutory filings including Statements of Actuarial Opinion ("SAO"), by GE's ERAC and UFLIC reinsurance subsidiaries and by the original writers of the LTC policies that GE reinsured, demonstrates significant one-year run-off deficiencies for 2014 through 2016 and demonstrates that LTC Disabled Life Reserve (or claim reserve) assumptions did not reflect actual experience on the reinsured policies. Moreover, the trend in LTC adverse experience was deteriorating significantly between 2014 and 2016.

241.    According to NAIC instructions, LTC Experience Reporting Forms need to be filled out only by the direct writers of the policies (the cedants in the LTC reinsurance arrangements with ERAC and UFLIC).  Thus, ERAC and UFLIC were not required to submit these forms to regulators.

242.    According to ERAC and UFLIC's Annual Statements, the direct writers of GE's LTC policies included the following companies:

- Allianz Life Insurance Company of North America;

- Lincoln Benefit Life Company;

- Massachusetts Mutual Life Insurance Company;

- American United Life Insurance Company;

- State Life Insurance Company;

- John Alden Life Insurance Company;

- Berkshire Life Insurance Company of America;

- Jackson National Life Insurance Company;

- Westport Insurance Corporation ("Westport");

- SCOR Global Life American Reinsurance Company ("SCOR");

- Transamerica Life Insurance Company;

- Metropolitan Life Insurance Company ("MetLife")

243.    Plaintiff's LTC actuarial experts analyzed data from the NAIC LTC Experience Reporting Forms, which are part of the annual statutory filings for companies with LTC inforce, including the LTC Experience Reporting Forms for ten of the above listed twelve ceding companies.[72]

244.    LTC Experience Forms 1, 2 and 3 provided by the original writers of the LTC business reinsured by GE indicate significant deficiencies in GE's LTC Active Life Reserves, Disabled Life Reserves, and Premium Deficiency Test assumptions consistently over a time period extending back to at least 2013. This information provides very strong evidence that GE's actuaries needed to perform a complete study of projection and reserve assumptions from at least the beginning of the Class Period.

---

[72] SCOR and Westport did not have publicly available LTC Experience Reporting Forms filed with the NAIC.

2. **An Analysis of Ceding Companies' LTC Experience Forms Reveals Significant Deficiencies in GE's LTC Active Life Reserves and Disabled Life Reserves and Worsening Trends**

(a) **Actual Incurred Claims**

245.    "LTC Experience Reporting Form 1," part of the Annual Statement, compares actual incurred claims as well as actual lives in force against what was expected based on Active Life Reserves assumptions.

246.    Actual incurred claims in the chart below represent the present value of claims paid and remaining claims reserve by year of claim incurral. For example, the actual incurred claims for Incurral Year 2014 represents the claims paid in 2014, 2015, and 2016, plus the claims reserve as of the end of 2016 discounted back to 2014 for claims incurred in 2014. The discount rate is the statutory valuation interest rate for claim reserves. The expected incurred claims by incurral year represent the aggregation of the expected claim cost for individuals covered under a policy inforce at the beginning the incurral year based on statutory active life reserve morbidity assumptions.

247.    The direct writers of the policies that GE's insurance subsidiaries were reinsuring have been consistently showing exceedingly unfavorable Actual to Expected ratios, underline(well in excess of 100%,) since at least 2013.[73] Here, actual to expected claims ratios increased from 122.7 (in 2013) to 137.51 (in 2016); 2015 had a ratio of 116 – which is still an "***alarming***" ratio.

---

[73] Analysts have noted that while actual to expected claims ratios for LTC insurers of above 100 per cent indicate that claims are worse than planned, ratios of 116 "paint an alarming picture." Ratner, *supra note* 51.

**Summary of A:E Incurred Claims of Direct Writers Reinsured by GE's Insurance Subsidiaries**

| Incurred Year | Actual Incurred Claims | Expected Incurred Claims | A:E Incurred Claims |
|---|---|---|---|
| 2013 | $1,163,070,256 | $947,562,692 | 122.74% |
| 2014 | $1,315,692,123 | $1,001,765,149 | 131.34% |
| 2015 | $1,371,258,779 | $1,176,457,386 | 116.56% |
| 2016 | $1,550,652,840 | $1,127,639,021 | 137.51% |

248.    The aggregated LTC Experience Form 1 information shown in the chart above details the **highly unfavorable performance** of the ALR assumptions used by the direct writers of the LTC business reinsured by ERAC and UFLIC. **These assumptions result in profoundly inadequate ALR**. This was (or should have been) a glaring red flag to GE that its LTC reserves were materially understated.

249.    Moreover, since the reinsurance arrangements between the direct writers and ERAC and UFLIC were almost entirely coinsurance reinsurance arrangements, the percentage deficiencies reflected in the direct writers' LTC Experience in the chart above (and also the chart below at ¶ 252), would have been highly indicative of the actual percentage deficiencies for the LTC business GE subsidiaries reinsured.

250.    Nevertheless, GE intentionally or recklessly disregarded the adverse claims experience of the direct writers of the LTC policies it was reinsuring, even though the adverse claims information summarized in the chart would have been shared between the direct writers and GE's insurance subsidiaries (ERAC/UFLIC) as a requirement of their reinsurance arrangements.

251.    Since GE did not revise its ALR assumptions until late 2017, it is clear that GE recklessly or intentionally ignored this obviously poor claims experience when determining the adequacy of its own LTC ALR since at least the beginning of the Class Period.

>**(b)**   **GE's Active Life Reserves Were Materially Understated due to Stale Morbidity and Persistency Assumptions**

252.    The chart below summarizes the most recently available Experience to Reported Policy Reserve Ratios by reporting year for the direct writers of the LTC policies that were reinsured by GE's insurance subsidiaries. ***Experience to Reported Ratios below 100% indicate that the experience is worse than expected in the Active Life Reserves assumptions.*** Over time, it is natural and expected that deficient ALR assumptions, which are locked-in at the time of issue or since they were unlocked due to a previously recognized premium deficiency, will produce lower Experience to Reported Policy Reserve Ratios as more actual experience is reported.

**Summary of LTC Experience Form 2 Results of Direct Writers Reinsured by GE's Insurance Subsidiaries**

| Year | Experience Policy Reserves | Reported Policy Reserves | Experience to Reported Ratio |
|------|---------------------------|--------------------------|------------------------------|
| 2013 | $10,024,333,414 | $12,536,550,252 | 79.96% |
| 2014 | $10,174,347,027 | $13,261,663,268 | 76.72% |
| 2015 | $10,365,887,872 | $14,412,297,693 | 71.92% |
| 2016 | $10,487,649,962 | $15,386,060,046 | 68.16% |

253.    As evident from the decreasing ratios by year in the chart above, GE was or should have been aware that the unfavorable Experience to Reported Policy Reserve Ratios in 2013 and 2014 were decidedly urgent warning signals that even worse ratios were extremely likely in the following years, and that their LTC ALR assumptions were materially inadequate.

254.    Claims experience changes occur over a period of time, not all of a sudden, as purportedly claimed by Defendant Flannery on January 16, 2018.[74] Thus, GE was reckless, at the least, to have not acted upon the poor experience shown in the aggregated LTC Experience

---

[74] GE Insurance Update Call Transcript 1/16/2018, pp. 8-9.

Form 2 forms of the direct writers of the LTC business it was reinsuring, by doing a thorough review of its LTC assumptions many by 2014 at the latest.

**(c)     GE Failed to Properly Update the Projection Assumptions Used in its Annual Asset Adequacy Testing**

255.    Actuaries must have a reasonable basis to draw conclusions about the adequacy of their reserve estimates or financial projections. This would include a review of all actuarial assumptions used to develop the reserve estimates and/or the financial projections. Without a thorough comparison of the actuarial assumptions with emerging results from actual experience, it is impossible for the actuary to assess the adequacy or reasonableness of his calculations.

256.    On January 16, 2018, Ryan Zanin, Chief Risk Officer at GE Capital, disclosed the following with respect to the comprehensive LTC Reserve testing the Company initiated in 2017:

> The actuarial analysis included a fundamental shift in estimating future claims costs, **from one that involved making incremental adjustments to existing projections in response to observed levels of claims experienced**, to one that rebuilds the projections utilizing the additional credible data for older attained ages that has become available.[75]

257.    By only making incremental adjustments to existing projections, GE failed to compare actuarial assumptions with emerging results for multiple years prior to late 2017. When GE finally did this comparison in late 2017, it was ***forced to increase its Disabled Life Reserves (or claim reserves) by approximately $500 million, or over 16%, and its Active Life Reserves (future benefit reserves) by approximately $8.9 billion, or over 117%.***

258.    Given GE's numerous failures to properly account for its recent experience in developing LTC reserves, its violations of pertinent actuarial standards, its failures to implement proper actuarial practices and its numerous hindsight tests showing significant deficiencies in its

---

[75] GE Insurance Update Call Transcript 1/16/2018, p. 4.

LTC reserves, GE did not have a reasonable basis to state that its LTC reserves were adequate in its ERAC and UFLIC annual statutory financial statements on GE's SEC filings.

259.    Moreover, GE intentionally or recklessly failed to comply with the requirements of ASOP No. 41 by failing to communicate deficient reserves and insufficient reserve assumptions to regulatory authorities.[76]

E.    **GE Violated GAAP and Employed Unsustainable Business Practices to Record Revenue and Earnings on its LTSAs and to Conceal the Truth About its Contract Asset Balance**

260.    Throughout the Class Period, GE relied on a range of unsustainable techniques to improperly record revenue and earnings on its long-term contracts, including LTSAs, often with no legitimate expectation that the Company would ever receive cash payment on those contracts. To conceal that GE Power (the segment with the largest balance of LTSAs) was not generating revenue organically, GE actively renegotiated existing LTSAs with customers for no economic purpose other than to accelerate the recording of revenue to meet internal growth and earnings targets. This practice typically required GE to make concessions to customers on a contract's payment terms, such as offering discounts and pushing out the payment dates, dramatically decreasing the likelihood that GE would ever actually receive the cash payment associated with the earnings GE recorded.

261.    What's more, GE's accounting for its LTSAs also violated GAAP, and enabled GE to record revenue based on estimates that did not reflect reality. Indeed, GE's estimates of revenue and costs were not reasonably dependable because GE relied on historical data to make these estimates, rather than taking into account known current information or reasonable

---

[76] ASB ASOP No. 41, paragraph 3.4.4.b.2. "If the assumption or method significantly conflicts with what, in the actuary's professional judgment, would be reasonable for the purpose of the assignment, the actuary must disclose that fact and the additional information specified in section 4.3."

projections about the realities of the power market when making those estimates. These GAAP violations were particularly egregious considering that GE was simultaneously relying on accounting adjustments to accelerate profit on its LTSAs on the basis of purported costs savings—savings that were directly tied to the Company's deficient cost and revenue estimates.

262.    Because GE was recording revenue and earnings but not collecting cash, the gap between GE's earnings and cash flow grew—a gap that GE recorded on its balance sheet as a Contract Asset (*i.e.*, the difference between revenue recorded and payment received). To help mask this growing discrepancy and the rapid rise of GE's Contract Asset balance—which is typically a "red flag" for investors and was described by analysts as a "black box"—GE employed yet another unsustainable business technique that involved persuading customers to agree to accept invoices on contracts earlier than necessary for no reason other than so that GE could "factor" those invoices to generate much-needed cash flow, which cash flow was merely the result of GE Capital taking on the attendant risk rather than GE's Industrial business. Had GE not employed this unsustainable practice, the gap between earnings and cash would have been even greater and would have required GE to disclose the truth about its revenue recognition techniques earlier than it did.

263.    The techniques used to accelerate the recording of revenue depended on GE's ability to renegotiate existing LTSAs with customers. However, GE Power only had a finite number of LTSAs and there were only a finite number of ways to manipulate a particular contract to accelerate earnings on it. By the end of 2017, GE had largely run out of ways to manipulate its LTSAs to conceal that GE Power Services was not generating revenue organically, and Defendants ultimately were forced to disclose the truth about GE Power's weak earnings and the segment's negative impact on GE's industrial CFOA.

1.      **Background on GE's LTSAs and Contract Assets**

264.    LTSAs represent agreements that require GE to maintain and service its customers' assets over the contract term (generally 5 to 25 years).[77]  GE recognizes revenue for LTSAs as it performs work under the agreements based on the costs it incurred to date at the estimated margin rate for the contract.[78]  However, GE billed its customers, and customers generally paid GE, under LTSAs based on the utilization of the asset or major events within the contracts.[79]  Consequently, GE frequently recognized revenue and earnings before it actually billed, or received cash from, its customers.

265.    When GE recognized revenue on LTSAs before it was entitled to bill the customer, GE recorded **Contract Assets** on its balance sheet. For example, GE reported, "The difference between the timing of our revenue recognition and cash received from our customers results in either a contract asset (revenue in excess of billings) or a contract liability (billing in excess of revenue)."[80]

266.    GE's 2014 Form 10-K reported the following with respect to contract costs and estimated earnings for LTSAs:

> Contract costs and estimated earnings reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as power generation, aircraft engines and aeroderivative units) and long-term product maintenance or extended warranty arrangements.[81]

---

[77] GE 2017 Form 10-K, p.82.

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] GE's 2014 Form 10-K, p. 168.

267.     The 2014 Form 10-K also stated as follows with respect to revenue recognition

on LTSAs:

> Revenue recognition on long-term product services agreements requires
> estimates of profits over the multiple-year terms of such agreements, considering
> factors such as the frequency and extent of future monitoring, maintenance and
> overhaul events; the amount of personnel, spare parts and other resources
> required to perform the services; and future billing rate, cost changes and
> customers' utilization of assets. We routinely review estimates under product
> services agreements and regularly revise them to adjust for changes in outlook.
> We also regularly assess customer credit risk inherent in the carrying amounts of
> receivables and contract costs and estimated earnings, including the risk that
> contractual penalties may not be sufficient to offset our accumulated investment
> in the event of customer termination. We gain insight into future utilization and
> cost trends, as well as credit risk, through our knowledge of the installed base of
> equipment and the close interaction with our customers that comes with
> supplying critical services and parts over extended periods.[82]

268.     LTSAs represent approximately half of the total Contract Asset balance. Indeed,

in the 2016 Form 10-K—which was the first time the Company broke out the balance of

different types of Contract Assets in its financial statements—GE reported total Contract Assets

of $25.2 billion and $21.2 billion for 2016 and 2015, respectively, of which LTSAs represented

$12.75 billion in 2016 and $10.3 billion in 2015. As of December 31, 2017, LTSAs represented

$15.2 billion of GE's total contract asset balance of $28.9 billion.

269.     The majority of GE's Contract Assets reside within the Power segment (with

Aviation as the next largest holder of Contract Assets):

| Asset Breakdown | Power Dec. 31, 2017 | Total Dec. 31, 2017 |
|---|---|---|
| Revenue in Excess of Billings | | |
|     Long-term product service agreements (b)(f) | $7.439 billion | $15.157 billion |
|     Long-term equipment contract revenue (c) | $3.777 billion | $6.954 billion |
| Total revenue in excess of billings | $11.215 billion | $22.111 billion |
| | | |
| Deferred inventory costs (d) | $1.565 billion | $3.839 billion |
| Non-recurring engineering costs (e) | $7 billion | $1.814 billion |

---

[82] *Id.* pp.85-86.

| Other | – | $1.097 billion |
|---|---|---|
| **Total Contract Assets** | **$12.786 billion** | **$28.861 billion** |

| Asset Breakdown | Power<br>Dec. 31, 2016 | Total<br>Dec. 31, 2016 |
|---|---|---|
| Revenue in Excess of Billings | | |
|     Long-term product service agreements (b) | $6.595 billion | $12.752 billion |
|     Long-term equipment contract revenue (c) | $3.062 billion | $5.859 billion |
| Total revenue in excess of billings | $9.657 billion | $18.611 billion |
| | | |
| Deferred inventory costs (d) | $1.168 billion | $3.349 billion |
| Non-recurring engineering costs (e) | $18 billion | $2.185 billion |
| Other | $10 billion | $1.018 billion |
| Total Contract Assets | $10.852 billion | $25.162 billion |

(b) Long-term product service agreement balances are presented net of related billings in excess of revenues of $3,037 million and $3,750 million at December 31, 2017 and 2016, respectively.

(c) Reflects revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems or commercial aircraft engines).

(d) Represents cost deferral for shipped goods (such as components for wind turbine assembly within our Renewable Energy segment) and labor and overhead costs on time and material service contracts (primarily originating in Power and Aviation) and other costs for which the criteria for revenue recognition has not yet been met.

(e) Includes costs incurred prior to production (*e.g.*, requisition engineering) for long-term equipment production contracts, primarily within our Aviation segment, which are allocated ratably to each unit produced.

(f) The assets of legacy GE Oil & Gas were contributed to BHGE upon formation. The contributed assets included certain small-scale liquefied natural gas (LNG) contracts that were historically reported in our Power segment; therefore, on January 1, 2017, $236 million was transferred to Oil & Gas and additional $239 million was transferred to Oil & Gas on July 3, 2017 at the completion of the transaction.

270.    As these charts demonstrate, total Contract Assets increased by $3.7 billion in 2017, driven mostly by Contract Assets within the Power segment, which increased by $1.9 billion—*i.e.*, GE Power accounted for 52% of the 2017 increase in total Contract Assets.

Indeed, 44% of GE's Contract Assets are within the Company's Power segment, which explains how the Power segment impacts the growing Contract Asset most significantly.[83] Moreover $1.558 billion of Power's Contract Asset rise was explained by revenues recognized in excess of billings on service ($844 million) and equipment ($715 million).

### 2. GE's Unsustainable Reliance on Cumulative Catch-Up Adjustments and its Impact on GE's Contract Asset Balance

271.   During the Class Period, a key driver of the growth in the reported balance of GE's Contract Assets was accounting adjustments to reflect purported changes in the estimated profitability of its LTSAs. GE recorded these adjustments as cumulative catch-up adjustments or "**cum catch adjustments**."  For example, GE's 2016 Form 10-K explained that the Company's contract asset balance **increased by approximately $4 billion** over the prior year (from $21.156 billion to $25.162 billion) "**primarily driven by a change in estimated profitability within our long-term product service agreements resulting in an adjustment of $2,216 million**, as well as an increase in deferred inventory costs."

272.   Put differently, changes to how GE estimated profitability on its long-term product service agreements **added $2.2 billion to GE's 2016 earnings**—a significant amount considering that GE's total earnings from continuing operations was $9.8 billion for 2016.

273.   These significant accelerations of profit were accounting adjustments. As a simple illustration, assume GE had a 5-year long-term product service agreement for which it

---

[83] GE did not even include contract assets as its own line item on the Company's balance sheet until February 2016, when GE first did so in the Company's Form 10-K for the fiscal year ended December 31, 2015. Prior to that, GE included its contract asset balance within the "Other Assets" line item (although the Company did provide the amount of its contract asset balance on an annual basis in the Form 10-K notes).  GE only began to report its contract asset balance on a quarterly basis in 2016, and it was not until February 2017—when GE issued its Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K")—that GE broke out the different type of assets that make up the Company's reported "contract assets" line item.

estimated it could bill the customer $100 per year. At the outset of the agreement, GE would estimate the total costs required to perform this agreement (*e.g.*, GE 2017 Form 10-K, p.82, "We recognize revenue as we perform under the arrangements based upon costs incurred at the estimated margin rate of the contract."). The following table illustrates a hypothetical of this estimate:

| Contract Term | 5 years |
|---|---|
| Estimated Contract Cash Flow | $500 |
| Estimated Cost to Complete Contract | $(450) |
| Profit Margin | $50 |
| Profit % | 10% |

274.    In this scenario, GE would expect to account for the revenue and costs pursuant to the agreement as follows:

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Revenue | $ 100 | $ 100 | $ 100 | $ 100 | $ 100 | $ 500 |
| Cost | $ (90) | $ (90) | $ (90) | $ (90) | $ (90) | $(450) |
| Profit | $ 10 | $10 | $10 | $10 | $10 | $ 50 |

275.    Assume further that in the third year of the agreement, GE implemented a new estimate based on an assumption that the costs to complete the contract had been reduced as follows:

| Contract Term | 5 years |
|---|---|
| Estimated Contract Cash Flow | $500 |
| *Revised* Estimated Cost to Complete Contract | $(400) |
| *Revised* Profit Margin | $100 |
| *Revised* Profit % | 20% |

276.    In this scenario, GE would have, in theory, understated the profit in the first two years of the agreement. That is, GE originally had applied a 10% profit margin to years 1 and 2, but the newly estimated profit margin was 20%. As a result, GE recorded a cumulative catch-up adjustment so that the total profit recognized on the agreement-to-date "caught up" and was equal to the present profit margin.

|  | Year 1 | Year 2 | *Year 3* | Year 4 | Year 5 | Total |
|---|---|---|---|---|---|---|
| Revenue | $ 100 | $ 100 | *$ 100* | $ 100 | $ 100 | $ 500 |
| Cost | $ (90) | $ (90) | *$ (80)* | $ (80) | $ (80) | $(420) |
| Catch-Up |  |  | *$20* |  |  | 20 |
| Cost, net | $(90) | $(90) | *$(60)* | $(80) | $(80) | $(400) |
| Profit | $ 10 | $10 | *$40* | $20 | $20 | $ 100 |
| Profit Margin | 10% | 10% | 40% | 20% | 20% | 20% |

277.     The table above illustrates the sudden and significant increase in profitability due to a cumulative catch-up adjustment in the quarter or year the adjustment is recorded. As described below, GAAP permitted such adjustments so long as GE reasonably estimated the costs to complete the contract. This requirement exists to prevent an optimistic estimate of costs in early periods, which may not be supported if, for example, project cost overruns were to emerge. In that instance, profits would have been overstated.

278.     GAAP applicable to this accounting method (ASC 605-35-05-10) is designed to reflect the "economic substance of an entity's transactions" and should present the relationship between a contract's profits and costs accurately. GE Power, however, relied on unsustainable methods to generate cum catch adjustments and, thereby, accelerate the recording of revenue and related profit. According to FE-7, a former Finance Leader who worked at GE Power in Europe through the Class Period, GE actively renegotiated LTSAs with customers solely for the purpose of increasing the total contract margin, and often did so for no economic reason other than to generate positive cum catch adjustments.

279.     In substantial part due to these accounting adjustments, GE's overall Contract Assets drastically increased from $12 billion as of December 31, 2013 to $29 billion as of December 31, 2017. Therefore, on a cumulative basis, GE's financial statements reflected the benefit of approximately $29 billion of revenue for which it was not yet entitled to bill the

customer. The graphs below demonstrate the contract asset balance on an annual and quarterly basis.[84]



---

[84] It does not appear that GE reported Contract Assets on a quarterly basis until 2016.



280.   Throughout 2017, GE's financials continued to benefit from changes to estimates on the Company's portfolio of Contract Assets. GE's Contract Assets increased from the year-end 2016 balance of $25.2 billion by $2.2 billion in the first quarter and $3.8 billion in the second quarter of 2017, "primarily due to adjustments *driven by lower forecasted costs* to complete the contracts and *timing of billings relative to revenue recognition* on [GE's] long-term equipment and service contracts." Thus, as in the example above, in each of these quarters, GE revised its cost estimates downward as an accounting enabler of additional present period profits.

281.   FE-5 described GE's business model of hunting for a more efficient way to service contracts in order to support claims of cost reduction.  FE-5 explained the LTSAs have a flat revenue stream (as in the example above), thus if GE could find efficiencies in servicing the

contracts, GE would not "see the cash flow benefit" for 15-20 years because the contracts are long.

282.    By the end of the third-quarter 2017, through September 30, 2017, GE's Contract Asset balance had increased $4.6 billion for the year. GE's LTSAs increased as well, as the Company explained in its 3Q 2017 Form 10-Q:

> Revenues in excess of billings increased $2,606 million and $1,328 million for our long-term service agreements and long-term equipment contracts, respectively. ***The increase in our long-term service agreements is due to a $1,930 million cumulative catch up adjustment driven by lower forecasted costs to complete these contracts as well as increased forecasted revenue and $676 million due to the timing of revenue recognized for work performed relative to billings and collections.***[85]

283.    Once again, GE revealed that this increase in Contract Assets was, in large part, the product of additional changes to estimated profitability on its LTSAs, which had the added effect of boosting earnings by ***$649 million for the third quarter 2017 and by $1.93 billion for the first nine months of 2017***. In this instance though, GE provided new disclosure concerning these assets. Specifically, GE indicated that the Contract Assets had also grown due to "increased forecasted revenue." In the context of the example above, GE assumed that future annual billings would increase from the $100 per year baseline. As with assumed improvement in costs, this assumption of increased revenue also enabled GE to accelerate the recognition of accounting profits.

284.    These accounting adjustments to earnings were vital to GE's consolidated financial results: As noted by the Wall Street Journal on November 1, 2017:[86]

---

[85] 3Q 2017 Form 10-Q, p. 86.

[86] Michael Rapoport, *GE Shows How 'Black Box' Assets Boost Profits*, Wall Street Journal, (updated Nov. 1, 2017, 4:36 PM ET, https://www.wsj.com/articles/ge-shows-how-black-box-assets-boost-profits-1509549624.

This time around, GE said how much the increase in the portfolio boosted earnings, by $649 million in the third quarter and $1.93 billion for the first nine months of 2017, on a pretax basis. **That is equal to 44% and 51% of pretax earnings from continuing operations for each period**, respectively.

285.    Quite simply, without these improper accounting adjustments, GE would have fallen dramatically short of consensus earnings targets. Based on information initially disclosed by GE on a quarterly basis in the third quarter of 2017, it is now possible to understand how significant these adjustments had been to GE's reported EPS. For example, in the third quarter of 2016, GE reported EPS of $0.32 slightly exceeding the consensus EPS estimate of $0.30. These undisclosed adjustments, however, accounted for $0.07 or 20% of GE's reported EPS in that period. Similarly, in the fourth quarter of 2016, GE's reported EPS of $0.46 exactly matching the consensus EPS estimate. These adjustments, however, accounted for $0.05 or 12% of reported EPS in that period. Absent these adjustments, GE's reported EPS in each of these quarters would have fallen far short of consensus EPS targets. GE's failure to provide appropriate disclosure related to these adjustments precludes expansion of this analysis to other quarters during the Class Period.

### 3.    The "Black Box" of GE's Contract Assets

286.    As discussed above, the primary driver of the $4 billion increase in GE's Contract Assets in 2016 was assumed accounting changes to the estimated profitability of its customer agreements. Specifically, $2.2 billion (or 55%) of the increase was due to these "cum catch" adjustments.[87]

287.    During 2017, GE accelerated an additional $2.1 billion of profit pursuant to these purported changes in estimates of contract profitability. The adjustments therefore constituted a massive percentage of GE's total earnings from its industrial businesses (*i.e.*, the non-GE

---

[87] GE 2016 Form 10-K, pp. 90; 164.

Capital businesses). The quantum of profit GE derived from these accounting tricks was markedly higher in 2016 and 2017 than in previous periods (The table below understates the significance of these adjustments because GE presents a favorable picture of Industrial profits by excluding significant costs of its corporate function, losses incurred by its GE Capital business, and other charges. Thus, these adjustments, when measured against GE's pre-tax earnings, as done by the Wall Street Journal, comprised a greater concentration of GE's overall reported earnings.):

| Year | Acceleration of Profit | % of Total Industrial Segments Profit |
|------|------------------------|----------------------------------------|
| 2014 | $1.0B | 6% |
| 2015 | $1.4B | 8% |
| 2016 | $2.2B | 13% |
| 2017 | $2.1B | 14% |

288.    In GE's 2017 Form 10-K, filed on February 23, 2018, the Company also reported, for the first time, the segments where these accounting adjustments were recorded. Approximately $1.3 billion of these changes were recorded in the Power segment.[88] **_Thus, these changes resulted in 47% of the total profit reported by the Power segment in 2017_**.

289.    The accumulation of Contract Assets within GE's Power segment, in particular, raised significant concern amongst securities analysts, as well as the press. This was especially so considering the importance of GE Power to GE's overall business.  Part of this concern was GE's acceleration of profits, including through cum catch adjustments, at a time when the Power segment was otherwise experiencing a dramatic decline.

290.    According to an October 31, 2017 article in the Wall Street Journal, entitled "*GE's Numbers Game: Pick From Four Earnings Figures*":

---

[88] GE 2017 Form 10-K, p.149.

Another area of concern is how GE accounts for its $29.8 billion portfolio of assets relating to long-term equipment and product-service contracts. That portfolio has grown 18% this year, as GE adjusts estimates and assumptions about how much profit it will ultimately reap from those contracts. Such adjustments added $2.2 billion to GE's earnings in 2016, the company said in its annual report.

Some analysts are concerned because GE provides little visibility into those estimates and assumptions—and because the company's actions can boost its earnings but not current free cash flow. **Typically, big gaps between earnings, which are calculated on an accrual basis, and cash flow, which is money going into and out of a company, are a red flag for investors**.

291.    During GE's 3Q 2017 earnings call, on October 20, 2017, Jeff Sprague, analyst from Vertical Research Partners, pointedly asked GE management how it was comfortable with its seemingly ever increasing Contract Assets balance. The inquiry challenged the reality of this increase in light of GE's poor results during the quarter, including "aggressive forecasts" and "unrealistic assumptions." As shown below, the analyst referred to Contract Assets as one of the "elephants in the room":

### Jeff Sprague - Vertical Research Partners – Analyst

There's been a couple elephants in the room leading up to today, and another one has been the contract asset account, which is also built upon numerous assumptions. As we sit here and listen to aggressive forecasts, unrealistic assumptions, et cetera, particularly in power, how do we get comfortable with what's gone on in that account? And have you guys actually been able to scrub through that yet?

### Jeff Bornstein

[W]e have been digging through that, I would say, over the last six months. I think we are very comfortable with where we are. And I think you've got to think about it, in power's case, in a number of buckets. The first is long-term service agreements. And I want to be clear here: in the third quarter with this performance, our productivity or CSA cum catch was actually down $45 million year-over-year. So it's a small contributor to where we are year-over-year in the quarter. But it's not that reason that we were way off where we thought we would be in the third quarter.

The second is we have really grown long-term equipment agreements. Now, this is 81-1 accounting. These are long-term contracts. They're generally anywhere

from 12 to 24 months, where we build projects out, and along – as we go along the way we incur cost, we rev rec on milestones, and then there's also cash billing milestones. And they don't always line up on top of one another.

That has grown over the last two years really as a function of two things. One is we added Alstom to the portfolio, which had a much higher content of long-term projects. And as we built out the H units, we've done a lot more full scope, much larger scope projects, even if it was just contained to the turbine island, all the way through HRSGs and the steam tail that we got with Alstom.

So the amount of this activity in the portfolio has grown. And as a result of that, our 81-1 balances, particularly in power, have grown. And so that cost, if you will, generally liquidates over 12 to 18 months. *So we're higher this year by about $800 million than we originally forecast, almost all of that in power.* But that will liquidate and turn to cash as we hit billing milestones over the next 12 to 18 months.

292.     On October 23, 2017, JPMorgan published a report calling into question the actual value of GE's Contract Assets. JPMorgan focused specifically on the fact that more than 50% of the sales in GE Power had been sold at prices insufficient to achieve profitability:[89]

Our view is that GE is competing irrationally, giving away content and terms that underprice the risk around these projects, something that management alluded to when discussing the growth in equipment related contract assets that now have elongated payment terms of 12-24 months. Looking at contract assets . . . and receivables sold to GE Capital (~$4B in Power), we see ~$10B in estimated deals that we believe represent business that was too competitively bid. This represents > 50% of Power equipment sales.

293.     A Deutsche Bank analyst was quoted in a November 1, 2017 Wall Street Journal article as stating GE's Contract Assets were "kind of **a black box**."[90] On November 4, 2017, Barron's published an interview of the JPMorgan analyst covering GE, Stephen Tusa.[91] The

---

[89] JPMorgan, "Not Much Left for Bears to Say…The Numbers Now Speak For Themselves," October 23, 2017.

[90] Michael Rapoport, *GE Shows How 'Black Box' Assets Boost Profits*, Wall Street Journal, (updated Nov. 1, 2017, 4:36 PM ET, https://www.wsj.com/articles/ge-shows-how-black-box-assets-boost-profits-1509549624.

[91] Jack Hough, *JPMorgan Analyst: The Case Against GE*, Barron's (Nov. 4, 2017), https://www.barrons.com/articles/jpmorgan-analyst-the-case-against-ge-1509761964

analyst expressed concern that a charge was forthcoming related to GE's Contract Assets

because GE had been overly optimistic in its pricing:

> [Q] Is that what you meant when you wrote that GE 'is competing irrationally, giving away content and terms that underprice the risk'?
>
> Tusa: [A] Correct. What I believe, whereas Mitsubishi Heavy Industries may come in with a gas turbine that's a little more efficient than GE's gas turbine and priced competitively, GE will come to the customer and say, 'Hey, we will finance this for you at a very competitive rate, and make an investment in the power plant if you want us to, and throw in all this content.' **And they do that at an all-in price that doesn't necessarily position GE to withstand some of the risk that project may face over the next 18 to 24 months. Ultimately, where that will manifest itself, 18 or 24 months down the road, GE will book this charge that says, 'Hey, we underestimated how much this would cost us.'** But ultimately, they've already got the turbine in place. They've already got the market share. And that's kind of the most important thing to them. That's a big reason their cash flow has been so weak relative to their earnings. That's where these things called contract assets, which are about $29 billion on the GE industrial balance sheet, would show up. This contract accounting is based on certain long-term assumptions that may or may not come true from a cash perspective.

294.    Other analysts expressed surprise that GE was able to accelerate this magnitude

of profit, particularly when GE's Power unit, the key segment in which these adjustments are

recorded, was in a free fall. For example, a July 24, 2017 JPMorgan report stated:

> Starting with Power, there is a negative mosaic here that we have been talking about recently, where Power Gen is the next "distributor like" vertical at risk of disruption from the triple threat of renewables, energy efficiency and storage, but we were flat out speechless (not easy for us) to hear the commentary on the deteriorating state of this business which was all new news in terms of messaging from the company…**even non cash earnings can't drive a positive result**. The Power dynamics are not cyclical, they are potentially secular, getting worse, and we are cutting our numbers here further.

295.     A November 13, 2017 Forbes article, reported "In terms of divisions, power

looks to continue to be a black hole; organic revenues may decline double digits and operating

profits may fall by a quarter."[92]

296.     Following GE's announcement on January 24, 2018 that the SEC had opened an

investigation into its revenue recognition for LTSAs, among other things, the press and analysts

were quick to highlight the lack of disclosure from GE surrounding its profits from the

accumulation of Contract Assets. For example, a January 29, 2018 Bloomberg article stated:

> General Electric Co. investors have long griped that the sprawling company's
> financials can be a black box.
>
> Now, securities regulators are poking around in one of the biggest and darkest
> corners of that box. GE's power-equipment division, its single largest unit, has
> come under scrutiny – alongside its ailing insurance business – for how it
> accounts for revenue for servicing gas turbines and other heavy duty machines
> the company sells.[93]

297.     Again, the media has expressed concern that these accounting changes were

accelerating profit at the same time when GE's Power segment was otherwise experiencing

widespread demise:

> Given how significantly the power markets have deteriorated and how severely
> GE underestimated those trends, there is rightful concern that the company
> wasn't conservative enough.[94]

---

[92] Antoine Gara, *General Electric Slashes Its Dividend 50% As CEO Flannery Resets Ailing Conglomerate*, Forbes (Nov. 13, 2017), https://www.forbes.com/sites/antoinegara/2017/11/13/general-electric-slashes-its-dividend-50-as-new-ceo-flannery-resets-ailing-conglomerate/#4ccd08384bed

[93] Rick Clough, *How a Bad Bet on Power Put a Spotlight on GE's Murky Accounting*, Bloomberg (updated on Jan. 29, 2018 12:38PM ET), https://www.bloomberg.com/news/articles/2018-01-29/how-a-bad-bet-on-power-put-a-spotlight-on-ge-s-murky-accounting

[94] Brooke Sutherland, *GE SEC Probe Shows Bad News Is Far From Over*, BloombergGadfly (updated on Jan. 25, 2018 6L50AM ET), https://www.bloombergquint.com/opinion/2018/01/24/ge-sec-probe-shows-bad-news-is-far-from-over

298.    As highlighted by the securities analysts above, and set forth in further detail

below, during the Class Period, GE failed to disclose material information regarding the

significance of its Contract Asset accounting. Further, GE failed to maintain adequate internal

controls over and account for its Contract Assets in accordance with GAAP. In particular, it

failed to establish reasonably dependable estimates of contract revenues and costs.  These

failures began to emerge in the fourth quarter of 2017, when GE reported an $850 million

charge to earnings to correct for project cost overruns that eviscerated a substantial portion of

previously recognized profits.

### 4.    GE's Accounting for Contract Assets Violated GAAP

299.    GE recognized revenue from LTSAs based on the costs it incurred plus the

estimated margin of its contracts.[95] GAAP related to this method of accounting is set forth in

ASC 605-35 (Revenue Recognition, Construction-Type and Production-Type Contracts).

300.    GE's accounting involved estimating both revenue and the related costs (*e.g.*, GE

2017 Form 10-K, p.82, "Revenue recognition on long-term product services agreements

requires estimates of both customer payments expected to be received over the contract term as

well as the costs to perform required maintenance services."). GAAP is clear that use of this

accounting method is dependent on the ability to make reasonably dependable estimates—

specifically estimates of progress towards completion, contract revenues, and contract costs.

(ASC 605-35-05-11).

301.    The estimated revenue from a contract is the amount the seller expects to realize

from the customer. (ASC 605-35-25-16). For example, for LTSAs, GE was paid based upon the

utilization of assets (*e.g.*, on an hourly basis) or on a milestone basis (*e.g.*, when an overhaul

---

[95] GE 2017 Form 10-K, p.82.

occurred).[96] GE's estimate of asset utilization impacted both the amount of customer payments and the costs to provide the service. This is because asset utilization influences the timing and extent of service events such as overhauls.[97]

302.   The determination of estimated revenue requires "careful consideration." *(Id.)* GAAP states that "a contractor's estimating procedures should provide reasonable assurance of a continuing ability to produce reasonably dependable estimates." (ASC 605-35-25-60). In other words, GAAP require an ongoing review of the contract to ensure revenue estimates continue to remain reasonable.

303.   Consistent with the requirement set forth in GAAP, GE disclosed that it used a combination of historical utilization trends and information about market trends to formulate revenue estimates.[98] Thus, GE's accounting should have taken into consideration whether expected revenue was likely to be lower than revenue in recent periods (*e.g.*, due to declines in Power generation requirements). These conditions clearly confronted GE's Power segment during the Class Period. For example, on July 24, 2017, JPMorgan commented about the downward revenue trends GE faced:

> Of note, in services, they pointed to outage volumes, particularly larger F-class outages, running down close to 10%, driven by lower utilization, lower capacity payments in North America, and extended intervals between outages.

304.   Given these conditions, during the Class Period, GE's estimates of revenue and related profit on LTSAs in its Power segment required downward revision—the opposite of the direction assumed by GE as evidenced by its favorable cum catch adjustments. Further,

---

[96] GE 2017 Form 10-K, p.82.
[97] *Id.*
[98] *Id.*

pursuant to ASC 605-10-S99, the accounting should have taken into consideration factors such as whether, and to what extent, the revenue will be collectible.

305.    As with revenue, GAAP also require that contract costs are identified, estimated, and accumulated with a reasonable degree of accuracy and that total estimated costs of a project include costs incurred to date and an estimate of the costs to complete the contract. (ASC 605-35-25-32). For costs incurred to date on a contract, GAAP at ASC 605-35-25-33 states:

> An entity should be able to determine costs incurred on a contract with a relatively high degree of precision, depending on the adequacy and effectiveness of its cost accounting system…[A]n objective of each system or of each set of procedures should be to accumulate costs properly and consistently by contract with a sufficient degree of accuracy to assure a basis for the satisfactory measurement of earnings.

306.    GAAP, at ASC 605-35-25-44, recognizes the estimate of costs to complete a contract is a "significant variable" in determining profit on a contract.  GAAP requires that estimates of future costs are determined using "systematic and consistent procedures" and that the estimates of future costs include the same elements of costs that have been incurred on the contract to-date. Further, GAAP requires that estimates of costs to complete a contract are reviewed periodically and revised to reflect new information.

307.    Pursuant to ASC 605-35-25-62, GE was required to employ estimating procedures that provided a "reasonable assurance of a continuing ability to produce reasonably dependable estimates."  Further, GAAP  at ASC 605-35-25-63 states:

> Ability to estimate covers more than the estimating and documentation of contract revenues and costs; it covers a contractor's entire contract administration and management control system. The ability to produce reasonably dependable estimates depends on all the procedures and personnel that provide financial or production information on the status of contracts. It encompasses systems and personnel not only of the accounting department but of all areas of the entity that participate in production control, cost control, administrative control, or accountability for contracts.

308.    In other words, GAAP requires that future costs estimates for long-term contracts not be based simply on costs incurred to date and a projection of future costs, but a full complement of procedures, internal controls, and personnel to produce dependable estimates.

309.    As described below, GE's internal control environment related to, and its accounting for, Contract Assets prior to the fourth quarter of 2017 failed to achieve these objectives.

(a)    <strong>GE Failed to Implement Adequate Internal Controls to Ensure GAAP was Appropriately Applied to Contract Assets</strong>

310.    On January 24, 2018, during the Company's Q4 2017 earnings conference call, GE disclosed that the SEC was investigating its revenue recognition and internal controls associated with Contract Assets.

311.    While GE has not disclosed the nature of the SEC's investigation, the allegations by FE-7 (¶¶ 321-336 ) clearly indicate that GE's accounting associated with Contract Assets, particularly during 2016 and 2017, failed to incorporate reasonably dependable estimates. Specifically, in a period of markedly down performance for the Power segment, GE's accounting failed to incorporate reasonably dependable estimates of expected project revenues and costs to complete contracts. Instead, GE accelerated the use of accounting gimmicks that, in violation of GAAP, ignore the economic substance of its LTSAs. Indeed, GE's cumulative catch-up adjustments wreak of earnings management.

312.    During that same January 24, 2018 call, Russell Stokes, the CEO of GE Power, provided a closer look at the weakened state of GE's internal controls and accounting for GE's Contract Assets. Mr. Stokes responded to an analyst inquiry as follows:

115

*Scott Davis, Melius Research*

If I was to look at one part of our model that we're probably a little bit insecure of, I should say, it's just around price in Power . . . maybe just Russell could fill us in on where we stand there.

*Russell Stokes – CEO of GE Power*

There is an element of price that we have acknowledged that we felt up to now, just given that we did not have the level of attention that we should have had on that portion of the business. We also acknowledged in the past cost overruns around some of the execution that had taken place as well.

313.    Indeed, Stokes acknowledged that GE did not have the internal controls in place expected by GAAP to formulate dependable estimates. Moreover, the gaps in GE's internal controls had not detected project cost overruns, which would have negated GE's assumptions enabling the massive accounting-related accelerations of profits. Consequently, the analyst pressed on:

*Scott Davis, Melius Research*

So Russell, I mean, one of the things that – your competitors have always said that GE is a little bit tough on price. And maybe you guys had made some decisions in the past that weren't economic. Is that something that has materially changed under your watch?...

*Russell Stokes*

So across the board, we are implementing much more disciplined underwriting practices…The process is definitely tighter than I would say it was in the past.

314.    In this response, Mr. Stokes addressed the concern raised by the JPMorgan analyst. That is, GE's contract underwriting, or pricing, had been too aggressive to acquire new business, the result of which was that customer payments would be insufficient to enable GE to profitably deliver these contracts. In other words, GE acknowledged that the cumulative catch-up (cum-catch) adjustments violated GAAP because GE's estimates were not, in fact, reasonably dependable reflections of the revenues and costs associated with the Contract Assets.

315.     Indeed, the internal controls apparently implemented by new management culminated in **charges to earnings of $850 million in the fourth quarter of 2017**. To uncover the reasons for this charge, analysts were forced to press GE for more information:

### Jeff Sprague - Vertical Research Partners

It seems like there's something below the line. I don't know what I am missing.

### Jamie Miller

Yes, Jeff, the thing I would probably point you to is that Power in the fourth quarter had a very tough quarter. And when you look at where we thought 2017 would land versus where it did, it was substantially lower there. Now, when you really deconstruct the fourth quarter for Power, there were really two or three main items there. One of which is just sort of one-time adjustments and some non-repeat items. . . . And as Russell and the team have come in, first, the one-time items piece of it, which is about $850 million, about half of that was a charge for slow-moving and obsolete inventory that we took. We obviously don't expect that to repeat as we get into next year.

316.     Mr. Stokes, however, conceded that GE's implementation of new controls resulted in this substantial charge to earnings reducing the profit that had been accelerated into prior quarters. In doing so, Mr. Stokes shined a light on GE's use of estimates in prior periods that violated GAAP because those estimates were not reasonably dependable. *(Id.)*

Jamie is right. On execution, we continue to just do everything we need to run the business better. We dove deeply into projects and we are working through cost overruns and adjustments that we needed to take in those projects, as we were nearing the conclusion of a number of legacy contracts. Truing up costs with partners on deals that were underwritten back in the 2013, 2014, 2015 timeframe.

317.     This charge to earnings had serious ramifications on GE's financial results for 2017. As of September 30, 2017, GE had reported $2.5 billion of profit from its Power segment. But, on an annual basis, GE reported only $2.8 billion of profit from the Power segment. *In other words, the charges recorded in the fourth quarter of 2017 significantly impaired GE's*

***annual profit run rate. The SEC's ongoing investigation into GE's accounting for Contract Assets indicates that this $850 million charge is the tip of the iceberg.***

318.     The charge recorded to correct GE's Contract Assets in the Power segment in the fourth quarter of 2017 reduced GE's total Industrial Operating Profit by 19%. (GE 1/24/18 Press Release, p.1 reporting metric as $3,526 million). GE acknowledged "Power continues to be challenging, Power segment profit down 88%." *(Id.)* The Power segment reported profit of $260 million in the fourth quarter of 2017 as compared to $2,167 million in the fourth quarter of 2016. (*Id.* p.2).

319.     The root cause of this charge was GE's failure to implement disciplined internal controls surrounding the estimation of project revenues and costs in accordance with GAAP. As described by FE-7 (¶¶ 321-336), this exposed GE's failure to implement reasonably dependable estimates. Specifically, despite its disclosures indicating otherwise, GE relied only on historical data to estimate contract revenues and costs. In doing so, GE failed to consider the then-current outlook for revenues and costs.

320.     Consequently, GE violated GAAP because GE's estimates of revenue and costs were not reasonably dependable estimates. GE's failures in this regard was egregious considering the massive accounting adjustments it recorded to accelerate profits on the basis of purported cost savings, thus enabling GE to meet prior earnings targets particularly when GE was well aware that analysts characterized GE's accounting in this area as a black box. Those concerns were proven well-founded when GE belatedly appears to have implemented such controls and swiftly detected and corrected the accounting deficiencies.

**(b)      GE Used Monetization and Cumulative Catch-up Adjustments to Mask the Declines in the Power Segment and Manipulate GE's Earnings and Cash Flow**

321.    FE-7 worked in Europe as a Finance Leader at GE Power Services at all times through the Class Period.  FE-7 reported to the Finance Manager for GE Power Europe, who reported to the CFO of GE Power Europe, who then reported to the CFO of Power Generation Services, Tim Donovan.

322.    According to FE-7, GE Power Services actively renegotiated LTSAs with customers in order to trigger positive cum catch margin adjustments or avoid negative cum catch margin adjustments. FE-7 explained, for example, that GE would renegotiate contracts solely for the purpose of increasing the total contract margin, and often did so for no economic reason other than to generate a positive cum catch (or avoid a negative cum catch).

323.    FE-7 explained that one technique GE Power Services Europe used during the 2015-2016 timeframe to trigger positive cum catch adjustments (and the associated revenue boost) was called "de-scoping."  This meant that GE would approach a current LTSA customer and persuade the customer to eliminate or "de-scope" the GE-provided service labor portion of a contract and instead use the customer's own labor services. GE Power Services did this because its margin on the service labor portion of a contract was very small relative to the much higher profit margin on capital parts and upgrades. Even though GE made money on the labor portion of the agreement, removing the low-margin GE service labor from the contract mathematically increased the overall average contract profit margin over the life of the contract, because the contract would, as a result, consist of mostly higher margin future capital parts and upgrades, despite the absence of any indication that the customer would eventually use their own labor. This, in turn, would trigger a positive cum catch adjustment to increase revenue,

because the profit margin on the contract was now higher (despite the decrease in overall contract price/scope).

324.    FE-7 explained that these contract-renegotiation techniques (such as the example described above) were often employed for no economic purpose (and despite the negative business consequences of the contract renegotiations, as in the de-scoping example above) other than to accelerate the recording of revenue into a particular accounting period in order to meet internal growth or earnings targets.  Indeed, according to FE-7, it was internally acknowledged within GE Power Services Europe that once growth and earnings targets were set each year, cum catch adjustments would be used to make up the difference between the numbers that were actually achievable and the targets that were set. FE-7 explained that GE Power Services had teams dedicated to determining which contracts were good candidates for generating positive cum catch adjustments through renegotiation (and also for determining which contracts needed to be renegotiated to avoid triggering a negative cum catch). According to FE-7, GE Power Services Europe employed several contract-renegotiation techniques (like the example described above) on the vast majority of its LTSAs. Indeed, FE-7 estimated that, between 2015 to 2017, a significant portion of GE Power Services Europe's profits were generated from cum catch adjustments.

325.    Using contract renegotiations to boost revenue from cum catch adjustments was not sustainable. Indeed, according to FE-7, GE Power Services only had a finite number of LTSA in its portfolio, and there were only a finite number of ways to amend and manipulate a particular LTSA to squeeze positive cum catch revenue increases from each contract. According to FE-7, by the end of 2017, GE Power Services Europe had already exhausted most

of the techniques used to trigger these revenue-boosting cum catch adjustments, which GE relied on to conceal the fact that the Company was not generating revenue organically.

326.    According to FE-7, the techniques used to manipulate cum catch profit adjustments had the additional negative effect of often requiring a substantial postponement of cash collection for GE Power. Indeed, FE-7 explained that in order to persuade customers to agree to renegotiate contracts (which GE had to do to trigger positive cum catch adjustments) GE had to give concessions, such as price discounts and deferrals of payment dates.  GE was therefore often foregoing future cash solely for the purpose of triggering cum catch adjustments and revenue recognition in the short term, which eventually caught up with the Company.

327.    FE-7 explained that because GE was recording revenue (as a result of cum catch adjustments) but not collecting cash, the Company's contract asset balance increased, which also led to a growing discrepancy between GE's operating profit and the CFOA generated during that same period. As a result of this cash crisis, FE-7 explained that beginning in Q4 2015, GE Power management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs, which would help to conceal that GE was renegotiating contracts solely to boost earnings at the expense of collecting payment.  FE-7 was directly involved in working with his U.S. counterparts during Q1 2016 through Q3 2016 to come up with ways to generate CFOA and mask the growing gap between operating profit and CFOA (as well as the steady increase in GE's total contract asset balance).

328.    The solutions FE-7 and his U.S. counterparts developed were known as "monetization," which involved factoring (*i.e.*, selling) receivables in order to generate CFOA. To create the invoices used for factoring, GE Power Services would persuade its customers to renegotiate the billing contract terms so that the triggering event for an invoice was earlier in

time than it would have been (in some cases, by a number of years), but for the contract renegotiation. This was done solely in order to allow GE Power to accelerate the invoicing of the customer (*i.e.*, create invoices) for purposes of factoring, with no actual change to the underlying performance obligations.

329.     According to FE-7, this enabled GE to pull forward the future customer billing into the current accounting period so that it could bill the customer immediately. However, in order to induce the customer to enter into such a modification and agree to revised invoicing terms, GE would typically have to discount the payment required and also push the actual payment due date further into the future—often by a year or more (compared to the non-renegotiated scenario).  To actually "monetize" this payment, which was not yet due, GE would then factor the receivable, either by selling it to itself (selling it to Working Capital Solutions ("WCS")—a subsidiary of GE Capital) or selling it to an outside party, often with recourse.

330.     According to FE-7, since GE Power was selling fewer and fewer power turbines and equipment after the economic crisis began in 2008, it consequently had fewer new customers to whom it could sell new LTSAs.  At the same time, the existing number of LTSAs available to monetize was finite. As a result, after monetizing customers' future payments as often as possible in 2016 (which GE did to mask the discrepancy between profit and CFOA and obtain desperately needed cash), there were less and less monetization opportunities, and eventually the cash crisis could no longer be concealed.

331.     FE-7 also explained that the estimations used for future costs, revenues, and margins on GE Power Services' LTSAs were deficient (such estimates were performed on an annual basis for each contract). Indeed, according to FE-7, GE Power did not adequately consider the current and future "run rates" (*i.e.*, the amount of hours a turbine runs) when

estimating costs on its contracts, and instead used the historical average of the prior three years, which were known not to reflect the current and likely future turbine run rates. FE-7 explained that GE Power Services also failed to adequately consider the customers' own current and future estimation of their run rates. Indeed, a steady downturn in the energy markets between 2009 and 2014 (driven not just by the economic crisis but also as a result of improved energy conservation and a greater supply of energy from renewable sources during that time) meant that GE's customers ran their power turbines for fewer and fewer hours each year. As FE-7 explained, this impacted GE's contract revenue because the significant service work and billing dates on many LTSAs were often tied, in part, to the number of hours a turbine runs—the less hours a turbine runs, the less opportunity for GE to perform and bill for major service work. By using a historic three-year average—rather than taking into account the known current and estimated future decline in hours—to project revenue and costs on a multi-year contract, GE was able to improperly delay recognizing the necessary negative contract cum catch adjustment to reflect fewer anticipated billing opportunities during the remainder of the contract.

332.   What's more, FE-7 explained, GE also did not adequately account for customers' overall risk profile (including credit risk), despite that GE Power Services entered into long-term (*i.e.*, 20 to 30 years) contracts with customers. Indeed, GE Power Services was often pushing out payment dates when it renegotiated contracts with customers (which it did to generate positive or avoid negative cum catch adjustments), but was not accounting for the possibility that GE would not be able to collect payment that far out in the future. As FE-7 explained it, GE Power Services was effectively lending to its customers but failing to account for any associated credit risk, and assumed for its own accounting purposes that future

collection on the LTSAs was certain (and therefore did not maintain any sort of reserve to account for future risk on its contract asset account).

333.    FE-7 interfaced with multiple inter-disciplinary functions that were directly involved in creating GE's positive cum catch and monetizing its contract assets to create CFOA. For example, FE-7 interfaced directly with the finance, risk, modeling, sales, and controllership teams in Europe and globally that contributed to the generation of an increase in the margin percentage that GE used to create positive cum catch in the Power Services business in Europe. FE-7 also was involved in 2016 in simulating what would have happened to GE Power Service's cum catch if it utilized a one year average instead of a three year average to estimate the unit's margin percentage.  FE-7 understood, based on conversations with GE Power employees, that the simulation was requested by Teo Osben, the Chief Financial Officer of Multi-Year Agreements, and that he ultimately decided against using a one year average because it had a negative impact on GE's overall global cum catch.

334.    FE-7 also worked with Kevin Weber, GE Power's Senior Commercial Finance Manager in the U.S., who informed and educated FE-7 on various techniques and principles that GE Power used globally to generate CFOA—*i.e.*, "monetization." As detailed above, this process involved GE Power encouraging its customers to accept revised contract terms to better enable GE power to monetize (sell or factor) those assets to either WCS or to a pool of third party investors.  In fact, FE-7 discussed "best practices" with Kevin Weber to utilize in their respective monetization efforts. FE-7 explained that Estela Delgadillo, GE's Global Cash Leader for GE Power who reported directly to Tim Donovan (CFO of Power Generation Services since 2011), hired Kevin Weber in early 2016 specifically to lead the global monetization effort.

335.    FE-7 was aware that there were (and occasionally received) weekly, monthly, and quarterly reports regarding GE's monetization efforts.  According to FE-7, the quarterly reports outlined the total amount of cash that GE had generated through these monetization efforts and broke those figures down across GE Power by region.  It was FE-7's understanding that the quarterly reports, which were PowerPoint slides, were to ultimately be used for GE's quarterly Blueprint Review for discussion with GE Power's global leadership, including Paul McElhinney (President & CEO of GE Power Services from May 2014 through December 2017) and Tim Donovan.  The monthly reports contained the same information as in the quarterly reports for Power Services in Europe, and the weekly reports were used to assess which customer contracts needed to be renegotiated for purposes of GE's cum catch adjustments and its monetization efforts.

336.    FE-7 was also tasked with writing quarterly status update reports on contractual renegotiations for purposes of GE's reporting requirements.  Those reports included the number of renegotiations, the number of commitments secured from the renegotiations, the impact on cum catch, and a description of each renegotiation and the main drivers of the renegotiation. These reports were written for the controller in Europe to send to GE's corporate headquarters. It was FE-7's understanding that these status update reports were sent to GE's Global Controller, who then delivered them to Jan Hauser, Sr. VP, Controller, and Chief Accounting Officer, who ultimately signed off on GE's Sarbanes-Oxley certifications.

### (c)    GE Failed to Provide Adequate Disclosure Regarding Contract Assets

337.    Item 303 of Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A), requires a discussion of liquidity, capital

resources, results of operations, and other information necessary to an understanding of a registrant's financial condition, changes in financial condition, and results of operations.

338.    Item 303(a)(3) establishes the following relevant requirements related to revenue and results of operations:

• Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected; and

• Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues.

339.    The SEC has summarized the principal objectives of MD&A disclosure as follows: "The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations."[99]  The MD&A requirements are intended to satisfy three principal objectives:

• to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

• to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

• to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

340.    The last principal objective means that the user should be provided with the information to assess whether an extrapolation of historical operating results is a sound basis for assessing future results.

---

[99] Financial Reporting Release (FR) 72, December 29, 2003.

341. Despite these requirements, GE provided inadequate disclosures, simply stating that it had increased its estimated billings or reduced its estimated costs to complete its contract resulting in billions of dollars of increased Contract Assets. For example, in its second quarter of 2017 financial statements, GE reported, "Contract assets increased $3.8 billion, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts." (GE Form 10-Q for the quarter ended June 30, 2017, p.37)

342. Consequently, investors lacked sufficient information to assess the uncertainty in GE's assumptions embedded in Contract Assets, including whether hoped-for levels of profitability could be realistically achieved. For example, GE did not indicate that its estimates relied extensively, if not exclusively, on historical, rather than reasonably dependable estimates of GE's expected experience. Further, GE did not disclose that its weighting of historical data was engineered to maximize profit recognized in the current period. Moreover, as described further below, GE did not disclose the erosion of its backlog of contracts from which it could sustain its acceleration of profit. Importantly, GE's cumulative catch-up adjustments had the impact of recognizing profit today that would otherwise have been recognized in the future. Such disclosures were particularly needed in consideration of the lack of disciplined internal controls at GE prior to the fourth quarter of 2017.

343. As noted herein, GE's lack of disclosure in this area caused analysts and the media to describe GE's accounting as a "black box" during the Class Period. Contrary to GE's financial reporting, the issues identified above clearly warranted disclosure due to the trend of the enormous growth of Contract Assets from 2014 through 2017.

344.    Further, the SEC has specific MD&A disclosure requirements for unusual

transactions that have had, or might reasonably be expected to have material effect on revenue

or operating income. As an example, the SEC identifies "Shipments of product at the end of a

reporting period that significantly reduce customer backlog and that reasonably might be

expected to result in lower shipments and revenue in the next period." (SEC Staff Accounting

Bulletin No. 101) GE's cumulative catch-up adjustments had exactly this result. This

consideration was particularly relevant because GE's Power segment was experiencing a

downturn. As a result, GE's population of contracts was aging, with fewer opportunities to

identify further cost savings, and the slowdown in the Power business resulted in a shrinking

number of new contracts to provide resources GE could draw from for future comparable

adjustments. As GE's cumulative catch-ups slowed beginning in the second quarter of 2017,

JPMorgan reacted to GE's impaired ability to lever Contract Assets for further profit

acceleration:[100]

> Management said that LTSA gains were $0.5B in 2Q vs $0.6B prior year,
> **showing what happens to segment profits when this lever becomes less of a
> [year-to-year] contributor** (2Q segment profits of $3.9B were down $0.2B y/y,
> and missed our estimate by $0.1B). This is contrary to the 1Q segment profit
> results which beat our estimates by $0.3B, when LTSA gains were $0.8B, up
> $0.3B y/y. Looking to 2H17, contract assets (of which LTSA gains are a portion)
> **are expected to be flat y/y, showing this source of non-cash earnings growth
> is slowing**.

345.    The next example highlighted by the SEC as warranting disclosure and enhanced

discussion was "Granting of extended payment terms that will result in a longer collection

period for accounts receivable (regardless of whether revenue has been recognized) and slower

cash inflows from operations, and the effect on liquidity and capital resources."

---

[100] JPMorgan, July 24, 2017,.

346.    This factor was also relevant because, as noted above, to alleviate the growth of Contract Assets, GE offered customers extended payment terms in exchange for the ability to bill in the current period. GE first disclosed the existence of this program in its 2017 Annual Report. (GE 2017 Form 10-K, p.80, "In certain circumstances, GE provides customers primarily within our Power, Renewable Energy and Aviation businesses with extended payment terms for the purchase of new equipment, purchases of significant upgrades and for fixed billings within our long-term service contracts.").

347.    As detailed in ¶¶ 321-336, GE masked its growing Contract Asset balance by coming up with a way to generate cash flow on its LTSAs—a practice known internally as "monetization." To do so, GE Power Services, for example, would persuade its customers to renegotiate the billing contract terms so that the triggering event for an invoice was earlier in time than it would have been but for the contract renegotiation. In order to induce the customer to agree to revised invoicing terms, GE would typically have to discount the payment required and also push the actual payment date further into the future. This practice was employed solely to accelerate the invoicing of the customer for purposes of "***factoring***"—the process of selling long-term receivables either internally or to third parties—which allowed GE to generate cash flow, despite that it was not entitled to payment on the underlying invoices for years.

348.    Indeed, during the Class Period, GE's industrial units sold billions of dollars of receivables, including these long-term receivables to GE Capital. Although the factoring was an intercompany transaction, it served as meaningful window dressing. GE reported the receipt of cash on the sale of the receivable as CFOA, which was offset by use of cash for financing activities by GE Capital.

349.     In each way, this presentation continued to allow GE to conceal its developing

cash crisis. Analysts were focused on 1) GE's ability to generate cash flow from its core

industrial businesses and 2) discounted the cash flow reported by GE Capital since that business

was being wound down. Consequently, GE solved two key problems: 1) GE pumped the brakes

on the growth of Contract Assets and 2) GE was able to improve its reported CFOA. GE

expanded this financing vehicle greatly in 2016, when the balance of related GE Capital

receivables was $1.9 billion at December 31, 2016 as compared to $0.1 billion as of the prior

year. As of December 31, 2017, GE Capital had $2.1 billion of these long-term receivables

outstanding.

350.     Factoring of receivables to GE Capital had the following impact on CFOA from

2015 to 2017:

| CFOA Increase/(Decrease) | 2015 | 2016 | 2017 |
|---|---|---|---|
| | | | |
| Current Receivable Sales | $2.1B | $2.1B | $(2.0)B |
| Long-Term Receivable Sales | $0.1B | $1.6B | $0.3B |
| Total Factoring Included in CFOA | $2.2B | $3.7B | $(1.7)B |
| Industrial CFOA | $12.1B | $11.6B | $9.7B |

351.     As shown in the table above, the factoring of receivables to GE Capital was a

significant source of cash included in Industrial CFOA in both 2015 and 2016. In 2017,

however, when GE curtailed this activity, Industrial CFOA was dramatically reduced. This

activity was a surprise to even the most sophisticated users of GE's financial statements. For

example, after GE's new disclosures in its Annual Report filed on February 23, 2018, JPMorgan

observed:

> The evidence here now points to the systemic use of GE Capital **as the grease
> for the machine**. Receivables factoring, among other instruments, is a key
> building block, which management added helps to 'manage short term liquidity,'
> not just credit exposure as in the past. Here, while current receivables factoring is
> being wound down, the enhanced disclosure around 'long term receivables'

factoring was most interesting, in which management fully acknowledges they extend terms across their businesses to compete. This all matters because adjusting for the $3.5B in factoring, which is likely going to be incrementally more of a challenge/expensive, [Free Cash Flow] would have been $3.5B in 2016, a year that had been viewed as more 'normalized' than 2017. . . . ***We continue to see that receivables activity inflated cash in 2016 even more than we had previously expected***, for which 2017 is beginning to come down, but is far from 'normal' (factoring activities increased cash by > $10B since 2011). All in, adjusting 2016 and 2017 for receivables factoring we now know of….

352.    GE's financial engineering of reported cash flow was the subprime version of the industrial world. GE Capital gave little regard to the credit quality and risk of the underlying cash flow because it was a related party.

353.    Ultimately, the explosive growth in Contract Assets, the massive cumulative catch-up adjustments, and the liquidity management programs were precisely the type of transactions that warranted enhanced MD&A disclosure. GE, however, continued to leave investors guessing about its "black box" accounting.

354.    On January 16, 2018, during the same call in which GE disclosed it recorded an $8.9 billion charge to increase its LTC Reserves, GE advised that it would reduce the size of its Industrial Finance business within GE Capital by $15 billion.[101] GE's CFO further explained a large portion of the reduction would come from moving its internal factoring of receivables off the books of GE Capital.[102] JPMorgan commented on this issue as follows:[103]

New management appears to be working to wind down this program that we have always considered to be of questionable practice and value, ***inflating Industrial CFOA using [GE Capital] and the lack of disclosure there***.

355.    Thus, GE's previously reported financial information concerning Contract Assets: 1) violated GAAP; 2) failed to provide appropriate disclosure; and 3) evidence further

---

[101] GE Insurance Update Transcript, 1/16/2018, p. 5.

[102] *Id.* at p.7.

[103] JPMorgan, February 23, 2018, p.5

deficiencies in GE's internal controls for financial reporting.

**F.      Defendants Also Failed to Disclose a Known Trend or Uncertainty at GE**

356.    Item 303 of SEC Regulation S-K requires the Company's quarterly and annual SEC filings to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

357.    Similarly, the regulation required GE to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. § 229.303(a)(3)(i).

358.    In violation of Item 303, the Company's SEC filings during the Class Period failed to disclose the following facts known or recklessly disregarded by Defendants:

(a)      the serious risks and uncertainties associated with GE's LTC exposure;

(b)      that in 2015 the Company "again reviewed [its] insurance exposure" and took no action to increase its LTC reserves despite alarming adverse claims experience in the LTC policies it was reinsuring and mounting industry-wide negative trends in the LTC market;

(c)      that the Company failed to timely record: (i) approximately $10 billion in before-tax charges to its LTC reserves in violation of GAAP; and (ii) $15 billion in contributions to its statutory LTC reserves in violation of statutory insurance regulations;

(d)      that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain cash flow for its quarterly "key" dividend payments and stock buyback program;

(e)     that the Company was intentionally manipulating forecasted costs and profitability on its portfolio of Contract Assets in order to artificially inflate the Company's quarterly and annual earnings in violation of GAAP without which GE would have fallen dramatically short of consensus earnings targets;

(f)     the Company failed to maintain adequate internal controls over its financial reporting with respect to both its LTC reserves and Contract Assets; and

(g)     that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period.

359.    Moreover, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, defendants Immelt and Bornstein signed certifications appearing in GE's mandatory periodic filings with the SEC throughout the Class Period, stating those filings did not contain false and misleading statements. Defendants Immelt and Bornstein signed these certifications in connection with the GE's annual and quarterly SEC filings, while they were at the Company.

360.    Specifically, Defendants Immelt and Bornstein certified that "the information contained in [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of the [Company]." Moreover, Defendants Immelt and Bornstein certified that these SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [those] report."

### G.    GE Failed to Maintain Adequate Internal Controls Over its Financial Reporting

361.    GE's management was responsible for maintaining a system of internal control over financial reporting ("ICFR") that provided reasonable assurance regarding the reliability of

financial reporting and the preparation of its financial statements in accordance with GAAP. The Sarbanes-Oxley Act of 2002 (SOX) Section 404 (SOX 404), as implemented by SEC Rule 33-8238, required GE management to evaluate its ICFR on an annual basis to determine whether it was effective for the purpose specified above. Further, SOX Section 302 (SOX 302) required GE's CEO and CFO to make certifications that included the effectiveness of disclosure controls and procedures on a quarterly basis. GE and its management were also required to disclose these assessments. At all times during the Class Period, GE's SOX 404 and SOX 302 disclosures purported that its ICFR was effective. These disclosures necessitated that GE did not have a material weakness in its ICFR.

362.    In general, management's SOX 404 report is presented on an annual basis as of the end of an entity's fiscal year, while management's SOX 302 certification is included in each period the Company issues financial statements. Among other elements, the SOX 302 certification includes a discussion of any significant changes in the entity's ICFR since the prior reporting period. The specific nature of these reports, including management's obligations prior to releasing those reports, is discussed in greater detail in the sections below.

### (a)    GE's SOX 404 Assertions

363.    During the Class Period, GE assured investors that its ICFR functioned properly to prevent or detect and correct instances of materially inaccurate financial reporting. For example, GE reported: (GE 2016 Form 10-K, p.129).

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. With our participation, an evaluation of the effectiveness of our internal control over financial reporting was conducted as of December 31, 2016, based on the framework and criteria established in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2016.

364.     These disclosures assured investors that GE did not have a *material weakness* in

its internal control over financial reporting. A material weakness is a: (SEC Release No. 33-

8810 § II.A, p.9 n.18).

> [D]eficiency, or a combination of deficiencies, in internal control over financial
> reporting such that there is a reasonable possibility that a material misstatement
> of the registrant's annual or interim financial statements will not be prevented or
> detected on a timely basis.

365.     A reasonable possibility arises when the chance of a future event occurring (*e.g.*,

a material misstatement) is more than slight. (SEC Release No. 33-8810 § II.B, n.47).

> A significant deficiency is: (SEC Release No. 33-8829 § I, p.3)
> A deficiency, or a combination of deficiencies, in [internal control over financial
> reporting] that is less severe than a material weakness, yet important enough to
> merit attention by those responsible for oversight of the registrant's financial
> reporting.

366.     The SEC's SOX 404 guidance is organized around two broad principles, namely

that in evaluating the effectiveness of ICFR, management should consider the design of its

ICFR, and the operation of its ICFR.[104]

367.     An evaluation of ICFR begins with the identification and assessment of the risks

to reliable financial reporting. (*Id*. § II.A., pp.9-10) For example, it is axiomatic that effective

internal control over assumptions, such as those used in LTC Reserve-setting, requires that

documentation be maintained regarding important assumptions (or other similar criteria) used in

financial reporting. (SEC Rule 33-8810 states "Management is responsible for maintaining

evidential matter, including documentation, to provide reasonable support for its assessment.")

368.     While undertaking this evaluation, Defendants should have considered the

sources and potential likelihood of misstatements occurring within its financial statements. (*Id*.

§ I, p.4). In other words, the SEC emphasizes that management should "perform more extensive

---

[104] SEC Release No. 33-8810 § I, pp.4-5.

testing in high-risk areas." (*Id*. § I, p.5. *See also*, § III.B., p.48). In particular, the SEC observes that the likelihood that a control would fail to operate was an important consideration, including, for example, due to the complexity of the control or the risk of management override. (*Id.*, *see* § II.A.2.a, pp.25-26). Further, the SEC reiterates that ICFR impacting significant accounting estimates or critical accounting estimates, such as those impacting LTC Reserves, is generally assessed as higher risk. (*Id.*, *see* § II.A.2.a, pp.26-27).

369.    Next, management evaluates whether its ICFR is in place to address those risks (*i.e.*, the design of ICFR). (*Id.*, *see* § II.A.1, p.12). Finally, management should ensure that testing procedures are performed regarding the operating effectiveness of those ICFR. (*Id.*, *see* § II.A.2, p.21). The COSO Framework characterizes such testing as part of an entity's monitoring of ICFR (*e.g.*, "Monitoring ensures that internal control continues to operate effectively."). (COSO Internal Control – Integrated Framework, May 2013, Ch. 9, Monitoring, p.124).

370.    If management is aware, or determines, that a control is not designed or operating effectively, a deficiency exists that must be evaluated. (SEC Release No. 33-8810, *see* § II.A.1.b, p.15). Management's evaluation of the severity of a control deficiency does not necessitate that a material misstatement has already occurred. (*Id.* § II.B.1, p.35). Rather, the evaluation focuses on whether a reasonable possibility of a material misstatement existed. (*Id.*, "The severity of a deficiency in ICFR does not depend on whether a misstatement actually has occurred but rather on whether there is a reasonable possibility that the company's ICFR will fail to prevent or detect a misstatement on a timely basis.")

371.    This evaluation focuses on the impact if a misstatement were to occur. Impact is assessed as higher in consideration of factors such as financial materiality, the business area

affected, the business processes affected, effect on the entity's reputation, expected response of external stakeholders, as well as mitigating controls.

372.    The proper evaluation of the severity of deficiencies is critical. All significant deficiencies and material weaknesses must be reported to the audit committee. Further, management cannot disclose in its report that ICFR is effective if there is a single material weakness, and any material weakness requires disclosure of the nature of the deficiency in management's SOX 404 report. (SEC Release No. 33-8238, *see* § II.B.3.c). This is because significant internal control deficiencies adversely affect a company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with GAAP. These risks expose a company's financial statements to material misstatement.

### (b)    GE's SOX 302 Certifications

373.    The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") Framework states the CEO has the responsibility to establish the tone at the top for the organization. (COSO Internal Control – Integrated Framework, May 2013, Ch. 5, Control Environment, p.40 and Appendix B, p.149)[105] The CEO has "ultimate ownership responsibility for the internal control system." *(Id.)* This is why, at least in part, in addition to the requirements of SOX 404, SOX 302 requires executive officers of SEC registrants to certify that appropriate ICFR has been implemented and was operating effectively to enable an opinion that the Company's regulatory filings did not contain any untrue material facts or omit to state a material fact (*see* example certification included below).

---

[105] COSO is a joint initiative of five private sector accounting and auditing organizations dedicated to providing guidance on enterprise risk management, internal controls and fraud deterrence.

374.    During the Class Period, in each of GE's periodic financial statements filed with the SEC, GE's CEO and CFO made the following certification: (GE 2016 Form 10-K, Exs. 31(a) and 31(b))

1. I have reviewed this annual report on Form 10-K of GE Electric Company;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal

quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

375.    The SOX 302 certification addresses whether the financial statements and financial information are "fairly present[ed]." By rule, this statement is intended to include the management's discussion and analysis [MD&A] of financial condition and results of operation. (SEC Release No. 33-8124 § II.B.3). The term "fairly present" extends beyond whether the financial information was presented in accordance with generally accepted accounting principles (GAAP). Rather, the SEC's view was that fair presentation: *(Id.)*

[E]ncompasses the selection of appropriate accounting policies, proper application of appropriate accounting policies, disclosure of financial information that is informative and reasonably reflects the underlying transactions and events and the **inclusion of any additional disclosure necessary to provide investors with a materially accurate and complete picture** of an issuer's financial condition, results of operations and cash flows.

376.    A fact is material if there is "a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (ASC 250-10-S99).

377.    In addition, as seen in the certification above, SOX 302 certifications contain representations regarding two types of controls:  1) disclosure controls and procedures (see #4

above) and 2) ICFR (see #4b and d, and #5 above). While disclosure controls and procedures include key aspects of ICFR, (SEC Release No. 33-8238 §§ II.D and E) disclosure controls and procedures have a broader definition. (SEC Release No. 33-8124, § II.B ). Disclosure controls and procedures should "capture information that is relevant to an assessment of the need to disclose risks and developments that pertain to the issuer's business." *(Id.)*

378.     Ultimately, prior to making the SOX 302 certifications, management was required to conduct an appropriate evaluation of ICFR. In doing so, the SEC expected management's evaluation to focus on "areas of weakness or continuing concern." (SEC Release No. 33-8238 § II.E)

> While the evaluation is of effectiveness overall, a company's management has the ability to make judgments (and it is responsible for its judgments) that evaluations, particularly quarterly evaluations, should focus on developments since the most recent evaluation, areas of weakness or continuing concern or other aspects of disclosure controls and procedures that merit attention.

379.     This is because the "required evaluation should help to identify potential weaknesses and deficiencies in advance of a system breakdown, thereby ensuring the continuous, orderly and timely flow of information within the company and, ultimately, to investors and the marketplace." (SEC Release No. 33-8124 § VII).

### (c)     GE's "Audit" Personnel Were Not Competent to Assess LTC Reserves

380.     The outsized risk and uncertainty associated with GE's LTC Reserves warranted close attention from GE. In particular, for ICFR to operate effectively, GE needed experienced personnel to evaluate the Company's claims experience, monitor industry data, and assess whether GE had processes in place such that LTC Reserves were set in consideration of such data. GE, however, not only lacked the frontline personnel to enable such a process to occur,

GE also failed to implement effective monitoring of such processes to enable an adequate assessment of the effectiveness of its ICFR.

381. For example, FE-2 explained that prior to his audit of ERAC's LTC reserves, the only people that had ever looked into ERAC were part of GE's CAS program. FE-2 described CAS as a program at GE where entry level personnel (newly graduated from college) spend up to three years moving through the GE organization by going into various business units. According to FE-2, the CAS personnel would send 4-6 inexperienced people to supposedly audit "everything under the sun." CAS did not have actuaries or anyone experienced with evaluating models, so none of ERAC's underlying assumptions could be evaluated. This, according to FE-2, is not the same as a proper audit by experienced internal audit staff, but more akin to a management training program. Indeed, according to FE-2, Senior Management including Joseph Pizzuto, former Chief Audit Executive of GE Capital acknowledged that CAS is "not Internal Audit." According to FE-2, CAS was not capable of auditing the insurance business because they lacked understanding and were unable to challenge anything questionable. FE-2 adamantly reiterated that business units like ERAC need auditors that understand the business.

382. FE-1 further reported that GE's internal controls were a "myth." FE-1 recounted how he went through an internal audit and that GE's audit team did not have the necessary expertise. According to FE-1, GE was "looking for the appearance of controls" to make it look like the models were being audited, but they did not have the experience or knowledge to deal with the reality of the situation. He added that the reason that he was hired was to modernize and improve model governance, but he soon realized that GE management did not want actual

model governance controls; rather, they merely "wanted it look like they had model governance controls."

383.    FE-5 also reported that while GE created a more defined internal audit department after the Company had been officially designated as a SIFI, in 2015 GE's internal audit program was "bastardized" – particularly as it related to GE Capital issues.  According to FE-5, GE's CAS program morphed into a resource for GE rather than providing the function of thoroughly auditing all of the business units.  FE-5 advised that ultimately this led the auditors to be "less audit focused" which was detrimental to GE Capital specifically.  FE-5 added that Internal Audit became more hands-off and things were lost in the shuffle.

384.    FE-6 also confirmed that prior to the early 2015 audit of ERAC, no internal auditors had been auditing the ERAC unit. According to FE-6, the Fed described GE's CAS which had previously audited GE's various business units, as "a bunch of young individuals" with limited experience.   According to FE-6, the Fed's MRA (Matters Requiring Attention) memo detailed that GE Capital needed a more robust internal audit department than CAS with deeper industry knowledge and institutional knowledge of the various business units across all of GE Capital, including Insurance.  FE-6 further described the CAS personnel as not having the background knowledge to properly audit the various business units within GE Capital, especially the legacy insurance business which required oversight from an actuary.  According to FE-6, CAS would rotate every three months to a different business unit so there was no institutional knowledge or continuity.

385.    FE-6 explained that the Fed's "mandate" to increase the size, scope and knowledge of GE Capital's internal audit staff was carried out by Joseph Pizzuto.  Prior to the Fed's mandate the internal audit staff at GE Capital (excluding CAS) was roughly 15-20 people.

FE-6 also reported that the Fed required GE Capital to enhance their internal audit function from a "risk based perspective" by developing detailed audit plans that focused on higher risk areas of GE Capital and have more permanent personnel that were assigned to specific businesses.

### (d)   Defendants Violated SOX and Relevant SEC Regulations

386.   These issues in combination with the many control deficiencies described herein caused GE's internal controls concerning its LTC Reserves and Contract Assets to contain an material weakness at least as of December 31, 2014. This material weakness was attributable to the fact that GE's ICFR was not adequately designed to provide reasonable assurance regarding the reliability of the Company's financial reporting.

387.   GE's internal control for LTC Reserves was deficient in numerous respects, including in regard to the setting and review of reserve-related assumptions, model validation and control, and experience studies that underlay the LTC assumptions. The scope and seriousness of these control deficiencies evidenced a material weakness in internal control for GE's LTC Reserve processes concerning its financial reporting and disclosures because a reasonable possibility of a material misstatement resided in its financial statements.

388.   Put simply, and as described above, GE's ICFR was inadequate, which implicated the Company's inability to identify and correct material issues in its financial reporting associated with its LTC Reserves including the related benefit expenses reflected in its purported earnings and its margin testing. GE's material control weakness includes its:

> • Failure to design or implement controls that provided reasonable assurance of appropriately assessing LTC reserve-related assumptions. This deficiency included inadequate testing of the data employed in GE's assumptions and failure to consider adequate experience data, including industry data.

• Failure to have the right staff (*i.e.*, experience and depth), the right data (*e.g.*, without errors and for relevant recent periods and appropriate systems/models), adequate documentation, and adequate peer review.

• Failure to design or implement controls that provided reasonable assurance of appropriately governing and implementing the changes to assumptions into LTC models.

The LTC-related material weakness persisted through the Class Period.

389.    On January 16, 2018, the full extent of GE's deficient ICFR associated with LTC Reserves was revealed when GE acknowledged a massive charge to earnings and ongoing recapitalization of its LTC subsidiaries would be required.

390.    As described in herein, GE's ICFR associated with Contract Assets was also exposed to control deficiencies. While GE needed systematic and consistent procedures to yield reasonably dependable estimates of project costs instead, GE leveraged financial engineering techniques focused on accelerating profits.

391.    Ultimately, the Contract Asset-related control deficiencies failed to detect and correct the shortcomings in GE's estimation of project costs. While GE assumed revenue improvements and cost efficiencies to support material accelerations of accounting profit, GE was actually materially exposed to the declining power market and project cost overruns. Had GE's ICFR operated effectively, these cost overruns would have been identified and addressed on a timely basis. In that event, GE's acceleration of profits into earlier periods using Contract Assets would have been limited, or eliminated altogether.

392.    Further, GE's disclosure controls and procedures also failed to address the need for enhanced disclosures concerning GE's heightened use of its monetization strategy during 2016 and 2017.

393.    These Contract Asset-related control deficiencies comprised a material weakness that persisted through at least September 30, 2017. Soon thereafter, in the fourth quarter of

2017, GE installed new management, which implemented disciplined controls designed to address whether reported Contract Assets and related disclosures were appropriate. These controls, in turn, swiftly detected project cost overruns that required an $850 million change to earnings first reported by GE on January 24, 2018, along with enhanced disclosure regarding GE's financial engineering.

394.     As set forth above, SEC regulations required GE to focus on areas of weakness or continuing concern. Clearly, both LTC Reserves and Contract Assets met this criterion. As the SEC has stated, the reason for this focus is to identify deficiencies before a system breakdown so that users of GE's financial statements were provided with timely information.

395.     GE's control deficiencies aggregated in such a way that there was at least a reasonable possibility that a material misstatement of GE's financial statements relating to its LTC reserves or Contract Assets would not be prevented or detected on a timely basis (*i.e.*, the definition of a material weakness). Despite this, GE violated SOX and relevant SEC regulations, including SEC Release 33-8238 and 33-8810, by failing to make appropriate and required disclosure of this material weakness at any point during the Class Period.

396.     Consequently, GE's evaluation of its ICFR and its related disclosures in earlier periods constituted a severe departure from the diligence ordinarily expected in similar circumstances under SOX 404 and 302. These violations made Defendants statements and certifications relating to ICFR, including the assertions by GE management regarding the effectiveness of its Disclosure Controls and Procedures, pursuant to SOX 404 and 302 materially false and misleading.

## VII.   GE'S MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

397.     Throughout the Class Period, as detailed above, the financial metrics that GE published to investors with respect GE and GE Capital's quarterly and annual pre-tax earnings,

cash and equivalents, CFOA, and Segment Profits were each materially false and misleading because Defendants omitted to disclose that GE Capital failed to timely increase its reserves by billions of dollars for its LTC reinsurance business as required under state insurance regulations and GAAP.

398.    Specifically, Defendants failed to disclose that: (1) the assumptions and modeling underlying the LTC reserves were woefully stale and not properly updated despite GE's own experience (including its experience with the Genworth spin-off) and its knowledge of LTC trends and experience requiring the updating of these assumptions and modeling which would have led to material increases in LTC reserves; (2) GE was intentionally obfuscating the facts of its LTC exposure by failing to make the most basic disclosures required by GAAP (indeed during the Class Period, Defendants almost completely failed to make any meaningful disclosure regarding GE's LTC business or exposure); (3) GE failed to maintain sufficient internal controls over its financial reporting with respect to LTC reserves including for many years having a woefully insufficient internal audit function; (4) GE was stuck reinsuring the worst block of LTC policies after the Genworth spin-off because including them with Genworth jeopardized the spin-off; (5) GE had analyzed its LTC portfolio in 2015 and intentionally decided not to sell it because it would have required a large discount; (6) GE failed to take appropriate steps to increase its LTC Reserves because doing so would have eliminated the dividend cash flow from GE Capital to GE and would have impaired GE's ability to continue funding a dividend and repurchase shares for its shareholders; and (7) GE violated GAAP and SEC regulations by, among other things, under-reserving for LTC exposure and failing to disclose the true risks and uncertainties associated with the LTC book.

399.    Additionally, throughout the Class Period, as detailed above, the financial

metrics that GE published to investors with respect GE's Quarterly and Annual CFOA, Industrial CFOA, Contract Asset Balance, and Power Segment revenue and operating profits were each materially false and misleading because Defendants omitted to disclose that those figures were generated in reliance on unsustainable business practices and GAAP violations. Specifically, Defendants failed to disclose that: (1) in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically; (2) in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite; and (3) the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers.

400.    Accordingly, all of the Company's financial disclosures detailed in the charts below were materially false and misleading. Additionally, all of the SOX certifications contained in the Company's Form 10-Ks and Form 10-Qs detailed above and referenced in the charts below (including the representations that the reports did not contain material

misrepresentations or omissions and concerning management's assessment of internal controls)

were false and misleading for failure to disclose the information detailed above.

**GE's Annual Earnings, Cash, Profits, Cash Flow from
Operating Activities, Contract Asset Balance, Industrial CFOA and Power Revenues** [106]

| Earnings From Cont. Ops Before Taxes (In millions) | 2014 | 2015 | 2016 |
|---|---|---|---|
| GE Capital | 7,641 | (2,739) | (2,037) |
| Consolidated | 17,229 | 8,186 | 9,030 |

| Cash & Equivalents (In millions) | 2014 | 2015 | 2016 |
|---|---|---|---|
| GE Capital | 74,292 | 60,111 | 37,604 |
| Consolidated | 90,208 | 70,483 | 48,129 |

| Segment Operating Profits (In millions) | 2014 | 2015 | 2016 |
|---|---|---|---|
| Total Industrial Segment Profit (Loss) | 17,764 | 17,966 | 17,598 |
| GE Capital Profit (Loss) | 7,019 | (7,983) | (1,251) |
| Total Segment Profit (Loss) | 24,783 | 9,983 | 16,347 |

| Cash Flows From Operating Activities (In millions) | 2014 | 2015 | 2016 |
|---|---|---|---|
| GE CFOA | 15,171 | 16,354 | 29,960 |
| GE Industrial CFOA | 12,171 | 12,054 | 11,610 |

| Contract Assets (In millions) | 2014 | 2015 | 2016 |
|---|---|---|---|
| Consolidated | 16,960 | 21,156 | 25,163 |

| GE Power Segment (In millions) | 2014 | 2015 | 2016 |
|---|---|---|---|
| GE Power revenues | 27,564 | 21,490 | 26,827 |
| GE Power operating profits | 5,352 | 4,502 | 4,979 |

---

[106] The numbers included within these charts represent what GE published to investors after each quarterly or annual reporting period through its SEC filings. Because GE had discontinued operations within GE Capital at different times during the Class Period, subsequent SEC filings may contain adjusted historical numbers for comparability purposes that may differ from the numbers published in these charts.

**GE's Quarterly Earnings, Cash, Profits, Cash Flow
from Operating Activities, Contract Asset Balance and Industrial CFOA
Q 4 2014 - Q4 2017**

| Earnings From Cont. Ops Before Taxes (In millions) | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GE Capital | 2,247 | (6,301) | 856 | 769 | (2,454) | (948) | (623) | (163) | (303) | (139) | (195) | (211) |
| Consolidated | 6,079 | (4,948) | 3,583 | 3,257 | 1,903 | 238 | 3,824 | 2,074 | 2,893 | 832 | 1,515 | 1,466 |

| Cash & Equivalents (In millions) | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GE Capital | 74,292 | 73,632 | 74,644 | 82,276 | 60,111 | 65,778 | 42,192 | 41,939 | 37,604 | 33,689 | 29,829 | 27,019 |
| Consolidated | 90,208 | 87,055 | 91,666 | 99,086 | 70,483 | 75,075 | 52,123 | 52,530 | 48,129 | 41,564 | 44,049 | 39,854 |

| Segment Operating Profits (In millions) | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Industrial Segment Profit (Loss) | 5,988 | 3,560 | 4,356 | 4,530 | 5,522 | 3,314 | 4,122 | 4,320 | 5,842 | 3,622 | 3,947 | 3,630 |
| GE Capital Profit (Loss) | 1,891 | (12,544) | 218 | 734 | (1,615) | (893) | (600) | 26 | 215 | (47) | (172) | 24 |
| Total Segment Profit (Loss) | 7,879 | (8,984) | 4,574 | 5,264 | 3,907 | 2,421 | 3,523 | 4,345 | 6,057 | 3,575 | 3,775 | 3,654 |

| Cash Flows From Operating Activities (In millions) | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GE CFOA | | 1,340 | 2,610 | 2,576 | 9,828 | 7,856 | 2,833 | 7,653 | 11,618 | 370 | 3,215 | 465 |
| GE Industrial CFOA | | 890 | 2,610 | 2,576 | 5,978 | 356 | (745) | 3,757 | 8,242 | (1,630) | 1,467 | 1,740 |

| Contract Assets (In millions) | Q4 2014 | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | Q1 2017 | Q2 2017 | Q3 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consolidated | 16,960 | | | | 21,156 | 21,654 | 23,458 | 24,354 | 25,163 | 27,382 | 28,924 | 29,809 |

149

VIII.   **DEFENDANTS' ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS REGARDING LTC RESERVES AND CONTRACT ASSETS**

A.      **Defendants' Statements**[107]

1.      **Fourth Quarter and Full Year 2014**

401.    On January 23, 2015, GE issued a press release, and filed the same on Form 8-K

with the SEC, entitled "GE 4Q 2014 Earnings" summarizing the Company's financial and

operating results for the quarter and year ended December 31, 2014 and containing the same

false and misleading financial metrics referenced in the charts above.

402.    On the same day, the Company hosted a conference call during which Defendant

Immelt spoke positively about the Company and its financial condition:

> ***We ended the year with substantial liquidity and financial strength***. GE Capital ended the year with Tier 1 common ratio of 12.7%, substantially above the regulatory guidelines. ***We returned about $11 billion to investors in dividends and buyback***, and we remain on track for $12 billion to $15 billion for free cash flow and dispositions in 2015.

403.    Defendant Bornstein also provided opening remarks and added additional

information regarding GE Capital's financials:

> Our liquidity levels are strong, ending the quarter at $76 billion. This includes $13 billion attributable to Synchrony. . . . On the right side of the page, ***asset quality trends continue to be stable***, with significant improvements in our mortgage portfolio . . . .
>
> *              *              *
>
> ***Overall, Keith and the team continue to execute the portfolio strategy and deliver solid operating results.*** As we look forward to 2015, we expect GE Capital to generate about $0.60 on an EPS basis, as Jeff discussed last month during the annual Outlook Meeting. We expect GE Capital to earn approximately $1.5 billion in the first quarter of the year.

---

[107] In addition to GE's materially false and misleading financials and overstated earnings, cash flow, profits and contract assets, Plaintiff also alleges that the statements highlighted in bold and italics within this section were materially false and misleading and/or omitted to disclose material information as detailed herein.

404.    Following the opening remarks, Steve Tusa of JPMorgan asked about the

outlook for GE Capital dividends:

**Steve Tusa** - *JPMorgan - Analyst*

Got you. Then just one last question, just on cash. Jeff, just philosophically
around the dividend, you guys are bumping up against an 80%-ish type of payout
ratio on the free cash when it comes to the dividend. I mean, there is a pretty
significant -- it's a big dividend relative to your free cash flow.

Is that dividend viewed -- I mean, is there a fine line here? Given obviously the
location of cash makes it a little bit complicated as far as moving things around
and being able to pay that. Would you -- is there a fine line as a percentage of
free cash flow that you don't mind going over Industrial free cash flow and
paying the dividend?

I mean is it -- and as far as growth, do you view the dividend, it's a must-grow
over time? I'm just trying to get my hands around how much you defend that
dividend.

**Jeff Immelt**

You've got $16 billion of cash on the balance sheet right now. We are going to
do Alstom this year. ***You're still sitting on top of substantial excess cash in GE
Capital.***

Look, ***I view the dividend as being key***. We have capital allocation choices we
make. ***We're going to continue to grow our free cash flow as time goes on, and
we're comfortable with where we are right now***.

405.    On February 27, 2015, GE filed its Annual Report on Form 10-K with the SEC,

announcing GE's financial and operating results for the quarter and fiscal year ended December

31, 2014 (the "2014 Form 10-K"). This report contained the same false and misleading financial

metrics referenced in the charts above.

406.    In the 2014 Form 10-K, GE reported its total insurance liabilities at $27.578

billion and stated as follows with respect to asset impairment testing:

We review identified intangible assets with defined useful lives and subject to
amortization for impairment whenever events or changes in circumstances
indicate that the related carrying amounts may not be recoverable. . . . ***For our
insurance activities remaining in continuing operations, we periodically test***

151

***for impairment our deferred acquisition costs and present value of future
profits***.

407.    The 2014 Form 10-K also stated as follows with respect to GE's Contract Assets

(which at the time were identified in SEC filings as "contract costs and estimated earnings"):

> ***Contract costs and estimated earnings reflect revenues earned in excess of
> billings on our long-term contracts to construct technically complex equipment
> (such as power generation, aircraft engines and aeroderivative units) and
> long-term product maintenance or extended warranty arrangements. These
> amounts are presented net of related billings in excess of revenues relating to
> long-term product maintenance or extended warranty arrangements of $2,329
> million and $1,842 million at December 31, 2014 and 2013, respectively***.

408.    With respect to revenue recognition on LTSAs, the 2014 Form 10-K stated:

> Revenue recognition on long-term product services agreements requires
> estimates of profits over the multiple-year terms of such agreements, considering
> factors such as the frequency and extent of future monitoring, maintenance and
> overhaul events; the amount of personnel, spare parts and other resources
> required to perform the services; and future billing rate, cost changes and
> customers' utilization of assets. ***We routinely review estimates under product
> services agreements and regularly revise them to adjust for changes in outlook***.
> We also regularly assess customer credit risk inherent in the carrying amounts of
> receivables and contract costs and estimated earnings, including the risk that
> contractual penalties may not be sufficient to offset our accumulated investment
> in the event of customer termination. We gain insight into future utilization and
> cost trends, as well as credit risk, through our knowledge of the installed base of
> equipment and the close interaction with our customers that comes with
> supplying critical services and parts over extended periods. ***Revisions may affect
> a product services agreement's total estimated profitability resulting in an
> adjustment of earnings; such adjustments increased earnings by $1.0 billion,
> $0.3 billion and $0.4 billion in 2014, 2013 and 2012, respectively***. We provide
> for probable losses when they become evident.

409.    Defendants' statements  regarding excess cash and stable asset quality trends at

GE Capital and periodic testing of GE Capital's insurance portfolio for impairment (¶¶ 403 and

404) were materially false and misleading and failed to disclose:

(a)    the serious risks and uncertainties associated with GE's LTC exposure;

(b)    that the Company failed to timely record increases to LTC Reserves by

billions of dollars in violation of GAAP and statutory insurance regulations;

(c)    that the Company failed to maintain adequate internal controls over its financial reporting with respect to LTC Reserves; and

(d)    that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period.

410.    Defendant Immelt's statement regarding the dividends (¶ 402) was materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

411.    Defendants' statements regarding contract assets and revenue recognition on LTSAs (¶¶ 406-408) were materially false and misleading and failed to disclose:

(a)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)    that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of

153

GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers;

(d)     that the Company failed to maintain adequate internal controls over its financial reporting with respect to its Contract Assets; and

(e)     that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period and GE's public statements were materially false and misleading at all relevant times and omitted the material information discussed herein.

### 2.     GE's February 2, 2015 Letter to the Fed

412.     Moreover, in a February 2, 2015 letter from Keith S. Sherin, then Vice Chairman of GE and CEO of GE Capital, to Robert Frierson, Secretary Board of Governors of the Federal Reserve System, Sherin detailed, among other things, the responsibilities of ***GE's Risk Committee,*** formed in 2011, which purportedly had "ultimate responsibility for oversight of GECC's enterprise risks" and which had "established a rigorous meeting and engagement process to oversee GECC effectively and independently."  Sherin described GE's Risk Committee as follows:

> ***GE Risk Committee***
>
> Ultimate responsibility for oversight of GECC's enterprise risks is currently vested in the GE Risk Committee, whose principal charter is to provide "independent oversight of the Company's wholly-owned subsidiary, General Electric Capital Corporation (GECC), including the adequacy and effectiveness of its risk management and credit review functions." This is the core of what GECC and GE strongly believe to be a thoughtful and effective protocol for managing GECC's risks while maintaining an informed view of the relationship between GECC and GE.
>
> The GE Risk Committee consists of four eminently qualified and dedicated independent directors who have significant financial services experience and who have successfully led institutions in both the private and public sectors… W. Geoffrey Beattie, John J. Brennan, James E. Rohr, and Mary L. Schapiro….

*The GE Risk Committee has established a rigorous meeting and engagement process to oversee GECC effectively and independently. Its GECC-focused oversight has steadily intensified since the Committee's formation in 2011, with more frequent and more in-depth meetings and other sessions with GECC management. In 2014, the GE Risk Committee convened more than 20 meetings focused on GECC matters.* The GE Risk Committee has added monthly calls with the GECC Chief Risk Officer and senior leadership to allow for more comprehensive risk updates. The annual schedule includes in-depth reviews of each GECC business, site visits to GECC locations and GE Risk Committee exposure to a range of GECC risk and business leaders and other subject matter experts. We anticipate a similar GE Risk Committee schedule during 2015. The meeting schedule is illustrative, but of course captures only a portion of the time that the GE Risk Committee members spend on GECC oversight when also accounting for informal interactions with GECC management, preparation for meetings and review of board reporting and other materials.[108]

413.    Defendant Sherin's statements regarding risk management at GE were materially false and misleading and failed to disclose that the Company maintained inadequate internal controls over its financial reporting with respect to LTC reserves and financial reporting.

### 3.    Barclays Industrial Select Conference (February 18, 2015)

414.    On February 18, 2015, GE presented at the Barclays Industrial Select Conference.  After opening remarks, the Company answered analyst questions. Scott Davis of Barclays Capital asked:

**Scott Davis** - *Barclays Capital – Analyst*

[W]hat is it that the GE management team is missing that isn't capturing the attention of investors and getting people to own the stock?

**Jeff Bornstein**

I think that there has been a lot of uncertainty around GE Capital and what is the right size; what options do we have; what does it mean to be a SIFI. Your dividend and capital allocation policy at GE capital is subject to, ultimately in 2017, to a formal CCARs process publicly, etc.

---

[108] As set forth in the February 2, 2015 letter, GE's Risk Committee was made up of four independent directors from GE's board (W. Geoffrey Beattie, John J. Brennan, James E. Rohr, and Mary L. Schapiro) with significant financial services, accounting and risk management experience.

I get a lot of questions around what is the optionality or what is the right -- and **we are absolutely laser focused on monetizing the entirety of the $130 billion [ret] portfolio. And we will continue to look at the balance of the portfolio and make sure we are staying in platforms that add real value.**

415.     Defendant Bornstein's comments (¶ 414) were materially false and misleading and failed to disclose that instead of being able to "monetize" the GE Capital portfolio, only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

### 4.     GE Capital Investor Meeting (April 10, 2015)

416.     On April 10, 2015, GE announced a major restructuring strategy that included: (1) the sale of substantial GE Capital assets; and (2) a plan to return more than $90 million to GE shareholders through 2018 through cash dividends, a $50 million share buyback program and a share exchange involving the split-off of Synchrony Financial, GE Capital's North American retail finance business.

417.     The same day, the Company hosted a conference call during which Defendant Immelt stated, in part:

Today we are announcing a definitive step in our evolution to create a focused infrastructure and technology company. We plan to sell most GE Capital assets over the next 18 to 24 months and **remain primarily in core verticals and markets GE knows best**.

418.     Keith Sherin provided additional information regarding GE Capital:

Thank you, Jeff. As you all know, we have done a lot over the last six years to shrink GE Capital while also **making it much safer**.

*        *        *

[T]here has been more discussion around the SIFI de-designation process. De-designation guidance was published in February and the recent congressional hearings gave us additional input on regulatory thinking around the subject.

*     *     *

We have obviously been just watching what the FSOC is saying. In February, there were some brief guidelines issued about the offramp and that is a start. Obviously no one has ever done it.

And then obviously the hearings, the Congressional hearings, I think you look at some of the commentary around the hearings, one that SIFIs received higher capital charges to encourage them to shrink. Two, that if a SIFI actually changed its business model they should come in and talk to the FSOC about the change and what it meant for the designation. And those things, those three things, all line up with our strategy here around capital allocation.

***So we are trying to achieve an objective that is good for the financial system that is also really good for our shareholders and I think we have found that sweet spot here***.

I would say is the faster we go and the smaller we get, certainly in the US, as Jeff said, the earlier we will be able to address the characteristics that made us systemic and apply to de-designate.

419.    In discussing the "Future [of] GE Capital segment," Sherin stated, in part:

So next I want to just give you a snapshot of GE Capital going forward. The left side shows the ending net investment forecast for the next several years. You can see that we plan to shrink rapidly. Our goal is to get down to $90 billion globally by the end of 2017. Our estimate is that we will have about $50 billion of ENI outside the US and about $40 billion in the US.

On the right side you can see that the future GE Capital segment will have about $1.5 billion in net income and a 13% return on tangible equity, ***ex[cluding]-insurance. We plan on giving you the pro forma financial information for this future GE Capital every quarter as we go forward.***

420.    Defendant Bornstein followed up by summarizing as follows:

***In this construct we believe that we will be in a position to return up to $90 billion or more of cash between 2015 and 2018 through dividends, buybacks*** and the Synchrony exchange. The dividend remains a priority for the Company. ***We plan to maintain the current dividend through 2016 and expect it to grow thereafter***. The current dividend yield on the stock is an attractive 3.7%.

421.    The Bank of America analyst, Andrew Obin, asked:

**Andrew Obin** - *BofA Merrill Lynch - Analyst*

I guess what I was asking is that there is a linkage -- there is a regulatory linkage between GE Industrial balance sheet and GE Capital and from that perspective

the fact that you still continue to support GE Capital's debt, what does that imply for ability to lever up GE Industrial? That's what I am asking. (multiple speakers)

**Jeff Bornstein**

I understand your question. As Dan went through, we are going to maintain enormous amounts of liquidity. We will have 24 months of maturity coverage in excess of 140% as we work through this plan. So that's effectively defeasing the maturities associated with that GE Capital debt. **There is not going to be anything implied on the GE balance sheet for that debt as part of the guarantee**. As long as GE Capital and the rating agencies are comfortable that the cash flows of GE Capital can be a source to repay those maturities, that debt will not be applied on the GE Company metrics.

422.    Jeff Sprague, an analyst from Vertical Research, asked a question regarding the dividend going forward:

**Jeff Sprague** - *Vertical Research - Analyst*

All right. And then finally, what would you consider a normal payout ratio then as you think about the dividend going forward?

**Jeff Bornstein**

Around 50%.

**Jeff Immelt**

I think in the context, Jeff, of the dividend, flat or growing. In other words *I think the dividend is key for the stock* and I think that's the way investors ought to be thinking about it. And again with all of this buyback, the cash outlay on dividends is -- reduces dramatically.

423.    On this news, GE's common stock jumped by $2.78, or 10.8 percent to close at $28.51 per share on April 10, 2015.

424.    Defendants Immelt's and Bornstein's statements regarding the dividends (¶¶ 420 and 422) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

425.    Defendant Sherin's statements (¶ 418) about SIFI de-designation were materially false and misleading and failed to disclose that the real reason GE was seeking de-designation as a non-bank SIFI was that the Company did not want federal regulators looking into GE Capital's books including its materially understated LTC liabilities and weak internal controls.

426.    GE's calculation of income and tangible equity excluding LTC insurance liabilities (¶ 419) and the Company's failure to address its substantial LTC liabilities in a call devoted entirely to GE Capital's businesses made these statements materially false and misleading.

### 5.    GE Responds to Genworth's LTC Reserve Charges (April 14, 2015)

427.    An April 14, 2015 article in TheStreet.com, written by Dan Freed and entitled, "*GE Stuck With $28 Billion Insurance Liability*" noted that in the wake of Genworth's increases to its LTC Reserves GE was asked about its own LTC exposure and why it was selling its LTC assets.[109]  The article reported:

> GE spokesman Seth Martin declined to comment on why GE isn't selling these assets, but says they are in runoff. "We have not written any new policies in several years."

428.    GE's statements were materially false and misleading and failed to disclose that the Company was failing to timely record increases to LTC Reserves of billions of dollars in violation of GAAP and statutory insurance regulations.

### 6.    First Quarter 2015

429.    On April 17, 2015, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 1Q 2015 Earnings," summarizing the Company's financial and

---

[109] Dan Freed, *GE Stuck With $28 Billion Insurance Liability*, TheStreet (Apr. 14, 2015), https://www.thestreet.com/story/13112319/1/ge-stuck-with-28-billion-insurance-liability--exclusive.html

operating results for the quarter ended March 31, 2015 and containing the same false and

misleading financial metrics referenced in the charts above.

430.    On the same day, the Company hosted a conference call during which Defendant

Immelt stated, in part:

> Meanwhile simplification continues to track good results and we're seeing more
> benefits ahead. *One of the goals for 2015 is to expand margins in both*
> *equipment and service. We grew equipment margins by 120 basis points and*
> *service by 70 basis points in the quarter. We are making progress on margins*
> *as a Company*.
>
> *       *       *
>
> Dispositions in CFOA are on track and *we expect GE Capital to dividend*
> *between $500 million and $7 billion in line with what we talked about last week*
> *and we will update this as we go through the year*. We will continue to drive
> investor friendly capital allocation. *The dividend remains a top priority*. . . *So*
> *between Synchrony, the buyback and dividends we can return $90 billion to*
> *investors over the next few years*.

431.    In response to a question from Joe Richie of Goldman Sachs about whether de-

designation as a non-bank SIFI was the goal of the GE Capital asset sales, Defendant Bornstein

responded in the affirmative:

> You are correct, I would say the second order of priority would be we think in
> the US our ability to execute quickly and in scale is very favorable today and it is
> a big part of the discussion around the SIFI status.

432.    Defendant Immelt's statement regarding the dividends (¶ 430) materially false

and misleading and failed to disclose that only by materially under-reserving for liabilities

related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free

cash flow for its quarterly dividend payments and stock buyback program.

433.    Defendant Bornstein's statement about the goal of the GE Capital Exit Plan asset

sales being SIFI de-designation (¶¶ 430-431) was materially false and misleading and failed to

disclose that the real reason GE was seeking de-designation as a non-bank SIFI was that the

Company did not want federal regulators looking into GE Capital's books including its materially understated LTC liabilities and weak internal controls.

434.    GE filed a Quarterly Report on Form 10-Q with the SEC, on May 4, 2015, announcing GE's financial and operating results for the quarter ended March 31, 2015.  This report contained the same false and misleading financial metrics referenced in the charts above.

### 7.    Annual Shareholders Meeting (April 22, 2015)

435.    On April 22, 2015, GE hosted its Annual Shareholders Meeting during which Defendant Bornstein stated, in relevant part:

> And we have more clarity now regulatorily on the off ramp from de-designated from being a systemically important financial institution. And we've got an approach that we think is shareholder friendly, allows us to execute this with a level of purchasing cost that we think is plausible for shareholders. ***And over time, as Keith Sherin and the team execute this plan, we see an opportunity to return about $35 billion of capital from GE Capital back to the company, and ultimately, back to you.***
>
> S***o between now and 2018, our view is, we can deliver $90 billion plus back to shareholder, and we'll do that a number of different ways***. ***One is through the dividends. We are very focused and supportive of the dividend. It's one of our single biggest priorities***.
>
> We plan for the dividend to remain where it is today, probably through 2016. We expect it from there to grow as earnings grow into the future.
>
> *     *     *
>
> ***And then in the plan that Keith and the team are executing, where we shrink GE Capital to just the core, return $35 billion of excess capital, and we use those proceeds to buy back the company stock,*** we'll lose $0.25 a share of earnings from GE Capital from those businesses we sold, but we'll get $0.25 back in accretion with a lower share count outstanding.

436.   Defendant Immelt stated:

Two weeks ago, we announced a significant strategic change for G.E. Capital. In the future, we'll focus only on financing businesses connected to G.E.'s industrial markets and sell the remainder of G.E. Capital. We've already achieved a large part of this goal through the Synchrony split and the sale of our commercial real estate business.

***Executing this plan should allow us to deliver $90 billion in dividends and buyback over the next few years.***

437.   Defendants Immelt and Bornstein's statements regarding the dividends and buybacks (¶¶ 435-436) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

438.   Defendant Bornstein's statements about the GE Capital SIFI de-designation off-ramp (¶ 435) were materially false and misleading and failed to disclose that the real reason GE was seeking de-designation as a non-bank SIFI was that the Company did not want federal regulators looking into GE Capital's books including its materially understated LTC liabilities and weak internal controls.

### 8.   Electrical Products Group Conference (May 20, 2015)

439.   On May 20, 2015, GE attended the Electrical Products Group Conference during which Defendant Immelt made a presentation on behalf of the Company regarding reducing the Company's  investment in GE Capital:

So who gets the money? This is again just talking about -- there is going to be a ton of cash generated and the answer is primarily you. Primarily our investors are going to get dividend growth. You're going to get -- the Synchrony split comes back in $20 billion, the $35 billion coming from. . . .

\*         \*         \*

162

So that's GE. I think like the portfolio, like the moves we have made. ***Strong portfolio, balanced portfolio, really in good shape***.

440.     Defendant Immelt's statement regarding GE Capital having a "[s]trong portfolio, balanced portfolio, really in good shape" (¶ 439) was materially false and misleading and omitted to disclose that the Company was failing to timely record increases to LTC reserves of billions of dollars in violation of GAAP and statutory insurance regulations.

### 9.     Sanford C. Bernstein Strategic Decisions Conference (May 27, 2015)

441.     On May 27, 2015, GE made a presentation at the Sanford C. Bernstein Strategic Decisions Conference during which Defendant Sherin reported the following business update on GE Capital:

**Keith Sherin**

***The verticals as we go forward. These are really very strong businesses. They are connected to GE***. They provide synergy between the industrial and the financial business. We will have about $90 billion of investment. We will earn about $1.5 billion, have a tangible equity of 13% ex-insurance.

*             *             *

In terms of the Company priorities, ***the dividend remains a priority. It's going to be flat in 2016 and then grow thereafter***. . . .   The buyback of $35 billion from GE Capital, basically we need to shrink our risk-weighted assets, get the proceeds from those sales and then return that capital back to the parent over time and we have a small amount that we think we've will be working on for the fourth quarter of 2015 and then our capital plan for 2016 will deliver a substantial amount of that back and there may be some that comes back in 2017.

442.     Defendant Sherin's statement regarding the dividends and buyback (¶ 441) was materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

443.     Defendant Sherin's statement regarding GE Capital's Verticals business (including the insurance businesses) being "really very strong businesses" (¶ 441) was

materially false and misleading and failed to disclose that the Company was failing to timely record increases to LTC Reserves by billions of dollars in violation of GAAP and statutory insurance regulations.

### 10. Second Quarter 2015

444. On July 17, 2015, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 2Q 2015 Earnings," summarizing the Company's financial and operating results for the period ended June 30, 2015 and containing the same false and misleading financial metrics referenced in the charts above.

445. On July 30, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2015. This report contained the same false and misleading financial metrics referenced in the charts above.

446. In the Form 10-Q's MD&A section, GE again described its GE Capital Exit Plan in substantially the same language that it used on May 4, 2015.

### 11. Third Quarter 2015

447. On October 16, 2015, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 3Q 2015 Earnings," summarizing the Company's financial and operating results for the quarter ended September 30, 2015 and containing the same false and misleading financial metrics referenced in the charts above.

448. On November 2, 2015, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2015. This report contained the same false and misleading financial metrics referenced in the charts above.

### 12.    Annual Outlook Investor Meeting (December 16, 2015)

449.    On December 16, 2015, GE hosted its Annual Outlook Investor Meeting during which Defendant Immelt presented an overview of the Company and spoke at length regarding the restructuring of GE Capital:

> We are returning a lot of cash to investors, $32 billion to investors from a standpoint of dividend and Synchrony and buyback. And we continue to invest in growth, in organic growth.
>
> *        *        *
>
> Free cash flow plus dispositions will be towards the higher end of that range. The way to think about that is we received a $2.5 billion dividend from GE Capital last Friday for a total of $3 billion for the year. We could get an additional dividend yet this year and so that has made up for the lack of having the appliance transaction close in 2015.
>
> *        *        *
>
> Dividends in 2015 and 2016 what we are counting on and then the rest will come in in 2017 and 2018. Like I said earlier, we had a $500 million dividend in the first quarter this year. We received an additional $2.5 billion last week, so that is a total of $3 billion. And we still think there is a good chance we will get a good chance we will get an additional $1.5 billion this year and still do $18 billion next year.

450.    Defendant Immelt's statement regarding the dividends (¶ 449) was materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

### 13.    Fourth Quarter & Full Year 2015

451.    On January 22, 2016 GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 4Q 2015 Earnings," summarizing the Company's financial and operating results for the quarter and year ended December 31, 2015 and containing the same false and misleading financial metrics referenced in the charts above.

452.    On February 26, 2016, GE filed  its 2015 Form 10-K announcing GE's financial and operating results for the quarter and fiscal year ended December 31, 2015.  This report contained the same false and misleading financial metrics referenced in the charts above.

453.    The 2015 Form 10-K stated as follows with respect to Contract Assets:

*Contract assets reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems and aircraft engines), long-term product maintenance or extended warranty arrangements and other deferred contract related costs. Long-term product maintenance amounts are presented net of related billings in excess of revenues of $2,602 million and $2,329 million at December 31, 2015 and 2014, respectively. Included in contract assets at December 31, 2015, is $1,979 million related to the Alstom acquisition*.

454.    The 2015 Form 10-K also reported as follows with respect to revenue recognition on LTSAs:

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*. We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. *Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $1.4 billion, $1.0 billion and $0.3 billion in 2015, 2014 and 2013, respectively*. We provide for probable losses when they become evident.

455.    The 2015 Form 10-K also repeated the following with respect to asset impairment testing:

We review identified intangible assets with defined useful lives and subject to amortization for impairment whenever events or changes in circumstances indicate that the related carrying amounts may not be recoverable.  . . *For our*

166

*insurance activities remaining in continuing operations, we periodically test for impairment our deferred acquisition costs and present value of future profits*.

456.    With respect to LTC reserve testing, the 2015 Form 10-K stated:

Our run-off insurance activities include providing insurance and reinsurance for life and health risks and providing certain annuity products. Two primary product types are provided: traditional insurance contracts and investment contracts. Insurance contracts are contracts with significant mortality and/or morbidity risks, while investment contracts are contracts without such risks. . . . For traditional long-duration insurance contracts, including long-term care, term, whole life and annuities payable for the life of the annuitant, we report premiums as earned income when due . . . . *Liabilities for unpaid claims and estimated claim settlement expenses represent our best estimate of the ultimate obligations for reported and incurred-but-not-reported claims and the related estimated claim settlement expenses. Liabilities for unpaid claims and estimated claim settlement expenses are continually reviewed and adjusted through current operations*.

457.    Defendants' statements  regarding (i) periodic testing of GE Capital's insurance

portfolio for impairment; (ii) LTC Reserves "represent[ing] our best estimate of the ultimate

obligations" and (iii) LTC liabilities being "continually reviewed and adjusted through current

operations" (¶ 456) were materially false and misleading and failed to disclose:

(a)    emerging LTC trends in GE's own "Tests of Claims Reserves" at ERAC

and UFLIC;

(b)    the serious risks and uncertainties associated with GE's LTC exposure;

(c)    that the Company had "again reviewed" its insurance exposure, including

its  LTC insurance exposure in 2015 but had taken no action to materially increase its LTC

reserves  despite alarming adverse claims experience in the LTC policies it was reinsuring and

mounting industry-wide negative trends in the LTC market;

(d)    that the Company failed to timely record increases to LTC reserves by

billions of dollars in violation of GAAP and statutory insurance regulations;

(e)     the Company failed to maintain adequate internal controls over its financial reporting with respect to LTC reserves; and

(f)     that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period.

458.   Defendants' statements regarding contract assets and revenue recognition on LTSAs (¶¶ 453 and 454) were materially false and misleading and failed to disclose:

(a)     that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)     that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)     that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers;

(d)    that the Company failed to maintain adequate internal controls over its

financial reporting with respect to its Contract Assets; and

(e)    that as a result of the foregoing, GE materially overstated its earnings and

cash flows during the Class Period and GE's public statements were materially false and

misleading at all relevant times and omitted the material information discussed herein.

### 14.    Barclays Industrial Select Conference (February 17, 2016)

459.    On February 17, 2016, GE participated in the Barclays Industrial Select

Conference during which Defendant Bornstein provided a summary of the Company's current

financial status and future prospects, including those specific to GE Capital.  As part of his

presentation, with respect to the dividend from GE Capital, Defendant Bornstein stated "***we***

***expect the business to dividend about $18 billion back to the Company this year.  We plan on***

***investing that $18 billion in reducing the share count in the Company***."

460.    Defendant Bornstein's statements regarding dividends and buybacks (¶ 459)

were materially false and misleading and failed to disclose that only by materially under-

reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to

maintain sufficient free cash flow for its quarterly dividend payments and stock buyback

program.

### 15.    First Quarter 2016

461.    On April 22, 2016, GE issued a press release, and filed the same on Form 8-K

with the SEC, entitled "GE 1Q 2016 Earnings," summarizing the Company's financial and

operating results for the quarter ended March 31, 2016 and containing the same false and

misleading financial metrics referenced in the charts above.

462.    On the same day, the Company hosted a conference call during which Defendant Immelt spoke positively about the Company overall, including GE Capital, its portfolio and the expected dividend:

> We continue to execute our GE Capital strategy. We have $166 billion of Capital deals signed. GE Capital sent a $7.5 billion dividend to the Parent in the quarter, and GE Capital filed for SIFI de-designation in March.

> *        *        *

> We returned $8.3 billion to investors in dividend and buyback, and our capital allocation framework remains on track. Importantly, we are reaffirming our 2016 framework goal of $1.45 to $1.55 EPS, 2% to 4% organic growth, CFOA of $29 billion to $32 billion, and $26 billion of cash to investors.

> Our performance in the quarter again validates the strength of the GE operating model. Diversity is a key strength during this period of volatility.

> *        *        *

> Cash was in line with expectations. As I said earlier, we received a $7.5 billion dividend from Capital.

> *        *        *

> ***Our balance sheet remains very strong, and we ended the quarter with $106 billion of liquidity at GE Capital*** and $9 billion of cash on the balance sheet. Meanwhile, we returned $8.3 billion of cash to investors in buyback and dividend.

> ***We expect to receive $18 billion from GE Capital for the year*** . . .

463.    Defendant Bornstein also provided some insight into GE Capital:

> The last segment I'll cover is GE Capital. Our Verticals businesses earned $496 million this quarter. That's up 43% from prior year, driven by higher gains, better operations, partially offset by lower tax benefits and impairments. ***Portfolio quality continues to remain stable***.

> *        *        *

> The timing of dividends for the rest of the year is dependent on the timing of deal closures, but we expect to pay roughly half of the $18 billion we've targeted in the first half of the year and the remainder in the second half.

> *        *        *

Overall, Keith and the GE Capital team have executed ahead of schedule and on all aspects of the plan we shared with you one year ago. We expect to be largely completed with the asset sales by 2016.

On March 31 we filed the request to the FSOC for the rescission of GE Capital's designation as a SIFI. The filing demonstrates that GE Capital has substantially reduced its risk profile and is significantly less interconnected to the financial system, and therefore does not pose any threat to the US financial system. We hope to complete the de-designation process as soon as possible.

464.    Following the Company's opening remarks, the Company opened the line to analysts' questions.  Deane Dray of RBC Capital Markets asked about the "cadence of buybacks, that $18 billion" and the "sequence" for the "balance of the year," to which Defendant Bornstein responded:

The way we planned it out, as you saw in the cash flow walk that Jeff took you through, we bought $6.1 billion worth of stock back through the first quarter. Our plan is to buy back roughly 50% in the first half, 50% in the second half; and that's how we're still planning for the dividends to flow from GE Capital. No change versus what we suggested we would do.

465.    On May 4, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended March 31, 2016.  This report contained the same false and misleading financial metrics referenced in the charts above.

466.    The Form 10-Q also stated the following with respect to Contract Assets:

***Contract assets reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems and aircraft engines), long-term product maintenance or extended warranty arrangements and other deferred contract related costs. Long-term product maintenance amounts are presented net of related billings in excess of revenues of $2,675 million and $2,602 million at March 31, 2016 and December 31, 2015, respectively***.

467.    Defendant Immelt's statements regarding the dividends (¶ 462) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program. Defendant

Bornstein's statement regarding the portfolio quality at the GE Capital Verticals business "remain[ing] stable" was materially false and misleading and failed to disclose that the Company was failing to timely record increases to LTC Reserves by billions of dollars in violation of GAAP and statutory insurance regulations.

468.    Defendants' statements regarding its Contract Assets (¶ 466) were materially false and misleading and failed to disclose:

(a)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)    that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers;

(d)     that the Company failed to maintain adequate internal controls over its

financial reporting with respect to its Contract Assets; and

(e)     that as a result of the foregoing, GE materially overstated its earnings and

cash flows during the Class Period and GE's public statements were materially false and

misleading at all relevant times and omitted the material information discussed herein.

### 16.     Sanford C. Bernstein Strategic Decisions Conference (June 1, 2016)

469.     On June 1, 2016, GE presented at the Sanford C. Bernstein Strategic Decisions

Conference during which Defendant Sherin spoke about GE Capital:

> So, we are a lot smaller. Assets are down 50% when we filed and even within
> that a third of the assets that are remaining are in cash and liquidity. That's up
> substantially from where it was when we were designated. And we are not just
> smaller; we exited whole pools of risk.
>
> *            *            *
>
> ***In 2016 our plan is to return $18 billion of dividends. We are on track for that.
> We paid $7.5 billion in the first quarter. We do need a SIFI de-designation to
> realize the total objectives we have here, but we feel confident about our ability
> to finish the remaining sales and close the assets. That's the biggest driver here
> is lowering our risk-weighted assets by closing on these asset sales. That frees
> up the capital and the excess capital we're returning back to the parent***.
>
> *            *            *
>
> Here's the earnings outlook for GE Capital. We've been giving the total net
> income forecast for GE Capital just to try to make it easier. With all the moving
> parts it's been tough to forecast. So, our verticals estimate for this year is $1.6
> billion, as we said.
>
> *            *            *
>
> So, to be able to basically dismantle GE Capital and take it to a place where
> we've got $80 billion of ending net investment and to get the excess interest cost
> out of here in that time frame has been a really -- ***it's a great profile overall.***
>
> *            *            *
>
> And then you look at capital continuing overall. We are going to lose a little over
> $1 billion this year. We had in April 10 we forecast to lose around $1 billion. We
> think we will make between zero and $0.5 billion in 2017 and we had a forecast

for breakeven roughly. And then in 2018 a little under $1 billion is what we forecast on April 10, and we are somewhere between $0.5 billion and $1 billion on a consolidated basis.

470.    Following Sherin's remarks, Steve Winoker, an analyst from Sanford C.

Bernstein, asked Sherin to put GE's transformation into context.  Sherin falsely represented that

all of GE Capital's "insurance business is gone."

**Steve Winoker - Sanford C. Bernstein**

And I was going to say, Keith, you may not look it, but you've been at the Company for 35 years. And so, can you help portfolio managers in the audience from a long-term contexts put the current transformation over just the last year and a half into context from an investment perspective as they think about the business going forward?

**Sherin**

Yes, I think the last year and a half has been dramatic, but it's really it's been many years of portfolio change. ***If you look at what the portfolio is today versus take it when Jeff started, all of the insurance business is gone. That was a huge change in the portfolio***. All the materials businesses are now out of the portfolio, the plastics, the specialty materials, silicones.

\*        \*        \*

We feel like this GE Capital plan just makes the Company so much simpler. One, for investors, I think it's been too complicated for investors; and two, to run. I think for GE leadership going forward it's just a simpler portfolio with a lot more common processes, a lot more common customers and a lot more common shared services inside the Company from, as I said, the R&D, the services and the globalization. It's a cleaner more synergistic portfolio.

So we feel great about it.

471.    Defendant Sherin's statement that GE Capital's insurance portfolio was gone

(¶ 470) was materially false and misleading and failed to disclose:

> (a)    that GE in fact retained significant LTC business and exposure;

> (b)    the serious risks and uncertainties associated with GE's existing LTC

insurance exposure;

174

(c)     that the Company had "again reviewed" its insurance exposure, including its  LTC insurance exposure in 2015 but had taken no action to materially increase its LTC reserves  despite alarming adverse claims experience in the LTC policies it was reinsuring and mounting industry-wide negative trends in the LTC market; and

(d)     that the Company was failing to timely record increases to LTC reserves by billions of dollars in violation of GAAP and statutory insurance regulations.

472.   Defendant Sherin's statements regarding the dividends (¶ 469) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

### 17.     Second Quarter 2016

473.   On July 22, 2016, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 2Q 2016 Earnings," summarizing the Company's financial and operating results for the quarter ended June 30, 2016 and containing the same false and misleading financial metrics referenced in the charts above.  The press release also noted that on June 28, 2016, the FSOC rescheduled GE Capital's designation as a non-bank SIFI.

474.   On the same day, the Company hosted a conference call during which defendant Bornstein noted that the Company had a higher insurance reserve provision "***resulting from updates to our models on our runoff long-term care book***" and that the portfolio quality of the LTC book "***remains stable.***"

> In addition, in the second quarter, GE borrowed $5 billion from GE Capital which will mature in the fourth quarter of this year. This makes a ton of sense for the Company as we already own the excess debt and the borrowing cost is lower than our dividend yield. The proceeds were used for an accelerated share repurchase program launched in June. This helps accelerate our buyback within the year.

* * *

Last, I will cover GE Capital. As mentioned earlier on June 28, GE Capital was de-designated as a systemically important financial institution marking a major step in our GE Capital exit plan. Our vertical businesses earned $452 million this quarter down 15% from prior year including higher base earnings offset by lower gains and *higher insurance reserve provisions resulting from updates to our models on our runoff long-term care book. Portfolio quality remains stable.*

475.   On August 1, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended June 30, 2016 (the "2Q 2016 Form 10-Q"). This report contained the same false and misleading financial metrics referenced in the charts above.

476.   The 2Q 2016 Form 10-Q also stated the following with respect to Contract Assets:

*Contract assets reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems and aircraft engines), long-term product maintenance or extended warranty arrangements and other deferred contract related costs. Long-term product maintenance amounts are presented net of related billings in excess of revenues of $2,948 million and $2,602 million at June 30, 2016 and December 31, 2015, respectively*.

477.   In the 2Q 2016 Form 10-Q's MD&A section discussed the GE Capital Exit Plan in relevant part as follows:

**THE GE CAPITAL EXIT PLAN**

Under the GE Capital Exit Plan . . . the Company will retain certain GE Capital businesses, principally its vertical financing businesses  . . . that relate to the Company's core industrial domain and other operations, **including our run-off insurance activities**, and allocated corporate costs (together referred to as GE Capital Verticals or Verticals).

*We expect GE Capital to release approximately $35 billion in dividends to GE (subject to regulatory approval) as a result of the sale of GE Capital assets.* We received $4.3 billion in dividends from GE Capital in 2015 and $11 billion in the first half of 2016. In July 2016, we received an additional $4 billion of common dividends from GE Capital bringing our year-to-date total to $15 billion. . . .

Given the progress of the GE Capital Exit Plan to date, we expect to largely complete that plan by the end of 2016. On March 31, 2016, GE filed its request to the Financial Stability Oversight Council (FSOC) for rescission of GE Capital's designation as a nonbank Systemically Important Financial Institution (SIFI). On June 28, 2016, we received approval of our request to the FSOC for rescission of GE Capital's designation as a nonbank SIFI.

478.    In the 2Q 2016 Form 10-Q, GE also announced a $100 million increase in its insurance reserves, revealing: "Within [GE] Capital, **Verticals net earnings decreased by $0.1 billion due to higher insurance reserve provisions [$0.1 billion]** and lower gains, partially offset by core increases."

479.    Statements during the second quarter 2016 conference call and in GE's 2Q 2016 10-Q regarding the $100 million LTC reserve charge taken "due to higher insurance reserve provisions" (¶¶ 474 and 478) and comments that the $100 million LTC reserve charge "result[ed] from updates to our models on our runoff long-term care book" which "portfolio quality remain[ed] stable" were materially false and misleading and failed to disclose:

(a)    that the $100 million LTC reserve increase was woefully deficient given emerging LTC trends in annual statutory filings of the ceding companies GE was reinsuring and shown in its own "Tests of Claims Reserves";

(b)    that in 2015 the Company had "again reviewed [its] insurance exposure" and taken no action to materially increase its LTC reserves despite alarming adverse claims experience in the LTC policies it was reinsuring and mounting industry-wide negative trends in the LTC market;

(c)    that the Company failed to timely record increases to LTC reserves by billions of dollars in violation of GAAP and statutory insurance regulations;

(d)    the Company failed to maintain adequate internal controls over its financial reporting with respect to LTC reserves; and

(e)    that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period.

480.    Statements in GE's 2Q 2016 10-Q regarding the dividends (¶ 477) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

481.    Defendants' statements regarding its Contract Assets (¶ 476) were materially false and misleading and failed to disclose:

(a)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)    that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA

within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers;

(d)     that the Company failed to maintain adequate internal controls over its financial reporting with respect to its Contract Assets; and

(e)     that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period and GE's public statements were materially false and misleading at all relevant times and omitted the material information discussed herein.

### 18.     Third Quarter 2016

482.    On October 21, 2016, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 3Q 2016 Earnings," summarizing the Company's financial and operating results for the quarter ended September 30, 2016 and containing the same false and misleading financial metrics referenced in the charts above.

483.    On the same day, the Company hosted a conference call to discuss its third quarter 2016 results.  During the call, Defendant Bornstein stated, in part:

> *GE Capital paid $5 billion of dividends during the third quarter. In October, they paid an additional $2 billion, and we expect an incremental $2 billion dividend before the end of the year for a total of $20 billion in 2016 versus the $18 billion target.*
>
> Overall, the Capital team continued to execute ahead of schedule on all aspects of the plan that we shared with you 18 months ago. We expect to be largely complete by the end of 2016.

484.    Defendant Immelt provided additional details regarding the anticipated buyback:

"*We're increasing the buyback from $18 billion to $22 billion. This makes the total cash returned to investors $30 billion for the year, ahead of plan. So in a time of volatility, the GE model is performing*."

179

485.    On November 2, 2016, GE filed a Quarterly Report on Form 10-Q with the SEC, announcing GE's financial and operating results for the quarter ended September 30, 2016 (the "3Q 2016 Form 10-Q"). This report contained the same false and misleading financial metrics referenced in the charts above.

486.    The 3Q 2016 Form 10-Q also stated the following regarding Contract Assets:

> ***Contract assets reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems and aircraft engines), long-term product maintenance or extended warranty arrangements and other deferred contract related costs. Long-term product maintenance amounts are presented net of related billings in excess of revenues of $2,970 million and $2,602 million at September 30, 2016 and December 31, 2015, respectively***.

487.    Defendants' statements regarding the dividends and buyback program (¶¶ 483 and 484) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

488.    Defendants' statements regarding Contract Assets (¶ 486) were materially false and misleading and failed to disclose:

(a)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization,"

that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)     that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers;

(d)     that the Company failed to maintain adequate internal controls over its financial reporting with respect to its Contract Assets; and

(e)     that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period and GE's public statements were materially false and misleading at all relevant times and omitted the material information discussed herein.

### 19.    Annual Investor Outlook Meeting (December 14, 2016)

489.    On December 14, 2016, the Company hosted its Annual Outlook Investor Meeting with analysts.  During the conference call, Defendants represented that the GE dividend would be $8 billion, the stock buyback between $11 billion and $13 billion, and the GE Capital dividend would be $6 billion to $7 billion. When discussing the dividend, Immelt stated: "And then we still have $10 billion on the sidelines as it pertains to incremental leverage and we will think about that as time goes on in terms of the best usage of that capital."

490.    Defendants also provided an industrial CFOA guidance of between $12 billion and $14 billion.

491.    Defendant Immelt projected a strong year for the Power segment, specifically with respect to service upgrades within that segment:

Next year when I look at backlogs and we look at run rates there is a fantastic opportunity to have a great year in services in 2017. And that is going to be driven by upgrades, ***we still see a very strong pipeline not just in the Power business but across the portfolio, but another good year in Power upgrades***. . . . So, between repower, upgrades, big installed basis in Power and in Aviation, we are going to see very strong organic growth in the service franchises in 2017. So that is service.

492.    A JPMorgan analyst noted that the "$6 billion to $7 billion GE Capital dividends to [GE]" was "a little bit below what [GE] had initially laid out," and expressed concern regarding anticipated cash flows and dividends from GE Capital. In response, CFO Bornstein suggested that dividends were sustainable by stressing that GE Capital was performing well on cash flows, stating: "***We pulled dividends [from 2017] into 2016.  We are actually several billion dollars ahead of the plan that we gave you, we are not behind plan***."

493.    Steve Tusa, analyst at JP Morgan, asked about how LTSA cumulative catch-ups were accounted for by the Company.  Specifically, "Do you exclude those because they are non-cash or does that kind of play into that whole bucket of (multiple speakers) the $1.5 million service and productivity?"  Immelt responded that, "***it all goes into the service, Steve. But I think we always look at these as kind of like net beneficial to both the customers and us***."

494.    Defendants' statements regarding the dividends (¶¶ 489 and 492) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

495.    Defendants' statements regarding GE's industrial CFOA, the "very strong pipeline" in Power, specifically with respect to the services division, revenue recognition on LTSAs and Contract Assets and the impact of cum catch adjustments (¶¶ 490-493) were materially false and misleading for the reasons set forth in ¶ 488.

### 20.    Fourth Quarter & Full Year 2016

496.    On January 20, 2017, GE issued a press release, and filed the same on Form 8-K

with the SEC, entitled "GE 4Q 2016 Earnings," summarizing the Company's financial and

operating results for the quarter and year ended December 31, 2016 and containing the same

false and misleading financial metrics referenced in the charts above.

497.    On the same day, the Company hosted a conference call to discuss its fourth

quarter and year end 2016 results. During the call, CFO Bornstein reiterated the prior 2017 EPS,

CFOA, and dividend guidance, stating:

> Finally, I will cover GE Capital. The verticals earned $478 million in this
> quarter, up 9% from prior year driven principally by lower impairments in EFS.
> GECAS, EFS and Industrial Finance all had strong quarters and overall portfolio
> quality remains stable.

*      *      *

> **GE Capital paid $4 billion of dividends during the fourth quarter for a total
> of $20 billion in 2016** versus the original $18 billion target for the year.

> Dividends of $5 billion ahead of the original plan announced in April of 2015.
> Overall the GE Capital team delivered **a strong verticals performance** while
> executing on all aspects of the exit plan.

498.    During the call, Defendant Bornstein assured investors that earnings in the

Power segment would be strong in 2017: "***As we said in December we expect double-digit***

***earnings growth in Power in 2017.***" Defendant Bornstein also stated as follows with respect to

GE Power Services:

> We need our service business to do more or less what they did this year. ***The
> service business for the year grew operating profit about 7%. We are looking
> for mid-single digits, that kind of performance in 2017***. We've got to deliver
> the structural cost-out just given where we are in the industry and the volatility.

183

499.    Analysts were provided an opportunity to ask questions following the Company's prepared remarks.  Steve Winoker, the analyst from Sanford C. Bernstein & Co., asked specifically with regard to cash flow and the following exchange took place:

**Steven Winoker** - Sanford C. Bernstein & Co. - Analyst

Thanks, good morning. Since I only have one question I'd love to focus on cash here. And within that, Jeff, is there any factoring this quarter from GE Capital into GE industrial?

And then also while it's the strongest cash flow quarter in a while, still a little bit below what we thought you guys implied when we talked about it before. Then as you think about it progressing through 2017 and beyond maybe just talk a little more about the cash flow initiative comp that really can give investors confidence that the cash flow part of the story is improving.

**Jeff Bornstein**

Okay, there's a lot in that. So let me start with the fourth quarter, Steve.

We improved working capital in fourth quarter about $5.2 billion which the best we can tell is the strongest working capital quarter the Company has ever had. And I want to just give you some of the pieces on that.

\*        \*        \*

So within that accounts receivable performance you asked about factoring. For the total year, factoring with GE Capital was a $1.6 billion change for the year. It was $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit in the year between what we did with GE Capital around factoring. And in the fourth quarter importantly, and you see it because our receivables improved $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit going from this past third quarter to this quarter was $700 million.

So it was actually down $1.6 billion year-to-year between third and fourth quarter each of those years. ***So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring***.

**Jeff Immelt**

Steve, I would add, the one piece that we're still not happy with in terms of Q4 is inventory. And I think we generated, we reduced working capital by $3 billion for the year and still didn't do what I think either Jeff or I want to see on inventory.

We expect inventory to go down by $2 billion next year. ***And we think that's going to give us a ton of momentum as it pertains to CFOA and working capital in 2017***.

**Jeff Bornstein**

So let me just follow up and answer that part of your question. So we came in at $11.6 billion of industrial CFOA. ***We were shooting to be something closer to $12 billion of CFOA in the latest update we gave you.***

When you subtract CapEx you get industrial free cash flow we ended up at $8.9 billion. That was actually right in the middle of the range we gave you coming into the year on industrial free cash flow. But the $400 million light is really all about inventory and it's essentially the $1 billion roughly, the $1 billion sales miss left more in inventory than we expected.

Now not all of that would have converted to receivables and then from receivables would have converted to cash but a significant piece of it would have been. So I would say on an industrial free cash flow basis a couple hundred million lighter, on industrial CFOA closer to $400 million lighter and most of it is about that volume not going out the door and not being rev rec.

500.    On February 24, 2017, the Company filed its 2016 Form 10-K.  This report contained the same false and misleading financial metrics referenced in the charts above.

501.    In the 2016 Form 10-K, the Company updated investors on the progress of the GE Capital Exit Plan and how much in dividends GE Capital had paid and was expected to pay back to GE as a result of the sale of GE Capital assets:

As a result of the GE Capital Exit Plan dispositions, ***GE Capital has paid $24.4 billion in dividends to GE in 2015 and 2016 ($4.3 billion and $20.1 billion, respectively). We expect GE Capital to release additional dividends of up to approximately $10 billion through the remainder of the plan***. In January 2017, GE received an additional $2.0 billion of common dividends from GE Capital. As of December 31, 2016, we are ahead of our plan, having signed agreements with buyers for $197 billion of ending net investment (ENI), excluding liquidity (as originally reported at December 31, 2014), of which $190 billion has closed.

As of December 31, 2016, we have substantially completed the dispositions related to the GE Capital Exit Plan. In addition, as part of our initiative to reduce the size of our financial services businesses, we completed the split-off of our remaining interest in GE Capital's North American Retail Finance business, Synchrony Financial, to holders of GE common stock, which resulted in a $20.4 billion buyback of GE common stock (671.4 million shares) in 2015. . .*The result of all these actions reduced GE Capital's total assets by 63% from $500 billion at December 31, 2014 to $183 billion at December 31, 2016.*

502.    The 2016 Form 10-K stated the following with respect to Contract Assets:

*Contract assets increased $4,006 million in 2016, which was primarily driven by a change in estimated profitability within our long-term product service agreements resulting in an adjustment of $2,216 million, as well as an increase in deferred inventory costs*.

503.    The 2016 Form 10-K also reported a balance of LTSAs of $12.75 billion and stated as follows: "*Long-term product service agreement balances are presented net of related billings in excess of revenues of $3,750 million and $2,602 million at December 31, 2016 and 2015, respectively*."

504.    The 2016 Form 10-K also stated as follows with respect to revenue recognition on long-term product services agreements:

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*. We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. *Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $2.2 billion, $1.4 billion and $1.0 billion in 2016, 2015 and 2014, respectively.* We provide for probable losses when they become evident.

505.    In the 2016 Form 10-K, while discussing the impact of the new accounting standards to be effective in 2018, Defendants continued to provide materially false and misleading information regarding the historic and current accounting for the Company's LTSAs:

> ***Power and Aviation Service Agreements - For our long-term product service agreements, primarily in our Power and Aviation businesses, we expect to continue to recognize revenue based on costs incurred plus an estimated margin rate (over time model).*** However, the new standard provides prescriptive guidance tied to several factors for determining what constitutes the proper scope of a customer contract for accounting purposes. These factors include optional purchases, contract modifications, and termination clauses. For example, under the new standard contract modifications will be accounted for prospectively by recognizing the financial effect of the modification over the remaining life of the contract. ***Under existing accounting guidance revisions to estimated margin rates resulting from modifications were reflected as cumulative effect adjustments to earnings in the current period***.

506.    The 2016 Form 10-K also repeated the following with respect to asset impairment testing and accounting for insurance liabilities:

> ***For our insurance activities remaining in continuing operations, we periodically test for impairment our deferred acquisition costs and present value of future profits***.

> \*      \*      \*

> Liabilities for unpaid claims and estimated claim settlement expenses represent our best estimate of the ultimate obligations for reported and incurred-but-not-reported claims and the related estimated claim settlement expenses. ***Liabilities for unpaid claims and estimated claim settlement expenses are continually reviewed and adjusted through current operations***.

507.    Defendants' statements regarding the dividends (¶¶ 497 and 501) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

508.    Defendants' statements regarding industrial CFOA, GE's Power segment, specifically with respect to the services division, Contract Assets, revenue recognition on LTSAs and factoring (¶¶ 498-499, 501-505) were materially false and misleading for the reasons set forth in ¶ 488.

509.    Defendants' statements regarding periodic testing of GE Capital's insurance portfolio for impairment (¶ 506) were materially false and misleading and failed to disclose:

(a)     the serious risks and uncertainties associated with GE's LTC exposure;

(b)     that in 2015 the Company had "again reviewed [its] insurance exposure" and taken no action to materially increase its LTC reserves despite alarming adverse claims experience in the LTC policies it was reinsuring and mounting industry-wide negative trends in the LTC market;

(c)     that the Company failed to timely record billions in contributions to its statutory LTC reserves in violation of  statutory insurance regulations;

(d)     the Company failed to maintain adequate internal controls over its financial reporting with respect to both its LTC reserves and Contract Assets; and

(e)     that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period.

### 21.    Barclays Industrial Select Conference (February 22, 2017)

510.    On February 22, 2017, GE participated in the Barclays Industrial Select Conference during which Defendant Bornstein provided a summary of the Company's current financial status and future prospects, including those specific to GE Capital:

> On the GE Capital restructuring, it's the largest corporate restructuring we think in the world that anybody has ever attempted. We have moved about $300 billion of assets in a year and a half. We're essentially done. We have one deal in France we're waiting for EU approval on, hopefully in the next week or two, and we'll be largely done with the M&A piece of what is the restructuring of GE Capital.

From here, we'll have some assets that will run off with time, just because it makes more economic sense to do that. ***And so I think the capital team has executed everything they committed that they would and more, and the dividends are slightly ahead of plan.***

So we expect in 2017 the GE Capital dividend above $7 billion for the Company; keeps us right on track with what we committed to investors.

511.    Defendant Bornstein responded to a participant's question about GE Capital and

it's "longer-term capital structure," as follows:

**Jeff Bornstein**

***So, I think we're going -- by 2018, I think we'll be pretty close to steady-state in GE Capital in terms of what the capital structure is going to shake out***. We're not regulated anymore, so the capital structure is more a function of where we sit with the rating agencies in terms of their capital allocation models.

*      *      *

So I think that the GE Capital structure balance sheet, how we ought to think about the business going forward, is starting to play itself out. And I think when we get through 2018, we'll have a very clear picture of what the cap structure looks like and what we should expect.

We still think -- when we talked in April 2015, we talked about a business that we thought could return 10% or 11%. I think we're still in that ballpark.

512.    A participant asked specifically with regard to insurance:

**Unidentified Participant**

Will you be selling that insurance -- will you sell the liability in that insurance; kind of write a check and get rid of it? Is that in the cards?

**Jeff Bornstein**

***Not today. I continually look at it. I think interest rates are a fundamental challenge and (inaudible) long-term liabilities in a low interest rate environment is a challenge.***

513.    At the conference, Defendant Bornstein detailed GE's reliance on cum-catch

adjustments on its LTSAs:

The other is in our long-term service contract accounting. We have an enormous portfolio, many times bigger than anybody else in the space, both in power--

principally in Power Systems and Aviation. And the rules around it are changing. And it's complex, but there are several things that we do today that we account for on a cum-catch basis. And I'll explain that in a moment that now we'll be accounted for on a prospective basis.

***So, for instance, if you have a contract with a customer today and you modify it, you add a bunch of new equipment to it, you extend the maturity, you change something around the operating conditions, and you reprice it. A lot of these things are priced on a per-utilization per-hour basis, if you will. In today's model, that kind of a modification you would go back to the first day of the contract, recalculate based on the changes.  What's the margin rate for the contract now?  If the margin rate went down, you go back to day one, and you'll book a loss for restating time zero to the current date on the lower margin rate. If the margin rate is higher, you do the opposite. You get a cum-catch gain, and you restate the margin rate of contract. So for things like modifications, termination clauses, et cetera, upgrades; all of that will be accounted for prospectively, as opposed to retrospectively. Things like productivity will continue to act like they do today, which is a cum-catch.***

So, we'll go through some of those details in the K. Our best estimate today, our expectation is that 2018 impact of all that is, we think, is going to be about a $0.05 EPS decline. After 2018, that will get smaller and start to approach zero. And at some point a few years after that, it will actually be accretive to what otherwise we would have-- in the old accounting model-- reported as earnings. So there's no cash associated with any of this accounting change. It doesn't change anything about the economics of these contracts in any way. It's just a point of where you're recognizing revenue and where you're recognizing cost.

514.    Defendant Bornstein's statements regarding cum catch adjustments, and revenue recognition on LTSAs (¶ 513) were materially false and misleading and omitted material information for the reasons set forth in ¶ 488. Defendants' statements regarding the dividends (¶ 510) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

515.     Defendant Bornstein's statement regarding the "steady-state" in GE Capital (¶ 511) was materially false and misleading and failed to disclose:

(a)     the serious risks and uncertainties associated with GE's LTC exposure;

(b)     that in 2015 the Company had "again reviewed [its] insurance exposure" and taken no action to materially increase its LTC reserves despite alarming adverse claims experience in the LTC policies it was reinsuring and mounting industry-wide negative trends in the LTC market;

(c)     that the Company failed to timely record billions in contributions to its statutory LTC reserves in violation of statutory insurance regulations;

(d)     the Company failed to maintain adequate internal controls over its financial reporting with respect to its LTC reserves; and

(e)     that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period.

## 22.     GE Power and Renewable Energy Investor Meeting (March 8, 2017)

516.     On March 8, 2017, GE held its Power and Renewable Energy Investor Meeting. During the meeting, Defendant Bornstein reiterated the Company's industrial CFOA guidance range of $12 billion to $14 billion: "Back to the 2017 framework. . . . *No change on free cash flow or cash flow*, $16 billion to $20 billion, *with industrial CFOA embedded in there of $12 billion to $14 billion*."

517.     Steve Bolze explained that the Company felt "very strongly about double-digit earnings growth in 2017" within the Power segment.  Bolze also emphasized a focus on cash conversion within the Power segment:

Now as we have gone through this transition now and transformation, as I said earlier, *it has opened our eyes to how much we can run this place with better*

*cost efficiency and cash flow. We are now, and I am turning more of my attention on two key incremental areas for value generation, cost and cash*.

*You will hear a big focus on cash generation action; all of our incentives are aligned as a leadership team around Power*. We are going to be leveraging the same awesome playbook that you saw in the integration for all the costs across the Power business. And then as far as working capital, another $1 billion to be released in working capital from the business and part of our increasing our free cash flow from operations.

\* \* \*

*Now let's talk about the game plan going forward. This is it. It is three key strategic priorities: deliver organic growth; aggressive cost out for a flat market; and improving cash conversion. And with that our plan in 2017 calls for 5% organic growth, operating profit double-digit, with a 150 plus point greater than expansion in our margins*. We are going to walk – I'm going to walk through each of these three things in more detail and show you the clarity we have on this path.

518.    GE's statements about industrial CFOA and a focus on cash conversion within the Power segment (¶¶ 516-517) were materially false and misleading and failed to disclose:

(a)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)    that the Company failed to maintain adequate internal controls over its financial reporting with respect to Contract Assets; and

(d)     that the Company was overstating revenues, margins, and earnings on its

LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to

artificially manipulate the Company's quarterly and annual financial results in violation of

GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA

within the GE Power segment were deficient and did not adequately account for the risk of non-

payment from customers.

### 23.    JPMorgan Aviation, Transportation & Industrials Conference (March 13, 2017)

519.    On March 13, 2017, GE participated in the JPMorgan Aviation, Transportation

& Industrials conference during which Rich Laxer, CEO of GE Capital, responded to a question

about GE Capital's runoff insurance business:

**Steve Tusa** - *JPMorgan - Analyst*

And then just lastly from me on a discops basis, the insurance liability, what's
the plan, anything planned there, or you just want that down over an extended
period of time; not something that's talked about a lot but it's relatively sizable....

**Richard A. Laxer:**

***Those are long-dated assets. And given the interest rate environment we're in
right now, it's not attractive to do something. We always look at it, but just
given where rates are at this point, it's not an attractive exit.***

*             *             *

**Steve Tusa** - *JPMorgan - Analyst*

Regarding the insurance liabilities, you mentioned it was because of the rate
environment is not attractive to look at a solution now. What sort of bogey level
would you think you'd have to see in terms of the rate environment to consider
that transaction where the bid/ask comes...?

**Richard A. Laxer**

***I think there's are a lot of factors there. So it's hard to give you a specific
number, but we would like to see a few increases before that would be
attractive.***

520.   Rich Laxer's statements regarding GE Capital's runoff insurance business (¶ 519) were materially false and misleading and failed to disclose:

(a)   the serious risks and uncertainties associated with GE's LTC exposure;

(b)   that in 2015 the Company had "again reviewed [its] insurance exposure" and taken no action to materially increase its LTC reserves despite alarming adverse claims experience in the LTC policies it was reinsuring and mounting industry-wide negative trends in the LTC market;

(c)   that the Company failed to timely record billions in contributions to its statutory LTC reserves in violation of  statutory insurance regulations;

(d)   the Company failed to maintain adequate internal controls over its financial reporting with respect to its LTC reserves; and

(e)   that as a result of the foregoing, GE materially overstated its earnings and cash flows during the Class Period.

### 24.   JPMorgan Aviation, Transportation and Industrials Conference

521.   On March 13, 2017, GE participated in the JP Morgan Aviation, Transportation and Industrials Conference, where Rich Laxer, CEO of GE Capital, provided a summary of the GE Capital's overall financial condition:

> Since we announced the exit plan **we paid $47 billion of dividends, $5 billion ahead of where we thought we'd be at this point. That includes the spinoff of Synchrony and we've got good momentum coming into this year. We paid $2 billion already of a dividend out of the $6 billion to $7 billion that we project that we will pay in 2017. GE Capital now is aligned with the industrials**. Our businesses are in the business of supporting industrial growth, working with our industrial businesses and their customers to help drive orders for the Company. I will talk more about that.
>
> **And the go-forward business has a good financial profile.**
>
> *          *          *

From a dividend standpoint we paid $47 billion between the Synchrony and cash dividends. We will have $51 billion paid out by the end of this year and as I said we've already paid $2 billion so far this year and our capital levels and liquidity for the Company remain very conservative and very strong.

**Steve Tusa** - *JPMorgan* - *Analyst*

Okay. And then just one other check-the-box item on getting an update on the trajectory. $10 billion in dividends leftover, $6 billion to $7 billion this year. Is that the right number for 2018, $3 billion to $3.5 billion depending on what you get done this year?

**Rich Laxer**

Yes. So the way to think about it is we have paid up until this year $24.4 billion. If you add in the $2 billion that we've already paid this quarter puts you at $26.4 billion. By the end of this year we will be at $31 billion. *Now what we talked about and 2015, we said that about $31 billion of dividends would come from the sale of the assets and that's roughly what you see there the rest will come from earnings from the assets that we kept, the reason of Capital, etc. So, $31 billion is on track by the end of this year. In terms of the $35 billion, as just mentioned at the outlook meeting in December, we will probably be inside of that number because we sold a lot faster than we expected.*

522.     Rich Laxer's statements regarding the dividends and the "good financial profile" of GE Capital moving forward (¶ 521) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

### 25.   First Quarter 2017

523.     On April 21, 2017, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 1Q 2017 Earnings," summarizing the Company's financial and operating results for the quarter ended March 31, 2017 and containing the same false and misleading financial metrics referenced in the charts above.

524.     On an earnings call the same day, Defendant Bornstein presented information regarding GE Capital:

Finally, I'll cover GE Capital. The verticals earned $535 million in the quarter, up 8% from the prior year, driven principally by lower impairments, higher tax benefits, partially offset by lower gain. GECAS, energy finance and industrial finance all had strong quarters, and overall portfolio quality remains stable.

In the first quarter, the verticals funded $1.8 billion of unbooked volume and enabled $2.2 billion of industrial orders. Other continuing operations generated a $582 million loss in the quarter, driven by excess interest expense, restructuring costs related to portfolio transformation and headquarters operating cost. . . .

Discontinued operations generated $242 million loss, driven by exit plan-related items and operating cost. Overall, GE capital reported a net loss of $290 million. We ended the quarter with $167 billion of assets, including $43 billion of liquidity. Assets were down $16 billion from year-end.

*      *      *

**GE Capital paid $2 billion of dividends during the quarter and an additional $2 billion this week. We remain on track for $6 billion to $7 billion of dividends for the total year. Overall, the GE Capital team delivered a strong performance from the verticals, while executing on all aspects of our exit plan**.

525.    During the call, Defendant Bornstein also discussed GE's weak industrial CFOA

results for the quarter:

[O]ur industrial CFOA was at $1.6 billion usage of cash, about $1 billion below our expectations. **We expect to see most of this come back over the remainder of the year**, and **we see no change for our outlook for the year of $12 billion to $14 billion of industrial CFOA**.

526.    Despite these poor industrial CFOA results, CEO Immelt emphasized that GE

still posted a net positive CFOA figure, aided by a GE Capital dividend, stating:

On cash, we have CFOA of $400 million.  This included a dividend from GE Capital of $2 billion.  Industrial CFOA was a negative $1.6 billion . . . .  Cash is lumpy, and we expect to have a strong second quarter.

*      *      *

GE Capital paid $2 billion of dividends during the quarter and an additional $2 billion this week. We remain on track for $6 billion to $7 billion of dividends for the total year.

196

527.    Defendant Immelt also explained that GE's industrial CFOA would improve:

***Despite a slow start, we plan to hit $12 billion to $14 billion of industrial CFOA for the year***. We believe that capital dividend should be $6 billion to $7 billion for the year. Dispositions are on track. We're on track to return $19 billion to $21 billion to investors through dividend and buyback.

So to recap, we had 10% orders growth, 7% organic growth, 130 basis points of margin expansion and 20% organic industrial operating profit growth, and a commitment to hit CFOA for the year. So this is a good start.

528.    During the call, Defendant Bornstein detailed the impact that Contract Assets

had on GE's weak industrial CFOA for the quarter, explaining that the Company would

"recover the vast majority [of it] over the second to the fourth quarter":

Contract assets were a use of $1.9 billion. This was $300 million worse than expected. Of the $1.9 billion, $500 million was from our long-term equipment contracts, where the timing of our $1 billion revenue recognition milestones differ. ***This will catch up throughout the year as we execute against the contract***. The remaining $1.4 billion is our long-term service agreements. There were 2 pieces to this. $600 million is related to service contracts where we've incurred cost and booked the revenue, but haven't yet billed the customer. ***We expect this to partly come back over the year*** as we see higher asset utilization in Power and Aviation. ***And we've seen these similar trends in the prior years***.

The other $800 million are contract adjustments driven by better cost performance and part life, primarily driven by Power and Aviation. ***Versus expectations, the $300 million of lower cash on contract assets is driven by $200 million of long-term equipment contracts that we expect to come back throughout the year, and the $100 million is from services contract adjustments I just walked through, which will come back over the remaining life of those contracts as we build the utilization. In total, we're about $1 billion off our first quarter plan, but we'll recover the vast majority over the second to the fourth quarter***.

529.    Bornstein went on to say:

Over the past several years, the strong growth in our long-term services agreements and the associated shop visits has driven the percentage of spares used in LTSA to be a much greater proportion of the historical order and sales rate. These spares are also part of the LTSA billing and are already accounted for in revenues. We believe the new spares rate provides investors with more visibility to transactional market dynamics. Consumption of spares in long-term service agreements can be impacted by customer fleet management, optimization shop visits over the life of the contract over various other reasons. Starting with

the first quarter of '17, we will report only a ship rate for spares on this new basis as the orders and shipments are virtually the same. This change does not impact any reported financial information. Historical information for spares rate on the new basis, as well as the old method, are included in the supplemental presentation material.

530.    Defendant Bornstein also assured investors that "the contract drag on cash flow"

for 2017 would be the same as in 2016, and *that GE was "not pulling future profit forward"*

*on the contracts*:

> *[W]e expect the contract drag on cash flow for the year to be roughly the same*, '16 versus '17 . . . I think you got a number of phenomena that's going on. We're investing like crazy in productivity and cost-out. . . . When we get lower cost, the cost to execute against our contracts improves. And when they improve, the accounting has to account for that and where it changes our view on the ultimate profitability of these contracts. That's one mechanism, and we're hugely focused on that. *And I think you want us focused on that, that's all future cash, future economics, et cetera, on a go-forward basis. We're not pulling future profit forward. That is not what we're doing*. We're just restating what – where we are in the contract from inception to date. The second part is where the long-term service agreements that protect our installed base, *our penetration continues to improve*. . . .

531.    When an analyst pressed Defendants for more clarity on the Company's

"noncash earnings from contract assets." In response, Bornstein explained what drove the

increase in Contract Assets for the quarter:

> CSA contracts in the quarter were up $1.4 billion year-over-year. $800 million of that increase was associated with contract updates, okay? And that's versus $500 million a year ago. So it's higher by $266 million year-over-year. *Of the about $300 million, it's up year-over-year, a little more than half of that is in power*. *And most of that is associated with updates of part costs when we change standards every year. So for the contracts that were under review in the first quarter, if we change the standard on the part cost and deliver against that contract in the future, we did that update*. And then there's a small update for escalation that's mostly around our Aviation business. We update it once a year on escalation within the service contract.

> The – that part of long-term contracts that are revenues versus billing, so outside of contract updates was $600 million in the first quarter. And that's really where we've incurred shop visits, outages. We've incurred cost against those service contracts ahead of actually billing the hours or the events associated with it. So that's mostly timing. *And some of that will come back over the course of the*

*year, as we actually bill against the utilization or bill against an outage or a shop visit. So I would say that's mostly timing*. That's the $1.4 billion increase that you see in contracts year-over-year.

532.    On May 5, 2017, the Company filed its quarterly report for the quarter ended March 31, 2017 on a Form 10-Q (the "1Q 2017 Form 10-Q") with the SEC.  This report contained the same false and misleading financial metrics referenced in the charts above.

533.    The 1Q 2017 Form 10-Q also stated as follows with respect to Contract Assets:

*Contract assets increased $2.2 billion, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts*.

534.    The 1Q 2017 Form 10-Q also reported a balance of LTSAs of $14.19 billion and stated as follows: "*Long-term product service agreement balances are presented net of related billings in excess of revenues of $3,171 million and $3,750 million at March 31, 2017 and December 31, 2016, respectively*."

535.    The 1Q 2017 Form 10-Q also stated that cash from operating activities decreased $7.5 billion, primarily due to:

Cash used for industrial operating activities of $1.6 billion in the three months ended March 31, 2017, compared to cash generated of $0.4 billion in the three months ended March 31, 2016, primarily due to [among other things]. . .  *An increase in contract assets of $1.9 billion and $0.7 billion in the three months ended March 31, 2017 and 2016, respectively, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts*.

536.    In the 1Q 2017 Form 10-Q's MD&A section, GE stated, in relevant part:

Capital revenues decreased by $0.2 billion, or 7%, primarily due to organic revenue declines and lower gains, partially offset by lower impairments.

Capital losses decreased $0.8 billion, or 95%, primarily due to lower treasury operation expenses, lower preferred dividend expenses and lower restructuring expenses associated with the GE Capital Exit Plan.

Within Capital, Verticals net earnings increased due to lower impairments ($0.1 billion) and core increases ($0.1 billion), partially offset by lower gains ($0.1 billion).

537. Defendants' statements regarding the dividends (¶ 524) were materially false and misleading and failed to disclose that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program. Defendants' statements regarding Contract Assets and CFOA (¶¶ 525-528, 530-531, 533-535) were materially false and misleading and failed to disclose:

(a) that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b) that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c) that the Company failed to maintain adequate internal controls over its financial reporting with respect to Contract Assets; and

(d) that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA

within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers.

### 26. Electrical Products Group Conference (May 24, 2017)

538.    On May 24, 2017, GE participated in the Electrical Products Group Conference at which the Company made an opening presentation discussing its overall financial condition and future prospects. Immelt unequivocally stated: "***This is a strong, very strong company***,"

539.    With regard to capital allocation and GE Capital, Immelt stated:

And that just leads into a discussion on capital allocation really for the next 2 years. So let's say, '17 and '18, we have $72 billion or $74 billion of capital to allocate inside the company. If you add up, what I would call, just the bedrock of the company, keeping it safe and secure, the dividend, funding new products, kind of the first 4 things, the pension, that's roughly half of the cash we have available to allocate, right? So the company's incredibly strong from a balance sheet standpoint. You should look to capital allocation decisions around dividend and buyback and things like that. These are things that we're committed to. This shows what's remaining on the buyback, the announced M&A. This is kind of the Alstom, finishing out the Alstom JVs, finishing out Baker Hughes. And there's still probably $8 billion to $12 billion of cash out there to allocate in the future.

The other thing I would say is that we tend sometimes to look at -- ***despite all the cash we've got on GE Capital, we're going to get ongoing dividends from GE Capital as time goes on. There's other sources of cash that aren't even on this page as you think going forward. So very strong, very committed to the capital allocation choices we've made, especially the dividend***. And this is the way to think about GE and the strength of the company going forward.

540.    Defendant Immelt's statements regarding the dividends, capital allocation, and strength of the Company (¶¶ 538-539) were materially false and misleading and failed to disclose, among other things, that only by materially under-reserving for liabilities related to GE Capital's legacy LTC reinsurance policies was GE able to maintain sufficient free cash flow for its quarterly dividend payments and stock buyback program.

### 27.    CEO Succession Plan Meeting (June 12, 2017)

541.    On June 12, 2017, the Company hosted a conference call to discuss its "CEO Succession" plan.  During that call, Immelt announced that Flannery, then President and CEO of GE Healthcare, would become CEO of GE effective August 1, 2017 and Chairman and CEO effective January 1, 2018. Jeff Immelt would remain on at the Company as Chairman of the Board through his retirement from the Company on December 31, 2017. In addition, Jeff Bornstein, current CFO, was promoted to Vice Chair of GE.  During the meeting, Defendant Bornstein discussed expectations for the Company's cash flow, stating:  "***We expect to deliver cash performance in the second quarter that's sequentially better than the first***. And we expect it to be better than the second quarter of the previous year. So no change to anything we talked to you about."

### B.    The Truth Begins to Emerge While Defendants Continue to Mislead the Market

### 1.    <u>July 21, 2017:</u> Results for Second Quarter 2017 (Partial Corrective Disclosure)

542.    On July 21, 2017, *before the market opened*, GE issued a press release, and filed with the SEC the same on Form 8-K, entitled "GE 2Q 2017 Earnings" summarizing the Company's financial and operating results for the quarter ended June 30, 2017 and containing the same false and misleading financial metrics referenced in the charts above. The Company disclosed industrial operating and verticals EPS of $0.28 and CFOA of $3.2 billion ($1.5 billion industrial CFOA) for the second quarter 2017.  Defendant Immelt stated in the press release that "***we expect cash flow to continue to improve throughout the year***."

543.    On the same day, before the market opened, the Company hosted a conference call to discuss its second quarter 2017 financial results.  Defendants Immelt, Bornstein, and Flannery participated in the call. During the call, the Company hinted for the first time of a

looming issue at GE Capital, but did not provide context or the magnitude of the problem: "***We recently have had adverse claims experience in a portion of our long-term care portfolio and we will assess the adequacy of our premium reserves.  We will update you in the fourth quarter***."[110]  With respect to GE Capital Verticals business, Bornstein represented that, "In the second quarter, the Verticals funded $1.9 billion of unbooked volume and enabled approximately $3.9 billion of industrial orders. ***Overall, portfolio quality remains stable.***"

544.    During the call, Defendant Immelt explained that cash flow would improve in the second half of the year and reiterated a "***solid***" industrial CFOA range of $12 billion to $14 billion:

> For cash, CFOA was $3.5 billion in the quarter: $2 billion from capital and $1.5 billion from Industrial CFOA, in line with expectations. . . .  Contract assets were a drag, but better than a year ago. ***The second-half CFOA profile will be a lot like last year***. . . . ***Contract assets will grow at about the same level, and we will benefit from timing of other items***. We ended the quarter with $14 billion of cash on the balance sheet, in line with expectations. ***And we should be within the $12 billion to $14 billion goal for Industrial CFOA***.

545.    Despite reiterating that cash flow would improve through the remainder of the year, Defendant Bornstein revealed that GE was trending towards the lower end of the $12 billion to $14 billion range for industrial CFOA for the year, driven in part by weakness in Power:

> We had a better cash quarter. CFOA was $3.5 billion, including a $2 billion dividend from GE Capital. Industrial CFOA was $1.5 billion in the quarter. It was up $3.1 billion from the first quarter and up substantially from the second quarter of last year. At the half, Industrial CFOA is a $200 million usage.
>
> ***We expect substantial improvement in cash in the second half, driven by higher earnings, continued working capital improvement on higher shipments, partly offset by contract assets.*** <u>For the year, we are trending to the bottom end of the $12 billion to $14 billion range on CFOA, driven by pressure, principally in Power and Oil & Gas</u>. . . Dividend remains our priority. We are relooking the

---

[110] Corrective information is underlined.

$11 billion to $13 billion range of cash used for buyback based on the timing of dispositions. Year to date, we bought back $3.6 billion of shares.

546.    During the call, Defendant Bornstein clarified his statements about CFOA in the second quarter:

> What I meant to say on the call was *we expected that CFOA in the second quarter would be substantially better sequentially from the first and substantially better than the second quarter of last year*.  I didn't mean to say that we would be flat year over year.

547.    Bornstein also represented on the call that Power would be up in the second half of 2017:

> Then when you think about total year, *we still think about the Power business being up mid-single digits on revenue and up roughly high- to low-double digits on earnings*. I just think that in the backdrop of everything we've got in front of us here that it does feel softer.

548.    During the call, Defendant Immelt asserted that the Company would meet its "target of $17.2 billion for Industrial EBIT . . ., even with those headwinds" and also stressed that *"[w]e have created a very strong position in Power* . . . .  We don't like the current oil and gas cycle, but *our business is significantly improved* and will prosper as the cycle recovers." Defendant Immelt further explained that recent growth in equipment had "*open[ed] up service growth in the long term*" and while "[c]ontract assets were a drag" they were "*better than a year ago*" and would "*grow at about the same level*."

549.    During the Q&A portion of the earnings call, analysts were focused on the announcement that industrial CFOA was expected to come in at the lower end of the $12 billion to $14 billion range, and one analyst asked for more "transparency" into the expected cash conversion within the Power segment.  Rather than reveal the truth about GE's improper accounting on its Contract Assets, Defendant Bornstein continued to conceal the fraud and assured investors that the Power business would deliver a positive CFOA: "*So we expect the*

***Power business to deliver a positive CFOA in the year for sure*** . . . . ***So the Power business is going to be something like a 50% to 60% conversion in the year.***"

550. Defendant Bornstein also provided details on the expected drivers of strong second-half CFOA which included a discussion of the impact of Contract Assets on cash flow that continued to conceal that GE's improper accounting for its Contract Assets was how the Company was able to manufacture positive industrial CFOA and that the Company had been relying on unsustainable techniques:

> ***[O]n contract assets, we still expect contract assets to be a cash usage in the second half, but not nearly the rate that we saw in the first half. And we expect it to look very similar to the change in contract assets in the second half of last year, which was about $1.4 billion, $1.5 billion.***
>
> So if you look at second-half cash flow versus 2016, we delivered $11 billion of CFOA in the second half of last year. We need to do about $1 billion more this year, which is primarily a function of earning. And we expect working capital to be about $3.9 billion better in the second half. So the total improvement for the year of about $3.3 billion, and that's less than the $5.1 billion of working capital improvement we had in the second half of last year. ***As I said, contract assets will be a little bit of a drag in the second half, but in line with where we were in the second half of last year.***
>
> And I'd say lastly, other operating – ***all the other elements of cash flow will be better in the second half than the first half and will be better substantially versus 2016. So that is kind of how we think about going from first half to second half.***

551. On this news, the Company's stock price fell $0.78 per share, or 2.9 percent, to close at $25.91 per share on July 21, 2017.

### 2. July 28, 2017: Q2 2017 Form 10-Q

552. On July 28, 2017, the Company filed its quarterly report for the quarter ended June 30, 2017 on a Form 10-Q with the SEC (the "2Q 2017 Form 10-Q"). This report contained the same false and misleading financial metrics referenced in the charts above.

553.   The 2Q 2017 Form 10-Q also disclosed the following with respect to LTC

Reserve testing:

> *We test future policy benefit reserves associated with our run-off insurance activities for premium deficiencies annually. We have recently experienced elevated claim experience for a portion of our long-term care insurance products, which may result in a deficiency in reserves plus future premiums compared to future benefit payments*. Should such a deficiency exist, we would record a charge to earnings in the second half of 2017 upon completion of this review.

*   *   *

> The future policy benefit reserve is subject to an annual review to determine its adequacy. Should the liability for future policy benefits plus the present value of expected future gross premiums be insufficient to provide for the present value of expected future policy benefits and expenses, a premium deficiency would be recorded.

554.   In 2Q 2017 Form 10-Q, GE stated:

> *Contract assets increased $3.8 billion, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts.*

555.   The 2Q 2017 Form 10-Q also reported an LTSA balance of $14.76 billion and

stated as follows: "*Long-term product service agreement balances are presented net of related

billings in excess of revenues of $2,679 million and $3,750 million at June 30, 2017 and

December 31, 2016, respectively*."

556.   The 2Q 2017 Form 10-Q also stated that CFOA decreased $7.2 billion, primarily

due to, among other things:

> Cash used for industrial operating activities amounted to $0.4 billion and $0.2 billion in 2017 and 2016, respectively, primarily due to [among other things] . . . . *An increase in contract assets of $3.2 billion and $2.4 billion in 2017 and 2016, respectively, primarily due to adjustments driven by lower forecasted cost to complete the contracts and timing of billings relative to revenue recognition on our long-term equipment and service contracts*.

557.    Despite revealing part of the truth regarding adverse claims experience as it related to LTC reserves and the initiation of a comprehensive review of LTC reserves, Defendants continued to mislead the market by failing to disclose that the adverse claims experience causing the insufficiency of the Company's LTC reserves was not a "recent" occurrence, but had been persistent since at least the beginning of the Class Period (*see e.g.*, ¶¶ 240-259).

558.    Despite revealing part of the truth regarding industrial CFOA performing worse than initially anticipated, Defendants continue to mislead the market by failing to disclose:

(a)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)    that the Company failed to maintain adequate internal controls over its financial reporting with respect to Contract Assets; and

(d)    that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of

GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers.

559.    Moreover, Defendant Bornstein's statements about monetization were materially false and misleading and failed to disclose that GE was using factoring and other means in order to mask its cash crisis and by pulling cash from GE's future earnings.  In addition, as set forth in ¶¶ 321-336, the Company's factoring/monetization program was devised specifically in order to cover up the future cash hole at GE and that GE was improperly accelerating the recording of revenue and earnings on its LTSA through cum catch adjustments.

560.    Indeed, certain analysts picked up the Company's use of factoring to pull forward revenues. A July 24, 2017 report by Stephen Tusa of JPMorgan entitled, "Framework Reaffirmed" noted that:

> [C]ontract assets are now a ~$4.7B difference this year (prior guide had been $3.9B), another step higher set to reverse on earnings in the years ahead. **Receivables sales to GECS and extended payables terms are ways to temporarily drive working capital, though progress payments ($2B positive last year), and what promises to be heavy cash restructuring means there are still negative cash calls here.**
>
> *        *        *
>
> Two items of note we will be watching are receivables sales to GECS, and payables for which there is some evidence from the WSJ article of extended terms, despite an already stretched payables days ~90. In any event, the absolute FCF levels at the low end of guidance ($9B), and when considering an additional $1.8B in pension funding and $1+B of outflows for "other investing activities", equates to ~$6B, not enough to cover the dividend ($8.5B).
>
> *        *        *
>
> The key TBD here is the magnitude of LTSA gains and y/y uptick particularly after a ~$200mm y/y increase in 1H, and while there could be upside pressure to our/street's 3Q estimates driven by these gains, it will all come down to rolling 4-qtr cash flow, which we think will be the ultimate indicator of quality of earnings.

*     *     *

Management said that LTSA gains were $0.5B in 2Q vs $0.6B prior year, showing what happens to segment profits when this lever becomes less of a y/y contributor (2Q segment profits of $3.9B were down $0.2B y/y, and missed our estimate by $0.1B). This is contrary to the 1Q segment profit results which beat our estimates by $0.3B, when LTSA gains were $0.8B, up $0.3B y/y. Looking to 2H17, contract assets (of which LTSA gains are a portion) are expected to be flat y/y, showing this source of non-cash earnings growth is slowing. In 2Q17, contract assets were $1.3B. For the full year contract assets are now expected to grow by ~$4.7B vs $3.9B prior.

561.   Tusa also noted that GE "did not allow analysts with a differing perspective a question on the call."

### 3.   October 20, 2017: Results for Third Quarter 2017 (Partial Corrective Disclosure)

562.   On October 20, 2017, *before the market opened*, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE 3Q 2017 Earnings," summarizing the Company's financial and operating results for the quarter ended September 30, 2017 and containing the same false and misleading financial metrics referenced in the charts above. The earnings fell short of analyst expectations.[111] The announcement also included a disclosure that the claims rate in the LTC unit was sufficiently high to necessitate a thorough review and might prevent GE Capital from providing the parent company a dividend, thus putting pressure on whether GE could maintain its dividends to investors. In particular, as stated in the press release, the Company was "…deferring decision on additional dividends until Insurance reserve review is completed."

---

[111] "General Electric Company: Reports Third Quarter Earnings," *William Blair & Company*, October 20, 2017: "General Electric reported third-quarter industrial operating and verticals EPS of $0.29, compared with the consensus of $0.49 and our estimate of $0.50."

"General Electric: Large EPS miss; 2017 cash flow cut almost in half," *Deutsche Bank*, October 20, 2017: "GE reported a shocking 3Q17 miss of 29 cents (adjusted) or 20 cents below the consensus forecast of 49 cents."

563.     On the same day, before the market opened, the Company hosted a conference call to discuss its third quarter 2017 financial results.  Defendants Flannery, Bornstein, and Miller participated in the call. GE shocked the market when Defendant Bornstein announced that GE "did not receive a dividend in the quarter from GE Capital" and GE had "deferred the decision to pay approximately $3 billion of additional GE Capital dividends."

564.     Defendant Bornstein expanded on the Company's comprehensive review of its LTC reserves and further explained the delayed dividend:

> **_[W]e've recently observed elevated claims experience for a portion of the long-term care book at GE Capital's legacy insurance business,_** which represents $12 billion or roughly 50% of our insurance reserves. As a result, we began a comprehensive review in the third quarter of premium deficiency assumptions that are used in the annual claim reserve adequacy test. This is a very complex exercise, and the team is making good progress. We expect to complete this process by the end of the year. Until the review has been completed we've deferred the decision to pay approximately $3 billion of additional GE Capital dividends.  Year to date, GE Capital has paid $4 billion of dividends to GE.

565.     Defendant Miller also briefly addressed the ongoing LTC reserve review:

> At GE Capital, Jeff mentioned that we expect our insurance actuarial review to be concluded in the fourth quarter. As many of you may know, this book of business includes long-term care reinsurance, which can be quite difficult to analyze and reset the reserves. Jeff mentioned the decision to hold off on the GE Capital additional dividends for the third and fourth quarters until that analysis is finalized.

566.     Details also began to emerge about GE's significant cash flow issues, which the Company attributed to, among other things, the impact of its growing Contract Asset balance. Indeed, during the call, Defendant Miller announced that GE was **slashing its guidance for 2017 industrial CFOA from an initial range of $12 to $14 billion down to $7 billion**. Defendant Flannery also explained that the Company's 2017 EPS guidance was being revised downward to $1.05 to $1.10 per share (vs. prior guidance of $1.60 to $1.70 per share).

567.     Defendant Flannery, who had only recently assumed the CEO position, stated that the Company had been completing a review of its operations and that, "[w]hile the company has many areas of strength, it's also clear from our current results that we need to make some major changes with urgency and a depth of purpose. Our results are unacceptable, to say the least."

568.     During the call, Defendant Miller explained that the weak cash flow performance that forced GE to slash its industrial CFOA guidance was driven largely by the Power segment, in part as a result of the accounting used for Contract Assets within the segment: "Power is the biggest driver on lower volume, higher inventory, and the timing of payments on long-term equipment contracts." Analysts at Cowen called these reductions "drastic" and found the CFOA miss to be "enormous."

569.     Defendant Bornstein provided additional details about the impact that Contract Assets had on GE's weak industrial CFOA:

> Versus our expectations, our CFOA in the quarter was negatively impacted by two things: lower-than-expected power earnings, and underperformance in working capital.
>
> *        *        *
>
> Contract assets were a use of $800 million in the quarter. Of the $800 million, $300 million was from our equipment contracts, given the timing of our revenue recognition milestones which will catch up as we execute against these contracts. The remaining $500 million is from our long-term service agreements due to better cost performance and parts life, primarily in power and transportation.

570.     During a detailed discussion of the poor performance within the Power segment, Defendant Bornstein revealed the impact the weakening power market was having on GE's business:

> We are severely disappointed in the results of power, and are taking action to position the business going forward. This includes a refocus on the basics, significant additional cost-out plans, and changes to management, including

announcing a new head of power services this week. <u>The business has been</u> <u>undergoing market changes and we haven't changed fast enough with it</u>. . . .

The structure of the service market has also changed, as we discussed on the second-quarter conference call, driven by renewables, fleet penetration for AGPs, lower capacity payments, utilization, and outages. <u>However, the decline</u> <u>we saw in our service business in the third quarter was much sharper than the</u> <u>decrease in the first half. We expect these issues to persist through the fourth</u> <u>quarter and into 2018</u>.

571.    Defendant Bornstein also revealed the poor performance of GE's Power services

business, as well as the impact of cum catch adjustments for the quarter:

Service revenues of $4.3 billion were down 4%, with energy connections up 6%, and power down 5%. Power services were down on lower AGPs, down 54%, at 13 versus 28 units last year, and outages were down 18%. ***Our CSA [cum catch]*** ***adjustments in the quarter were $323 million, down from last year's $366*** ***million***.

572.    Analysts focused on GE's Contract Assets and the negative impact the

accounting for those contracts had on cash flow. During the call, Jeff Sprague of Vertical

Research Partners, pointedly confronted GE about the lack of transparency in how GE

accounted for its Contract Assets:

There's been a couple elephants in the room leading up to today, and another one has been the contract asset account, which is also built upon numerous assumptions. As we sit here and listen to aggressive forecasts, unrealistic assumptions, et cetera, particularly in power, how do we get comfortable with what's gone on in that account? And have you guys actually been able to scrub through that yet?

573.    In response, Defendant Bornstein assured investors that he stood behind the

methods used to account for the Company's Contract Assets and that the asset balance would

soon convert to cash, thereby continuing to conceal the true extent of the impact of GE's

improper accounting for Contract Assets on industrial CFOA:

[W]e have been digging through that, I would say, over the last six months. ***I*** ***think we are very comfortable with where we are. And I think you've got to*** ***think about it, in power's case, in a number of buckets. The first is long-term*** ***service agreements. And I want to be clear here: in the third quarter with this***

*performance, our productivity or CSA cum catch was actually down $45 million year-over-year. So it's a small contributor to where we are year-over-year in the quarter*. But it's not that reason that we were way off where we thought we would be in the third quarter.

The second is we have really grown long-term equipment agreements. Now, this is 81-1 accounting. These are long-term contracts. They're generally anywhere from 12 to 24 months, where we build projects out, and along – as we go along the way we incur cost, we rev rec on milestones, and then there's also cash billing milestones. And they don't always line up on top of one another.

That has grown over the last two years really as a function of two things. One is we added Alstom to the portfolio, which had a much higher content of long-term projects. And as we built out the H units, we've done a lot more full scope, much larger scope projects, even if it was just contained to the turbine island, all the way through HRSGs and the steam tail that we got with Alstom.

So the amount of this activity in the portfolio has grown. And as a result of that, our 81-1 balances, particularly in power, have grown. And so that cost, if you will, generally liquidates over 12 to 18 months. <u>So we're higher this year by about $800 million than we originally forecast, almost all of that in power</u>. *But that will liquidate and turn to cash as we hit billing milestones over the next 12 to 18 months*.

574.    Defendant Miller also explained that with respect to Contract Assets she was

"deeply familiar with the model":

On contract assets, look, I'm *deeply familiar with that model*. I've only been here in Boston for a couple of weeks, *but I have gone through and sat through a number of the reviews with businesses, and I know GE balance sheet very well. Look, there's nothing I've seen that gives me any indication of an accounting issue here. I think Jeff explained it pretty well in terms of the long-term contract equipment build we're seeing*.

575.    Relatedly, Defendant Miller assured investors that GE's "cum catch" was

expected to be in the range it had been previously, thereby continuing to conceal that

Defendants were improperly relying on cum catch adjustments to accelerate revenue and

earnings:

So look, we'll take you through this on November 13. Obviously this is a big fourth-quarter focus area. *The one thing I'd add to what Jeff said is the cum catch is still in the range of what we've been estimating before. And as we go through it, we'll lay out both how we think you should think about margins on*

*long-term equipment, margins on services, and just how best to sort of gauge the 2018 to 2017 run rate views.*

576.    In reaction to this news, there was an immediate price decline in GE's common stock price which opened 5.65% lower than the previous day's close.  While the price rebounded temporarily leading up to the market close, by the end of the very next trading day (October 23), after a number of prominent analysts (including UBS, JP Morgan and Morgan Stanley) downgraded the stock in light of the disclosures, the price closed at $22.32, down $1.26 or 5.34% from its close immediately preceding the October 20th disclosures.

577.    Analysts were not surprised by the substantial decline in the stock price and were more surprised by the temporary recovery on October 20:

> GE has declined 11% this week, marking its worst one-week performance since 2009. Clearly the wave of broker downgrades post-earnings is a factor, but **we believe that the +1% close on earnings day is also a contributing cause; quite frankly that was the harder move to explain in light of the guidance cut to $1.05-1.10 (vs. $1.54 extant consensus). In our 12 year history of covering GE, we have not seen such a sharp intra-day reversal as the one we saw on Friday, and one that was so difficult to explain.** But, in aggregate, the share price is reflecting the reduction to consensus earnings estimates for FY18, lower sell-side target prices and income-focused investors/funds re-positioning ahead of the dividend cut. We believe $20 is the level that folks are gravitating towards, as a key support level.[112]

578.    This theme of surprise was echoed by analysts at Deutsche Bank in a report issued on October 23, 2017:

> We find it extraordinary that investors and analysts appear to have jumped so quickly to adopt GE's narrative that cash flow is heading for a substantial rebound – driven by cost cutting (significantly already in the numbers) and the absence of black box one-time items such as Alstom taxes. Moreover, Aviation and other business "strength" (commercial spares +21%) will eventually soften – possibly blunting the future benefit from Power one day turning higher. We calculate a paltry FCF yield even if GE were able to realize a sizeable cash bounce next year.

---

[112] "General Electric Co.: What Is the Push Back?" *Morgan Stanley*, October 27, 2017 12:00 PM EST (emphasis added).

579.     Deane Dray, CPA, analyst at RBC Capital Markets reported, on October 23, 2017, that this meant that the "review may determine that roughly half of GE Capital's reserves are insufficiently funded and that additional contributions must be committed."  Thus, the GE Capital dividend "may no longer be feasible depending on the conclusion of the insurance reserve assessment."[113]

580.     Dray also expressed surprise that GE's stock price closed up 1%, after falling by 6 percent intraday on October 20, 2017. Dray opined that:

> **Biggest surprise: Despite guidance cuts, GE's stock ends the day up 1%.**
> Given the magnitude of the guidance cuts, the urgent question we fielded on Oct-20 was why the stock rallied from -6% at the open to up 1% at the close. Our take is that this rally was driven by two factors: (1) The bridge of cash usage items that will not repeat in 2018, demonstrating how $7 bil is not the "new normal", eased some shock over the CFOA guidance cut. (2) John Flannery's brutal honesty about GE's prior failings, along with a heartfelt "falling on his sword" by outgoing CFO Jeff Bornstein. These factors helped investors conclude that a bottom could be at hand.[114]

581.     In a report on October, 27, 2017, Morgan Stanley analyst Nigel Coe also addressed GE's steep intra-day price decline on Friday October 20, 2017 and substantial price drop on Monday October 23, 2017, noting:

> What explains the sharp sell-off? GE has declined 11% this week, marking its worst one-week performance since 2009. Clearly the wave of broker downgrades post-earnings is a factor, but we believe that the +1% close on earnings day is also a contributing cause; quite frankly that was the harder move to explain in light of the guidance cut to $1.05-1.10 (vs. $1.54 extant consensus). In our 12 year history of covering GE, we have not seen such a sharp intra-day reversal as the one we saw on Friday, and one that was so difficult to explain. But, in aggregate, the share price is reflecting the reduction to consensus earnings estimates for FY18, lower sell-side target prices and income-focused

---

[113] RBC Capital Markets, October 23, 2017, "General Electric Company - First Signs of Bottoming with Kitchen-Sinked 3Q17 + Reset 2017"

[114] *Id.* Emphasis in original.

investors/funds re-positioning ahead of the dividend cut. We believe $20 is the level that folks are gravitating towards, as a key support level.[115]

582.    On October 23, 2017, in a report entitled "*General Electric Co., Not Much Left For Bears To Say...The Numbers Now Speak For Themselves*," Stephen Tusa from JPMorgan questioned how deep the problems at GE Power went:

> We also wonder how, immediately following the departure of Power head Steve Bolze, a segment that is supposed to be driven by services can unravel so quickly. We are not saying there are accounting issues here, but given the legendary earning management prowess of historical GE, there would appear to be something perhaps more systemic, a challenge for anyone to cleanse, especially a 30 year insider.

Tusa also wrote, "How 'great' can businesses that have to sell receivables to a facility and build billions in Contract Assets to drive market share actually be?"

583.    On October 23, 2017, John Inch of Deutsche Bank issued a report on GE entitled, "*Back to the Future*" in which Inch expressed surprise and astonishment at GE's October 20, 2017 disclosure:

> GE's Power 3Q17 segment profit collapse was astounding with revenues down 4% and profits down 51% y/y. In only a matter of weeks, the company's service, aeroderivative and power conversion businesses seemingly fell apart. . .
>
> \*       \*       \*
>
> The fact that GE owes such a large bill for legacy insurance likely surprised a lot investors considering GE supposedly exited Genworth, ERC and GE's other insurance businesses many years ago. In fact, of GE Capital's ~$155bn of assets at 3Q17, roughly $27bn are reportedly tied to insurance. . . Why is GE still taking charges for its discontinued operations . . . .

584.    Despite revealing part of the truth regarding adverse claims experience as it related to LTC reserves and the initiation of a comprehensive review of LTC reserves, Defendants continued to mislead the market by failing to disclose that the adverse claims

---

[115] Nigel Coe, Morgan Stanley, *"General Electric Co., What Is the Push Back*?" (Oct. 27, 2018).

experience causing the insufficiency of the Company's LTC reserves was not a "recent" occurrence, but had been persistent since at least the beginning of the Class Period (*see e.g.,* ¶¶ 240-259).

585.    Despite revealing part of the truth regarding industrial CFOA performing worse than initially anticipated, Defendants continue to mislead the market by failing to disclose:

(a)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(b)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(c)    that the Company failed to maintain adequate internal controls over its financial reporting with respect to Contract Assets; and

(d)    that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers.

### 4.     **October 30, 2017**: 3Q 2017 Form 10-Q

586.     On October 30, 2017, the Company filed its quarterly report for the quarter

ended September 30, 2017 on a Form 10-Q with the SEC (the "3Q 2017 Form 10-Q").  This

report contained the same false and misleading financial metrics referenced in the charts above.

587.     The 3Q 2017 Form 10-Q also provided information regarding its LTC liabilities

and its ongoing reserve testing:

> Our run-off insurance activities include future policy benefit reserves of $ 19.2 billion and claim reserves of $4.9 billion at September 30, 2017 of which approximately $9.0 billion and $3.4 billion, respectively, relates to long-term care insurance contracts. We test future policy benefit reserves associated with our run-off insurance activities for premium deficiencies annually.
>
> ***We have recently experienced elevated claim experience for a portion of our long-term care insurance contracts*** that requires the completion of a comprehensive review of premium deficiency assumptions across all insurance products. This review will be completed in the fourth quarter of 2017. Based upon the work performed to date and complexity of the review as further described within our Critical Accounting Estimates and Note 11 to the consolidated financial statements, a charge related to a probable deficiency is not reasonably estimable at September 30, 2017.
>
> *     *     *
>
> ***We have recently experienced elevated claim experience for a portion of our long-term care insurance contracts,*** which is most pronounced for policyholders with higher attained ages. As a result, and as described below, we are conducting a comprehensive review of premium deficiency assumptions across all insurance products, including a reassessment of future claim projections for long-term care contracts that will be incorporated within our annual test of future policy benefit reserves for premium deficiencies, which is expected to be completed in the fourth quarter of 2017.
>
> *     *     *
>
> Should the net liability for future policy benefits plus the present value of expected future gross premiums be insufficient to provide for the present value of expected future policy benefits and expenses, we would be required to reduce any remaining capitalized acquisition costs and, to the extent a shortfall still exists, increase our existing future policy benefit reserves. We would record a charge to earnings for any premium deficiencies in the fourth quarter of 2017 upon completion of this review.

Based upon the work performed to date and complexity of the review described above, a charge related to a probable deficiency is not reasonably estimable at September 30, 2017. Until the above described review has been completed we have deferred the decision whether GE Capital will pay additional dividends to GE.

588.     The 3Q 2017 Form 10-Q stated the following with respect to Contract Assets:

Revenues in excess of billings increased $2,606 million and $1,328 million for our long-term service agreements and long-term equipment contracts, respectively. *The increase in our long-term service agreements is due to a $1,930 million cumulative catch up adjustment driven by lower forecasted costs to complete these contracts as well as increased forecasted revenue and $676 million due to the timing of revenue recognized for work performed relative to billings and collections. Revenue in excess of billings for our long-term equipment contracts increased $1,328 million primarily due to the timing of revenue recognized for work performed relative to the timing of billings and collections. The remaining increase in contract assets of $712 million is primarily due an increase in deferred inventory costs and non-recurring engineering costs*.

The change in estimated profitability within our long-term product service agreements in our Power, Aviation, Transportation, and Oil & Gas segments resulted in an adjustment of $649 million and $588 million for the three months ended September 30, 2017 and 2016, respectively, and $1,930 million and $1,714 million for the nine months ended September 30, 2017 and 2016, respectively, driven primarily by cost execution and increased productivity.

589.     In the 3Q 2017 Form 10-Q, GE further stated:

*Contract assets increased $4.6 billion. Revenues in excess of billings increased $2.6 billion and $1.3 billion for our long-term service and equipment agreements, respectively. The remaining increase in contract assets of $0.7 billion is primarily due an increase in deferred inventory costs and non-recurring engineering costs.*

590.     The 3Q 2017 Form 10-Q reported an LTSA balance of $15.36 billion and stated

as follows: "*Long-term product service agreement balances are presented net of related*

*billings in excess of revenues of $2,595 million and $3,750 million at September 30, 2017 and*

*December 31, 2016, respectively*."

591.     The 3Q 2017 Form 10-Q reiterated that cash from operating activities decreased

$14.3 billion, primarily due to, among other things:

Cash generated from Industrial CFOA[] amounted to an insignificant amount and $2.3 billion in 2017 and 2016, respectively, primarily due to [among other things] . . . . ***An increase in contract assets of $4.0 billion in 2017 compared with $3.0 billion in 2016, primarily due to cumulative catch up adjustments driven by lower forecasted cost to complete the contracts as well as increased forecasted revenue on our long-term service agreements and the timing of revenue recognized relative to the timing of billings and collections on both our long-term service agreements and long-term equipment contracts***.

592.    Despite revealing part of the truth regarding adverse claims experience as it related to LTC reserves, the initiation of a comprehensive review of LTC reserves, and the negative adjustments necessary to GE Power's cum catch adjustments and a growing Contract Asset balance and its effects on GE's industrial CFOA, Defendants continue to mislead the market by failing to disclose:

(a)    that the adverse claims experience causing the insufficiency of the Company's LTC reserves was not a "recent" occurrence, but had been persistent since at least the beginning of the Class Period (*see* ¶¶ 321-336).

(b)    that, in violation of GAAP, the Company had relied on unsustainable business practices to renegotiate LTSAs with customers for no true economic purpose and solely to generate positive cum catch margin adjustments (or avoid negative cum catch margin adjustments) in order to meet internal revenue and earnings projections, which GE used to conceal the fact that GE Power was not generating revenue organically;

(c)    that in order to mask the growing gap between earnings and CFOA that resulted from over-reliance on cum catch adjustments, GE Power generated CFOA by factoring receivables it obtained through contract renegotiation—a practice, known as "monetization," that was unsustainable because the existing number of LTSAs available to monetize in this way was finite;

(d)     that the Company failed to maintain adequate internal controls over its financial reporting with respect to Contract Assets; and

(e)     that the Company was overstating revenues, margins, and earnings on its LTSAs (which corresponded with an inflation of the Company's Contract Assets) in order to artificially manipulate the Company's quarterly and annual financial results in violation of GAAP, in part because the estimations used for future costs, revenues, and margins on LTSA within the GE Power segment were deficient and did not adequately account for the risk of non-payment from customers.

593.     On November 1, 2017, *Investor's Business Daily* published an article entitled "*Why There Is Little Hope General Electric's Dividend Will Stay Intact*" highlighting concerns from equity analysts regarding GE's dividend.  The article cited two main factors contributing to the uncertainty of the dividend: (i) declining industrial cash from operations, and (ii) and "the suspension of GE Capital dividends pending review of reserves needed to support a long-term care insurance business."

### 5.     <u>November 13-14, 2017</u>: Investor Update and Goldman Sachs Conference (Partial Corrective Disclosure)

594.     On November 13, 2017, *before the market opened*, GE issued a press release slashing its annual dividend in half, from $0.96 to $0.48 per share, only the second dividend cut for GE since the Great Depression.

595.     The Company later hosted its Investor Update, *during market hours the same day*, which JPMorgan later described as "an all hope is lost event," and reported that GE's dividend rate was no longer appropriate.  Defendant Flannery explained that, plagued by poor CFOA, GE had been paying out a dividend above its industrial CFOA for a number of years, and that GE Capital would not be paying a dividend to GE in 2018, stating:

[T]he reduction of this dividend to $0.48 is a product, really, of where we are as a company right now.  So we had a $0.96 dividend established.  We had a path where we thought the industrial cash flow generation would grow, that would grow into the dividend . . . .  The reality is that hasn't unfolded that way . . . . <u>[W]e've been paying a dividend in excess of our free cash flow for a number of years now</u>.

596.    Defendant Flannery reiterated the Company's CFOA forecast reduction, stating:

**[Unidentified Participant]:**

[S]hortly after you were named CEO, it was widely quoted in the Journal and elsewhere that the dividend was safe.  Surprised that you would make such a strong statement early on, which . . . has hurt your credibility right out of the gate . . . .  When did you make the decision?

**Flannery**

So I think <u>there's been major change in our cash flow forecast.</u>  So the time we went out with that first statement, we were having a $12 billion to $14 billion CFOA.  And the day I started, there was a guide to the low end of that range . . . .  So we're now at a $7 billion number. . . .  [F]undamentally, that <u>dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow</u> in the next couple of years . . . .  <u>So the single biggest delta, I think is obvious, which is what happened in the Power business</u>.

597.    Defendant Miller, who assumed the CFO role on November 1, 2017, also

provided an update regarding the Company's review of its GE Capital insurance reserves,

stating:

One area, I'll just pause and talk about for a minute, is GE Capital.  And as many of you know we're in the middle of an ongoing reserve review at our insurance businesses there. This process is ongoing.  It involves multiple third parties and it's not done at this point.  And I don't have a number for you today.

We're on track to conclude that in December.  <u>And we mentioned to you before, that we're not taking a second half GE Capital dividend of about $3 billion. And as we go through this process at this point I do expect the charge to be more than that.</u>  But we do have capital plans in place and we don't expect to have to put GE parent cash into GE Capital.

598.    GE also slashed its 2018 profit outlook by 50% to adjusted earnings of $1.00 to

$1.07 a share, compared with its earlier estimate of $2 per share.  GE also announced a series of

steps to save cash and refine operations, including revising compensation plans and shrinking

the size of the Company's Board to 12 from 18 members.  Indeed, Defendant Miller indicated

that GE would reduce its corporate workforce, which currently has approximately 24,000

employees, by 25 percent, or approximately 6,000 job cuts.

599.    During the conference, Russell Stokes claimed that Power's "***CSA assets have***

***been running fine***," but also stated that:

> We will have lower CSA or contractual asset gains. And I'd say really part of
> this is focusing the organization on actions that generate a cash return today.
> ***There is nothing wrong with CSAs. I've been around them for a long time***. But
> what we do get into is creating value that is going to play out and cash flows that
> play out over a 10-, 15-plus-year period. We're going to redeploy some of our
> resources to look and understand at how do we do more things in our service
> business to be able to ensure that we're generating cash today, but at the same
> time, taking care of those customers and understanding the performance
> guarantees and commitments there.

600.    Stokes also answered a question regarding Contract Assets from Jeff Sprague of

Vertical Research Partners:

> [***W]e've looked very hard at what's in those contracts in terms of some of the
> commitments that have been made. That's really what we were talking about in
> terms of the new strike zone-type process and what we're doing around pricing
> governance. We have taken a hard look at the way they've – service areas. I
> think there's a view around the service portfolio in terms of are we giving
> things away, et cetera. The contracts have a degree of productivity in them, at
> times, working with customers to look at how we restructure to ensure value
> for them. We may trade value, but then we get long-term economics back as
> well. There's actually short-term economics at times on things like AGPs and
> making sure that the assets are continuing to run. So I feel pretty good about
> where we are, but we're continuing to make sure that we put the right controls
> in place to make sure that we don't have issues going forward***. There's a degree
> of complexity, obviously, based on by country and financing requirements, et
> cetera, and we're working through all of that.
>
> *          *          *
>
> On the – if you looked at the contracts where we've worked through
> restructuring, the margin on the contracts remains the same. So the economic
> trade is something where we get value and the customer gets value. . . There's
> less of that risk associated with the CSAs. Everything that we're seeing around

the – where we have the long-term contracts, those assets we monitor, we can see that they're running equal to the utilization that we had assumed they have. And that's about 50% of our service book.

601.    Defendant Miller attempted to explain the basis for GE's cost and productivity estimates on the Contract Assets:

> So a minute on contract assets, and I know there is a lot of discussion here. . . . **So we have about $30 billion of contract assets, and about half of that relates to our contractual services arrangements.** About 40% of it relates to our long-term equipment assets. And just to explain for a minute what a contractual service arrangement really is, these are long-term contracts, typically 10 to 20 years, where our customers have predictable maintenance costs in exchange for performance guarantees on equipment, okay. . . .

602.    Also during the call, an analyst asked whether "[t]he contract asset headwind for 2018 [was] cum catch adjustments," or whether it was core project related activity. In response, Defendant Miller continued to conceal the improper reliance on cum catch adjustments to accelerate revenue and earnings on Contract Assets and the related impact on cash flow:

> **Most of that is core project-related activity. I think our cum catch is somewhere in the 700 to 800 number next year** . . . .

603.    A presentation GE provided investors as part of the Company's Investor Update showed that Contract Assets caused a **$3.9 billion outflow of cash in 2016, a projected $5 billion outflow of cash for 2017, and a projected $3 billion outflow for 2018**.



604.    This chart shows that GE expected Contract Assets to continue to negatively impact cash flow, which meant GE remained heavily reliant on non-cash earnings from its LTSAs. Post-Class Period, analysts at Deutsche Bank, in a January 29 and February 8, 2018 report, cautioned that GE's reliance on non-cash earnings, combined with a weak power market, could force GE to write down its Contract Assets at some point in the near future.

605.    On November 14, 2017, before the market opened, analysts at RBC Capital Markets issued a research report in which they downgraded GE stock, noting that "the market was caught by surprise by the magnitude of the missteps and secular challenges at Power, as well as the systemic cash flow shortfalls."  Indeed, they found the "admission that GE had been paying out a dividend above its industrial free cash flow for a number years, and that GE Capital would not be paying a dividend" to be "particularly damaging."  They also stated that the GE Capital dividend announcement "was a negative surprise and further compounded concerns that the final insurance reserve charge would be more severe than feared."

606.    Also before the market opened on November 14, 2017, analysts at Citigroup lowered its price target for GE from $27 to $25 per share. The analysts observed that: "Power is

a mess right now, GE Capital will likely take a big insurance charge, and Cash/EPS could flat-line close to $1."

607.    On November 14, 2017, starting at 9:30 a.m., GE attended a Goldman Sachs Group Inc.-sponsored conference during which analysts were particularly focused on GE Capital and noted that "GE Capital was noticeably absent in the discussion [yesterday]." Defendant Miller reiterated the information provided by the Company the day prior:

> [W]e're in the middle of a review of our insurance reserves.  This is a book of largely reinsured long-term care businesses back from more than a decade ago. That review is ongoing, we're right in the middle of it.  It involves multiple third parties. . . .  It's on track for completion in December . . . .  We had announced earlier that we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year.  At this point in the process, I'd tell you that I expect that charge to be more than that, but we also have capital plans in place and I don't expect to have to put parent cash into GE Capital at this point.

608.    Despite the negative announcements on November 13, 2017 and November 14, 2017, Defendant Flannery provided false assurances about GE's accounting in a CNBC interview during trading hours on November 14, 2017.  Specifically, Flannery said that "***there's no accounting issue. No one's been had***."[116]

609.    Defendant Flannery's statement was materially false and misleading and omitted to disclose that GE was failing to timely record billions of dollars of increases to its LTC reserves and was overstating costs and profitability on Contract Assets.

610.    As a result of these stunning revelations about GE's massive dividend cut and anticipated charges of more than $3 billion for its LTC reserves, the Company's stock price fell $1.47 per share, or over 7 percent, to close at $19.02 per share on November 13, 2017.  GE's

---

[116] Berkely Lovelace, Jr., *GE CEO Flannery: I'm not surprised by our stock's 2-day plunge*, CNBC (updated Nov. 14, 2017 1:26PM ET), https://www.cnbc.com/2017/11/14/ge-ceo-flannery-im-not-surprised-by-our-stocks-2-day-loss-of-nearly-9-percent-we-disappointed-investors.html

stock price fell an additional $1.12 per share, or 5.8 percent, to close at $17.90 per share on

November 14, 2017, **for a two day loss of approximately 12.6 %,** on extremely heavy volume.

611.    On November 16, 2017, Moody's Investors Service cut GE's long-term debt

rating, citing "extreme deterioration" in the energy business.  The cut was from A1 to A2.

According to an article by CNBC:

> The move comes the same week that GE rocked investors with news that it was
> slashing its dividend in half and making a multitude of other changes at the 125-
> year-old industrial conglomerate. GE shares were rocked on the news and are
> down nearly 10 percent on the week.
>
> Moody's indicated that it's unlikely GE makes the changes anytime soon that
> will justify the former rating on its bonds.
>
> Specifically, Moody's takes GE to task for using $25 billion from asset sales in
> 2016 and 2017 to repurchase stock in an effort to boost share price, taking out
> $10 billion of debt to fund acquisitions, and paying out a dividend higher than
> cash flows and as the company was downsizing key operations.
>
> The downgrades reflect the severe deterioration in the financial performance of
> GE's Power segment that will last through at least 2019, Rene Lipsch, senior
> credit officer, said in a statement. Along with the challenges in the Oil & Gas
> business posed by continued weakness in the global oil field services industry
> and the downturn in the North American market for freight locomotives, GE has
> to contend with weak earnings and cash flows in several segments that represent
> in aggregate about 50% of expected revenues in 2017.
>
> *      *      *
>
> Moody's does not anticipate that GE will allocate a meaningful portion of any
> proceeds from planned asset disposals to debt reduction in the near term to help
> expedite the restoration of its credit metrics," Lipsch said. "Over the last several
> years, GE pursued an aggressive financial policy that contributed to the
> weakening of its credit profile.

612.    Despite revealing part of the truth regarding the scope of the potential charge

concerning LTC reserves (greater than $3 billion) and the weakening cash flow situation at the

Company, Defendants continue to mislead the market by failing to disclose the full truth

regarding the overstatement of costs and profitability on Contract Assets.

## IX.    ADDITIONAL CORRECTIVE DISCLOSURES

613.    During the Class Period, as detailed herein, GE and the Individual Defendants engaged in a course of conduct that artificially inflated the price of GE securities and operated as a fraud or deceit on the Class Period purchasers of GE securities by making the materially false and misleading statements and omissions recited above.

614.    When the truth was disclosed and became known to the market, the price of GE securities declined precipitously as the prior artificial inflation was removed.  As a result of their purchases of GE securities at artificially inflated prices during the Class Period, Plaintiff and other members of the Class suffered a substantial economic loss (*i.e.*, damages under the federal securities laws). The price decline in GE securities was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

615.    The truth about GE's business was disclosed through a series of corrective disclosures beginning on July 21, 2017, as discussed above, with the disclosure of the comprehensive review of the Company's LTC reserves and concluding on January 24, 2018, with the announcement of the Company's fourth quarter 2017 results and the disclosure of an SEC investigation into the Company's understatement of its LTC reserves and "revenue recognition and controls for its long-term service agreements."

### A.    <u>January 16, 2018</u>: Insurance Update (Partial Corrective Disclosure)

616.    On January 16, 2018, *before the market opened,* GE issued a press release entitled "*GE Provides Update on Insurance Review; $6.2B after-tax GAAP charge in 4Q'17,*" confirming a multi-billion dollar loss in GE's legacy reinsurance business. The press release stated in relevant part:

GE (NYSE: GE) announced today that the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), will result in an <u>after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017, and GE Capital expects to make statutory reserve contributions of ~$15 billion over seven years</u>**.** The Kansas Insurance Department, NALH's primary regulator, approved a phased contribution of ~$3 billion in 1Q'18 and ~$2 billion annually from 2019 through 2024.

As we disclosed during the company's second- and third-quarter earnings calls and further discussed during our November 13, 2017, investor presentation, earlier this year GE Capital initiated a comprehensive review of our insurance reserves with the assistance of leading outside experts, said John Flannery, chairman and CEO of GE. This was a rigorous process involving complex factors and estimates relating primarily to long-term care policies written by primary insurance companies and reinsured by NALH.

Flannery added, "The required contributions to the statutory reserve will be made by GE Capital, which has sufficient liquidity to do so. We have been taking ongoing actions to make GE Capital smaller and more focused while maintaining its key capabilities to support financing for GE Industrial products. These actions will also help restore GE Capital ratios to appropriate levels. At a time when we are moving forward as a company, <u>a charge of this magnitude from a legacy insurance portfolio in run-off for more than a decade is deeply disappointing</u>."

The required statutory contributions will be a higher number than the GAAP charge, due primarily to modifications of certain assumptions to reflect various potential adverse conditions, as is required for statutory accounting purposes.

617.     That same day, on a conference call with investors and analysts, Defendant

Flannery stated, in part:

[W]e've been performing a comprehensive review of our insurance portfolio. We finished that work late last week and reviewed it with our regulator, and we're going to share those results of that review with you today.

<u>We've taken an after-tax GAAP charge of $6.2 billion, which is $7.5 billion at a 21% tax rate</u>. And you will see that reflected in our fourth quarter financials. <u>GE Capital will make a $3 billion statutory cash contribution to its insurance subsidiary in the first quarter of 2018 and approximately $2 billion annually from 2019 to 2024, for a total of approximately $15 billion</u>.

Needless to say, at a time when we are moving forward as a company, **I'm deeply disappointed at the magnitude of the charge in this legacy portfolio**.

*        *        *

**Clearly, in hindsight, we underappreciated the risk in this book**. Similar to the rest of the industry, the assumptions we made at that time have played out differently. In 2015, as part of the GE Capital exit process, we again reviewed our insurance exposure and determined that we'd looked at exit options when the interest rate environment was more favorable.

618.     Miller provided further details about the LTC reserve charge:

**In the quarter, we recorded a pretax charge of $9.5 billion** . . . The components of the pretax charge are the following: **an $8.9 billion increase in policy benefit reserves; and a $600 million write-down of the remaining deferred acquisition cost**. This GAAP charge represents our best estimate of the future cost based on what we know today. **The related statutory capital contributions will be approximately $15 billion, which will be funded over the next 7 years**. We estimate that our 2018 funding requirement will be approximately $3 billion, and we'll make that contribution in late February using GE Capital's excess cash. At this point, we estimate the annual contributions from 2019 to 2024 to be approximately $2 billion.

619.     In response to a question on the difference in the GAAP charge versus the

statutory contribution, Miller added:

The capital contribution is not based on GAAP numbers. It's actually based on regulatory or statutory accounting. And there is very prescribed rules not only around the accounting, but also around the required capital of insurance entities. So for statutory, you use more adverse assumptions. There is -- examples of that might be for morbidity. You use more adverse morbidity improvement assumptions. The discount rates tend to be prescribed as opposed to something where you estimate. And then a lot of these assumptions are set as of the end of the year as well. So it's just a different process than GAAP. And then when you get to actually looking at required capital, the insurance regulators have a regulatory calculation around risk-based capital. So that's really what determined the $15 billion contribution. This funding will be spread over 7 years, as we talked about before, so $3 billion next year, roughly $2 billion thereafter each year. And really, the statutory process, we've worked very closely with the Kansas Insurance Department. However, that process really runs for another month or so. The $15 billion is what we think it will be.[117]

---

[117] The Company also disclosed that the Kansas Insurance Department had approved GE's request for a permitted accounting practice to recognize the reserve increase over a seven-year period and as a result, GE Capital expected to contribute capital to its insurance subsidiaries of approximately $3.5 billion in 2018 and an additional $11.5 billion through 2024 *subject to ongoing monitoring by the Kansas Insurance Department*. As part of the deal with the Kansas Insurance Department, GE was also required to maintain specified capital levels at its insurance subsidiaries under capital maintenance agreements.

620.    Ryan Zanin, GE Capital's Chief Risk Officer since 2010, provided further detail: "This [LTC] business was primarily underwritten in the late '80s to early 2000s. Our book has been in run-off since 2006 with no new business written in over a decade. Across our books, we reinsure approximately 300,000 policies." Zanin also acknowledged the poor state of the LTC industry's adverse claims experience and poor financial performance during this call, stating: "Virtually, the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected."  While Zanin failed to acknowledge that most LTC insurers had made adjustments to their assumptions and increased reserves years before GE, his comments are an acknowledgement of the appropriateness of considering industry trends and experience when analyzing LTC reserves.

621.    Specifically, Zanin acknowledged the following:

Turning to long-term care portfolio. This business was primarily underwritten in the late '80s to early 2000s. Our book has been in run-off since 2006 with no new business written in over a decade. Across our books, we reinsure approximately 300,000 policies. . . .

In general, long-term care policies have proven challenging for the industry. Decades can pass between when policies are underwritten and when policyholders begin to claim benefits. As the insured population ages and actual claims arise, those claims are compared with the projected claims, and the adequacy of reserves is assessed. Virtually, the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected.

*      *      *

Each year, we perform an annual premium deficiency test, which, under GAAP, test to ensure the sufficiency of our current reserves plus future premiums to pay future claims across all insurance books. In all prior years, these test resulted in a positive margin, which, under GAAP, requires that original assumptions above the book remain locked.

In 2017, based on new claims experience studies, we undertook a deeper dive to better understand developing trends in claims. This led to a comprehensive actuarial review of all policy assumptions and a bottoms-up rebuilding of claims

cost curves. <u>We engaged 2 independent third-parties with actuarial experts to
help us with that work in addition to KPMG's audit review.</u>

The actuarial analysis included a fundamental shift in estimating future claims
costs, from one that involved making incremental adjustments to existing
projections in response to observed levels of claims experienced, to one that
rebuilds the projections utilizing the additional credible data for older retained
ages that has become available. The revised and reconstructed long-term care
claims cost projections, combined with the fact that claims costs stand out over
40 years, results in a very significant premium deficiency and is a primary driver
of today's aggregate after-tax GAAP reserve charge of $6.2 billion.

On a statutory basis, reserves are calculated assuming moderately adverse
conditions rather than our best estimate under GAAP. On a statutory basis, we
estimate today that we may contribute approximately $15 billion over 7 years to
build reserves at North America Life & Health.

622.     Zanin's comments are an acknowledgement that GE had not performed adequate

analysis of its LTC portfolio, including known trends and experience prior to 2017, and that the

Company had not previously employed or retained sufficient actuarial staff to perform such

analyses.

623.     After the conference call, on January 16, 2018, John G. Inch from Deutsche

Bank issued a report entitled "*Insurance woes hit GE hard*."  In that report, Inch noted that not

only were the "charges and scope of the problem . . . significantly worse than we had

anticipated," "[t]he charges come well after Genworth first flagged [LTC] issues in late 2014."

Inch went on to warn that "given GE's weak track record at accurately assessing its future

exposures for GE Capital businesses . . . , we believe future charges could still be forthcoming

both for GE's insurance businesses and other $ billions of remaining GE Capital liabilities."

624.     Deane Dray from RBC Capital Markets agreed and noted, in a January 25, 2018

report, that "our prior experience has been that the initial reserve charges for distressed GE

Capital businesses are usually inadequate in size and necessitate follow-on charges in

subsequent years . . . we would not be surprised to see further charges related to GE Capital insurance businesses."

625.    An article in the Financial Times issued on January 26, 2018 reported that "investors in General Electric were **shocked** to learn that the US industrial group would have to pay $15bn to cover long-term care insurance liabilities it retained after spinning off its Genworth Financial unit more than a decade before." [118]

626.    On January 17, 2018,  Nicholas Heymann of William Blair issued an analyst report on GE entitled, "*Charge for Legacy Reinsurance Announced to Reduce Uncertainty*," stating in part:

> GE's shares so far in 2018 had risen 4.3% versus a 3.9% rise for the S&P 500, reflecting a 2.9% decline in GE's share price yesterday following news of the $6.2 billion after-tax charge to restore NALH's reinsurance reserves. While there were widespread expectations that GE would likely be announcing a charge with its fourth quarter 2017 results relating to resolving NALH's inadequate reserves, we believe retaining the business and enhancing its reserves over time is likely to be less positively received than taking a charge and being able to outright divest the business. However, given regulatory concerns about the required reserve additions expected to total $15 billion from 2018 to 2024, this may not currently been an option for GE.
>
> NALH's primary regulator, the Kansas Insurance Department, approved the phased contributions to restore the adequacy of NALH's insurance reserves for long-term care policies written by primary insurance companies that were reinsured by NALH. The required contributions to NALH's statutory reserve will be made by GE Capital, which has adequate liquidity to make the reserve contributions. GE Capital had originally been expected to return excess capital dividends of $2 billion-$3 billion in the fourth quarter and a final $3 billion-$4 billion (primarily in 2018) as it continued to reduce the size of its receivable portfolios while it completed the exit from the vast majority of its prior financial service businesses. It is expected that these previously anticipated excess capital dividends, which GE's CEO John Flannery noted on November 14, 2017, would now not be made to the parent pending completion of the comprehensive review of the adequacy of NALH's reserves, will be used to fund the future

---

[118] Ed Crooks & James Fontanella-Khan, *GE's Insurance Liabilities Return to Haunt Investors*, FINANCIAL TIMES, (Jan. 26, 2018), https://www.ft.com/content/41a3ce2a-0155-11e8-9650-9c0ad2d7c5b5.

contributions to NALH's reserves. As a result, GE Capital will suspend its dividend to GE. GE expects this decision will have no impact on its industrial businesses or its 2018 capital allocation plans. . . . The extended period (through 2024) that NALH will continue require funding makes resolution of the adequacy of NALH's reinsurance reserves a now quantified but ongoing issue for several years.

627. Analysts covering GE opined that it is likely that GE knew about its problems for a very long time. For example, Scott Davis, an analyst with Melius Research, told Bloomberg in a January 25, 2018 article that it is "**very hard to believe that mysteriously overnight GE found problems they didn't know existed**."

628. Similarly, Jeff Sprague, an analyst with Vertical Research Partners, directly confronted Defendant Flannery during the conference and told him that it was "**hard to imagine a $15 billion problem materialized in the course of the year**."

629. *The Economist* published an article on January 18, 2018 entitled, "*After a huge loss on old reinsurance contracts, GE contemplates a break-up,*" which stated, in part:

Even before the 2007-08 financial crisis, which prompted the firm massively to pare back GE Capital, it had already spun out much of its insurance business into Genworth Financial, an American insurance company which listed in 2004 in the biggest initial public offering of that year, and sold the rest of it to Swiss Re, a reinsurer, in a deal worth $6.8bn, in 2006. Mr Immelt conceded at the time of the insurance sale that the business had always been a "tough strategic fit" for GE because of its low returns, volatility and need for capital. But a number of substantial life- and health-reinsurance liabilities, notably those related to long-term care insurance (which pays for products such as nursing-home care for the elderly), were left out of both the 2004 listing and the Swiss Re deal, although GE Capital did at least stop issuing new contracts.

That in the 12 years since then the firm appears to have done little about this residual portfolio seems an odd omission. The risk, after all, was well known. Other firms had problems with policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions; the long-term care market as a whole in America has run into trouble. One Pennsylvania insurer, Penn Treaty, was liquidated in 2017 after being left with just $500m in assets to cover a projected $4.6bn in claims.

630.    On the news of GE's $9.5 billion GAAP charge, $15 billion required addition to the Company's statutory LTC reserves, and the burgeoning Contract Asset balance, GE's stock price fell from a close of $18.76 per share on Friday, January 12, 2018 to a close of $18.21 per share on Tuesday, January 16, 2018 (the next trading day)[119] – an approximately 3% decline. GE's common stock continued to slide the following trading day, closing at $17.35 per share on Wednesday, January 17, 2018 (an additional drop of 4.7%), <u>for a total two-day drop of 7.52% on extremely heavy trading volume</u>.

**B.      January 24, 2018: Results for Fourth Quarter 2017 and Disclosure of Multi-Faceted SEC Investigation (Corrective Disclosure)**

631.    On January 24, 2018, *before the market opened*, GE issued a press release, and filed the same on Form 8-K with the SEC, entitled "GE Announces Fourth Quarter 2017 Results," disclosing a net loss of $9.8 billion for the fourth quarter 2017, including a $6.2 billion after-tax charge to increase LTC insurance reserves and steep declines in profit in its Power division. The press release stated, in part:

> GE Chairman and CEO John Flannery said, "In the fourth quarter, EPS was at the low-end of guidance, excluding insurance-related items, U.S. tax reform, and industrial portfolio actions. . . . Power was down significantly and we expect market challenges to continue.
>
> *         *         *
>
> GE Capital ended the quarter with $157 billion of assets, including $31 billion of liquidity. On a reported basis, the Verticals generated a loss of $(7.6) billion, which is down from last year driven by the effects of the charges in the Insurance business, and the associated Energy Financial Services impairments. Other continuing operations generated $1 billion in earnings in the quarter driven by tax benefits.

632.    On the same day, the Company hosted a conference call during which it disclosed that GE was being investigated by the SEC in connection with the insurance reserves

---

[119] The market was closed on Monday January 15, 2018.

increase **and** accounting for the Company's Contract Assets. Miller shocked the market by

announcing:

> I also want to note that we have been notified by the SEC that they are
> investigating the process leading to the insurance reserve increase and the fourth-
> quarter charge as well as GE's revenue recognition and controls for long-term
> service agreements. We are cooperating fully with the investigation, which is in
> very early stages.

633.    During that same call, Russell Stokes, the CEO of GE Power, revealed the true

state of GE's internal controls and accounting for GE's Contract Assets. Mr. Stokes responded

to an analyst inquiry as follows:

**Scott Davis, Melius Research**

> If I was to look at one part of our model that we're probably a little bit insecure
> of, I should say, it's just around price in Power…maybe just Russell could fill us
> in on where we stand there.

**Russell Stokes – CEO of GE Power**

> There is an element of price that we have acknowledged that we felt up to now,
> just given that we did not have the level of attention that we should have had on
> that portion of the business. We also acknowledged in the past cost overruns
> around some of the execution that had taken place as well.

634.    Indeed, Stokes acknowledged that GE did not have the internal controls in place

expected by GAAP to formulate dependable estimates. Moreover, the gaps in GE's controls had

not detected cost overruns, which would have negated GE's assumptions enabling the massive

accounting-related accelerations of profits. Consequently, the analyst pressed on:

**Scott Davis, Melius Research**

> So Russell, I mean, one of the things that – your competitors have always said
> that GE is a little bit tough on price. And maybe you guys had made some
> decisions in the past that weren't economic. Is that something that has materially
> changed under your watch?...

**Russell Stokes**

So across the board, we are implementing much more disciplined underwriting practices.…The process is definite[ly] tighter than I would say than it was in the past.

635.   Indeed, the internal controls apparently implemented by new management culminated in ***charges to earnings totaling at least $850 million in the fourth quarter of 2017*** due to cost overruns on certain Power projects and a write-off for slow-moving and obsolete inventory.

636.   To uncover the reasons for this charge, analysts were forced to press GE for more information:

**Jeff Sprague - Vertical Research Partners**

It seems like there's something below the line. I don't know what I am missing.…

**Jamie Miller**

Yes, Jeff, the thing I would probably point you to is that Power in the fourth quarter had a very tough quarter. And when you look at where we thought 2017 would land versus where it did, it was substantially lower there. Now, when you really deconstruct the fourth quarter for Power, there were really two or three main themes there. One of which is just sort of one-time adjustments and some non-repeat items.…And as Russell and the team have come in, first, the one-time items piece of it, which is about $850 million, about half of that was a charge for slow-moving and obsolete inventory that we took. We obviously don't expect that to repeat as we get into next year.

637.   Stokes confirmed that GE's implementation of new controls resulted in this substantial charge to earnings reducing the profit that had been accelerated into prior quarters:

Jamie is right. On execution, we continue to just do everything we need to run the business better. We dove deeply into projects and we are working through cost overruns and adjustments that we needed to take in those projects, as we were nearing the conclusion of a number of legacy contracts, showing up costs with partners on deals that were underwritten back in the 2013, 2014, 2015 timeframe.

638.     Relatedly, Defendant Miller emphasized that GE would adopt stronger controls to address its accounting for Contract Assets. For instance, Defendant Miller explained that: "Some of the controls that we're implementing are things like just really **_making sure that we are much tighter on our underwriting_**, not only how we think about the strike zone around returns, but importantly how the cash profile really looks on these contracts going out several years." Miller clarified that the Company was not at that point "seeing the effect of [those] controls yet."

639.     In response to a question from Gautam Khanna, analyst at Cowen and Company, regarding the nature and the scope of the SEC investigation into Contract Assets, Miller revealed the following:

> Sure. I can comment on that one. <u>So this is a space, CSAs, that I've spent a ton of time on over the years.</u> This is something that at the Company level we have really exhaustively reviewed it. We've got a deep finance team, a deep controllership team.
>
> And as the SEC has started to take a look at this, I would tell you it's very early days. As I have come into the role, I mean, just like John, I am going through a very deep review on pretty much everything in finance.
>
> Look, there is nothing here that I am overly concerned about. But look, if I see something, we will deal with it. But I don't see anything at this point.

640.     On this news, GE stock fell 2.66%, from a close on January 23, 2018 of $16.89 per share to a close of $16.44 per share on January 24, 2018, shedding approximately $6.15 billion in market capital.

641.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## X.        POST-CLASS PERIOD EVENTS

642.    On January 25, 2018, Bloomberg published an article commenting on the

mysterious timing of GE's disclosure of the LTC Reserve charge, entitled, "*GE's Surprise $15*

*Billion Shortfall Was 14 Years in the Makin*g," which stated, in part:

> The trouble at General Electric Co. began decades ago when a hole started to form inside its sprawling financial unit.
>
> The hole became a $15 billion shortfall in insurance reserves, disclosed last week. It's prompted a Securities and Exchange Commission investigation, called into question the oversight of GE leadership, pushed down the share price, and shocked investors who were asking Wednesday how this icon of American capitalism could allow the situation to deteriorate to this point.
>
> "It sure seems that previous management had a rosy view," said Scott Davis, an analyst with Melius Research in New York. "***There seemed to be no effort on their part to get ahead of the liability. I find it very hard to believe that mysteriously overnight GE found problems they didn't know existed***."
>
> *         *         *
>
> Some employees were aware that long-term-care insurance was in bad shape. And even as it sold the bulk of its finance business, executives resisted selling reinsurance assets, even when bankers encouraged them.
>
> Doing so would have forced GE to book a huge charge to reflect a drop in value, according to people with familiar with the situation who asked for anonymity because they weren't authorized to speak. That was an indication that the business was worth less than what GE reported to investors, the people said.[120]

643.    On January 29, 2018, John G. Inch of Deutsche Bank issued a report entitled

*SEC Enforcement investigation elevates GE risks* in which he discussed GE's Contract Assets:

> In 2018, GE expects contract assets to represent a further roughly $3bn asset flow drag – suggesting a still high prospective reliance on non-cash LTSA income off EPS expectations (based on FactSet consensus) that are expected to decline by 5 cents to $1.00.
>
> **GE Power's 4Q17 operating profit decline of 88% and single digit Power operating profit margins in 2017 against a backdrop of ongoing power**

---

[120]  https://www.bloomberg.com/news/articles/2018-01-25/ge-s-surprise-15-billion-shortfall-was-14-years-in-the-making

**industry contraction and pricing pressures could elevate the risks of sizeable contract asset writedowns** – hurting GE's book value at a time of rapidly rising Industrial debt. <u>In turn, forced LTSA revisions could significantly reduce associated 2018 contribution to GE total EPS</u> (currently likely >20%) – potentially significantly negatively pressuring GE's valuation if EPS guidance were to be consequently revised….

644.    Inch further explained in a February 8, 2018 report:

The current SEC Enforcement investigations into the company's contract asset accounting could end up requiring GE to incur write-downs, restate earnings and account for LTSAs on a more conservative basis – thereby reducing the LTSA contribution to future earnings. (We estimate LTSAs could comprise >20% of GE's 2018 EPS of roughly $1.00 based on FactSet consensus).

If GE were to modify aggressive accounting practices in other areas, apart from contract asset accounting, this could place incremental downward pressure on future reported adjusted earnings.

645.    A *MarketWatch* article published on February 10, 2018 noted that GE's "huge" accounting charges had given rise to an SEC investigation, and cited to a note written by research firm Audit Analytics, that, based on the new disclosures concerning GE's LTC business, the "**magnitude of the $6.2 billion charge is far more staggering than … the market anticipated**."[121]

646.    On February 21, 2018, CFO Jamie Miller presented at two separate analyst conferences, the Barclays Industrial Select Conference and the Citi Global Industrials Conference.  During the Citi Global Industrials Conference, Miller noted that the SEC had made several requests for information from GE and that the Company was meeting in-person with the SEC concerning its ongoing investigation of GE in March 2018. Specifically, Miller responded as follows to a question from a Citigroup analyst:

---

[121] Francine McKenna, *GE says shock multi-billion dollar insurance charge is 'a special case'*, MarketWatch (Feb. 10, 2018), https://www.marketwatch.com/story/ge-says-shock-multibillion-dollar-insurance-charge-is-a-special-case-2018-01-26

*Andrew Alec Kaplowitz -* Citigroup Inc, Research Division - MD and U.S. Industrial Sector Head

Okay. And then the other one with regard, obviously, is the SEC investigation. So maybe just tell us anything that you could tell us on it from where you updated us last time. How is it progressing? Does the SEC move slowly, fast? Anything you could tell us there?

*Jamie S. Miller*

So the process has started. They've made several requests for information. We're, of course, cooperating with that. And we've provided them some information. We'll have some face-to-face meetings with them in March. Regulatory investigations sort of proceed at their own pace. And we're working cooperatively with them, as they go through their process.

647.    In a February 21, 2018 article in the Wall Street Journal, by Thomas Gryta,

entitled, "*How Jeffrey Immelt's 'Success Theater' Masked the Rot at GE* " Gryta writes:

Mr. Immelt and his top deputies projected an optimism about GE's business and its future that didn't always match the reality of its operations or its markets, according to more than a dozen current and former executives, investors and people close to the company.

This culture of confidence trickled down the ranks and even affected how those gunning to succeed Mr. Immelt ran their business units, some of these people said, with consequences that included unreachable financial targets, mistimed bets on markets and sometimes poor decisions on how to deploy cash.

"The history of GE is to selectively only provide positive information," said Deutsche Bank analyst John Inch, who has a "sell" rating on the stock. "There is a credibility gap between what they say and the reality of what is to come."

Said Sandra Davis, who knows several GE executives as the founder of MDA Leadership Consulting: "GE itself has never been a culture where people can say, 'I can't.'"

*             *             *

Several GE executives were aware the 2018 profit goal of $2 a share wasn't realistic, they said, and some were surprised Mr. Immelt stuck to it at the May event.

*             *             *

But Mr. Immelt didn't like hearing bad news, said several executives who worked with him, and didn't like delivering bad news, either. He wanted people

to make their sales and financial targets and thought he could make the numbers, too, they said.

The optimism was evident in how Mr. Immelt and the board used the company's cash. Over the past three years, GE spent more than $29 billion on share repurchases, at an average price of almost $30, about twice the current level. That included billions of dollars spent less than a year before GE suddenly found itself strapped for cash last fall.

\* \* \*

When GE later sold most of GE Capital, Mr. Immelt laid out a strategy in which the industrial businesses would grow enough to offset the lost cash flow from the financial unit, so that GE's long-term financial projections and dividend were sustainable. It didn't work out that way. Free cash flow wasn't sufficient to cover the dividend for years.

\* \* \*

Mr. Immelt's optimism was part of the problem, according to some people close to the situation. They said he told the board that management had identified risks in the power business, yet downplayed them. The probability and risk were way off, one said.

648.    In a February 22, 2018 article by Michelle Fox of CNBC entitled "*GE has been 'brushing things under the rug' for decades, Deutsche Bank analyst says,*" Fox reported that Deutsche Bank opined that GE has been "brushing things under the rug and leveraging aggressive accounting" for several decades. "One could infer the prior management basically did this to drive the … adjusted EPS up as much as possible to pay themselves as much as possible," Inch said in an interview with CNBC's Power Lunch.[122]  Inch also stated that among the problems plaguing the Company is a collapse in cash flow and a severely curtailed profit outlook. Inch stated, there are "a lot of parties that are culpable here. The information they provided was one-sided. They made it overly complicated to dissect the financials. They

---

[122] https://www.cnbc.com/2018/02/22/ge-has-been-brushing-things-under-the-rug-for-decades-deutsche-bank-analyst-says.html

compounded the complexity on purpose so people wouldn't look at the details." Inch added,

"Now unfortunately they're paying a bit of a price for it."

649.     On February 23, 2018, GE filed its Annual Report on Form 10-K with the SEC,

announcing its financial and operating results for the quarter and fiscal year ended December

31, 2017 (the "2017 Form 10-K"). With respect to the LTC reserve charges, the 2017 Form 10-

K disclosed:

> On January 16, 2018, GE reported the results of a review of premium deficiency
> assumptions related to GE Capital's run-off insurance business. With the
> completion of that review and of the annual premium deficiency test, GE
> recorded an increase in future policy benefit reserves of $8.9 billion and $0.6
> billion of related intangible asset write-off for the fourth quarter of 2017. This
> resulted in an after-tax charge of $6.2 billion to GE's earnings in the fourth
> quarter of 2017. In addition, GE Capital will contribute approximately $15
> billion of capital to its run-off insurance business over the next seven years. GE
> Capital plans to make its first contribution of approximately $3.5 billion in the
> first quarter of 2018 and expects to make further contributions of approximately
> $2 billion per year in each of the six following years, subject to ongoing
> monitoring by the Kansas Insurance Department, its primary regulator. GE
> Capital plans to fund the capital contributions with its excess liquidity and other
> GE Capital portfolio actions and does not expect to make a common share
> dividend distribution to GE for the foreseeable future.
>
> *        *        *
>
> Future policy benefit reserves amounted to $30.6 billion and $18.7 billion
> primarily comprising $16.5 billion and $7.6 billion related to long-term care
> insurance contracts and $9.4 billion and $9.3 billion related to structured
> settlement annuities and other life and disability insurance products at December
> 31, 2017 and 2016, respectively.
>
> *        *        *
>
> During 2017 . . . we initiated a comprehensive review of premium deficiency
> assumptions across all insurance products, which included reconstructing our
> future claim cost assumptions for long-term care contracts utilizing trends
> observed in our emerging experience for older claimant ages and later duration
> policies. . . In addition to the adverse impact from the revised future claim cost
> assumptions over a long-term horizon, our premium deficiency assumptions
> considered mortality, length of time a policy will remain in force and both near-
> term and longer-term investment return expectations. . .**The test indicated a
> premium deficiency resulting in the unlocking of reserves and resetting of**

**actuarial assumptions to current assumptions. This resulted in a $9.5 billion charge to earnings, which included a $0.4 billion impairment of deferred acquisition costs, a $0.2 billion impairment of present value of future profits, and an $8.9 billion increase in future policy benefit reserves**. . . . In connection with our premium deficiency test in 2017, additions to reinsurance recoverables of $2.4 billion were largely offset by an allowance for losses of $2.2 billion based upon our assessment of collectability that would otherwise have reduced the earnings impact of the premium deficiency. . . . Claim reserves amounted to $5.1 billion and $4.6 billion of which $3.6 billion and $3.1 billion relates to long-term care insurance contracts as of December 31, 2017 and 2016, respectively.

650.     The Company also disclosed that in Power, Renewables and Aviation, it provides "extended payment terms." The program ramped up in 2016, shortly after the Alstom deal, boosting GE CFOA by $1.6B in 2016, before stabilizing this year at $300 million. The 2017 Form 10-K disclosed:

> In certain circumstances, ***GE provides customers primarily within our Power, Renewable Energy and Aviation businesses with extended payment terms for the purchase of new equipment, purchases of significant upgrades and for fixed billings within our long-term service contracts.*** Similar to current receivables, GE may sell these long-term receivables to GE Capital to manage short-term liquidity and fund growth. These transactions are made on arm's length terms and any fair value adjustments, primarily related to time value of money, are recognized within the Industrial business in the period these receivables are sold to GE Capital. GE Capital accretes interest and factoring fee income over the life of the receivables. Factoring fee income is eliminated in our consolidated results. In addition, the long-term portion of any remaining outstanding receivables as of the end of the period are reflected in All other assets within our consolidated statement of financial position. ***GE Capital had approximately $ 2.1 billion, $ 1.9 billion and $ 0.1 billion of financing receivables related to GE long-term customer receivables outstanding,*** net of deferred income of approximately $ 0.3 billion, $ 0.3 billion and an insignificant amount recorded in its balance sheet as of December 31, 2017 , 2016 and 2015 , respectively. The effect of cash generated from the sale of these long-term receivables with GE Capital **increased GE's CFOA by $0.3 billion, $1.6 billion and $ 0.1 billion in 2017, 2016 and 2015 , respectively.**

651.     On the insurance portfolio, GE disclosed that, as announced on January 16, 2018,

**reserves for LTC insurance contracts increased from $7.6 billion in 2016 to $16.5 billion in**

**2017, driven by the $9.5 billion charge in 4Q17**, with total future policy benefit reserves

amounting to $30.6 billion in 2017 versus $18.7 billion in 2016. Disabled Life Reserves (claim reserves) increased from $4.6 billion in 2016 to $5.1 billion in 2017, of which $3.6 billion related to long-term care insurance contracts ($3.1 billion in 2016).

652.    On February 25, 2018, an analyst from RBC noted that the Company's 2017 Form 10-K included: "More transparency on Contract Asset balances. Likely as a result of the criticism over the lack of transparency in its contract asset reporting (including an ongoing investigation by the SEC), for the first time, GE has now broken out its disclosures by individual segment on Page 149, vs. its prior practice of only providing it on a total company basis.

653.    On February 26, 2018, JP Morgan issued an analyst report entitled, "*Takeaways from the 10-K*" which analyzed GE's 2017 Form 10-K. The report states, in part:

> The evidence here now points to the systemic use of GE Capital as the grease for the machine. **Receivables factoring, among other instruments, is a key building block, which management added helps to "manage short term liquidity," not just credit exposure as in the past. Here, while current receivables factoring is being wound down, the enhanced disclosure around "long term receivables" factoring was most interesting, in which management fully acknowledges they extend terms across their businesses to compete**. . . We continue to see that receivables activity inflated cash in 2016 even more than we had previously expected, for which 2017 is beginning to come down, but is far from "normal" (factoring activities increased cash by >$10B since 2011) . . . . **The bottom line is that the incremental details paint the picture of the structural box of high leverage, weak FCF and increasingly limited pockets to pull from to change that narrative, a mosaic that we think is not reflected at the current stock price, highlighting the negative skew on risks, with greater visibility on the factors that bring the SOTP to our downside scenario of ~$10-12**.[123]

654.    On February 26, 2018, in an article entitled, "*Buffett Says He Was Staggered by GE's 'Big Time' Finance Lapses*," Bloomberg Markets reported that billionaire investor Warren Buffett said he was "staggered" by the size of the charge GE took earlier this year tied to an old

---

[123] Emphasis in original.

insurance portfolio.[124] "Clearly there were mistakes made, and they made mistakes in long-term care. . . . The accounting at GE has not been a model at all in recent years."

## XI.   ADDITIONAL SCIENTER ALLEGATIONS

655.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt and/or access to information reflecting the true facts regarding GE, their control over, and/or receipt and/or modification of GE's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

656.   Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least, the reckless disregard, of GE personnel at the highest levels of the Company.

657.   The following allegations all support a strong inference of scienter:

- The magnitude of GE's $15 billion understatement of its LTC reserves;

- Defendant Flannery's admission that GE's LTC Experience was like the rest of the industry and that in 2015, the Company "again reviewed [its] insurance exposure" but took no action to increase its LTC Reserves;

---

[124] https://www.bloomberg.com/news/articles/2018-02-26/buffett-says-he-was-staggered-by-general-electric-s-charge

- GE's acknowledgement, on January 24, 2018, that most LTC insurers had made adjustments to their assumptions and increased their LTC reserves years before, and it is appropriate to consider industry trends and experience when analyzing LTC reserves;

- An analysis of the actual incurred claims compared to the expected incurred claims for the LTC insurers reinsured by GE subsidiaries shows an extremely unfavorable ratio since at least 2013;

- GE's acknowledgement that the Company had not previously employed or retained actuaries with appropriate experience to conduct an adequate review of its LTC Reserves;

- GE relied on billions in cash from GE Capital to continue paying its dividends and funding its stock buyback program;

- The "retirement" of former GE Capital CEO Richard A. Laxer in the middle of GE's long-delayed deep dive into the adequacy of its LTC reinsurance reserves is highly suspicious in terms of timing;

- During the Class Period, GE selectively only provided investors with positive information;

- Defendants made financial disclosures for LTC and Contract Assets overly complicated and vague in order to hide the truth; and

- Statements by former employees corroborate that Defendants knew or were reckless in not knowing that the Company (i) materially under-reserved its LTC portfolio and (ii) manipulated cost and profitability estimates in violation of GAAP.

**A.    The Magnitude of GE's $15 Billion Understatement of its LTC Reserves Supports a Strong Inference of Scienter; They Had To See It Coming**

658.    On January 16, 2018, GE announced that it would have to set aside up to **$15 billion** of additional reserves for GE Capital's LTC reinsurance business over the next seven years.  GE also announced that it would assess a before-tax GAAP charge related to the review of its LTC insurance business of nearly $10 billion.  Later that day, on a conference call with investors and analysts, Defendant Flannery stated, in part, that "[c]learly, in hindsight, we underappreciated the risk in [GE's insurance business] book."

659.    This charge is the largest, by far, in the history of LTC insurers.  Indeed, this single charge almost equals the $10.5 billion in pre-tax charges for all of the reserve charges taken by LTC insurers since 2007.  By way of further comparison, in 2016, Genworth took a charge for $905 million to increase LTC reserves, and it made nine changes in estimates since 2004 totaling $3.8 billion. And in 2017, Penn Treaty was liquidated after being left with just $500 million in assets to cover a projected $4.6 billion in claims.

660.    Although GE tried to sell the story that this massive deficiency was only recently discovered, analysts covering GE weren't buying it.  It was clear to them that GE knew or recklessly disregarded this problem for years.

661.    For example, Jeff Sprague, an analyst with Vertical Research Partners, reported, "**[i]t's hard to imagine a $15 billion problem materialized in the course of the year**."

662.    After the January 16, 2018 conference call, John G. Inch from Deutsche Bank issued a report entitled "Insurance woes hit GE hard" noting that not only were the "charges and scope of the problem . . . significantly worse than we expected," "**[t]he charges came well after Genworth first flagged LTC issues in late 2014**. "

663.    On January 18, 2018, *The Economist* issued an article entitled, "*After a huge loss on old reinsurance contracts, GE contemplates a break-up,*" which stated, in part:

> That in the 12 years since [it sold certain of its insurance businesses to Swiss Re in 2006] the firm appears to have done little about this residual portfolio seems an odd omission. The risk, after all, was well known. Other firms had problems with policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions; the long-term care market as a whole in America has run into trouble. One Pennsylvania insurer, Penn Treaty, was liquidated in 2017 after being left with just $500m in assets to cover a projected $4.6bn in claims.

664.    Finally, Scott Davis, an analyst with Melius Research, told *Bloomberg* in a January 25, 2018 article that:  "There seemed to be no effort on [the part of previous GE

management] to get ahead of the liability.  I find it very hard to believe that mysteriously overnight GE found problems they didn't know existed." Very hard to believe, indeed!

**B.**      **Defendant Flannery Admitted That GE's LTC Experience Was Like the Rest of the Industry and That in 2015 The Company "again reviewed [its] insurance exposure" but Took No Action to Increase its LTC Reserves**

665.      On the January 16, 2018 conference call with analysts and investors, Defendant Flannery admitted that "we underappreciated the risk in this book. **Similar to the rest of the industry, the assumptions we made at that time have played out differently**."

666.      He also admitted that in 2015 the Company "**again reviewed [its] insurance exposure and determined that we'd looked at exit options when the interest rate environment was more favorable.**"

667.      Thus, by 2015, Defendants knew or recklessly disregarded that GE's LTC reserves were materially understated, but they did not disclose that to investors, did not commission a deeper dive into the adverse LTC conditions and the sufficiency of their LTC assumptions, and did not take steps to materially increase the Company's LTC reserves. Rather, they just decided to do and say nothing, then plan to sell their problem LTC business when interest rates rose.

**C.**      **GE Acknowledged That it is Appropriate to Consider Industry Trends and Experience When Analyzing LTC Reserves and That Most LTC Insurers Had Adjusted Their Assumptions and Increased Reserves Years Before GE**

668.      On January 16, 2018, Ryan Zanin, GE Capital's Chief Risk Officer, stated during a conference with analysts and investors that "In general, **long-term care policies have proven challenging for the industry**.  Decades can pass between when policies are underwritten and when policyholders begin to claim benefits. As the insured population ages and actual claims arise, those claims are compared with the projected claims, and the adequacy of reserves is

assessed. **Virtually, the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected.**"

669.     Thus, Zanin conceded that one has to consider industry trends when analyzing the sufficiency of LTC reserves. Zanin did not state, however, whether GE had done that in the past (and ignored those industry trends) or whether GE had not previously considered industry trends for LTC insurers.  In other words, he did not explain whether GE had failed to previously increase its LTC reserves with full knowledge of industry trends or by failing to even consider them; an intentional act or a reckless one.

> **D.     An Analysis of the Actual Incurred Claims Compared to the Expected Incurred Claims for the LTC Insurers Reinsured by GE Subsidiaries Shows an Extremely Unfavorable Ratio Since At Least 2013**

670.     While actual to expected claims ratios for LTC insurers of above 100 per cent indicate that claims are worse than planned, ratios of 116% or more "paint an alarming picture." Here, as shown in the chart at ¶ 247, *supra*, an average of the actual to expected claims ratios for ten of the twelve LTC insurers reinsured by ERAC and UFLIC were more than 122%, 131%, 116% and 137% respectively, in years 2013 – 2017.  These consistent, extremely unfavorable ratios show that the Active Life Reserve assumptions used in underwriting the policies were profoundly inadequate.  This was a bright red flag for GE that it had to review its own Active Life Reserve assumptions.

671.     Likewise, LTC Experience Reporting Form 2 compares experience policy reserves against reported policy reserves. *See supra* ¶ 252 (summarizing Experience to Reported Policy Reserve Ratios by reporting year for the direct writers of the LTC policies reinsured by GE's subsidiaries). Experience to Reported Ratios below 100% indicate that the experience is worse than expected in the Active Life Reserves assumptions.

672.   Over time, if the Active Life Reserve assumptions are deficient, this analysis will produce lower Experience to Reported Policy Reserve ratios as more actual experience is reported. As shown in the chart at ¶ 252 this basic analysis would have shown ratios declining from an already very bad 79.9% in 2013 to a horrific 68.1% in 2016.

673.   Since GE did not review and revise its Active Life Reserve assumptions until late 2017, it is clear that since at least 2014 (when the numbers for 2013 would have been available), GE intentionally or recklessly ignored the extremely poor claims experience of the companies it was reinsuring when determining the adequacy of its LTC Active Life Reserve.

**E.   GE Acknowledged That the Company Had Not Previously Employed Sufficient Actuarial Staff to Conduct an Adequate Review of its LTC Reserves**

674.   GE Capital CRO Zanin stated on January 16, 2018 that in 2017, "we undertook a deeper dive to better understand developing trends in claims. This led to a comprehensive actuarial review of all policy assumptions and a bottoms-up rebuilding of claims cost curves. **We engaged 2 independent third-parties with actuarial experts to help us with that work in addition to KPMG's audit review.**"

675.   Thus, GE admitted that prior to 2017 it had not performed a similar "deep dive" into the adequacy of its LTC reserves.  Zanin's admission also strongly implies that GE did not have, and had not previously retained, sufficient actuarial staff to properly determine the adequacy of its LTC reserves.  Under these circumstances (*i.e.* considering the size of GE's LTC exposure; the well-known reserve problems in the LTC industry (including the massive charges taken by Genworth); and material reserve deficiencies at UFLIC and ERAC since at least 2014), this failure is additional evidence of recklessness in the form of willful blindness, at the very least.

251

**F.      GE Relied on Billions in Cash From GE Capital to Continue Paying its Dividends and Funding its Stock Buyback Program**

676.    Defendants were motivated to commit the fraud alleged herein, *inter alia,* to allow GE to continue to pay billions of dollars in dividends on a quarterly basis at a time when its free cash flow did not support the payment of such a dividend.  Indeed, Defendant Flannery admitted, on GE's Investor Update call on November 13, 2017, that the Company had been paying out a dividend "in excess of our free cash flow for a number of years now."

677.    Because GE's main source of cash during the Class Period for its quarterly dividends and stock buyback program was GE Capital, Defendants devised a scheme whereby they put off updating the Company's reserve assumptions for its LTC reinsurance policies that the Company couldn't sell. Despite a severely deteriorating LTC market, with rising LTC costs, and massive reserve charges taken by other LTC insurers, including Genworth Financial which GE had spun-off in 2004, Defendants failed to materially increase the Company's LTC reserves thereby violating both GAAP and state statutory insurance regulations.

678.    Defendants knew that updating the Company's LTC reserves to proper levels would kill its cash cow.  And in fact, as a result of its "deep dive" into LTC reserves in mid-2017, GE announced on November 13, 2017 that GE Capital would indefinitely suspend dividend contributions to GE. As a result, GE was forced to slash its annual dividend in half, from $0.96 to $0.48 per share, only the second dividend cut for GE since the Great Depression.

679.    Moreover, during the Class Period, GE undertook a plan to sell a majority of the assets in GE Capital such that it could reap dividends from GE Capital of more than $20 billion in 2016 alone to support its dividend and share buyback programs.  Indeed, Defendant Bornstein readily admitted during GE's Q2 2017 Earnings Call that "our share buyback has always been predicated on dividends from GE Capital and the disposition."

680.    When the Company had drained GE Capital of much of its free cash flow, it was forced to turn to its other segments to obtain additional cash for its dividend.  Defendants then turned to monetizing the Company's LTSAs and improperly accelerated revenue recognition, in violation of GAAP, by changing the estimated profitability of those agreements.   Between December 31, 2013 and December 31, 2017, GE's Contract Assets (including the cumulative adjustments on LTSAs) increased from $12 billion to $29 billion, representing revenue and profit recognized by GE before it was entitled to bill and collect related cash from its customers.

681.    These adjustments constituted a very large percentage of GE's total earnings from its industrial businesses. Indeed, the quantum of profit GE derived from these accounting machinations was markedly higher in 2016 and 2017 than in previous periods.  For example, these changes resulted in approximately 50% of the total profit reported by the Power segment in 2017. Consequently, without these improper accounting adjustments, GE would have fallen dramatically short of consensus earnings targets and likely would not have been able to maintain its hallmark dividend.

682.    Moreover, GE failed to implement appropriate internal control over financial reporting in records to Contract Assets and failed to provide appropriate disclosure regarding the significance of these accounting adjustments to GE's profits.

683.    As shown in the chart below, during the Class Period, GE siphoned billions of dollars in cash from GE Capital for dividends and share repurchases:

| GE CAPITAL's CONTRIBUTION TO GE's DIVIDENDS AND BUYBACKS ($ figures in Billions) | | | | |
|---|---|---|---|---|
| YEAR | GE CAPITAL'S DIVIDENDS TO GE | GE DIVIDENDS | GE BUYBACKS | TOTAL CASH RETURNED TO GE SHAREHOLDERS | % FROM GE CAPITAL |
| 2013 | $6.0 | $7.8 | $10.2 | $18.0 | 33% |
| 2014 | $3.0 | $8.9 | $2.2 | $11.1 | 27% |
| 2015 | $4.3 | $9.3 | $2.7 | $12.0 | 36% |
| 2016 | $20.1 | $8.5 | $22.6 | $31.1 | 65% |
| 2017 | $4.0 | $8.1 | $3.5 | $11.6 | 34% |

684.    GE's share buyback volume was more dynamic than its dividend payouts. The chart below shows GE dividends and buybacks as compared to GE Capital dividends. GE Capital's dividend constituted at least 30% of GE's dividend/buyback activity annually from 2014 to 2017:





685.    As shown above, a large portion of GE's yearly dividend was supplied by GE Capital.  The spike in GE Capital dividends in 2016 resulted from the sell-off in GE Capital assets that was announced on April 10, 2015.

686.    When GE slashed its annual dividend in half on November 13, 2017, it admitted that its dividend rate was no longer appropriate because its industrial business did not grow as fast as previously expected.  Defendant Flannery explained that GE, plagued by poor cash flow, had been paying out a dividend above its industrial free cash flow for a number of years, and that GE Capital would not be paying a dividend to GE in 2018, stating: "[W]e've been paying a dividend in excess of our free cash flow for a number of years now."

### G.    The Former CEO of GE Capital "Retired" in the Middle of the LTC Reserve Review

687.    Former CEO of GE Capital, Richard Laxer, "retired" in December 2017 during the reevaluation of GE Capital's LTC reserves.  The timing of Laxer's retirement, near the conclusion of the comprehensive review at GE Capital that discovered a $15 billion shortfall in LTC reserves, is highly suspicious and further supports a finding of scienter.

**H.     During the Class Period, GE Selectively Provided Investors with Only Positive Information**

688.     In a February 22, 2018 article entitled "*GE has been 'brushing things under the rug' for decades,* Michelle Fox of CNBC quoted John Inch of Deutsche Bank, who had reported that "The history of GE is to selectively only provide positive information" and that GE has been "brushing things under the rug and leveraging aggressive accounting" for decades. "One could infer the prior management basically did this to drive the … adjusted EPS up as much as possible to pay themselves as much as possible."  Inch also stated that GE made it overly complicated to dissect its financials. "They compounded the complexity on purpose so people wouldn't look at the details."

**I.     Defendants Made Financial Disclosure for GE's LTC and Contract Assets Overly Complicated and Vague to Hide the Truth**

689.     With respect to LTC, a January 29, 2018 report, authored by John G. Inch of Deutsche Bank, entitled "*SEC Enforcement investigation elevates GE risks,*" stated:

> The high magnitude of the $9.5bn charge and $15bn cash bill (substantially beyond expectations for a business likely few were even aware retained such elevated risks) shocked the market and helped to drive GE's share price lower while widening its credit spreads.
>
> In addition, recall that GE didn't begin to flag long-term care insurance issues until mid-2017, well after its former insurance subsidiary Genworth first identified problems with its long-term care portfolio in late 2014.

690.     In fact, GE's total disclosure regarding its LTC business in its 2015 and 2016 Annual Reports was limited to just two obscure mentions disclosing that (i) GE excluded LTC contractual obligations from a cash flow table included in its MD&A and (ii) GE's Accounting Principles and Polices reported: "For traditional long-duration insurance contracts, including long-term care, term, whole life and annuities payable for the life of the annuitant, we report premiums as earned income when due."

691.   Moreover, even the LTC Reserves GE did record were obscured as components of GE's "Life insurance benefits" and "Other" liabilities. *See* ¶¶ 222-227, *supra*.

692.   GE's inclusion of LTC Reserves within its general insurance liabilities without any additional disclosure resulted in investors having no awareness of the elevation of risk associated with these obligations. In fact, investors concerned with assessing GE's LTC risk would likely have concluded that GE's exposure was inconsequential because reported liabilities remained stable.

693.   When GE contributed $419 million to strengthen reserves in 2016, it provided that information only in statutory filings, not in its financial statements.  And it did not report whether the need for the increase in reserves was due to losses in its LTC insurance business.

694.   Further, GE first disclosed the magnitude of its LTC Reserves in its third quarter 2017 financial statements, when it acknowledged more than $12 billion of then-existing LTC Reserves.  The very fact that GE had to announce this in 2017 demonstrates that prior GE disclosures omitted material information about a type of insurance product which was losing massive amounts of money throughout the industry.

695.   Intentionally or recklessly, GE's omission of any meaningful discussion of its LTC business strongly and falsely suggested to investors that any exposure from that business was minimal.

696.   Likewise, GE's disclosures with respect to its contract assets were purposely or recklessly unhelpful to investors.  An October 31, 2017 article in *The Wall Street Journal* entitled, "*GE Shows How 'Black Box' Assets Boost Profits*," stated:

> General Electric Co. lifted the veil slightly on a part of its accounting that analysts have said was too opaque, spotlighting how changes in one group of its assets help to lift profits.

257

697.   Analysts have complained they have little insight into the portfolio and the way it contributes to GE's current profits. The assets are "kind of a black box," said John Inch, a Deutsche Bank analyst who has been critical of GE over the quality of its earnings and disclosure.[125]

### J.   Statements by Former GE Employees Corroborate That Defendants Knew or Were Reckless in Not Knowing That the Company (i) Materially Under-Reserved for its LTC Portfolio and (ii) Manipulated Cost and Profitability Estimates in Violation of GAAP

#### 1.   FE-1 Was Given Changed Cash Flow Models Without Explanation

698.   FE-1, the former Actuarial Controller at GE Capital – ERAC from July 2015 – September 2016, reported that in late-2015, ERAC's Chief Actuary Clark Ramsey and LTC Managing Actuary David Benz stopped providing FE-1 with the documentation he needed to back-up changes in assumptions they made during the asset adequacy phase so FE-1 could not reconcile those changes with the liability cash flows.  Further, FE-1 started to get updated liability cash flow models from Benz "**without adequate justification or explanation as to what had changed in the liability cash flow models**." When he asked for backup documentation, he never got it.

699.   FE-1 believed, based on his experiences as a modeler, that Ramsey and Benz were **targeting "present value liability cash flows.**" FE-1 suspected that Ramsey and Benz were looking at the liability cash flows and then made changes to the liability assumptions.

700.   Some of the changes FE-1 received from Ramsey and Benz, with very little or no justification, were "so big, [he] couldn't reconcile them, get comfortable with them." Although he went to Ramsey for a verbal justification, he did not get it.

---

[125] Michael Rapoport, *GE Shows How 'Black Box' Assets Boost Profits*, Wall Street Journal, (updated Nov. 1, 2017, 4:36 PM ET, https://www.wsj.com/articles/ge-shows-how-black-box-assets-boost-profits-1509549624.

701.     During the loss recognition phase of his work in May-June 2016, FE-1 did independent calculations, which **uncovered a "loss recognition event" of around $200 million**.  He knew that GE Capital would "need to come up with" this amount and hold additional GAAP reserves. FE-1 presented this to Ramsey, who went up to the ERAC CFO's office and came back down hours later showing that they had a $78 million surplus, because they changed the way they were doing loss recognition.

702.     FE-1 expressed his concerns about the model changes to Ramsey, Steilen, the CEO of ERAC, and to KPMG.

703.     Finally, FE-1 said that the reason the 2018 LTC charge-off was so big was because "**this didn't happen after a year or two, this happened ever since GE spun-off Genworth**."  Over the years GE should have been increasing its reserves based on what the actuaries were seeing. **GE should have been "pushing capital down to ERAC**." But this was not happening.

> **2.     FE-2 found in 2014 that ERAC's LTC Portfolio Was Under-Reserved; Senior Management Agreed Assumptions Needed to be Updated; Defendants Knew About Concerns**

704.     FE-2, who served as Senior Insurance Audit Specialist from 2012 – 2014 and as a Senior Vice President from 2014 – 2017, most recently reported to Kevin McCord, GE Capital's director of Internal Audit, and Joseph Pizzuto, GE Capital's former Chief Audit Executive.

705.     In the summer of 2014, FE-2 conducted a financial audit of ERAC where he identified numerous issues, including that the ERAC legacy LTC insurance portfolio was being under-reserved.  FE-2 explained that **ERAC should have been updating their assumptions regularly, but in a specific case they had not, and in fact their assumptions were "stale by several years."**

706.     According to FE-2, following that summer 2014 audit, **ERAC's senior management agreed that the assumptions needed to be updated and that ERAC needed to recalculate their reserves based on the more up-to-date assumptions**. In fact, FE-2 described that when he presented ERAC's senior management with his audit findings related to the stale assumptions and inadequate reserves, management's response was "**no contest, we agree**."

707.     The issues identified in FE-2's insurance business audits were entered into GE Capital's formal audit system, where they are gathered together and presented to GE's Board of Directors and Audit Committee.  FE-2 confirmed that the Audit Committee reviewed all of his audits and that prioritized summaries on particular issues (*i.e.*, model risk, compliance, etc.) were put together for the GE Board.  According to FE-2, **Immelt and Sherin would have known about the model validation concerns because they were systemic throughout the GE Capital organization and had been identified by the Fed**.

708.     FE-2 explained that during his audit of ERAC's LTC reserves in August and September 2016, he found a systemic problem when it came to ERAC's loss recognition testing and a lack of back-up for the numbers being used to calculate the reserves. He suggested that what ERAC was doing with reserves was akin to putting a number on a financial statement without any explanation, and would lead one to think "where did that come from?"

709.     FE-2 confirmed that his 2016 loss recognition audit of ERAC was definitely elevated to the executives at GE Capital and GE.  FE-2 confirmed that Ronald Peters (ERAC's CEO), Ryan Zanin (GE Capital's Chief Risk Officer), and Defendants Immelt and Sherin were all aware of these issues.

710.     FE-2 advised that KPMG confirmed the concerns related to loss recognition testing that were raised in an internal GE Capital memo.  FE-2 went on to say that the very detailed memo written to Ramsey was also shared with others, including KPMG and FE-2.  According to FE-2, the memo detailed how the author disagreed with the methodology ERAC was using and questioned ERAC's process in evaluating reserves.  FE-2 agreed with the author's observations.  FE-2 said that the memo was "unsettling" and made ERAC look "really bad."

### 3.     FE-4 Confirmed that GE's LTC Business Was Recognized as a "Troublemaking Block of Business" that Nobody Wanted

711.     FE-4, an Insurance Professional within GE Capital's Insurance framework from before the start of the Class Period until the middle of the Class Period, worked on model validation used in GE Capital's insurance businesses.  He confirmed that while GE Capital was under SIFI designation, scrutiny by the Fed of GE Capital included examination of GE Capital's model validation.

712.     FE-4 also stated that **GE did not disclose a lot of information about the legacy insurance business for many years** to Wall Street or the SEC, although there were statutory filings to states where the legacy insurance business was domiciled.  According to FE-4, the legacy insurance business was GE Capital's "unwanted" and "troublemaking" block of business.  He explained that many of the ERAC/UFLIC policies dated back to the mid-1980s and that at the time, the original policy writers and industry professionals did not know how to design or price the policies:  "**it was all guess work**."

713.     FE-4 also explained that GE Capital sold everything in the ERC portfolio that they could to Swiss Re and that the policies that stayed with ERAC and UFLIC were the blocks for which Swiss Re did not like their "long-term unknown nature."  GE Capital was "stuck"

with these blocks.  The policies GE Capital was left with were "**long-tailed risk stuff**" **that no one wanted and that was not originally underwritten or priced properly**. He also said that "the stage at [GE Capital] was set" following the Swiss Re deal and that the remaining ERAC blocks were always "**the blocks that nobody wanted**" even many years ago and that these legacy blocks were "**troublemaker blocks" with the highest risk**.

### 4.  FE-6 Reported that Senior GE Management Recognized the Risk of the LTC Portfolio

714.  FE-6, who was executive at GE Capital from 2014 – 2015, reported that an audit team conducted a simple audit on GE Capital's insurance business in the first four months of 2015 and had a risk based audit plan going into 2016.  FE-6 confirmed that **prior to this audit, no internal auditors had been auditing the ERAC unit**.  Previously it had been, as the Fed described, "a bunch of young individuals" from GE's CAS with limited experience.  According to FE-6, the Fed's MRA (Matters Requiring Attention) memo detailed that GE Capital needed a more robust internal audit department than CAS with deeper industry knowledge and institutional knowledge of the various business  units across all of GE, including Insurance.  FE-6 further described the CAS personnel as not having the background knowledge to properly audit the various business units within GE Capital, especially the legacy insurance business which required oversight from an actuary.  According to FE-6, CAS would rotate every three months to a different business unit so there was no institutional knowledge or continuity.

715.  FE-6 further stated that the internal consensus amongst senior management, especially Dan Janki, Treasurer of GE, was that **there was risk related to the legacy LTC portfolios**. FE-6 explained that policies in the legacy LTC blocks were not being written any longer because of how risky they were.

716.    FE-6 advised that GE held onto certain LTC policies that did not get spun off with Genworth because GE "refused to sell them at such a huge discount." He recalled that Janki had said that "**his one big mistake was not selling off all the insurance policies and taking the hit at that time**."

### 5.    FE-7 Explained How GE Power Services Sold its Future to Hide Shortfalls in Current Revenue Projections

717.    FE-7, who worked in Europe as a Finance Leader at GE Power Services throughout the Class Period, stated that GE Power Services actively renegotiated LTSAs with customers **solely for the purpose of increasing the total contract margin**, and often did so for no economic reason other than to generate a positive cum catch (or avoid a negative cum catch).

718.    FE-7 explained that in 2015-2016, GE Power Services Europe persuaded LTSA customers to eliminate GE-provided service labor portion of a contract and use the customer's own labor services because GE's profit margin on the service labor portion of a contract was much smaller than its profit margin on capital parts and upgrades. Even though GE made money on labor, removing it from the contract increased the overall average profit margin. This, in turn, would trigger a positive cum-catch adjustment to increase revenue.

719.    FE-7 explained that GE Power Services had teams dedicated to determining which contracts were good candidates for generating positive cum catch adjustments.  Indeed, he estimated that **between 2015 to 2017, a significant portion of GE Power Services Europe's profits were generated from cum catch adjustments**.

720.    Using contract renegotiations to boost revenue from cum catch adjustments was **not sustainable**. According to FE-7, by the end of 2017, GE Power Services Europe had exhausted most of the techniques used to trigger these revenue-boosting adjustments, which GE relied on to conceal the fact that it was not generating revenue organically.

721.     Further, according to FE-7, the techniques described above often had the additional **negative effect of a substantial postponement of cash collection** for GE Power. FE-7 explained that in order to persuade customers to renegotiate, **GE Power had to give concessions, such as price discounts and deferrals of payment dates**.

722.     FE-7 explained that because GE was recording revenue as a result of cum catch adjustments, but not collecting cash, its contract asset balance increased, which led to a **growing discrepancy between GE's operating profit and the CFOA** generated during that same period. As a result of this cash crisis, beginning in Q4 2015, GE Power management created a task force to accelerate cash collection on GE Power's LTSAs through "monetization," which involved factoring (*i.e.,* selling) receivables to generate CFOA. GE Power Services would persuade its customers to renegotiate the billing contract terms so that the triggering event for an invoice would be in the current accounting period. **This was done solely to accelerate invoices for factoring, with no actual change to the underlying performance obligations**.

723.     Further, according to FE-7, to induce the customer to enter into such a modification, **GE would typically have to discount the payment required and also push the actual payment due date further into the future**.  To actually "monetize" this payment, which was not yet due, **GE would then sell the receivable, either to itself** (selling it to a subsidiary of GE Capital) or to an outside party, often with recourse.

724.     What's more, FE-7 explained that GE Power Services failed to adequately account for any associated credit risk, and assumed for its own accounting purposes that future collection on the LTSAs was certain.

725.    According to FE-7, after monetizing customers' future payments as often as possible in 2016, there were fewer opportunities, and **eventually the cash crisis could no longer be concealed**.

726.    Finally, FE-7 explained that quarterly reports outlined the total amount of cash that GE had generated through these monetization efforts and broke those figures down across GE Power by region.  FE-7 understood that these reports were to ultimately be used for GE's quarterly Blueprint Review **for discussion with GE Power's global leadership**.

## XII.    CLASS ACTION ALLEGATIONS

727.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that purchased or otherwise acquired the publicly traded securities of GE during the period from January 23, 2015 through January 23, 2018, inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class are Defendants; members of the immediate family of each of the Individual Defendants; any subsidiary or affiliate of GE, including GE's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; the directors and officers of GE during the Class Period and their immediate family members; and the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person or entity.

728.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GE securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by GE and/or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used

in securities class actions.

729.    Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law that is complained of herein.

730.    Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class action and securities

litigation.

731.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented material facts

about the business, operations and management of GE; and

(c)    to what extent the members of the Class have sustained damages and the

proper measure of damages.

732.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action

as a class action.

266

## XIII.  PRESUMPTION OF RELIANCE

733.  Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)  the omissions and misrepresentations were material;

(c)  the Company's securities traded in an efficient market;

(d)  the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)  Plaintiff and other members of the Class purchased GE securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

734.  At all relevant times, the markets for GE securities were efficient for the following reasons, among others:

(a)  as a regulated issuer, GE filed periodic public reports with the SEC;

(b)  GE regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)  GE was followed by numerous securities analysts employed by major brokerage firm(s) including: (1) JP Morgan; (2) William Blair; (3) Deutsche Bank; (4) Cowen & Co; (5) Oppenheimer & Co.; (6) Credit Suisse; (7) Citigroup; (8) BofA Merrill Lynch; (9) RBC Capital Markets; (10) Vertical Research Partners; (11) UBS; (12) Melius Research

LLC; (13) Stifel Nicholas; and (14) Morgan Stanley who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     GE common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "GE."

735.    As a result of the foregoing, the market for GE securities promptly digested current information regarding GE from all publicly available sources and reflected such information in the price of GE's securities.  Under these circumstances, all purchasers of GE securities during the Class Period suffered similar injury through their purchase of GE's securities at artificially inflated prices and the presumption of reliance applies.

736.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XIV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

737.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of GE who knew that the statement was false when made.

## XV.   CLAIMS FOR RELIEF

### <u>COUNT  I</u>

#### For Violation of Section 10(b) of the Exchange Act<br><u>and Rule 10b-5 Against All Defendants</u>

738.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

739.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

740.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes, and artifices to defraud;

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of GE securities during the Class Period.

741.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GE securities.  Plaintiff and the Class would not have purchased GE securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

742.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of GE securities during the Class Period.

## COUNT  II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

743.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

744.     The Individual Defendants acted as controlling persons of GE within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about GE, the Individual Defendants had the power and ability to control the actions of GE and its employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 20, 2018                         Respectfully submitted,


                                     /s/ Jonathan Gardner
                                    **LABATON SUCHAROW LLP**
                                    Jonathan Gardner
                                    Thomas A. Dubbs
                                    Louis Gottlieb
                                    Christine M. Fox
                                    Alfred L. Fatale III
                                    Ross M. Kamhi
                                    140 Broadway
                                    New York, New York 10005
                                    Telephone: (212) 907-0700
                                    Facsimile:  (212) 818-0477
                                    jgardner@labaton.com
                                    tdubbs@labaton.com
                                    lgottlieb@labaton.com
                                    cfox@labaton.com
                                    afatale@labaton.com
                                    rkamhi@labaton.com

                                    *Counsel for Court-Appointed Lead Plaintiff*
                                    *Arkansas Teachers Retirement System*

                                    **ROBBINS GELLER RUDMAN**
                                    **& DOWD LLP**
                                    Samuel H. Rudman
                                    David A. Rosenfeld

58 South Service Road, Suite 200
Melville, NY  11747
Telephone: 631/367-7100
Facsimile:  631/367-1173
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Art Leahy
Douglas R. Britton
655 West Broadway
Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7243
aleahy@rgrdlaw.com
dbritton@rgrdlaw.com

*Additional Counsel for Lead Plaintiff and the
Proposed Class*

## CERTIFICATION

I, Rod Graves, as Deputy Director of Arkansas Teacher Retirement System ("Arkansas Teacher"), hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of Arkansas Teacher.  I have reviewed the Consolidated Amended Class Action Complaint prepared against General Electric Company ("General Electric") alleging violations of the federal securities laws;

2.     Arkansas Teacher did not purchase securities of General Electric at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     Arkansas Teacher is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.     Arkansas Teacher's transactions in General Electric securities during the Class Period are reflected in Exhibit A, attached hereto;

5.     Arkansas Teacher sought to serve as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*Arkansas Teacher Retirement System v. Insulet Corporation*, No. 1:15-cv-12345 (D. Mass.)
*In re Vipshop Holdings Limited Securities Litigation*, No. 1:15-cv-3870 (S.D.N.Y.)
*Kasper v. AAC Holdings, Inc.*, No. 3:15-cv-0923 (M.D. Tenn.)
*Hong v. Extreme Networks, Inc.*, No. 5:15-cv-4883 (N.D. Cal.)
*Desai Vikramkumar v. Nimble Storage, Inc.*, No. 4:15-cv-5803 (N.D. Cal.)
*Ong v. Chipotle Mexican Grill, Inc.*, No. 1:16-cv-0141 (S.D.N.Y.)
*Friedman v. Endo International plc*, No. 1:16-CV-3912 (S.D.N.Y.)
*St. Lucie County Fire District Firefighters Pension Trust Fund v. Stericycle, Inc.*, No. 1:16-cv-7145 (N.D. Ill.)
*Knurr v. Orbital ATK Inc.*, No. 1:16-cv-1031 (E.D. Va.)
*Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc.*, No. 6:16-cv-1243 (E.D. Tex.)
*City of Miami General Employees' & Sanitation Employees' Retirement Trust v. R.H. Inc.*, No. 4:17-cv-0554 (N.D. Cal.)
*Ollila v. Babcock & Wilcox Enterprises, Inc.*, No. 3:17-cv-0109 (W.D.N.C.)
*Chavez v. Celadon Group, Inc.*, No. 1:17-cv-2828 (S.D.N.Y.)
*In re Aaron's, Inc., Securities Litigation*, No. 1:17-cv-2270 (N.D. Ga.)
*Bray v. Frontier Communications Corporation*, No. 3:17-cv-1617 (D. Conn.)
*Hachem v. General Electric Company*, No. 1:17-cv-8457 (S.D.N.Y.)
*Longo v. OSI Systems, Inc.*, No. 2:17-cv-8841 (C.D. Cal.)

6.     Arkansas Teacher sought to serve as a representative party but not as a lead plaintiff in the following class action filed under the federal securities laws during the last three years:

*Horowitz v. SunEdison, Inc.*, No. 4:15-cv-1769 (E.D. Mo.)

7.     Beyond its pro rata share of any recovery, Arkansas Teacher will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 19 day of March, 2018.

Rod Graves
*Deputy Director*
*Arkansas Teacher Retirement System*

**EXHIBIT A**

**TRANSACTIONS IN GENERAL ELECTRIC COMPANY**

| Common Stock | | | |
|---|---|---|---|
| **Ticker** | **CUSIP** | **SEDOL** | **ISIN** |
| GE | 369604103 | 2380498 | US3696041033 |

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 3/16/2017 | 15,300 | $29.69 | ($454,192.74) |
| Purchase | 3/16/2017 | 47,100 | $29.71 | ($1,399,270.35) |
| Purchase | 3/17/2017 | 39,400 | $29.96 | ($1,180,286.10) |
| Purchase | 3/17/2017 | 12,800 | $29.84 | ($381,944.32) |
| Purchase | 3/17/2017 | 21,500 | $29.82 | ($641,196.65) |
| Purchase | 3/22/2017 | 66,000 | $29.55 | ($1,950,168.00) |
| Purchase | 3/29/2017 | 35,200 | $29.55 | ($1,040,198.72) |
| Purchase | 4/21/2017 | 15,500 | $29.79 | ($461,667.50) |
| Purchase | 4/21/2017 | 1,100 | $29.76 | ($32,730.50) |
| Purchase | 4/21/2017 | 10,800 | $29.68 | ($320,575.32) |
| Purchase | 4/25/2017 | 25,000 | $29.48 | ($736,897.50) |
| Purchase | 4/25/2017 | 22,700 | $29.46 | ($668,689.79) |
| Purchase | 5/16/2017 | 39,700 | $28.05 | ($1,113,489.72) |
| Purchase | 6/5/2017 | 25,300 | $27.98 | ($707,858.58) |
| Purchase | 7/11/2017 | 78,900 | $26.23 | ($2,069,625.90) |
| Purchase | 7/21/2017 | 800 | $25.45 | ($20,362.24) |
| Purchase | 7/21/2017 | 2,000 | $25.52 | ($51,048.20) |
| Purchase | 7/21/2017 | 48,500 | $25.74 | ($1,248,191.15) |
| Purchase | 7/21/2017 | 5,800 | $25.86 | ($150,011.20) |
| Purchase | 7/26/2017 | 17,800 | $25.63 | ($456,270.96) |
| Purchase | 7/26/2017 | 41,900 | $25.62 | ($1,073,285.26) |
| Purchase | 7/26/2017 | 500 | $25.63 | ($12,814.90) |
| Purchase | 7/26/2017 | 800 | $25.63 | ($20,506.88) |
| Purchase | 7/26/2017 | 3,400 | $25.66 | ($87,227.00) |
| Purchase | 7/26/2017 | 3,800 | $25.65 | ($97,451.00) |
| Purchase | 7/27/2017 | 7,600 | $25.58 | ($194,411.80) |
| Purchase | 7/27/2017 | 12,500 | $25.71 | ($321,320.00) |
| Purchase | 7/27/2017 | 2,200 | $25.74 | ($56,632.62) |
| Purchase | 7/27/2017 | 600 | $25.58 | ($15,347.88) |
| Purchase | 9/7/2017 | 44,700 | $23.95 | ($1,070,587.35) |

### 4.00% Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, Series A

| Ticker | CUSIP | SEDOL | ISIN |
|---|---|---|---|
| N/A | 369604BM4 | BYXDK58 | US369604BM44 |

| Transaction Type | Trade Date | Par Amount | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 12/7/2015 | $145,000 | 89.25 | ($129,412.50) |
| Purchase | 12/8/2015 | $105,000 | 89.75 | ($94,237.50) |
| Sale | 1/19/2016 | -$250,000 | 89.53 | $223,827.50 |

### 5.00% Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock, Series D

| Ticker | CUSIP | SEDOL | ISIN |
|---|---|---|---|
| N/A | 369604BQ5 | BYZLD06 | US369604BQ57 |

| Transaction Type | Trade Date | Par Amount | Price | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 1/19/16 | $250,000 | 88.53 | ($221,327.50) |

2