**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SJUNDE AP-FONDEN and THE CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated,<br><br>                          Plaintiffs,<br><br>            v.<br><br>GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JAMIE MILLER, KEITH S. SHERIN, JAN R. HAUSER, and RICHARD A. LAXER,<br><br>                          Defendants. | 17 Civ. 08457 (JMF) (GWG)<br><br><br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

LATHAM & WATKINS LLP
Miles N. Ruthberg
Blake T. Denton
885 Third Avenue
New York, New York 10022
(212) 906-1200

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, Massachusetts 02116
(617) 948-6000

*Attorneys for Defendants*

September 12, 2018

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................3

    A.    GE & The Individual Defendants ........................................................3

    B.    GE Capital's Run-Off Insurance Business & LTC Reserves ..................4

    C.    GE Power's Power Services Sub-Division & LTSAs .............................6

    D.    LTC Reinsurance & GE Power Face Challenges In 2017 & 2018.........8

ARGUMENT .........................................................................................................10

I.    THE TAC FAILS TO PLEAD A SECTION 10(B) CLAIM ...........................10

    A.    Plaintiffs Fail Adequately To Plead A False Or Misleading Statement ...............11

        1.    Statements Regarding GE Capital's Run-Off Insurance Business, Including Its LTC Reserves, Were Not False Or Misleading ..................12

            a.    GE Disclosed That It Retained Exposure To LTC Liabilities ..............12

            b.    GE's Grouping Of Insurance Liabilities Was Not Misleading ..............13

            c.    LTC Reserves Are Non-Actionable Opinion Statements .............17

            d.    GE's LTC Disclosures Did Not Violate GAAP Or Item 303 ........19

        2.    Statements Regarding GE Power's LTSAs Were Not False Or Misleading .........21

            a.    GE's Reported LTSA-Related Financial Metrics Are Non-Actionable Opinion Statements And Comply With GAAP...........21

            b.    GE's Alleged "Unsustainable" Or "Unsound" LTSA Business Practices Do Not State A Claim For Fraud ...................23

        3.    Defendants' Statements Constitute Non-Actionable Forward Looking Statements And/Or Puffery ......................................26

B.     Plaintiffs Fail Entirely To Plead A Strong Inference Of Scienter .........................26

      1.     Plaintiffs Have Not Pled A Cognizable Motive...........................................27

      2.     Plaintiffs Have Not Pled Recklessness ......................................................28

           a.     Plaintiffs' Own Allegations Rebut An Inference of Scienter ........28

           b.     The Vague And Unsupported Allegations Of The FEs Fail To Raise A Strong Inference Of Scienter As To Any of The Defendants ....................................................................................30

           c.     Plaintiffs' Remaining Scattershot Theories Fail Adequately To Allege Scienter As To Any Of The Defendants......................31

           d.     The Absence Of Individual Scienter Is Also Fatal Here To Any Attempt To Plead Corporate Scienter ...................................33

           e.     The Non-Fraudulent Inference Is More Compelling ....................33

C.     The Five-Year Statute Of Repose Bars Any New Claims Arising From Alleged Misstatements Or Omissions Made Prior To July 25, 2013 ...................34

II.     THE TAC FAILS TO PLEAD A SECTION 20(A) CLAIM .............................................35

CONCLUSION...................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995)..........................................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).....................................................................................1, 35

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................................10

*Caifa v. Sea Containers Ltd.*,
   525 F. Supp. 2d 398 (S.D.N.Y. 2007).......................................................................18

*City of Omaha v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012).........................................................................................17

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd.*,
   655 F. Supp. 2d 262 (S.D.N.Y. 2009).......................................................................18

*Coronel v. Quanta Capital Holdings, Ltd.*,
   2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) .................................................8, 17, 31

*Cortina v. Anavex Life Scis. Corp.*,
   2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) .....................................................32, 33

*Dempsey v. Vieau*,
   130 F. Supp. 3d 809 (S.D.N.Y. 2015).......................................................................20

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..............................................................................26, 27, 28

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011)................................................................................17, 21

*Fogel v. Wal-Mart de Mexico SAB de CV*,
   2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)............................................................11, 28

*Friedman v. Endo Int'l PLC*,
   2018 WL 446189 (S.D.N.Y. Jan. 16, 2018) ....................................................24, 31, 33, 34

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................30, 31

*Harris v. AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015).............................................................................19

*Hensley v. IEC Elecs. Corp.*,
  2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)...........................................................27, 30

*In re Allied Capital Corp. Sec. Litig.*,
  2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)..................................................................24

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)........................................................................15, 23

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004)..............................................................................23

*In re Ferrellgas Partners, L.P. Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ........................................................31, 32, 34

*In re First Union Corp. Sec. Litig.*,
  128 F. Supp. 2d 871 (W.D.N.C. 2001) ...........................................................................23

*In re GLG Life Tech Corp. Sec. Litig.*,
  2014 WL 464762 (S.D.N.Y. Feb. 3, 2014)......................................................................13

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*,
  939 F. Supp. 2d 360 (S.D.N.Y. 2013)........................................................................34, 35

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014)....................................................................11, 19, 34

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) .........................................................................................19

*In re Pretium Res. Inc. Sec. Litig.*,
  256 F. Supp. 3d 459 (S.D.N.Y. 2017)........................................................................13, 21

*In re ProShares Trust Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)...............................................................................................15

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)................................................................................26

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)..............................................................................20

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) .................................................16, 32

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
  2016 WL 2757760 (S.D.N.Y. May 11, 2016) .................................................15, 26

*Janbay v. Canadian Solar, Inc.*,
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .......................................................20

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ..............................................................................27, 28

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ......................................................................22

*Kuwait Inv. Office v. Am. Int'l Grp. Inc.*,
  128 F. Supp. 3d 792 (S.D.N.Y. 2015) .................................................................34, 35

*Leidos, Inc. v. Indiana Public Ret. Sys.*,
  137 S. Ct. 1395 (2017) ...............................................................................................20

*Leidos, Inc. v. Indiana Public Ret. Sys.*,
  138 S. Ct. 369 (2017) .................................................................................................20

*Merck & Co., Inc. v. Reynolds*,
  559 U.S. 633 (2010) ...................................................................................................34

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
  Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) .....................................................27, 32, 34

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010) .....................................................................18

*Reilly v. U.S. Physical Therapy, Inc.*,
  2018 WL 3559089 (S.D.N.Y. July 23, 2018) .........................................................33

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009) ..................................................................................27, 28

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ...........................................................10

*Scott v. Gen. Motors Co.*,
  605 F. App'x 52 (2d Cir. 2015) (summary order) .................................................24

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.*,
  33 F. Supp. 3d 401 (S.D.N.Y. 2014) .......................................................................35

*SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*,
 829 F.3d 173 (2d Cir. 2016) ................................................................................34

*Stratte-McClure v. Morgan Stanley*,
 776 F.3d 94 (2d Cir. 2015) ..................................................................................19

*Tamar v. Mind C.T.I., Ltd.*,
 723 F. Supp. 2d 546 (S.D.N.Y. 2010) .................................................................28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) .......................................................................................27, 33

*Tongue v. Sanofi*,
 816 F.3d 199 (2d Cir. 2016) ................................................................................17

*Total Equity Capital, LLC v. Flurry*,
 2016 WL 3093993 (S.D.N.Y. June 1, 2016) ..................................................10, 32

*Wilbush v. Ambac Fin. Grp., Inc.*,
 271 F. Supp. 3d 473 (S.D.N.Y. 2017) .................................................................30

## STATUTES & REGULATIONS

15 U.S.C. § 78t ...........................................................................................................35

15 U.S.C. § 78u-4(b) .....................................................................................11, 26, 27

28 U.S.C. § 1658(b) ...................................................................................................34

## RULES

Fed. R. Civ. P. 9(b) ..........................................................................................10, 11, 35

Fed. R. Civ. P. 15 .......................................................................................................34

## OTHER AUTHORITIES

SEC Release No. 33-8350 ...........................................................................................20

SEC Release No. 33-9144 .....................................................................................15, 16

SEC Financial Reporting Manual § 9240 ...................................................................15

Defendants General Electric Co. ("GE"), Jeffrey R. Immelt, Jeffrey S. Bornstein, Jamie Miller, Keith S. Sherin, Jan R. Hauser, and Richard A. Laxer (the "Individual Defendants" and, together with GE, "Defendants") submit this memorandum of law in support of their motion to dismiss the Third Amended Complaint ("TAC") (Ex. 1, cited as "¶ _").[1]

## PRELIMINARY STATEMENT

This is a case of business setbacks, not securities fraud.  GE is a 126-year-old multinational conglomerate that has been a corporate leader throughout its existence, but has now encountered significant challenges.  Most recently, after GE's run-off insurance business experienced elevated claims in its long-term care ("LTC") policies, the company increased its reserves on those policies, with a corresponding charge to earnings at year-end 2017.  This increase in reserves resulted from a complex review process, which the company disclosed in real time.  Moreover, although GE had anticipated strong growth for its power business, adverse market conditions negatively affected its 2017 performance, also impacting GE's earnings.  Faced with these new realities, in late 2017, GE made the difficult decision to reduce its shareholder dividend in response to the unexpected failure to meet its revenue and cash flow targets.  In the TAC, Plaintiffs string together hyperbole and unsupported allegations in an effort to hold Defendants liable for what amounts (at most) to their failure to predict or avert these challenges.  But the federal securities laws provide remedies only for fraud, not for unsuccessful business strategies.

The crux of Plaintiffs' claim is the improbable assertion—without alleging any personal stock sales or other concrete financial benefits—that certain senior executives engaged in a multi-

---

[1]     Unless otherwise indicated herein, all internal citations and quotations are omitted, emphasis is added, and citations to "Ex. __" refer to exhibits attached to the Declaration of Blake T. Denton, submitted herewith.  The Court may consider any documents or statements incorporated into the TAC by reference, as well as disclosure documents filed with the SEC.  *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

year scheme to inflate GE's reported financial results, which unraveled in 2017 when the company

informed investors of the need to update insurance reserves in response to an increase in claims,

and revised its 2017 earnings guidance as a result of unexpectedly poor performance in its power

business.  According to Plaintiffs, Defendants (i) misled investors regarding the nature and extent

of liabilities associated with the run-off LTC reinsurance business; and (ii) manipulated the

accounting treatment of long-term service agreements ("LTSAs") in the power business.  All of

Plaintiffs' claims fail under the applicable pleading and statutory standards:

*First*, contrary to Plaintiffs' allegations, GE repeatedly disclosed its retention of run-off

LTC insurance liabilities and made other related disclosures about these liabilities in its public

filings.  These disclosures were accurate and complete, and did not mislead anyone.  Plaintiffs

further allege, cursorily, that the LTC reserves were understated.  Because those reserves require

complex actuarial assumptions and judgments, they are quintessential opinion statements—and

Plaintiffs plead no facts showing that these reserves were objectively or subjectively false.  As the

case law recognizes, complaints about reserves are extremely difficult to plead, and Plaintiffs do

not come close to satisfying the applicable standards.

*Second*, Plaintiffs attack statements relating to GE's expected revenue and cash flow over

the life of LTSAs.  Because (as Plaintiffs acknowledge) the statements were based on forecasts of

LTSAs' future profitability, incorporating complex methodology and assumptions, these too are

opinion statements.  Plaintiffs, however, again fail to allege with any particularity whatsoever that

the challenged statements were objectively or subjectively false.  Plaintiffs' conclusory allegations

on their face reflect differences in business judgments, not fraud.  Plaintiffs alternatively posit that

GE failed to disclose "unsustainable" and/or "unsound" business practices associated with LTSAs.

But there is no duty to disclose unsustainable business practices, and the TAC does not provide

any facts demonstrating that these business practices were unsound, much less fraudulent.

*Third*, Plaintiffs do not come close to pleading scienter.  Lacking any personal motive for Defendants to have committed fraud, Plaintiffs face the heightened challenge of raising a strong inference that Defendants did so recklessly or with conscious misbehavior—a challenge they cannot meet.  The TAC alleges no facts, internal documents, or witnesses demonstrating that anyone at GE (much less the Individual Defendants) knew or was reckless in not knowing earlier of the challenges faced by the run-off insurance and power businesses.  Instead, Plaintiffs proffer speculation and opinions of ten unnamed lower-level former employees ("FEs") (three in Milan, Italy) of subsidiaries of subsidiaries of GE who never had material contact with any of the Individual Defendants.  The FEs' beliefs based on their limited and isolated perspectives down the corporate ladder, far-removed from GE management, are of no probative value under the well-established standards for confidential witnesses.  Moreover, Plaintiffs acknowledge the most critical facts making scienter implausible—GE performed annual tests that showed its LTC reserves were sufficient; GE expressly disclosed the impact of the LTSA cumulative adjustments that Plaintiffs now attack; GE's external auditor, KPMG, issued clean opinions each year; and GE disclosed its emerging issues and processes in real time.

*Finally*, the five-year statute of repose bars multiple claims asserted for the first time in the TAC, including statements featured by Plaintiffs from GE's 2012 Form 10-K.

The TAC thus should be dismissed with prejudice.

## BACKGROUND

### A.     GE & The Individual Defendants

GE is a diversified global industrials company headquartered in Massachusetts, incorporated in New York, and traded on the New York Stock Exchange.  ¶¶ 3, 44.  The Individual

Defendants are current or former executives of GE or GE Capital.[2]  ¶¶ 45-50.

GE employs over 300,000 persons worldwide and offers products and services ranging from aircraft engines, power generation and oil and gas production equipment, to medical and financing products.  ¶ 44; *see also* Ex. 4, at 12.  In 2017, GE had eight primary business segments—Aviation, Capital, Healthcare, Lighting, Oil & Gas, Power, Renewable Energy, and Transportation—that were divided into 36 sub-segments operated by over 150 direct and indirect subsidiaries.  *See* Ex. 4, at 12, 28, 32, 36, 40, 44, 48, 51, 54; *id.* at Ex. 21.  The TAC focuses on two lines of business within these 36 sub-segments:  GE Capital's run-off insurance business (operated at third and fourth-tier subsidiaries of GE), and GE Power's Power Services ("PS") division (one of ten divisions of a subsidiary of GE).  ¶ 62.

### B.    GE Capital's Run-Off Insurance Business & LTC Reserves

Approximately 15 years ago, GE announced its intention to reduce its insurance holdings as part of a broader strategy to focus on higher-return and faster-growth businesses.  *See* Ex. 5, at Ex. 99(a)-(b); ¶ 66.  Through sales in 2004 and 2006, GE Capital "substantially completed [its] planned exit of the insurance business" but executed reinsurance agreements whereby third and fourth-level subsidiaries reinsured certain blocks of LTC and other policies.  *See* ¶¶ 66, 91-92, 106; Ex. 6, at 8.  Through reinsurance agreements, a primary LTC insurer cedes the risk associated

---

[2]     Mr. Immelt served as GE's CEO from September 2001 to July 2017, and as Chairman of GE's Board from September 2001 to October 2017.  ¶ 45.  Mr. Bornstein served as GE's CFO from July 2013 to October 2017, and was a member of GE Capital's Board from 2006 to 2015.  ¶ 46.  Ms. Miller has served as GE's CFO since November 2017, and, prior to that, served as GE's Controller and CAO from 2008 to 2013, GE's CIO from 2013 to 2015, and GE Transportation's President and CEO from 2015 to 2017.  ¶ 47.  Mr. Sherin served as GE's CFO from 1999 to July 2013, and as GE Capital's Chairman and CEO from July 2013 to September 2016.  ¶ 48.  Ms. Hauser served as GE's Controller and CAO from April 2013 through the filing of the TAC.  ¶ 49.  Mr. Laxer served as GE Capital's President and CEO from September 2016 to March 2018, and, prior to that, held senior roles within GE Capital since 2009.  ¶ 50.

with a pool of insurance policies to another insurance company.  ¶ 86.  GE disclosed that it had reduced its overall insurance exposure, but still retained these reinsurance liabilities.  *See* Ex. 29, at 2; Ex. 7, at 106-07 (2012 10-K); Ex. 8, at 109 (2013 10-K); Ex. 9, at 144 (2014 10-K); Ex. 10, at 144 (2015 10-K); Ex. 11, at 145 (2016 10-K).  The decision to run-off its insurance business reduced GE's exposure by $130 billion and generated $13 billion of cash.  *See* Ex. 12, at 3.

*GE's Reinsurance Business*.  Since 2006, GE Capital's insurance business has been in "run-off" mode, meaning it stopped issuing or reinsuring new policies, and is "running off" the LTC policies retained by its lower-level subsidiaries, ¶¶ 8-9, which are based in Kansas and regulated by the Kansas Insurance Department ("KID").  ¶¶ 187, 464.

*LTC Reserves*.  LTC contracts provide defined benefit levels of protection against the cost of LTC services, including assisted living, hospice care, and nursing home facilities.  ¶ 84.  Under a typical LTC contract, claims activity occurs late in the policy's life, as policyholders begin requiring end-of-life services.  ¶¶ 84, 493.  To account for these liabilities, GE maintains reserves based on complex estimates of LTC costs to be incurred, and premiums to be received, decades into the future.  *See* ¶ 171.  GE maintains two types of LTC reserves: (i) claims reserves (for current claims) and (ii) benefit reserves (for future claims).  ¶ 153.  Estimating benefit reserves requires making actuarial assumptions such as morbidity (the extent and cost of LTC services), mortality, policy length, interest rates, and anticipated future premium increases.  *See* ¶¶ 167, 493.

Under GAAP, these assumptions are set at the time a policy is issued or acquired, and are "locked-in" and unable to be changed or updated throughout the life of a contract, unless a premium deficiency occurs.  Ex. 4, at 87; *see also* ¶ 168.  A premium deficiency occurs when the estimate of future liabilities and premiums based upon current assumptions indicates that the previous estimates (based upon locked-in assumptions) "are inadequate to satisfy contract benefits

and expenses, as well as enable recoverability of deferred acquisition costs." ¶ 168. Pursuant to GAAP, GE annually tested the adequacy of its reported LTC reserves. ¶¶ 169, 215. As explained in more detail below, until 2017, the annual reserve testing process indicated that the reported reserves were sufficient. ¶¶ 167-72, 215; Ex. 8, at 76; Ex. 9, at 88; Ex. 10, at 89; Ex. 11, at 92.[3]

### C.    GE Power's Power Services Sub-Division & LTSAs

With regard to the LTSA allegations, the TAC focuses on PS, one of ten sub-divisions within GE Power (which is in turn a subsidiary of GE). ¶¶ 44, 77, 231; Ex. 4, at 28. PS services power plant turbines and installs upgrades to improve turbine performance (such as Advanced Gas Path ("AGP") solutions). *See* ¶¶ 278-79. One way PS performs work is through LTSAs, which typically last between five and 25 years. *See* ¶¶ 229, 231. Under an LTSA, GE promises to perform turbine maintenance (both during pre-planned turbine outages and as needed when issues arise) and guarantees that the turbine will remain operative, and the customer agrees to pay GE (typically based on the number of hours that the turbines are utilized) throughout the contractual service term. *See* Ex. 4, at 82; Ex. 13, at 4, 11; *see also* ¶ 229.

*Contract Assets*. In accordance with GAAP, GE recognizes revenue from LTSAs based upon an estimated life-of-contract profit margin. ¶ 236. Specifically, GE estimates both the total billings it expects to generate and the total costs it expects to incur over the life of an LTSA, taking into account historic and projected factors such as expected customer utilization of the turbine, life of parts, cost experience, and contractual terms and conditions. *See* ¶¶ 236, 239, 257.

---

[3]    On August 15, 2018, the Financial Accounting Standards Board ("FASB") issued prospective changes to the accounting standards for long-duration contracts, including LTC, which will take effect in 2021. The updated standards (which were not in effect with respect to any of the disclosures at issue here) will require, among other things, certain enhanced disclosures, as well as annual review of the assumptions used to measure the value of insurance obligations. *See* FASB Accounting Standards Update No. 2018-12, "Financial Services – Insurance" (Aug. 2018).

Under GAAP, GE recognizes revenue as it performs under the LTSA (*i.e.*, as costs are incurred), using the LTSA's total estimated billings and costs as the basis for the revenue calculation.[4]  *See* ¶¶ 236, 390-91, 394-97.  Because revenue recognition is timed based on GE's costs incurred—and not on cash received—GE's revenue in a period is not identical to cash received in that period.  ¶¶ 238-39.  GE records revenue in excess of billings to date as "contract assets," and billings in excess of revenue as "contract liabilities."  *Id.*; *see also* Ex. 4, at 82.  By the end of the LTSA term, billings and revenue align, resulting in no contract asset or liability.

*Cumulative Adjustments*.  Because they are estimates and dependent upon factors such as the conditions under which the customer operates the turbine, parts degradation/replacement, market demand for power, and other variables, projected life-of-contract billings and cost estimates for an LTSA often change over time as more information becomes known.  ¶ 247.  The company thus periodically reviews and updates the assumptions underlying its expected life-of-contract billings and estimated costs for each LTSA.  *Id.*; Ex. 14, at 14.  GAAP requires GE to recalculate its life-of-contract estimates, and where a new estimate differs from the one previously booked, a "cumulative adjustment" is recorded to reconcile the difference.[5]  ¶¶ 247-49.  Thus, GE's contract asset or liability balance adjusts when an LTSA's life-of-contract estimates change.

---

[4]    For example, consider an LTSA under which GE projects it will bill the customer $200 million over the life of the contract, and GE projects it will spend $100 million to service the contract over its life.  If GE incurs costs of $10 million to perform under the contract in Year 1 (10% of the expected $100 million life-of-contract costs), then GE would record $20 million in revenue under the LTSA in Year 1 (10% of the expected life-of-contract billings).

[5]    In May 2014, FASB and the International Accounting Standards Board ("IASB") announced amendments to revenue recognition standards that would become effective as of January 1, 2018, ¶ 299, which affect the timing of revenue recognition and classification between revenues and costs on long-term agreements.  On April 13, 2018, GE filed a Form 8-K that applied those new standards retrospectively to all periods presented in its financial statements after January 1, 2018 (*i.e.*, for fiscal years 2016 and 2017), resulting in an $8.7 billion reduction to GE's contract asset balance across nearly all of its industrial businesses (including, but not limited to, GE Power). *See* Ex. 15, at 3.

*Factoring.*  Starting in 2016, to better align cash with costs incurred, GE Power "factored" (*i.e.*, financed in exchange for cash) certain LTSA receivables with lenders, including GE Capital. ¶¶ 26, 291.  These transactions were carried out on an arm's-length basis.  *E.g.*, Ex. 4, at 79.

### D.    LTC Reinsurance & GE Power Face Challenges In 2017 & 2018

From 2017 to early 2018, GE discovered and promptly disclosed several issues that arose in connection with its run-off insurance and power businesses.

*LTC Reserve Analysis & Charge.*  On July 21, 2017, during GE's Q2 earnings call, GE's CFO Jeffrey Bornstein disclosed that due to recent "adverse claims experience in a portion of [GE Capital's] long-term care portfolio" GE Capital had initiated a review to "assess the adequacy of [its] premium reserves."  Ex. 16, at 9; ¶¶ 435, 493.  GE's Q2 2017 10-Q warned that the "recently experienced elevated claim experience" in the LTC portfolio may "result in a deficiency in reserves" and subsequent "charge to earnings."  Ex. 17, at 30.  In its Q3 2017 10-Q, GE reported that due to the complex and ongoing nature of its review, any potential charge was not then reasonably estimable.[6]  Ex. 18, at 31.  During the Q3 earnings call, Mr. Bornstein and Ms. Miller reported that, until GE Capital completed its analysis of LTC reserves, it would defer paying dividends to GE.  Ex. 19, at 6, 10, 12; ¶ 441.  GE updated investors again on November 13, 2017, when Ms. Miller confirmed that the review was ongoing but that she "expect[ed] the charge to be more" than GE Capital's deferred dividend payment of $3 billion.  ¶ 458.

GE Capital's review, assisted by independent experts, continued through 2017.  On January 16, 2018—less than one week after completing the review and discussing with the KID—GE publicly reported the results.  *See* Ex. 12, at 3; ¶¶ 463-64.  GE disclosed that its review, which

---

[6]    Under GAAP, an estimated loss from a loss contingency shall be accrued by a charge to income when it is both probable and reasonably estimable.  *See Coronel v. Quanta Capital Holdings, Ltd.*, 2009 WL 174656, at *28-29 (S.D.N.Y. Jan. 26, 2009).

included reconstructing future claim cost assumptions using emerging trends, indicated a premium deficiency resulting in the resetting of reserves using current assumptions. Ex. 4, at 87; ¶ 493. GE recorded an $8.9 billion increase in future policy benefit reserves and a $0.6 billion write-off of related intangible assets, resulting in an after-tax GAAP earnings charge of $6.2 billion in Q4 2017. ¶ 464. GE further reported that, to support these estimated liabilities, GE Capital would make capital contributions of $15 billion to the run-off insurance business over the next seven years, subject to ongoing monitoring by the KID. Ex. 20, at 2; ¶¶ 463-65.

*Power Earnings Miss*. In April 2017, GE announced its first quarter results, which included industrial cash flow from operating activities ("CFOA") (generally, cash from operating activities less dividends received from GE Capital) that was $1 billion lower than projected. ¶¶ 26, 28, 429; Ex. 4, at 14-15. At that time, GE "expect[ed] cash flows to improve throughout the remainder of the year," Ex. 21, at 1, in part because GE Power traditionally had lower earnings in early quarters in the year and strong late quarters, and GE still believed that Power could achieve its annual targets. Ex. 14, at 6; *see* Ex. 24, at 15; Ex. 11, at 35. In July 2017, GE reported its second quarter results, including an improved cash flow of $1.5 billion. Ex. 16, at 5. Still, GE cautioned investors that, because of pressure in its Power and Oil & Gas segments, it was "trending to the bottom end" of its projected CFOA of $12 to $14 billion. *Id.*; ¶ 434.

During the third quarter of 2017, GE experienced sharper than anticipated decreases in customer demand and a sluggish power market. *See* Ex. 19, at 8. On October 20, 2017, GE announced disappointing results that caused it to revise its 2017 earnings guidance from $1.60 – $1.70 per share to $1.05 – $1.10 per share, and lower CFOA estimates to $7 billion. *See* ¶¶ 441-44; Ex. 19, at 12. John Flannery, GE's then-new CEO, stated that "a decline in Power performance in a difficult market" contributed primarily to the earnings miss. Ex. 25, at 1. Mr. Bornstein

further explained that there were three primary drivers of Power's poor performance: (i) declining market demand (including year-over-year in PS and lower than targeted AGP and aeroderivative shipments); (ii) poor execution and customer issues (*i.e.*, project delays and failure to close deals); and (iii) margin headwinds (*i.e.*, increased demand for low-margin services, and decreased demand for high-margin ones).  Ex. 19, at 7-8.

On November 13, 2017, GE announced a 50% reduction of its expected shareholder dividend due to underperformance.  *See* Ex. 26, at 4; ¶ 456.  Mr. Flannery noted that Power was "challenged" in a tough market exacerbated by "poor execution."  Ex. 26, at 4, 6.

*Disclosure of SEC Investigation*.  On January 24, 2018, during GE's fourth quarter earnings call, Ms. Miller disclosed that the SEC had begun an investigation relating to the insurance charge and GE's revenue recognition for LTSAs.  Ex. 27, at 8; ¶ 479.  Ms. Miller relayed that GE was "cooperating fully with the [SEC] investigation, which is in very early stages."  Ex. 27, at 8.

## ARGUMENT

## I.      THE TAC FAILS TO PLEAD A SECTION 10(B) CLAIM

To pursue a claim for securities fraud under Section 10(b), Plaintiffs must plead facts showing (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation.  *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *3 (S.D.N.Y. Jan. 18, 2018).  As this Court has explained, in addition to the requirements under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that Plaintiffs allege "facts" establishing a "plausible" claim, Plaintiffs must also satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *See Total Equity Capital, LLC v. Flurry*, 2016 WL 3093993, at *2 (S.D.N.Y. June 1, 2016).  The PSLRA requirements include that

Plaintiffs must (i) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading"; and (ii) "with respect to each [alleged] act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (or scienter). *See* 15 U.S.C. §§ 78u-4(b)(1), (2). Here, because the TAC fails to allege with particularity that statements by GE or any Individual Defendant were false, or that any Defendant acted with a cognizable motive or recklessly, the TAC fails to plead either falsity or scienter under Rule 9(b) and the PSLRA.

### A.      Plaintiffs Fail Adequately To Plead A False Or Misleading Statement

Plaintiffs take a shotgun approach to pleading falsity, challenging over 150 statements related (in some cases, loosely) to LTC reinsurance and LTSAs over a five-year period, on behalf of a putative class of investors that purchased GE stock from February 27, 2013 through January 23, 2018 (the putative "Class Period").[7] *See* ¶¶ 326-421. But, "[P]laintiffs must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so." *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014). The TAC fails to meet this basic requirement.

Further, the TAC identifies only isolated statements with respect to several Individual Defendants. *See* Ex. 2. For example, the TAC alleges that the only instance in which Mr. Laxer made a supposed misstatement occurred in response to an analyst's questions at a March 13, 2017 industry conference. *See* ¶¶ 343-45. Like all of the statements challenged by Plaintiffs, Mr. Laxer's isolated, alleged misstatement does not support a claim for securities fraud.

---

[7]      A table categorizing each of the challenged statements, and the reason(s) why each should be dismissed, is attached as Exhibit 2. *See Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting appendices that serve as "organizational tools").

1.      Statements Regarding GE Capital's Run-Off Insurance Business,
        Including Its LTC Reserves, Were Not False Or Misleading

Plaintiffs allege that GE's LTC disclosures were insufficient in three ways: (i) GE allegedly
made statements about its run-off insurance business without adequate disclosures regarding its
exposure to LTC liabilities and related risks, *e.g.*, ¶¶ 334-41, 346-49; (ii) GE allegedly
misleadingly disclosed the amount of its LTC reserves, *e.g.*, ¶¶ 330-31, 350-55; and (iii) GE's LTC
reserves allegedly were inadequate, *e.g.*, ¶ 356.  Each allegation fails.

a.      *GE Disclosed That It Retained Exposure To LTC Liabilities*

Plaintiffs' allegation that GE made statements about its run-off insurance business, without
disclosing that it retained exposure to LTC liabilities, is simply a fiction.  *E.g.*, ¶¶ 334-41, 346-49.
In fact, GE's disclosures of the 2006 divestiture attached the purchase agreement, which expressly
referenced GE's retention of life and health reinsurance liabilities.  *See* Ex. 28, at Ex. 10(gg)
(defining "Excluded Business" to mean reinsurance business retained by GE); Ex. 29, at 2
(disclosing that the "life and health reinsurance business in the United States will not be included
in the transaction").  GE's subsequent 10-Ks disclosed that its run-off insurance business included
"long-duration insurance contracts."  Ex. 30, at 73; Ex. 31, at 81; Ex. 32, at 97; Ex. 33, at 105; Ex.
34, at 106; Ex. 7, at 107; Ex. 8, at 109; Ex. 9, at 144; Ex. 10, at 144; Ex. 11, at 145.  GE expressly
defined "long-duration insurance contracts" to include "long-term care" contracts.  Ex. 7, at 107;
Ex. 8, at 109; Ex. 9, at 144; Ex. 10, at 144; Ex. 11, at 145.  For instance, in its 2012 Form 10-K,
GE explained that "[f]or traditional long-duration insurance contracts *including long-term care ...*
[GE] report[s] premiums as earned income when due."  *See* Ex. 7, at 106-07.  GE further explained
how it accounted for the liabilities from its long-duration insurance contracts like LTC:
"Liabilities for traditional long-duration insurance contracts represent the present value of such
benefits less the present value of future net premiums based on mortality, morbidity, interest and

12

other assumptions at the time the policies were issued or acquired." *See id.* GE also disclosed adjustments to its LTC reserves based on periodic reviews of the LTC portfolio. ¶¶ 357-58. And GE disclosed that its 2015 "GE Capital Exit Plan" involved retaining its run-off insurance exposure. *See* Ex. 35, at 7; Ex. 36, at 7; Ex. 37, at 7; Ex. 22, at 62; Ex. 23, at 12; Ex. 24, at 13. Moreover, as Plaintiffs acknowledge, in early 2017, analysts *asked* GE about its plans to divest its remaining insurance liabilities. ¶¶ 342-44. And analysts called GE's disclosure that it was reviewing its LTC liabilities a "reminder" of its large legacy insurance portfolio. Ex. 38, at 1-2.

Plaintiffs cannot create a disclosure claim by cherry picking statements out of context and ignoring all of GE's continued disclosures about its run-off insurance and LTC liabilities. *See In re GLG Life Tech Corp. Sec. Litig.*, 2014 WL 464762, at *6-7 (S.D.N.Y. Feb. 3, 2014) (dismissing claims based on information that was "readily accessible in the public domain"); *see, e.g.*, ¶¶ 14, 339-41 (criticizing statement that "all of the insurance business is gone" when the same speaker said earlier on the call that the run-off insurance business remained, *see* Ex. 39, at 7, 11). GE disclosed, and the market knew, that GE retained its run-off insurance business, which included LTC liabilities. That is fatal to any claim based on the alleged misstatement or omission of that fact. *See, e.g.*, *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017) (finding that a corporation's "disclosure of the very information Plaintiffs contend [it] to have omitted" rendered those purported omissions "immaterial as a matter of law").

b.   *GE's Grouping Of Insurance Liabilities Was Not Misleading*

Plaintiffs next allege that GE actively concealed its LTC liabilities in its financial statements by: (i) classifying LTC benefit and claim reserves under line items for "Life insurance benefits" and "Other" (respectively) in financial statement footnotes, ¶¶ 353-54; and (ii) excluding LTC liabilities from the table of contractual obligations in the Management Discussion and Analysis ("MD&A") section of its annual SEC filings, ¶¶ 326-27. Both arguments are meritless.

*First*, Plaintiffs allege that investors somehow were misled when, in one footnote to its financial statements, GE grouped LTC liabilities with other insurance liabilities in a sub-line item called "Life insurance benefits." ¶¶ 350-55. But the TAC's own sources confirm that the industry often grouped LTC within "life insurance." For example, the Credit Suisse report on LTC cited by Plaintiffs (which is not about GE at all, but rather about other LTC companies) is titled "US Life Insurance Sector Review," and it describes LTC as within the "life insurance industry." Ex. 40, at 1, 9; *see* ¶¶ 128, 207. Likewise, the Evercore report on LTC cited by Plaintiffs is headed "Insurance – Life," and is titled "Thoughts on GE's Long Term Care Insurance Review and Implications for the Life Insurance Sector." Ex. 41, at 1; *see* ¶¶ 129, 200. It was not confusing, much less fraud, to group LTC within "life insurance."

In any event, the disclosures make clear that this sub-line item included retained LTC liabilities. GE's balance sheet had one line item that included insurance: "Investment contracts, insurance liabilities and insurance annuity benefits." Ex. 7, at 94-95; Ex. 8, at 97-98; Ex. 9, at 132-33; Ex. 10, at 132-33; Ex. 11, at 136-37. Note 11, which is also titled "Investment Contracts, Insurance Liabilities and Insurance Annuity Benefits," and which breaks out that line item into sub-line items, likewise contains only one insurance-related sub-line item, called "Life insurance benefits." Ex. 7, at 136; Ex. 8, at 146; Ex. 9, at 170; Ex. 10, at 166; Ex. 11, at 167. Moreover, Note 11 described these "Life insurance benefits" as "obligations … *in our run-off insurance operations*," ¶ 154, confirming that it included the retained LTC policies. *Supra* § I.A.1(c). In light of the many disclosures that GE retained LTC liabilities, a reasonable investor would understand that LTC insurance was included in the only Note 11 insurance-related sub-line item.[8]

---

[8]     The MD&A contractual obligations table further confirmed that the broad term "life insurance" included LTC, stating that the table "excluded long-term care, variable annuity and ***other*** life insurance contracts." *See* ¶ 122.

*See In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) (courts "presume that a reasonable investor can comprehend the basic meaning of plain-English disclosures").

The TAC fails to cite any law or regulation requiring that a particular term be used to describe insurance liabilities, or establishing that insurance liabilities cannot be grouped together. Plaintiffs rely solely on the "view" of FE-2, a non-management employee with no involvement in GE's financial reporting, that LTC policies and "pure" life insurance policies have different risk characteristics. ¶¶ 52, 157, 353. But FE-2's opinion is irrelevant. *See In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016) (a confidential witness's "personal view ... simply is not enough to support a claim"); *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (rejecting claim that defendant was required to disaggregate particular costs in line item where plaintiffs "point[ed] to no accounting or reporting requirements" requiring such disclosure).

Plaintiffs' allegation that GE's inclusion of reserves for current claims in the line item "Other" was misleading, given "the specific and known risks associated" with the claims, is also meritless. ¶¶ 351, 354. Again, Plaintiffs identify no accounting rule or standard prohibiting this classification. Moreover, Plaintiffs do not allege any error with the reserves for current claims.

*Second*, Plaintiffs criticize GE for opting to exclude LTC liabilities from the summary table of contractual obligations in its MD&A. ¶¶ 330-31. But as noted above, the LTC liabilities already were included in the balance sheet line item for insurance liabilities, and again in Note 11. The MD&A table's purpose is to disclose, not the total of those liabilities yet again, but rather the *timing* of cash flows. *See* U.S. Securities & Exchange Commission Financial Reporting Manual ("FRM") § 9240.1. Moreover, FRM Section 9240.7 "permits management to apply its judgment in determining what items should be included or excluded from the table." *See also* SEC Release

No. 33-9144 (cited at ¶ 329) (allowing "flexibility so that the presentation [in the table] can reflect company-specific information in a way that is suitable to a registrant's business").   During the Class Period, GE exercised its discretion to exclude certain long-duration insurance liabilities (not limited to LTC), as well as other non-insurance liabilities, from its table because the future cash flows were not reasonably determinable.   *See* Ex. 7, at 69; Ex. 8, at 72; Ex. 9, at 82; Ex. 10, at 85; Ex. 11, at 89 (excluding "derivatives, deferred revenue and other sundry items").   GE explicitly disclosed this choice, and its rationale, stating that the table "[i]ncluded contracts with reasonably determinable cash flows" and "***excluded long-term care***" contracts.   ¶¶ 326-33.   Plaintiffs do not, and cannot, allege that management's disclosed judgment to exclude LTC liabilities from the MD&A table was anything but a normal business decision, much less fraudulent.   And the fact that GE decided to include LTC liabilities in this table in 2018 (following its reserve increase), ¶ 330, "does not support the inference that a previously filed financial statement was fraudulent." *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *19 (S.D.N.Y. Sept. 28, 2012).

*Third*, Plaintiffs' allegation that differences between the MD&A table and Note 11 "created a deception that its reserves were more than … its contractual insurance obligations," ¶ 160, is based on a mischaracterization of the numbers being compared.   Plaintiffs seem to believe that a reserve (Note 11) is an asset on the balance sheet, so that if the reserve in Note 11 is greater than the "insurance liability" line in the MD&A table, then GE had "excess" reserves.   *See* ¶ 161.   But the reserve ***is*** the liability, *i.e.*, Note 11 is a breakdown of the liability line item.   The MD&A table simply separates the future cash outflows for certain liabilities by year, while Note 11 shows liabilities as a single present value.   But both show liabilities.   Moreover, as Plaintiffs' quotation of Genworth's disclosure discusses, the calculations of liabilities in the MD&A table and Note 11 may be prepared differently, so they are not necessarily comparable.   *See* ¶ 333.

16

Furthermore, GE clearly disclosed its insurance liabilities each year in Note 11.  Ex. 7, at 136; Ex. 8, at 146; Ex. 9, at 170; Ex. 10, at 166; Ex. 11, at 167.  As Plaintiffs' own sources confirm, interested investors could (and did) determine GE's insurance liabilities from publicly filed regulatory insurance filings—as Evercore (cited by Plaintiffs) did in 2017, noting that "[a]fter [its] review of the GE owned regulatory insurance filings, we have concluded that total statutory long term care reserves are around $13B."  Ex. 41, at 1; *see* ¶¶ 129, 200.

       c.     *LTC Reserves Are Non-Actionable Opinion Statements*

Plaintiffs' allegation that GE's LTC reserves were fraudulently underreported also fails. ¶ 356.  Because reserves are "inherently subjective," they must be analyzed as opinion statements. *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011).  Insurance reserves, in particular, are "extremely conjectural."  *Coronel*, 2009 WL 174656, at *14.  To avoid dismissal, Plaintiffs must plead with particularity that GE's reported LTC benefit reserves were both objectively false (*i.e.*, factually incorrect) and subjectively false (*i.e.*, Defendants did not actually believe them to be correct).  *See Fait*, 655 F.3d at 110; *City of Omaha v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012) (applying *Fait* to Section 10(b) claims).[9]  Plaintiffs fail to do either.

*First*, neither Plaintiffs nor any of the four insurance-related FEs (who apparently worked at third-tier or lower subsidiaries of GE) allege that GE's LTC reserves were understated, or otherwise objectively false, at any point.  Nor does the TAC specify when or by how much GE should have increased its LTC reserves, or which facts known to any Defendant should have

---

[9]     In rare circumstances, a material omission can also render opinions misleading.  *See Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016).  Plaintiffs do not appear to pursue this theory in the TAC.  In any event, to support this theory, Plaintiffs would have to "identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 209.  They have made no such showing here with respect to GE's LTC reserves.

triggered an increase.  *See, e.g.*, *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp.*
*Pub. Ltd.*, 655 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2009) (dismissing claim that "fail[ed] to allege
at what point in time an impairment charge should have been taken and which specific losses
known to the Company should have triggered [it]"); *Caifa v. Sea Containers Ltd.*, 525 F. Supp. 2d
398, 410 (S.D.N.Y. 2007) (same).  At most, the TAC alleges that FE-1, an actuarial controller at a
GE subsidiary who had no contact with any Individual Defendant, calculated a "loss recognition
event" of "around $200 million" in mid-2016.  ¶ 194.  But this allegation falls woefully short
because (i) the TAC does not plead how FE-1 purportedly calculated this event, or what impact if
any this event should have had on the level of insurance reserves; (ii) $200 million is immaterial
to GE, which had 2016 revenues of $123.7 billion, Ex. 11, at 28; and (iii) the TAC alleges KPMG
was aware of and "underst[ood] the concerns related to loss recognition testing ... raised in a
detailed memo written by FE-1," ¶ 195, but issued an unqualified audit opinion.  Ex. 11, at 130.

     *Second*, Plaintiffs do not plead that the LTC benefit reserves were subjectively false, *i.e.*,
that any Defendant believed the reserves were inadequate to cover future LTC liabilities.  Plaintiffs
observe that other insurance companies recorded LTC reserve charges in 2006-2016.  ¶¶ 113-16.
But the TAC does not allege (i) that any Defendant knew of these other charges; (ii) that these
companies disclosed changes in their actuarial assumptions that could have led any Defendant to
believe GE's own assumptions (much less reserves) were insufficient; or even (iii) whether GE
did or did not reassess its own reserves in light of these charges.  Pleading general facts about the
insurance industry cannot cure Plaintiffs' failure to plead specific facts showing that Defendants
did not believe GE's own LTC reserves were adequate.  *See, e.g.*, *Plumbers' Union Local No. 12*
*Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 185 (S.D.N.Y. 2010) ("Merely

alleging that there were signs of problems in the subprime mortgage market is not sufficient to show that the … defendants knew that their disclosures were false or misleading.").

Plaintiffs are left with the conclusory allegation that GE's LTC reserves "did not rest on a meaningful factual inquiry nor have any reasonable basis in fact" because "GE did not have valid models" for its reserve testing process.  ¶ 356.  But the FEs do not allege any errors in the *substance* of *LTC* reserve models or assumptions, but rather just a lack of sufficient documentation and validation.  *See* ¶¶ 178, 182 (FE-2 alleges there "appeared" to be an issue with documentation and validation); ¶ 184 (FE-3 offers criticisms of models being maintained in Excel, instead of a "professional program such as SAS or C++").  At best, these allegations reflect lower-level FEs' frustration that they did not have more visibility into decisions.  *See* ¶¶ 191-94 (FE-1's complaints that his supervisors "altered without any justification" unspecified assumptions and that he was excluded from "closed door sessions" with management).  Mere disagreement with management choices or imperfect internal processes is not fraud.  *See Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("disagreement with management's choices among alternative estimates" did not support fraud); *Magnum Hunter*, 26 F. Supp. 3d at 295 ("litany of criticisms of accounting practices" by confidential witnesses did not support inference of fraud).

> d.    *GE's LTC Disclosures Did Not Violate GAAP Or Item 303*

Nor did Defendants violate GAAP and SEC rules/regulations by failing to disclose material trends or uncertainties affecting GE's LTC reinsurance business.  *See, e.g.*, ¶¶ 360-62 (alleging GE violated ASC 450); ¶¶ 363-65 (alleging GE violated ASC 275); ¶¶ 405-08 (alleging GE violated Item 303 of Regulation S-K).[10]  As Plaintiffs acknowledge, the rules require disclosure

---

[10]    Circuits are split on whether violations of Item 303 give rise to a private right of action under Section 10(b) or Rule 10b-5. The Second Circuit has held "yes," *see Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015); the Ninth Circuit has held "no."  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054-56 (9th Cir. 2014).  The Supreme Court granted

only where the registrant has knowledge of a potential material impact on a company's financial results, to a reasonable degree of certainty. *See* ¶¶ 360-65, 405-08. And the TAC does not plead any particularized facts that any Defendant had such knowledge. A mere recitation of these accounting standards and a conclusion that Defendants violated them is insufficient. *See Dempsey v. Vieau*, 130 F. Supp. 3d 809, 818 (S.D.N.Y. 2015) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.").

Plaintiffs also criticize GE's disclosures under ASC 944-40-50-6, ¶¶ 366-67, and SEC Release 33-8350, ¶¶ 417-21, regarding the assumptions used in estimating LTC liabilities. Specifically, Plaintiffs take issue with GE's truthful disclosure that "[l]iabilities for traditional long-duration insurance contracts represent the present value of such benefits less the present value of future net premiums based on mortality, morbidity, interest and other assumptions at the time the policies were issued or acquired." *See* Ex. 7, at 107; Ex. 8, at 109; Ex. 9, at 144; Ex. 10, at 144; Ex. 11, at 145. Plaintiffs allege fraud solely by comparison to more granular disclosures by certain other companies in the LTC industry, ¶ 333, and GE's post-Class Period disclosures, ¶¶ 493-96. But neither ASC 944-40-50-6 nor SEC Release 33-8350 prescribes the level of detail required for such disclosure, and "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."[11] *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995).

---

*certiorari* to review that very issue in *Leidos, Inc. v. Indiana Public Ret. Sys.*, 137 S. Ct. 1395, 1396 (2017), but the case settled on the eve of oral argument. 138 S. Ct. 369 (2017).

[11]   Plaintiffs' conclusory allegations regarding the false or misleading nature of GE's SOX certifications and representations regarding compliance with GAAP, as well as the effectiveness of internal controls over its LTC reserve reporting, fail for the same reasons. *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (finding SOX certifications were not actionable where plaintiffs' allegations of lack of controls were conclusory assertions without any factual support); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) (finding the same with regard to plaintiffs' allegations concerning disclosures of internal controls).

2.      Statements Regarding GE Power's LTSAs Were Not False Or Misleading

Plaintiffs' attempt to plead a false or misleading statement in connection with GE's accounting for LTSAs fares no better.  Plaintiffs challenge (i) statements regarding GE's LTSA-related financial metrics, *e.g.*, ¶¶ 368-69; and (ii) statements that purportedly concealed "unsound" and "unsustainable" business practices, *e.g.*, ¶¶ 368, 370-97.  Neither category is actionable.

a.      *GE's Reported LTSA-Related Financial Metrics Are Non-Actionable Opinion Statements And Comply With GAAP*

Plaintiffs attack statements relating to GE's expected billings and estimated costs, and therefore the resulting contract assets and liabilities, over the life of LTSAs.  *See, e.g.*, ¶ 368.  But as Plaintiffs concede, statements relating to GE's LTSAs' contract assets and liabilities are "forecast[s]" that are based on subjective "methodology and assumptions." ¶ 243; *see also* ¶¶ 371-75.  Because these represent GE's projections of the total expected value of an LTSA over its future life, which is not presently, objectively determinable, they too are opinion statements.  *See Pretium*, 256 F. Supp. 3d at 476-77 (defendants' predictions of the output (and by extension, profitability) of a mining project over the mine's 22-year life was an opinion reflecting "judgments as to values that [are] not objectively determinable").  Accordingly, Plaintiffs must plead that GE's reported LTSA-related financial metrics were both objectively and subjectively false.  *See Fait*, 655 F.3d at 110.  Plaintiffs fail to do so.

*First*, Plaintiffs do not plead objective falsity—*i.e.*, that any projected billings and cost estimates that GE used to recognize revenues on LTSAs throughout the Class Period were inaccurate.  These estimates, by their very nature, reflect the as-of-yet unknown future profitability of multi-year LTSAs.  *See* ¶¶ 229, 243 (under applicable accounting standards, "GE determines LTSA revenues and the value of the resulting Contract Assets based on the ***expected profits*** that it anticipates earning … over the life of its LTSAs"); ¶ 249 (with respect to cumulative adjustments,

"the accounting rules at the time permitted GE to record, in a single period, all … ***expected profits*** that resulted from [a] change [in expected profit margin over the life of an LTSA]").

For instance, Plaintiffs argue that GE's model immediately should have incorporated lower utilization rates, ¶¶ 257-58, but admit that GE incorporated changes in utilization using three-year historical averages.  ¶ 258.  Plaintiffs do not allege how the use of three-year historical averages for any specific customer led to an inaccurate billings estimate for any specific LTSA, much less that it made GE's reported LTSA-related metrics false by any specific amount.  *See* ¶ 251 (FE-6 and FE-7 admitting that utilization rates are *customer-specific*, "based upon the number of hours the *subject plant (or equipment)* was expected to run or be utilized").  Plaintiffs also fail to allege with any particularity how the use of three-year historical averages (which they concede are (i) calculated based upon accurate historic actual cost data and (ii) updated every year to account for new market information), ¶¶ 389-98, is not a reasonable method of estimating billings for *decades-long* service contracts, nor do they sufficiently allege that any LTSA-related metric incorporating estimates of utilization violated GAAP.  *See Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012) ("G[AAP] tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management, and allow[s] reasonable accountants to reach different conclusions.").  The TAC's conclusory attacks on what it admits are judgment-laden methodologies do not come close to satisfying the PSLRA's pleading standards.

*Second*, Plaintiffs fail to plead subjective falsity—*i.e.*, that any Defendant knew that any of the inputs underlying GE's projected LTSA billings and estimated costs (and, therefore, reported contract assets) were inaccurate or otherwise in violation of GAAP.  Plaintiffs cite only the beliefs of FE-7, a "Risk Finance Leader" based in Milan, three reporting levels down from the CFO of the Power Generation Services subdivision of GE Power, itself a subsidiary of GE.  ¶¶ 57,

257-59.  Further, Plaintiffs acknowledge that the three-year approach had long been in effect, and their unsupported argument is that it was fraud not to change this existing methodology.

Plaintiffs ultimately are left with the untenable (and unsupported) argument that a subsequent change in accounting standards somehow renders prior financial statements fraudulent, even though the new accounting standards did not yet apply.  *See, e.g.*, ¶¶ 308-15.  This argument falls of its own weight.  The ASC 605 standard previously governed GE's recognition of LTSA revenue.  *See* ¶ 390.  In adopting ASC 606 in 2018, GE was required to recast what its prior years' revenue *would have* been under the new accounting standard.  Ex. 15, at 2.  That is not evidence that GE improperly accounted for LTSA revenue under ASC 605, much less that it did so fraudulently.  *See In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 882-83, 893-94 (W.D.N.C. 2001) (rejecting argument that an impairment loss pursuant to a newly promulgated accounting standard supported claim for fraud).  Indeed, GE's SEC filings, including its 2016 and 2017 Forms 10-K, expressly stated that as a result of ASC 606 it "expect[ed] significant changes in the presentation of [its] financial statements, including: (1) timing of revenue recognition, and (2) changes in classification between revenue and costs."  *See, e.g.*, Ex. 11, at 97; Ex. 4, at 90.

        b.    *GE's Alleged "Unsustainable" Or "Unsound" LTSA Business Practices Do Not State A Claim For Fraud*

Plaintiffs also advance the theory that GE's LTSA disclosures were misleading because they allegedly failed to disclose certain supposedly "unsustainable" business practices resulting in positive cumulative revenue adjustments.  *See, e.g.*, ¶¶ 368-69, 383-88.  Even taking that baseless allegation at face value, courts routinely reject the proposition that "statements regarding ... accurately reported revenue and income [can be] rendered materially misleading by failing to disclose that such income was unsustainable."  *Axis Capital*, 456 F. Supp. 2d at 587; *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (dismissing fraud claims

"premised on the assertion that [defendants] breached a duty to disclose that its revenues were 'unsustainable'"). Plaintiffs further make the sweeping contention that these business practices were "unsound" because they were used to "trigger positive cumulative catch-up adjustments." ¶¶ 250-97, 368-69, 383-88, 393, 398. But disagreements with supposed "unsound" business practices do not support fraud. *See Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *7 (S.D.N.Y. Jan. 16, 2018) ("The securities laws ... do not provide remedies for bad business decisions; they provide remedies only for fraud.").

The TAC also fails to allege with particularity that GE fraudulently employed any of the following challenged business practices:[12]

- **De-Scoping**: FE-7 states that GE negotiated with customers to "de-scop[e]" certain LTSAs— *i.e.*, to remove lower-margin GE labor from the service contract in an effort to increase the overall average profit margin over the life of the contract. ¶¶ 272-74. In addition to failing to identify any specific LTSAs purportedly impacted by this "improper" practice, or any resulting financial impact, the TAC fails to allege how negotiating for an increased profit margin constitutes an illegitimate business objective.

- **Concessions**: FE-7 states that GE renegotiated LTSAs with customers by offering concessions, such as price discounts and payment deferrals, without "account[ing] for any

---

[12]     Plaintiffs' conclusory allegations that GE "did not account for" alleged "unsustainable" and "unsound" business practices, ¶¶ 389-98, fail to plead with specificity any GAAP violation. *See In re Allied Capital Corp. Sec. Litig.*, 2003 WL 1964184, at *4 (S.D.N.Y. Apr. 25, 2003) (rejecting allegations valuations were "inappropriate" because plaintiffs "fail[ed] to allege what plaintiffs contend was the true valuation, or to plead specific facts indicating … [the] values were incorrect"). Contrary to Plaintiffs' allegation, ¶¶ 409-10, Item 303 does not require the disclosure of specific business or accounting practices. *See, e.g.*, *Scott v. Gen. Motors Co.*, 605 F. App'x 52 (2d Cir. 2015) (Item 303 did not require disclosure of a car manufacturer's business practice to sell excess inventory to dealerships and record it as revenue, even though the cars remained unsold on lots). Plaintiffs' conclusory allegations regarding GE's SOX certifications and internal controls over its financial reporting for LTSAs also are insufficient. *See supra* n.11 (citing cases).

associated [customer] credit risk." ¶¶ 275-76. But the TAC contains no particularized allegations of systemic customer non-payment leading to a plausible inference that GE's customer risk profiling for its LTSAs was improper or deficient in any way.

- **Incentives/Technology Upgrades**: Both FE-5, who left PS in 2013, and FE-6, who "reviewed LTSAs" until 2012, and were based in Milan, state that GE "offered incentives, such as free technology updates or discounted services, to prevent customers from terminating [LTSAs]." ¶¶ 55-56, 279. The TAC alleges that these incentives "otherwise would have garnered revenue and cash under the respective LTSAs" had GE not offered them for free. ¶ 277. But Plaintiffs fail to allege how contract negotiations geared toward "prevent[ing] LTSA customers from fleeing," ¶ 277, constitute fraud, rather than sound business strategy.

- **Eliminating or Extending Sunset Dates**: FE-5 and FE-6 state that GE renegotiated the elimination or extension of "sunset dates" (the latest possible termination date for a LTSA) in order to avoid taking write-offs for contracts where low utilization might lead to lower-than-projected customer billings. ¶¶ 280-82. But the TAC fails to allege how renegotiating an underperforming contract to avoid a write-off constitutes fraud.

- **Unilaterally Altering Services**: FE-10, who purports to have been "involved" with LTSAs sometime between "the early 2000s through January of 2014," states that GE "unilaterally alter[ed] services under LTSAs," ¶¶ 60, 283-84, but the TAC does not provide even one specific example of any such alteration, let alone any allegations as to how breaching a contractual obligation to a *customer* supports a securities fraud claim by *shareholders*.

- **Factoring**: The TAC lacks any specific allegations demonstrating that GE's use of factoring was improper, let alone fraudulent. ¶¶ 285-97. According to FE-7, GE used factoring to "accelerate cash collection on GE Power's LTSAs" and renegotiated LTSAs with customers

to enable GE to factor certain invoices at a discount to expected future billings.  ¶¶ 290-93.  But the TAC fails to allege how renegotiating a contract to create an earlier triggering event (*i.e.*, to create a guaranteed payment obligation), *see* ¶¶ 291-92, is anything other than a legitimate business decision that is within the discretion of management.  Similarly, FE-6's alleged "familiar[ity]" with GE's factoring practices, ¶ 293, FE-8's "underst[anding]" that GE renegotiated LTSAs in order to factor them, *id.*, FE-9's explanation that factoring was "widespread," ¶ 294, and FE-7's work with a GE employee who "informed and educated FE-7 about various techniques used globally by GE Power to generate CFOA," ¶ 295, do nothing to establish anything fraudulent about factoring.  FE-7's allegations that GE factored LTSAs to help "conceal" boosted earnings associated with GE's renegotiations of contracts, ¶ 290, reflect, at best, a "personal view" that "simply is not enough to support a claim." *Weight Watchers*, 2016 WL 2757760, at *6.

3.    Defendants' Statements Constitute Non-Actionable Forward Looking Statements And/Or Puffery

As set forth in Exhibit 2, several of the statements challenged by Plaintiffs constitute non-actionable forward-looking statements or puffery.  *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015) (the PSLRA "safe harbor" immunizes forward-looking statements that are "identified and accompanied by meaningful cautionary language," or as to which "plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading"); *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553 F.3d 187, 206 (2d Cir. 2009) ("[P]uffery," or general statements of corporate optimism, are not actionable because they are "too general to cause a reasonable investor to rely upon them.").

**B.    Plaintiffs Fail Entirely To Plead A Strong Inference Of Scienter**

The TAC also does not come close to pleading a "strong inference" of scienter—*i.e.*, an

26

"intent to deceive, manipulate or defraud"—for any Defendant.  15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  To meet this standard, "it is not sufficient to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110-11 (2d Cir. 2009) (emphasis in original).  Rather, the "strong" inference must be "more than merely plausible or reasonable—it must be cogent, and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  In this Circuit, a strong inference of scienter may be satisfied by alleging particularized facts showing (i) that defendants had the "motive and opportunity to commit fraud"; or (ii) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.  The TAC fails to do either.

### 1.    Plaintiffs Have Not Pled A Cognizable Motive

Plaintiffs allege that Defendants concealed GE's "true" financial condition to "prop up" GE's stock price and maintain the appearance of "financial strength." *See, e.g.*, ¶¶ 1, 21, 228.  But such "generic allegations are insufficient to satisfy the scienter requirement." *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *4 (S.D.N.Y. Sept. 11, 2014) (interest in keeping stock price high does not plead motive).  Plaintiffs do not allege that any Defendant benefited in any "concrete and personal" way from the alleged fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Indeed, the TAC does not allege that any Defendant sold stock during the Class Period, which "suggest[s] the absence of any nefarious motives." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).

Plaintiffs' conjecture that Defendants were driven to commit fraud in order to maintain GE's "sacrosanct" practice of paying shareholder dividends is factually unsupported and legally insufficient. *See, e.g.*, ¶¶ 5-6, 32, 63, 65, 224, 305, 382.  Tellingly, not even one FE suggests that any Defendant manipulated LTC reserves or LTSA profit margins in order to issue dividends,

much less derived some personal, unique benefit from this corporate practice.[13] Because "[e]arning profits for the shareholders is the essence of the duty of loyalty … it would be an unusual case where accomplishment of this objective constitutes the requisite motive to defraud the shareholders." *ECA*, 553 F.3d at 200; *see also Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 554-56 (S.D.N.Y. 2010) (rejecting contention that scienter could be inferred because defendant CEO stood to receive substantial dividend payment based on her significant holdings).

### 2.   Plaintiffs Have Not Pled Recklessness

Because Plaintiffs fail to allege a cognizable motive, they face the difficult task of establishing a strong inference that Defendants, without cause, recklessly engaged in securities fraud. *Kalnit*, 264 F.3d at 142 (without motive, allegations of scienter must be "correspondingly greater"). "Recklessness," in this context, is "not merely a heightened form of negligence," but must be "conscious … *i.e.*, a state of mind approximating actual intent." *S. Cherry St.*, 573 F.3d at 109 (internal emphasis omitted). Plaintiffs fail to meet this standard.

### a.   *Plaintiffs' Own Allegations Rebut An Inference of Scienter*

Plaintiffs concede multiple critical points that rebut any plausible inference of scienter. *First*, as to the LTC reserves, Plaintiffs acknowledge that each year GE performed a premium deficiency test, which showed that its LTC reserves were sufficient. *See* ¶ 215 ("And GE did [perform deficiency testing] …. In all prior years, these test[s] resulted in a positive margin."). The TAC further alleges that, as a result of this positive margin, the assumptions underlying the reserves were required to remain locked. *Id.* Plaintiffs attack the quality of the testing, but only in the most conclusory and insufficient fashion, *see supra* Section I.A.1.c., and in a way that falls well short of demonstrating scienter on the part of any Defendant.

---

[13]     A table compiling the allegations made by each of the FEs, along with their titles, locations, and dates of employment, is attached as Exhibit 3. *See Fogel*, 2017 WL 751155, at *18.

*Second*, again with respect to LTC reserves, Plaintiffs do not dispute that, throughout 2017, GE increased its disclosures as it reviewed future claim cost assumptions: first disclosing the elevated claims experience and internal review in Q2 while also warning of a potential premium deficiency; then disclosing the decision to defer dividends in Q3; and then updating investors again that the review was ongoing but the charge was expected to be more than $3 billion.  *See supra* at 8-9.  These disclosures are inconsistent with a desire to hide LTC liabilities; to the contrary, GE disclosed in real time the very concerns that Plaintiffs accuse Defendants of concealing.

*Third*, as to the LTSAs, Plaintiffs admit that in each year during the Class Period, GE disclosed the precise amount of its cumulative catch-up adjustments, and the precise resulting impact on GE's profits.  ¶ 286.  There thus can be no claim that any Defendant sought to hide these adjustments or otherwise mask their effect on operating profits.  Instead, Plaintiffs make vague allegations attacking GE's methodology for calculating these adjustments, which, as explained above, fall well short of the PSLRA's pleading requirements, and fail to establish an inference of scienter as to any Defendant.

*Fourth*, for both the LTC and LTSA allegations, Plaintiffs concede that KPMG issued a clean audit opinion each year, further undermining any fraudulent inference.  ¶ 415.  Plaintiffs do not allege that Defendants withheld any facts (much less material ones) from KPMG.  For LTC, most of the supposed misstatements Plaintiffs allege, such as the failure to separately break out the LTC liabilities, were apparent on the face of the financials.  *See supra* Section I.A.2.  Plaintiffs allege, furthermore, that KPMG was aware of other purported issues, such as FE-1's alleged concerns about generic model changes.  *See* ¶¶ 193, 195.  For LTSAs, Plaintiffs concede that KPMG issued an unqualified audit opinion after GE disclosed the Power earnings and CFOA misses that Plaintiffs allege were caused by GE's purported LTSA accounting fraud.  ¶ 305.

29

> b.    *The Vague And Unsupported Allegations Of The FEs Fail To Raise A Strong Inference Of Scienter As To Any of The Defendants*

Nor do the FEs' allegations save Plaintiffs.  To support an inference of recklessness, "confidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements."  *Hensley*, 2014 WL 4473373, at *5 n.1.

Here, **none** of the FEs is alleged to have interacted in any meaningful way with any Individual Defendant or to have had any personal, first-hand knowledge of information in any Individual Defendant's possession.  *See* Ex. 3.  This is not surprising, given the FEs' rank-and-file positions in limited roles, multiple levels below senior management.  Because these witnesses did not have "any contact with the Individual Defendants," these allegations add nothing to the scienter analysis, as "the law is abundantly clear that [their] allegations are insufficient to support scienter." *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017); *accord Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-90 (S.D.N.Y. 2011) ("[E]ven confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants … or else that the witness was privy to the[ir] knowledge.").

In its nearly 200 pages, the TAC contains only a single allegation that any FE was privy to what any Individual Defendant actually knew: with respect to Mr. Bornstein alone, and related solely to factoring LTSAs, the TAC provides a one-sentence recollection of FE-9, a "member" of GE Power's "Enterprise Risk Team" at some point between 2004 and 2017 based in Schenectady, New York.  ¶¶ 59, 295.  According to FE-9, "at an internal meeting in or around June 2017" (which FE-9 does not allege he attended), Mr. Bornstein purportedly "acknowledged GE's reliance [on factoring to generate CFOA], noting that the Company was 'in too deep' to depart from the practice."  ¶ 295.  Plaintiffs have not alleged that factoring is unlawful or improper, nor can they, given that it is a common business practice.  Moreover, that sole remark, unaccompanied by any

30

context, or any link to a contradictory statement, cannot raise an inference of scienter. *See Coronel*, 2009 WL 174656, at *27 ("[B]ecause the Complaint alleges no specific facts demonstrating that *Defendants possessed*—at the time they made the allegedly false statements concerning the reserve amounts—information contradicting their statements, fraud has not been shown.").

Given this near complete lack of personal contact, it is unsurprising that **none** of the FEs identifies any specific information possessed by Defendants that contradicted their public statements.  Instead, the FEs speculate that the Individual Defendants "would have had" such information.  *See, e.g.*, ¶ 183 (FE-2 "***believes*** that audit issues were presented independently to the Audit Committee" and "***also believes*** that issues relating to model validation were required to go up to GE Capital and GE"); ¶ 202 (FE-4 states Ms. Miller "***would have*** been given a list of LTC policies that reflected … underlying risk" because she "***would have*** been 'intimately' involved" with an insurance business divestiture); ¶¶ 269, 296 (describing who FEs "***understood***" may have reviewed certain presentations).  Such speculation does not come close to raising a strong inference of scienter.  *See, e.g.*, *In re Ferrellgas Partners, L.P. Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) ("Put simply, Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations."); *Glaser*, 772 F. Supp. 2d at 591 ("[M]ere allegations that defendants 'would have' or 'should have' had such knowledge [are] insufficient.").  Plaintiffs' own belief that it is "implausible" that the Defendants did not possess contradictory information, *see, e.g.*, ¶¶ 214-21, 296, 321-23, is equally irrelevant.  *See Endo*, 2018 WL 446189, at *4 (alleging "little more than the fact that the Individual Defendants held powerful positions at the company … does not suffice").

    c. *Plaintiffs' Remaining Scattershot Theories Fail Adequately To Allege Scienter As To Any Of The Defendants*

Plaintiffs' sundry other allegations fail to plead a cogent inference of scienter.

*First*, Plaintiffs point to the size of the increase in LTC reserves and amount of LTSA cumulative adjustments, *see, e.g.*, ¶¶ 218, 318, but in addition to the myriad of other deficiencies in these allegations (discussed above), the alleged "magnitude" of a purported fraud cannot serve "as an independent basis for scienter." *Total Equity Capital*, 2016 WL 3093993, at *5; *see also Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 302 ("Because the size of an alleged fraud alone does not create an inference of scienter, Plaintiff's repeated allegation concerning the magnitude of the write-downs is insufficient to plead scienter.").

*Second*, modifications to GE's reporting of LTC liabilities post-Class Period, *see, e.g.*, ¶¶ 11, 213-15, do not raise a strong inference of scienter. *See, e.g.*, *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *8 (S.D.N.Y. Dec. 29, 2016) (finding the fact that defendant "changed the way it reported its investor relations expenses and then stopped reporting them altogether" did not support strong inference of scienter).

*Third*, the retirement of some Defendants, *see, e.g.*, ¶¶ 30, 45, 82, 223-25, "without more, is simply insufficient to establish the required inference of scienter." *Ferrellgas*, 2018 WL 2081859, at *19. Apart from rank speculation, Plaintiffs allege no facts linking the departures to the business setbacks in reinsurance or Power, much less to any alleged fraud. *See UBS*, 2012 WL 4471265, at *18 ("[A]bsent additional factual allegations linking [the executives'] resignation ... to the alleged fraud, such allegations are insufficient to raise a strong inference of scienter.").

*Fourth*, GE's knowledge of negative trends in the LTC market, including through industry groups, ¶¶ 204-07, does not remotely suggest specific knowledge of a shortfall in GE's LTC reserves. ¶¶ 113-16, 203-07. "[K]nowledge of a general economic trend does not equate to harboring a mental state to deceive, manipulate, or defraud." *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 300. Similarly, Defendants' alleged focus on the impact of the

32

new accounting rules announced in May 2014 (described *supra* note 5) on GE's revenue recognition practices for LTSAs, *see, e.g.*, ¶¶ 319-20, if anything, suggests, that GE was, at all times, aware of the applicable accounting standards and committed to applying them correctly.

*Fifth*, Messrs. Immelt's, Sherin's, and Bornstein's execution of SOX certifications does not (i) support that they acted with knowledge or recklessness; or (ii) impute that knowledge or recklessness to GE. ¶¶ 222, 324. "[A]llowing [SOX] certifications to create an inference of scienter … would eviscerate the pleading requirements for scienter set forth in the PSLRA." *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *19 (S.D.N.Y. July 23, 2018).

*Finally*, Plaintiffs posit that the existence of ongoing SEC inquiries evidences scienter. ¶¶ 226, 325. But such "investigations cannot bolster allegations of scienter that do not exist," particularly in the absence of motive. *Cortina*, 2016 WL 7480415, at *8.

### d.    *The Absence Of Individual Scienter Is Also Fatal Here To Any Attempt To Plead Corporate Scienter*

Because Plaintiffs fail to plead scienter for any Individual Defendant (or even any individual at a GE subsidiary), they likewise fail to plead corporate scienter. *See Endo*, 2018 WL 446189, at *4 ("[I]n the absence of allegations giving rise to a strong inference of scienter on the part of the Individual Defendants, Plaintiffs cannot establish scienter on the part of Endo itself.").

### e.    *The Non-Fraudulent Inference Is More Compelling*

When "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323.

Plaintiffs' entire case is built on hindsight, relying on later events to suggest Defendants knew earlier of problems that ultimately developed. Rather than fraud, the more plausible inference is that Defendants failed to anticipate the LTC problems or the cash flow and market issues that would plague its Power segment. GE's prompt review of relevant issues, along with

33

its timely and accurate updates to the market as these setbacks occurred, bolster this inference. *See* ¶¶ 429-30, 433-35, 440-45, 453-54, 463-66, 477-79; *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 302 (finding company's "incremental strategy" of "taking six write-downs" during the alleged class period "contradict[ed] an inference of scienter"). Put differently, "[i]t is equally plausible that [D]efendants were in a constant game of 'Catch up'—acknowledging [the problems] and disclosing their continued efforts to resolve them, only to learn of yet more." *See Magnum Hunter*, 26 F. Supp. 3d at 297-98. "But whether bad luck or bad business acumen, Defendants' failure[s] do[] not give rise to an inference of knowing fraud." *Ferrellgas*, 2018 WL 2081859, at *20; *see also Endo*, 2018 WL 446189, at *7.

### C. The Five-Year Statute Of Repose Bars Any New Claims Arising From Alleged Misstatements Or Omissions Made Prior To July 25, 2013

Finally, the statute of repose bars claims asserted for the first time in the TAC premised upon misstatements or omissions made prior to July 25, 2013, *i.e.*, five years before Plaintiffs filed the TAC on July 25, 2018. *See* 28 U.S.C. § 1658(b); *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650 (2010) (§ 1658(b)(2) erects "an unqualified bar on actions instituted 5 years after such violation ... giving defendants total repose after five years"). The statute of repose runs from the date of each relevant misstatement or omission, and it is not subject to equitable tolling. *See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 177 (2d Cir. 2016); *Kuwait Inv. Office v. Am. Int'l Grp. Inc.*, 128 F. Supp. 3d 792, 807-08 (S.D.N.Y. 2015). And "when a claim is barred by a statute of repose, Rule 15 may not be construed to permit relation back …." *In re Longtop Fin. Tech. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 380 (S.D.N.Y. 2013).

More specifically, and as set forth in Exhibit 2, Plaintiffs' claims related to the summary table in the MD&A section of GE's 2012 Form 10-K and Q1 2013 Form 10-Q (*see, e.g.*, ¶¶ 326-27, 350-51), as well as all claims stemming from GE's April 19, 2013 Form 8-K (¶ 350), July 19,

2013 Form 8-K (¶ 350), and the May 31, 2013 Sanford C. Bernstein Strategic Decisions Conference (¶¶ 346-47, 349), must be dismissed as untimely.[14]  *See Longtop Fin. Tech*, 939 F. Supp. 2d at 379 (rejecting as untimely claims that purported "merely [to] add[] additional violations to pre-existing causes of action" because that "ignore[s] the distinction between statutes of repose and statutes of limitations").  Likewise, all claims in the TAC against Ms. Hauser and Mr. Sherin based on alleged misstatements made before July 25, 2013, including in the 2012 10-K, the Q1 2013 10-Q, and the July 19, 2013 8-K, *see* Ex. 1, at App'x A, also are barred as a matter of law by the five-year statute of repose.  *See Kuwait*, 128 F. Supp. 3d at 807.

## II.   THE TAC FAILS TO PLEAD A SECTION 20(A) CLAIM

A claim under Section 20(a) must have, as a predicate, a primary violation of the Securities Exchange Act of 1934.  15 U.S.C. § 78t.  Because Plaintiffs fail to state a claim under Section 10(b), the Section 20(a) claim must also be dismissed.  *See ATSI*, 493 F.3d at 108.  The Section 20(a) claims against the Individual Defendants also fail because Plaintiffs have not alleged with particularity that any Defendants culpably participated in the alleged fraud.  *See Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) ("Culpable participation … must be pleaded with the same particularity as scienter.").

## <u>CONCLUSION</u>

The TAC states no claim under the stringent pleading requirements of Rule 9(b) and the PSLRA.  It should be dismissed with prejudice.

---

[14]   Seven complaints were filed and consolidated in this action.  Before the TAC, the first and only complaint to challenge statements made prior to July 25, 2013 was *The Cleveland Bakers and Teamsters Pension Fund v. General Electric Company, et al.*, 1:18-cv-01404, ECF No. 4 (S.D.N.Y. Feb. 20, 2013) (the "Cleveland Complaint"), which this Court consolidated with this action on February 26, 2018, ECF No. 61.  The Cleveland Complaint did not bring claims based on all of the pre-July 25, 2013 sources, misstatements, and omissions now challenged in the TAC, nor did it assert any claims against Ms. Hauser, Mr. Sherin, or Mr. Laxer.

Dated: New York, New York
       September 12, 2018

Respectfully submitted,

LATHAM & WATKINS LLP

By:   /s/ Miles N. Ruthberg
      Miles N. Ruthberg
      Blake T. Denton
      885 Third Avenue
      New York, New York 10022
      (212) 906-1200
      miles.ruthberg@lw.com
      blake.denton@lw.com

      Sean M. Berkowitz (*pro hac vice*)
      330 North Wabash Avenue, Suite 2800
      Chicago, Illinois 60611
      (312) 876-7700
      sean.berkowitz@lw.com

      William J. Trach (*pro hac vice*)
      200 Clarendon Street
      Boston, Massachusetts 02116
      (617) 948-6000
      william.trach@lw.com

      *Attorneys for Defendants General Electric Company, Jeffrey R. Immelt, Jeffrey S. Bornstein, Jamie Miller, Keith S. Sherin, Jan R. Hauser, and Richard A. Laxer*