UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                       :

SJUNDE AP-FONDEN and THE CLEVELAND       :
BAKERS AND TEAMSTERS PENSION FUND,    :
individually and on behalf of all others similarly situated,  :
                                         :

               Plaintiffs,          :         17-CV-8457 (JMF)
                                       :

          -v-                     :         OPINION AND ORDER
                                       :

GENERAL ELECTRIC COMPANY, et al.,         :
                                       :

               Defendants.       :
                                       :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

     In this putative class action, Lead Plaintiff Sjunde AP-Fonden and Plaintiff the Cleveland

Bakers and Teamsters Pension Fund (together, "Plaintiffs"), two pension funds, bring claims

against General Electric Company ("GE") and six current or former GE executives (the

"Individual Defendants" and, together with GE, "Defendants").  Plaintiffs allege violations of

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a),

and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.  Defendants now

move, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs'

claims.  For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

     GE is an industrial conglomerate founded in 1892 with a diverse portfolio of business

lines including medical technology, aviation, oil and gas, power generation, and financial

services.  Fourth Amended Complaint, ECF No. 179 ("FAC" or "Complaint") ¶¶ 44, 61.[1]  At all

times relevant to this case, the Individual Defendants served in executive roles at GE and GE

Capital, GE's financial services arm.  *Id.* ¶ 4.  Specifically, Jeffrey R. Immelt served as GE's

Chief Executive Officer from September 2001 to July 2017 and as Chairman of the Board from

September 2001 to October 2017; Jeffrey S. Bornstein served as GE's Senior Vice President and

Chief Financial Officer from July 2013 to October 2017; Jamie Miller took over from Bornstein

as CFO on November 1, 2017, and had previously served as GE's Chief Accounting Officer,

among other roles; Keith S. Sherin was GE Capital's Chief Executive Officer and Chairman

from July 2013 to September 2016; Jan R. Hauser was GE's "Vice President-Controller" and

Chief Accounting Officer starting in April 2013; and Richard A. Laxer served as President and

Chief Executive Officer of GE Capital from September 2016 to March 2018.  *Id.* ¶¶ 45-50.

Historically, GE has paid investors "a meaningful and consistent quarterly dividend" —

so consistent, in fact, that until recently, GE had cut its dividend only once since the Great

Depression, in the midst of the 2008 subprime mortgage crisis.  *Id.* ¶ 5.  In the fall of 2017,

however, GE revealed that it was cutting its quarterly dividend in half following severe cash flow

issues in the Industrials group, which includes GE's power division ("GE Power").  *Id.* ¶¶ 19,

31-32, 456.  Exacerbating matters, just two months later, GE announced that it needed to

increase reserves for its insurance portfolio by $8.9 billion, resulting in a $6.2 billion charge to

earnings.  *Id.* ¶ 33.  Plaintiffs' fraud allegations center on statements (or omissions) relating to

these two business lines — insurance and power — made between February 27, 2013 and

---

[1]     These facts are drawn from the operative complaint — namely, the Fourth Amended
Complaint — as well as attached exhibits, documents that the Fourth Amended Complaint
incorporates by reference, and legally required public disclosures filed with the SEC.  *See
Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016); *see* ECF No. 177 (stipulating that the Fourth
Amended Complaint is the operative one for purposes of this motion).

January 23, 2018 (the "Class Period").  *Id.* ¶ 510.  In particular, as detailed below, Plaintiffs

allege numerous misrepresentations about (1) the risk and quality of GE's long-term care

insurance portfolio and (2) its accounting and revenue recognition for certain long-term service

agreements in its power division.

## A.  Long-Term Care Insurance Portfolio

Plaintiffs' first battery of claims concerns GE's long-term care ("LTC") insurance

portfolio.  LTC insurance protects an insured from "the high cost of home care, assisted living

care, adult day care, respite care, hospice care, nursing home care, and other specialized skilled

facility care required when an individual becomes unable to perform the basic activities of daily

living."  *Id.* ¶ 84.  Premiums for LTC policies are calculated based on assumptions regarding

mortality rates (how long insureds will live), lapse rates (how many insureds will let their

policies lapse), morbidity rates (how many insureds will end up making claims on their LTC

policies), and interest rates (how much interest will be earned on insurance reserves).  *Id.* ¶ 85.

Under Generally Accepted Accounting Principles ("GAAP"), the assumptions underlying an

insurance policy are "locked in" unless an insurer determines it has a "deficiency" — that is,

when anticipated premiums and current reserves are insufficient to cover expected benefit

payments and expenses.  *Id.* ¶¶ 168, 215.  Insurers are required by GAAP and applicable statutes

to perform deficiency tests each year to ensure that reserves are adequate and that the original

assumptions underlying a block of policies do not need to be revised.  *Id.* ¶¶ 169-70, 215.  To

reduce risk exposure, primary LTC insurers typically enter into reinsurance agreements in which

they cede some of the risk of their portfolios to the reinsurer.  *Id.* ¶ 86.

In the 1990s and early 2000s, GE Capital wrote and reinsured LTC policies, capturing

20% of the market by 2001.  *Id.* ¶ 7.  In the mid-2000s, however, GE decided to exit the

insurance business. *Id.* ¶¶ 7-8, 99-104.  In 2004, it spun off the majority of its LTC insurance

portfolio to a newly formed company, Genworth.  *Id.* ¶¶ 8, 91.  Two years later, GE

"substantially completed" its exit from the insurance business by selling most of its remaining

insurance operations to Swiss Re.  *Id.* ¶¶ 8, 105.  In each of those deals, however, GE agreed to

reinsure portions of the LTC insurance blocks it was transferring.  *Id.* ¶¶ 92-98, 107.  So while it

had, on the surface, transferred much of its insurance portfolio to other companies, and it was no

longer writing new LTC policies, GE retained significant exposure to the LTC insurance market

through the policies it had reinsured.  *Id.*  ¶¶ 8, 95.[2]  In fact, the LTC policies reinsured in the

Genworth spin-off were the "worst" and "riskiest" ones — so undesirable that the Genworth

initial public offering could have "run into obstacles" had GE not agreed to "backstop" them.  *Id.*

¶¶ 95-97.  Following those deals, GE executives told investors that GE Capital had "sold all the

insurance businesses," resulting in a safer, "more focused" portfolio.  *Id.* ¶¶ 108-11 (emphasis

omitted).

Around the same time, other LTC insurers began to suffer heavy losses in their LTC

portfolios.  These losses flowed from systemic mispricing of LTC premiums: When issuing the

policies, insurers had overestimated policy lapse rates and interest rates, while underestimating

how many policyholders would submit claims and how long claimants would require benefits.

*Id.* ¶¶ 87-90, 115.  Consequently, insurers had both set premiums too low and reserved too little

money to cover future claims.  To mitigate this problem, between approximately 2009 and 2017,

LTC insurers sought thousands of premium rate increases from state insurance regulators, and

several large insurers, including Genworth, recorded large "reserve charges" to their earnings —

---

[2]      For simplicity, the Court will refer to GE's block of reinsurance policies as its
"insurance" portfolio, even though it acted only as a reinsurer during the relevant time.  *Id.* ¶ 86.

hundreds of millions of dollars apiece — to shore up their LTC reserves.  *Id.* ¶¶ 115-16.

Between the early 2000s and 2016, the underlying problems in the LTC market — which were

"common" and "well-known" — had driven the number of insurers still issuing new LTC

policies down from over one hundred to fewer than a dozen.  *Id.* ¶¶ 113-15 (emphasis omitted).

        During this same period, GE continued to tout its successful exit from the insurance

business and the quality and safety of GE Capital's remaining portfolio.  *Id.* ¶¶ 131-45.  At the

same time, it said little about its LTC portfolio in particular.  It did, however, change the way it

reported its insurance liabilities in annual regulatory filings.  Before 2012, GE's yearly Form 10-

K filings provided an "insurance liabilities" figure that included its LTC liabilities.  *Id.* ¶ 120.

By contrast, starting with its Form 10-K for 2012, GE omitted LTC liabilities from the

calculation.  *Id.* ¶ 122; ECF No. 173-7 ("2012 10-K"), at 3.[3]  Instead, it pointed readers to a

"Note" sixty-seven pages later that ostensibly revealed the entirety of its insurance liabilities.

*See* 2012 10-K at 3.  As the 2012 Form 10-K stated, those liabilities "comprise[d] mainly

obligations to annuitants and policyholders in our run-off insurance operations."  *Id.* at 10.  The

relevant disclosures in GE's Form 10-Ks for 2013, 2014, 2015, and 2016 were substantially

similar.  *See* ECF Nos. 173-8, at 3, 10; 173-9, at 3, 9; 173-10, at 4, 10; 173-11, at 6, 15; FAC

¶ 123.

        In July 2016, GE reported that GE Capital's earnings in its "vertical business" were down

15% from the previous year due to "lower gains and higher insurance reserve provisions

resulting from updates to our models on our runoff long-term care book."  FAC ¶ 146 (emphasis

---

[3]      To avoid confusion, because the exhibits submitted by Defendants in support of their
motion — including GE's Form 10-Ks and other regulatory filings — do not include every page,
citations to those exhibits are to the page numbers generated by the Court's electronic filing
system, not to their original page numbers.

omitted).  Then-CFO Jeffrey Bornstein assured investors that "portfolio quality remain[ed] stable."  *Id.* ¶ 146 (emphasis omitted).  The following spring, in response to analyst questions about why GE did not simply sell off its remaining LTC exposure (following GE's announcement that it had increased reserves by $100 million), Bornstein pointed to the "low interest rate environment" and described interest rates as "a fundamental challenge."  *Id.* ¶¶ 147-48.  Echoing that, the CEO of GE Capital, Richard Laxer, said it would not be "attractive" to sell "given the interest rate environment."  *Id.* ¶ 149.  In July 2017, prompted by "adverse claim experience in a portion of [its] long-term care portfolio," GE announced that it would reassess the adequacy of its insurance reserves.  *Id.* ¶ 209 (emphasis omitted).  On January 16, 2018, GE announced that it was increasing "future policy benefit reserves" by $8.9 *billion*, resulting in a $6.2 billion charge to earnings in the fourth quarter of 2017.  *Id.* ¶ 33.

**B.  GE Power's Long-Term Service Agreements**

The second set of fraud claims relates to the renegotiation of long-term service agreements by GE Power and how GE recognized revenues and profit from those renegotiations. GE builds "large-scale power generation facilities," such as power plants, turbines, and generators, along with the equipment needed to service these facilities.  *Id.* ¶¶ 229, 231.  In addition, the company — through a division of GE Power called GE Power Services — provides "a broad portfolio of aftermarket services," including "long-term maintenance service[s]."  *Id.* ¶¶ 231-32 (emphasis omitted).  A long-term service agreement ("LTSA"), which typically extends between five and twenty-five years, "might include monitoring, maintenance, service, and spare parts for a gas turbine installed in a customer's power plant."  *Id.* ¶¶ 19, 229.

Under these contracts, GE was paid "based on the utilization of the asset (per hour usage for example) or upon the occurrence of a major event within the contract such as an overhaul,"

*id.* ¶ 237, and "the significant service work and billing dates on many LTSAs were often tied, in

part," to customer utilization, *id.* ¶ 251.  "Thus, the more (or fewer) hours a turbine runs, the

more (or less) opportunity for GE to perform and bill for major service work.  In addition, the

more (or fewer) hours a turbine runs, the more (or less) quickly it will reach the milestones that

trigger cash payments to GE under its LTSAs."  *Id.*  But GE did not recognize revenue from

LTSAs only when customers actually paid.  Instead, it estimated revenues and costs over the

entire life of the agreement and, based on the costs it incurred as it performed under the LTSA,

recognized a proportional amount of estimated revenue even if it had not yet been paid.  *Id.*

¶¶ 236-38.  On its financial statements, GE listed this not-yet-received revenue as "[c]ontract

[a]ssets."  *Id.* ¶ 239.  Because both the amount and timing of payment under the LTSAs was

based on how much a customer used the piece of equipment covered by the agreement, an

accurate understanding of customer utilization rates was "critical" to properly estimate revenue,

and thus "contract assets," over the life of the LTSA.  *Id.* ¶¶ 243-45, 251.  GE had "real time"

access to customer utilization data courtesy of monitoring technology it installed on customers'

equipment.  *Id.* ¶ 246.  Despite that, GE used "the historical average of [customer utilization]

rates over the three prior years" to estimate revenues from LTSAs.  *Id.* ¶ 257.

      In the mid-2000s, GE endeavored to scale back on "non-core" business lines like

financial services and to refocus its energies on more traditional, "core" businesses like

industrials and power generation.  *Id.* ¶¶ 109-10, 132-33, 227.  Around the time of the 2008

financial crisis, however, the use of traditional power sources slumped worldwide.  *Id.* ¶¶ 252,

254.  In the years that followed and into the Class Period, equipment utilization among GE

customers continued to drop as energy conservation techniques and renewable energy sources

became more widely available.  *Id.* ¶¶ 253-54.  Compounding matters, GE was selling fewer gas

turbines and consequently entering into fewer new LTSAs; it had less leverage to command high prices for services in what new LTSAs it did enter into; and some existing LTSA customers were unable or unwilling to perform under the original terms of their agreements. *Id.* ¶¶ 254-56. Given its access to real-time customer utilization data, GE was aware of the negative trend in customer utilization and knew that using a one-year average, rather than a three-year average, would require it to lower its LTSA revenue estimates. *Id.* ¶¶ 246, 254, 257-59.

    To generate revenue during the downtown, GE renegotiated its existing LTSAs to make them more profitable. For instance, GE would bargain with customers to eliminate the contract provision calling for GE-sourced labor, which had lower profit margins than, for example, "capital parts and upgrades." *Id.* ¶ 273. Removing these low-margin labor costs increased the average profit margin over the life of the contract. *Id.* And under accounting rules in place at the time, when GE made such a modification — one that yielded a higher average profit margin — it could recognize all of the additional average profit from *previous* years, going back to the start of the contract, in a single reporting period. Such a revision was called a "cumulative catch-up adjustment." *Id.* ¶¶ 260-61, 273, 300, 383. GE used positive cumulative catch-up adjustments to meet earnings targets and inflate revenues. *Id.* ¶¶ 260-62. But renegotiating the contracts came at a price; while removing the labor provisions (which Plaintiffs term "de-scoping") generated short-term revenues through catch-up adjustments, it actually cut into GE's long-term profits. *Id.* ¶¶ 273-74. And to induce customers to renegotiate, GE had to offer discounts and payment deferrals, which had the effect of increasing GE's credit exposure. *Id.* ¶¶ 274-76. Moreover, in yet another attempt to generate short-term revenue, GE persuaded customers to purchase "Advanced Gas Path" ("AGP") technology overhauls, which provided a

"one time bump" in revenue for GE at the expense of lower services fees in future years.  *Id.* ¶¶ 278-79.

Because cumulative catch-up adjustments produced revenues in a single reported period, but did not necessarily produce cash, a gulf formed between GE's revenue and its cash on hand. *Id.* ¶ 288.  To address this cash flow problem and mask the growing disparity, GE began to "factor[]" the payment streams (or "receivables") — that is, to "monetize" customers' not-yet-due-payments by selling the receivables to outside parties or to GE Capital in exchange for cash. *Id.* ¶¶ 290-93.  GE Power's management led a "global" effort to factor "everything," including LTSAs.  *Id.* ¶¶ 294-96.  Given the finite number of LTSAs and the dwindling number of new LTSAs that GE was signing, however, GE would eventually run out of contracts to factor in exchange for cash.  *Id.* ¶¶ 297-98.

On April 21, 2017, Immelt disclosed to investors that, although "reported profits . . . were in line with expectations," industrial cash flow from operating activities ("CFOA") was negative $1.6 billion, "about $1 billion below . . . expectations."  *Id.* ¶¶ 26, 301 (emphasis omitted). Nevertheless, he predicted that GE would shake off its "slow start" and still hit its "guidance" of $12 to $14 billion in CFOA for the year.  *Id.* ¶ 302.  He doubled down on this prediction in July 2017, forecasting that GE was "trending to the bottom end" of its CFOA guidance.  *Id.* ¶ 303.  In October 2017, however, Jamie Miller, who replaced Bornstein as CFO following the latter's resignation,[4] revealed that GE now predicted CFOA would be only $7 billion for the year, a fraction of its estimate from only months before.  *Id.* ¶ 304.  On January 24, 2018, GE announced that the SEC was investigating the events leading up to GE's LTC insurance charge as well as its

---

[4]    Immelt, Sherin, and Laxer would also resign during the second half of 2017.  *See* FAC ¶¶ 223, 225, 304.

revenue recognition practices for LTSAs. *Id.* ¶ 479.  Finally, on April 13, 2018, GE filed a Form 8-K revising some of its revenue projections in light of a new accounting rule.  Under the new rule, GE's reported contract assets were $8.7 billion less than previously calculated. *Id.* ¶¶ 308-09.

## C.  Procedural History

On November 1, 2017, a putative class action suit was filed against GE, Immelt, Bornstein, and John L. Flannery, GE's then-CEO.  *See* ECF No. 1.  Following consolidation and coordination with related cases and the appointment of Sjunde-AP Fonden as Lead Plaintiff, *see* ECF Nos. 11, 16, 55, 61, 116, 139,[5] Plaintiffs filed a Third Amended Complaint, ECF No. 157, and, thereafter, the operative Fourth Amended Complaint, *see* ECF Nos. 177, 179.[6]  Defendants now move to dismiss that Complaint in its entirety for failure to state a claim.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  The Court will not dismiss any claims unless Plaintiffs have failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the

---

[5]     The Court appointed Sjunde AP-Fonden as Lead Plaintiff by order entered May 29, 2018, with an explanation to be provided "in a forthcoming opinion."  ECF No. 139.  For a variety of reasons, the Court never issued that written opinion and sees little point in doing so now.  Instead, it suffices to say that the Court granted the motion of Sjunde AP-Fonden substantially for the reasons stated in its memorandum of law in opposition to the other motions for appointment as lead plaintiff.  *See* ECF No. 105.

[6]     The Fourth Amended Complaint was filed only to strike certain allegations and is otherwise identical to the Third Amended Complaint.

defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

More specifically, Plaintiffs must allege facts showing "more than a sheer possibility that a

defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

Further, if Plaintiffs "have not nudged their claims across the line from conceivable to plausible,

[those claims] must be dismissed."  *Id.* at 570.

Because Plaintiffs in this case allege securities fraud, they must also satisfy the

heightened pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure,

which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R.

Civ. P. 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §

78u-4(b)(2), which requires that scienter — that is, a defendant's "intention to deceive,

manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v Makor Issues &

Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).  To satisfy Rule 9(b),

a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d

Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the

PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities

fraud], state with particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind."  *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d

71, 88 n.14 (2d Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)).

**DISCUSSION**

Plaintiffs' principal claims are that GE fraudulently concealed huge liabilities in its LTC insurance portfolio and weakening performance in its power division in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.[7]  To recover damages under Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted); *accord Waggoner v. Barclays PLC*, 875 F.3d 79, 93 & n.23 (2d Cir. 2017).  "The test for whether a statement or omission is materially misleading . . . is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis added) (internal quotation marks omitted).  Statements of opinion are treated somewhat differently.  For an opinion to give rise to liability under the securities laws, a plaintiff must plead that (1) "the speaker did not hold the belief she professed," (2) a "supporting fact she supplied" for the opinion was untrue, or (3) the speaker has "omit[ted] information whose omission makes the [opinion] statement misleading to a reasonable investor."  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327, 1332 (2015)).

---

[7]     As discussed below, Plaintiffs also bring certification and "control person" claims under Section 20(a) of the Exchange Act.

As noted above, the PSLRA also requires a plaintiff to plead scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — with particularity. *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted). To satisfy that requirement, a complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)). Moreover, a plaintiff must "allege facts supporting a strong inference *with respect to each defendant*." *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (emphasis added). A "strong inference" is one that is "more than merely plausible or reasonable," *Tellabs*, 551 U.S. at 314, and the scienter inquiry is "inherently comparative," *id.* at 323. That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and permit a claim to proceed "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323-24.

In this Circuit, a plaintiff may satisfy the PSLRA's scienter pleading requirement "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'cns*, 493 F.3d at 99. The latter, the only theory at issue in this case, requires allegations that show "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015). As a general matter, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have

known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309.

Defendants argue that, in light of the foregoing standards, each set of Plaintiffs' claims fails as a matter of law. They also contend that any claims that were alleged for the first time in the Third Amended Complaint (the "TAC") and that are premised on misstatements or omissions made before July 25, 2013 — five years before the TAC was filed — are barred by the statute of repose governing securities fraud violations. ECF No. 174 ("Defs.' Mem."), at 34-35. The Court will begin with the statute of repose issue before addressing Defendants' other arguments.

## A. The Statute of Repose

Congress has enacted an "unqualified bar" to securities actions instituted "5 years after [the] violation" forming the basis of the action, "giving defendants total repose" after that period. *Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010) (quoting 28 U.S.C. § 1658(b)(2)). The statute of repose begins running from the date of each alleged statement or omission, *see, e.g.*, *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 378 (S.D.N.Y. 2013), and is not subject to equitable tolling, *see, e.g.*, *SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos.*, 829 F.3d 173, 177 (2d Cir. 2016). Nor may previously unasserted claims "relate back" to the filing of an earlier complaint under Rule 15(c) if such claims are otherwise barred by the statute of repose. *See, e.g.*, *In re Longtop*, 939 F. Supp. 2d at 379-80 (finding that Rule 15 did not save a plaintiff's Section 10(b) claims otherwise barred by the five-year statute of repose); *see also, e.g.*, *Bensinger v. Denbury Res. Inc.*, 31 F. Supp. 3d 503, 510 (E.D.N.Y. 2014) (same, for Section 14(a) claims brought after the applicable period of repose had run); *Silvercreek Mgmt.*,

14

*Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 451 (S.D.N.Y. 2017) (same, for Section 12(a)(2) claims brought after the applicable period of repose had run).

Applying those standards here, the Court must dismiss Plaintiffs' claims that are based on statements or omissions predating July 25, 2013 and were not asserted in one of the seven complaints filed and consolidated into the operative complaint. That means that the following claims must be and are dismissed: (1) all claims based on the table in the Management Discussion & Analysis section of GE's 2012 Form 10-K and Q1 2013 Form 10-Q, *see, e.g.*, FAC ¶¶ 326, 350; (2) all claims based on statements made in GE's April 19, 2013 Form 8-K, *see id.* ¶ 350; (3) all claims based on statements made at the May 31, 2013 Sanford C. Bernstein Strategic Decisions Conference, *see id.* ¶¶ 346-47; and (4) all claims based on statements made by Defendants Sherin or Hauser before July 25, 2013, including in the 2012 Form 10-K, the Q1 2013 Form 10-Q, and the July 19, 2013 Form 8-K, *see, e.g.*, *id.* ¶¶ 326, 350; *id.* at 182 (App'x A).

Plaintiffs' only argument to the contrary is that because an earlier-filed motion to intervene timely raised claims based on *other* statements made in GE's 2012 Form 10-K and Q1 2013 Form 10-Q, *see* ECF No. 57; 18-CV-1404, ECF No. 1, at ¶¶ 48, 49, then *any* claim based on *any* statement in those filings was timely made even if asserted for the first time in a later complaint after the statute of repose had run. *See* ECF No. 178 ("Pls.' Opp'n"), at 35; ECF No. 180 ("Defs.' Reply"), at 15. Plaintiffs cite no authority for this position, however, and there is no principled basis to adopt it. Securities fraud claims arise from, among other things, *specific* "statement[s] of a material fact" and *specific* material omissions, 17 C.F.R. § 240.10b-5(b), 15 U.S.C. § 78u-4(b)(1), not from the documents in which those statements are contained. The statute of repose for such claims begins running from the time that each allegedly fraudulent

statement or omission is made.  *See In re Longtop*, 939 F. Supp. 2d at 378.  Accordingly, a timely raised claim based on misleading statements made before July 25, 2013, does not somehow preserve other, as-yet-unpleaded claims based on different misleading statements, even if the two sets of misleading statements were made at the same time and in the same document. By the same token, claims based on pre-July 25, 2013 statements by Defendants Hauser and Sherin, and not included in any earlier complaint, are not saved merely because some earlier complaints named Sherin as a defendant.  *See* Pls.' Opp'n 35.

In sum, the statute of repose bars Plaintiffs' claims based on statements, omissions, or misrepresentations made before July 25, 2013, and which were not timely raised in an earlier complaint or motion to intervene.  Those claims are therefore DISMISSED with prejudice.

## B.  Statements Relating to GE's LTC Insurance Portfolio

With that, the Court turns to Plaintiffs' claims based on alleged misrepresentations and omissions relating to GE's LTC insurance portfolio.  Plaintiffs' basic thesis is that GE knew about massive exposure in its deteriorating LTC insurance portfolio; knew that its reserves were inadequate for these liabilities (and lacked actuarial models that would allow it to properly assess the sufficiency of its reserves); and concealed these problems from investors in public statements and regulatory filings.  For the reasons below, the Court finds that Plaintiffs fail to state a claim for securities fraud based on any LTC-related statement or omission.

### 1.  The MD&A Table

Plaintiffs first allege that GE misled investors by excluding its LTC liabilities from the "[i]nsurance liabilities" line item of a table in the Management Discussion & Analysis ("MD&A") section of its Class Period 10-Ks, which purported to provide a snapshot of GE's total contractual liabilities.  FAC ¶¶ 326-33.  According to Plaintiffs, the reported figure

"materially understated GE's total insurance liabilities, misled investors into believing that GE's future LTC liabilities were immaterial, and misleadingly overstated the adequacy of GE's reported reserves" by suggesting that its reserves greatly exceeded its insurance liabilities.  *Id.* ¶ 327.  Plaintiffs allege that the exclusion of LTC liabilities also violated Item 303(a)(5) of Regulation S-K, which requires a company to "include *all* of the obligations . . . that fall within . . . specified categories" of liabilities that the company opts to disclose in its contractual obligations table.  17 C.F.R. § 229.303(a)(5) (emphasis added).  *See* FAC ¶¶ 328-33.

Viewed in context and together with the rest of the Form 10-K, however, GE's reported "insurance liabilities" figures were not misleading.  The table expressly disclosed that it "excluded long-term care, variable annuity and other life insurance contracts," 2012 10-K at 3, which put readers on notice that some portion of GE's insurance liabilities were not included in the table figure.  More significantly, though, the insurance liabilities line item directed readers to "Note 11," located later in the Form 10-K, which broke out in tabular form GE's "investment contracts, insurance liabilities and insurance annuity benefits."  *Id.* at 10.  And for each year during the Class Period, the figure in Note 11 was many billions of dollars higher than the one in the MD&A table.  In 2012, for example, the Note 11 figure was $28.268 billion, while the analogous figure in the MD&A table was only $14.0 billion.  *Id.* at 3, 10.  More granularly, the sub-item "[l]ife insurance benefits" in Note 11 — which, along with investment contracts and insurance liabilities, "comprise[d] mainly obligations to annuitants and policyholders in our run-off insurance operations" — stood at $20.427 billion, $6 billion more than the "insurance liabilities" listed in the MD&A table.  *Id.* at 10.  This ten-figure disparity means that no reasonable investor, having reviewed both the MD&A table and Note 11 (as the filing directed her to do), could leave with the impression that GE's LTC liabilities were "immaterial" or that

GE's total insurance liabilities were "declining" or materially less than they really were.  *See* FAC ¶ 327; Pls.' Opp'n 12 (emphasis omitted).[8]

Plaintiffs are arguably on firmer ground in contending that GE's failure to include LTC liabilities in its "insurance liabilities" line item violated Item 303(a)(5) of Regulation S-K.  *See* 17 C.F.R. § 229.303(a)(5) ("[T]he presentation must include *all of the obligations* of the registrant that fall within the specified categories." (emphasis added)); SEC Financial Reporting Manual § 9240.7 (2008) ("If management's judgment results in items being excluded from the table, accompanying footnotes should describe the nature of items excluded and why they are excluded.").  But even if GE did violate Item 303, that violation did not give rise to a securities fraud claim.  Section 10(b) and Rule 10b-5 prohibit omissions of "material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, *not misleading*."  17 C.F.R. § 240.10b-5(b) (emphasis added); *see* 15 U.S.C. § 78j(b).  Here, for the reasons already discussed, GE's omission of LTC liabilities from its MD&A table was not misleading because it fully disclosed its total insurance liabilities in Note 11 (and elsewhere in its Form 10-Ks, *see, e.g.*, 2012 10-K at 5, 7).  *See Stratte-McClure*, 776 F.3d at 102 (holding that "omitting an item required to be disclosed . . . *can* render [a] financial statement misleading" and thus give rise to liability "*in appropriate cases*" (emphasis added)).

---

[8]     Nor did the omission of LTC liabilities from the MD&A table "falsely indicate[] that . . . GE's reserve exceeded its liabilities."  Pls.' Opp'n 12.  Both numbers — the "insurance liabilities" figure and Note 11's "investment contracts, insurance liabilities and insurance annuity benefits" estimate — are estimates of GE's insurance obligations, not two sides of a balance sheet item.  The relevant Form 10-Ks expressly disclosed that the former excluded certain liabilities, including LTC contracts, and directed readers to the latter, which excluded nothing.  In other words, reading the two pages together offers no basis to think that the liabilities figure should be subtracted from the reserves figure.  *See* 2012 10-K at 3, 10.

In the alternative, the fact that GE disclosed the entirety of its insurance liabilities elsewhere in its Form 10-Ks defeats any finding that GE acted with the requisite scienter in omitting the liabilities from its tables.  That is, the disclosure of those liabilities — and the explicit directions to readers as to how to find those disclosures — strongly undercuts any inference that GE had the "intention to deceive, manipulate, or defraud" investors by omitting LTC liabilities from its MD&A tables during the Class Period.  *Tellabs*, 551 U.S. at 313; *see, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 & n.62 (2d Cir. 2014) (agreeing that "specific disclosures" about defendants' subprime mortgage exposure "undercut the inference that [they] knew or recklessly disregarded that their [subprime] portfolio was inconsistent with their representations about risk management, much less that they intended to conceal or recklessly concealed" the extent of their exposure); *see also In re UBS AG Sec. Litig.*, No. 07-CV-11225 (RJS), 2012 WL 4471265, at *19 (S.D.N.Y. Sept. 28, 2012) ("The fact that UBS made multiple profit warnings and subsequent disclosures before it was required to do so further weakens Lead Plaintiff's arguments with respect to scienter."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 530 (S.D.N.Y. 2012) (holding that a company's "disclosures relating to the type of conduct alleged" foreclosed plausible allegations of scienter based on recklessness).

At bottom, Plaintiffs' complaint is that GE should have more clearly presented its LTC liabilities in its Class Period Form 10-Ks.  GE's presentations are certainly not going to win any awards for clarity.[9]  But "[d]isclosure of an item of information is not required simply because it

---

[9]      GE's more comprehensive disclosure of its LTC liabilities beginning with its 2017 Form 10-K confirms that its Class Period 10-Ks could have been clearer.  *See* FAC ¶¶ 492-97; ECF No. 173-4, at 16, 18-19, 21-22.  But, contrary to Plaintiffs' assertions, it is not evidence that those filings were *misleading*.  At best, it speaks to whether Defendants acted with scienter in omitting the LTC liabilities from the earlier tables.  But the change in disclosure practices alone

may be relevant or of interest to a reasonable investor." *Kleinman v. Elan Corp.*, 706 F.3d 145, 152-53 (2d Cir. 2013) (internal quotation marks and ellipsis omitted).  Instead, disclosure is required "only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Id.* (internal quotation marks omitted).  Because GE's failure to disclose its LTC liabilities in its Class Period MD&A table would not be "misleading to an ordinary investor," *Omnicare*, 135 S. Ct. at 1328, Plaintiffs' claims predicated on those statements or omissions, *see* FAC ¶¶ 326-33, must be and are DISMISSED.

## 2.  LTC Reserves

Next, Plaintiffs argue that Defendants' statements about its "insurance reserves" — assets set aside to cover future claims payments, *see* FAC ¶¶ 152-53 — were false or misleading.  *See* Pls.' Opp'n 19-20.  There is no dispute that, because there is no "objective standard for setting . . . reserves," *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011), such statements are to be analyzed as opinions, *see, e.g.*, *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *8 (S.D.N.Y. Oct. 5, 2016); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 716-17 (S.D.N.Y. 2013). Accordingly, they are actionable only if (1) Defendants "did not hold the belief [they] professed" in the opinion; (2) if the opinion contained an "embedded statement[] of fact" that was untrue; or (3) if the statement "omits material facts about the issuer's inquiry into or knowledge concerning [the] opinion, and . . . those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 135 S. Ct. at 1327, 1329; *Tongue*, 816 F.3d at 209-10 (applying *Omnicare* to Section 10(b) and Rule 10b-5 claims).  With respect to the third category, for

---

is insufficient to establish a strong inference of scienter.  *See, e.g.*, *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016).

example, if a company told investors that it believed its conduct was "lawful," those investors would "likely expect[] such an assertion to rest on some meaningful legal inquiry." *Omnicare*, 135 S. Ct. at 1328. If it turned out the company had made that statement without having consulted a lawyer, it would be misleading because the company's statement did not "fairly align[] with the information in [its] possession at the time." *Id.* at 1329.

Plaintiffs' arguments about GE's LTC reserves run together somewhat, *see* Pls.' Opp'n 18-20, but they ultimately press two distinct theories: first, that Defendants themselves did not subjectively believe their statements about LTC reserves were "true," *id.* at 19-20; and second, that the statements were misleading because they indicated to investors that GE had an adequate basis to make estimates when, in fact, "they did not rest on a meaningful factual inquiry nor have any reasonable basis in fact." FAC ¶ 356; *see also* Pls.' Opp'n 18-19. Both arguments center on allegations about widespread issues with actuarial models used by GE's insurance subsidiaries. *See* FAC ¶¶ 175-185. According to Plaintiffs, around 2012 these subsidiaries were placed under GE Capital, which undertook an audit of the models the subsidiaries used to assess insurance liability and reserve adequacy. *Id.* ¶ 176. Former employees report "overarching issue[s]" with the models, including a lack of supporting or explanatory documentation, the use of Microsoft Excel rather than "professional program[s]" to create and run the models, the "[h]ard-coding of . . . assumption value[s]" in lieu of using variables, and the lack of a "single inventory of models," which is a "strongly suggested model risk management requirement" according to guidance from the Federal Reserve. *Id.* ¶¶ 177-80, 184. Models suffering from these problems could not be validated and approved. *Id.* ¶ 182.[10] These problems were documented in a central

---

[10]    In both the Complaint and their briefing, Plaintiffs broadly assert that "*none of the models used . . . were validated or approved by GE's Model Validation group.*" FAC ¶ 175; *see also* Pls.' Opp'n 19. Upon closer inspection, however, what the Complaint actually alleges is

database at GE Capital, "Audit Works," *id.* ¶¶ 172, 183, and, according to one former employee, some of the model validation issues were serious enough to be reported to GE Capital's Risk Committee, and "through . . . written audit reporting," to the senior management at GE, including Immelt and Sherin.  *Id.* ¶ 183.

Even taken together, however, these facts fall short of satisfying Plaintiffs' burden to plausibly allege that any Defendant did not "believe[] their LTC reserve statements were true." Pls.' Opp'n 20.  That is, even if Defendants knew that "the models used to set the reserves were fraught with serious issues," *id.* at 19, given the nature of those issues — a lack of "validation" caused by insufficient documentation, use of inappropriate modeling software, subpar actuarial practices, and so on — the facts alleged do not come close to the facts in other cases where courts have found that a defendant affirmatively disbelieved (or recklessly credited) a statement of opinion, *see, e.g.*, *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 314-16 (S.D.N.Y. 2013) (defendant officers "knew that the . . . evidence on which they relied" showed that the company should take a valuation allowance against the company's "deferred tax assets," but publicly expressed opinions to the contrary (citing cases)); *City of Westland*, 928 F. Supp. 2d at 717 ("[s]enior company executives" testified to state regulators that the defendant company "knew that its estimated . . . reserves were insufficient to meet . . . obligations, or at least was aware that it had no reasonable basis for believing the estimates"); *In re Converium Holding AG Sec. Litig.*, No. 04-CV-7897 (DLC), 2006 WL 3804619, at *13 (S.D.N.Y. Dec. 28, 2006) ("[T]he

---

that one former employee did "not *believe* that any of the models used . . . were validated or approved by GE's Model Validation group during his tenure" because, "[w]hen periodically checking on the status of models . . . , [he] recalled seeing rejections of . . . models, which were sent back for explanations, corrections, or remediations."  FAC ¶ 182 (emphasis added and omitted).  Even drawing all inferences in Plaintiffs' favor, these allegations do not support the assertion that no models were ever validated and approved, and the Court need not credit it for that reason.

Officer Defendants understood that the publicly reported numbers were at odds with [their] internal analyses, and [they] believed that the internal analyses more accurately reflected the actual financial condition of the company.").  Instead, this case is closer to those in which defendants allegedly "possess[ed] facts which should have led them" to make further inquiry, but which, without more, "do not sufficiently allege that the individuals" disbelieve their stated opinions.  *SEC v. Rio Tinto PLC*, No. 17-CV-7994 (AT), 2019 WL 1244933, at *8 (S.D.N.Y. Mar. 18, 2019); *see City of Omaha. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) (per curiam) (concluding that "plausibly plead[ing] that defendants were aware of facts that *should* have led them" to undertake goodwill impairment testing did not suffice to allege that "defendants did not believe in their statements of opinion regarding . . . goodwill at the time they made them"); *Rio Tinto*, 2019 WL 1244933, at *8 (holding that the defendants' knowledge of "severe adverse developments" at a business did not demonstrate that they did not hold their stated beliefs about its valuation).

Compounding this deficiency is the dearth of specific allegations about both how pervasive these problems were — *e.g.*, how many models there were overall, how many were defective, what roles they played in modeling GE's insurance reserves, and what issues they were subject to — and which Defendants knew how much about them.  The fact that some Defendants may have known of some issues with respect to an unspecified number of models in lower-level GE Capital insurance subsidiaries, as Plaintiffs allege, FAC ¶¶ 175-85, does not show that any particular Defendant did not believe in the accuracy of GE's insurance reserve estimates, *see, e.g.*, *In re Lions Gate Entm't Corp.*, 165 F. Supp. 3d at 22 ("In order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to each defendant.").  Moreover, Plaintiffs' allegation that the Defendants knew "the results of

GE's periodic loss recognition, deficiency, [and] cash-flow testing," Pls.' Opp'n 20, actually *undercuts* their claim that Defendants knew GE was under-reserved.  After all, as the Complaint itself acknowledges, GE's yearly deficiency testing resulted in positive margins *every year through 2017* — i.e., throughout the Class Period.  FAC ¶¶ 215, 466; ECF No. 173-12, at 11[11]

Nor do Plaintiffs adequately plead that GE's statements about its LTC reserves were misleading because they signaled to investors that GE had done its homework in arriving at the estimates, when in reality "they did not rest on a meaningful factual inquiry nor have any reasonable basis in fact."  FAC ¶ 356.  Pleading a misleading opinion under *Omnicare*'s third prong is "no small task for an investor," as the investor must "identify particular (and material) facts going to the basis for the . . . opinion — facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have" — that conflict with what the opinion would convey to investors.  *Omnicare*, 135 S. Ct. at 1332.  Moreover, whether an opinion is misleading by omission "always depends on context," as "[a] reasonable investor does not expect that *every* fact known" to a defendant "supports its opinion statement."  *Id.* at 1329-30; *see also Tongue*, 816 F.3d at 214.  GE's reserve statements may well have suggested to reasonable investors that the company had engaged in some sort of reasoned and reliable actuarial process.  That said, the Complaint does not establish that GE failed to undertake a "meaningful factual inquiry" into its reserves or that Defendants lacked "any reasonable basis in fact" for their estimates.  To the contrary, the Complaint details a complex actuarial modeling process for calculating insurance

---

[11]     Plaintiffs also make scattered allegations that some of the insurance subsidiaries' assumptions were "stale," FAC ¶¶ 186-88, or subject to "results-driven manipulation," *id.* ¶¶ 189-96.  But the Complaint itself acknowledges that in the only instance of assumptions being stale, the problem was quickly remedied.  *See id.* ¶ 188.  And although Plaintiffs note one former employee's suspicions about the manipulation of deficiency testing, the Complaint does not allege that any Defendant or executive knew about such issues, *see id.* ¶¶ 190-96, or that GE's auditor, which did allegedly know, saw any reason to act on these "concerns," *id.* ¶ 195.

reserve estimates, as well as an auditing scheme designed to (and which, in fact, did) detect weaknesses in that process.  *See* FAC ¶¶ 166-88.  Rather than "conflict[ing] with what a reasonable investor would take from" the reserve statements, *Omnicare*, 135 S. Ct. at 1329, therefore, the deficiencies in the GE subsidiaries' models are more akin to "fact[s] cutting the other way" from their estimates, *Tongue*, 816 F.3d at 210, 214 (quoting *Omnicare*, 135 S. Ct. at 1329), or "information that ran counter to [their] opinion," *id.* at 212.  In either case, the alleged deficiencies are insufficient to establish that the opinion was misleading when made.

The Second Circuit's decision in *Tongue* is particularly instructive.  There, the plaintiffs alleged that a drug company's optimistic projections about the likely approval of a drug, and its opinions about the drug's efficacy, were misleading because the company did not disclose that the FDA had given it negative interim feedback about the drug candidate, specifically about methodological problems with its trials, such as a small sample size and the use of single-blind studies.  *See id.* at 203-04, 211-14.  The Second Circuit held that the company's statements were not misleading because the plaintiffs "fail[ed] to demonstrate any conflict" between "statements about the general effectiveness of [the drug] and the FDA's methodological feedback."  *Id.* at 214.  So too here: GE's estimates of its insurance reserves — and the implied message that those estimates were based on an adequate inquiry and accurate inputs — do not run counter to facts showing, for example, that some of the models underlying the estimates were not validated, lacked adequate supporting documentation, were created using less sophisticated software, or used "hard-cod[ed]" assumption values rather than variables.  FAC ¶¶ 177-80, 184.  "[S]o long as Defendants conducted a 'meaningful' inquiry and in fact held th[e] view" expressed, *Tongue*, 816 F.3d at 214 — and Plaintiffs fail to plausibly allege they did not do so — the statements of

LTC reserves are not actionable, and Plaintiffs' claims based on them, *see* FAC ¶ 356, must be and are DISMISSED.[12]

### 3.  Violations of GAAP and Regulation S-K

Next, Plaintiffs argue that Defendants violated Item 303 of Regulation S-K and various GAAP provisions by failing to make certain disclosures in GE's financial statements.  The provisions at issue vary somewhat in their particulars, but all would require disclosure of something — a "loss contingency," trend, risk, or uncertainty — if both known to GE and "reasonably likely" or "reasonably possible" to have a "material" impact on its revenues, liquidity, capital resources, or critical accounting estimates, among other things.  *See* FAC ¶¶ 360-67, 399-408.  The Court need not dwell on these particulars or determine whether GE's financial statements violated GAAP and Regulation S-K in the ways alleged, however, because Plaintiffs do not plead facts that GE's omissions were made under circumstances that "give rise to a strong inference of scienter."  *Stratte-McClure*, 776 F.3d at 106.

Plaintiffs do not attempt to demonstrate scienter by establishing that Defendants had the "motive and opportunity" to commit fraud.  *See id.* at 106; Pls.' Opp'n 28 & n.18.  Instead, as "strong circumstantial evidence of conscious misbehavior or recklessness," *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016), Plaintiffs allege that Defendants were aware that GE had retained significant LTC exposure following the 2004 Genworth spin-off and the

---

[12]     Claims based on Defendants' July 2016 statements about a $100 million increase in LTC reserves (FAC ¶¶ 357-59) fail for a different reason.  The PSLRA requires a complaint to "specify each statement alleged to have been misleading [and] *the reason or reasons why the statement is misleading*."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  Plaintiffs' conclusory allegations that the statements were misleading "for the reasons set forth in ¶ 356," or without disclosure of GE's "liability for *future* LTC claims," FAC ¶ 359, do not succeed in "specify[ing] . . . why the statement[s] [are] misleading," and therefore must be dismissed.  *See Rombach*, 355 F.3d at 174 (holding that "plaintiffs must do more than say that [challenged statements] were false and misleading; they must demonstrate with specificity why and how that is so").

2006 sale of its insurance businesses to Swiss Re, FAC ¶¶ 201-02; understood the extent of GE's "LTC liabilities, future payment obligations, and reserves," Pls.' Opp'n 30-31, based on GE's required annual testing, FAC ¶¶ 214-15; with respect to that annual testing, knew of the validation issues with their insurance subsidiaries' models, *id.* ¶¶ 166-95; comprehended the systemic challenges in the LTC industry, including higher-than-anticipated claims experience and the charges to income that other insurers had taken to increase their reserves, *id.* ¶¶ 113-16, 198, 203-07; and knowingly removed GE's LTC liabilities from the MD&A tables in its annual filings during the Class Period, *id.* ¶ 213.  As evidence of scienter, Plaintiffs also point to the abrupt resignations of high-level executives, including Immelt, Bornstein, Sherin, and Laxer; GE's eventual nine-billion-dollar reserve adjustment; the suspicious timing of GE's reversion to more comprehensive disclosures regarding LTC liabilities in its 2017 Form 10-K; and the SEC's investigation into GE's LTC insurance business.  *See id.* ¶¶ 213, 218, 223, 225, 226.

But even taken together, these facts do not support a "strong inference" that Defendants' failures to disclose (assuming they had a duty to disclose) were done with "conscious recklessness."  *See Stratte-McClure*, 776 F.3d at 106.  "[T]o qualify as 'strong,' an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Tellabs*, 551 U.S. at 314 (internal quotation marks omitted)).  Engaging in the "comparative inquiry" called for by the PSLRA, *see Tellabs*, 551 U.S. at 314, the Court concludes that an alternative inference — that Defendants did not realize the brewing storm in their LTC portfolio, masked in part by out-of-date actuarial assumptions and sloppy practices, and then made disclosures and adjustments as they learned about the scale of the problem — is more compelling than the

inference of fraud.  This conclusion is principally founded on one ineluctable fact: GE's annual

deficiency testing showed positive results through and including 2016.  *See* FAC ¶¶ 215, 466;

*see also, e.g.*, ECF No. 173-12, at 10 (statement of GE CEO John Flannery).  That fact

undermines any attempt to demonstrate that Defendants were somehow aware of potential loss

contingencies or trends in the LTC industry that would have had a material impact on GE's

financial position — and by extension, that "defendants knew of specific facts that [were]

contrary to their public statements."  *Rombach*, 355 F.3d at 176.[13]

      That conclusion — that Plaintiffs fail to plausibly allege conscious misbehavior or

recklessness — is further reinforced by the timing and number of disclosures that Defendants *did*

make.  As other courts have observed, a company's "incremental strategy" of taking successive

write-downs during a class period "contradicts an inference of scienter," *Plumbers &*

*Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d

287, 302 (S.D.N.Y. 2010), as it is more consistent with poor accounting — a "constant game of

'Catch up'" — than with fraud, *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278,

297-98 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).  That is precisely what

happened here: In July 2016, GE disclosed that it was increasing its reserves by $100 million

following "updates to our models on our runoff [LTC] book"; in July 2017, the company shared

that it had suffered "adverse claim experience in . . . [its] long-term care portfolio," and would be

undertaking a review of its reserves; in October 2017, it noted that, even though the review was

not yet complete, it expected a reserve charge to exceed $3 billion; and in January 2018, it

---

[13]    Plaintiffs allege that Defendants were aware of problems with the insurance subsidiaries'
models for their annual testing.  FAC ¶¶ 166-95.  But just as those allegations were insufficient
to establish that Defendants disbelieved their own reserve estimates, they are insufficient to show
that Defendants did not believe in the soundness of the annual deficiency testing.

confirmed that it would record an unexpected $9 billion charge to ensure its reserves were adequate. FAC ¶¶ 146, 209-11, 435, 441, 453, 458, 459, 453-66. The fact that these disclosures occurred in "dribs and drabs" suggests poor accounting and prognostication, not fraud. *Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d at 297-98.

Plaintiffs' remaining, more general allegations — based on the size of the alleged fraud, the changes to GE's reporting practices, the SEC's investigation, and the resignations of GE executives — do not nudge them across the line. *See, e.g.*, *Plumbers & Steamfitters*, 694 F. Supp. 2d at 302 (noting that "the size of an alleged fraud alone does not create an inference of scienter"); *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *8 (S.D.N.Y. Dec. 29, 2016) ("[T]hat [Defendant] changed the way it reported its . . . expenses and then stopped reporting them altogether . . . does not give rise to a strong inference that Defendants acted with the required state of mind."); *id.* ("SEC investigations, by themselves, do not give rise to a compelling inference of scienter."); *In re UBS*, 2012 WL 4471265, at *18 ("[A]bsent additional factual allegations linking the executives' resignation to the alleged fraud, such allegations are insufficient to raise a strong inference of scienter." (internal quotation marks and ellipsis omitted)). Instead, Plaintiffs' own allegations — namely, that GE's annual deficiency testing returned positive results year after year — foreclose a "strong inference" that Defendants were consciously reckless as to whether their failure to make disclosures under GAAP and SEC rules would mislead investors. *See* 15 U.S.C. § 78u-4(b)(2)(A). Indeed, those allegations suggest that Defendants had little reason to think trends or uncertainties in the LTC

industry would have a material negative impact on GE's financial position.[14]  Accordingly,

Plaintiffs' LTC-related GAAP and Regulation S-K claims must be and are DISMISSED.[15]

### 4.  Other Public Statements

Finally, with respect to their LTC-related claims, Plaintiffs allege a number of false or

misleading statements made during the Class Period by GE executives (most, but not all,

Individual Defendants here) at conferences, in press releases, and on investor/analyst calls.

These statements fall into two rough categories: (1) statements about GE Capital's LTC

insurance exposure and its overall portfolio risk, FAC ¶¶ 334-41, 346-49; and (2) claims made in

2017 about why GE did not liquidate its remaining LTC insurance position, *id.* ¶¶ 342-45.  The

Court will address each set of claims in turn.

### a.  GE's Sale of Its Insurance Businesses and Ongoing LTC Exposure

The first category of statements mostly concerns GE Capital's transition away from

insurance.  Specifically, Plaintiffs point to the following statements (emphasis added

throughout):

---

[14]    For the same reasons, Plaintiffs' claims based on Sherin's April 2015 statement that GE had "done a lot over the last six years to shrink GE Capital while also making it much safer" fall short.  FAC ¶ 348.  Put simply, in light of GE's annual deficiency testing, it was entirely consistent for Sherin to know that GE "remained exposed to billions of dollars in high-risk LTC insurance liabilities," FAC ¶ 349, *and* to believe in good faith that GE's insurance reserves were adequate to cover its liabilities.

[15]    That includes Plaintiffs' stray allegations about critical accounting estimates and SEC Release 33-8350, FAC ¶¶ 417-21, and their allegation that GE violated Accounting Standards Codification ("ASC") 944-40-50-6, which "requires insurance entities to 'disclose in their financial statements the methods and assumptions used in estimating the liability for future policy benefits,'" FAC ¶ 366-67.  GE did describe its methods and assumptions, if tersely, *see, e.g.*, 2012 10-K at 9, and "plaintiffs supply no authority in support of their argument that ASC [944] requires greater particularity than [GE] provided," *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

- "We've sold Plastics, and we sold NBC and we've sold the North American Retail Finance business, *we've sold reinsurance business*, the insurance business, the bond insurance business."  FAC ¶ 334.

- GE's "2014 portfolio activity continues the Company's longer-term redeployment of capital from non-core assets like media, plastics *and insurance* to higher-growth-higher margin businesses in Oil & Gas, Power, Aviation and Healthcare."  *Id.* ¶ 335.

- "[W]e exited insurance in time" and GE achieved its "risk reduction" goal to "[s]ell insurance before the storm."  *Id.* ¶ 337.

- "[W]e exited whole pools of risk."  *Id.* ¶ 339.

- "If you look at what the portfolio is today versus take it when Jeff[rey Immelt] started, *all of the insurance business is gone.*  That was a huge change in the portfolio."  *Id.* ¶ 340.

Plaintiffs do not contend that any of these statements were literally false.  Instead, they argue that — absent the additional disclosure that GE retained billions of dollars of legacy LTC liabilities — they were materially misleading to investors because they suggested that GE's LTC insurance exposure had been reduced, and was being further reduced, when, in fact, the company's exposure was "materially increasing."  *Id.* ¶¶ 336, 338, 341.

"[T]aken together and in context," and viewed from "the perspective of a reasonable investor," however, the statements suggest no such thing.  *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 140 (2d Cir. 2017) (internal quotation marks omitted).  All of the challenged statements were made in reference to GE's highly publicized and much-touted decision to reconstitute its entire business portfolio by moving away from "non-core" business lines, many of which were housed in GE Capital, and re-focusing on "core" lines of business and assets like power generation, oil and gas, and aviation.  *See* FAC ¶¶ 69-72; ECF No. 173-39, at 4; ECF No. 181-4, at 7; ECF No. 181-5, at 3-4 ("We have done a lot of work over the last 10 years [2004-2014] on the portfolio. . . .  [O]n the financial service side, smaller — look, we exited insurance in time.  I think we got too big in consumer finance . . . where we stand here today just less portfolio activity and very tight focus on returns.").  Simply

put, statements that GE had gotten out of those business lines — that, as of *2004* and *2006*, *see*

FAC ¶¶ 8, 66, the company was no longer writing new insurance or reinsurance policies —

would not lead a reasonable investor to draw any conclusions about its legacy insurance

exposure, let alone that that exposure was diminishing.  That is especially true of the last

challenged statement, *see id.* ¶ 34, ECF No. 173-39, at 11 ("all of the insurance businesses are

gone"), which came within minutes of the speaker, Sherin, making explicit mention of GE's

multi-billion dollar "runoff insurance" portfolio, *see* ECF No. 173-39, at 7.

It is true that, "once a company speaks on an issue or topic, there is a duty to tell the

whole truth, even when there is no existing independent duty to disclose." *In re Vivendi, S.A.*

*Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (internal quotation marks and alterations omitted).

But that duty is triggered only by speaking on a specific "issue or topic," and GE's decision to

speak about selling its insurance businesses — truthfully, and in the larger context of GE's move

away from "non-core" businesses — did not give rise to a duty to qualify those statements by

simultaneously disclosing that it had retained a portfolio of run-off insurance policies.  *See, e.g.*,

*Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) ("[R]evealing

one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what

was revealed would not be so incomplete as to mislead." (internal quotation marks omitted)); *In*

*re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28,

2018) ("Mylan's statements disclosing some sources of past income created a duty to tell the

whole truth about past sources of income.  But Mylan's statements explaining past income do not

obligate Mylan to disclose *future* risk.").[16]  To hold otherwise would mean that any reference to

---

[16]     Plaintiffs' authorities on this point, Pls.' Opp'n 16 & n.6, either do not concern the duty
to disclose created by half-truths, *see, e.g.*, *In re Genworth*, 103 F. Supp. 3d at 779 (discussing
misleading opinions under *Omnicare*), or involve cases in which a defendant's statement about a

GE's old insurance businesses, however oblique, would obligate GE to disclose the insurance liabilities in its portfolio. The securities laws do not impose that burden.

### b. Interest Rates and GE's Reasons for Not Liquidating Its LTC Exposure

Finally, Plaintiffs contend that, in early 2017, Defendants Bornstein and Laxer misleadingly suggested to investors that GE had not liquidated its remaining LTC insurance portfolio because of unattractively low interest rates. Specifically, on February 22, 2017, when asked whether GE would "sell the liability in that insurance[,] kind of write a check and get rid of it," Bornstein responded in the negative, adding: "I think interest rates are a fundamental challenge in selling long-term liabilities in a low interest rate environment is a challenge [sic]." FAC ¶ 342. On March 13, 2017, Laxer echoed that statement, noting: "[G]iven the interest rate environment we're in right now, it's not attractive to do something. We always look at it, but just given where rates are at this point, it's not an attractive exit." *Id.* ¶ 343. Pressed on what "bogey level" GE would want before considering the transaction, Laxer answered: "I think there's a lot of factors there. So it's hard to give you a specific number, but we would like to see a few [interest rate] increases before that would be attractive." *Id.* ¶ 344. Plaintiffs contend that these statements were misleading because they suggested that "the interest rate environment was the primary impediment to GE liquidating its remaining LTC insurance exposure" when, in fact,

---

specific topic was misleading for failure to disclose other, material facts about that *same* topic, *e.g.*, *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 235 (S.D.N.Y. 2010) (boilerplate statement that defendant "may have" subprime CDO exposure was misleading in light of defendant's $50 billion credit default obligation position); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*, 423 F. Supp. 2d 348, 360 (S.D.N.Y. 2006) (statements that company faced "no serious problems" and "nothing else in [its] books gives . . . huge cause for concern" were misleading when defendants allegedly knew the company had substantial investments in WorldCom and Tyco, companies which by that point had "massive" and "well-publicized" problems and whose share prices had plummeted).

GE could not have liquidated because of (1) the low quality and adverse claims experience of the portfolio and (2) GE's failure to adequately reserve for its liabilities.  *See id.* ¶¶ 342-45.

Whether or not these comments were misleading, however, the Complaint fails to plausibly allege that either Bornstein or Laxer "knew facts or had access to information suggesting that their public statements were not accurate."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009).  "To determine whether a plaintiff has specifically alleged defendants' knowledge of facts or access to information contradicting their public statements, Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements."  *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (Sullivan, J.) (internal citations and quotation marks omitted); *see also Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").  Here, Plaintiffs do not identify any specific information known or available to Bornstein or Laxer that contradicted their statements that interest rates, and interest rates alone, were the reason GE was not selling its LTC portfolio.  For example, while it seems entirely possible that Bornstein and Laxer knew by early 2017 that GE had been suffering unprecedented, adverse claims experience in its LTC portfolio, in turn raising questions about both the continuing adequacy of its reserves and the marketability of its portfolio (given that the company, through Bornstein himself, revealed such claims experience only a few months later, FAC ¶ 435, and by the end of the year was predicting a multi-billion dollar charge to shore up its reserves, *id.* ¶¶ 210, 471), Plaintiffs furnish no specific allegations demonstrating such knowledge.  Absent such allegations, their claims cannot survive.

It is no substitute to argue, as Plaintiffs do, that Bornstein and Laxer knew GE had legacy

LTC exposure and were aware that the sky was falling in the industry as a whole.  *See, e.g.*,

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166,

185 (S.D.N.Y. 2010) ("Merely alleging that there were signs of problems in the subprime

mortgage market is not sufficient to show that the defendants knew that their disclosures were

false or misleading." (internal quotations and alterations omitted)); *Plumbers & Steamfitters

Local 773*, 694 F. Supp. 2d at 300 ("[K]nowledge of a general economic trend does not equate to

harboring a mental state to deceive, manipulate, or defraud.").[17]  Nor is it enough to assert,

without more, that Defendants knew that GE's LTC portfolio was deteriorating based on their

"access to various sources of nonpublic (and public) information concerning the Company's

LTC exposure."  FAC ¶ 220; Pls.' Opp'n 30-31.  Without specific identification of "the reports

or statements containing this information," *Plumbers' Union Local No. 12*, 753 F. Supp. 2d at

185, Plaintiffs' theory boils down to little more than Defendants "must have known" based on

their roles at GE.  "It is well established," however, "that boilerplate allegations that defendants

knew or should have known of fraudulent conduct based solely on their board membership or

executive positions are insufficient to plead scienter."  *In re Sotheby's Holdings, Inc.*, No. 00-

CV-1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); *accord Schwab v.*

---

[17]     *Arkansas Teacher Retirement System v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 486
(S.D.N.Y. 2014), upon which Plaintiffs rely, Pls.' Opp'n 31, does not suggest otherwise.  There,
the defendant company had to write off a large number of customer "leads" as worthless, senior
management was "personally involved in directing hands-on efforts to improve . . . lead quality,"
*and* the individual defendants were aware that the issue was industry-wide — all of which, taken
together, made it "implausible" that the defendants were unaware of the company's own
problems.  Here, while there are allegations that Bornstein and Laxer knew of other LTC
insurers' problems, there are no specific facts in the Complaint showing that, by early 2017, the
two executives were aware of deterioration in GE's portfolio or that they were "personally
involved in directing hands-on efforts" to address the issue.

*E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 432 (S.D.N.Y. 2017); *Goplen v. 51job, Inc.*, 453 F.
Supp. 2d 759, 773 (S.D.N.Y. 2006) (stating that general allegations that "defendants, due to their
high-level positions in the Company, had access to adverse undisclosed financial information
through internal corporate documents, meetings, and reports . . . without any further facts or
details, do not adequately demonstrate . . . knowledge of facts or access to information
contradicting their public statements").  Accordingly, these claims — as with the rest of
Plaintiffs' claims relating to Defendants' LTC-related statements — must be, and are,
DISMISSED.

### C.  Statements Relating to GE's LTSAs

Heading to the back nine, the Court turns to Plaintiffs' claims that GE fraudulently
engaged in a variety of "unsustainable" business practices relating to its LTSAs (that is, long-
term service agreements) with GE Power customers in an effort to conceal poor performance
following a worldwide downturn in energy equipment usage.  Here again, the Court will address
each category of allegedly fraudulent statements or omissions in turn.

#### 1.  LTSA Revenue Projections

As with GE's LTC reserve estimates, Plaintiffs attack various revenue and profit
projections reported by GE in its financial statements — specifically, its contract assets, reported
profits for GE's Industrials group, cumulative catch-up revenue, and earnings per share — as
false or misleading.[18]  According to Plaintiffs, GE's concealment of negative market conditions
and reliance on "accounting gimmickry" to prop up its performance numbers (1) show that

---

[18]      As a reminder, "contract assets" represent revenues recognized, but not yet received, by
GE, and "cumulative catch-up" revenue (or adjustments) resulted when GE renegotiated a
contract (or otherwise recalculated its profit margin over the lifetime of a contract) and then
booked profits based on that higher profit margin for the *preceding* years going back to the
inception of the contract.  *See supra* Background Section, Part B.

Defendants could not have believed their reported projections were accurate and (2) obligated Defendants to disclose facts about those market conditions and GE's business practices, which they failed to do.  FAC ¶¶ 368-69; Pls.' Opp'n 26.  The lone allegation concerning these misleading projections, however, is an omnibus, sixteen-line recapitulation of GE's purported accounting lapses and contract renegotiation practices.  *See* FAC ¶ 368.  It does not suffice to show that the projections and estimates at issue were misleading.

At the outset, Plaintiffs' halfhearted contention that these metrics are statements of fact, rather than opinion, is unavailing.  *See* Pls.' Opp'n 25.  Where determining a reported financial metric is "not a matter of objective fact," but rather a reflection of "management's opinion or judgment" as to how "a variety of predictable and unpredictable circumstances" will play out, the statement should be analyzed as an opinion.  *Fait*, 655 F.3d at 113.  Here, the Complaint itself describes contract assets as "forecast[s]" based on "expected profits . . . [and] costs [GE] expects to incur" over the life of decades-long service agreements that are based on management's "methodology and assumptions."  FAC ¶ 243.  That is, the metric expresses GE's "expectations for the future rather than presently existing, objective facts."  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d at 531; *accord In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 477 (S.D.N.Y. 2017) ("[P]rojections regarding the . . . Project's future productivity and profitability are statements of opinion since they do not express presently existing objective facts.").  It is immaterial that GE's judgment-laden projections incorporate "objective, verifiable data," as Plaintiffs emphasize.  Pls.' Opp'n 25.  Public opinion polls and bookies' odds do as well, but no one would describe them as "facts."  Consequently, these financial metrics must be analyzed as statements of opinion, not fact.

In an effort to meet the *Omnicare* standards, Plaintiffs first argue that it is "inconceivable" Defendants believed their own LTSA-related projections were accurate when made because they knew that customer utilization of GE's products — and by extension, future LTSA revenues from maintenance of those products — was rapidly falling off.  Pls.' Opp'n 26; FAC ¶ 383.  But Plaintiffs do not dispute that Defendants' models did, in fact, incorporate accurate customer utilization data.  *See* FAC ¶¶ 257-59.  Plaintiffs complain that GE used "the historical average of run rates over the prior three years," *id.* ¶ 257, rather than some unspecified shorter interval.  But there is nothing inherently unreasonable about using a three-year average to forecast revenues for contracts lasting up to twenty-five years, and Plaintiffs point to no regulations or rules that required GE to do otherwise.  And more to the point, as Defendants observe, Defs.' Reply 10, sharp downturns in customer utilization (like the one that allegedly occurred between 2010 and 2013, *see* FAC ¶ 254) were ultimately incorporated into Defendants' revenue models — just not as quickly as Plaintiffs might have liked.  In other words, Defendants' projections incorporated the very data upon which Plaintiffs rely to impeach those projections; pointing to that data to suggest that Defendants did not subjectively believe their own projections thus makes no sense.

Second, Plaintiffs suggest the Defendants could not have believed their LTSA-related projections because the accounting standard permitting them to retrospectively recognize cumulative catch-up revenues from their various LTSA renegotiation practices, ASC 605, was due to be replaced by a standard that permitted only *prospective* recognition of such revenue. *See, e.g.*, FAC ¶¶ 299-300; Pls.' Opp'n 8-9.  But the fact that Defendants knew a new accounting standard was coming into effect in the future — one under which GE could not book cumulative catch-up revenues retrospectively, and might have to adjust its contract assets downwards, *see*

FAC ¶¶ 299, 308, 383-84 — does not lead to, let alone compel, the inference that Defendants did not believe their revenue projections were accurate *under then-existing accounting standards*. To hold otherwise would nullify the effective dates of new accounting and GAAP standards by forcing issuers to comply with them early or risk liability under the securities laws.  Thus, Plaintiffs fail to allege facts that support a plausible inference that Defendants did not subjectively believe that their LTSA-related revenue projections were accurate or reasonable.

Plaintiffs' other line of attack — that Defendants "failed to disclose numerous material facts regarding the underlying factors and negative market condition impacting LTSA profitability," Pls.' Opp'n 26 — fares no better.  Most fundamentally, neither the Complaint nor Plaintiffs' memorandum of law in opposition to Defendants' motion provides a basis for *why* the revenue projections, without further disclosures, were misleading to a reasonable investor.  *See* FAC ¶ 368 (alleging in conclusory fashion that "GE's reported Contract Assets . . . were materially false or misleading when made," followed by a lengthy list of GE's accounting and LTSA renegotiation practices); Pls.' Opp'n 26 ("Defendants also failed to disclose numerous material facts . . . , *see, e.g.*, [a five-page section of the brief], rendering their statements materially misleading.").  Such pleading is inadequate under Rule 9 and the PSLRA.  *See Rombach*, 355 F.3d at 172.  Based on the string citation that follows Plaintiffs' conclusory assertion in their memorandum of law, one can surmise that they are suggesting that the LTSA-related projections would leave a reasonable investor with impressions about GE's knowledge of, or inquiry underlying, the LTSA projections that did not align with the "numerous material facts" that Defendants did not disclose.  *See id.* at 26; *Omnicare*, 135 S. Ct. at 1329.  But citation is not argument, and the Court cannot untangle what Plaintiffs' arguments might be based on a list of cases alone, especially cases that involved a much starker conflict between a defendant's

statement and the omitted facts in its possession than any conflict that might exist here.  *See, e.g.*, *Wilson*, 2017 WL 7052046, at *1 (finding that the "defendants' cost and schedule estimates were misleading because [they] omitted the fact that [the defendants] had not performed a meaningful inquiry into the engineering necessary to complete the . . . project"); *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017) (stating that the defendants' press releases and public statements "communicate[d] the belief that [their smartphone game] was to be launched by the end of 2014, despite . . . Defendants' knowledge of the delays that would postpone the launch into the following year"); *cf. Garcia v. Sessions*, 721 F. App'x 35, 38 (2d Cir. 2018) (rejecting an agency's conclusion based on "a single sentence and a string of citations to cases that . . . do not fully support its findings").

In sum, the Complaint fails to adequately allege that Defendants did not believe their LTSA-related revenue projections were accurate or that the projections would suggest things to a reasonable investor that did not align with undisclosed facts in GE's possession.

### 2.  GAAP Violations

The next set of claims can be addressed quickly.  Plaintiffs argue that GE's "failure to account for its unsound and unsustainable business practices in recognizing revenue" violated at least five, but perhaps as many as eight, related GAAP provisions.  *See* FAC ¶¶ 389-98.  The uncertainty regarding exactly how many provisions are at issue highlights the defect in these claims: They are pled so skeletally that they do not satisfy even Rule 8's relatively lenient thresholds, *see Iqbal*, 556 U.S. at 678, much less the heightened standards imposed by Rule 9 and the PSLRA.  For instance, one paragraph states that "GE's undisclosed, unsustainable and unsound practices, which it did not account for in recognizing revenue or making cumulative catch-up adjustments, was a violation of ASC 605-10-S99," FAC ¶ 393, yet it does not bother

even to state what ASC-605-10-S99 says.  The remaining allegations recite different accounting standards in some detail, *see id.* ¶¶ 390-91, 394-97, or baldly assert that GE violated those standards, but make no effort to link the standards to any specific act, practice, statement, or lapse by GE, or even to any other allegations in the Complaint, *see id.* ¶ 391 ("GE failed to conduct these ongoing reviews and/or made estimates that were unreasonable to support its cumulative catch-up adjustments and, as a result, violated the foregoing GAAP provisions"); *id.* ¶ 398 ("GE's failure to account for its unsound and unsustainable business practices . . . violates the GAAP provisions described above."); Defs.' Mem. 20; Defs.' Reply 4 n.4.  Such "naked assertions" of liability do not "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (alterations omitted).  Of necessity, then, they also fail to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), or to "specify . . . the reason or reasons why" GE's financial statements violated GAAP and were therefore misleading, 15 U.S.C. § 78u-4(b)(1); *see, e.g.*, *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171-72 (S.D.N.Y. 2015) (finding that absent "a restatement or allegations pointing to objective facts that Defendants' accounting methods violated GAAP," conclusory allegations of non-compliance with GAAP did not suffice); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 376-77 (S.D.N.Y. 2011) (dismissing "conclusory" allegations of GAAP violations that "fail[ed] to afford proper notice, much less provide facially plausible factual allegations").  The allegations here fail to state a claim for relief and are, therefore, DISMISSED.

### 3.  Item 303 Violations

Next, Plaintiffs allege that GE violated Item 303 of SEC Regulation S-K by failing to disclose trends or uncertainties known to GE and likely to have a material impact on GE's

financial position.  *See* FAC ¶¶ 399-404, 409-10; Pls.' Opp'n 26-27.  From a review of the

Complaint and Plaintiffs' memorandum of law in opposition to Defendants' motion, three main

allegations of "trends[,] . . . demands, commitments, events or uncertainties" stand out, 17 C.F.R.

§ 229.303(a)(1): first, GE's reliance on "unsustainable business practices to renegotiate LTSAs"

in order "to generate positive cumulative catch-up adjustments," FAC ¶¶ 409-10, Pls.' Opp'n 27;

second, the "deteriorating power industry" and "decreased [GE] asset usage" at the root of GE's

"struggl[es]," Pls.' Opp'n 27; FAC ¶ 410; and third, GE's use of factoring to generate cash and

mask the growing disparity between revenue and cash flow, FAC ¶ 410.[19]  The Court will

address each alleged theory of Item 303 liability in turn.

GE's failure to disclose the first "trend" does not support Item 303 liability because

Plaintiffs' theory of fraud does not ultimately hang together.  Throughout the Complaint,

Plaintiffs state that GE employed a "*host* of unsustainable business practices in order to trigger

positive cumulative catch-up adjustments."  FAC ¶ 260 (emphasis added); *see also id.* ¶¶ 263-66,

410.[20]  But a careful reading of the Complaint indicates that only *one* of these practices — "de-

scoping" (in which GE eliminated the GE-sourced labor requirement in LTSAs, thereby raising

the profit margin over the life of the contracts) — produced cumulative catch-up revenue.  *See*

---

[19]     Plaintiffs level other charges against GE under the rubric of Item 303, *see* FAC ¶¶ 409-10, but the additional undisclosed items do not amount to "trends" or "uncertainties" facing GE. *See Scott v. Gen. Motors Co.*, 605 F. App'x 52, 54-55 (2d Cir. 2015) ("Plaintiff failed adequately to allege that GM's alleged inventory practices were 'known trends or uncertainties' that were 'reasonably expect[ed] to have a material impact on net sales or revenues or income.").  Many are general allegations of corporate mismanagement that Item 303 does not obligate GE to disclose.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 650 (S.D.N.Y. 2017).

[20]     Specifically, (1) "de-scoping," (2) extending payment periods and offering discounts, (3) providing free technology, (4) pulling revenue forward by selling one-time upgrades at the expense of lower future service fees, and (5) unilaterally altering services under LTSAs.  *See* FAC ¶¶ 272-84.

*id.* ¶¶ 261, 273.  The other complained-of practices had the direct or indirect effect of reducing

GE's future revenues (by, for instance, increasing the risk of customer non-payment), but none

allowed GE to book catch-up revenues in the way that Plaintiffs describe.  That is, none of the

others allegedly changed the "margin" on an LTSA in a way that would permit GE to go back to

year zero of the agreement and book the difference for all past years in a single reporting period.

*Compare id.* ¶ 273, *with id.* ¶¶ 275-84.  Thus, the Complaint does not sufficiently allege that GE

employed a "host" of unsustainable business practices for no other reason "than to generate

positive cumulative catch-up revenue"; it alleges only one such practice.  *Id.* ¶ 410.  It follows

that no "trend" of using such practices together existed that Defendants needed to disclose.  *See*

17 C.F.R. § 229.303(a)(1), (a)(3).

Nor do GE's failures to disclose two of the "unsustainable practices" on their own — de-

scoping and deferral of payments — constitute violations of Item 303.  *See* FAC ¶ 409.  The

Complaint does not allege facts showing that either of those practices was "reasonably likely" (or

that any Defendant thought them reasonably likely) to have a material impact on GE's financial

position, liquidity, or revenues.  *See, e.g.*, *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d

743, 758 (S.D.N.Y. 2018) (finding no Item 303 violation where the "Plaintiffs fail[ed]

sufficiently to allege that defendants thought it was 'reasonably possible'" that a company had

breached important contracts); Defs.' Reply 8.  That is, there are no allegations of how many

LTSAs were "de-scoped," or how many customers' payments deferred, or what overall effect

such modifications would have on GE's overall financial position that would permit a plausible

inference that either practice was "reasonably likely" to have a material impact on GE.  *See* FAC

¶¶ 272-76.  17 C.F.R. § 229.303(a)(1), (a)(3).  Accordingly, Plaintiffs fail to plead a violation of Item 303 based on GE's "unsustainable" contract renegotiation practices.[21]

Next, Plaintiffs argue in their memorandum of law that GE failed to disclose "the deteriorating power industry" and "customers' migration to sustainable energy sources and resulting decreased asset usage."  Pls.' Opp'n 27.  As Defendants observe, however, these allegations are not actually in the Complaint.  *See* FAC ¶ 410 ("summariz[ing]" GE's alleged Item 303 violations related to LTSAs).  At most, Paragraph 410 of the Complaint alleges that GE failed to disclose that it had been "relying on unsustainable business practices to renegotiate LTSAs with customers . . . to conceal that GE Power *was struggling*."  *Id.* (emphasis added).  But that is too generalized and oblique to give fair notice of much more specific Item 303 violations concerning trends in the "deteriorating power industry" and "customers' migration to sustainable energy sources."  The Court therefore declines to consider the argument.  *See, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 128 n.6 (S.D.N.Y. 2013).

Finally, Plaintiffs allege that GE failed to disclose that "GE Power generated [cash] by 'monetizing' receivables" through extensive factoring of LTSAs.  FAC ¶ 410.  Here, Plaintiffs hit the mark.  The Complaint details, through allegations by former employees with firsthand knowledge among other things, that GE was factoring "everything" in its Power and Renewable Divisions, including as many LTSAs as it could.  *See id.* ¶¶ 293-94, 297.  Factoring was a "global . . . effort" directed by GE Power management in conjunction with GE Capital (which bought some of the receivable streams from the LTSAs), and which was reported in "weekly,

---

[21]     The Complaint concretely alleges that GE's "Advanced Gas Path" overhaul renegotiations had a substantial impact on GE's future revenues.  *See* FAC ¶ 278-79.  For whatever reason, though, Plaintiffs do not allege an Item 303 violation based on the non-disclosure of that "trend."  *See id.* ¶¶ 409-10.

monthly, and quarterly reports" that were integrated into presentations for GE Power's global leadership. *Id.* ¶¶ 295-96.  One former employee alleges that Bornstein, then GE's CFO, acknowledged in a June 2017 meeting that GE was "in too deep" to stop factoring; at other times Bornstein discussed factoring in detail during earnings calls.  *See id.* ¶¶ 295, 381.  Yet "the existing number of LTSAs available to monetize was finite," and due to slackening demand for new turbines (and thus new LTSAs), GE would not be able to continue factoring receivables indefinitely.  *See id.* ¶ 297.  Those allegations, taken together, are more than sufficient to show that factoring was a trend or event that was "reasonably likely to result" in a change in GE's liquidity or that GE "reasonably expect[ed]" to have "a material . . . impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(1), (a)(3).  Because factoring trades away future revenue for immediate cash, it stands to reason that GE's comprehensive factoring of LTSA receivables would have a material impact on future revenue.

The same allegations support a "strong inference" that GE and at least some of the Individual Defendants were "at least consciously reckless regarding whether their failure to provide adequate Item 303 disclosures . . . would mislead investors about material facts." *Stratte-McClure*, 776 F.3d at 106.  If credited, the allegations in the Complaint show that, throughout the Class Period, the management of GE Power and GE Capital were *organizing* — and, *a fortiori*, knew about — "global" efforts to factor as many LTSAs as they could.  *See* FAC ¶¶ 290-96.  If credited, the Complaint shows also that Bornstein (who signed GE's financial statements) both knew of the practice and acknowledged that GE was in "deep" with regard to factoring.  *Id.* ¶ 295; *see also id.* ¶ 381 (Bornstein discussing in detail the extent of factoring within GE's divisions).  In short, Plaintiffs plausibly allege that Bornstein and GE (through Bornstein and other executives whose knowledge or intent may be imputed to it, *see Teamsters*

*Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008))

"knew facts . . . suggesting that" GE's financial disclosures would be misleading without

disclosure of its widespread use of factoring, *ECA*, 553 F.3d at 199, amounting to "at least a

reckless disregard of a known or obvious duty to disclose." *Christine Asia Co. v. Ma*, 718 F.

App'x 20, 24 (2d Cir. 2017) (internal quotation marks omitted).[22]

In sum, Plaintiffs' factoring-based Item 303 claim survives against GE and Bornstein for

GE's 2015 filings and beyond, but is dismissed as to all other Defendants.  The remaining Item

303-based claims are dismissed in their entirety.

### 4.  Other Public Statements

Once again, Plaintiffs also allege various false or misleading statements made during the

Class Period by GE or Individual Defendants in SEC filings, earnings calls, and conferences.

Roughly grouped, the statements concerned GE's calculation of contract assets, FAC ¶¶ 370-76;

use of factoring, *id.* ¶¶ 379-82; cumulative catch-up adjustments, *id.* ¶¶ 377-78, 383-84; and

other aspects of GE Power's performance, *id.* ¶¶ 385-88.  Most of the statements are not

adequately alleged to be false or misleading.  With respect to the statements about factoring,

however, the motion will be denied, as Plaintiffs adequately plead that the statements were

misleading and were made with the requisite state of mind.

---

[22]     That said, it is doubtful that the Complaint supports such a claim for fraud as to GE's
Class Period filings prior to the Form 20-K for 2015.  According to Plaintiffs, GE Power
management set up the factoring task force "beginning in 2015," FAC ¶ 290, and were
"monetizing customers' future payments as often as possible *in 2016*."  *Id.* ¶ 297; *see also id.*
¶ 295 (alleging that Bornstein commented in June 2017 that GE was "in too deep" with
factoring).  In other words, there are no allegations of widespread factoring prior to 2015.  The
Court need not and does not resolve the issue here, however, as Defendants do not raise it.

### a.   Statements Related to Contract Asset Determination

In its Class Period Form 10-Ks, GE explained that "[r]evenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements," which in turn required consideration of a number of factors.  FAC ¶ 371.  In the course of that explanation, GE stated the following:

- "We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook."

- "We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings."

- "We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods."

- "Revisions that affect a product services agreement's total estimated profitability result in an adjustment of earnings . . . .  We provide for probable losses when they become evident."

*See id.* ¶¶ 371-75.  Plaintiffs argue that these statements were false or misleading (1) "for the reasons identified in ¶ 368" and (2) because GE did not, in fact, "routinely review" or "regularly revise" estimates of the profitability of LTSAs based on customer utilization data and the like, but rather "disregarded" that information and/or "manipulated . . . critical inputs" to "create the appearance of profitability."  *Id.* ¶ 376.

"[F]or the reasons identified in ¶ 368" does not cut it under the PSLRA's pleading standards, which require the complaint to "*specify* each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1) (emphasis added).  That is, the Complaint fails to "specify" which of the "foregoing statements" quoted in paragraphs 371 to 375 were false or misleading or which of the several reasons laid out in (the just as lengthy) Paragraph 368 made them false.  *Cf. Kucana v. Holder*,

558 U.S. 233, 243 n.10 (2010) (noting that "specify" means "to name or state explicitly or in

detail" (quoting Webster's New Collegiate Dictionary 1116 (1974)).  As such, Plaintiffs' first

attempt at pleading falsity falls short.  *See, e.g.*, *Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d

438, 453 (S.D.N.Y. 2008) ("[The] use of large block quotes from SEC filings and press releases,

followed by generalized explanations of how the statements were false or misleading[, is] not

sufficient to satisfy the heightened pleading requirements."); *In re ITT Educ. Servs., Inc. Sec. &*

*S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012) ("Plaintiff's bolding and

italicizing does little to satisfy the PSLRA's specificity requirement.").  For the same reason,

Plaintiffs' allegations in paragraphs 377 and 378 of the Complaint fail to state a claim.  *See* FAC

¶ 378 ("The foregoing statement that 'revisions to estimated margin rates resulting from

modifications were reflected as cumulative effect adjustments to earnings in the current period'

was materially false or misleading when made for the reasons described in ¶ 368.").

Plaintiffs' second theory of liability — that GE did not, in fact, "routinely review" or

"regularly revise" estimates of the profitability of LTSAs based on customer utilization data and

the like, but rather "disregarded" that information and/or "manipulated . . . critical inputs" to

"create the appearance of profitability," *id.* ¶ 376 — is stronger, if only because it adequately

specifies the allegedly false and misleading statements and the reasons they were misleading.

Nevertheless, the allegation that Defendants did not "routinely review" or "regularly revise" the

estimates underlying its LTSA projections "to adjust for changes in outlook," but rather

"disregarded" data relating to "customers' utilization of assets and cost trends," is contradicted

by the Complaint, which elsewhere alleges that Defendants monitored "the historical average of

run rates over the prior three years" — *i.e.*, customers' utilization of assets — and incorporated

that average into its LTSA revenue and profit projections.  *Id.* ¶¶ 257-58.  In other words,

Plaintiffs themselves plead facts undermining the claim that GE "disregarded" customer trends that would make the statements in paragraphs 371-75 false.  At bottom, Plaintiffs' preference for a different revenue estimation model does not amount to securities fraud.

Likewise, it is not immediately clear how Defendants' alleged "manipulat[ion of] . . . critical inputs" — more specifically, their (1) use of various LTSA renegotiation techniques to increase profit margins and (2) sales of LTSA receivables for cash, *see id.* ¶¶ 260-97 — rendered false or misleading their statements that GE "routinely review[ed] estimates" and "regularly revise[d] them to adjust for changes in outlook." *Id.* ¶ 376.  GE's statements and its undisclosed "manipulat[ive]" practices do not appear to be at odds with one another.  What Plaintiffs seem to argue is that, "[a]t a minimum," the statements were *misleading* without an accompanying disclosure that "[GE] Power was experiencing a material downturn" or an "adjust[ment] downward [of] LTSA profitability and revenues."  Pls.' Opp'n 23.  But Plaintiffs provide no concrete explanation of why GE's general overview of LTSA revenue determination would mislead a reasonable investor absent disclosure of broader market trends or a write-down of revenue projections.[23]  Lacking that, Plaintiffs fail to allege that the statements in question are false or misleading, and their claims based on these statements, FAC ¶¶ 370-76, are dismissed.

---

[23]    The cases cited by Plaintiff — *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759 (S.D.N.Y. 2006), and *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH) (AKT), 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) — offer no support either.  *See* Pls.' Opp'n 23.  The former actually cuts *against* Plaintiffs, as the court there found that the "plaintiffs fail[ed] to allege sufficient facts" to show that a press release misleadingly omitted that the defendant was experiencing a downturn in revenues.  453 F. Supp. 2d at 769.  The latter involved much more detailed and numerous allegations of fraudulent activity, including that the defendant was violating its own "published revenue recognition policies."  2013 WL 6330665, at *5.

**b.  Statements Related to Cumulative Catch-Up Adjustments and Cash Flow**

Next, Plaintiffs challenge a series of statements relating to GE's use of cumulative catch-up adjustments and its "monetization" of LTSA receivables.  First, at a conference on February 22, 2017, Bornstein gave a detailed explanation of how cumulative catch-up revenue was accounted for under the then-operative accounting rule, ASC 605; described how such revenue would be accounted for differently when the new accounting standard came into effect; and predicted that the change would have a modest effect on GE's earnings per share.  *See* FAC ¶ 383.  Plaintiffs allege that Bornstein's discussion was misleading because he failed to disclose that GE generated billions in cumulative catch-up adjustments "through fraudulent, unsustainable, and unsound business practices."  *Id.* ¶ 384 (citing *id.* ¶¶ 250-97).  Laying aside the lack of specificity about which of the statements in Bornstein's lengthy comments were misleading, Plaintiffs do not explain why his seemingly accurate and somewhat technical explanation of *how* cumulative catch-up accounting worked under ASC 605 (which the Court assumes is the relevant portion, as it is emphasized in bold and italics) would mandate disclosure of the importance of that accounting method to the company.  "The requirement to be complete and accurate . . . does not mean that by revealing one fact one must reveal all others that, too, would be interesting . . . ."  *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) (internal quotation marks and ellipses omitted).  Nor is there a general duty to disclose that one's revenues are "unsustainable."  *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004).  Plaintiffs are closer to the mark when they observe that GE's "reliance on cumulative catch-up . . . accounted for far more" of GE's earnings than was suggested by Bornstein's prediction regarding GE's earnings per share, suggesting that he knew or had reason to know otherwise when he spoke.  FAC ¶ 384; *see also id.* ¶ 311.  But those

allegations fall short of alleging facts that would demonstrate that the prediction — indisputably a statement of opinion — was false or misleading under *Omnicare*.[24]

Additionally, in a conference call to report first quarter results in 2017, Bornstein mentioned a roughly $300 million year-over-year increase in "contract updates." *Id.* ¶ 387. "[M]ost of that," he continued, "is associated with updates of part costs when we change standards every year.  So for the contracts that were under review in the first quarter, if we change the standard on the part cost and deliver against that contract in the future, we did that update." *Id.*  According to Plaintiffs, that statement was false because "in fact the adjustments were due to the undisclosed, unsustainable business practices" described at length in the Complaint, *see id.* ¶¶ 260-97, rather than "updates of part costs."  But while the Complaint does contain some hard numbers documenting GE's reliance on cumulative catch-up revenue, *see, e.g.*, *id.* ¶¶ 286-87, 309, it is devoid of facts plausibly alleging that Bornstein's (somewhat difficult-to-parse) statement that "most" of the growth at issue was attributable to part costs updates was false.  Such a conclusory allegation of falsity does not support a claim of fraud.  *See, e.g.*, *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692-93 & n.80 (S.D.N.Y. 2008).

### c.  Statements Related to GE's Use of "Factoring"

Finally, Plaintiffs argue that GE made several misleading statements that minimized its reliance on "factoring."  In the first statement, in its 2016 Form 10-K filed with the SEC on

---

[24]     Along similar lines, Plaintiffs argue that Bornstein falsely stated that GE "was not pulling future profit forward" on its LTSAs, when in fact "that was exactly what it was doing through its use of cumulative catch-up adjustments."  FAC ¶¶ 385-86.  The parties do not squarely brief whether this statement is false or not.  *See* Pls.' Opp'n 24-25; Defs.' Reply 11; ECF No. 173-2, at 42.  To the Court, it seems to be an accurate description of how cumulative catch-up revenue is accounted for under ASC 605, an apparently distinct phenomenon from "pulling profit forward."  To the extent that Plaintiffs elsewhere allege that GE engaged in business practices that *did* "pull future profit forward," *e.g.*, FAC ¶ 297-98, those allegations are distinct and do not render Bornstein's statements about not pulling future profit forward on its LTSAs false.

February 24, 2017, GE disclosed that, "[*i*]*n order to manage credit exposure*, the Company sells additional current receivables to third parties."  FAC ¶ 379 (emphasis added).  In the second, on a conference call to discuss GE's 2016 year-end results, Bornstein was asked about GE Power's cash flow, and specifically whether there was "any factoring . . . from GE Capital into GE industrial?"  *Id.* ¶ 381.  Bornstein responded that factoring "was actually down $1.6 billion year-to-year between [the] third and fourth quarter . . . .  So there's very good underlying performance here.  It's not just about, it's actually very little to do with GE Capital factoring."  *Id.*  Plaintiffs contend that these statements were false or misleading because (1) GE did not use factoring merely to "manage credit risk," but also to shore up (and mask) substantial liquidity problems; and (2) factoring had a *lot* — not "very little" — to do with generating cash flow in GE's Industrials group.  *Id.* ¶ 380, 382.

With respect to the Form 10-K, Defendants respond that factoring is a "legitimate business decision" and that "GE never stated that [managing credit exposure] was factoring's 'sole' purpose, which is Plaintiffs' mischaracterization."  Defs.' Mem. 26; Defs.' Reply 11.  The former misses the point, while the latter amounts to *ipse dixit* that the statement was not misleading.  To the contrary, a reasonable investor could read the 2016 Form 10-K and conclude that GE factored LTSA receivables *only* to reduce its credit exposure while, in reality, as Plaintiffs plausibly and specifically allege, GE was also factoring to shore up its dwindling cash flow and mask the growing gap between contract assets and actual cash being generated in the Industrials group, including from LTSAs.  *See* FAC ¶¶ 288-97, 380, 498.  By suggesting otherwise, Defendants "omit[ted] to state a material fact necessary" to make the statements "not misleading."  17 C.F.R. § 240.10b-5; *cf., e.g.*, *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) (finding that statements attributing

revenue growth to an "improving macroeconomic situation, product quality and efficient sales and marketing efforts" were misleading by omitting that growth was also due in part to bribes).

For this claim to survive the pending motion, however, the statements must also have been made, as relevant here, with "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence," *Stratte-McClure*, 776 F.3d at 106, which is established by showing that a defendant "knew facts or had access to information suggesting that [its] public statements were not accurate," *ECA*, 553 F.3d at 199.  Here, Plaintiffs allege that management at GE Power and GE Capital directed the efforts to factor LTSA receivables to increase short-term liquidity and that senior members of GE's management, including Bornstein (who signed GE's 2016 Form 10-K, *see* FAC 182 (App'x A)), were aware of the practice before and around the same time as the Form 10-K was issued, *see* FAC ¶¶ 290, 293, 295, 296.  In particular, Bornstein is alleged to have "acknowledged GE's reliance" on factoring and commented that GE was "in . . . deep" with respect to factoring in a meeting just a few months after the 2016 Form 10-K was issued.  *Id.* ¶ 295.  Accordingly, GE "knew facts or had access to information" showing that its 2016 Form 10-K was misleading in this respect. Thus, Defendants' motion to dismiss this claim is denied.  *See SAIC*, 818 F.3d at 95.

By contrast, Plaintiffs' other factoring-related claim must be dismissed.  Even if Plaintiffs adequately plead that Bornstein's statement that GE's cash numbers "actually [had] very little to do with GE Capital factoring," FAC ¶ 381-82, was false or misleading — which the Court need not decide — his simultaneous disclosure of the actual factored dollar amounts in 4Q 2015 and 2016 in the very same statement, FAC ¶ 381, undercuts any inference that he intended to deceive investors or was reckless regarding the risk that they might be misled.  *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 186 & n.62 (concluding that "specific

disclosures" about a company's mortgage exposure "undercut the inference that defendants knew or recklessly disregarded" the risk of misleading investors about their risk management and overall exposure); Defs.' Reply 11.  Accordingly, the Complaint fails to make out a "strong inference" — one "at least as compelling as any opposing inference one could draw from the facts alleged," *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation marks omitted) — of scienter, and that claim must be dismissed.

## D.  Remaining Claims

Remaining are Plaintiffs' "certification" claims and its "control person" claims under Section 20(a) of the Exchange Act.  First, Plaintiffs allege that Immelt, Sherin, and Bornstein falsely certified that they had reviewed GE's internal controls and found them effective. FAC ¶¶ 414-16.  Similarly, Plaintiffs allege that those Defendants made certifications pursuant to Sarbanes-Oxley that falsely stated that GE's financial statements were prepared in accordance with GAAP and in all material respects fairly represented the financial position of the company. FAC ¶ 411-13.  As to internal controls, the Complaint does not "allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why," *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012); *accord, e.g.*, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017), so that claim must be dismissed.  As for the claims about GAAP, for the same reasons that Plaintiffs' standalone GAAP-based claims fail, Plaintiffs either fail to adequately allege that GE violated GAAP, *see* FAC ¶¶ 389-98, or fail to adequately allege that Immelt, Sherin, or Bornstein acted with scienter in certifying that the LTC-related information in GE's financial statements comported with GAAP, *id.* ¶¶ 360-67; *see, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 400 (S.D.N.Y. 2016) ("[Defendant's Sarbanes-Oxley] certifications are not actionable

omissions because plaintiffs fail to adequately plead scienter on [his] part . . . .").  Accordingly, these claims, FAC ¶¶ 411-16, must be and are dismissed.

That leaves Plaintiffs' Section 20(a) control person claims.  "To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted); *see also* 15 U.S.C. § 78t(a).  For all but two of their claims, Plaintiffs have failed to plead a primary violation, and it follows that the corresponding Section 20(a) claims must also be dismissed.  *See, e.g.*, *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *15 (S.D.N.Y. Jan. 18, 2018).  As for Section 20(a) liability with respect to the two primary violation claims that survive (that is, Plaintiffs' claims regarding statements about factoring in GE's 2016 Form 10-K and GE's failure to disclose factoring in its Class Period financial statements), all Defendants muster is a conclusory assertion, on the last page of their brief, that "Plaintiffs have not alleged with particularity that any Defendants culpably participated in the alleged fraud."  Defs.' Mem. 35.  That may well be right.  But given the parties' paltry briefing on what is required to make out a Section 20(a) claim, *see id.*; Pls.' Opp'n 35, an issue that has vexed even district courts graced with better briefing, *see, e.g.*, *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437-39 (S.D.N.Y. 2014) (describing intra-circuit divide on whether a plaintiff must plead "culpable participation"), and Defendants' failure to genuinely put the sufficiency of Plaintiff's Section 20(a) pleading at issue, *see SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, No. 14-CV-2270 (JMF), 2014 WL 6603951, at *1 (S.D.N.Y. Nov. 20, 2014) (declining to address an issue

raised in a "single, conclusory, one-sentence argument"), Defendants' motion to dismiss the surviving Section 20(a) claims is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, except as to (1) Plaintiffs' Section 10(b) and Rule 10b-5 claims concerning (a) factoring in GE's 2016 Form 10-K and (b) GE's failure to disclose factoring in its Class Period financial statements, which survive against GE and Bornstein; and (2) for now, Plaintiffs' Section 20(a) claims against each Individual Defendant.  That leaves the question of whether Plaintiffs should be granted leave to amend the claims that have been dismissed.  Although Plaintiffs already had one opportunity to amend their Complaint following Defendants' motion to dismiss, and were expressly warned that they would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss," ECF No. 175, the Court concludes that leave to amend is warranted given the nature of the Court's rulings and the sheer number of issues addressed.  *See, e.g.*, *ATSI Comm'cns*, 493 F.3d at 108 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."); *see also, e.g.*, *Sanchez v. ASA Coll., Inc.*, No. 14-CV-5006 JMF, 2015 WL 3540836, at *13 (S.D.N.Y. June 5, 2015) (granting leave to amend in spite of the plaintiff's earlier opportunity to amend).  In particular, Plaintiffs may be able to allege additional facts regarding the Individual Defendants' knowledge, or conscious disregard of, GE's actuarial issues (with respect to its LTC portfolio) and the trends and risks it should have disclosed (with respect to its LTSAs) that would permit Plaintiffs to clear the scienter bar, *see, e.g.*, *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199 (JMF), 2017 WL 3278928, at *4 (S.D.N.Y. Aug. 1, 2017), and as to their more threadbare claims, to allege facts that may meet the requirements of Rules 8 and 9(b).

Accordingly, by **September 19, 2019**, the parties shall meet and confer and submit a joint letter, not to exceed four pages, concerning their views on the next steps in this litigation, including whether Plaintiffs plan to file a Fifth Amended Complaint and what an appropriate deadline and motion practice schedule would be in that event; whether a status conference is appropriate or necessary; and, if Plaintiffs do not intend to amend the Fourth Amended Complaint, whether the parties believe the Court should entertain supplemental briefing with respect to Plaintiffs' Section 20(a) claims in light of this Opinion and Order.

The Clerk of Court is directed to terminate ECF No. 172.

SO ORDERED.

Dated:  August 29, 2019
     New York, New York

_____
JESSE M. FURMAN
United States District Judge