# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SJUNDE AP-FONDEN and THE CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JAMIE MILLER, KEITH S. SHERIN, JAN R. HAUSER, and RICHARD A. LAXER,<br><br>Defendants. | Case No. 1:17-cv-8457-JMF<br><br>Hon. Jesse M. Furman<br><br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>TABLE OF CONTENTS</u>

Page

I.   NATURE OF THE ACTION ...........................................................................2
     A.   Defendants Conceal GE's Massive Long-Term Care Insurance Liabilities ...........4
     B.   Defendants Manufacture Illusory Earnings By Manipulating Long-Term Service Agreements ................................................................8
     C.   Defendants' Fraud Unravels .................................................................10

II.  JURISDICTION AND VENUE ....................................................................14

III. PARTIES ...................................................................................................14
     A.   Plaintiffs ............................................................................................14
     B.   Defendants .........................................................................................15
     C.   Relevant Non-Parties ........................................................................17

IV.  COMPANY BACKGROUND .......................................................................20
     A.   GE Capital's Expansion .....................................................................20
     B.   In The Years Following The Credit Crisis, GE Vows To De-Risk GE Capital And To Re-Focus On Its Core Industrials Businesses .............................22
     C.   As Cracks Develop In GE's Plan, Defendants Bury Them Rather Than Disclose Them .................................................................................24

V.   DEFENDANTS' LONG-TERM CARE INSURANCE FRAUD .....................27
     A.   Overview Of Long-Term Care Insurance ...........................................27
     B.   GE Touts Its Exit From The LTC Insurance Market But Continues To Reinsure The Worst Blocks Of That Business ..........................................29
          1.   The Genworth Spin-Off .............................................................29
          2.   GE Sells Insurance Solutions To Swiss Re And Proclaims Its Exit From The Insurance Market But Continues To Hold Significant LTC Exposure .....................................................................34
     C.   Continued Deterioration In The LTC Insurance Market Leads Insurers To Exit The Market, Seek Premium Rate Increases, And Record Massive Reserve Increases .................................................................................35
     D.   As Other Insurers Increase Their LTC Reserves During The Class Period, GE Deliberately Conceals Its LTC Liabilities ......................................38
     E.   After Concealing GE's LTC Liabilities, Defendants Continue Assuring Investors About GE Capital's Reduced Risks ......................................43
     F.   Defendants Mislead Investors Regarding GE's LTC Reserves Throughout The Class Period .................................................................................50

       1.     Defendants Misrepresent The Extent And Adequacy Of GE's LTC Reserves .................................................................................50

       2.     Defendants Lacked A Reasonable Basis For Concluding GE's LTC Reserves Were Adequate .................................................54

            a.     Defendants Knew That All Models Used By ERAC And UFLIC Were Fatally Flawed And Were Not Validated Or Approved By GE Capital's Model Validation Group...................57

            b.     Internal Audits Informed Defendants That Assumptions For Blocks Of LTC Policies Were Stale ...............................................62

            c.     Actuarial Analyses Concluded That Assumptions Used In Periodic Testing Bearing On The Adequacy Of GE's LTC Reserves Were Susceptible To Results-Driven Manipulation .................................................................................63

            d.     Defendants Were Aware Of The Adverse Claims Experiences Of The Direct Writers Of LTC Policies GE Reinsured .................................................................................65

            e.     Defendants Knew GE's LTC Portfolio Contained Over 300,000 Policies With Substantial Risk.........................................66

            f.     Defendants Knew That The LTC Industry Was Deteriorating ..................................................................67

    G.     Defendants Belatedly Reveal The Extent Of GE's LTC Exposure And GE Records A Massive $9 Billion Reserve Charge Along With A Commitment To Increase Capital Contributions By An Additional $15 Billion .................................................................................68

    H.     Additional Allegations Of Scienter.........................................................70

VI.    DEFENDANTS' CONTRACT ASSET, LONG-TERM SERVICE AGREEMENT, AND INDUSTRIAL CFOA FRAUD ....................................76

    A.     Background On GE Power's Operations And LTSAs...........................78

    B.     GE's LTSA Revenues And Corresponding Contract Assets ................79

    C.     GE's Use Of Assumptions To Determine LTSA Revenues And Contract Assets .................................................................................81

    D.     Defendants Ignore Objective Customer And Industry Data To Avoid Recording Negative Cumulative Catch-Up Adjustments ......................83

    E.     GE Power Relies On Undisclosed, Unsustainable Practices To Trigger Positive Cumulative Catch-Up Adjustments And Conceal GE Power's Decline .................................................................................86

1.      Eliminating GE-Provided Services To Increase Short-Term Profits At The Expense Of Long-Term Profits ......................................................90

2.      Extending Payment Terms And Discounts, But Failing To Account For Risk Of Customer Non-Payment.........................................................90

3.      Providing Free Technology Without Recognizing A Corresponding Reduction In LTSA Revenues Or Profitability.........................................91

4.      Intentionally Omitted .................................................................92

5.      Unilaterally Altering Services Under LTSAs ...........................................92

F.      Defendants Use "Factoring" To Bridge The Cash Divide Between GE's Non-Cash Cumulative Catch-Up Adjustments To Revenue And Industrial CFOA ......................................................................................93

G.      With An Accounting Change Looming, Defendants Slowly Reveal GE's Unsustainable Overreliance On Cumulative Catch-Up Revenues.........................97

H.      GE's Post-Class Period Restatement Confirms The Extent To Which Defendants Manipulated Cumulative Catch-Up Adjustments And Their Material Impact On GE's Reported Financial Statements During The Class Period ............................................................................101

I.      Additional Allegations Of Scienter......................................................104

VII.    DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ...................................................108

A.      Statements Regarding GE's "Insurance Liabilities" (i.e., Disclosed Insurance Liabilities) And "Contractual Obligations".........................................108

1.      Statements Regarding GE's Insurance Liabilities Were Materially Misleading.......................................................................108

2.      Statements Regarding GE's Disclosed Insurance Liabilities Violated Item 303(a)(5) By Excluding LTC Liabilities ..........................109

B.      Statements Regarding GE Capital's Insurance Exposures And Risks.................111

1.      Statements Regarding GE Capital's Run-Off Insurance Exposure ........111

2.      Statements Regarding Defendants' Purported Reduction Of GE Capital's Risks ...................................................................115

C.      Statements Regarding GE's Insurance Reserves In Its Financial Statements Were Materially False Or Misleading, Violated GAAP, and Lacked Any Reasonable Basis In Fact.................................................116

1.      GE's Reported "Life Insurance Benefits" Were Materially Misleading.......................................................................118

2.     GE's Reported Reserves Were Materially False Or Misleading Because They Were Not Based On A Meaningful Inquiry Nor Had Any Reasonable Basis In Fact ................................................................. 118

D.     GE Violated GAAP By Failing To Disclose Material Contingencies Related To Its LTC Exposure ................................................................. 119

E.     GE Violated GAAP By Failing To Disclose Uncertainties Relating To Its Calculation Of LTC Exposure ................................................................. 120

F.     GE Violated GAAP By Failing To Disclose Information Regarding The Basis For Its Class Period LTC Reserve Estimates ................................ 121

G.     Statements Regarding GE's Contract Assets, LTSAs, And Industrial CFOA ................................................................................................. 122

1.     Metrics Relating To Revenues And Values Of GE's Contract Assets ................................................................................................. 122

2.     Statements Concerning The Manner In Which GE's Contract Assets Were Determined ................................................................ 123

3.     Statements Concerning New Accounting Standards .............................. 126

4.     Statements Regarding Factoring ................................................................ 127

5.     February 22, 2017:  Barclays Industrial Select Conference .................... 129

6.     First Quarter 2017 ................................................................................. 130

H.     GE's Accounting For Its Contract Assets And Cumulative Catch-Up Adjustments Violated GAAP ................................................................ 131

I.     GE Violated Item 303(a)(1)-(3) By Failing To Disclose Known Trends, Demands, Commitments, And Uncertainties ............................................ 133

1.     Omissions Concerning GE's LTC Liabilities ........................................ 135

2.     Omissions Concerning GE's Contract Assets, LTSAs, And Industrial CFOA ................................................................................. 137

J.     SOX Certifications And Representations Regarding GE's Compliance With GAAP ................................................................................................. 138

K.     Statements Regarding GE's Internal Controls Over Financial Reporting .......... 139

L.     Omissions Regarding The Critical Accounting Estimates Defendants Used To Calculate Its LTC Reserves ................................................................ 139

VIII.     LOSS CAUSATION/ECONOMIC LOSS ................................................................ 141

A.     April 21, 2017: Financial Results For 1Q 2017 .................................... 143

B.     July 21, 2017: Financial Results For 2Q 2017 .................................... 145

| | | |
|---|---|---|
| C. | October 20, 2017: Financial Results for 3Q 2017 ................................. | 146 |
| D. | November 13-14, 2017: Investor Update And Goldman Sachs Conference ....... | 151 |
| E. | January 16, 2018: GE's "Insurance Update" ........................................ | 155 |
| F. | January 24, 2018: Disclosure Of Fourth Quarter 2017 Financial Results And SEC Investigations Into GE's LTC Reserves And Revenue Recognition Practices Related To LTSAs ............................................ | 160 |
| IX. | ADDITIONAL POST-CLASS PERIOD EVENTS ....................................... | 163 |
| A. | Investors Express Shock Over GE's LTC Reserve Charge And Identify A "Credibility Gap" With Management ................................................. | 163 |
| B. | GE Files Its 2017 10-K ................................................................ | 165 |
| X. | PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE .................. | 171 |
| XI. | THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE .................................................................... | 172 |
| XII. | CLASS ACTION ALLEGATIONS ....................................................... | 173 |
| XIII. | CAUSES OF ACTION ................................................................... | 175 |
| XIV. | PRAYER FOR RELIEF .................................................................. | 179 |
| XV. | JURY TRIAL DEMANDED .............................................................. | 179 |

Court-appointed Lead Plaintiff Sjunde-AP Fonden ("Lead Plaintiff" or "AP7"), along with additional plaintiff The Cleveland Bakers and Teamsters Pension Fund ("Cleveland Bakers") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action on behalf of themselves and a class ("Class") consisting of all persons and entities that purchased or otherwise acquired the common stock of General Electric Company ("GE" or the "Company") from February 27, 2013, through January 23, 2018, inclusive (the "Class Period"). Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants GE, Jeffrey R. Immelt ("Immelt"), Jeffrey S. Bornstein ("Bornstein"), Jamie S. Miller ("Miller"), Keith S. Sherin ("Sherin"), Jan R. Hauser ("Hauser"), and Richard A. Laxer ("Laxer") (collectively, "Defendants"). Defendants Immelt, Bornstein, Miller, Sherin, Hauser, and Laxer are collectively referred to as the "Individual Defendants."

As set forth herein, Plaintiffs and members of the Class purchased GE common stock at artificially inflated prices created and/or maintained by Defendants' materially false or misleading statements and omissions throughout the Class Period. When the truth concerning the Company was belatedly revealed to the market, Plaintiffs and Class members suffered massive monetary damages. Except as to allegations specifically pertaining to Plaintiffs, all allegations herein are based upon the investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, the review and analysis of: (i) public filings made by GE with the SEC[1]; (ii) press releases and other public statements issued by Defendants; (iii) research reports purchased from securities and

---

[1] For the Court's convenience, attached as Appendix A is a chart listing Defendant GE's SEC filings that are referenced herein.

financial analysts; (iv) media and news reports related to GE; (v) transcripts of GE's earnings and other investor conference calls; (vi) publicly available presentations, press releases, and interviews by GE and its employees; (vii) economic analyses of the movement and pricing of GE publicly traded common stock; (viii) consultations with relevant consultants and experts; (ix) media reports and other publicly available information concerning Defendants; and (x) interviews of former employees ("FE") of GE, several of whom, on information and belief, are known to GE and have been provided counsel by GE. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.     On June 12, 2017, GE announced that John Flannery ("Flannery") would succeed Immelt as GE's Chief Executive Officer ("CEO") beginning on August 1, 2017. What followed Flannery's succession was a dismantling and unraveling of a multi-year scheme of fraud and deception that Immelt and his senior management team, including his Chief Financial Officer ("CFO"), Bornstein, had used to prop up GE's reported financial results for more than a decade.

2.     Flannery's dismantling of GE's fraud included revealing billions of dollars of previously-concealed liabilities in GE's insurance business, erasing several billions of dollars more of illusory and artificially boosted profits in GE's Industrials business, slashing GE's dividend in half, and acknowledging the weakness of GE's core businesses that Immelt had concealed for years. As the truth about GE's financial condition has been revealed, the Company's stock has shed over $100 billion of market capitalization and has been eliminated from the Dow Jones Industrial Average ("DJIA") index, a position it occupied for over a century, the SEC has launched two investigations, and GE has forced the resignation of numerous culpable senior executives.

3.     GE is a New York Stock Exchange ("NYSE") traded, multinational industrial conglomerate, whose roots extend to Thomas Edison and the beginning of electrical energy

production in the United States.  In its over one-hundred years as a public company, GE was a blue chip member of the DJIA index, until it was recently replaced given the plummet in its market capitalization due to the fraud.

4.      GE Power (or "Power"), GE's largest Industrials segment, provides products and services related to energy production to customers worldwide.  GE's financial arm, GE Capital, was at one time, one of the world's largest financing operations engaged in, among other things, financing activities in commercial and residential real estate, auto loans, structured financial products, and insurance.  Although at times contributing more than half of GE's earnings for much of the two decades before the Class Period, GE Capital was crippled by the 2008 financial crisis in part because of its aggressive expansion into subprime, auto, and other credit instruments.  With regulatory scrutiny into its GE Capital business, GE began to unwind its financial businesses and wind down GE Capital.

5.      Throughout its history, GE has been particularly revered as a company that pays investors a meaningful and consistent quarterly dividend.  GE's retail investors, including countless retirees, have relied upon the Company's stock dividend as a significant source of income, considering it "sacrosanct."  Prior to the most recent dividend cut in late 2017, GE had only cut its dividend once since the Great Depression.  That cut came on Immelt's watch in the midst of the subprime mortgage crisis in 2008, when GE cut its dividend by more than half.  Immelt resolved that it would never happen again.  Indeed, he would later tell investors during a July 21, 2017 earnings call:

> [E]verybody here [at GE] prioritizes the dividend at a very high level.  And I just don't want anybody to ever be confused about that . . . .

> *I was here the day we cut the dividend [in 2008]. It was the worst day of my tenure as CEO. And the **dividend is** really, I think, **incredibly important for our investors** . . . .* [2]

6. Following the mortgage crisis in 2008, GE's dividend yield increased from approximately 2.49% to 4.75% towards the end of 2017. To generate cash flow to pay the dividend, GE relied principally upon dividends that were "upstreamed" from GE Capital to GE, and cash from GE's industrial operations, most significantly GE Power. In an era of historically low interest rates, GE's substantial dividend yield was a highly attractive source of income for GE investors, more than 40% of whom are small "retail" investors and retirees who chose GE stock for its consistent and reliable dividend payments. What investors did not know, however, was that GE's ability to pay those dividends depended upon unsustainable fraudulent practices designed to prop up GE's reported financial position in the short term, while imperiling GE's long-term fate.

### A. Defendants Conceal GE's Massive Long-Term Care Insurance Liabilities

7. Notwithstanding the sale of most of GE Capital's non-core assets from 2013 through 2015, GE Capital still sat on an undisclosed ticking time bomb that seriously threatened GE's long term health. In the 1990s and early 2000s, GE Capital expanded into writing and reinsuring long-term care ("LTC") insurance policies, amassing approximately 20% of the total market by 2001. LTC insurance policies cover end-of-life care in, for example, nursing homes and assisted living facilities. By the early 2000s, however, LTC insurers began to understand that the pricing assumptions utilized in writing decades of policies were severely mistaken. As a result, LTC insurers faced mounting unforeseen liabilities, and many insurers ceased writing new policies altogether, determining that the LTC business was not profitable.

---

[2] All emphasis is added and all original emphasis is omitted unless otherwise noted.

8.     In 2004, GE purportedly spun off the majority of GE Capital's LTC insurance book to a new public company called Genworth Financial, Inc. ("Genworth").  By 2006, GE Capital had stopped writing new LTC insurance policies, and GE sold the vast majority of GE Capital's remaining insurance operations to Swiss Reinsurance Company Ltd. ("Swiss Re").  Investors were unaware that what GE had retained following these transactions was approximately 300,000 of the worst, high-risk LTC insurance contracts, or over 4% of the total toxic LTC market.

9.     Despite this exposure, between 2006 and the start of the Class Period, GE downplayed its insurance business in its statements to investors, characterizing the business as a "run-off" operation.  GE included its future expected yearly LTC liabilities in each of its 10-Ks as part of an entry titled "Insurance liabilities," set forth in a table of the Management, Discussion & Analysis section titled "Contractual Obligations" (GE's "Disclosed Insurance Liabilities").  The table did not identify what specific portion of GE's Disclosed Insurance Liabilities was attributable solely to LTC.  Instead, GE grouped its LTC liabilities together with its liabilities under, among other things, guaranteed investment contracts, structured settlements, annuities, and life insurance policies.

10.    By the start of the Class Period, having promised to shrink GE Capital and focus the Company's capital efforts on Industrials, Defendants ramped up their efforts to conceal GE Capital's toxic LTC obligations from the market in a three-pronged scheme.

11.    *First*, on February 26, 2013, the day before the Class Period begins, Defendants altered their prior disclosure practices and removed GE's LTC liabilities from the Disclosed Insurance Liabilities in GE's Form 10-K for fiscal year 2012 ("2012 10-K") **without any explanation**, in violation of Generally Accepted Accounting Principles ("GAAP"), as well as various SEC regulations described herein.  For each 10-K that followed during the Class Period,

Defendants continued to exclude LTC liabilities from GE's Disclosed Insurance Liabilities. Thus, Defendants not only continued to shield the specific expected magnitude of GE's LTC liabilities from investors, but investors were now denied any ability to properly assess the Company's cash flow obligations going forward.

12.     Moreover, by removing expected LTC liabilities completely from the Disclosed Insurance Liabilities, Defendants sent the message to investors that GE's LTC-related obligations were immaterial. Indeed, throughout the rest of the Class Period, Defendants failed to disclose any contractual liabilities for LTC, nor did they provide any other meaningful information concerning the nature or extent of GE Capital's LTC exposure. Instead, beginning on February 26, 2013 and continuing through the end of the Class Period, GE's Disclosed Insurance Liabilities decreased year-over-year, further suggesting that LTC obligations had been rendered immaterial and that GE was winding down its remaining insurance exposures.

13.     In addition, prior to excluding LTC payment obligations, GE's Disclosed Insurance Liabilities entry consistently exceeded the Company's reported insurance reserves. Beginning on February 26, 2013, however, the reserves suddenly exceeded the Disclosed Insurance Liabilities each and every year through the end of the Class Period, suggesting to the market that GE was in complete control of its future payment obligations.

14.     *Second*, Defendants continued to represent to the market throughout the Class Period that GE Capital had successfully exited the insurance business, insulating GE from the deteriorating industry. For example, on May 31, 2013, Mike Neal ("Neal"), then Chairman and CEO of GE Capital, told the market, "we have made [GE Capital] smaller. We have made it safer." On December 16, 2014, Defendants described GE's "sell[ing] insurance before the storm" as a "risk reduction" measure. Immelt added, "we exited insurance in time." On April 10, 2015, Sherin

stated, "we have done a lot over the last six years to shrink GE Capital while also making it much safer." Later, on June 1, 2016, Sherin boasted, "all of the insurance business is gone. That was a huge change in the portfolio." Again, Defendants made all of these statements despite knowing that GE Capital still was liable for over 4% of all of the existing policies in the toxic LTC market.

15.     *Third*, Defendants further concealed GE's true LTC exposure by refusing to quantify reserves directly attributable to LTC policies in GE's financial statements. Defendants grouped some non-discernable amount for LTC reserves in line items titled "Life insurance benefits" and "Other." Not until the fall of 2017 did investors learn ***any*** information concerning the massive portion of the mislabeled "Life insurance benefits" that were actually reserves attributable to LTC exposure. Further, even if Defendants had disclosed the quantity of the LTC reserves, the market would have been unable to fully assess the adequacy of such reserves because, as set forth above and herein, Defendants stopped disclosing GE's LTC obligations as part of its Disclosed Insurance Liabilities.

16.     Making matters worse, throughout the Class Period, Defendants knew or recklessly disregarded warning signs that GE had internally under-reserved for its LTC obligations, in violation of GAAP, statutory insurance, and SEC regulations. For example, Defendants ignored internal warnings from employees that the Company's assumptions were stale by several years and otherwise inaccurate, and ignored the results of internal audits that identified systemic failures with respect to testing bearing upon the adequacy of LTC reserves. Likewise, Defendants refused to increase GE's LTC reserves despite having access to information demonstrating the Company had flawed loss recognition testing, and lacked supporting details and explanations for reserve testing.

17. Thus, throughout the Class Period, in violation of GAAP, SEC regulations, and the federal securities laws, Defendants intentionally concealed the Company's mammoth LTC liabilities and refused to properly account for such liabilities through adequate reserves. When it came to GE's LTC exposure, Defendants deliberately left investors completely in the dark.

**B.     Defendants Manufacture Illusory Earnings By Manipulating Long-Term Service Agreements**

18. At the same time that Defendants were hiding a massive hole in GE's balance sheet caused by GE's insurance liabilities, they were also propping up GE's Power business—the "core" of GE's Industrials business—through a fraudulent revenue recognition scheme.

19. GE Power is the largest segment within the Industrials arm of the Company's business. GE Power builds and sells industrial products like power plants, turbines, and generators, and then services many of those products for customers through long-term service agreements ("LTSAs") that span between 5 and 25 years. As the Company sought to shrink GE Capital prior to and during the Class Period, GE invested heavily in GE Power and its other industrial businesses.

20. During the Class Period, however, Power's businesses were suffering as a result of, among other things, declining margins on its equipment sales, increased reliance on renewable energy sources, and lower customer utilization rates. Yet, through 2016, GE Power reported impressive results and appeared impervious to these negative market forces.

21. To mask the troubles in GE's Industrials business, Defendants used a widespread accounting fraud to prop up its results of operations. In particular, Defendants manipulated the value of GE's "Contract Assets"—a balance sheet entry that quantified expected profits for work specified under LTSAs for which GE had not yet been paid—in order to generate non-cash revenue

and meet earnings targets.  GE's Contract Assets ballooned from $9.4 billion in 2012 to $28.8 billion in 2017.  By 2016 and 2017, more than 50% was comprised of expected LTSA earnings.

22.     As numerous former employees have revealed, and as GE has now essentially conceded in its post-Class Period disclosures, the vast majority of these purported LTSA earnings were wholly manufactured through accounting gimmickry.  Specifically, although claiming in its Class Period disclosures that it relied on actual utilization rates of its services and other market assumptions to estimate the profitability of its LTSAs, GE ignored its actual experience with industrial customers and avoided writing down the value of its Contract Assets.  Additionally, GE actively sought to negotiate revised LTSA terms with its customers—on terms less favorable to GE overall—to eliminate lower-margin services from existing LTSAs and then used the revised assumptions to generate immediate revenues, known as cumulative catch-up adjustments.  Teams of personnel within GE's Industrials business were exclusively dedicated to identifying LTSAs where such manipulations could generate these fake earnings.

23.     Throughout the Class Period, GE Power increasingly relied upon cumulative catch-up revenues to meet its earnings targets.  And, as would be later revealed after the end of the Class Period, GE abused cumulative catch-up adjustments to prop up its earnings by an astounding *13%* in 2016 and *44%* in 2017.

24.     GE Power's reliance on cumulative catch-up adjustments to generate the appearance of profitability created a growing cash flow problem.  This is because GE had little hope of turning the earnings generated from its accounting adjustments into actual cash because the assumptions used to generate those earnings were simply false.  Thus, while GE's earnings swelled because of increased Contract Assets, its cash flows stalled, thereby exposing a massive chasm between GE's earnings and cash flows towards the end of the Class Period.

25.     Compounding GE's problem was that new accounting rules proposed in 2014 would eliminate GE's ability to use cumulative catch-up adjustments to boost its Contract Assets. As the rule change loomed, GE was compelled to increase its transparency over its Contract Assets, beginning in 2017.

26.     As investors began to perceive the increasing gulf between GE Power's reported revenues and its Industrial Cash Flow from Operating Activities ("CFOA"), which is a measurement of cash actually received for goods and services provided, GE Power turned to another accounting mechanism to extend the life of its scheme. Specifically, GE Power began "factoring" its LTSA receivables, or selling them to GE Capital for immediate cash. In the short term, factoring mitigated GE Power's cash flow problem by transforming GE Capital's cash-on-hand into Industrial CFOA. But over the longer term, there were simply not enough LTSA receivables for GE Power to factor in order to maintain this charade. As a result, Industrial CFOA cratered and the scheme collapsed.

### C.     Defendants' Fraud Unravels

27.     Defendants' frauds began to unravel in early-2017, and through a series of disclosures between April 21, 2017 and January 24, 2018, GE blindsided investors by revealing massive CFOA declines, billions of dollars in unexpected LTC exposures and reserve charges, multiple SEC investigations, and a devastating 50% dividend cut.

28.     On April 21, 2017, the Company shocked investors when it reported Industrial CFOA of "*negative* $1.6 billion," which was $1 billion less than projected, due in large part to $1.9 billion in cash outflows on GE's Contract Assets and, in particular, $1.4 billion in negative cash flows related to its LTSAs. These revelations regarding GE's inability to generate Industrial CFOA due to its LTSA Contract Assets led to a 2.4% stock price decline, with analysts recognizing

that "investors reacted to negative industrial cash flow" and, more specifically, "the contract asset headwind."

29.     When GE disclosed its second quarter 2017 earnings results on July 21, 2017, it revealed further cash flow shortfalls, disclosing to investors that it was now "trending to the bottom end" of its Industrial CFOA guidance.  In addition, GE revealed that due to "adverse claims experience in a portion of our long-term care portfolio," GE would be conducting a thorough examination into "the adequacy of our premium reserves," and committed to updating investors in the fourth quarter of 2017.  GE's stock price fell by 5% in response to this news, as analysts responded negatively to GE's CFOA and LTC disclosures and recognized the risk that such issues posed to GE's beloved dividend.

30.     On October 6, 2017, GE announced the sudden departures of numerous high-level executives, including Immelt, who was slated to continue as a director on GE's Board of Directors ("Board") until the end of 2017, Bornstein, who was supposed to continue on as CFO after Immelt's retirement, and Laxer, GE Capital's CEO, together with other lieutenants of Immelt.

31.     When Flannery convened his first earnings conference call as GE's new CEO on October 20, 2017, he delivered shocking news to GE's investors. First, because of severe cash flow issues, GE would be slashing its cash flow guidance in half, to $7 billion from the $12 to $14 billion that Immelt and Bornstein had emphatically confirmed just a few months earlier. Moreover, GE revealing that, due to its ongoing in-depth LTC insurance review, GE Capital would not be paying $3 billion in upstream dividends to GE.  Analysts expressed shock regarding GE's LTC disclosures "considering GE supposedly exited [its LTC] businesses" years ago.  Analysts also expressed fear that these disclosures could lead to a dividend cut.  GE's stock price plummeted nearly 10% in response to this news.

32.     Investors' fears became reality on November 13, 2017.  With GE Capital and GE Power both ailing, GE announced that it was slashing its quarterly dividend in half, only the second time since the Great Depression the Company would not pay its expected dividend.  The dividend cut, on a yearly basis, would cost investors $4.1 billion.  According to S&P Global data, GE's dividend cut qualified as the largest dividend cut in history by a U.S. company outside of a financial crisis, and the eighth largest dividend cut of all time.  Further, going forward, GE announced that GE Capital would not be able to contribute to the Company's ability to make dividend payments for the "foreseeable future," casting a pall over GE's continued ability to pay what had been widely considered by the market as an untouchable dividend.

33.     On January 16, 2018, GE disclosed the bombshell results of Flannery's "deep dive" into its LTC insurance exposures, revealing that it was increasing its LTC "future policy benefit reserves by *$8.9 billion*," resulting in "a $6.2 billion charge ($7.5 billion upon re-measurement under tax reform) on an after-tax GAAP basis to GE's earnings in the fourth quarter of 2017."  In addition to this reserve charge, GE disclosed that "GE Capital will need to contribute approximately *$15 billion* of capital to [its insurance subsidiaries] over the next seven years."  Investors drove GE's stock price down by more than 13% in response to this news, as analysts roundly recognized that GE's reserve charge "was *far more severe* than the market had been anticipating."

34.     Finally, on January 24, 2018, in announcing the Company's fourth quarter 2017 earnings results, GE disclosed that it had "been notified by the SEC that they are investigating the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge *as well as* GE's revenue recognition and controls for its long-term service agreements."  GE's stock price "tumbled" by more than 4% in response to this news, as analysts recognized that financial results

reported by the Company "were quickly made irrelevant when management unexpectedly disclosed" the SEC investigations to investors.

35.     Post-Class Period events have shone further light on Defendants' Class Period deceptions.  On February 24, 2018, GE filed its 10-K for fiscal year 2017 ("2017 10-K"), which, among other things, reverted to the Company's pre-Class Period practice of ***including*** GE's LTC liabilities in its Disclosed Insurance Liabilities.  The inclusion of LTC liabilities caused its Disclosed Insurance Liabilities to skyrocket from $11.1 billion in 2016 to ***$38 billion*** in 2017.  In addition, while GE had previously disclosed that it had used receivables factoring as a means of managing its credit risk, it reported in the 2017 10-K that it also factored receivables to "manage short term liquidity"—i.e., in an effort to mitigate the cash flow issues that had been caused by its reliance on non-cash cumulative catch-up revenues.

36.     Further, on April 13, 2018, GE "la[id] bare the truth of the actual economics" of its LTSAs when, under the guise of a change in accounting standards, GE reported revised financial statements for fiscal years 2016 and 2017 and quantified its prior reliance on cumulative catch-up adjustments.  Notably, the Company wrote down the value of its LTSA Contract Assets by a staggering ***$8.7 billion***, revised its 2017 Industrials profits downward by 17%, and disclosed that cumulative catch-up revenues inflated GE's reported earnings-per-share ("EPS") by 13% and 25% in 2016 and 2017, respectively.  In stark contrast to GE's increasing reliance on cumulative catch-up adjustments to boost its revenues, its competitors—including Boeing, Lockheed Martin, and United Technologies—have reported minimal, if any, reliance on the practice.

37.     As set forth in great detail herein, Defendants' admissions, the Company's SEC filings, GAAP and SEC regulations, and statements from former employees all demonstrate that

Defendants knew or recklessly disregarded the problems at GE Capital and GE Power throughout the Class Period, yet continuously misled GE's investors.

38.     This action seeks to recover the massive monetary damages that GE's investors have suffered on account of Defendants' fraud.

## II.     JURISDICTION AND VENUE

39.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

40.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of Defendants' actions, and the subsequent damages, took place within this District.  Further, GE's common stock trades on the NYSE, located within this District.

41.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiffs

42.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with approximately $56 billion in assets under management as of

July 22, 2018.  As set forth in the certification attached hereto as Exhibit A, AP7 purchased or otherwise acquired GE common stock during the Class Period and was damaged thereby.

43.     Plaintiff Cleveland Bakers is a Taft-Hartley pension fund.  Members participate in the fund based upon a collective bargaining agreement between their employer and either Bakers' Union Local No. 19 or Teamsters Local Union No. 507.  As set forth in the attached Exhibit B, Cleveland Bakers purchased or otherwise acquired GE common stock during the Class Period and was damaged thereby.

**B.     Defendants**

44.     Defendant GE is incorporated in the State of New York and maintains its corporate headquarters in Boston, Massachusetts.  GE holds itself out as a global digital industrial company with products and services ranging from aircraft engines, power generation, and oil and gas production equipment to medical imaging, financing, and industrial products.

45.     Defendant Immelt served as the Chairman of GE's Board from September 7, 2001 to October 2, 2017, when he was replaced by Flannery.  Flannery assumed this position three months ahead of schedule because Immelt "resigned" earlier than expected.  Immelt also served as GE's CEO from September 2001 through July 31, 2017, and was a member of GE Capital's Board from 1998 through 2015.  Immelt's total estimated compensation during the Class Period was $119.5 million, with his annual compensation totaling approximately $19.8 million in 2013, $37.3 million in 2014, $33.0 million in 2015, $21.3 million in 2016, and $8.1 million in 2017. Immelt was a direct and substantial participant in the fraud, including through his making of the false or misleading statements and omissions alleged herein and participation in the conference and earnings calls described herein until his departure.

46.     Defendant Bornstein was appointed Senior Vice President and CFO of GE, effective July 1, 2013, replacing Sherin, and served in that role until October 31, 2017.  Bornstein

also served as a member of GE Capital's Board from 2006 through 2015.  In connection with replacing Immelt with Flannery as GE's new Chairman and CEO, GE's Board also appointed Bornstein as Vice Chairman of GE, effective June 12, 2017.  But shortly thereafter, on October 10, 2017, GE announced that Bornstein's term as Vice Chairman would abruptly conclude at the end of the year.  Bornstein's total estimated compensation during the Class Period was $46.7 million, with his annual compensation totaling approximately $7.2 million in 2013, $16.3 million in 2014, $13.3 million in 2015, and $9.9 million in 2016.  Bornstein was a direct and substantial participant in the fraud, including through his making of the false or misleading statements and omissions alleged herein and participation in the conferences and earnings calls described herein until his sudden, early-departure on October 31, 2017.

47.     Defendant Miller has served as GE's CFO since November 1, 2017.  Miller joined GE in 2008 as Vice President, Controller, and Chief Accounting Officer ("CAO").  She became GE's Senior Vice President and Chief Information Officer in 2013, and became President and CEO of GE Transportation in 2015.  In 2017, Miller's compensation totaled approximately $5.1 million.  Miller was a direct and substantial participant in the fraud, including through her making of the false or misleading statements and omissions alleged herein in GE's 2012 10-K (by signing the report in her capacity as GE's Principal Accounting Officer).

48.     Defendant Sherin served as CFO of GE from 1999 until July 2013, when he became GE Capital's Chairman and CEO.  Sherin held both positions until he resigned, effective September 1, 2016.  Sherin also served as Vice Chairman of GE from 2007 until December 31, 2016.  During the Class Period, Sherin's total estimated compensation was $92.6 million, with his annual compensation totaling approximately $11.5 million in 2013, $24.7 million in 2014, $26 million in 2015, and $30.4 million in 2016, the year he departed GE.  Sherin was a direct and

substantial participant in the fraud until he left GE in September 2016, including through his making of the false or misleading statements and omissions alleged herein in GE's 2012 10-K and 10-Q for the three months ended March 31, 2013 (the "1Q13 10-Q") (by signing the report in his capacity as Vice Chairman and CFO, and as the Company's Principal Financial Officer) and participation in the conferences and earnings calls described herein, until he resigned from GE and GE Capital, effective September 1, 2016.

49.     Defendant Hauser joined GE as Vice President-Controller and CAO, effective April 15, 2013, and remained in that role throughout the Class Period. Hauser was a direct and substantial participant in the fraud, including through her making of the false or misleading statements and omissions alleged herein in GE's quarterly and annual reports to the SEC on Forms 10-Q and 10-K during the Class Period (by signing the reports in her capacity as GE's Principal Accounting Officer).

50.     Defendant Laxer was the President and CEO of GE Capital from September 2016 until his retirement from GE, which was announced in December 2017 and became effective on March 31, 2018. Between 2009 and September 2016, Laxer held a number of senior roles within GE Capital, and was the CEO of GE Capital International prior to becoming the President and CEO of GE Capital. Laxer was a direct and substantial participant in the fraud, including through his making of false or misleading statements and omissions through his participation in the conference calls and earnings calls described herein.

C.     **Relevant Non-Parties**[3]

51.     FE-1 worked at GE as an Actuarial Controller at Employers Reassurance Corporation ("ERAC"), a wholly owned indirect subsidiary of GE Capital, from July 2015 to

---

[3] All former employees are defined using masculine pronouns to protect their anonymity.

September 2016.  ERAC comprised the insurance and reinsurance operations of GE following the spin-off of its insurance business to Genworth in 2004 (described in further detail below).  FE-1 worked out of the Overland Park, Kansas office and reported to Clark Ramsey ("Ramsey"), Vice President and Chief Actuary at ERAC.  FE-1's primary responsibility was governance over experience studies, assumption setting, asset adequacy modeling, and loss recognition modeling.

52.    FE-2 worked in various roles at GE, including as an A & H Valuation Actuary (Senior Actuary) at ERAC from 2006 to 2012, a Senior Insurance Audit Specialist & SME at GE Capital Audit from 2012 to 2014, and a Senior Vice President, Insurances & SME at GE Capital Audit from 2014 through the end of his tenure (January 1, 2017).  The SME designation refers to being the Designated Insurances' Subject Matter Expert.  GE Capital Audit refers to the Internal Audit department of GE Capital.  From 2012 onward, FE-2 reported ultimately to the Chief Audit Executive as part of GE Capital Audit—a position held by Christina Selby and, later, by Joseph Pizzuto ("Pizzuto").  FE-2's direct supervisor during the latter part of his tenure was Kevin McCord, the current director of Internal Audit for GE Capital's portfolio of insurance companies. McCord also reported ultimately to Pizzuto.

53.    FE-3 worked at GE from August 2013 through the end of 2016 in the Financial Planning and Analysis ("FP&A") Unit.  In this role, FE-3 was involved in financial planning and analysis and was tasked with reviewing Sarbanes-Oxley Act of 2002 ("SOX") compliance in the area of analytics controls.  Specifically, he reviewed the SOX models for GE Capital, including for the legacy insurance business.  His role was to improve documentation, controls, and the effectiveness of the controls.

54.    FE-4 worked in various roles at GE and, thereafter, Genworth, for years before the Class Period through mid-2016, including as a FP&A Analyst for GE Capital during the Genworth initial public offering ("IPO"), and as Director for Genworth Long-Term Care Insurance into 2013.

55.    FE-5 worked in various roles at GE, including as a Commercial Manager in GE Power Services from 2010 through the end of 2013, and was based in Milan, Italy.  In this role, FE-5 had responsibilities with respect to thermal power generation plants (i.e., gas and steam turbines and generators, for example) and related LTSAs.

56.    Intentionally omitted.[4]

57.    FE-7 worked in various roles at GE, including as a Risk Finance Leader at GE Power Services in Europe from early 2015 through early 2018.  FE-7 reported to the Finance Manager for GE Power Europe, who reported to the CFO of GE Power Europe, who then reported to the CFO of Power Generation Services, Tim Donovan ("Donovan").[5]

58.    FE-8 worked in various roles at GE, including in sales as a Product Development Manager from the summer of 2016 through April 2017.  In this role, FE-8 was involved in LTSA contract negotiations.

59.    FE-9 worked in both the Power and Renewable Energy Divisions of GE from 2004 through August 2017.  FE-9 was stationed in Schenectady, New York.  During his tenure with GE Power, FE-9 worked on the Enterprise Risk Team, which was tasked with identifying and examining GE's risk exposure.  As a member of the Enterprise Risk Team, FE-9 worked with the risk teams in GE Power to evaluate risks associated with renegotiated LTSAs.

---

[4] FE-6 has been removed from the Complaint at his request.

[5] Plaintiffs understand that FE-7 served as a consultant for prior counsel with respect to the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 83).  Plaintiffs' undersigned counsel has not retained FE-7 in any capacity, but has verified the information provided to prior counsel.

60.     FE-10 worked in various roles at GE from the early 2000s through January of 2014, including in Operations and Maintenance and as a Contract Fulfillment Manager within GE Power. In this role, FE-10 was involved with GE Power's LTSAs, and was involved in the use of GE's internal modeling tool, COSMOS, to forecast operations and earnings information on those LTSAs.

## IV.     COMPANY BACKGROUND

61.     Founded in 1892 as an electrical generation and manufacturing company, GE has grown over the last century to be one the world's largest multi-national conglomerates with business lines organized around various segments, including, among others, energy generation, transportation, financial services, and medical technology.

62.     Relevant to this Action are two of GE's largest and most important business segments, which historically have been principal drivers of its revenue: (i) GE Capital, once a wholly-owned subsidiary and now a division of GE that operates GE's financial services businesses; and (ii) GE Power, the largest segment of GE's Industrials businesses, which builds industrial products including power plants, turbines, and generators, and provides, among other things, services on such products through various contractual agreements.

### A.     GE Capital's Expansion

63.     Added in 1896, GE was one of the original twelve members of the DJIA index, and a continuous member for over 110 years (since 1907), until it was removed from the index on June 26, 2018.  Over time, GE's common stock became a darling of investors due to its substantial and reliable dividend.  Prior to and throughout the Class Period, Defendants, analysts, and investors recognized the importance of GE's consistent dividends to its investors and to the market value of GE's securities.  Indeed, during the Class Period, Immelt candidly acknowledged that he "view[ed] the dividend as key" and "incredibly important for our investors."  Investor's Business Daily noted

as recently as 2017 that "investors have come to view GE's dividend as sacrosanct, in part because the Dow giant has paid it for years and consistently describes it as a top priority."

64.     Historically, GE's success had been largely attributable to its renowned manufacturing businesses, which included jet engines, locomotives, appliances, and light bulbs. Over time, however, these businesses shrunk and, by as early as 2000, GE's most important and profitable segment became GE Capital, its financial services arm.  Founded in 1932 as General Electric Contracts Corporation to provide financing to enable consumers to purchase GE's consumer products, GE Capital grew into a sprawling international financial unit under Jack Welch's 20-year tenure with the Company (1981 to 2001), which provided financial services ranging from credit cards to automobile and home loans to insurance.

65.     After taking the helm of GE from Jack Welch in 2001, Immelt initially continued to grow GE Capital.  Indeed, by 2004, GE Capital held over $618.5 billion in assets and, at its peak in 2001, accounted for nearly 60% of GE's total profits.  As GE Capital grew, GE became increasingly more reliant upon flow-through dividend payments from GE Capital to fund its dividend payments to investors.

66.     Due to its "[in]adequate returns," according to Immelt, in 2003, GE sought to exit one of GE Capital's primary lines of business and asset exposures: insurance.  According to Immelt, the Company was focusing its efforts on higher-return businesses, and insurance did not fit within that strategy.  GE spun-off Genworth, its primary reinsurance business, in 2004, and later sold its remaining insurance operations to Swiss Re in 2006.  While the Company continued to hold a run-off insurance portfolio following these sales, Immelt's February 10, 2006 Letter To Stakeholders triumphantly announced that GE Capital had "exit[ed]" the insurance business,

which had "dampened a strong performance by the rest of the Company" over the prior years.  The result of these dispositions, according to Immelt, was "a faster-growth, less-volatile company."

67.     But GE Capital was not as financially sound as Immelt had led the market to believe.  The subprime mortgage meltdown and resulting financial crisis of 2008 decimated GE Capital's business, which, as one Fortune article described in 2008, "put[] the future of the entire Company at risk."  Specifically, because GE Capital was not regulated like a bank, it could—and did—assume more risks than banks in the years prior to the subprime mortgage meltdown.  Indeed, in the run-up to the 2008 financial crisis, GE Capital had amassed a multi-billion dollar portfolio of risky commercial real estate and other mortgage-related assets, and was funding nearly a third of its assets through short-term borrowings.  This strategy left GE dangerously exposed to adverse changes in the real estate and credit markets.

68.     This is precisely what occurred during the financial crisis—mortgage asset values declined, the credit markets froze, and GE Capital's liquidity disappeared as it was unable to roll-over its short-term debt.  GE Capital's business model left GE so exposed that the Company needed a $15 billion infusion of cash (with $3 billion coming from Warren Buffet), raised on just a week's notice, to stay afloat.  In addition, to weather the financial crisis, GE cut its dividend by 68%—the first time GE reduced its dividend since 1938.

**B.     In The Years Following The Credit Crisis, GE Vows To De-Risk GE Capital And To Re-Focus On Its Core Industrials Businesses**

69.     In the aftermath of the financial crisis, GE and Immelt vowed to de-risk GE Capital's balance sheet.  Specifically, GE announced that it would be re-focusing on its "core" lines of business and assets while divesting GE Capital of its "non-core" assets.  Specifically, as described by Neal on a December 2, 2008 conference call, GE planned to "segment[] GE Capital into three segments": (i) "a core finance company of about $350 billion, that is focused on mid-

market customers that benefit from our domain knowledge in vertical markets"; (ii) "[a] second business that we call GE Global Banking of about $90 billion that has attractive returns and consists of many of our banks and joint ventures"; and (iii) "a collection of platforms that we plan to exit, platforms that attract too much leverage for our conservative model and tend to compete head to head with the banks."  With respect to the third bucket, Neal stated that "[t]hese platforms will be restructured, sold or run off over time."

70.     In the years following the financial crisis, GE and Immelt repeatedly touted their efforts to return the Company to its industrial roots, and to continue de-risking GE Capital, praising in at least one press release the Company's "redeployment of capital from non-core assets like media, plastics and insurance to higher-growth-higher margin businesses in Oil & Gas, Power, Aviation and Healthcare."  This plan, according to GE, made GE Capital, and thus GE, "safer" because the assets that GE Capital retained were "very safe" and "our best stuff."

71.     GE accelerated its efforts to shrink GE Capital after it was designated a "Systematically Important Financial Institution," or "SIFI," in 2013.  In response to the financial crisis, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010, which created the "Financial Stability Oversight Council" and enabled it to designate banks and other non-bank financial institutions as SIFIs.  SIFIs were subject to, among other things, increased capital requirements and heightened regulatory oversight.  In particular, the SIFI designation limited GE Capital's ability to use short-term borrowed money and forced it to operate with more capital.

72.     Immelt pursued plans to shrink GE Capital to shed its SIFI designation.  To this end, in April 2015, Immelt announced that GE was effectively restructuring and winding down GE Capital.  Pursuant to this plan, dubbed the "GE Capital Exit Plan," GE would sell off most of

GE Capital's assets within 24 months.  This downsizing effort was partly successful, as GE Capital was merged with and into GE in December 2015 and shed its SIFI designation in 2016.  In all, GE Capital sold over $360 billion in assets in its quest to remove its SIFI designation.  By the end of 2017, GE Capital retained only $154.7 billion in total assets, a far cry from the $500 billion in total assets that GE Capital reported at year-end 2014, just prior to the announcement of the GE Capital Exit Plan.  Defendants continued to assure investors that this reduction in assets made GE Capital "much safer."

73.     Between 2010 and 2014, as GE was winding down GE Capital and while oil prices were at historic highs, the Company embarked on an oil and gas buying spree, purchasing at least nine businesses in the oil and gas industry.  In addition, in 2015, GE purchased Alstom Energy— a company that manufactures coal-fueled turbines used by power plants, for approximately $10 billion.

74.     With these acquisitions and the Company's continued efforts to wind-down GE Capital, GE appeared well on its way to accomplishing its goal of returning to its industrial roots.

**C.      As Cracks Develop In GE's Plan, Defendants Bury Them Rather Than Disclose Them**

75.     As GE's plan to shrink GE Capital progressed following the financial crisis, the Company encountered a huge roadblock—GE Capital's multi-billion run-off LTC reinsurance portfolio.  As discussed herein, even though GE Capital had stopped generating new insurance business in or around 2006, it continued to reinsure approximately 300,000 LTC insurance policies.  In the years following GE's spin-off of its insurance operations, exposure to toxic LTC insurance caused other insurers—including Genworth, which GE had spun off and which held certain of the policies that GE continued to re-insure—to record billions of dollars in reserve

charges.  Though GE Capital had sold off hundreds of billions of dollars in assets in the years following the subprime crisis, it was unable to sell its reinsurance exposure.

76.     The future liabilities that GE would foreseeably incur in connection with these LTC policies, and the large reserve increases it needed to record to account for those liabilities, were in stark contrast to the Company's statements to the market that GE Capital was now a smaller, safer, and less risky Company.  Thus, rather than disclose the extent of its future LTC liabilities to investors with any clarity, GE deliberately *removed* them from its Class Period financial disclosures.  By concealing these liabilities from investors' view, GE was able to, among other things: (i) avoid recording massive increases in its LTC insurance reserves; and (ii) mislead investors that GE Capital was a leaner, safer business than it had been in prior years.  The truth, however, was that at the same time Defendants were making these representations to investors, GE Capital was sitting on a ticking time bomb of LTC risk, which exploded at the end of the Class Period when the Company was forced to belatedly book a *$9.5 billion* reserve charge and commit an additional *$15 billion* over the next seven years to shore up its insurance reserves.

77.     Consistent with the plan announced by GE in the wake of the financial crisis to focus its core business, GE's wind-down of GE Capital coincided with the ramp-up of its Power business.  GE Power is the largest segment within GE's Industrials unit.  The Power business builds industrial products including power plants, turbines, and generators, and serves power generation, industrial, government, and other customers around the world with products and services related to energy production.  Power's products and technologies harness resources, such as oil, gas, coal, diesel, and nuclear to produce electric power and include gas and steam turbines.  Within the Power segment are a number of divisions that provide customers different product and services offerings through LTSAs, including GE Power Services.

78.     However, shortly after Defendants determined to focus GE's resources and capital on Industrials, a global downturn in the power industries occurred, which impacted oil and gas prices particularly hard.  As a result, GE's Power businesses saw fewer orders for equipment, which negatively impacted organic growth.  In addition, increased reliance on renewable energy sources (coupled with falling renewable energy costs) drove customers away from GE's oil and gas businesses and into other sources of energy such as wind and solar.

79.     Again, rather than disclose these problems to investors, Defendants concealed them.   Specifically, Defendants masked GE Power's disappointing revenues by secretly renegotiating its existing LTSAs—oftentimes at less advantageous terms—for the sole purpose of recording an immediate boost to revenues through an accounting adjustment known as a "cumulative catch-up."

80.     By increasingly relying upon "cumulative catch-up" revenue, GE Power continued to generate what appeared to be impressive revenues and profits during the Class Period.  For instance, Power generated $26.8 billion of GE's overall revenue of $123.7 billion in 2016 and $36.0 billion of GE's overall revenue of $122.1 billion in 2017.  Power also reported purported profits of $5.4 billion in 2014 (which GE subsequently revised downward in its 2015 10-K), $4.5 billion in 2015, and $5.0 billion in 2016.

81.     However, GE's reliance on "cumulative catch-ups" to fill its revenue gap created a liquidity and cash flow problem for the Company.  Over time, in an effort to plug the cash flow and liquidity hole that had been created by their scheme to fill GE Power's revenue hole, Defendants resorted to the unsustainable practice of selling LTSA receivables to GE Capital and other third parties to generate much needed short-term cash, which cannibalized future revenues

and profits the LTSA would have provided.  Ultimately, there were not enough LTSA receivables to sell, and GE's reported CFOA suffered.

82.     Although Defendants Bornstein and Immelt continued to hype Power's ability to generate revenues and cash at the start of 2017, projecting $12 to $14 billion CFOA in 2017, just a few months later—as both executives were forced to take early "retirements," and new management took over—this guidance was slashed in half by new CEO, Flannery.

83.     In October 2017, Flannery led a "deep dive" into GE Power's financials and by January 2018, the results of this deep dive led to troubling revelations including the disclosure of the massive volume of LTSA that comprised GE Power's balance sheet, the implausible increase of these assets over the prior three years notwithstanding the decrease in the industry, an inability to collect on these booked revenues, and a reversal of more than $8 billion of retained earnings attributed to cumulative catch-up adjustments during the Class Period.  Moreover, the Company revealed an SEC investigation into its practices.

## V.     DEFENDANTS' LONG-TERM CARE INSURANCE FRAUD

### A.     Overview Of Long-Term Care Insurance

84.     LTC insurance is intended to protect consumers from the high cost of home care, assisted living care, adult day care, respite care, hospice care, nursing home care, and other specialized skilled facility care required when an individual becomes unable to perform the basic activities of daily living.  These costs are typically not covered by health insurance, Medicare, or Medicaid.

85.     Insurance companies typically price LTC insurance premiums based on four assumptions: (i) mortality rates (how long individuals who have policies are expected to live, pay premiums, and collect benefits); (ii) lapse rates (how many insureds will stop paying their premiums and let their policies terminate); (iii) morbidity rates (the chance someone will develop

27

a condition requiring LTC); and (iv) interest rates (the rate of interest income earned on reserves held against premiums collected).

86.     Insurance companies began marketing and selling LTC insurance in the 1970s.  At that time, among other factors, insurers modeled LTC insurance pricing after Medicare supplement policies, which projected high policyholder lapse rates, favorable interest rates, and assumed mortality and morbidity rates beneficial to insurance providers.  These assumptions projected that LTC insurers would pay less in claims than the capital they accumulated from premium payments, and fueled a boom in the industry.  By the early 2000s, more than 100 carriers sold LTC insurance.  At the peak of the LTC market in 2002, these companies wrote approximately 750,000 new policies annually.  Reinsurance also played an important role in the LTC market, as primary LTC insurers would typically enter into reinsurance agreements as a means of diversifying or reducing their risk exposure to LTC liabilities.  Through reinsurance agreements, a primary LTC insurer transfers the risk associated with a pool of insurance policies to another insurance company.  During the Class Period, GE acted strictly as an LTC reinsurer.  As a reinsurer, GE received premiums and claims experience data from the original writers of the blocks of insurance it reinsured.

87.     In the years prior to the start of the Class Period, LTC insurers began to learn that the major pricing assumptions that fueled the expansion of the LTC market in the 1970s and 1980s were woefully inaccurate.  Specifically, insurers had greatly overestimated expected lapse rates and interest rates, and had dramatically underestimated the number of policyholders that would file claims and the length of time that such claimants would require benefits.

88.     For example, insurers initially assumed that 8% of policyholders would let their policies lapse within one year, with an additional 4% thereafter.  In practice, only 4% let their

policies lapse in the first year, and just 0.5% thereafter.  In addition, by 2007, insurers had reduced their assumptions for mortality rates by 10% compared to the assumptions that were used to price LTC policies in 2000, and by 2014 those rates had been reduced by an additional 20%.  Likewise, morbidity rates in 2014 were between 15 to 45% higher than they were in 2000.  During this same time period, interest rates were 2 to 4%, far lower than the 3 to 8% assumed by insurers.

89.     As reflected above, the LTC industry experienced a proverbial perfect storm, where mortality, morbidity, lapse, and investment earnings assumptions have each experienced adverse actual experiences compared to initial pricing assumptions used in policies sold before the mid-2000s.

90.     LTC insurers' use of flawed assumptions to price LTC policies meant that they had significantly underestimated the extent of their liabilities under these policies.  Each of these miscalculations negatively affected an insurer's or reinsurer's ability to make payments due under the policies and consequently, subjected insurers and reinsurers to large losses on their LTC exposure.  As discussed below, these miscalculations led most insurers, including GE, to abandon writing LTC policies prior to the Class Period.  Some insurers, like GE, however, still faced massive liabilities from their existing LTC portfolios.

**B.      GE Touts Its Exit From The LTC Insurance Market But Continues To Reinsure The Worst Blocks Of That Business**

**1.      The Genworth Spin-Off**

91.     In November 2003, GE announced its intention to spin-off most of its mortgage and life insurance operations, including the bulk of its LTC insurance book, through the Genworth IPO.  This was disclosed as part of a larger strategy to exit its low-return businesses and redeploy capital to refocus on higher-growth businesses.  Specifically, GE spun off most of the life insurance assets, and all of the mortgage insurance assets held by GE Financial Assurance Holdings Inc.

("GEFAH"), which had a book value of approximately $10 billion. GE retained the insurance and reinsurance operations conducted through its principal insurance businesses, GE Insurance Solutions, and its subsidiary ERAC. Among other things, ERAC reinsured LTC policies originally written by Allianz, American United LLC, Berkshire Life, Jackson National Life, John Alden, Lincoln Benefit Life, MassMutual, State Life, Trans America, and others.

92.     In addition, as part of the spin-off, GE's Union Fidelity Life Insurance Company ("UFLIC") subsidiary entered into agreements to reinsure portions of Genworth's LTC portfolio. Specifically, UFLIC agreed to reinsure 100% of a block of LTC policies that had been issued originally by Travelers and reinsured by Genworth. The Genworth Prospectus for the IPO described the reinsurance transactions as follows:

> Prior to the completion of this offering, we will enter into a number of arrangements with GE governing our separation from GE and a variety of transition and other matters, including our relationship with GE while GE remains a significant stockholder in our company. These arrangements include several significant reinsurance transactions with Union Fidelity Life Insurance Company, or UFLIC, an indirect, wholly-owned subsidiary of GE. As part of these transactions, we will cede to UFLIC, effective as of January 1, 2004, all of our in-force structured settlement contracts, substantially all of our in-force variable annuity contracts, **and a block of long-term care insurance policies that we reinsured in 2000 from The Travelers Insurance Company, a subsidiary of Citigroup, Inc., which we refer to in this prospectus as Travelers. In the aggregate, these blocks of business do not meet our target return thresholds, and although we remain liable under these contracts and policies as the ceding insurer, the reinsurance transactions will have the effect of transferring the financial results of the reinsured blocks to UFLIC**.

93.     Thus, while GE superficially transferred this block of LTC policies to Genworth in connection with its IPO, Genworth transferred the financial risks of these LTC blocks right back to GE (via UFLIC) through the reinsurance agreements.

94.     On November 19, 2003, during a call with investors, Immelt touted the portions of the business that GE retained "as a piece low return, very stable, runoff block from [its] [GEFAH] portfolio." Immelt further claimed that GE strategically retained these assets, that they were

"pric[ed] very diligently" and that they supplied "pretty safe earnings." In addition, Immelt stated that GE "maintained strong reserv[es]" against these assets.

95. In truth, GE had retained some of the worst blocks of this LTC business. As reported by Bloomberg in January 2018 and in contrast to Immelt's positive statements regarding GE's remaining LTC reinsurance, people familiar with the Genworth IPO indicated that the LTC blocks that GE reinsured through the Genworth spin-off comprised the riskiest blocks of that portfolio. In fact, as Bloomberg reported in January 2018, these individuals stated that GE was informed by the Genworth IPO underwriters—Goldman Sachs Group, Inc. and Morgan Stanley & Co. Inc.—that the IPO "could run into obstacles" if these LTC policies were included in the spin-off. Accordingly, GE agreed to backstop them.

96. Former GE employees confirmed this. FE-2 understood, early in his tenure at ERAC, that when GE spun off Genworth in the IPO it apparently pulled certain LTC policies out of the IPO deal because "they are the bad ones." FE-2 recalled first learning this as part of relatively recent oral history of ERAC and GE soon after being hired, from at least three sources: (i) Mr. Frank Knoor (currently retired ERAC Risk Manager, when FE-2 was being trained in the particular responsibilities for the valuation of his own LTC blocks); (ii) Dale Filsinger ("Filsinger") (ERAC's Chief Risk Officer ("CRO")), and; (iii) Jim Berger (an LTC Valuation Actuary and Economic Capital Actuary with GE during the Class Period), to whom FE-2 reported.

97. FE-2 explained that GE's apparent original strategy was to divest as much of its LTC book as possible to Genworth, but they could not divest it all. Including some of its riskier LTC blocks would have made the Genworth IPO a less desirable investment. FE-2 recalls learning from individuals at the senior management level within ERAC that individuals at GE (and likely

Genworth) were worried that the Genworth IPO would fail if the riskier LTC blocks were included in the deal.

98.     According to Genworth in its IPO documents, the LTC reinsurance business retroceded to GE in connection with the IPO was associated with $1.5 billion in reserves.  GE, however, did not provide its own investors with any information following the Genworth IPO regarding the size, composition, or quality of this LTC exposure, or the risks associated therewith.

99.     Instead, following the Genworth IPO, GE went to great lengths to assure investors that it was exiting the insurance market and would continue to reduce its remaining insurance exposure.  For example, during a December 18, 2003 conference call, Immelt stated that GE had "exited, or announced the exit, [of] a substantial portion of our insurance business," and explained that the Genworth IPO "takes the low return insurance business and makes it *a much smaller portion of the overall GE portfolio*."

100.    Several months later, during an April 8, 2004 conference call, Sherin stated, with respect to GE's remaining exposure, that "[w]e're seeing some *good momentum* in the life business and long-term care segments."  A few months later, on July 9, 2004, Sherin assured investors that "*our plan is to sell down [the remaining insurance] position in an orderly manner*, but the plan to reduce capital insurance is on track."

101.    By October 8, 2004, when asked during a conference call whether GE's higher normalized dividend rate that period reflected "the lower capital intensity of the business with insurance kind of shrinking as a percent of the total," Sherin told investors that "we have exited insurance."  During the same call, Sherin assured the market that GE had analyzed—and had reduced the risks associated with—its remaining insurance position:

> The whole focus at our reinsurance business which as I said we call insurance solutions today, has been *to re-underwrite the book from top to bottom* and Ron

Pressman and his team have taken apart every single line of business.  They write—every single decision is made based on what we think our return on equity is going to be based on the risk we're taking.  ***They've done a great job of reducing risk*** by isolating how much exposure we have and aggregating the exposure across the entire underwriting portfolio.

102.   Three weeks later, on October 26, 2004, the Chairman of GE Capital, Dennis Dammerman, represented that GE's remaining insurance exposures in Employers Reinsurance Corporation ("ERC") (which subsequently was renamed Insurance Solutions) were high quality, stating that it had "gotten out of, like $4 billion in premiums of business that didn't have adequate returns," and that it had "the most sophisticated underwriting system . . . of anybody in the industry."  During the same call, James Parke, Vice Chairman and CFO of GE Capital Services and Senior Vice President of GE reaffirmed, "[w]e plan on continuing to downsize the insurance business as we look forward, ***it's going to be a much smaller part of our total financial services businesses***."

103.   On January 21, 2005, Bill Cary, GE's Vice President of Investor Communications, once again assured investors that GE was "absolutely executing a clear plan to redeploy capital away from Insurance and ***we're going to continue to shrink the Insurance business going forward***."

104.   Later that year, during a May 18, 2005 conference, Immelt praised the Genworth IPO because it allowed GE to exit the insurance industry successfully.  Immelt stated, "***[w]e really just didn't belong where we were in insurance.  We got out I think in as elegant away [sic] as we could***.  And Genworth is running well and the balance sheet is great and we feel great about where we are.  ***And that's kind of behind us now***."

33

2.    **GE Sells Insurance Solutions To Swiss Re And Proclaims Its Exit From The Insurance Market But Continues To Hold Significant LTC Exposure**

105.    In 2006, GE disclosed that it had sold off the vast majority of its remaining insurance operations to Swiss Re, including: (i) the June 2006 sale of GE Insurance Solutions (f/k/a ERC) for $6.8 billion; and (ii) the December 2006 sale of all of the remaining operations of subsidiary GE Life for $0.9 billion.

106.    Following these dispositions, GE stated in its 10-K for the year ended December 31, 2006:

> In 2006, *we substantially completed our planned exit of the insurance businesses* through the sale of the property and casualty insurance and reinsurance businesses and the European life and health operations of GE Insurance Solutions Corporation (GE Insurance Solutions) and the sale of GE Life, our U.K.-based life insurance operation, to Swiss Reinsurance Company (Swiss Re).

107.    As with the Genworth IPO, however, GE's sale to Swiss Re did not include a substantial portion of its remaining LTC exposure.  FE-2 explained that GE retained the risk for certain blocks of LTC policies in the Swiss Re deal because Swiss Re (like Genworth) did not want those policies. At the time, Swiss Re had clearly expressed a desire to not underwrite LTC reinsurance.  FE-2 recalled first learning this as part of relatively recent oral history of ERAC and GE soon after being hired by ERAC in 2006.

108.    On numerous occasions following GE's sale of Insurance Solutions to Swiss Re, and leading up to the start of the Class Period, GE touted its purported "exit" from insurance, praising the move as "strategically important" to GE and one that improved GE Capital's risk profile.

109.    For example, during an April 11, 2008 conference call, Immelt told investors that "what we've done over the last few years is try to *de-risk* financial services *by exiting insurance, reinsurance*, mortgage insurance, and we want to continue to do that to get more of a debt spread

34

and consistent model."  During a February 10, 2009 presentation at the Barclays Capital Industrial Select Conference, Sherin stated more specifically that over "the last several years, *we've exited* mortgage insurance, bond insurance, life insurance, *long-term care insurance, reinsurance*."

110.    Immelt likewise assured investors on a June 8, 2011 conference call that GE Capital "sold *all* the insurance businesses, life insurance, bond insurance, *reinsurance*" and, after those dispositions, had "a tremendously more focused portfolio."  Immelt repeated this statement during a January 20, 2012 earnings call, telling investors that while GE previously "had significant insurance operations," it has since "*sold all the insurance businesses*."

111.    Defendants similarly assured investors that any remaining insurance exposures would be reduced over time.  Indeed, even as early as December 21, 2005, William Blair & Company, L.L.C. analysts wrote after a meeting with GE executives that while "GE will continue to own the U.S. life reinsurance portion of Insurance Solutions . . . this business will also continue to be downsized over time."

112.    At no point in making these representations to investors did Defendants disclose the vast size or risky profile of the toxic LTC portfolio that GE had retained following these dispositions.  Even though, as discussed herein, the Company's run-off portfolio included billions of dollars in risky LTC insurance policies, and that GE's liabilities under these policies were materially increasing over time, Defendants provided investors with no meaningful disclosures regarding the extent of GE's LTC liabilities or the burgeoning risks associated with its legacy LTC portfolio during the Class Period.

C.    **Continued Deterioration In The LTC Insurance Market Leads Insurers To Exit The Market, Seek Premium Rate Increases, And Record Massive Reserve Increases**

113.    At the same time GE was touting its safe exit from insurance, its peers were taking drastic steps to address negative market-wide developments in the LTC industry.  In fact, due to

the rising costs and liabilities associated with providing LTC insurance, most insurers chose to exit the LTC market altogether.  Indeed, following a peak of approximately 750,000 new LTC policies issued in 2002, annual individual LTC policy sales declined sharply each year, to a low of roughly only 172,000 policies sold in 2013 (the start of the Class Period).  The number of carriers issuing new policies likewise fell sharply, from over 100 insurers in the early 2000s to less than a dozen by 2016.

114.    Even the biggest players in the LTC market fell victim to these issues, and many insurers stopped selling new LTC policies during this time period, including Unum Group ("Unum") and Allianz (an original writer of LTC policies reinsured by GE, via ERAC) in 2009, MetLife (another original writer of LTC policies reinsured by GE, via UFLIC) in 2010, Prudential in 2012, and John Hancock in 2016.  In announcing its exit from the LTC market, MetLife spokeswomen stated that "the financial challenges facing the [LTC] insurance industry in the current environment *are well-known*" and "aren't unique to MetLife."  Prudential similarly stated that its exit "reflects the challenging economics of the individual long-term care market."

115.    As insurers exited the LTC market in droves, adverse claims experience and losses mounted.  To account for the dramatic increase in their expected future liabilities to LTC policyholders, many insurance companies sought to increase LTC premiums.  All told, between 2009 and 2017, LTC insurers sought premium rate increases on more than *4,500* occasions.  Some of the increases sought have been as high as *130%* (Genworth) and have spanned multiple states (e.g., Genworth and Unum's rate increases in 2015, which spanned 17 and 21 states, respectively).  Notably, in approving rate increase requests by Genworth, MetLife, and John Hancock in 2016, the Pennsylvania Insurance Department stated that "[t]he current policies in place are not generating sufficient premium to pay future claims to policyholders.  *This is a common problem*

*for a number of insurers nationwide* because policyholders are keeping their policies longer than expected and are living longer than projected."

116.    In addition to these premium rate increases, as reflected in the chart below, insurers also recorded massive reserve charges to account for their increased future LTC liabilities:

| Year | Company | Reserve Amount | Explanation |
|---|---|---|---|
| July 2006 | GE Capital Life Assurance Company of New York (one of the entities spun off by GE in connection with the Genworth IPO) | $200 million reserve increase (required by NYDFS) | "long-term care business ha[d] sustained continued losses due to the aging of the block and persistency," and that its reserves were based on overly aggressive assumptions |
| February 2012 | Unum | $573.6 million pre-tax charge ($456 million after-tax), which resulted in a $454.4 million net loss for 4Q11 | "due largely to . . . its strategic review of the long-term care business," which resulted in "an increase to long-term care policy and claim reserves" |
| November 2012 | Prudential | ***$698 million reserve charge***; resulting in "a pre-tax loss of $685 million from divested businesses, primarily related to long-term care insurance" | "charge related to [its] long-term care insurance [portfolio] to reflect updates of actuarial assumptions based on our annual review" |
| November 2014 | Genworth | $531 million reserve increase | Claimants staying on-claim longer than expected and using more of the available benefits |
| February 2015 | Unum | $698.2 million reserve increase | Resulting from low interest rates |
| February 2015 | Genworth | $700 million reserve increase | Resulting from completion of annual loss recognition testing |
| September 2016 | Genworth | $905 million reserve increase | Resulting from an annual review of assumptions |
| November 2016 | Manulife (John Hancock) | $455 million reserve increase and a charge against earnings of $313 million | Resulting from "updates to policyholder assumptions" and a "a downward revision to our ultimate reinvestment rate assumptions" |

37

**D.     As Other Insurers Increase Their LTC Reserves During The Class Period, GE Deliberately Conceals Its LTC Liabilities**

117.    For years leading up to the Class Period and as the LTC market sharply deteriorated, GE conditioned the market to believe that it had improved its risk profile by exiting the insurance business, and that its remaining exposures would be run-off in an orderly fashion.  In making these representations, Defendants failed to provide investors with meaningful information regarding the Company's remaining multi-billion dollar run-off LTC portfolio.  Defendants omitted this information even though GE was fully aware of the risks posed by its remaining LTC exposure in light of, among other things, its own experience with the LTC policies it reinsured from Genworth, the massive reserve and premium increases taken by Genworth and others, and the decision by GE and others to exit the LTC insurance business altogether.

118.    Recognizing that GE Capital's rising LTC risks and liabilities threatened to derail their narrative that GE Capital had become less risky, Defendants took increased steps to conceal them from investors' view during the Class Period, including, as described below, ***intentionally removing*** any disclosure from its annual SEC filings concerning the extent of its LTC liabilities.

119.    Specifically, GE's 10-Ks include a tabular breakdown required by Item 303(a)(5) of Regulation S-K of the Company's "Contractual Obligations," which purported to disclose GE's "contractual obligations for future payments" as of each year-end.  Prior to and throughout the Class Period, GE included a line item in its "Contractual Obligations" table called "Insurance liabilities" (defined herein as GE's "Disclosed Insurance Liabilities").  This line item purports to identify the total amount of money that GE expected to pay out in future insurance claims.

120.    Prior to the start of the Class Period, GE regularly included future claims payments on its run-off LTC portfolio within its Disclosed Insurance Liabilities line item.  For example, in its 10-K for the year-ended December 31, 2008, GE stated that its Disclosed Insurance Liabilities

38

"*[i]ncluded* guaranteed investment contracts, structured settlement and single premium immediate annuities based on scheduled payouts, *as well as* those contracts with reasonably determinable cash flows such as deferred annuities, universal life, term life, *long-term care*, whole life and other life insurance contracts."  As reflected below, this line item, one component of which was LTC liabilities, totaled $22 billion as of December 31, 2008:

**Contractual Obligations**

As defined by reporting regulations, our contractual obligations for future payments as of December 31, 2008, follow.

| | | | | Payments due by period | | |
|---|---|---|---|---|---|---|
| (In billions) | | Total | 2009 | 2010-2011 | 2012-2013 | 2014 and thereafter |
| Borrowings (Note 18) | $ | 523.8 | $ 193.7 | $ 115.6 | $ 79.8 | $ 134.7 |
| Interest on borrowings | | 142.0 | 20.0 | 29.0 | 18.0 | 75.0 |
| Operating lease obligations (Note 5) | | 6.6 | 1.3 | 2.2 | 1.6 | 1.5 |
| Purchase obligations (a)(b) | | 63.0 | 40.0 | 16.0 | 6.0 | 1.0 |
| Insurance liabilities (Note 19) (c) | | 22.0 | 3.0 | 5.0 | 3.0 | 11.0 |
| Other liabilities (d) | | 97.0 | 33.0 | 8.0 | 4.0 | 52.0 |
| Contractual obligations of discontinued operations (e) | | 1.0 | 1.0 | – | – | – |

(a)   Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.
(b)   Excluded funding commitments entered into in the ordinary course of business by our financial services businesses. Further information on these commitments and other guarantees is provided in Note 31 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.
(c)   Included guaranteed investment contracts, structured settlements and single premium immediate annuities based on scheduled payouts, as well as those contracts with reasonably determinable cash flows such as deferred annuities, universal life, term life, long-term care, whole life and other life insurance contracts.
(d)   Included an estimate of future expected funding requirements related to our pension and postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: deferred taxes, derivatives, deferred revenue and other sundry items. See Notes 21 and 29 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report for further information on certain of these items.
(e)   Included payments for other liabilities.

121.    By 2011, GE's Disclosed Insurance Liabilities had increased to $23.7 billion.  The table included in GE's 10-Ks did not specify the quantity of Disclosed Insurance Liabilities attributable to LTC, but purported to at least set forth GE's comprehensive obligations related to its run-off insurance operations.

122.    When GE filed its 2012 10-K on February 26, 2013 (the day before the Class Period begins), however, it altered the manner in which it presented its contractual obligations.  In particular, GE, without any explanation, began *excluding* LTC liabilities from its Disclosed Insurance Liabilities.  Indeed, in the 2012 10-K, GE reduced its reported insurance liabilities to

$14.0 billion and, unlike prior 10-Ks, stated that this figure "*excluded long-term care*, variable annuity and other life insurance contracts":

**Contractual Obligations**

As defined by reporting regulations, our contractual obligations for future payments as of December 31, 2012, follow.

| (In billions) | | Total | | 2013 | | 2014-2015 | | 2016-2017 | | 2018 and thereafter |
|---|---|---|---|---|---|---|---|---|---|---|
| Borrowings and bank deposits (Note 10) | $ | 414.1 | $ | 139.2 | $ | 103.2 | $ | 60.9 | $ | 110.8 |
| Interest on borrowings and bank deposits | | 92.8 | | 9.7 | | 14.2 | | 10.1 | | 58.8 |
| Purchase obligations(a)(b) | | 65.8 | | 33.8 | | 13.5 | | 5.8 | | 12.7 |
| Insurance liabilities (Note 11)(c) | | 14.0 | | 1.6 | | 2.9 | | 2.0 | | 7.5 |
| Operating lease obligations (Note 19) | | 4.1 | | 0.9 | | 1.3 | | 0.9 | | 1.0 |
| Other liabilities(d) | | 83.7 | | 19.3 | | 10.0 | | 8.3 | | 46.1 |
| Contractual obligations of discontinued operations(e) | | 1.9 | | 1.9 | | – | | – | | – |

(a)   Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, contractual commitments related to factoring agreements, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b)   Excluded funding commitments entered into in the ordinary course of business by our financial services businesses. Further information on these commitments and other guarantees is provided in Note 25 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.

(c)   Included contracts with reasonably determinable cash flows such as structured settlements, guaranteed investment contracts, and certain property and casualty contracts, and excluded long-term care, variable annuity and other life insurance contracts.

(d)   Included an estimate of future expected funding requirements related to our pension and postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: deferred taxes, derivatives, deferred revenue and other sundry items. For further information on certain of these items, see Notes 14 and 22 to the consolidated financial statements in Part II, Item 8. "Financial Statements and Supplementary Data" of this Form 10-K Report.

(e)   Included payments for other liabilities.

123.     GE excluded its LTC liabilities from its Disclosed Insurance Liabilities in the 2012 10-K and *every* 10-K it issued during the Class Period.  In addition, GE did not otherwise quantify this liability (or provide any other meaningful information concerning the nature or extent of its LTC obligations) in the 2012 10-K or its Class Period SEC filings, thus misleading investors that any remaining LTC-related liabilities were immaterial.

124.     In each year of the Class Period, GE reported an annual *reduction* in its Disclosed Insurance Liabilities.  Indeed, by 2016, GE had reported just $11.1 billion in Disclosed Insurance Liabilities, a 21% reduction from the $14.0 billion figure it reported on the day before the first day of the Class Period, and a 53% reduction from the $23.7 billion in Disclosed Insurance Liabilities it reported in the 10-K for fiscal year 2011.

125.     Defendants had no basis (apart from concealing the true extent of GE's insurance liabilities from investors) to exclude GE's LTC liabilities from its Disclosed Insurance Liabilities during the Class Period.  In fact, following the end of the Class Period, GE effectively conceded

that the omitted LTC liabilities were material and should have been included in its Disclosed Insurance Liabilities throughout the Class Period.  Indeed, when GE filed its 2017 10-K—*after* GE had belatedly revealed the true extent of its LTC exposure—it reverted to its pre-Class Period practice of *including* in its Disclosed Insurance Liabilities "all contracts associated with [its] run-off insurance operations," including LTC liabilities.  Once GE's LTC liabilities were added back into this line item, its Disclosed Insurance Liabilities more than *tripled*, increasing from $11.1 billion in 2016 to $38.0 billion in 2017:

**CONTRACTUAL OBLIGATIONS**

As defined by reporting regulations, our contractual obligations for estimated future payments as of December 31, 2017 , follow.

| (In billions) | | Total | 2018 | 2019-2020 | 2021-2022 | 2023 and thereafter |
|---|---|---|---|---|---|---|
| | | | | Payments due by period | | |
| Borrowings (Note 10) | $ | 134.6 | $ 24.7 | $ 27.7 | $ 18.2 | $ 64.0 |
| Interest on borrowings | | 40.8 | 3.7 | 6.0 | 4.7 | 26.4 |
| Purchase obligations(a)(b) | | 63.3 | 22.1 | 19.2 | 12.5 | 9.5 |
| Insurance liabilities (Note 11)(c) | | 38.0 | 2.5 | 4.1 | 4.0 | 27.4 |
| Operating lease obligations (Note 25) | | 5.3 | 1.1 | 1.7 | 1.2 | 1.3 |
| Other liabilities(d) | | 71.0 | 15.3 | 5.5 | 5.5 | 44.7 |
| Contractual obligations of discontinued operations(e) | | 1.6 | 1.1 | 0.1 | 0.2 | 0.2 |

(a)   Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b)   Excluded funding commitments entered into in the ordinary course of business. See Notes 19 and 21 to the consolidated financial statements for further information on these commitments and other guarantees.

(c)   Included all contracts associated with our run-off insurance operations and represents the present value of future policy benefit and claim reserves.

(d)   Included an estimate of future expected funding requirements related to our postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: derivatives, deferred revenue and other sundry items. See Notes 12, 13 and 19 to the consolidated financial statements for further information on certain of these items.

(e)   Included payments for other liabilities.

126.    As reflected below, Defendants' deliberate omission of GE's LTC insurance liabilities misled investors into believing that the Company's insurance liabilities were declining throughout the Class Period when, in truth (and as Defendants revealed at the end of the Class Period), they were *alarmingly increasing*:



127.    By removing GE's LTC insurance liabilities from its Class Period disclosures, Defendants falsely conveyed to investors that GE's LTC business had been run off to the point that it was no longer a material exposure.  In addition, erasing these liabilities from investors' view allowed the Company to fraudulently: (i) report decreasing insurance liabilities throughout the Class Period; and (ii) avoid recording the massive reserve charges that other insurers were announcing throughout the Class Period.  In truth, as investors would belatedly learn, GE remained exposed to billions of dollars in LTC liabilities throughout the Class Period, and its total insurance liabilities had dramatically ***increased***—not decreased—during this time period.

128.    Given GE's deliberate omission of its LTC liabilities, investors were unable to meaningfully assess the extent of the Company's LTC exposure or its total insurance liabilities. Indeed, after reviewing GAAP financial performance, statutory LTC experience reporting forms, premium rate filings and experience updates, Society of Actuaries and other industry data, reports and presentations from industry consultants, and participating in calls with so-called LTC experts, Credit Suisse Group AG ("Credit Suisse") analysts noted as late as ***2017*** that "[d]espite all of the

time and effort put into studying the long-term care product, history financials, reserving methodologies, etc., *we still find ourselves in a position of being unable to draw very specific conclusions*," as company disclosures regarding LTC exposure was "*still far short of acceptable*."

129. Moreover, even after GE began to make disclosures regarding its expected LTC reserve increase, market experts were unable to accurately quantify its exposure. For example, on September 15, 2017, after GE had announced that it had begun witnessing "adverse claims experience" in its LTC portfolio, Evercore Group L.L.C. ("Evercore") analyst Thomas Gallagher issued a report that predicted, based on his "review of the GE owned regulatory insurance filings," that GE would report a reserve increase of approximately "$2.5B plus." Months later, GE reported a pre-tax reserve increase of approximately $9 billion, and committed to insurance regulators to increase that reserve by an additional $15 billion over the next seven years. This was almost *ten times* the size of Evercore's estimate.

130. Accordingly, GE's material misstatements and omissions related to its Class Period disclosures denied investors any ability to understand the Company's massive LTC exposure.

**E.    After Concealing GE's LTC Liabilities, Defendants Continue Assuring Investors About GE Capital's Reduced Risks**

131. After removing GE Capital's LTC insurance liabilities from GE's Disclosed Insurance Liabilities, Defendants continued representing to investors throughout the Class Period that they had made GE Capital "safer" by selling its "non-core" assets and by running off its remaining insurance exposures. At no point during their discussions about "de-risking" GE Capital did Defendants disclose that GE had still retained a toxic LTC portfolio or had a crippling, multi-billion dollar future liability. To the contrary, Defendants omitted any disclosure regarding these massive liabilities even as: (i) the LTC market continued to crumble; and (ii) GE's LTC exposure became an increasingly large part of GE Capital's remaining asset base.

132.    For example, on April 19, 2013, during the Company's first quarter 2013 earnings call (the "1Q13 Earnings Call"), Immelt stated, "GE Capital delivered a solid quarter, up 9% while ***they continue to shrink their non-core assets***, which were down $17 billion in the quarter versus previous years."  Sherin similarly stated, "[w]e have got over $60 billion of noncore assets.  We continue to run those off."

133.    It is clear that analysts were interpreting these statements as Defendants desired. For example, J.P. Morgan Securities Inc. ("J.P. Morgan") analyst C. Stephen Tusa, Jr., CFA ("Tusa") stated in an April 22, 2013 report that "[w]e don't think portfolio quality is an issue," and that "[c]ash has been a bright spot of the story, largely related to the continued wind down of non-core GE Capital assets, a story that remains on track."

134.    On May 22, 2013, during an Electrical Products Group Conference, GE announced it was entering into the second phase of its plan to liquidate GE Capital's "non-core assets," which included "***continu[ing] to do run-off of non-core assets***."  Analysts seized upon these statements noting that the Company is "committed to continued run-off of its non-core Capital assets."

135.    During the Sanford C. Bernstein Strategic Decisions Conference on May 31, 2013, Chairman and CEO of GE Capital, Neal, stated that "we have made [GE Capital] smaller.  ***We have made it safer***.  We have made it more core."  Neal further described GE Capital's remaining portfolio as "***our best stuff***" and claimed that it ***"is very safe for us and we err on the side of being safe and being secure***."

136.    On November 15, 2013, GE Capital held an Investor Day Meeting where it announced further reductions to its asset base and a continued reduction of its non-core portfolios. For example, during the call, Sherin boasted that "[t]he team has done a fantastic job of reducing the overall size of GE Capital, and ***more importantly, we're exiting the non-core assets***."  Sherin

44

added that "we'll still have about $50 billion in non-core assets that Bill's going to show you, some of what we're doing *to continue to run this off, and put the proceeds of that back into the core business*." GE Capital Chief Operating Officer Cary further stated, "we entered the crisis with almost a third of our portfolio activities that today we would define as non-core. *We've really shrunk that dramatically*. And now over 85% of our book are in things, activities, places, markets, products that we like a lot, that we think we can grow successfully."

137. Analysts continued to buy into Defendants' representations that GE Capital's portfolio was becoming safer. For instance, in a November 25, 2013 report, Barclays analysts further stated that "the overall GE story is improving and at a faster rate than is generally perceived, in our view; *it is becoming lower risk and more shareholder friendly*. Portfolio simplification should continue to be a powerful stock driver. . . . GE has plenty of cash and B/S optionality. . . . [And] an excellent core portfolio."

138. During the Company's December 18, 2013 guidance update call, Immelt affirmatively represented that, as part of GE's divestiture of "non-core" assets, it "*sold reinsurance business*." Yet in making this representation, Immelt failed to disclose that the Company continued to reinsure hundreds of thousands of high-risk LTC insurance policies.

139. In September 2014, GE again represented to investors that it had divested—and would continue to divest—non-core assets including, specifically, its run-off insurance portfolio. Indeed, on September 8, 2014, GE issued a press release announcing the sale of its Appliances business to Electrolux and noted that GE's "2014 portfolio activity continues the Company's longer-term *redeployment of capital from non-core assets like* media, plastics *and insurance* to higher-growth-higher margin businesses in Oil & Gas, Power, Aviation and Healthcare."

140. In connection with its December 16, 2014 guidance update call (the "12/16/14 Guidance/Update Call"), Defendants specifically stated that they had made GE Capital safer by selling insurance assets. Indeed, in a presentation to investors, GE indicated that it had executed on its "risk reduction" plan to "*sell insurance before the storm*." During the 12/16/14 Guidance/Update Call, Immelt further boasted that "*we exited insurance in time*." Again, Defendants made no mention of the significant LTC risks that GE continued to reinsure.

141. Moreover, as discussed above, following the announcement of GE Capital's designation as a SIFI in April 2015, the Company announced a plan to once again reduce substantially the size of its financial services businesses, this time through the sale of most of the remaining assets of GE Capital (i.e., the GE Capital Exit Plan). During a specially-convened call with investors on April 10, 2015 to discuss this strategy, Sherin lauded the Company's prior efforts to de-risk GE Capital, stating, "[a]s you all know, we have done a lot over the last six years to shrink GE Capital while also *making it much safer*."

142. Defendants further suggested that the assets that would remain on GE Capital's books following the execution of the GE Capital Exit Plan would be safe and less capital intensive, and would therefore generate a positive return for investors. For example, during the Company's April 22, 2015 Annual Shareholders Meeting, Bornstein stated that "the businesses that you'll be left with will be those businesses that are *synergistically aligned to our industrial businesses* and *provide real competitive advantage* and, importantly, from a capital allocation perspective, *generate a return that's well in excess of our cost of capital*."

143. As a result of the GE Capital Exit Plan, through the sale of assets, GE reduced GE Capital's total assets by 63% from $500 billion as of December 31, 2014 to $183 billion as of December 31, 2016. Over this same time period, as discussed above, GE's Disclosed Insurance

Liabilities declined from $12.6 billion to $11.1 billion. Yet Defendants failed to disclose that GE had retained a multi-billion dollar portfolio of deteriorating LTC insurance policies.

144.    Instead, Defendants continued to tout the "strong," "solid," and less-risky nature of GE Capital's remaining assets. During the June 1, 2016 Sanford C. Bernstein Strategic Decisions Conference, Sherin stated:

> So, we are a lot smaller. Assets are down 50% when we filed and even within that a third of the assets that are remaining are in cash and liquidity. That's up substantially from where it was when we were designated. ***And we are not just smaller; we exited whole pools of risk***.

145.    In fact, during the same Conference, Sherin boldly represented that GE had gotten rid of ***all*** of its insurance business. In response to an analyst request for Sherin to put GE's transformation over the last year and a half into context from a long-term perspective, Sherin boasted that "[i]f you look at what the portfolio is today versus take it when Jeff [Immelt] started, ***all of the insurance business is gone. That was a huge change in the portfolio***. . . . It's a cleaner more synergistic portfolio. So we feel great about it."

146.    In July 2016, Defendants provided their first indication during the Class Period that GE had any material exposure to LTC liabilities. Specifically, on July 22, 2016, Defendants Immelt and Bornstein participated in a conference call with analysts and investors to discuss its second quarter 2016 results (the "2Q16 Earnings Call"). During the call, Bornstein announced that the "vertical business earned $452 million this quarter, down 15% from prior year including higher base earnings offset by lower gains and ***higher insurance reserve provisions resulting from updates to our models on our runoff long-term care book***." Bornstein assured investors, however, that "***[p]ortfolio quality remains stable***." Yet despite expressly discussing the topic of LTC insurance and confirming that they were aware of—and had been reviewing—GE's LTC exposure, Defendants provided investors with no meaningful information regarding the extent of

the Company's LTC exposure. To the contrary, Defendants' disclosures falsely suggested to investors that GE's remaining exposures were immaterial and that its LTC portfolio quality remained stable.

147. In the Company's quarterly report on its 10-Q for the three months ended for the June 30, 2016 (the "2Q16 10-Q") filed shortly thereafter, GE stated, "[w]ithin [GE] Capital, Verticals net earnings decreased by $0.1 billion *due to higher insurance reserve provisions ($0.1 billion)* and lower gains, partially offset by core increases." Given the multi-billion dollar reserve increases that other LTC insurers like Genworth had taken during this time period, *see* ¶ 116, GE's reserve increase of just $100 million signaled to investors that its remaining LTC exposure was small and posed no material future risk to the Company. Indeed, following GE's disclosure of the $100 million reserve increase, analysts at RBC reaffirmed their belief that "GE Capital's balance sheet and risk profile have been *dramatically reduced* over the past year as the company completed sales and spins of +80% of its finance businesses."

148. In addition, when analysts began to question management regarding the Company's run-off insurance exposure following the Company's announcement of a $100 million reserve increase, Defendants actively misled investors regarding the risks associated with that portfolio. For example, during the February 22, 2017, Barclays Industrial Select Conference, Bornstein was asked if GE would consider "sell[ing] the liability in that insurance; kind of write a check and get rid of it?" In response, rather than disclosing the massive risk the portfolio still carried, Bornstein falsely claimed that the "low interest rate environment" was the primary impediment to selling its remaining insurance liabilities, "I think interest rates are a fundamental challenge and (inaudible) long-term liabilities in a low interest rate environment is a challenge."

149.    Laxer, CEO of GE Capital, made similar misstatements during the Company's March 13, 2017, J.P. Morgan Aviation, Transportation & Industrials Conference, telling J.P. Morgan analyst Tusa that it would not be "attractive" for GE to sell its run-off insurance portfolio "given the interest rate environment we are in right now."  Laxer went on to state, "we would like to see a few increases before that would be attractive."  Tusa cited these representations in a report he issued that day, stating, "[o]n the insurance liabilities assets, GE noted that it's not attractive to exit this business in the current rate environment and would need a couple more increases in rates to start considering a move."

150.    In truth, and in stark contrast to the foregoing statements by Bornstein and Laxer, it was not simply low interest rates were preventing GE from selling its LTC insurance portfolio. Rather, GE could not sell its LTC portfolio because—as investors would learn at the end of the Class Period—the "check" that GE would have had to write to "get rid of it" exceeded *$20 billion*. Indeed, as discussed herein, GE's Disclosed Insurance Liabilities increased by nearly *$27 billion* when it began including LTC in its calculation at the end of the Class Period, and its LTC liabilities were so massive that led to the Company booking a *$9 billion* reserve charge in 2017 and agreeing to contribute an additional *$15 billion* in capital to its insurance subsidiaries over the next seven years.

151.    In light of the foregoing misrepresentations and omissions concerning GE Capital's reduced risk profile, and given Defendants' failure to disclose GE's LTC insurance liabilities throughout the Class Period, investors were unaware of, and could not discern from GE's false or misleading disclosures, the grave risks facing the Company.

### F. Defendants Mislead Investors Regarding GE's LTC Reserves Throughout The Class Period

#### 1. Defendants Misrepresent The Extent And Adequacy Of GE's LTC Reserves

152.    In a further effort to conceal GE's outsized LTC insurance exposure from investors, Defendants issued materially false or misleading statements during the Class Period regarding the extent and adequacy of GE's insurance reserves, including its LTC reserves.

153.    By way of background, GE was required to hold two different reserves against its LTC insurance exposures: "Benefit Reserves" and "Claims Reserves." "Benefit Reserves" are established for policies at the time they are issued and reserves against future claims **not yet made** by policyholders.  It is calculated as the present value of future benefits to be paid less the present value of future net premiums payable.  "Claims Reserves" by contrast, reserve against future payments to be made on claims that have **already** been made on or before the end of a particular reporting period.  Claims Reserves are calculated as the present value of the amount needed to provide for the estimated ultimate cost of settling such claims.  When an insured event occurs, Claims Reserves are incurred and Benefit Reserves are released.

154.    GE did not expressly disclose Benefit Reserves or Claims Reserves in the 2012 10-K or its Class Period SEC filings, nor did it separately disclose the extent of its LTC Benefit Reserves or Claims Reserves to investors throughout most of the Class Period.  Instead, GE disclosed to investors only a line item titled "Life insurance benefits," which it described as "obligations to annuitants and policyholders in our run-off insurance operations."  Though not defined as such during the Class Period, GE's post-Class Period SEC filings indicate that its "Life insurance benefits" figures reflected the aggregated amount of GE's Benefit Reserves relating to **all** of its insurance policies, including its LTC insurance policies (even though LTC insurance is

plainly distinct from life insurance in terms of expected premium receipts, claims payments liabilities, and other risk characteristics).

155.    In fact, as investors would learn at the end of the Class Period, *none* of the reserves contained in GE's "Life insurance benefits" disclosure actually related to life insurance policies.

156.    Indeed, as reflected in GE's 2017 10-K, the "Life insurance benefits" line item actually consisted of: (i) LTC reserves (41% and 54% of the total in 2016 and 2017, respectively); (ii) reserves for "[s]tructured settlement annuities with life contingencies and other contracts" (49% and 31% of the total in 2016 and 2017, respectively); and (iii) "[s]hadow adjustments," which reflect "unrealized gains on specific investment securities" that would result in a premium deficiency if realized (10% and 15% of the total in 2016 and 2017, respectively).

157.    Calling the risk exposure from such policies "Life insurance benefits" was materially false or misleading.  Indeed, in FE-2's view, GE's inclusion of LTC reserves in an entry titled "Life insurance benefits" cannot be a truthful statement since the characteristics and risks associated with LTC (a type of health insurance with periodic incurred benefit payments structure) is separate and distinct from those of pure life insurance (pure mortality products often paying a single face amount), versus even of annuities (pure survival products).  Such a statement misleads investors reading it because it fails to communicate the correct characteristics of the risks associated with GE's LTC portfolio, a particularly important communication in light of the negative conditions within the LTC insurance marketplace during the time period the statements were made.

158.    In addition, prior to mid-2017, GE did not separately disclose its Claims Reserves to investors.  Instead, GE subsumed those reserves in an "Other" line item that also included non-reserve items like "claims adjustment expenses."  As investors would learn at the end of the Class

Period, over **70%** of GE's Claims Reserves were actually reserves held against its undisclosed LTC insurance liabilities.  Indeed, GE's 10-Q for the three months ended September 30, 2017 the ("3Q17 10-Q") disclosed that $3.4 billion of its $4.6 billion Claims Reserves was related to LTC insurance contracts.

159.    Because GE did not separately disclose its LTC reserves to investors during the Class Period, but instead bundled those LTC reserves within its disclosure of "Life insurance benefits" and "Other" reserves, investors could not discern the extent that GE had reserved for its exposure to the toxic LTC insurance market—which constituted the vast majority of its insurance exposure throughout the Class Period.

160.    Relatedly, Defendants' decision to **remove** GE's LTC liabilities from its Disclosed Insurance Liabilities, as discussed above, but **bundle** GE's LTC Benefit Reserve in its line item described as "Life insurance benefits" created a deception that its reserves were more than adequate to satisfy its contractual insurance obligations.

161.    As reflected below in ¶ 162 below, prior to excluding LTC payment obligations from its Disclosed Insurance Liabilities, GE's Disclosed Insurance Liabilities exceeded its disclosed "Life insurance benefits"—i.e., its Benefit Reserves.  Beginning on February 25, 2013, however, when GE filed the 2012 10-K that omitted its LTC insurance liabilities, and continuing into and throughout the remainder of the Class Period, the trend reversed and GE began representing to investors that its reserves **exceeded** its future insurance liabilities.

162.    Tellingly, after GE came clean regarding the true extent of its LTC exposure, the trend reversed once again:



163.    Thus, Defendants' removal of GE's LTC liabilities from its Disclosed Insurance Liabilities in its Class Period 10-Ks, in violation of GAAP and applicable SEC regulations falsely indicated to investors that GE had ***more than adequately reserved*** for its remaining insurance payment obligations.

164.    Defendants' deception concealed from investors that, in truth, GE's insurance reserves were materially inadequate throughout the Class Period.  Indeed, while the LTC market continued to deteriorate between 2008 and 2016, GE's reported "Life insurance benefits" figure remained relatively flat, fluctuating by an average of just 6.2% annually.  In 2017, however, after the Company's disclosure of its true LTC exposure, GE's reported Benefit Reserves skyrocketed ***by over 63%***, from $18.74 billion to $30.55 billion:



**165.** GE's LTC reserve figure—which it disclosed for the first time on October 20, 2017 to represent roughly $12 billion or 50% of its insurance reserves—ballooned to over $20 billion by the end of 2017. Contractual liabilities against these reserves, which were disclosed to be $11.1 billion at year-end 2016, spiked to $38 billion as of December 31, 2017.

        **2.**     **Defendants Lacked A Reasonable Basis For Concluding GE's LTC Reserves Were Adequate**

**166.** Contrary to Defendants' representations concerning the extent and adequacy of GE's reserves for its remaining insurance liabilities, unbeknownst to investors, there were crippling issues with the models, assumptions, and periodic testing utilized by GE to purportedly assess and affirm the adequacy of those reserves during the Class Period. These issues, of which Defendants knew or recklessly disregarded, rendered GE's reported "Life insurance benefits" figures and statements concerning the Company's insurance exposures and reserves materially false or misleading and without a reasonable basis in fact.

167.    As a general matter, the required amount of Benefit Reserves and Claim Reserves is determined through actuarial accounting methods that project an insurer's future payment obligations under its policies.  The assumptions used to project these future payment obligations have a direct and material effect on the amount of required reserves.  As described above, assumptions typically used to determine future payment obligations, and thus calculate required reserves, include mortality rates, morbidity rates, lapse rates, and interest rates.

168.    GAAP requires the ongoing application of the original liability assumptions in subsequent periods unless a potential reserve deficiency is identified (ASC 944-40-35-5)—in other words, the assumptions used to determine Benefit Reserves are "locked in" at the time an insurance obligation is entered into or acquired.  Deficiencies occur when policyholder premiums and current reserves are inadequate to satisfy contract benefits and expenses, as well as enable recoverability of deferred acquisition costs (AAG, 7.46, 9.85-.93).

169.    To test for a potential reserve deficiency, GE conducted periodic testing, as required by GAAP, such as loss recognition testing, which is a formalized process utilized to determine if a particular company is able to align certain assets and liabilities within a particular line of business, FE-2 explained.  If a deficiency is identified, GAAP requires insurers to "unlock" their assumptions and determine their liability for future policy benefits using assumptions revised to consider then-current experience.  Any resulting loss is recorded in the current period.

170.    As a reinsurer, GE was also required to perform statutory cash-flow testing to assess the adequacy of their Benefit Reserves.  Cash flow testing involves determining whether an entity has sufficient reserves to cover expected future payment obligations under its policies.  Where cash flow testing identifies a reserve margin that is less than zero, reserves must be increased.  In accordance and conformity with Statutory Accounting for Insurance Companies, as set forth in the

NAIC Accounting Practices and Procedures Manual, as well as state laws, regulation, and general administrative rules, GE was similarly required to make a good faith estimate of their reserves based on certain enumerated factors.  According to the Insurance Information Institute, "actuarial estimates of the amounts that will be paid on outstanding claims must be made so that profit on the business can be calculated.  Insurers estimate claims costs . . . based on their experience. Reserves are adjusted, with a corresponding impact on earnings, in subsequent years as each case develops and more details become known."

171.    At GE, assessing the adequacy of its insurance reserves was purportedly a product of actuarial analysis at the insurance subsidiary level (ERAC and UFLIC), followed by subsequent review through GE's Internal Audit function and/or Corporate Audit Staff ("CAS").  During the Class Period, the actuarial process included the following: (i) the creation of an experience study by the lead actuary, which compares the actual experience on a block of business with a model of how the insurer expected that experience to look at some earlier point in time (often at inception of the policy); (ii) an assumption governance phase in which assumptions to be used in subsequent stages of the process, including mortality rates, morbidity rates, lapse rates, and interest rates, are proposed and set, usually by comparing GE's actual experience with its expected experience;  (iii) an asset adequacy phase, wherein cash flow testing for assets and liabilities is conducted; and (iv) loss recognition testing, which, as noted above, is supposed to analyze whether GE was sufficiently reserved for its LTC exposure within ERAC and UFLIC (and, more globally, North American Life and Health).

172.    All aspects of these processes, including the models, methodologies, and underlying assumptions utilized, are then subject to review by GE's Internal Audit, which identifies and prioritizes audit issues for remediation, and reports those findings to the Company's

senior management and relevant Board committees.  FE-2 explained that audit findings and work papers, and summaries thereof, are stored in a central system within GE Capital called Audit Works, which is a system of record for all issues.  CAS also participate in audits of GE's business lines.

173.    As noted above, for fiscal year 2017, in concert with GE's change of management and new CEO Flannery's "deep dive" into GE's fundamentals, GE's Benefit Reserves were increased to an astounding *$30 billion*.  Bornstein's explanation for the 2017 increase was purportedly the fact that GE had "recently experienced elevated claim experience for a portion of [its] long-term care insurance contracts."

174.    This explanation was false.  As discussed below, prior to 2017, Defendants ignored a host of red flags, including Internal Audit and actuarial findings identifying critical issues with the models, assumptions, and testing relating to GE's LTC exposure, and elevated, adverse claims experiences from the direct writers of policies GE was reinsuring, and the market as a whole.  As shown below, these and other adverse facts indicated that GE had no basis on which to rely on the adequacy of its reported "Life insurance benefits," or the accuracy or veracity of outputs generated from periodic testing using any model under ERAC or UFLIC.

> **a.    Defendants Knew That All Models Used By ERAC And UFLIC Were Fatally Flawed And Were Not Validated Or Approved By GE Capital's Model Validation Group**

175.    Model risk management at ERAC and UFLIC was a major problem through the Class Period.  Indeed, during this time period, *none* of the models used by those business lines were validated or approved by GE's Model Validation group, but all were flagged with serious audit issues.  Evidence of these major challenges was documented as audit issues and in audit work papers, as were all issues identified by GE Capital's Internal Audit from at least 2012 through the beginning of 2017, according to FE-2.

176.    By way of background, in or around late 2012, after ERAC and UFLIC were placed under GE Capital's umbrella, GE's Internal Audit group performed its first audit of ERAC and UFLIC, which included a review of all models owned by those lines of business.  FE-2 explained that before ERAC and UFLIC were placed as subsidiaries under GE Capital, they had not been subject to either internal auditing of GE Capital Audit or GE Capital's governance requirements, which included requirements that all models be reviewed, validated, and approved for use.  Thus, up to and including 2012, ERAC's and UFLIC's models were not independently reviewed, validated, and approved in accordance with an appropriate formal model risk governance policy, which required an independent and functioning second-line-of-defense model validation function. FE-2 further explained that it was expected that ERAC and UFLIC would be complying with the governance requirements of GE Capital and/or seeking temporary approvals for exemptions within a reasonable amount of time after the organizational transfer.

177.    In addition, there were documented GE Capital audit issues surrounding ERAC's and UFLIC's models not being a part of the single model inventory held and approved by GE Capital's Model Validation group.  To this end, FE-2 noted that prior to 2013 there was not a single inventory of models for ERAC and UFLIC.  A single inventory of models is a very strongly suggested model risk management requirement appearing in SR 11-7 (Supervisory Guidance on Model Risk Management by the Board of Governors of the Federal Reserve System, Office of the Comptroller of the Currency), to which GE Capital—and, by extension, ERAC and UFLIC—were subject.

178.    In his auditing reviews of models used by ERAC and UFLIC, FE-2 identified that there appeared to be an overarching issue in several examples of models lacking sufficient supporting or explanatory documentation. FE-2 denotes this type of exception as a "first step

failure"—meaning no further audit review could/should be performed with respect to any such model as it did not meet the requirements of the model governance policy of GE Capital, nor those of SR 11-7. Once this type of failure has been remediated, then further model validation examination and further Internal Audit examination can be made. In other words, until such remediation is complete, models cannot be adequately validated, and an audit of those models, or their outputs, cannot occur.

179. FE-2 identified examples of model risk associated with using Excel-based models at ERAC and UFLIC, explaining that while Excel is a useful tool for complex calculations, often, documentation for the spreadsheet is not imbedded into the spreadsheet. As well, critical historical information and support for the model, its control and testing of inputs, links, internal calculation techniques chosen, length and complexity of formulas in a single cell, and control of outputs may not be available at all in Excel form. As a result, it would be nearly impossible for anyone other than the original programmer to review, test, or validate those models with their inputs and outputs.

180. Hard-coding of values into formulas is another example FE-2 explained was an issue at ERAC and UFLIC. Hard-coding of an assumption value (e.g., valuation interest rate for calculating present values) into a formula rather than by using a variable increases model risk. Not only is it hard to find all of the places in all of the cells that use the new assumption value, but there is also the manual risk of incorrectly inputting the new value where it is needed. Generally, the spreadsheet controls are improved by establishing variables where needed in formulas rather than specific assumption values that are subject to change. This type of infirmity renders models highly susceptible to error.

181. FE-2 likewise explained that some models can become "stale" over time, particularly where inputs or assumptions are susceptible to frequent change (like interest rates or,

for LTC policies, lapse rates). Therefore, a good model risk governance policy will incorporate a process of periodic, independent validations on a model to ensure the model is currently appropriate, operating accurately for its intended purpose, and generating reasonable outputs. It is critical that a good model risk governance policy address and attempt to mitigate the effects of the many possible model risks

182. Despite these critical issues, FE-2 does not believe that ***any*** of the models used by ERAC or UFLIC were validated or approved by GE's Model Validation group during his tenure with the Company. The GE Capital Model Validation group is able to provide a complete history of validation of specific models presented for validation and/or exemption. The history is stored electronically. The status and issues surrounding the models of ERAC and UFLIC appear in this system. When periodically checking on the status of models and modeling at GE Capital, FE-2 recalled seeing rejections of ERAC models, which were sent back for explanations, corrections, or remediations.

183. These debilitating issues were well known within GE. In addition to Audit Works, FE-2 explained that audit issues identified as "Schedule II" are considered "huge issues" of significant importance, "Priority 2" issues are medium issues, and "Priority 3" are lesser issues. Each issue is prioritized by the audit team; a Schedule II is discussed with the Audit Director and the Chief Audit Executive prior to being issued to the business. Schedule IIs are reported quarterly to the Risk Committee at GE Capital. For purposes of tracing the reporting of the issue through the Risk Committees, a Schedule II would first be issued to ERAC/UFLIC. Then, Filsinger, the CRO at ERAC, as part of his normal practice, would report the risk issues he was aware of to the CRO of GE Capital (Anne Kratky, who served as the deputy CRO until Ryan Zanin ("Zanin") assumed the position). The CRO of GE Capital, in turn, presents that information to the Risk

Committee of GE Capital's Board of Directors. The senior management at GE (including the CEO, CFO, CRO, and COO) would be made aware of the formal issue through the written audit reporting. FE-2 believes that audit issues were presented independently to the Audit Committee via the Chief Audit Executive. FE-2 also believes that issues relating to model validation were required to go up to GE Capital and GE since many were Schedule II issue. Therefore, Immelt, Sherin, and Zanin were all aware of these issues. The Chief Audit Executive's presentation includes information on issues, trends, and remediation efforts on open issues.

184. Concerns about the lack of documentation for ERAC and UFLIC models were also raised during a review of Internal Audit's 2015 audit, in which FE-3 participated. At the time, FE-3 was involved in the review of models within GE Capital for SOX compliance, and explained that Internal Audit had looked at all of the SOX models in the legacy insurance business, raised concerns, and recommended that the models be "overhauled." FE-3 further explained that his review of the models within GE's legacy insurance business also found a lack of documentation for the models, and that that the insurance models were very large, and were not written using a professional program such as SAS or C++, but rather maintained in Excel. FE-3 also flagged as an issue the fact that the SOX Controller did not own the models, and that the insurance models each had an owner and second owner in the same business unit (i.e., the creator and "independent" reviewer were housed in the same unit). FE-3 was told during the course of his review that the business unit was going to re-write the models, and recalled that by the summer of 2016, the new analytical models were drafted. FE-3 believes that the SOX analytic problems with the models were not cleared up until (or around) December 2016.

185. Given the foregoing issues, Defendants had no reasonable basis on which to rely on the accuracy or veracity of outputs generated from periodic testing using any model within

GE's legacy insurance business lines and, in turn, on the adequacy of their reported "Life insurance benefits." Indeed, in January of 2018, Flannery admitted that when GE finally "open[ed] up the model back to its core fundamental assumptions," the result was the need for a "complete overhaul of the model and the risk assessment."

       **b.**       **Internal Audits Informed Defendants That Assumptions For Blocks Of LTC Policies Were Stale**

186. Internal audits conducted during the Class Period on blocks of LTC policies within GE's legacy insurance business lines also found that GE was relying on stale assumptions when conducting critical, periodic deficiency testing that assessed the adequacy of GE's LTC reserves.

187. In the summer of 2014, FE-2 was imbedded with a team of GE's CAS for the purposes of auditing at ERAC and UFLIC in the Overland Park, Kansas home office. In one specific block case of valuation, FE-2 and his team found that the assumptions ERAC was using were "stale by several years" and needed to be updated. As discussed above, differences in actual versus expected lapse rates and morbidity rates (among other assumptions) typically change the status of an insurance policy or block and result in increased or decreased future liabilities, which can trigger, among other things, reserve increases.

188. FE-2 stated that ERAC's senior management agreed with his audit findings. The exception was presented to the actuary responsible, and was quickly confirmed. The actuary reported the corrected amount, thus the magnitude of the exception was made known. The actuary reported the exception to ERAC management. The correction was an increase in reserves for the block. FE-2 noted that the Audit Manager independently reported on status of audit exceptions and progress to ERAC management. As noted above, all audit issues were entered into Audit Works, and reported as described in ¶¶ 172, 183.

c.      **Actuarial Analyses Concluded That Assumptions Used In
        Periodic Testing Bearing On The Adequacy Of GE's LTC
        Reserves Were Susceptible To Results-Driven Manipulation**

189.    Despite assuring investors that GE maintained adequate controls over its financial
reporting, including with respect to its reported "Life insurance benefits," multiple witnesses
confirmed that testing conducted to assess the adequacy of those reserves could be—and, in fact,
was—manipulated to avoid generating negative events (i.e., events indicating that LTC liabilities
exceed LTC investments (i.e., incoming premiums and interest earned thereon)).

190.    FE-1 explained that after assumptions were approved and locked in during the
assumption governance phase, discussed above in ¶ 171, they were loaded into models by ERAC's
Chief Actuary, Ramsey, and David Benz ("Benz"), the LTC Managing Actuary.  These models
were used to test cash flow liabilities and assets in the asset adequacy and loss recognition phases.
Importantly, both FE-1 and FE-2 explained that once assumptions are proposed, debated, and
approved in the assumption governance phase, any subsequent changes made to the approved
assumptions must be supported by detailed reasons and back-up documentation.

191.    On numerous occasions during the Class Period, however, assumptions impacting
the results of GE's cash flow testing and loss recognition testing were inexplicably altered without
any justification.  To this end, FE-1 explained that in late 2015 (November and December),
Ramsey and Benz stopped providing FE-1 with the documentation necessary to back-up the
changes in assumptions they had made—changes FE-1 recalled were "really big changes."  Indeed,
after Thanksgiving 2015, FE-1 started to receive updated liability cash flow results from Benz
"without adequate justification or explanation as to what had changed in the liability cash flow
model."  FE-1 suspected that Benz and Ramsey were looking at the liability cash flows and making
changes to the liability assumptions.  They would then ask FE-1 to run those updated liability cash
flows in the asset adequacy process.  But, FE-1 was never given the actual liability assumptions;

63

instead, he was only given the results of the liability cash flow test. When FE-1 requested from Ramsey and Benz the underlying model through which the results were generated, it was never provided. Instead, he was told, among other things, that certain assumptions had been changed.

192. FE-1 recalled that he started receiving "much larger" changes with very little or no justification—changes "so big, I couldn't reconcile them [with prior cash flow testing results], get comfortable with them." According to FE-1, if the difference made by a change was over $50 million, he would dig deeper into the different line items such as premiums and expenses to try and understand the change. FE-1 recounted how there were a couple instances where the difference from one iteration of a cash flow test to another was hundreds of millions of dollars and he could tell that it was coming directly from claims, which are the result of two assumptions (morbidity (or frequency) and utilization (what percentage of the total benefit is being used)). FE-1 was told by Benz that the changes were requested by Ramsey.

193. FE-1 further recalled long, closed door sessions between Benz and Ramsey after which FE-1 would get a new iteration of liability cash flow without explanation. FE-1 suspected assumptions were being changed with a predetermined cash flow target in mind. By November 2015, FE-1 suspected he was being excluded from the assumption-setting process. FE-1 expressed his concerns about the model changes to Ramsey, William Steilen (ERAC's CFO at the time), the CEO of ERAC, and to GE's auditors (KPMG).

194. During the loss recognition testing phase of the actuarial process in May to June 2016, which followed the asset adequacy phase, FE-1 calculated a "loss recognition event" of around $200 million. FE-1 believed that GE Capital would "need to come up with" this amount and hold additional GAAP reserves. After FE-1 presented this information to Ramsey and others though, Ramsey went up to Steilen's office and came back down hours later showing that they had

a $78 million surplus because they changed the way they were doing loss recognition testing. FE-1 recalled how Ramsey and Steilen claimed to be "calculating this in a much better way." When FE-1 received one of the last iterations of liability cash flows from Benz, Benz let FE-1 know that he was "very uncomfortable" with what he had received from Ramsey.

195.    FE-2 explained that the GE Capital Audit team, FE-1, and KPMG were "all in agreement" about FE-1's concerns regarding liability cash flow and loss recognition testing (in or around the summer of 2016). According to FE-2, KPMG confirmed understanding the concerns related to loss recognition testing that were raised in a detailed memo written by FE-1 during the time of this audit. FE-2 recalled that the memo was reported by FE-1 to be sent to Mr. Ramsey.

196.    Despite these glaring and obvious flaws in the actuarial process used to test the adequacy of GE's Benefit Reserves, Defendants nonetheless continued to rely on the results of such testing throughout the Class Period, as GE continued to reaffirm the adequacy of its reserves against insurance liabilities.

### d.    Defendants Were Aware Of The Adverse Claims Experiences Of The Direct Writers Of LTC Policies GE Reinsured

197.    As discussed above, well before the beginning of the Class Period, across the LTC industry, claims were significantly higher than insurers had expected, due to increased longevity, low lapse rates, and increases in healthcare costs.

198.    The industry experience of the LTC insurers that GE reinsured should have been well-known to GE as reinsurer of these policies. As set forth in the chart below, since at least 2010, the direct writers of the LTC policies that GE reinsured through its ERAC and UFLIC subsidiaries had actual-to-expected claims ratios that exceeded 100%, meaning that the dollar value of claims they actually incurred exceeded the dollar value of claims that insurers had expected to incur based on their assumptions regarding lapse, mortality, and morbidity rates:

65

**Summary Of Actual-To-Expected Incurred Claims Of Direct Writers Reinsured By GE's Insurance Subsidiaries**

| Year | Actual Incurred Claims | Expected Incurred Claims | Actual/Expected Incurred Claims |
|------|------------------------|--------------------------|----------------------------------|
| 2010 | $933,348,253 | $769,416,073 | 121.3% |
| 2011 | $1,015,285,925 | $822,131,849 | 123.5% |
| 2012 | $1,134,956,979 | $889,907,347 | 127.5% |
| 2013 | $1,163,070,256 | $947,562,692 | 122.7% |
| 2014 | $1,315,692,123 | $1,001,765,149 | 131.3% |
| 2015 | $1,371,258,779 | $1,176,457,386 | 116.6% |
| 2016 | $1,550,652,840 | $1,127,639,021 | 137.5% |

199.    Analysts have noted that actual-to-expected claims ratios of 116% or greater "paint an alarming picture."  As reflected in the preceding chart, six of the seven years were significantly worse than 116%, presenting a catastrophic miss from a statistical point of view.

200.    In fact, on September 15, 2017, after GE first alerted investors to the potential for a reserve charge on its LTC portfolio, Evercore analysts issued a report expressing their belief that some of the LTC blocks that GE reinsured were experiencing "actual to expected claims performance" as high as 162%.

> **e.    Defendants Knew GE's LTC Portfolio Contained Over 300,000 Policies With Substantial Risk**

201.    Despite purporting to "exit" the industry, Defendants knew prior to and throughout the Class Period that GE's over 300,000 LTC policies exposed the Company to a number of risks, none of which were disclosed to investors.  As stated above, in both the Genworth IPO and GE's sale to Swiss Re, GE was forced to retain a substantial portion of its remaining LTC exposure, including many of the most high risk blocks.  As multiple former employees explained, Genworth and Swiss Re refused to take on the "bad ones" because of the policies' "long-term unknown risk."

202.    Miller served as a controller during the Genworth IPO.  According to FE-4, Miller's responsibilities preparing for the Genworth IPO were such that she did "almost everything except

actuary work," including analyzing what business stayed and went in the IPO and consolidating financial information related to affected businesses. Miller would have been "intimately" involved with the Genworth IPO and related reinsurance of the three product lines by UFLIC, FE-4 stated, and would have been given a list of LTC policies that reflected the underlying risk.

### f.   Defendants Knew That The LTC Industry Was Deteriorating

203.   As shown above, Defendants also knew well before the Class Period—and repeatedly touted to investors—that the LTC market was in serious decline. As Zanin admitted in January 2018, "*[v]irtually, the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected*."

204.   In addition, GE was a member of the Society of Actuaries Long Term Care Insurance Section ("SOA LTCI"), which, among other things, publishes newsletters three times per year and organizes section meetings, including a three- to four-day annual meeting, to discuss pertinent issues and ongoing research projects in the LTC insurance industry. The newsletter is called Long-Term Care News and, as stated in each newsletter, "is free to section members" and "available on the SOA website (www.soa.org)."

205.   Prior to and during the Class Period, Long-Term Care News published articles that chronicled the negative issues facing LTC insurers. For example, the August 2014 issue of Long-Term Care News (Issue 36) featured the article *Mechanics and Basics of Long-Term Care Rate Increases* as its centerpiece. The article described the "misses of the past in terms of pricing assumptions and the need for rate increases" which by then had "been well established." The article discusses how industry-wide mis-estimation of morbidity, persistency, and interest rates, among other things, had resulted in a general need for premium increases, advocating that there ought to be a "shift" in the thinking and regulation "regarding LTC rates and the basis for which a rate increase is determined."

206.     Key GE personnel intimately involved with the Company's LTC portfolio served in SOA LTCI leadership roles and published for the SOA LTCI during the Class Period.  For example, Jim Berger, an LTC Valuation Actuary and Economic Capital Actuary with GE during the Class Period, was the "Chairperson" of the SOA LTCI and, in that role, oversaw the SOA LTCI's activities in 2014.  David Benz, ERAC's LTC Managing Actuary responsible for locking in the assumptions during the assumption governance phase, published in the Long-Term Care News.  The Vice Chairperson of the SOA LTCI in 2014 was Robert Hanes, a director at KPMG LLP in Radnor, Pennsylvania.

207.     According to Issue 36 of Long-Term Care News, SOA LTCI held its annual meeting in Orlando, Florida in October 2014, and included a "standing room only" general session tackling the "elephant in the room"—whether "the long-term care insurance industry ha[s] a future given its current challenges, missed assumptions and plummeting sales."  The session featured a presentation by Genworth CEO Thomas McInerney, during which he discussed his belief that "many carriers in the industry waited too long to take action when emerging [claims] experience was incongruent with original assumptions and recommend[ed that] carriers annually evaluate results against assumptions."   The 2014 annual meeting also included a presentation titled *Mitigating Industry Trends in LTC Experience*.  According to a 2017 LTC industry report issued by Credit Suisse, the presentation "demonstrated the need for additional premium rate increases across the industry" and suggested that, without a rate increase, the industry may suffer a $50 billion premium shortfall.

**G.     Defendants Belatedly Reveal The Extent Of GE's LTC Exposure And GE Records A Massive $9 Billion Reserve Charge Along With A Commitment To Increase Capital Contributions By An Additional $15 Billion**

208.     As noted above, throughout the Class Period, investors were led to believe that GE no longer had any material LTC exposure.  However, as investors would belatedly learn at the end

of the Class Period, GE had retained, concealed, and under-reserved for **billions** of dollars in LTC insurance liabilities.

209.    In was not until July 21, 2017—just one fiscal quarter after Bornstein and Laxer falsely represented to investors that low interest rates were the primary reason why the Company was retaining its run-off insurance business—that GE announced that, in truth, it was suffering from "***adverse claim experience in a portion of our long-term care portfolio***," and that this negative LTC claims experience was severe enough to require the Company to reassess the adequacy of its insurance reserves.  However, after years of being told that GE Capital's risk had been reduced and that the insurance business had been successfully exited, coupled with the complete removal of GE's LTC liabilities from its Disclosed Insurance Liabilities, the market did not and could not fully appreciate what was still to come.

210.    Three months later, on October 20, 2017, the Company revealed that ***roughly 50%*** of its total insurance reserves—or ***over $12 billion***—related to GE's LTC exposure, and further announced that it was suspending GE Capital's $3 billion dividend payment to GE until its reserve analysis was completed.  Less than a month later, Miller admitted that even though its reserve testing was not yet complete, GE expected its forthcoming LTC reserve charge to eclipse the size of GE Capital's $3 billion dividend payment.

211.    Finally, GE shocked analysts and investors alike on January 16, 2018, when it recorded a ***$9 billion*** charge to earnings related to an increase to the Company's LTC Benefit Reserves.  The Company further disclosed that, due to an increase in its future LTC liabilities, GE Capital expected to contribute ***$15 billion*** in capital to its insurance subsidiaries over the next seven years.

### H.     Additional Allegations Of Scienter

212.     Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or ultimate authority over GE's and the Individual Defendants' materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section VII were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above Defendants' scienter is further evidenced by the following facts:

213.     *First*, Defendants deliberately removed GE's enormous LTC liabilities from its public filings the day before the start of the Class Period, breaking from prior practices and excluding LTC liabilities from its required Disclosed Insurance Liabilities without any explanation to investors.  *See* Section V.C.  By excluding LTC liabilities and failing to offer any explanation, GE falsely represented in SEC filings that it had no material LTC exposure (i.e., payment obligations).   The timing of Defendants' decision to exclude this information is highly suspicious—indeed, the Company had included LTC liabilities in its pre-Class Period disclosures, and after GE finally revealed the extent of its LTC exposure in the 2017 10-K, it reverted to this pre-Class Period practice.  Then and only then did GE report that its insurance liabilities had skyrocketed to $38.0 billion.

214.     Moreover, it is implausible that Defendants were unaware of the nature and extent of GE's increasing LTC liabilities, as: (i) GE reviewed and quantified these liabilities before intentionally removing them from the Company's Disclosed Insurance Liabilities before the first day of the Class Period; (ii) Flannery has admitted that GE reviewed its LTC insurance exposure by no later than 2015 as part of the GE Capital Exit Plan; and (iii) at least as of July 2016, Bornstein

spoke directly on the topic of LTC insurance. Further, it is implausible that over *$20 billion* in previously unknown insurance liabilities materialized overnight, or even in the year since GE's prior annual review.

215. *Second*, Defendants were required to quantify GE's LTC liabilities, future payment obligations, and reserves every year as part of GE's annual reserve deficiency testing, and deliberately chose not to disclose them. As a regulated insurance business, GE was required to perform deficiency testing (including cash flow and loss recognition testing) to determine the adequacy of its LTC reserves when actual experience differed from the originally expected experience for each primary assumption. As part of such testing, GE was obligated to (and purportedly did) calculate its future payment obligations, including those under its LTC insurance policies. And GE did. As Zanin stated on January 16, 2018, "[e]ach year, we perform an annual premium deficiency test, which, under GAAP, test[s] to ensure the sufficiency of our current reserves plus future premiums to pay future claims across all insurance books. In all prior years, these test[s] resulted in a positive margin, which, under GAAP, requires that original assumptions above the book remain locked." Yet, despite doing so, Defendants intentionally (and inexplicably) excluded GE's LTC payment obligations from GE's Disclosed Insurance Liabilities and failed to increase GE's LTC reserves in accordance with those obligations.

216. *Third*, Defendants knew GE's LTC liabilities compromised nearly half of the Company's Benefit Reserves. When GE finally began breaking out its LTC reserves in 2017, it was revealed that nearly *50%* ($9 billion of its $19.2 billion) of its "Life insurance benefits" (or Benefit Reserves) and nearly *70%* ($3.4 billion of its $4.9 billion) of its "Claims Reserves" were attributable to its LTC insurance exposure. This information was readily available to Defendants, as Bornstein confirmed in October 2017 when he revealed that "the long-term care book at GE

71

Capital's legacy insurance business [] represents $12 billion or roughly 50% of our insurance reserves." Given the size of GE's LTC reserves and their material contribution to GE's total insurance reserves throughout Class Period, it is implausible that Defendants were unaware of the nature and extent of the Company's LTC-related liabilities and risks.

217. *Fourth*, Defendants repeatedly assured investors that GE was eliminating its LTC business and had minimal remaining exposure to LTC insurance. Prior to and throughout the Class Period, by Defendants' own admission, they were hyper focused on the Company's exit from the LTC business and made numerous false or misleading statements to investors to minimize the extent of GE's remaining LTC insurance exposure. For example, Immelt told investors at various times that GE had "exited all the insurance businesses" and "sold all the insurance businesses," while Sherin similarly stated that "all of the insurance business is gone." Indeed, Defendants made statements and/or fielded questions regarding this precise issue during earnings calls and investor conferences. In that regard, the Individual Defendants controlled the contents of their statements on behalf of the Company. These and related statements strongly and plausibly suggest that each of the Individual Defendants had detailed knowledge of or access to the material facts and information misrepresented or concealed by Defendants.

218. *Fifth*, the magnitude of the required increase in GE's LTC reserves and the Company's significant overstatement of prior earnings supports an inference of scienter. On January 16, 2018, Defendants revealed that GE's belated reserve testing related to its LTC portfolio showed that the Company was materially under-reserved and disclosed that it would take an "after tax GAAP charge of $6.2 billion for the fourth quarter of 2017" on an approximately $9 billion pre-tax charge, and that GE would need to make an additional "statutory reserve contributions of ~$15 billion over seven years." GE's LTC reserve charge erased GE's entire

earnings reported from all other segments for fiscal 2017, and almost all of the profits previously reported by GE Capital's "Verticals" segment over the four years prior. Given the sheer size of the LTC reserve charge, it is implausible that Defendants were unaware of GE's LTC liability or that GE had materially understated that LTC reserve during the Class Period. As one analyst from Vertical Research Partners, LLC reported following GE's shocking disclosure, "[i]t is hard to imagine a $15 billion problem materialized in the course of a year, like there was not enough rigor behind this process."

219. *Sixth*, the Individual Defendants held high-level positions and had access to material, adverse, nonpublic information concerning GE's LTC portfolio, underlying policies, and exposure. As GE's CEO, CFOs, and CAO during the Class Period, Immelt, Bornstein, Sherin (who also served as GE Capital's Chairman and CEO from July 2013 until September 2016), Miller, and Hauser, controlled the Company's day-to-day operations and were informed of and responsible for monitoring GE's LTC liabilities, and the impact of those liabilities on the Company's operations. Similarly, as the President and CEO of GE Capital from September 2016 until his retirement from GE, which was announced in December 2017, Laxer controlled GE's day-to-day operations at GE Capital.

220. In their respective roles, the Individual Defendants had access to various sources of nonpublic (and public) information concerning the Company's LTC exposure, including its contractual obligations and liabilities, the nature of the underlying policies within the LTC portfolio, GE's claims experience, and the claims experience of industry participants. These sources made readily available to Defendants information that was adverse to their public statements during the Class Period.

221.     In addition to the information identified above, the Individual Defendants likewise had access to an overwhelming amount of internal information directly related to GE's LTC portfolio, including: (i) the assumptions underlying the over 300,000 LTC policies the Company had been unable to unload to Genworth, Swiss Re, or any other entity; (ii) the claims experiences of the insurance provides whom GE reinsured since the inception of the LTC policies, many of which date back decades; (iii) the analyses and results of GE's periodic loss recognition, deficiency, and statutory cash-flow testing to assess the adequacy of the Company's Benefit Reserves, which, among other things, shows whether an entity has sufficient reserves to cover expected future payment obligations; (iv) GE's estimates on their current and required LTC reserves; and (v) the analyses and reports, including model validation, of the Company's internal actuaries, auditors, and other employees focused on risk.  The fact these Defendants had access to this detailed information shows that Defendants knew, or were reckless in not knowing, that GE's LTC reserves (reported only as a portion of the Company's overall reserves) was materially understated.

222.     *Seventh*, Immelt, Sherin, and Bornstein reviewed, approved, and signed GE's false or misleading SEC filings and certifications pursuant to SOX and Exchange Act Rule 13a-14(a). The alleged fraud includes numerous false or misleading reported financial results and figures, and violations of accounting and disclosures regulations.  During the Class Period, as GE's CEO and CFOs, Immelt, Sherin, and Bornstein signed GE's SOX certifications in connection with GE's 10-Qs and 10-Ks filed with the SEC (the "SOX Certifications").  As signatories of both: (i) the SOX Certification representing that "[t]he information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [GE]; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," these Defendants each had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTC exposure and its impact on the Company's financial performance and condition.  As GE's CEO and CFOs, these Defendants' knowledge or recklessness is imputed to the Company.

223.    *Eighth*, the timing and circumstances of resignations of high-ranking executives, including Immelt, Bornstein, Sherin, and Laxer during or shortly after the revelation of the alleged fraud is highly suspicious.  Just weeks before GE surprised investors when it began to disclose adverse material facts concerning the Company's LTC reserves and exposure, GE announced that Immelt would "resign" as CEO of GE, effective July 31, 2017, and that the Board of Directors had voted to appoint Flannery as CEO, effective August 1, 2017.  In August 2017, just after GE revealed that it was "assess[ing] the adequacy of our premium reserves" and would "update" investors the following quarter, GE announced that Sherin would also "resign" from his position as CEO of GE Capital, effective September 1, 2017, and would similarly exit his positions as Vice Chairman and Executive Officer of GE.

224.    Then, shortly before the October 20, 2017 announcement that the $12 to $14 billion Industrial CFOA figure would be slashed to $7 billion, Bornstein unexpectedly departed GE, despite having been named to the important post of "Vice Chairman" just a short time earlier in June 2017.  Indeed, at a June 12, 2017 GE "CEO Succession Investor Meeting," Immelt stressed the importance of Bornstein's role going forward.  Immelt stated that "one of the things [he] feel[s] best about is the ***Flannery-Bornstein partnership***, which [he] view[s] as being ***critical*** to the company."  Flannery added—in response to a question from a Morgan Stanley analyst about "the John [Flannery] and Jeff Bornstein partnership"—that Flannery "is excited to have Jeff [Bornstein]

*as a partner*.  And I think *that's what you should expect*."  Bornstein, for his part, stated, "I've known John [Flannery] for the better part of 23 years" and "I couldn't be more excited about this. I think that we're excited to get John up to speed and really tackle some of what's possible for this company."  Less than four months later, the "partnership" GE had trumpeted to investors as being critical to the Company was abruptly terminated.  On October 6, 2017, GE announced that Bornstein would leave the company and forfeit 80% of the lucrative award package he had just received after being named Vice Chairman.  Shortly thereafter, GE slashed its dividend and, in early 2018, the apparent reason for the dissolution of the Flannery-Bornstein partnership came to light.  The Company announced two separate SEC investigations into GE's practices related to LTC insurance and accounting for Contract Assets and LTSAs (discussed below), all of which occurred under Bornstein's watch.

225.    Finally, in December 2017, in the middle of GE's belated "deeper dive" into the adequacy of its LTC reserves, Laxer, who had just become GE Capital's CEO a year earlier, abruptly "resigned" from GE.

226.    *Ninth*, the SEC investigation into the same misconduct alleged herein supports an inference of scienter.  GE disclosed on January 24, 2018 that it had "been notified by the SEC that they are investigating the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long term-service agreements."

## VI.    DEFENDANTS' CONTRACT ASSET, LONG-TERM SERVICE AGREEMENT, AND INDUSTRIAL CFOA FRAUD

227.    As GE Capital was in the process of being wound down during the Class Period, GE's Industrials segment became the focus of GE's growth.  GE Power was the largest unit within its Industrials business during the Class Period.  As a result, analysts and other market participants

viewed the GE Power segment as a key indicator of the profitability of GE's core operations and as a key indicator of the strength of GE's Industrials operations.

228.    Unbeknownst to investors, during the Class Period, Defendants were engaged in various practices designed to artificially prop up the appearance of Industrials' financial strength, including the strength of GE Power.  Central to Defendants' deception was GE's Contract Assets, an item it reported in its financial statements.

229.    As part of its Industrials energy business, GE builds large-scale power generation facilities, including the equipment and services necessary to maintain these facilities over extended time frames.  The agreements themselves are termed LTSAs, and such agreements might include monitoring, maintenance, service, and spare parts for a gas turbine installed in a customer's power plant.  An LTSA's typical duration is between 5 and 25 years.  The profits that GE expects to earn over the lifetime of the agreements that govern these projects are booked as Contract Assets on GE's balance sheet.  As discussed below, the long-term nature of the LTSAs enabled GE to manipulate such agreements in order to artificially inflate its Contract Assets, which in turn inflated its reported revenues and profits.

230.    Defendants' artificial inflation of GE's LTSA Contract Assets during the Class Period: (i) gave investors a false picture of the profitability of GE's closely-watched Power segment; (ii) violated GAAP; (iii) rendered misleading GE's statements, which are discussed below, about how it accounted for Contract Assets; and (iv) purportedly enabled GE to meet its short-term earnings targets.  In addition, the artificial inflation of GE's LTSA Contract Assets was not sustainable and ultimately created material risks to GE's health, and ultimately led to an $8.7 billion write-down of those assets as of year-end 2017.

## A.     Background On GE Power's Operations And LTSAs

231.    The GE Power segment builds industrial products such as power plants, turbines, and generators, and provides power generation, industrial, government, and other customers globally with products and services related to energy production.  These products and technologies harness natural resources, such as oil, gas, coal, diesel, and nuclear to produce electric power and include gas and steam turbines.  Within the GE Power segment are a number of divisions that provide customers different product and services offerings through LTSAs, including a division called GE Power Services.

232.    GE explained that it provides its "customers with solutions to meet their needs through a broad portfolio of aftermarket services, including equipment upgrades, ***long-term maintenance service agreements***, repairs, equipment installation, monitoring and diagnostics, asset management and performance optimization tools," among other things.

233.    As noted, the sale of gas turbines was a major source of GE's revenue.  As a result, senior management, including Immelt and Bornstein, were keenly aware and routinely discussed such sales, including their purported impact on GE Power's growth, with investors.  For example, on January 17, 2014, during GE's 4Q13 Earnings Call, Immelt reported that there were "125 orders for heavy-duty gas turbines."  Bornstein likewise explained that GE had 65 orders of gas turbines in the fourth quarter alone, up from 26 in the prior year.  In GE's 4Q14 Earnings Call for 2014, held on January 23, 2015, Bornstein reported that GE saw 41 gas turbines orders in the fourth quarter of 2014.  At this point, Bornstein was projecting to "grow services, including" in 2015, and expected to see a "flat gas turbine market."

234.    Similarly, on January 22, 2016, in its Q415 earnings call, Immelt reported that "Power booked 12 H-turbine orders in the quarter, and we now have 33 in backlog."  And on

January 20, 2017, in its Q417 earnings call, Immelt reported that nine H-turbines had shipped in the prior quarter.

235.    Senior management's focus on gas turbine sales and associated LTSAs is not surprising.  Throughout the Class Period, GE Power accounted for a substantial portion of GE's revenue and overall profits.  Indeed, the GE Power segment generated $26.8 billion of GE's overall revenue of $123.7 billion in 2016 and $36.0 billion of GE's overall revenue of $122.1 billion in 2017, *representing approximately 30% of GE's total revenue in 2017*.  Even as technological and energy innovations weakened the power market over the last decade, GE Power reported profits of $5.4 billion in 2014 (which GE subsequently revised downward in its 2015 10-K), $4.5 billion in 2015, $5.0 billion in 2016, and $2.8 billion in 2017.

## B.    GE's LTSA Revenues And Corresponding Contract Assets

236.    As noted above, LTSAs represent long-term agreements that require GE to maintain and service customer assets.  According to GE's 2017 10-K, it recognizes revenue on its LTSAs as it performs under the agreements "based upon costs incurred at the estimated margin rate of the contract."  According to the Company, "[r]evenue recognition on [LTSAs] requires estimates of both customer payments expected to be received over the contract term as well as the costs to perform required maintenance services."  Thus, in essence, the Company estimates the total revenues it expects to generate and the total costs it expects to incur from an LTSA, then uses those estimates to distribute revenues and profits over the life of the LTSA.

237.    However, GE's LTSA customers do not pay GE according to the same timeline that GE uses to recognize revenues.  Rather, LTSA customers generally pay GE "based on the utilization of the asset (per hour usage for example) or upon the occurrence of a major event within the contract such as an overhaul."

238.     Because GE recognizes revenues as it performs under the LTSAs but does not bill customers until certain utilization milestones or major events are achieved, GE frequently recognizes LTSA revenues *before* it actually bills, or receives payment from, its LTSA customers.

239.     To account for this timing discrepancy, GE reports revenues that have been recognized, but not yet billed, on LTSAs as a sub-category of assets identified as Contract Assets in its financial statements.  As GE explained in its Class Period quarterly filings, "[c]ontract assets reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems and aircraft engines), long-term product maintenance or extended warranty arrangements and other deferred contract related costs."  1Q16 10-Q at Note 8.

240.     During the Class Period, GE reported rapidly growing Contract Assets.  Between 2012 and 2015, GE's disclosed Contract Assets were as follows:

| ($bn) | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Contract Assets | $9.443 | $12.522 | $16.990 | $21.156 |

241.     The growth of Contract Assets continued in 2016 and 2017.  In 2016, GE expanded its disclosure of Contract Assets, disclosing for the first time the proportion of its Contract Assets that were comprised of LTSAs and beginning in 2017, GE further disclosed the proportion of the LTSAs attributed to GE Power:

| ($bn) | 2015 | 2016 | 2017 |
|---|---|---|---|
| Contract Assets | $21.156 | $25.162 | $28.861 |
| GE LTSAs | $10.346[6] | $12.752 | $15.157 |
| GE Power LTSAs | Not reported | $6.595 | $7.439 |

---

[6] This figure was subsequently disclosed in the 2016 10-K.

242.     As evident from the table above, 55% and 65% of the increases in GE's Contract Assets in 2016 and 2017, respectively, were due to LTSAs.

**C.     GE's Use Of Assumptions To Determine LTSA Revenues And Contract Assets**

243.     As noted above, GE determines LTSA revenues and the value of the resulting Contract Assets based on the ***expected*** profits that it anticipates earning—and the costs it expects to incur—over the life of its LTSAs.  Thus, the methodology and assumptions used to forecast these revenues and costs are critical to the accuracy of GE's reported LTSA-related revenues and Contract Assets.

244.     In particular, a detailed and accurate understanding and evaluation of how customers will utilize their assets over the term of the LTSA is critical to determining an accurate profit margin.  Indeed, as GE disclosed in the 2017 10-K, "a significant estimate in determining expected revenues of a contract is estimating how customers will utilize their assets over the term of the agreement."

245.     Because, as described above, utilization rates are also critically important to the *timing* of the payments that GE receives under its LTSAs, "[t]he estimate of utilization will impact both the amount of customer payments [GE] expect[s] to receive and [GE's] estimate of costs to complete the agreement as asset utilization will influence the timing and extent of overhauls and other service events over the life of the contract."

246.     Due to the critical importance of utilization rates to the revenues GE recognized under its LTSAs—and the timing of payments from LTSA customers to GE—GE assured investors that it had insight into its customer utilization rates.  For example, in each of the 10-Ks it filed with the SEC during the Class Period, GE stated that it "gain[s] insight into future utilization and cost trends . . . through our knowledge of the installed base of equipment and the close

81

interaction with our customers that comes with supplying critical services and parts over extended periods." Indeed, FE-5 explained that, with customer consent, GE had technology installed to monitor customer assets for which it provided services, such as gas turbines. GE was then able to, and did, access the information regarding customer utilization in "real time."

247. Further, because GE calculates LTSA revenues and Contract Assets using long-term assumptions regarding, among other things, utilization rates, instances arise where those assumptions, and thus GE's estimated revenues, change over the life of an LTSA. During most of the Class Period, such changes were reflected in GE's financial statements through an accounting mechanism known as a "cumulative catch-up adjustment." In simple terms, a cumulative catch-up adjustment was a way for GE to record revenues attributable to changes in the profit margins that GE expected to earn on its LTSAs.

248. Cumulative catch-up adjustments could be either positive or negative. A positive cumulative catch-up may occur when a reporting company determines that it has been underestimating its margin on its LTSAs, and adjusts its expected profits upward, resulting in an increase in revenues. By contrast, a negative cumulative catch-up adjustment may occur when a reporting company adjusts its expected profits downward, resulting in a reversal of revenues, or loss recognition.

249. During the Class Period, GE's adjustments were referred to as "cumulative" because, as discussed in ¶ 261, below, if GE changed its expected profit margin in the third year of a 10-year LTSA, the accounting rules at the time permitted GE to record, in a *single* period, all three years of increased (or decreased) expected profits that resulted from this change.

**D.    Defendants Ignore Objective Customer And Industry Data To Avoid Recording Negative Cumulative Catch-Up Adjustments**

250.    In the early 2000s, GE was experiencing significant growth throughout Europe and other international locations.  When the LTSAs were negotiated during this time, the power plants subject to the LTSAs were generally run at full capacity around-the-clock thereby incurring a high utilization rate.

251.    For the reasons described above, these utilization rates were critical to GE's ability to recognize revenues, and collect cash, on LTSAs.  According to FE-7, when GE entered into an LTSA, the pricing in the contract was largely based upon the number of hours the subject plant (or equipment) was expected to run or be utilized, and the significant service work and billing dates on many LTSAs were often tied, in part, to the same.  Thus, the more (or fewer) hours a turbine runs, the more (or less) opportunity for GE to perform and bill for major service work.  In addition, the more (or fewer) hours a turbine runs, the more (or less) quickly it will reach the milestones that trigger cash payments to GE under its LTSAs.

252.    Utilization of traditional power sources began to decline in or around 2008 during the worldwide financial crisis.  Put simply, plants were used with less frequency, generating less wear-and-tear that would normally have required GE services (and produced GE services revenues) and delayed GE from reaching milestones under the LTSAs that would have triggered GE's ability to invoice revenues.

253.    The downturn in the energy markets continued into the Class Period, as improved energy conservation and a greater reliance on renewable energy sources meant that GE's customers ran their power turbines for fewer and fewer hours each year.  According to a report called *2017 Power and Utilities Industry Trends*, published by PricewaterhouseCooper, "[e]nd-use electricity consumption declined in 22 out of 28 E.U. countries between 2005 and 2014," and "the electricity

sales growth rate since 2002 has hovered around 1 percent or less per year, and demand has declined in five of those years." Indeed, according to the Department of Energy's Energy Information Administration, electricity consumption in the U.S. peaked in 2007 and has declined ever since, despite population and economic growth in the ten ensuing years. In the first nine months of 2017, for example, electricity generation declined by 2.6% compared to the same period in 2016.

254.   GE's customers were not immune to these dramatic changes in the industry. FE-5 stated that from 2010 into the Class Period, GE realized through its monitoring of customer utilization that usage of oil/gas turbines by customers was down 80 to 90%. Making matters worse, as these contracts came up for renegotiation or renewal, GE was no longer able to push the prices it once had for LTSAs. To this end, FE-5 explained that when GE entered into many of the existing LTSAs in the early 2000s, the Company had the ability to pressure counterparts into signing LTSAs at high prices in exchange for GE moving that counterpart up the priority list for new equipment sold by GE. Because of these market conditions, certain of GE's LTSA customers were either unable or unwilling to carry out their LTSAs at the current terms. FE-5 explained that because of the way GE recognizes revenue on LTSAs, if and when an LTSA is terminated, GE would have to write off the value of it from its backlog of revenue. GE avoided this outcome at all costs.

255.   At this same time, Power was selling fewer gas turbines, which significantly reduced GE Power's ability to generate new LTSAs (according to FE-5), but increased GE Power's reliance on LTSAs to make up for revenue shortfalls through cumulative catch-up adjustments (described below).

256. All told, market conditions during the Class Period had a three-fold negative impact on GE Power: (i) fewer turbine sales; (ii) fewer new LTSAs; and (iii) lower expected revenues and profits on existing and new LTSAs. In addition, market conditions negatively impacted the Company's cash flows, as reduced utilization rates pushed out the milestones that triggered payment to GE.

257. Rather than incorporate these unfavorable market conditions into its revenue and cash flow estimates for its LTSAs (which would have resulted in negative cumulative catch-up adjustments), GE largely ignored them. According to multiple former employees, GE Power did not adequately consider (or ignored) the current and future run rates of LTSA customers when estimating future costs, revenues, and margins on its LTSAs. Instead, according to FE-7, GE used the historical average of run rates over the prior three years, which were known internally not to reflect the current and likely future turbine run rates (to which GE had direct access to and could view in real time). Thus, FE-7 explained that the assumptions used to estimate future costs, revenues, and margins on GE Power Services' LTSAs were deficient.

258. Importantly, use of historical averages was not a reliable means of estimating profitability (i.e., revenue and costs) since the demand for power—and corresponding amount of time a turbine would run—was declining world-wide. By using a historic three-year average—rather than taking into account the known current and estimated future decline in hours—to project revenue and costs on a multi-year contract, FE-7 explained that GE improperly delayed recognizing the negative contract cumulative catch-up adjustment necessary to reflect fewer anticipated billing opportunities during the remainder of the contract. Indeed, rather than immediately incorporate lower utilization rates into its models, GE's methodology gradually

incorporated these rates over a three-year period. This had the effect of inflating the reported Contract Assets.

259. In 2016, FE-7 was involved in simulating what would have happened to GE Power Service's LTSA revenues if it utilized a one-year average instead of a three-year average to estimate the unit's margin percentage. FE-7 understood, based on conversations with GE Power employees, that the simulation was requested by Teo Osben, the Chief Risk Financial Officer of Multi-Year Agreements, and that he ultimately decided against using a one-year average because it had a negative impact on GE's global cumulative catch-up adjustments.

### E. GE Power Relies On Undisclosed, Unsustainable Practices To Trigger Positive Cumulative Catch-Up Adjustments And Conceal GE Power's Decline

260. In addition to ignoring market factors indicating that the profitability of GE's LTSAs was declining during the Class Period, GE Power took matters one step further by employing a host of unsustainable business practices in order to trigger *positive* cumulative catch-up adjustments. These accounting adjustments artificially *inflated* GE's revenues and Contract Assets in the short term, and served to maintain the façade around GE Power's profitability and contribution to GE's overall success that Defendants created through false or misleading statements made during the Class Period.

261. Positive cumulative catch-up adjustments can generate significant and immediate increases in revenues for a company. For example, assume that a company revises its estimates in year three of a 10-year LTSA such that it now expected to earn $20 per year on the LTSA instead of $10. During year three, the Company would book an immediate profit of *$40* ($20 it expects to earn in year three plus an additional $10 in profit for each of years one and two). In this example, during the year in which the cumulative catch-up adjustment was recorded, profits from this LTSA *quadrupled* over the prior year.

262.    In practice, GE used positive cumulative catch-up adjustments as a tool to meet its earnings targets.  According to FE-7, it was internally acknowledged within GE Power Europe that once growth and earnings targets were set each year, cumulative catch-up adjustments would be used to make up the difference between the numbers that were actually achievable and the targets that were set.  FE-7 estimated that, between 2015 and 2017, a significant portion of GE Power Services Europe's profits were generated from cumulative catch-up adjustments.

263.    Thus, in response to decreasing customer utilization and other market factors, which negatively (or should have negatively) impacted the margins on GE's LTSAs, FE-7 explained that Power actively renegotiated LTSAs with customers solely for the purpose of increasing the total contract margin and thus generating immediate positive cumulative catch-up adjustments.  Indeed, during the Class Period, there were teams at Power specifically dedicated to identifying contracts that were good candidates for generating positive cumulative catch-up adjustments (or avoiding negative cumulative catch-up adjustments) through renegotiation, according to FE-7.

264.    Power's use of contract renegotiations, described in detail below, to artificially increase its Contract Assets misled investors as to the strength of Power's business and financial condition, and exposed GE to the risk of declining revenues in the event it was no longer able to manipulate existing LTSAs to generate such adjustments. That risk, as well as the practices that created the risk, were concealed from investors.

265.    Indeed, as multiple former employees explained, Power only had a finite number of LTSAs in its portfolio and a limited number of ways to renegotiate and manipulate those LTSAs to squeeze out positive cumulative catch-up revenue increases, all at the expense of future profitability.  FE-5 explained that GE Power were forced to offer incentives, such as free

technology updates or discounted services, to prevent customers from terminating the agreements. This meant GE's undisclosed reliance on renegotiating LTSAs to inflate GE's Contract Assets would inevitably be curtailed. In other words, as Power ran out of LTSAs to manipulate, the positive cumulative catch-up adjustments GE was using to prop up profits would come to a crashing halt.

266. Notably, by the end of 2017, according to FE-7, GE Power Services Europe had already exhausted most of the techniques that GE used to trigger these revenue-boosting cumulative catch-up adjustments and which were relied upon to conceal the fact that the Company was not generating revenue organically.

267. As shown below, Power's reliance on manipulating and "renegotiating" LTSAs— at the expense of future profitability—was well known within GE. According to FE-5 and FE-10, GE maintained operations plans and modeling tools for all LTSAs that included projections for services, costs, revenues, and profitability (i.e., margins). These plans and tools were originally run through an Excel-based program, COSMOS, and were later moved to a server-based application called ICAM, which allowed for even more enhanced reporting, analysis, and modeling, FE-5 explained. FE-5 further explained that COSMOS, and later ICAM, were modeling tools used to create a "hypothesis" of predicted future use of the equipment and give an understanding of earnings. According to FE-5, "all commercial people" used and could access the system.

268. According to FE-10, customer run time, forecasted outages, scheduled service and maintenance dates, and expenses are certain of the primary inputs. FE-10 explained that the information populated into these plans was usually provided by GE Power's Contract Performance Managers ("CPMs"), each of whom was stationed at the specific customer location and served as

GE's "eyes and ears" at those locations. FE-10 further explained that once the information was populated into the system, it generated a schedule for service and/or maintenance based on, among other things, current run rates, and produced a revised revenue forecast and cumulative catch-up adjustment (negative or positive) based on that information. Based on his experience and familiarity with the process, FE-10 believed there were instances where the models concluded a negative cumulative catch-up adjustment was needed in light of changing conditions, but those results were either ignored or altered.

269. Defendants also had access to regular reporting on the renegotiations of LTSAs, and their financial impact. To this end, during his tenure, FE-7 wrote quarterly status update reports on contractual renegotiations for purposes of GE's reporting requirements. Those reports included the number of renegotiations, the number of commitments secured from the renegotiations, and the impact on cumulative catch-ups. These reports were written for the controller in Europe to send to GE's corporate headquarters. FE-7 understood his reports were provided to the controller in Europe and then sent to GE's Global Controller, who then delivered them to Hauser. Hauser, in turn, signed the SOX Certifications, as GE's CAO.

270. Intentionally omitted.[7]

271. As set forth below, the undisclosed techniques Power used to trigger positive cumulative catch-up adjustments exposed GE to a number of undisclosed risks.

---

[7] The allegations at paragraph 270 attributed to FE-6 have been removed at his request.

1. **Eliminating GE-Provided Services To Increase Short-Term Profits At The Expense Of Long-Term Profits**

272.    In order to trigger positive cumulative catch-ups during the Class Period, GE Power eliminated from existing LTSAs the costs associated with certain designated services that, but for their elimination, would have also generated future revenues and profits.

273.    Specifically, in order to increase the overall profit margin on a particular LTSA, GE Power would eliminate the component of the LTSA that called for GE-sourced labor and instead allow the customer to use its own labor services, according to FE-7.  This practice, known as "de-scoping," had the effect of increasing the short-term profit margin on the labor portion of a service contract, which was typically lower relative to the higher margins on capital parts and upgrades.  Removing the lower-margin GE labor from the service contract mathematically increased the overall average profit margin over the life of the contract, because the contract would, as a result, consist of mostly higher margin future capital parts and upgrades.  This, in turn, would trigger a positive cumulative catch-up adjustment and increase short-term revenue because the profit margin on the contract was now higher.

274.    These manipulations of existing service contracts to generate higher margins and thus cumulative catch-up revenue came at a long-term cost to GE Power.  By removing labor portion of the service contract, GE actually cut its long-term profits (i.e., the profit to be earned on the service calls through the provision of labor) just so that it could increase its short-term margins and report windfall cumulative catch-up adjustments in the particular quarter, padding earnings.

2. **Extending Payment Terms And Discounts, But Failing To Account For Risk Of Customer Non-Payment**

275.    In order to persuade customers to agree to renegotiate LTSAs, thus enabling GE to trigger positive cumulative catch-up, FE-7 and other former employees explained that GE was often forced to give concessions, such as price discounts and deferrals of payment.  Thus, GE was

foregoing future revenues and profits, as well as their ability to timely collect, in order to generate artificial earnings through adjustments.

276.     As FE-7 explained, GE Power was effectively lending money to its customers but failing to account for any associated credit risk, and assumed for its own accounting purposes that future collection on the LTSAs was certain (and therefore did not maintain any sort of reserve to account for future risk on its Contract Asset account).  By failing to account for any risk associated with its LTSAs, GE made unreasonable revenue and profitability estimations despite representing to investors that its LTSA revenue and profit estimates account for customers' overall risk profile (including credit risk).

### 3.     Providing Free Technology Without Recognizing A Corresponding Reduction In LTSA Revenues Or Profitability

277.     During the Class Period, in an attempt to prevent LTSA customers from fleeing, GE Power also gave away technology updates that otherwise would have garnered revenues and cash under the respective LTSAs.

278.     "AGPs" referred to GE's "Advanced Gas Path" overhaul, which was essentially a package of products that GE sold to its turbine customers, having the overall effect of upgrading the turbines and making them more efficient.  As J.P. Morgan analyst Tusa stated in a report dated December 12, 2016, the AGP "overhaul, booked as a one-time transaction, raises revenue in the year delivered, but, as per our channel checks, can lower the future services revenue stream, essentially a one time bump, and a pull forward of services revenue."  Tusa also reported that "a mosaic from channel checks with several utilities suggests that a post-AGP renegotiation of related services contracts is common, and the event likely represents a material amount of the $1.4 billion of non-cash LTSA gains booked in 2015."

279.     The Wall Street Journal reported on February 22, 2018 that other former executives confirmed that GE was, indeed, "pulling future profit forward."  In particular, in an article titled, *How Jeffrey Immelt's Success Theater Masked the Rot at GE*, The Wall Street Journal wrote, "Some analysts have expressed concern GE's accounting for the [AGP] upgrades masked pressure on the [Power] division.  According to former executives, the upgrades meant lower service fees for customers, in exchange for one-time upgrade costs, meaning that ***future sales were being pulled forward.***"  Indeed, FE-5 similarly stated that GE Power offered incentives, such as free technology updates or discounted services, to prevent customers from terminating the agreements.

### 4.     Intentionally Omitted

280.     Intentionally omitted.[8]

281.     Intentionally omitted.[9]

282.     Intentionally omitted.[10]

### 5.     Unilaterally Altering Services Under LTSAs

283.     To inflate revenues, GE also stopped replacing parts despite contractual obligations to do so, all under the guise of employing a new "reliability maintenance" approach to units GE Power was servicing.

284.     FE-10 gave the example of a car warranty that provided for the replacement of a particular part at a certain mileage interval, where the service related to that replacement was already paid for, but the service provider refused to make the replacement if it believed the unit or part was operating in a reliable manner.  FE-10 explained that this practice enabled GE Power to

---

[8] The allegations at paragraph 280 attributed to FE-6 have been removed at his request.

[9] The allegations at paragraph 281 attributed to FE-6 have been removed at his request.

[10] The allegations at paragraph 282 attributed to FE-6 have been removed at his request.

increase profitability over the life of an LTSA. FE-10 recalled this practice created many problems with customers, as they had contracted for periodic servicing and were not receiving it.

### F. Defendants Use "Factoring" To Bridge The Cash Divide Between GE's Non-Cash Cumulative Catch-Up Adjustments To Revenue And Industrial CFOA

285. GE's manipulation of its Contract Asset balances and cumulative catch-up adjustments drove GE Power to report strong financial results during the Class Period. For example, the GE Power segment reported revenues of $20.6 billion, $21.5 billion, and $26.8 billion 2014, 2015, and 2016, respectively. During the same years, Power reported impressive profits of $5.4 billion (which GE subsequently revised downward in its 2015 10-K), $4.5 billion, and $5.0 billion, respectively.

286. According to GE's Class Period SEC filings, cumulative catch-up payments accounting for an increasing percentage of the GE Industrial's profits:

| ($bn) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Cumulative catch-up adjustments | $0.4 | $0.3 | $1.0 | $1.4 | $2.2 | $2.1 |
| GE Industrials Profit | $15.486 | $16.220 | $17.764 | $17.966 | $17.598 | $14.740 |
| Percent | 2.6% | 1.9% | 5.6% | 7.8% | 12.5% | 14.3% |

287. In fact, according to a November 1, 2017 article in The Wall Street Journal entitled *GE Shows How 'Black Box' Assets Boost Profits*, LTSA increases boosted GE's earnings for the third quarter of 2017 by $649 million on a pre-tax basis and by $1.93 billion for the first nine months of 2017, equaling 44% and 51% of pre-tax earnings from continuing operations for each period, respectively.

288. In addition to the concealed risks described above, GE's increased reliance on non-cash cumulative catch-up adjustments to drive Industrials' revenues created a serious cash flow

problem for the Company. Much of the revenue that GE was booking as a result of these adjustments would not translate into cash for the year, and likely would never turn into cash because, as described above, GE had been artificially inflating its Contract Asset values solely to generate cumulative catch-up revenue. Thus, as GE increasingly relied on cumulative catch-up adjustments during the Class Period without actually collecting any cash (a discrepancy that was exacerbated by reduced utilization rates), the Company's reported Contract Assets swelled, but so did the gap between GE's earnings and its Industrial Cash Flow from Operating Activities, or CFOA. For example, while GE reported steadily increasing Industrials revenues in 2015, 2016, and 2017 ($108.796 billion, $113.676 billion, and $116.157 billion, respectively), Industrial CFOA declined sharply over the same period—from $12.238 billion in 2015, to $11.610 billion in 2016, to just $9.698 billion in 2017.

289.    As The Wall Street Journal noted in an October 30, 2017 article titled *GE's Numbers Game: Pick from Four Earnings Figures*, "[t]ypically, big gaps between earnings, which are calculated on an accrual basis, and cash flow, which is money going into and out of a company, are a red flag for investors."

290.    In an effort to mask this red flag, and as a result of the cash crisis created by GE Power's reliance on cumulative catch-up revenue, FE-7 confirmed that beginning in 2015, GE Power's management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs, which would help to conceal that GE was renegotiating contracts solely to boost earnings at the expense of collecting payment. FE-7 was directly involved with his U.S. counterparts during the first through third quarter of 2016 in working to find ways for GE Power to generate CFOA.

291.    The solutions FE-7 and his U.S. counterparts developed were known as "monetization," which involved factoring (i.e., selling) receivables in order to generate CFOA.  To create the invoices used for factoring, GE Power Services would persuade its customers to renegotiate the billing contract terms so that the triggering event for an invoice was earlier in time than it would have been (in some cases, by a number of years), but for the contract renegotiation. FE-7 explained that this practice enabled GE to pull forward the future customer billing into the current accounting period so that it could bill the customer immediately.

292.    However, FE-7 further explained that in order to induce the customer to enter into such a modification and agree to revised invoicing terms, GE would typically have to discount the payment required and also push the actual payment due date further into the future—often by a year or more (compared to the non-renegotiated scenario).  This was done solely in order to allow GE Power to accelerate the invoicing of the customer (i.e., create invoices) for purposes of factoring, with no actual change to the underlying performance obligations.

293.    FE-7 explained that in order to actually "monetize" this payment, which was not yet due, GE would then factor the receivable by selling it to either Working Capital Solutions ("WCS"), a subsidiary of GE Capital, or an outside party, often with negative consequences to GE, such as decreased profit on the receivable.  FE-8 worked on negotiations for LTSAs for new products, and took part in planned contract negotiations with prospective customers.  FE-8 understood from at least one of those planned calls that GE needed new contracts signed quickly so that GE could turn and sell the LTSA to banks for cash.

294.    FE-9 explained that factoring was widespread within the Power (and Renewable) Divisions.  He specifically recalled GE was factoring "everything" in Renewable and his counterparts in Power were doing the same.  FE-9 was aware of factoring within the Power

Division while he worked in the Renewable Division because Power and Renewable were under the same management umbrella with the same approval chain up until 2014 or 2015. FE-9 recalled that he would send factoring proposals up the management chain each quarter and approvals would come back down through the chain.

295. GE Power's reliance on factoring to generate CFOA was well known within GE. Indeed, FE-9 explained that, at an internal meeting in or around June 2017, Bornstein acknowledged GE's reliance, noting that the Company was "in too deep" to depart from the practice. FE-7 similarly explained he worked with Kevin Weber, GE Power's Senior Commercial Finance Manager in the U.S., who informed and educated FE-7 about various techniques used globally by GE Power to generate CFOA. FE-7 also stated that Estela Delgadillo, GE's Global Cash Leader for GE Power who reported directly to Donovan, the CFO of Power Generation Services during the Class Period, hired Kevin Weber in early 2016 specifically to lead the global monetization effort.

296. GE's monetization of its LTSAs was also recorded in weekly, monthly, and quarterly reports, according to FE-7. The quarterly reports outlined the total amount of cash that GE had generated through monetization, broken down by region. The monthly reports contained the same information as the quarterly reports for Power Services Europe, and the weekly reports were used to assess which customer contracts needed to be renegotiated for purposes of GE's cumulative catch-up adjustments. FE-7 understood that the quarterly reports, which were in the form of a Power Point presentation, were ultimately used for GE's quarterly Blueprint Review for discussion with GE Power's global leadership, including Paul McElhinney (President and CEO of GE Power Services from May 2014 through December 2017) and Donovan. According to GE's current organizational chart, the individuals who hold both of these positions report directly to the

CEO of GE Power, who in turn reports directly to GE's CEO.  Moreover, given the size and frequency of GE Power's factoring to GE Capital—and the overall impact such factoring had on GE Power's and GE Capital's balance sheets—it is implausible that Laxer, as the CEO of GE Capital, was unaware of this practice or its purpose.

297.    GE Power's reliance on "monetization" exposed GE to a number of risks. According to FE-7, since GE Power was selling fewer and fewer power turbines and equipment after the economic crisis began in 2008, it consequently had fewer new customers to whom it could sell new LTSAs.  At the same time, the existing number of LTSAs available to monetize was finite. As a result, after monetizing customers' future payments as often as possible in 2016, there were fewer and fewer monetization opportunities, and eventually the cash crisis could no longer be concealed.

### G.    With An Accounting Change Looming, Defendants Slowly Reveal GE's Unsustainable Overreliance On Cumulative Catch-Up Revenues

298.    GE's reliance on cumulative catch-ups to boost its revenue recognition while impairing the quality of its Contract Assets was unsustainable because it created a huge gap between the revenues booked immediately and cash estimated to be generated over the long-term. As the revenues that were booked immediately were increasingly based on unreasonable assumptions and based on longer extensions of the terms, the probability of actually generating cash from the Contract Assets, declined.  Moreover, any effort to close the gap between Contract Asset revenues and cash through factoring had a limited life.

299.    Most notably, however, GE's scheme to manipulate its LTSAs was not sustainable because the accounting standards that had allowed for cumulative catch-up adjustments were changing.  Specifically, in May 2014, the Financial Accounting Standards Board announced disclosed amendments to the then-current revenue recognition standards through ASC 606, which,

among other things, prohibited companies like GE from recognizing cumulative catch-up adjustments on its LTSAs.  GE knew that when these amendments became effective on January 1, 2018, its scheme would collapse.

300.    In light of this looming accounting change, GE was forced to make additional disclosures about its reliance on cumulative catch-up revenues, though still did not reveal the true enormity of its accounting manipulation.  For example, during the February 22, 2017 Barclays Industrial Select Conference, Bornstein stated:

> The other is in our long-term service contract accounting.  We have an enormous portfolio, many times bigger than anybody else in the space, both in power—principally in power systems and aviation.

> And the rules around it are changing.  And it's complex, but there are several things that we do today that we account for on a cum[ulative]-catch basis—I'll explain that in a moment—that now we'll be accounted for on a prospective basis.  *So, for instance, if you have a contract with a customer today and you modify it*.

> You add a bunch of new equipment to it, you extend the maturity, you change something around the operating conditions, and you reprice it.  *A lot of these things are priced on a per-utilization perhour basis, if you will.*

> In today's model, that kind of a modification you would go back to the first day of the contract, recalculate based on the changes.  What's the margin rate for the contract now?  *If the margin rate went down, you go back to day one, and you'll book a loss for restating times zero to the current date on the lower margin rate.*

> If the margin rate is higher, you do the opposite.  You get a cum[ulative]-catch gain, and you restate the margin rate of contract.  *So for things like modifications, termination clauses, etc., upgrades, all of that will be accounted for prospectively as opposed to retrospectively.*

301.    With fewer LTSAs to factor and its inability to continue relying on cumulative catch-up revenues, GE's charade was up and the catch flow issues that were created by its LTSA scheme began to materialize.  On April 21, 2017, while GE reported profits that were in line with expectations, GE reported—as Immelt admitted in a conference call held that day—that "***Industrial CFOA was a negative $1.6 billion.***" Bornstein elaborated, stating, "our industrial

98

CFOA was at $1.6 billion usage of cash, **about $1 billion below our expectations**" due in large part to $1.4 billion in negative cash flows from GE's LTSAs. GE's 1Q17 earnings press release explained that Industrial CFOA for 1Q17 was a mere $370 million (*i.e.*, before deducting CFOA attributable to GE Capital dividends in the amount of $2 billion) and had **declined year-over-year 95%** from $7.902 billion in 1Q16. The market reacted swiftly to this shocking news, as GE's stock price fell 2.4% on heavy trading volume despite the otherwise favorable report on earnings—as distinguished from cash flow.

302.  Immelt and Bornstein "played off" the tremendous Industrial CFOA shortfall as a temporary phenomenon. Immelt stated on GE's April 21, 2017 earnings call that GE's disappointing Industrial CFOA was just a "slow start" and that—despite starting out $1.6 billion in the hole after first quarter 2017 results—Industrial CFOA would improve so dramatically during the remainder of the year that full year 2017 guidance of $12 to $14 billion would still be achieved. Immelt stated, "[d]espite a **slow start**, we plan to hit $12 billion to $14 billion of industrial CFOA for the year."

303.  On GE's July 21, 2017 earnings call, Bornstein stated that GE was "trending to the bottom end of the $12 billion to $14 billion range on CFOA," but affirmed that "[d]ividend remains [GE's] priority," and then went on to represent that Power would be up in the second half of 2017, stating, "then when you think about total year, we still think about the Power business being up mid-single digits on revenue and up roughly high to low double digits on earnings."

304.  Several months later, on October 20, 2017, GE announced that Industrial CFOA for 2017 would be **slashed almost in half** from the $12 billion figure Immelt and Bornstein had assured the market could be achieved. On an October 20, 2017 earnings call, GE's new CFO Miller (Bornstein had departed abruptly, as explained more fully below), stated that:

On cash flow, we now expect industrial cash flow for the year to be ***about $7 billion*** . . . . This is well below the $12 billion estimate we provided at second-quarter earnings, and it's principally driven by three businesses. ***Power is the biggest driver*** on lower volume, higher inventory, and the timing of payments on long-term equipment contracts.

305.     On this news of a gargantuan slash to Industrial CFOA (as well as the simultaneous announcement that "upstreaming" of dividends from GE Capital to GE would be suspended pending a review of LTC insurance reserves, as discussed above), analysts began to focus on the daunting possibility that GE would cut its dividend. Of course, while the market did not know it, the dividend cut was inevitable due to the concealed fraud. The 50% dividend cut was ultimately announced not long thereafter, GE's stock price sank precipitously as news of the cut was released, and disclosure of an SEC investigation into GE's accounting for its LTSAs followed.

306.     Events after the Class Period corroborate the fraud, as Industrials cash flow continued downward in 2018 due to the fact that the fraud at GE Power could no longer be sustained. Indeed, in its April 20, 2018 earnings call, GE reported that "total industrial free cash flow was negative $2 billion in the [first] quarter [of 2018]." Further, the Company's 2018 financial figures confirm the material extent to which GE had been using cumulative catch-up adjustments to pad its reported revenues and profits. For example, no longer able to rely upon cumulative catch up revenues, GE reported on July 20, 2018 that Power's revenues declined 19% year-over-year, while quarterly profits plummeted by 58% year-over-year. Overall, GE's reported EPS declined by 33%, from $0.12 in the second quarter of 2017 to $0.08 in the second quarter of 2018.

307.     That GE's class period reliance on its unsustainable practices of boosting revenues from cumulative catch-up adjustments and artificially inflated assessments of revenue from Contract Assets is underscored by GE Power's abysmal performance in the two quarters since the SEC began its investigation into GE's practices.

### H. GE's Post-Class Period Restatement Confirms The Extent To Which Defendants Manipulated Cumulative Catch-Up Adjustments And Their Material Impact On GE's Reported Financial Statements During The Class Period

308. On April 13, 2018, in response to ASC 606's revenue recognition amendments becoming effective, GE filed an 8-K with the SEC restating its financials and quantifying the impact that such adjustments had on its financial performance during the Class Period.

309. Under the cover of a change in accounting rules, the Company now disclosed in the 4/13/18 8-K that it was effectively writing down the value of its LTSA Contract Assets by *$8.7 billion*. This disclosure confirms the stunning extent to which GE relied upon cumulative catch-up revenues to generate profits during the Class Period. Indeed, with this disclosure, GE effectively admitted, among other things, that: (i) it had previously booked over $8.7 billion in revenues due to cumulative catch-up adjustments that have not yet turned into cash for the Company; (ii) *more than half (57%)* of GE's reported LTSA Contract Assets as of year-end 2017 were the product of cumulative catch-up adjustments; and (iii) its LTSA Contract Assets are actually worth 57% less than previously reported.

310. In light of the above, GE admitted that ASC 606's revenue recognition amendments had "*significantly impacted* all of our industrial businesses except for Renewable Energy, Healthcare, and Current and Lighting" GE further acknowledged its efforts to manipulate Contract Asset values during the Class Period to generate cumulative catch-up adjustments, admitting that "contract modifications were accounted for [by GE] as cumulative effect adjustments" during the Class Period, and that the Company was now being more conservative with how it estimated the terms of its LTSAs, now defining it as "the shorter of the stated term or the term not subject to unilateral termination."

311.    As reflected in the below chart, GE's restatement confirms that its quarterly and annual profits and EPS were materially impacted by its manipulation of cumulative catch-up adjustments:

|  | Fiscal 2016 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | Fiscal 2017 |
|---|---|---|---|---|---|---|
| **Diluted EPS** | $ 1.00 | $ 0.10 | $ 0.15 | $ 0.22 | $ (1.15) | $ (0.68) |
| **Diluted EPS From Cumulative Catch-Up Adjustments** | $ 0.13 | $ 0.08 | $ 0.03 | $ 0.05 | $ 0.13 | $ 0.30 |
| **Diluted EPS Minus Cumulative Catch-Up Adjustments** | $ 0.87 | $ 0.02 | $ 0.12 | $ 0.17 | $ (1.28) | $ (0.98) |
| **% Inflation of Diluted EPS From Cumulative Catch-Up Adjustments** | 13% | 80% | 20% | 22% | 10% | 44% |

312.    While several of GE's competitors issued similar restatements following the enactment of ASC 606's revenue recognition amendments, none were even remotely close to the size of GE's adjustments.  For example, as reported by The Financial Times in an April 19, 2018 article titled *General Electric sets out on road to regaining investors' trust*:

> The revisions resulting from ASC 606 have been much greater for GE than for some of its peers.  Boeing revised its 2017 operating earnings of $10.3bn up by $66m.  Lockheed Martin shaved just $8m from reported 2017 operating profits of about $5.12bn.  United Technologies said in February that it expected the new standard to have "an immaterial impact" on net income this year.  For Microsoft, reported operating income for 2016-17 was revised up from $22.3bn to $29bn.

> For GE, by contrast, the new standard meant revising 2017 profits from industrial operations down by 17 per cent, from $14.7bn to $12.2bn, mostly because of a changed view of long-term contracts for servicing equipment such as aero engines and turbines for power plants.  As originally reported, those profits fell 16 per cent from 2016. Under the new standard, they were down 23 per cent.

313.    In addition, The Financial Times article included the below chart, which confirms that nearly every one of GE's divisions had used the prior accounting standard to improve the appearance of their financial performance in 2017:



New accounting standard changes the view of how GE's divisions did in 2017

(Per cent)

■ Change in profits as restated
■ Change in profits originally reported

Source: Company reports
© FT

314.    In response to GE's restatement, The Financial Times quotes J.P. Morgan analyst Tusa as stating that ASC 606 has "la[id] bare the truth of the actual economics" of GE's LTSAs.

315.    Thus, as described above, and as GE has now effectively admitted, the Company's Class Period financial results were achieved to a material degree by recording cumulative catch-up revenues that ignored objective, verifiable information concerning declines in utilization throughout the power industry and, specifically, within the Company's own customer base.  GE's manipulation of its Contract Assets, its failure to properly account for critical negative developments, despite assuring investors that these factors were, in fact, the basis by which GE determined revenue recognition on LTSAs, rendered GE's disclosed Contract Assets, and associated catch-up adjustments for the LTSA portion of those Contract Assets, unreliable and unsupported.

## I.    Additional Allegations Of Scienter

316.    Scienter is further evidenced by the following facts:

317.    *First*, GE repeatedly touted GE Power's purported financial strength and growth to investors, including its contribution of significant revenues and profits to GE's bottom line. During the Class Period, GE Power was identified as one of GE's "core segment[s]" and repeatedly touted Power as a primary driver of GE's growth prospects and value, directing investors' attention to Power's purported ability to, among other things, contribute significant earnings to GE.  Indeed, in January 2017, Bornstein flouted "double-digit earnings growth in Power" for 2017, noting GE's focus to deliver services growth with Power.  All told, the Power segment generated revenues of $20.6 billion, $21.5 billion, and $26.8 billion in 2014, 2015, and 2016, respectively.  During the same years, Power reported profits of $5.4 billion (which GE subsequently revised downward in its 2015 10-K), $4.5 billion, and $5.0 billion, respectively. In short, Power's performance was of paramount importance to GE (and investors) during the Class Period.

318.    *Second*, the sheer size of GE Power's LTSAs is strong evidence of scienter.  As discussed above, LTSAs comprised almost half of GE's entire reported Contract Assets.  For example, in 2015, LTSAs accounted for $10.346 billion of GE's $21.156 billion in Contract Assets, and in 2016, LTSAs accounted for $12.752 billion of GE's $25.162 billion in Contract Assets.  In addition, cumulative catch-up adjustments on those LTSAs had a material impact on GE's reported earnings during the Class Period, improving GE's reported EPS by 13% and 44% in 2016 and 2017, respectively, and accounting for a staggering 80% of GE's reported EPS in the first quarter of 2017.

319.    *Third*, Defendants GE, Immelt, Bornstein, Miller, Sherin, and Hauser were hyper-focused on GE Power and the impact of new accounting rules announced in May 2014 on GE's revenue recognition practices for LTSAs.  In November of 2016, Hauser publicly addressed the

new revenue accounting rules to take effect in 2018, stating, "[w]e've been on this journey for a while now. . . . It's a significant undertaking that certainly we, as an entire organization, take very seriously—our audit committee as well has been quite involved." To this end, Bloomberg reported that:

> Hauser gets detailed information from GE's project management team, including a type of executive snapshot of updates on key areas, such as controls, disclosures and IT system implications.
>
> There is also an update on the technical memos with nitty-gritty details, including a status update on technical memos completed and those that are still in process. They are scored as high, medium or low priority in terms of their impact.
>
> Moreover, there is information about who has them open, whether they are technical or disclosures, how to do the retrospective lookback, and how to process and map the right general ledger accounts.

320.    In addition Bloomberg reported that "there are monthly meetings with the CFO and the audit committee—doing 'deep dives' on different technical topics and on matters that are unique to certain segments." With respect to contracts, like LTSAs, Hauser stated that, while "contracts with seemingly similar terms and conditions are being evaluated in the same way," "[i]f it's not all viewed the same way, then it's an area that is worked through—weekly."

321.    *Fourth*, Immelt, Sherin, Bornstein, Miller, and Hauser held high-level positions, controlled the contents of GE's public statements, and had access to material, adverse, nonpublic information concerning GE Power's operations, including with respect to Contract Assets and underlying LTSAs. Because of their high-level positions, each of Immelt, Sherin, Bornstein, Miller, and Hauser was provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information concerning the Company, Immelt, Sherin, Bornstein, Miller, and Hauser knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed

to, and were being concealed from the public, and that the representations that were being made to investors were materially false, misleading, and/or incomplete. As the Company's senior-most executives, Immelt, Sherin, Bornstein, Miller, and Hauser were responsible for the accuracy of GE's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.

322. *Fifth*, as GE's CEO, CFOs, and CAO during the Class Period, Immelt, Sherin, Bornstein, Miller, and Hauser controlled the Company's day-to-day operations and were informed of and responsible for monitoring GE Power's Contract Assets, and the impact of those purported assets on the Company's operations. Indeed, in their respective roles, Immelt, Sherin, Bornstein, Miller, and Hauser had access to various sources of nonpublic (and public) information concerning GE's Contract Assets, including: (i) internal modeling for all LTSAs that, according to FE-5 and FE-10, forecasted the revenues, costs, and profitability of each LTSA; (ii) the terms, conditions, and payment obligations for each LTSA; (iii) the assumptions underlying the GE Power's revenue and profit margin estimates for LTSAs and the data or information on which those assumptions were purportedly based, including with respect to customers' current and future utilization rates; (iv) the run rates and utilization data for each customer, particularly through GE's monitoring technology installed in customer units for which GE provided services; and (v) records concerning renegotiations relating to LTSAs and monetization or factoring. As described above, these sources made readily available to Defendants information that was adverse to Defendants' public statements during the Class Period. In addition, as CEO of GE's Transportation unit during the Class Period, Miller was aware of GE's reliance on cumulative catch up adjustments to boost its revenues. *See* ¶ 313.

323.    The fact that Defendants Immelt, Bornstein, Miller, Sherin, and Hauser had access to this detailed information shows that they knew, or were reckless in not knowing, that statements concerning GE's Contract Assets were materially false or misleading.  Indeed, during the Class Period, GE repeatedly told investors that the Company "routinely review[ed] estimate[s]" on LTSAs to "adjust for changes in outlook," such that it is implausible Defendants did not know its revenue recognition and profitability estimates on LTSAs lacked a reasonable basis in fact.

324.    *Sixth*, GE has admitted that the Company did not have adequate internal controls over revenue recognition and profit estimation practices for Contract Assets, including LTSAs. As noted above, the alleged fraud includes numerous false or misleading reported financial results and figures, and violations of accounting and disclosures regulations.  And, as GE's CEO and CFOs, Immelt, Sherin, and Bornstein signed GE's SOX Certifications.  ¶¶ 411-13.  As such, these Defendants each had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTSAs (and Contract Assets, generally) and the impact of GE's revenue recognition and profit estimation practices, and artificial triggering of cumulative catch-up adjustments, on the Company's financial performance and condition.  As GE's CEO and CFOs, these Defendants' knowledge or recklessness is imputed to the Company.

325.    *Seventh*, during an earnings conference call held before the market opened, GE disclosed that it has "been notified by the SEC that they're investigating . . . GE's revenue recognition and controls for long term-service agreements."

## VII. DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A. Statements Regarding GE's "Insurance Liabilities" (i.e., Disclosed Insurance Liabilities) And "Contractual Obligations"

#### 1. Statements Regarding GE's Insurance Liabilities Were Materially Misleading

326.    Each of GE's SEC filings identified below contained a disclosure titled "Contractual Obligations," which included, among other things, GE's Disclosed Insurance Liabilities.  Specifically, GE reported the following figures as its "Insurance liabilities" during the Class Period:

| SEC Filing | Disclosed Insurance Liabilities ($bn) |
|---|---|
| 2012 10-K (dated 2/26/13) | $14.0 |
| 2013 10-K (dated 2/27/14) | $13.5 |
| 2014 10-K (dated 2/27/15) | $12.6 |
| 5/8/15 8-K (dated 5/8/15) | $12.6 |
| 8/7/15 8-K (dated 8/7/15) | $12.6 |
| 2015 10-K (dated 2/26/16) | $11.5 |
| 2016 10-K (dated 2/24/17) | $11.1 |

327.    Each of the foregoing figures was materially false or misleading when reported because by excluding GE's LTC insurance liabilities from this disclosure, Defendants materially understated GE's total insurance liabilities, misled investors into believing that GE's future LTC liabilities were immaterial, and misleadingly overstated the adequacy of GE's reported reserves by falsely indicating that GE held insurance reserves that exceeded its total insurance liabilities. *See* ¶¶ 117-30; 160-65.

### 2. Statements Regarding GE's Disclosed Insurance Liabilities Violated Item 303(a)(5) By Excluding LTC Liabilities

328. GE was required under Item 303(a)(5) to include in its Class Period 10-Ks a tabular breakdown of all of its known material contractual obligations. Specifically, Item 303(a)(5) states:

In a tabular format, provide the information specified in this paragraph (a)(5) as of the latest fiscal year end balance sheet date with respect to the registrant's known contractual obligations specified in the table that follows this paragraph (a)(5)(i). The registrant shall provide amounts, aggregated by type of contractual obligation. The registrant may disaggregate the specified categories of contractual obligations using other categories suitable to its business, *but the presentation must include all of the obligations of the registrant that fall within the specified categories*. A presentation covering at least the periods specified shall be included. The tabular presentation may be accompanied by footnotes to describe provisions that create, increase or accelerate obligations, or other pertinent data to the extent necessary for an understanding of the timing and amount of the registrant's specified contractual obligations.

329. In Release No. 33-9144, dated September 17, 2010 (the "2010 Release"), the SEC stated that "[t]he purpose of the contractual obligations table is to provide aggregated information about contractual obligations and contingent liabilities and commitments *in a single location* so as to improve transparency of a registrant's short-term and long-term liquidity and capital resources needs." The 2010 Release goes on state that "registrants should prepare the disclosure consistent with that objective," and that "[u]ncertainties about what to include . . . should be resolved consistent with the purpose of the disclosure." Importantly, the SEC further stated in the 2010 Release that companies "should highlight any changes in presentation that are made, *so that investors are able to use the information to make comparisons from period to period*." Finally, where a contractual obligations disclosure is linked to a financial statement disclosure, the SEC advised companies in the 2010 Release to provide sufficient information to allow investors to "tie" the information in the contractual obligations disclosure to the financial statement disclosure.

330. As discussed herein, GE's Class Period 10-Ks included a tabular breakdown of its contractual obligations, which purported to quantify GE's total insurance liabilities. Prior to the

Class Period, GE recognized that this amount of liabilities (referred to herein as GE's Disclosed Insurance Liabilities) should have included its LTC insurance liabilities.  In a break with its prior practice, however, Defendants altered GE's disclosure practices the day before the start of the Class Period and deliberately omitted GE's LTC liabilities from its Disclosed Insurance Liabilities. After the end of the Class Period, GE reverted to its pre-Class Period practices and once again included its LTC liabilities within its Disclosed Insurance Liabilities.

331.    Defendants' failure to disclose GE's billions of dollars in LTC liabilities during the Class Period violated Item 303(a)(5), including its requirement that the tabular breakdown of liabilities "include all of the obligations of the registrant that fall within the specified categories." Further, while GE's insurance liabilities disclosures during the Class Period referenced Note 11 to its financial statements, it contained no explanation as to how GE's Disclosed Insurance Liabilities related to the amounts disclosed in Note 11, or whether the figures disclosed in Note 11 included any reserves related to GE's LTC liabilities.  In truth, investors were unable to reconcile GE's Disclosed Insurance Liabilities in the Management's Discussion and Analysis of Financial Condition and Results of Operation ("MD&A") section of 2012 10-K and its Class Period SEC filings to the amounts in Note 11 because Note 11 *included* LTC reserves while, as described above, GE's Disclosed Insurance Liabilities in the MD&A section *excluded* LTC liabilities.

332.    By excluding its LTC liabilities from its disclosures without providing any separate disclosure of the nature or extent of these liabilities, or how they related to GE's disclosed insurance reserves, GE failed to provide investors with a single meaningful disclosure of its material insurance liabilities as required by Item 303(a)(5), and prevented investors from:    (i) assessing the adequacy of the insurance reserves recorded in GE's financial statements and described in the Notes to its financial statements; and (ii) comparing GE's Class-Period Disclosed

Insurance Liabilities in the MD&A section (which excluded LTC liabilities) to those reported in prior periods (which included LTC liabilities).

333. In sharp contrast to GE's LTC omissions, other companies with significant LTC exposure provided fulsome discussions of the future liabilities and risks associated with their exposure to these risky insurance policies. For example, in its 2012 10-K and throughout the Class Period, Genworth did not expressly exclude its LTC liabilities from its disclosed insurance liabilities. Moreover, Genworth included footnote disclosures that, unlike GE, identified material facts concerning its insurance liabilities and specifically explained how these liabilities related to the insurance reserves disclosed in the notes to its financial statements. For example, Genworth disclosed during the Class Period that its disclosed insurance liabilities amount:

> Includes estimated claim and benefit, policy surrender and commission obligations offset by expected future deposits and premiums on in-force insurance policies and investment contracts. Also includes amounts established for recourse and indemnification related to our U.S. mortgage insurance contract underwriting business. Estimated claim and benefit obligations are based on mortality, morbidity and lapse assumptions comparable with our historical experience. The obligations in this table have not been discounted at present value. In contrast to this table, our obligations reported in our consolidated balance sheet are recorded in accordance with U.S. GAAP where the liabilities are discounted consistent with the present value concept under accounting guidance related to accounting and reporting by insurance enterprises, as applicable. Therefore, the estimated obligations for insurance liabilities presented in this table significantly exceed the liabilities recorded in reserves for future policy benefits and the liability for policy and contract claims. Due to the significance of the assumptions used, the amounts presented could materially differ from actual results. We have not included separate account obligations as these obligations are legally insulated from general account obligations and will be fully funded by cash flows from separate account assets. We expect to fully fund the obligations for insurance liabilities from cash flows from general account investments and future deposits and premiums.

### B. Statements Regarding GE Capital's Insurance Exposures And Risks

#### 1. Statements Regarding GE Capital's Run-Off Insurance Exposure

334. On December 18, 2013, GE held its Annual Investor Outlook Meeting. During the meeting, Immelt, speaking on behalf of the Company, continued to conceal GE's mounting

exposure to LTC insurance by touting the reduction in assets at GE Capital. He stated, in relevant part, "[w]e've sold Plastics, and we sold NBC and we've sold the North American Retail Finance business, *we've sold reinsurance business*, the insurance business, the bond insurance business."

335.   On September 8, 2014, GE issued a press release announcing the sale of its Appliances business to Electrolux. The press release stated that GE's "2014 portfolio activity continues the Company's longer-term *redeployment of capital from non-core assets like* media, plastics *and insurance* to higher-growth-higher margin businesses in Oil & Gas, Power, Aviation and Healthcare."

336.   The foregoing statements in ¶¶ 334-35 were materially false or misleading when made. Specifically, it was false or misleading for Immelt to state that GE had sold reinsurance business during the Class Period and for GE to state that it had redeployed capital away from insurance without disclosing to investors that the Company remained exposed to billions of dollars in high-risk LTC reinsurance liabilities. Immelt's and GE's statements misled investors to believe that GE had reduced—and was continuing to reduce—its insurance exposures at a time when its LTC liabilities were materially increasing.

337.   On December 16, 2014, GE held its annual guidance and update call with analysts and investors. GE also disseminated a presentation in connection with the call titled *The Pivot*, which was presented during the call by Immelt, on behalf of the Company. In the presentation, GE indicated that the Company had achieved its "risk reduction" goal to "*[s]ell insurance before the storm*." During the call, Immelt further stated that "*we exited insurance in time*."

338.   The foregoing statements in ¶ 337 were materially false or misleading when made. Specifically, it was false or misleading for GE and Immelt to represent that GE had reduced GE Capital's risks by "sell[ing]" and "exit[ing] insurance" without disclosing that the Company

remained exposed to billions of dollars in high-risk LTC reinsurance liabilities. Immelt's and GE's statements misled investors to believe that GE had reduced—and was continuing to reduce—its insurance exposure at a time when GE's LTC liabilities were materially increasing. It was similarly materially false or misleading to suggest that GE had reduced its insurance exposure "in time" and "before the storm" without also disclosing that it remained exposed to "the storm" due to this multi-billion dollar LTC liability.

339. On June 1, 2016, GE presented at the Sanford C. Bernstein Strategic Decisions Conference during which Sherin stated the following about GE Capital:

> So, we are a lot smaller. Assets are down 50% when we filed and even within that a third of the assets that are remaining are in cash and liquidity. That's up substantially from where it was when we were designated. And we are not just smaller; *we exited whole pools of risk*.

340. Sherin went on to state, in response to an analyst request to put GE's transformation over the last year and a half into context from a long-term perspective, that "*[i]f you look at what the portfolio is today versus take it when Jeff started, all of the insurance business is gone. That was a huge change in the portfolio*."

341. The foregoing statements in ¶¶ 339-40 were materially false or misleading when made. Specifically, it was materially false or misleading for Sherin to state that GE had "exited whole pools of risk" and that "all of the insurance business is gone" without disclosing to investors that the Company remained exposed to billions of dollars in high-risk LTC reinsurance liabilities. Sherin's statements misled investors to believe that GE had reduced its insurance exposures at a time when GE's LTC liabilities were materially increasing.

342. On February 22, 2017, Bornstein participated in the Barclays Industrial Select Conference on behalf of GE. During the conference, Bornstein stated that "we have the stub insurance piece which has got virtually no returns associated with it," which prompted an analyst

to ask whether GE would "sell the liability in that insurance kind of write a check and get rid of it." Bornstein responded in the negative and falsely claimed that interest rates presented a challenge to selling such liabilities, and stated, "**I think interest rates are a fundamental challenge** in selling long-term liabilities in a low interest rate environment is a challenge."

343.   Similarly, on March 13, 2017, GE participated in the J.P. Morgan Aviation, Transportation & Industrials Conference during which Laxer, in response to an analyst's questions, created the false or misleading belief that the interest rate environment made selling GE's LTC portfolio unattractive at that time—when in fact it was the adverse claims experience and other risks attendant to GE's LTC portfolio that made the book so risky and unattractive that GE could not sell it. Specifically, when asked "what's the plan" for GE's remaining insurance liabilities, Laxer stated:

> Those are long-dated assets **and given the interest rate environment we're in right now, it's not attractive to do something**. We always look at it, but just given where rates are at this point, it's not an attractive exit.

344.   When pressed as to, "[w]hat sort of bogey level would you think you'd have to see in terms of the rate environment to consider that transaction," Laxer stated, "**I think there's a lot of factors there. So it's hard to give you a specific number, but we would like to see a few increases before that would be attractive**."

345.   The foregoing statements in ¶¶ 342-44 were materially false or misleading when made. Specifically, it was materially false or misleading for Bornstein and Laxer to indicate to investors that the interest rate environment was the primary impediment to GE liquidating its remaining LTC insurance exposure without disclosing that GE had been unable to liquidate its multi-billion dollar LTC portfolio due to its low quality, its "adverse claims experience" and GE's failure to adequately reserve for its future LTC liabilities.

### 2. Statements Regarding Defendants' Purported Reduction Of GE Capital's Risks

346. On May 31, 2013, during the Sanford C. Bernstein Strategic Decisions Conference, Neal, speaking on behalf of GE Capital, stated, "[b]ut what I'd like to do is just take a few minutes and kind of catch you up where we are at Capital and things actually are pretty good, and we feel good about—there's a lot going on, lot going on in our world.  But the business, I think's, doing well.  We have made it smaller.  *We have made it safer.  We have made it more core*."

347. During the same conference, Neal stated that GE Capital's remaining portfolio was comprised of "*our best stuff*" and "is *very safe* for us and *we err on the side of being safe and being secure*."  Further, in response to an analyst's question, "what's the core growth on a go-forward basis, post that run-off," Neal stated, in part:

> The way we talk about it is to get the company—and by the way this is alchemy rather than science—but the way we talk about it is to get the company to a size where it should pencil out to be, you know, about a third of our earnings, 30% of earnings.  Jeff talked about that and as we do that, *we're becoming a better company because the things that were exiting are things that we think, at least, are not the things that we have the most advantage in with that*.

348. On April 10, 2015, the Company hosted a call with analysts and investors to discuss the GE Capital Exit Plan announced earlier that day, during which Sherin stated that "[a]s you all know, we have done a lot over the last six years to shrink GE Capital while also *making it much safer*."

349. The foregoing statements in ¶¶ 346-48 were materially false or misleading when made.  Specifically, it was false or misleading for Neal to represent to investors that GE Capital's portfolio was "very safe," "safer," and "our best stuff," and for Sherin to represent that Defendants had made GE Capital "much safer" without disclosing that the Company remained exposed to billions of dollars in high-risk LTC reinsurance liabilities.  Neal's statements misled investors to believe that GE had reduced—and was continuing to reduce—GE Capital's risk exposures at a

time when its insurance liabilities were materially increasing due to its LTC exposure.  Neal's

statements further mislead investors into believing that GE Capital had only retained the portfolios

it knew best and desired to keep when, in fact, it had been forced to retain the LTC portfolio due

to its substantial (and increasing) risks and liabilities.

### C. Statements Regarding GE's Insurance Reserves In Its Financial Statements Were Materially False Or Misleading, Violated GAAP, and Lacked Any Reasonable Basis In Fact

350.    In each of GE's Class Period 10-Ks and 10-Qs, and in an earnings press release

published each quarter during the Class Period, GE reported as a line item to its financial

statements, "Investment contracts, insurance liabilities and insurance annuity benefits," both for

GE and GE Capital.  GE reported the following figures during the Class Period for these line items:

| Source | GE Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) | GE Capital Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) |
|---|---|---|
| 2012 10-K (2/26/13) | $28.268 | $28.696 |
| 4/19/13 8-K | $28.1 | $28.7 |
| 1Q13 10-Q (5/8/13) | $28.093 | $28.681 |
| 7/19/13 8-K | $27.1 | $27.6 |
| 2Q13 10-Q (7/26/13) | $27.074 | $27.615 |
| 10/18/13 8-K | $26.7 | $27.2 |
| 3Q13 10-Q (11/1/13) | $26.661 | $27.155 |
| 1/17/14 8-K | $26.5 | $27.0 |
| 2013 10-K (2/27/14) | $26.544 | $26.979 |
| 4/17/14 8-K | $27.0 | $27.6 |
| 1Q14 10-Q (5/12/14) | $27.019 | $27.604 |
| 7/18/14 8-K | $27.4 | $27.9 |
| 2Q14 10-Q (7/31/14) | $27.365 | $27.908 |
| 10/17/14 8-K | $27.5 | $28.0 |
| 3Q14 10-Q (11/4/14) | $27.491 | $27.991 |
| 1/23/15 8-K | $27.6 | $28.0 |
| 2014 10-K (2/27/15) | $27.578 | $28.027 |
| 1Q15 10-Q (5/4/15) | $27.6 | $28.2 |
| 5/8/15 8-K | $27.578 | $28.027 |
| 7/17/15 8-K | $26.8 | $27.4 |
| 2Q15 10-Q (7/30/15) | $27.622 | $28.222 |

| Source | GE Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) | GE Capital Investment Contracts, Insurance Liabilities, and Insurance Annuity Benefits (in $bn) |
|---|---|---|
| 8/7/15 8-K | $27.578 | $28.027 |
| 10/16/15 8-K | $26.1 | $26.6 |
| 3Q15 10-Q (11/2/15) | $26.135 | $26.646 |
| 1/22/16 8-K | $25.7 | $26.2 |
| 2015 10-K (2/26/16) | $25.692 | $26.155 |
| 4/22/16 8-K | $26.3 | $27.0 |
| 1Q16 10-Q (5/4/16) | $26.318 | $26.955 |
| 7/22/16 8-K | $27.1 | $27.6 |
| 2Q16 10-Q (8/1/16) | $26.135 | $26.646 |
| 10/21/16 8-K | $27.1 | $27.6 |
| 3Q16 10-Q (11/2/16) | $27.126 | $27.642 |
| 3Q16 10-QA (11/9/16) | $27.126 | $27.642 |
| 1/20/17 8-K | $26.1 | $26.5 |
| 2016 10-K (2/24/17) | $26.086 | $26.546 |
| 4/21/17 8-K | $26.3 | $26.9 |
| 1Q17 10-Q (5/5/17) | $26.301 | $26.880 |

351.    Note 11 to the financial statements as a whole, and specifically to the balance sheet entry for the line items, "Investment contracts, insurance liabilities and insurance annuity benefits," both for GE and GE Capital, in each of GE's 10-Ks for the fiscal years 2012 through 2016, included line items for "Life insurance benefits" and "Other."  GE reported the following figures (in $bn) during the Class Period for these line items:

| Note 11 for 10-K | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| "Life insurance benefits" ($bn) | $20.427 | $18.959 | $20.688 | $19.978 | $18.741 |
| "Other" ($bn) | $3.304 | $3.405 | $3.369 | $3.223 | $4.992 |

352.    Each of the foregoing figures in ¶¶ 350-51 was materially false or misleading when made for the reasons discussed below.

117

### 1. GE's Reported "Life Insurance Benefits" Were Materially Misleading

353.    GE's line item titled "Life insurance benefits" in Note 11 was actually reflected in its "Benefit Reserves," of which approximately 50% was associated with high-risk LTC insurance policies *and none of which* was for life insurance policies.  The remainder of this reserve was associated with structured settlement annuities and "shadow adjustments."  ¶¶ 155-56.  Given the materially different risk profile of life insurance policies versus LTC policies, it was materially misleading to refer to GE's LTC reserves as "Life insurance benefits."

354.    GE's line item titled "Other" actually constituted its Claims Reserves, the vast majority of which (as much as 70%) was held against GE's toxic LTC contracts. *See* ¶ 158.  Given the specific and known risks associated with LTC reserves, it was materially misleading to refer to the LTC Claims Reserves as an "Other" category.

355.    Additionally, the "Life insurance benefits" line item was purportedly a reserve against GE's Disclosed Insurance Liabilities which were disclosed in each MD&A for each 10-K.

### 2. GE's Reported Reserves Were Materially False Or Misleading Because They Were Not Based On A Meaningful Inquiry Nor Had Any Reasonable Basis In Fact

356.    GE's insurance reserves and liabilities and its "Life insurance benefits" reported in Note 11 to its financial statements, set forth in ¶¶ 350-51 above, were materially false or misleading when made because they did not rest on a meaningful factual inquiry nor have any reasonable basis in fact.  As set forth in ¶¶ 175-96 above, numerous former employees directly responsible for testing and auditing GE's reserve assumptions revealed that GE did not have valid models associated with or adequate controls its reserve testing process, and that GE's senior management had received repeated warnings during the Class Period about the deficiencies in GE's reserve testing for LTC liabilities.  Moreover, Defendants were aware of deterioration within the LTC industry and GE's LTC portfolio.  *See* ¶¶ 197-207.

357.     In addition, on July 22, 2016, the Company hosted its 2Q16 Earnings Call, during which Bornstein stated that the "vertical businesses earned $452 million this quarter down 15% from prior year including higher base earnings offset by lower gains and ***higher insurance reserve provisions resulting from updates to our models on our runoff long-term care book***."

358.     In the 2Q16 10-Q, GE announced a $100 million increase in its insurance reserves, revealing, "[w]ithin [GE] Capital, Verticals net earnings decreased by $0.1 billion ***due to higher insurance reserve provisions ($0.1 billion)*** and lower gains, partially offset by core increases."

359.     The foregoing statements ¶¶ 357-58 were materially false or misleading when made for the reasons set forth in ¶ 356.  Furthermore, Bornstein's disclosure of a $100 million increase to GE's LTC Claims Reserves was materially false or misleading without disclosure of GE's multi-billion dollar insurance liability for *future* LTC claims related to this portfolio.

### D.     GE Violated GAAP By Failing To Disclose Material Contingencies Related To Its LTC Exposure

360.     Within GAAP, ASC 450 governs the disclosure and accrual of contingencies for all companies, including public companies in their SEC filings.  ASC 450 defines a "contingency" as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur."

361.     Where a loss contingency is both probable (more likely than not) and estimable, GAAP requires the loss to be recorded.  In a situation where the loss contingency is not both probable and estimable, GAAP nonetheless requires companies to make disclosures about such contingency.  Specifically, where a material loss is "reasonably possible"—i.e., more likely than remote but less likely than probable—and the amount of the loss is reasonably estimable, ASC 450 requires companies to disclose the nature of the contingency and provide its estimate of the amount

or range of loss.  If the loss is reasonably possible but not estimable, then a company must disclose the nature of the contingency and describe why it is unable to estimate the amount of the loss.

362.    GE's Class Period financial statements violated ASC 450 by, *inter alia*, failing to disclose to investors ***any*** meaningful information regarding the nature and extent of its LTC exposure, or the future uncertainties and potential losses that could arise from that exposure. Indeed, GE's Class Period financial statements did not disclose its potential LTC-related liabilities or losses, and did not provide investors with any estimate of the amount or range of charges that could result from such exposure.  Instead, as discussed herein, GE deliberately excluded any estimate of future LTC-related payments from its disclosure of future insurance liabilities, even though such liabilities should have been disclosed under GAAP because they were reasonably possible and potentially material.

### E.    GE Violated GAAP By Failing To Disclose Uncertainties Relating To Its Calculation Of LTC Exposure

363.    ASC 275 requires companies to disclose in their financial statements the "risks and uncertainties" existing as of the date of the financial statements, including, *inter alia*, those arising out of the "use of estimates in the preparation of financial statements."

364.    Specifically, ASC 275 requires companies to include a "discussion of estimates when, based on known information available before the financial statements are issued or available to be issued . . . it is reasonably possible that the estimate will change in the near term and the effect of the change will be material."  The required disclosure "shall indicate the nature of the uncertainty and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term."  Further, "[i]f the estimate involves a loss contingency covered by [ASC 450], the disclosure also shall include an estimate of the possible loss or range of loss, or state that such an estimate cannot be made."  ASC 275-10-50-15 notes that "examples

of assets and liabilities . . . that . . . may be based on estimates that are particularly sensitive to change in the near term" include amounts reported for "long-term obligations" and "long-term contracts," as well as "contingent liabilities for obligations of other entities."

365.    GE's 2012 10-K and Class Period SEC filings failed to provide sufficient information to investors regarding the basis for its estimated LTC reserves.  Among other things, GE failed to provide any meaningful disclosure regarding the qualitative or quantitative impact that changes to critical LTC reserve assumptions—like mortality rate, morbidity rate, and lapse rate—would have on GE's reserve calculation.  Nor did GE provide investors with any discussion of how GE's reported reserves would change if it were calculated using *current* assumptions rather than "assumptions at the time the policies were issued or acquired."  Further, GE failed to provide any meaningful disclosure regarding its estimated future payment obligations under its LTC policies, notwithstanding that it was required to calculate such amounts in order to evaluate the adequacy of its reserves.  Rather than disclose those future payment obligations, as discussed above, GE deliberately omitted LTC liabilities from the quantification of its Disclosed Insurance Liabilities throughout the Class Period.

## F.    GE Violated GAAP By Failing To Disclose Information Regarding The Basis For Its Class Period LTC Reserve Estimates

366.    With respect to long-duration insurance contracts, ASC 944-40-50-6 requires insurance entities to "disclose in their financial statements the methods and assumptions used in estimating the liability for future policy benefits."

367.    As discussed herein, GE failed to make any meaningful disclosure regarding the methods and assumptions used to calculate its LTC Benefit Reserves until the third quarter of 2017.  Unlike its more fulsome post-Class Period disclosures, ¶¶ 493-96, and unlike the disclosures of other companies with significant LTC exposures, ¶ 333, GE merely stated in its 2012 10-K and

Class Period 10-Ks that "[l]iabilities for traditional long-duration insurance contracts represent the present value of such benefits less the present value of future net premiums based on mortality, morbidity, interest and other assumptions at the time the policies were issued or acquired."

**G.      Statements Regarding GE's Contract Assets, LTSAs, And Industrial CFOA**

368.     During the Class Period, GE's reported Contract Assets and cumulative catch-up adjustments were materially false or misleading when made.  In sum, these estimates of profitability of GE's LTSAs were based on models and inputs designed to manufacture and manage earnings through practices such as: (i) disregarding the deteriorating power industry and ignoring or manipulating critical, adverse real-time utilization data that GE maintained with respect to customers' assets on which GE provided services; (ii) relying on historical data which underestimated costs, leading to the unsustainable and undisclosed practices that underlay GE's cumulative catch-ups to increase short term profits; (iii) renegotiating LTSAs solely to trigger positive (and avoid negative) cumulative catch-up adjustments in order to allow GE to recognize a short-term gain at the long-term expense of the Company, including by forfeiting revenues and profits on GE-provided services, labor, technology updates, and products (i.e., de-scoping); (iv) extending customers' payment terms and, as a result, harming GE's ability to collect on receivables; (v) shifting costs associated with services rendered to a later period in order to recognize higher profits in the current period, with the hope that GE could make up the difference (i.e., realize cost savings) at a later point; and (vi) failing to account for the uncollectibility of LTSA revenues from high-credit risk customers who purchased finance equipment and services.

**1.      Metrics Relating To Revenues And Values Of GE's Contract Assets**

369.     The practices summarized above rendered the following metrics materially false or misleading when made for the reasons set forth in ¶ 368:

|  | Contract Assets ($bn) | GE Industrials Profits ($bn) | Cumulative Catch-up ($bn) | EPS | Source |
|---|---|---|---|---|---|
| **2012** | | | | | |
| **Annual** | $9.443 | $15.486 | $0.4 | $1.39 | 2012 10-K |
| **2013** | | | | | |
| **Q1** | - - | $4.836 | - - | $0.35 | 1Q13 10-Q |
| **Q2** | - - | $3.839 | - - | $0.31 | 2Q13 10-Q |
| **Q3** | - - | $3.965 | - - | $0.32 | 3Q13 10-Q |
| **Q4** | - - | $5.480 | - - | $0.49 | 1/17/14 8-K |
| **Annual** | $12.522 | $16.220 | $0.3 | $1.47 | 2013 10-K |
| **2014** | | | | | |
| **Q1** | - - | $5.212 | - - | $0.29 | 1Q14 10-Q |
| **Q2** | - - | $4.166 | - - | $0.35 | 2Q14 10-Q |
| **Q3** | - - | $4.331 | - - | $0.34 | 3Q14 10-Q |
| **Q4** | - - | $5.988 | - - | $0.52 | 1/23/15 8-K |
| **Annual** | $13.990 | $17.764 | $1.0 | $1.51 | 2014 10-K |
| **2015** | | | | | |
| **Q1** | - - | $3.56 | - - | ($1.13) | 1Q15 10-Q and 10-QA |
| **Q2** | - - | $4.356 | - - | $0.24 | 2Q15 10-Q |
| **Q3** | - - | $4.530 | - - | $0.28 | 3Q15 10-Q |
| **Q4** | $21.9 | $5.522 | - - | $0.26 | 1/22/16 8-K |
| **Annual** | $21.156 | $17.966 | $1.4 | $0.17 | 2015 10-K |
| **2016** | | | | | |
| **Q1** | $21.654 | $3.314 | - - | $0.02 | 1Q16 10-Q |
| **Q2** | $23.458 | $4.122 | - - | $0.36 | 2Q16 10-Q |
| **Q3** | $24.354 | $4.320 | - - | $0.23 | 3Q16 10-Q and 10-QA |
| **Q4** | $25.2 | $5.842 | - - | $0.39 | 1/20/17 8-K |
| **Annual** | $25.162 | $17.598 | $2.2 | $1.00 | 2016 10-K |
| **2017** | | | | | |
| **Q1** | $27.382 | $3.622 | - - | $0.10 | 1Q17 10-Q |
| **Q2** | $28.924 | $3.947 | - - | $0.15 | 2Q17 10-Q |
| **Q3** | $29.809 | $3.630 | - - | $0.22 | 3Q17 10-Q |
| **Q4** | $28.9 | $3.542 | - - | $(1.15) | 1/24/18 8-K |
| **Annual** | $28.861 | $14.740 | $2.1 | $(0.68) | 2017 10-K |

## 2. Statements Concerning The Manner In Which GE's Contract Assets Were Determined

370. In addition, as set forth below, in GE's 2012 10-K and Class Period 10-Ks, Defendants purported to describe the manner in which its Contract Assets were determined.

371.    The 2012 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

> Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate and cost changes. ***We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook. We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings***, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. ***We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions that affect a product services agreement's total estimated profitability result in an adjustment of earnings; such adjustments increased earnings by $0.4 billion in 2012, increased earnings by $0.4 billion in 2011 and decreased earnings by $0.2 billion in 2010. We provide for probable losses when they become evident***.

372.    The 2013 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

> Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate and cost changes. ***We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook. We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings***, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. ***We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions that affect a product services agreement's total estimated profitability result in an adjustment of earnings; such adjustments increased earnings by $0.3 billion, $0.4 billion and $0.4 billion in 2013, 2012 and 2011, respectively. We provide for probable losses when they become evident***.

373.    The 2014 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

124

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*.

*We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings*, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. *We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $1.0 billion, $0.3 billion and $0.4 billion in 2014, 2013 and 2012, respectively*. We provide for probable losses when they become evident.

374.    The 2015 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*.

*We also regularly assess customer credit risk inherent in the carrying amounts of receivables* and contract costs and estimated earnings, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. *We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $1.4 billion, $1.0 billion and $0.3 billion in 2015, 2014 and 2013, respectively*. We provide for probable losses when they become evident

375.    The 2016 10-K stated the following with respect to revenue recognition on GE's

LTSAs:

Revenue recognition on long-term product services agreements requires estimates of profits over the multiple-year terms of such agreements, considering factors such as the frequency and extent of future monitoring, maintenance and overhaul events; the amount of personnel, spare parts and other resources required to perform the services; and future billing rate, cost changes and customers' utilization of assets. *We routinely review estimates under product services agreements and regularly revise them to adjust for changes in outlook*.

*We also regularly assess customer credit risk inherent in the carrying amounts of receivables and contract costs and estimated earnings*, including the risk that contractual penalties may not be sufficient to offset our accumulated investment in the event of customer termination. *We gain insight into future utilization and cost trends, as well as credit risk, through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods. Revisions may affect a product services agreement's total estimated profitability resulting in an adjustment of earnings; such adjustments increased earnings by $2.2 billion, $1.4 billion and $1.0 billion in 2016, 2015 and 2014, respectively.* We provide for probable losses when they become evident.

376.    The foregoing statements in ¶¶ 371-75 were materially false or misleading when made for the reasons identified in ¶ 368, and because contrary to GE's statements that the Company "routinely review[ed] estimates" under LTSAs and "regularly revise[d] them to adjust for changes in the outlook," including "customers' utilization of assets" and "cost trends," GE, in fact, disregarded or manipulated these critical inputs to inflate revenues, profits, and asset values, and to create the appearance of profitability.

### 3.    Statements Concerning New Accounting Standards

377.    In the 2016 10-K, while discussing the impact of the new accounting standards to be effective in 2018, Defendants continued to provide materially false or misleading information regarding the historic and current accounting for the Company's LTSAs:

*Power and Aviation Service Agreements—For our long-term product service agreements, primarily in our Power and Aviation businesses, we expect to continue to recognize revenue based on costs incurred plus an estimated margin rate (over time model)*. However, the new standard provides prescriptive guidance tied to several factors for determining what constitutes the proper scope of a customer contract for accounting purposes. These factors include optional purchases, contract modifications, and termination clauses. For example, under the

new standard contract modifications will be accounted for prospectively by recognizing the financial effect of the modification over the remaining life of the contract. *Under existing accounting guidance revisions to estimated margin rates resulting from modifications were reflected as cumulative effect adjustments to earnings in the current period*.

378.    The foregoing statement that "revisions to estimated margin rates resulting from modifications were reflected as cumulative effect adjustments to earnings in the current period" was materially false or misleading when made for the reasons described in ¶ 368.

### 4.    Statements Regarding Factoring

379.    The 2016 10-K stated as follows with respect to GE's factoring of receivables:

In order to manage credit exposure, the Company sells additional current receivables to third parties outside the Receivables Facility described in Note 22. In connection with certain of these sales, we provide servicing activities and limited recourse to the purchasers.  At December 31, 2016 and 2015, GE serviced $2,962 million and $2,167 million, respectively, of these receivables that remain outstanding.  Of these balances, $458 million and $378 million at December 31, 2016 and 2015, respectively, were current receivables serviced by GE Capital that GE sold directly to third-parties.  At December 31, 2016 and 2015, our maximum exposure to loss under the limited recourse arrangements is $215 million and $154 million, respectively.

380.    The foregoing statement that factoring was used solely to "manage credit exposure" was materially false or misleading when made because, as described above in ¶¶ 285-97, and as the Company would later reveal, it also used factoring "[i]n order to manage short-term liquidity," including in an effort to mask the liquidity issues caused by GE's reliance on manipulating LTSAs and abusing cumulative catch-up adjustments to inflate revenues by over $8.7 billion.

381.    During a January 20, 2017 conference call associated with GE's 4Q16 and 2016 year-end results, analysts were provided an opportunity to ask questions following the Company's prepared remarks.  Here, analysts displayed their skepticism about the Company's reported Contract Assets due to the fact that there was an increasing gap between Industrial CFOA and Contract Assets.  Steven Winoker, an analyst from Sanford C. Bernstein & Co., asked the

following with regard to GE Power's cash flow, to which Bornstein specifically denied that
factoring from GE Capital played a notable role in Power's performance:

> **Steven Winoker—Sanford C. Bernstein & Co.—Analyst**
> Thanks, good morning. Since I only have one question I'd love to focus on cash
> here. And within that, Jeff, is there any factoring this quarter from GE Capital into
> GE industrial?
>
> And then also while it's the strongest cash flow quarter in a while, still a little bit
> below what we thought you guys implied when we talked about it before. Then as
> you think about it progressing through 2017 and beyond maybe just talk a little more
> about the cash flow initiative comp that really can give investors confidence that the
> cash flow part of the story is improving.
>
> **Jeff Bornstein—General Electric Company—SVP & CFO**
> Okay, there's a lot in that. So let me start with the fourth quarter, Steve.
>
> We improved working capital in fourth quarter about $5.2 billion which the best we
> can tell is the strongest working capital quarter the Company has ever had. And I
> want to just give you some of the pieces on that.
>
> *     *     *
>
> So within that accounts receivable performance you asked about factoring. For the
> total year, factoring with GE Capital was a $1.6 billion change for the year. It was
> $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit
> in the year between what we did with GE Capital around factoring. And in the fourth
> quarter importantly, and you see it because our receivables improved $500 million,
> is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit
> going from this past third quarter to this quarter was $700 million.
>
> So it was actually down $1.6 billion year-to-year between third and fourth quarter
> each of those years. ***So there's very good underlying performance here. It's not
> just about, it's actually very little to do with GE Capital factoring***.

382.    The foregoing statement that GE was not relying on factoring to generate CFOA
was materially false or misleading when made because, in fact, GE was heavily reliant on factoring
to monetize its Contract Assets and to generate CFOA to meet targets and pay its dividends, as
discussed in ¶ 380.

### 5.   February 22, 2017:  Barclays Industrial Select Conference

383.   On February 22, 2017, during the Barclays Industrial Select Conference, Bornstein detailed GE's reliance on cumulative catch-up adjustments on its LTSAs:

> The other is in our long-term service contract accounting.  We have an enormous portfolio, many times bigger than anybody else in the space, both in power—principally in Power Systems and Aviation.  And the rules around it are changing.  And it's complex, but there are several things that we do today that we account for on a cum[ulative]-catch basis.  And I'll explain that in a moment that now we'll be accounted for on a prospective basis.
>
> ***So, for instance, if you have a contract with a customer today and you modify it, you add a bunch of new equipment to it, you extend the maturity, you change something around the operating conditions, and you reprice it.  A lot of these things are priced on a per-utilization per-hour basis, if you will.  In today's model, that kind of a modification you would go back to the first day of the contract, recalculate based on the changes, what's the margin rate for the contract now.  If the margin rate went down, you go back to day one, and you'll book a loss for restating time zero to the current date on the lower margin rate.  If the margin rate is higher, you do the opposite.  You get a cum[ulative]-catch gain, and you restate the margin rate of contract.  So for things like modifications, termination clauses, et cetera, upgrades; all of that will be accounted for prospectively, as opposed to retrospectively.  Things like productivity will continue to act like they do today, which is a cum[ulative]-catch.***
>
> So, we'll go through some of those details in the K.  Our best estimate today, our expectation is that 2018 impact of all that is, we think, is going to be about a $0.05 EPS decline.  After 2018, that will get smaller and start to approach zero.  And at some point a few years after that, it will actually be accretive to what otherwise we would have—in the old accounting model—reported as earnings.  So there's no cash associated with any of this accounting change.  It doesn't change anything about the economics of these contracts in any way.  It's just a point of where you're recognizing revenue and where you're recognizing cost.

384.   The foregoing statements were materially false or misleading when made because they did not disclose that GE had been generating billions of dollars in cumulative catch-up adjustments during the Class Period through fraudulent, unsustainable, and unsound business practices, as described in ¶¶ 250-97.  Moreover, as GE admitted after the end of the Class Period, its reliance on cumulative catch-up revenues accounted for far more than $0.05 in earnings.  As described in ¶ 311, GE's use of these adjustments contributed $0.13 to GE's EPS in 2016, $0.30

in 2017, and was responsible for as much as 80% of GE's reported quarterly EPS during the Class Period.

### 6. First Quarter 2017

385. During the 1Q17 earnings call on April 21, 2017, an analyst from Credit Suisse asked questions about GE's Industrial CFOAs and Contract Assets. In response, Bornstein assured investors that "the contract drag on cash flow" for 2017 would be the same as in 2016, and **that GE was "not pulling future profit forward"** on the contracts, stating:

> **[W]e expect the contract drag on cash flow for the year to be roughly the same**, '16 versus '17. . . . I think you got a number of phenomena that's going on. We're investing like crazy in productivity and cost-out. . . . When we get lower cost, the cost to execute against our contracts improves. And when they improve, the accounting has to account for that and where it changes our view on the ultimate profitability of these contracts. That's one mechanism, and we're hugely focused on that. **And I think you want us focused on that, that's all future cash, future economics, et cetera, on a go-forward basis. We're not pulling future profit forward. That is not what we're doing**. We're just restating what—where we are in the contract from inception to date. The second part is where the long-term service agreements that protect our installed base, **our penetration continues to improve**.

386. The foregoing statements were materially false or misleading when made because in direct response to an analyst's question, Bornstein claimed that GE was "not pulling future profit forward." In fact, that was exactly what it was doing through its use of cumulative catch-up adjustments, backed by the undisclosed, unsustainable, and unsound business practices described in ¶¶ 250-97.

387. One analyst pressed Defendants for more clarity on the Company's "noncash earnings from contract assets." In response, Bornstein explained what supposedly drove the increase in Contract Assets for the quarter:

> CSA contracts in the quarter were up $1.4 billion year-over-year. $800 million of that increase was associated with contract updates, okay? And that's versus $500 million a year ago. So it's higher by $266 million year-over-year. **Of the about $300 million, it's up year-over-year, a little more than half of that is in power**.

*And most of that is associated with updates of part costs when we change standards every year. So for the contracts that were under review in the first quarter, if we change the standard on the part cost and deliver against that contract in the future, we did that update.* And then there's a small update for escalation that's mostly around our Aviation business. We update it once a year on escalation within the service contract. The—that part of long-term contracts that are revenues versus billing, so outside of contract updates was $600 million in the first quarter. And that's really where we've incurred shop visits, outages. We've incurred cost against those service contracts ahead of actually billing the hours or the events associated with it. So that's mostly timing. *And some of that will come back over the course of the year, as we actually bill against the utilization or bill against an outage or a shop visit. So I would say that's mostly timing.* That's the $1.4 billion increase that you see in contracts year-over-year.

388.    The foregoing statements were materially false or misleading when made because Bornstein claimed that the adjustments were attributed to "updates of part costs," when in fact the adjustments were due to the undisclosed, unsustainable business practices described in ¶¶ 250-97.

## H.    GE's Accounting For Its Contract Assets And Cumulative Catch-Up Adjustments Violated GAAP

389.    GE's failure to perform reasonably dependable analyses of both the revenue and related costs associated with Power's LTSAs also violated GAAP.  GE's accounting for its Contract Assets involved estimating both revenue and the related costs.  As GE reported in its 2017 10-K, "[r]evenue recognition on long-term product services agreements requires estimates of both customer payments expected to be received over the contract term as well as the costs to perform required maintenance services."

390.    Under ASC 605-35 (Revenue Recognition, Construction-Type, and Production-Type Contracts), use of this accounting method is dependent on the ability to make reasonably dependable estimates, including, most specifically, estimates of progress towards completion, contract revenues, and contract costs.  ASC 605-35-05-11.

391.    Estimated revenue from a contract is the amount of revenue the seller expects to realize from the contract.  ASC 605-35-25-16.  The determination of estimated revenue requires

"careful consideration." *Id.* GAAP states that "a contractor's estimating procedures should provide reasonable assurance of a continuing ability to produce reasonably dependable estimates." ASC 605-35-25-62. In other words, GAAP requires an ongoing review of the contract to ensure revenue and cost estimates continue to remain reasonable. GE failed to conduct these ongoing reviews and/or made estimates that were unreasonable to support its cumulative catch-up adjustments and, as a result, violated the foregoing GAAP provisions.

392. For its LTSAs, GE was paid based upon the utilization of assets (e.g., the amount of hours a turbine was running) or on a milestone basis (e.g., when major equipment maintenance or an entire overhaul was performed). GE's estimate of asset utilization impacted both the amount of customer payments and the costs to provide the service. This is because asset utilization influences the timing and extent of service events such as overhauls.

393. During the Class Period, GE's undisclosed, unsustainable and unsound practices, which it did not account for in recognizing revenue or making cumulative catch-up adjustments, was a violation of ASC 605-10-S99.

394. As with revenue, GAAP also requires that contract costs be identified, estimated, and accumulated with a reasonable degree of accuracy and that total estimated costs of a project include costs incurred to date and an estimate of the costs to complete the contract. ASC 605-35-25-32. For costs incurred to date on a contract, GAAP at ASC 605-35-25-33 states:

> An entity should be able to determine costs incurred on a contract with a relatively high degree of precision, depending on the adequacy and effectiveness of its cost accounting system. . . . [A]n objective of each system or of each set of procedures should be to accumulate costs properly and consistently by contract with a sufficient degree of accuracy to assure a basis for the satisfactory measurement of earnings.

395. GAAP, at ASC 605-35-25-44, recognizes the estimate of costs to complete a contract is a "significant variable" in determining profit on a contract. GAAP requires that

estimates of future costs are determined using "systematic and consistent procedures" and that the estimates of future costs include the same elements of costs that have been incurred on the contract to-date. Further, GAAP requires that estimates of costs to complete a contract be reviewed periodically and revised to reflect new information.

396.  Pursuant to ASC 605-35-25-62, GE was required to employ procedures that provided a "reasonable assurance of a continuing ability to produce reasonably dependable estimates." Further, GAAP at ASC 605-35-25-63 states:

> Ability to estimate covers more than the estimating and documentation of contract revenues and costs; it covers a contractor's entire contract administration and management control system. The ability to produce reasonably dependable estimates depends on all the procedures and personnel that provide financial or production information on the status of contracts. It encompasses systems and personnel not only of the accounting department but of all areas of the entity that participate in production control, cost control, administrative control, or accountability for contracts.

397.  In other words, GAAP requires that future costs estimates for long-term contracts not be based simply on costs incurred to date and a projection of future costs, but a full complement of procedures, internal controls, and personnel to produce dependable estimates.

398.  GE's failure to account for its unsound and unsustainable business practices in recognizing revenue during the Class Period violates the GAAP provisions described above.

**I.      GE Violated Item 303(a)(1)-(3) By Failing To Disclose Known Trends, Demands, Commitments, And Uncertainties**

399.  GE's annual and quarterly reports filed with the SEC are subject to the disclosure requirements of, among other things, Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Item 303(a)(1)-(3) generally requires companies to disclose in the MD&A section of its annual SEC filings any known trends, demands, commitments, events, or uncertainties that are reasonably likely to have a material impact on the company's financial condition.

400.    With respect to liquidity, Item 303(a)(1) requires issues to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

401.    With respect to capital resources, Item 303(a)(2) requires companies to, among other things:

>    a.    "Describe the registrant's material commitments for capital expenditures as of the end of the latest fiscal period, and indicate the general purpose of such commitments and the anticipated source of funds needed to fulfill such commitments"; and
>
>    b.    "Describe any known material trends, favorable or unfavorable, in the registrant's capital resources.  Indicate any expected material changes in the mix and relative cost of such resources.  The discussion shall consider changes between equity, debt and any off-balance sheet financing arrangements."

402.    Finally, with respect to results of operations, Item 303 requires companies to "[d]escribe any known trends or uncertainties that have or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations."

403.    On May 18, 1989, the SEC issued an interpretive release concerning registrants' disclosure obligations under to Item 303 (the "1989 Release").  The 1989 Release stated:

>    Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
>    (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
>    (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

404.    The purpose of the MD&A discussion, according to the SEC, is to provide investors information "necessary to an understanding of a [company's] financial condition, changes in financial condition and results of operations."  In particular, there are three principal objectives of the MD&A: (i) to provide an explanation of a company's financial statements that enables investors to see the company through management's eyes; (ii) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (iii) to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can judge the extent to which past performance predicts future performance.

### 1.    Omissions Concerning GE's LTC Liabilities

405.    Prior to and during the Class Period, the negative developments in the LTC insurance industry, which led other companies with LTC exposure (like Genworth, Unum, MetLife, and others) to increase reserves, raise premiums and—in many cases—exit the industry altogether, *see* ¶¶ 87-90, 113-16, was a trend that was reasonably likely to—and did—have a material impact on GE's financial results, capital position, and liquidity.  The negative trends with GE's own reinsurance portfolio, including, among other things, the widening gap between its actual claims and expected claims, the increasing future liabilities, and growing insufficiency of its LTC reserves, likewise were trends that were reasonably likely to impact the Company's financial results, capital position and liquidity.  Further, GE's portfolio of 300,000 high-risk LTC insurance policies and the increasing liabilities GE was subject to under those policies, represented a demand, commitment, and/or uncertainty that was reasonably likely to have a material impact on GE's financial results, capital position, or liquidity during the Class Period.

406.    As discussed in ¶¶ 113-16, negative trends in the LTC industry led GE's competitors to record billions in reserve charges during the Class Period.  During this same time

period, GE's own exposure to the LTC industry caused its insurance liabilities to dramatically increase (an increase that was not disclosed to investors until the end of the Class Period) and eventually caused the Company to belatedly record a **$9 billion** charge to earnings at the end of fiscal year 2017. GE's LTC exposure will also require it to contribute **$15 billion** in capital to ERAC and UFLIC over seven years.

407.    In light of the above, GE was required under Item 303 to disclose on February 26, 2013 and throughout the Class Period, *inter alia*, the negative trends occurring in the LTC market, the expected impact of those trends—and of GE's increasing LTC insurance liabilities (and any potential uncertainties related to those liabilities)—on GE's financial results, capital position, and liquidity. More specifically, GE was required—but failed—to disclose information to investors concerning the existence and extent of this demand, commitment, and/or uncertainty.

408.    In light of the above, Item 303 required GE to disclose in its 10-Ks, among other things, material facts concerning the negative trends that were ongoing in the LTC insurance market generally and within its own LTC portfolio, the extent of GE's (increasing) exposure to the LTC market, and manner and extent to which those trends were expected to negatively impact GE's liquidity, capital position, and financial results. GE violated Item 303 on February 26, 2013 and throughout the Class Period by failing to provide investors with any meaningful disclosures concerning the negative developments in the LTC industry, the nature or extent of GE's LTC exposure, or the risks or uncertainties created by such exposure. Indeed, rather than make these required disclosures, as discussed herein, Defendants deliberately ***excluded*** GE's LTC exposure from its Disclosed Insurance Liabilities throughout the Class Period.

### 2. Omissions Concerning GE's Contract Assets, LTSAs, And Industrial CFOA

409. GE additionally violated its Item 303 disclosure obligations by providing investors with no (or misleading) information to assess the many assumptions embedded in GE's Contract Assets, including whether estimated levels of profitability could realistically be achieved. For example, GE did not disclose that: (i) it was renegotiating LTSAs to its detriment, by eliminating some lower margin revenues, in order to trigger cumulative catch-ups; (ii) it had extended out the contract terms which gave customers additional time to make payment; (iii) its estimates relied on historical, rather than reasonably dependable current estimates; (iv) it had underestimated the credit risk of its customers, some of whom were now unable to pay; or (v) it was renegotiating its LTSAs for the sole purpose of padding its earnings by booking cumulative catch-up revenue adjustments.

410. To summarize, GE violated its Item 303(a)(3) disclosure obligations by failing to disclose that: (i) the Company had been relying on unsustainable business practices to renegotiate LTSAs with customers with no benefit to GE other than to generate positive cumulative catch-up adjustments (or avoid negative cumulative catch-up adjustments) to meet revenue and earnings projections, and to conceal that GE Power was struggling; (ii) to mask the growing discrepancy between GE's Contract Assets and Industrial CFOA, which resulted from GE's abuse of cumulative catch-up adjustments, GE Power generated CFOA by "monetizing" receivables—often through LTSA contract renegotiations with terms that were more harmful to GE than the initial terms; (iii) the Company was overstating revenues, margins and earnings on its LTSAs, through its reports of inflated Contract Assets, in order to artificially manipulate the Company's quarterly and annual financial results; (iv) the Company failed to maintain adequate internal controls over its financial reporting with respect to its Contract Assets; and (v) as a result of the foregoing, GE

materially overstated its earnings and Contract Asset values during the Class Period, and GE's public statements were materially false or misleading at all relevant times by omitting the material information discussed herein.

**J.     SOX Certifications And Representations Regarding GE's Compliance With GAAP**

411.    GE's 10-Ks filed on February 26, 2013 and throughout the Class Period represented that "[o]ur financial statements are prepared in conformity with [GAAP]."

412.    GE's 10-Ks and 10-Qs contained certifications from GE's CEO and CFO stating that: (i) GE's filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (ii) GE's "financial statements, and other financial information . . . fairly present in all material respects the financial condition, results of operations and cash flows of [GE] as of, and for, the periods presented"; and (iii) "[t]he information contained in the report fairly presents, in all material respects, the financial condition and results of operations of [GE]."  Immelt and Sherin issued the foregoing certifications in connection with the 2012 10-K and the 1Q13 10-Q.  Immelt and Bornstein issued the foregoing representations in GE's 2013 10-K, 2014 10-K, 2015 10-K, 2016 10-K, and its quarterly reports filed on 10-Qs covering each of the periods from 2Q13 through 1Q17.

413.    The foregoing statements were materially false or misleading when made because GE's financial statements did not comply with GAAP and did not, in all material respects, fairly present the financial position of the Company during the periods reported.  For the reasons discussed in ¶¶ 360-67, 389-98, GE violated GAAP by, among other things, failing to adequately disclose its material LTC risks and exposure or the material uncertainties surrounding the portfolio, failing to hold sufficient reserve against its LTC liabilities, and overstating its earnings and

Contract Asset values, in violation of GAAP. As such, the Defendants issuing SOX Certifications had no reasonable basis to assert that GE's financial statements complied with GAAP.

### K. Statements Regarding GE's Internal Controls Over Financial Reporting

414. In GE's 2012 10-K and Class Period 10-Ks and 10-Qs, GE's CEO and CFO certified that they evaluated GE's disclosure controls and procedures and internal controls over financial reporting and concluded that both GE's disclosure controls and internal controls over financial reporting were effective. Immelt and Sherin issued the foregoing certifications in connection with the 2012 10-K and the 1Q13 10-Q. Immelt and Bornstein issued the foregoing certifications in GE's 2013 10-K, 2014 10-K, 2015 10-K, 2016 10-K, and its quarterly reports filed on 10-Qs covering each of the periods from 2Q13 through 1Q17.

415. Additionally, in GE's 2012 10-K and each of its Class Period 10-Ks, KPMG stated that, "in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting."

416. The foregoing statements were materially false or misleading when made because, as GE admitted at the end of the Class Period, and as confirmed by numerous former employees, its disclosures controls and procedures and internal controls over financial reporting, including with respect to its insurance reserves, earnings and Contract Asset values, were inadequate during the Class Period. Indeed, in 2018—after the end of the Class Period—GE identified a number of controls over its Contract Assets that it was only starting to implement, including with respect to cost analysis and estimates.

### L. Omissions Regarding The Critical Accounting Estimates Defendants Used To Calculate Its LTC Reserves

417. In SEC Release 33-8350, dated December 29, 2003 (the "2003 Release"), the SEC stated that "management's most important responsibilities include communicating with investors

139

in a clear and straightforward manner" and that MD&A disclosures are "a critical component of that communication." The SEC stated in the 2003 Release that one of the three principal objectives of MD&A disclosures is "to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance."

418.    In the 2003 Release, the SEC stated that companies should provide disclosures about critical accounting estimates where: (i) "the nature of the estimates or assumptions is material due to the levels of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change"; and (ii) "the impact of the estimates and assumptions on financial condition or operating performance is material." The disclosures, according to the 2003 Release, "should provide greater insight into the quality and variability of information regarding financial condition and operating performance" by disclosing how the Company "arrived at the estimate, how accurate the estimate/assumption has been in the past, how much the estimate/assumption has changed in the past, and whether the estimate/assumption is reasonably likely to change in the future." Further, the 2003 Release stated that "[q]uantitative disclosure should be considered and may be required to the extent material if quantitative information is reasonably available."

419.    That 2012 10-K and GE's Class Period SEC filings failed to provide sufficient information to investors regarding the critical accounting estimates that it was using to calculate its LTC reserves. Specifically, GE failed to provide any meaningful disclosure regarding the qualitative or quantitative impact that changes to critical LTC reserve assumptions—like mortality rate, morbidity rate, and lapse rate—would have on GE's reserve calculation. Nor did GE provide investors with any discussion of how GE's reported reserves would change if it were calculated

using *current* assumptions rather than "assumptions at the time the policies were issued or acquired." Further, GE failed to provide any meaningful disclosure regarding its estimated future payment obligations under its LTC policies, notwithstanding that it was required to calculate such amounts in order to evaluate the adequacy of its reserves. Rather than disclose those future payment obligations, as discussed above, GE deliberately omitted LTC liabilities from the quantification of its Disclosed Insurance Liabilities in the MD&A section throughout the Class Period.

420.   Instead, with respect to its "[l]iabilities for traditional long-duration insurance contracts," which would include LTC policies, GE merely stated the following regarding its critical accounting estimates in its 2012 10-K and Class Period 10-Ks, "[l]iabilities for traditional long-duration insurance contracts represent the present value of such benefits less the present value of future net premiums based on mortality, morbidity, interest and other assumptions at the time the policies were issued or acquired."

421.   In stark contrast to GE's prior SEC filings, and as discussed further in ¶¶ 492-96, GE's 2017 10-K—which it filed after belatedly disclosing its true LTC exposure—contained the level of detail regarding the critical accounting estimates that GE used to calculate its LTC reserves that GE was required to—but did not—provide to investors during the Class Period.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

422.   Class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omitting material facts relating to, *inter alia*, the Company's: (i) exposure to enormous, undisclosed, and under-reserved-for liabilities related to LTC insurance; and (ii) reliance on revenues generated through the undisclosed and unsustainable business practice of renegotiating LTSAs with GE customers for no true economic

purpose other than to generate positive cumulative catch-up adjustments, and its related failure to account for reduced utilization rates and other negative developments in the power market when determining LTSA revenues and profits during the Class Period.

423.   As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of GE's common stock was artificially inflated throughout the Class Period.

424.   Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased GE stock at artificially inflated prices on the NYSE.  But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Class members would not have purchased GE stock at the artificially inflated prices at which it traded during the Class Period.

425.   The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between April 21, 2017 and January 24, 2018.  During this corrective disclosure period, GE's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited GE's stock price.  It was not until the final partial corrective disclosure and/or materialization of concealed risk on January 24, 2018 that the full truth was known to the market such that there was no longer any artificial inflation in GE's stock price attributable to the fraud.

426.   The declines in GE's stock price during the corrective disclosure period, including, *inter alia*, the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

427.     Plaintiffs and other members of the Class suffered economic losses as the price of GE's stock fell in response to partial corrective disclosures and/or the materializations of concealed risks.  The price declines on the partial corrective disclosure dates in GE stock were a direct result of the materially false or misleading statements and omissions. It was foreseeable that such disclosures would cause GE's stock price to decline.  Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other members of the Class.

428.     The following partial corrective disclosures caused GE's stock price to decline, thereby damaging investors, and are representative, not exclusive, of the partial corrective disclosures and/or materializations of concealed risks that led to Plaintiffs' damages for which relief is sought in this case.

### A.     April 21, 2017: Financial Results For 1Q 2017

429.     On Friday, April 21, 2017, before the market opened, GE issued a press release and filed it on an 8-K with the SEC, entitled "GE 1Q 2017 Earnings."  Among other things, the press release reported that "Industrial operating cash flows[] were **negative** $1.6 billion driven primarily by an increase in working capital and **timing of billings on our long-term equipment and service contracts**."

430.     Also on Friday, April 21, 2017, before the market opened, GE held an earnings conference call to discuss its 1Q 2017 results with analysts and investors.  During the call, Immelt reiterated the results reported in the April 21 press release, stating, "**Industrial CFOA was a negative $1.6 billion**."  Bornstein elaborated on Immelt's comments, stating, "our industrial CFOA was at $1.6 billion usage of cash, **about $1 billion below our expectations**." According to Bornstein, the largest contributor to this negative CFOA was cash outflows on GE's Contract

Assets ($1.9 billion) and, more specifically, GE's LTSA Contract Assets ($1.4 billion).   As

Bornstein explained:

> Contract assets were a use of $1.9 billion.  This was $300 million worse than
> expected.  Of the $1.9 billion, $500 million was from our long-term equipment
> contracts, where the timing of our $1 billion revenue recognition milestones differ.
> This will catch-up throughout the year as we execute against the contract.  ***The
> remaining $1.4 billion is our long-term service agreements***.  There were 2 pieces
> to this.  $600 million is related to service contracts where we've incurred cost and
> booked the revenue, but haven't yet billed the customer.  We expect this to partly
> come back over the year as we see higher asset utilization in Power and Aviation.
> And we've seen these similar trends in the prior years.  The other $800 million are
> contract adjustments driven by better cost performance and part life, primarily
> driven by Power and Aviation.

431.    Defendants' April 21, 2017 disclosure corrected and/or reflected the materialization

of risks concealed by the material misstatements and omissions alleged herein.  On this news, GE's

stock price declined from a close of $30.27 on April 20, 2017 to $29.55 on April 21, 2017, a drop

of $0.72 per share, or 2.4%, on heavy volume of 72,351,400 shares.

432.    Analysts were surprised by the revelation of negative Industrial CFOA cash flow

and expressly stated that investors were reacting to this disappointing information, despite

otherwise favorable earnings results reported by GE.  For example, an April 21, 2017 Morningstar

analyst report stated, "[s]hares of . . . General Electric slumped April 21 as ***investors reacted to

negative industrial cash flow in the first quarter***, which largely overshadowed [other more

favorable results]."  An April 21, 2017 Morgan Stanley report similarly noted, "we continue to be

disappointed by weak cash generation, with $1.6bn of negative CFOA . . . ***the contract asset

headwind clearly drops a flag on the quality of the quarter***."  An April 23, 2017 RBC analyst

report entitled *Cash Flow Shortfall Gives Investors a Reason Not to Like 1Q17 Beat* expressly

stated under "Key points" that:

- "GE's 1Q17 earnings call ***was hijacked*** by its disappointing cash flows
  from operating activities (CFOA)"; and

- "the 1Q [2017 CFOA] shortfall and back-end-weighted ramp arguably drove most of the -2.4% stock reaction."

**B.     July 21, 2017: Financial Results For 2Q 2017**

433.    On Friday, July 21, 2017, before the market opened, GE issued a press release and filed it on an 8-K with the SEC, entitled "GE 2Q 2017 Earnings" that summarized earnings for the second quarter ended June 30, 2017.

434.    During a July 21, 2017 earnings conference call held before the market opened, Bornstein updated investors on the $12 to $14 billion CFOA guidance for 2017 that the Company had reiterated during the earnings call held in April 2017 (discussed above) by stating:

> For the year, we are ***trending to the bottom end*** of the $12 billion to $14 billion range on CFOA, driven by pressure, principally in Power and Oil & Gas.

435.    In addition, Bornstein provided results for GE Capital and stated, "[w]e recently have had ***adverse claims experience in a portion of our long-term care portfolio*** and we will assess the adequacy of our premium reserves.  We will update you in the fourth quarter."

436.    Defendants' July 21, 2017 disclosures corrected and/or reflected the materialization of risks concealed by the material misstatements and omissions alleged herein.

437.    As investors absorbed this news, GE's stock price fell $0.78 from a close of $26.69 on Thursday, July 20, 2017 to close at $25.91 on Friday, July 21, 2017, a drop of 2.92% on unusually large volume of over 90 million shares.  On the next following trading day, Monday, July 24, 2017, the share price decline continued as the market continued to digest this news, and GE shares dropped to close at $25.43 on July 24, 2017, on heavy volume of over 56 million shares, a two-day drop of $1.26 per share, or nearly 5%.

438.    Analysts noted the importance of the surprising news that Industrial CFOA was being forecasted to come in at the low end of the $12 to $14 billion range.  For example, RBC issued a report on July 23, 2017 stating, "[o]n [the] last earnings call [on July 21, 2017] . . . GE

145

'ripped the band-aid' by cutting its 2017 EPS and Industrial CFOA guidance ranges to their respective low ends" and "Importantly, the company now expects full-year Industrial CFOA to come in at the low-end of its $12-$14 billion guidance range . . . ."

439.    Analysts were similarly surprised about the adverse claims experience in the LTC book of business.  For example, a J.P. Morgan analyst report dated July 24, 2017 noted that, although the magnitude of the LTC reserve issue had not been revealed, the mere existence of the issue presented a risk to GE Capital being able to sustain the dividends it had been "upstreaming" to its parent company, GE, which, in turn, presented a risk to GE's ability to continue to pay dividends to GE shareholders.  The J.P. Morgan report states:

> [T]he comment [on the 2Q17 earnings call] that [GE] will be evaluating Insurance for losses is a stark reminder that GECS is not just GECAS.  Indeed, GECAS is $40B of assets out of a total $153B.  In fact, Insurance is almost the same size at ~$36B, with roughly breakeven earnings contribution, ***and now prone to "adverse claims" in long term care***, which according to our JPM Insurance analysts has in recent years been measured in "the billions" for others.  This is a TBD, and we now see some risk to vertical earnings in 2H, ***as well as risk to potential for meaningful up streamed dividends in the years ahead***.

### C.    October 20, 2017: Financial Results for 3Q 2017

440.    On October 20, 2017, before the market opened, GE filed an 8-K with the SEC attaching a "GE 3Q 2017 Earnings" summary.  The summary reported GE's CFOA for the quarter (as discussed further below) and stated that although GE Capital had paid $4 billion in dividends to GE through September 30, 2017, the Company was "deferring decision on additional dividends until Insurance reserve review [related to LTC insurance] is completed."

441.    On October 20, 2017, before the market opened, GE held an earnings conference call to discuss its results for the third quarter ended September 30, 2017.  On the call, Bornstein stated:

> Our reported CFOA was $500 million in the quarter.  That represents GE cash flow . . . .  Next on GE Capital [do see] we did not receive a dividend in the quarter.  As

you know, we're in the process of performing an actuarial analysis of claims reserves in our insurance business. Until that review has been completed, ***we have deferred the decision to pay GE Capital dividends to GE***.

Our industrial CFOA was $1.7 billion in the quarter, adjusted for $1.3 billion of US pension plan funding and deal taxes. This is down $1.2 billion from prior year. With BHGE, on a dividend basis and excluding oil and gas CFOA, our industrial CFOA was $2.1 billion.

*     *     *

Contract assets were a use of $800 million in the quarter. . . . $500 million is from our long-term service agreements due to better cost performance and parts life, primarily in power and transportation.

442.    On the call, Miller further stated:

On cash flow, we now expect industrial cash flow for the year to be about $7 billion . . . . This is well below the $12 billion estimate we provided at second-quarter earnings, and it's principally driven by three businesses. Power is the biggest driver on lower volume, higher inventory, and the timing of payments on long-term equipment contracts. Oil and gas is about $1 billion off; about half of that being driven by lower volume and collections in the first half, and the rest driven by our methodology change to show them on the dividend basis for the second half of the year. And renewables is also about $500 million off on lower-than-expected volume impacting inventory and progress collections.

443.    On the call, Flannery added:

As Jamie [Miller] mentioned, cash will be approximately $7 billion for the year. Power alone will be lower than expected by $3 billion on lower earnings and higher inventory. . . .

We expect substantially higher cash generation in 2018 driven by lower structural headwinds, things like tax and restructuring charges; a rigorous cost-out plan; and a substantial improvement in working capital. That said, ***obviously, $7 billion of cash is significantly lower than guidance***, and this performance is simply not acceptable.

444.    On the call, Bornstein further stated:

GE Capital ended the quarter with $155 billion of assets, including $33 billion of liquidity, down $6 billion from the second quarter. As I mentioned on our last earnings call, ***we have recently observed elevated claims experience*** for a portion of the long-term care book at GE Capital's legacy insurance business, ***which represents $12 billion or roughly 50% of our insurance reserves.***

147

As a result, we began a ***comprehensive review in the third quarter of premium deficiency assumptions*** that are used in the annual claims reserve adequacy test. This is a very complex exercise, and the team is making good progress. We expect to complete this process by the end of the year. ***Until the review has been completed, we have deferred the decision to pay approximately $3 billion of additional GE Capital dividends***. Year to date, GE Capital has paid $4 billion of dividends to GE.

445.    During the call, Flannery also announced that the Company had "identified $20-billion plus of assets that we will exit in the next 1 to 2 years."

446.    In reaction to the Company's disclosures regarding LTC insurance reserves and Industrial CFOA, which corrected and/or reflected the materialization of risks concealed and the material misstatements and omission alleged herein, there was an immediate price decline in GE's stock, which opened on the NYSE trading on October 20, 2017 down more than 5.6% from the closing price of $23.58 on the previous day, October 19, 2017.   While the price rebounded temporarily by the close of trading on Friday, October 20, 2017, by the close of the market on the next trading day (Monday, October 23, 2017)—after investors had sufficient time to absorb the impact of this news and after several analysts (including J.P. Morgan, Morgan Stanley and UBS AG) downgraded GE's stock in light of the disclosures—the stock closed at $22.32 on October 23, 2017, down $1.26, or 5.34%, from the close on Thursday, October 19, 2017 on extremely high volume of 187,340,900 shares traded.   As the market continued to absorb this news, GE's stock price continued its slide over the next few trading days, falling to $21.89 on October 24, 2017, and then to $21.50 on October 25, 2017 and then to $21.32 on October 26, 2017.   Thus, over the course of this five-day period while the market digested the information disclosed on October 20, 2017, GE's stock price sank from a close of $23.58 on October 19, 2017 to a close of $21.32 on October 26, 2017, a cumulative drop of $2.26, or almost 10%.

447. As discussed below, the changed views of analysts from the time the information was initially disclosed on October 20, 2017 to the next trading day (October 23, 2017) demonstrate that the market continued to digest the information after the initial disclosure on October 20, 2017.

448. For example, on October 20, 2017, when GE held its conference call, Morningstar opined that the GE's dividend was "at risk" based on the October 20, 2017 disclosures. But, by Monday, October 23, 2017, after further digesting the information disclosed on October 20, 2017, Morningstar then informed investors that the risk of a dividend cut was more likely. Specifically, in an analyst report on Friday, October 20, 2017, Morningstar wrote, "[w]e plan to cut our fair value estimate by as much as 10% following General Electric's third-quarter earnings report, which revealed deeper challenges in the power segment than we had anticipated." The report specifically pointed to GE "halv[ing] management's original 2017 target of $12 billion-$14 billion in industrial cash from operations," and further wrote:

> More concerning is the suspension of GE Capital dividends, ***pending actuarial analysis of claims reserves in a long-term care insurance business***. Absent these dividends to the parent, and with Flannery positioning 2018 as a trough or "reset" year, ***we think it would be irrational for GE to maintain its current dividend. Flannery did not explicitly confirm a cut*** but hinted that GE would be managed for total shareholder return going forward.

449. Thus, as the title of the report stated, Morningstar was initially of the view that the "Dividend [Was] ***at Risk***." But, by the next trading day, Monday, October 23, 2017, Morningstar actually acted on its plan to lower estimates for GE by 10% (lowering its price target for the stock from $32 to $29) and stated:

> We're lowering our fair value estimate to $29 from $32 ***on weaker-than-expected industrial cash flow generation***. GE's dismal third quarter revealed both financial and behavioral factors that also lead us to believe ***the risk of a dividend cut has increased***. Originally, we had four conditions that caused us to believe GE would be able to maintain its $8 billion dividend. ***Two of those conditions broke down in the third quarter***. Management indicated that industrial cash from operations would reach only $7 billion in 2017, ***far short of the original $12 billion-$14 billion prior management targeted***. Subtracting capital expenditures from this new

figure would leave only about $4 billion in industrial free cash flow, and that is before the $1.8 billion of pension contributions that GE is expected to make this year. Second, we had anticipated an additional $3 billion-$4 billion in GE Capital dividends to help bridge the gap if industrial free cash flow came in light. However, *management revealed the suspension of GE Capital dividends pending review of reserves needed to support a long-term care insurance business*. In our view, these were the two most important conditions needed to sustain the current dividend.

450.    An RBC analyst report dated October 23, 2017 offered the following explanation

for why the stock rebounded on Friday, October 20, 2017, despite the negative news:

New CEO John Flannery's much-anticipated inaugural earnings call set off a rollercoaster day for GE stock. We believe that his brutal honesty about prior mismanagement and commitment to rethinking the entire business model resonated well with investors. The turning point that sparked the stock rally from down -6% Friday morning, in our view, was during Q&A when management crisply explained how the ~$7 bil 2017 CFOA level was not the "new normal". . . .

Biggest surprise: Despite guidance cuts, GE's stock ends the day up 1%. Given the magnitude of the guidance cuts, the urgent question we fielded on Oct-20 was *why the stock rallied from -6% at the open to up 1% at the close*. Our take is that this rally was driven by two factors: (1) The bridge of cash usage items that will not repeat in 2018, demonstrating how $7 bil is not the "new normal", eased some shock over the CFOA guidance cut. (2) John Flannery's brutal honesty about GE's prior failings, along with a heartfelt "falling on his sword" by outgoing CFO Jeff Bornstein. These factors helped investors conclude that a bottom could be at hand.

451.    The RBC report then, like the October 23, 2017 Morningstar report, went on to

state, "[w]e expect GE to cut its dividend ahead of the Nov-13 analyst meeting," and went on to:

(i) discuss what was learned from the earnings call; (ii) stress both CFOA and LTC concerns; and

(iii) actually *lower its price target* for GE's stock, stating:

The deterioration of GE's cash generation and sustainability of its dividend remains one of the biggest topics of debate facing the company today. To address this, new CEO John Flannery was unequivocal about his focus and commitment to improving cash flows at the company. That said, *GE was forced to once again cut its 2017 Industrial CFOA target, moving from ~$12 billion down to ~$7 billion*, implying a -40% decrease. In addition, the company had originally planned to orchestrate $6-$7 billion of total GE Capital (GECC) dividend back to the parent for the full-year. However, though it has only generated $4 billion YTD, *management is deferring any decisions on additional GECC dividends until it completes an*

***actuarial review of the claims reserves in its insurance business*** to gauge the level of cash outlays that may become necessary.

Another area of the report states:

> GE is currently in the midst of reviewing the adequacy of its reserves on its long-term care reinsurance business within GE Capital, which is expected to conclude in 4Q17. ***Given that this review may determine that roughly half of GE Capital's reserves are insufficiently funded and that additional contributions must be committed***, management has opted to defer any decision on transferring further dividends from GE Capital to the Industrial parent in 2H17. Year-to-date, the company has generated $4 billion of GE Capital dividends, vs. the prior target of $6-$7 billion for the year, ***which may no longer be feasible*** depending on the conclusion of the insurance reserve assessment.

452.    In an October 23, 2017 analyst report, Deutsche Bank AG ("Deutsche Bank") similarly pointed to the surprising disclosures regarding GE's likely LTC charges in issuing a "sell" recommendation to investors, stating, *inter alia*:

> The fact that GE owes such a large bill for legacy insurance likely surprised a lot investors considering GE supposedly exited Genworth, ERC and GE's other insurance businesses many years ago. In fact, of GE Capital's [approximately] $155bn of assets at 3Q17, roughly $27bn are reportedly tied to insurance. . . . Why is GE still taking charges for its discontinued operations . . . .

### D.    November 13-14, 2017: Investor Update And Goldman Sachs Conference

453.    On Monday, November 13, 2017, before the market opened, GE released to the market the long-awaited "GE Investor Update" from its CEO, Flannery. Flannery had been conducting a 100-days' long "deep dive" into all of GE's businesses and had earlier promised investors that he would update them on GE's plans for the future in November 2017, including an update on the LTC insurance issue.

454.    In the written "GE Investor Update," GE announced that it was cutting its dividend by 50% from the then-current level of $0.96 per share to $0.48 per share. The "GE Investor Update" stated that this reduction meant that the all-important dividend yield was be reduced from approximately 4.7% to approximately 2.3%. The "GE Investor Update" further stated that there

would be a "[p]otential 4Q [2017] insurance reserve adjustment," but did not specify the amount, and further disclosed that while GE Capital had paid GE $4 billion in dividends thus far through the year, the decision on whether GE Capital would pay any further dividends to GE in 2017 was "deferred" and that GE was "[n]ot planning for dividend from GE Capital in 2018."

455. This announcement was a highly significant event as the dividend cut was only the second dividend cut GE had made since the Great Depression (the other one was during the financial crisis in 2008), and was attributable to GE's disappointing CFOA and forthcoming LTC reserve charge.

456. Beginning at 9 a.m. New York time, and continuing after the market had opened, GE held an "Investor Update" conference call with analysts and investors to discuss the written update further. During the call, CEO Flannery stated:

> You saw this morning that we announced the reduction in our dividend. It's in the context really of focusing on managing the company for total shareholder return. *I'd just start by saying we understand this is an extremely painful action for our shareholders, our owners. We're reducing the dividend by 50% to $0.48 a share.* Not a decision we took lightly. It was after extreme deliberation and consideration what the alternatives were.
>
> *     *     *
>
> With respect to the dividend, again, I just want to reiterate, *we understand how important the dividend is to our shareholders*, especially the people who use it for current income. We've gone through exhaustive analysis of this, but I want to start, first and foremost, with a full recognition of the gravity of this decision and the effect it has on many people. That said, the reduction of this dividend to $0.48 is a product, really, of where we are as a company right now. So we had a $0.96 dividend established. We had a path where we thought the industrial cash flow generation would grow, that would grow into the dividend, that we'd end up in 2018 with a payout ratio that was quite comparable to what you'd see from our peers. The reality is that hasn't unfolded that way. The cash profile has not unfolded that way, *and we've been paying a dividend in excess of our free cash flow for a number of years now*.

457. GE then went on to discuss reasons why its dividend was being cut—Industrial CFOA shortfalls and the lack of an upstream dividend from GE Capital to GE for the remainder

of 2017 and 2018 as a consequence of the LTC insurance issues.  Defendant Flannery reiterated

the Company's CFOA forecast reduction, in the following question and answer exchange during

the call:

> **Unidentified Participant:**
>
> [S]hortly after you were named CEO, it was widely quoted in the Journal and
> elsewhere that the dividend was safe.  Surprised that you would make such a strong
> statement early on, which . . . has hurt your credibility right out of the gate. . . .
> When did you make the decision? . . .
>
> **John L. Flannery—General Electric Company—Chairman & CEO:**
>
> So I think ***there's been major change in our cash flow forecast***.  So the time we
> went out with that first statement, we were having a $12 billion to $14 billion
> CFOA.  And the day I started, there was a guide to the low end of that range. . . .
> So we're now at a $7 billion number. . . .  [F]undamentally, that ***dividend was***
> ***predicated on us growing to a certain level that we just did not see happening in***
> ***terms of industrial cash flow*** in the next couple of years . . . .  ***So the single biggest***
> ***delta, I think is obvious, which is what happened in the Power business***.

458.    On the call, regarding GE's review of its LTC insurance reserves, Miller updated

investors as follows:

> One area, I'll just pause and talk about for a minute, is GE Capital.  And as many
> of you know, ***we're in the middle of an ongoing reserve review at our insurance***
> ***businesses there***.  This process is ongoing.  It involves multiple third parties and
> it's not done at this point.  And I don't have a number for you today.  We're on
> track to conclude that in December.  ***And we mentioned to you before that we're***
> ***not taking a second half [2017] GE Capital dividend of about $3 billion.  And as***
> ***we go through this process, at this point, I do expect the charge to be more than***
> ***that***.  But we do have capital plans in place and we don't expect to have to put GE
> parent cash into GE Capital.
>
> \*        \*        \*
>
> Probably the last thing I would just mention on this page is that we're not planning
> a GE Capital dividend [to be paid to GE] for 2018.

459.    On November 14, 2017, Miller appeared at a Goldman Sachs conference beginning

at 9:30 a.m. New York time (i.e., after the market had opened), during which one analyst noted

that in "[y]esterday's presentation, GE Capital was noticeably absent in the discussion there."

Miller reiterated, "you saw that we cut the dividend yesterday by 50%" and provided further information.  In response to an analyst's question, Miller further elaborated on the information provided in the November 13, 2017 presentation the day before, stating:

> And then the second piece to your question was really around the insurance review we have ongoing.  Many of you may know, we're in the middle of a review of our insurance reserves.  This is a book of largely reinsured long-term care businesses back from more than a decade ago.  That review is ongoing, we're right in the middle of it. It involves multiple third parties.  It's not done so we don't have any answers to it today.  It's on track for completion in December.  So when we know what that is, we'll announce it.  We had announced earlier that we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year.  At this point in the process, ***I'd tell you that I expect that charge to be more than that***, but we also have capital plans in place and I don't expect to have to put parent cash into GE Capital at this point.  But look, when we know and when we understand this better, we will announce it and be sure everybody knows.

460.    The enormous 50% dividend slash was more than analysts had been anticipating.  For example, after the October 20, 2017 disclosures (discussed above), in an October 23, 2017 analyst report, Morgan Stanley had forecasted a "higher probability of a dividend cut to [approximately] $0.70 . . . ."  Thus, the unanticipated halving of the dividend to a substantially lower $0.48 per share, and the need for charges exceeding $3 billion for LTC reserves, caught analysts and the market off guard and sent the stock price reeling.  This news, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions alleged here, caused GE's stock price dropped from a close of $20.49 on Friday, November 10, 2017 to close at $19.02 on Monday, November 13, 2017, a drop of over 7%, on heavy volume of over 261 million shares.  The share price decline continued on the next trading day as the market continued to digest the shocking news about GE's massive dividend cut and need for larger-than-previously-disclosed LTC insurance reserves.  On Tuesday, November 14, 2017, GE's stock fell an additional $1.12 per share, or 5.8%, to close at $17.90 on even heavier volume of 312,556,800 shares.  The stunning news released by GE on November 13, 2017 and

further discussed by GE at the November 14, 2017 Goldman Sachs conference resulted in a two-day share price free fall of more than 12.5%.

461.     As analysts explained, the dividend cut was particularly distressing news to GE's "retail investors" who placed great emphasis on GE's attractive dividend yield.  In a November 14, 2017 Deutsche Bank report, under the heading ***Negative surprises***, Deutsche Bank wrote, "[t]he dividend cut to 48 cents ***was steeper than we expected***."  The Deutsche Bank report goes on to note that "retail investors," who own approximately 40% of GE's shares, were particularly apt to punish the stock because such investors had been heavily reliant on GE's (formerly) attractive dividend yield.  The Deutsche Bank report states:

> Yesterday, GE's analyst meeting ***surprised*** on several fronts.
>
> **Steep dividend cut**
> For the third time in its history, GE cut its dividend.  Only this time, the cut wasn't predominantly driven by macro forces as was the case in the past (ie, Great Depression, Great Recession) but instead was heavily attributable to circumstances that were created by GE itself—namely excessive earnings ramp/targets matched with a dividend payout ratio of 45-50%.
>
> The cut to 48 cents from 96 cents came in lower than consensus expectations of ~60 cents, in our opinion. . . .
>
> ***With >40% of GE's common equity owned by retail investors, we believe substantial near term selling pressure on GE could further ensue as retail investors who previously counted on the GE dividend look elsewhere***.

462.     In a November 14, 2017 analyst report, Citigroup Global Markets, Inc. lowered its price target from $27 to $25 and wrote that "***[p]ower is a mess*** right now.  GE Capital will likely take ***a big insurance charge***, and Cash/EPS could flat-line close to $1" and further that "the long term care reserve in GE Capital ***will be bigger than we thought***."

**E.     January 16, 2018: GE's "Insurance Update"**

463.     On Tuesday, January 16, 2018, before the market opened, GE issued a press release announcing the results of its reserve testing related to its LTC portfolio and disclosed the shocking

news that it will take an "after tax GAAP charge of $6.2 billion for the fourth quarter of 2017" ($8.9 billion pre-tax) and that "GE Capital expects to make statutory reserve contributions of ~ $15 billion over seven years."

464.    On January 16, 2018, before the market opened, GE also filed an 8-K with the SEC, which stated:

> On January 16, 2018, GE provided an update on the previously reported review of premium deficiency assumptions related to GE Capital's run-off insurance business (North American Life and Health ("NALH")).  With the completion of that review, and of NALH's annual premium deficiency test, *GE recorded an increase in future policy benefit reserves of $8.9 billion* and $0.6 billion of related intangible asset write-off for the fourth quarter of 2017.  *This will result in a $6.2 billion charge* ($7.5 billion upon remeasurement under tax reform) on an after-tax GAAP basis *to GE's earnings in the fourth quarter of 2017*.
>
> As a regulated insurance business, NALH is subject to a statutory accounting framework for setting reserves that requires the modification of certain assumptions to reflect moderately adverse conditions and other differences from the reserve calculation under GAAP.  Under that framework, we estimate that *GE Capital will need to contribute approximately $15 billion of capital to NALH over the next seven years*.  GE Capital plans to make a first capital contribution of approximately $3 billion in the first quarter of 2018 and expects to make further contributions of approximately $2 billion per year in each of the six following years, subject to ongoing monitoring by NALH's primary regulator, the Kansas Insurance Department.  GE Capital plans to fund the capital contributions with its excess liquidity and other GE Capital portfolio actions and *does not expect to make a common share dividend distribution to GE for the foreseeable future*.

465.    On January 16, 2018, before the market opened, GE held an "Insurance Update Call" as a follow-up to the press release.  During the call, Flannery stated:

> We've taken an after-tax GAAP charge of $6.2 billion, which is $7.5 billion at a 21% tax rate.  And you will see that reflected in our fourth quarter financials.  GE Capital will make a $3 billion statutory cash contribution to its insurance subsidiary in the first quarter of 2018 and approximately $2 billion annually from 2019 to 2024, for a total of approximately $15 billion.
>
> Needless to say, at a time when we are moving forward as a company, I'm *deeply disappointed at the magnitude of the charge* in this legacy portfolio.

* * *

Clearly, in hindsight, we underappreciated the risk in this book.

466.    In contrast to Defendants' repeated proclamations during the Class Period that GE had "exited" the insurance business and that "all of the insurance business is gone," Flannery acknowledged on January 16, 2018 that GE had only "exit[ed] *the majority* of our insurance businesses in the 2004 to 2006 timeframe."  He also conceded that, notwithstanding GE's lack of disclosures to investors regarding its LTC liabilities, GE had been focused internally on its LTC portfolio throughout the Class Period.  Flannery noted that executives "reviewed" GE's LTC exposure "[i]n 2015, as part of the GE Capital exit process" and further stating that GE's LTC book "has gone through a standard evaluation process and testing every year as is the standard in the industry."

467.    During the January 16, 2018 conference call, Zanin noted that GE's experience was no different than those of other LTC insurers (many of which had increased their reserves long before GE), stating, "the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected."

468.    In response to this disturbing news, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions alleged here, caused GE's share price sank from a close of $18.76 on Friday, January 12, 2018 to $18.21 on Tuesday, January 16, 2018 (the next trading day), a drop of approximately 3% on heavy trading volume of 205,657,000 shares.  As investors continued to digest the news, the price drop continued the following trading day when on January 17, 2018, GE's stock fell to $17.35 from the January 16 close of $18.21, a drop of an additional 4.7% on heavy trading volume of 185,781,800 shares.  The share price decline continued for the next two days, closing at $16.77 on January 18, 2018 and then at $16.26 on January 19, 2018.  Thus, as the market continued to digest the news,

GE's stock price declined over this four-day period from a close of $18.76 on Friday, January 12, 2018 to close at $16.26 on January 19, 2018, a cumulative drop of $2.50 per share or more than 13%.

469.     Analysts were incredulous about the enormity of the LTC reserve charge.  During the January 16 call, analyst Jeffrey Todd Sprague, Founder and Managing Partner at Vertical Research Partners, LLC, remarked that "[i]t is hard to imagine a $15 billion problem materialized in the course of a year, like there was not enough rigor behind this process."

470.     Numerous analysts also remarked that the LTC reserve charge was greater than what the market had expected.  In an analyst report dated January 16, 2018, entitled *Insurance woes hit GE hard*, Deutsche Bank stated its surprise regarding GE's enormous charge to earnings related to LTC insurance especially since LTC reserve issues had been revealed to the market by other companies with LTC exposure (but not by GE) at least as early as 2014:

> This morning, GE announced that it would take $6.2bn of 4Q17 after-tax charges to shore up reserves for GE Capital's long term care reinsurance book ($7.5bn at 21% US tax rate), or ***more than twice the original estimate last year of ~$3bn***, which we had presumed was a pretax number—this was not publicly specified.  The charges come well after Genworth first flagged long term care issues in late 2014.  The company also called out a considerable cash funding requirement of $15bn over the next 7 years. . . .

> Overall, the charges and scope of the problem are ***significantly worse than we had anticipated***.

471.     In an analyst report dated January 16, 2018, entitled, *GE—Insurance Reserve Much Worse Than Anticipated; $15 Bil of Contributions Over 7 Years*, RBC wrote:

> Our view: Although we had been previously warned that Sector Perform-rated GE's insurance portfolio reserve charge would be substantial, ***the initial amount announced on Jan-16 was far more severe than the market had been anticipating***, and exceeded expectations in early November of a +$3 billion charge.  Specifically, GE now expects to record a $6.2 billion after-tax GAAP initial charge in 4Q17 and confer over $15 billion of total statutory capital contributions (cash) over the next seven years based on a "comprehensive bottom-up rebuild" of all claim curves and assumptions.

&ast;    &ast;    &ast;

Long-awaited insurance portfolio reserve charge was ***higher than expected***; $6.2 billion after-tax charge in 4Q17 and $15 billion of contributions over seven years. On Jan-16, GE finally announced the results of its comprehensive review of GE Capital's run-off insurance portfolio. Specifically, management sized the pre-tax GAAP charge at $9.5 billion (or $6.2 billion after-tax), to be booked in 4Q17, and estimates a total statutory capital contribution of $15 billion over the next seven years. Recall that GE had previously estimated that the charge would be over +$3 billion and that it would announce these results in Dec-2017; clearly, ***the severity of the reserve shortfall was more dire than anticipated***. . . . Management stated that these new charges are based on a "comprehensive bottom-up rebuild" of all claim curves, projections, and assumptions, which ***suggests to us that the prior standards for the actuarial reviews had been inadequate***.

472.    In an analyst report dated January 16, 2018, entitled *GE Capital Charge Problematic on Many Levels*, Cowen wrote:

GE Capital's Woes A Problematic Development—GE announced a $6.2B after-tax charge ($9.5B pretax) related to its review of the insurance portfolio (i.e. GE North American Life & Health; "NALH") it divested over 10 years ago. ***The $6.2B is 2x+ larger than GE had originally guided*** . . . . GE Capital plans to make $15B of "statutory reserve contributions" (i.e., cash contributions) over the next seven years, with $3B to be paid in Q1:18 and $2B/year to be paid over 2019-2024.

473.    The negative coverage continued the next day as analysts continued to digest the completely unanticipated news GE revealed the day before. On January 17, 2018, Deutsche Bank reemphasized the dire effect of the failure to properly reserve in the LTC business, stating:

GE needs cash. Separating out Aviation and Healthcare (relatively robust cash generators) could strand substantial liabilities with the Power business that could face years of long term fundamental pressures. Power itself requires substantial cash to fund its downsizing and new product development. Moreover, ***GE Capital now requires cash to pay the $15bn of Insurance reserve funding (over 7 years), which would end up $9bn short once the $28bn of cash available pays off ~$25bn of run-off debt over the next 3 years (excluding the contribution from annual Capital earnings***, which may also shrink as EPS and the Industrial Finance books are meaningfully taken down).

474.    Similarly, in a January 17, 2018 analyst report, J.P. Morgan analyst Tusa continued to digest the implications the January 16, 2018 disclosures would have for GE's future earnings and wrote, "[y]esterday's charge from GE was **materially larger than expected**, and the

implications of dealing with it are dilutive to earnings, FCF [free cash flow] and ultimately value." (emphasis in original). Tusa went on to note that the charge was so large that it implicates the financial strength of "the consolidated company now, and is not a ring fenced [GE Capital] issue."

475. In fact, in a January 17, 2018 article titled *GE Capital Drags Down its Parent and CEO*, reporters at The New York Times noted that Flannery himself admitted, "I share your **surprise and disappointment** of this coming out of a legacy business."

476. The market continued to digest this news on January 18, 2018. For example, a January 18, 2018 article in The Economist titled, *After a huge loss on old reinsurance contracts, GE contemplates a break-up*, stated, "[t]hat in the 12 years since [the Genworth and Swiss Re deals], the firm appears to have done little about this residual portfolio seems **an odd omission**. **The risk, after all, was well known.** Other firms had problems with policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions; the long-term care market as a whole in America has run into trouble."

**F.** **January 24, 2018: Disclosure Of Fourth Quarter 2017 Financial Results And SEC Investigations Into GE's LTC Reserves And Revenue Recognition Practices Related To LTSAs**

477. On January 24, 2018, before the market opened, GE issued a press release, filed with the SEC on an 8-K, announcing its 4Q 2017 results. The press release stated that GE suffered a net loss of $9.8 billion for 4Q 2017, which included a $6.2 billion after-tax charge to increase LTC insurance reserves and substantial profit shortfalls in its Power unit. The press release further stated:

> GE Chairman and CEO John Flannery said, "In the fourth quarter, EPS was at the low-end of guidance, excluding insurance-related items, U.S. tax reform, and industrial portfolio actions. . . . Power was down significantly and we expect market challenges to continue."

478.    The press release further stated, "GE Capital ended the quarter with $157 billion of assets, including $31 billion of liquidity.  On a reported basis, the Verticals generated a loss of $(7.6) billion, *which is down from last year driven by the effects of the charges in the Insurance business*" and that:

> GE announced last week that the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), resulted in an *after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017*, and GE Capital expects to make statutory reserve contributions of approximately *$15 billion over 7 years*.

479.    Also on January 24, 2018, during an earnings conference call held before the market opened, GE disclosed that it has "been *notified by the SEC that they are investigating* the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long term-service agreements."

480.    In response to these disclosures regarding the SEC investigations, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions alleged here, caused GE's stock price declined from a close of $16.89 on January 23, 2018 to $16.44 on January 24, 2018, a 2.66% decrease on heavy volume of over 167 million shares.  The share decline continued the next day as the price continued to drop to close at $16.18 on January 25, 2018, again on heavy volume of over 95 million shares.  Thus, as the market continued to digest the news over this two-day period, GE's stock price declined from a close of $16.89 on January 23, 2018 to $16.18 on January 25, 2018, a cumulative drop of $0.71 or more than 4%.

481.    Analysts cited the disclosure of the SEC investigations as a reason for the decline in GE's stock.  For example, in an RBC analyst report dated January 25, 2018, RBC lowered its price target for GE's stock and wrote that any positive developments in GE's financial results:

[W]ere quickly made irrelevant when management unexpectedly disclosed during the earnings call that the SEC had opened two separate investigations: one into GE's insurance reserve charge and the other into its contract asset accounting practices. ***The stock reaction to this negative news was swift, reversing a +4% relief rally into a 2%-3% decline***. While it is difficult to handicap the risks associated with these SEC reviews in their early stages, this overhang will likely continue to dog GE over the near-term and present any bottom-fishing investors with a reason to stay on the sidelines. We are lowering our 2019 EPS by -4c and our price target to $17.

**Biggest surprise: Discloses two separate SEC investigations**. GE's stock sell-off on Jan-24 was seemingly prompted by the unsettling revelation of two SEC investigations. Recall that it announced on Jan-16 that GE Capital's insurance reserves were found to be inadequate, requiring $15 bil of capital contributions over the next seven years. This development apparently elicited the interest of the SEC, which may be looking into how a liability of this magnitude had been permitted to languish unnoticed for so long. Separately, GE revealed that the SEC had opened an investigation into its contract asset accounting practices in late-2017.

482.    Market commentators also pointed to the disclosure of the SEC investigations as a reason for the decline in GE's stock. For example, a January 25, 2018 CBS MarketWatch article entitled, *GE stock swings lower after disclosure of SEC investigation*, states:

General Electric Co's stock was soaring after the company reported fourth-quarter results, then the industrial conglomerate's bombshell about a government accounting probe triggered a sharp pullback that erased all the gains.

\*    \*    \*

The stock . . . had traded up as much as 5.8% in premarket trade, after GE reported fourth-quarter results, and after the start of the post-earnings conference call.

\*    \*    \*

But after the SEC probe [was announced on the earnings call], the stock took a sharp dive. It tumbled 2.7% in active trade Wednesday, enough to pace the Dow Jones Industrial Average[] . . . decliners. Volume spike to 167 million shares, making the stock the most actively traded on major U.S. exchanges.

483.    The declines in GE's stock following the revelations during the corrective disclosure period (April 21, 2017 through January 24, 2018) and the resulting losses suffered by

Plaintiffs and members of the Class were proximately caused by the misstatements and omissions

of material fact alleged herein.

## IX.     ADDITIONAL POST-CLASS PERIOD EVENTS

### A.     Investors Express Shock Over GE's LTC Reserve Charge And Identify A "Credibility Gap" With Management

484.     In a report dated January 29, 2018 titled *SEC Enforcement investigation elevates*

*GE risks*, Deutsche Bank analyst John G. Inch ("Inch") stated:

> In turn, the high magnitude of the $9.5bn charge and $15bn cash bill (***substantially beyond expectations for a business likely few were even aware retained such elevated risks***) shocked the market and helped to drive GE's share price lower while widening its credit spreads.

> In addition, recall that GE didn't begin to flag long-term care insurance issues until mid-2017, well after its former insurance subsidiary Genworth first identified problems with its long-term care portfolio in late 2014.

485.     Just three weeks earlier, on January 5, 2018, Inch similarly noted, in a report titled

*GE Insurance risks*:

> From GE's latest 10-Q 3Q2017 filing, the company retains insurance and investment contract liabilities of ~$27bn.  Long-term care exposures were pegged at $12bn or roughly half of the company's insurance reserves.  ***It is undoubtedly surprising to many*** that GE maintains $ billions of "run-off" insurance exposure even though the Genworth IPO occurred nearly 14 years ago while GE also sold its Insurance Solutions businesses including [ERC] to Swiss Re in 2005.

> *         *         *

> Even though Genworth first publicly identified problems with its long-term care portfolio in late 2014, GE didn't begin to flag the issue until the second quarter 2017 conference call.

> *         *         *

> [W]e find it odd that it has taken GE so long to get a handle on its potential long-term care reserve deficiencies.  As we understand it, most companies perform these reviews in 4Q on a regular basis.  Considering the highly regulated (and automated) nature of the insurance business, it isn't clear what would have been causing the lengthy GE process review.

[W]ith the insurance bill now potentially topping $4bn, *where exactly is the ceiling*?  In our opinion, GE's track record at forecasting losses for "run off" or "discontinued operations" isn't exactly stellar—think WMC and Lake Financial that required recurring top-up charges *long after the businesses were reportedly sold/discontinued*.

486.    On January 25, 2018, Bloomberg published an article commenting on the mysterious timing of GE's disclosure of the LTC reserve charge, entitled, *GE's Surprise $15 Billion Shortfall Was 14 Years in the Making*, which stated, in part:

The trouble at General Electric Co. began decades ago when a hole started to form inside its sprawling financial unit.

The hole became a $15 billion shortfall in insurance reserves, disclosed last week.  It's prompted a Securities and Exchange Commission investigation, called into question the oversight of GE leadership, pushed down the share price, and shocked investors who were asking Wednesday how this icon of American capitalism could allow the situation to deteriorate to this point.

"It sure seems that previous management had a rosy view," said Scott Davis, an analyst with Melius Research in New York.  "There seemed to be no effort on their part to get ahead of the liability.  *I find it very hard to believe that mysteriously overnight GE found problems they didn't know existed*."

\*     \*     \*

Some employees were aware that long-term-care insurance was in bad shape.  And even as it sold the bulk of its finance business, executives resisted selling reinsurance assets, even when bankers encouraged them.

Doing so would have forced GE to book a huge charge to reflect a drop in value, according to people with familiar with [sic] the situation who asked for anonymity because they weren't authorized to speak.  That was an indication that the business was worth less than what GE reported to investors, the people said.

487.    On February 1, 2018, Audit Analytics issued a report titled *Could We Have Predicted the General Electric Insurance Charge?*, which noted that the "*magnitude of the $6.2 billion [after-tax] charge is far more staggering than . . . the market anticipated*."  The Audit Analytics report went on to note that, since 2004, no less than *30* insurance companies have modified their LTC reserves on *60* different occasions.

164

488.     In a February 21, 2018 article in The Wall Street Journal titled *How Jeffrey Immelt's 'Success Theater' Masked the Rot at GE*, Thomas Gryta remarked:

> "The history of GE is to selectively only provide positive information," said Deutsche Bank analyst John Inch, who has a "sell" rating on the stock. "There is a credibility gap between what they say and the reality of what is to come."

> Said Sandra Davis, who knows several GE executives as the founder of MDA Leadership Consulting: "GE itself has never been a culture where people can say, 'I can't.'"

489.     Gryta's article went on to note that "Mr. Immelt's optimism was part of the problem, according to some people close to the situation.  ***They said he told the board that management had identified risks in the power business, yet downplayed them***."

490.     Similarly, in a February 22, 2018 article by Michelle Fox of CNBC entitled *GE has been 'brushing things under the rug' for decades, Deutsche Bank analyst says*, Fox reported that, according to Deutsche Bank analyst Inch, GE has been "brushing things under the rug and leveraging aggressive accounting" for several decades.  "***One could infer the prior management basically did this to drive the . . . adjusted EPS [] up as much as possible to pay themselves as much as possible***," Inch said in an interview with CNBC's Power Lunch.  Inch also stated that GE "***made it overly complicated to dissect the financials.  They compounded the complexity on purpose so people wouldn't look at the details***."  Inch added, "Now unfortunately they're paying a bit of a price for it."

491.     On March 19, 2018, in a blog post titled No. 258: *Long-Term Care Insurance—The Kansas Insurance Department's Bailout of General Electric*, noted industry expert and Indiana University professor emeritus Joseph M. Belth, Ph.D. recognized that GE's LTC exposure "***was not widely known until recently.***"

**B.     GE Files Its 2017 10-K**

492.     On February 23, 2018, GE filed with the SEC its 2017 10-K.

493.    With respect to GE's "Critical Accounting Estimates" related to its insurance liabilities, the 2017 10-K dramatically expanded upon the Company's disclosures on this topic during the Class Period, stating:

INSURANCE AND INVESTMENT CONTRACT LIABILITIES

Insurance and investment contract liabilities amounted to $38.1 billion and $26.1 billion at December 31, 2017 and 2016, respectively.  These primarily comprise a liability for future policy benefits for those claims not yet incurred and claim reserves for claims that have been incurred or are estimated to have been incurred but not yet reported.

Future policy benefit reserves amounted to $30.6 billion and $18.7 billion primarily comprising $16.5 billion and $7.6 billion related to long-term care insurance contracts and $9.4 billion and $9.3 billion related to structured settlement annuities and other life and disability insurance products at December 31, 2017 and 2016, respectively.   Long-term care insurance provides defined benefit levels of protection against the cost of long-term care services provided in the insured's home, in assisted living or nursing home facilities.  Structured settlement annuities typically provide fixed monthly or annual annuity payments through death of the policyholder (with some specifying a minimum duration of payments) while traditional life and disability insurance triggers a payment in the event of death or disability of the policyholder.

Future policy benefit reserves represent the present value of future policy benefits less the present value of future net premiums and were first established based on actuarial assumptions at the time the policies were issued or acquired plus a margin for adverse deviation.  These assumptions include, but are not limited to, interest rates, health care experience (including type and cost of care), morbidity, mortality, the length of time a policy will remain in force and anticipated future premium increases from future in-force rate actions.  Assumptions are locked-in throughout the life of a contract unless a premium deficiency develops. Our annual premium deficiency testing assesses the adequacy of future policy benefit reserves, net of capitalized acquisition costs, using current assumptions.  The results of historic premium deficiency testing were mostly driven by changes in assumptions, results from line of business experience studies and the impact from changes in estimated reinvestment rates on investment securities.  We have not originated new policies since 2006.

During 2017, in response to elevated claim experience for a portion of our long-term care insurance contracts that was most pronounced for policyholders with higher attained ages, we initiated a comprehensive review of premium deficiency assumptions across all insurance products, which included reconstructing our future claim cost assumptions for long-term care contracts utilizing trends observed in our emerging experience for older claimant ages and later duration policies.  Certain of

our long-term care policyholders only recently started to reach the prime claim paying period and our new claim cost assumptions considered the emerging credibility of this claim data.  In addition to the adverse impact from the revised future claim cost assumptions over a long-term horizon, our premium deficiency assumptions considered mortality, length of time a policy will remain in force and both near-term and longer-term investment return expectations.  Future investment yields estimated in 2017 were lower than in previous premium deficiency tests, primarily due to the effect of near term yields on approximately $15 billion of future expected capital contributions.  The test indicated a premium deficiency resulting in the unlocking of reserves and resetting of actuarial assumptions to current assumptions.  This resulted in a $9.5 billion charge to earnings, which included a $0.4 billion impairment of deferred acquisition costs, a $0.2 billion impairment of present value of future profits, and an $8.9 billion increase in future policy benefit reserves.  We commenced integrating these new assumptions into our systems and processes embedded in our framework of internal controls over financial reporting and expect to continue the integration in 2018.

494.    Regarding the assumptions it uses to calculate its reserves, GE expanded upon its

Class Period disclosures, stating the following in the 2017 10-K:

The primary assumptions used in the premium deficiency tests include:

*Morbidity*.  Morbidity assumptions used in estimating future policy benefit reserves are based on estimates of expected incidences of disability and claim costs, and include consideration of antiselection and estimates of expected future morbidity improvement.  Historical premium deficiency assumptions considered the risk of antiselection by including issue age adjustments to morbidity based on an actuarial assumption that long-term care policies issued to younger individuals have exhibited lower expected incidences and claim costs than those issued to older policyholders.  Recent claim experience and the development of reconstructed claim cost curves indicated minimal issue age adjustments impacting claim cost projections and accordingly, in 2017 issue age adjustments were no longer assumed in developing morbidity assumptions.

*Mortality*.  Mortality assumptions used in estimating future policy benefit reserves are based on published mortality tables as adjusted for the results of our experience studies and estimates of expected future mortality improvement.  For life insurance products, higher mortality increases our future policy benefit reserves, while for annuity and long-term care insurance contracts, higher mortality decreases our future policy benefit reserves.

*Discount rate*.  Interest rate assumptions used in estimating future policy benefit reserves are based on expected investment yields, net of related investment expenses.  In estimating future yields, we consider the actual yields on our current investment securities held by our run-off insurance operations, the future rates at which we expect to reinvest any proceeds from investment security maturities, and

the average long-term yield we expect from the proceeds of estimated future capital contributions into our run-off insurance operations.  Such contribution may comprise cash that will be used to purchase investment securities or other qualifying investments from GE Capital's portfolio.  The adverse impact on our statutory reserves arising from our revised assumptions, including the collectability of reinsurance recoverables, is expected to require GE Capital to contribute approximately $15 billion additional capital to its run-off insurance operations in 2018-2024, subject to ongoing monitoring by the Kansas Insurance Department. GE is required to maintain specified capital levels at these insurance subsidiaries under a capital maintenance agreement.  The cash component of the capital contribution will be invested at the current market yields at the time of contribution, which has the impact of lowering the average long-term investment yield used to calculate the discount rate and, as such, further adversely impacted the estimated premium deficiency.  Our discount rate assumptions for purposes of performing premium deficiency assessments ranged from 2.6%-6.0% in 2017 with a weighted-average rate of 5.7% across different tenors and 5.3%-6.7% in 2016 with a weighted-average rate of 6.2%.

*Future long-term care premium rate increases*.  We consider recent experience with rate increases in establishing our current expectations.  As a reinsurer, we rely upon the primary insurers that underwrite the underlying policies to propose rate increases to the relevant state insurance regulator as we have no ability to institute premium rate increases on the policyholders themselves.

495.    Additionally, as discussed herein, in the 2017 10-K, GE reverted to its pre-Class Period practice of including LTC liabilities within its Disclosed Insurance Liabilities.  This change had the effect of increasing GE's Disclosed Insurance Liabilities from $11.1 billion as of December 31, 2016 to $38.0 billion as of December 31, 2017.

496.    GE also significantly revamped the presentation of Note 11 to its financial statements.  Specifically, GE dramatically enhanced the quality of its disclosures regarding the Company's "Investment contracts, insurance liabilities and insurance annuity benefits."  Among other things, GE stopped referring to its Benefit Reserves as "Life insurance benefits," separately identified GE's Claims Reserves, and expressly disclosed the size of GE's LTC Benefit Reserves and Claims Reserves:

**NOTE 11. INVESTMENT CONTRACTS, INSURANCE LIABILITIES AND INSURANCE ANNUITY BENEFITS**

Investment contracts, insurance liabilities and insurance annuity benefits comprise mainly obligations to annuitants and insureds in our run-off insurance operations.

| December 31 (In millions) | | 2017 | 2016 |
|---|---|---|---|
| Future policy benefit reserves | | | |
| Long-term care insurance contracts | $ | 16,522 $ | 7,629 |
| Structured settlement annuities with life contingencies and other contracts | | 9,448 | 9,267 |
| Shadow adjustments(a) | | 4,582 | 1,845 |
| | | 30,552 | 18,741 |
| Investment contracts | | 2,569 | 2,813 |
| Claim reserves(b) | | 5,094 | 4,606 |
| Unearned premiums and other | | 372 | 386 |
| | | 38,587 | 26,546 |
| Eliminations | | (451) | (460) |
| Total | $ | 38,136 $ | 26,086 |

(a)   To the extent that unrealized gains on specific investment securities supporting our insurance contracts would result in a premium deficiency should those gains be realized, an increase in future policy benefit reserves is recorded, with an after-tax reduction of net unrealized gains recognized through Other comprehensive income.

(b)   Included $3,590 million and $3,129 million related to long term-care insurance contracts and $364 million and $362 million related to short-duration contracts, net of eliminations, at December 31, 2017 and December 31, 2016, respectively.

During 2017, in response to elevated claim experience for a portion of our long-term care insurance contracts that was most pronounced for policyholders with higher attained ages, we initiated a comprehensive review of premium deficiency assumptions across all insurance products, which included reconstructing our future claim cost assumptions for long-term care contracts utilizing trends observed in our emerging experience for older claimant ages and later duration policies. Certain of our long-term care policyholders only recently started to reach the prime claim paying period and our new claim cost assumptions considered the emerging credibility of this claim data. In addition to the adverse impact from the increased expected future claim cost assumptions over a long-term horizon, our premium deficiency assumptions considered mortality, length of time a policy will remain in force and both near-term and longer-term investment return expectations. Future investment yields estimated in 2017 were lower than in previous premium deficiency tests, primarily due to the effect of near term yields on approximately $15 billion of future expected capital contributions. The indicated premium deficiency resulted in a $9,481 million charge to earnings, which included a $398 million impairment of deferred acquisition costs, a $216 million impairment of present value of future profits, and an $8,867 million increase in future policy benefit reserves.

In response to the premium deficiency, our future policy benefit reserves at December 31, 2017 were unlocked and updated to reflect our most recent assumptions, including discount rates ranging from 2.6% - 6.0% with a weighted-average rate of 5.7% across different tenors . Any future adverse changes in our assumptions could result in an increase to future policy benefit reserves. Any favorable changes to these assumptions could result in additional margin in our premium deficiency test and higher income over the remaining duration of the portfolio, including higher investment income.

Claim reserve activity included incurred claims of $2,020 million , $1,989 million and $1,761 million of which $135 million , $123 million and $24 million related to the recognition of adjustments to prior year claim reserves arising from our periodic reserve evaluation in the years ended December 31, 2017, 2016 and 2015, respectively. Paid claims were $1,670 million , $1,671 million and $1,679 million in the years ended December 31, 2017, 2016 and 2015, respectively. The vast majority of paid claims relate to prior year insured events primarily as a result of the length of time long-term care policyholders remain on claim.

497.    GE's 2017 10-K also provided, for the first time, data on its LTC claims-related activity. This new data is summarized in the following table, and belies any assertion by GE that adverse LTC experience developed in 2017:

| Year | Claims Incurred | Claims Paid |
|---|---|---|
| 2015 | $1.8B | $1.7B |
| 2016 | $2.0B | $1.7B |
| 2017 | $2.0B | $1.7B |

498.    Separately, with respect to GE's Contract Assets, the 2017 10-K stated:

In certain circumstances, GE provides customers primarily within our Power, Renewable Energy and Aviation businesses with extended payment terms for the purchase of new equipment, purchases of significant upgrades and for fixed billings within our long-term service contracts. Similar to current receivables, GE may sell these long-term receivables to GE Capital to manage short-term liquidity and fund growth. These transactions are made on arm's length terms and any fair value adjustments, primarily related to time value of money, are recognized within the

Industrial business in the period these receivables are sold to GE Capital. GE Capital accretes interest and factoring fee income over the life of the receivables. Factoring fee income is eliminated in our consolidated results. In addition, the long-term portion of any remaining outstanding receivables as of the end of the period are reflected in All other assets within our consolidated statement of financial position. GE Capital had approximately $ 2.1 billion, $ 1.9 billion and $ 0.1 billion of financing receivables related to GE long-term customer receivables outstanding, net of deferred income of approximately $ 0.3 billion, $ 0.3 billion and an insignificant amount recorded in its balance sheet as of December 31, 2017, 2016, and 2015, respectively. The effect of cash generated from the sale of these long-term receivables with GE Capital increased GE's CFOA by $0.3 billion, $1.6 billion and $ 0.1 billion in 2017, 2016 and 2015, respectively.

499.    On February 25, 2018, an analyst from RBC noted that the Company's 2017 10-K included, "[m]ore transparency on Contract Asset balances. Likely as a result of the criticism over the lack of transparency in its contract asset reporting (including an ongoing investigation by the SEC), for the first time, GE has now broken out its disclosures by individual segment on Page 149, vs. its prior practice of only providing it on a total company basis." (emphasis in original).

500.    On February 26, 2018, J.P. Morgan issued an analyst report entitled, *Takeaways from the 10-K*, which analyzed GE's 2017 10-K. The report states, in part:

The evidence here now points to the systemic use of GE Capital as the grease for the machine. Receivables factoring, among other instruments, is a key building block, which management added helps to "manage short term liquidity," not just credit exposure as in the past. Here, while current receivables factoring is being wound down, the enhanced disclosure around "long term receivables" factoring was most interesting, in which management fully acknowledges they extend terms across their businesses to compete. . . . We continue to see that receivables activity inflated cash in 2016 even more than we had previously expected, for which 2017 is beginning to come down, but is far from "normal" (factoring activities increased cash by >$10B since 2011).

*        *        *

The bottom line is that the incremental details paint the picture of the structural box of high leverage, weak FCF [free cash flow] and increasingly limited pockets to pull from to change that narrative, a mosaic that we think is not reflected at the current stock price, highlighting the negative skew on risks, with greater visibility on the factors that bring the SOTP to our downside scenario of ~$10-12.

501.     Finally, on March 25, 2018, The Wall Street Journal published an article titled *The Long Shadow of GE Capital Looms Over GE*, in which Neuberger Berman Group LLC analyst Martin Sankey recognized the inadequacy of GE's disclosures regarding GE Capital's run-off businesses.  Sankey stated, "[i]t is not fully known what residual risks GE retained when it dismantled GE Capital."

## X.     PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

502.     At all relevant times, the market for GE common stock was open and efficient for the following reasons, among others: (i) GE common stock met the requirements for listing, and was listed and actively traded on the NYSE under the ticker symbol "GE"; (ii) as a registered and regulated issuer of securities, GE filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) GE regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) GE was followed by numerous securities analysts employed by major brokerage firms, including J.P. Morgan, Deutsche Bank, RBC, Credit Suisse, Barclays, Morgan Stanley, and UBS, who wrote reports that were distributed to the sales force and customers of their respective brokerage firms; (v) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of GE's common stock; and (vi) without knowledge of the misrepresented or omitted facts, Plaintiffs and members of the Class purchased or otherwise acquired GE common stock between the time GE made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of GE's common stock was artificially inflated by Defendants' material misrepresentations and omissions.

503.    As a result of the foregoing, the market for GE common stock promptly digested current information regarding GE from all publicly available sources and the price of GE's stock reflected such information.  Based upon the materially false or misleading statements and omissions of material fact alleged herein, GE common stock traded at prices in excess of the true value of GE common stock during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired GE common stock relying upon the integrity of the market price of GE common stock and other market information relating to GE.

504.    Under these circumstances, Plaintiffs and other members of the Class, as purchasers or acquirers of GE common stock at artificially-inflated prices during the Class Period, suffered similar injuries, and a presumption of reliance under the fraud-on-the-market doctrine applies.

505.    Further, at all relevant times, Plaintiffs and other members of the Class relied on Defendants to disclose material information as required by law.  Plaintiffs and other members of the Class would not have purchased or otherwise acquired GE common stock at artificially inflated prices if Defendants disclosed all material information as required by law.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiffs and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

506.    The Private Securities Litigation Reform Act's statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

507. None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

508. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

509. To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of GE who knew that the forward-looking statement was materially false or misleading.

## XII. CLASS ACTION ALLEGATIONS

510. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of GE between February 27, 2013 and January 23, 2018.

511. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of GE, members of GE's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing

persons' legal representatives, heirs, successors, or assigns; and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of GE.

512. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GE's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class. Class members may be identified from records maintained by GE or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

513. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

514. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

515. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about GE's business, operations, and management; (iii) to what extent Class members have sustained damages; and (iv) the proper measure of damages.

516. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore,

as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   CAUSES OF ACTION

<u>**COUNT I**</u>
**Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

517.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

518.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs; (ii) cause the market price of GE common stock to trade above its true value; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire GE common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period.  In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

519.    While in possession of material adverse, non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for GE common stock, in violation of Section 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

520.    Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein, in that they failed to disclose such facts, even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding GE's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

521.    As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of GE common stock during the Class Period. Relying directly or indirectly upon the materially false or misleading statements made by Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants, Plaintiffs and other members of the Class purchased or otherwise acquired GE common stock during the Class Period at artificially inflated prices. As the previously misrepresented and/or concealed material facts eventually emerged, the price of GE common stock substantially declined, causing losses to Plaintiffs and other members of the Class. These declines and the preceding disclosures are set forth above in Section VIII.

522.    At the time of the material misrepresentations and omissions alleged herein, Plaintiffs and other members of the Class were not aware of their falsity and believed them to be true.  Had Plaintiffs and other members of the Class known the relevant truth regarding GE's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired GE common stock at artificially-inflated prices.

523.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II
### Violation Of Section 20(a) Of The Exchange Act
### Against The Individual Defendants

524.    Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein.  This claim is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

525.    Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning GE, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

526.    In their respective roles, the Individual Defendants had regular access to non-public information about GE's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of GE's corporate officers and employees, attendance at management meetings and meetings of the

Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

527.    Each of the Individual Defendants was a controlling person of GE within the meaning of Section 20(a), as alleged herein.  By virtue of their high-level positions, and their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiffs allege were materially false or misleading.

528.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of GE common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above in Section VII.  The scheme: (i) deceived the investing public regarding GE's operations and the true value of GE's common stock; and (ii) caused Plaintiffs and other members of the Class to purchase GE common stock at artificially inflated prices, which plummeted in value as the truth concerning the magnitude of GE's LTC exposure and the manipulation of costs and profitability of GE's LTSAs was revealed.

529.    The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiffs allege were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be

corrected. In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

530. As set forth above, Defendants violated Section 10(b) and Rule 10b-5, by their acts and omissions as alleged herein. By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to Section 20(a). As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiffs and other members of the Class suffered damages in connection with their transactions in GE's common stock during the Class Period.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, including:

1. Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

2. Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

3. Awarding Plaintiffs their costs and expenses incurred in this Action, including reasonable counsel fees and expert fees; and

4. Awarding such other and further relief as may be just and proper.

## XV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: October 17, 2018

Respectfully submitted,

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

*/s/ Sharan Nirmul*
David Kessler
Gregory M. Castaldo
Darren J. Check
Sharan Nirmul
Richard A. Russo, Jr.
Michelle M. Newcomer
Joshua A. Materese
Evan R. Hoey
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
dkessler@ktmc.com
gcastaldo@ktmc.com
dcheck@ktmc.com
snirmul@ktmc.com
rrusso@ktmc.com
mnewcomer@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com

*Counsel for Lead Plaintiff Sjunde AP-Fonden
and Lead Counsel for the Class*

**GRANT & EISENHOFER, P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Charles T. Caliendo
Caitlin M. Moyna
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
ccaliendo@gelaw.com
cmoyna@gelaw.com

*Counsel for Additional Plaintiff Cleveland Bakers and Teamsters Pension Fund and Local Counsel for the Class*

**APPENDIX A**

**DEEFENDANT GE'S SEC FILINGS**

| SEC Filings | | |
|---|---|---|
| **Term** | **Definition** | **Signed by:** |
| 2012 10-K | Form 10-K for the year-ended December 31, 2012 (filed 02/26/2013) | Keith S. Sherin<br>Jamie S. Miller<br>Jeffrey R. Immelt |
| 2013 10-K | Form 10-K for the year-ended December 31, 2013 (filed 02/27/2014) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 2014 10-K | Form 10-K for the year-ended December 31, 2014 (filed 02/27/2015) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 2015 10-K | Form 10-K for the year-ended December 31, 2015 (filed 02/26/2016) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 2016 10-K | Form 10-K for the year-ended December 31, 2016 (filed 02/24/2017) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 2017 10-K | Form 10-K for the year-ended December 31, 2017 (filed 02/23/2018) | Jamie S. Miller<br>Jan R. Hauser<br>John L. Flannery |
| 1Q13 10-Q | Form 10-Q for the Period Ending March 31, 2013 (filed 05/08/2013) | Keith S. Sherin |
| 2Q13 10-Q | Form 10-Q for the Period Ending June 30, 2013 (filed 07/26/2013) | Jan R. Hauser |
| 3Q13 10-Q | Form 10-Q for the Period Ending September 30, 2013 (filed 11/01/2013) | Jan R. Hauser |
| 1Q14 10-Q | Form 10-Q for the Period Ending March 31, 2014 (filed 05/12/2014) | Jan R. Hauser |
| 2Q14 10-Q | Form 10-Q for the Period Ending June 30, 2014 (filed 07/31/2014) | Jan R. Hauser |
| 3Q14 10-Q | Form 10-Q for the Period Ending September 30, 2014 (filed 11/04/2014) | Jan R. Hauser |
| 1Q15 10-Q | Form 10-Q for the Period Ending March 31, 2015 (filed 05/04/2015) | Jan R. Hauser |
| 1Q15 10-QA | Form 10-Q/A for the Period Ending March 31, 2015 (filed 05/15/2015) | Jan R. Hauser |
| 2Q15 10-Q | Form 10-Q for the Period Ending June 30, 2015 (filed 07/30/2015) | Jan R. Hauser |
| 3Q15 10-Q | Form 10-Q for the Period Ending September 30, 2015 (filed 11/02/2015) | Jan R. Hauser |

| SEC Filings | | |
|---|---|---|
| **Term** | **Definition** | **Signed by:** |
| 1Q16 10-Q | Form 10-Q for the Period Ending March 31, 2016 (filed 05/04/2016) | Jan R. Hauser |
| 2Q16 10-Q | Form 10-Q for the Period Ending June 30, 2016 (filed 08/01/2016) | Jan R. Hauser |
| 3Q16 10-Q | Form 10-Q for the Period Ending September 30, 2016 (filed 11/02/2016) | Jan R. Hauser |
| 3Q16 10-QA | Form 10-Q/A for the Period Ending September 30, 2016 (filed 11/09/2016) | Jan R. Hauser |
| 1Q17 10-Q | Form 10-Q for the Period Ending March 31, 2017 (filed 05/05/2017) | Jan R. Hauser |
| 2Q17 10-Q | Form 10-Q for the Period Ending June 30, 2017 (filed 07/28/2017) | Jan R. Hauser |
| 3Q17 10-Q | Form 10-Q for the Period Ending September 30, 2017 (filed 10/30/2017) | Jan R. Hauser |
| 4/19/13 8-K | Form 8-K for the Period Ending 4/19/13 (filed 4/19/13) | Brackett B. Denniston III |
| 7/19/13 8-K | Form 8-K for the Period Ending 7/19/13 (filed 7/19/13) | Jan R. Hauser |
| 10/18/13 8-K | Form 8-K for the Period Ending 10/18/13 (filed 10/18/13) | Jan R. Hauser |
| 1/17/14 8-K | Form 8-K for the Period Ending 1/17/14 (filed 1/17/14) | Jan R. Hauser |
| 4/17/14 8-K | Form 8-K for the Period Ending 4/17/14 (filed 4/17/14) | Jan R. Hauser |
| 7/18/14 8-K | Form 8-K for the Period Ending 7/8/14 (filed 7/18/14) | Jan R. Hauser |
| 10/17/14 8-K | Form 8-K for the Period Ending 10/17/14 (filed 10/17/14) | Jan R. Hauser |
| 1/23/15 8-K | Form 8-K for the Period Ending 1/23/15 (filed 1/23/15) | Jan R. Hauser |
| 5/8/15 8-K | Form 8-K for the Period Ending 3/31/15 (filed 5/8/15) | Jan R. Hauser |
| 8/7/15 8-K | Form 8-K for the Period Ending 6/30/15 (filed 8/7/15) | Jan R. Hauser |
| 10/16/15 8-K | Form 8-K for the Period Ending 10/16/15 (filed 10/16/15) | Jan R. Hauser |
| 1/22/16 8-K | Form 8-K for the Period Ending 12/31/15 (filed 1/22/16) | Jan R. Hauser |
| 4/22/16 8-K | Form 8-K for the Period Ending 3/31/16 (filed 4/22/16) | Jan R. Hauser |
| 7/22/16 8-K | Form 8-K for the Period Ending 6/30/16 (filed 7/22/16) | Jan R. Hauser |

| SEC Filings | | |
|---|---|---|
| **Term** | **Definition** | **Signed by:** |
| 10/21/16 8-K | Form 8-K for the Period Ending 10/21/16 (filed 10/21/16) | Jan R. Hauser |
| 1/20/17 8-K | Form 8-K for the Period Ending 1/20/17 (filed 1/20/17) | Jan R. Hauser |
| 4/21/17 8-K | Form 8-K for the Period Ending 4/20/17 (filed 4/21/17) | Jan R. Hauser |
| 1/24/18 8-K | Form 8-K for the Period Ending 1/24/18 (filed 1/24/18) | Jan R. Hauser |
| 4/13/18 8-K | Form 8-K for the Period Ending 4/13/18 (filed 4/13/18) | Jan R. Hauser |