**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| SJUNDE AP-FONDEN and THE CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated, | 17 Civ. 08457 (JMF) (GWG) |
| Plaintiffs, | |
| v. | **<u>ORAL ARGUMENT REQUESTED</u>** |
| GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JAMIE MILLER, KEITH S. SHERIN, JAN R. HAUSER, and RICHARD A. LAXER, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**<u>MOTION TO DISMISS THE FIFTH AMENDED COMPLAINT</u>**

LATHAM & WATKINS LLP
Miles N. Ruthberg
Blake T. Denton
885 Third Avenue
New York, New York 10022
(212) 906-1200

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
(312) 876-7700

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, Massachusetts 02116
(617) 948-6000

Sarah A. Tomkowiak (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200

*Attorneys for Defendants*

December 18, 2019

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ................................................................................................3

    A.    Procedural Background And Dismissal Of The Fourth Amended
Complaint................................................................................................4

    B.    The Fifth Amended Complaint .......................................................6

        1.    Plaintiffs' LTC-Related Claims Contain New Opinions, Not Facts...........6

        2.    Plaintiffs' LTSA-Related Claims Lack New Substance ..........................7

ARGUMENT ................................................................................................7

I.    THE 5AC FAILS TO PLEAD A SECTION 10(B) CLAIM ...............................7

    A.    Plaintiffs' LTC Claims Again Should Be Dismissed ...........................9

        1.    GE's Presentation Of Insurance Liabilities Was Not Misleading .............9

        2.    LTC Reserves Are Non-Actionable Opinion Statements .........................13

            a.    Mr. Axene's Analysis Of MetLife Statutory Filings Misses
The Mark..................................................................................14

            b.    Unidentified PowerPoints Cannot Save Plaintiffs' Claims ...........19

        3.    GE's Alleged Omissions Regarding LTC Exposure Or Related
Risks Are Not Actionable ........................................................20

            a.    GE's LTC Disclosures Did Not Violate Item 303 ........................21

            b.    The Significant Trends & Developments Sections In GE's
10-Qs Were Not Misleading .........................................22

        4.    GE's Public Statements Regarding LTC Were Not False Or
Misleading................................................................................23

    B.    Plaintiffs' LTSA Claims Should Be Dismissed In Their Entirety .......................24

        1.    GE's LTSA And Factoring Disclosures Did Not Violate Item 303 ..........24

            a.    Plaintiffs' Item 303 Claim Based Upon LTSA
Modifications And Cumulative Catch-up Adjustments Fails........25

b.     Plaintiffs' Item 303 Claim Based Upon Alleged Declining Utilization Fails...................................................................28

c.     Plaintiffs' Item 303 Claim Based Upon Factoring of LTSA Receivables Fails ...........................................................33

2.     GE's Public Statements Regarding LTSA Contract Assets And Factoring Were Not False Or Misleading..................................................36

II.     THE 5AC FAILS TO PLEAD A SECTION 20(A) CLAIM..........................................38

CONCLUSION...................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)........................................................................1

*Axar Master Fund, Ltd. v. Bedford*,
308 F. Supp. 3d 743 (S.D.N.Y. 2018) .....................................................28

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019) .....................................................29

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................7, 8

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) .............................................................27

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ....................................................................38

*City of Pontiac Policemen's & Firemen's Ret. Sys v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ....................................................................32

*City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*,
2019 WL 452051 (S.D.N.Y. Feb. 5, 2019) ...............................................25, 34

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018) ......................................................27, 28

*Diehl v. Omega Protein Corp.*,
339 F. Supp. 3d 153 (S.D.N.Y. 2018) ......................................................23

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011) .....................................................................13

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ....................................................................10

*Fogel v. Wal-Mart de Mexico SAB de CV*,
2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)..............................................8

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen*
   *Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) ............................37

*Friedman v. Endo Int'l PLC*,
   2018 WL 2021561 (S.D.N.Y. Apr. 27, 2018), *aff'd sub nom. Steamfitters'*
   *Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019) .....................26, 27

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................................................32

*Goplen v. 51job, Inc.*,
   453 F. Supp. 2d 759 (S.D.N.Y. 2006) .................................................................................27

*Harris v. AmTrust Fin. Servs., Inc.*,
   2015 WL 5707235 (S.D.N.Y. Sept. 29, 2015)......................................................................18

*Highland Capital Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005)..................................................................................11

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ..................................................................................................21

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006)..................................................................................12

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013) .................................................................................23

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) .................................................................................39

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018) .................................................................................40

*In re Coty Inc. Sec. Litig.*,
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .....................................................................31

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
   2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018)................................................................15, 37

*In re Francesca's Holdings Corp. Sec. Litig.*,
   2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ................................................................30, 32

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006) .................................................................................35

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   2018 WL 1449206 (S.D.N.Y. March 23, 2018) .............................................................39, 40

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012) ...................................................................38

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) .............................................................................20

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007)...................................................................................12

*In re ShengdaTech, Inc. Sec. Litig.*,
   2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) .......................................................39

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
   2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .......................................................31

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
   2016 WL 2757760 (S.D.N.Y. May 11, 2016) .......................................................30

*Johnson v. Sequans Commc'ns S.A.*,
   2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) .........................................................31

*Kalin v. Xanboo, Inc.*,
   526 F. Supp. 2d 392 (S.D.N.Y. 2007) ..................................................................39

*Leidos, Inc. v. Indiana Public Ret. Sys.*,
   137 S. Ct. 1395 (2017) .........................................................................................20

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
   2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013) ..................................................34, 35

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015).................................................................................*passim*

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ....................................................13

*Poindexter v. EMI Record Grp. Inc.*,
   2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) .......................................................13

*Sgarlata v. PayPal Holdings, Inc.*,
   2019 WL 4479562 (N.D. Cal. Sept. 18, 2019) ................................................11, 16

*Schaffer v. Horizon Pharma PLC*,
   2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) .........................................................29

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014) ...............................................................39, 40

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ..................................................................................20

## STATUTES & REGULATIONS

15 U.S.C. § 78u-4 ............................................................................................................8

28 U.S.C. § 1658 ............................................................................................................28

17 C.F.R. §§ 229.303 ....................................................................................................21

Kan. Stat. Ann. 40-222 ..................................................................................................19

Defendants General Electric Co. ("GE"), Jeffrey R. Immelt, Jeffrey S. Bornstein, Jamie Miller, Keith S. Sherin, Jan R. Hauser, and Richard A. Laxer (the "Individual Defendants" and, together with GE, "Defendants") submit this memorandum of law in support of their motion to dismiss the Fifth Amended Complaint ("5AC") (Ex. 1, cited as "¶ _")[1] with prejudice.

## PRELIMINARY STATEMENT

Plaintiffs' 5AC suffers from the same infirmities as the Fourth Amended Complaint ("FAC"). Like Plaintiffs' prior complaints, the gravamen of the 5AC is that certain senior GE executives, without any personal financial motive, engaged in a multi-year fraud to mislead investors regarding liabilities and reserves for GE's run-off long-term care ("LTC") reinsurance business, and "severe cash flow issues" with GE Power's long-term service agreements ("LTSAs"). This Court previously dismissed nearly all of these claims either as time-barred or for failure to plead falsity or scienter with the requisite particularity, and allowed Plaintiffs another opportunity to replead. The 5AC drops most of Plaintiffs' time-barred claims and several of their affirmative misstatement claims. As to the claims Plaintiffs continue to assert, the 5AC does not (and cannot) cure their fatal defects.

*First*, Plaintiffs again fail to plead a claim based on GE's disclosures of its LTC liabilities and estimated LTC reserves. Plaintiffs attempt to salvage such claims by introducing two "experts" who opine, respectively, that GE's LTC disclosures were "obscure" and its assumptions used to assess the estimated LTC reserves were "outdated." *E.g.*, ¶¶ 284-95; 189-214. But neither "expert" has any actual knowledge of GE's LTC reserve testing or any Defendant's state of mind.

---

[1]     Unless otherwise indicated herein, all internal citations and quotations are omitted, emphasis is added, and citations to "Ex. __" refer to exhibits attached to the Declaration of Blake T. Denton, submitted herewith. The Court may consider any documents or statements incorporated into the 5AC by reference, as well as disclosure documents filed with the SEC. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

1

Instead, these "experts" reach their opinions by reviewing publicly available information which is irrelevant or only tangentially relevant to GE's insurance reserves and/or facts that this Court already considered and rejected.  The "expert" opinions therefore add nothing to Plaintiffs' insufficient allegations.  Plaintiffs also add vague allegations from a previously-cited former employee ("FE") regarding a newly-recalled PowerPoint containing GE's LTC claims experience, but fail to allege that the claims experience was even negative, much less so negative as to render GE's reserves insufficient.  Because the 5AC fails to allege any facts challenging the sufficiency of GE's LTC disclosures or establishing that GE's LTC reserves were subjectively false (or had no reasonable basis in fact), Plaintiffs' LTC-related claims again must be dismissed.

*Second*, Plaintiffs' winnowed LTSA claims—which no longer contend that GE ever misreported its contract assets or related LTSA financial metrics—are now based primarily on alleged violations of Item 303, which Plaintiffs claim required GE's specific disclosure of a "decline in . . . utilization," "modifications to LTSAs," and a "widespread reliance on factoring." ¶¶ 321, 406-25.  Plaintiffs still fail to allege particularized facts that would establish any of the foregoing trends, let alone facts that would show such trends were known to or recklessly disregarded by any of the Defendants and would have had a material impact on GE's financials. Plaintiffs' related challenges to five isolated statements loosely related to Power LTSAs fail for the additional reasons that those statements were accurate statements of historical fact, inactionable opinions and/or puffery, and Plaintiffs fall far short of raising the requisite "strong inference" of scienter as to any alleged misstatement.

Consistent with the Court's prior Order, the more plausible inference—rather than fraud— is that Defendants failed to anticipate the problems in its run-off reinsurance business and Power segment and updated the market in real time as more information became available.  The outcome of this motion to dismiss the 5AC should be the same as the outcome of Defendants' motion to

dismiss the FAC, with two exceptions—(i) Plaintiffs' Section 10(b) factoring-related claims, and all Section 20(a) control person claims should (along with the rest of the claims) be dismissed;[2] and (ii) dismissal of the 5AC should be with prejudice.

## BACKGROUND

Defendants assume the Court's familiarity with the factual background of this action, as set forth in Defendants' prior Motion to Dismiss, ECF No. 174 (the "Motion"), and the Court's Opinion and Order Granting In Part Defendants' Motion to Dismiss the Fourth Amended Complaint, ECF No. 185 (the "Order").

GE is a global industrial company that employs over 280,000 persons worldwide. ¶ 44; *see also* Ex. 43, 2017 10-K, at 12. In 2017, GE had eight primary business segments—Aviation, Capital, Healthcare, Lighting, Oil & Gas, Power, Renewable Energy, and Transportation—that were divided into 36 sub-segments operated by over 150 direct and indirect subsidiaries. *See* ¶¶ 44, 78; Ex. 43, 2017 10-K, at 12, 28, 32, 36, 40, 44, 48, 51, 54; *id.* at Ex. 21. Plaintiffs' claims focus on GE Capital's run-off reinsurance business (operated at third and fourth-tier subsidiaries of GE), and GE Power's LTSAs (from its Power Services division). *See* ¶¶ 51-52, 80, 327. The Individual Defendants are current or former executives of GE or GE Capital.[3] ¶¶ 45-50.

---

[2]    At the time of the Court's prior ruling on factoring, the Court did not have the benefit of full briefing on the FE allegations on that issue. As discussed *infra* § I.B, the FEs relied upon by Plaintiffs do not have personal knowledge to support their broad allegations.

[3]    Mr. Immelt served as GE's CEO from September 2001 to July 2017, and as Chairman of GE's Board from September 2001 to October 2017. ¶ 45. Mr. Bornstein served as GE's CFO from July 2013 to October 2017, and was a member of GE Capital's Board from 2006 to 2015. ¶ 46. Ms. Miller has served as GE's CFO since November 2017, and, prior to that, served as GE's Controller and CAO from 2008 to 2013, GE's CIO from 2013 to 2015, and GE Transportation's President and CEO from 2015 to 2017. ¶ 47. Mr. Sherin served as GE's CFO from 1999 to July 2013, and as GE Capital's Chairman and CEO from July 2013 to September 2016. ¶ 48. Ms. Hauser served as GE's Controller and CAO from April 2013 through the filing of the 5AC. ¶ 49. Mr. Laxer served as GE Capital's President and CEO from September 2016 to March 2018, and prior to that, held senior roles within GE Capital since 2009. ¶ 50.

A.      **Procedural Background And Dismissal Of The Fourth Amended Complaint**

On August 29, 2019, the Court dismissed the bulk of Plaintiffs' FAC, finding that for the vast majority of their claims, Plaintiffs failed to plead falsity or scienter, or were barred from bringing them by the statute of repose. The Court denied Defendants' prior Motion only as to a limited number of factoring claims, and further ruled that Plaintiffs' corresponding Section 20(a) claims would survive "for now." Order at 56.

*Dismissal of Time-Barred Claims.* As an initial matter, the Court explained that "the statute of repose bars Plaintiffs' claims based on statements, omissions, or misrepresentations made [five years] before [the TAC], and which were not timely raised in an earlier complaint or motion to intervene," and on that basis, dismissed several of Plaintiffs' claims with prejudice. *Id.* at 16.

*Dismissal of LTC-Related Claims.* The Court also dismissed all of Plaintiffs' claims related to GE's LTC reinsurance portfolio. *See id.* at 16-36. The Court first rejected Plaintiffs' claims that "GE misled investors by excluding its LTC liabilities from the '[i]nsurance liabilities' line item of a table in the [MD&A] section of its Class Period 10-Ks," finding that the disclosures in GE's 10-Ks, including in Note 11 to the financial statements, both negated any finding of scienter and ensured that "no reasonable investor . . . could leave with the impression that GE's LTC liabilities were 'immaterial' or that GE's total insurance liabilities were 'declining' or materially less than they really were." *Id*. at 16-20. The Court next analyzed GE's LTC reserves as opinion statements and found that Plaintiffs failed to meet the requirements for pleading opinion liability under *Omnicare*. *Id.* at 22-26. Then, the Court dismissed Plaintiffs' LTC-related claims based on alleged violations of Item 303 of Regulation S-K and various GAAP provisions for failure to plead scienter. *Id.* at 26-30. In so doing, the Court emphasized the "ineluctable fact" that "GE's annual deficiency testing [for LTC reserves] showed positive results through and including 2016," as well as GE's numerous disclosures regarding the issues surrounding LTC reserves once they arose. *Id.*

at 28-29.  Finally, the Court dismissed Plaintiffs' claims based on other public statements regarding GE's LTC business, because they failed to plead either a duty to disclose or scienter.  *Id.* at 30-36.

*Dismissal of the Vast Majority of LTSA Claims.*  The Order also dismissed nearly all of the FAC's claims regarding GE Power's LTSA business.  *Id.* at 36-54.  The Court dismissed claims that GE's "contract assets, reported profits for GE's industrials group, cumulative catch-up revenue, and earnings per share" were false or misleading.  *Id.* at 36-37.  Recognizing that such metrics are opinion statements, *id.*, the Court found that Plaintiffs failed to plead subjective falsity under *Omnicare*.  *See id.* at 38.  The Court also rejected Plaintiffs' alternate theory—*i.e.*, that Defendants failed to disclose material facts that purportedly impacted LTSA profitability—noting that Plaintiffs failed to "provide[] a basis for *why* the revenue projections, without further disclosures, were misleading to a reasonable investor."  *Id.* at 39-40 (emphasis in original).

The Order also dismissed Plaintiffs' claims based upon alleged violations of GAAP, noting that the alleged violations were "pled so skeletally that they do not satisfy even Rule 8's relatively lenient thresholds."  *Id.* at 40-41.  The Court dismissed all but one of Plaintiffs' LTSA-related claims for failure to disclose alleged trends or uncertainties in violation of Item 303.  *See id.* at 41-46.  Plaintiffs alleged three supposed trends:  (i) GE's alleged reliance on "unsustainable business practices" in order to "generate positive cumulative catch-up adjustments"; (ii) the "deteriorating power industry" and "decreased [GE] asset usage"; and (iii) GE's purported reliance on factoring. *Id.* at 42.  The Court dismissed Plaintiffs' claims based upon the first two of the alleged trends, *id.* at 42-44, and allowed Plaintiffs' claim based upon the third to survive only with respect to GE and Mr. Bornstein for statements from 2015 and later, *id.* at 44-46.

Finally, the Order also dismissed all but one of Plaintiffs' remaining LTSA claims based upon GE's disclosures or other public statements by Defendants.  *See id.* at 46-54.  The Court reasoned that Plaintiffs failed to adequately allege falsity and/or scienter as to all of the statements

they challenged regarding the way that GE determined its contract assets, *id.* at 47-49, or GE's cumulative catch-up adjustments and cash flow, *id.* at 50-51, as well as to all but one of the statements Plaintiffs challenged regarding factoring, *id.* at 51-54.

### B.    The Fifth Amended Complaint

On October 25, 2019, Plaintiffs filed the 5AC.  Contrary to the Court's guidance, the 5AC does not allege *any* additional facts regarding "the Individual Defendants' knowledge, or conscious disregard of, GE's actuarial issues (with respect to its LTC portfolio)," "the trends and risks it should have disclosed (with respect to its LTSAs)," or, "as to their more threadbare claims," facts that "may meet the requirements of Rules 8 and 9(b)."  Order at 56.

### 1.    Plaintiffs' LTC-Related Claims Contain New Opinions, Not Facts

The 5AC adds nothing of substance to the LTC allegations and theories this Court already found deficient.  In the 5AC, Plaintiffs remove confidential witness allegations central to their prior complaint, and replace them with "expert" opinions regarding GE's presentation of LTC liabilities in financial statements, ¶¶ 284-95, and GE's LTC premium deficiency testing, *e.g.*, ¶¶ 187-215.  First, purported expert Dr. Roman Weil offers his opinion—based on the exact same facts that the Court rejected before—that no reader of GE's financial statements could have discerned the extent of GE's LTC risks.  ¶¶ 284-95; Order at 16-20.  Second, purported expert Mr. David Axene opines that GE's annual premium deficiency tests incorporated assumptions that were outdated and inconsistent with both industry practice and GE's own claims experience. ¶¶ 187-215.  This opinion is based entirely on the statutory (not GAAP) filings of, and assumptions used by, a different company—MetLife—whose LTC exposure was reinsured by UFLIC, the smaller of GE's two reinsurance subsidiaries.  ¶¶ 136-48, 193-205.  The sole new *factual* allegation in the 5AC not based on publicly disclosed information involves a PowerPoint that FE-2 now recalls may have been "received" by senior GE executives.  ¶¶ 131-34.  But the 5AC does not

6

describe this PowerPoint in detail, explain whether the PowerPoint even contained negative claims experience, or provide any factual allegations regarding Defendants' review of the PowerPoint. Nor does it identify any Individual Defendant other than Mr. Immelt and "the CFO" who allegedly "received" the document.  *Id.*

2.   Plaintiffs' LTSA-Related Claims Lack New Substance

With respect to GE Power's LTSA business, the 5AC *removes* many of Plaintiffs' former claims, and does nothing to rehabilitate the previously dismissed claims.  Plaintiffs instead simply repeat their two prior theories of liability.  First, Plaintiffs claim that GE violated Item 303 by failing to disclose three alleged trends or uncertainties.  *See, e.g.*, ¶ 321; *see also* Order at 41-46. Second, Plaintiffs again challenge statements by Mr. Bornstein in early 2017 and language in GE's Form 10-K for 2016 concerning GE's use of factoring.  *See, e.g.*, ¶ 322; *see also* Order at 50-54.

In support of these claims, there are no new theories of wrongdoing, no new facts, and no new allegations by anyone who claims to have had direct contact with any Individual Defendant. Rather, the 5AC includes only two new FEs:  FE-11—described as "a senior executive at GE Distributed Power and GE Power" who alleges that a 2013 analysis of the power market "rolled up" to the CEO of GE Distributed Power, two reporting levels below Mr. Immelt, ¶¶ 70, 343— and FE-12—who allegedly worked as "a senior financial executive for GE Power" and whose sole contribution to the 5AC is that GE tracked utilization rates "in real time," ¶¶ 71, 349—an allegation that Plaintiffs already made in the FAC at ¶ 246.

**ARGUMENT**

I.   **THE 5AC FAILS TO PLEAD A SECTION 10(B) CLAIM**

Plaintiffs' Section 10(b) claims are again subject to the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), as set forth in the Order (at 10-11), in addition to the requirements under *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that Plaintiffs allege facts, not mere speculation, establishing a "plausible" claim.  The 5AC challenges over 100 statements or omissions related to LTC reinsurance and LTSAs as false or misleading.[4]  As this Court explained, the test for whether a statement or omission is misleading is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor."  Order at 12 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016)).

In addition to the requirement to plead falsity, "with respect to each [alleged] act or omission," Plaintiffs must "state with particularity facts giving rise to a strong inference that [each] defendant acted with the required state of mind" (or scienter).  15 U.S.C. § 78u-4(b)(2).  As the Court previously observed (and as remains true in the 5AC), Plaintiffs "do not attempt to demonstrate scienter by establishing that Defendants had 'motive and opportunity' to commit fraud," and instead rely on a theory of "conscious misbehavior or recklessness."  Order at 26.[5]  To plead recklessness, Plaintiffs must allege facts that show "a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Id.* at 13.

Here, because the 5AC fails to allege with particularity that any of the challenged statements were false or misleading, or that any Defendant acted recklessly, the 5AC fails to plead falsity or scienter for each of Plaintiffs' Section 10(b) claims.

---

[4]    A table categorizing each of the challenged statements or omissions, and the reason(s) why each should be dismissed, is attached as Exhibit 3.  *See Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *18 (S.D.N.Y. Feb. 27, 2017) (accepting appendices that serve as "organizational tools").

[5]    In the 5AC, Plaintiffs reference the salaries of some (not all) of the Individual Defendants. *See ¶¶* 45-48.  To the extent these allegations are an attempt to plead that Defendants had motive to commit securities fraud (a link Plaintiffs do not make), the Court should reject it for the reasons stated in Defendants' prior Motion.  *See* Mot. 27-28.  And indeed, the 5AC still does not allege any stock sales by any Defendant during the class period—a fact that "suggest[s] the absence of any nefarious motives."  *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010).

### A.    Plaintiffs' LTC Claims Again Should Be Dismissed

In the 5AC, Plaintiffs abandon the FAC's core theory that GE Capital's LTC reinsurance business lacked sound actuarial validation models and processes, removing all allegations attributed to FE-1 and FE-3, and altering allegations from FE-2.  Plaintiffs also drop their claims that GE violated any GAAP disclosure obligations, FAC ¶¶ 360-67, and that Defendants falsely represented that GE did not retain any LTC exposure, FAC ¶¶ 334-36, 339-41, 346-349.  As to their remaining claims that the Court previously considered and rejected, Plaintiffs re-assert those claims, adding only "expert" opinions and speculative allegations regarding purported deficiencies in the assumptions GE used in its annual premium deficiency testing.  As before, Plaintiffs  allege that Defendants: (i) misleadingly obscured and concealed GE's LTC liabilities in its SEC filings, ¶¶ 251-57; (ii) fraudulently understated GE's LTC liabilities, *e.g.*, ¶¶ 12, 135; (iii) omitted information about GE's LTC exposure and related risks in GE's financial statements, ¶¶ 228-50; and (iv) misrepresented the extent of GE's LTC risks in public statements, ¶¶ 258-68.  The 5AC still fails to state an actionable LTC-related claim.

### 1.    GE's Presentation Of Insurance Liabilities Was Not Misleading

As the Court previously held, "[v]iewed in context and together," GE's presentations of LTC liabilities in its SEC filings "were not misleading."  Order at 17.  Specifically, rejecting Plaintiffs' challenges to GE's exclusion of LTC liabilities from its MD&A contractual obligations table, the Court found that "no reasonable investor, having reviewed both the MD&A table and Note 11 (as the filing directed her to do), could leave with the impression that GE's LTC liabilities were 'immaterial' or that GE's total insurance liabilities were 'declining' or materially less than they really were."  *Id*. at 17-18.  That is because there was a consistent "ten-figure disparity" between GE's MD&A contractual obligations table—which expressly disclosed that it "excluded long-term care, variable annuity and other life insurance contracts," with a cross-reference to Note

11—and the figure in Note 11. *Id.* at 17. Note 11 broke out in tabular form GE's total "investment contracts, insurance liabilities and insurance annuity benefits," which GE disclosed "comprise[d] mainly obligations to annuitants and policyholders in [GE's] runoff insurance operations," and thus necessarily included LTC. *Id.* The Court alternatively held that "the fact that GE disclosed the entirety of its insurance liabilities elsewhere in its Form 10-Ks," including in Note 11, with "explicit directions to readers as to how to find those disclosures," defeated "any finding that GE acted with the requisite scienter in omitting the liabilities from its [MD&A] tables." *Id.* at 19.

In the 5AC, Plaintiffs criticize the same MD&A table and Note 11, ¶¶ 245, 251, 257, repeating the theory rejected by this Court that the disclosures "obscured and misleadingly minimized the nature and extent of [GE's LTC] risks," ¶ 269. Because Plaintiffs cannot change the facts that doomed this theory before, Plaintiffs proffer instead the opinion of a paid "accounting expert consultant," Dr. Weil, ¶¶ 284-95, and several pages of attorney argument, ¶¶ 272-83. Those are not well-pled factual allegations, and they are insufficient to change the result.

*First*, Plaintiffs' inclusion of an "expert" opinion does not lend credence to their already-rejected challenges to GE's MD&A table. As an initial matter, expert "opinions cannot substitute for facts under the PSLRA." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006). And there are no new *facts* in the 5AC relating to the MD&A table. Indeed, in reaching his "conclu[sion]" that "no reader of GE's financial statements, no matter how diligent or sophisticated, could have discerned the extent of GE's LTC risks," Dr. Weil reviewed the *very same information* that this Court analyzed when reaching the opposite conclusion. ¶ 285 ("Dr. Weil analyzed each of GE's 10-Ks for fiscal years 2012 through 2016, including GE's financial statements, the notes to GE's financial statements (including Note 11) and the MD&A Contractual Obligations table."). Dr. Weil's sole rationale for his "opinion" is that there is "no explanation as to how the figures in Note 11 relate, if at all, to the insurance liabilities line item in the MD&A

Contractual Obligations table." *Id.*  The FAC made an identical allegation.  FAC ¶ 331 (alleging that GE's financial statements "contained no explanation as to how GE's Disclosed Insurance Liabilities [in the MD&A table] related to the amounts disclosed in Note 11").  Dr. Weil's opinion is entitled to no greater weight than this previous allegation, *see Sgarlata v. PayPal Holdings, Inc.*, 2019 WL 4479562, at *10 (N.D. Cal. Sept. 18, 2019) (applying the "same standard applied to confidential informants" to expert allegations, and rejecting an expert opinion that did not allege any particularized facts), and his expertise is not needed to understand or analyze Plaintiffs' factual allegations.  *Accord Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) ("[E]xpert testimony is inadmissible when it addresses 'lay matters which a [fact-finder] is capable of understanding and deciding without the expert's help.'").

*Second*, Plaintiffs continue to assert that GE's presentation of its insurance liabilities was misleading because investors could not determine the *precise* amount of GE's LTC liabilities from the MD&A table or Note 11.  ¶¶ 272-80.  Again, Plaintiffs identify no new facts; they simply argue from facts this Court already considered and rejected.  *See* Order at 16-20 (holding that "[d]isclosure of an item of information is not required simply because it may be relevant or of interest to a reasonable investor," and that because GE "fully disclosed its total insurance liabilities in Note 11," GE's "omission of LTC liabilities from its MD&A table was not misleading").[6]

*Third*, Plaintiffs attempt to rely on Dr. Weil to buttress their rejected claim that grouping LTC under "Life insurance benefits" and "Other" in Note 11 was misleading.  *See* Order at 16-20.

---

[6]     Plaintiffs again argue that GE's exclusion of LTC liabilities from the MD&A table because they were not "reasonably determinable" is an "acknowledgement that those GAAP LTC liabilities did not reasonably approximate GE's LTC risks."  ¶ 282.  As Defendants explained before, ECF 180, at 6 n.7, Plaintiffs compare apples to oranges:  LTC reserves are broad estimates of future liabilities over many decades, whereas the MD&A table is a granular near-term outlook.  GE's exclusion of LTC liabilities from a table presenting granular near-term liabilities says nothing about GE's ability to approximate its long-term LTC "risks"—it just means estimates of near-term outflows were not sufficiently precise to be useful.

According to Dr. Weil—an accountant who has no discernable background in insurance products, ¶¶ 74-77—the risks of insuring LTC benefits are higher than the risks of insuring "pure" life insurance, thereby necessitating a separate line item for LTC in Note 11. *E.g.*, ¶¶ 287-94. But that is the exact same "view" that was expressed by FE-2 in the FAC (and again in the 5AC). FAC ¶ 157; 5AC ¶ 255 (same). Like FE-2, Dr. Weil fails to cite to any rule requiring that a particular term be used to describe insurance liabilities, establishing that insurance liabilities cannot be grouped together, or mandating that LTC liabilities be reported separately from other life insurance liabilities.[7] *See In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) (rejecting claim that defendant was required to disaggregate particular costs in line item where plaintiffs "point[ed] to no accounting or reporting requirements" mandating such disclosure). Dr. Weil just says that a separate classification for LTC liabilities was "important." ¶ 287. His opinion is not fact. *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) ("no 'presumption of truthfulness' accorded to 'opinions couched as factual allegations'").

As this Court previously held, GE disclosed its retention of run-off LTC reinsurance liabilities to investors. Order at 32. And as Defendants pointed out in their prior Motion, Note 11 expressly described the category "Life insurance benefits" as including "obligations … *in our run-off insurance operations*," *i.e.*, GE's retained LTC portfolio. ¶ 252; Ex. 8, 2012 10-K, at 136; Ex. 13, 2013 10-K, at 146; Ex. 19, 2014 10-K, at 170; Ex. 24, 2015 10-K, at 166; Ex. 33, 2016 10-K, at 167. The MD&A table further confirmed that "life insurance" included LTC, stating that the table "excluded long-term care, variable annuity and *other* life insurance contracts." ¶¶ 247-48. Plaintiffs' own sources confirm that the industry often grouped LTC within "life insurance." Mot.

---

[7]     Plaintiffs' challenges to GE's classification of LTC reserves for claims that already had been made (*i.e.*, "claims reserves" or "DLR reserves") as "Other" fail for the additional reason that Plaintiffs do not even allege that GE's claims reserves were insufficient.

14. For example, a Credit Suisse report on LTC cited in the FAC[8] is titled "US Life Insurance Sector Review," and it describes LTC as within the "life insurance industry."[9]  Ex. 35, at 1, 9.

*Finally*, Plaintiffs' claims also fail because the 5AC again is devoid of any allegation that any Defendant acted with scienter in excluding LTC liabilities from the MD&A table,[10] or including LTC reserves in the sub-line item "Life insurance benefits" or "Other."  As this Court found, the "disclosure of those liabilities—and the explicit directions to readers as to how to find those disclosures [in Note 11]—strongly undercuts any inference that GE had the intention to deceive, manipulate, or defraud investors.'"  Order at 19-20 & n.9.  Unsurprisingly, Dr. Weil says nothing about anyone's state of mind (including *any* Defendant's), other than his own.

       2.     <u>LTC Reserves Are Non-Actionable Opinion Statements</u>[11]

Plaintiffs also fail to plead an actionable claim based upon GE's reported LTC reserves. The Court previously held that Plaintiffs failed to allege that GE's LTC reserves, which are indisputably opinion statements, were false or misleading.  Order at 20-26 (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011)).  Specifically, the Court rejected the two theories of opinion liability pressed by Plaintiffs in the FAC, holding that Plaintiffs' allegations regarding

---

[8]     Plaintiffs removed any mention of this Credit Suisse report in the 5AC, but the Court may still consider it.  *See Poindexter v. EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) (court may consider allegations made in earlier complaint on a motion to dismiss).

[9]     For the first time, Plaintiffs allege, albeit in passing, that GE's GAAP classifications were "inconsistent" with ERAC's and UFLIC's statutory filings, which "described LTC reserves as 'reserve for accident and health contracts,' a separate line item from 'reserve for life contracts.'" ¶¶ 256-57.  But ERAC's and UFLIC's statutory filings are subject to different requirements under Kansas law, and have no bearing on GE's GAAP financial reporting obligations.

[10]     Plaintiffs point again to GE's decision to include LTC liabilities in the MD&A table in 2018 (following its reserve increase), ¶¶ 316-17, but as this Court held, "the change in disclosure practices alone is insufficient to establish a strong inference of scienter."  Order at 19-20 n.9.

[11]     Although Plaintiffs abandon their challenges to the LTC reserve figures reported in line items under Note 11 of GE's financial statements, *see* FAC ¶ 351, the 5AC alleges that GE was under-reserved, or that GE would have to take an "inevitable" charge, *e.g.*, ¶¶ 135, 138-39, 161.

widespread issues with actuarial models used by GE's reinsurance subsidiaries were insufficient to establish either subjective falsity or that GE's LTC reserves "did not rest on a meaningful factual inquiry nor have any reasonable basis in fact."  *Id*. at 22-24 (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1332 (2015)).  In reaching its decision, the Court found that Plaintiffs' own allegations "undercut[]" their claim that Defendants knew GE was under-reserved, because "[a]fter all, as the Complaint itself acknowledges, GE's yearly deficiency testing resulted in positive margins *every year through 2017*—i.e., throughout the Class Period."  Order at 23-24 (emphasis in original).  In the 5AC, Plaintiffs omit all FE allegations purporting to disparage GE's actuarial models and processes.  Yet they pursue the same claims, citing to an "expert" opinion, ¶¶ 189-212; and FE-2's discussion of a PowerPoint that he speculates Defendants "would have" seen,  ¶¶ 131-34.  These amendments do not salvage Plaintiffs' claims.

> a.  *Mr. Axene's Analysis Of MetLife Statutory Filings Misses The Mark*

Plaintiffs' claimed actuarial expert, Mr. Axene, ¶¶ 72-73, cannot save Plaintiffs' opinion claims.  As explained below, his analysis is off point and does not evidence any Defendant's state of mind or any actual inquiry undertaken (or not) by GE.  *See* ¶¶ 136-46, 193-212.

Plaintiffs allege that because "over 99.5% of MetLife's LTC exposures were reinsured by UFLIC," a fourth-tier subsidiary of GE, MetLife's "LTC exposures were UFLIC's LTC exposures, and MetLife's assumptions were UFLIC's assumptions."  ¶¶ 135-48.  From that premise, Mr. Axene cites to disclosures in MetLife's publicly available statutory filings and rate increase applications (which were submitted to state insurance regulators) and alleges that they reveal "severe deficiencies" in GE's annual GAAP premium deficiency testing.[12]  ¶ 193.  Specifically,

---

[12]   Although Mr. Axene purports to have reviewed certain regulatory filings of ERAC and UFLIC, *e.g.*, ¶¶ 126-28, 189, neither he nor Plaintiffs claim that any figure or estimate referenced therein was incorrect or somehow reflected any use of "grossly outdated" assumptions, ¶ 197.

he claims that *MetLife's* disclosures reveal that *GE* (i) used "grossly outdated" mortality and lapse rate assumptions that were "far more aggressive" than its peers, ¶¶ 193-205; and (ii) had "highly negative claims experience" that existed "years before" and "persisted throughout" the Class Period, ¶¶ 135-48.  As a result, Mr. Axene speculates that the only way GE's annual premium deficiency testing could result in positive margins throughout the Class Period was if GE used "grossly inaccurate" assumptions that were "inconsistent with its own claims experience." ¶¶ 209-12.  Mr. Axene's purported analysis does not withstand scrutiny.

*First*, Mr. Axene's "analysis" of what Plaintiffs call "UFLIC/MetLife's" assumptions and claims experience says nothing about GE's other reinsurance subsidiary ERAC, which reinsures approximately three-quarters of GE's total LTC portfolio (and which Plaintiffs admit has nothing to do with MetLife).  ¶ 114; *see* Ex. 45, Mar. 2019 Teach-In Presentation, at 6.  In fact, given that under GAAP a business may conduct premium deficiency testing on an aggregate level for all products within its subsidiaries, Ex. 4, ASC 944-60-25-2, 3, Mr. Axene's UFLIC-only analysis has little bearing on GE's premium deficiency testing.  Mr. Axene's failure to address any of ERAC's assumptions or claims experience in his "analysis" is exacerbated by the fact that the majority of GE's LTC charge in January 2018 was attributable to ERAC, not UFLIC, *see* ¶ 208.[13]

---

[13]     Plaintiffs do not even purport to have any information about assumptions used by ERAC, but Plaintiffs' "expert" speculates "that there is no reason to believe that ERAC's assumptions were any better than UFLIC's."  ¶ 206.  An allegation that there is "no reason to believe" is the antithesis of pleading facts with particularity. *See, e.g.*, *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018).  And, in any event, his assertion that because ERAC's reserve increase was "much larger" than UFLIC's, that must mean that ERAC's best estimate assumptions were "just as—if not more—outdated and overly optimistic," ¶ 208, is specious.  ERAC reinsures 200,000+ LTC policies, compared to UFLIC's 70,000+ policies, and the policies have different attributes.  Ex. 45, Mar. 2019 Teach-In Presentation, at 6.  Plaintiffs further admit that 80% of ERAC's LTC reserves relate to reinsurance agreements with five insurers, none of which are MetLife.  ¶ 51.

*Second*, as Plaintiffs admit, MetLife's statutory filings reflect assumptions used to assess the adequacy of MetLife's *statutory* LTC reserves, which differ from the assumptions it (let alone ERAC and UFLIC) used to test its *GAAP* LTC reserves.  ¶ 194.  And while Mr. Axene alleges that assumptions for statutory reserves are "typically more conservative" than for GAAP reserves, he can only posit that the assumptions used by GE in its GAAP testing "necessarily suffered from the same deficiencies."  *Id.*  That supposition does not suffice.  *See Sgarlata*, 2019 WL 4479562, at *10 (rejecting expert opinion regarding "the most reasonable assumption" related to a privacy network because it "appear[ed] to be merely a guess about the structure of Defendants' network").

*Third*, while Plaintiffs speculate that MetLife's claims experience data "was available to and reviewed every year by GE's most senior executives," ¶ 148, neither Plaintiffs nor Mr. Axene allege that any Defendant reviewed MetLife's statutory filings, and thus his analysis has no bearing on whether Defendants "affirmatively disbelieved (or recklessly credited) a statement of opinion," Order at 22.  Mr. Axene did not have contact with *any* Defendant, much less any insight into GE's actuarial analyses or knowledge of supposed "catastrophic" and "alarming" warning signs.  *See* ¶¶ 140, 189-215.  Mr. Axene does not allege that *any* Defendant knew what assumptions MetLife used in its statutory filings or GAAP premium deficiency testing, let alone that any Defendant knew that any such assumption meant that GE's GAAP assumptions were somehow deficient.

*Fourth*, even if Plaintiffs had alleged that certain Defendants were aware of and had considered MetLife's statutory filings (which they do not allege), that would not establish that Defendants believed GE's GAAP LTC reserves were incorrect.   In his evaluation of "UFLIC/MetLife's" mortality and lapse rate assumptions, ¶¶ 195-205, Mr. Axene nowhere addresses the myriad other actuarial assumptions that impact premium deficiency testing, including, for example, morbidity (the extent and cost of LTC services), discount rates (expected future investment yields used to discount projected nominal cash outflows), interest rates, or

anticipated future premium increases (on a state-by-state level).  *See* ¶ 90.  At bottom, Mr. Axene does not explain how knowledge of MetLife's statutory filings would undermine *any* Defendant's subjective belief that GE's GAAP LTC reserves were sufficient.  Nor, for that matter, does the 5AC allege how MetLife's statutory assumptions establish that Defendants lacked "any reasonable basis in fact" for GE's GAAP LTC reserves.   Order at 24.   Mr. Axene criticizes "UFLIC/MetLife's" purported use of, for example, "30+ year-old mortality tables" with "higher selection factors than were supported by the actual experience" and "lapse rate assumptions that were 50% higher than industry standards," ¶¶ 200, 214, but those criticisms do not establish that *GE* failed to undertake a "meaningful factual inquiry" into its reserves.  Order at 24.  To the contrary, Plaintiffs allege that "GE conducted annual claims experience studies with respect to its LTC blocks," ¶ 130, "GE's claims experience analyses were conducted by senior GE actuaries," ¶ 128, and non-defendant employees "prepared analyses of ERAC's LTC liabilities, including anticipated cash flows of such liabilities, static and dynamic validations of the model's liability values and cash flows, confirmation of the reasonableness of the projected liability cash flows and of the underlying assumptions, and selection and confirmation of certain key assumptions," ¶ 56. And, Plaintiffs of course still concede the unavoidable fact that GE's annual premium deficiency testing resulted in positive margins every year throughout the Class Period.  ¶ 188.

Moreover, Mr. Axene does not and cannot state whether, by how much, or when GE should have increased its LTC reserves in response to MetLife's purported claims experience data—let alone attest to any Defendant's knowledge regarding these issues.  He also ignores the fact that, as Plaintiffs' cited sources recognize, assumptions used in annual premium deficiency tests are heavily dependent on actuarial judgment and interpretation of data.  *See* Ex. 6, ASOP No. 18, at 3.2 (noting that "assumption setting" is not fixed by rule and requires that the actuary use "professional judgment of future events affecting the incidence and cost of LTC benefits"); Exs. 7

& 23, Milliman Surveys (discussing variance in assumptions across LTC industry).  Mr. Axene

can only second guess, in hindsight, GE's complex actuarial judgments.  ¶ 212.  That does not

state a claim.  *Accord Harris v. AmTrust Fin. Servs., Inc.*, 2015 WL 5707235, at *10 (S.D.N.Y.

Sept. 29, 2015) ("In the absence of a restatement or allegations pointing to objective facts that

Defendants' accounting methods violated GAAP, carping about Defendants' application of GAAP

amounts to no more than a 'naked assertion' devoid of 'further factual enhancement[.]'").[14]

*Fifth*, even fully accepting Mr. Axene's "analysis," it would in fact disprove Plaintiffs'

claims.  Assuming MetLife and UFLIC used the "same [statutory] assumptions" (which they did

not),[15] and that such assumptions could be ascribed to GE's entire LTC business (which they

---

[14]    Mr. Axene also speculates that "GE's actuaries" were "exposed" to "significant infirmities with GE's best estimate assumptions."  ¶ 209.  But no Individual Defendant was an actuary.  *E.g.*, ¶ 152 ("Miller was responsible for 'almost everything except actuary work.'").  Further, the 5AC does not specify the alleged "infirmities" in GE's assumptions (even though FE-2 purports to have been an actuary at ERAC, ¶ 112), and its passing reference to certain characteristics of UFLIC's and ERAC's reinsured LTC policies—which were voluntarily disclosed by GE one year after the end of the Class Period—does nothing to buttress Plaintiffs' claims.  *See* ¶¶ 116-22.  Moreover, Plaintiffs' current theory is at odds with FE-2's prior allegations, casting doubt on his veracity. *Compare* ¶¶ 215 (alleging GE's assumptions were "outdated" and "inconsistent" throughout the Class Period) *with* FAC ¶¶ 187-88 (alleging that FE-2 informed ERAC's senior management of "stale" assumptions in 2014 that were then "correct[ed]").  Additionally, in the FAC, Plaintiffs conceded that KPMG reviewed such assumptions and issued a clean audit opinion each year during the Class Period, FAC ¶ 415, and do not allege anything in the 5AC that undermines that fact (such as through allegations that GE withheld information from KPMG).  Finally, Plaintiffs ignore that GE Capital and its subsidiaries were under supervision by the Federal Reserve Board for a portion of the Class Period, *e.g.*, Ex. 19, 2014 10-K, at 52, and do not allege that the Federal Reserve Board ever raised any issues related to ERAC's or UFLIC's LTC reserves or testing assumptions.

[15]    As Plaintiffs admit, MetLife merely stated, in its 2012 and 2016 rate filings, that its assumptions were "*consistent* with the business plan in the primary risk taker's [] asset adequacy testing."  ¶ 193.  That is confirmed by the actuarial certifications attached to MetLife's 2012 and 2016 statutory rate filings, which state the "assumptions used in [MetLife's] rate filings" are "consistent but not identical" to UFLIC's, and that the "assumptions used in the rate filings include a policy coverage type adjustment and an additional downward adjustment to the morbidity assumptions ranging by duration from 8% to 2%," which "remove an implicit margin in the asset adequacy testing assumptions."  *E.g.*, Ex. 12, MetLife Rate Increase Filing, at 55 (Nov. 13, 2013).

cannot), and that they could be extrapolated to GAAP assumptions (which they cannot), these allegations do not help Plaintiffs. The fact that MetLife, one of the largest global providers of insurance, used the same assumptions, and openly disclosed its use of such assumptions in rate applications to **state regulators** belies any notion that such assumptions were "grossly outdated" or "inconsistent with prevailing industry assumptions." ¶ 197.[16] Instead, the fact that a reputable carrier, reviewing the same claims experience, reached the same assumptions would negate Plaintiffs' conclusions.[17]

        b.    *Unidentified PowerPoints Cannot Save Plaintiffs' Claims*

Plaintiffs' new allegations from FE-2 fare no better. Over one year after the FAC was filed, FE-2 now recalls and refers to annual PowerPoint presentations containing ERAC and UFLIC claims experience data that he neither prepared nor presented (nor saw presented by others), but that he nonetheless baselessly speculates were "received" by Mr. Immelt and unnamed executives. ¶¶ 131-34. According to FE-2, there was at least a *five-person* chain of custody between the alleged unspecified drafter of the presentation and the unknown person alleged to have presented information to any Defendant. *See* ¶ 133. Critically, the 5AC does not contain any details as to whether the PowerPoints even contained negative claims experience (and, if so, in

---

[16]    As Plaintiffs concede, "LTC insurance is subject to substantial regulation." ¶ 88. LTC insurers are "required to disclose to state regulators the number of policies covered along with data regarding their claims experience (e.g., incurred claims, lives inforce) and, in particular, comparing their actual claims experience to their expected claims experience." *Id*. Indeed, consistent with their oversight and enforcement authority, during the Class Period, regulators and independent auditors reviewed UFLIC's and ERAC's annual assumptions and claims experience, and the Kansas Insurance Department had continuous authority to conduct a financial examination of the companies. *See* Ex. 46, Press Release (Aug. 19, 2019), at 1; Kan. Stat. Ann. 40-222.

[17]    Plaintiffs' further allegation that UFLIC self-reported those same assumptions for use in voluntary industry surveys held in 2012 and 2015, ¶ 198, also undermines any notion that such assumptions were "grossly" unreasonable, ¶ 197; *see* Exs. 7 & 23, Milliman Surveys.

what years and amounts), much less warned that GE's reserves may be inadequate to cover future liabilities.[18]  Instead, the Court is left only with Plaintiffs' vague speculation that such "claims experience data" would show that "the risks associated with GE's toxic LTC portfolio had become a reality."[19]  ¶ 135.  There are no allegations in the 5AC that the information reported in the PowerPoints was withheld from GE's actuaries, who made the underlying assumptions, or KPMG, GE's outside auditor, ¶ 170, which reviewed the assumptions.  As before, Plaintiffs' allegations fall short of satisfying Plaintiffs' burden to plausibly allege that any Defendant did not "believe[] their LTC reserve statements were true," that GE failed to undertake a "meaningful factual inquiry" into its reserves, or that Defendants lacked "any reasonable basis in fact" for their estimates.  Order at 22, 24.  At most, even if these unidentified PowerPoints are given any weight, "this case is [still] closer to those in which defendants allegedly possess[ed] facts which should have led them to make further inquiry, but which, without more, do not sufficiently allege that the individuals disbelieve[d] their stated opinions."  *Id.* at 23.

3.    GE's Alleged Omissions Regarding LTC Exposure Or Related Risks Are Not Actionable

As before, Plaintiffs continue to rely on Item 303,[20] alleging that Defendants failed to disclose known material trends and uncertainties in GE's run-off reinsurance business.  Dismissing

---

[18]    Indeed, even if the PowerPoints reported negative claims experience (which Plaintiffs do not allege), *see* ¶¶ 131-34, that would not imply that GE was under-reserved under GAAP.

[19]    FE-2's ambiguous assertion that the purported PowerPoint showed a "hump" where necessary reserves were expected to peak, *see* ¶ 132, does not adequately allege that GE's reserves were inadequate at any time; Plaintiffs do not even allege that GE's reserves were set below the "hump" (or that Defendants would even understand what that "hump" meant).

[20]    Circuits are split on whether violations of Item 303 give rise to a private right of action under Section 10(b) or Rule 10b-5.  The Second Circuit has held "yes," *see Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015); the Ninth Circuit has held "no," *see In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054-56 (9th Cir. 2014).  The Supreme Court granted *certiorari* to review that very issue in *Leidos, Inc. v. Indiana Public Ret. Sys.*, 137 S. Ct. 1395, 1396 (2017), but the case settled on the eve of oral argument.  138 S. Ct. 369 (2017).

Plaintiffs' Item 303-based claims in the FAC, the Court held that Plaintiffs failed to plead facts demonstrating that GE's purported omissions were made under circumstances that "give rise to a strong inference of scienter."   Order at 26.   The Court concluded that the non-fraudulent inference—"that Defendants did not realize the brewing storm in their LTC portfolio, masked in part by out-of-date actuarial assumptions and sloppy practices, and then made disclosures and adjustments as they learned about the scale of the problem"—was more compelling than the inference of fraud.  *Id.* at 27-28.  Plaintiffs now repeat their Item 303-based "trend" theory, relying on essentially the same facts as they did in the FAC.   ¶¶ 228-29.   Plaintiffs also present an alternative but similar version of this claim, alleging that the "Significant Trends & Development" sections in some of GE's Form 10-Qs were materially misleading because they did not disclose the same supposed trends.  ¶¶ 234-38.  These amendments do not save Plaintiffs' claims.

a.      *GE's LTC Disclosures Did Not Violate Item 303*

Plaintiffs still fail to plead particularized facts that would establish the existence of a trend or uncertainty that would have a material impact on GE's financial condition—let alone facts that would establish Defendants' contemporaneous knowledge or reckless disregard of the same.  *See* 17 C.F.R. §§ 229.303(a)(1), (a)(3) (an issuer must "describe any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," or "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations").  An alleged failure to make a disclosure required by Item 303 can serve as the basis for a Section 10(b) claim only if it is material and all of the other requirements to sustain such a claim (including scienter) are met.  *See* Order at 26; *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 n.7 (2d Cir. 2016).  In lieu of

facts, Plaintiffs merely cite to the same PowerPoints vaguely described by FE-2 and the opinions from Mr. Axene discussed above. [21]   ¶¶ 131-48, 152, 156.  These allegations are insufficient.

As the Court recognized, GE periodically disclosed uncertainties stemming from adverse claims experience in its LTC portfolio, as they became known to GE.  *See* Order at 28-29. Plaintiffs continue to argue that GE knew and should have disclosed *more* than it did about its LTC policies and their associated risk, but Item 303 does not impose that burden.  *See id.* at 18. Indeed, Plaintiffs still concede the "ineluctable fact" that "GE's annual deficiency testing showed positive results through and including 2016," *id.* at 28; ¶¶ 92, 188, and cannot dispute that the timing and number of disclosures GE made about its LTC reserves "contradicts an inference of scienter," Order at 28.  As before, the more compelling inference is that GE's incremental disclosures and write-downs reflect, if anything, "poor accounting and prognostication"—not fraud.  *Id.* at 29.

        b.    *The Significant Trends & Developments Sections In GE's 10-Qs Were Not Misleading*

Based on this same flawed "trend" theory, Plaintiffs newly allege that certain of GE's 10-Qs from Q1 2015 to Q3 2017 were rendered misleading because GE spoke "affirmatively on the topic of 'Significant Trends & Developments'" and therefore had a duty to (but did not) make "disclosure[s] concerning its LTC exposure." ¶ 234.  That also fails.

*First*, GE's disclosure of information totally unrelated to LTC under a discretionary section called "Significant Trends & Developments" in select 10-Qs prior to Q2 2017 did not create a duty to speak about LTC, much less disclose specific information about GE's LTC policies and the

---

[21]     In addition to the deficiencies with these PowerPoints already discussed, Plaintiffs do not allege what information stated or otherwise made clear that "claims experience" was a trend or uncertainty that was reasonably likely to have a material impact on GE's financial position, liquidity, or reserves, let alone that any Defendant believed (or even understood) the same. ¶ 135.

22

alleged industry-wide negative claims experiences, ¶ 228.  *See, e.g.*, Order at 32-33 (duty to speak "triggered only by speaking on a specific 'issue or topic'"); *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 163-64 (S.D.N.Y. 2018) (no disclosure violation where defendant disclosed requirements of plea agreement, but not defendants' compliance with those requirements, as they were "different topics").  *Second*, with respect to GE's subsequent, voluntary disclosures in Q2 and Q3 2017 that the Company had "experienced elevated claim experience for a portion of [its] long-term care insurance products" that could necessitate an earnings charge in later filings, *see* Ex. 40, Q2 2017 10-Q, at 30, Ex. 42, Q3 2017 10-Q, at 31, Plaintiffs fail to allege how these truthful statements were rendered misleading by the omission of more specific information about GE's LTC business.  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579-82 (S.D.N.Y. 2013) (broad risk disclosures not misleading for omitting specific risks because "a corporation is not required to reveal all facts on a subject just because it reveals a single fact").

*Finally*, Plaintiffs again fail to adequately plead scienter.  Regardless of whether Defendants were duty bound to include the information Plaintiffs claim (they were not), Plaintiffs do not allege—through documentary evidence, confidential witnesses, or otherwise—that any Defendant omitted any such information with the intent to defraud investors or with conscious recklessness.  That failure alone dooms their "trend" claims.  *See* Order at 27-28; *supra* § I.A.3.a.

4.      GE's Public Statements Regarding LTC Were Not False Or Misleading

Plaintiffs continue to challenge a number of statements made during the Class Period by GE executives at conferences, in press releases, and on investor/analyst calls.  As before, these statements "fall into two rough categories:  (1) statements about GE Capital's LTC insurance exposure and its overall portfolio risk; . . . and (2) claims made in 2017 about why GE did not liquidate its remaining LTC insurance position."  Order at 30.  Despite the Court's clear explanation as to the insufficiency of such allegations, the 5AC relies entirely on these same

rejected allegations.  *Compare* ¶¶ 259-68, *with* FAC ¶¶ 145-46, 334-49, 358; *see* Order at 30-36.

Absent new allegations, these claims "cannot survive," Order at 34, and must be dismissed again.

**B.      Plaintiffs' LTSA Claims Should Be Dismissed In Their Entirety**

Plaintiffs' LTSA claims fare no better.  Plaintiffs now retreat from the primary theories of

liability advanced in the FAC.  The FAC alleged that Defendants falsely reported GE's contract

assets and other LTSA metrics, violated several provisions of GAAP, and made other false or

misleading statements regarding GE Power's LTSA business.  *See* FAC ¶¶ 368-98.  This Court's

Order was crystal clear, however:  none of those claims held water.  Notwithstanding the Order's

invitation to "allege additional facts" that would state fraud with particularity or "permit Plaintiffs

to clear the scienter bar," Order at 56, the 5AC simply drops the lion's share of Plaintiffs' claims.

Plaintiffs now hinge their case on the legal theories that were originally their proverbial "Plan B."

For the reasons discussed below, Plaintiffs' factual allegations are plainly insufficient.

**1.      GE's LTSA And Factoring Disclosures Did Not Violate Item 303**

Plaintiffs now rely principally on Item 303 as a basis for their LTSA claims.  *See supra*

§ I.A.3.  Just like in the FAC, Plaintiffs continue to insist that, under these provisions, Defendants

were required to disclose (i) GE Power's alleged "extensive reliance on modifications to LTSAs"

in order to drive cumulative catch-up adjustments, ¶¶ 321, 358-85, 407-08, 414-20; Order at 42-

44; (ii) alleged declines in the "utilization of GE-serviced power equipment," ¶¶ 321, 346-57, 407-

13; Order at 44; and (iii) GE Power's alleged "widespread reliance on factoring" of LTSAs to

manage liquidity, ¶¶ 321, 386-405, 407-08, 421-25; Order at 44-46.  But the 5AC simply fails to

plead particularized facts that would establish the existence of any of the foregoing trends, let alone

that would show they were presently known to or recklessly disregarded by any of the Defendants.

These deficiencies are fatal to each of Plaintiffs' Item 303 claims.

a.    *Plaintiffs' Item 303 Claim Based Upon LTSA Modifications And
Cumulative Catch-up Adjustments Fails*

The Court already rejected Plaintiffs' theory that Item 303 required the disclosure of LTSA

modifications—including modifications that would allegedly "de-scope" those agreements, or

allow customers to defer payments thereunder—because Plaintiffs failed to allege facts that would

"permit a plausible inference" that those modifications were "'reasonably likely' to have a material

impact on GE." *See* Order at 42-44.  The Court specifically noted that "there [we]re no allegations

of how many LTSAs were 'de-scoped,' or how many customers' payments were deferred, or what

overall effect such modifications would have on GE's overall financial position." *Id.* at 43.

Despite this Court's guidance as to what Plaintiffs must plead, the 5AC *still* does not even

attempt to allege how many LTSAs were "de-scoped," or how many customers' payments were

deferred, or what effect the alleged LTSA modifications would have on GE's overall financial

position.  Nor does it allege, for instance, by how much "long-term revenue and cash flows" were

"cut" through removing admittedly lower margin labor from LTSAs, ¶¶ 361, 366, 417, or by how

long customers' payment terms were deferred, ¶¶ 367, 418, or how many LTSAs made up GE

Power's global portfolio and how many had already been renegotiated, ¶¶ 363, 416.  Accordingly,

Plaintiffs' Item 303 claims concerning GE's LTSA modifications and cumulative catch-up

adjustments again fail.[22]  *See City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting,

Inc.*, 2019 WL 452051, at *8 (S.D.N.Y. Feb. 5, 2019) (dismissing Item 303 claim where plaintiffs

failed to make "allegations addressing the 'anticipated magnitude'" of the undisclosed event).

---

[22]    As Defendants pointed out in their prior Motion, *see* Mot. 29, the MD&A sections in GE's
Form 10-Ks disclosed the portion of its revenue attributable to cumulative catch-up adjustments.
*See, e.g.*, Ex. 13, 2013 10-K, at 74; Ex. 19, 2014 10-K, at 85-86; Ex. 24, 2015 10-K, at 87; Ex. 33,
2016 10-K, at 90; Ex. 39, Q1 2017 10-Q, at 36, 44; Ex. 40, Q2 2017 10-Q, at 37, 45; Ex. 41, Q3
2017 Earnings Call Tr., at 8.  Plaintiffs are thus wrong that Defendants failed to disclose the
magnitude of GE Power's cumulative catch-up adjustments.

Moreover, as this Court previously recognized, "[t]he other complained-of practices had the direct or indirect effect of reducing GE's future revenues (by, for instance, increasing the risk of customer non-payment), but none allowed GE to book catch-up revenues in the way that Plaintiffs describe," and thus there was "no 'trend' . . . that Defendants needed to disclose." Order, at 43.  As such, "Plaintiffs' theory of fraud does not ultimately hang together." *Id.* at 42.  Plaintiffs provide no new ways that GE supposedly generated cumulative catch-up adjustments, nor do they offer facts that dispute this Court's prior conclusion.  Plaintiffs just repeat their prior allegation that "deferred payment . . . reduced the likelihood of collectability," ¶ 418; *see* FAC ¶ 275 (same), without tying such allegation to any cumulative catch-up adjustments.

Nor do Plaintiffs' allegations regarding the adoption of ASC 606's revenue recognition amendments, ¶¶ 380-85, save their claims.  In the FAC, Plaintiffs claimed that the fact that GE's contract asset balance was lower under a new accounting standard is somehow evidence that GE was incorrectly reporting its revenues under the old standard.  FAC ¶¶ 299-300, 308-15.  This Court rejected that argument, finding that "the fact that Defendants knew a new accounting standard was coming into effect in the future," showed nothing about what Defendants believed "*under then-existing accounting standards*."  Order at 38-39 (emphasis in original).  Plaintiffs try to twist that exact same allegation into an Item 303 violation, but it fares no better there.  *See* ¶ 364.  The difference between GE's contract asset balance under ASC 605 and ASC 606 says nothing about "unsustainable" business practices, ¶ 416; *see* ¶¶ 363-64, much less evidences any "trend" that had to be disclosed under Item 303.[23]  *See Friedman v. Endo Int'l PLC*, 2018 WL 2021561,

---

[23]   Plaintiffs provide no support for their incorrect contention that, through the required ASC 606 recast, GE "effectively wrote down the value of LTSA Contract Assets," ¶ 437; as Defendants previously explained, ASC 606 required GE to "recast what its prior years' revenue *would have* been under the new accounting standard," Mot. 23.  The ASC 606 recast was not a write-down. GE has never said that its LTSA contract asset balance under ASC 605 was overstated.

at *2 (S.D.N.Y. Apr. 27, 2018) (Furman, J.) (rejecting Item 303 claim that was "merely a repackaged version of [plaintiffs'] central argument in the [prior] Complaint"), *aff'd sub nom. Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019).

The 5AC also fails to allege any facts establishing the requisite strong inference of scienter. Once again, Plaintiffs offer only generalized statements from FEs as to what Defendants might have seen.  The 5AC repeats the same allegations about:  (i) two software programs that FE-5 believed "all commercial people" used and could access, ¶ 375; (ii) "quarterly status reports" that FE-7 wrote "for the controller in Europe to send to GE's corporate headquarters," and that he believed were passed along to "GE's Global Controller, who then delivered them to Hauser," ¶¶ 377, 404; and (iii) FE-10's "belie[f that] there were instances where the models concluded a negative cumulative catch-up adjustment was needed in light of changing conditions, but those results were ignored," ¶ 376.  *See* FAC ¶ 267 (alleging same FE-5 statements), ¶ 269 (alleging same FE-7 statements), ¶ 268 (alleging same FE-10 statements).  But these allegations from the FAC remain insufficient.  None says anything about what Defendants actually knew or saw, and for that reason, they cannot establish scienter.  *See, e.g.*, *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (rejecting allegations regarding alleged access to reports because confidential witness "had no knowledge of whether [individual defendants] actually accessed or reviewed the reports"); *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 768 (S.D.N.Y. 2006) (dismissing complaint for failing "to identify any documents, meetings, or reports that show that defendants knew or should have known that the [company's] revenues were misstated").

Furthermore, even if any Defendant saw these vaguely described documents, there is no allegation that any Defendant *knew of a trend* that would trigger an Item 303 disclosure obligation. Plaintiffs must do more than plead that Defendants should have known of an adverse trend; they must allege Defendants' *actual* knowledge of that trend.  *See Das v. Rio Tinto PLC*, 332 F. Supp.

3d 786, 810 (S.D.N.Y. 2018).  Unless a trend both exists *and* is known, Item 303 liability cannot attach.  *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758 n.90 (S.D.N.Y. 2018) ("Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC.").

Lastly, Plaintiffs allege (and have previously alleged, *see* FAC ¶ 319), "Defendants GE, Immelt, Bornstein, Miller, Sherin, and Hauser were hyper-focused on GE Power and the impact of ASC 606" prior to its implementation, ¶ 370.  It is hardly surprising (as Plaintiffs already observed in ¶ 319 of the FAC) that senior management (including two CFOs and a CAO) would find it important that GE understand and comply with a new authoritative accounting rule.  That allegation does nothing to establish scienter.

b.   *Plaintiffs' Item 303 Claim Based Upon Alleged Declining Utilization Fails*

Plaintiffs' next Item 303 theory is that Defendants knew of but failed to disclose declining customer utilization trends in GE Power's LTSA business.  *See* ¶¶ 346-57, 407-13.  Plaintiffs have already advanced this theory, though the Court previously "decline[d] to consider [it]" because they did so for the first time in briefing on Defendants' Motion to Dismiss the FAC.[24]  Order at 44.  Plaintiffs fail to allege the requisite facts to support such a claim.

Plaintiffs ignore that the allegedly non-disclosed information was, in fact, disclosed. Plaintiffs allege that "Defendants were required to disclose whether the declining utilization of GE-serviced assets under LTSAs was reasonably expected to have a 'material . . . unfavorable

---

[24]   Plaintiffs' claims related to utilization trends are also barred in part by the five-year statute of repose.  *See* Order at 14-15.  Specifically, Plaintiffs' Item 303 claim must be dismissed to the extent it is based upon any of GE's Forms 10-Q filed in 2013 (on May 8, July 26, and November 1), the 2013 Form 10-K (filed on February 27, 2014), or the first two Forms 10-Q filed in 2014 (on May 12 and July 31) because they were filed before October 25, 2014, *i.e.*, five years before Plaintiffs filed the 5AC on October 25, 2019.  *See* 28 U.S.C. § 1658(b); Order at 14-15.

impact on . . . liquidity' (i.e., CFOA) and the extent to which that trend was reasonably expected to impact GE's Industrial CFOA." ¶ 412.  Beginning with its annual report for 2014, each of GE's Form 10-Ks specifically stated that a significant trend and development in GE's Power business was that "[e]xcess capacity in developed markets"—*i.e.* that demand for power was less than what GE potentially could supply to the market—had resulted in "uncertainty for the industry and business."  *See* Ex. 19, 2014 10-K, at 33; Ex. 24, 2015 10-K, at 38; Ex. 33, 2016 10-K, at 38.  GE also disclosed, among other things, that uncertainty was driven by "continued pressure in oil and gas applications and macroeconomic and geopolitical environments," *e.g.* Ex. 24, 2015 10-K, at 38, and that it was "seeing growth in renewable energy industries" which benefited GE's Renewables business, but that growth was "offset by the decline in the oil & gas industry," *id.* at 47.  The challenges in power demand were made explicit:  GE saw "soft demand in the North American electrical distribution market, slow economic recovery in Europe, and continued soft demand in other parts of the developed world."[25]  *E.g.*, *id.*  These disclosures encompass the very topics Plaintiffs claim GE was required to disclose and foreclose Plaintiffs' Item 303 claim based upon adverse power trends.  *See, e.g.*, *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 257 (S.D.N.Y. 2019) (rejecting Item 303 claim based on failure "to disclose the state of the Japanese regulatory environment" where public filings "described the regulatory changes underway in the Japanese market"); *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *14 (S.D.N.Y. Jan. 18, 2018) (rejecting claim where the "'trend' identified by Plaintiffs . . . was explicitly identified").

---

[25]     The MD&A section of each of GE's Class Period 10-Ks and 10-Qs also warned investors of GE's susceptibility to worsening energy market conditions, specifically disclosing for example that "reduced energy demand in [GE's] Power & Water business could affect [its] ability to fully recover [its] contract costs and estimated earnings," and that "[i]f slower growth in the global economy continues for a significant period or there is significant deterioration in the global economy, [GE's] results of operations, financial position and cash flows could be materially adversely affected."  Ex. 13, 2013 10-K, at 19; *see also, e.g.*, Ex. 19, 2014 10-K, at 114-15; Ex. 24, 2015 10-K, at 118; Ex. 33, 2016 10-K, at 123.

Even without these express disclosures, however, Plaintiffs' claims would still fail.  In support of Plaintiffs' Item 303 claims, they offer most of the same allegations as in the FAC, which the Court found insufficient under Plaintiffs' now-abandoned theory that GE improperly manipulated its LTSA accounting.  *E.g.*, *compare* ¶ 347 ("[F]rom 2010 into the Class Period, GE realized through its monitoring of customer utilization that usage of oil and gas turbines by customers was down 80-90%."), *with* FAC ¶ 254 (same); *compare* ¶ 356 (using a one-year, rather than a three-year, average would have a "negative impact on GE's global cumulative catch-up adjustments"), *with* FAC ¶ 259 (same); *compare* ¶ 340 (PricewaterhouseCoopers report stating that demand "declined in five of th[e] years" between 2005 and 2014), *and* ¶ 341 (Department of Energy statistics), *with* FAC ¶ 253 (same).  Those allegations are no more compelling when re-cast as Item 303 violations, as the 5AC pleads no facts establishing that any FE had a basis of knowledge for their statements,[26] or the existence of any particular portfolio-wide trend in utilization, let alone the actual or expected material financial impact of any such trend.[27]

---

[26]    For instance, the 5AC pleads no facts suggesting that FE-5—a European "Commercial Manager" who had nondescript "responsibilities" with respect to "thermal power generation plants" and "related LTSAs"—would know about utilization trends across GE's entire LTSA portfolio during the Class Period, particularly given that FE-5 left GE in 2013.  *See* ¶ 65; *see also* ECF No. 180, at 9-10.  Nor does the 5AC establish that FE-7—who was a "Risk Finance Leader" based in Milan, three reporting levels down from the CFO of the Power Generation Services subdivision of GE Power—was in a position to evaluate utilization trends outside of Europe, let alone across GE Power's global portfolio.  *See* ¶ 66.  Accordingly, the Court need not credit the allegations of these FEs.  *See In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *6 (S.D.N.Y. May 11, 2016) (rejecting claim where confidential witness "was not in a position to know whether the growth rate in that business segment was in decline").

[27]    For example, FE-5's statement—regarding a decline in customer utilization between 2010 and some later date "in[] the Class Period," *see* ¶ 347—says nothing about what specific impact that alleged decline had or was expected to have on GE's financials during the Class Period, failing even to specify what portion of the decline (if any) took place therein.  *See In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *18 (S.D.N.Y. Mar. 31, 2015) (rejecting Item 303 claim based on alleged deteriorating vendor relationships where complaint failed to plead any changes in vendor pricing or terms "in a non-conclusory manner"); *see also* ECF No. 180, at 10.

On top of these deficient allegations, the 5AC adds only more supposition and generalization by two other low-level former employees, FE-11 and FE-12.  FE-12's contention that "utilization rates were tracked in real time by sensors in all GE-serviced equipment" tells nothing about what the resulting data showed (and to whom) or whether there was a trend requiring disclosure.  ¶ 349; *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *6-7, *10-11 (S.D.N.Y. Mar. 26, 2019) (rejecting Item 303 claim where "witness statements relied upon" did not "support the assertions based upon them").  Similarly deficient are FE-11's allegations that "everyone knew" about the downturn in the global energy market.  ¶ 343.  The FEs cannot muster any allegations as to how much GE's customers' utilization declined in any given region, whether that regional decline had a material impact on Power's financials, how long that decline was sustained, whether or how long that lower utilization was expected to continue, or any other information from which the Court can infer a trend for purposes of Item 303.  Instead, the 5AC simply contends that reports showed that "the European market had gone to renewables" and "told the same story" on "the U.S. side," which is plainly insufficient.  ¶ 343.  *See, e.g.*, *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6-7 (S.D.N.Y. Mar. 29, 2016) ("generic allegations" that, "starting in late 2012, sales . . . were 'struggling,' 'underperform[ing],' 'forecasted to be down,' and 'smaller than expected'" failed to plead a trend requiring disclosure under Item 303).

Finally, Plaintiffs plead no facts that would establish that any Defendant recklessly disregarded the alleged known utilization trend.  Plaintiffs' contention that Defendants' recklessness can be inferred because of the "disparity between the actual run rates GE monitored

---

Likewise, FE-7's statement regarding modeling LTSA utilization on a one-year, as opposed to three-year, average of historical data—which does not even attempt to allege the actual financial impact thereof—fares no better, ¶ 356.  *See Johnson v. Sequans Commc'ns S.A.*, 2013 WL 214297, at *12 (S.D.N.Y. Jan. 17, 2013) (rejecting Item 303-equivalent claim where "[p]laintiffs [did] not plausibly allege[] that. . . the [relevant] industry was in steep decline" at the relevant time).

31

in real time and the expected future run rates, and the three-year average rates that GE chose to employ in quantifying and reporting its Contract Assets," ¶ 357; *see* ¶¶ 409-10, is nonsense.  As an initial matter, Plaintiffs concede that GE's three-year average incorporated the very same "real time" utilization data they now claim should have been disclosed, ¶¶ 356-57, "just not," as this Court recognized, "as quickly as Plaintiffs might have liked," Order at 38.  As such, even crediting FE-5's vague allegation that GE's internal data reflected that utilization "was down 80-90%" from "2010 into the Class Period," ¶ 347, it would mean that the entire alleged drop in utilization *was captured by and incorporated into* GE's LTSA contract asset balance.  ¶¶ 356-57.[28]  In other words, the fact that GE incorporated any alleged utilization declines it observed into its contract assets is wholly inconsistent with recklessness approaching conscious misconduct on the part of Defendants.  *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys v. UBS AG*, 752 F.3d 173, 186 & n.62 (2d Cir. 2014) (concluding that a company's disclosures about mortgage exposure "undercut the inference that defendants knew or recklessly disregarded" the risk of misleading investors about their risk management and overall exposure).  And of course, none of the FEs alleges that any Defendant ever actually saw—or even knew about—the vague "analyses" or "data" regarding utilization declines, which Plaintiffs allege would have been conveyed through levels of management to Defendants, ¶¶ 343, 347-50, 356; *see Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (rejecting credibility of confidential witnesses in part due to lack of allegations "that those sources ever had any contact with anyone at the [defendant company], much less with the Individual Defendants").[29]

---

[28]    Notwithstanding Defendants' invitation in briefing on the FAC, *see* Mot. 22, Plaintiffs have yet to articulate why the business decision to use a three-year utilization average to estimate future revenues on contracts that last as long as 25 years, *see* ¶ 328, is improper, let alone fraudulent.

[29]    For the same reasons that the 5AC fails to plead scienter, Plaintiffs also fail to plead any Defendant's actual knowledge of any such trends.  *Francesca's*, 2015 WL 1600464, at *17.

c.      *Plaintiffs' Item 303 Claim Based Upon Factoring of LTSA Receivables Fails*

Defendants respectfully submit that, notwithstanding the Court's prior Order, no Item 303 factoring claims should proceed.  As with its claims regarding LTSA modifications, the 5AC lacks even basic allegations regarding how many GE Power LTSAs were factored or for which customers, the specific terms or "negative consequences" of any such factoring arrangements, ¶ 398, or the actual or expected impact of factoring on GE's CFOA at any time, *cf.* Order at 43-44.  In lieu of any quantifiable factoring allegations, Plaintiffs rely on FE-9's statement, which the Court previously credited, that GE was factoring "everything" in its Power and Renewable Divisions.  Order at 44-46.  But FE-9's sweeping allegation does not withstand scrutiny.  As the 5AC makes clear, FE-9 did not even work in Power during the time period Plaintiffs claim GE was factoring Power receivables.  *See* ¶ 400 (asserting that FE-9 "was aware of factoring within the Power Division *while he worked in the Renewable Division* because Power and Renewable were under the same management umbrella with the same approval chain up until 2014 or 2015").  As a result, and based on his own allegations, FE-9 would not have been aware of Power's LTSA factoring after 2015, which is before another FE cited by Plaintiffs alleges factoring of Power LTSAs even had been conceived.  ¶¶ 394-95; *cf.* Order at 44-45.  Instead, at most (and by his own admission), FE-9 only was aware of factoring in GE's Renewable Energy segment—not Power—during the Class Period.  The Renewable Energy segment is not the subject of any of Plaintiffs' claims (for good reason).  *See* ¶¶ 20, 340, 343 (describing alleged decline in power market, and concurrent growth of renewable energy market).

Without FE-9's generalized allegation that GE was factoring "everything" in Power, Plaintiffs are left with factoring allegations attributed to FE-7, whom Plaintiffs note served as a paid "consultant for prior counsel." ¶ 66 n.4.  But FE-7 too only speaks generically about factoring

"as often as possible" and "negative consequences," ¶¶ 398, 401, without even attempting to demonstrate a "reasonably likely" (let alone material, and known to GE) impact that Power's factoring of LTSAs would have on GE's overall liquidity and financial condition. *See Rackspace Hosting, Inc.*, 2019 WL 452051, at *8 (dismissing Item 303 claim where plaintiffs failed to allege "anticipated magnitude" of undisclosed event against "the totality of [the company's] activity").

Appropriately discounting these allegations, as this Court should, reveals just how thin Plaintiffs' three pages of allegations regarding factoring in their 165-page 5AC are. ¶¶ 393-405. Plaintiffs repeat FE-9's vague allegation that Mr. Bornstein stated, at an internal meeting in June 2017, which FE-9 does not even claim he attended, that GE was "'in too deep' to depart from the practice" of factoring. ¶ 402. Not only is FE-9's allegation inconsistent with Plaintiffs' own theory that GE already was forced to "depart from the practice" of factoring by the end of 2016, *see* ¶ 401, Mr. Bornstein's alleged statement **in June 2017** says nothing about his state of mind with respect to alleged factoring-related issues prior to that date. Moreover, Plaintiffs cannot dispute that GE disclosed in the MD&A sections of its public filings not only that it factored current customer receivables, but the amount of CFOA that resulted from those transactions. *E.g.*, Ex. 33, 2016 10-K, at 87. And beginning with its Form 10-K for 2017, GE made additional disclosures surrounding the amounts of long-term receivables that it factored. *See* Ex. 43, 2017 10-K, at 80. Accordingly, Defendants respectfully maintain that the Court should dismiss Plaintiffs' factoring-based Item 303 claims.[30]

---

[30]    If Plaintiffs' factoring-based claims are the only ones to survive, Plaintiffs cannot proceed on a "corrective disclosure" theory of loss causation. Plaintiffs cannot rely on GE's purported "revelation" in its 2017 10-K that it engaged in factoring also to "manage short-term liquidity" to prove loss causation, ¶ 428, given that GE filed its 2017 10-K on February 23, 2018, Ex. 43, one month *after* the end of the Class Period on January 23, 2018. *See Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, *PLC*, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013) ("[R]evelation [that] occurred more than a month after the close of the proposed class period … cannot be a

Moreover, Plaintiffs' Item 303 claims as to 2015 factoring should be dismissed for the additional reason that inconsistencies in Plaintiffs' three-page narrative regarding GE Power's factoring LTSA receivables demonstrate that factoring was not a "trend" in 2015. Plaintiffs initially claim that GE "resorted to factoring" beginning "in 2015," ¶ 393, and FE-9 apparently claims he was aware that GE Power was factoring "everything" in "2014 or 2015," ¶ 400. But elsewhere in the 5AC, FE-7 claims that during the "first through third quarters of 2016" GE began its factoring program, ¶¶ 394-95, adding that "Kevin Weber" was hired "in early 2016 specifically to lead the global monetization effort," ¶ 403. The Court need not credit Plaintiffs' factoring theory if Plaintiffs cannot even articulate a coherent explanation of when they claim factoring was "widespread." ¶ 321. *See In re GeoPharma, Inc. Sec. Litig*., 411 F. Supp. 2d 434, 466 n.83 (S.D.N.Y. 2006) (illogical allegations do not raise a strong inference of scienter).

Finally, the Court's prior Order dismissed Plaintiffs' factoring-based Item 303 claims as to Messrs. Immelt, Sherin, and Laxer and Mmes. Miller and Hauser, *see* Order at 46, and noted that "there [we]re no allegations of widespread factoring prior to 2015" in the FAC, *id.* at 46 n.22. Nonetheless, Plaintiffs continue to allege without any factual foundation whatsoever that there were Item 303 violations by all Defendants collectively "throughout the Class Period beginning no later than the 2014 10-K, or in the Company's 10-Qs filed thereafter." *See, e.g.*, ¶ 425. Plaintiffs have provided no basis for revisiting the Court's prior ruling dismissing the factoring-based claims as to Messrs. Immelt, Sherin, and Laxer and Mmes. Miller and Hauser, as well as any alleged violations before 2015, and the Court should again dismiss those claims for the same reasons articulated in the Order. *See* Order at 46.

---

corrective disclosure sufficient to establish loss causation."). If these claims survive, Plaintiffs must proceed on some other loss causation theory.

2.    GE's Public Statements Regarding LTSA Contract Assets And Factoring
Were Not False Or Misleading

In addition to their Item 303 omission claims, Plaintiffs also bring claims based upon alleged misrepresentations by Defendants, *see* ¶¶ 322, 426-37—most of which were already challenged in the FAC, *see* Order 46-54; FAC ¶¶ 379, 381, 383, 385.  Plaintiffs no longer base their claims upon GE's Form 10-K disclosures regarding the manner in which GE's contract assets were determined, *see* Order at 47-49; *see also, e.g.*, FAC ¶¶ 370-76, or the impact of ASC 606, *see, e.g.*, FAC ¶¶ 377-78.  Rather, in the 5AC, Plaintiffs attack five statements—three of Mr. Bornstein's statements from early 2017, which Plaintiffs unsuccessfully challenged in connection with the FAC, one new statement from Mr. Bornstein that they challenge for the first time in the 5AC, and one statement that previously survived dismissal of the FAC.  Plaintiffs' claims all fail.

With respect to the three statements that this Court already found insufficient to sustain a claim—*i.e.*, Mr. Bornstein's remarks on GE's Q4 2016 earnings call, ¶¶ 429-31; FAC ¶ 381, at the February 22, 2017 Barclays Industrial Select Conference, ¶¶ 432-33; FAC ¶ 383, and on GE's Q1 2017 earnings call, ¶¶ 434-35; FAC ¶ 385—the 5AC does nothing to cure the deficiencies identified in the Order.  Order at 50-54.  In particular, Plaintiffs do not allege any new facts that would undermine any of the Court's findings that these accurate statements were not actionable.  Order at 50-51, 51 n.24, 53-54.  Each of these claims thus again should be dismissed.

In addition to statements they previously challenged in the FAC, Plaintiffs also attack other remarks by Mr. Bornstein on GE's Q1 2017 earnings call.  ¶¶ 436-37.  Specifically, Plaintiffs challenge Mr. Bornstein's statement regarding his "expect[ation]" that "service contracts where we've incurred cost and booked the revenue, but haven't yet billed the customer" would "partly come back over the year as we see higher asset utilization in Power and Aviation."  ¶ 436. Plaintiffs allege that these statements were false or misleading because "throughout the Class

Period, utilization of Power-serviced assets was drastically down."  ¶ 437 (citing ¶¶ 340-57).  But Mr. Bornstein's own "expect[ation]" as to what would happen in the future is plainly an opinion statement—one that Plaintiffs have not adequately alleged he disbelieved or did not rest on a meaningful inquiry.  *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 227 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Invest v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) (statements about "expected future profitability" were inactionable opinions).  And in any event, Mr. Bornstein's statement is also inactionable under the PSLRA safe harbor for forward looking statements:  the earnings conference call incorporated by reference cautionary language that "margins; cost structure and plans to reduce costs; . . . [and] cash flows, including the impact of working capital, contract assets and pension funding contributions" were "uncertain."  *See* Ex. 36, Q1 2017 Earnings Call Tr., at 1; Ex. 38, "Caution Concerning Forward Looking Statements" (Apr. 21, 2017), at 1; *In re Ferrellgas*, 2018 WL 2081859, at *12-13 (statement was "clearly forward-facing," given that it "project[ed] future results and incorporate[d] language, such as the words 'expect' and 'expectation,' that signal the statements' reference to future results").[31]

Finally, as to the one alleged misstatement claim this Court previously elected not to dismiss—that GE's Form 10-K for 2016 stated that GE engaged in factoring current receivables "[i]n order to manage credit exposure," ¶¶ 426-28; *see* Order at 51-53—Defendants respectfully submit that it should now be dismissed.  For the reasons discussed *supra* § I.B.2.c, the Court should not credit the contradictory allegations of FEs who cannot string together a coherent theory.

---

[31]     Moreover, as discussed, nowhere does the 5AC allege particularized facts of turbine customer utilization erosion at any particular point, let alone that "throughout the Class Period" utilization was "drastically down."  *See supra* § I.B.1.b.  Nor does it allege facts that would establish Mr. Bornstein's (or any other Defendant's) reckless disregard of any such alleged declines.

Plaintiffs do not allege particularized facts establishing that GE was "factoring to shore up its dwindling cash flow and mask the growing gap between contract assets and actual cash being generated," let alone that it was required to disclose the same.  Order at 52.  Notwithstanding the Order, Defendants respectfully disagree that a reasonable investor would be led to believe GE engaged in factoring *only* in order to "manage credit exposure," and draw the Court's attention to the rest of the relevant disclosure, which adds that GE sells receivables "in part to fund the growth of [its] industrial businesses."  *See* Ex. 33, 2016 10-K, at 87; *see also In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("statements are not misleading [where] they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring").  These deficiencies warrant the dismissal of Plaintiffs' LTSA claims.[32]

## II.     THE 5AC FAILS TO PLEAD A SECTION 20(A) CLAIM

In its Order, the Court dismissed all of Plaintiffs' Section 20(a) claims based on related dismissed primary violation claims.  Order at 55-56.  But, Plaintiffs' Section 20(a) claims based on the two primary violation factoring-related claims survived, on the basis that the parties had not sufficiently briefed those claims.  *Id*.  An actionable Section 20(a) claim requires a primary violation, control of the primary violator, and culpable participation in the controlled person's fraud.  *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  Here, Plaintiffs fail to plead any Individual Defendant's liability under Section 20(a).

*First*, Plaintiffs' Section 20(a) claims all fail because the 5AC does not plead a single primary violation.  *Second*, Plaintiffs raise nothing more than conclusory allegations regarding each Individual Defendant's purported control over GE, *e.g.*, ¶¶ 529-30, and fail to allege how the several Individual Defendants who worked at GE subsidiaries for the majority of the Class Period

_____

[32]     Plaintiffs repeat their SOX certifications allegations, ¶¶ 45, 46, 48, 49, 377-78, but add nothing new to their almost identical allegations that this Court previously rejected.  Order at 54.

could have "control[led]" GE for purposes of Section 20(a).  *See Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) (plaintiffs "must allege facts from which it can be inferred that the defendant had actual power or influence over the controlled person").  For example, Ms. Miller worked at GE Transportation for the majority of the Class Period, from 2015 to late 2017, ¶ 47; Mr. Sherin served as CEO of GE Capital from July 2013 to September 2016, ¶ 48; and Mr. Laxer worked at GE Capital throughout the entire Class Period, ¶ 50.[33]

*Third*, Plaintiffs fail to plead each Individual Defendant's "culpable participation."  The weight of authority in this Circuit requires Plaintiffs to plead "culpable participation" in any primary violation under Section 20(a), with the same particularity required to plead scienter, *see, e.g.*, *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) ("Section 20(a) liability requires an 'individualized determination ... of the defendant [control person's] particular culpability.'"); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (observing that "most courts have held that the PSLRA's heightened pleading requirements apply to the culpable participation element [and] that the plaintiff must 'plead with particularity facts giving rise to a strong inference' of the requisite state of mind," and dismissing Section 20(a) claims where plaintiff failed to plead recklessness with the particularity required by the PSLRA); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 2018 WL 1449206, at *8 (S.D.N.Y. March 23, 2018) (same).  Accordingly, to plead culpable participation, Plaintiffs must plead particularized facts of each Individual Defendant's conscious misbehavior or

---

[33]    Neither Mr. Sherin's signature on GE's 2012 10-K and Q1 2013 10-Q (both of which were dismissed with prejudice, Order at 15), nor Ms. Miller's signature on GE's 2012 10-K, show that either exercised control of GE during the entire Class Period.  An allegation of control also cannot extend past dates of employment, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 771 (S.D.N.Y. 2017), which precludes liability against Mr. Sherin for any primary violations that occurred after his departure in December 2016, ¶ 48, for Messrs. Immelt and Bornstein for any primary violations that occurred after their departures in October 2017, ¶¶ 45-46, and for Ms. Hauser for any primary violations that occurred prior to her joining GE in April 2013, ¶ 49.

recklessness; *i.e.*, facts indicating that the controlling person "knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Special Situations*, 33 F. Supp. 3d at 438-39 (dismissing Section 20(a) claim based on "a detailed allegation of involvement" because it did not "amount to an allegation of conscious behavior" sufficient to plead culpable participation). The 5AC contains no such allegations.

As discussed *supra* §§ I.A-B, the 5AC, like the FAC, does not allege *any* factual basis to show that any Defendant knew (or was guilty of conscious misconduct or recklessness in not knowing) of any alleged fraud related to GE's LTC reinsurance or Power LTSA businesses. Alleging that a Defendant signed public filings with misleading statements is not sufficient to plead culpable participation. *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 256 (S.D.N.Y. 2018). Nor is it "proper to infer a defendant's awareness of information that contradicts public statements 'solely because of his corporate position.'" *In re Inv. Tech.*, 2018 WL 1449206, at *8. And for the two factoring claims that survived previously, to the extent they survive in the 5AC, Plaintiffs make no attempt to allege any Individual Defendant knew or should have known of any fraudulent conduct involving factoring. With respect to Mr. Bornstein, for the reasons described *supra* § I.B.1.c, FE-9's vague recollection of his alleged June 2017 "'in too deep' to depart from the practice of" factoring statement, ¶ 402, does not give rise to a strong inference of scienter, and thus, does not adequately plead his culpable participation.

## CONCLUSION

The 5AC states no claim under the stringent pleading requirements of Rule 9(b) and the PSLRA. It should be dismissed with prejudice.

Dated: New York, New York
        December 18, 2019

Respectfully submitted,

LATHAM & WATKINS LLP

By:   /s/ Miles N. Ruthberg
      Miles N. Ruthberg
      Blake T. Denton
      885 Third Avenue
      New York, New York 10022
      (212) 906-1200
      miles.ruthberg@lw.com
      blake.denton@lw.com

      Sean M. Berkowitz (*pro hac vice*)
      330 North Wabash Avenue, Suite 2800
      Chicago, Illinois 60611
      (312) 876-7700
      sean.berkowitz@lw.com

      William J. Trach (*pro hac vice*)
      200 Clarendon Street
      Boston, Massachusetts 02116
      (617) 948-6000
      william.trach@lw.com

      Sarah A. Tomkowiak (*pro hac vice*)
      555 Eleventh Street NW
      Washington, D.C. 20004
      (202) 637-2200
      sarah.tomkowiak@lw.com

      *Attorneys for Defendants General Electric*
      *Company, Jeffrey R. Immelt, Jeffrey S.*
      *Bornstein, Jamie Miller, Keith S. Sherin,*
      *Jan R. Hauser, and Richard A. Laxer*