# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SJUNDE AP-FONDEN and THE
CLEVELAND BAKERS AND TEAMSTERS
PENSION FUND, individually and on behalf
of all others similarly situated,

            Plaintiffs,

        v.

GENERAL ELECTRIC COMPANY,
JEFFREY R. IMMELT, JEFFREY S.
BORNSTEIN, JAMIE MILLER, KEITH S.
SHERIN, JAN R. HAUSER, and RICHARD
A. LAXER,

            Defendants.

Case No. 1:17-cv-8457-JMF

Hon. Jesse M. Furman

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIFTH AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................1

II.   SECTION 10(b) LIABILITY BASED ON VIOLATIONS OF ITEM 303 ...........2

III.  PLAINTIFFS' LONG-TERM CARE INSURANCE CLAIMS...........................3

    A.    Background Facts Regarding GE's LTC Exposures ................................3

    B.    Defendants Concealed Known LTC Trends, Commitments, and
Uncertainties in Violation of Item 303 and Section 10(b)...........................6

        1.    Defendants Omitted LTC Trends, Commitments, and
Uncertainties that Were Reasonably Likely to Have a Material
Impact on GE's Financial Condition ..............................................6

        2.    Defendants Knew of the Material LTC Trends and Were at
Least Reckless in Failing to Disclose Them.................................10

            a.    GE's Premium Deficiency Test Results Do Not Negate
the Inference of Defendants' Scienter..............................14

            b.    GE's Belated Disclosures Do Not Undermine the
Inference of Defendants' Scienter ...................................15

    C.    Defendants Omitted GE's LTC Liabilities from the MD&A Table in
Violation of Item 303(a)(5) and Section 10(b) ......................................16

        1.    Defendants Removed GE's LTC Obligations from the MD&A
Table in Violation of Item 303(a)(5) ..........................................16

        2.    Defendants Were at Least Reckless in Omitting GE's LTC
Liabilities from the MD&A Table ...............................................19

    D.    Defendants Made Actionable Misstatements Regarding GE's LTC
Exposures.......................................................................................20

IV.  PLAINTIFFS' POWER CLAIMS..................................................22

    A.    Background Facts Regarding Power and Its LTSAs ..............................22

    B.    Defendants Concealed Known LTSA Trends in Violation of Item 303
and Section 10(b)...........................................................................25

        1.    Declining Utilization Rates of GE-Serviced Power Equipment................25

            a.    Declining Utilization Rates Were Reasonably Likely to
Have a Material Impact on GE's Financial Condition
and Liquidity..................................................................25

            b.    Defendants Knew of Declining Utilization Rates and
Were at Least Reckless in Failing to Disclose Them ..................28

i

2.      GE's Reliance on LTSA Modifications to Increase Power's
        Revenues .......................................................................................................30

        a.      GE's Reliance on Renegotiating LTSAs to Drive
                Cumulative Catch-Up Revenues Was Reasonably
                Likely to Have a Material Impact on GE's Financial
                Position and Liquidity ....................................................................30

        b.      Defendants Knew of GE's Reliance on LTSA
                Modifications and Were at Least Reckless in Failing to
                Disclose It .....................................................................................33

3.      GE's Reliance on Factoring to Conceal Power's Liquidity
        Issues ............................................................................................................35

        a.      GE's Reliance on Factoring Was Reasonably Likely to
                Have a Material Impact on GE's Financial Condition
                and Liquidity ..................................................................................35

        b.      Defendants Knew of GE's Reliance on Factoring and
                Were at Least Reckless in Failing to Disclose It ...........................36

4.      Defendants Made Actionable Misstatements Regarding GE's
        LTSAs ...........................................................................................................37

V.      THE COMPLAINT PLEADS A SECTION 20(a) CLAIM ...............................39

VI.     CONCLUSION....................................................................................................40

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)......................................................................................12

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005).......................................................................21

*Ark. Teacher Ret. Sys. v. Bankrate, Inc.*,
18 F. Supp. 3d 482 (S.D.N.Y. 2014).........................................................................13

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017).......................................................................39

*In re CannaVest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018).......................................................................40

*Christine Asia Co., Ltd. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) ..........................................................................19, 35

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
2020 WL 248729 (S.D.N.Y. Jan. 15, 2020) .............................................................39

*Contant v. Bank of Am. Corp.*,
2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018) ...........................................................18

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ......................................................28-29

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011).....................................................................................17

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)..............................................27, 30, 31-32

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) .............................................................13

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ...................................................................................19

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................13

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)........................................................11, 29, 34

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)........................................................................17

*Highland Capital Mgmt., L.P. v. Schneider*,
  379 F. Supp. 2d 461 (S.D.N.Y. 2005)........................................................19

*In re HP Sec. Litig.*,
  2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) ...........................................21

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)........................................................11, 16, 19, 29

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010)........................................................................37

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)........................................... 8, 27, 32-33, 37

*Lopez v. CTPartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)..................................................... 27-28

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*,
  797 F.3d 160 (S.D.N.Y. 2015)....................................................................13

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014)...........................................................15

*McKenna v. SMART Techs. Inc.*,
  2012 WL 3589655 (S.D.N.Y. Aug. 21, 2012) ...........................................11, 12, 27

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)..........................................................22

*New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ..............................................................11, 34, 37

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...................................................................12, 33

*In re NYSE Specialists Sec. Litig.*,
  503 F.3d 89 (2d Cir. 2007)..........................................................................19

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)...................................................14, 16, 34

*Omnicare, Inc. v. Laborers Dist. Council Constr. Industr. Pension Fund*,
  575 U.S. 175 (2015)............................................................................................8

*Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  2019 WL 4674839 (D. Conn. Sept. 25 2019)..................................................22

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)...........................................................26-27, 32, 35

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016)....................................................21

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) .........................................................................8

*In re Platinum & Palladium Antitrust Litig.*,
  2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .................................................19

*In re Ply Gem Holdings, Inc.*,
  2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016)............................................28, 32

*In re Sadia, S.A. Sec. Litig.*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009)...............................................................16

*In re Salix Pharm.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)...................................................29

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)...............................................................................11

*SEC v. Woodruff*,
  778 F. Supp. 2d. 1073 (D. Colo. 2011) ............................................................13

*Sgarlata v. PayPal Holdings, Inc.*,
  409 F. Supp. 3d 846 (N.D. Cal. Sept. 18, 2019) .............................................19

*Shah v. Zimmer Biomet Holdings, Inc.*,
  348 F. Supp. 3d 821 (N.D. Ind. 2018) ...........................................................7-8

*Speakes v. Taro Pharm. Indus., Ltd.*,
  2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)............................................18-19

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)....................................................................2, 8, 9, 30

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)..............................................................................11

v

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................37

*In re Tronox, Inc. Sec. Litig.*,
    769 F. Supp. 2d 202 (S.D.N.Y. 2011).......................................................................39

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) .......................................................................37

*In re VEON Ltd. Sec. Litig.*,
    2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)..........................................................11

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)......................................................................................21

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................................ 39-40

## Other Authorities

17 C.F.R. § 229.303(a)(1) .............................................................................................. 2-3

17 C.F.R. § 229.303(a)(3) ...................................................................................................3

17 C.F.R. § 229.303(a)(5) ...................................................................................................3

17 C.F.R. § 229.303(a), Instruction 3 ...........................................................................3, 14

SEC Div. of Corp. Fin. Reporting Manual § 9240.7 ..........................................................3

SEC Release No. 33-9144, 2010 WL 3615543 (Sept. 17, 2010) .......................................3

## I.      PRELIMINARY STATEMENT

Plaintiffs' Fifth Amended Class Action Complaint (ECF No. 191, the "Complaint")[1] addresses each of the deficiencies the Court identified in its August 29, 2019 Order (ECF No. 185, the "Order") dismissing Plaintiffs' LTC insurance claims. While the Court previously concluded that Plaintiffs had not satisfied the *Omnicare* pleading standard in alleging that GE's LTC reserve figures were misstated under GAAP, this Complaint does not assert such claims, rendering *Omnicare* inapplicable. Instead, Plaintiffs primarily allege that Defendants failed to disclose known LTC-related trends, uncertainties, and commitments that were likely to impact GE's financial condition, in violation of Item 303 and Section 10(b). The Complaint augments these claims with new factual allegations establishing that the "brewing storm in [GE's] LTC portfolio" (Order at 27) had materialized *years* before GE first publicly hinted at a large LTC exposure in the summer of 2017, and before GE finally revealed its astounding magnitude in January 2018.

The inference of Defendants' scienter has also been significantly strengthened, including through detailed factual allegations from a well-placed former employee confirming that ***Immelt***, ***Bornstein***, and other senior GE executives ***were made aware*** of this "brewing storm"—in the form of annual claims experience data presented to them in PowerPoint format—and the continuing risks it posed to GE's financial condition. The Complaint also negates any non-fraudulent inference that could be drawn from GE's premium deficiency tests. In addition, the Complaint clarifies that investors could not have discovered the truth about GE's massive LTC risks from the MD&A Table or Note 11 of GE's Forms 10-K.

Plaintiffs have also refined their GE Power ("Power") claims to address the Court's

---

[1] Unless otherwise noted herein, all capitalized terms shall have the definitions ascribed to them in the Complaint, all internal quotation marks and citations are omitted, and all emphasis is added.

concerns. The Complaint no longer asserts that GE's reported Contract Asset amounts were false and misleading, focusing instead on Defendants' omission of material LTSA trends in violation of Item 303. Plaintiffs further explain how these undisclosed trends led to GE's undisclosed factoring scheme, which the Court previously found supported an actionable Item 303 violation.

Rather than address the merits of *this* Complaint, Defendants' motion attempts to refashion Plaintiffs' claims to fit them within the Order. For example, despite recognizing that the Complaint does not challenge GE's reported reserve figures, Defendants repeatedly contend that the Complaint's LTC claims fail because they do not "establish[] that GE's LTC reserves were subjectively false" under *Omnicare*. Elsewhere, Defendants rewrite the plain language of their public disclosures in an effort to rebut Plaintiffs' Item 303 claims. They contend, for example, that GE's Forms 10-K had "expressly described" a life insurance benefits line item as including GE's retained LTC portfolio even though it did no such thing. Similarly, they argue that GE made "explicit" disclosures of a precipitous decline in Power utilization rates when, in fact, they had disclosed only a modest decline in demand for new turbines—not the *80% to 90% decline* in utilization rates for *existing* GE-serviced turbines that was eviscerating its LTSA portfolio.

Viewed through the lens of Plaintiffs' present Item 303 claims, which concern the obligation to disclose risks to GE's financial condition and liquidity, Defendants' efforts to re-litigate the allegations of a prior complaint and imbue generalized "disclosures" with specific meanings that they never had, fall short. Their motion should be denied.

## II.     SECTION 10(b) LIABILITY BASED ON VIOLATIONS OF ITEM 303

In the Second Circuit, the failure to disclose information required by Item 303 of Regulation S-K "can serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). Item 303 requires the disclosure of "known trends[,] . . . demands, commitments, events or uncertainties" that are "reasonably likely

to result in the registrant's liquidity decreasing in a material way" (17 C.F.R. § 229.303(a)(1)), or that the registrant "reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from continuing operations" (17 C.F.R. § 229.303(a)(3)). Item 303 disclosures must "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a), Instruction 3.

Item 303(a)(5) requires companies to set forth *all* known contractual obligations—including LTC insurance liabilities—in tabular form in the MD&A section of GE's Forms 10-K. 17 C.F.R. § 229.303(a)(5). If any contractual obligations are excluded from this table (the "MD&A Table"), the "accompanying footnotes should describe the nature of items excluded and *why* they are excluded." SEC Div. of Corp. Fin. Reporting Manual § 9240.7. Where a contractual obligation is linked to a financial statement line item, companies must provide sufficient information to allow investors to "tie" the figures in the MD&A Table to the financial statement disclosure. SEC Release No. 33-9144, 2010 WL 3615543, at *5 n.17 (Sept. 17, 2010).

## III.   PLAINTIFFS' LONG-TERM CARE INSURANCE CLAIMS

### A.   Background Facts Regarding GE's LTC Exposures

Throughout the Class Period, GE reinsured over 300,000 LTC policies. ¶ 81. The Society of Actuaries has described LTC policies as being among the "riskiest insurance policies sold." ¶ 95. LTC's uniquely risky profile owes partly to its complexity, as LTC pricing and profitability depend on more variables than other insurance products, including morbidity rates, mortality rates, lapse rates, and interest rates. ¶¶ 90, 95-106. These risks were exacerbated by rising health care costs and the fact that most LTC policies, including those reinsured by GE, were priced using variables that vastly understated insurers' future liabilities. *Id*. As these heightened risks became apparent in the early 2000s, insurers—including GE—sought to exit the LTC market entirely. ¶ 87.

GE's LTC portfolio was particularly toxic because, unlike other insurers' exposures, a large number of GE's policies included features that increased the risk that GE would have to pay higher claim costs—and for longer periods of time—than it would under standard LTC policies. These features, which GE disclosed for the first time in March 2019, included: (i) inflation protection, which protected policyholders—*at GE's expense*—from the rising cost of health care; (ii) joint lives coverage, where a single policy insured *multiple persons*; (iii) lifetime benefits, meaning there was *no limit* for how long a policyholder could be "on claim"; and (iv) payment options that provided coverage *even after* policyholders ceased paying premiums. *See* ¶¶ 116-22. GE's risks were further compounded by its inability as a reinsurer to unilaterally seek premium increases to offset its rising claims costs. ¶ 101.

Due to the extreme toxicity of its LTC exposures, GE was unsuccessful in multiple attempts to divest them. In 2003, GE's investment bankers told the Company that its Genworth spin-off *would fail* if the LTC blocks remained in the deal, forcing GE to retain its exposure to those blocks by agreeing to reinsure them. ¶ 111. Publicly, however, Immelt assured investors that GE had retained only a "very stable run off block" of insurance. ¶ 110. Swiss Re similarly rejected GE's LTC exposures when it purchased GE's remaining insurance businesses in 2005. ¶¶ 113-15.

By the start of the Class Period, Defendants had already witnessed adverse trends emerge within GE's LTC portfolio, which persisted—and, in fact, worsened—throughout the Class Period. UFLIC's actual claims experience was consistently—and significantly—worse than expected, with far more "lives inforce" than anticipated (meaning fewer policies were lapsing) and claims costs that were 35% to 62% higher than forecast. ¶¶ 136, 139-43.[2] Meanwhile, UFLIC's LTC reserves rapidly decreased relative to its growing LTC liabilities. ¶¶ 144-46. ERAC's claims

---

[2] Industry analysts consider claims rates just 16% higher than expected to be "alarming." ¶ 140.

experience was equally bad, if not worse, in part because it reinsured even riskier policies. ¶¶ 147, 207.[3] Moreover, because GE reinsured a "younger" block of LTC policies, its liabilities would continue to increase as its insureds began to reach their "prime" claims-making ages. ¶ 154. These adverse developments presented massive financial and liquidity risks to GE and were exacerbated by GE's use of *original* pricing assumptions—which were inconsistent with GE's actual claims experience—to calculate its GAAP reserves. ¶¶ 157-61.

Defendants have admitted that GE reviewed its LTC portfolio—including actual claims data—and thus knew of the risk it posed to GE's financial condition and liquidity. ¶¶ 126-30, 156. Further, according to FE-2, Immelt, Bornstein and other senior executives received a PowerPoint presentation every year of the Class Period that: (i) quantified ERAC's and UFLIC's quickly worsening claims experience, the rising LTC claims, declining termination rates, and the impact of interest rates on GE's premium investments (¶¶ 131-34); and (ii) included a timeline of GE's insurance reserves showing a "hump" where reserves were expected to peak in the future, reflecting that the worst was yet to come and that GE's reserves would need to be increased (¶ 132).

Moreover, through its participation in industry trade groups, LTC conferences, and LTC-related pricing studies, GE understood the general negative trends within the LTC industry, including inaccurate LTC pricing assumptions and the resulting need for many of GE's peers—whose portfolios were less risky than GE's—to record massive reserve charges. ¶¶ 162-86.

GE disclosed *none* of these trends, commitments, or uncertainties in its Class Period SEC filings. ¶¶ 216-57. Instead, Defendants assured investors that GE's insurance risks were trending in the opposite direction, purportedly because GE had sold its toxic insurance exposures "before

---

[3] For example, 34% of ERAC's policies provide joint lives coverage (0% for UFLIC). ¶¶ 117, 147. Further, 70% of ERAC's policies offer lifetime benefits (35% for UFLIC). ¶ 147.

the storm" and its "portfolio quality remain[ed] stable." ¶¶ 259-65. Defendants reinforced this perception by *removing* LTC liabilities from GE's MD&A disclosure of GE's insurance liabilities.

GE first revealed the existence of a negative trend in its LTC claims experience to investors in July 2017, when it disclosed that it was reassessing its LTC reserves. ¶ 297. On October 20, 2017, GE revealed that approximately half of its total insurance reserve—*over $12 billion*—was related to LTC exposures. ¶ 298. Ultimately, in January 2018, GE disclosed a *$9 billion LTC reserve increase* and a commitment to contribute an additional *$15 billion* in capital to its insurance subsidiaries over the next seven years. ¶ 300. Finally, on January 24, 2018, GE disclosed that the SEC was investigating its LTC reserve charge. ¶ 301.

### B. Defendants Concealed Known LTC Trends, Commitments, and Uncertainties in Violation of Item 303 and Section 10(b)

#### 1. Defendants Omitted LTC Trends, Commitments, and Uncertainties that Were Reasonably Likely to Have a Material Impact on GE's Financial Condition

Plaintiffs allege specific undisclosed trends, commitments, and uncertainties that existed within GE's LTC portfolio during the Class Period. These include: (i) GE's **commitment** to fund LTC claims on over 300,000 of the riskiest LTC policies in the industry; (ii) the **trend** of negative claims experience and rising claim costs occurring in the industry due to declining mortality, lapse, and interest rates, and increasing morbidity, which led many of GE's peers to record massive LTC-related reserve charges; (iii) the **trend** of persistently negative and worsening claims experience within GE's own LTC portfolio and the growing disparity between GE's actual experience and the assumptions it was using to set, and assess the adequacy of, its LTC reserves; and (iv) the **uncertainties** relating to GE's inability to unilaterally offset its mounting claims costs with premium increases. ¶ 228. Plaintiffs have further alleged that these trends, commitments, and

uncertainties were known to Defendants, reasonably likely to materially impact GE's financial results and liquidity, and thus required to be disclosed under Item 303 and Section 10(b).

*First*, Plaintiffs allege with particularity that GE had in fact retained over 300,000 unusually risky LTC policies that were burning a hole in its balance sheet. ¶¶ 110, 113, 150. Plaintiffs identify the specific (newly-disclosed) features that rendered GE's LTC policies among the riskiest in the industry, including inflation protection, joint lives coverage, and lifetime benefits. ¶¶ 116-22. Plaintiffs also allege that, each year of the Class Period, GE incurred significantly more claims than expected and had far more "lives inforce" than expected, that its LTC reserves severely declined as a percentage of its expected claims costs, and that these trends worsened as the Class Period progressed. ¶¶ 135-48.[4] Plaintiffs also identify negative LTC industry trends, and explain that declining mortality, lapse, and interest rates, coupled with rising morbidity and health care costs, rendered LTC insurance far riskier than initially thought and subjected LTC reinsurers—including GE—to increased financial and liquidity risks. ¶¶ 162-86.

*Second*, the Complaint adequately alleges that these trends, commitments, and uncertainties were reasonably likely to materially impact GE's financial condition and liquidity. Plaintiffs allege that GE's: (i) LTC claims experience trends; (ii) calculation of reserves using assumptions that were inconsistent with its own claims experience; (iii) retention of "younger" and riskier blocks (which meant that its highest claim-paying years were still to come); and (iv) inability to increase premiums, created the risk of a seismic reserve deficiency and portended the $9 billion dollar charge announced in January 2018. *See, e.g.*, ¶¶ 135-48, 154, 157-61, 178-86, 193-212, 231; *Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 837-38 (N.D. Ind.

---

[4] In 2016 alone, UFLIC incurred **62.5% more** LTC claims than expected and set aside **less than one-quarter** of the reserves needed to pay its LTC claims. ¶¶ 139, 145.

2018) (describing reasonably likely standard under Item 303 as requiring "more than a remote possibility but . . . less than more-likely-than-not").

Defendants' failure to disclose these known trends, commitments, and uncertainties—and their reasonably likely impact on GE—constitutes a violation of Section 10(b) because "a reasonable investor would interpret the absence of an Item 303 disclosure [regarding LTC] to imply the nonexistence" of any material LTC-related trends or risks. *Stratte-McClure*, 776 F.3d at 104 (finding Item 303 breach where company failed to disclose deteriorating market conditions "that, in light of the company's exposure to the market, was likely to cause trading losses that would materially affect the company's financial condition"); *see also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 712 (2d Cir. 2011) (failure to disclose trend of declining real estate market and risks it posed to company's financial condition actionable under securities laws).

Defendants do not dispute that these trends, commitments and uncertainties existed and were reasonably likely to have a material impact on GE's financial condition and liquidity, nor do they claim to have fully disclosed any of them to investors.[5] Instead, Defendants argue that Plaintiffs fail to meet the pleading standard for opinion statements set forth in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). *See, e.g.*, ECF No. 196 ("MTD") at 13-14, 16-17.[6] But the Complaint challenges no such opinion statements. While the Court previously held that GE's GAAP LTC reserve figures "are to be analyzed as opinions" (Order at 20), the Complaint **no longer pleads** those figures as actionable misstatements—as Defendants concede elsewhere in their brief (*see* MTD at 13 n.11). Rather,

---

[5] Defendants themselves claim that these negative trends and risks rendered GE's LTC liabilities no longer "reasonably determinable" as of the start of the Class Period. ¶ 282; MTD at 11 n.6.

[6] To the extent the chart Defendants filed with their motion (ECF No. 195-3) contains arguments beyond those in their brief, they are waived. *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) ("Issues not sufficiently argued in the briefs are considered waived[.]").

Plaintiffs' claims primarily concern Defendants' ***omission of known facts*** in violation of Item 303, and thus do not implicate *Omnicare*.

Equally unavailing is Defendants' assertion that they had no duty to disclose these material LTC trends within the "Significant Trends & Developments" section of GE's Forms 10-Q. MTD at 22-23. "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose." Order at 32 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016)). Here, by choosing to disclose to investors the significant trends that existed within GE's business—including those likely to cause GE to incur excess costs (*see* ECF No. 195-28 at 33)—Defendants assumed a duty to identify all such trends, ***including those within GE's LTC portfolio***. Order at 32; *cf. Stratte-McClure*, 776 F.3d at 101.[7] Defendants' failure to do so rendered GE's "Significant Trends & Developments" disclosures materially misleading. *Id.*

Defendants' attack on GE's claims experience data alleged in the Complaint—the accuracy of which they do not dispute—also misses the mark. MTD at 14-19, 21-22. In particular, Defendants wrongly assert that this claims experience data "says nothing about GE's other reinsurance subsidiary, ERAC." *Id*. at 15. In fact, it speaks volumes about ERAC, which (i) insured riskier policies than UFLIC (¶¶ 117, 147) and (ii) booked ***greater*** absolute and percentage reserve increases than UFLIC in 2018 (¶ 207), thus indicating that ERAC's claims experience and reserve

---

[7] Later in the Class Period, Defendants tacitly recognized this duty by making affirmative—albeit incomplete—disclosures about GE's LTC portfolio within this discussion. *See* ¶¶ 235, 237. And while Defendants wrongly contend that the Complaint fails to allege that their Q2 2017 and Q3 2017 disclosures were misleading (MTD at 23), the Complaint asserts that Defendants failed to disclose ***all*** of the material LTC-related trends of which they were aware, including the fact that this "elevated claim experience" began ***long before*** GE's first disclosure in 2017. *See* ¶¶ 235-38.

assumptions were just as bad—*if not worse*—than UFLIC's throughout the Class Period.[8]

Moreover, while Defendants argue that GE's claims experience data should be disregarded

because it is based on statutory, not GAAP, reserves and assumptions (MTD at 16), they do not—

and cannot—dispute the Complaint's allegation that GE's GAAP assumptions were *even more*

*aggressive* than its statutory assumptions. ¶ 194; *see also* ECF No. 195-44 at 5 (confirming that

GE calculates statutory reserves "under *moderately adverse* conditions"). This means that GE's

GAAP reserves and assumptions were *even more* out of step with GE's actual claims data than the

statutory reserves and assumptions, creating *additional* financial uncertainties that should have

been disclosed to investors.

### 2.     Defendants Knew of the Material LTC Trends and Were at Least Reckless in Failing to Disclose Them

Plaintiffs amply allege that Defendants knew of the trends plaguing GE's LTC portfolio

and were thus "at least consciously reckless regarding whether their failure to provide adequate

Item 303 disclosures . . . would mislead investors about material facts." Order at 45 (quoting

*Stratte-McClure*, 776 F.3d at 106 (ellipsis in original)). *First*, the Complaint alleges that

***Defendants Immelt and Bornstein personally reviewed GE's deteriorating LTC claims data***

***throughout the Class Period***. These new allegations detail how Immelt and other senior GE

executives received an annual PowerPoint presentation that compiled GE claims experience data,

including: (i) the level of claims and how they were building over time; (ii) projected reserves;

(iii) historical termination rates; and (iv) interest rates, current investment assets, and earnings.

---

[8] Defendants contend that ERAC's reserve increase was larger than UFLIC's because it insured more policies (MTD at 15 n.13), but that does not explain why ERAC's reserve increase was larger *on a percentage basis*. ¶¶ 147, 207. Rather, the larger percentage increase indicates that ERAC's portfolio had deteriorated *more significantly* than UFLIC's portfolio.

¶ 131. The PowerPoint presentation also included a "hump" showing that GE *expected* that its LTC reserves would need to be increased in order to satisfy its ballooning LTC obligations. ¶ 132.

Because the PowerPoints identified for Immelt, Bornstein, and other GE executives: (i) *the precise trends* that were concealed from investors; and (ii) *their expected impact* on GE's LTC reserves, they raise a strong inference of scienter. *See New Orleans Emps.' Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (particularity requirement met where plaintiffs alleged "how frequently" spreadsheets were prepared, "who reviewed them, and the issues they addressed"); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (strong inference of "at least a reckless disregard of a known or obvious duty to disclose" when defendants omit material information in their possession required by Item 303); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (same); *Galestan v. OneMain Holdings*, *Inc.*, 348 F. Supp. 3d 282, 300 (S.D.N.Y. 2018) (scienter adequately pled where former employee alleged defendants' exposure to negative internal information through "specific reports that were circulated during the Class Period"); *McKenna v. SMART Techs. Inc.*, 2012 WL 3589655, at *5 (S.D.N.Y. Aug. 21, 2012) (scienter inferred where former employee stated that defendants received internal reports containing "information contrary to the picture" portrayed in public statements).[9]

---

[9] Immelt's and Bornstein's scienter is imputed to GE. *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("[T]he most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."). Plaintiffs allege that additional GE executives received this PowerPoint—including Dale Filsinger (ERAC's CRO), Ronald Peters (President of ERAC and UFLIC), and Ryan Zanin (GE Capital's CRO)—and that other senior actuaries and executives reviewed claims experience data and signed ERAC and UFLIC annual statutory filings. ¶¶ 126-34, 186. The scienter of these non-defendant executives is likewise imputed to GE. *See Dynex*, 531 F.3d at 195 ("[I]t is [also] possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."); *In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *10 n.3 (S.D.N.Y. Sept. 19, 2017) (same).

Defendants' efforts to discredit these well-pled allegations fail. For example, Defendants' assertion that FE-2 "baselessly speculates" that Immelt and Bornstein received the PowerPoint presentation each year (MTD at 19) is squarely contradicted by the Complaint. Because FE-2 "was responsible for confirming . . . that the PowerPoint presentation was provided to senior GE executives each year" (¶ 134), FE-2 was undoubtedly "in [a] position" to "possess the information alleged," including FE-2's unequivocal assertion that these executives "***without a doubt***" received the PowerPoint each year. *Id.*; *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *McKenna*, 2012 WL 3589655, at *5 (crediting former employee allegations where complaint explains "why those employees would have access to the information" and "identifies the reports containing the information contrary to the picture" portrayed publicly). Defendants' suggestion that the PowerPoints did not "contain[] negative claims experience" data is equally unsupported (MTD at 19), as the Complaint alleges that the PowerPoints contained ***actual experience data***, including "the level of claims and how they were building over time," and shows that GE's claims experience was ***profoundly negative***—and ***worsening***—throughout the Class Period. ¶¶ 131, 135-48.[10]

*Second*, the inference of Defendants' scienter is strengthened by Plaintiffs' allegation that, instead of disclosing these known LTC-related trends to investors, Defendants attempted to

---

[10] Defendants' remaining attacks are easily rejected, as they again wrongly presume that Plaintiffs allege GE's LTC reserves as actionable misstatements. *See* MTD at 20 (arguing that Complaint fails to show that they: (i) "did not believe[] their LTC reserve statements were true" (alteration in original); (ii) "failed to undertake a 'meaningful factual inquiry' into [GE's] reserves"; (iii) "lacked 'any reasonable basis in fact' for their estimates"; or (iv) "disbelieve[d] their stated opinions"). It is equally irrelevant whether: (i) Defendants "withheld [data] from GE's actuaries" or KPMG; (ii) the "hump" showed "that GE's reserves were inadequate at any time"; or (iii) KPMG and the Federal Reserve signed off on GE's reported LTC reserves. MTD at 18, 20, and n.14. Defendants' reliance on KPMG's "clean audit opinion[s]" (MTD at 18 n.14) is also misplaced, as Plaintiffs' claims concern Defendants' omission of material facts from the MD&A sections of GE's Forms 10-K***, which are not covered by KPMG's opinions***. *See, e.g.*, *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (rejecting argument that audit negates inference of scienter).

conceal them by: (i) *altering GE's disclosure practices*; and (ii) *affirmatively misleading* investors about GE's LTC exposures. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 199 (S.D.N.Y. 2010) ("reassurances to investors . . . regarding the key issues in [the] case" are sufficient to plead scienter); *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *15 (S.D.N.Y. Jan. 20, 2015) (actions taken to "conceal negative financial prospects" in public filings supported scienter); *SEC v. Woodruff*, 778 F. Supp. 2d. 1073, 1089 (D. Colo. 2011) (unexplained change in financial reporting gave rise to inference of scienter).

*Third*, the Complaint bolsters the inference of scienter by alleging that Defendants: (i) were aware of the massive size of GE's LTC exposure and its highly risky nature (¶¶ 149-55); (ii) admitted that GE reviewed its LTC portfolio annually throughout the Class Period (¶ 156); (iii) had attempted to calculate GE's LTC-related obligations at the start of the Class Period but could *no longer reasonably determine* them (MTD at 11 n.6); (iv) knew that GE continued to use its *original* (and outdated) pricing assumptions to set and assess its GAAP reserves (¶¶ 157-61, 187-215); and (v) knew of negative industry-wide LTC trends (including the fact that the original assumptions used to price LTC policies *vastly understated* their risks), the deleterious financial impact that these trends were having on other LTC insurers, and the fact that GE's LTC portfolio was performing *just as poorly* as those other insurers' exposures (¶¶ 162-86). *See Ark. Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 486 (S.D.N.Y. 2014) (scienter supported by defendants' awareness of "widespread" industry problems impacting company); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*, 797 F.3d 160, 180 (2d Cir. 2015) (inferring scienter based on awareness of "broader conditions in the market").

Defendants contend that this strong inference of scienter is negated by GE's: (i) premium deficiency testing results; and (ii) LTC disclosures late in the Class Period. These arguments fail.

### a.       GE's Premium Deficiency Test Results Do Not Negate the Inference of Defendants' Scienter

Previously, the Court held that GE's positive premium deficiency test results raised the "more compelling" inference that "Defendants did not realize the brewing storm in their LTC portfolio" and "had little reason to think trends or uncertainties in the LTC industry would have a material negative impact on GE's financial position." Order at 27-30. Plaintiffs allege new, particularized facts, including specific reports (PowerPoint presentations), who received them (Immelt, Bornstein, and other senior GE executives) and when (annually), which establish Defendants' knowledge of the "brewing storm" and its reasonably likely impact on GE's financial condition. ¶¶ 131-32, 135-48. These new allegations tip the scienter scales and at least give rise to the equally compelling inference that Defendants acted with scienter irrespective of GE's positive deficiency tests. *See supra* at Section III.B.2; *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 39 (S.D.N.Y. 2019) ("[E]ven if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the tie . . . goes to the plaintiff.") (ellipsis in original).

Moreover, GE's premium deficiency test results say nothing about whether trends or uncertainties existed within a portfolio that were reasonably likely to impact GE's future financial condition, which is the focus of Defendants' Item 303 disclosure obligations. *See* 17 C.F.R. § 229.303(a), Instruction 3 (disclosures "shall focus specifically on material events and uncertainties known to management ***that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition***"). Here, Defendants ***knew*** that GE's deteriorating LTC portfolio was reasonably likely to have a material impact on its future financial condition, as the annual PowerPoint presentations indicated that GE would need to increase its reserves in the future to satisfy its growing LTC liabilities. ¶ 132.

The Complaint also includes new allegations demonstrating that the premium deficiency tests do not negate Defendants' scienter because they were conducted using ***knowingly outdated assumptions***. ¶¶ 193-212. For example, GE utilized outdated mortality assumptions despite knowing, through its participation in periodic Milliman surveys, that it was the ***only*** insurer still using them. ¶ 198. Moreover, Defendants knew that GE's actual claims experience was wholly inconsistent with the sanguine "locked" assumptions it used to set its reserves ***and*** the "best estimate" assumptions it used to conduct its deficiency tests, rendering the results of those tests irrelevant to the assessment of Defendants' scienter.

Defendants contend that MetLife's use of the same outdated assumptions absolves them of liability (MTD at 18-19), but this argument overlooks a critical fact. MetLife adopted UFLIC's assumptions not because they were correct, but because ***UFLIC***—not MetLife—bore the financial responsibility for those policies as "primary risk taker." *See* ¶ 193. In addition, objective data in the Complaint indicates that ***UFLIC was the only company*** that used certain outdated assumptions to assess the adequacy of its LTC reserves. ¶ 198.

**b.    GE's Belated Disclosures Do Not Undermine the Inference of Defendants' Scienter**

While Defendants contend that "the timing and number of disclosures" made by GE late in the Class Period regarding "uncertainties stemming from adverse claims experience in its LTC portfolio as they became known" undermines the inference of their scienter (MTD at 22), this ignores Plaintiffs' new scienter allegations showing that Defendants knew of adverse LTC trends ***years before*** GE's first LTC disclosure.[11] Further, these disclosures were made in connection with:

---

[11] This fact pattern stands in sharp contrast to *In re Magnum Hunter Resources Corp. Securities Litigation*, 26 F. Supp. 3d 278, 297-98 (S.D.N.Y. 2014), where the defendants began issuing corrective disclosures almost immediately after making false statements. *See* Order at 28.

(i) GE's newly appointed CEO, John Flannery, embarking on a "deep dive" of GE's financials (¶¶ 32-33, 158); and (ii) the abrupt resignations of Immelt (from the Board) and Bornstein (as CFO) (¶¶ 45-46). Thus, they do not undermine ***Immelt's*** and ***Bornstein's*** scienter. Instead, that GE's disclosures coincide with Immelt's and Bornstein's ouster strengthens the inference of scienter. *See In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) (resignations of executives within weeks of corrective disclosures support inference of scienter).

### C.    Defendants Omitted GE's LTC Liabilities from the MD&A Table in Violation of Item 303(a)(5) and Section 10(b)

#### 1.    Defendants Removed GE's LTC Obligations from the MD&A Table in Violation of Item 303(a)(5)

Plaintiffs also allege an actionable violation of Item 303(a)(5) based on GE's failure to disclose LTC liabilities in its MD&A Table. Defendants argue that this omission was not materially misleading because GE incorporated its LTC liabilities into Note 11 of its financial statements. MTD at 12.[12] But "materiality is a fact-intensive inquiry more appropriate for summary judgment or trial, and courts are loathe to dismiss a securities fraud complaint on materiality grounds unless the omitted material is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Lexmark*, 367 F. Supp. 3d at 31 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)); *see also SAIC*, 818 F.3d at 96 (vacating dismissal of Item 303-based Section 10(b) claims on, *inter alia*, materiality grounds). Defendants fall short of this lofty standard.

*First*, investors did not know that Note 11 included the LTC liabilities that were omitted

---

[12] Although Defendants assert that GE excluded its LTC obligations from the MD&A Table because "estimates of near-term outflows were not sufficiently precise" (MTD at 11 n.6.), this unsupported *post hoc* justification is found nowhere in Defendants' Class Period disclosures and would not have satisfied Item 303. Item 303 required disclosure of what rendered these obligations undeterminable in 2012, when they had been sufficiently determinable a year earlier. ¶ 249.

from the MD&A Table. GE expressly **excluded** LTC liabilities from the MD&A Table, but did **not** expressly include them in Note 11.[13] While Defendants aver that "Note 11 **expressly** described the category 'Life insurance benefits' as including 'obligations . . . in our run-off insurance operations,' **i.e.**, GE's retained LTC portfolio" (MTD at 12 (ellipsis in original)), it in fact did nothing of the sort. *See* ¶ 272; ECF Nos. 195-13, 195-19, 195-24, 195-33. Only **after** the Class Period did GE disclose that Note 11 included LTC reserves.[14] Neither "Life insurance benefits" nor "run-off insurance operations" was defined in GE's Class Period Forms 10-K, and Defendants' strained use of "i.e." to argue that "Life insurance benefits" and "run-off insurance operations" *really* meant "GE's retained LTC portfolio" (MTD at 12) proves Plaintiffs' point and, in fact, supports the Complaint's allegation that it was materially misleading for GE to bury billions of dollars in LTC reserves within the "Life insurance benefits" line item. ¶¶ 251-57, 284-95. As a result, GE's Note 11 disclosures do not render Defendants' omissions immaterial as a matter of law. *Ganino*, 228 F.3d at 167-68.

*Second*, even if Note 11 had expressly included LTC liabilities, investors still could not have discerned their magnitude. Defendants now expressly acknowledge the futility of trying to compare the MD&A Table figures to Note 11, conceding that to do so is "***compar[ing]*** __apples to__

---

[13] Moreover, the MD&A Table provided no indication that the footnote's exclusionary language applied *only* to the phrase "Insurance liabilities" but *not* to the "Note 11" reference, which footnote "(c)" directly followed. *See Enron Creditors Recovery Corp. v. Alfa*, *S.A.B. de C.V.*, 651 F.3d 329, 335 (2d Cir. 2011) ("a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows") (ellipsis in original).

[14] Even Defendants' own explanations are inconsistent: while GE's Forms 10-K indicated that "run-off insurance operations" were encompassed within Note 11's line items for investment contracts, insurance liabilities, and annuities, GE disclosed *after* the Class Period that a fourth line item in Note 11, simply entitled "Other," also held **billions** of dollars' worth of GE's LTC reserves. ¶¶ 252-53 (post-Class Period disclosures that **54%** of "Life insurance benefits" reserves and **63%** of "Other" reserves were allocated to LTC liabilities). If GE itself could not keep straight where its LTC portfolio resided on its balance sheet, investors had no chance at all.

__*oranges*__: *LTC reserves are broad estimates of future liabilities over many decades, whereas the MD&A table is a granular near-term outlook*." MTD at 11 n.6. Hence, investors could not have subtracted the "Insurance liabilities" line item in the MD&A Table from Note 11 to obtain a measure of GE's LTC portfolio. ¶ 274.[15] Moreover, that "granular" near-term outlook is precisely what Item 303(a)(5) required GE to provide so that investors could assess its financial condition.

*Third*, even if the two disclosures were comparable, investors still had no way of isolating GE's LTC liabilities from the two other categories of insurance liabilities omitted from the MD&A Table. ¶¶ 278-80. Because the LTC portfolio was far riskier than annuities and traditional life insurance products, this distinction was critical, as it prevented investors from gauging the true risk posed by GE's LTC exposures. ¶ 254.

Dr. Roman Weil, an accounting expert and economist, analyzed GE's financial statements and confirmed that a reasonable investor could not determine the extent of GE's LTC liabilities and risks from its disclosures in Note 11 and the MD&A Table. *See* ¶¶ 284-95.[16] While "[p]laintiffs are not required to provide expert analysis at the pleading stage, much less rebut anticipated counterarguments," it is hardly improper. *Contant v. Bank of Am. Corp.*, 2018 WL 5292126, at *6 (S.D.N.Y. Oct. 25, 2018).  To the contrary, such allegations are routinely credited at the pleading stage. *See, e.g.*, *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *5 (S.D.N.Y. Sept. 24, 2018) (rejecting defendants' attack on plaintiffs' expert allegations at pleading stage, holding "the

---

[15] Plaintiffs' analysis comparing MD&A "Insurance liabilities" to Note 11 before the Class Period (when LTC obligations were included) and during the Class Period (when they were excluded) makes this fact clear: the "Insurance liabilities" entry was *never* comparable to Note 11's total or its "Life insurance benefits" line item. ¶¶ 275-76.

[16] Defendants' contentions that Dr. Weil "has no discernable background in insurance products" and "says nothing about anyone's state of mind" are meritless. MTD at 12-13. Dr. Weil addresses the adequacy of GE's supposed LTC disclosures, and his credentials as an accounting expert are unassailable. Further, Dr. Weil's allegations were provided to address what *investors* could conclude about GE's disclosures, not about what Defendants believed, which would be improper.

facts and expert opinion that [plaintiffs] have proffered . . . at the least creat[e] a fact issue worthy

of discovery"); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *13 n.9

(S.D.N.Y. Mar. 28, 2017) ("The Second Circuit and district courts in this circuit routinely rely on

expert and statistical analyses contained in pleadings.").[17]

### 2. Defendants Were at Least Reckless in Omitting GE's LTC Liabilities from the MD&A Table

Plaintiffs also sufficiently allege that Defendants were "at least consciously reckless"

regarding whether their Item 303(a)(5) violation "would mislead investors about material facts."

Order at 45. *First*, Defendants' knowledge of their obligation to include LTC liabilities in the

MD&A Table is apparent, as they included these liabilities in GE's pre- and post-Class Period

Forms 10-K. ¶ 244. *Second*, their decision to **remove** those liabilities during the Class Period—in

violation of this clear obligation, while providing no explanation as to why they were removed or

why they were no longer reasonably determinable, raises a strong inference of scienter. ¶¶ 14, 245;

*Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (scienter pled where defendants'

"omission rises to at least a reckless disregard of a known or obvious duty to disclose"); *SAIC*, 818

F.3d at 96 (strong inference of "at least a reckless disregard of a known or obvious duty to disclose"

when defendants omit material information in their possession required by Item 303). *Third*,

---

[17] Defendants' authorities either do not support the proposition for which they are offered or are readily distinguishable. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007) (**no** analysis of expert opinion alleged in a complaint); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) (ruling on motion in limine); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (district court did not abuse discretion in holding expert affidavit attached to complaint was not a written instrument under Rule 10); *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 860 (N.D. Cal. 2019) (expert allegations credited where they satisfy standard applied to confidential witness allegations). The standard set forth in *Sgarlata* is readily met here, as Dr. Weil, whose credentials Defendants do not contest, is identified as an expert in reviewing financial statements and offers opinions based on his review of GE's financial statements. ¶¶ 74-76.

Immelt's and Bornstein's receipt of annual PowerPoint presentations showing GE's deteriorating LTC claims data strengthens the inference of their scienter. ¶¶ 130-34; *see supra* at Section III.B.2.

### D.    Defendants Made Actionable Misstatements Regarding GE's LTC Exposures

Defendants also made affirmative misrepresentations regarding GE's LTC exposures. *First*, Bornstein's July 22, 2016 statement that GE's LTC "***[p]ortfolio quality remains stable***" is actionable. ¶ 263. While the Court did not previously assess this statement, which was made in a discussion concerning "updates to [GE's] models on [its] runoff long-term care book" (*id.*), the Complaint alleges with particularity that Bornstein's representation was false in light of GE's highly negative LTC claims experience, which Bornstein was aware of and which indicated that GE's LTC portfolio was far from "stable." *See, e.g.*, ¶ 265.

*Second*, Defendants misrepresented that: (i) GE had executed its "risk reduction" plan to "sell insurance 'before the storm'" and "exited insurance ***in time***" (¶ 259); and (ii) "[i]f you look at what the portfolio is today versus . . . when Jeff [Immelt] started, ***all of the insurance business is gone*** . . . . ***It's a cleaner more synergistic portfolio. So we feel great about it***." ¶ 261. While these statements were each alleged in the prior complaint, Defendants are wrong to claim that Plaintiffs rely entirely on their prior allegations of falsity. Rather than focusing on GE's complete departure from the LTC business, the Complaint alleges misstatements regarding ***the continuing risk*** from its retained LTC portfolio. Specifically, Plaintiffs allege that Defendants falsely implied that GE had significantly de-risked GE Capital while concealing that: (i) 60% of its run-off insurance book comprised toxic LTC policies that offered particularly risky benefits; (ii) the reserves it held against these exposures were based on outdated pricing assumptions; (iii) actual claims experience was far worse than expected; and (iv) the biggest risks had yet to materialize given the youth of GE's insureds—all of which ***heightened*** the risk that GE Capital would suffer massive losses. ¶¶ 260, 262, 265; *see In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453

(S.D.N.Y. 2005) (statements actionable if they convey impression of "a state of affairs that differ in a material way from the one that actually exist[ed]") (alteration in original); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) (statements that would "misle[a]d a reasonable investor" are actionable) (alteration in original). Once Defendants spoke on the topic of **de-risking** GE Capital, they had a "duty to tell the whole truth" about the significant risks that remained, including GE's massive LTC risks. *Vivendi*, 838 F.3d at 258.[18]

*Third*, Defendants offered misleading excuses for GE's inability to sell its remaining LTC exposures, including: (i) Bornstein's February 2017 statements that "interest rates are a fundamental challenge" and that the "low interest rate environment" was the primary impediment to GE selling its remaining LTC liabilities; and (ii) Laxer's March 2017 statement that it would not be "attractive" for GE to sell its run-off insurance portfolio at that time "given the interest rate environment we are in right now." ¶ 267. Contrary to these statements, GE's toxic LTC portfolio and perilous claims experience—not interest rates—were the primary factors that prevented GE from offloading these exposures. *Cf.* Order at 52-53 (holding that it was misleading to state that GE was relying on factoring to reduce credit risk without also disclosing its use to generate liquidity) (citing *In re VEON*, 2017 WL 4162342, at *6); *In re HP Sec. Litig.*, 2013 WL 6185529, at *9 (N.D. Cal. Nov. 26, 2013) (misleading to discuss reasons for asset's weak performance without disclosing all plausible reasons known to defendants).

Finally, Plaintiffs adequately allege Defendants' scienter for each of the above statements. While the Court previously held that Plaintiffs had not included any "specific allegations"

---

[18] The Court previously observed that Defendants' statements did not give rise to a duty to disclose "that it had retained a portfolio of run-off insurance policies." Order at 32. Here, by contrast, Plaintiffs allege that by discussing the **riskiness** of GE Capital's retained assets, Defendants assumed a duty to reveal the **significant undisclosed risks** associated with GE's LTC portfolio.

demonstrating "that Bornstein and Laxer knew by early 2017 that GE had been suffering unprecedented, adverse claims experience in its LTC portfolio" (Order at 34), the Complaint now pleads these very facts, alleging that Bornstein and other senior executives received annual PowerPoint presentations identifying GE's negative LTC claims experience. ¶¶ 131-34. These new allegations, coupled with Defendants' awareness that GE's prior efforts to offload its LTC exposures failed because of *the poor quality of the exposures*, not the unfavorable interest rate environment, raise a strong inference of scienter. ¶¶ 110-12, 113-15.

This inference is strengthened by Defendants' access to UFLIC's and ERAC's annual statutory filings. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013) (scienter pled where defendants "(1) possessed knowledge of facts or access to information contradicting their public statements, or (2) failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud"); *Ont. Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 2019 WL 4674839, at *23 (D. Conn. Sept. 25 2019) (same).

## IV.   PLAINTIFFS' POWER CLAIMS

### A.   Background Facts Regarding Power and Its LTSAs

Power builds and sells industrial products (including power plants, turbines, and generators) to customers around the globe and services them through LTSAs, which typically span a period of 5 to 25 years. ¶¶ 323, 327-28. Historically, these LTSAs buoyed GE's bottom line and provided a consistent and profitable long-term revenue stream separate from sales of equipment, making turbines a centerpiece of Power's financial success. ¶ 328. GE booked expected LTSA revenues as Contract Assets on its balance sheet. ¶ 330. Contract Assets thus represented cash that Power expected to receive from its LTSA customers at some point in the future.

By the start of the Class Period, Power was the largest segment in GE's Industrials unit, a "core segment" and a primary driver of GE's growth prospects and value. ¶¶ 324-25. Due to the

magnitude of Power's financial impact on GE, analysts and others in the marketplace historically viewed its profitability as a barometer for GE's core operations and Industrials business. ¶ 326. Prior to and during the Class Period, however, the global power market experienced a secular decline in demand for traditional energy sources like coal and gas, and increased demand for renewable energy. ¶¶ 340, 344-45. This shift resulted in Power selling fewer turbines—a sales metric that GE's senior executives, including Immelt and Bornstein, spoke about regularly to investors. ¶¶ 344-45. Critically, fewer turbine sales resulted in fewer LTSAs, hampering GE's ability to generate this once steady and profitable source of revenue. *Id.*[19]

Without new LTSAs, Power's existing LTSAs became even more vital to its success, and the utilization rates of equipment serviced under Power's LTSAs were consolidated and monitored in real time. ¶¶ 347-48. Indeed, Defendants stated that they had "insight into future utilization and cost trends . . . through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods" and "routinely review[ed] estimates under product services agreements and regularly revise[d] them to adjust for changes in outlook." ¶¶ 334-35, 351. Through these monitoring efforts, Defendants learned leading into the Class Period that ***customer utilization of GE-serviced turbines trended down between 80% and 90%*** between 2010 and 2013. ¶¶ 340, 346-49.

Low utilization rates posed a major problem for Power because they affected the timing of payments to GE under its LTSAs. ¶¶ 329, 332. Specifically, GE booked Contract Asset revenues from LTSAs based on the expected utilization rates of the equipment, but it would not bill—or receive payments (i.e., cash flows) from—its customers until particular utilization "milestones"

---

[19] While the global shift from traditional to renewable energy yielded stagnating growth of roughly 1% in Europe and modest declines in the United States, Power fared far worse. ¶¶ 340-41.

(typically 30,000 and 60,000 hours) were achieved. ¶ 332. As utilization rates secretly trended downward, the gulf between when GE booked LTSA revenue and when it collected that revenue from its customers widened, contributing to a liquidity crisis. ¶¶ 332, 346-47, 352.

Meanwhile, in an effort to mask the impact that the shifting global power industry had on GE's revenues, Defendants tried to squeeze every dollar out of Power's existing LTSAs by modifying these contracts and leaning on an accounting mechanism known as cumulative catch-up adjustments to generate additional revenue. Specifically, GE renegotiated and "de-scoped" existing LTSAs to remove the low-margin labor portions of the contract. This increased the overall profit margin on these agreements, but at the expense of long-term revenue and cash flows associated with these excluded labor provisions. ¶ 366. GE did this because it allowed for the immediate booking of additional paper profits, in the form of cumulative catch-up adjustments, which gave the appearance of a significant boost to revenues. ¶¶ 338, 359-61. Yet to convince its LTSA customers to agree to these contract modifications, GE often had to push out customers' payment dates, which compounded Power's liquidity problems by widening the gap between GE's recording of LTSA revenues and its collection of cash from its customers. ¶ 367.

Finally, GE attempted to conceal these severe liquidity problems by engaging in rampant factoring of its LTSA receivables to GE Capital, trading away *additional* future profits for immediate cash. *See* Order at 44-46. Because Power had limited ability to generate new LTSAs, it would inevitably run low on LTSAs to factor, laying bare the liquidity crisis at Power. Order at 45; *see also* ¶¶ 400-01. The Court previously sustained claims based on these allegations.

**B.      Defendants Concealed Known LTSA Trends in Violation of Item 303 and Section 10(b)**

    **1.      Declining Utilization Rates of GE-Serviced Power Equipment**

        **a.      Declining Utilization Rates Were Reasonably Likely to Have a Material Impact on GE's Financial Condition and Liquidity**

The Complaint alleges that a sharp drop in the utilization rates of GE-serviced power equipment began before and continued during the Class Period, constituting a trend that was reasonably likely to—and did—materially impact GE's liquidity.[20] *First*, Plaintiffs identify the trend with particularity. According to FE-5, customer utilization of GE-serviced oil and gas turbines had ***dropped by 80% to 90%*** between 2010 and FE-5's departure in 2013, and this decline was evident internally from GE's own customer monitoring data. ¶¶ 347, 352, 410. FE-7 confirmed that this trend continued through the Class Period. ¶ 356. Indeed, in 2016, Power considered switching its input data from an average of the three most recent years' utilization rates (e.g., 2014-2016) to only the most recent year (e.g., 2016), but Teo Osben, the Chief Risk Financial Officer of Multi-Year Agreements, rejected the switch because the plunging utilization rates rendered a three-year average more favorable to GE. *Id.*

*Second*, the Complaint alleges with particularity that this trend of plummeting utilization rates was reasonably likely to impact GE's financial position and liquidity. As GE publicly acknowledged, utilization rates were a primary and essential input in its estimation of both the ***amount*** and the ***timing*** of payments from its LTSA customers. ¶¶ 333-34. Moreover, FE-7 explained that the value of GE's LTSAs depended in large part on how heavily the underlying equipment was used (¶ 329), and FE-11 stated that payments to GE were triggered by the

---

[20] The Court previously declined to consider this argument, holding that Plaintiffs' prior complaint lacked sufficient allegations concerning GE's deteriorating asset usage. Order at 44. Plaintiffs now explicitly detail the drop in utilization rates and its effect on GE's liquidity, thereby demonstrating how Defendants violated Item 303 in GE's Forms 10-K filed on or after October 25, 2014.

achievement of major utilization milestones (¶ 332). Thus, GE's ability to convert Contract Assets into cash—the means by which LTSAs provided liquidity to GE—was directly compromised by the declining utilization rates, which the Company's own internal data reflected. ¶¶ 346, 352, 411.

Instead of addressing this GE-specific trend and its impact on GE's liquidity, Defendants contend that general macroeconomic warnings in GE's SEC filings "foreclose Plaintiffs' Item 303 claim based upon adverse power trends." MTD at 29 (citing statements concerning "the decline in the oil & gas industry," "soft demand in the North American electrical distribution market," and "slow economic recovery in Europe"). Their argument fails because Plaintiffs' claim is *not* that GE failed to disclose industry-wide "adverse power trends" (*id.*), but rather that Defendants failed to disclose a precipitous drop in the ***utilization rates of GE-serviced assets***, which directly impaired GE's liquidity hampering its ability to convert LTSA-derived Contract Assets into cash. *See, e.g.*, ¶¶ 21, 321, 346, 412.

These two independent trends—the global economic malaise that Defendants disclosed and the plunging utilization rates of GE-serviced assets that they concealed—were distinct both in degree and in kind. *First*, while demand for traditional power sources had plateaued, slowing to 1% growth in Europe and declining slightly in the U.S. (¶¶ 340-41), the Complaint alleges an entirely different trajectory for Power's utilization rates: a dramatic ***80% to 90% drop*** in utilization. ¶¶ 347, 352, 410. *Second*, even if stagnant demand for traditional energy sources was common knowledge during the Class Period, Power's plummeting utilization rates were not. As described below, GE tracked this trend using proprietary monitoring equipment and GE personnel embedded at customer facilities. ¶¶ 347-52. Defendants' generalized disclosures of macroeconomic headwinds did nothing to illuminate the more particular and severe utilization trend that was rapidly impairing GE's liquidity and were thus inadequate under Item 303. *See Panther Partners*

*Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (holding that "generic cautionary language" does "not fulfill [a defendant's] duty to inform the public of ***the particular, factually-based [trends] of which it was aware***"). This is particularly true in light of the consistently *appreciating* value of GE's disclosed Contract Assets during the Class Period, which suggested a false trend—***increasing*** LTSA cash flows—wholly at odds with what Defendants knew to be inevitable given Power's deteriorating utilization rates. ¶¶ 354-55; *see also McKenna*, 2012 WL 3589655, at *6 (deeming disclosures "not specific enough to warrant a reasonable investor's attention" and thus inadequate under Item 303).[21]

Moreover, Defendants failed to explain ***how*** the trend of declining utilization rates was reasonably expected to impact GE's liquidity. This, too, is fatal to their argument. As the Second Circuit made clear in *Litwin*, Item 303 does not simply require disclosure of the trend itself, but also an explanation of ***how*** it might impact on the company's financial position:

> [T]he key information that plaintiffs assert should have been disclosed is whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect Blackstone's investments. And ***this potential future* impact *was certainly not public knowledge*** . . . . Blackstone was required to disclose ***the manner in which*** those then-known trends, events, or uncertainties might reasonably be expected to materially ***impact*** Blackstone's future revenues.

634 F.3d at 718-19; *see also Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 35 (S.D.N.Y. 2016) (observing that in *Litwin* and *Stratte-McClure*, "[t]he Circuit therefore held that,

---

[21] GE's other warnings were similarly inadequate, as they said nothing about the existing, GE-specific trend of rapidly declining utilization rates. *See, e.g.*, MTD at 29 n.25 ("reduced energy demand . . . *could* affect [its] ability to fully recover . . . contract costs and estimated earnings" and "*[i]f* slower growth in the global economy constitutes for a *significant* period . . . [GE's] results of operations, financial position and cash flows could be materially adversely affected"); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 511 (S.D.N.Y. 2013) (holding that defendants' disclosures "did not provide the extent increasing mobile users would affect the Company's overall revenues at a time this trend was already affecting the Company's revenues as a result of the Company's product decisions").

on the facts pled, the companies were obliged to disclose the 'potential future *impact*' of the known trend") (emphasis in original). Here, even if investors could have inferred that a stagnant global energy industry would depress demand for *new* GE turbines (¶ 344), they had no way of knowing the *impact* that these headwinds were already having on GE's existing LTSAs—including delayed maintenance milestones, deferred billing dates, and diminished LTSA cash flows. *See* ¶¶ 332-34, 346, 352, 411. Because Defendants' generic "disclosures fail[ed] to provide clarity on the extent of the expected *effect*" of the plunge in utilization rates, they d[id] not satisfy Item 303. *In re Ply Gem Holdings, Inc.*, 2016 WL 5339541, at *6 (S.D.N.Y. Sept. 23, 2016) (denying motion to dismiss Item 303 claim because disclosures of alleged trend were inadequate).

**b.   Defendants Knew of Declining Utilization Rates and Were at Least Reckless in Failing to Disclose Them**

Plaintiffs sufficiently allege that Defendants knew of the trend of declining customer utilization rates and its expected effect on GE's liquidity during the Class Period and were, at minimum, reckless in failing to disclose that information to investors. Defendants repeatedly referenced their actual knowledge of utilization rates when they stated in GE's Class Period SEC filings that they "***routinely review*** estimates under product services agreements [i.e., LTSAs] and regularly revise them to adjust for changes in outlook" while assuring investors they had "***insight into future utilization*** and cost trends . . . through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods." ¶¶ 334-35. These claims of vigilance over customer utilization rates during the Class Period support a finding that they knew those rates had sharply declined. *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017) (holding that CPI's admissions that "it was able to know these sorts of things," and that it "had reasonably good visibility" and "deep process and technology integration with its key customers," "support[ed] an

inference that CPI had pre-IPO knowledge of the trend by demonstrating CPI had resources that would have alerted it to the trend"); *see also In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (scienter adequately pled where defendants publicly claimed "visibility" into inventory and plaintiffs alleged the company's receipt of non-public inventory data).

The Complaint also describes how Defendants obtained this knowledge. For example, FE-5 explained that GE's customers consented to the Company installing monitoring technology on GE-serviced assets, such as gas turbines, which ***revealed to GE in real time*** that customer utilization was down 80% to 90%. ¶¶ 347-48. These allegations are corroborated by multiple former employees. ¶ 349 (FE-12 explaining that GE tracked utilization rates in real time at a monitoring and diagnostic center in Atlanta); ¶ 350 (FE-10 reporting that GE embedded CPMs at customer locations to serve as GE's "eyes and ears" on the ground and to provide information about customer usage); *see Galestan*, 348 F. Supp. 3d at 301 (crediting allegations of FEs "from several geographic areas" and who "span different levels of the Company hierarchy," thereby providing "[c]orroboration from multiple sources") (alteration in original). Coupled with Defendants' own statements regarding their attention to utilization rates, these particularized allegations further support a finding that Defendants knew utilization rates were plummeting. *See SAIC*, 818 F.3d at 96 (defendants' receipt of internal investigation results before filing 10-K "strongly suggest[ed]" knowledge of undisclosed risks sufficient to support Item 303 violation).[22]

Finally, Plaintiffs describe in detail that GE not only knew about, but also regularly ***analyzed***, data showing that utilization rates continued their decline throughout the Class Period. As noted above, GE's Chief Risk Financial Officer of Multi-Year Agreements refused to switch

---

[22] The Complaint also plausibly alleges that Defendants were preoccupied by GE's LTSA portfolio following the May 2014 announcement of ASC 606, which sought to preclude companies from relying on cumulative catch-up revenues. ¶ 415.

utilization input data from a three-year average to only the most recent year because the continuing plunge in utilization rendered the three-year average more favorable to GE. ¶ 356. This analysis by a high-level executive confirmed GE's awareness of the continued deterioration in utilization rates and is imputable to Defendants. *See supra* at n.9. Similarly, GE's own statements about the importance of utilization rates to customer payments (i.e., LTSA-related cash flows) reflected its understanding of the impact of this trend on GE's liquidity. ¶¶ 333-34.[23]

When considered holistically, the foregoing facts demonstrate that Defendants were "at least consciously reckless" of the danger that their concealment of declining utilization rates would mislead investors. *Stratte-McClure*, 776 F.3d at 106.

## 2. GE's Reliance on LTSA Modifications to Increase Power's Revenues

### a. GE's Reliance on Renegotiating LTSAs to Drive Cumulative Catch-Up Revenues Was Reasonably Likely to Have a Material Impact on GE's Financial Position and Liquidity

The Complaint also alleges with particularity that, in order to bridge the gap between Power's revenue targets and what was actually achievable given the declining demand for its products and services, GE regularly relied on LTSA modifications to generate cumulative catch-up revenues. ¶¶ 344, 373. FE-7 reported that Power actively renegotiated LTSAs during the Class Period for the singular purpose of generating positive cumulative catch-up adjustments. ¶ 359. In fact, teams were created at Power specifically dedicated to identifying contracts that could be renegotiated to generate positive cumulative catch-up adjustments. ¶ 373. Moreover, Power

---

[23] In arguing that GE's incorporation of the three-year average of utilization data into its Contract Asset estimates negates Plaintiffs' allegations of scienter, Defendants again misconstrue the Complaint. *See* MTD at 31-32. Plaintiffs do not allege that GE's statements of its historical Contract Assets were false, but rather that Defendants failed to disclose information about the trend of declining utilization rates and its reasonably likely effect on GE's future liquidity. *See Facebook*, 986 F. Supp. 2d at 512 ("Item 303 ***does*** require the disclosure of a company's analysis of the ***future*** impact of a material trend."). GE's use of three-year *historical* data, even if accurate, does nothing to satisfy this *forward-looking* obligation.

consistently tracked the performance of its LTSAs in internal databases available throughout Power and in reports transmitted to GE's highest officers. *See* ¶¶ 347-52, 404, 415.

The Complaint also alleges with particularity that this trend was reasonably likely to materially affect GE's liquidity and revenue, explaining that, while GE's increased reliance on LTSA modifications and cumulative catch-ups had a positive immediate effect on revenue, it reduced *future* revenues and *delayed* cash flows.  It was also unsustainable in light of the finite number of LTSAs that could be modified.

*First*, to incentivize customers to renegotiate, Power often agreed to push out payment dates, which impaired GE's liquidity by increasing the gap between revenues and cash flows. ¶¶ 367, 418. *Second*, though removing low-margin revenue components of an LTSA allowed GE to boost its current profits (by recording a positive cumulative catch-up adjustment), it denied Power those future revenues and cash flows. ¶¶ 360-61, 366, 417. *Third*, again to induce customers to renegotiate LTSAs, Power often provided additional concessions that further reduced future revenues and cash flows. ¶ 367.

Defendants contend that they satisfied their disclosure obligations by providing historical information about GE's cumulative catch-up adjustments each reporting period. MTD at 25 n.22. This argument again misconstrues Plaintiffs' claim and Defendants' Item 303 disclosure obligations. Plaintiffs are not challenging the veracity of GE's *reported* cumulative catch-up revenues; rather, Plaintiffs' Item 303 claim concerns Defendants' failure to disclose GE's reliance on renegotiating its LTSAs to generate them, which reduced *future* revenues and widened the gulf between revenues and cash flows. ¶¶ 363-64, 379, 389, 401.

The result of this gulf was a foreseeable liquidity crisis, which the mere disclosure of historical data did nothing to illuminate. *Facebook*, 986 F. Supp. 2d at 511-12 ("Identification of

a past trend does not satisfy a company's disclosure obligations under Item 303[.]"). GE's reports of *ever-increasing* cumulative catch-up adjustments further obscured the danger lurking behind them; no reasonable investor could discern from those figures the dwindling supply of LTSAs to renegotiate or the impending effect of ASC 606 in precluding them in the future. ¶¶ 363-64; *see Litwin*, 634 F.3d at 720 ("[T]he District Court failed to consider another relevant qualitative factor—that the omissions 'mask[ ] a change in earnings or other trends.' Such a possibility is precisely what the required disclosures under Item 303 aim to avoid.") (quoting SAB No. 99, 64 Fed. Reg. at 45,152) (alteration in original). "Th[ese] potential ***future impact[s]*** [were] certainly not public knowledge . . . and thus cannot be considered part of the total mix of information already available to investors." *Ply Gem Holdings*, 2016 WL 5339541, at *6.[24]

Defendants next argue that Plaintiffs fail "to allege how many LTSAs were 'de-scoped,' or how many customers' payments were deferred, or what effect the alleged LTSA modifications would have on GE's overall financial position." MTD at 25. But Defendants' demand for such allegations is misplaced, as "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or ***quantitative*** inquiries." *Panther Partners*, 681 F.3d at 122; *see also Litwin*, 634 F.3d at 721 ("[A]ll Item 303 requires in order to trigger a disclosure obligation[] [is] a known trend that Blackstone reasonably

---

[24] Defendants assert—without explanation—that "[t]he difference between GE's contract asset balance under ASC 605 and ASC 606 says nothing about unsustainable business practices, much less evidences any trend." MTD at 26. This is incorrect. Plaintiffs allege that GE relied on renegotiating LTSAs to meet revenue targets and that this practice was unsustainable because of their finite number (¶¶ 363, 401), and ASC 606's looming prohibition on generating revenues in this manner (¶ 364) only exacerbated the situation. Further, GE later disclosed that, as a result of ASC 606, its LTSA Contract Assets were worth less than 50% of what it had previously disclosed and that the change had, in Defendants' own words, "significantly impacted" Power. ¶ 381. Thus, while Plaintiffs do not allege that GE's reported Contract Assets were false, GE was obligated to disclose that its reliance on renegotiating LTSAs to generate uncollected revenues was reasonably likely to impact its future revenues and that such reliance was imperiling its liquidity position.

expected would materially affect its investments and revenues. Plaintiffs allege that they were unaware of, but legally entitled to disclosure of, the very information that the District Court held had to be specified in plaintiffs' complaint."). Item 303's disclosure obligations fall on Defendants, and there is no numerical prerequisite without which an Item 303 claim must fail.

Moreover, even if such an accounting were required, the Complaint *does* specify both qualitative and quantitative measures of the value and impact of those contracts and customers subject to GE's renegotiation campaign. Plaintiffs allege, for example, that: (i) GE Power Services Europe had nearly exhausted its LTSA modification opportunities by the end of 2017; (ii) GE booked ***$8.7 billion*** in revenue due to modifications yielding cumulative catch-ups; and (iii) ***more than half*** of GE's LTSA Contract Assets by the end of 2017 owed to this practice and were worth ***less than 50%*** of their previously reported value. ¶¶ 363, 381; *see also Novak*, 216 F.3d at 312-13 ("[T]he complaint provides specific facts concerning the Company's significant write-off of inventory directly following the Class Period, which tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made."). In fact, the Complaint explains that this practice was so rampant that it ***created a cash crisis at GE that led directly to Defendants' addiction to factoring*** the paper revenues created by LTSA modifications, which Plaintiffs also quantify. *See, e.g.*, ¶¶ 386-90. At the pleading stage, such detail adequately describes the trend and its foreseeable material impact on GE.

### b.    Defendants Knew of GE's Reliance on LTSA Modifications and Were at Least Reckless in Failing to Disclose It

The Complaint also alleges detailed facts demonstrating Defendants' knowledge that GE's reliance on LTSA modifications to generate cumulative catch-up adjustments threatened GE's liquidity and revenue, including GE's preoccupation with monetizing its LTSAs, the monetization task force it created, and the "senior commercial finance manager" it hired to oversee this effort.

¶¶ 394-96, 403, 415. Efforts to monetize LTSAs were also tracked and reported internally to top executives in weekly, monthly, and quarterly reports, and were accessible to GE senior management, including the Individual Defendants. ¶¶ 404-05; *Lexmark*, 367 F. Supp. 3d at 35 (holding Item 303 knowledge requirement satisfied where defendants "used models to track the changes in EMEA inventory levels and the numbers reflecting 3Q14, 4Q14, and 1Q15 inventory were in fact presented to Individual Defendants").[25] Indeed, ***the very fact that Defendants resorted to factoring*** GE's LTSA receivables in the first place indicates their awareness of the risk that GE's LTSA modifications posed to its liquidity position. *See infra* at Section IV.B.3.

Defendants also monitored the impact of the practice on Power's business. FE-5 explained that the revenues and profitability of all LTSAs were systematically tracked, analyzed, and modeled through GE's internal COSMOS and ICAM programs, which "all commercial people" at Power had access to and used (¶ 375), while FE-10 confirmed that Power personnel stationed at customers' facilities inputted data on customer usage and other variables into Power's databases, providing further insight into the profitability and revenue streams of the LTSAs (¶ 376). Defendants also understood that GE's ability to rely on cumulative catch-ups would soon come to an end. ¶ 370; *see, e.g.*, *Galestan*, 348 F. Supp. 3d at 300. Moreover, the Individual Defendants became hyper-focused on the looming implementation of ASC 606, repeatedly addressing it in their public statements ***without disclosing*** the impact that it would have on GE's liquidity and revenue. ¶¶ 369-71; *see also Celestica, Inc.*, 455 F. App'x at 14 (scienter pled where misrepresentations concerned a "subject about which investors and analysts often inquired"). These particularized allegations raise a strong inference of scienter.

---

[25] Similar reports, provided to the controller in Europe, GE's Global Controller, and Defendant Hauser, were created to track renegotiations and their impact on cumulative catch-ups. ¶¶ 373-77.

### 3. GE's Reliance on Factoring to Conceal Power's Liquidity Issues

#### a. GE's Reliance on Factoring Was Reasonably Likely to Have a Material Impact on GE's Financial Condition and Liquidity

The Court previously held that Plaintiffs adequately stated a claim based on Defendants' knowledge and concealment of GE's reliance on "factoring" LTSA receivables to paper over the Company's liquidity crisis, in violation of Item 303. Order at 44-46. Defendants have provided the Court with no basis to depart from its prior ruling in this regard.

*First*, Defendants' demand for arbitrary details such as "how many GE Power LTSAs were factored," "the specific terms" of factoring agreements with third parties, and other unspecified "quantifiable" allegations (MTD at 33) ignores the Second Circuit's directive that "Item 303's disclosure obligations . . . do not turn on restrictive mechanical or quantitative inquiries." *Panther Partners*, 681 F.3d at 122. Moreover, Plaintiffs *do*: (i) quantify the gap between Contract Assets and Industrials cash flows (tens of billions of dollars), of which Power was the largest part and the principal source of GE's liquidity crisis and Contract Assets write-down (¶¶ 35, 80, 324, 386, 390, 393-401, 428); (ii) describe its effect on GE's liquidity (¶¶ 393, 397); (iii) explain how GE cajoled customers into earlier invoicing by pushing out payment dates for the singular purpose of accelerating invoices to factor (¶¶ 395-97); and (iv) detail how GE tracked these efforts in weekly, monthly, and quarterly reports to Power's leadership (¶ 404).

*Second*, Defendants' assertions that "FE-9 would not have been aware of Power's LTSA factoring" and "FE-9 only was aware of factoring in GE's Renewable Energy segment—not Power" (MTD at 33) are improper factual contentions not pled in the Complaint and should be ignored. *See Christine Asia*, 718 F. App'x at 23 (district court improperly accepted defendants' contrary factual account at pleading stage). What Plaintiffs allege (and the Court rightly credited) is that Power was factoring "everything" and that "[b]ecause factoring trades away future revenue

for immediate cash, it stands to reason that GE's comprehensive factoring of LTSA receivables would have a material impact on future revenue." Order at 44-45; *see also* ¶ 400.[26]

Defendants' argument that FE-7 "only speaks generically" and does not describe the foreseeable impact of factoring on GE's liquidity is equally baseless. MTD at 33-34. The Complaint recounts FE-7's observations, which are corroborated by two other witnesses, of how Power's management set about accomplishing their goal of "monetizing LTSAs" (¶¶ 394-95), extracted earlier invoices from customers in exchange for delayed payments (¶ 397), measured these efforts in internal reports transmitted to top executives (¶ 404), and were faced with the unavoidable reality that GE's factoring campaign could no longer conceal its cash crisis (¶ 401).

### b. Defendants Knew of GE's Reliance on Factoring and Were at Least Reckless in Failing to Disclose It

The Court correctly held that Plaintiffs' allegations that Power: (i) along with GE Capital management, organized a "global" effort to factor "everything" (¶¶ 400, 422, 428); and (ii) tracked LTSA receivables monetized (and cash generated therefrom) in weekly, monthly, and quarterly reports, reporting the results up the managerial chain, including in presentations to Power's top leadership (¶¶ 404-05), establish Defendants' knowledge of the trend and that they were "at least consciously reckless regarding whether their failure to provide adequate Item 303 disclosures . . . would mislead investors about material facts." Order at 45-46 (ellipsis in original).[27] Bornstein's

---

[26] Defendants' argument that FE-9 was not in a position to know of GE's factoring practices (MTD at 33 and n.2) is further refuted by FE-9's: (i) positions in the Power and Renewable Energy Divisions from 2004 through August 2017, which fell under the same management umbrella; (ii) role on the Enterprise Risk Team while at Power, which evaluated risks associated with renegotiating LTSAs; (iii) direct involvement in sending factoring proposals up the management chain each quarter and receiving approvals; (iv) specific recollection that his counterparts in Power were factoring "everything"; and (v) attendance at an internal meeting where Bornstein acknowledged GE's "deep" reliance on factoring. ¶¶ 68, 400, 402.

[27] This Court has already rejected Defendants' argument that they are shielded from liability because GE disclosed the fact that it engaged in factoring. *See* Order at 44-46. GE was obligated

scienter is further confirmed by his numerous statements on the subject, both internally (¶ 402)[28] and publicly (¶¶ 429-30), which were made at a time when GE was increasingly cash-starved and its "underlying performance" was dependent on identifying new LTSAs to factor (¶¶ 426-28). *See Celestica, Inc.*, 455 F. App'x at 14; *accord In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("In the context of specific inquiries . . . defendants' omission of actual circumstances that were contrary to their answers presents an obvious risk of misleading investors.").[29]

### 4.    Defendants Made Actionable Misstatements Regarding GE's LTSAs

Plaintiffs adequately allege that Defendants made misstatements concerning GE's reliance on factoring and Power's declining utilization rates. *First*, Bornstein's January 20, 2017 statement that "there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring" is actionable. ¶¶ 430-31. While the Court previously held that GE's disclosure of the amount of receivables factored undermined Bornstein's scienter (Order at 53), the Complaint raises a strong inference that Bornstein knew or recklessly disregarded the risk that

---

to disclose the trend of generating cash at the expense of long-term revenues (¶ 397) **and** the future **impact** of this trend. *See Litwin*, 634 F.3d at 718-19. GE's disclosures of historical factoring levels did not satisfy these obligations and, as discussed below, were themselves misleading.

[28] Defendants contend that Bornstein's June 2017 statement to insiders is not probative of his scienter at any earlier juncture. MTD at 34. They are wrong. When viewed holistically with all of Plaintiffs' other allegations, this allegation confirms that "Plaintiffs plausibly allege that Bornstein and GE . . . knew facts . . . suggesting that GE's financial disclosures would be misleading without disclosure of its widespread use of factoring." Order at 45-46 (ellipses in original); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007); *see also Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) ("Depending on the problem, its existence in February 2008 may support an inference that it was present six months earlier.").

[29] Defendants argue in a footnote that Plaintiffs fail to adequately plead loss causation for these statements (MTD at 34 n.30), but this argument ignores Plaintiffs' allegations that the risks related to factoring materialized during the Class Period, when GE began to disclose the poor cash flows resulting from this unsustainable practice. *See, e.g.*, ¶¶ 451-53, 456, 458. Plaintiffs do not allege factoring claims prior to 2015 or against any of the dismissed defendants.

he would mislead investors by concealing GE's dependence on factoring to conceal the liquidity crisis created by Power's reliance on cumulative catch-up revenue. *See* ¶¶ 386-92.

*Second*, Plaintiffs sufficiently plead that Bornstein's February 22, 2017 statement about the impact of ASC 606 on GE's LTSAs and Contract Assets is actionable. ¶¶ 432-33. While the Court previously held that Plaintiffs did not explain why these statements warranted additional disclosures (Order at 50), the Complaint now explains that it was misleading for Bornstein to claim the rule change "doesn't change anything about the economics of" GE's LTSAs when Defendants knew or recklessly disregarded that ASC 606 grievously impaired GE's ability to generate future cumulative catch-up revenues, which comprised a material portion of earnings. ¶¶ 432-33.

*Third*, while the Court previously held that Bornstein's statement that "***[w]e're not pulling future profit forward. That is not what we're doing***" (¶ 434) did not mislead investors as to GE's use of factoring, which the Court found to be distinct from GE's modification of LTSAs (Order at 51 n.24), the Complaint now clarifies the inextricable link between these practices. In short, Power modified LTSAs to generate cumulative catch-up revenues, and then factored the resulting receivables in an effort ***to pull forward cash from future periods*** and conceal the liquidity issues caused by its reliance on contract modifications. ¶¶ 358-67, 380-85, 393-401. The Complaint also establishes Defendants' knowledge of these practices. ¶¶ 368-79, 402-05.

*Finally*, Bornstein's April 21, 2017 statements, including that GE expected utilization rates "to partly come back over the year as we see higher asset utilization in Power" and that "we've seen these similar trends in the prior years" (¶ 436),[30] were directly contradicted by the drastic

---

[30] Defendants wrongly contend these statements are forward-looking and protected by the PSLRA safe harbor. Bornstein based his statements on false ***historical facts***—e.g., that "we've ***seen***" higher utilization rates in Power. In any event, Defendants fail to establish that these statements were protected by anything other than insufficient, boilerplate language that cash flows and contract assets, among other metrics, were "uncertain." MTD at 37.

decline in utilization rates (¶¶ 340-57). Plaintiffs also adequately allege that Defendants witnessed Power's declining utilization rates in real time. *See supra* at Section IV.B.1.B.[31]

## V.     THE COMPLAINT PLEADS A SECTION 20(a) CLAIM

The Complaint states a Section 20(a) claim against the Individual Defendants. *First*, as described above, Plaintiffs allege a primary violation by GE. *Second*, Plaintiffs allege that each of the Individual Defendants controlled GE. Control is "a fact-intensive inquiry that should not be resolved on a motion to dismiss," *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 669 (S.D.N.Y. 2017), and allegations of control are subject to the notice pleading standard of Federal Rule of Civil Procedure 8, *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011).

Here, Defendants do not dispute that Immelt and Bornstein controlled GE. As for the other Individual Defendants, their control is established by, *inter alia*, allegations that: (i) Hauser was GE's Chief Accounting Officer from April 2013 through the end of the Class Period and signed 19 false and misleading SEC filings (¶ 49); (ii) Miller signed the 2012 10-K as GE's Chief Accounting Officer, then served as CEO of GE Transportation before replacing Bornstein as GE's CFO (¶ 442); (iii) Laxer was President and CEO of GE Capital from September 2016 until December 2017 (¶ 50); and (iv) Sherin was GE's CFO and Vice Chairman at the start of the Class Period, later served as Chairman and CEO of GE Capital and signed Class Period filings (¶ 48). *See also* Appendix A to Complaint.

District courts in this Circuit disagree as to whether culpable participation must be pled with particularity, *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 2020 WL 248729, at *23 (S.D.N.Y. Jan. 15, 2020), and whether it contains a state of mind requirement. *In re*

---

[31] The Court has already held that Defendants' 2016 Form 10-K statement that factoring was used "to manage credit exposure" (¶ 427) was materially misleading and made with scienter. Order at 52-53. Defendants have provided no basis for the Court to revisit its ruling.

*WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414-16 (S.D.N.Y. 2003). Because Plaintiffs'

particularized allegations establish a strong inference of the Individual Defendants' scienter, they

necessarily plead culpable participation. *In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222,

254 (S.D.N.Y. 2018).[32] The Complaint alleges that the Individual Defendants signed false and

misleading SEC filings and personally made false and misleading statements. *See, e.g.*, ¶¶ 261,

267, 464. Moreover, they had access to information contradicting those filings by virtue of, *inter

alia*, Miller's intimate involvement in the Genworth spin-off (¶ 152), Hauser's duties as Chief

Accounting Officer and her tracking of LTSA renegotiations (¶¶ 49, 377), and Laxer's and

Sherin's leadership of GE Capital (¶¶ 48, 50), which housed the LTC portfolio and entered into

factoring deals with Power.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motion.

DATED: January 31, 2020                Respectfully submitted,

                                       **KESSLER TOPAZ**
                                       **MELTZER & CHECK, LLP**

                                       *S/ Sharan Nirmul*
                                       Sharan Nirmul
                                       David Kessler
                                       Gregory M. Castaldo
                                       Darren J. Check
                                       Richard A. Russo, Jr.
                                       Michelle M. Newcomer
                                       Eric K. Gerard
                                       Joshua A. Materese
                                       Evan R. Hoey

---

[32] Defendants are wrong to suggest that *In re CannaVest*, 307 F. Supp. 3d at 253-56, holds that signing misleading public filings does not establish culpable participation. *See* MTD at 40. Moreover, the court in *CannaVest* inferred from a defendant's position that they would have been aware of information contradicting the company's public statements. 307 F. Supp. 3d at 255.

280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
dkessler@ktmc.com
gcastaldo@ktmc.com
dcheck@ktmc.com
rrusso@ktmc.com
mnewcomer@ktmc.com
egerard@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com

*Counsel for Lead Plaintiff Sjunde AP-Fonden
and Lead Counsel for the Class*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
Jonathan D. Park
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com
jpark@gelaw.com

*Counsel for Additional Plaintiff Cleveland Bakers
and Teamsters Pension Fund and Local Counsel for
the Class*

41