# EXHIBIT A

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 10899 / December 9, 2020**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 90620 / December 9, 2020**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4194 / December 9, 2020**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20165**

| | |
|---|---|
| In the Matter of<br><br>**GENERAL ELECTRIC COMPANY,**<br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against General Electric Company ("GE" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

## Summary

GE, a large publicly-traded company that operates a number of lines of business, failed to disclose material information to investors related to two of its key reportable segments during the period from 2015 through 2017. First, GE failed to disclose to investors information concerning the nature of its reported profit growth in its power business and $2.5 billion in reported cash collections. Second, from the third quarter of 2015 through the first quarter of 2017, GE failed to disclose to investors worsening trends in its insurance business and the potential for substantial losses. GE's insurance business ultimately incurred a $9.5 billion pre-tax charge against GE's earnings for the fourth quarter of 2017 and required capital contributions by GE of approximately $15 billion over seven years to fund expected future insurance claims.

GE's power business (known as GE Power) manufactures gas turbines and earns revenue, among other ways, by selling these power turbines to power plant operators and entering agreements to service the turbines for customers in the future. GE failed to disclose that more than one quarter of GE Power's reported profits in 2016 and almost half of its reported profits in the first three quarters of 2017 resulted from reductions in estimates of the cost to complete its multi-year agreements to provide repairs and service for customers' power turbines. Under GE's accounting method, these reductions in cost estimates resulted in large revenue and earnings increases in the period in which the estimates were changed. In public disclosures, GE misled investors by describing its Power segment profits without explaining that more than $1.4 billion in 2016 and $1.1 billion in the first three quarters of 2017 stemmed from reductions in cost estimates.

GE reported increased industrial cash collections commensurate with increased Power segment profits in 2016 and 2017 by changing its practices to sell (or "factor") longer term receivables from its Power service multi-year agreements, principally to GE's own subsidiary (known as GE Capital). Selling longer term receivables to GE Capital allowed GE immediately to report increased industrial cash flow, without disclosing that GE was depleting future cash flows by moving them into the present. As a result of this new practice, called "deferred monetization," GE boosted a publicly reported cash flow measure by more than $1.4 billion in 2016 and more than $500 million in the first three quarters of 2017. GE failed to disclose to investors its adoption and reliance on deferred monetization which increased present industrial cash flow at the expense of future years.

GE's insurance business reinsured billions of dollars' worth of policies written by other insurers, including a substantial number of long-term care insurance policies. Long-term care policies cover future costs associated with growing older, such as nursing home and assisted living expenses. Long-term care policies – including those insured by GE – were badly underpriced. By 2015 and 2016, claims by long-term care insurance policy-holders had been exceeding GE's

---

[1]  The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

original projections for years.  In 2015 and 2016, despite known continuing trends of increasing costs from long-term care insurance policies, GE's insurance business lowered projected claims costs for the distant future and simultaneously concluded that it did not have insurance losses.  GE failed to disclose its rising claim costs and the resulting potential for material insurance losses.

In 2017 and 2018, GE made a series of public announcements describing disappointing cash and earnings results in its GE Power business as well as the $9.5 billion pre-tax insurance charge and required capital contributions of approximately $15 billion over seven years.  These issues contributed to GE's almost 75% stock decline during those years.

<u>**Respondent**</u>

1.      **General Electric Company** is incorporated in the state of New York, and since 2016, the company has been headquartered in Boston, Massachusetts.  GE describes itself as a high technology industrial company that operates a number of lines of business, including in the power, renewable energy, aviation, and healthcare industries.  GE's common stock is registered pursuant to Section 12(b) of the Exchange Act, and is quoted under the ticker symbol "GE" on the New York Stock Exchange.

<u>**GE Promises Long-Term Growth While Facing Challenges in its Power Business**</u>

2.      At an investor conference in May 2015, GE's CEO described the company's plans for future earnings growth.  GE was undergoing substantial change; among other things, the company had announced its agreement to acquire a power company in April 2014 to add to its GE Power line of business and its planned divestiture of much of its GE Capital business in April 2015.  At the May 2015 investor conference, GE's CEO presented investors and analysts who followed and reported on GE's stock performance with a framework to grow GE's non-GAAP Industrials and Verticals Operating Earnings per Share measure from expectations of $1.25 – $1.35 in 2015 to $2 per share in 2018.[2]

3.      While GE sought to achieve this goal, GE Power faced marketplace challenges.  In internal planning documents in 2014 and 2015, GE described its power markets as "flat" and a "challenging environment" and noted increasing price pressure and excess industry capacity.  As a result, GE Power increasingly depended on existing maintenance contracts in its GE Power Services division to achieve operating earnings and cash targets.  A significant portion of GE Power Services' earnings and cash came from highly profitable contractual service agreements ("service agreements") lasting anywhere from 15 to 30 years, through which GE shared the risk of maintaining covered power turbines with its customers, the power plant operators.  In 2016, GE Power Services was responsible for 83% of GE Power's segment profits and 89% of its operating

---

[2] GAAP (short for "generally accepted accounting principles") is a common set of accounting principles, standards, and procedures that public companies must follow when they compile their financial statements, and is the accounting standard adopted by the Commission that must be followed by public companies in the U.S.  Non-GAAP measures are numerical measures of a public company's historical or future financial performance, financial position, or cash flows; these metrics are prepared by a company outside of GAAP and may include or exclude amounts that would be utilized under GAAP.

cash flows.  In 2017, the business was responsible for 98% of GE Power's segment profits and all of its operating cash flows.

4.      Internal risk assessments for the GE Power Services business completed in 2014 and 2015 noted that it was subject to the same challenges facing all divisions within GE Power. Indeed, GE Power Services acknowledged internally that it had increased risk that its service agreements would need to be renegotiated due to lower than anticipated power consumption and increasing competition from other companies that offered servicing and repair of the power turbines after GE Power had sold them to customers.  The business also faced the prospect that customers would exercise termination clauses in the service agreements if they did not receive price and terms concessions from GE Power, which created further risk to GE Power Services.

5.      GE Power Services's market challenges placed strain on its financial results.  GE Power had a $5 billion "deferred balance" of unbilled revenue reported in GE's financial statements as a part of the "contract assets" on its balance sheet, because under GE's accounting method, the company recognized revenue from service agreements when it incurred costs, typically-earlier in time than when it billed under the agreements.  Were a customer to stop using a turbine, use it less, or exercise its termination rights under a service agreement, GE Power Services faced the potential that it would be unable to collect the "deferred balance" related to that contract.

### GE Power's Reduced Cost Estimates Were Critical to Meeting Financial Targets

6.      GE Power Services endeavored to meet internal operating profit targets set by GE, in part, through reducing its costs and correspondingly reducing estimates of costs required to perform its obligations under service agreements.  GE Power Services' financial results were impacted by more than $1.4 billion in revenue and earnings in 2016 and more than $1.1 billion in revenue and earnings in the first three quarters of 2017 as a result of reductions in cost estimates. As illustrated in the chart below, these increases were more than double the amount recognized in 2014 or 2015 and accounted for 29% and 45% of GE Power's reported segment profit to investors in 2016 and the first three quarters of 2017, respectively.  Without GE Power Services' reductions in cost estimates, GE would have missed the forecast it provided to investors for its non-GAAP industrial operating profit metric in 2016.[3]

---

[3] At GE, industrial operating profit was what is known as a non-GAAP measure GE reported to provide investors with information about its industrial businesses.

4



7.      GE Power Services was able to generate earnings resulting from reductions in cost estimates because of the revenue accounting model it applied to its service agreements.  Under relevant accounting rules, GE applied a cost to cost percentage of completion approach to estimating revenue on its service agreements.  This approach relies on the use of reasonably dependable estimates of total costs, billings, and extent of progress toward completion of the contract.  GE estimated what the margin would be for the life of the service agreement and applied that profit margin to each dollar of cost incurred to date in order to estimate revenue earned to date under the agreement.  GE updated its margin assessment at least once a year during a scheduled contract margin review, which assessed costs incurred to date as well as revisions to forward looking estimates related to expected costs and revenues over the remaining life of the service agreement.  To the extent that the margin changed as a result of changes to estimates, GE applied the new margin to costs incurred to date in order to make a new estimate of revenue earned to date. The difference between the old and new estimates of revenue earned to date was recognized as revenue and earnings in the period in which the margin estimate was changed.  Projected cost reductions over the life of the service agreement increased the contract profit margin and resulted in an increase to revenue and earnings in the current period.

8.      Executives at GE Power informed GE management that a significant portion of GE Power's segment profits was the result of reductions in cost estimates and that these changes were critical to meeting financial targets.  Moreover, executives at GE understood that these reductions in cost estimates necessarily increased GE's deferred balance of unbilled revenue, since gains from reductions in cost estimates did not increase the amount GE was entitled to bill its customers in any given period.  Nonetheless, GE executives directed GE Power Services executives to both increase earnings and keep the deferred balance from growing further.  This was described internally by one GE Power executive as putting GE Power Services between "a rock [and] a hard place" since the business lacked opportunities to increase earnings without increasing the deferred balance.

**GE Power Increases Intercompany Factoring to Reduce its Deferred Balance and
Meet Cash Targets**

9.       At the same time that GE Power recognized increased unbilled revenues and
earnings arising from reductions in cost estimates, GE was aware of investor and analyst concerns
that its cash collections were not keeping pace with revenue and that its unbilled revenue was
growing in its industrial business.  Executives at GE Power and GE Power Services cited analyst
reports when they discussed internally the need to show improved cash performance.  In one
presentation to GE senior management in August of 2016, a GE Power executive posited that GE's
stock price could reach $40/share if operating cash flow performance improved.

10.       When GE reported its financial results to investors, it included an Industrial Cash
Flow from Operations ("Industrial CFOA" or "Industrial Cash Flow") measure designed to
highlight the company's ability to generate cash flow without its GE Capital operations, since GE
Capital had been substantially downsized by 2015.[4]  GE also provided investors with an annual
forecast for the Industrial Cash Flow measure.

11.       GE's Industrial Cash Flow measure had always been influenced by sales of current
receivables (also referred to as "factoring") between GE's industrial businesses and its GE Capital
business, but GE significantly expanded factoring in 2016 and 2017 without disclosing this change
to investors.  During those years, GE engaged in a practice it referred to as "deferred monetization"
to increase Industrial Cash Flow and decrease the growing deferred balance.  Deferred
monetization was different from GE's past factoring practices in two key respects: (1) GE
previously sold receivables due in one year or less, but deferred monetization involved the sale of
unbilled receivables with due dates up to five years out; and (2) in order to engage in deferred
monetization, GE renegotiated a number of service agreements and provided pricing and/or other
concessions to entice customers to agree to the changes to the agreements that were required to
permit factoring to GE Capital.

12.       Executives at GE Power Services understood that GE's new deferred monetization
practice pulled forward future years' cash collections into the present year, decreasing cash flows
in later periods.  Deferred monetization was described internally as a "drug" because the company
needed to continue to do more deferred monetization to achieve equivalent effects period after
period.  The practice was also costly for the business, as it involved offering discounts to customers
and paying interest expense on factored receivables to GE Capital.  GE's senior executives, and
those at GE Power and GE Power Services not only agreed to engage in the practice, but expanded
it in part to meet internal cash flow targets set by GE's leadership.  By May 2017, GE Power
Services and GE Power executives referred to deferred monetization in internal documents as "not
sustainable" and questioned whether the GE Power Services business model was economically
viable.

---

[4] Industrial CFOA is a non-GAAP measure which GE described as a "useful measure[] to compare the capacity of
our industrial operations to generate operating cash flow with the operating cash flow of other non-financial
businesses and companies[.]"

13.    By the end of 2017, GE Power Services had monetized more than $2.7 billion in long-term receivables through the new deferred monetization practice, which increased its Industrial Cash Flow by more than $1.4 billion in 2016 and more than $500 million in the first three quarters in 2017.  The chart below details the significant impact of GE's deferred monetization practice during 2016 and 2017.



14.    Indeed, deferred monetization accounted for approximately 12% of total reported Industrial Cash Flow at 2016 year end and approximately 33% of Industrial Cash Flow after the first three quarters of 2017.  The practice enabled GE to achieve its public Industrial Cash Flow forecast for 2016.  At the end of 2016, GE Power Services executives estimated that the practice had created a $500 million reduction in Industrial Cash Flow for 2017 alone.  When the practice was discontinued in 2017, GE Power Services had pulled forward $878 million in cash from 2018, $585 million from 2019, $407 million from 2020, and $400 million from later years.  The chart below details the reduction in GE's reported Industrial Cash Flow results since 2017 that resulted from deferred monetization in earlier years.



### GE's Power Disclosure Failures in 2016 and 2017

15.     Between May 2016 and October 2017, GE's disclosures regarding its GE Power business omitted material information regarding its reductions in cost estimates and reliance on its new deferred monetization practice, causing GE's disclosures to be incomplete and misleading.  As a result of the conduct above, GE omitted material information in: (1) its annual report filed with the Commission on Form 10-K for fiscal year 2016; (2) its quarterly reports filed with the Commission on Forms 10-Q for the first, second, and third quarters of 2016 and 2017; (3) its earnings press releases filed with the Commission on Forms 8-K for the first, second, and third quarters of 2016 and 2017 and the fiscal year 2016; (4) quarterly earnings calls with investors and analysts during the time period; and (5) investor conferences in March and December 2016 and in March 2017.

16.     GE commentary on earnings calls, at investor conferences, and in its quarterly and annual reports during this period was materially misleading in light of the manner in which it described its earnings results.  GE described changes in profit in its Power business as arising from items other than reductions in cost estimates in its service agreement portfolio despite recognition internally that these changes were critical to GE's reported results.  For example, in the company's 2016 Form 10-K, GE stated that increase in Power segment profit for the year was "mainly driven by the effects of the acquisition [of a competitor power business], as well as material deflation, partially offset by lower cost productivity and an unfavorable business mix, driven by [turbine] shipments in the current year."  In fact, the GE Power Services' reduction in cost estimates on service agreements resulted in the reported GE Power segment profit.

17.     GE's disclosure of its Industrial Cash Flow non-GAAP measure in earnings releases and on earnings calls, at investor conferences, and in its quarterly and annual reports was misleading in light of its failure to disclose the extent to which the reported measure relied on

8

changes in practice expanding intercompany factoring in its GE Power business and pulling forward cash from future periods. GE's own description of the measure asserted that it "provides management and investors with useful measures to compare the capacity of our industrial operations to generate operating cash flow with the operating cash flow of other non-financial businesses and companies." Yet GE's deferred monetization practice marked increasing reliance on factoring with GE Capital, its internal financial business, in part to meet Industrial Cash Flow targets. GE's disclosure of intercompany factoring in its quarterly and annual reports suggested that the company only factored "current assets," and it did not modify this disclosure to reveal the impact of deferred monetization after it began the practice. In addition, until the second quarter of 2017, GE did not disclose its deferred monetization practice in earnings calls and investor conferences even in response to analyst questions about cash flow.

18.    In addition, the failure to disclose GE's deferred monetization practice misled GE's investors about the company's earnings quality by making it appear as if GE Power was converting earnings to cash in the present period, when in fact GE Power was pulling forward cash from future periods to offset current period growth in unbilled revenue and earnings.

19.    In a November 2017 investor conference, GE explained to investors for the first time that changes in service agreement cost estimates were offsetting lower transactional volume during the 2014 through 2016 time frame. By the end of 2017, GE had discontinued its deferred monetization. Since then, the company has provided investors with detail regarding the decrease in Industrial Cash Flow that has been generated by the practice.

## GE's Insurance Portfolio Gains Importance As the Company Divests its Capital Business

20.    GE has been in the insurance business since at least the 1980s, insuring billions of dollars' worth of policies primarily written by other companies – a practice known as "reinsurance." Beginning in or about 2004, GE explored exiting the insurance business. Between 2004 and 2007, GE divested large portions of its insurance portfolio, but it was unable to completely exit the business. GE's remaining insurance portfolio contained, among other things, billions of dollars' worth of long-term care insurance policies that GE would be unable to sell without incurring billions in losses. GE stopped reinsuring new insurance policies in or around 2008.

21.    The long-term care insurance policies reinsured by GE were underpriced, meaning that long-term care insurance companies had not set premium rates to be paid by customers at a high enough level to pay the costs to be covered by the policies. By the 2010's, long-term care insurance was understood to be a troubled product industry-wide because many companies had, from the beginning, underestimated the number, duration, and severity of claims that would be submitted under the policies, while overestimating the likely returns on investments made with premiums. Moreover, far fewer customers let policies lapse than the industry had expected. As a result, GE had to pay more for nursing home and other medical costs than originally forecast, because policyholders were living longer and requiring more expensive care while GE was earning less than expected on invested premiums.

22.     By 2015, GE's insurance holdings were consolidated in a management entity in the company's GE Capital business referred to as North American Life and Health ("NALH"). Executives at NALH were tasked with the administration of the insurance portfolio as well as financial analysis of the expected claims and premiums.  When GE announced in April 2015 that it would divest much of its GE Capital business, it determined that its insurance operations would remain with the company because they were effectively unsellable without large losses.

23.     Executives at NALH and at GE Capital acknowledged internally during 2015 and 2016 that NALH's continuing and expected losses posed a growing risk to GE's financial statements.  GE had not publicly disclosed this risk to investors.  In connection with its plan to divest much of GE Capital, GE had introduced a non-GAAP measure referred to as "Verticals," which GE's CEO described to investors as "the way we think about GE going forward."  Verticals was designed to measure the performance of the anticipated remaining operations in GE Capital, including healthcare, energy, and aviation financing businesses as well as insurance operations. NALH was a part of the remaining operations in Verticals, and its financial results had the potential to be a larger influence on the smaller GE Capital entity covered by the Verticals measure.  NALH and GE Capital executives discussed how to minimize losses at NALH, particularly "shock losses" – large, unforecasted losses in any period.

### NALH Offsets Deteriorating Claims Experience By Assuming Fewer Claims in the Future

24.     Under relevant accounting rules, each year NALH engaged in an impairment test, referred to by NALH as a "loss recognition test" to evaluate whether the reserves GE held for future insurance claims were adequate.  As part of loss recognition testing, each year actuaries (business professionals who are routinely employed by insurance companies to determine premium rates and to evaluate liabilities) evaluated actual claims experience, set current best estimate assumptions, used the best estimate assumptions to project out NALH's insurance liabilities, and compared those projections to the insurance reserves on NALH's financial statements.

25.     As part of the annual loss recognition testing, NALH collected and analyzed an additional year's worth of claims data.  This process – referred to by NALH as an "experience study" – typically occurred in or around the fourth quarter of the year, and was used by NALH to perform the annual loss recognition testing in the third quarter of the following year.  Using this analysis, which was based on data received up through December 31 of the prior year, as well as other information, NALH actuaries proposed a revised set of assumptions.  The loss recognition testing resulted in a "margin" calculation.  If the margin was positive, there was no change to GE's financial statements.  If the margin was negative, GE would have to record an income statement charge in the period in which the loss recognition test was performed of at least the amount of negative margin.  A negative margin could also prompt NALH to perform a more detailed review of its reserves, which could lead to recognizing significantly larger losses.

26.     NALH experienced higher claims experience than anticipated on its long-term care insurance portfolio.  This higher experience stressed NALH's loss recognition testing margin. Feeling pressure from GE Capital to avoid losses that would negatively impact GE's financial

statements, NALH leadership used lower future claims cost assumptions in loss recognition testing and changed the testing process to achieve positive loss recognition testing margins.

27.     In 2015, NALH changed assumptions used in the testing process after preliminary analysis indicated a loss recognition testing margin that was negative.  Most notably, NALH increased its morbidity improvement assumption, a key assumption that projected lower claims over time due to general and unspecified improvements in medical care and other developments that would improve people's health.  By using altered assumptions which anticipated lower future claims costs and higher future premiums, NALH produced a positive margin in 2015.

28.     In early 2016, as claims experience for GE's long-term care policies continued to deteriorate, NALH executives began briefing GE Capital executives on the possibility of significant losses during the year.  In May, one GE Capital executive responded to the potential for an additional $40 million to $130 million in losses by noting that such a result "could derail Verticals income target for the year."  At a subsequent meeting that same month, NALH executives advised GE Capital executives of the potential for an additional $200 million in losses, which prompted one GE Capital executive to respond that such a result would be a "train wreck." Following that meeting, an NALH executive summarized GE's insurance problems as follows:

> The essence is that NALH is now a large piece of the GE Capital['s remaining] operations and the NALH poor experience and P&L volatility are likely going to cause issues over time.  [We] work the issues as they arise but this business is going to have major challenges due to the nature of the portfolio itself, current market conditions and continued deterioration from long term care business.

29.     During the summer of 2016, NALH management and actuaries had internal discussions about whether the assumptions of improved claims experience in the future were realistic.  By August 2016, however,  NALH considered but decided not to make certain assumptions less aggressive because the change would have had too great a negative impact on the margin.  Further, NALH failed to follow up on its lead long-term care actuary's observation that he did not believe certain assumptions about future claims were supportable in light of recent experience.

30.     In early August 2016, NALH's actuaries concluded their work on the annual loss recognition test.  The actuaries presented a loss recognition testing margin of negative $178 million, a result that, if used, would have required GE to take a $178 million loss to earnings.

31.     In response to the negative $178 million loss recognition testing result, NALH executives employed a new approach, referred to as the "rollforward," which eliminated the loss recognition testing deficiency.  The rollforward, which changed the "valuation date" for certain assumptions used in the loss recognition testing, changed the margin from negative $178 million to a positive $86 million, avoiding any losses on GE's financial statements.

32.     NALH executives justified the rollforward as a means to provide a "more current" estimate for loss recognition testing.  But the rollforward did not reassess all actuarial assumptions

in light of deteriorating claims experience during 2016.  In fact, it did not include claims cost data received during 2016.  Instead, those performing the rollforward process took actuarial assumptions based on claims data and assumptions from the end of 2015 and projected them forward nine months.  Because NALH's loss recognition testing model used assumptions that resulted in projections that the margin would improve over time, "aging" the model nine months improved the margin by $300 million, and caused the margin to turn positive.

33.     The rollforward raised questions from internal auditors, who questioned changing the loss recognition testing methodology midstream and stated in a January 2017 assessment that "[i]t is not a common practice to make such a change to a vital GAAP metric without a formalized oversight and approval process."  NALH had failed to adequately document the rationale employed in its roll-forward assumption setting process.

34.     By the end of 2016, an NALH executive warned a GE Capital executive that long-term care experience had continued to deteriorate during the year.  He further posited that key assumptions regarding future claims improvement had not been realized in recent actual experience.

35.     During 2017, NALH actuaries completed analyses which indicated that NALH might need to substantially increase its insurance reserves.  In July 2017, GE publicly disclosed a review of its insurance portfolio, which ultimately led to GE's $9.5 billion pre-tax charge against earnings in January 2018 and required capital contributions of approximately $15 billion over seven years.  In GE's quarterly report on Form 10-Q for the third quarter of 2017, the company began to provide detailed information regarding its long-term care insurance exposure and, later, additional detail about the assumptions used in its loss recognition testing process.

## GE's Insurance Disclosure Failures from 2015 to 2017

36.     From the third quarter of 2015 through the first quarter of 2017, GE's disclosures about its insurance business omitted material known trends of increasing costs in its historical claims experience and uncertainties, inherent in increasingly optimistic assumptions of lower future claims costs, that material insurance losses were reasonably likely in the future.  As a result of the conduct described above, GE omitted material information in: (1) its annual report on Form 10-K for fiscal years 2015 and 2016; and (2) its quarterly reports on Forms 10-Q for the third quarter of 2015; the first, second, and third quarters of 2016; and the first quarter of 2017.

37.     Pursuant to Item 303 of Regulation S-K, 17 C.F.R. § 229.303, companies with an obligation to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act are required to disclose in Item 7 of Management's Discussion and Analysis of Financial Condition and Results of Operations of Form 10-K, among other things, information that the registrant believes to be necessary to an understanding of the company's "financial condition, changes in financial condition and results of operations."

38.     Item 303(a)(3)(ii) of Regulation S-K, 17 C.F.R. § 229.303(a), requires such companies to describe, among other things, "any known trends or uncertainties that have had or

12

that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations" in its annual report on Form 10-K. Instruction 3 to Item 303(a) of Regulation S-K requires that the "discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." Item 303(b) of Regulation S-K requires discussion of material changes in such known trends or uncertainties in quarterly reports on Form 10-Q.

39.     In its Forms 10-K and Forms 10-Q from the third quarter of 2015 through the first quarter of 2017, GE failed to disclose known trends and uncertainties regarding increasing costs and reasonably likely losses in its insurance business. Despite known trends of increasing costs from long-term care insurance policies, NALH lowered projected claims costs for the distant future and simultaneously concluded that it did not have insurance losses. Because GE had a large and risky long-term care insurance block, and because NALH was depending on increasingly optimistic projections on future claims while experiencing known trends of increasing historical claims, GE understood that there were known uncertainties inherent in their estimates that were reasonably likely to come to fruition and had the potential for material insurance losses in the future. Nonetheless, during those years, NALH offset increasing historical claims experience by assuming projected claims costs would significantly decrease in the distant future. NALH and GE Capital executives were informed that this approach rendered material losses reasonably likely in the future. In addition, NALH executives and actuaries questioned whether future claims assumptions were appropriate in light of recent experience. The failure to disclose these known trends and uncertainties caused GE's Forms 10-K and Forms 10-Q from the third quarter of 2015 through the first quarter of 2017 to be materially misleading.

## GE's Internal Accounting Control Failures

40.     GE did not design and maintain sufficient internal accounting controls governing: (1) management's process for determining, reporting, and recording its loss recognition testing for its insurance business, and (2) the supporting documentation that must be maintained to evidence management's process in determining its loss recognition testing estimate. As evidenced by GE's internal audit report, the company's rollforward process lacked formal oversight and approval, and the company failed to adequately document the rationale for the rollforward process it employed in its estimate. As a result, GE failed to keep books and records that in reasonable detail accurately and fairly reflected its transactions as required under Section 13(b)(2)(A) of the Exchange Act and failed to devise and maintain a sufficient system of internal accounting controls as required under Section 13(b)(2)(B) of the Exchange Act.

## GE's Disclosure Control and Procedures Failures

41.     GE lacked sufficient disclosure controls and procedures to ensure that known trends and uncertainties regarding its insurance liabilities were accumulated and communicated to the GE executives responsible for the company's disclosure in a timely manner as required by Rule 13a-15(a). In particular, GE executives were not informed until the second quarter of 2017 of NALH's

13

increasingly optimistic projections of future liabilities despite higher than expected claims.  In addition, GE was not informed of GE Capital's and NALH's use of the roll-forward in 2016.

## **Offer and Sale of Securities**

42.     During the relevant period, GE offered and sold bonds as part of an 8.7 billion Euro bond offering in May 2017 and engaged in tender offers involving GE preferred and common stock.  Also during the relevant period, GE employees exercised GE stock options issued pursuant to the company's employee compensation plan.

## **Violations**

43.     As a result of the conduct described above, GE violated Section 17(a)(2) and (3) of the Securities Act, which prohibit any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities.  Negligence is sufficient to establish violations of Sections 17(a)(2) and 17(a)(3).  *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

44.     In addition, GE violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder, which require reporting companies to file with the Commission complete and accurate annual and quarterly reports and reports of material events such as earnings announcements.  GE also violated Exchange Act Rule 12b-20, which requires an issuer to include in a statement or report filed with the Commission any information necessary to make the required statements in the filing not materially misleading.

45.     In addition, GE violated Exchange Act Rule 13a-15(a), which requires issuers required to file reports pursuant to Exchange Act Section 13(a) or 15(d) to maintain disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e).

46.     In addition, GE violated Section 13(b)(2)(A) of the Exchange Act, which requires reporting companies to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect their transactions and dispositions of their assets.

47.     In addition, GE violated Section 13(b)(2)(B) of the Exchange Act, which requires all reporting companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP or any other criteria applicable to such statements.

48.     In addition, GE violated Rule 100(b) of Regulation G, which prohibits a registrant, or person acting on its behalf, from making public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion

14

of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

## **GE's Remedial Efforts**

In determining to accept the Offer, the Commission considered remedial acts promptly undertaken by GE. Among other things, GE has replaced management at its insurance and power subsidiaries, revised investor disclosures to address insurance and power trends and risks, added internal controls on its insurance loss recognition testing process, and added disclosure controls and procedures concerning its insurance liabilities.

## **Undertakings**

Respondent has undertaken to:

1.      Report to the Commission staff during a one-year term, as set forth herein, GE's compliance with Commission regulations and GAAP regarding its financial reporting and the status of any remediation, implementation, auditing and testing of its internal accounting controls and compliance measures related to its insurance and Power businesses. During this period, should GE discover credible evidence, not already reported to the Commission staff, of insufficiencies in the design or operation of its internal accounting controls related to its insurance loss recognition testing process or in the design or operation of its disclosure controls and procedures related to its insurance and Power businesses, GE shall report such insufficiencies to the Commission staff and state either that all such insufficiencies have been remediated or that it cannot certify compliance. During this one-year period, GE shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare a final follow-up report, as described below:

a.      GE shall submit to the Commission staff a written report within 150 calendar days of the entry of this Order setting forth a complete description of its internal accounting controls, policies, and procedures related to its insurance loss recognition testing process as well as a complete description of its disclosure controls and procedures related to its Insurance and Power businesses (the "Initial Report"). The Initial Report shall also include GE's remediation efforts to date, including a description of the controls, policies, and procedures in place, and any proposals to make improvements, that are reasonably designed to improve internal accounting controls, policies and procedures and disclosure controls and procedures of GE for ensuring compliance with Commission regulations and GAAP, and the parameters of the subsequent reviews.

b.      GE shall undertake a follow-up review, incorporating any comments provided by the Commission staff on the Initial Report, to further test, monitor and assess as necessary whether its internal accounting controls, policies and procedures and disclosure controls and procedures are reasonably designed to: (1) provide reasonable assurance of compliance with Commission regulations and GAAP; (2) detect and prevent insufficiencies in the design or operation of its internal accounting controls, policies, and

15

procedures relating to its insurance loss recognition testing; and (3) detect and prevent insufficiencies in the design or operation of its disclosure controls and procedures related to its insurance and Power businesses.  GE shall submit to the Commission staff its final follow-up report within 365 calendar days of the entry of this Order (the "Final Report").

      c.     The Initial and Final Reports shall be transmitted to Celia Moore, Assistant Director, Boston Regional Office, Division of Enforcement, Securities and Exchange Commission, 33 Arch Street, 24th Floor, Boston, MA 02110.  GE may extend the time period for issuance of the Initial and Final Reports with prior written approval of the Commission staff.  GE shall provide its external auditors with copies of the Initial and Final Reports and shall provide staff with any written reports or recommendations produced by the external auditors in response to those Reports.

      d.     The Initial and Final Reports submitted by GE will likely include confidential financial, proprietary, competitive business or commercial information. Public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the Initial and Final Reports and the contents thereof are intended to remain and shall remain nonpublic, except (1) pursuant to court order, (2) as agreed by the parties in writing, (3) to the extent that the Commission staff determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) is otherwise required by law.

      e.     GE shall certify, in writing, compliance with the undertaking(s) set forth above.  The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and GE agrees to provide such evidence.  The certification and supporting materials shall be submitted to Celia Moore, Assistant Director, Boston Regional Office, Division of Enforcement, Securities and Exchange Commission, 33 Arch Street, 24th Floor, Boston, MA 02110, no later than 60 days from the date of the completion of the undertakings

      f.     Within one year of the entry of this Order, should GE discover credible evidence, not already reported to the Commission staff, that its disclosure controls and procedures are not free from material weakness, GE shall provide a detailed report to the Commission staff.

    2.     GE shall preserve and retain all documentation regarding all certifications and reports for seven (7) years and shall make it available to the Commission staff upon request.

    3.     In determining whether to accept GE's Offer, the Commission has considered these undertakings.  GE agrees that if the Division of Enforcement believes that GE has not satisfied these undertakings, it may petition the Commission to reopen the matter to determine whether

additional sanctions are appropriate.  For good cause shown, the Commission staff may in its sole discretion extend any of the procedural dates relating to the undertakings.

4. GE (including its officers, directors, and employees, and third-party consultants within GE's control) shall cooperate fully with the Commission with respect to this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party and subject to compliance with applicable law.  GE agrees that such cooperation shall include, but is not limited to:

a. Production of Information: at the Commission's request, upon reasonable notice, and without subpoena, GE (including its officers, directors, and employees, and third-party consultants within GE's control) shall truthfully and completely disclose all information in its possession requested by the Commission staff in connection with the Commission's investigation, litigation or other related proceedings;

b. Production of Documents: at the Commission's request, upon reasonable notice, and without subpoena, GE (including its officers, directors, and employees, and third-party consultants within GE's control) shall provide any document, record or other tangible evidence in its possession requested by the Commission staff in connection with the Commission's investigation, litigation or other related proceedings; and

c. Production of Cooperative Personnel: at the Commission's request, upon reasonable notice, and without subpoena, GE (including its officers, directors, and employees, and third-party consultants within GE's control) shall secure the attendance and truthful statements, deposition, or testimony of any GE officer, director, or employee or third-party consultant within GE's control, excluding any person who is a party to any related litigated judicial or administrative proceeding, at any meeting, interview, testimony, deposition, trial, or other legal proceeding.

The foregoing obligations are subject to GE's reservation of rights: (i) to claim that documents or information requested is subject to attorney-client privilege, attorney-work-product protection, or bank examiner privilege; and (ii) to seek entry of a confidentiality order as to: sensitive business documents or information; sensitive personnel documents or information; or confidential information pertaining to parties other than GE.

d. Service and Personal Jurisdiction Consents:  GE further agrees that, with respect to this action and any related judicial or administrative proceeding or investigation commenced by the Commission or to which the Commission is a party, it will: (i) accept service by email, mail or facsimile transmission of notices, requests, or subpoenas issued by the Commission for documents or testimony at depositions, hearings, or trials, or in connection with any related investigation by the Commission staff ("Commission Service"); (ii) appoint GE's undersigned attorney as agent to receive Commission Service; (iii) with respect to Commission Service, waive the territorial limits upon service contained in Rule 45 for the Federal Rules of Civil Procedure and any applicable local rules, provided that the party requesting the testimony reimburses GE's travel, lodging, and subsistence

17

expenses at the then-prevailing U.S. Government per diem rates; and (iv) consent to personal jurisdiction over GE in any United States District Court for purposes of enforcing any Commission Service.

IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent GE's Offer.

Accordingly, pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, it is hereby ORDERED that:

A.      Respondent GE cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and (3) of the Securities Act, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 13a-15(a), and Rule 100(b) of Regulation G thereunder, and Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

B.      Respondent shall, within 60 days of the entry of this Order, pay a civil money penalty in the amount of $200,000,000.00 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying GE as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to John Dugan, Associate Director, Boston Regional Office, Division of Enforcement, Securities and Exchange Commission, 33 Arch Street, 24th Floor, Boston, MA 02110.

C.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created to be administered by a third party for the penalties referenced in paragraph B above, the costs of which shall be paid by the Fair Fund.  Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

D.      Respondent shall comply with the undertakings enumerated in Section III above.

By the Commission.

Vanessa A. Countryman
Secretary