UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                        :

SJUNDE AP-FONDEN et al., *individually and on behalf*  :
*of all others similarly situated*,                        :
                                          :

                          Plaintiffs,         :               17-CV-8457 (JMF)
                                          :

          -v-                          :        OPINION AND ORDER
                                          :

GENERAL ELECTRIC COMPANY et al.,          :
                                          :

                        Defendants.       :
                                          :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this putative class action, Lead Plaintiff Sjunde AP-Fonden and Plaintiff the Cleveland

Bakers and Teamsters Pension Fund (together, "Plaintiffs"), two pension funds, bring claims

against General Electric Company ("GE") and six current or former GE executives (the

"Individual Defendants" and, together with GE, "Defendants").  Plaintiffs allege violations of

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15

U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R.

§ 240.10b-5.  In a previous Opinion and Order, familiarity with which is assumed, the Court

granted in part and denied in part Defendants' motion to dismiss the Fourth Amended Complaint

("FAC") and granted Plaintiffs leave to amend.  *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F.

Supp. 3d 379 (S.D.N.Y. 2019) (ECF No. 185).  Thereafter, Plaintiffs filed their Fifth Amended

Complaint (the "Complaint").  *See* ECF No. 191 ("Compl.").  Defendants now move, once again

pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' amended

claims.  For the reasons that follow, the motion is once again granted in part and denied in part.

# BACKGROUND

As they did in the FAC, Plaintiffs allege in the Complaint claims relating to misrepresentations about (1) the risk and quality of GE's long-term care ("LTC") insurance portfolio and (2) its accounting and revenue recognition for certain long-term service agreements ("LTSAs") made by its power division between February 27, 2013 and January 23, 2018 (the "Class Period"). *See* Compl. 1-4.  The following background relevant to these claims is drawn from the Complaint, as well as attached exhibits; documents that the Complaint incorporates by reference; and legally required public disclosures filed with the SEC. *See Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

## A.  Long-Term Care Insurance Portfolio

Plaintiffs' first set of claims pertains to GE's LTC insurance portfolio, a brief review of which is in order. *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 385-87 (describing background facts supporting LTC insurance claims).  LTC insurance protects an insured from "the out-of-pocket costs of LTC services, such as assisted living and nursing home facilities, home health aides, respite or hospice care, and other similar services required when an individual becomes unable to independently perform the basic activities of daily living."  Compl. ¶ 83.

LTC insurance companies are required by state regulators "to establish reserves to pay future claims, and to assess the adequacy of those reserves on a regular basis." *Id.* ¶ 89.  "LTC reserves are composed of 'active life reserves' (or 'ALR') and 'disabled life reserves' (or 'DLR').  ALR (or 'benefit reserves') are maintained for LTC insurance policies on which no claim has yet been made, while DLR (or 'claims reserves') are maintained for LTC insurance policies on which a claim has already been made (i.e., the policyholder has filed a claim for coverage)." *Id.*  ALR is calculated based on various assumptions, including incidence rates (how

many insureds ultimately file claims); lapse rates (how many insureds will let their policies lapse); morbidity rates (how many insureds develop a condition requiring LTC); mortality rates (how long insureds will live); utilization rates (the amount of benefits used by insureds when they file claims); and interest rates. *Id.* ¶ 90. "DLR is calculated using (i) utilization rates; and (ii) claims termination rates, which are a function of lapse rates and mortality rates." *Id.* ¶ 91.

Under Generally Accepted Accounting Principles ("GAAP"), "ALR assumptions are 'locked' at the time the policy is originated." *Id.* ¶ 92. Accordingly, "th[e]se assumptions do not change until such time as a reserve deficiency is identified" through annual reserve testing processes. *Id.* "If a deficiency is identified, original ALR assumptions are 'unlocked' and ALR is recalculated using revised assumptions that account for the insurer's actual claims experience and, potentially, the experience of the LTC industry as a whole." *Id.* DLR assumptions, on the other hand, are not "locked" under GAAP; instead, "they are based on 'best estimate' assumptions . . . that reflect[] anticipated experience with no provision for risk of adverse deviation . . . based on experience studies, i.e., the insurer's experience with respect to the policies covered by the DLR." *Id.* ¶ 93 (internal quotation marks omitted). "When a policy is entered into with a customer, the insurance company calculates and sets aside ALR for that policy. When a policy goes 'on claim,' ALR associated with that policy is generally transferred to DLR." *Id.* ¶ 89.

In the 1990s and early 2000s, GE Capital, GE's financial services arm, wrote and reinsured LTC policies, capturing 20% of the market by 2001. *Id.* ¶ 8. In the mid-2000s, however, GE decided to exit the insurance business. To that end, it spun off the majority of its LTC insurance portfolio to a newly formed company, Genworth, in 2004, *see id.* ¶¶ 9, 108, and sold its remaining insurance stake to Swiss Re in 2006, *see id.* ¶¶ 113-14. In both transactions,

however, GE agreed to reinsure portions of the transferred LTC insurance blocks and, therefore, retained significant exposure even as it had, on the surface, transferred much of its insurance portfolio to other companies and was no longer writing new LTC policies.  *Id.* ¶¶ 109, 113-14.[1] In fact, the reinsurance blocks GE retained were the "worst of the worst," some of the "riskiest blocks of LTC insurance in the entire industry," *id.* ¶¶ 110, 114, 265 (emphases omitted) — so much so that, had GE not agreed to retain them, it "would have threatened" the deals with Genworth and Swiss Re, *id.* ¶ 111 (emphasis omitted); *see id.* ¶¶ 114-15.  Following these transactions, and throughout the Class Period, GE's remaining LTC insurance operations resided in Employers Reassurance Corporation ("ERAC"), a wholly owned indirect subsidiary of GE, organized within GE Capital and domiciled in Kansas, and Union Fidelity Life Insurance Company ("UFLIC"), a wholly owned subsidiary of ERAC.  *Id.* ¶¶ 51-52.

During this same period, a "perfect storm" of factors "catastrophically impacted the profitability of LTC insurers and reinsurers" as a result of "negative deviations between th[e] original pricing assumptions [employed at LTC policy origination] and actual claims experience."  *Id.* ¶¶ 96-100, 104.  This was especially problematic for "LTC reinsurers like GE, as only the [original] ceding insurer may apply to a state regulator for a rate increase, and reinsurers are at their mercy to do so."  *Id.* ¶ 101.  Notwithstanding these developments and GE's continued exposure, GE repeatedly publicly touted its successful exit from the insurance business and the quality and safety of GE Capital's remaining portfolio.  *See id.* ¶¶ 10, 15, 259.  Beginning in 2013, GE changed the way it reported its insurance liabilities in annual regulatory filings.  Before 2013, GE's yearly SEC Form 10-K filings provided an "Insurance liabilities"

---

[1]     For simplicity, the Court will refer to GE's block of reinsurance policies as its "insurance" portfolio, even though it acted primarily as a reinsurer during the relevant time.

figure that included its LTC liabilities.  *Id.* ¶ 244.  Starting with the 2012 Form 10-K, however, GE omitted LTC liabilities from this calculation, instead pointing readers to a "Note" sixty-seven pages later that ostensibly revealed the entirety of its insurance liabilities.  *See id.* ¶¶ 246-47, 251; *see also* ECF No. 195-8 ("2012 Form 10-K"), at 48, 81.[2]  As the 2012 Form 10-K stated, these liabilities "comprise[d] mainly obligations to annuitants and policyholders in our run-off insurance operations."  2012 Form 10-K, at 81.  The relevant disclosures in GE's Form 10-Ks for 2013, 2014, 2015, and 2016 were substantially similar.  *See* Compl. ¶ 248.

In each year during the Class Period, ERAC and UFLIC "submitted a series of statutory filings to the Kansas Insurance Department," their primary regulator, "pertaining to, among other things, their financial condition and the performance of their reinsurance portfolios."  *Id.* ¶ 126.  "In connection with these statutory filings, ERAC and UFLIC conducted claims experience studies, which involved a review and analysis of actual claims experience data related to the LTC blocks that ERAC and UFLIC reinsured."  *Id.* ¶ 127.  Moreover, "on an annual basis, ERAC and UFLIC claims experience data was compiled in a PowerPoint presentation and presented to senior GE executives, including [CEO Jeffrey R.] Immelt and the CFO."  *Id.* ¶ 131 (emphasis omitted).  This PowerPoint presentation "contained similar items each year, including": "[t]he level of claims and how they were building over time"; "[p]rojected reserves"; "[t]otal historical termination rates, including deaths"; and "[i]nterest rates, current investment assets and earnings."  *Id.*

---

[2]     Because the excerpts of GE's Form 10-Ks that were filed with the Court, *see, e.g.*, *id.*; ECF No. 195-24 ("2015 Form 10-K"), use inconsistent pagination, references to specific page numbers in these documents are to the page numbers generated by the Court's electronic case filing system.

In July 2017, prompted by "adverse claims experience in a portion of [its] long-term care portfolio," GE announced that it would reassess the adequacy of its insurance reserves.  *Id.* ¶ 297 (emphasis and internal quotation marks omitted).  On January 16, 2018, GE announced that it was increasing "future policy benefit reserves" by $8.9 billion, resulting in a $6.2 billion charge to earnings in the fourth quarter of 2017.  *Id.* ¶ 32 (internal quotation marks omitted).

## B.  GE Power's LTSAs

The second set of fraud claims relates to the renegotiation of LTSAs by GE Power and how GE recognized revenues and profit from these renegotiations.  A division of GE Power called GE Power Services offered customers LTSAs, typically five- to twenty-five-year contracts to maintain and service equipment that included, for example, "monitoring, maintenance, service, and spare parts for a gas turbine installed in a customer's power plant."  *Id.* ¶¶ 19, 327.  Under these contracts, GE was paid "based on the utilization of the power equipment or upon the occurrence of a major event specified within the contract such as an 'overhaul.'"  *Id.* ¶ 332.  GE did not recognize revenue from LTSAs only when customers actually paid.  Instead, it estimated revenues and costs over the entire life of the agreement and, based on the costs it incurred as it performed under the LTSA, recognized a proportional amount of estimated revenue even if it had not yet been paid.  *See id.* ¶ 331.  Because both the amount and timing of payment under the LTSAs was based on how much a customer used the piece of equipment covered by the agreement, an accurate understanding of customer utilization rates was "critical[]" to properly estimate this not-yet-received revenue, known as "[c]ontract assets," over the life of the LTSA.  *Id.* ¶¶ 330, 332-34.  GE had "real time" access to customer utilization data courtesy of monitoring technology on customers' equipment.  *Id.* ¶ 348.  GE used "the historical average of

[customer utilization rates] over the prior three years" to estimate revenues from LTSAs. *Id.* ¶ 356.

Around the time of the 2008 financial crisis, however, the use of traditional power sources slumped worldwide. *See id*. ¶¶ 340, 342. In the years that followed and into the Class Period, equipment utilization among GE customers continued to drop. *See id.* ¶¶ 344-45. To generate revenue during the downturn, GE renegotiated its existing LTSAs to yield a higher average profit margin, which, under accounting rules in place at the time, allowed GE to recognize all of the additional average profit from previous years, going back to the start of the contract, in a single reporting period — a technique known as a "cumulative catch-up adjustment." *See id.* ¶¶ 22, 336-38. These renegotiated contracts came at a price, generating short-term revenues through catch-up adjustments, but actually cutting into GE's long-term profits. *See id.* ¶¶ 363, 366-67. Moreover, because cumulative catch-up adjustments produced revenues in a single reported period, but did not necessarily produce cash, a gulf formed between GE's revenue and its cash on hand. *Id.* ¶¶ 23, 366, 386. To address this cash flow problem and mask the growing disparity, GE began to "factor[]" the payment streams (or "receivables") — that is, to "monetize" customers' not-yet-due-payments by selling the receivables to outside parties or to GE Capital in exchange for cash. *Id.* ¶¶ 393-95, 398. GE Power's management led a "global" effort to factor "everything," including LTSAs. *Id.* ¶¶ 400, 402-03. Given the finite number of LTSAs and the dwindling number of new LTSAs that GE was signing, however, GE would eventually run out of contracts to factor in exchange for cash. *See id.* ¶ 401. This risk was exacerbated by a looming accounting rule change, set to take effect in 2018, which would "prohibit[] companies like GE from recognizing cumulative catch-up adjustments on its LTSAs." *Id.* ¶¶ 364, 369. On April 13, 2018, GE filed a Form 8-K revising some of its revenue

projections in light of the new accounting standards, under which GE's reported contract assets were "effectively writ[ten] down" by $8.7 billion.  *See id.* ¶¶ 35, 380-81, 437, 443.

## C.  Procedural History

On November 1, 2017, a putative class action suit was filed against GE; Immelt; Jeffrey S. Bornstein, GE's then-CFO; and John L. Flannery, GE's then-CEO.  *See* ECF No. 1.[3] Following consolidation and coordination with related cases and the appointment of Sjunde AP-Fonden as Lead Plaintiff, *see* ECF Nos. 11, 16, 55, 61, 116, 139, Plaintiffs filed a Third Amended Complaint, ECF No. 157, and, thereafter, the FAC, *see* ECF Nos. 177, 179. Defendants moved to dismiss the FAC in its entirety for failure to state a claim.  *See* ECF No. 172, 177.  On August 29, 2019, the Court issued its earlier Opinion and Order granting in part and denying in part Defendants' motion and granting Plaintiffs leave to amend.  *See Sjunde AP-Fonden*, 417 F. Supp. 3d 379.

The Court first dismissed with prejudice all of "Plaintiffs' claims based on statements, omissions, or misrepresentations made before July 25, 2013, and which were not timely raised in an earlier complaint or motion to intervene" as time-barred by the five-year statute of repose.  *Id.* at 392.  The Court then turned to "Plaintiffs' claims based on alleged misrepresentations and omissions relating to GE's LTC portfolio" and determined "that Plaintiffs fail[ed] to state a claim for securities fraud based on any LTC-related statement or omission."  *Id.*  The Court reached that conclusion for several reasons.  First, the Court concluded that the exclusion of LTC liabilities from the Management Discussion & Analysis ("MD&A") tables in GE's Class Period Form 10-Ks — and their inclusion in "Note 11" — was not misleading and did not give rise to

---

[3]     Flannery was dropped as a defendant in the Third Amended Complaint and Plaintiffs' subsequent pleadings.  *See* ECF No.  157, at 1; FAC 1; Compl. 1.

an Item 303-based claim because GE's disclosure of "the entirety of its insurance liabilities . . . defeat[ed] any finding that GE acted with the requisite scienter." *Id.* at 393-94.  Second, the Court reasoned that "Defendants' statements about [GE's] 'insurance reserves' — assets set aside to cover future claims payments," *id.* at 394-95 — were not actionable because they qualified as opinion statements, *id.* at 395, and Plaintiffs failed to meet their burden under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), "to plausibly allege that any Defendant did not believe their LTC reserve statements were true," *Sjunde AP-Fonden*, 417 F. Supp. 3d at 396 (internal quotation marks and alteration omitted).  Third, Plaintiffs' alleged violations of Item 303 and various GAAP provisions failed "because Plaintiffs d[id] not plead facts that GE's omissions were made under circumstances that 'give rise to a strong inference of scienter.'" *Id.* at 398 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)).  And fourth, various allegedly false or misleading statements made during the Class Period by GE executives did not give rise to securities fraud claims because "GE's decision to speak about selling its insurance businesses — truthfully, and in the larger context of GE's move away from 'non-core' businesses — did not give rise to a duty to qualify those statements by simultaneously disclosing that it had retained a portfolio of run-off insurance policies." *Id.* at 401-02.  Additionally, the FAC "fail[ed] to plausibly allege that [the relevant Individual Defendants] 'knew facts or had access to information suggesting that their public statements were not accurate.'" *Id.* at 402 (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009)).

Next, the Court turned to "Plaintiffs' claims that GE fraudulently engaged in a variety of 'unsustainable' business practices relating to its LTSAs . . . with GE Power customers in an effort to conceal poor performance following a worldwide downturn in energy equipment

usage." *Id.* at 404.  Here too, the Court granted Defendants' motion to dismiss as to several of

Plaintiffs' claims.  First, the Court determined that Plaintiffs "fail[ed] to adequately allege that

Defendants did not believe their LTSA-related revenue projections were accurate or that the

projections would suggest things to a reasonable investor that did not align with undisclosed

facts in GE's possession." *Id.* at 406.  Second, Plaintiffs' allegations of GAAP violations were

pleaded "so skeletally that they [did] not satisfy even Rule 8's relatively lenient thresholds, much

less the heightened standards imposed by Rule 9 [of the Federal Rules of Civil Procedure] and

the" Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2).  *Id.*

(citation omitted).  Third, the alleged Item 303 violations based on failure to disclose GE's

reliance on unsustainable business practices to renegotiate LTSAs in order to generate positive

cumulative catch-up adjustments failed "because Plaintiffs' theory of fraud d[id] not ultimately

hang together," *Sjunde AP-Fonden*, 417 F. Supp. 3d at 407, while the alleged Item 303 violations

based on the deteriorating power industry and customers' migration to sustainable energy

sources and resulting decreased asset usage were not actually pleaded in the FAC, *see id.* at 408.

Finally, the Court held that most of the public statements at issue concerning LTSAs were "not

adequately alleged to be false or misleading." *Id.* at 410.  Just two Section 10(b) claims were

held to be adequately pleaded, both concerning GE's extensive "factoring" of LTSAs: (1) a

failure to disclose GE's comprehensive factoring in violation of Item 303, *see id.* at 408-09; and

(2) a misleading statement in GE's 2016 Form 10-K  "that, in order to manage credit exposure,

the Company sells additional current receivables to third parties," *id.* at 413-14 (internal

quotation marks, alteration, and emphasis omitted).

      Finally, the Court turned to Plaintiffs' claims under Section 20(a) of the Exchange Act.  It

concluded the "certification" claims needed to be dismissed because Plaintiffs "d[id] not allege

specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why," "fail[ed] to adequately allege that GE violated GAAP, [and] fail[ed] to adequately allege that [the relevant Individual Defendants] acted with scienter in certifying that the LTC-related information in GE's financial statements comported with GAAP."  *Id.* at 414 (internal quotation marks and citations omitted).  All "control person" claims for which Plaintiffs failed to plead primary violations were also dismissed.  *See id.* at 415.  The Court, however, denied Defendants' motion to dismiss the two Section 20(a) control person claims for which primary violations were adequately alleged in light of "Defendants' failure to genuinely put the sufficiency of Plaintiff's Section 20(a) pleading at issue."  *Id.*

Despite largely granting Defendants' motion to dismiss, the Court "conclude[d] that leave to amend [wa]s warranted given the nature of the Court's rulings and the sheer number of issues addressed."  *Id.*  "In particular," the Court observed, "Plaintiffs may be able to allege additional facts regarding the Individual Defendants' knowledge, or conscious disregard of, GE's actuarial issues (with respect to its LTC portfolio) and the trends and risks it should have disclosed (with respect to its LTSAs) that would permit Plaintiffs to clear the scienter bar, and as to their more threadbare claims, to allege facts that may meet the requirements of Rules 8 and 9(b)."  *Id.* at 415-16 (citation omitted).  Thereafter, Plaintiffs filed the operative Complaint on October 25, 2019, Compl., which Defendants now move to dismiss, ECF No. 194.

**D.  GE's Settlement with the SEC**

On December 9, 2020, Defendants notified the Court that GE had reached a settlement with the SEC, announced earlier that day, arising from an investigation referenced in the Complaint regarding violations of Sections 13(a) and 17(a)(2)-(3) of the Exchange Act and rules promulgated thereunder.  *See* ECF No. 201; ECF No. 201-1 ("Settlement") ¶¶ 43-48; *see also*

Compl. ¶ 501.  In a letter filed two days later, Plaintiffs request that the Court take judicial notice

of the Settlement's "detailed factual findings . . . confirm[ing] Plaintiffs' allegations that GE

misled investors concerning GE Power and the GE LTC business."  ECF No. 202, at 1.

Defendants, meanwhile, urge the Court to infer from the fact of the Settlement evidence of the

lack of scienter, on the theory that the Settlement charges only violations of the Exchange Act

that lack scienter requirements.  *See* ECF No. 203, at 2.  The Court will do neither.

Although the Court may take judicial notice of publicly filed documents such as the

Settlement on a motion to dismiss, it may not do so for the purpose of considering the truth of the

facts alleged therein.  *See, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d

Cir. 2008) (finding no abuse of discretion where the district court took notice of regulatory

filings because they "were [not] offered for the truth of the matter asserted" but rather for the fact

that "assertions were made in . . . regulatory filings").  The cases cited by Plaintiffs are thus

distinguishable.  *See Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (summary order)

(affirming a decision of the district court to take judicial notice of an SEC order because "the

district court took judicial notice of the documents for the purpose of establishing that the

information was publicly available; it did not consider the documents for their truth," and citing

*In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at *7 & n.6, *10, *13 (S.D.N.Y. June 10,

2010), a case cited by Plaintiffs here, as an example of same).[4]  Nor will the Court affirmatively

infer that "the non-scienter, non-Section 10(b) settlement weighs in favor of dismissal of the

---

[4]      *In re Facebook, Inc., IPO Securities & Derivative Litigation*, 986 F. Supp. 2d 428
(S.D.N.Y. 2013), does appear to take judicial notice of an SEC order for the truth of the facts
asserted therein but does so without significant analysis of the appropriateness of doing so and
without considering contrary guidance from the Second Circuit, such as *Finn*, 471 F. App'x at
32, and *Staehr*, 547 F.3d at 425.  *See In re Facebook*, 986 F. Supp. 2d at 438 n.3.  To the extent
that *In re Facebook* stands for that proposition, the Court declines to follow it.

[Complaint]," ECF No. 203, at 2.  *Fries v. Northern Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 712, 722 (S.D.N.Y. 2018), and *Shemian v. Research In Motion Ltd.*, No. 11-CV-4068 (RJS), 2013 WL 1285779, at *4 n.3 (S.D.N.Y. Mar. 29, 2013) (Sullivan, J.), *aff'd*, 570 F. App'x 32 (2d Cir. 2014), cited by Defendants, both involved SEC orders that were incorporated by reference in the complaint, and both merely noted that settlements charging non-scienter-based violations do not support an inference of scienter.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  The Court will not dismiss any claims unless Plaintiffs have failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, Plaintiffs must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Further, if Plaintiffs "have not nudged their claims across the line from conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Because Plaintiffs in this case allege securities fraud, they must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," and the PSLRA, which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with

particularity, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).  To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)); *see In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff must "allege facts supporting a strong inference with respect to each defendant").

A "strong inference" is one that is "more than merely plausible or reasonable," *Tellabs*, 551 U.S. at 314, and the scienter inquiry is "inherently comparative," *id.* at 323.  Thus, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," and permit a claim to proceed "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 323-24.  In this Circuit, a plaintiff may satisfy the PSLRA's pleading requirements for scienter "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The latter — the only theory pressed in this case — requires allegations showing "a state of mind approximating actual intent, and not merely a heightened

form of negligence." *Stratte-McClure*, 776 F.3d at 106 (internal quotation marks omitted).  As a general matter, courts have approved of claims when plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309.

## DISCUSSION

To recover damages under Section 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted); *accord Waggoner v. Barclays PLC*, 875 F.3d 79, 93 & n.23 (2d Cir. 2017).  "The test for whether a statement is materially misleading . . . is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (internal quotation marks omitted).

The Court will begin with Plaintiffs' claims relating to the LTC insurance portfolio and then turn to their claims relating to the LTSAs.  After that, the Court will consider Plaintiffs' certification and control person claims under Section 20(a) of the Exchange Act.

**A.  The LTC Insurance Portfolio Claims**

The Court previously dismissed all of Plaintiffs' claims based on alleged

misrepresentations and omissions relating to GE's LTC insurance portfolio.  *See Sjunde AP-*

*Fonden*, 417 F. Supp. 3d at 392.  In their Complaint, Plaintiffs drop their claims based on the

theory that GE's LTC reserve figures were misstated under GAAP.  Instead, they "primarily

allege that Defendants failed to disclose known LTC-related trends, uncertainties, and

commitments that were likely to impact GE's financial condition, in violation of Item 303 and

Section 10(b)."  ECF No. 198 ("Pls.' Opp'n"), at 1.  Plaintiffs' new allegations "bolster[ing] the

inference of scienter" notwithstanding, *id.* at 13, the Court once again concludes that Plaintiffs

fail to state a claim for securities fraud based on any LTC-related statement or omission.

**1.  Undisclosed Trends, Commitments, Uncertainties**

In the FAC, "Plaintiffs argue[d] that Defendants violated Item 303 of Regulation S-K

. . . by failing to make certain disclosures in GE's financial statements," namely: "trend[s],

risk[s], [and] uncertaint[ies] . . . both known to GE and 'reasonably likely' or 'reasonably

possible' to have a 'material' impact on its revenues, liquidity, capital resources, or critical

accounting estimates, among other things."  *Sjunde AP-Fonden*,  417 F. Supp. 3d at 398.  The

Court dismissed these claims "because Plaintiffs d[id] not plead facts that GE's omissions were

made under circumstances that 'give rise to a strong inference of scienter.'"  *Id.* (quoting *Stratte-*

*McClure*, 776 F.3d at 106).  The Complaint again alleges the existence of undisclosed "negative

trends, demands, commitments, events, and uncertainties . . . with respect to the LTC market

generally, and GE's LTC exposures specifically . . . [that] were known to Defendants and were

reasonably likely to have material effects on GE's financial condition or results of operation."

Compl. ¶¶ 228-29 (internal quotation marks and brackets omitted); *see* Pls.' Opp'n 6-8.

Plaintiffs' primary new allegations pertaining to scienter are that "Defendants Immelt and Bornstein personally reviewed GE's deteriorating LTC claims data throughout the Class Period" in the form of "an annual PowerPoint presentation that compiled GE claims experience data." Pls.' Opp'n 10 (emphasis omitted).  Once again, however, Plaintiffs' allegations fall short.

First, it is not clear from the Complaint what exactly the "annual PowerPoint presentation" showed.  According to "FE-2," a former GE employee who worked in various roles at GE between 2006 and 2017, Compl. ¶ 63,  the PowerPoint presentation "contained similar items each year," including "[t]he level of claims and how they were building over time"; "[p]rojected reserves"; "[t]otal historical termination rates, including deaths"; and "[i]nterest rates, current investment assets and earnings," *id.* ¶ 131.  In particular, the presentation included "a timeline of GE's insurance reserves, which always showed a 'hump' where reserves were expected to peak and then decline (because no new business was being written)." *Id.* ¶ 132.  But no timeframe for this graph is described — merely the assertion that the "hump" remained at some unknown point in the future throughout FE-2's tenure, which ended on January 1, 2017. *Id.* ¶¶ 63, 132.  Nor is it clear what this graph was intended to depict.  Did the y-axis of the "timeline of GE's insurance reserves" represent the reserves' level in absolute terms or their growth?  Did the "insurance reserves" encompass *all* of GE's insurance interests or just LTC insurance?  What was the scale?  Even if the existence of the "hump" really did inevitably "mean[] that GE had to have reserve growth reflected on its financial statements," *id.* ¶ 132, that fact alone does not come close to establishing "a strong inference of scienter" of a trend that was "reasonably likely to materially impact GE's financial condition and liquidity," Pls.' Opp'n 7, 11.

Nor does the Complaint adequately allege that "Defendants Immelt and Bornstein personally reviewed GE's deteriorating LTC claims data" via the PowerPoint presentations. *Id.* at 10 (emphasis omitted). The Complaint alleges that, "[e]ach year," the PowerPoint was provided to the chief risk officer of ERAC, who then presented it to ERAC and UFLIC's president, who then presented it to GE Capital's chief risk officer, who in turn presented it to Defendants Immelt and Bornstein. *See* Compl. ¶¶ 53-54, 61, 133. According to FE-2, who "did not prepare the PowerPoint presentation," but who "reviewed [it] each year" "in performing his work as an internal auditor," and "was responsible for confirming, from a control perspective, that the information in the PowerPoint presentation made sense," "the PowerPoint presentation was provided to senior GE executives each year" and was, "without a doubt," "received by Immelt [and Bornstein] . . . each year." *Id.* ¶¶ 131, 134. This falls short of Plaintiffs' burden, "where a complaint relies on information from a [confidential source] to establish scienter, . . . [to] describe the nature of the [confidential source's] contact with the individual defendants that would be probative of defendants' mental state." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 n.19 (S.D.N.Y. 2020); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-90 (S.D.N.Y. 2011) ("Indeed, even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge."); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) ("Plaintiffs do not allege any facts indicating that [the confidential source] was in a position to have knowledge regarding communications with . . . senior management or the conclusions reached by . . . senior management upon receipt of this information.").

Indeed, FE-2's role — "confirming, from a control perspective, that the information

in the PowerPoint presentation made sense, and that the PowerPoint presentation was provided to senior GE executives each year" — does not reveal that he has knowledge of who specifically reviewed the presentation.  Nor does his conclusory assertion that Immelt and Bornstein "without a doubt" received the presentation "each year."  Compl. ¶ 134.  This is the language of supposition (albeit confident supposition), not personal knowledge, and does not suffice to establish that FE-2 "had any contact with the Individual Defendants or would have knowledge of what they knew."  *In re Am. Express Co. Sec. Litig.*, No. 02-CV-5533 (WHP), 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008), *aff'd sub nom. Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010); *cf. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) ("[B]land assertions that they 'would have received' such information offer nothing concrete and are not allegations of fact."), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (summary order).  *McKenna v. SMART Technologies Inc.*, No. 11-CV-7673 (KBF), 2012 WL 3589655, at *5 (S.D.N.Y. Aug. 21, 2012), cited by Plaintiffs on this point, Pls.' Opp'n 12, is inapposite.  It concerned claims under Sections 11, 12, and 15 of the Securities Act of 1933, for which scienter need not be pleaded.  *See McKenna*, 2012 WL 3589655, at *3 ("Given that [the plaintiff's] Securities Act claims are strict liability claims, [it] need not plead scienter . . . .").  The defendants there were challenging the specificity of allegations with respect to how the confidential witnesses knew of an "alleged slow-down in demand," not how the confidential witnesses knew of any individual defendant's knowledge of that slow-down.  *Id.* at *1, 3, 5.[5]

---

[5]      The Complaint also incorporates expert opinions that characterize GE's LTC premium deficiency testing as inadequate and its presentation of LTC insurance liabilities in its financial disclosures as misleading.  *See* Compl. ¶¶ 187-215, 285-95.  The parties dispute whether the Court should credit these opinions.  *See* ECF No. 196 ("Defs.' Mem."), at 10-12; Pls.' Opp'n 18-

## 2.   The Omission of LTC Liabilities from the MD&A Table

The Court previously dismissed Plaintiffs' claim "that GE's failure to include LTC liabilities in its 'insurance liabilities' line item [in the MD&A table] violated Item 303(a)(5) of Regulation S-K," on the grounds that (1) "GE's omission of LTC liabilities from its MD&A table was not misleading because it fully disclosed its total insurance liabilities in Note 11 (and elsewhere in its Form 10-Ks)," and (2) "the fact that GE disclosed the entirety of its insurance liabilities elsewhere in its Form 10-Ks defeats any finding that GE acted with the requisite scienter in omitting the liabilities from its tables." *Sjunde AP-Fonden*, 417 F. Supp. 3d at 393-94 (citation omitted).  The Complaint adds no new factual allegations that change this analysis. Instead, Plaintiffs now put forth statements from Dr. Roman Weil, their "accounting expert consultant," asserting that "investors could not discern the size of GE's LTC liabilities nor the extent of associated risk through even the closest review of GE's SEC filings."  Compl. ¶ 284. Plaintiffs further repeat their contention that "investors could not have subtracted the 'Insurance liabilities' line item in the MD&A Table from Note 11 to obtain a measure of GE's LTC portfolio" and so "investors . . . had no way of isolating GE's LTC liabilities."  Pls.' Opp'n 18.

These changes do not lead to a different result.  As the Court already noted, "the 'insurance liabilities' figure and Note 11's 'investment contracts, insurance liabilities and insurance annuity benefits' estimate . . . are estimates of GE's insurance obligations, not two sides of a balance sheet item . . . [and the Form 10-K] offers no basis to think that the liabilities figure should be subtracted from the reserves figure." *Sjunde AP-Fonden*, 417 F. Supp. 3d at 393 n.8.  Additionally, the new allegations do not change the fact that GE "fully disclosed its

19 & n.17.  In any event, Plaintiffs' experts do not speak to the question of Defendants' scienter and so do not affect the Court's analysis.

total insurance liabilities in Note 11 (and elsewhere in its Form 10-Ks)," and that the omission of the LTC liabilities from the MD&A table was therefore "not misleading." *Id.* at 394 (citation omitted). As the Court previously explained, "[a]t bottom, Plaintiffs' complaint is that GE should have more clearly presented its LTC liabilities in its Class Period Form 10-Ks"; but "disclosure is required 'only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading,'" and the absence of LTC liabilities from the MD&A table would not be misleading to an ordinary investor. *Id.* (quoting *Kleinman v. Elan Corp.*, 706 F.3d 145, 152-53 (2d Cir. 2013)).

Moreover, even if the failure to disclose LTC liabilities in the MD&A table were misleading, Plaintiffs' new allegations do nothing to address the Court's alternative holding that they failed to adequately plead scienter. Plaintiffs identify three bases for finding "that Defendants were at least consciously reckless regarding whether their Item 303(a)(5) violation would mislead investors about material facts": (1) GE's inclusion of LTC liabilities in pre- and post-Class Period Form 10-Ks; (2) GE's removal of LTC liabilities from the MD&A tables during the Class Period; and (3) Immelt and Bornstein's receipt of the annual PowerPoint presentations. Pls.' Opp'n 19-20 (internal quotation marks omitted). The first two grounds fall short for the same reasons this Court previously explained. *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 394 n.9 (citing *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016)). The third fails for the reasons described above.

### 3. Affirmative Misrepresentations

Finally, Plaintiffs also argue that Defendants "made affirmative misrepresentations regarding GE's LTC exposures." Pls.' Opp'n 20. The Court previously considered and dismissed claims based on each of these statements, *see Sjunde AP-Fonden*, 417 F. Supp. 3d at

400-04, which once again "fall into two rough categories: (1) statements about GE Capital's

LTC insurance exposure and its overall portfolio risk; and (2) claims made in 2017 about why

GE did not liquidate its remaining LTC insurance position." *Id.* at 400 (citations omitted).[6]  The

Court previously dismissed the first category of claims because "GE's decision to speak about

selling its insurance businesses — truthfully, and in the larger context of GE's move away from

'non-core' businesses — did not give rise to a duty to qualify those statements by simultaneously

disclosing that it had retained a portfolio of run-off insurance policies." *Id.* at 401-02 (citing

*Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012); *In re Mylan*

*N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at \*6 (S.D.N.Y. Mar. 28, 2018)).

And the Court found the second category wanting because, "whether or not these comments

were misleading," the FAC "fail[ed] to plausibly allege that either [of the relevant Individual

Defendants] 'knew facts or had access to information suggesting that their public statements

were not accurate.'" *Sjunde AP-Fonden*, 417 F. Supp. 3d at 402 (quoting *Hennessee Grp.*, 573

F.3d at 110).

  With respect to the first category, Defendants argue that they now "allege[]

misstatements regarding *the continuing risk* from [GE's] retained LTC portfolio," "[r]ather than

focusing on GE's complete departure from the LTC business."  Pls.' Opp'n 20.  But relative

emphasis aside, this purported distinction fails because the FAC also emphasized the riskiness of

GE's continuing exposure to its retained LTC portfolio.  *Compare* Pls.' Opp'n 20 ("[T]he

---

[6]  Plaintiffs contend that "the Court did not previously assess" Bornstein's July 22, 2016 statement that GE's LTC "[p]ortfolio quality remains stable."  Pls.' Opp'n 20 (emphasis omitted).  In fact, this exact statement was included in the FAC that was previously before the Court, *see* FAC ¶ 146, and was quoted in the Court's previous opinion, *see Sjunde AP-Fonden*, 417 F. Supp. 3d at 386.  In any event, the claim that this statement was an actionable misrepresentation suffers from the same deficiencies as the others.

Complaint alleges misstatements regarding *the continuing risk* from [GE's] retained LTC portfolio."), *with* FAC ¶ 336 ("[I]t was false or misleading for Immelt to state that GE had sold reinsurance business during the Class Period and for GE to state that it had redeployed capital away from insurance without disclosing to investors that the Company *remained exposed to billions of dollars in high-risk LTC reinsurance liabilities*." (emphasis added)).  The Complaint does not change the Court's conclusion.  With respect to the second category of alleged misrepresentations, Plaintiffs point to the "annual PowerPoint presentations identifying GE's negative LTC claims experience" as "adequate[] alleg[ations] [of] Defendants' scienter for each of [these] statements.  Pls.' Opp'n 21-22.  As discussed above, however, these allegations do not suffice.  Thus, Plaintiffs' claims based on Defendants' statements about why GE did not liquidate its remaining LTC position must be dismissed for the reasons described in the Court's prior Opinion and Order.  *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 402-05.

## B.  The LTSA Claims

The Court turns, then, to Plaintiffs' renewed allegations concerning misrepresentations and omissions relating to GE Power's LTSAs.  The Court dismissed nearly all of these claims alleged in the FAC.  *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 404-14.  Just two, both stemming from statements or omissions related to GE's extensive factoring of LTSAs, survived.  *See id.* at 408-09, 413-14.  The Complaint "refine[s]" the LTSA claims, "no longer assert[ing] that GE's reported Contract Asset amounts were false and misleading, focusing instead on Defendants' omission of material LTSA trends in violation of Item 303."  Pls.' Opp'n 1-2.  Notwithstanding the new focus on Item 303, the Court once again finds that all of the claims based on statements pertaining to GE's LTSAs must be dismissed, with two exceptions.

### 1. Item 303 Claims

The alleged Item 303 violations related to LTSAs can be grouped into three categories:
(1) omissions concerning GE's reliance on LTSA modifications to generate revenue;
(2) omissions concerning declining utilization rates; and (3) omissions concerning the
widespread use of factoring.  The Court will address each category in turn.

In the first category, the Complaint alleges that GE had an obligation to disclose the
"trend" of "GE's reliance on LTSA modifications and cumulative catch-up adjustments," namely
the "de-scoping [of] existing service contracts to generate higher margins, and thus cumulative
catch-up revenue," and its "incentiviz[ing] [of] customers to renegotiate the terms of their
LTSAs[] [by] offer[ing] numerous incentives, including deferred payment terms on the
LTSA[s]."  Compl. ¶¶ 417-19.  The Court previously determined that "GE's failures to disclose
. . . de-scoping and deferral of payments [do not] constitute violations of Item 303."  *Sjunde AP-
Fonden*, 417 F. Supp. 3d at 408.  The Complaint does nothing to change this conclusion.
Plaintiffs fault Defendants for "argu[ing] that Plaintiffs fail 'to allege how many LTSAs were
"de-scoped," or how many customers' payments were deferred, or what effect the alleged LTSA
modifications would have on GE's overall financial position,'" Pls.' Opp'n 32 (quoting Defs.'
Mem. 25), without acknowledging that Defendants' language comes straight from the Court's
previous opinion, *see Sjunde AP-Fonden*, 417 F. Supp. 3d at 408.  Nor do *Panther Partners Inc.
v. Ikanos Communications, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012), and *Litwin v. Blackstone
Group, L.P.*, 634 F.3d 706, 721 (2d Cir. 2011), cited by Plaintiffs, *see* Pls.' Opp'n 32-33, cast
doubt on the Court's previous conclusions.  In *Panther Partners*, for example, plaintiffs failed to
disclose the "100%" defect rate for "all chips sold to clients representing 72% of revenues," 681
F.3d at 122 — in other words, precisely the sort of information that the Court called for, and

invited Plaintiffs to allege in the Complaint, when it noted the absence of any "allegations of how many LTSAs were 'de-scoped,' or how many customers' payments deferred," etc., *Sjunde AP-Fonden*, 417 F. Supp. 3d at 408.  Thus, these claims must be and are dismissed for the same reasons as in the prior opinion.

Plaintiffs raised the second category of omissions earlier in the litigation, but the Court "decline[d] to consider" them because the relevant "allegations [we]re not actually in the [FAC]."  *Id.*  The Complaint does now allege this theory — namely, "that Defendants knew of the trend of declining customer utilization rates and its expected effect on GE's liquidity during the Class Period and were, at minimum, reckless in failing to disclose that information to investors," Pls.' Opp'n 28 — but the allegations are insufficient to survive Defendants' motion to dismiss.  First, Defendants did disclose as a significant trend and development that "[e]xcess capacity in developed markets [and] continued pressure in oil and gas applications and macroeconomic and geopolitical environments result in uncertainty for the industry and business."  2015 Form 10-K, at 18.  As the Complaint alleges, it was precisely this trend, "[t]he power market decay," that "had direct and negative impacts on GE Power's revenue and ability to generate CFOA" that is, cash flow from operating activities, "during the Class Period."  Compl. ¶ 344; *see also id.* ¶¶ 340-43, 345.  Plaintiffs distinguish "both in degree and in kind" between what they characterize as "two independent trends — the global economic malaise that Defendants disclosed and the plunging utilization rates of GE-serviced assets that they concealed."  Pls.' Opp'n 26.  But this distinction relies heavily on the allegation by "FE-5," a former GE employee, Compl. ¶ 65, "that from 2010 into the Class Period, GE realized through its monitoring of customer utilization that usage of oil and gas turbines by customers was down 80-90%," *id.* ¶ 347.  This allegation, however, is too vague to carry the weight that Plaintiffs

assign to it.  Was this decline observed across all "customers" or only some subset?  How far

"into the Class Period"?  Nor is it clear from the Complaint's description of FE-5 as "a

Commercial Manager in GE Power Services from 2010 through the end of 2013, . . . based in

Milan, Italy," *id.* ¶ 65, that he would have had access to global GE Power utilization trends; he

certainly did not after his departure from GE relatively early in the Class Period.  Finally, as

Defendants note, Defs.' Mem. 31-32, even crediting this "80-90%" decline in utilization rates

evident from "the run-rate data," Compl. ¶ 352, this very same data was used to compile the

"three-year historical . . . average" that GE used to "determine[] the value of its LTSA Contract

Assets," *id.* ¶ 356.  Plaintiffs argue that the decision to use three-year averages rather than the

most recent years' utilization rates is evidence of scienter, Pls.' Opp'n 25, but as the Court

already explained, "there is nothing inherently unreasonable about using a three-year average to

forecast revenues for contracts lasting up to twenty-five years, and Plaintiffs point to no

regulations or rules that required GE to do otherwise."  *Sjunde AP-Fonden*, 417 F. Supp. 3d at

405.  "And more to the point . . . sharp downturns in customer utilization . . . were ultimately

incorporated into Defendants' revenue models — just not as quickly as Plaintiffs might have

liked."  *Id.*

Finally, as they did in the FAC, Plaintiffs allege an Item 303 violation based on

Defendants' failure to disclose "GE's reliance on 'factoring' LTSA receivables to paper over the

Company's liquidity crisis."  Pls.' Opp'n 35.  In its previous opinion, the Court observed that the

FAC "detail[ed], through allegations by former employees with firsthand knowledge among

other things, that GE was factoring 'everything' in its Power and Renewable Divisions, including

as many LTSAs as it could" and held that these "same allegations support[ed] a 'strong

inference' that GE and at least some of the Individual Defendants were 'at least consciously

reckless regarding whether their failure to provide adequate Item 303 disclosures . . . would mislead investors about material facts.'" *Sjunde AP-Fonden*, 417 F. Supp. 3d at 408-09 (quoting *Stratte-McClure*, 776 F.3d at 106).  Defendants' arguments, *see* Defs.' Mem. 33-35, do not give the Court cause to revisit this holding, so the motion to dismiss the Complaint's factoring-based Item 303 claim against Defendants GE and Bornstein for GE's filings from 2015 on is denied for the same reasons.  *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 408-09 & n.22.

### 2.  Affirmative Misrepresentations

Once again, Plaintiffs also allege various false or misleading statements made during the Class Period by GE or the Individual Defendants in SEC filings, earnings calls, and conferences. The Court previously considered, and granted dismissal with respect to the claims relating to most of these statements, with the exception of a statement about factoring in GE's 2016 Form 10-K.  *See id.* at 410, 413-14.  Once again, the Court concludes that the claim related to statements about factoring in the 10-K is the only such claim to survive.

Plaintiffs point to the following statements as misleading:

- January 20, 2017 earnings call: "So there's very good underlying performance here.  It's not just about, it's actually very little to do with GE Capital factoring." Compl. ¶ 430.

- February 22, 2017 conference: "So there is no cash associated with any of this accounting change.  It doesn't change anything about the economics of these contracts in any way.  It's just a point of where you're recognizing revenue and where you're recognizing cost." *Id.* ¶ 432.

- April 21, 2017 conference call: "[W]*e expect the contract drag on cash flow for the year to be roughly the same*, '16 versus '17 . . . .  And I think you want us focused on that, that's all future cash, future economics, et cetera, on a go-forward basis.  *We're not pulling future profit forward.  That is not what we're doing.* We're just restating what — where we are in the contract from inception to date. The second part is where the long-term service agreements that protect our installed base, our penetration continues to improve." *Id.* ¶ 434 (first alteration in original).

- April 21, 2017 conference call: "Contract assets were a use of $1.9 billion.  This was $300 million worse than expected.  Of the $1.9 billion, $500 million was from our long-term equipment contracts, where the timing of our $1 billion revenue recognition milestones differ.  This will catch up throughout the year as we execute against the contract.  The remaining $1.4 billion is our long-term service agreements.  There were 2 pieces to this.  $600 million is related to service contracts where we've incurred cost and booked the revenue, but haven't yet billed the customer.  *We expect this to partly come back over the year as we see higher asset utilization in Power* and Aviation.  *And we've seen these similar trends in the prior years.  The other $800 million are contract adjustments driven by better cost performance and part life, primarily driven by Power* and Aviation." *Id.* ¶ 436.

- 2016 Form 10-K: "*In order to manage credit exposure*, GE sells current receivables to GE Capital and other third parties in part to fund the growth of our industrial businesses. . . .  "[*I*]*n order to manage credit exposure*, the Company sells additional current receivables to third parties outside the Receivables Facility described in Note 22.  In connection with certain of these sales, we provide servicing activities and limited recourse to the purchasers." *Id.* ¶¶ 426-27.

The Court previously considered, and dismissed, Plaintiffs' claim based on the January 20, 2017 statement, concluding that Bornstein's "simultaneous disclosure of the actual factored dollar amounts in 4Q 2015 and 2016 in the very same statement undercuts any inference that he intended to deceive investors or was reckless regarding the risk that they might be misled." *Sjunde AP-Fonden*, 417 F. Supp. 3d at 414 (citation omitted).  Plaintiffs offer no new facts to support a "strong inference" of scienter, *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015); *see* Pls.' Opp'n 37-38, so this claim must be dismissed, *see Sjunde AP-Fonden*, 417 F. Supp. 3d at 414.

Although Plaintiffs now excerpt and emphasize a different part of the February 22, 2017 statement, the Court also previously considered, and dismissed, claims based on that statement, and the Complaint does not add new facts that change the Court's conclusion that Bornstein's "seemingly accurate" description of how cumulative catch-up accounting works did not mandate further disclosures.  *See id.* at 412.  Similarly, no new facts are alleged that would alter the Court's conclusions with respect to the first April 21, 2017 statement.  *See id.* at 412 n.24.

Although Plaintiffs claim "the Complaint now clarifies the inextricable link between the[] practices" of factoring and modifying LTSAs, Pls.' Opp'n 38, the link Plaintiffs draw was already apparent from the FAC, *see, e.g.*, FAC ¶¶ 57, 290-91 ("[A]s a result of the cash crisis created by GE Power's reliance on cumulative catch-up revenue, [former GE employee] FE-7 confirmed that beginning in 2015, GE Power's management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs . . . . The solutions FE-7 and his U.S. counterparts developed were known as 'monetization,' which involved factoring (i.e., selling) receivables in order to generate CFOA.").  Thus, the claim based on this statement must again be dismissed.

The remaining April 21, 2017 statement, in which Bornstein offered that "[w]e expect . . . [to] see higher asset utilization in power," Compl. ¶ 436 (emphasis omitted), is an opinion statement subject to the *Omnicare* standard, *see, e.g.*, *Lefkowitz v. Synacor, Inc.*, No. 18-CV-2979 (LGS), 2019 WL 4053956, at *7 (S.D.N.Y. Aug. 28, 2019) (analyzing statements about future revenue growth prefaced with "We expect" as opinion); *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) (same).  Thus, "'[s]o long as Defendants conducted a "meaningful" inquiry and in fact held the view' expressed — and Plaintiffs fail to plausibly allege they did not do so — the statements . . . are not actionable." *Sjunde AP-Fonden*, 417 F. Supp. 3d at 398 (citation and brackets omitted) (quoting *Tongue*, 816 F.3d at 214).  Although Plaintiffs contend this statement was "directly contradicted by the drastic decline in utilization rates," Pls.' Opp'n 38-39, there is not in fact a conflict between a stated expectation of *future* uptick in utilization rates and facts showing a decline in utilization rates in the *preceding* years.  Thus, Plaintiffs' claims based on this statement must be dismissed.

Finally, with respect to the statement in GE's 2016 Form 10-K, the Court previously concluded that "a reasonable investor could read the 2016 Form 10-K and conclude that GE factored LTSA receivables *only* to reduce its credit exposure while, in reality, as Plaintiffs plausibly and specifically allege, GE was also factoring to shore up its dwindling cash flow and mask the growing gap between contract assets and actual cash being generated in the Industrials group, including from LTSAs." *Sjunde AP-Fonden*, 417 F. Supp. 3d at 413.  Although Defendants "respectfully disagree" with this conclusion, Defs.' Mem. 38, their arguments provide no reason for reconsideration.  Thus, the motion to dismiss as to the claim based on the factoring-related statement in the 2016 Form 10-K is denied.

## C.  The Section 20(a) Claims

Plaintiffs repeat some of the allegations supporting their "certification" claims under Section 20(a) of the Exchange Act, *see, e.g.*, Compl. ¶¶ 45-46, 48-49, 377, but barely press them, omitting any mention of them in their opposition brief.  Accordingly, they can be, and are, deemed abandoned.  *See, e.g.*, *Leath v. Cnty. of Orange*, No. 18-CV-7318 (NSR), 2020 WL 4016530, at *6 (S.D.N.Y. July 15, 2020) ("It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims." (collecting cases)).  In any event, any certification claim is not adequately alleged for the same reasons that the Court provided in its prior opinion.  *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 414 (citing *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017); *Janbay v. Canadian Solar, Inc.*, No. 10-CV-4430 (RWS), 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012)).

That leaves only Plaintiffs' Section 20(a) control person claims.  "To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the

controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant

was, in some meaningful sense, a culpable participant in the controlled person's

fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir.

2014) (internal quotation marks omitted); *see also* 15 U.S.C. § 78t(a).  For the reasons discussed

above, Plaintiffs fail to plead a primary violation for all but two of their claims, and it follows

that the corresponding Section 20(a) claims must also be dismissed.  *See, e.g.*, *Schaffer v.*

*Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at *15 (S.D.N.Y. Jan. 18,

2018).  By contrast, Plaintiffs' allegations with respect to the remaining two Section 20(a) claims

— corresponding to the surviving primary claims discussed above — are sufficient.

      First, Bornstein is alleged to be the chief financial officer of GE during much of the Class

Period and to have signed several of the relevant SEC filings, including the 2016 Form 10-K that

included the misleading primary violation above.  "[B]oilerplate allegations that a party

controlled another based on officer or director status are insufficient." *Youngers v. Virtus*

*Investment Partners Inc.*, 195 F. Supp. 3d 499, 524 (S.D.N.Y. 2016).  "Nonetheless, corporate

officers usually are presumed to possess the ability to control the actions of their employees[,]

and directors and officers who sign registration statements or other SEC filings are presumed to

control those who draft those documents."  *In re Bioscrip, Inc. Sec. Litig.*, 95 F.Supp.3d 711

(S.D.N.Y. 2015) (internal quotation marks and brackets omitted) (quoting *City of Westland*

*Police & Fire Ret. Sys. v. MetLife, Inc.,* 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013)).

Accordingly, and mindful that "[w]hether a person is a 'controlling person' is a fact-intensive

inquiry, and generally should not be resolved on a motion to dismiss," *In re MF Glob. Holdings*

*Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013) (quoting *Katz v. Image Innovations*

*Holdings, Inc.*, 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008)), the Court concludes that Plaintiffs adequately plead Bornstein's control person status.

Finally, Plaintiffs adequately allege that Bornstein was, in some meaningful sense, a culpable participant in the alleged fraud by GE.  As the parties acknowledge, there is an intra-Circuit split over whether culpable participation must be pleaded with the same particularity as scienter.  *See* Defs.' Mem. 39-40; Pls.' Opp'n 39-40.  But the Court need not and does not wade into that dispute here because it finds that Plaintiffs' allegations with respect to Bornstein suffice even under the heightened standard.  Indeed, the Court has already found that Plaintiffs adequately plead Bornstein's scienter as to both remaining factoring primary violations.  "[I]t would make little sense to hold that Plaintiffs have pled a primary violation against a defendant but have not adequately pled 'culpable participation' by that same defendant in the same course of conduct."  *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 255 (S.D.N.Y. 2018); *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 249 (S.D.N.Y. 2010) ("Allegations sufficient to plead scienter for the purposes of primary liability pursuant to Section 10(b) 'necessarily satisfy' the culpable participation pleading requirement for Section 20(a) claims." (quoting *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004)).  Therefore, Defendants' motion to dismiss these surviving Section 20(a) claims against Bornstein is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, except as to (1) Plaintiffs' Section 10(b) and Rule 10b-5 claims concerning (a) factoring in GE's 2016 Form 10-K and (b) GE's failure to disclose factoring in its Class Period financial statements from 2015

on, which survive against GE and Bornstein; and (2) Plaintiffs' corresponding Section 20(a)

control person claims against Bornstein.

In their letter requesting that the Court take judicial notice of the facts alleged in the

Settlement between the SEC and GE, Plaintiffs include a cursory request in the alternative for

leave to amend the Complaint again "to the extent the Court determines" it "is insufficient with

respect to falsity or scienter."  ECF No. 202, at 4.  This request is DENIED.  Although leave to

amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2),

and leave is often granted when a complaint is dismissed under Rule 9(b), *see ATSI Commc'ns*,

493 F.3d at 108, it is ultimately "within the sound discretion of the district court to grant or deny

leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

Plaintiffs have been given, and taken, multiple opportunities to amend their pleadings, and were

previously warned that they would "not be given any further opportunity to amend the complaint

to address issues raised by [Defendants' prior] motion to dismiss."  ECF No. 175, at 1.  The

Settlement, which concerns non-scienter-based violations of the Exchange Act, does not change

this analysis — particularly because the Court's dismissal of many of Plaintiffs' claims is

grounded primarily in inadequate allegations of scienter.  Indeed, in several respects, the

Settlement actually *undermines* Plaintiffs' allegations of scienter.  *See, e.g.*, Settlement ¶ 41

("GE executives were not informed until the second quarter of 2017 of . . . increasingly

optimistic projections of future liabilities despite higher than expected claims.  In addition, GE

was not informed of GE Capital's . . . use of the roll-forward in 2016.").  Thus, Plaintiffs have

not "given any indication that they are in possession of facts that would cure the problems

identified above."  *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645,

at *9 (S.D.N.Y. July 16, 2020) (internal quotation marks and brackets omitted).  Accordingly, the Court will not grant leave to amend.

By separate order to be entered today, the initial pretrial conference will be REINSTATED and adjourned to **February 25, 2021** at **3:15 p.m.** (to be held by telephone, in light of the COVID-19 pandemic).  In accordance with Paragraph 2.B of the Court's Individual Rules and Practices, the parties are required to file on ECF a joint letter as well as a proposed Civil Case Management Plan and Scheduling Order attached as an exhibit to the joint letter, no later than **Thursday of the week prior to the initial pretrial conference**.  The contents of the joint letter will be described in the separate order to be entered today.

The Clerk of Court is directed to terminate ECF No. 194 and to terminate Jeffrey R. Immelt, John L. Flannery, Jamie Miller, Keith S. Sherin, Jan R. Hauser, and Richard A. Laxer as defendants in this case.

SO ORDERED.

Dated: January 29, 2021
      New York, New York

JESSE M. FURMAN
United States District Judge