# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SJUNDE AP-FONDEN and THE
CLEVELAND BAKERS AND
TEAMSTERS PENSION FUND,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, et al.,

Defendants.

17 Civ. 08457 (JMF) (GWG)

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    SUMMARY OF FACTS .......................................................................... 4

III.   PROCEDURAL BACKGROUND............................................................ 6

IV.   ARGUMENT ........................................................................................... 7

     A.      Securities Class Actions Are Well-Suited for Class Action Treatment................. 7

     B.      Rule 23(a) Is Satisfied........................................................................ 8

         1.      Numerosity Is Established ......................................................... 8

         2.      Commonality Is Established ...................................................... 8

         3.      Typicality Is Established............................................................ 9

         4.      Adequacy Is Established ............................................................ 10

         5.      The Proposed Class Is Ascertainable ...................................... 12

     C.      Rule 23(b)(3) Is Satisfied.................................................................. 12

         1.      Predominance Is Established ..................................................... 13

             a.      Reliance Is Presumed Under *Affiliated Ute* .................................. 14

             b.      The Fraud-on-the-Market Presumption of Reliance Applies........ 15

                 i.      The Five *Cammer* Factors Weigh In Favor of a Finding of Market Efficiency............................................. 16

                 ii.      The *Krogman* Factors Favor a Finding of Market Efficiency ...................................................................... 19

             c.      Damages Are Measurable by a Common Methodology.............. 20

         2.      Superiority Is Established ......................................................... 22

     D.      Class Counsel Satisfies the Requirements of Rule 23(g) ..................... 23

V.    CONCLUSION...................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972) ................................................................................................2, 14

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................................................................................................13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ..........................................................................................7, 13, 14

*In re Bank of Am. Corp. Sec., Deriv., and Emp. Ret. Income Sec. Act (ERISA)
Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012) ........................................................................ *passim*

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ......................................................................................................7

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................................20

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ....................................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .............................................................16, 17, 20, 21

*China Agritech, Inc. v. Resh*,
138 S. Ct. 1800 (2018) ..................................................................................................7

*In re China N.E. Petro. Holdings Ltd. Sec. Litig.*,
2017 WL 11564337 (S.D.N.Y. Aug. 8, 2017) ...........................................................15

*In re Deutsche Telekom Ag Sec. Litig.*,
229 F. Supp. 2d 277 (S.D.N.Y. 2002) ..........................................................................1

*Dodona I, LLC v. Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) ...............................................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ..............................................................................................13, 14

*In re Facebook, Inc., IPO Sec. and Deriv. Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) ......................................................................... 11-12

*Fogarazzo v. Lehman Bros., Inc.,*
    232 F.R.D. 176 (S.D.N.Y. 2005) ..........................................................................14

*In re Globalstar Sec. Litig.,*
    2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ......................................................8, 9

*Gruber v. Gilbertson,*
    2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)................................................15, 16

*Halliburton Co. v. Erica P. John Fund, Inc.,*
    573 U.S. 258 (2014)..........................................................................................7, 15, 20

*Hawaii Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entm't*
    *Holdings, Inc.,*
    2021 WL 1198799 (S.D.N.Y. Mar. 30, 2021) ..................................................14, 15

*In re JPMorgan Chase & Co. Sec. Litig.,*
    2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)............................................. *passim*

*Krogman v. Sterritt,*
    202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................3, 16, 20

*Lapin v. Goldman Sachs & Co.,*
    254 F.R.D. 168 (S.D.N.Y. 2008) ........................................................................11

*McIntire v. China Media Express Holdings, Inc.,*
    38 F. Supp. 3d 415 (S.D.N.Y. 2014)....................................................................17

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC,*
    328 F.R.D. 86 (S.D.N.Y. 2018) .....................................................................17, 22

*In re Parmalat Sec. Litig.,*
    2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)...............................................11, 23

*Pearlstein v. Blackberry Ltd.,*
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ............................................ 20, 23-24

*In re Petrobras Secs.,*
    862 F.3d 250 (2d Cir. 2017)...........................................................................13, 15

*In re Petrobras Sec. Litig.,*
    312 F.R.D. 354 (S.D.N.Y. 2016) ........................................................................21

*In re Pfizer Inc. Sec. Litig.,*
    282 F.R.D. 38 (S.D.N.Y. 2012) .........................................................................13

*Pirnik v. Fiat Chrysler Autos. N.V.,*
    327 F.R.D. 38 (S.D.N.Y. 2018) (Furman, J.)................................................ *passim*

*Pub Emps.' Ret. Sys. of Mo. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ................................................................ 8-9

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)................................................................20, 21

*In re Sadia S.A. Sec. Litig.*,
    269 F.R.D. 298 (S.D.N.Y. 2010) .............................................................18

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008)......................................................13

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) .......................................8, 9

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ..........................................................7, 15

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ...............................................................11

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ..........................................14, 19, 20, 21

*In re Teva Sec. Litig.*,
    2021 WL 872156 (S.D.N.Y. Mar. 9, 2021) .............................................22

*Tsereteli v. Residential Asset Securitization Trust 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ........................................................ 22-23

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013).......................................................................7

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    333 F.R.D. 39 (S.D.N.Y. 2019) ...............................................................17

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001).....................................................................10

*Wagner v. Barrick Gold Corp.*,
    251 F.R.D. 112 (S.D.N.Y. 2008) .............................................................18

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).......................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)....................................................................................2

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) ........................................................21

*Wilson v. LSB Indus., Inc.*,
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ................................ *passim*

*In re Winstar Commc'ns. Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ...........................................12, 17, 18

**Other Authorities**

17 C.F.R. § 239.13 ...........................................................................18

Fed. R. Civ. P. 23(a) .............................................................. *passim*

Fed. R. Civ. P. 23(b)(3)...................................................................22

Fed. R. Civ. P. 23(c)(1)(A) ...............................................................7

H.R. Conf. Rep. No. 104- 369 (1995)..............................................11

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Lead Plaintiff Sjunde-AP Fonden ("Lead Plaintiff" or "AP7") and Additional Plaintiff The Cleveland Bakers and Teamsters Pension Fund ("Cleveland Bakers") (collectively, "Plaintiffs") respectfully request that the Court: (1) certify the Class (defined below); (2) appoint Plaintiffs as Class Representatives; and (3) appoint Kessler Topaz Meltzer & Check, LLP ("KTMC") as Class Counsel and Grant & Eisenhofer P.A. ("G&E") as Liaison Counsel (together with Class Counsel, "Counsel").

## I.    PRELIMINARY STATEMENT

This action arises out of Defendants'[1] material misstatements and omissions concerning GE's use of factoring to conceal cash flow problems that existed within its Power business. With this motion, Plaintiffs seek to certify a class of all persons and entities that purchased or acquired GE common stock between March 2, 2015 and January 23, 2018, inclusive (the "Class Period") and were damaged thereby ("Class").[2] ¶ 514. Securities fraud cases are ideally suited for class treatment. *See e.g.*, *In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 282 (S.D.N.Y. 2002) ("Class actions are generally well-suited to securities fraud cases"). This case is no exception, as the Class meets all prerequisites for certification under Rule 23(a) and Rule 23(b)(3).

*First*, the Class is comprised of thousands of investors who purchased GE common stock during the Class Period and were injured by Defendants' conduct. Thus, joinder of all Class members is impracticable. *See infra* Section IV.B.1.

---

[1] "Defendants" include General Electric Company ("GE" or the "Company") and Jeffrey S. Bornstein ("Bornstein"). Unless otherwise stated, all internal quotations and citations are omitted and all emphasis is added. Citations to ¶ __ refer to paragraphs of the Fifth Amended Complaint (Dkt. #191) ("Complaint" or "5AC").

[2] Excluded from the Class are: (a) Defendants; (b) GE's subsidiaries and affiliates; (c) any officer, director, or controlling person of GE, and members of the immediate families of such persons; (d) any entity in which any Defendant has a controlling interest; (e) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors, and assigns of any such excluded party.

*Second*, although "[e]ven a single [common] question" establishes commonality, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011), this action involves numerous common issues of law and fact, including whether: (1) Defendants violated the federal securities laws; (2) Defendants' misrepresented or omitted material facts during the Class Period; and (3) Defendants acted with the requisite scienter. *See infra* Section IV.B.2.

*Third*, Plaintiffs' claims are typical of absent Class members' claims. Plaintiffs, like all other members of the Class, seek recovery for economic loss arising from Defendants' misstatements and omissions in GE's public filings with the Securities and Exchange Commission ("SEC") during the Class Period. Thus, typicality is satisfied. *See infra* Sections IV.B.3.

*Fourth*, Plaintiffs are adequate representatives of the Class. They are the type of large institutional investors that Congress determined are best positioned to lead a class of investors, their interests do not conflict with other Class members, and they, along with Counsel, have prosecuted—and will continue to prosecute—this action vigorously on behalf of the entire Class. *See infra* Section IV.B.4. Their chosen lead counsel, KTMC, and liaison counsel, G&E, are sophisticated, well-respected and highly-experienced lawyers who have led numerous securities fraud class actions. *See infra id*. and IV.D.

*Fifth*, common questions predominate over individual questions. The primary elements of Plaintiffs' claims—including falsity, materiality, scienter, loss causation, and control—are issues that affect all Class members equally and are susceptible to common proof. The same is true for the element of reliance. Here, because Plaintiffs' claims are premised on material omissions, they and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

Notwithstanding that the *Affiliated Ute* presumption applies, Plaintiffs and the Class are also entitled to the "fraud-on-the-market" presumption of reliance. During the Class Period, GE common stock traded on the New York Stock Exchange (the "NYSE") which this Court previously recognized as a "paradigmatic efficient market." *Pirnik v. Fiat Chrysler Autos. N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (Furman, J.). Moreover, Plaintiffs' expert, Dr. David I. Tabak, has confirmed that the market for GE's common stock was efficient throughout the Class Period, finding that each market efficiency factor set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001), weighs in favor of a finding of efficiency. *See* Ex. 1, Expert Report of David I. Tabak, Ph.D. ("Tabak Rpt." or "Tabak Report").[3]

Common issues concerning damages likewise predominate. The out-of-pocket methodology that Dr. Tabak will eventually use to measure Class members' damages is the standard methodology used in securities cases like this one, has been repeatedly endorsed in this Circuit, is consistent with Plaintiffs' theory of liability, and can be employed on a classwide basis. *See infra* Section IV.C.1.c.

*Finally*, the class action device is a superior method for fairly and efficiently adjudicating this action. Given the large number of investors who purchased GE common stock during the Class Period, it would be far too costly and inefficient for each individual Class member to file and litigate separate actions. *See infra* Section IV.C.2.

Because this action meets each of the requirements of Rule 23(a) and Rule 23(b)(3), Plaintiffs respectfully request that the Court grant their motion.

---

[3] Citations to "Ex. __" refer to the exhibits attached to the Declaration of Sharan Nirmul in Support of Plaintiffs' Motion for Class Certification.

## II.     SUMMARY OF FACTS

GE Power is the largest segment within the Industrials arm of GE's business. ¶ 19. The segment constructs and sells products like power plants, turbines, and generators and contracts with customers to service such products through long-term service agreements ("LTSAs"). *Id.* In the early years of the century, GE endeavored to downsize its financial arm, GE Capital. *Id.* In turn, the Company relied heavily on GE Power and its other industrial businesses to generate profits. *Id.*

In the years leading up to the start of the Class Period, however, the use of traditional power sources worldwide waned. ¶¶ 340, 342. As power usage slumped, so too did GE's sales of gas turbines and its customers' utilization of existing GE's equipment, including those turbines. ¶ 345. These declines directly drove down GE Power's earnings under its LTSAs associated with that equipment. ¶¶ 344-45, 352.

GE attempted to make up for these lost earnings by modifying its existing LTSAs to increase its profit margin, and then utilizing an accounting technique known as a "cumulative catch-up adjustment" to book immediate profits based on that higher margin. ¶¶ 336-38. In most instances, GE recorded those cumulative catch-up earnings on its income statement long before it could actually invoice customers and collect cash under those agreements. *Id.* That was because under its LTSAs, GE could only collect cash from customers when certain utilization levels were achieved or upon some occurrence within the LTSA, such as significant service work. ¶¶ 237, 251.

For this reason, the non-cash revenues that GE recorded from cumulative catch-up adjustments came at a steep cost to GE: they created an ever-widening gap between GE Power's recorded earnings and its actual cash collections, which GE referred to as industrial cash flows

from operating activities ("Industrial CFOA"). *Id*.[4] As GE Power's cash collections continued to lag its revenues, the "Contract Assets" line item reported on its balance sheet—which reflected revenues that were recorded but not yet billed—ballooned. ¶ 386. As GE's Industrial CFOA increasingly failed to keep pace with its recorded earnings, analysts and investors expressed concerns about the Company's cash flow and the quality of its earnings. ¶¶ 318, 387.

In an effort to assuage these concerns and conceal the growing gap between GE Power's revenues and cash collections, GE increased its reliance on receivables factoring—i.e., selling receivables to GE Capital or third parties in exchange for immediate cash—including the factoring of LTSA receivables. ¶¶ 393-405. In fact, GE created a task force dedicated specifically to extracting every dollar possible out of existing LTSAs through receivables factoring. ¶¶ 394-95. Through factoring, GE pulled forward future cash flows into the current quarter and, in light of the steep concessions it often agreed to in order to factor a receivable, it was oftentimes "trad[ing] away future revenue for [this] immediate cash." Dkt. #185 at 45; Dkt. #201-1 at ¶ 11. Defendants recognized that GE's factoring practices were not sustainable, including because GE Power only had a finite number of LTSA receivables to sell. ¶¶ 394, 401, 416.

In stark contrast to the true state of affairs within GE Power—and in violation Item 303 of Regulation S-K—GE's Class Period financial statements did not disclose material facts regarding GE's factoring practices, the true extent of the cash flow problems that GE was attempting to conceal through receivables factoring, or the risks associated with GE's reliance on factoring. ¶¶ 421-25. Rather, Defendants affirmatively misled investors about the purpose of the Company's factoring practices, claiming that such practices were aimed at managing credit risk, not liquidity:

---

[4] At all relevant times during the Class Period, Industrial CFOA was an important, publicly reported financial metric for GE and the frequent subject of analyst and market commentary and inquiry. ¶¶ 391, 429, 434.

"[i]n order to manage credit exposure, the Company sells current receivables to third parties." Dkt. #185 at 51-52; ¶¶ 426-27.

Over the short term, GE's alleged factoring scheme accomplished its objective. It created the illusion of sustainable cash flows and concealed the expanding gulf between GE Power's revenues and cash collections, and in turn the weakness in the Power business. ¶¶ 393-95. Eventually, however, GE could no longer rely on this unsustainable practice to conceal its weak Industrial cash flows. At the same time, its prior reliance on receivables factoring further eroded its cash flows by creating a hole that GE could not factor its way out of. ¶¶ 401-02. As the truth was gradually revealed to investors—in the form of, among other things, disclosures of poor Industrial cash flows, massive reductions in Industrial CFOA guidance, and a dividend cut that was attributable in part to weaker-than-expected Industrial cash flows—GE's stock price plummeted, causing substantial harm to Plaintiffs and the Class. ¶¶ 447, 451-505.

## III.   PROCEDURAL BACKGROUND

Lead Plaintiff AP7 is a Swedish public pension fund, and Additional Plaintiff Cleveland Bakers is a Taft-Hartley Pension fund. ¶¶ 42-43. Both Plaintiffs purchased or otherwise acquired GE common stock during the Class Period and suffered significant losses when the truth that was concealed by Defendants' misstatements and omissions was revealed to the market. *Id*.

On May 30, 2018, AP7 was appointed Lead Plaintiff of the action. Dkt. #139. Cleveland Bakers filed a complaint in a related action on February 20, 2018 (Case No. 1:18-cv-01404-JMF, Dkt. #4 (S.D.N.Y)) that was ultimately consolidated with this action (Dkt. #61) and is an additional named plaintiff.

Relevant here, Plaintiffs filed the 5AC on October 25, 2019 alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules promulgated thereunder including U.S. Securities and Exchange

Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 against Defendants GE and Jeffrey S. Bornstein, among others. Dkt. #191.

On January 29, 2021, the Court issued an Order sustaining Plaintiffs' allegations of misstatements and omissions relating to factoring. Dkt. #206. The parties subsequently agreed to, and the Court approved, a case schedule requiring Plaintiffs to file this motion by May 21, 2021. Dkt. #211; Fed. R. Civ. P. 23(c)(1)(A).

## IV.   ARGUMENT

### A.   Securities Class Actions Are Well-Suited for Class Action Treatment

To certify the Class, Plaintiffs must establish that the requirements of Rule 23(a)—namely, numerosity, commonality, typicality, and adequacy of representation—and at least one subsection of Rule 23(b) are satisfied. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460, (2013); *Pirnik*, 327 F.R.D. at 43 (same). Actions "alleging violations of Section[ ] 10(b) . . . of the Exchange Act are especially amenable to class certification," and "[i]n light of the importance of the class action device in securities fraud suits," the Rule 23 "factors are to be construed liberally." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013); *see Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267-68 (2014) ("*Halliburton II*"); *Basic Inc. v. Levinson*, 485 U.S. 224, 229-30, 249-50 (1988).

Class certification is appropriate where, as here, the requirements of Rule 23 are satisfied by a preponderance of the evidence. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). The inquiry at this stage is not whether Plaintiffs will ultimately prevail on the merits, but whether the requirements of Rule 23 are met—thus, the Court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Pirnik*, 327 F.R.D. at 43 ("Rule 23 grants courts no license to engage in free-ranging merits") (quoting *Amgen*, 568 U.S. at 466); *see In re Bank of Am. Corp. Sec., Deriv., and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134,

140 (S.D.N.Y. 2012) ("class certification is emphatically not an opportunity for a second round of review, at a higher standard no less, of the substantive merits of plaintiffs' underlying claims").

As demonstrated below, all requirements of Rule 23 are met here.

### B.      Rule 23(a) Is Satisfied

#### 1.      Numerosity Is Established

"Numerosity may be presumed when a class consists of forty or more plaintiffs." *Bank of Am.*, 281 F.R.D. at 138. "[A] showing that a large number of shares were outstanding and traded during the relevant period" satisfies the numerosity requirement. *Id.*

Here, the proposed Class consists of thousands of members. During the Class Period, GE's stock was heavily traded on the NYSE, with between 8.6 and 10.2 billion shares of GE common stock outstanding during the Class Period. Tabak Rpt. at Ex. 7, Column 3. Moreover, on average, more than 202 million shares of GE common stock were traded each week during the Class Period. Tabak Rpt. at ¶ 17. Joinder of this vast number of investors would be impractical and the "numerosity" requirement is thus satisfied. *See, e.g.*, *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *4 (S.D.N.Y. Aug. 13, 2018) (numerosity satisfied where defendant corporation "had an average of 22.7 million shares outstanding during the [c]lass [p]eriod . . . and an average weekly trading volume of 965,064 shares"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019) (numerosity satisfied where between 60.5 million and 80.5 million shares were outstanding); *In re Globalstar Sec. Litig.*, 2004 WL 2754674, at *4 (S.D.N.Y. Dec. 1, 2004) (108 million shares outstanding rendered joinder impracticable).

#### 2.      Commonality Is Established

The "commonality" requirement under Rule 23(a) is met if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Even a single common question of law or fact may suffice to satisfy the commonality requirement." *Pub. Emps.' Ret. Sys. of Mo. v. Merrill*

*Lynch & Co., Inc.*, 277 F.R.D. 97, 105 (S.D.N.Y. 2011); *see Globalstar*, 2004 WL 2754674, at *4 ("The commonality requirement has been applied permissively in securities fraud cases.").

Here, because all Class members' claims arise out of the same misrepresentations and omissions by Defendants and are subject to common proof. Here, questions of law and fact common to the Class abound, including whether Defendants misrepresented and omitted facts, whether those misrepresentations and omissions were material, and whether Defendants acted with the requisite scienter. *See Wilson*, 2018 WL 3913115, at *4 (such issues are "susceptible to common answers because their resolution does not differ based on the identity of the plaintiff"); *Signet Jewelers*, 2019 WL 3001084, at *8 (holding that questions concerning falsity, materiality and scienter are common to the class). Thus, the commonality requirement is satisfied here.

### 3. Typicality Is Established

Rule 23(a)'s "typicality" requirement is met when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To establish typicality, Plaintiffs must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *3 (S.D.N.Y. Sept. 29, 2015). The "requirement is not demanding." *Id*.

Here, the typicality requirement is easily met. Like other members of the Class, Plaintiffs purchased shares of GE common stock during the period in which the stock price of GE shares was artificially inflated as a result of Defendants' omissions and misrepresentations, and, like other Class members, Plaintiffs were harmed when the truth concealed by those omissions and misrepresentations was publicly revealed. ¶¶ 447-49. The proof necessary for Plaintiffs to prevail on their individual claims is exactly the same that is required to prove the claims of the rest of the Class. *See Bank of Am.*, 281 F.R.D. at 139 (typicality established where "class plaintiffs assert that

they acquired BofA securities at prices allegedly inflated by defendants' misstatements and/or omissions, and have an interest in maximizing their recovery"). Accordingly, typicality is established.

### 4.    Adequacy Is Established

Rule 23(a)'s "adequacy" prong requires that the proposed class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts assess whether "1) plaintiff's interests are antagonistic to the interests of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Bank of Am.*, 281 F.R.D. at 139-40 (citing *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). Only a "fundamental" conflict of interest will defeat adequacy under Rule 23(a)(4). *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001).

Plaintiffs are plainly adequate Class representatives. As explained above, each purchased GE common stock during the Class Period and was injured by the same wrongful course of conduct that injured the Class. *See* Complaint at Exhibits A and B. As a result, Plaintiffs' interests are not antagonistic to the Class—to the contrary, it is in Plaintiffs' economic interest to vigorously prosecute this action on behalf of the entire Class.

Moreover, to date, Plaintiffs have demonstrated their commitment participate in and supervise the prosecution of this action on behalf of the Class. They have retained highly experienced counsel, KTMC and G&E, kept themselves informed of developments in the case, vigorously prosecuted this action on behalf of all Class members, and will continue to do so.[5]

---

[5] For example, through counsel, Plaintiffs have: (1) investigated and filed amended complaints; (2) successfully opposed Defendants' motion to dismiss as to claims relating to factoring; (3) served and responded to discovery, including by collecting and producing documents; (4) retained and consulted experts; and (5) evaluated documents produced by Defendants in response to Plaintiffs' discovery requests. Plaintiffs will continue to perform similar activities throughout this action, including participating in discovery, trial preparation, and any settlement discussions.

These facts support a finding of adequacy. *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008) (concluding plaintiff was adequate class representative where it was "familiar with the facts and legal theories underlying the case, [] in regular contact with his lawyers, has met with them, has reviewed the complaint and other case documents, and understands that [it] is responsible for making decisions that impact the class and representing the class's best interests"); *Bank of Am.*, 281 F.R.D. at 140 (noting that "plaintiffs have retained experienced and qualified counsel who have, to date, ably conducted this litigation").

Additionally, as institutional investors, Plaintiffs are especially well-qualified to serve as Class representatives. *See* H.R. Conf. Rep. No. 104- 369, at 34 (1995) (the PSLRA was intended to "increase the likelihood that institutional investors will serve as lead plaintiffs"—i.e., in leadership roles).

And, further bolstering their adequacy (and typicality), neither Plaintiff is subject to any unique defense. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 94 (S.D.N.Y. 2010) (the question is "whether the defenses will become the focus of the litigation, thus overshadowing the primary claims, and prejudicing other class members"); *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (the unique defense rule "is not rigidly applied in this Circuit," and "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit").

Finally, Plaintiffs have protected the interests of the Class by retaining KTMC and G&E. Both firms are highly experienced, have a proven track record in litigating complex securities class actions like this one, and will vigorously prosecute the claims of the proposed Class. Exs. 2-3 (firm resumes). Counsel's adequacy is further established by their work on this case to date. *See, e.g.*, *In re Facebook, Inc., IPO Sec. and Deriv. Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015) (adequacy

established where "[c]ounsel is highly qualified and has prosecuted this action vigorously, their efforts resulting in surviving a motion to dismiss against some of the finest firms in the nation"). Accordingly, Plaintiffs respectfully submit that their proposed Counsel satisfy the adequacy requirement of Rule 23(a)(4).

### 5.     The Proposed Class Is Ascertainable

"The standard for ascertainability [under Rule 23] is not demanding. It is designed only to prevent the certification of a class whose membership is truly indeterminable." *Facebook*, 312 F.R.D. at 353. To meet the requirement, a class need only be "sufficiently definite"—a standard met when, as here, the proposed class is "defined by objective criteria that are administratively feasible" to apply. *Id.* at 352 (citing *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).

Here, the proposed Class is defined by objective criteria—persons and entities that purchased or acquired GE common stock during the Class Period and were damaged thereby. *See supra* Section I; *see, e.g.*, *Wilson*, 2018 WL 3913115, at *7 (purchasers of securities during specified period could be "identified from the books and records maintained by [the defendant] and its agents"); *In re Winstar Commc'ns. Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (acknowledging that in a securities class action, "[w]hether a prospective class member purchased [the securities] during the class period can be objectively determined by examination of brokerage or trading statements").

### C.     Rule 23(b)(3) Is Satisfied

Once a putative class representative has shown that its proposed class meets the four requirements of Rule 23(a), the court then must determine whether the action can be maintained under one of the three subsections of Rule 23(b). Plaintiffs seek class certification under Rule 23(b)(3) because, as discussed below, "questions of law or fact common to class members

predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Pirnik*, 327 F.R.D. at 43 (citing Fed. R. Civ. P. 23(b)(3)).

### 1.    Predominance Is Established

"Predominance is a test readily met in certain cases alleging . . . securities fraud[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This inquiry is satisfied where "***questions*** of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis in original); *see In re Petrobras Secs.*, 862 F.3d 250, 268 (2d Cir. 2017) (predominance is a "comparative standard" that "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof," only that common issues "*predominate* over any questions affecting only individual [class] members") (emphasis in original).

"Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). Courts regularly hold that Section 10(b) elements of falsity, scienter, materiality, and loss causation are common to all Class members. *See Amgen*, 568 U.S. at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"); *id.* at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions"); *see also In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("[a]ll of these [10(b)] elements, other than reliance in cases that are not premised on fraud-on-the-market, are subject to class wide proof in securities litigation").[6]

---

[6] Common questions also predominate as to Plaintiffs' Section 20(a) claim because "provided there is predominance with respect to the Section 10(b) claim—i.e., the 'primary violation'—the predominance requirement will also be met with respect to the Section 20(a) claim, as the issue of control is susceptible to generalized proof." *See In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 572 n.21 (S.D.N.Y. 2008).

Accordingly, whether common questions predominate for Plaintiffs' Section 10(b) claims often "turns on the element of reliance." *Halliburton I*, 563 U.S. at 810; *Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 n.17 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ("[r]eliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts").

As demonstrated below, Plaintiffs and putative Class members are entitled to a presumption of reliance under *Affiliated Ute* because their claims arise from Defendants' material omissions. Alternatively, as demonstrated by Plaintiffs' expert, Dr. Tabak, Plaintiffs and Class members can avail themselves of the fraud-on-the-market presumption of reliance.

### a.    Reliance Is Presumed Under *Affiliated Ute*

In cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153. Instead, in such cases, reliance is presumed where the: (1) Defendants had an "obligation to disclose" the omitted information; and (2) the omitted information was material. *Id* at 154; *see also Hawaii Structural Ironworkers Pension Trust Fund, Inc. v. AMC Entm't Holdings, Inc.*, 2021 WL 1198799, at *7 (S.D.N.Y. Mar. 30, 2021) (reliance may be satisfied "where a plaintiff's fraud claims are based on omissions and the plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material").[7] "[T]he theory behind the *Affiliated Ute* presumption [is] that, when material information is concealed, plaintiffs should only have to prove that 'a reasonable investor might have considered the omitted facts important in the making of [her] investment decision.'" *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) (quoting *Affiliated Ute*, 406 U.S. at 153-54).

---

[7] As discussed *supra*, proof of materiality is not required at the class certification stage.  *See Amgen*, 568 U.S. at 467.

This case fits squarely within the intended application of the *Affiliated Ute* presumption. Plaintiffs' claims arise from Defendants' alleged material omissions regarding GE's reliance on and the purpose for factoring. ¶¶ 421-27. Moreover, Defendants had an obligation to disclose this material information under Item 303 and in order to not render misleading Defendants' statements in GE's 2016 Form 10-K concerning factoring. *Id.* As such, reliance is presumed under *Affiliated Ute*. *See, e.g.*, *Gruber v. Gilbertson*, 2019 WL 4439415, at *7 (S.D.N.Y. Sept. 17, 2019) (applying *Affiliated Ute* at class certification where defendants failed to disclose that the individual defendants had more than a 5% ownership stake in the defendant company); *In re China N.E. Petro. Holdings Ltd. Sec. Litig.*, 2017 WL 11564337, at *5 (S.D.N.Y. Aug. 8, 2017) (granting class certification and applying *Affiliated Ute* because "Plaintiff is correct that this case is primarily focused on numerous material omissions"); *Smith Barney*, 290 F.R.D. at 47-48 (applying *Affiliated Ute* at class certification to case involving both misstatements and omissions where primary issue was defendants' failure to disclose a scheme to generate profits at the expense of funds).

### b.    The Fraud-on-the-Market Presumption of Reliance Applies

Under *Basic* and *Halliburton II*, Plaintiffs "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton II*, 573 U.S. at 283-84. Of the requirements necessary to invoke the presumption, "only market efficiency is to be considered at this stage." *Pirnik*, 327 F.R.D. at 44; *see also Halliburton II*, 573 U.S. at 279 (plaintiffs need only show that security at issue traded in a "generally efficient market" at the class certification stage); *Petrobras*, 862 F.3d at 278 (that burden is not "onerous").

There should be no dispute that the market for GE common stock was efficient throughout the Class Period. GE common stock was listed and actively traded during the Class Period on the

NYSE, which this Court has previously deemed "a paradigmatic efficient market." *Pirnik*, 327 F.R.D. at 44 (noting where securities at issue traded on the NYSE that "[d]efendants wisely do not dispute that [p]laintiffs have established that FCA securities traded in an efficient market during the [c]lass [p]eriod"); *JPMorgan*, 2015 WL 10433433, at *7 ("Most courts to consider the issue have concluded that a stock's listing on the New York Stock Exchange is a strong indication that the market for the stock is efficient."); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) (same).

While GE common stock's NYSE listing alone should establish market efficiency, the five factors set forth in *Cammer*, often invoked by courts to assess market efficiency, and the three additional factors laid out in *Krogman*, 202 F.R.D. at 477-78, confirm that GE stock traded in an efficient market throughout the Class Period.

> **i.    The Five *Cammer* Factors Weigh In Favor of a Finding of Market Efficiency**

Under *Cammer*, courts consider the following factors in assessing market efficiency: (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the issuer to file an S-3 registration statement; and (5) a history of immediately movement of the stock price caused by unexpected corporate events or financial releases. *See Cammer*, 711 F. Supp. at 1286-87; *see also Pirnik*, 327 F.R.D. at 44. As Dr. Tabak has shown, each of the five "*Cammer* factors" strongly supports a finding of market efficiency.

***GE Common Stock Had a High Weekly Trading Volume***. In *Cammer*, the court held that "average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293. During the Class Period, the average market-maker-

adjusted weekly trading volume of GE stock was *2.19%* of shares outstanding. Tabak Rpt. at ¶ 17. This heavy trading volume justifies a strong presumption that GE stock traded in an efficient market. *See, e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (trading volume of 3.2% points to market efficiency); *McIntire v. China Media Express Holdings, Inc.*, 38 F. Supp. 3d 415, 431-32 (S.D.N.Y. 2014) (finding of 17% average weekly trading volume, even if inflated, justifies a strong presumption of an efficient market).

*GE Common Stock Was Thoroughly Covered By Analysts*. "*Cammer* recognizes that a stock covered by a 'significant number of analysts' is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors." *Carpenters Pension*, 310 F.R.D. at 79 (citing *Cammer*, 711 F. Supp. at 1286). Securities analysts employed by a significant number of major brokerage firms— including Credit Suisse, Deutsche Bank, JP Morgan, Oppenheimer, and UBS—published reports on GE's securities during the Class Period. Tabak Rpt. at ¶ 21. In total, hundreds of analysts' reports were published over the Class Period, with at least nine analysts issuing one or more reports each month. *Id.* Under *Cammer* and its progeny, this type of extensive coverage of GE by securities analysts and the media establishes that GE's common shares trade in an informationally efficient market during the Class Period. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (fifteen firms provided analyst coverage over the course of the class period as a whole); *Winstar*, 290 F.R.D. at 446 (three analysts reported on the security during the class period).

*There Were Numerous Market Makers for GE Common Stock*. The third *Cammer* factor looks at the existence of market makers and traders who increase liquidity in the market. As *Cammer* explained, market makers and arbitrageurs "ensure completion of the market mechanism"

and "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87.

The NYSE maintains a "designated market maker" system, ensuring that at least one entity is acting as a market maker for all stocks traded on the NYSE. Tabak Rpt. at ¶ 22. Further, over 2,400 institutions collectively held over 5.6 billion shares of GE common stock at the start of the class period and a total of between 56.1 and 58.1% of outstanding GE common stock over the quarter ends within the class period. Tabak Rpt. at ¶¶ 24, 27. During the Class Period, of the institutions with a non-zero holding of shares at the end of a quarter, 85.1% reported a different holding figure at the end of the next quarter. Tabak Rpt. at ¶¶ 25, 27. These observations show that as a group, institutions were not passive investors, but changed their positions, a hallmark of arbitrage activity. Tabak Rpt. at ¶ 25.

In addition, as explained *supra* in Section IV.C.1.b, courts recognize that the NYSE is an "open, well-developed and efficient market," and that when "a security is listed on the NYSE . . . or a similar national market, the market for that security is presumed to be efficient." *In re Sadia S.A. Sec. Litig.*, 269 F.R.D. 298, 309 (S.D.N.Y. 2010); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008). There is little doubt that these factors together demonstrate that the GE common stock traded on an open and liquid market.

***GE Was Eligible to File Form S-3 Registration Statements***. A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for twelve straight months and possesses a float of at least $75 million. 17 C.F.R. § 239.13. "The ability to file this form indicates that the company is easily able to issue new securities." *Winstar*, 290 F.R.D. at 447. GE satisfied the conditions for S-3 registration eligibility throughout the Class Period. Tabak Rpt. at ¶¶ 28-29.

*GE's Stock Price Reacted to Unexpected News*. This Court has recognized that when "Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact." *Pirnik*, 327 F.R.D. at 45, n.3. As a result, here, where each of the first four *Cammer* factors strongly supports a finding of market efficiency, an "event study" establishing the fifth *Cammer* factor is not "necessary to demonstrate [market] efficiency." *Strougo*, 312 F.R.D. at 320. In any event, as described below, the evidence submitted in the Tabak Report, in the form of an event study, demonstrates a causal connection between new company specific-information and the reactions in the market prices of GE common stock. Tabak Rpt. at ¶¶ 30-42.

In his event study, Dr. Tabak analyzed the connection between news and movements in the price of GE stock. *See* Tabak Rpt. at ¶¶ 31, 36-41. The event study demonstrated that statistically significant movements in price were "were **more than four times** as likely to be observed on earnings-announcement days as on other days." Tabak Rpt. at ¶ 38. In addition, the event study showed that "[t]he absolute magnitude of the price movements on news days" was "also higher than on non-news days," and that "usually that difference itself [was] statistically significant." Tabak Rpt. at ¶ 42. Dr. Tabak concluded that "there is very strong evidence that GE's stock price responded to new information during the Class Period." Tabak Rpt. at ¶ 42.

ii.   **The *Krogman* Factors Favor a Finding of Market Efficiency**

Under *Krogman*, "[s]ubstantial market capitalization with a narrow bid-ask spread[ ] and a large public float . . . indicate that [a corporation's securities] trade[ ] in an efficient market such that the *Basic* presumption is appropriate." *JPMorgan*, 2015 WL 10433433, at *7 (citing *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012)).

Here, these considerations further support an inference of market efficiency. GE's market capitalization was least $140 billion throughout the Class Period, reaching a peak of over $300 billion. Tabak Rpt. at ¶ 44. GE's market capitalization of $147 billion on January 23, 2018, the last day of the Class Period, exceeded the market capitalization of more than 98% of the members of the Russell 3000 Index which is composed of 3,000 of the largest stocks traded in the United States. *Id.*; *see Carpenters Pension*, 310 F.R.D. at 80 ("The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient."). During the Class Period, GE's common stock float averaged over 99.9% of the shares outstanding. Tabak Rpt. at ¶ 48; *see JPMorgan*, 2015 WL 10433433, at *7 (average float of 99% supported inference of efficiency); *Pearlstein v. Blackberry Ltd.*, 2021 WL 253453, at *16 (S.D.N.Y. Jan. 26, 2021) (average float of 84.4% of shares outstanding supported finding of market efficiency). And, finally, the average daily bid-ask spread for GE stock during the class period was .04% of the stock price. Tabak Rpt. at ¶ 47; *see Strougo*, 312 F.R.D. at 317 ("The markets for companies with . . . smaller bid-ask spread are more likely to be efficient.").[8]

### c.    Damages Are Measurable by a Common Methodology

It is "well-established in [the Second Circuit] that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *see also Strougo*, 312 F.R.D. at 313 ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases."); *Pirnik*, 327 F.R.D. at 47 (holding that issues relating to damages model were "merits issues" and went "beyond the Rule 23 inquiry"). Plaintiffs need only

---

[8] Some courts also consider "autocorrelation" when assessing market efficiency, *see, e.g.*, *Billhofer*, 281 F.R.D. at 160-62, which refers to an investor's ability to use previous price movements to predict future price movements. Dr. Tabak analyzed this factor and concluded that it supports a finding of market efficiency here. Tabak Rpt. at ¶¶ 49-53.

show that their damages model "measure damages that result from the class's asserted theory of injury." *Roach*, 778 F.3d at 407 (interpreting *Comcast*).

This case complies with *Comcast*. While Dr. Tabak does not provide (and is not required to provide) a full damages calculation at this time, his report proposes a straightforward out-of-pocket event study methodology based upon Plaintiffs' sole theory of liability—that Defendants made material misstatements and omissions that caused artificial inflation in GE's stock price. *See* Tabak Rpt. § VI.[9] Using this methodology, Dr. Tabak will, at the appropriate time, use his event study to quantify the amount of artificial inflation in GE's stock price caused by Defendants' conduct. *See id.* That artificial inflation amount—which will be calculated using common evidence—can then be formulaically applied to all Class members' transactions to compute individual damages. *Id.*

This proposed methodology directly aligns with Plaintiffs' theory of liability—i.e., that GE's stock price was artificially inflated due to Defendants' misconduct and Plaintiffs suffered an out-of-pocket loss when the relevant truth was revealed—and has been endorsed time and again by courts presiding over securities class actions in this Circuit, including this Court in *Pirnik*. *See id.*, 327 F.R.D. at 47 (finding event study methodology satisfied *Comcast*); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 371-72 (S.D.N.Y. 2016) (same); *JPMorgan*, 2015 WL 10433433, at *7 (same; collecting cases); *Waggoner*, 875 F.3d at 105-06 (*same*); *Carpenters Pension*, 310 F.R.D. at 99 (same); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) (same); *Wilson*, 2018 WL 3913115, at *17 (same; finding this proposed model "suffices at the class certification stage to show that the issue of damages does not preclude a finding that common issues of law and fact

---

[9] Rule 23 does ***not*** require a plaintiff to set forth a detailed model for proving damages at the class certification stage. *See Strougo*, 312 F.R.D. at 313. In fact, even in a case where "damages may have to be ascertained on an individual basis," this "is not sufficient to defeat class certification." *Id.*

predominate over individual damages issues"). Moreover, courts have routinely endorsed and accepted at the class certification stage Dr. Tabak's out-of-pocket event study methodology, most recently in *In re Teva Sec. Litig.*, 2021 WL 872156, at *40 (S.D.N.Y. Mar. 9, 2021).

In short, Plaintiffs have sufficiently established that their proposed damages calculation methodology will actually measure damages that result from the proposed Class's asserted theory of injury.

## 2.    Superiority Is Established

To determine whether a class action is superior to other methods of adjudication, courts must consider the following four factors: (1) the interests of members of the class in individually controlling the prosecution of separate actions; (2) whether other litigation has already commenced; (3) the desirability or undesirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

Here, each of these factors supports a finding that superiority is established. Plaintiffs seek to represent a Class consisting of a large number of geographically-dispersed GE common stock purchasers whose individual damages are likely small enough to render individual litigation prohibitively expensive. *See Menaldi*, 328 F.R.D. at 100 ("Securities suits easily satisfy the superiority requirement [because] [m]ost violations of the federal securities laws . . . inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible.").

Concentrating litigation against Defendants in a single forum has a number of benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of the judicial system. *See Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 283 F.R.D. 199, 218 (S.D.N.Y. 2012) ("Concentrating this litigation in a single forum, particularly this one, has clear benefits. It avoids the 'risk of inconsistent adjudication,' and encourages 'the fair and

efficient use of the judicial system.'"). Further, "the Southern District of New York is well known to have expertise in securities law." *Id*. Thus, the benefits of concentrating litigation against Defendants in this Court heavily favor certifying the Class. Multiple lawsuits, on the other hand, would be costly and inefficient.

Finally, domestic securities class actions generally raise no unusual manageability issues. Indeed, federal securities class actions are routinely certified in the Southern District and raise no unusual manageability issues. *Id*. ("There are no difficulties likely to be encountered in the management of this action as a class action apart from those inherent in any hard fought battle where substantial sums are at issue and all active parties are represented by able counsel. This Court, as is true of many other courts in this district, has overseen and managed many securities class actions. There is no reason to believe that doing so again would not be the superior method of resolving these disputes."). This case is no different. *See, e.g.*, *Parmalat*, 2008 WL 3895539, at *11 n.95 (noting that denial of class certification on manageability grounds is "disfavored"). Accordingly, superiority is established.

### D.     Class Counsel Satisfies the Requirements of Rule 23(g)

In appointing class counsel, courts must consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to represent the class. Fed. R. Civ. P. 23(g).

Plaintiffs have retained KTMC as lead counsel and G&E as liaison counsel to represent them in this matter. Both law firms are highly experienced in litigating federal securities class actions. Moreover, as described *supra* Section IV.B.4, counsel has demonstrated its commitment to prosecuting this action. *See Pearlstein*, 2021 WL 253453, at *11 (finding Rule 23(g)

requirements satisfied where lead counsel and additional counsel had together been "ably conduct[ing]" the litigation for several years).

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (2) appoint Plaintiffs to serve as Class Representatives; (3) appoint KTMC as Class Counsel and G&E as Liaison Counsel for the Class; and (4) grant such other and further relief as the Court deems just and proper.


Dated: May 21, 2021                              Respectfully submitted,

                                                 **KESSLER TOPAZ MELTZER &**
                                                 **CHECK, LLP**

                                                 *S/ Sharan Nirmul*
                                                 Sharan Nirmul
                                                 Gregory M. Castaldo
                                                 Richard A. Russo, Jr.
                                                 Joshua A. Materese
                                                 Michelle M. Newcomer
                                                 Evan R. Hoey
                                                 280 King of Prussia Road
                                                 Radnor, PA 19087
                                                 Telephone: (610) 667-7706
                                                 snirmul@ktmc.com
                                                 gcastaldo@ktmc.com
                                                 rrusso@ktmc.com
                                                 jmaterese@ktmc.com
                                                 mnewcomer@ktmc.com
                                                 ehoey@ktmc.com

                                                 *Counsel for Lead Plaintiff Sjunde AP-*
                                                 *Fonden and Proposed Lead Counsel for the*
                                                 *Class*

                                                 **GRANT & EISENHOFER P.A.**
                                                 Jay W. Eisenhofer
                                                 Daniel L. Berger
                                                 Barbara Hart
                                                 Caitlin M. Moyna

Jonathan D. Park
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
jeisenhofer@gelaw.com
dberger@gelaw.com
bhart@gelaw.com
cmoyna@gelaw.com
jpark@gelaw.com

*Counsel for Additional Plaintiff Cleveland Bakers and Teamsters Pension Fund and Proposed Liaison Counsel for the Class*