# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SJUNDE AP-FONDEN and THE CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL ELECTRIC COMPANY, JEFFREY R. IMMELT, JEFFREY S. BORNSTEIN, JAMIE MILLER, KEITH S. SHERIN, JAN R. HAUSER, and RICHARD A. LAXER,<br><br>Defendants. | Case No. 1:17-cv-8457-JMF<br><br>Hon. Jesse M. Furman<br><br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## [PROPOSED] SIXTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION ....................................................................................2

    A.   Defendants Concealed GE's Massive Long-Term Care Liabilities and Risks.......................................................................................................4

    B.   Defendants Concealed Material Risks Related to GE Power and Its Long-Term Service Agreements....................................................................7

    C.   Defendants' Fraud Unravels ......................................................................9

II.   JURISDICTION AND VENUE ..........................................................................13

III.   PARTIES ............................................................................................................14

    A.   Plaintiffs................................................................................................14

    B.   Defendants .............................................................................................14

    C.   Relevant Non-Parties .............................................................................19

        1.   GE's Subsidiaries.........................................................................19

        2.   Non-Defendant GE Employees......................................................19

        3.   Former GE Employees ..................................................................21

        4.   Plaintiffs' Expert Consultants .......................................................23

IV.   COMPANY BACKGROUND .............................................................................26

V.   PLAINTIFFS' LONG-TERM CARE INSURANCE ALLEGATIONS .........................27

    A.   The LTC Insurance Industry ...................................................................28

        1.   The Rise and Fall of the LTC Market.............................................28

        2.   LTC Reserve and Reporting Requirements ....................................29

        3.   The Outsized Risk of LTC Insurance .............................................31

    B.   Prior to the Class Period, GE Spun Off and Sold Its Insurance Businesses, But Was Forced to Keep the Worst of Its LTC Portfolio.................34

        1.   GE Claimed to Have Reduced Its LTC Insurance Risk When It Spun off Genworth in 2004........................................................35

        2.   GE Sold Its Remaining Insurance Stake to Swiss Re in 2006, but Again Retained Exposure to Its Riskiest LTC Blocks.........................36

        3.   Recently Disclosed Data Confirms That GE's Retained LTC Policies Were Ultra-Risky and Among the Most Toxic in the LTC Industry.................................................................................37

    C.   Defendants' Scienter: During the Class Period, Defendants Knew That GE's Retained LTC Portfolio Posed Severe Risks to Its Financial Condition...............................................................................................39

1.     Defendants Knew That GE's LTC Portfolio Had Significantly Deteriorated Prior to, and Continued to Deteriorate Throughout, the Class Period .................................................. 40

    a.     Immelt and Bornstein Received Actual LTC Claims Experience Data on an Annual Basis ............................................. 40

    b.     Defendants Witnessed Negative Claims Experience Within GE's LTC Blocks Prior to and During the Class Period .......................................................... 42

2.     Defendants Knew That GE Was Exposed to Over 300,000 of the Most Toxic LTC Insurance Policies in the Industry ......................... 47

3.     Defendants Knew That GE Was Using Its Original Pricing Assumptions to Calculate GAAP LTC Reserves During the Class Period ........................................................... 50

4.     Defendants Knew of Industry-Wide Trends and Data Confirming That Original Pricing Assumptions Were Inconsistent with Actual Claims Experience and Vastly Understated the Financial Risks to LTC Insurers ..................................... 51

5.     Defendants Knew That Other LTC Insurers Had Recorded Billions of Dollars in Reserve Charges during the Class Period Due to Increased Risks and Inaccurate Pricing Assumptions .................. 57

6.     Plaintiffs' Actuarial Expert Has Corroborated Plaintiffs' Allegations and Has Identified Severe Deficiencies in GE's Annual Premium Deficiency Tests ........................................... 60

    a.     Asset Adequacy Testing Under GAAP and SAP ........................ 61

    b.     UFLIC's Best Estimate Reserve Assumptions Were Outdated, Inconsistent with Prevailing Industry Assumptions, and Contradicted by GE's Actual Experience ...................................................... 61

    c.     ERAC's Best Estimate Assumptions Were Similarly Outdated and Inconsistent with Industry Practice ........................ 66

    d.     GE's Negative Claims Experience Further Indicate That Its Best Estimate Assumptions Were Outdated and Inconsistent with GE's Actual Claims Experience ........................ 66

7.     Axene's Analyses Corroborate Plaintiffs' Allegations of Scienter .................................................................. 67

D.     Defendants' Materially False or Misleading Statements and Omissions ............. 68

1.     Defendants Omitted Material Facts in Violation of Item 303 of Regulation S-K and Section 10(b) ........................................... 69

a.    Overview of GE's Item 303 Disclosure Obligations .....................69

b.    Defendants Failed to Disclose Material Facts and Trends Concerning to GE's LTC Insurance Portfolio ..................71

c.    Defendants Failed to Disclose Material LTC-Related Contractual Obligations and Risks In Violation of Item 303(a)(5) ......................................................................................76

2.    GE's Financial Statements Misleadingly Obscured and Concealed Its LTC Liabilities .....................................................79

3.    Defendants Misrepresented the Nature and Extent of GE's LTC Risks During the Class Period ..................................................82

E.    Investors Could Not Have Determined GE's LTC Liabilities and Risks by Reviewing the Company's SEC Filings .........................................85

1.    GE Did Not Quantify Its LTC Liabilities in Its SEC Filings....................85

2.    Investors Could Not Have Quantified GE's LTC Liabilities and Risks by Comparing GE's MD&A Table to Its Note 11 Disclosures ......................................................................................86

3.    Plaintiffs' Accounting Expert Confirms that GE's LTC Liabilities and Risks Were Not Quantified in the Company's SEC Filings ..........................................................................................92

F.    The Truth Is Revealed...........................................................................95

1.    Defendants Slowly Reveal GE's True LTC Risks to Investors................95

2.    Analysts Express Shock at GE's True LTC Risk and Confirm that the Market Had Been Misled Throughout the Class Period .............97

G.    GE's Post-Class Period LTC Disclosures.............................................101

VI.    PLAINTIFFS' GE POWER ALLEGATIONS.................................................102

A.    GE Power's Operation .........................................................................103

B.    GE Power's Long-Term Service Agreements and Contract Assets ....................104

C.    Cumulative Catch-Up Adjustments on LTSAs.....................................106

D.    Declines in the Use of Traditional Power Sources Negatively Impacted GE Power ..............................................................................................107

E.    Negative Trends within GE Power and Defendants' Knowledge Thereof.................................................................................................109

1.    The Steep Decline in Utilization of GE-Serviced Assets Negatively Affected GE Power's Cash Flows.........................................109

2.    GE Power's Reliance on LTSA Modifications and Cumulative Catch-Up Adjustments Adversely Impacted Its Cash Flows.................112

a.      Defendants' Knowledge of or Reckless Disregard for Material Facts Concerning GE Power's LTSA Practices ...........115

b.      GE's Post-Class Period Restatement Confirms the Extent to Which the Company Relied on LTSA Modifications and Cumulative Catch-Up Revenue ....................118

3.     GE Power's Factoring of LTSA Receivables to Mask the Industrial CFOA Crisis ...............................................................120

a.      Defendants Misled the Market as GE's Contract Asset Tally Soars ...................................................................................120

b.      GE Power Engaged in Rampant Factoring to Conceal Its Deteriorating Cash Flow ........................................................122

F.     Defendants' Materially False or Misleading Statements and Omissions ...........125

1.     Defendants Omitted Material Facts in Violation of Item 303 of Regulation S-K and Section 10(b) ...........................................125

a.      Declining Utilization of GE-Serviced Assets Under LTSAs ...................................................................................125

b.      GE Power's Reliance on LTSA Modifications and Cumulative Catch-Up Adjustments ...............................126

c.      GE Power's Widespread Use of and Reliance on Factoring to Hide its Liquidity Crisis ..........................................128

2.     Defendants' Materially False or Misleading Statements and Omissions...........................................................................130

a.      GE's 2016 10-K ....................................................................130

b.      GE's January 20, 2017 Earnings Call ...........................................131

c.      February 22, 2017 Barclays Industrial Select Conference .............................................................................132

d.      GE's April 21, 2017 Earnings Call ...............................132

G.     Defendants Slowly Reveal GE's Liquidity Crisis ...............................................134

VII.     LOSS CAUSATION/ECONOMIC LOSS ...................................................................136

A.     April 21, 2017: Financial Results for 1Q17.........................................................137

B.     July 21, 2017: Financial Results for 2Q17...........................................................139

C.     October 20, 2017: Financial Results for 3Q17 ....................................................141

iv

D.     November 13-14, 2017: Investor Update and Goldman Sachs
Conference ............................................................................146

E.     January 16, 2018: GE's "Insurance Update" ........................................150

F.     January 24, 2018: Disclosure of 4Q17 Financial Results and SEC
Investigations into GE's LTC Reserves and Revenue Recognition
Practices Related to LTSAs ....................................................155

VIII.  PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ....................157

IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION
DOCTRINE ARE INAPPLICABLE....................................................159

X.    CLASS ACTION ALLEGATIONS ....................................................159

XI.   AMENDED ALLEGATIONS............................................................161

A.     Beginning in 2015, as Cash Collections Waned and GE Power's
Deferred Balance Ballooned, GE Resorted to "Deferred Monetization"
to Meet CFOA Targets in 2015 ..............................................162

B.     During the First Half of 2016, as the Pipeline of Receivables that GE
Power Services Could Factor through Existing Approved Deferred
Monetization Programs Dried Up, Defendants Expanded Deferred
Monetization Even Further ....................................................164

C.     Despite Poor Second Quarter Performance on Cash Flow, GE and
Bornstein Promised Investors that GE Would Make up the Shortfall
During Second Half of 2016 and Meet its Full Year CFOA Guidance ..............165

D.     After Publicly Re-Assuring Investors About GE's Industrial CFOA,
Bornstein Internally Sounded the Alarm to GE's Senior-Most
Executives ........................................................................167

E.     On Bornstein's Order, GE Power Doubled Down on Factoring in the
Second Half of 2016, Pulling Forward More Than $1 Billion in
Additional Future Cash Flows ................................................168

F.     As GE's Reliance on Factoring Hit Record Highs in Late 2016,
Defendants Announced Improved Cash Figures for 3Q16 and Re-
Affirmed High Expectations for 4Q16 Industrial CFOA ....................170

G.     Defendants Knew that GE Increased Its Reliance on Factoring to
Record Levels in the Fourth Quarter of 2016 ..............................171

H.     Prior to January 20, 2017, Defendants Knew that Factoring Was the
Single-Most Important Factor Driving GE's Industrial CFOA Results
in 2016 ..........................................................................173

I.     On January 20, 2017, Despite Knowing that Factoring Was a
Significant Driver of GE's Industrial CFOA Performance in 2016,
Defendants Made Materially False or Misleading Statements to the
Market About the Size, Scope, and Impact of GE's Factoring Practices ..........175

J.     In an Effort to Conceal the Falsity of Bornstein's Statement, Defendants Altered the Intercompany Factoring Disclosures in GE's 2016 10-K .................................................................................178

XII.    CAUSES OF ACTION .................................................................................180

XIII.   PRAYER FOR RELIEF .................................................................................184

XIV.  JURY TRIAL DEMANDED .................................................................................184

Court-appointed Lead Plaintiff Sjunde-AP Fonden ("Lead Plaintiff" or "AP7"), along with additional plaintiff The Cleveland Bakers and Teamsters Pension Fund ("Cleveland Bakers") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this federal securities class action on behalf of themselves and a class ("Class") consisting of all persons and entities that purchased or otherwise acquired the common stock of General Electric Company ("GE" or the "Company") from February 27, 2013, through January 23, 2018, inclusive (the "Class Period"). Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and the rules and regulations promulgated thereunder, including U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants GE, Jeffrey R. Immelt ("Immelt"), Jeffrey S. Bornstein ("Bornstein"), Jamie Miller ("Miller"), Keith S. Sherin ("Sherin"), Jan R. Hauser ("Hauser"), and Richard A. Laxer ("Laxer") (collectively, "Defendants"). Defendants Immelt, Bornstein, Miller, Sherin, Hauser, and Laxer are collectively referred to as the "Individual Defendants."

As set forth herein, Plaintiffs and Class members purchased GE common stock at artificially inflated prices created and/or maintained by Defendants' materially false or misleading statements and omissions throughout the Class Period. When the truth concerning the Company was belatedly revealed to the market, Plaintiffs and Class members suffered massive monetary damages. Except as to allegations specifically pertaining to Plaintiffs, all allegations herein are based upon the investigation undertaken by Plaintiffs' counsel, which included, but was not limited to, the review and analysis of: (i) public filings made by GE with the SEC[1]; (ii) press releases and

---

[1] For the Court's convenience, attached as Appendix A is a chart listing Defendant GE's SEC filings that Plaintiffs allege contain materially false or misleading statements or omissions.

other public statements issued by Defendants; (iii) research reports purchased from securities and financial analysts; (iv) media and news reports related to GE; (v) transcripts of GE's earnings and other investor conference calls; (vi) publicly available presentations, press releases, and interviews by GE and its employees; (vii) economic analyses of the movement and pricing of GE publicly traded common stock; (viii) consultations with relevant consultants and experts; (ix) media reports and other publicly available information concerning Defendants; and (x) interviews of former employees ("FE") of GE, several of whom, on information and belief, are known to GE and have been provided counsel by GE. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     Throughout its history, GE has been particularly revered as a company that pays investors a meaningful and consistent quarterly dividend. GE's retail investors, including countless retirees, have relied upon the Company's stock dividend as a significant source of income, considering it "sacrosanct." Prior to the most recent dividend cut in late 2017, GE had only cut its dividend once since the Great Depression. That cut came on Immelt's watch in the midst of the subprime mortgage crisis in 2008, when GE cut its dividend by more than half. Immelt resolved that it would never happen again. Indeed, he would later tell investors during a July 21, 2017 earnings call:

> [E]verybody here [at GE] prioritizes the dividend at a very high level. And I just don't want anybody to ever be confused about that . . . .
>
> ***I was here the day we cut the dividend [in 2008]. It was the worst day of my tenure as CEO***. And the ***dividend is*** really, I think, ***incredibly important for our investors*** . . . .[2]

---

[2] All emphasis is added and all original emphasis is omitted unless otherwise noted.

2.      Following the mortgage crisis in 2008, GE's dividend yield increased from approximately 2.49% to 4.75% towards the end of 2017. To generate cash flow to pay the dividend, GE relied principally upon dividends that were "upstreamed" from GE Capital to GE, and cash from GE's industrial operations, most significantly GE Power. In an era of historically low interest rates, GE's substantial dividend yield was a highly attractive source of income for GE investors, more than 40% of whom are small "retail" investors and retirees who chose GE stock for its consistent and reliable dividend payments.

3.      What investors did not know, however, was that GE's ability to pay those dividends depended upon unsustainable fraudulent practices designed to prop up GE's reported financial position in the short term, while imperiling GE's long-term fate.

4.      On June 12, 2017, GE announced that John Flannery ("Flannery") would succeed Immelt as GE's Chief Executive Officer ("CEO") beginning on August 1, 2017. What followed Flannery's succession was a dismantling and unraveling of a multi-year scheme of fraud that Immelt and his senior management team, including Bornstein, his Chief Financial Officer ("CFO"), had used to conceal material facts, risks, and negative trends from investors' view for more than a decade.

5.      Flannery's dismantling of GE's fraud included : (i) disclosing billions of dollars of previously concealed liabilities in GE's run-off insurance business, stemming from a massive, toxic portfolio of Long-Term Care ("LTC") insurance contracts that GE had declared were largely sold off decades before; (ii) revealing a liquidity crisis and overall weakness in GE's Industrials business that had been disguised by paper profits from modifications to GE's Long-Term Service Agreements ("LTSAs") and by the factoring of the LTSA paper revenues to GE Capital for cash to stave off liquidity issues in these businesses. GE's reckoning of its insurance risks, and the

deterioration of cash flows in its Industrials business fueled a liquidity crisis that led to it cutting in half its dividend, and then further reducing it to a penny.

6.      Investors were blindsided by GE's disclosures but, internally at GE, the severely negative trends in GE's run-off insurance business and within its Industrials business that imperiled the Company were well known to Defendants and highly material to GE's business. Compounding Defendants' failure to alert investors of these known risks—as the law required of them—were Defendants' numerous material false and misleading representations regarding GE's LTC portfolio and its Industrials business throughout the Class Period.

7.      As the truth about GE's financial condition was revealed, the Company's stock shed over $100 billion of market capitalization, was removed from the Dow Jones Industrial Average ("DJIA") index, a position it had occupied for over a century, the SEC launched two investigations, and GE forced the resignation of numerous culpable senior executives.

**A.      Defendants Concealed GE's Massive Long-Term Care Liabilities and Risks**

8.      Notwithstanding the sale of most of GE Capital's non-core assets between 2013 and 2015, GE Capital still sat on an undisclosed ticking time bomb during the Class Period, which seriously threatened GE's long term health. In the 1990s and early 2000s, GE Capital expanded into writing and reinsuring LTC insurance policies, amassing approximately 20% of the total market by 2001. LTC insurance policies cover end-of-life care in, for example, nursing homes and assisted living facilities. By the early 2000s, however, LTC insurers like GE began to understand that the pricing assumptions utilized in writing hundreds of thousands of policies over more than a decade were severely mistaken. As a result, LTC insurers faced mounting unforeseen liabilities, and many insurers—including GE—ceased writing new policies altogether, determining that the LTC business was not profitable.

9.      In 2004, GE spun off the majority of GE Capital's LTC insurance book to a new public company called Genworth Financial, Inc. ("Genworth"). By 2006, GE Capital had stopped writing new LTC insurance policies, and GE sold the vast majority of GE Capital's remaining insurance operations to Swiss Reinsurance Company Ltd. ("Swiss Re"). Yet as part of these transactions, GE had retained approximately 300,000 of the worst, high-risk LTC insurance contracts, or *over 4% of the entire LTC market*. The policies that GE retained were so toxic that Swiss Re refused to take them, and GE's investment bankers advised them that their inclusion in the Genworth initial public offering ("IPO") could *kill* the deal.

10.      Despite this massive, undisclosed exposure, between 2006 and the start of the Class Period, GE downplayed the remaining risks associated with its LTC portfolio in its public statements to investors, characterizing the business as a "run-off" operation, leaving reserve levels at a bare minimum and representing that it had gotten out of the business "before the storm." All of these steps and statements combined to make investors believe that there was minimal risk related to GE's remaining portfolio leading into the Class Period.

11.      Whereas investors and the market were kept in the dark, by the start of the Class Period, GE knew that its LTC exposure had dramatically increased and posed a severe risk to the Company's overall financial condition. In particular, prior to and throughout the Class Period, GE's LTC exposures had suffered through several years of negative trends in the form of rising claims experience coupled with declining interest rates and lapse rates and an inability to unilaterally seek premium rate increases, all of which indicated the material risk that GE's insurance risks were ballooning.

12.      Defendants knew about these negative facts and trends because *Immelt* and other senior executives received a PowerPoint presentation each year discussing the actual claims

experience that GE was witnessing within its LTC blocks. Defendants also knew that this highly negative actual claims experience was inconsistent with the decades-old assumptions that GE had been using to calculate and report its LTC reserves under Generally Accepted Accounting Principles ("GAAP"). This growing disparity between GE's LTC reserves and its deteriorating claims experience meant that a massive LTC reserve increase was inevitable.

13.     Yet rather than disclose these highly material facts and trends to investors, Defendants concealed them. GE made no substantive disclosures to investors regarding the multi-billion dollar LTC exposure that was ballooning on its balance sheet. In fact, GE did not even separately identify its LTC liabilities (let alone its risks) in the Company's financial statements. Instead, it buried its LTC liabilities within a "Life insurance benefits" line item in the Company's financial statements.

14.     To further obscure these risks, Defendants altered their prior disclosure practices and removed GE's LTC liabilities from its "Contractual Obligations" table in the "Management Discussion & Analysis" ("MD&A") section of their 10-Ks *without any explanation*, in violation of SEC regulations. Defendants continued this practice in each 10-K that followed during the Class Period.

15.     At the same time, Defendants continued to push the narrative that by exiting the LTC insurance business, GE had become insulated from the deteriorating industry. For example, on May 31, 2013, when specifically discussing GE's exit from the LTC industry, Mike Neal ("Neal"), then Chairman and CEO of GE Capital, told the market, "we have made [GE Capital] smaller. We have made it safer." On December 16, 2014, Defendants stated that GE had reduced its risks by selling its insurance exposures "in time" and "before the storm." Again, Defendants made all of these statements despite knowing that GE Capital still held billions of dollars' worth

of the riskiest LTC policies on the market, which it had tried unsuccessfully to offload on multiple occasions, and which were vastly underperforming throughout the Class Period.

16.     It was not until the fall of 2017 that investors learned *any* information concerning the massive portion of GE's mislabeled "Life insurance benefits" that were actually reserves attributable to LTC exposures, and even then investors were still not told about the true risks that this exposure posed to GE's financial condition.

17.     Thus, throughout the Class Period, in violation of SEC regulations and the federal securities laws, Defendants intentionally concealed the Company's mammoth LTC liabilities and risks from investors' view. When it came to GE's LTC remaining risk exposure and the underlying trends that were exacerbating that exposure, Defendants deliberately left investors completely in the dark.

**B.     Defendants Concealed Material Risks Related to GE Power and Its Long-Term Service Agreements**

18.     At the same time that Defendants were hiding GE's ballooning LTC risks, they were causing—and concealing—an undisclosed liquidity crisis in GE's Power business—the "core" of GE's Industrials business—through a series of steps that sacrificed the Company's future cash flows in order to make the Power unit's current revenue look better.

19.     GE Power is the largest segment within the Industrials arm of the Company's business. The segment builds and sells industrial products like power plants, turbines, and generators, and then services many of those products for customers through LTSAs that span between 5 and 25 years. As the Company sought to shrink GE Capital prior to and during the Class Period, it invested heavily in GE Power and its other industrial businesses.

20.     Heading into the Class Period, the use of traditional power sources and fossil fuels was declining and being replaced by renewable energy sources. Through 2016, however, GE

Power continued to report impressive results and appeared impervious to this negative market force. Unbeknownst to investors, however, these market forces—and the strategies that GE was employing to counteract them—were exposing the Company to numerous interrelated risks.

21.     *First*, utilization of GE-serviced assets under LTSAs—a critical input in both the estimation and timing of cash collection under the contracts—was free-falling as a result of the market downturn. As a result, GE Power was unable to hit the key service milestones within the LTSAs, which prevented GE from invoicing and collecting on its reported revenues.

22.     *Second*, in order to offset the declining revenues associated with the power market downturn, GE Power became increasingly reliant on the practice of renegotiating and modifying profit margins on LTSAs to manufacture new revenue on the contracts. Specifically, GE actively sought to negotiate revised LTSA terms with its customers—even on terms less favorable to GE overall—to eliminate lower-margin services from existing LTSAs. GE then revised its profit margins under its LTSAs and used those higher margins to generate immediate revenues, known as "cumulative catch-up adjustments." Teams of personnel within GE's Industrials business were exclusively dedicated to identifying LTSAs where such renegotiations could ensue. As would be later revealed after the end of the Class Period, GE Power increasingly relied upon cumulative catch-up revenues to meet its earnings targets, propping up its earnings by an astounding *13%* in 2016 and *44%* in 2017.

23.     While GE Power's reliance on cumulative catch-up adjustments generated the appearance of profitability and suggested that GE was withstanding the market downturn, it amplified the segment's cash flow problem. In particular, in order to generate cumulative catch-up revenues, GE employed several business practices that either delayed or eliminated altogether its ability to collect actual cash from its customers. Thus, while GE's earnings swelled because of

the increased cumulative catch-up revenues, its cash flows stalled, thereby exacerbating the massive chasm between GE's earnings and cash flows.

24.     *Third*, to address the increasing gulf between GE Power's reported revenues and its Industrial Cash Flow from Operating Activities ("CFOA")—a measurement of cash actually received for goods and services provided—GE Power began "factoring" its LTSA receivables to bridge the gulf and prop up liquidity, selling those receivables to GE Capital or third parties for immediate cash. All the while, Defendants falsely told the market that factoring from GE Power was done to manage "credit risk"—never once disclosing that, in truth, factoring was used to mitigate GE Power's declining CFOA.

25.     But factoring was only a temporary fix to GE Power's cash flow problem. By stealing from the future to stay afloat in the present, GE Power's "factoring" just made GE's reckoning all the more inevitable. Over the longer term, there were simply not enough LTSA receivables for GE Power to factor to bridge the gap between revenue and CFOA. As a result, Industrial CFOA cratered and the scheme collapsed.

### C.     Defendants' Fraud Unravels

26.     Defendants' fraud began to unravel in early 2017, and through a series of disclosures between April 21, 2017 and January 24, 2018, GE blindsided investors by revealing massive CFOA declines and billions of dollars in unexpected LTC exposures, combining to cause a devastating 50% dividend cut. GE also announced multiple SEC investigations into both facets of the conduct alleged herein.

27.     On April 21, 2017, the Company shocked investors when it reported Industrial CFOA of "***negative*** $1.6 billion," which was $1 billion less than projected, due in large part to $1.9 billion in cash outflows on GE's Contract Assets and, in particular, $1.4 billion in negative cash flows related to its LTSAs. These revelations led to a 2.4% stock price decline, with analysts

recognizing that "investors reacted to negative industrial cash flow" and, more specifically, "the contract asset headwind." However, GE's stock remained artificially inflated as the Company still projected $12-$14 billion in Industrial CFOA guidance, suggested that a turnaround was forthcoming with respect to portions of Industrial CFOA and made no mention of LTC exposure.

28.     When GE disclosed its 2Q17 earnings results on July 21, 2017, it revealed further cash flow shortfalls, disclosing to investors that it was now "trending to the bottom end" of its $12-$14 billion Industrial CFOA guidance. In addition, without disclosing the size of the remaining LTC portfolio, GE revealed that due to "adverse claims experience in a portion of our long-term care portfolio," GE would be conducting a thorough examination into "the adequacy of our premium reserves," and committed to updating investors in 417. GE's stock price fell by nearly 5% in response to this news, as analysts responded negatively to GE's CFOA and LTC disclosures and recognized the risk that such issues posed to GE's beloved dividend.

29.     On October 2, 2017, GE announced the abrupt departure of Immelt as Chairman of GE's Board of Directors ("Board"), who had been slated to continue as a director on GE's Board until the end of 2017. A few days later, on October 6, 2017, GE announced the unexpected departure of numerous high-level employees, including Bornstein, who was supposed to continue on as CFO after Immelt's retirement. Later, on December 22, 2017, GE announced that Laxer would be stepping down as GE Capital's CEO.

30.     When Flannery convened his first earnings conference call as GE's new CEO on October 20, 2017, he delivered more shocking news to GE's investors. First, because of the previously undisclosed severe cash flow issues, GE would be slashing its cash flow guidance in half, to $7 billion from the $12 to $14 billion range that Immelt and Bornstein had emphatically confirmed just a few months earlier. Moreover, GE revealed that, despite the fact that its in-depth

LTC insurance review was still ongoing, GE Capital was suspending its $3 billion in upstream dividends to GE. Analysts expressed shock regarding the undisclosed risk still remaining in GE's LTC portfolio "considering GE supposedly exited [its LTC] businesses" years ago. While GE had characterized it as a suspension of the upstream dividend payment, analysts expressed fear that these disclosures could lead to GE cutting its dividend to shareholders. GE's stock price plummeted nearly 10% in response to this news.

31.     Investors' fears became reality on November 13, 2017. With GE Capital and GE Power both ailing, GE announced that it was slashing its quarterly dividend in half, only the second time since the Great Depression the Company would not pay its expected dividend. Further, GE announced that GE Capital would not be able to contribute to the Company's ability to make dividend payments for the "foreseeable future," casting a pall over GE's continued ability to pay what had been widely considered by the market as an untouchable dividend. The dividend cut, on a yearly basis, would cost investors a staggering ***$4.1 billion***. According to S&P Global data, GE's dividend cut qualified as the largest dividend cut in history by a U.S. company outside of a financial crisis, and the eighth largest dividend cut of all time.

32.     On January 16, 2018, GE disclosed the bombshell results of Flannery's "deep dive" into its LTC insurance exposures, revealing that it was increasing its LTC "future policy benefit reserves by ***$8.9 billion***," resulting in "a $6.2 billion charge ($7.5 billion upon remeasurement under tax reform) on an after-tax GAAP basis to GE's earnings in the fourth quarter of 2017." In addition to this reserve charge, GE disclosed that "GE Capital will need to contribute approximately ***$15 billion*** of capital to [its insurance subsidiaries] over the next seven years." Investors drove GE's stock price down by more than 13% in response to this news, as analysts

roundly recognized that GE's reserve charge "was *far more severe* than the market had been anticipating."

33.     Finally, on January 24, 2018, in announcing the Company's 4Q17 earnings results, GE disclosed that it had "been notified by the SEC that they are investigating the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge *as well as* GE's revenue recognition and controls for its long-term service agreements." GE's stock price "tumbled" by more than 4% in response to this news, as analysts recognized that financial results reported by the Company "were quickly made irrelevant when management unexpectedly disclosed" the SEC investigations to investors.

34.     Post-Class Period events have shed more light on Defendants' Class Period deceptions. On February 24, 2018, GE filed its 10-K for fiscal year 2017 ("2017 10-K"), which, among other things, reverted to the Company's pre-Class Period practice of *including* GE's LTC liabilities in its Disclosed Insurance Liabilities. The inclusion of LTC liabilities caused its Disclosed Insurance Liabilities to skyrocket from $11.1 billion in 2016 to *$38 billion* in 2017. In addition, while GE had previously disclosed that it had used receivables factoring as a means of managing its credit risk, it reported in the 2017 10-K that it also factored receivables to "manage short term liquidity"—i.e., in an effort to mitigate the cash flow issues that had been caused by its reliance on non-cash cumulative catch-up revenues.

35.     Further, on April 13, 2018, GE "la[id] bare the truth of the actual economics" of its LTSAs when GE reported revised financial statements for fiscal years 2016 and 2017 and quantified its prior reliance on cumulative catch-up adjustments. Notably, the Company wrote down the value of its LTSA Contract Assets by a staggering *$8.7 billion*, revised its 2017 Industrials profits downward by 17%, and disclosed that cumulative catch-up revenues inflated

GE's reported earnings-per-share ("EPS") by 13% and 25% in 2016 and 2017, respectively. In stark contrast to GE's increasing reliance on cumulative catch-up adjustments to boost its revenues, its competitors—including Boeing, Lockheed Martin, and United Technologies—had reported minimal, if any, reliance on the practice.

36.     Additionally, on February 26, 2019, after GE's LTC risks had been fully exposed to the market, GE filed its 10-K for fiscal year 2018 and finally began providing investors with the detailed LTC related trend and risk disclosures that it failed to make throughout the Class Period.

37.     As set forth in great detail herein, Defendants' admissions, the Company's SEC filings, GAAP and SEC regulations, and statements from former employees all demonstrate that Defendants knew or recklessly disregarded the problems at GE Capital and GE Power throughout the Class Period, yet continuously misled GE's investors.

38.     This action seeks to recover the massive monetary damages that GE's investors have suffered on account of Defendants' fraud.

## II.    JURISDICTION AND VENUE

39.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

40.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business in this District and a significant portion of Defendants' actions, and the subsequent damages, took place within this District. Further, GE's common stock trades on the New York Stock Exchange ("NYSE"), located within this District.

41.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

III.    **PARTIES**

    A.    **Plaintiffs**

42.     Lead Plaintiff AP7 is a Swedish public pension fund, established under law as a Swedish governmental agency, with over $50 billion in assets under management. As set forth in the certification attached hereto as Exhibit A, AP7 purchased or otherwise acquired GE common stock during the Class Period and was damaged thereby.

43.     Plaintiff Cleveland Bakers is a Taft-Hartley pension fund. Members participate in the fund based upon a collective bargaining agreement between their employer and either Bakers' Union Local No. 19 or Teamsters Local Union No. 507. As set forth in Exhibit B attached hereto, Cleveland Bakers purchased or otherwise acquired GE common stock during the Class Period and was damaged thereby.

    B.    **Defendants**

44.     Defendant GE is incorporated in the State of New York and maintains its corporate headquarters in Boston, Massachusetts. During the Class Period, GE portrayed itself as a global digital industrial company with products and services ranging from aircraft engines, power generation, and oil and gas production equipment to medical imaging, financing, and industrial products.

45.     Defendant Immelt served as the Chairman of GE's Board from September 7, 2001 to October 2, 2017, when he abruptly resigned three months earlier than expected and was replaced by Flannery. Immelt also served as GE's CEO from September 2001 through July 31, 2017, and

was a member of GE Capital's Board from 1998 through 2015. Immelt's total estimated compensation during the Class Period was $119.5 million, with his annual compensation totaling approximately $19.8 million in 2013, $37.3 million in 2014, $33.0 million in 2015, $21.3 million in 2016, and $8.1 million in 2017. Immelt participated directly and substantially in the fraud by making the materially false or misleading statements alleged herein, failing to disclose material facts to investors, participating in the conference and earnings calls described herein, and knowingly and/or recklessly disregarding known risks until his departure. Furthermore, Immelt reviewed, approved, and signed GE's false or misleading SEC filings, including its 10-Qs and 10-Ks, and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and Exchange Act Rule 13a-14(a). The SOX certification represented that "[t]he information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [GE]. The Rule 13a-14(a) certification represented that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." As a signatory, Immelt had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTC exposure and GE's Power business.

46.     Defendant Bornstein was appointed Senior Vice President and CFO of GE, effective July 1, 2013, replacing Defendant Sherin, and served in that role until October 31, 2017. Bornstein also served as a member of GE Capital's Board from 2006 through 2015 and as CFO of GE Capital from 2008 until his elevation to CFO of GE in 2013. In connection with replacing Immelt with Flannery as GE's new Chairman and CEO, GE's Board also appointed Bornstein as Vice Chairman of GE, effective June 12, 2017. But shortly thereafter, on October 6, 2017, GE announced that Bornstein's term as Vice Chairman would abruptly conclude at the end of the year.

Bornstein's total estimated compensation during the Class Period was $46.7 million, with his annual compensation totaling approximately $7.2 million in 2013, $16.3 million in 2014, $13.3 million in 2015, and $9.9 million in 2016. Bornstein participated directly and substantially in the fraud by making the materially false or misleading statements alleged herein, failing to disclose material facts to investors, participating in the conference and earnings calls described herein, and knowingly and/or recklessly disregarding known risks until his sudden, early departure on October 31, 2017. Furthermore, Bornstein reviewed, approved, and signed GE's false or misleading SEC filings, including its 10-Qs and 10-Ks, and certifications pursuant to SOX and Exchange Act Rule 13a-14(a). The SOX certification represented that "[t]he information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [GE]. The Rule 13a-14(a) certification represented that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." As a signatory, Bornstein had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTC exposure and GE's Power business.

47.     Defendant Miller has served as GE's CFO since November 1, 2017. On July 31, 2019, GE announced that Miller would be stepping down as CFO but would retain the position until the Company could find a replacement. Miller joined GE in 2008 as Vice President, Controller, and Chief Accounting Officer ("CAO"). She became GE's Senior Vice President and Chief Information Officer in 2013 and became President and CEO of GE Transportation in 2015. In 2017, Miller's compensation totaled approximately $5.1 million. Miller participated directly and substantially in the fraud by making the materially false or misleading statements alleged

herein, failing to disclose material facts to investors, and knowingly and/or recklessly disregarding known risks by signing GE's 2012 10-K in her capacity as GE's Principal Accounting Officer.

48.     Defendant Sherin served as CFO of GE from 1999 until July 2013, when he became GE Capital's Chairman and CEO. Sherin held both positions until he resigned, effective September 1, 2016. Sherin also served as Vice Chairman of GE from 2007 until December 31, 2016. During the Class Period, Sherin's total estimated compensation was $92.6 million, with his annual compensation totaling approximately $11.5 million in 2013, $24.7 million in 2014, $26 million in 2015, and $30.4 million in 2016, the year he departed GE. Sherin participated directly and substantially in the fraud until he left GE in September 2016 by making the materially false or misleading statements alleged herein, failing to disclose material facts to investors, participating in the conference and earnings calls described herein, and knowingly and/or recklessly disregarding known risks until he resigned from GE and GE Capital, effective September 1, 2016. Furthermore, Sherin reviewed, approved, and signed GE's false or misleading SEC filings, including its 10-Qs and 10-Ks, and certifications pursuant to SOX and Exchange Act Rule 13a-14(a). The SOX certification represented that "[t]he information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [GE]. The Rule 13a-14(a) certification represented that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." As a signatory, Sherin had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTC exposure and GE's Power business.

49.     Defendant Hauser joined GE as Vice President-Controller and CAO, effective April 15, 2013, and remained in that role throughout the Class Period. Hauser participated directly

and substantially in the fraud by making the materially false or misleading statements alleged herein, failing to disclose material facts to investors, and knowingly and/or recklessly disregarding known risks by signing GE's quarterly and annual reports to the SEC on 10-Qs and 10-Ks during the Class Period in her capacity as GE's Principal Accounting Officer. Furthermore, Hauser reviewed, approved, and signed GE's false or misleading SEC filings, including its 10-Qs and 10-Ks, and certifications pursuant to SOX and Exchange Act Rule 13a-14(a). The SOX certification represented that "[t]he information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of [GE]. The Rule 13a-14(a) certification represented that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." As a signatory, Hauser had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTC exposure and GE's Power business.

50.    Defendant Laxer was the President and CEO of GE Capital from September 2016 until his retirement from GE, which was announced in December 2017 and became effective on March 31, 2018. Between 2009 and September 2016, Laxer held a number of senior roles within GE Capital and was the CEO of GE Capital International prior to becoming the President and CEO of GE Capital. Laxer participated directly and substantially in the fraud by making the materially false or misleading statements alleged herein, failing to disclose material facts to investors, participating in the conference and earnings calls described herein, and knowingly and/or recklessly disregarding known risks until his departure.

### C. Relevant Non-Parties[3]

#### 1. GE's Subsidiaries

51.     Employers Reassurance Corporation ("ERAC") is a wholly-owned indirect subsidiary of GE (organized within GE Capital), which is domiciled in Kansas and regulated by the Kansas Insurance Department. ERAC, inclusive of its wholly-owned subsidiary Union Fidelity Life Insurance Company ("UFLIC") (described below), comprised the entirety of GE's insurance and reinsurance operations during the Class Period. Approximately 80% of ERAC's LTC reserves relate to reinsurance agreements with five insurers: Allianz, John Alden, Lincoln Benefit, Mass Mutual, and State Life.

52.     UFLIC is a wholly-owned subsidiary of ERAC and an indirect wholly-owned subsidiary of GE. In connection with the Genworth spinoff, UFLIC and Genworth entered into a reinsurance transaction pursuant to which Genworth ceded to UFLIC the risk on a block of LTC insurance policies originally written by The Travelers Life and Annuity Company ("Travelers"). Travelers was acquired by MetLife (now Brighthouse) in 2005.

#### 2. Non-Defendant GE Employees

53.     Ryan A. Zanin ("Zanin") was GE Capital's Chief Risk Officer ("CRO") from July 2010 through April 2015, and again from November 2016 until his retirement in July 2018, and was also listed as a Director or Trustee of ERAC and UFLIC in their Annual Statements for 2015 through 2017.

54.     Dale E. Filsinger ("Filsinger") has served as the CRO at ERAC since 1998. Filsinger was also listed as a Director or Trustee of ERAC and UFLIC in its Annual Statements for 2013 through 2017.

---

[3] All former employees are defined using masculine pronouns to protect their anonymity.

55.     Clark A. Ramsey ("Ramsey") was Vice President and Chief Actuary of ERAC and a Senior Vice President and Chief Actuary at GE Capital during the Class Period. Ramsey, a member of the American Academy of Actuaries, was appointed by the ERAC Board to submit annual actuarial opinions to the Kansas Insurance Department on behalf of ERAC, as required by Kansas insurance laws, and rendered such opinions each year from 2008 through 2016. Ramsey was also listed as a Director or Trustee of ERAC and UFLIC in their 2017 annual statements, and as a Vice President and Chief Actuary in UFLIC's 2013 annual statement.

56.     James C. Berger ("Berger") was the LTC Valuation leader at ERAC from February 2004 through February 2014, when he was promoted to Senior Actuary, in which capacity he served through the remainder of the Class Period. For fiscal years 2008 through 2013, Berger prepared analyses of ERAC's LTC liabilities, including anticipated cash flows of such liabilities, static and dynamic validations of the model's liability values and cash flows, confirmation of the reasonableness of the projected liability cash flows and of the underlying assumptions, and selection and confirmation of certain key assumptions. For fiscal year 2017, Berger prepared analyses of certain critical aspects of ERAC's LTC liabilities including analysis of morbidity improvement experience and related assumptions.

57.     David R. Benz ("Benz"), FSA, MAAA, was the Managing Actuary—LTC for ERAC and, according to his LinkedIn page, a Managing Actuary at GE Capital, during the Class Period. He prepared analyses for fiscal year 2017 of claim-specific information and for certain critical aspects of the analysis of the LTC liabilities, including preparation of anticipated cash flows, both static and dynamic validations of the model's liability measures and cash flows, selection of certain key assumptions, confirmation of the reasonableness of the projected liability cash flows and assumptions underlying them, and requested sensitivity tests.

58.     Irwin Lee Don served as ERAC's president during the Class Period. Don was listed as a Director or Trustee on each of ERAC's statutory filings every year during the Class Period. Don was also listed as UFLIC's Vice President in 2013. Don was also listed as a Director or Trustee of UFLIC in its Annual Statements throughout the Class Period.

59.     Kathleen Ann Russell served as Secretary for ERAC and UFLIC throughout the Class Period.

60.     Sarah Quirk Baker served as Treasurer for both ERAC and UFLIC in 2013.

61.     Ronald Dean Peters served as UFLIC's President and was listed as a Director or Trustee of UFLIC in its Annual Statements throughout the Class Period. Peters was also listed as ERAC's President throughout the Class Period and was listed as its CEO and CFO in ERAC's Annual Statement for 2013, and as a Director or Trustee of ERAC in its Annual Statements for 2013 through 2017.

62.     Jane Brady Kipper served as UFLIC's Treasurer from 2014 through 2017 and was a UFLIC Vice President in 2013. Kipper also served as ERAC's Treasurer from 2014 through 2017.

### 3.      Former GE Employees

63.     FE-2 worked in various roles at GE, including as an A & H Valuation Actuary (Senior Actuary) at ERAC from 2006 to 2012, a Senior Insurance Audit Specialist & SME at GE Capital Audit from 2012 to 2014, and a Senior Vice President, Insurances & SME at GE Capital Audit from 2014 through the end of his tenure (January 1, 2017). The SME designation refers to being the Designated Insurances' Subject Matter Expert. GE Capital Audit refers to the Internal Audit department of GE Capital. From 2012 onward, FE-2 reported ultimately to the Chief Audit Executive as part of GE Capital Audit—a position held by Christina Selby and, later, by Joseph Pizzuto. FE-2's direct supervisor during the latter part of his tenure was Kevin McCord, the current

director of Internal Audit for GE Capital's portfolio of insurance companies. McCord also reported ultimately to Pizzuto.

64.     FE-4 worked in various roles at GE and, thereafter, Genworth, for years before the Class Period through mid-2016, including as a FP&A Analyst for GE Capital during the Genworth IPO, and as Director for Genworth Long-Term Care Insurance into 2013.

65.     FE-5 worked in various roles at GE, including as a Commercial Manager in GE Power Services from 2010 through the end of 2013, and was based in Milan, Italy. In this role, FE-5 had responsibilities with respect to thermal power generation plants (i.e., gas and steam turbines and generators) and related LTSAs.

66.     FE-7 worked in various roles at GE, including as a Risk Finance Leader at GE Power Services in Europe from early 2015 through early 2018. FE-7 reported to the Finance Manager for GE Power Europe, who reported to the CFO of GE Power Europe, who then reported to the CFO of Power Generation Services, Tim Donovan.[4]

67.     FE-8 worked in various roles at GE, including in sales as a Product Development Manager, from the summer of 2016 through April 2017. In this role, FE-8 was involved in LTSA contract negotiations.

68.     FE-9 worked in both the Power and Renewable Energy Divisions of GE from 2004 through August 2017. FE-9 was stationed in Schenectady, New York. During his tenure with GE Power, FE-9 worked on the Enterprise Risk Team, which was tasked with identifying and

---

[4] Plaintiffs understand that FE-7 served as a consultant for prior counsel with respect to the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 83). Plaintiffs' undersigned counsel has not retained FE-7 in any capacity, but has verified the information provided to prior counsel.

examining GE's risk exposure. As a member of the Enterprise Risk Team, FE-9 worked with the risk teams in GE Power to evaluate risks associated with renegotiated LTSAs.

69.     FE-10 worked in various roles at GE from the early 2000s through January of 2014, including in Operations and Maintenance and as a Contract Fulfillment Manager within GE Power. In this role, FE-10 was involved with GE Power's LTSAs, and was involved in the use of GE's internal modeling tool, COSMOS, to forecast operations and earnings information on those LTSAs.

70.     FE-11 served in various roles at GE from prior to the Class Period through mid-2017. During the period of early 2013 to mid-2017 he served as a senior executive at GE Distributed Power and GE Power.

71.     FE-12 worked for GE during the entire Class Period, and as a senior financial executive for GE Power from approximately mid-2016 through the end of the Class Period. His GE Power responsibilities included reviewing contract costs and ensuring proper accounting for products and services, including LTSAs and their receivables.

**4.     Plaintiffs' Expert Consultants**

72.     David Axene ("Axene") is an insurance and actuarial expert that Plaintiffs have retained to provide independent analysis of GE's LTC exposures during the Class Period. Axene is an internationally recognized actuarial strategist and thought leader who frequently speaks and writes on healthcare issues and provides consulting to all types of health care organizations including: (i) health plans, such as HMOs, PPOs, managed care plans, BlueCross Blue Shield plans, and insurance companies; (ii) healthcare providers, including hospitals, medical groups, and ancillary providers; (iii) federal, state, local, and international governments and government programs, including Medicare, Medicaid, CHAMPUS, and social systems; (iv) employer health benefit plan sponsors; (v) healthcare innovation and technology companies; (vi) medical device

and technology suppliers; (vii) dispute resolution services, including arbitration and mediation; and (viii) expert opinion and testimony.

73.     Axene is the founder, President, and Managing Partner of Axene Health Partners LLC, a healthcare and actuarial firm providing actuarial, analytical, and care management consulting services by its experienced actuaries, physician consultants, and health care analytics team. Prior to founding Axene Health Partners, Axene enjoyed a successful consulting career at Ernst & Young, LLP, where he was responsible for the firm's health actuaries, and at Milliman & Robertson, Inc, (now Milliman USA) where he led their healthcare management consulting activities, as an Equity Principal, including founding their Care Guidelines division. Axene has served as Chair of the Society of Actuaries ("SOA") Health Section Council and the Entrepreneurial Actuaries Section and is a certified ARIAS-US arbitrator. Axene has also served in numerous professional organizations in the actuarial field, including the Regulatory Change Task Force of the SOA, to which he was appointed by the President of the SOA. He is also a Fellow of the SOA, a Chartered Enterprise Risk Analyst, a Fellow of the Conference of Consulting Actuaries, and a Member of the American Academy of Actuaries. Axene earned a Master of Science in applied mathematics from the University of Washington and a Bachelor of Science in physics and engineering from Seattle Pacific University. Axene has delivered dozens of presentations at SOA events and has served as an expert witness in numerous healthcare and insurance matters.

74.     Roman L. Weil, Ph.D. ("Dr. Weil") is an accounting expert that Plaintiffs have retained to provide independent analysis of GE's accounting and disclosures regarding its LTC portfolio. Dr. Weil is an economist, accountant, and Professor Emeritus at the Booth School of Business at the University of Chicago, where he was a professor from 1965 until his retirement in

2008. During the 2019-2020 academic year, Dr. Weil is a visiting professor at the Rady School of Management of the University of California, San Diego. He also has been a visiting professor at Harvard Law School, Princeton University, Georgetown University's McDonough School of Business, NYU Stern School of Business and NYU Law School, and Johns Hopkins University's Carey Business School, as well as both Stanford University's Graduate School of Business and Law School.

75.     Dr. Weil earned his B.A. in Economics and Mathematics from Yale University in 1962, and earned his M.S. in industrial administration in 1965 and his Ph.D. in Economics in 1966, both from the Tepper School of Business at Carnegie Mellon University. He became a Certified Public Accountant in Illinois in 1973, and was a Certified Management Accountant from 1974 to 2008. Dr. Weil served as the co-director of the Chicago/Stanford/Tuck Directors' Consortium, which he co-founded, and has designed and implemented continuing education programs for partners at the accounting firms of Andersen and PricewaterhouseCoopers, as well as for employees at Goldman Sachs, Montgomery Ward, Merck, and William Blair and for business executives in Great Britain, Singapore, and Hong Kong.

76.     Dr. Weil has published more than 100 articles in academic and professional journals, co-authored more than 12 textbooks, and served as the principal investigator on various research projects of the National Science Foundation. He also is the senior editor of and contributor to the Litigation Services Handbook, now in its sixth edition, and has served as the editor or associated editor of the Accounting Review, Communications of the Association for Computing Machinery, Management Science, the Journal of Accounting and Economics, and the Financial Analysts Journal.

77.     Dr. Weil has consulted for governmental agencies, including the U.S. Treasury Department and the SEC, and numerous Fortune 500 companies in the private sector. At the Financial Accounting Standards Board, he has served on two task forces—one on consolidations and the other on interest methods—and on the Financial Accounting Standards Advisory Council. He has also served on the Standing Advisory Group of the Public Company Accounting Oversight Board.

## IV.     COMPANY BACKGROUND

78.     Founded in 1892 as an electrical generation and manufacturing company, GE has grown over the last century to be one the world's largest multi-national conglomerates with business lines organized around various segments, including, among others, energy generation, transportation, financial services, and medical technology. In 1896, GE became one of the original twelve members of the DJIA index, on which it continued to trade for 110 years (since 1907), until it was removed from the index on June 26, 2018.

79.     Over time, GE's common stock became a darling of investors due to its substantial and reliable dividend. Prior to and throughout the Class Period, Defendants, analysts, and investors recognized the importance of GE's consistent dividends to its investors and to the market value of GE's securities. Indeed, during the Class Period, Immelt candidly acknowledged that he "view[ed] the dividend as . . . key" and "incredibly important for our investors." Investor's Business Daily noted as recently as 2017 that "investors have come to view GE's dividend as sacrosanct, in part because the Dow giant has paid it for years and consistently describes it as a top priority."

80.     Two of GE's largest and most important businesses during the Class Period were: (i) GE Capital, a wholly-owned subsidiary of GE founded in 1932 to provide consumer financing for GE's consumer products, that grew into a sprawling international financial services unit providing services ranging from credit card, automobile, and home loan financing to insurance

that now operates as a division of GE; and (ii) GE Power, which during the Class Period was the largest segment of GE's Industrials businesses, builds industrial products including power plants, turbines, and generators, and provides, among other things, services on such products through various contractual agreements.

## V.    PLAINTIFFS' LONG-TERM CARE INSURANCE ALLEGATIONS

81.    Throughout the Class Period, Defendants knew, but failed to disclose to investors, material facts and trends indicating that GE was exposed to massive financial risks resulting from its retention of over 300,000 LTC insurance policies, which were so toxic that GE tried to—but could not—offload them as part of its pre-Class Period efforts to exit the insurance business.

82.    This Section begins by describing: (i) the rise and fall of the LTC market in general; (ii) the risks inherent in providing LTC insurance and the manner in which those risks grew over time; and (iii) GE's retention of some of the riskiest LTC policies in the industry following its spin off of Genworth and the sale of its insurance subsidiary to Swiss Re. These allegations are followed by detailed allegations concerning the material facts, data, and trends that Defendants knew during the Class Period, which indicated that GE's retained LTC insurance exposures posed a substantial financial risk to the Company. Next, this Section identifies the material facts, trends, demands, commitments, uncertainties, and other material information that Defendants concealed from investors throughout the Class Period, and the specific false or misleading statements that Defendants made to investors about GE's retained insurance exposures. Finally, this Section explains why it was impossible for investors to determine GE's true LTC liabilities and risks by reviewing the Company's Class Period financial statements, and describes how GE's true LTC liabilities and risks were slowly revealed to investors through a series of corrective disclosures.

A.      **The LTC Insurance Industry**

1.      **The Rise and Fall of the LTC Market**

83.      LTC insurance products were first introduced in the 1970s to help offset the out-of-pocket costs of LTC services, such as assisted living and nursing home facilities, home health aides, respite or hospice care, and other similar services required when an individual becomes unable to independently perform the basic activities of daily living. These costs are typically not covered by health insurance, Medicare, or Medicaid, and they can be significant depending on the nature or severity of the illness or condition requiring LTC, the age of onset of such illness or condition, and the duration of time for which LTC is required.

84.      An LTC insurance policyholder pays regular premiums to maintain the policy, and can make a claim as set forth in the policy. Most LTC policies have a defined benefit trigger (e.g., when an insured requires assistance with two out of six activities of daily living or requires supervision due to a severe cognitive impairment) and provide consumers with specified benefits (typically actual costs) up to a daily benefit maximum for a defined period of time.

85.      The LTC market experienced rapid growth in the mid- to late-1980s and 1990s as insurers, believing they could manage the attendant risk, catered to consumers increasingly drawn to such plans. As consumers realized the appeal of these benefits, demand soared. By the early 2000s, more than 100 carriers sold LTC insurance, underwriting approximately 750,000 policies annually. GE was *the* market leader in LTC sales at that time, underwriting $243 million in premiums and garnering a 23% share of the more than $1 billion LTC market in 2001.

86.      Reinsurance, the practice by which a primary insurer transfers the risk associated with a pool of policies to another insurer in exchange for a portion of the premiums, played an important role in the LTC market. Primary LTC insurers looked to reinsurers to diversify or reduce their risk exposure to LTC liabilities. GE played a significant role as a reinsurer as well, reinsuring

LTC policies underwritten by other carriers through its GE Capital subsidiaries, ERAC and UFLIC.

87.     The early success of the LTC market did not endure. After peaking between 2002 and 2003, sales began to plummet and have never recovered. The decline coincided with a growing number of insurers exiting the market and significant price increases in new policies offered by insurers who realized that their initial risk estimates had been unduly optimistic. By 2015, the LTC market had shrunk to $257 million in annual premiums sales, and seven of the top ten carriers in 2001—including GE Capital—had dropped out of the market for underwriting new policies altogether.

## 2.     LTC Reserve and Reporting Requirements

88.     LTC insurance is subject to substantial regulation. This regulation is primarily at the state level—in GE's case, by the Kansas Insurance Department. LTC insurers are required to disclose to state regulators the number of policies covered along with data regarding their claims experience (e.g., incurred claims, lives inforce) and, in particular, comparing their actual claims experience to their expected claims experience.

89.     LTC insurance companies are also required by regulation to establish reserves to pay future claims, and to assess the adequacy of those reserves on a regular basis. LTC reserves are composed of "active life reserves" (or "ALR") and "disabled life reserves" (or "DLR"). ALR (or "benefit reserves") are maintained for LTC insurance policies on which no claim has yet been made, while DLR (or "claims reserves") are maintained for LTC insurance policies on which a claim has already been made (i.e., the policyholder has filed a claim for coverage). When a policy is entered into with a customer, the insurance company calculates and sets aside ALR for that policy. When a policy goes "on claim," ALR associated with that policy is generally transferred to DLR.

90.     ALR is calculated using assumptions that include:

- *incidence rates*: the rate at which policyholders go "on claim";

- *lapse rates*: the percentage of insureds who stop paying premiums and let their policies terminate;

- *morbidity rates*: the chance someone will develop a condition requiring LTC;

- *mortality rates*: how long policyholders are expected to live;

- *utilization rates*: the amount of benefits used when an insured goes on claim compared to the amount of benefits available; and

- *inflation scenarios and interest rates*: the rate of interest income earned on reserves held against premiums collected.

91.     DLR is calculated using (i) utilization rates; and (ii) claims termination rates, which are a function of lapse rates and mortality rates. GE, like many companies with insurance businesses, is required to report its insurance reserves under two different accounting standards. *First*, GE establishes reserves under GAAP, and, as a publicly held company, discloses its GAAP reserves as liabilities in its SEC filings. *Second*, GE's insurance subsidiaries, ERAC and UFLIC, establish reserves under Statutory Accounting Principles ("SAP") in accordance with Kansas insurance laws.

92.     Under GAAP, ALR assumptions are "locked" at the time the policy is originated. This means that ALR is calculated using original pricing assumptions, and those assumptions do not change until such time as a reserve deficiency is identified (through the annual reserve testing processes discussed herein). If a deficiency is identified, original ALR assumptions are "unlocked" and ALR is recalculated using revised assumptions that account for the insurer's actual claims experience and, potentially, the experience of the LTC industry as a whole. Further, even though ALR assumptions remain "locked" prior to the identification of a reserve deficiency, the Actuarial

Standards of Practice ("ASOP") mandate that the insurer regularly review those assumptions to test their accuracy.

93.     By contrast, the assumptions employed to establish and assess DLR—under GAAP—*are not* "locked." Rather, they are based on "best estimate" assumptions. ASOP defines a "best estimate" assumption as one "that reflects anticipated experience with no provision for risk of adverse deviation." Best estimates are based on experience studies, i.e., the insurer's experience with respect to the policies covered by the DLR. If the insurer has insufficient claims experience to develop robust best estimates for its DLR, applicable actuarial standards provide that industry-wide experience data should be used instead of, or in conjunction with, the insurer's experience. If a policy is reinsured, the ceding insurer regularly shares claims experience data with the reinsurance company, which the latter uses to determine its best estimates.

94.     Though ALR and DLR are distinct, they overlap. For instance, best estimate assumptions regarding mortality and utilization used in connection with setting DLR are also relevant to establishing and assessing ALR for policies that are not yet on claim.

### 3.     The Outsized Risk of LTC Insurance

95.     The Society of Actuaries ("SOA") has described LTC insurance as one of "the riskiest insurance products sold." This is because, as described above, the pricing, and ultimate profitability, of LTC insurance is dependent upon more variables than other insurance products. At the time LTC policies are written, insurers make assumptions regarding each of the variables discussed above (mortality rates, lapse rates, morbidity rates, interest rates, etc.) and then use those assumptions to: (i) price the LTC policies; and (ii) calculate the reserves that must be set aside to pay future claims on those policies.

96.     Over the past two decades, negative deviations between those original pricing assumptions and actual claims experience have catastrophically impacted the profitability of LTC insurers and reinsurers.

97.     Morbidity and mortality rates are two variables where insurers' original assumptions have missed the mark by a wide margin. All else being equal, declines in mortality rates increase the chances that an insured will require LTC services as they age, in turn leading to increased claims and costs for LTC insurers. Thus, as life expectancies increase, as they have over the past two decades, so too does the risk for insurers and reinsurers of LTC policies. The same is true for morbidity rates—as the likelihood increases that insureds will develop conditions that require LTC, so too does the risk to LTC insurers.

98.     Risks to LTC insurers also increased because they overestimated the number of LTC policyholders that would allow their policies to lapse. As lapse rates decline, more LTC polices remain inforce and the risks to insurers increase. Meanwhile, declining interest rates adversely affected insurers' ability to generate sufficient returns on premium investments, reducing the extent to which LTC insurers can rely on premiums to fund future liabilities.

99.     Certain features of LTC insurance regulations further increase the risks to insurers and reinsurers. For example, state insurance laws require that private LTC policies be sold as guaranteed renewable, meaning that they can be cancelled only for non-payment of premiums: if the insured keeps paying her premiums, the insurer must honor the coverage.

100.    Additionally, state laws require that LTC insurance policies be sold as level-funded, meaning that the premium payments determined at the time of purchase are designed (though not guaranteed) to remain constant for the life of the policy. In order to increase premium rates insurers must apply for and obtain approval from state insurance regulators, which typically requires a

showing that actual claims experience has exceeded the insurer's assumptions. Regulators frequently resist insurers' efforts to raise premiums.

101.    Obtaining premium increases is particularly difficult for LTC reinsurers like GE, as only the ceding insurer may apply to a state regulator for a rate increase, and reinsurers are at their mercy to do so. GE acknowledged this reality after the end of the Class Period, acknowledging that "[a]s a reinsurer, we are unable to directly or unilaterally pursue long-term care insurance premium rate increases."

102.    While each of the foregoing factors are favorable for the policyholder, they pose significant financial risks to LTC insurers and reinsurers in the form of higher claims costs and reserve increases, particularly when actual claims experience differs negatively from insurers' original pricing assumptions.

103.    LTC risks also increase over time, as insureds age and/or become widows and widowers (which increases both the likelihood they will require LTC and the costs of such care), underwriting effects on morbidity wear off, and maximum benefits increase for policies with inflation protection.

104.    Furthermore, health care costs covered by LTC policies continue to rise. Rising costs and morbidity rates, coupled with declining mortality, lapse, and interest rates, created a perfect storm for LTC insurers and reinsurers that caused their claims payments to dramatically increase, leading to a cash flow disparity that required them to: (i) increase their LTC reserves (and record the associated charges on their balance sheet) to account for these risks; and (ii) alert their investors to the increasing risks associated with these insurance exposures.

105.    With premiums level-funded and difficult to increase, the risk of a reserve charge dramatically increases when an LTC insurer's actual claims experience (i.e., its actual claims rates,

mortality rates, morbidity rates, lapse rates, etc.) deviate negatively from the insurer's pricing assumptions. These concerns are magnified for LTC reinsurers like GE, which cannot readily seek to offset this negative claims experience with premium increases. Meanwhile, this negative claims experience could lead to significant capital contributions, as state regulators require insurers to maintain a minimum capital level to support LTC policies. Reflecting their increased risks, LTC capital requirements are high relative to other insurance products. These factors, and the others described above, make LTC insurance inherently more risky than other forms of insurance, like life insurance.

106.    By comparison, the primary risks associated with traditional life insurance typically include interest rate risk and mortality, making for a far more predictable liability stream. Moreover, while longer lifespans increase the costs of LTC (by increasing the likelihood and duration that LTC will be required), they reduce the costs to life insurers. Indeed, the increasing life expectancies lengthen the time during which life insurance premiums are collected and earning interest income, while claims are paid later, meaning that the present value of life insurance liabilities will, all else being equal, decrease. These characteristics underscore that LTC and life insurance are fundamentally different products.

> **B.    Prior to the Class Period, GE Spun Off and Sold Its Insurance Businesses, But Was Forced to Keep the Worst of Its LTC Portfolio**

107.    Recognizing the risks detailed above, and as part of a larger strategy to exit its low-return businesses and redeploy capital to refocus on higher return, higher-growth business lines, GE determined and announced in 2003 that it would "exit" all of its insurance businesses—including LTC.

**1.    GE Claimed to Have Reduced Its LTC Insurance Risk When It Spun off Genworth in 2004**

108.    In November 2003, GE announced its intention to reduce its LTC insurance risks by spinning off most of its mortgage and life insurance operations through an IPO of the newly-created Genworth. Genworth completed its IPO in May 2004. In connection with the IPO, GE spun off substantially all of the assets and liabilities of GE Financial Assurance Holdings, Inc. ("GEFAH"), an indirect subsidiary of GE and a holding company for a group of companies that provided life insurance, LTC insurance, group life and health insurance, annuities and other investment products, and U.S. mortgage insurance, with a book value of approximately $10 billion.

109.    However, through what Genworth described as "several significant reinsurance transactions with UFLIC," GE retained what Genworth later described as "a block of long-term care insurance policies that [it] reinsured from [The Travelers Insurance Company] in 2000." In 2005, MetLife (now Brighthouse) acquired Travelers, including its LTC blocks that were reinsured by UFLIC.

110.    Immelt publicly described GE's retained LTC reinsurance exposure as "a piece of low return, *very stable* run off block from the [GEFAH] portfolio." While this statement was not made during the Class Period, it set the market's understanding of the purportedly-low LTC risks following the Genworth IPO. This understanding was reinforced during the Class Period when GE falsely and fraudulently advised investors in 2014 that it had successfully navigated the LTC "storm," and once again when Bornstein advised investors in 2016 that GE's LTC "portfolio quality . . . remain[ed] stable." In reality, as investors would learn at the end of the Class Period, the LTC blocks that GE reinsured through the Genworth IPO were the *riskiest blocks held by Genworth at that time*, and, in fact, constituted some of the riskiest blocks of LTC insurance *in the entire industry*.

111.    Years later, after the end of the Class Period, insiders told Bloomberg that the IPO underwriters—Goldman Sachs and Morgan Stanley—had warned GE that the IPO "could run into obstacles" if these retained LTC blocks were included in the spin-off. Put differently, the LTC blocks that GE retained were so risky that their inclusion in the Genworth IPO **would have threatened** the entire deal.

112.    FE-2, a senior actuary at ERAC at the time, confirmed that members of ERAC's senior management had confided that GE executives behind the spin-off were worried that the ***IPO would fail if these riskier LTC blocks were included*** in the deal. FE-2 learned from at least three sources, including retired ERAC Risk Manager Frank Knoor, ERAC CRO Filsinger, and GE LTC Valuation and Economic Capital Actuary Berger (to whom FE-2 reported directly), that GE pulled these LTC policies out of the IPO because "***they [we]re the bad ones***."

## 2.    GE Sold Its Remaining Insurance Stake to Swiss Re in 2006, but Again Retained Exposure to Its Riskiest LTC Blocks

113.    In November 2005, GE announced the sale of the property and casualty business of GE Insurance Solutions Corporation, its reinsurance and primary commercial insurance subsidiary, to Swiss Re through the sale of assets of GE's indirect U.S. subsidiary Employers Reinsurance Corporation ("ERC") (GE Insurance Solutions' former parent). Mirroring the Genworth IPO, however, GE ***once again retained the riskiest LTC-related risk*** in the deal.

114.    Specifically, excluded from the Swiss Re deal were the life and health reinsurance businesses of ERC's subsidiary, ERAC, which included certain disability and LTC business that ERC retroceded to ERAC. The LTC blocks that ERAC continued to reinsure following the Swiss Re transaction were primarily underwritten in the 1990s by Allianz, American United Life Insurance Company, Berkshire Life Insurance Company of American, Jackson National Life Insurance Company, John Alden Life Insurance Company, Lincoln Benefit Life Company,

Massachusetts Mutual Life Insurance Company, State Life Insurance Company, and Transamerica Life Insurance Company, among others. They, too, were among the riskiest LTC policies in the industry, carrying significantly heightened risk compared to standard LTC policies—precisely why GE was forced to retain them. The Swiss Re transaction closed in June 2006 for $6.8 billion, excluding closing adjustments.

115.     According to FE-2, GE retained the risk for these LTC blocks because Swiss Re, like Genworth before it, *would not take* those policies, forcing GE to retain these blocks in order to complete the deal. Indeed, after the end of the Class Period, in May of 2018, Allianz CFO Giulio Terzariol confirmed as much, telling his investors that GE—through ERAC—had reinsured Allianz's "very bad LTC" blocks.

3.     **Recently Disclosed Data Confirms That GE's Retained LTC Policies Were Ultra-Risky and Among the Most Toxic in the LTC Industry**

116.     In March 2019, after the end of the Class Period, GE identified for investors, for the first time, certain aspects of its retained LTC reinsurance blocks that "could result in claimants being on claim for longer periods or at higher daily claim costs." Put differently, GE identified some of the very same features that made its LTC policies ultra-risky and which had prevented it from offloading them onto Genworth and Swiss Re. Importantly, because GE had stopped writing and reinsuring LTC policies by 2008, all of the policies discussed by GE in 2019 necessarily existed within GE's reinsurance portfolio throughout the entirety of the Class Period, such that Defendants knew or had access to this information throughout the Class Period.

117.     *First*, approximately 34% of the LTC policies ERAC reinsured covered "joint lives," meaning that a single policy "provide[s] coverage for two lives [and] permit[s] either life under a single contract to receive benefits at the same time or separately." As a result, while GE's remaining book contained roughly 202,000 policies as of the end of 2018, it actually insured

270,000 lives. Notably, according to a March 8, 2019 UBS analyst report regarding GE, titled "*Long-Term Care: disclosures help, but also show risks from relatively aggressive assumptions*," GE was the **only** one of its key peers to insure or reinsure such joint life policies. GE recently admitted that the ERAC portfolio was "more challenging" due to this feature and as a result, it purportedly now carries "higher reserves" for this book.

118.   **Second**, 84% of the LTC policies GE reinsures offer inflation protection. Inflation protection increases the maximum allowable benefits under an LTC policy "to protect the policyholder from the rising cost of [health] care." Some of GE's policies offered "automatic annual increases of 3% to 5%" while others provided for "policyholder elected inflation-indexed increases." By contrast, UBS's March 8, 2019 analyst report showed that GE's peers offered inflation protection on only 14-34% of their LTC blocks as of 2018.

119.   **Third**, approximately 60% of the LTC policies GE reinsured contained lifetime benefits. Lifetime benefits allowed the policyholder to "receive coverage up to the specified daily maximum [for] as long as the policyholder is claim eligible and receives care for covered services." This means that there was **no cap** on the amount of time a policyholder could be "on claim." By contrast, GE's peers were far less exposed to this risky policy type, with only 15% of MetLife policies offering lifetime benefits by 2018, and 9%, 10% and 11% of policies with lifetime benefits for Prudential, Unum, and Manulife (formerly John Hancock), respectively.

120.   **Fourth**, the entirety of GE's LTC book was comprised of individual policies, which are typically riskier than group policies. By contrast, many of its peers service a mixed book of individual and group policies.

121.    **Fifth**, GE stated in its 2018 10-K that its LTC blocks also included "premium payment options [that] may limit the period over which the policyholder pays premiums while still receiving coverage **after** premium payments cease."

122.    **Sixth**, GE admitted that, unlike primary underwriters of LTC blocks, "[a]s a reinsurer, [it is] unable to directly or unilaterally pursue insurance premium rate increases," whereas GE's peers had the ability to request premium rate increases from state regulators to offset rising costs associated with adverse claims experiences and other flawed assumptions. Instead, GE was left to the will of underlying insurers to encourage or implore them to pursue rate increases that would benefit GE.

### C.    Defendants' Scienter: During the Class Period, Defendants Knew That GE's Retained LTC Portfolio Posed Severe Risks to Its Financial Condition

123.    As discussed herein, throughout the Class Period, Defendants misstated and omitted material information concerning GE's massive LTC liabilities and risks. In violation of Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), Defendants failed to disclose material facts, trends, and risks pertaining to GE's LTC portfolio. Further, GE's financial statements obscured its exposure to the LTC industry, and during the Class Period, GE made affirmative false statements to re-affirm investors' misunderstandings regarding GE's LTC risks.

124.    Because of these material misrepresentations and omissions, GE's LTC liabilities and risks remained concealed from investors' view throughout the Class Period. The facts set forth below establish Defendants' awareness of material facts and trends concerning GE's own LTC portfolio, which reflected the enormous—and mounting risks—associated with GE's LTC exposures. These facts—which include, but are not limited to, data that Plaintiffs and their experts have compiled from the statutory filings prepared by ERAC, UFLIC, and the insurers that ceded LTC risk to those companies—reveal that GE and its senior executives, **including Immelt**, were

aware of the deterioration in GE's LTC portfolio, and the corresponding increase in risks to the Company, prior to and throughout the Class Period.

125.    When viewed holistically, the facts alleged below raise a strong inference that Defendants knew of material undisclosed facts and trends related to its run-off LTC insurance portfolio, and were aware of, or recklessly disregarded, the magnitude of the financial risks to which that portfolio exposed the Company.

> **1.     Defendants Knew That GE's LTC Portfolio Had Significantly Deteriorated Prior to, and Continued to Deteriorate Throughout, the Class Period**

> > **a.     Immelt and Bornstein Received Actual LTC Claims Experience Data on an Annual Basis**

126.    Each year during the Class Period, ERAC and UFLIC submitted a series of statutory filings to the Kansas Insurance Department pertaining to, among other things, their financial condition and the performance of their reinsurance portfolios. These annual submissions are reviewed and signed by the President, Treasurer, and Secretary of ERAC and UFLIC. For 2013, Ronald Dean Peters (ERAC and UFLIC President), Kathleen Ann Russell (ERAC and UFLIC Secretary), and Sarah Quirk Baker (ERAC and UFLIC Treasurer) signed the ERAC and UFLIC statutory filings, while Peters, Russell, and Jane Brady Kipper (ERAC and UFLIC Treasurer) signed the ERAC and UFLIC filings for 2014 through 2017.

127.    In connection with these statutory filings, ERAC and UFLIC conducted claims experience studies, which involved a review and analysis of actual claims experience data related to the LTC blocks that ERAC and UFLIC reinsured. One of the reasons that insurers and reinsurers conduct claims experience studies is to assess the accuracy of the assumptions they are using to calculate reserves. To facilitate these experience studies, GE regularly received actual claims

experience data from the insurers that had ceded their LTC risk to ERAC and UFLIC (e.g., Genworth, Allianz, etc.).

128.     According to ERAC's statutory filings with the Kansas Insurance Department, GE's claims experience analyses were conducted by senior GE actuaries, including Ramsey, Berger, and Benz. These and other GE, ERAC, and UFLIC actuaries signed (and submitted to the Kansas Insurance Department) annual certifications attesting to the analyses they conducted and the data they reviewed. For example, during the Class Period, Benz signed certifications indicating that he reviewed "claim specific information" related to GE's reinsured portfolios that "was provided by the original cedant companies or their third party claims administrators."

129.     Benz confirmed his and GE's access to—and analysis of—GE's actual LTC claims experience data in an August 2017 article he published, titled "*Searching for Morbidity Improvement in the SOA Experience Database*," where he acknowledged that GE "has access to data from a variety of direct writers" of LTC insurance that GE reinsures, and that he personally analyzes that data.

130.     FE-2 also confirmed that GE conducted annual claims experience studies with respect to its LTC blocks. FE-2 stated that these studies were conducted by Berger and Benz, began in the autumn of ever year, and involved a review of experience data provided by the ceding insurers. Once the study was completed, it was shared with Filsinger and Peters.

131.     FE-2 further stated that on an annual basis, ERAC and UFLIC claims experience data was compiled in a PowerPoint presentation and presented to senior GE executives, ***including Immelt and the CFO***. FE-2 did not prepare the PowerPoint presentation, but in performing his work as an internal auditor, he reviewed the presentation each year. FE-2 stated that the

PowerPoint presentation was "used for quite a long time" to report up to GE's executives. According to FE-2, the PowerPoint presentation contained similar items each year, including:

- The level of claims and how they were building over time;

- Projected reserves;

- Total historical termination rates, including deaths; and

- Interest rates, current investment assets and earnings.

132.    With respect to projected reserves, FE-2 explained that the PowerPoint presentation included a timeline of GE's insurance reserves, which always showed a "hump" where reserves were expected to peak and then decline (because no new business was being written). FE-2 stated that during his tenure at the Company, "GE was not at the top of the hump yet," which meant that GE had to have reserve growth reflected on its financial statements.

133.    Each year, the PowerPoint presentation was provided to Filsinger and then to Peters. Filsinger and Peters would then present the PowerPoint to Zanin. Zanin, with Peters and/or Filsinger present, then presented the PowerPoint to Immelt and the CFO.

134.    FE-2 was responsible for confirming, from a control perspective, that the information in the PowerPoint presentation made sense, and that the PowerPoint presentation was provided to senior GE executives each year. FE-2 stated that "without a doubt" this presentation was received by Immelt, the CFO, and Zanin each year.

> **b.    Defendants Witnessed Negative Claims Experience Within GE's LTC Blocks Prior to and During the Class Period**

135.    Analyses of GE's actual LTC claims experience data establishes that prior to and throughout the Class Period: (i) GE's actual claim experience was extremely negative and deviated sharply (and negatively) from its reserve assumptions; (ii) GE's LTC reserves, which were calculated on the basis of these inaccurate assumptions, were materially understating its future

liabilities; and (iii) as a result, it was inevitable that GE would need to record a material charge to increase its LTC reserves. Thus, GE, Immelt, Bornstein, and other senior GE executives—who received a PowerPoint presentation reflecting GE's LTC claims experience data every year— knew, even before the Class Period began, that the risks associated with GE's toxic LTC portfolio had become a reality.

136. The data summarized below pertains to UFLIC's LTC reinsurance block, and was compiled from a review of annual statutory statements filed by MetLife. During the Class Period, over 99.5% of MetLife's LTC exposures were reinsured by UFLIC, and over 99.5% of UFLIC's total LTC exposure consisted of this reinsured MetLife block. Moreover, MetLife statutory rate filings during the Class Period explain that it and UFLIC used the same assumptions to calculate their LTC reserves. Thus, MetLife's LTC exposures were UFLIC's LTC exposures, and MetLife's assumptions were UFLIC's assumptions.

137. As described below, MetLife's disclosures regarding UFLIC's reinsurance block reveal a highly negative claims experience that existed years before the start of the Class Period and persisted throughout the entirety of the Class Period.

138. ***Actual-to-Expected Incurred Claims***. As part of its statutory filings, MetLife submitted LTC Experience Reporting Form 1, which is intended to track actual claims (both number and dollar amount) and persistency against expected amounts. Expected amounts are calculated using the assumptions underlying MetLife's (and thus UFLIC's) ALR. One of the metrics MetLife disclosed as part of LTC Experience Reporting Form 1 was Actual-to-Expected Incurred Claims, which compares the present value of actual claims and reserves for a cohort of active lives to expected claims. An Actual-to-Expected Incurred Claims ratio greater than 100% means that the dollar amount of actual claims being filed is greater than the insurer expected, and

thus constitutes a warning sign that an insurer's ALR assumptions—and the reserves that are calculated based on those assumptions—are understating future liabilities.

139.    During the Class Period, UFLIC/MetLife's Actual-to-Expected Incurred Claims ratio consistently exceeded 100%, as set forth below:

| Incurred Year | Actual-to-Expected Incurred Claims |
|---|---|
| 2009 | 135.3% |
| 2010 | 137.9% |
| 2011 | 152.8% |
| 2012 | 156.8% |
| 2013 | 143.6% |
| 2014 | 158.8% |
| 2015 | 143.1% |
| 2016 | 162.5% |

140.    Analysts have noted that Actual-to-Expected Incurred Claims ratios of 116% or more "paint an alarming picture" for an insurer. Plaintiffs' actuarial expert, Axene, has described UFLIC's ratios as "catastrophic."

141.    ***Actual-to-Expected Lives Inforce***. On an annual basis, MetLife's LTC Experience Reporting Form 1 also reported Actual-to-Expected Lives Inforce. Lives inforce are the number of policyholders who have active policies (i.e., policyholders who have not terminated their policies due to death or lapse). An Actual-to-Expected Lives Inforce ratio greater than 100% indicates that the reporting company's ALR assumptions are overestimating the number of policies that would terminate, and thus underestimating future liabilities.

142.    During the Class Period, UFLIC's/MetLife's Actual-to-Expected Lives Inforce ratios persistently exceeded 100%, as set forth below:

| Incurred Year | Actual-to-Expected Lives Inforce |
|---|---|
| 2009 | 103.7% |
| 2010 | 101.1% |
| 2011 | 100.6% |
| 2012 | 101.8% |
| 2013 | 103.1% |
| 2014 | 103.2% |
| 2015 | 108.9% |
| 2016 | 103.2% |

143.    During the Class Period, UFLIC's/MetLife's Actual-to-Expected Lives Inforce ratios greatly exceeded those of other LTC insurers who took reserve charges prior to GE's 2017 charge:

| Insurer | Actual-to-Expected Lives Inforce in Year Prior to Reserve Charge (Year before Reserve Charge) |
|---|---|
| Genworth | 101.4% (2013) |
| Prudential | 100.6% (2011) |
| Unum | 98.0% (2010) |

144.    ***Experience-to-Reported Policy Reserves***. As part of its statutory filings, MetLife submitted "LTC Experience Reporting Form 2," which calculates the ratio of experience reserves to reported reserves by calendar year. "Experience-to-Reported Policy Reserves" is a measure of the sufficiency of GE's reserves to cover actual expenses. "Reported policy reserves" refer to the reserve amounts that are reported to state regulators, and are the reserves GE believes it will need to cover its future liabilities. "Experience reserves," or actual reserves, are the amounts that GE has actually set aside. Ratios below 100% indicate that the insurer set aside insufficient policy reserves to cover its LTC liabilities.

145.   During the Class Period, UFLIC's/MetLife's "Experience-to-Reported Policy Reserves" ratios were far below 100% and consistently deteriorated:

| Reporting Year | Experience-to-Reported Policy Reserves |
|---|---|
| 2008 | 100.0% |
| 2009 | 92.1% |
| 2010 | 82.4% |
| 2011 | 75.2% |
| 2012 | 66.6% |
| 2013 | 57.9% |
| 2014 | 49.9% |
| 2015 | 37.8% |
| 2016 | 22.5% |

146.   The 100% ratio that is reflected in the above table for 2008 does not mean that UFLIC's reserves were adequate in 2008. Rather, LTC Experience Reporting Form 2 was designed so that **all insurers** reported an "Experience-to-Reported Policy Reserve" ratio of 100% for 2008. Yet even assuming that UFLIC had appropriately set its policy reserves in 2008, by 2016, UFLIC's LTC reserve assumptions provided for **less than one-quarter** of the policy reserves needed. These extremely unfavorable—and consistently worsening—ratios indicate that UFLIC's ALR assumptions had projected substantially lower claims and/or persistency rates (i.e., higher mortality and/or lapse rates) than what actually occurred every year since at least 2009, and provide further indication that, throughout the Class Period, GE was aware of the risk that its reserves were insufficient to cover its expected future LTC liabilities.

147.   While ERAC's claims experience data was not reported in any statutory filings by ERAC or its ceding insurers, Axene has concluded that ERAC's claims experience was not significantly more positive than UFLIC's. This is because, as set forth in ¶ 207, below, ERAC reserves were increased by a **greater** percentage than UFLIC's in January 2018, indicating that

ERAC's portfolio had deteriorated even more than UFLIC's. In addition, as GE's March 2019 disclosures make clear, ERAC's LTC portfolio contained policies that were even riskier than UFLIC's. For example, 34% of ERAC's LTC book covered "joint lives," which policies, as described above, are riskier than policies on single insureds. UFLIC held *no* joint lives policies. Additionally, 70% of ERAC's policies provided lifetime benefits, compared to just 35% for UFLIC.

148.    The foregoing facts, which are based on claims experience data that was available to and reviewed every year by GE's most senior executives, establish that the risks associated with GE's insurance block were manifest—and dramatically increasing—during the Class Period. Moreover, based on the foregoing data, Defendants knew that the assumptions GE was using to calculate LTC reserves were inconsistent with its actual claims experience, thus making a material charge to increase its LTC reserves inevitable.

**2.    Defendants Knew That GE Was Exposed to Over 300,000 of the Most Toxic LTC Insurance Policies in the Industry**

149.    In addition to their awareness of GE's deteriorating LTC claims experience, Defendants also knew before the start of the Class Period that the LTC policies it retained following the Genworth and Swiss Re deals were among riskiest in the industry. According to a January 2018 article in The Wall Street Journal, GE was informed by its investment bankers that the policies it retained were so toxic that attempting to bundle them into the spinoffs would create "obstacles," i.e., they had the potential to block the transactions from occurring at all. Additionally, as noted above, multiple former employees confirmed that Genworth and Swiss Re refused to take on these LTC policies because they were the "bad ones."

150.    Specifically, Immelt, who was CEO of the Company and Chairman of the Board at the time of the Genworth and Swiss Re transactions, issued public statements to investors

specifically addressing the nature of, and risks associated with, GE's run-off insurance portfolio. Thus, he knew that, notwithstanding his representation to investors that GE had retained a "very stable" book of run-off insurance exposures, GE's portfolio of over 300,000 high-risk LTC policies—over 4% of all LTC policies in existence during the Class Period—was composed of some of the riskiest LTC insurance inforce at that time.

151.    Immelt also knew that GE had entered into capital maintenance agreements with ERAC and UFLIC that required GE to provide the capital necessary to maintain certain risk-based capitalization levels—and to provide claims payment guarantees—for those reinsurance subsidiaries.

152.    Like Immelt, Miller also had first-hand knowledge that GE retained its riskiest book of LTC business following the Genworth IPO, as she was GE's Controller at the time of the IPO. According to FE-4, Miller was "intimately" involved with the Genworth IPO and the three product lines reinsured by UFLIC. Miller was responsible for "almost everything except actuary work," including analyzing what LTC blocks stayed with GE following the IPO and consolidating financial information related to affected businesses, and she would have been given a list of LTC policies that reflected the underlying risk. As such, Miller understood GE had not retained a "very stable run off block" of exposures, but instead was reinsuring some of the ***riskiest exposures in the entire LTC marketplace***.

153.    Immelt, Miller, and other GE executives did not just know that GE had retained the riskiest LTC policies in the industry, they also knew the details about the features of those policies, described above in ¶¶ 116-22, which made them so risky. As GE admitted after the end of the Class Period, these policy features (which existed at the time of the Genworth spin-off and the Swiss Re sale) created material, GE-specific risks, including the risk of "claimants being on claim

for longer periods or at higher daily claim costs, or alternatively limiting the premium paying period."

154.   Amplifying these risks inherent in the terms of GE's LTC policies themselves, Defendants knew during the Class Period that GE had yet to incur the bulk of its future LTC liabilities. As it would reveal to investors at the end of the Class Period, GE knew that it had reinsured "younger" blocks of insurance, whose policyholders only began to reach their "prime" claims-making ages at the end of the Class Period. Thus, Defendants knew that GE's negative claims experience was only going to grow over time.

155.   In addition, GE's LTC portfolio throughout the Class Period was, by far, GE's largest insurance exposure. LTC "represent[ed] approximately 60% of [GE's] underlying insurance exposure," comprising over 40% of GE's ALR and over 67% of its DLR at the end of 2016. GE's LTC exposure vastly exceeded the next largest concentration of insurance exposures, structured settlement annuities, which accounted for just "35% of the total portfolio." The remaining "5% of the book relates to the reinsurance of traditional life and other policies." Thus, traditional life insurance policies constituted *at most* 5% of GE's total insurance exposures.

156.   Finally, Defendants knew of the risks inherent in GE's retained LTC portfolio because that portfolio was reviewed on an annual basis. As described above, GE conducted annual claims experience studies and other analyses, and actual experience data was reported directly to GE's senior executives, including Immelt. Moreover, Flannery stated that in 2017, GE's LTC book "has gone through a standard evaluation process and testing *every year* as is standard in the industry," and further noted that senior GE executives "reviewed" GE's LTC exposures "[i]n 2015, as part of the GE Capital exit process."

**3.    Defendants Knew That GE Was Using Its Original Pricing
Assumptions to Calculate GAAP LTC Reserves During the Class
Period**

157.    Defendants also knew that, notwithstanding the significant deterioration of GE's

LTC portfolio, GE continued to use ***original pricing assumptions*** to calculate its GAAP ALR

reserves throughout the Class Period. These assumptions were inconsistent with (and significantly

more positive than) GE's actual claims experience (as evidenced by the actual-to-expected ratios

of greater than 100% set forth above), and thus created the certain risk of a material increase to

GE's GAAP reserves.

158.    On January 16, 2018, Zanin, GE Capital's CRO, stated at the end of the Class

Period that GE kept its LTC assumptions regarding mortality rates, morbidity rates, lapse rates,

etc. "locked" prior to 2017. As such, for all years prior to GE's 2017 LTC "deep dive," GE

calculated the ALR portion of its GAAP reserve (which was included within the "Investment

contracts, insurance liabilities and insurance annuity benefits" liability line item on GE's balance

sheet) using the original assumptions used to price those policies when they were issued between

"the late '80s [and] early 2000s."

159.    Even if it was appropriate, under GAAP, for GE to keep these original ALR

assumptions locked prior to 2017, Defendants knew, for the reasons discussed herein, that GE was

calculating its ALR using assumptions that were fundamentally inconsistent with GE's actual

claims experience. As a result, Defendants knew that GE's GAAP ALR reserves—which were

calculated using these locked assumptions—significantly understated GE's LTC liabilities and

risks, and that a reserve increase was inevitable.

160.    Moreover, Defendants knew that GE's policies contained term features that were

especially risky, like lifetime benefits, inflation protection and joint lives coverage, and that GE's

LTC portfolio included "younger books of business where a large percentage of policyholders

[we]re only now reaching the prime claim-paying period, ages 80 and plus." Accordingly, Defendants knew that, compared to its peers who, as described below, took massive reserve charges on less risky portfolios years earlier, GE too would be forced to record massive reserve increases as the policyholders underlying its risky LTC blocks aged.

161.    In sum, Defendants knew that GE's LTC claims experience was already extremely bad, that the worst was yet to come, and that absent a dramatic reversal of decades-long industry and GE-specific LTC trends or massive premium rate increases (over which GE had no control), a large increase in LTC GAAP reserves was inevitable.

> **4.    Defendants Knew of Industry-Wide Trends and Data Confirming That Original Pricing Assumptions Were Inconsistent with Actual Claims Experience and Vastly Understated the Financial Risks to LTC Insurers**

162.    Throughout the Class Period, Defendants knew that LTC risks were manifesting themselves across the entire LTC industry, and that policies far less risky than GE's were creating financial havoc for other LTC insurers. GE—including Bornstein and Immelt—acknowledged their awareness of these industry-wide risks when they (falsely) claimed that GE had exited the LTC business "in time" and "before the storm." *See* ¶ 259. FE-2 described the deterioration in the broader LTC industry as a clear outright signal of the risk in GE's LTC portfolio.

163.    In particular, prior to and throughout the Class Period, leading insurance and actuarial organizations like the National Association of Insurance Commissioners ("NAIC") extensively studied and reported on trends in LTC pricing assumptions compared to actual claims experience—and the risks that these trends created for LTC insurers and reinsurers. State insurance regulators use these analyses to establish standards and best practices, conduct peer review, and coordinate their regulatory oversight. These studies have demonstrated that most insurers' original

assumptions used to price their rates and reserves were woefully inadequate and inconsistent with actual claims experience.

164.    For example, according to a 2016 NAIC study, while pricing assumptions on policies issued in the 1990s generally assumed that 8% of policyholders would let their policies lapse within one year, with an additional 4% thereafter, in practice, only approximately 4% let their policies lapse in the first year, and just 0.5% thereafter. Thus, insurers' estimated lapse rates were approximately double the actual rates.

165.    Studies sponsored by the SOA and LIMRA (f/k/a the Life Insurance and Market Research Association) conducted prior to the Class Period similarly showed that lapse rates continued to decline. For example, the 2010 "U.S. Long-Term Care Insurance Persistency Study" found that "[p]ersistency for LTCI products continues to increase," including because voluntary lapse rates for averaged just "3.8 percent for all policies combined for the 2005-2007 experience study," which was down from 5.2% compared to the prior 2002-2004 study. That LTC insurers had overestimated lapse rates was therefore neither new nor surprising by the beginning of the Class Period.

166.    Interest rates earned on investment contracts, through which GE and other insurers and reinsurers invested LTC reserves, also yielded far lower returns compared to initial assumptions due, in large part, to fallout from the 2008 financial crisis, which resulted in a precipitous decline in interest rates that remained depressed for many years as the Fed sought to stabilize the markets. Indeed, by 2016 interest earnings rates were only between 2% and 4%, compared to the 5% to 8% assumed in 1990s LTC pricing, according to NAIC.

167.    NAIC has also observed that most insurers have seen mortality rates well below what was expected when these products were priced. As a result, by 2007, many insurers had

reduced their mortality assumptions by 10% compared to those used to price LTC policies in 2000, and an additional 20% by 2014. On the other hand, in 2014 morbidity rates observed were between 15% and 45% higher than they were in 2000.

168.    In addition, on an annual basis the NAIC publishes a "Long-Term Care Experience Report," which analyzes, among other things, industry-wide actual claims and persistency experience for LTC insurers and reinsurers, and compares that actual experience to insurers' and reinsurers' expectations. For example, NAIC Long-Term Insurance Care Experience Reports published prior to and during the Class Period indicate that, on an industry-wide basis, LTC insurers were witnessing Actual-to-Expected Incurred Claims that routinely exceeded 100%, thus confirming that LTC insurers were persistently understating the risks associated with their policies:

| Year | Industry-Wide Actual-to-Expected Incurred Claims (Individual Claims) |
|------|------|
| 2016 | 142.69% |
| 2015 | 133.55% |
| 2014 | 130.75% |
| 2013 | 127.52% |
| 2012 | 127.52% |
| 2011 | 121.33% |
| 2010 | 117.93% |

Notably, UFLIC's Actual-to-Expected Incurred Claims ratios set forth in ¶ 139 above were significantly worse than these industry averages.

169.    The negative developments and trends within the LTC industry were also analyzed and reported on by SOA and its section on LTC insurance (the "SOA LTCIS") and LIMRA. Among other things, the SOA LTCIS publishes newsletters three times per year and organizes section meetings, including a three- to four-day annual meeting, to discuss pertinent issues and ongoing research projects in the LTC insurance industry. The newsletter is called Long-Term Care

News and, as stated in each newsletter, "is free to section members" and "available on the SOA website (www.soa.org)."

170.    GE was an active member of the SOA LTCIS throughout the Class Period, and key GE personnel intimately involved with the Company's LTC portfolio served in SOA LTCIS leadership roles and published articles for the SOA LTCIS during the Class Period. For example, Berger was the Chairperson of the SOA LTCIS and, in that role, oversaw the SOA LTCIS's activities in 2014, and Benz published in the Long-Term Care News. The Vice Chairperson of the SOA LTCIS in 2014 was Robert Hanes, a director at KPMG LLP, GE's outside auditor.

171.    Both before and during the Class Period, studies generated by the SOA LTCIS confirmed that insurers had grossly overestimated lapse rates and interest rates, and had dramatically underestimated the number of policyholders that would file claims and the length of time that such claimants would require benefits, among other key pricing assumptions. These inaccuracies posed significant financial risks to LTC insurers, as they led to actual claims experiences that were: (i) far greater (and more expensive) than expected; and (ii) consistently getting worse.

172.    For example, the June 2011 SOA LTC Experience Intercompany Report concluded that "the compiled data (when compared with the five previous Reports) demonstrates both stabilization of results and continuation of trends," including a stabilization of overall mortality rates of 1.0% (whereas initial pricing assumptions assumed higher death rates) and a continuation of *declining* trends in voluntary lapse rates (5.2%, compared to 5.5% in the prior report) and total termination rates (6.2%), meaning that more policyholders were keeping their policies rather than letting them lapse. Other findings of note included that policies with unlimited benefit periods (which, as discussed herein, comprised 60% of GE's portfolio) "appear[ed] to have higher

incidence rates than policies with limited benefit periods." Moreover, the June 2011 SOA Report found that "the number of claimants increased from just over 175,000 in the previous 2004 Report to 310,000 claimants in this Report" and that "[b]enefits paid more than tripled from $4.1 billion to $13.1 billion."

173.    Long-Term Care News also published articles that chronicled the negative issues facing LTC insurers. For example, the August 2014 issue of Long-Term Care News (Issue 36) featured, as its centerpiece, an article titled "*Mechanics and Basics of Long-Term Care Rate Increases*." The article described the "misses of the past in terms of pricing assumptions and the need for rate increases," which by then had "been well established." The article also discussed how industry-wide misestimation of morbidity, persistency, and interest rates, among other things, had resulted in a general need for premium increases, advocating that there ought to be a "shift" in the thinking and regulation "regarding LTC rates and the basis for which a rate increase is determined."

174.    Benz and other GE actuaries published articles in Long-Term Care News that reflected their understanding of the issues facing LTC insurers. For example, even before the Class Period began, in May 2011, Benz published an article in Long-Term Care News titled "*Now What?*" that described the current "gloom" in the LTC industry. Benz's article further recognized that "[c]arriers and agents exited the market in spurts" due to, among other things, the industry-wide reality that "policy termination rates were going to be much lower than anticipated."

175.    Further, according to Issue 36 of Long-Term Care News, SOA LTCIS held its annual meeting in Orlando, Florida in October 2014, and included a "standing room only" general session that addressed the "elephant in the room—does the long-term care insurance industry have a future given its current challenges, **missed assumptions** and plummeting sales?" Discussed

during the session was the fact that "[c]laims experience has deteriorated in recent years, contributing to carriers exiting the market." The session featured a presentation by Genworth CEO Thomas McInerney, during which he discussed his belief that "many carriers in the industry waited too long to take action when emerging [claims] experience was incongruent with original assumptions and recommend[ed that] carriers annually evaluate results against assumptions."

176.    GE executives were also active in the Intercompany Long-Term Care Insurance ("ILTCI") Conference Association, an industry group that "[p]rovide[s] educational events, including an annual conference, for representatives of the long term care insurance community," and "[f]oster[s] research, reports, meetings and workshops" addressing industry-related issues. Prior to and throughout the Class Period, the ILTCI held an annual conference where market participants discussed negative developments in the industry. Throughout the Class Period, ERAC sponsored the annual ILTCI conferences and numerous GE executives, including Berger and Benz, attended and presented at the conferences, during which negative trends in the LTC industry were discussed. For example, ILTCI presentations discussed the extent to which original LTC assumptions had been discredited by decades of actual LTC experience, including "[u]ltimate lapse [rate] dropping from 4.75% to 1%," "[i]nterest rate dropping from 6.9% to 4.5%"; and "[m]orbidity higher than expected 10%."

177.    Given the widely studied trends in LTC claims experience by these organizations, and as a result of its membership in the same, by the start of the Class Period, GE was well aware that industry-wide LTC claims experience was significantly worse than anticipated, inconsistent with original LTC pricing assumptions, and had severely understated the financial risks to LTC insurers. In light of these facts, coupled with the deterioration in GE's own LTC books, Defendants were aware of the severe financial risks that GE's LTC blocks posed to its own financial condition,

particularly given that, as described above, GE continued to use original "locked" assumptions to calculate its ALR throughout the Class Period.

> ### 5. Defendants Knew That Other LTC Insurers Had Recorded Billions of Dollars in Reserve Charges during the Class Period Due to Increased Risks and Inaccurate Pricing Assumptions

178.    LTC insurers' mispricing of LTC policies—and their use of reserve assumptions that were highly inconsistent with actual claims experience—hampered their ability to make payments due under the policies. Concurrently, insurers and reinsurers were subjected to rising costs and liabilities—and thus large losses—on their LTC exposure. Even those insurers whose policies were *far less risky* than GE's were forced to seek premium increases and take reserve charges during the Class Period.

179.    As a result of rising costs and liabilities, most insurers (including GE) chose to exit the LTC market altogether, by not underwriting new policies or selling off their exposures. Indeed, following a peak of approximately 750,000 new LTC policies issued in 2002, annual individual LTC policy sales declined sharply each year, to a low of roughly only 172,000 policies sold in 2013 (the start of the Class Period). The number of carriers issuing new policies likewise fell sharply, from over 100 insurers in the early 2000s to less than a dozen by 2016.

180.    Even the biggest players in the LTC market fell victim to these issues. For example, Unum and Allianz (an original writer of LTC policies reinsured by ERAC) stopped selling new LTC policies in 2009. MetLife (another original writer of LTC policies reinsured by UFLIC) ceased further sales in 2010. Prudential and John Hancock sold their last policies in 2012 and 2016, respectively. In announcing its exit from the LTC market, a MetLife spokeswomen stated that "the financial challenges facing the LTC [insurance] industry in the current environment *are well-known*" and "aren't unique to MetLife." Prudential similarly stated that its exit "reflects the challenging economics of the individual long-term care market."

181.    To account for the dramatic increase in their expected future liabilities to LTC policyholders, many insurance companies also sought approval for premium rate increases to offset mounting LTC liabilities. All told, between 2009 and 2017, LTC insurers sought premium rate increases on more than *4,500* occasions. Some of the increases sought have been as high as *130%* (Genworth) and have spanned multiple states (e.g., Genworth's and Unum's rate increases in 2015, which spanned 17 and 21 states, respectively). Notably, in approving rate increase requests by Genworth, MetLife, and John Hancock in 2016, the Pennsylvania Insurance Department stated that "[t]he current policies in place are not generating sufficient premium to pay future claims to policyholders. ***This is a common problem for a number of insurers nationwide*** because policyholders are keeping their policies longer than expected and are living longer than projected."

182.    Notwithstanding efforts to eliminate their LTC exposure and/or offset losses, many top insurers were forced to record massive GAAP and statutory reserve charges to cover increasing LTC costs and future liabilities. For example, in February 2012 Unum recorded a ***$573.6 million*** pre-tax charge ($561.2 million after tax), which resulted in a $425.4 million net loss for its 4Q11, "due largely to . . . its strategic review of the long-term care business," which resulted in "an increase to long-term care policy and claim reserves." Factors Unum cited as driving its significant reserve charge were the "significant decline in long-term interest rates which occurred late in . . . 2011" and "an updated ***industry study*** for long-term care experience which was made available mid-year 2011 from the Society of Actuaries," which "showed that lower termination rates than we had previously assumed were beginning to emerge in the industry and in [its] own experience." Additionally, Unum revealed that it "changed [its] morbidity assumptions to reflect emerging industry experience as well as [its] own company experience. Unum disclosed increased reserves

again in February 2015, this time by *$698.2 million*, primarily due to low interest rates, among other factors.

183.   In November 2012, Prudential also recorded a *$698 million* reserve charge, resulting in a "pre-tax loss of $685 million from divested businesses, primarily related to long-term care insurance" "to reflect updates of actuarial assumptions based on our annual review."

184.   In November 2014, Genworth increased its reserves by *$531 million*, explaining that claimants were staying on claim longer than expected and using more of the available benefit. Genworth increased reserves by another *$729 million* in February 2015, following completion of its annual loss recognition testing, and in September 2016 by *$905 million* due to the company's annual review of assumptions. Genworth's massive, and multiple, reserve charges were glaring red flags that should have raised significant concerns about GE's mounting LTC risk—as described above, the LTC blocks spun off to Genworth were *far less risky* than the ones GE was forced to retain.

185.   In November 2016, Manulife increased reserves by *$455 million* and recorded a charge against earnings of *$313 million* as a result of "updates to policyholder assumptions" and a "downward revision to our ultimate reinvestment rate assumptions."

186.   GE knew full well that its LTC blocks were not immune to the issues being faced by these other insurers. Indeed, Benz admitted as much in his August 2017 article referenced in ¶ 129 above, where he stated that he and his team had performed "trend analys[e]s" of GE's claims experience data "*and found the results to . . . be consistent with*" *analyses of industry-wide LTC data*. Put differently, Benz acknowledged that, even though GE failed to record a GAAP ALR reserve charge until the end of the Class Period, and even as it continued to use original ALR assumptions to calculate its LTC reserves throughout the Class Period, GE had access to claims

experience data indicating that its LTC exposures were faring ***no better*** than those of other LTC insurers.

### 6.    Plaintiffs' Actuarial Expert Has Corroborated Plaintiffs' Allegations and Has Identified Severe Deficiencies in GE's Annual Premium Deficiency Tests

187.    On January 16, 2018, GE held an "insurance update" conference call to address the enormous reserve charge taken in connection with long-term insurance. Speaking for GE during the call were Flannery, Miller, Matthew Cribbins, Vice President of Investor Communications, and Zanin. Zanin stated as follows:

> Each year we perform an annual premium deficiency test, which under GAAP test [sic] to ensure the sufficiency of our current reserves plus future premiums to pay future claims across all insurance books. In all prior years, these tests resulted in a positive margin, which under GAAP requires that original assumptions about the book remain locked.

> In 2017, based on new claims experience studies, we undertook a deeper dive to better understand developing trends in claims. This led to a comprehensive actuarial review of all policy assumptions and a bottoms-up rebuilding of claims cost curves.

188.    Defendants have pointed to the fact that GE purportedly passed its annual premium deficiency tests as evidence that they did not know they faced risks associated with the Company's LTC business. They further stated that they were not permitted to change the assumptions they used to calculate GAAP reserves. However, GE's purported passed tests do not negate Defendants' scienter.

189.    Through the below objective analyses and his review of a wealth of evidence— including ERAC's and UFLIC's annual statutory filings, Plaintiffs' actuarial expert, Axene, has concluded that GE's annual premium deficiency tests incorporated "best estimate" assumptions that were outdated and inconsistent with both industry practice and GE's own highly negative claims experience, which rendered meaningless the results of its annual premium deficiency tests.

### a.   Asset Adequacy Testing Under GAAP and SAP

190.   GE performed two tests annually to assess the adequacy of its LTC reserves: Loss Recognition Testing on its GAAP reserves and Cash Flow Testing on its statutory reserves. Through both Loss Recognition Testing and Cash Flow Testing, an insurance company assesses the adequacy of its reserves by analyzing whether those reserves (together with future expected premiums) are sufficient to cover future expected liabilities.

191.   Importantly, for purposes of each of these tests, GE was required to estimate its future liabilities using best estimate assumptions, which, as described above, must be based on actual experience studies and/or industry experience data. According to Axene, the use of inaccurate or outdated best estimate assumptions in either Loss Recognition Testing or Cash Flow Testing will produce inaccurate deficiency test results. For example, a best estimate mortality rate that overestimates the portion of active policyholders who will die prior to going on claim will underestimate the insurer's present value of future claims in Loss Recognition Testing, and would lead the insurer to incorrectly identifying the GAAP reserves as sufficient.

192.   As set forth below, Axene has analyzed UFLIC's best estimate assumptions and has determined that, during the Class Period, they were outdated, inconsistent with prevailing industry assumptions, and contradicted by GE's actual claims experience.

### b.   UFLIC's Best Estimate Reserve Assumptions Were Outdated, Inconsistent with Prevailing Industry Assumptions, and Contradicted by GE's Actual Experience

193.   Because, as discussed above, over 99.5% of UFLIC's total LTC reinsurance exposure was to just one ceding insurance company, MetLife, Axene analyzed the accuracy of UFLIC's best estimate assumptions by reviewing MetLife's disclosures regarding its "best estimate" assumptions during the Class Period, which MetLife stated were the same as UFLIC's

assumptions. In particular, MetLife certified that its assumptions "are consistent with the business plan in the primary risk taker's year-end 2016 asset adequacy testing." MetLife made similar statements in connection with its 2012 asset adequacy assumptions.

194.    While the best estimate assumptions discussed below were used to assess the adequacy of UFLIC's statutory reserves, Axene has stated that such assumptions are typically more conservative than GAAP best estimate assumptions. This is because, unlike Cash Flow Testing for statutory reserves, Loss Recognition Testing under GAAP assumes that the insurer is a going concern. As a result, Axene concluded that the best estimate assumptions UFLIC used for Loss Recognition Testing under GAAP necessarily suffered from the same deficiencies as the best estimate assumptions used for Cash Flow Testing.

195.    Based on his review, Axene has concluded that UFLIC's assumptions were outdated, inconsistent with prevailing industry assumptions at the time, and contradicted by UFLIC's actual claims experience.

196.    In particular, as described below, UFLIC's mortality and lapse rates were far more aggressive, i.e., optimistic for the insurer, than those utilized by UFLIC's peers. The combined effect of highly aggressive mortality and lapse rate assumptions is greater than the sum of either alone.

197.    First, UFLIC's mortality assumptions were grossly outdated and inconsistent with prevailing industry assumptions, resulting in aggressively optimistic mortality assumptions. A standard actuarial practice is to use a reported mortality table as a baseline, with adjustments or selection factors applied based on actual mortality rates. During the Class Period, UFLIC used the 1983 Individual Annuitant Mortality ("1983 IAM") Table to develop its best estimate mortality assumptions.

198.    By the start of the Class Period, however, most insurers were using more recent mortality data, contained in the 1994 Group Annuitant Mortality ("1994 GAM") Table, to set mortality assumptions. In fact, industry surveys of reserve assumptions and methodologies conducted by actuarial experts Milliman in 2012 and 2015, show that out of 24 and 25 respondents in 2012 and 2015, respectively, **UFLIC was the only company** that used the 1983 IAM Table. ERAC did not participate in the Milliman surveys.

199.    UFLIC's use of the 1983 IAM Table as a basis for mortality rates was itself aggressively optimistic. The 1983 IAM Table mortality rates were, on average, approximately **50% higher** than the 1994 GAM Table rates for policyholders over the age of 50 (the vast majority of LTC policyholders). Higher mortality rate assumptions translate into lower expected future liabilities for LTC insurers.

200.    Furthermore, UFLIC's data shows that even where it had actual claims experience, it used higher selection factors than were supported by the actual experience. A selection factor is used to alter an actuarial table to account for an insurer's actual claims experience. For example, if a table shows that 1,000 policyholders will die 11 years after initiating a policy (i.e., "policy duration 11"), but an insurer's actual experience shows that only 850 policyholders died, then the indicated selection factor would be 85% for policy duration 11.

201.    Axene compared UFLIC's applied mortality selection factor to UFLIC's actual claims experience in 2012 and 2016, for policy duration years 11-18. In nearly every instance, UFLIC's applied mortality selection factor exceeded the observed rate, as shown in the following chart.

**OBSERVED AND APPLIED MORTALITY SELECTION
FACTORS FOR 2012 AND 2016[5]**

| Duration | 2012 | | 2016 | |
|---|---|---|---|---|
| | Observed | Assumed | Observed | Assumed |
| 11 | 71% | 75% | - | - |
| 12 | 74% | 77% | - | - |
| 13 | 76% | 80% | - | - |
| 14 | 83% | 82% | - | - |
| 15 | 83% | 85% | 75% | 77% |
| 16 | 85% | 87% | 81% | 80% |
| 17 | 87% | 90% | 81% | 84% |
| 18 | 91% | 92% | 89% | 88% |
| 19 | - | - | 90% | 91% |
| 20 | - | - | 93% | 94% |
| 21 | - | - | 93% | 96% |
| 22 | - | - | 98% | 98% |

202.    UFLIC's use of inaccurate selection factors resulted in total mortality assumptions that assumed a higher number of deaths and thus a lower number of claimants and required reserves. Thus, not only was UFLIC starting with an outdated baseline, it was also applying inappropriate selection factors that were inconsistent with its actual experience. This rendered its mortality assumptions still aggressive (i.e., reserves were based upon assumptions showing fewer lives continuing on claim in the future).

203.    LTC industry mortality studies available to UFLIC confirm that UFLIC's best estimate mortality assumptions based on the 1983 IAM Table were outdated and inconsistent with available experience data. In particular, the SOA/LIMRA Long Term Care Experience Intercompany Report published in 2011 (for years 1984-2007), in 2015 (for years 2000-2011) and

---

[5] The 2012 data begins with policy duration 11 because, given the runoff nature of UFLIC's portfolio, it had no insureds with policy duration 10 or lower. Similarly, the 2016 data begins with policy duration 15 because UFLIC had no insureds with policy duration 14 or lower by that time.

in 2016 (for years 2008-2011) show dramatically lower mortality rates at ages 70-90 than the 1983 IAM Table, as shown in the following chart:

**MORTALITY RATES BY ATTAINED AGE**



204.     UFLIC's assumed lapse rate assumptions were also far higher than what other LTC insurers were utilizing. In particular, UFLIC's lapse assumption rates were approximately ***50% higher*** than the industry average. For example, in 2012, UFLIC used an ultimate lapse rate of 1.75%, but the average industry lapse rate used at that time was about 1.1%. Like mortality rates, a higher lapse rate translates into lower assumed future liabilities for an LTC insurer.

205.     Based on the above analysis, Axene has concluded that UFLIC's best estimate assumptions during the Class Period were outdated and inconsistent with prevailing industry assumptions.

### c. ERAC's Best Estimate Assumptions Were Similarly Outdated and Inconsistent with Industry Practice

206. Axene has also concluded that there is no reason to believe that ERAC's best estimate assumptions were any better than UFLIC's.

207. Axene reviewed the actuarial reserve figures reported in ERAC's and UFLIC's 2016 and 2017 statutory filings to determine the portion of the reserve charge that GE reported in January 2018 taken by UFLIC and ERAC, respectively. Based on this analysis, he determined the portion of the reserve charge attributed to each entity. As is evident from the below, ERAC was forced to increase its reserves by a greater percentage than UFLIC (173.8% increase versus 121.5% increase):

| Reporting Year | UFLIC | ERAC | Total GE |
|---|---|---|---|
| 2016 | $675,000,000 | $1,275,000,000 | $1,950,000,000 |
| 2017 | $1,495,000,000 | $3,491,500,000 | $4,986,500,000 |
| Dollar Increase | $820,000,000 | $2,216,500,000 | $3,036,500,000 |
| Percentage Increase | 121.5% | 173.8% | 155.7% |

208. According to Axene, the fact that ERAC's reserve increase in 2017 was much larger than UFLIC's—on both a dollar and percentage basis—indicates that ERAC's best estimate assumptions were just as—if not more—outdated and overly optimistic as UFLIC's.

### d. GE's Negative Claims Experience Further Indicate That Its Best Estimate Assumptions Were Outdated and Inconsistent with GE's Actual Claims Experience

209. As described above in ¶¶ 135-48, GE's highly negative actual-to-expected experience ratios indicate that its "locked" Active Life Reserve assumptions were inconsistent with (and significantly more optimistic than) its actual claims experience. Axene has opined that these highly negative ratios would have exposed to GE's actuaries the significant infirmities with GE's best estimate assumptions.

66

210.    In particular, Axene has stated that, when an insurer's Loss Recognition Testing consistently results in positive margins (i.e., a passed Loss Recognition Testing or premium deficiency test), it demonstrates that the insurer's Active Life Reserve assumptions are consistent with its using best estimate assumptions for future LTC claims (i.e., the insurer is appropriately reserved). This is because the risk of a Loss Recognition Testing failure (and thus a reserve increase) increases when there is a significant negative deviation between Active Life Reserve assumptions and best estimate assumptions.

211.    Thus, according to Axene, GE's representation that it passed its Loss Recognition Testing ever year prior to the 2017 reserve increase shows that, throughout the Class Period, GE used best estimate assumptions that are correlated highly with its locked Active Life Reserve assumptions. Thus, Axene has stated that GE's actual-to-expected results throughout the Class Period and in the years prior to GE's 2017 reserve increase can also be used to assess its best estimate assumptions.

212.    As set forth above in ¶¶ 135-48, prior to and throughout the Class Period, GE was suffering from significantly negative claims experience within its LTC books relative to its locked Active Life Reserve assumptions. According to Axene, the consistent negative variance between GE's actual claims experience and its assumptions—without a corresponding GAAP Active Life Reserve increase—demonstrates that, prior to 2017, GE was using best estimate assumptions that were *inconsistent* with its own claims experience, and that aligned closely with its locked Active Life Reserve assumptions, *not its actual claims experience*.

### 7.    Axene's Analyses Corroborate Plaintiffs' Allegations of Scienter

213.    Through the above analyses, Axene has identified numerous facts indicating that GE tested the adequacy of its LTC reserves during the Class Period using outdated assumptions

that were not supported—and, in fact, contradicted by—the actual claims experience data that was being reviewed by the Company and communicated directly to Immelt.

214.    In particular, Axene has shown that UFLIC was *the only insurer* during the Class Period using 30+ year-old mortality tables, and that it applied lapse rate assumptions that were *50% higher* than industry standards. GE *knew* of these facts by virtue of UFLIC's participation in periodic Milliman surveys during the Class Period that reported on the assumptions that insurers were using to value their LTC liabilities. In addition, GE and its senior-most executives knew that these assumptions were inconsistent with GE's own claims experience data.

215.    GE's use of best estimate assumptions that were outdated, inconsistent with prevailing industry standards, and contrary to GE's own, highly negative, claims experience data, supports an inference of scienter. It also confirms that GE's positive annual deficiency tests— which were the product of these stale and inconsistent assumptions—do not negate the inference of Defendants' scienter.

### D.    Defendants' Materially False or Misleading Statements and Omissions

216.    Although the LTC market generally—and GE's reinsured LTC portfolio in particular—deteriorated sharply in the years leading up to the Class Period, Defendants made *no mention* of these material facts, risks or trends, or their likely impact on GE's financial condition, in their Class Period statements to investors. Instead, Defendants stayed silent about these growing risks, altered the manner in which GE reported its LTC insurance risks to investors in violation of SEC regulations, mischaracterized the Company's risky LTC exposures as "life insurance," and continued to mislead investors into believing that GE had reduced its LTC risks and that its remaining exposures were safe and would continue to be "run off" over time.

1.      **Defendants Omitted Material Facts in Violation of Item 303 of Regulation S-K and Section 10(b)**

a.      **Overview of GE's Item 303 Disclosure Obligations**

217.    GE's annual and quarterly reports filed with the SEC are subject to the disclosure requirements of Item 303. These required disclosures must be made in the MD&A section of the Company's annual and quarterly reports filed with the SEC.

218.    The purpose of MD&A disclosures, according to the SEC, is to provide investors with information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." In particular, there are three principal objectives of the MD&A: (i) to provide an explanation of a company's financial statements that enables investors to see the company through management's eyes; (ii) to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and (iii) to provide information about the quality and potential variability of a company's earnings and cash flow, so that investors can judge the extent to which past performance predicts future performance.

219.    For the past 30 years, the SEC has emphasized that public companies have a duty to disclose significant trends, risks, and uncertainties that could impact their performance in the future. First, on May 18, 1989, the SEC issued an interpretive release concerning registrants' MD&A disclosure obligations, including those arising under Item 303 (the "1989 Release"). The 1989 Release affirms that the MD&A sections of public company SEC filings "are intended to provide, in one section of a filing, material historical ***and prospective*** textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, ***with particular emphasis on the registrant's prospects for the future***."

220.    Citing to Securities Act Release No. 6711, the 1989 Release also states that "[t]he Commission has long recognized the need for a narrative explanation of the financial statements, *because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance*. MD&A is intended to give the investor an opportunity to look at the company *through the eyes of management* by providing both a short and long-term analysis of the business of the company. . . . It is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors *which are peculiar to and necessary for an understanding and evaluation of the individual company*."

221.    Finally, quoting from the Instructions to Item 303, the 1989 Release states that the MD&A "shall focus specifically on material events and uncertainties known to management that would cause reported financial information *not to be necessarily indicative of future operating results or of future financial condition*."

222.    On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 (the "2003 Rule"). It emphasizes that MD&A disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show *and do not show*, as well as *important trends and risks* that have shaped the past *or are reasonably likely to shape the future*."

223.    A company's failure to disclose information required by Item 303 in its annual and quarterly reports filed with the SEC is actionable under the federal securities laws, including under Section 10(b) of the Exchange Act. As discussed below, Item 303 required Defendants here to disclose material information about GE's significant LTC-related risks in the MD&A section of GE's quarterly and annual reports. Defendants' failure to make such disclosures constitutes a violation of Section 10(b) of the Exchange Act.

**b.    Defendants Failed to Disclose Material Facts and Trends Concerning to GE's LTC Insurance Portfolio**

224.    Item 303(a)(1), focusing on liquidity, requires companies to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."

225.    Item 303(a)(2) focuses on the balance sheet, requiring companies to: "[d]escribe any known material trends, favorable or unfavorable, in the registrant's capital resources. Indicate any expected material changes in the mix and relative cost of such resources. The discussion shall consider changes between equity, debt and any off-balance sheet financing arrangements."

226.    Finally, Item 303(a)(3), focusing on earnings, requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations."

227.    As to all three of these disclosure obligations, the 1989 Release makes clear that "[a] disclosure duty exists where a ***trend***, ***demand***, ***commitment***, ***event*** or ***uncertainty*** is both [(i)] presently known to management and [(ii)] ***reasonably likely*** to have material effects on the registrant's financial condition or results of operation." *See also Stratte-McClure v. Morgan*

*Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). The disclosure obligation is not limited to "the mere fact" of the trend itself, but rather it also requires disclosure of "the manner in which those then-known trends, events, or uncertainties **might reasonably be expected** to materially impact" the company's business. *Litwin v. Blackstone*, 634 F.3d 706, 719 (2d. Cir. 2011).

228.    As described above, prior to and throughout the Class Period, the following negative trends, demands, commitments, events, and uncertainties existed with respect to the LTC market generally, and GE's LTC exposures specifically:

- GE's commitment to fund LTC claims and expenses on over 300,000 LTC policies which were among the riskiest in the LTC industry;

- GE's persistently negative claims experience on its LTC portfolio;

- That GE's actual claims experience was persistently worse than its "locked" ALR assumptions;

- That GE's actual claims experience was persistently worse than its best estimate assumptions;

- The uncertainties related to GE's inability, as a reinsurer, to offset its negative actual claims experience by directly seeking regulatory approval for premium increases, which could only be pursued by its ceding insurers; and

- The industry-wide negative claims experience within the LTC industry including declining mortality rates, declining lapse rates, declining interest rates, and increased morbidity rates.

229.    Defendants did not disclose **any** of the foregoing information to investors in GE's 10-Ks for fiscal years 2012 through 2016. These omissions violated Item 303 because the undisclosed trends, demands, commitments, events, or uncertainties were known to Defendants and were "reasonably likely to have material effects on [GE's] financial condition or results of operation."

230. ***First***, as described in detail in Section V.C., above, the foregoing trends, demands, commitments, events, and uncertainties were ***known to GE and its management*** throughout the Class Period. In particular, Defendants knew that:

- GE's LTC blocks were suffering from highly negative claims experience prior to and throughout the Class Period (*see* ¶¶ 135-48);

- GE's actual claims experience was significantly worse than the assumptions it was using to calculate and assess its LTC reserves, as reflected by actual-to-expected ratios that exceeded 100% and experience-to-reported policy reserve ratios well below 100% (*see id.*, ¶¶ 193-212);

- GE was reinsuring over 300,000 of the most risky LTC insurance policies, which contained features like lifetime benefits, joint lives coverage, and inflation protection, that rendered them ultra-risky (*see id.*, ¶¶ 149-56);

- GE used its original pricing assumptions to calculate its GAAP ALR reserves during the Class Period (¶¶ 157-61);

- Industry-wide declines in mortality rates, lapse rates and interest rates, and increases in morbidity rates, which confirmed that original LTC pricing assumptions had vastly understated the risks to LTC insurers (*see* ¶¶ 162-77);

- Other LTC insurers, including those with less-risky portfolios and those who had ceded portions of their LTC risk to GE, had recorded billions of dollars in reserve charges due to increased risks and inaccurate pricing assumptions (*see* ¶¶ 178-86); and

- As a result of the foregoing, GE's LTC exposures posed substantial, undisclosed financial risk to the Company.

231. ***Second***, the below facts establish that the foregoing trends, demands, commitments, events, and uncertainties were reasonably likely to occur and reasonably likely to have a material impact on GE's financial condition and/or results of operations:

- GE was extensively exposed to LTC risk, holding a ***massive portfolio of over 300,000 LTC policies***, or more than 4% of the entire LTC market (*see* ¶¶ 81, 149-56);

- The LTC portfolio was GE's largest insurance exposure during the Class Period, comprising approximately 60% of its insurance liabilities (*see* ¶¶ 119, 155, 172);

- GE's LTC blocks were among the riskiest in the entire LTC industry, and contained features such as lifetime benefits, joint lives coverage, and inflation protection that

made them riskier than other insurers' portfolios and uniquely exposed to the deteriorating LTC industry (*see* ¶¶ 116-22);

- GE purportedly insured "younger books of business" than its peers, meaning that GE was not immune from the LTC reserve hits that its peers were forced to take years before, as GE's policies were fast approaching their "prime claim-paying" age (*see* ¶ 160);

- Even though GE's policyholders had not yet reached their "prime claim-paying" age, GE had already witnessed significantly negative claims experience in its LTC blocks, as reflected by actual-to-expected ratios that exceeded 100% and experience-to-reported policy reserve ratios well above 100%, which indicated that GE's actual claims experience was inconsistent with (and much more negative than) the assumptions being used to calculate its reserves (*see* ¶¶ 135-48);

- Notwithstanding the above, GE continued to calculate its GAAP reserves using the original "locked" assumptions, which were outdated and inconsistent with GE's negative actual claims experience and industry-wide LTC claims experience, and were inconsistent with the assumptions that other insurers were using to calculate their reserves (*see* ¶¶ 135-48, 157-61, 193-212);

- There was widespread acknowledgement within the LTC industry that the assumed mortality, morbidity, and lapse rates that were used to price LTC policies were inconsistent with actual experience and led to the understatement of LTC risks (*see* ¶¶ 162-77);

- GE itself acknowledged that virtually "the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected" (*see* ¶ 489); and

- Other holders of LTC policies that were less risky than GE's portfolio—like Genworth, which held the best LTC policies reinsured by GE—were forced to record billions of dollars in reserve adjustments and related GAAP charges (*see* ¶¶ 178-86).

232.     Based upon the foregoing allegations, Defendants violated Item 303 by failing to disclose in GE's 10-Ks for fiscal years 2012 through 2016: (i) the negative trends, demands, commitments, and uncertainties set forth in ¶ 228; and (ii) their expected impact on GE's financial condition, liquidity and results of operations.

233.     For the same reasons, Defendants' failure to disclose the information set forth in ¶ 228 in GE's 10-Qs filed during the Class Period rendered those filings materially false or misleading.

234.    In addition, GE's 10-Qs filed during the following quarters contained affirmative disclosures titled "Significant Trends & Developments": 1Q15, 2Q15, 3Q15, 1Q16, 2Q16, 1Q17, 2Q17, and 3Q17. Despite speaking affirmatively on the topic of "Significant Trends & Developments," GE's 10-Qs for the following quarters contained **no** disclosure concerning GE's LTC exposure: 1Q15, 2Q15, 3Q15, 1Q16, 2Q16, and 1Q17. GE's failure to disclose the material facts set forth in ¶ 228 rendered GE's disclosures materially false or misleading for the reasons set forth in ¶¶ 230-31.

235.    GE's "Significant Trends & Developments" in its 2Q17 10-Q contained the following statements regarding its LTC insurance exposure:

> We test future policy benefit reserves associated with our run-off insurance activities for premium deficiencies annually. We have recently experienced elevated claim experience for a portion of our long-term care insurance products, which may result in a deficiency in reserves plus future premiums compared to future benefit payments. Should such a deficiency exist, we would record a charge to earnings in the second half of 2017 upon completion of this review. See Note 11 of the consolidated financial statements for further information.

236.    Despite affirmatively speaking on the topic of significant trends and developments regarding GE's LTC exposures, the 2Q17 10-Q failed to disclose all of the material trends identified in ¶ 228 above. GE's failure to make these disclosures rendered the 2Q17 10-Q materially false or misleading for the reasons set forth in ¶¶ 230-31.

237.    GE's "Significant Trends & Developments" in its 3Q17 10-Q contained the following statements regarding its LTC insurance exposure:

> Our run-off insurance activities include future policy benefit reserves of $ 19.2 billion and claim reserves of $4.9 billion at September 30, 2017 of which approximately $9.0 billion and $3.4 billion, respectively, relates to long-term care insurance contracts. We test future policy benefit reserves associated with our run-off insurance activities for premium deficiencies annually. We have recently experienced elevated claim experience for a portion of our long-term care insurance contracts that requires the completion of a comprehensive review of premium deficiency assumptions across all insurance products. This review will be completed in the fourth quarter of 2017. Based upon the work performed to date

and complexity of the review as further described within our Critical Accounting Estimates and Note 11 to the consolidated financial statements, a charge related to a probable deficiency is not reasonably estimable at September 30, 2017. Until the above described review has been completed we have deferred the decision whether GE Capital will pay additional dividends to GE.

238.    Despite affirmatively speaking on the topic of significant trends and developments regarding GE's LTC exposures, the 3Q17 10-Q failed to disclose all of the material trends identified in ¶ 228 above. GE's failure to make these disclosures rendered the 3Q17 10-Q materially false or misleading for the reasons set forth in ¶¶ 230-31.

> **c.**     **Defendants Failed to Disclose Material LTC-Related Contractual Obligations and Risks In Violation of Item 303(a)(5)**

239.    Item 303(a)(5) required Defendants to include in GE's Class Period 10-Ks a tabular breakdown of ***all*** of its known contractual obligations, including all of its contractual obligations related to its LTC insurance policies. In particular, Item 303(a)(5) states:

> In a tabular format, provide the information specified in this paragraph (a)(5) as of the latest fiscal year end balance sheet date with respect to the registrant's known contractual obligations specified in the table that follows this paragraph (a)(5)(i). The registrant shall provide amounts, aggregated by type of contractual obligation. The registrant may disaggregate the specified categories of contractual obligations using other categories suitable to its business, ***but the presentation must include all of the obligations of the registrant that fall within the specified categories***. A presentation covering at least the periods specified shall be included. The tabular presentation may be accompanied by footnotes to describe provisions that create, increase or accelerate obligations, or other pertinent data to the extent necessary for an understanding of the timing and amount of the registrant's specified contractual obligations.

240.    The SEC has since underscored the point. In the 2003 Rule, the Commission stated that while "the amendments allow a registrant to disaggregate the specified categories by using other categories suitable to its business, [] ***the table must include all of the obligations that fall within specified categories***."

241.     It reaffirmed this position in 2016, stating in SEC Release No. 33-10064 (the "2016 Release") that "[r]egistrants may disaggregate the categories specified in the item and use other categories suitable to their businesses, *so long as the presentation includes all of the registrant's obligations that fall within the specified categories*."

242.     With respect to companies' disclosure obligations under Item 303(a)(5), the SEC's Financial Reporting Manual specifically states that if any contractual obligations are excluded from the table, the "accompanying footnotes should describe the nature of items excluded and why they are excluded."

243.     In addition, where a contractual obligations disclosure is linked to a financial statement disclosure, the SEC advised companies in Release No. 33-9144, dated September 17, 2010 (the "2010 Release") to provide sufficient information to allow investors to "tie" the information in the contractual obligations disclosure to the financial statement disclosure.

244.     GE has long recognized that its insurance business falls within this broad disclosure mandate. Accordingly, the Company includes an "Insurance liabilities" line item in the "Contractual Obligations" table of its 10-Ks' MD&A section. Both before the Class Period began and then again after it ended, this entry disclosed GE's total expected payments on future claims from its entire insurance business, *including its LTC portfolio*, which plainly involved contractual obligations to LTC policyholders.

245.     Notwithstanding the plain language of Item 303(a)(5) and the SEC's statements in the 2003 Rule and the 2016 Release, GE changed its disclosure practices with the filing of its 2012 10-K to exclude LTC contractual obligations from its MD&A table, and continued this practice in each of its Class Period 10-Ks. As a result, the 10-Ks that GE filed during the Class Period (for fiscal years 2013 through 2016) violated Item 303(a)(5) by: (i) failing to include GE's LTC

insurance liabilities within the MD&A Contractual Obligations table; and (ii) failing to explain "the nature of the [LTC] items excluded and why they [we]re excluded."

246.    For example, in the 2012 10-K filed on February 26, 2013, a footnote to the "Insurance liabilities" line item ("footnote (c)") stated that GE *excluded* liabilities stemming from its LTC, variable annuity, and "other" life insurance portfolios from this line item. As set forth below, GE's removal of these three insurance blocks had the effect of reducing the GE's "Insurance liabilities" entry from $23.7 billion at the beginning of 2012 (as GE reported in its 2011 10-K) to $14.0 billion at the beginning of 2013—a reduction of nearly 41%:

*Contractual Obligations*

As defined by reporting regulations, our contractual obligations for future payments as of December 31, 2012, follow.

| (In billions) | Total | 2013 | 2014–2015 | 2016–2017 | 2018 and thereafter |
|---|---|---|---|---|---|
| Borrowings and bank deposits (Note 10) | $414.1 | $139.2 | $103.2 | $60.9 | $110.8 |
| Interest on borrowings and bank deposits | 92.8 | 9.7 | 14.2 | 10.1 | 58.8 |
| Purchase obligations (a)(b) | 65.8 | 33.8 | 13.5 | 5.8 | 12.7 |
| Insurance liabilities (Note 11)(c) | 14.0 | 1.6 | 2.9 | 2.0 | 7.5 |
| Operating lease obligations (Note 19) | 4.1 | 0.9 | 1.3 | 0.9 | 1.0 |
| Other liabilities (d) | 83.7 | 19.3 | 10.0 | 8.3 | 46.1 |
| Contractual obligations of discontinued operations (e) | 1.9 | 1.9 | — | — | — |

(a) Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, contractual commitments related to factoring agreements, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b) Excluded funding commitments entered into in the ordinary course of business by our financial services businesses. Further information on these commitments and other guarantees is provided in Note 25.

(c) Included contracts with reasonably determinable cash flows such as structured settlements, guaranteed investment contracts, and certain property and casualty contracts, and excluded long-term care, variable annuity and other life insurance contracts.

(d) Included an estimate of future expected funding requirements related to our pension and postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: deferred taxes, derivatives, deferred revenue and other sundry items. For further information on certain of these items, see Notes 14 and 22.

(e) Included payments for other liabilities.

247.    Rather than explaining "the nature of items excluded and why they are excluded," as required by the SEC, GE disclosed only that the insurance liabilities line item "[i]ncluded contracts with reasonably determinable cash flows" and "excluded long-term care, variable annuity and other life insurance contracts."

248.    GE maintained this disclosure practice during the Class Period. In particular, GE's 10-Ks for fiscal years 2013 through 2016 excluded LTC contractual obligations from the "Insurance liabilities" line item of the MD&A table and stated in a footnote that the "Insurance

liabilities" line item "[i]ncluded contracts with reasonably determinable cash flows" and "excluded long-term care, variable annuity and other life insurance contracts." Defendants' Contractual Obligations disclosures in GE's 10-Ks for fiscal years 2013 through 2016 violated Item 303(a)(5) by omitting GE's LTC contractual obligations and failing to provide investors with any substantive information concerning the extent of GE's LTC contractual obligations, the high-risk nature of those obligations, or the fact that those risks were significantly increasing.

249.    If LTC policies, variable annuities, and life insurance had been removed because they no longer exhibited "reasonably determinable cash flows," Defendants violated Item 303 by failing to explain why that had changed from the years pre-dating the start of the Class Period, when LTC contractual obligations *were* included in the MD&A table. Defendants did not disclose—in the footnotes to the MD&A table or anywhere else in GE's Class Period 10-Ks—the material facts, trends or events that suddenly caused those contractual obligations to no longer be reasonably determinable.

250.    Defendants' removal of GE's LTC contractual obligations from the MD&A table in GE's 10-Ks for fiscal years 2013 through 2016, and its failure to otherwise disclose material facts concerning the nature and extent of GE's LTC obligations or the reasons why such obligations were being excluded, constitute a violation of Item 303(a)(5).

### 2.    GE's Financial Statements Misleadingly Obscured and Concealed Its LTC Liabilities

251.    GE did not separately disclose its LTC-related liabilities in its 10-Ks for fiscal years 2013 through 2016, or in its 10-Qs filed during the Class Period. Instead, GE's insurance liabilities appeared in a balance sheet line item titled "Investment Contracts, Insurance Liabilities and Insurance Annuity Benefits," which was broken out in Note 11 of GE's 10-Ks to include a line item called "Life insurance benefits."

252.     Though not defined as such during the Class Period, GE's post-Class Period SEC filings indicate that its "Life insurance benefits" figures reflected the aggregated amount of GE's ALR liabilities relating to **all** of its insurance policies, which included LTC insurance policies **as well as other obligations**. Similarly, as investors would learn at the end of the Class Period, GE also included billions of dollars in LTC DLR liabilities within the non-descript "Other" line item. As with the "Life insurance benefits" figure, GE's Class Period filings did not disclose how much of the obligations in "Other" related to LTC insurance.

253.     In truth, and as investors would not learn until the end of the Class Period, a majority of these liabilities related to LTC insurance. For example, GE disclosed in its 2017 10-K that its "Life insurance benefits" line item actually consisted of: (i) LTC reserves (41% and 54% of the totals in 2016 and 2017, respectively); (ii) reserves for "[s]tructured settlement annuities with life contingencies and other contracts" (49% and 31% of the totals in 2016 and 2017, respectively); and (iii) "[s]hadow adjustments," which reflect "unrealized gains on specific investment securities" that would result in a premium deficiency if realized (10% and 15% of the totals in 2016 and 2017, respectively). GE did not disclose **any** ALR liabilities related to traditional life insurance policies. Similarly, GE disclosed that over 63% of the "Other" line item in its 2016 10-K consisted of LTC DLR liabilities. Additionally, as GE later revealed, LTC made up 60% of its total insurance liabilities.

254.     As described herein, LTC insurance presented significant and unique risks to insurers that other forms of insurance, like traditional life insurance, did not. Defendants' practice of burying GE's LTC reserves within line items titled "Life insurance benefits," which included virtually **no** life insurance policies, was materially misleading because it obscured and concealed the significant amount of LTC risks to which GE was exposed, and misleadingly indicated to

investors that those exposures represented "life insurance" liabilities. For the same reasons, given that over 60% of GE's "Other" line item actually consisted of LTC DLR liabilities, and given the specific known, unique risks associated with GE's LTC insurance exposures, it was materially misleading for GE to refer to its LTC DLR liabilities as "Other" throughout the Class Period.

255.    Indeed, FE-2 confirmed that GE's inclusion of LTC reserves in an entry titled "Life insurance benefits" was not a truthful statement since the characteristics and risks associated with LTC (a type of health insurance with periodic incurred benefit payments structure) are separate and distinct from those of pure life insurance (pure mortality products often paying a single face amount) and of annuities (pure survival products). Such a statement misleads investors by failing to communicate accurate characteristics of the risks associated with GE's LTC portfolio, a particularly important disclosure in light of the negative conditions within the LTC insurance marketplace during the Class Period.

256.    Moreover, GE's inclusion of LTC reserves within the "Life insurance benefits" line item is *inconsistent* with how its reinsurance subsidiaries reported that risk to the Kansas Insurance Department. Indeed, throughout the Class Period, GE's annual statements to the Kansas Insurance Department described LTC reserves as "reserve for *accident and health* contracts," a separate line item from "reserve for life contracts."

257.    In light of the above, GE's failure to disclose its LTC liabilities in its 10-Ks for fiscal years 2013 through 2016 or in its 10-Qs filed throughout the Class Period, and its inclusion of LTC liabilities within the "Life insurance benefits" and "Other" line items in Note 11 of its 10-Ks for fiscal years 2013 through 2016, rendered those SEC filings materially misleading. These allegations are further corroborated by expert analyses conducted by Plaintiffs' accounting expert, Dr. Weil, which are set forth in ¶¶ 284-95.

### 3. Defendants Misrepresented the Nature and Extent of GE's LTC Risks During the Class Period

258.    During the Class Period, Defendants continued to spin the false narrative that GE Capital had been "de-risked" and that its remaining insurance exposures were stable and being run-off in an orderly fashion. Defendants' statements about "de-risking" GE Capital omitted material facts concerning the Company's toxic LTC portfolios, the negative claims experience that was occurring in those portfolios, or the crippling risk of future LTC-related capital contributions and/or earnings charges.

259.    *First*, in a presentation to investors during its December 16, 2014 guidance update call, Defendants stated that GE had executed on its "risk reduction" plan to "sell insurance *'before the storm,'*" thereby indicating to investors that GE's LTC exposures had been reduced. During the accompanying call, Immelt assured investors, "we exited insurance *in time*."

260.    These statements were demonstrably false because, in fact, GE had not exited the LTC industry "in time" and certainly had not avoided "the storm." Indeed, GE's most significant risks facing its massive LTC portfolio lay ahead and were certain to occur, given the lifetime benefits, joint lives coverage, and inflation protection GE offered on a much "younger" book of insureds compared to its peers, many of whom had already suffered massive losses as a result of the same stale and grossly inaccurate assumptions GE continued to use. Further, GE's own LTC experience continued to deteriorate as actual claims experience significantly outpaced expectations. Additionally, despite this adverse claims experience, GE continued to use its original, "locked" pricing assumptions to calculate its GAAP reserves, which severely understated the magnitude of its LTC exposure and the risks it posed to the Company's financial condition, including the heightened the risk of a significant reserve charge. Thus, Defendants' statements were misleading because they failed to disclose to investors the significant LTC risks to which GE

remained exposed, and led investors to believe that any remaining insurance-related risks were immaterial to the Company when nothing could have been further from the truth.

261.   **Second**, during the June 1, 2016 Sanford C. Bernstein Strategic Decisions Conference, Sherin boasted that "[i]f you look at what the portfolio is today versus take it when Jeff [Immelt] started, all of the insurance business is gone. That was a huge change in the portfolio. . . . ***It's a cleaner more synergistic portfolio. So we feel great about it.***"

262.   This statement was materially false or misleading when made. Once again, despite speaking directly about GE's insurance portfolio, 60% of which was LTC, Defendants failed to advise the market of the tremendous risk still present in that portfolio and had no reasonable basis to claim they "fe[lt] great about it" or that it was "cleaner" when, in truth, the portfolio was awash in undisclosed LTC risks.

263.   **Third**, on July 22, 2016, Defendants Immelt and Bornstein spoke directly on the topic of GE's LTC exposure, following up their announcement that the "vertical businesses earned $452 million this quarter down 15% from prior year including higher base earnings offset by lower gains and higher insurance reserve provisions resulting from updates to our models on our runoff long-term care book," by assuring investors that GE's LTC "***[p]ortfolio quality remains stable***."

264.   Thereafter, on August 1, 2016, GE's quarterly report for the three months ended June 30, 2016 (the "2Q16 10-Q") stated, "[w]ithin [GE] Capital, Verticals net earnings decreased by $0.1 billion due to higher insurance reserve provisions ($0.1 billion) and lower gains, partially offset by core increases."

265.   The statements in ¶¶ 259, 261, 263-64 were materially false or misleading because they suggested that raising GE's reserves by a mere $100 million was sufficient to cover GE's LTC insurance liabilities. Far from being stable, GE had evidence that its actual LTC claims

experience was far worse than expected. Moreover, GE retained the worst of the worst blocks following the Genworth IPO and Swiss Re sale, offering lifetime benefits, joint lives coverage, and inflation protection on a much younger book of insureds compared to its peers, many of whom had already suffered massive losses as a result of the same stale and grossly inaccurate assumptions GE continued to use. Even Genworth, who acquired the best LTC policies written by GE, had been forced to record billions of dollars in reserve adjustments and related GAAP charges (*see* ¶¶ 181, 184), indicating that GE would suffer a similar fate. Indeed, GE's actual LTC claims experience continued to deteriorate as actual claims experience significantly outpaced GE's expectations, requiring additional reserves, and required GE Capital to make billions of dollars in capital contributions to ERAC and UFLIC, and thus its "portfolio quality" was not "stable." Additionally, despite this adverse claims experience, GE continued to use its original, "locked" pricing assumptions to calculate its GAAP reserves, which severely understated the magnitude of its LTC exposure and the risks it posed to the Company's financial condition, including the heightened the risk of a significant reserve charge.

266.   Moreover, given the multi-billion dollar reserve increases that other LTC insurers like Genworth had taken during this period (*see* ¶¶ 178-86), GE's reserve increase of just $100 million misleadingly signaled to investors that its remaining LTC exposure was small, was being monitored vigilantly, and posed no material future risk to the Company. Indeed, following GE's disclosure of the $100 million reserve increase, analysts at RBC reaffirmed their belief that "GE Capital's balance sheet and risk profile have been ***dramatically reduced*** over the past year as the company completed sales and spins of +80% of its finance businesses."

267.   ***Fourth***, when analysts later questioned management about the Company's run-off insurance exposure following its announcement of a $100 million reserve increase, Defendants

misled investors about the risks that the portfolio carried. In particular, during the February 22, 2017 Barclays Industrial Select Conference, Bornstein was asked if GE would consider "sell[ing] the liability in that insurance; kind of write a check and get rid of it?" In response, rather than disclosing the massive risk that the portfolio posed to GE—much of it emanating from the LTC reinsurance business about which Defendants remained silent throughout the Class Period— Bornstein falsely claimed that the "low interest rate environment" was the primary impediment to selling its remaining insurance liabilities: "I think interest rates are a fundamental challenge and (inaudible) long-term liabilities in a low interest rate environment is a challenge." Laxer, CEO of GE Capital, made similarly misleading claims during the Company's March 13, 2017 J.P. Morgan Aviation, Transportation & Industrials Conference, telling J.P. Morgan analyst Stephen Tusa ("Tusa") that it would not be "attractive" for GE to sell its run-off insurance portfolio "given the interest rate environment we are in right now."

268.    The statements set forth in ¶ 267 were materially false or misleading when made. As described in detail above, at the time these statements were made, GE was witnessing significantly negative claims experience in its LTC blocks, which—as the Company would reveal just months later—had burned a **$9 billion** hole in GE's balance sheet and required **$15 billion** in capital contributions to ERAC and UFLIC. These realities—not interest rates—are what prevented GE from offloading its LTC exposures.

### E.    Investors Could Not Have Determined GE's LTC Liabilities and Risks by Reviewing the Company's SEC Filings

#### 1.    GE Did Not Quantify Its LTC Liabilities in Its SEC Filings

269.    During the Class Period, Defendants did not disclose to investors the extent of GE's LTC liabilities and risks. Indeed, Defendants' SEC filings provided investors with *no quantitative disclosures or qualitative discussion of GE's LTC liabilities and risks*. Instead, their public

statements to investors obscured and misleadingly minimized the nature and extent of those risks. Defendants' misstatements and omissions deprived the market of a clear view of GE's LTC-related liabilities and risk.

270.    As described above, Defendants' misstatements and omissions rendered GE's SEC filings materially false or misleading because investors had no way of uncovering the true extent of GE's LTC liabilities—let alone the true risks that portfolio posed to GE's financial condition— from its SEC filings.

271.    In fact, GE's 10-Ks referred to LTC just **twice**, and as described above, GE altered its disclosure practices during the Class Period to **remove** LTC contractual obligations from their MD&A risk disclosures. In contrast, other companies with exposure to LTC insurance provided their investors with copious disclosures concerning the nature and extent of the LTC risks they faced. For example, Unum's 2012 10-K contained extensive discussion of that insurer's LTC portfolio, including **116** references to the issue, while Genworth discussed its LTC obligations **178** times in its 2012 10-K.

### 2.    Investors Could Not Have Quantified GE's LTC Liabilities and Risks by Comparing GE's MD&A Table to Its Note 11 Disclosures

272.    GE's insurance liabilities disclosure in the MD&A table referred investors to "Note 11" to GE's financial statements (which appeared 40 pages later in the 10-K), but investors could not have determined the extent of GE's LTC risk from Note 11. For one thing, Note 11 **did not contain any reference to LTC insurance**. As shown in the below excerpt from the 2012 10-K, Note 11 did not provide investors with any indication as to where LTC insurance liabilities could be found within the various line items, nor did it disclose the precise amount of LTC liabilities, if any, that were included within those line items:

## Note 11.

### Investment Contracts, Insurance Liabilities and Insurance Annuity Benefits

Investment contracts, insurance liabilities and insurance annuity benefits comprise mainly obligations to annuitants and policyholders in our run-off insurance operations and holders of guaranteed investment contracts.

| December 31 (In millions) | 2012 | 2011 |
|---|---|---|
| Investment contracts | $ 3,321 | $ 3,493 |
| Guaranteed investment contracts | 1,644 | 4,226 |
| Total investment contracts | 4,965 | 7,719 |
| Life insurance benefits[a] | 20,427 | 19,257 |
| Other[b] | 3,304 | 3,222 |
| | 28,696 | 30,198 |
| ELIMINATIONS | (428) | (424) |
| Total | $28,268 | $29,774 |

(a) Life insurance benefits are accounted for mainly by a net-level-premium method using estimated yields generally ranging from 3.0% to 8.5% in both 2012 and 2011.

(b) Substantially all unpaid claims and claims adjustment expenses and unearned premiums.

273.     Moreover, for several reasons discussed below, investors could not have reliably determined (or even approximated) the extent of GE's LTC risks by comparing the figures in Note 11 to the figures in the MD&A table.

274.     ***First***, a reasonable investor could not simply subtract the "Insurance liabilities" line item in the MD&A table from the figures in Note 11 to estimate GE's LTC exposure. This is because, as Defendants themselves have acknowledged in Court filings, the "Insurance liabilities" figures that appeared in the MD&A table and Note 11 figures were "prepared differently" during the Class Period and thus are "not necessarily comparable." Memorandum of Law in Support of Defendants' Motion to Dismiss the Third Amended Complaint at 16 (ECF No. 174). Indeed, prior to and throughout the Class Period, ***there was no discernable arithmetic relationship*** between the "Insurance liabilities" figures disclosed in the MD&A table and the figures disclosed in Note 11, and Defendants failed to provide investors with any information that they could use to tie the MD&A disclosures to Note 11.

275.     To be sure, in the years prior to the start of the Class Period, the "Insurance liabilities" entry of GE's MD&A table included ***all*** of GE's run-off insurance liabilities—including

87

the LTC, variable annuity, and "other" life insurance blocks that GE began excluding when it filed its 2012 10-K. Yet, as reflected in the below excerpts from GE's 2011 10-K, even during these pre-Class Period years, GE's disclosed "Insurance liabilities" in the 10-K MD&A tables *did not match* (or even approximate) any of the figures disclosed in Note 11:

### Contractual Obligations

As defined by reporting regulations, our contractual obligations for future payments as of December 31, 2011, follow.

| (In billions) | Total | Payments due by period | | | |
|---|---|---|---|---|---|
| | | 2012 | 2013–2014 | 2015–2016 | 2017 and thereafter |
| Borrowings and bank deposits (Note 10) | $453.4 | $173.8 | $104.5 | $52.6 | $122.5 |
| Interest on borrowings and bank deposits | 116.1 | 12.2 | 17.5 | 12.8 | 73.6 |
| Purchase obligations[a][b] | 57.3 | 32.5 | 15.1 | 4.7 | 5.0 |
| Insurance liabilities (Note 11)[c] | 23.7 | 2.9 | 3.6 | 2.5 | 14.7 |
| Operating lease obligations (Note 19) | 4.5 | 1.0 | 1.4 | 0.9 | 1.2 |
| Other liabilities[d] | 73.6 | 23.5 | 12.5 | 8.0 | 29.6 |
| Contractual obligations of discontinued operations[e] | 1.4 | 1.4 | — | — | — |

(a) Included all take-or-pay arrangements, capital expenditures, contractual commitments to purchase equipment that will be leased to others, contractual commitments related to factoring agreements, software acquisition/license commitments, contractual minimum programming commitments and any contractually required cash payments for acquisitions.

(b) Excluded funding commitments entered into in the ordinary course of business by our financial services businesses. Further information on these commitments and other guarantees is provided in Note 25.

(c) Included contracts with reasonably determinable cash flows such as structured settlements, certain property and casualty contracts, and guaranteed investment contracts.

(d) Included an estimate of future expected funding requirements related to our pension and postretirement benefit plans and included liabilities for unrecognized tax benefits. Because their future cash outflows are uncertain, the following non-current liabilities are excluded from the table above: deferred taxes, derivatives, deferred revenue and other sundry items. For further information on certain of these items, see Notes 14 and 22.

(e) Included payments for other liabilities.

## Note 11.

### GECS Investment Contracts, Insurance Liabilities and Insurance Annuity Benefits

GECS investment contracts, insurance liabilities and insurance annuity benefits comprise mainly obligations to annuitants and policyholders in our run-off insurance operations and holders of guaranteed investment contracts.

| December 31 (In millions) | 2011 | 2010 |
|---|---|---|
| Investment contracts | $ 3,493 | $ 3,726 |
| Guaranteed investment contracts | 4,226 | 5,502 |
| Total investment contracts | 7,719 | 9,228 |
| Life insurance benefits[a] | 19,257 | 17,640 |
| Unpaid claims and claims adjustment expenses | 2,597 | 2,437 |
| Unearned premiums | 370 | 426 |
| Universal life benefits | 255 | 262 |
| Total | $30,198 | $29,993 |

(a) Life insurance benefits are accounted for mainly by a net-level-premium method using estimated yields generally ranging from 3.0% to 8.5% in both 2011 and 2010.

276.     Similar disparities existed throughout the pre-Class Period years, as shown below. Even when all of GE's run-off insurance liabilities were included in Note 11 **and** the MD&A table, there was **no arithmetic relationship** between the two disclosures:



277.     Thus, when GE began excluding LTC and other insurance blocks from the MD&A table during the Class Period, investors had no reason to think that they could determine (or even approximate) the value of those excluded liabilities by comparing the data contained in the MD&A table to Note 11. More specifically, investors had no reason to believe—because GE had given them no reason to believe—that they could subtract the "Insurance liabilities" line item in the MD&A table from the figures in Note 11 and arrive at GE's excluded insurance liabilities.

278.     **Second**, even if the difference between "Insurance liabilities" and the Note 11 disclosures had some significance, reasonable investors could not have used those disclosures to approximate GE's LTC liabilities. This is because the MD&A table excluded **three** categories of insurance obligations (LTC, variable annuities, and "other" life insurance policies), and GE's disclosures provided investors with **no way of determining what portion of that difference was attributable** to each, creating enormous uncertainty.

279.   In GE's 2015 10-K, for example, the difference between GE's "Insurance liabilities" and its "Life insurance benefits" was nearly $8.5 billion. If 10% of that difference was composed of LTC policies, GE's LTC liabilities would stand at a modest $850 million; if 95%, it would soar above $8 billion. GE's disclosure failures prevented investors from determining the size of GE's LTC-specific liability, which was of critical importance to investors given that profile of LTC insurance differed markedly from annuities and life insurance in ways that influence investors' informed decisions.

280.   Moreover, by combining GE's LTC-specific portfolio with two other excluded insurance products, Defendants prevented investors from observing changes in the LTC exposure over time. Consequently, investors could not tell whether GE's LTC-related liabilities were increasing, decreasing, or remaining constant from year to year.

281.   *Third*, even if investors had somehow been able to accurately deduce the size of GE's LTC liabilities from the figures disclosed in Note 11 and the MD&A table, the resulting figure *still* would not have accurately reflected GE's actual LTC-related *risk exposure* during the Class Period. That is because, as described above, GE's LTC liabilities *significantly understated* GE's true LTC risks because they were calculated using decades-old assumptions, locked-in by GAAP, that Defendants knew were inconsistent with prevailing industry assumptions and experience and GE's own LTC claims experience data and severely understated the risk that GE's LTC portfolio posed to the Company's financial condition throughout the Class Period. As a result, even if investors could have precisely quantified GE's LTC liabilities from its Class Period 10-Ks, they still would not have appreciated the risk that these insurance policies posed to GE's financial condition.

282.    Defendants' own disclosures indicate that ***Defendants knew*** GE's GAAP LTC liabilities did not reflect its LTC risks during the Class Period. Defendants claim to have excluded LTC contractual obligations from the MD&A tables contained in each of its 10-Ks for fiscal years 2012 through 2016 because those obligations were no longer "reasonably determinable." But during each of those years, GE calculated—and included within the "Investment contracts, insurance liabilities and insurance annuity benefits" line item on its balance sheet—LTC-related insurance liabilities (in the form of ALR reserves) that purportedly had been calculated under GAAP. GE necessarily must have determined that those liabilities ***did not*** reasonably approximate its expected LTC contractual obligations, or else it would have included that GAAP figure within the MD&A table (as it did at the end of the Class Period after it recorded a $9 billion reserve charge). GE's decision not to include those LTC liabilities—which had been calculated under GAAP using decades old assumptions that were ***inconsistent*** with its actual claims experience— in its MD&A table's risk disclosures is thus ***an acknowledgement*** that those GAAP LTC liabilities ***did not*** reasonably approximate GE's LTC risks. This concession not only confirms that GE withheld material information from investors' view, it establishes that ***they did so with scienter***.

283.    In sum, GE's misstatements and omissions prevented investors from drawing any meaningful conclusions regarding the extent of LTC risks facing the Company. In fact, as alleged above and as confirmed by after-the-fact attempts to reconstruct those risks, any conclusions that investors attempted to draw from GE's Class Period disclosures would have led them to ***significantly underestimate*** GE's true exposure to LTC risks.

**3.    Plaintiffs' Accounting Expert Confirms that GE's LTC Liabilities and Risks Were Not Quantified in the Company's SEC Filings**

284.    Dr. Weil, Plaintiffs' accounting expert consultant, confirmed that investors could not discern the size of GE's LTC liabilities nor the extent of associated risk through even the closest review of GE's SEC filings.

285.    Dr. Weil analyzed each of GE's 10-Ks for fiscal years 2012 through 2016, including GE's financial statements, the notes to GE's financial statements (including Note 11) and the MD&A Contractual Obligations table. Based on Dr. Weil's review of these documents, he has concluded that no reader of GE's financial statements, no matter how diligent or sophisticated, could have discerned the extent of GE's LTC risks. Dr. Weil notes that while the MD&A Contractual Obligations table includes a line item called "Insurance liabilities," it specifically "exclude[s] long-term care" from that line item along with "variable annuities and other life insurance policies," and although it directs the reader to Note 11, it provides no explanation as to how the figures in Note 11 relate, if at all, to the insurance liabilities line item in the MD&A Contractual Obligations table.

286.    Further, as discussed in detail below, Dr. Weil has stated that a reader of GE's financial statements would not reasonably conclude that "Life insurance benefits" includes liabilities for LTC because LTC benefits are not "Life insurance benefits." Yet, according to Dr. Weil, even if a reader believed that "Life insurance benefits" included LTC liabilities, the reader could not assume that the difference between the "Insurance liabilities" in the MD&A Contractual Obligations table and the "Life insurance benefits" in Note 11 equaled the total amount of GE's LTC liabilities.

287.    Dr. Weil stated that it was important for GE to disclose its LTC liabilities, either within Note 11 or elsewhere in its financial disclosures, separately from "variable annuities and

'other' life insurance policies," or any other grouped insurance products or liabilities. This is because the risks of insuring LTC benefits are higher than the risks of insuring life insurance benefits. While both types of insurance require the insurer to estimate liabilities based on assumptions regarding expected investment yields, mortality, morbidity, insurance terminations, and expenses (including the impact of inflation on expenses), insurers apply these assumptions differently with respect to life insurance and LTC insurance because the pattern of benefits and terminations for life insurance differs from that for LTC insurance.

288.    According to Dr. Weil, the costs of life insurance benefits depend primarily on the death benefit amount, the time of the policyholder's death, and insurance terminations. By contrast, the costs of LTC insurance benefits depend on the time of the policyholder's death, insurance terminations, and several additional variables, including whether and when the insured requires LTC, the length of time LTC is required, the benefit amount (which can vary and can be subject to a maximum daily or monthly amount and a maximum lifetime amount), and the elimination period (the length of time between when LTC begins and when benefit payments begin).

289.    For instance, according to Dr. Weil, life insurance benefits are typically paid after a single event (the policyholder's death), whereas LTC insurance benefits are often as a result of a less predictable series of events that can last for years. The insured may require LTC but recover and no longer need LTC, only to need it again later and make another claim—an issue that does not arise in life insurance. Moreover, LTC claim terminations do not follow any established mortality table. Mortality rates for LTC insureds tend to be high in the months immediately following a claim, after which the rates decline before increasing again as the insureds age.[6]

---

[6] SOA Experience Study Calculations, October 2016 (revised November 2016), at 91.

290.    In addition, life insurance benefits are typically contractually fixed as set amounts, whereas LTC insurance benefits are typically structured as periodic payments, which vary.

291.    For these reasons, Dr. Weil has opined that the pattern of LTC insurance benefits—and their corresponding cost to the insurer (or reinsurer)—differs significantly from the pattern of life insurance benefits. As a result, cost estimates for LTC insurance benefits have a wider range than for life insurance benefits, although they often have a monthly cap.

292.    This, according to Dr. Weil, is compounded by the greater uncertainty of LTC insurance costs, relative to life insurance costs, arising from the unexpected increase in LTC benefit costs seen in recent years. Genworth has published data showing that "long term care costs for nursing homes, assisted living facilities, and in-home care are higher than most people have planned for and only continue to rise." For example, annual median costs for private room nursing homes have risen nearly 54% from 2004 to 2018 as shown below:



293.    Moreover, annual median costs for assisted living facilities have risen nearly 67% over that same period, as shown in the following table:



294.    Rising healthcare costs also cause LTC insureds to delay discretionary insurance terminations and make additional claims, further increasing insurance costs for LTC insurance companies. The possibility that actual costs will exceed estimated costs creates downside risk for the insurer, and these risks are greater for LTC insurance companies than for life insurance companies.

295.    Dr. Weil's analyses and opinions set forth above thus corroborate Plaintiffs' foregoing allegations, including that GE's description of its LTC insurance liabilities as "Life insurance benefits" falsely and misleadingly presented those liabilities as less risky than they were.

**F.    The Truth Is Revealed**

    **1.    Defendants Slowly Reveal GE's True LTC Risks to Investors**

296.    Despite Defendants' awareness throughout the Class Period that GE's reinsured LTC blocks were deteriorating sharply and the risks associated with those positions were correspondingly skyrocketing, they only began to reveal those risks to investors in July 2017, and it was not until January 2018 that investors fully appreciated, for the first time, GE's LTC risks.

297.    On July 21, 2017—just one fiscal quarter after Bornstein and Laxer falsely represented to investors that low interest rates were the primary reason why the Company was

retaining its run-off insurance business—GE announced that, in truth, it was suffering from "*adverse claims experience in a portion of our long-term care portfolio*," and that this negative LTC claims experience was severe enough to require the Company to reassess the adequacy of its insurance reserves. However, given that the market had been told for years that GE had exited the insurance industry and that its remaining exposures were "stable"—coupled with GE's failure to make any substantive risk disclosure concerning its LTC portfolio even as other insurers' exposures were laid bare—it did not and could not fully appreciate what was still to come.

298.   Three months later, on October 20, 2017, the Company revealed that *roughly 50%* of its total insurance reserves—or *over \$12 billion*—related to GE's LTC exposure. GE further announced that it was suspending GE Capital's \$3 billion dividend payment to GE until its reserve analysis was completed.

299.   Less than a month later, Miller admitted that even though its reserve testing was not yet complete, GE expected its forthcoming LTC reserve charge to eclipse the size of GE Capital's \$3 billion dividend payment.

300.   On January 16, 2018, GE shocked analysts and investors alike when it announced that it was recording a *\$9 billion* charge to earnings related to an increase to the Company's LTC benefit reserves (ALR). The Company further disclosed that, due to an increase in its future LTC liabilities, GE Capital expected to contribute *\$15 billion* in capital to its insurance subsidiaries over the next seven years.

301.   Finally, on January 24, 2018, GE announced that it had "been notified by the SEC that they are investigating the process leading to the [LTC] insurance reserve increase and the fourth-quarter [reserve] charge."

**2.    Analysts Express Shock at GE's True LTC Risk and Confirm that the Market Had Been Misled Throughout the Class Period**

302.    Analyst coverage during the corrective disclosure period further confirms that investors were unable to use GE's Class Period SEC filings to accurately quantify GE's LTC liabilities and risks. Indeed, even *after* Flannery's "deep dive" announcement in July 2017, which alerted the market specifically to the potential problem in GE's LTC portfolio, analysts *still* could not accurately gauge GE's LTC liabilities from the Company's financial reports.

303.    In one of the most thorough discussions of GE's insurance exposures after GE's "deep dive" announcement, Evercore was only able to observe in a September 2017 report that, "[i]n terms of the GAAP disclosure, there are about $24B of insurance reserves, *some portion of which is long term care*." In other words, even after the firm specifically trained its attention on the LTC portfolio following Flannery's announcement, Evercore had no way of determining its size from GE's financial statements. Analysts could not—and did not—do so by comparing the "Insurance liabilities" entry of the MD&A table with Note 11.

304.    That investors could not comprehend GE's LTC-related risk exposure from its GAAP reserve figures was *proven* in the fall of 2017. On October 20, 2017, Bornstein revealed— for the first time during the Class Period—that "$12 billion or roughly 50% of our insurance reserves" were allocated to the Company's LTC portfolio. Ten days later, the Company disclosed in its 3Q17 10-Q that it held $12.4 billion in LTC reserves, thus disclosing its LTC liabilities as measured under GAAP.

305.    The following day, Morgan Stanley issued its GE "*10-Q Review*," noting GE's $12.4 billion in LTC liabilities and the Company's anticipated "probable deficiency" as a result of its elevated claims experience. Based on the information disclosed, Morgan Stanley attempted to

quantify GE's LTC risk: "Our model assumes a net **$3bn charge**, which would preclude the receipt of $2-3bn of parent dividends that had been earmarked for 2H17."

306.    Similarly, on November 8, 2017—again, after GE's LTC liabilities under GAAP, but not its attendant risk to liquidity or earnings, had finally been revealed—RBC issued a report titled "*Limbo to Finally End with the Unveiling of the Flannery Plan*." The bank stated: "We expect the company to announce a **$2-3 billion** reserve contribution against the legacy long-term care insurance business that is currently in run-off at GE Capital."

307.    Several weeks later, GE announced that it was recording an **$8.9 billion** increase in future LTC benefits reserves and a $600 million write-down of deferred acquisition costs, resulting in a **$9.5 billion pretax/$6.2 billion after-tax earnings charge**. That is, even with GE's GAAP-measured LTC liabilities fully disclosed near the end of the Class Period, the LTC-related risk to GE's earnings was **more than double** what one of the world's most sophisticated investment banks was able to estimate. This disparity underscores that average investors were unable to discern GE's LTC risk—particularly through the majority of the Class Period when even GE's LTC liabilities under GAAP remained hidden in its financial statements.

308.    Finally, in response to the Company's January 2018 announcement of a massive $9 billion pre-tax earnings charge, analysts and other market participants expressed shock and outrage at the amount of undisclosed LTC risk that was hidden on GE's books throughout the Class Period.

309.    In a report dated January 29, 2018 titled "*SEC Enforcement investigation elevates GE risks*," Deutsche Bank analyst John G. Inch ("Inch") stated:

> In turn, the high magnitude of the $9.5bn charge and $15bn cash bill **(substantially beyond expectations for a business likely few were even aware retained such elevated risks)** shocked the market and helped to drive GE's share price lower while widening its credit spreads.

In addition, recall that **GE didn't begin to flag long-term care insurance issues until mid-2017,** well after its former insurance subsidiary Genworth first identified problems with its long-term care portfolio in late 2014.

310.     Just three weeks earlier, on January 5, 2018, Inch similarly noted, in a report titled

"*GE Insurance risks*":

> From GE's latest 10-Q 3Q2017 filing, the company retains insurance and investment contract liabilities of ~$27bn. Long-term care exposures were pegged at $12bn or roughly half of the company's insurance reserves. ***It is undoubtedly surprising to many that GE maintains $ billions of "run-off" insurance exposure even though the Genworth IPO occurred nearly 14 years ago while GE also sold its Insurance Solutions businesses including [ERC] to Swiss Re in 2005.***

> \*        \*        \*

> Even though Genworth first publicly identified problems with its long-term care portfolio in late 2014, GE didn't begin to flag the issue until the second quarter 2017 conference call.

> \*        \*        \*

> [W]e find it odd that it has taken GE so long to get a handle on its potential long-term care reserve deficiencies. As we understand it, most companies perform these reviews in 4Q on a regular basis. Considering the highly regulated (and automated) nature of the insurance business, it isn't clear what would have been causing the lengthy GE process review. . . .

> [W]ith the insurance bill now potentially topping $4bn, where exactly is the ceiling? In our opinion, GE's track record at forecasting losses for "run off" or "discontinued operations" isn't exactly stellar—think WMC and Lake Financial that required recurring top-up charges long after the businesses were reportedly sold/discontinued.

311.     On January 25, 2018, Bloomberg published an article commenting on the

mysterious timing of GE's disclosure of the LTC reserve charge, titled, "*GE's Surprise $15 Billion*

*Shortfall Was 14 Years in the Making*," which stated, in part:

> The trouble at General Electric Co. began decades ago when a hole started to form inside its sprawling financial unit.

> The hole became a $15 billion shortfall in insurance reserves, disclosed last week. It's prompted a Securities and Exchange Commission investigation, called into question the oversight of GE leadership, pushed down the share price, and shocked

investors who were asking Wednesday how this icon of American capitalism could allow the situation to deteriorate to this point.

"It sure seems that previous management had a rosy view," said Scott Davis, an analyst with Melius Research in New York. "There seemed to be no effort on their part to get ahead of the liability. ***I find it very hard to believe that mysteriously overnight GE found problems they didn't know existed.***"

*      *      *

Some employees were aware that long-term-care insurance was in bad shape. And even as it sold the bulk of its finance business, executives resisted selling reinsurance assets, even when bankers encouraged them.

Doing so would have forced GE to book a huge charge to reflect a drop in value, according to people with familiar with [sic] the situation who asked for anonymity because they weren't authorized to speak. That was an indication that the business was worth less than what GE reported to investors, the people said.

312.     On February 1, 2018, Audit Analytics issued a report titled "*Could We Have Predicted the General Electric Insurance Charge?*" noting that the "***magnitude of the $6.2 billion [after-tax] charge is far more staggering than . . . the market anticipated***." The Audit Analytics report went on to note that, since 2004, no less than ***30*** insurance companies have modified their LTC reserves on ***60*** different occasions.

313.     In a February 21, 2018 article in The Wall Street Journal titled "*How Jeffrey Immelt's 'Success Theater' Masked the Rot at GE*," Thomas Gryta remarked:

"The history of GE is to selectively only provide positive information," said Deutsche Bank analyst John Inch, who has a "sell" rating on the stock. "There is a credibility gap between what they say and the reality of what is to come."

Said Sandra Davis, who knows several GE executives as the founder of MDA Leadership Consulting: "GE itself has never been a culture where people can say, 'I can't.'"

314.     Similarly, in a February 22, 2018 article by Michelle Fox of CNBC titled "*GE has been 'brushing things under the rug' for decades, Deutsche Bank analyst says*," Fox reported that, according to Deutsche Bank analyst Inch, GE has been "'brushing things under the rug and

100

leveraging aggressive accounting' for several decades. . . . 'One could infer the prior management basically did this to drive the . . . adjusted EPS [] up as much as possible to pay themselves as much as possible,'" Inch said in an interview with CNBC's Power Lunch. (first alteration added). Inch also stated that GE "*made it overly complicated to dissect the financials. They compounded the complexity on purpose so people wouldn't look at the details*." Inch added, "Now unfortunately they're paying a bit of a price for it."

315.    On March 19, 2018, in a blog post titled "*No. 258: Long-Term Care Insurance— The Kansas Insurance Department's Bailout of General Electric*," noted industry expert and Indiana University professor emeritus Joseph M. Belth, Ph.D. recognized that GE's LTC risk exposure "*was not widely known until recently*."

### G.    GE's Post-Class Period LTC Disclosures

316.    After the end of the Class Period and after the LTC rot on GE's balance sheet had already been laid bare, the Company finally began providing its investors with the detailed LTC-related disclosures that it should have been making throughout the Class Period, and that other LTC insurers had been providing to their investors for years.

317.    In particular, GE's 2018 10-K, which it filed with the SEC on February 26, 2019, mentions LTC *over 50 times* and contains over seven full pages of detailed, substantive disclosures regarding the nature and risks associated with its LTC portfolio, including:

- GAAP and statutory LTC reserves, on an aggregate and per-policy basis;

- Number of LTC policies and covered lives inforce;

- Average LTC policyholder attained age;

- Number of LTC policies on claim and percentage of policies that are premium paying;

- Recent trends regarding morbidity rates and mortality rates, and their potential impact on GE's LTC liabilities and reserves;

- "Key Portfolio Characteristics," including the extent to which GE has reinsured LTC policies providing joint lives coverage, inflation protection coverage and lifetime benefits coverage;

- Two pages of disclosures regarding GE's LTC premium deficiency testing process, including the results of its 2017 and 2018 premium deficiency tests;

- Key changes in its LTC reserve assumptions in 2018, along with a risk disclosure that future adverse changes in reserve assumptions could lead to the resetting of reserve assumptions and result in an earnings charge;

- GAAP LTC reserve sensitivities by assumption, which quantified the estimated increase to future reserves in the event that any one of GE's reserve assumptions proves to be inaccurate;

- Detailed risk disclosures regarding GE's statutory LTC reserves and the potential impact of statutory reserve increases on GE's GAAP reserve and financial condition; and

- GE's inability to unilaterally seek premium rate increases from state regulators.

## VI.   PLAINTIFFS' GE POWER ALLEGATIONS

318.   Throughout the Class Period, a storm was also brewing in GE Power. Industrial CFOA was a metric of critical importance to investors. A chasm, however, had been growing between anticipated revenues already booked as Contract Assets on GE's balance sheet and its ability to convert those into CFOA. As The Wall Street Journal noted on October 30, 2017, that gap between earnings and cash flow was "a red flag for investors."

319.   To hide the decline in GE's Industrial CFOA, Defendants concealed from the market that: (i) GE Power customers' use of assets that GE serviced through LTSA had starkly declined, resulting in less revenue and delaying Power's ability to invoice and collect cash on those LTSAs; (ii) GE Power had resorted to modifying LTSAs to generate "catch-up" revenue on paper, to the detriment of future cash flow; and (iii) these practices created a gap between revenue and Industrial CFOA, which GE attempted to close, and successfully hid from investors during the Class Period through a systemic practice of "factoring" LTSA receivables—that is, selling them

to GE Capital and third parties for cash (often at a discount), to the detriment of GE Power's future revenues and cash flow.

320.    This Section describes GE Power and its importance to GE's overall profitability. It then identifies the material adverse facts and trends set forth in the paragraph above and provides detailed allegations that Defendants knew of those adverse facts and trends, and that each such trend was reasonably likely to have a material adverse effect on GE's financial condition.

321.    As set forth below, Defendants failed to disclose these material adverse facts and trends to investors, and made affirmative false or misleading statements concerning GE Power's business and its Industrial CFOA. In particular, in violation of Item 303, Defendants failed to disclose: (i) the steep decline in the utilization of GE-serviced power equipment; (ii) GE Power's extensive reliance on modifications to LTSAs to generate short-term paper revenues through positive cumulative catch-up adjustments; and (iii) GE Power's widespread reliance on factoring to manage its resulting liquidity problem by selling those paper revenues for cash. Defendants' failure to disclose this information allowed GE to conceal the widening gap between GE's Contract Assets and Industrial CFOA.

322.    Defendants also affirmatively misrepresented facts concerning: (i) the declining rates at which customers were utilizing GE-serviced equipment under GE Power's LTSAs; and (ii) the Company's reliance on factoring to generate Industrial CFOA and hide liquidity problems. These material misrepresentations and omissions concealed material risks concerning GE's deteriorating cash flows from GE Power's LTSA throughout the Class Period.

A.    **GE Power's Operation**

323.    GE Power builds and sells industrial products such as power plants, turbines, and generators, and related products and services to industrial, governmental, and other customers

around the world. These products and technologies harness natural resources, such as oil, gas, coal, and diesel, to produce electric power.

324.    By the start of the Class Period, GE Power was the largest segment in GE's Industrials unit. The Company touted GE Power as one of GE's "core segment[s]" and as a primary driver of GE's growth prospects and value, directing investors' attention to GE Power's purported ability to, among other things, contribute significantly to GE's earnings. For example, in January 2017, Bornstein touted "double-digit earnings growth in Power" for 2017, and he specifically emphasized GE's focus on increasing the services provided by GE Power to its customers. In that year, 2017, GE Power generated $36.0 billion in revenue, or *approximately 30% of GE's total 2017 revenues* of $122.1 billion. GE Power generated revenue of $20.6 billion, $21.5 billion, and $26.8 billion in 2014, 2015, and 2016, respectively.

325.    Even as technological and energy innovations weakened the power market over the last decade, GE Power reported profits of $5.4 billion in 2014 (which GE subsequently revised downward to $4.5 billion in its 2015 10-K), $4.5 billion in 2015, and $5.0 billion in 2016.

326.    Given its material contribution to GE's financial performance, GE Power was of paramount importance to GE (and investors) during the Class Period. Analysts and other market participants viewed GE Power as a key indicator of the profitability of GE's core operations and the strength of GE's Industrials operations.

**B.      GE Power's Long-Term Service Agreements and Contract Assets**

327.    Within GE Power are a number of divisions that provide customers with different products and service offerings through LTSAs, including GE Power Services. GE Power's LTSAs are long-term contracts, typically with gas- and coal-turbine clients, for GE to maintain and service equipment. These contracts may include, for example, monitoring, maintenance, service, and spare parts for a gas turbine installed in a customer's power plant.

328.    The typical duration of an LTSA is between 5 and 25 years. LTSAs are meant to provide GE with a profitable and steady long-term revenue stream distinct from and, in addition to, the actual sales of equipment.

329.    The contract price for a given LTSA is determined based on the revenue GE expects to earn on the contract over its lifetime and the costs GE expects to incur in performing under the LTSA. To price LTSAs during the Class Period, GE considered, among other things, the timing and extent of future maintenance and overhaul events, as well as the cost of labor, spare parts and other resources required to perform those services. FE-7 stated that when GE entered into an LTSA, the pricing in the contract was largely based upon the number of hours the subject plant (or equipment) was expected to run or be utilized, and the significant service work and billing dates on many LTSAs were often tied, in part, to the same.

330.    In its financial statements, GE reports revenue that has been recognized on LTSAs, **but not yet billed**, as a sub-category of assets called Contract Assets. As GE explained in its Class Period quarterly filings, "[c]ontract assets reflect revenues earned in excess of billings on our long-term contracts to construct technically complex equipment (such as gas power systems and aircraft engines), long-term product maintenance or extended warranty arrangements and other deferred contract related costs." In simple terms, a Contract Asset represents cash expected from sales already booked.

331.    LTSA customers do not pay GE according to the same timeline that the Company uses to recognize revenue. The Company recognizes LTSA revenue *before* it receives actual payment (or cash)—and, in fact, before it even invoices the customer.

332.    LTSA customers generally pay GE cash based on the utilization of the power equipment or upon the occurrence of a major event specified within the contract such as an

"overhaul." Thus, the rate at which a customer utilizes its GE-serviced asset is critically important to the *timing* of the payments that GE receives over the term of the LTSA. These payment-triggering events are referred to as "milestones" within the LTSAs. FE-11 explained that there were generally two major events that occurred at 30,000 and 60,000 hours of use (or utilization).

333.   Throughout the Class Period, GE explained in public filings that "[t]he estimate of utilization will impact both the amount of customer payments [GE] expect[s] to receive and [GE's] estimate of costs to complete the agreement as asset utilization will influence the timing and extent of overhauls and other service events over the life of the contract."

334.   Because a change in the utilization rate of equipment under an LTSA impacts both the timing and extent of overhauls and other service events over the life of the LTSA, as well as the timing of invoices to the customer, Defendants repeatedly stated in SEC filings (specifically, in its Class Period 10-Ks) that they "*routinely review estimates under product services agreements* [or long-term services agreements] and regularly revise them to adjust for changes in outlook."

335.   Relatedly, Defendants assured investors that they had "insight into future utilization and cost trends . . . through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods." As explained in Section VI.E.1., GE Power was able to, and did, monitor utilization of power equipment covered by LTSAs in "real time."

## C.   Cumulative Catch-Up Adjustments on LTSAs

336.   GE calculates LTSA revenue and Contract Assets using long-term assumptions regarding, among other things, utilization rates and the expected profitability of services to be provided under the LTSA. These assumptions can change over the life of an LTSA. Such changes are reflected in GE's financial statement through an accounting mechanism known as a cumulative catch-up adjustment.

106

337.     This type of an accounting adjustment was a way for GE to record additional revenue in excess of billing and costs attributable to changes in the profit margins that GE expected to earn on its LTSAs. A positive cumulative catch-up adjustment occurred when GE determined it had been underestimating its margin on its LTSAs and adjusted its expected profits upward, resulting in an increase in LTSA revenue.

338.     Positive cumulative catch-up adjustments can generate significant and immediate increases in revenue for a company. For example, assume that a company revises its estimates in year three of a 10-year LTSA such that it now expects to earn $20 per year on the LTSA instead of $10. During year three, the company would book an immediate profit of *$40* ($20 it expects to earn in year three plus an additional $10 in profit for each of years one and two). In this example, during the year in which the cumulative catch-up adjustment was recorded, profits from this LTSA *quadrupled* over the prior year.

339.     Likewise, if GE determined that it overestimated its profit margin on an LTSA, it was required to revise its estimates downward, booking the entire negative revision in a single accounting period.

**D.     Declines in the Use of Traditional Power Sources Negatively Impacted GE Power**

340.     Utilization of traditional power sources and fossil fuels, such as gas and coal, began to decline in or around 2008 during the worldwide financial crisis. The downturn in the energy markets continued into the Class Period, as improved energy conservation and a greater reliance on renewable energy sources meant that GE's customers ran their power turbines for fewer and fewer hours each year. This downturn was detailed in a report published by PricewaterhouseCooper, called 2017 Power and Utilities Industry Trends, which stated that: "[e]nd-use electricity consumption declined in 22 out of 28 E.U. countries between 2005 and

2014," and "the electricity sales growth rate since 2002 has hovered around 1 percent or less per year, and demand has declined in five of those years."

341.    Similarly, according to the Department of Energy's Energy Information Administration, electricity consumption in the U.S. peaked in 2007 and has declined ever since, despite population and economic growth in the ten ensuing years. In the first nine months of 2017, for example, electricity generation declined by 2.6% compared to the same period in 2016.

342.    Through this downturn in the energy markets, with the exception of Nuclear power, the average cost for non-traditional energy sources continued to decline, as reflected below:



343.    FE-11 stated that in 2013, an analysis was conducted to understand the global energy market, including demand. The analysis showed that the European market had gone to renewables. FE-11 further stated that on the U.S. side the analysis told the same story as in Europe. "[E]veryone knew" about the downturn, FE-11 stated, and the analysis painted a picture that the sky was falling. FE-11 stated the analysis rolled up to Lorraine Bolsinger (former President and CEO of GE Distributed Power), who was on the executive committee and reported to Steve Bolze

(former President and CEO of GE Power who was fired in October 2017 after Flannery's deep dive into GE's business). Bolze reported to Defendant Immelt.

344.     The power market decay had direct and negative impacts on GE Power's revenue and ability to generate CFOA during the Class Period, as it reduced demand for one of GE Power's major product categories and sources of revenue, gas turbines. Senior management, including Immelt and Bornstein, were keenly aware of and routinely discussed gas turbine sales, and their impact on GE Power's growth, with investors throughout the Class Period.

345.     Because Power was selling fewer gas turbines, it significantly reduced GE Power's ability to generate new LTSAs, according to FE-5. Moreover, GE Power was forced to accept less profitable terms on new LTSAs (and, critically, renegotiated LTSAs) to avoid losing them to competitors. FE-5 explained that when GE entered into many of the existing LTSAs in the early 2000s, the Company had the ability to pressure counterparts into signing LTSAs at high prices in exchange for GE moving that counterparty up the priority list for new equipment sold by GE. Because of these market conditions, certain of GE's LTSA customers were either unable or unwilling to carry out their LTSAs at the current terms.

**E.     Negative Trends within GE Power and Defendants' Knowledge Thereof**

**1.     The Steep Decline in Utilization of GE-Serviced Assets Negatively Affected GE Power's Cash Flows**

346.     As the power market deteriorated, there was a sharp decline in the utilization of equipment serviced by GE Power under its LTSAs, which adversely affected GE Power's ability to convert Contract Assets into cash.

347.     FE-5 stated that from 2010 into the Class Period, GE realized through its monitoring of customer utilization that usage of oil and gas turbines by customers was down 80-

90%. This meant that the LTSAs on those turbines would generate less cash, with delayed collection.

348.    FE-5 explained that, with customer consent, GE had technology installed to monitor customer assets for which it provided services, such as gas turbines. GE was then able to, and did, access the information regarding customer utilization in "real time."

349.    FE-12 similarly explained that utilization rates were tracked in real time by sensors in all GE-serviced equipment, which communicates with monitoring and diagnostic centers. GE maintains a monitoring and diagnostic center in Atlanta, Georgia, which consolidates data from other centers around the country and globe.

350.    Moreover, FE-10 explained that GE Power stationed Contract Performance Managers ("CPMs") at customer locations to serve as GE's "eyes and ears."

351.    At all relevant times, Defendants knew or had access to these critical customer utilization rates—or "run-rates"—in real time. As noted above, Defendants stated that they had "insight into future utilization and cost trends . . . through our knowledge of the installed base of equipment and the close interaction with our customers that comes with supplying critical services and parts over extended periods" and "routinely review[ed] estimates under product services agreements."

352.    Defendants therefore were reviewing the run-rate data showing that utilization rates had declined 80-90%. These declining utilization rates thus alerted Defendants, in real time, that plants and related equipment were being used with less frequency, generating less wear-and-tear that would normally have required GE services and delayed GE from reaching milestones under the LTSAs that would have permitted GE to invoice customers and convert paper Contract Assets to CFOA.

353.    It was therefore reasonably likely that the declines in utilization that Defendants were seeing through the Company's monitoring system would have a material, unfavorable impact on GE's ability to invoice and collect the unbilled revenue it had booked as Contract Assets.

354.    Despite Defendants' knowledge of this trend and the reasonable likelihood it would have a material, unfavorable impact on GE's financial condition, they did not disclose the trend in Class Period SEC filings as required by Item 303, more fully discussed below. Instead, Defendants simply disclosed financial results that reflected increasing Contract Assets and increasing (i.e., positive) cumulative catch-up adjustments—an immediate earnings boost from changing the historical profitability of LTSAs and taking the "catch up" in profitability in the quarter the adjustment is made.

355.    Given the direct link between changes in utilization rates and GE's ability to hit key milestones and collect cash from LTSA customers, a reasonable investor could not have understood from GE's booking of increased Contract Assets and cumulative catch-up revenue that the *actual trend* in the value of GE's LTSAs was negative during the Class Period because of cratering run-rates.

356.    Moreover, GE determined the value of its LTSA Contract Assets by using a three-year historical run-rate average that did not reflect the declining run-rates it was systematically monitoring in real time. Specifically, according to FE-7, GE used the historical average of run-rates (i.e., utilization rates) over the prior three years to estimate future costs, revenue, and margins on GE Power's LTSAs. But, according to FE-7, GE knew that the historical average run rates over the prior three years did not reflect the current run-rates (to which GE had direct access and could, and did, view in real time), or the likely future run rates. As one example, in 2016, FE-7 was involved in simulating what would have happened to GE Power Service's LTSA estimated revenue

if it utilized a one-year run-rate average instead of a three-year run-rate average to estimate the unit's margin percentage. FE-7 understood, based on conversations with GE Power employees, that the simulation was requested by Teo Osben, the Chief Risk Financial Officer of Multi-Year Agreements, and that Osben ultimately decided against using a one-year average specifically because it had a negative impact on GE's global cumulative catch-up adjustments.

357.    Given the clear disparity between the actual run rates GE monitored in real time and the expected future run rates, and the three-year average rates that GE chose to employ in quantifying and reporting its Contract Assets on LTSAs, GE's reporting of those Contract Assets did not reflect the risk of deteriorating cash flows from LTSAs.

### 2.    GE Power's Reliance on LTSA Modifications and Cumulative Catch-Up Adjustments Adversely Impacted Its Cash Flows

358.    The cyclical downturn in the turbine market created a revenue problem for GE Power. The billions of dollars in unbilled revenue tied up in GE Power's LTSAs offered a prime opportunity for GE to offset its earnings declines. But, while GE was able to renegotiate LTSAs to generate cumulative catch-up revenues on paper, that practice did not generate Industrial CFOA, and, unbeknownst to investors, came at the expense of future revenue and cash flows on LTSAs.

359.    FE-7 explained that, during the Class Period, GE Power actively renegotiated LTSAs with customers solely for the purpose of increasing the total contract margin over the lifetime of a contact and thus generating positive cumulative-catch up adjustments (or expected revenue). As noted above Section VI.C., positive cumulative catch-up adjustments can generate material and immediate increases in earnings.

360.    Specifically, to increase the overall profit margin on a particular LTSA, GE Power would eliminate the component of the LTSA that called for GE-sourced labor and instead allow the customer to use its own labor services, according to FE-7. This practice, known as

"de-scoping," had the effect of increasing the short-term profit margin on the labor portion of a service contract, which was typically lower relative to the higher profit margin portions of a service contract for parts and upgrades.

361.    Removing the lower-margin GE labor from the service contract mathematically increased the overall average profit margin over the life of the LTSA. This would, as GE intended, trigger a positive cumulative catch-up adjustment. That is, GE could book additional revenue in the current reporting period based on reallocating the additional profit margin over the life of the LTSA, including to prior periods. It thus increased revenue in the short-term while reducing GE's total revenues and future cash flows on the LTSA.

362.    GE Power's reliance on LTSA modification to squeeze out short-term revenue posed a severe risk to the segment's revenue and cash flows in at least the following ways, all of which were known by Defendants.

363.    *First*, Defendants knew that GE Power's ability to renegotiate LTSAs to generate positive cumulative catch-up adjustments was not sustainable. GE Power only had a finite number of LTSAs in its portfolio and a limited number of ways to modify them to make them more profitable in the short-term, all at the expense of future cash flows. By the end of 2017, according to FE-7, GE Power Services Europe had already exhausted most of the techniques that GE used to trigger these revenue-boosting cumulative catch-up adjustments.

364.    Moreover, GE knew its ability to pull revenue out of its LTSAs through cumulative catch-up adjustments was waning because the accounting standards that had allowed for such adjustments were changing with the introduction and implementation of ASC 606. Specifically, in May 2014, the Financial Accounting Standards Board announced disclosed amendments to the then-current standards governing how companies estimate and recognize revenue from long-term

contracts. ASC 606 was designed to make a company's cash flow more closely match its income, and prohibited companies like GE from recognizing cumulative catch-up adjustments on its LTSAs.

365.    To put into perspective the extent to which GE relied on cumulative catch-up adjustments during the Class Period, since 2013, cumulative catch-up payments began accounting for an ever increasing percentage of the GE Industrial's profits as follows:

| ($bn) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| **Cumulative catch-up adjustments** | $0.4 | $0.3 | $1.0 | $1.4 | $2.2 | $2.1 |
| **GE Industrials Profit** | $15.486 | $16.220 | $17.764 | $17.966 | $17.598 | $14.740 |
| **Percent** | 2.583% | 1.85% | 5.629% | 7.792% | 12.501% | 14.247% |

366.    ***Second***, de-scoping existing service contracts to generate higher margins, and thus cumulative catch-up revenue, came at a long-term cost to GE Power. By removing the labor portion of the service contract, GE actually cut into its long-term revenue and cash flows (i.e., the cash to be earned on service calls through the provision of labor, after which GE Power could invoice the customer) just so that it could increase its short-term margins and report windfall cumulative catch-up revenue in a particular quarter to meet earnings expectations.

367.    ***Third***, in order to persuade customers to agree to renegotiate LTSAs, FE-7 and other former employees explained that GE was often forced to give concessions, such as payment deferrals. The rampant extension of payment terms impaired GE's cash flows by lengthening the time between when GE booked revenue and collected cash on that revenue. Extending payment dates heightened the risk that GE would be unable to actually invoice LTSA customers. As FE-7 explained, GE Power was effectively lending money to its customers but failing to account for any

associated credit risk, and assumed for its own accounting purposes that future collection on the LTSAs was certain.

### a. Defendants' Knowledge of or Reckless Disregard for Material Facts Concerning GE Power's LTSA Practices

368.    During the Class Period, Defendants knew: (i) that GE was increasingly reliant on cumulative catch-up adjustments to create a picture of financial health at GE Power, and (ii) that this practice increasingly threatened GE's ability to generate Industrial CFOA.

369.    Defendants' repeated statements to investors regarding impending accounting changes demonstrates their knowledge of the extensive use of cumulative catch-up adjustments (¶¶ 432, 438). Defendants knew that these amendments became effective on January 1, 2018 and specifically told investors the LTSAs were under review in connection with the Company's analyses of the impact of ASC 606 on LTSA revenue recognition and GE's corresponding results (i.e., Contract Assets). For example, during the 1Q17 earnings call on April 21, 2017, Bornstein specifically stated the contacts were "under review."

370.    Defendants GE, Immelt, Bornstein, Miller, Sherin, and Hauser were hyper-focused on GE Power and the impact of ASC 606. In November of 2016, Hauser publicly addressed the new revenue accounting rules to take effect in 2018, stating, "[w]e've been on this journey for a while now. . . . It's a significant undertaking that certainly we, as an entire organization, take very seriously—our audit committee as well has been quite involved." To this end, Bloomberg reported that:

> Hauser gets detailed information from GE's project management team, including a type of executive snapshot of updates on key areas, such as controls, disclosures and IT system implications.
>
> There is also an update on the technical memos with nitty-gritty details, including a status update on technical memos completed and those that are still in process. They have a scoring of high, medium or low priority in terms of their impact.

Moreover, there's information about who has them open, whether they are technical or disclosures, how to do the retrospective lookback, and how to process and map the right general ledger accounts.

371.    In addition, Bloomberg reported that "there are meetings with the CFO monthly and the audit committee—doing 'deep dives' on different technical topics and on matters that are unique to certain segments." With respect to contracts, like LTSAs, Hauser stated that, while "contracts with seemingly similar terms and conditions are being evaluated in the same way," "[i]f it's not all viewed the same way, then it's an area that is worked through—weekly."

372.    Moreover, multiple former employees confirmed that extensive internal reporting was available to Defendants, who signed the financial statements and made affirmative false or misleading statements regarding GE's Power division throughout the Class Period (¶¶ 356, 375-77, 404).

373.    According to FE-7, it was internally acknowledged within GE Power Europe that once growth and earnings targets were set each year, cumulative catch-up adjustments would be used to make up the difference between the numbers that were actually achievable and the targets that were set. FE-7 explained that, during the Class Period, there were teams at GE Power specifically dedicated to identifying contracts that were good candidates for generating positive cumulative catch-up adjustments (or avoiding negative cumulative catch-up adjustments) through renegotiation.

374.    Defendants also had a clear window into exactly how GE Power was manufacturing "new" revenue out of existing LTSAs and the impact of such practices on LTSA profitability both in the short- and long-term.

375.    According to FE-5, GE maintained operations plans and modeling tools for all LTSAs that included projections for services, costs, revenue, and profitability (i.e., margins). These plans and tools were originally run through an Excel-based program, COSMOS, and were

later moved to a server-based application called ICAM, which allowed for even more enhanced reporting, analysis, and modeling, FE-5 explained. FE-5 further explained that COSMOS, and later ICAM, were modeling tools used to predict future use of the equipment and give an understanding of earnings. According to FE-5, "all commercial people" used and could access the system.

376.     According to FE-10, customer run time, forecasted outages, scheduled service and maintenance dates, and expenses are certain of the primary inputs. FE-10 explained that the information populated into these plans was usually provided by GE Power's CPMs, each of whom was stationed at the specific customer's location and served as GE's "eyes and ears" at those locations. FE-10 further explained that once the information was populated into the system, it generated a schedule for service and/or maintenance based on, among other things, current run rates, and produced a revised revenue forecast and cumulative catch-up adjustment (negative or positive) based on that information. Based on his experience and familiarity with the process, FE-10 believed there were instances where the models concluded a negative cumulative catch-up adjustment was needed in light of changing conditions, but those results were ignored.

377.     During his tenure, FE-7 wrote quarterly status update reports on contractual renegotiations for purposes of GE's reporting requirements. Those reports included the number of renegotiations, the number of commitments secured from the renegotiations, and the impact on cumulative catch-ups. These reports were written for the controller in Europe to send to GE's corporate headquarters. FE-7 understood his reports were provided to the controller in Europe and then sent to GE's Global Controller, who then delivered them to Hauser. Hauser, in turn, signed GE's Class Period SOX Certifications, as GE's CAO.

378.     As GE's CEO and CFOs, Immelt, Sherin, and Bornstein signed GE's Class Period SOX Certifications. As such, these Defendants each had a duty to monitor any conduct or

information that threatened to undermine the veracity of these filings, including all material facts concerning GE's LTSAs (and Contract Assets, generally) and the impact of GE's revenue recognition and profit estimation practices, and triggering of cumulative catch-up adjustments, on the Company's financial performance and condition.

379.    Despite their knowledge that it was reasonably likely that the foregoing practices would impair GE's ability to convert disclosed Contract Assets into actual cash, the Company did not make any disclosures alerting investors to the cause of the growing gap between Contract Assets and their ability to generate Industrial CFOA.

> **b.    GE's Post-Class Period Restatement Confirms the Extent to Which the Company Relied on LTSA Modifications and Cumulative Catch-Up Revenue**

380.    On April 13, 2018, in response to ASC 606's revenue recognition amendments becoming effective, GE filed an 8-K with the SEC restating its financials and quantifying the impact that such adjustments had on its financial performance during the Class Period.

381.    This disclosure confirms the stunning extent to which GE relied upon cumulative catch-up revenue to generate profits during the Class Period, as GE effectively admitted, among other things, that: (i) it had previously booked over $8.7 billion in revenue due to cumulative catch-up adjustments that have not yet turned into cash for the Company; (ii) ***more than half*** of GE's reported LTSA Contract Assets as of year-end 2017 were the product of cumulative catch-up adjustments; and (iii) its LTSA Contract Assets wereactually worth over 50% less than previously reported. In light of the above, GE admitted that ASC 606's revenue recognition amendments had "***significantly impacted*** all of our industrial businesses except for Renewable Energy, Healthcare, and Current and Lighting."

382.    As reflected in the below chart, GE's restatement confirms that its quarterly and annual profits and EPS were materially driven by cumulative catch-up adjustments:

| | Fiscal 2016 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | Fiscal 2017 |
|---|---|---|---|---|---|---|
| **Diluted EPS** | $ 1.00 | $ 0.10 | $ 0.15 | $ 0.22 | $ (1.15) | $ (0.68) |
| **Diluted EPS From Cumulative Catch-Up Adjustments** | $ 0.13 | $ 0.08 | $ 0.03 | $ 0.05 | $ 0.13 | $ 0.30 |
| **Diluted EPS Minus Cumulative Catch-Up Adjustments** | $ 0.87 | $ 0.02 | $ 0.12 | $ 0.17 | $ (1.28) | $ (0.98) |
| **% Inflation of Diluted EPS From Cumulative Catch-Up Adjustments** | 13% | 80% | 20% | 22% | 10% | 44% |

383.    While several of GE's competitors issued similar restatements following the enactment of ASC 606's revenue recognition amendments, none were even remotely close to the size of GE's adjustments. For example, as reported by The Financial Times in an April 19, 2018 article titled, "*General Electric sets out on road to regaining investors' trust*":

> The revisions resulting from ASC 606 have been much greater for GE than for some of its peers. Boeing revised its 2017 operating earnings of $10.3bn up by $66m. Lockheed Martin shaved just $8m from reported 2017 operating profits of about $5.12bn. United Technologies said in February that it expected the new standard to have "an immaterial impact" on net income this year. For Microsoft, reported operating income for 2016-17 was revised up from $22.3bn to $29bn.

> For GE, by contrast, the new standard meant revising 2017 profits from industrial operations down by 17 per cent, from $14.7bn to $12.2bn, mostly because of a changed view of long-term contracts for servicing equipment such as aero engines and turbines for power plants. As originally reported, those profits fell 16 per cent from 2016. Under the new standard, they were down 23 per cent.

384.    In addition, The Financial Times article included the below chart, which confirms that nearly every one of GE's divisions had used the prior accounting standard to improve the appearance of their financial performance in 2017:



New accounting standard changes the view of how GE's divisions did in 2017

Source: Company reports
© FT

385.    In response to GE's restatement, The Financial Times quoted J.P. Morgan analyst Tusa as stating that ASC 606 has "la[id] bare the truth of the actual economics" of GE's LTSAs.

**3.      GE Power's Factoring of LTSA Receivables to Mask the Industrial CFOA Crisis**

**a.      Defendants Misled the Market as GE's Contract Asset Tally Soars**

386.    As GE increasingly relied on cumulative catch-up adjustments during the Class Period without actually collecting any cash—a discrepancy that was exacerbated by reduced utilization rates—the Company's reported Contract Assets swelled, but so did the gap between GE's earnings and its Industrial CFOA.

387.    As The Wall Street Journal noted in an October 30, 2017 article titled *GE's Numbers Game: Pick from Four Earnings Figures*, "[t]ypically, big gaps between earnings, which are calculated on an accrual basis, and cash flow, which is money going into and out of a company, are a red flag for investors."

388.     GE reported rapidly growing Contract Assets during the Class Period, as reflected below. Without addressing the liquidity issues that were being created by virtue of renegotiating LTSAs, starting in 2016, GE expanded its disclosure of Contract Assets, disclosing what percentage of Contract Assets were LTSAs and in 2017, what portion of those were specifically attributed to GE Power:

| ($bn) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|
| Contract Assets | $9.443 | $12.522 | $13.990 | $21.156 | $25.162 | $28.861 |
| GE LTSAs | Not reported | Not reported | Not reported | $10.346[7] | $12.752 | $15.157 |
| GE Power LTSAs | Not reported | Not reported | Not reported | Not reported | $6.595[8] | $7.439 |

389.     As evident from the table above, the market could determine that more than half of GE's Contract Assets in 2016 and 2017, respectively, were comprised of LTSAs, but they could not tell how much was due to GE's undisclosed practice of renegotiating LTSAs.

390.     While GE reported steadily increasing Industrials revenue in 2015, 2016, and 2017, Industrial CFOA declined sharply over the same period:

| ($bn) | 2015 | 2016 | 2017 |
|---|---|---|---|
| Industrials Revenue | $108.796 | $113.156 | $116.157 |
| Industrials CFOA | $12.054 | $9.865 | $7.024 |

391.     In response to GE's expanded disclosures and the increasing gap between Industrial CFOA and Contract Assets, analysts began to question GE's reported Contract Assets, prodding Defendants for additional information as to whether the Company was generating CFOA through factoring. For example, during GE's January 20, 2017 4Q16 earnings call, a Sanford C. Bernstein & Co. analyst asked: "[I]is there any factoring this quarter from GE Capital into GE industrial?"

---

[7] This figure was subsequently disclosed in the 2016 10-K.
[8] This figure was subsequently disclosed in the 2017 10-K.

392.     In direct response, Bornstein lied about the source for GE Power CFOA, stating: "So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring." Defendant Bornstein's false statement was made against the backdrop of Defendants equally false representation to the market that GE used factoring to "manage credit risk."

### b.     GE Power Engaged in Rampant Factoring to Conceal Its Deteriorating Cash Flow

393.     Contrary to Defendant Bornstein's false statement that GE Power's CFOA had "very little to do with GE Capital factoring," in truth, beginning in 2015, GE had resorted to factoring its receivables to manage liquidity and mask the disparity between Contract Assets and Industrial CFOA, and indeed to hide the fact that Industrial CFOA was declining.

394.     To this end, FE-7 confirmed that beginning in 2015, GE Power's management created a task force that was responsible for determining how to accelerate cash collection on GE Power's LTSAs, which would help to conceal that GE was renegotiating contracts solely to boost earnings at the expense of collecting payment. FE-7 was directly involved with his U.S. counterparts during the first through third quarters of 2016 in working to find ways for GE Power to generate CFOA.

395.     The solutions FE-7 and his U.S. counterparts developed were known as "monetization," which involved factoring (i.e., selling) receivables in order to generate CFOA. To create the invoices used for factoring, GE Power Services would persuade its customers to renegotiate the billing contract terms so that the triggering event for an invoice was earlier in time than it would have been (in some cases, by a number of years), but for the contract renegotiation.

396.     FE-7 explained that this practice enabled GE to pull forward the future customer billing into the current accounting period so that it could bill the customer immediately.

397.     However, FE-7 further explained that in order to induce the customer to enter into such a modification and agree to revised invoicing terms, GE would typically have to discount the payment required and also push the actual payment due date further into the future—often by a year or more (compared to the non-renegotiated scenario). This was done solely to allow GE Power to accelerate the invoicing of the customer (i.e., create invoices) for purposes of factoring, with no actual change to the underlying performance obligations.

398.     FE-7 explained that in order to actually "monetize" this payment, which was not yet due, GE would then factor the receivable by selling it to either Working Capital Solutions, a subsidiary of GE Capital, or an outside party, often with negative consequences to GE, such as decreased profit on the receivable.

399.     FE-8 worked on negotiations for LTSAs for new products, and took part in planned contract negotiations with prospective customers. FE-8 understood from at least one of those planned calls that GE needed new contracts signed quickly so that GE could turn and sell the LTSA to banks for cash.

400.     FE-9 explained that factoring was widespread within the Power (and Renewable) Divisions. He specifically recalled GE was factoring "everything" in Renewable and his counterparts in Power were doing the same. FE-9 was aware of factoring within the Power Division while he worked in the Renewable Division because Power and Renewable were under the same management umbrella with the same approval chain up until 2014 or 2015. FE-9 recalled that he would send factoring proposals up the management chain each quarter and approvals would come back down through the chain.

401.     According to FE-7, the existing number of LTSAs available to monetize was finite. As a result, after monetizing customers' future payments as often as possible in 2016, there were

fewer and fewer monetization opportunities, and eventually the cash crisis could no longer be concealed.

402.    GE Power's reliance on factoring to generate CFOA was well known within GE. Indeed, FE-9 explained that, at an internal meeting in or around June 2017, **Bornstein acknowledged GE's reliance on factoring, noting that the Company was "in too deep" to depart from the practice**.

403.    FE-7 similarly explained he worked with Kevin Weber, GE Power's Senior Commercial Finance Manager in the U.S., who informed and educated FE-7 about various techniques used globally by GE Power to generate CFOA. FE-7 also stated that Estela Delgadillo, GE's Global Cash Leader for GE Power who reported directly to Donovan—the CFO of Power Generation Services during the Class Period—hired Kevin Weber in early 2016 specifically to lead the global monetization effort.

404.    GE's monetization of its LTSAs was also recorded in weekly, monthly, and quarterly reports, according to FE-7. The quarterly reports outlined the total amount of cash that GE had generated through monetization, broken down by region. The monthly reports contained the same information as the quarterly reports for Power Services Europe, and the weekly reports were used to assess which customer contracts needed to be renegotiated for purposes of GE's cumulative catch-up adjustments. FE-7 understood that the quarterly reports, which were in the form of a Power Point presentation, were ultimately used for GE's quarterly Blueprint Review for discussion with GE Power's global leadership, including Paul McElhinney (President and CEO of GE Power Services from May 2014 through December 2017) and Donovan.

405.    According to GE's organizational chart, the individuals who hold both of these positions report directly to the CEO of GE Power, who in turn reports directly to GE's CEO.

Moreover, given the size and frequency of GE Power's factoring to GE Capital—and the overall impact such factoring had on GE Power's and GE Capital's balance sheets—it is implausible that Laxer, as the CEO of GE Capital, was unaware of this practice or its purpose.

**F.     Defendants' Materially False or Misleading Statements and Omissions**

**1.     Defendants Omitted Material Facts in Violation of Item 303 of Regulation S-K and Section 10(b)**

406.   Throughout the Class Period, Defendants' 10-Ks, and 10-Qs incorporating the Company's MD&A disclosures, were materially false or misleading because they failed to disclose the information required by Item 303.

407.   GE's Item 303 disclosure obligations are set forth above in full in ¶¶ 217-23. Among other obligations, Item 303(a)(1), focusing on liquidity, requires companies to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Item 303(a)(3)(ii) requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations."

408.   Defendants violated Item 303 because they failed to disclose the known trends, demands, commitments, events, or uncertainties identified below with respect to GE Power that were reasonably likely to have material effects on GE's financial condition or results of operation.

**a.     Declining Utilization of GE-Serviced Assets Under LTSAs**

409.   As result of deterioration and changes within the Power industry, throughout the Class Period, GE was experiencing significant declines in customer utilization of assets GE serviced under LTSAs, as discussed in ¶¶ 346-57.

410.    This trend was widely known to GE and GE's management, including both Defendants Bornstein and Immelt. These Defendants knew utilization rates were critically important to the determination and realization of profits on LTSAs, spoke on the topic to investors, assured investors they were routinely reviewing and had insight into customer utilization, and, at all relevant times during the Class Period, had access to, among other things, real-time customer utilization data that showed 80% to 90% declines in usage. ¶ 347.

411.    This trend was "reasonably likely to have a current or future effect on the registrant's financial condition." GE's ability to convert Contract Assets (or recognized revenue) to Industrial CFOA was largely dependent on a customer's utilization of their GE-serviced asset and, as a result, it was reasonably likely that the declining utilization rates would impact GE's ability to reach critical "milestones" within the LTSA. The inability to reach key milestones directly and negatively impacted GE's ability to invoice and collect cash on underlying LTSAs, as set forth above in ¶ 352.

412.    Accordingly, pursuant to Item 303, Defendants were required to disclose whether the declining utilization of GE-serviced assets under LTSAs was reasonably expected to have a "material . . . unfavorable impact on . . . liquidity" (i.e., CFOA) and the extent to which that trend was reasonably expected to impact GE's Industrial CFOA.

413.    In violation of Item 303, Defendants failed to disclose any of this information in 10-Ks filed by GE throughout the Class Period, or in the Company's 10-Qs, which incorporate the relevant 10-K on a quarterly basis.

### b.    GE Power's Reliance on LTSA Modifications and Cumulative Catch-Up Adjustments

414.    As explained above, in response to the negative market conditions addressed in Section VI.E.2. and their impact on GE Power's operations, GE Power relied on renegotiating and

modifying LTSAs to increase the total contract margin and generate immediate positive cumulative catch-up revenues.

415.    This trend and its corresponding impact on LTSA profitability was widely known to GE and GE's senior management. ¶¶ 368-79. From the announcement of ASC 606 in May 2014, Defendants were hyper-focused on LTSAs. Efforts to monetize LTSAs were reported internally in weekly, monthly, and quarterly reports, and were accessible to GE senior management, including the Individual Defendants. ¶ 404. These Defendants also knew of the trend from reports reflecting the number of LTSA renegotiations and their impact on cumulative catch-ups. Moreover, each reporting period, Defendants disclosed Contract Assets and positive cumulative catch-up adjustments, the cause of which Defendants knew was LTSA modifications.

416.    This trend was "reasonably likely to have a current or future effect on the registrant's financial condition" for the following reasons. ***First***, GE Power's ability to trigger positive cumulative catch-up revenue was knowingly unsustainable because the segment had only a finite number of LTSAs in its portfolio and limited ways to modify those LTSAs (as was needed to readjust estimates and generate catch-up adjustments). And, in light of the looming effective date of ASC 606, there was a date by which it would no longer be permissible. Thus, it was reasonably unlikely under ASC 606 that GE Power could continue to generate the immediate revenue it had so heavily relied upon during the Class Period.

417.    ***Second***, de-scoping existing service contracts to generate higher margins, and thus cumulative catch-up revenue, came at a long-term cost to GE Power. By removing the labor portion of the service contract, GE actually cut its long-term cash flow (i.e., the profit to be earned on service calls through the provision of labor after invoicing) just so that it could increase its short-term margins and report windfall cumulative catch-up adjustments in the particular quarter.

418.     *Third*, to incentivize customers to renegotiate the terms of their LTSAs, GE offered numerous incentives, including deferred payment terms on the LTSA. Because GE voluntarily extended payment terms and deferred payment, it delayed both the time in which GE could bill for and collect cash on those contracts and significantly reduced the likelihood of collectability.

419.     Accordingly, pursuant to Item 303, Defendants were required to disclose whether GE's reliance on LTSA modifications and cumulative catch-up adjustments was reasonably expected to have a "material . . . unfavorable impact on . . . liquidity" (i.e., CFOA) and to what extent that trend was reasonably expected to impact GE's CFOA. Further, Defendants were required to disclose whether the reliance on LTSA modifications and cumulative catch-up adjustments would have a "material . . . unfavorable impact on . . . results of operation" and to what extent that trend was reasonably expected to impact GE Power's revenue.

420.     In violation of Item 303, Defendants failed to disclose any of this information in 10-Ks filed by GE throughout the Class Period beginning no later than the 2014 10-K, or in the Company's 10-Qs filed thereafter.

### c.     GE Power's Widespread Use of and Reliance on Factoring to Hide its Liquidity Crisis

421.     As set forth above in ¶¶ 386-405, to mask the growing discrepancy between GE's Contract Assets and Industrial CFOA and its inability to convert Contract Assets into cash, GE Power engaged in widespread factoring of LTSA receivables to generate CFOA—often through LTSA contract renegotiations with terms that were less advantageous to GE than the initial terms.

422.     This trend was widely known to GE and GE's management, including both Bornstein and Immelt, as evidenced by the following facts: (i) in an internal meeting in or around June 2017, Bornstein himself stated GE was "*in too deep*" to depart from the practice of factoring (¶ 402); (ii) during the Class Period, GE internally created a task force to accelerate cash

collections on its LTSAs to help close the gap and concealed that GE was renegotiating contracts solely to boost earnings at the expense of collecting payment (¶ 394); (iii) according to multiple former employees, GE was factoring "everything" in its Power and Renewable Divisions (¶ 400); and (iv) throughout the Class Period, high-ranking GE executives pushed for monetization of invoices such that factoring was a global effort directed by GE Power management in conjunction with GE Capital and third parties (which bought some of the receivable streams from the LTSAs), and was reported in weekly, monthly, and quarterly reports. ¶¶ 403-04.

423.    This trend was "reasonably likely to have a current or future effect on the registrant's financial condition." Because factoring trades away future revenue for immediate cash, it was reasonably likely that GE's monetization and widespread factoring of LTSA receivables would have a material impact on future revenue and liquidity.

424.    Accordingly, pursuant to Item 303, Defendants were required to disclose whether GE Power's monetization of receivables through extensive factoring was reasonably expected to have a "material . . . unfavorable impact on . . . liquidity" (i.e., CFOA) and the extent to which that trend was reasonably expected to impact GE's Industrial CFOA. Additionally, Defendants were required to disclose whether factoring would have a "material . . . unfavorable impact on . . . results of operation" and the extent to which that trend was reasonably expected to impact GE Power's revenue.

425.    In violation of Item 303, Defendants failed to disclose any of this information in 10-Ks filed by GE throughout the Class Period beginning no later than the 2014 10-K, or in the Company's 10-Qs filed thereafter.

### 2.    Defendants' Materially False or Misleading Statements and Omissions

#### a.    GE's 2016 10-K

426.    In addition to violating trend disclosure rules under Item 303, Defendants also made affirmative false or misleading statements with respect to factoring. In this regard, the 2016 10-K at page 87 stated the following concerning the purpose for GE's factoring of receivables: "*In order to manage credit exposure*, GE sells current receivables to GE Capital and other third parties in part to fund the growth of our industrial businesses."

427.    The 2016 10-K similarly stated at page 155 that "*[i]n order to manage credit exposure,* the Company sells additional current receivables to third parties outside the Receivables Facility described in Note 22. In connection with certain of these sales, we provide servicing activities and limited recourse to the purchasers."

428.    The foregoing statements in ¶¶ 426-27 that factoring was used solely to "*manage credit exposure*" were materially false or misleading when made because, as GE would later reveal and numerous former employees have stated, the Company also used factoring in order to manage short-term liquidity. Indeed, GE used factoring in an effort to shore up its dwindling cash flow and mask the growing gap between Contract Assets and actual cash that Power was generating for the Industrials, including from LTSAs, as evidenced by the following facts: (i) in an internal meeting in or around June 2017, Bornstein himself stated GE was "*in too deep*" to depart from the practice of factoring (¶ 402); (ii) during the Class Period, GE internally created a task force to accelerate cash collections on its LTSAs to help close the gap and, according to FE-7, concealed that GE was renegotiating contracts solely to boost earnings at the expense of collecting payment (¶ 394); (iii) according to multiple former employees, GE was factoring "everything" in its Power and Renewable Divisions (¶ 400); and (iv) throughout the Class Period, high-ranking GE executives

pushed for monetization of invoices such that factoring was a global effort directed by GE Power management in conjunction with GE Capital and third parties (which bought some of the receivable streams from the LTSAs), and was reported in weekly, monthly and quarterly reports (¶¶ 403-04).

### b.   GE's January 20, 2017 Earnings Call

429.   In response to GE's expanded disclosures and the increasing gap between Industrial CFOA and Contract Assets, analysts began to question GE's reported Contract Assets. During a January 20, 2017 conference call associated with GE's 4Q16 and 2016 full year results, Steven Winoker, an analyst from Sanford C. Bernstein & Co., asked the following with regard to GE Power's cash flow:

> **_Since I only have one question I'd love to focus on cash here. And within that, Jeff, is there any factoring this quarter from GE Capital into GE industrial?_**
>
> And then also while it's the strongest cash flow quarter in a while, still a little bit below what we thought you guys implied when we talked about it before. Then as you think about it progressing through 2017 and beyond maybe just talk a little more about the cash flow initiative comp that really can give investor's confidence that the cash flow part of the story is improving.

430.   In response to this direct question, Defendant Bornstein stated: "So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring."

431.   Defendant Bornstein's statements were materially false or misleading when made because, in truth, GE was heavily reliant on factoring LTSA receivables to monetize Contract Assets and generate CFOA to meet targets, pay its dividends, and conceal the liquidity crisis that GE created through Power's strategy of manufacturing unbilled cumulative catch-up revenue, as evidenced by the facts set forth in ¶¶ 386-92.

### c.      February 22, 2017 Barclays Industrial Select Conference

432.    On February 22, 2017, during the Barclays Industrial Select Conference, Bornstein

discussed the impact of ASC 606 on GE's performance. Specifically, he stated:

> So there is no cash associated with any of this accounting change. It doesn't change
> anything about the economics of these contracts in any way. It's just a point of
> where you're recognizing revenue and where you're recognizing cost.

433.    Defendant Bornstein's statement identified in ¶ 432 was materially false or

misleading when made because, as detailed above and as revealed following GE's restatement of

Power's financial results after its implementation of ASC 606, GE was heavily reliant on

cumulative catch-up adjustments—prohibited under ASC 606—to generate revenues and, in turn,

cash from factoring of LTSA receivables. Thus, the accounting change significantly impaired GE

Power's ability to generate cash from LTSAs. ¶¶ 380-85, 438-43. GE has admitted that cumulative

catch-up revenue accounted for material portions of its earnings, in stark contrast to Bornstein's

statement. *Id.*

### d.      GE's April 21, 2017 Earnings Call

434.    During an April 21, 2017 conference call associated with GE's 1Q17 results, an

analyst from Credit Suisse asked questions about GE's Industrial CFOAs and Contract Assets. In

response, Bornstein assured investors that "*[W]e expect the contract drag on cash flow for the

year to be roughly the same*, '16 versus '17," and further stated:

> And I think you want us focused on that, that's all future cash, future economics, et
> cetera, on a go-forward basis. **We're not pulling future profit forward. That is not
> what we're doing.** We're just restating what—where we are in the contract from
> inception to date. The second part is where the long-term service agreements that
> protect our installed base, our penetration continues to improve.

435.    Defendant Bornstein's bolded statements identified in ¶ 434 were materially false

or misleading when made because, in response to an analyst's question, Bornstein claimed that GE

was "*not pulling future profit forward*" when, in fact, GE Power was relying at that time

extensively on renegotiating LTSAs to generate cumulative catch-up revenue and factoring to generate discounted invoices early, which GE Power then sold to GE Capital or other third parties to pull forward profits (often at a discounted rate) from future periods.

436.    During the same call, Immelt reiterated the results reported in the April 21 press release, stating, "***Industrial CFOA was a negative $1.6 billion***." According to Bornstein, the largest contributor to this negative CFOA was cash outflows on GE's Contract Assets ($1.9 billion) and, more specifically, GE's LTSA Contract Assets ($1.4 billion). Bornstein then stated:

> Contract assets were a use of $1.9 billion. This was $300 million worse than expected. Of the $1.9 billion, $500 million was from our long-term equipment contracts, where the timing of our $1 billion revenue recognition milestones differ. This will catch up throughout the year as we execute against the contract. The remaining $1.4 billion is our long-term service agreements. There were 2 pieces to this. $600 million is related to service contracts where we've incurred cost and booked the revenue, but haven't yet billed the customer. ***We expect this to partly come back over the year as we see higher asset utilization in Power*** and Aviation. ***And we've seen these similar trends in the prior years***. ***The other $800 million are contract adjustments driven by better cost performance and part life, primarily driven by Power*** and Aviation.

437.    Defendant Bornstein's bolded statements in ¶ 436 were materially false or misleading when made because contrary to his assertion throughout the Class Period, utilization of GE-serviced assets under GE Power's LTSAs, the primary driver of Contract Assets, was drastically ***down***, impairing GE's ability to collect unbilled revenues. Further, Defendants had not "seen these similar trends" in prior years—throughout the Class Period, utilization of Power-serviced assets was drastically down. ¶¶ 340-57. Moreover, the disclosed Contract Assets were inflated by Defendants' extensive reliance on LTSA modification and cumulative catch-up adjustments. Indeed, GE effectively wrote down the value of LTSA Contract Assets by ***$8.7 billion*** when, in April 2018, it restated its financials pursuant to ASC 606.

G.      **Defendants Slowly Reveal GE's Liquidity Crisis**

438.    With ASC 606's effective date on the horizon, GE made additional disclosures about its reliance on cumulative catch-up revenue. For example, during the February 22, 2017 Barclays Industrial Select Conference, Bornstein stated:

> The other is in our long-term service contract accounting. We have an enormous portfolio, many times bigger than anybody else in the space, both in Power -- principally in Power systems and Aviation.
>
> And the rules around it are changing and it's complex, but there are several things that we do today that we account for on a cum[ulative] catch basis -- I'll explain that in a moment -- that now will be accounted for on a prospective basis. ***So, for instance, if you have a contract with a customer today and you modify it***.
>
> You add a bunch of new equipment to it, you extend the maturity, you change something around the operating conditions and you reprice it. ***A lot of these things are priced on a per-utilization, per hour basis, if you will.***
>
> In today's model, that kind of a modification you would go back to the first day of the contract, recalculate based on the changes. What's the margin rate for the contract now? ***If the margin rate went down, you go back to day one and you book a loss for restating times zero to the current date on the lower margin rate.***
>
> If the margin rate is higher, you do the opposite. You get a cum[ulative] catch gain, and you restate the margin rate of contract. ***So for things like modifications, termination clauses, etc., upgrades, all of that will be accounted for prospectively as opposed to retrospectively.***

439.    With fewer LTSAs to factor and an inability to continue relying on cumulative catch-up revenue, the cash flow issues that were created by the undisclosed steps taken during the Class Period began to materialize gradually, but the extent of the fraud remained concealed with additional false statements made by Defendants in connection with these partial corrective disclosures.

440.    On April 21, 2017, while Defendants acknowledged that Industrial CFOA was ***about $1 billion below our expectations***" due in large part to $1.4 billion in negative cash flows from GE's LTSAs, they simultaneously claimed that the disappointing Industrial CFOA was just

a "slow start" and that—despite starting out $1.6 billion in the hole after 1Q17 results—Industrial CFOA would improve so dramatically during the remainder of the year that full year 2017 guidance of $12 to $14 billion would still be achieved. As a result, the full extent of the fraud remained hidden from the investing public and the stock remained inflated.

441.    Likewise, on GE's July 21, 2017 earnings call, Bornstein represented that Power would be up in the second half of 2017, stating, "then when you think about total year, we still think about the Power business being up mid-single digits on revenue and up roughly high- to low-double digits on earnings." Once again, by failing to disclose the steps taken in GE Power to mask the undisclosed trends, the full extent of the fraud had remained hidden from the investing public and the stock remained inflated.

442.    It was not until October 20, 2017, when GE announced that Industrial CFOA for 2017 would be *slashed almost in half* from the $12 billion to $14 billion range Immelt and Bornstein had assured the market could be achieved, that investors began to appreciate the extent of the problems at Power. In this respect, on an October 20, 2017 earnings call, GE's new CFO Miller (Bornstein had departed abruptly, as explained more fully below), stated that:

> On cash flow, we now expect industrial cash flow for the year to be *about $7 billion* . . . . This is well below the $12 billion estimate we provided at second-quarter earnings, and it's principally driven by three businesses. *Power is the biggest driver* on lower volume, higher inventory, and the timing of payments on long-term equipment contracts.

443.    The following events after the Class Period corroborate the fraud, as Industrial CFOA continued downward in 2018 due to the fact that the fraud at GE Power could no longer be sustained:

- As previously discussed, on April 13, 2018, GE restated its financials and quantifying the impact that such adjustments had on its financial performance during the Class Period. Specifically, GE disclosed that it was effectively writing down the value of its LTSA Contract Assets by *$8.7 billion*.

135

- In its April 20, 2018 earnings call, GE reported that "total industrial free cash flow was negative $2 billion in the [first] quarter [of 2018]." Further, the Company's 2018 financial figures confirm the material extent to which GE had been using cumulative catch-up adjustments to pad its reported revenue and profits.

- No longer able to rely upon cumulative catch up revenue, GE reported on July 20, 2018 that Power's revenue declined 19% year-over-year, while quarterly profits plummeted by 58% year-over-year. Overall, GE's reported EPS declined by 33%, from $0.12 in the second quarter of 2017 to $0.08 in the second quarter of 2018.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

444.   Class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations and omissions of material facts, trends, commitments, events, and uncertainties required to be disclosed, relating to, *inter alia*: (i) the Company's continuing exposure to enormous and undisclosed risks related to its retained LTC insurance portfolio; and (ii) the undisclosed risks GE faced due to the deterioration of its Industrial CFOA.

445.   As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of GE's common stock traded at artificially inflated prices throughout the Class Period.

446.   Unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions, Class Members purchased GE stock at artificially inflated prices on the NYSE. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Class members would not have purchased or otherwise acquired GE stock at the artificially inflated prices at which it traded during the Class Period.

447.   The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between April 21, 2017 and January 24, 2018. During this corrective disclosure period, GE's stock fell precipitously as the

artificial inflation caused by Defendants' unlawful conduct exited GE's stock price. It was not until the final corrective disclosure and/or materialization of concealed risk on January 24, 2018 that the full truth was known to the market such that there was no longer any artificial inflation in GE's stock price attributable to the fraud.

448.    The declines in GE's stock price during the corrective disclosure period, including, *inter alia*, the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

449.    Plaintiffs and other Class members suffered economic losses as the price of GE's stock fell in response to partial corrective disclosures and/or the materializations of concealed risks. The price declines in GE stock on the corrective disclosure dates were a direct result of the materially false or misleading statements and omissions alleged herein. It was foreseeable that such disclosures would cause GE's stock price to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiffs and other Class members.

450.    The following corrective disclosures caused GE's stock price to decline, thereby damaging investors, and are representative, not exclusive, of the partial corrective disclosures and/or materializations of concealed risks that led to Plaintiffs' and investors' damages for which relief is sought in this case.

### A.    April 21, 2017: Financial Results for 1Q17

451.    On Friday, April 21, 2017, before the market opened, GE issued a press release and filed it on an 8-K with the SEC, titled "GE 1Q 2017 Earnings." Among other things, the press release reported that "Industrial operating cash flows[] were ***negative*** $1.6 billion driven primarily by an increase in working capital and ***timing of billings on our long-term equipment and service***

*contracts*." The slide deck for GE's 1Q17 earnings presentation identified GE's CFOA guidance of $12 to $14 billion for 2017.

452.   Also on Friday, April 21, 2017, before the market opened, GE held an earnings conference call to discuss its 1Q17 results with analysts and investors. During the call, Immelt reiterated the results reported in the April 21 press release, stating, "***Industrial CFOA was a negative $1.6 billion***." Bornstein elaborated on Immelt's comments, stating, "our industrial CFOA was at $1.6 billion usage of cash, ***about $1 billion below our expectations***." According to Bornstein, the largest contributor to this negative CFOA was cash outflows on GE's Contract Assets ($1.9 billion) and, more specifically, GE's LTSA Contract Assets ($1.4 billion). As Bornstein explained:

> Contract assets were a use of $1.9 billion. This was $300 million worse than expected. Of the $1.9 billion, $500 million was from our long-term equipment contracts, where the timing of our $1 billion revenue recognition milestones differ. This will catch-up throughout the year as we execute against the contract. ***The remaining $1.4 billion is our long-term service agreements***. There were 2 pieces to this. $600 million is related to service contracts where we've incurred cost and booked the revenue, but haven't yet billed the customer. We expect this to partly come back over the year as we see higher asset utilization in Power and Aviation. And we've seen these similar trends in the prior years. The other $800 million are contract adjustments driven by better cost performance and part life, primarily driven by Power and Aviation.

453.   Defendants' April 21, 2017 disclosure partially corrected and/or reflected the materialization of risks concealed by their material misstatements and omissions of material facts, as alleged herein. On this news, GE's stock price declined from a close of $30.27 on April 20, 2017 to $29.55 on April 21, 2017, a drop of $0.72 per share, or 2.4%, on heavy volume of 72,351,400 shares.

454.   Analysts were surprised by the revelation of negative Industrial CFOA cash flow and expressly stated that investors were reacting to this disappointing information, despite otherwise favorable earnings results reported by GE. For example, an April 21, 2017 Morningstar

analyst report stated, "[s]hares of . . . General Electric slumped April 21 as *investors reacted to negative industrial cash flow in the first quarter*, which largely overshadowed [other more favorable results]." An April 21, 2017 Morgan Stanley report similarly noted, "we continue to be disappointed by weak cash generation, with $1.6bn of negative CFOA . . . *the contract asset headwind clearly drops a flag on the quality of the quarter*." An April 23, 2017 RBC analyst report titled "*Cash Flow Shortfall Gives Investors a Reason Not to Like 1Q17 Beat*" expressly stated under "Key points" that:

- "GE's 1Q17 earnings call *was hijacked* by its disappointing cash flows from operating activities (CFOA)"; and

- "the 1Q [2017 CFOA] shortfall and back-end-weighted ramp arguably drove most of the -2.4% stock reaction."

**B.       July 21, 2017: Financial Results for 2Q17**

455.       On Friday, July 21, 2017, before the market opened, GE issued a press release and filed it on an 8-K with the SEC titled, "GE 2Q 2017 Earnings," that summarized earnings for the second quarter ended June 30, 2017.

456.       During a July 21, 2017 earnings conference call held before the market opened, Bornstein updated investors on the $12 to $14 billion Industrial CFOA guidance for 2017 that the Company reiterated during the earnings call held in April 2017 by stating:

> For the year, we are *trending to the bottom end* of the $12 billion to $14 billion range on CFOA, driven by pressure, principally in Power and Oil & Gas.

457.       In addition, Bornstein provided results for GE Capital and stated, "[w]e recently have had *adverse claims experience in a portion of our long-term care portfolio* and we will assess the adequacy of our premium reserves. We will update you in the fourth quarter."

458.    Defendants' July 21, 2017 disclosures partially corrected and/or reflected the materialization of risks concealed by their material misstatements and omissions of material facts, as alleged herein.

459.    As investors absorbed this news, GE's stock price fell $0.78 from a close of $26.69 on Thursday, July 20, 2017 to close at $25.91 on Friday, July 21, 2017, a drop of 2.92% on unusually large volume of over 90 million shares. On the next trading day, Monday, July 24, 2017, the share price decline continued as the market continued to digest this news, and GE shares dropped to close at $25.43 on July 24, 2017 on heavy volume of over 56 million shares, a two-day drop of $1.26 per share, or nearly 5%.

460.    Analysts noted the importance of the surprising news that Industrial CFOA was being forecasted to come in at the low end of the $12 to $14 billion range. For example, RBC issued a report on July 23, 2017 stating, "[o]n [the] last earnings call [on July 21, 2017] . . . GE 'ripped the band-aid' by cutting its 2017 EPS and Industrial CFOA guidance ranges to their respective low ends" and "[i]mportantly, the company now expects full-year Industrial CFOA to come in at the low-end of its $12-$14 billion guidance range . . . ."

461.    Analysts were similarly surprised about the adverse claims experience in the LTC book of business. For example, a J.P. Morgan analyst report by Tusa, dated July 24, 2017, noted that, although the magnitude of the LTC reserve issue had not been revealed, the mere existence of the issue presented a risk to GE Capital being able to sustain the dividends it had been "upstreaming" to its parent company, GE, which, in turn, presented a risk to GE's ability to continue to pay dividends to GE shareholders. The J.P. Morgan report states:

> [T]he comment [on the 2Q17 earnings call] that [GE] will be evaluating Insurance for losses is a stark reminder that GECS is not just GECAS. Indeed, GECAS is $40B of assets out of a total $153B. In fact, Insurance is almost the same size at ~$36B, with roughly breakeven earnings contribution, ***and now prone to "adverse***

*claims" in long term care*, which according to our JPM Insurance analysts has in recent years been measured in "the billions" for others. This is a TBD, and we now see some risk to vertical earnings in 2H, *as well as risk to potential for meaningful up streamed dividends in the years ahead*.

### C.     October 20, 2017: Financial Results for 3Q17

462.    On October 20, 2017, before the market opened, GE filed an 8-K with the SEC attaching a "GE 3Q 2017 Earnings" summary. The summary reported GE's CFOA for the quarter (as discussed further below) and stated that although GE Capital had paid $4 billion in dividends to GE through September 30, 2017, the Company was "deferring decision on additional dividends until Insurance reserve review [related to LTC insurance] is completed."

463.    On October 20, 2017, before the market opened, GE held an earnings conference call to discuss its results for 3Q17. On the call, Bornstein stated:

> Our reported CFOA was $500 million in the quarter. That represents GE cash flow . . . . Next on GE Capital [do see] we did not receive a dividend in the quarter. As you know, we're in the process of performing an actuarial analysis of claims reserves in our insurance business. Until that review has been completed, *we have deferred the decision to pay GE Capital dividends to GE*.

> Our industrial CFOA was $1.7 billion in the quarter, adjusted for $1.3 billion of US pension plan funding and deal taxes. This is down $1.2 billion from prior year. With BHGE, on a dividend basis and excluding oil and gas CFOA, our industrial CFOA was $2.1 billion.

> *            *            *

> Contract assets were a use of $800 million in the quarter. . . . $500 million is from our long-term service agreements due to better cost performance and parts life, primarily in power and transportation.

464.    On the call, Miller further stated:

> On cash flow, we now expect industrial cash flow for the year to be about $7 billion . . . . This is well below the $12 billion estimate we provided at second-quarter earnings, and it's principally driven by three businesses. Power is the biggest driver on lower volume, higher inventory, and the timing of payments on long-term equipment contracts. Oil and gas is about $1 billion off; about half of that being driven by lower volume and collections in the first half, and the rest driven by our methodology change to show them on the dividend basis for the second half of the

year. And renewables is also about $500 million off on lower-than-expected volume impacting inventory and progress collections.

465.    On the call, Flannery added:

As Jamie [Miller] mentioned, cash will be approximately $7 billion for the year. Power alone will be lower than expected by $3 billion on lower earnings and higher inventory. . . .

We expect substantially higher cash generation in 2018 driven by lower structural headwinds, things like tax and restructuring charges; a rigorous cost-out plan; and a substantial improvement in working capital. That said, ***obviously, $7 billion of cash is significantly lower than guidance***, and this performance is simply not acceptable.

466.    On the call, Bornstein further stated:

GE Capital ended the quarter with $155 billion of assets, including $33 billion of liquidity, down $6 billion from the second quarter. As I mentioned on our last earnings call, ***we have recently observed elevated claims experience*** for a portion of the long-term care book at GE Capital's legacy insurance business, ***which represents $12 billion or roughly 50% of our insurance reserves***.

As a result, we began a ***comprehensive review in the third quarter of premium deficiency assumptions*** that are used in the annual claims reserve adequacy test. This is a very complex exercise, and the team is making good progress. We expect to complete this process by the end of the year. ***Until the review has been completed, we have deferred the decision to pay approximately $3 billion of additional GE Capital dividends***. Year to date, GE Capital has paid $4 billion of dividends to GE.

467.    During the call, Flannery also announced that the Company had "identified $20-billion plus of assets that we will exit in the next 1 to 2 years."

468.    In reaction to the Company's disclosures, which partially corrected and/or reflected the materialization of risks concealed by Defendants' material misstatements and omission of material fact, as alleged herein, there was an immediate price decline in GE's stock, which opened trading on the NYSE on October 20, 2017 trading down more than 5.6% from the closing price of $23.58 on the previous day, October 19, 2017. While the price rebounded temporarily by the close of trading on Friday, October 20, 2017, by the close of the market on the next trading day (Monday,

October 23, 2017)—after investors had sufficient time to absorb the impact of this news and after several analysts (including J.P. Morgan, Morgan Stanley, and UBS AG) downgraded GE's stock in light of the disclosures—the stock closed at $22.32 on October 23, 2017, down $1.26, or 5.34%, from the close on Thursday, October 19, 2017 on extremely high volume of 187,340,900 shares traded. As the market continued to absorb this news, GE's stock price continued its slide over the next few trading days, falling to $21.89 on October 24, 2017, and then to $21.50 on October 25, 2017 and then to $21.32 on October 26, 2017. Thus, over the course of this five-day period while the market digested the information disclosed on October 20, 2017, GE's stock price sank from a close of $23.58 on October 19, 2017 to a close of $21.32 on October 26, 2017, a cumulative drop of $2.26, or almost 10%.

469.    As discussed below, the changed views of analysts from the time the information was initially disclosed on October 20, 2017 to the next trading day (October 23, 2017) demonstrate that the market continued to digest the information after the initial disclosure on October 20, 2017.

470.    For example, on October 20, 2017, when GE held its conference call, Morningstar opined that the GE's dividend was "at risk" based on the October 20, 2017 disclosures. But, by Monday, October 23, 2017, after further digesting the information disclosed on October 20, 2017, Morningstar then informed investors that the risk of a dividend cut was more likely. Specifically, in an analyst report on Friday, October 20, 2017, Morningstar wrote, "[w]e plan to cut our fair value estimate by as much as 10% following General Electric's third-quarter earnings report, which revealed deeper challenges in the power segment than we had anticipated." The report specifically pointed to GE "halv[ing] management's original 2017 target of $12 billion-$14 billion in industrial cash from operations," and further wrote:

> More concerning is the suspension of GE Capital dividends, ***pending actuarial analysis of claims reserves in a long-term care insurance business***. Absent these

dividends to the parent, and with Flannery positioning 2018 as a trough or "reset" year, *we think it would be irrational for GE to maintain its current dividend*. *Flannery did not explicitly confirm a cut* but hinted that GE would be managed for total shareholder return going forward.

471.    Thus, Morningstar was initially of the view that the "Dividend [Was] *at Risk*." But, by the next trading day, Monday, October 23, 2017, Morningstar actually acted on its plan to lower estimates for GE by 10% (lowering its price target for the stock from $32 to $29) and stated:

We're lowering our fair value estimate to $29 from $32 *on weaker-than-expected industrial cash flow generation*. GE's dismal third quarter revealed both financial and behavioral factors that also lead us to believe *the risk of a dividend cut has increased*. Originally, we had four conditions that caused us to believe GE would be able to maintain its $8 billion dividend. *Two of those conditions broke down in the third quarter*. Management indicated that industrial cash from operations would reach only $7 billion in 2017, *far short of the original $12 billion-$14 billion prior management targeted*. Subtracting capital expenditures from this new figure would leave only about $4 billion in industrial free cash flow, and that is before the $1.8 billion of pension contributions that GE is expected to make this year. Second, we had anticipated an additional $3 billion-$4 billion in GE Capital dividends to help bridge the gap if industrial free cash flow came in light. However, *management revealed the suspension of GE Capital dividends pending review of reserves needed to support a long-term care insurance business*. In our view, these were the two most important conditions needed to sustain the current dividend.

472.    An RBC analyst report dated October 23, 2017 offered the following explanation for why the stock rebounded on Friday, October 20, 2017, despite the negative news:

New CEO John Flannery's much-anticipated inaugural earnings call set off a rollercoaster day for GE stock. We believe that his brutal honesty about prior mismanagement and commitment to rethinking the entire business model resonated well with investors. The turning point that sparked the stock rally from down -6% Friday morning, in our view, was during Q&A when management crisply explained how the ~$7 bil 2017 CFOA level was not the "new normal". . . .

Biggest surprise: Despite guidance cuts, GE's stock ends the day up 1%. Given the magnitude of the guidance cuts, the urgent question we fielded on Oct-20 was *why the stock rallied from -6% at the open to up 1% at the close*. Our take is that this rally was driven by two factors: (1) The bridge of cash usage items that will not repeat in 2018, demonstrating how $7 bil is not the "new normal", eased some shock over the CFOA guidance cut. (2) John Flannery's brutal honesty about GE's prior failings, along with a heartfelt "falling on his sword" by outgoing CFO Jeff Bornstein. These factors helped investors conclude that a bottom could be at hand.

473.    The RBC report, like the October 23, 2017 Morningstar report, went on to state, "[w]e expect GE to cut its dividend ahead of the Nov-13 analyst meeting," and went on to: (i) discuss what was learned from the earnings call; (ii) stress both CFOA and LTC concerns; and (iii) actually *lower its price target* for GE's stock, stating:

> The deterioration of GE's cash generation and sustainability of its dividend remains one of the biggest topics of debate facing the company today. To address this, new CEO John Flannery was unequivocal about his focus and commitment to improving cash flows at the company. That said, ***GE was forced to once again cut its 2017 Industrial CFOA target, moving from ~$12 billion down to ~$7 billion***, implying a -40% decrease. In addition, the company had originally planned to orchestrate $6-$7 billion of total GE Capital (GECC) dividend back to the parent for the full-year. However, though it has only generated $4 billion YTD, ***management is deferring any decisions on additional GECC dividends until it completes an actuarial review of the claims reserves in its insurance business*** to gauge the level of cash outlays that may become necessary.

Another area of the report states:

> GE is currently in the midst of reviewing the adequacy of its reserves on its long-term care reinsurance business within GE Capital, which is expected to conclude in 4Q17. ***Given that this review may determine that roughly half of GE Capital's reserves are insufficiently funded and that additional contributions must be committed***, management has opted to defer any decision on transferring further dividends from GE Capital to the Industrial parent in 2H17. Year-to-date, the company has generated $4 billion of GE Capital dividends, vs. the prior target of $6-$7 billion for the year, ***which may no longer be feasible*** depending on the conclusion of the insurance reserve assessment.

474.    In an October 23, 2017 analyst report, Deutsche Bank similarly pointed to the surprising disclosures regarding GE's likely LTC charges in issuing a "sell" recommendation to investors, stating, *inter alia*:

> The fact that GE owes such a large bill for legacy insurance likely surprised a lot investors considering GE supposedly exited Genworth, ERC and GE's other insurance businesses many years ago. In fact, of GE Capital's [approximately] $155bn of assets at 3Q17, roughly $27bn are reportedly tied to insurance. . . . Why is GE still taking charges for its discontinued operations . . . .

### D.      November 13-14, 2017: Investor Update and Goldman Sachs Conference

475.    On Monday, November 13, 2017, before the market opened, GE released to the market the long-awaited "GE Investor Update" from Flannery. Flannery had been conducting a 100-days' long "deep dive" into all of GE's businesses and had earlier promised investors that he would update them on GE's plans for the future in November 2017, including an update on the LTC insurance issue.

476.    In the written "GE Investor Update," GE announced that it was cutting its dividend by 50% from the then-current level of $0.96 per share to $0.48 per share. The "GE Investor Update" stated that this reduction meant that the all-important dividend yield would be reduced from approximately 4.7% to approximately 2.3%. The "GE Investor Update" further stated that there would be a "[p]otential 4Q[17] insurance reserve adjustment," but did not specify the amount, and further disclosed that while GE Capital had paid GE $4 billion in dividends to GE through the year, the decision on whether GE Capital would pay any further dividends to GE in 2017 was "deferred" and that GE was "[n]ot planning for dividend from GE Capital in 2018."

477.    This announcement was a highly significant event, as the dividend cut was only the second dividend cut GE had made since the Great Depression (the other one was during the financial crisis in 2008), and, as detailed in the Investor Update call described below, was directly attributable to GE's disappointing CFOA and forthcoming LTC reserve charge.

478.    Beginning at 9 a.m. New York time, and continuing after the market had opened, GE held an "Investor Update" conference call with analysts and investors to discuss the written update further. During the call, Flannery stated:

> You saw this morning that we announced the reduction in our dividend. It's in the context really of focusing on managing the company for total shareholder return. ***I'd just start by saying we understand this is an extremely painful action for our shareholders, our owners. We're reducing the dividend by 50% to $0.48 a share.***

Not a decision we took lightly. It was after extreme deliberation and consideration what the alternatives were.

*     *     *

With respect to the dividend, again, I just want to reiterate, **we understand how important the dividend is to our shareholders**, especially the people who use it for current income. We've gone through exhaustive analysis of this, but I want to start, first and foremost, with a full recognition of the gravity of this decision and the effect it has on many people. That said, the reduction of this dividend to $0.48 is a product, really, of where we are as a company right now. So we had a $0.96 dividend established. We had a path where we thought the industrial cash flow generation would grow, that would grow into the dividend, that we'd end up in 2018 with a payout ratio that was quite comparable to what you'd see from our peers. The reality is that hasn't unfolded that way. The cash profile has not unfolded that way, **and we've been paying a dividend in excess of our free cash flow for a number of years now**.

479.     GE then went on to discuss reasons for its dividend cut—Industrial CFOA shortfalls and the lack of an upstream dividend from GE Capital to GE for the remainder of 2017 and 2018 as a consequence of the LTC insurance issues. Flannery reiterated the Company's CFOA forecast reduction in the following question and answer exchange during the call:

**Unidentified Participant:**

[S]hortly after you were named CEO, it was widely quoted in the Journal and elsewhere that the dividend was safe. Surprised that you would make such a strong statement early on, which . . . has hurt your credibility right out of the gate. . . . When did you make the decision? . . .

**John L. Flannery—General Electric Company—Chairman & CEO:**

So I think **there's been major change in our cash flow forecast**. So the time we went out with that first statement, we were having a $12 billion to $14 billion CFOA. And the day I started, there was a guide to the low end of that range. . . . So we're now at a $7 billion number. . . . [F]undamentally, that **dividend was predicated on us growing to a certain level that we just did not see happening in terms of industrial cash flow** in the next couple of years . . . . **So the single biggest delta, I think is obvious, which is what happened in the Power business**.

480.     On the call, regarding GE's review of its LTC insurance reserves, Miller updated investors as follows:

One area, I'll just pause and talk about for a minute, is GE Capital. And as many of you know, *we're in the middle of an ongoing reserve review at our insurance businesses there*. This process is ongoing. It involves multiple third parties and it's not done at this point. And I don't have a number for you today. We're on track to conclude that in December. *And we mentioned to you before that we're not taking a second half [2017] GE Capital dividend of about $3 billion. And as we go through this process, at this point, I do expect the charge to be more than that*. But we do have capital plans in place and we don't expect to have to put GE parent cash into GE Capital.

*       *       *

Probably the last thing I would just mention on this page is that we're not planning a GE Capital dividend [to be paid to GE] for 2018.

481.   On November 14, 2017, Miller appeared at the Goldman Sachs Industrials Conference beginning at 9:30 a.m. New York time (i.e., after the market had opened), during which one analyst noted that in "[y]esterday's presentation, GE Capital was noticeably absent in the discussion there." Miller reiterated, "you saw that we cut the dividend yesterday by 50%" and provided further information. In response to an analyst's question, Miller further elaborated on the information provided in the November 13, 2017 presentation the day before, stating:

And then the second piece to your question was really around the insurance review we have ongoing. Many of you may know, we're in the middle of a review of our insurance reserves. This is a book of largely reinsured long-term care businesses back from more than a decade ago. That review is ongoing, we're right in the middle of it. It involves multiple third parties. It's not done so we don't have any answers to it today. It's on track for completion in December. So when we know what that is, we'll announce it. We had announced earlier that we had deferred the decision on a GE Capital dividend of about $3 billion in the second half of the year. At this point in the process, *I'd tell you that I expect that charge to be more than that*, but we also have capital plans in place and I don't expect to have to put parent cash into GE Capital at this point. But look, when we know and when we understand this better, we will announce it and be sure everybody knows.

482.   The enormous 50% dividend slash was more than analysts had been anticipating. For example, after the October 20, 2017 disclosures, in an October 23, 2017 analyst report, Morgan Stanley had forecasted a "higher probability of a dividend cut to [approximately] $0.70 . . . ." Thus, the unanticipated halving of the dividend to a substantially lower $0.48 per share and the need for

148

charges exceeding $3 billion for LTC reserves caught analysts and the market off guard and sent the stock price reeling. This news, which partially corrected and/or reflected the materialization of risks concealed by Defendants' materially false or misleading statements and omissions of material facts, as alleged herein, caused GE's stock price to drop from a close of $20.49 on Friday, November 10, 2017 to close at $19.02 on Monday, November 13, 2017, a drop of over 7%, on heavy volume of over 261 million shares. The share price decline continued on the next trading day as the market continued to digest the shocking news about GE's massive dividend cut and need for larger-than-previously-disclosed LTC insurance reserves. On Tuesday, November 14, 2017, GE's stock fell an additional $1.12 per share, or 5.8%, to close at $17.90 on even heavier volume of 312,556,800 shares. The stunning news released by GE on November 13, 2017 and further discussed by GE at the November 14, 2017 Goldman Sachs Industrials Conference resulted in a two-day share price free fall of more than 12.5%.

483.    As analysts explained, the dividend cut was particularly distressing news to GE's "retail investors" who placed great emphasis on GE's attractive dividend yield. In a November 14, 2017 Deutsche Bank report, under the heading "***Negative surprises***," Deutsche Bank wrote, "[t]he dividend cut to 48 cents ***was steeper than we expected***." The Deutsche Bank report goes on to note that "retail investors," who had owned approximately 40% of GE's shares, were particularly apt to punish the stock because such investors had been heavily reliant on GE's (formerly) attractive dividend yield. The Deutsche Bank report states:

> Yesterday, GE's analyst meeting ***surprised*** on several fronts.
>
> **Steep dividend cut**
> For the third time in its history, GE cut its dividend. Only this time, the cut wasn't predominantly driven by macro forces as was the case in the past (ie, Great Depression, Great Recession) but instead was heavily attributable to circumstances that were created by GE itself—namely excessive earnings ramp/targets matched with a dividend payout ratio of 45-50%.

The cut to 48 cents from 96 cents came in lower than consensus expectations of ~60 cents, in our opinion. . . .

**With >40% of GE's common equity owned by retail investors, we believe substantial near term selling pressure on GE could further ensue as retail investors who previously counted on the GE dividend look elsewhere.**

484.    In a November 14, 2017 analyst report, Citigroup Global Markets, Inc. lowered its price target from $27 to $25 and wrote that "***[p]ower is a mess*** right now. GE Capital will likely take *a big insurance charge*, and Cash/EPS could flat-line close to $1" and further stated that "the long term care reserve in GE Capital *will be bigger than we thought*."

### E.    January 16, 2018: GE's "Insurance Update"

485.    On Tuesday, January 16, 2018, before the market opened, GE issued a press release announcing the results of its reserve testing related to its LTC portfolio and disclosed the shocking news that it would take an "after tax GAAP charge of $6.2 billion for the fourth quarter of 2017" ($8.9 billion pre-tax) and that "GE Capital expects to make statutory reserve contributions of ~$15 billion over seven years."

486.    On January 16, 2018, before the market opened, GE also filed an 8-K with the SEC, which stated:

> On January 16, 2018, GE provided an update on the previously reported review of premium deficiency assumptions related to GE Capital's run-off insurance business (North American Life and Health ("NALH")). With the completion of that review, and of NALH's annual premium deficiency test, ***GE recorded an increase in future policy benefit reserves of $8.9 billion*** and $0.6 billion of related intangible asset write-off for the fourth quarter of 2017. ***This will result in a $6.2 billion charge*** ($7.5 billion upon remeasurement under tax reform) on an after-tax GAAP basis ***to GE's earnings in the fourth quarter of 2017***.
>
> As a regulated insurance business, NALH is subject to a statutory accounting framework for setting reserves that requires the modification of certain assumptions to reflect moderately adverse conditions and other differences from the reserve calculation under GAAP. Under that framework, we estimate that ***GE Capital will need to contribute approximately $15 billion of capital to NALH over the next seven years***. GE Capital plans to make a first capital contribution of approximately $3 billion in the first quarter of 2018 and expects to make further contributions of

approximately $2 billion per year in each of the six following years, subject to ongoing monitoring by NALH's primary regulator, the Kansas Insurance Department. GE Capital plans to fund the capital contributions with its excess liquidity and other GE Capital portfolio actions and ***does not expect to make a common share dividend distribution to GE for the foreseeable future***.

487.    On January 16, 2018, before the market opened, GE held an "Insurance Update Call" as a follow-up to the press release. During the call, Flannery stated:

> We've taken an after-tax GAAP charge of $6.2 billion, which is $7.5 billion at a 21% tax rate. And you will see that reflected in our fourth quarter financials. GE Capital will make a $3 billion statutory cash contribution to its insurance subsidiary in the first quarter of 2018 and approximately $2 billion annually from 2019 to 2024, for a total of approximately $15 billion.

> Needless to say, at a time when we are moving forward as a company, I'm ***deeply disappointed at the magnitude of the charge*** in this legacy portfolio.

*       *       *

> Clearly, in hindsight, we underappreciated the risk in this book.

488.    In contrast to Defendants' repeated proclamations during the Class Period that GE had exited LTC before "the storm," and that the quality of its LTC book was "stable," Flannery acknowledged on January 16, 2018 that GE had been focused internally on its LTC portfolio throughout the Class Period. Flannery noted that executives "reviewed" GE's LTC exposure "[i]n 2015, as part of the GE Capital exit process" and further stated that GE's LTC book "has gone through a standard evaluation process and testing every year as is the standard in the industry."

489.    During the January 16, 2018 conference call, Zanin acknowledged that GE's LTC claims experience was no different from—and thus, no better than—those of other LTC insurers (many of which had increased their reserves long before GE), stating, "the entire industry has experienced greater claims than originally anticipated where more people go on claim and for longer than expected."

490.    In response to this disturbing news, which partially corrected and/or reflected the materialization of risks concealed by Defendants' materially false or misleading statements and omissions of material facts, as alleged herein, GE's share price sank from a close of $18.76 on Friday, January 12, 2018 to $18.21 on Tuesday, January 16, 2018 (the next trading day), a drop of approximately 3% on heavy trading volume of 205,657,000 shares. As investors continued to digest the news, the price drop continued the following trading day when, on January 17, 2018, GE's stock fell to $17.35 from the January 16 close of $18.21, a drop of an additional 4.7% on heavy trading volume of 185,781,800 shares. The share price decline continued for the next two days, closing at $16.77 on January 18, 2018 and then at $16.26 on January 19, 2018. Thus, as the market continued to digest the news, GE's stock price declined over this four-day period from a close of $18.76 on Friday, January 12, 2018 to close at $16.26 on January 19, 2018, a cumulative drop of $2.50 per share, or more than 13%.

491.    Analysts were incredulous about the enormity of the LTC reserve charge. During the January 16, 2018 call, analyst Jeffrey Todd Sprague, Founder and Managing Partner at Vertical Research Partners, LLC, remarked that "[i]t is hard to imagine a $15 billion problem materialized in the course of a year, like there was not enough rigor behind this process."

492.    Numerous analysts also remarked that the LTC reserve charge was greater than what the market had expected. In an analyst report dated January 16, 2018, titled "*Insurance woes hit GE hard*," Deutsche Bank stated its surprise regarding GE's enormous charge to earnings related to LTC insurance, especially since LTC reserve issues had been revealed to the market by other companies with LTC exposure (but not by GE) at least as early as 2014:

> This morning, GE announced that it would take $6.2bn of 4Q17 after-tax charges to shore up reserves for GE Capital's long term care reinsurance book ($7.5bn at 21% US tax rate), or ***more than twice the original estimate last year of ~$3bn***, which we had presumed was a pretax number—this was not publicly specified. The

charges come well after Genworth first flagged long term care issues in late 2014. The company also called out a considerable cash funding requirement of $15bn over the next 7 years. . . .

Overall, the charges and scope of the problem are **significantly worse than we had anticipated**.

493.    In an analyst report dated January 16, 2018, titled "GE—Insurance Reserve Much

Worse Than Anticipated; $15 Bil of Contributions Over 7 Years," RBC wrote:

Our view: Although we had been previously warned that Sector Perform-rated GE's insurance portfolio reserve charge would be substantial, **the initial amount announced on Jan-16 was far more severe than the market had been anticipating**, and exceeded expectations in early November of a +$3 billion charge. Specifically, GE now expects to record a $6.2 billion after-tax GAAP initial charge in 4Q17 and confer over $15 billion of total statutory capital contributions (cash) over the next seven years based on a "comprehensive bottom-up rebuild" of all claim curves and assumptions.

\*      \*      \*

Long-awaited insurance portfolio reserve charge was **higher than expected**; $6.2 billion after-tax charge in 4Q17 and $15 billion of contributions over seven years. On Jan-16, GE finally announced the results of its comprehensive review of GE Capital's run-off insurance portfolio. Specifically, management sized the pre-tax GAAP charge at $9.5 billion (or $6.2 billion after-tax), to be booked in 4Q17, and estimates a total statutory capital contribution of $15 billion over the next seven years. Recall that GE had previously estimated that the charge would be over +$3 billion and that it would announce these results in Dec-2017; clearly, **the severity of the reserve shortfall was more dire than anticipated**. . . . Management stated that these new charges are based on a "comprehensive bottom-up rebuild" of all claim curves, projections, and assumptions, which **suggests to us that the prior standards for the actuarial reviews had been inadequate**.

494.    In an analyst report dated January 16, 2018, titled "*GE Capital Charge Problematic*

*on Many Levels*," Cowen wrote:

GE Capital's Woes A Problematic Development—GE announced a $6.2B after-tax charge ($9.5B pretax) related to its review of the insurance portfolio (i.e. GE North American Life & Health; "NALH") it divested over 10 years ago. **The $6.2B is 2x+ larger than GE had originally guided** . . . . GE Capital plans to make $15B of "statutory reserve contributions" (i.e., cash contributions) over the next seven years, with $3B to be paid in Q1:18 and $2B/year to be paid over 2019-2024.

495.   The negative coverage continued the next day as analysts continued to digest the completely unanticipated news GE revealed the day before. On January 17, 2018, Deutsche Bank reemphasized the dire effect of GE's massive LTC exposure, stating:

> GE needs cash. Separating out Aviation and Healthcare (relatively robust cash generators) could strand substantial liabilities with the Power business that could face years of long term fundamental pressures. Power itself requires substantial cash to fund its downsizing and new product development. Moreover, **GE Capital now requires cash to pay the $15bn of Insurance reserve funding (over 7 years), which would end up $9bn short once the $28bn of cash available pays off ~$25bn of run-off debt over the next 3 years (excluding the contribution from annual Capital earnings**, which may also shrink as EPS and the Industrial Finance books are meaningfully taken down).

496.   Similarly, in a January 17, 2018 analyst report, J.P. Morgan analyst Tusa continued to digest the implications the January 16, 2018 disclosures would have for GE's future earnings and wrote, "[y]esterday's charge from GE was **materially larger than expected**, and the implications of dealing with it are dilutive to earnings, FCF [free cash flow] and ultimately value." (emphasis in original). Tusa went on to note that the charge was so large that it implicates the financial strength of "the consolidated company now, and is not a ring fenced [GE Capital] issue."

497.   In fact, in a January 17, 2018 article titled "*GE Capital Drags Down its Parent and CEO*," reporters at The New York Times noted that Flannery himself admitted, "I share your **surprise and disappointment** of this coming out of a legacy business."

498.   The market continued to digest this news on January 18, 2018. For example, a January 18, 2018 article in The Economist, titled "*After a huge loss on old reinsurance contracts, GE contemplates a break-up*," stated, "[t]hat in the 12 years since [the Genworth and Swiss Re deals], the firm appears to have done little about this residual portfolio seems **an odd omission. The risk, after all, was well known**. Other firms had problems with policyholders living longer and incurring higher medical costs than insurers had built into their initial assumptions; the long-term care market as a whole in America has run into trouble."

**F.     January 24, 2018: Disclosure of 4Q17 Financial Results and SEC Investigations into GE's LTC Reserves and Revenue Recognition Practices Related to LTSAs**

499.     On January 24, 2018, before the market opened, GE issued a press release, filed with the SEC on an 8-K, announcing its 4Q17 results. The press release stated that GE suffered a net loss of $9.8 billion for 4Q17, which included a $6.2 billion after-tax charge to increase LTC insurance reserves and substantial profit shortfalls in its Power unit. The press release further stated:

> GE Chairman and CEO John Flannery said, "In the fourth quarter, EPS was at the low-end of guidance, excluding insurance-related items, U.S. tax reform, and industrial portfolio actions. . . . Power was down significantly and we expect market challenges to continue."

500.     The press release further stated, "GE Capital ended the quarter with $157 billion of assets, including $31 billion of liquidity. On a reported basis, the Verticals generated a loss of $(7.6) billion, *which is down from last year driven by the effects of the charges in the Insurance business*" and that:

> GE announced last week that the comprehensive review and reserve testing for GE Capital's run-off insurance portfolio, North American Life & Health (NALH), resulted in an *after-tax GAAP charge of $6.2 billion for the fourth quarter of 2017*, and GE Capital expects to make statutory reserve contributions of approximately *$15 billion over 7 years*.

501.     Also on January 24, 2018, during an earnings conference call held before the market opened, GE disclosed that it had "been *notified by the SEC that they are investigating* the process leading to the [LTC] insurance reserve increase and the fourth-quarter charge as well as GE's revenue recognition and controls for long term-service agreements."

502.     In response to these disclosures regarding the SEC investigations, which corrected and/or reflected the materialization of risks concealed by the materially false or misleading statements and omissions of material facts, as alleged herein, caused GE's stock price to decline

from a close of $16.89 on January 23, 2018 to $16.44 on January 24, 2018, a 2.66% decrease on heavy volume of over 167 million shares. The share decline continued the next day as the price continued to drop to close at $16.18 on January 25, 2018, again on heavy volume of over 95 million shares. Thus, as the market continued to digest the news over this two-day period, GE's stock price declined from a close of $16.89 on January 23, 2018 to $16.18 on January 25, 2018, a cumulative drop of $0.71 or more than 4%.

503.   Analysts cited the disclosure of the SEC investigations as a reason for the decline in GE's stock. For example, in an RBC analyst report dated January 25, 2018, RBC lowered its price target for GE's stock and wrote that any positive developments in GE's financial results:

> [W]ere quickly made irrelevant when management unexpectedly disclosed during the earnings call that the SEC had opened two separate investigations: one into GE's insurance reserve charge and the other into its contract asset accounting practices. ***The stock reaction to this negative news was swift, reversing a +4% relief rally into a 2%-3% decline***. While it is difficult to handicap the risks associated with these SEC reviews in their early stages, this overhang will likely continue to dog GE over the near-term and present any bottom-fishing investors with a reason to stay on the sidelines. We are lowering our 2019 EPS by -4c and our price target to $17.

> **Biggest surprise: Discloses two separate SEC investigations**. GE's stock sell-off on Jan-24 was seemingly prompted by the unsettling revelation of two SEC investigations. Recall that it announced on Jan-16 that GE Capital's insurance reserves were found to be inadequate, requiring $15 bil of capital contributions over the next seven years. This development apparently elicited the interest of the SEC, which may be looking into how a liability of this magnitude had been permitted to languish unnoticed for so long. Separately, GE revealed that the SEC had opened an investigation into its contract asset accounting practices in late-2017.

504.   Market commentators also pointed to the disclosure of the SEC investigations as a reason for the decline in GE's stock. For example, a January 25, 2018 CBS MarketWatch article, titled "*GE stock swings lower after disclosure of SEC investigation*," states:

> General Electric Co's stock was soaring after the company reported fourth-quarter results, then the industrial conglomerate's bombshell about a government accounting probe triggered a sharp pullback that erased all the gains.

\* \* \*

The stock . . . had traded up as much as 5.8% in premarket trade, after GE reported fourth-quarter results, and after the start of the post-earnings conference call.

\* \* \*

But after the SEC probe [was announced on the earnings call], the stock took a sharp dive. It tumbled 2.7% in active trade Wednesday, enough to pace the Dow Jones Industrial Average[] . . . decliners. Volume spike to 167 million shares, making the stock the most actively traded on major U.S. exchanges.

505.    The declines in GE's stock following the revelations during the corrective disclosure period (April 21, 2017 through January 24, 2018) and the resulting losses suffered by Plaintiffs and Class members were proximately caused by the misstatements and omissions of material fact alleged herein.

## VIII.   PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

506.    At all relevant times, the market for GE common stock was open and efficient for the following reasons, among others: (i) GE common stock met the requirements for listing on, and was listed and actively traded on, the NYSE under the ticker symbol "GE"; (ii) as a registered and regulated issuer of securities, GE filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) GE regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) GE was followed by numerous securities analysts employed by major brokerage firms, including J.P. Morgan, Deutsche Bank, RBC, Credit Suisse, Barclays, Morgan Stanley, and UBS, who wrote reports that were distributed to the sales force and customers of their respective brokerage firms; (v) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of GE's

common stock; and (vi) without knowledge of the misrepresented or omitted facts, Plaintiffs and Class members purchased or otherwise acquired GE common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of GE's common stock was artificially inflated by Defendants' material misrepresentations and omissions.

507.    As a result of the foregoing, the market for GE common stock promptly digested current information regarding GE from all publicly available sources and the price of GE's stock reflected such information. Based upon the materially false or misleading statements and omissions of material fact alleged herein, GE common stock traded at prices in excess of its true value during the Class Period. Plaintiffs and other Class members purchased or otherwise acquired GE common stock relying upon the integrity of the market price of GE common stock and other market information relating to GE.

508.    Under these circumstances, Plaintiffs and other Class members, as purchasers or acquirers of GE common stock at artificially inflated prices during the Class Period, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

509.    Further, at all relevant times, Plaintiffs and other Class members relied on Defendants to disclose material information as required by law. Plaintiffs and other Class members would not have purchased or otherwise acquired GE common stock at artificially inflated prices if Defendants disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## IX.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

510.   The Private Securities Litigation Reform Act's statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

511.   None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

512.   To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof. As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

513.   To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of GE who knew that the forward-looking statement was materially false or misleading.

## X.   CLASS ACTION ALLEGATIONS

514.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) individually and on behalf of a Class consisting of all persons and

entities that purchased or otherwise acquired the publicly traded common stock of GE between February 27, 2013 and January 23, 2018.

515.    Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of GE, members of GE's Board of Directors, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of GE.

516.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, GE's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiffs believe that there are at least hundreds, if not thousands, of members in the proposed Class. Class members may be identified from records maintained by GE or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

517.    Plaintiffs' claims are typical of Class members' claims, as all Class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

518.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

519.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public

during the Class Period misrepresented or omitted material facts about GE's business, operations, and management; (iii) to what extent Class members have sustained damages; and (iv) the proper measure of damages.

520.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    AMENDED ALLEGATIONS

521.    In addition to the materially false or misleading statements of material fact and omissions of material fact regarding factoring alleged above in paragraphs ¶¶421-25, 426-27, Defendant Bornstein, speaking on behalf of GE, made additional materially false or misleading statements to investors on January 20, 2017, during GE's earnings conference call to discuss its fourth quarter and fiscal year 2016 financial results.

522.    During that conference call, Immelt and Bornstein were asked by Sanford Bernstein analyst Steven Winoker the following question:

> Since I only have one question I'd love to focus on cash here. And within that, Jeff, is there any factoring this quarter from GE Capital into GE industrial?
>
> And then also while it's the strongest cash flow quarter in a while, still a little bit below what we thought you guys implied when we talked about it before. Then as you think about it progressing through 2017 and beyond maybe just talk a little more about the cash flow initiative comp that really can give investors confidence that the cash flow part of the story is improving.

523.    In response, Bornstein downplayed GE's reliance on factoring, stating:

> So within that accounts receivable performance you asked about factoring. For the total year, factoring with GE Capital was a $1.6 billion change for the year. It was $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit in the year between what we did with GE Capital around factoring. And in the

fourth quarter importantly, and you see it because our receivables improved $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit going from this past third quarter to this quarter was $700 million. So it was actually down $1.6 billion year-to-year between third and fourth quarter each of those years. So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring.

524.    As alleged below, Bornstein's statements were materially false or misleading statements of material fact when made, and he knew it.

**A.    Beginning in 2015, as Cash Collections Waned and GE Power's Deferred Balance Ballooned, GE Resorted to "Deferred Monetization" to Meet CFOA Targets in 2015**

525.    Prior to 2015, GE Power factored only short-term receivables. In 2015, however, Bornstein and other GE and GE Power executives understood that in order to meet the Company's CFOA targets and mitigate growth in its deferred balance—i.e., the balance of revenues GE had recorded, including on its LTSAs, but for which it had not yet billed the customer, they needed to expand the existing factoring program to include long-term receivables.

526.    This novel factoring program was referred to at GE as "deferred monetization" or "deferred factoring," and it referred to the process by which GE Power Services reclassified a deferred asset into a long-term receivable and then sold that receivable to GE Capital's financing arm, Working Capital Solutions ("WCS") for cash.

527.    In 2015, GE's corporate leadership, including Bornstein, approved the expansion of GE's factoring program to include deferred monetization. Initially, GE Power sought to execute up to $500 million in deferred monetization transactions with WCS related to GE's sale of "upgrades" to existing turbines, called AGPs (the "AGP Upgrade Pool").

528.    GE Power Services began selling AGP upgrades to its customers prior to the Class Period in an effort to generate new GE Power revenues in a declining market. Because of competitive pressure in the marketplace, customers to whom GE Power Services sold these

upgrades generally refused to pay more than a small fraction of the total contract price upfront, forcing GE Power to offer extended payment terms. As GE recorded profits from the sale of upgrades but failed to collect cash upfront for those sales, GE Power's "deferred balance" swelled and its cash flows suffered, expanding the already-large gap that existed between GE Power's operating profits and its cash flow. To mitigate this growth and improve its reported cash flows, GE Power turned to deferred monetization.

529.    Bornstein knew that this deferred monetization program was critical to GE Power's ability to achieve its cash targets. Among other ways, Bornstein was specifically informed through internal company presentations that: (i)  ; and (ii) ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅. Through his approval of the AGP Upgrade Pool, Bornstein authorized GE Power Services to sell to WCS hundreds of millions of dollars of future cash flows, at a steep discount, so that GE Power could immediately book the cash it received from WCS as CFOA.

530.    From the outset, deferred factoring came with substantial costs to GE in the form of factoring fees and interest expenses, which reduced GE's operating profit. To that end, GE Power's factoring fees ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ in 2016. Bornstein was aware that increased factoring was driving a significant increase in interest expenses during the Class Period. GE Power also had to provide discounts to customers in return for permission to issue an early invoice for a future fixed billing (discussed below at ¶ 535), further reducing its earnings.

531.    In 2015 alone, GE Power Services incurred ▅▅▅▅▅▅▅▅▅▅▅▅. Lynn Calpeter, the CFO of GE Power, ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

███████████████████████████████████████████████████. By 2016, those factoring fees ballooned to $563 million. In internal emails, other senior GE Power executives admitted that ████████████████████████████████████████████████████████

████████████████████

532.   GE Power Services ultimately completed approximately $214 million in deferred monetization during 2015, generating $140 million of CFOA. But in pulling forward hundreds of millions of dollars in future cash flows, GE Power created large cash holes in future reporting periods, including 2016. It was well understood within GE that those holes would need to be filled in future periods, and that the only way to do so was through increasing deferred monetization.

**B.     During the First Half of 2016, as the Pipeline of Receivables that GE Power Services Could Factor through Existing Approved Deferred Monetization Programs Dried Up, Defendants Expanded Deferred Monetization Even Further**

533.   As GE's cash flow performance deteriorated in the first half of 2016, Bornstein again authorized GE Power to further expand its undisclosed deferred monetization program.

534.   First, as the number of AGP factoring opportunities waned in 2016, and in order to meet GE Corporate's aggressive 2016 cash targets, GE Power Services, with Bornstein's knowledge, expanded its factoring to WCS to include all fixed billings within LTSAs due within up to five years. These were fixed dollar amounts that GE Power Services was entitled to receive in the future for past work performed, but under the terms of its LTSAs, it was not yet able to invoice the customer or collect the cash.

535.   Second, as the supply of eligible fixed billings dwindled, including within LTSAs, GE Power Services received authorization for yet another expansion of GE's factoring program. This time, GE Power Services began renegotiating its LTSAs with its customers to transform *variable* billings into *fixed* billing streams so that those fixed receivables could then be factored to

WCS for immediate cash. This cash came at an even greater cost to GE. Indeed, in addition to the heightened fees, interest expenses, and customer discounts that GE incurred to execute all its deferred monetization transactions, GE Power Services was forced to offer additional discounts to its customers in order to convince them to accept fixed payment terms. Yet, GE Power Services agreed to incur these added costs because it gained the ability to factor these future cash streams and boost its reported CFOA.

536.    Third, for more complex receivables, GE Power Services, together with WCS, created novel structures through which GE Power Services could reclassify and then factor receivables associated with bundles of customer contracts. But these structures came at a significant cost to GE Power Services. For example, in or around March 2016, GE Power Services factored ███████████████████████████████████████████████████████ ███████████████ of CFOA that GE Power Services could book immediately.

537.    Following these rapid expansions to GE Power's deferred monetization program, GE Power because increasingly reliant upon deferred monetization to meet its 2016 cash targets. In the first half of 2016, for example, GE Power executed approximately $731 million in deferred monetization transactions.

538.    According to Lynn Calpeter, GE Power had Bornstein's approval to engage in these factoring programs.

C.    **Despite Poor Second Quarter Performance on Cash Flow, GE and Bornstein Promised Investors that GE Would Make up the Shortfall During Second Half of 2016 and Meet its Full Year CFOA Guidance**

539.    On July 22, 2016, GE held its second quarter 2016 earnings conference call for analysts and investors. During the call, GE reported $400 million in Industrial CFOA for the first half of 2016, an 89% decrease compared to the first half of 2015. Even at this level, had GE Power

not executed over $700 million in deferred monetization transactions during the first two quarters of 2016, GE would have reported *negative* CFOA to investors for the first half of the year.

540.    Notwithstanding GE's poor cash performance in the first half, Immelt reaffirmed that GE was still "on track for [its] CFOA goals for the year." More specifically, Bornstein assured investors that GE's disappointing cash performance in the first half was primarily due to "timing" issues and that the Company would recover from its first half CFOA shortfall during the second half of 2016:

> Fortunately, most of this is timing between the first half and the second half. In the second half, we are planning for income plus depreciation and amortization of around $8 billion, working capital improvement of $3 billion to $4 billion, driven by second half shipments and improvement in AR performance particularly delinquency and other timing items such as tax of $1 billion to $2 billion. That walks you to the total framework of $12 billion to $14 billion of industrial CFOA, no change to our framework for the year.

541.    During the conference call, in response to a question from JP Morgan analyst Stephen Tusa regarding GE's second half outlook for cash, Bornstein again stated: "So through the half, industrial CFOA was about $400 million. So when we look through the second half we've guided $12 billion to $14 billion for the year. We've not changed anything about that guidance."

542.    Analysts picked up on Bornstein's statement that GE's cash performance would markedly improve in the second half. For example, in a July 25, 2016 analyst report titled "Backend Needs a Lot More Power," Morgan Stanley analyst Nigel Coe stated that GE's second quarter disclosures "were not wholly unexpected," and that 2016 was expected to be "an abnormally back end loaded year in every respect."

543.    Likewise, UBS analysts stated in a July 25, 2016 report that while "[c]ash flow was disappointing in 1H . . . the ramp in 2H shipments and an increased focus on receivables should drive improved working capital in 2H." William Blair analyst Nicholas Heymann similarly stated

on July 25, 2016 that GE was "well-positioned for [a] robust second-half finish in 2016 that should accelerate in 2017."

544.    However, unbeknownst to analysts and investors, necessary to GE's plan for achieving its cash targets in the second half of 2016 was an expansion of GE's undisclosed deferred monetization program.

**D.    After Publicly Re-Assuring Investors About GE's Industrial CFOA, Bornstein Internally Sounded the Alarm to GE's Senior-Most Executives**

545.    Just days after the July earnings call, on July 24, 2016, Bornstein sent an email to the members of the Company's Corporate Executive Council, which included roughly thirty (30) of GE's top executives that reported to Immelt.

546.    In that email, Bornstein noted that,



547.    In his July 24 email, Bornstein also highlighted that

548.    Finally, Bornstein told the Corporate Executive Council that while

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

**E.**     **On Bornstein's Order, GE Power Doubled Down on Factoring in the Second Half of 2016, Pulling Forward More Than $1 Billion in Additional Future Cash Flows**

549.     Contemporaneous internal company documents demonstrate that, by this point in time, long-term receivables factoring was the primary tool GE Power Services utilized to generate CFOA for the Company.

550.     In response to Bornstein's directive and with his approval, GE Power significantly expanded its reliance on factoring—including the factoring of long-term receivables associated with the deferred balance—in an effort to meet GE's publicly-disclosed cash targets.

551.     In 2016, GE had forecasted approximately $12 billion of Industrial CFOA for the year, which included ████████████ from GE Power. In order to reach that target, GE Power expected to do ███████████████████████.

552.     As Bornstein knew, GE Power's continued expansion of the deferred monetization program led to yet another massive increase in interest costs. Indeed, GE Power Services' reliance on factoring costs ballooned ████████████████████████ in 2016. Not surprisingly, GE Executives and Corporate Controllers, including Mahajan, voiced concerns about the vast increase in GE Power's factoring-related expenses. For example, GE Power's Global Financial Planning and Analysis Leader, Michael Eshoo, said in relevant part:



553.    Mahajan responded as follows:

554.    In the same email chain, Eshoo and Mahajan ███████████████████████████████████████████████████████████████████████████████████

555.    Nevertheless, in the wake of Bornstein's July 25, 2016 e-mail ███████████████████████████████████████████████, GE Power ramped up its reliance on deferred monetization even further. Indeed, in the third quarter alone, GE Power executed $581 million in additional deferred monetization transactions in order to increase GE's reported CFOA. Thus, while Eshoo told Mahajan in February 2016 that ████████████████████████████████████████████, by the end of the third quarter it had already executed over $1.3 billion in such transactions.

556.     During this time, Bornstein and Immelt received regular updates on GE Power's deferred monetization activities, which included the volume of deferred monetization transactions that GE Power was executing to generate CFOA for its business.

557.     Throughout the second half of 2016, GE Power Services' cash leaders continued to provide these updates to Bornstein and Immelt and ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

558.     On September 8, 2016, for example, Bornstein met with Erik Ryan, GE Power's Financial Planning and Analysis Manager to discuss the unit's cash performance. During that meeting, Bornstein ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ A week later, during a September 15, 2016 cash review, Bornstein was made aware that GE Power Services ████████████████████████

████████████████████████████████████████

**F.     As GE's Reliance on Factoring Hit Record Highs in Late 2016, Defendants Announced Improved Cash Figures for 3Q16 and Re-Affirmed High Expectations for 4Q16 Industrial CFOA**

559.     On October 21, 2016, when GE reported its financial results for the third quarter of 2016, it announced significantly improved cash figures. Specifically, during a conference call held for analysts and investors that day, Immelt stated:

> We had a pretty good quarter for cash. Industrial CFOA was $2.9 billion, up 13% from 2015. Year-to-date, free cash flow was $17.3 billion, including a Capital dividend of $5 billion. We received an additional $2 billion dividend from Capital in October. In the fourth quarter, we expect Industrial CFOA to be more than $9 billion based on higher earnings and lower working capital. In addition, we should receive a $4 billion dividend from GE Capital. So for the year, we expect free cash flow plus dispositions to be more than $32 billion above our goal.

560.    Immelt went on to state that "[a]ll of [GE's] cash metrics look solid for the year." Bornstein reiterated Immelt's positive comments on cash. He stated that GE "generated $2.9 billion of Industrial CFOA in the third quarter, which was up 13% versus last year," and noted that these results were "driven primarily by working capital improvements in receivables and inventory." Bornstein further stated:

> Fourth quarter will be another large Industrial cash quarter on $5 billion of cash income and continued progress on working capital, principally around inventories related to higher volume of deliveries in the quarter. Industrial CFOA is expected to generate between $11 billion and $12 billion of cash for the total year.

561.    Following Immelt's and Bornstein's statements, RBC Capital Markets analyst Deane Dray stated in an October 23, 2016 report that GE's CFOA performance was one of the "biggest surprise[s]" for the Company in the third quarter. Dray went on to state: "Recall that GE had a slow start to the year on CFOA generation, sparking some investor concerns over its ability to reach its 2016 cash flow targets. ***In our view, these worries have now been alleviated*** . . . ."

562.    Of course, as alleged in ¶¶ 533-58, the reality on the ground at GE was the opposite—the Company was strained to generate Industrial CFOA and was relying heavily on factoring to conceal its cash collection issues and boost its reported cash flows.

### G.    Defendants Knew that GE Increased Its Reliance on Factoring to Record Levels in the Fourth Quarter of 2016

563.    In the fourth quarter, as GE scrambled to meet its full-year cash promises to investors, there were frantic emails between GE Power executives, GE Corporate executives, and GE Capital executives discussing the pipeline of available deferred monetization opportunities. In addition, there were regular—and, at times, daily—meetings held between these executives—including Bornstein—where these monetization and factoring opportunities were discussed.

564.    These updates and the internal recognition within GE of GE Power's reliance on factoring to hit CFOA targets continued throughout the quarter, including on December 5, 2016,

when Charles Masurel, GE Power's Financial Planning and Analysis Cash Leader, informed GE Power Services's CEO, Paul McElhinney and other senior officers that ███████████████

████████████████████████████████████████

565.    By the end of 2016, GE was able to hit the CFOA targets that Immelt and Bornstein had set for the business, but only through a record amount of factoring. In the fourth quarter of 2016, GE Power executed an unprecedented amount of deferred monetization transactions—$788 million—in order to drive up its fourth quarter 2016 cash flows, bringing its total deferred monetization transactions to $2.1 billion for 2016. The majority of these deferred monetization transactions involved GE Power's renegotiation of variable billings to fixed billings, which—as noted above—came at an extremely high cost to GE. Moreover, as noted above, while these deferred monetization transactions generated cash for GE Power in the short term, they necessarily did so at the expense of GE's future cash flows.

566.    Moreover, GE Power's overall reliance on receivables factoring substantially increased in 2016. GE Power's factoring penetration rate—i.e., factored receivables as a percentage of total receivables—increased 16 percentage points during 2016, from 45% at the end of 2015 to 61% at year-end 2016. Over the same period, GE Power's factored receivables balance increased from $2.974 billion to $4.96 billion, driven by a $2 billion increase in long-term receivables factoring.

567.    Ultimately, as discussed herein, through the accelerated factoring of both short-term and long-term receivables, GE Power achieved its 2016 cash targets (delivering nearly $4 billion in CFOA), and factoring was instrumental in GE recording "the biggest cash quarter in [its] history" in the fourth quarter of 2016.

**H.      Prior to January 20, 2017, Defendants Knew that Factoring Was the Single-Most Important Factor Driving GE's Industrial CFOA Results in 2016**

568.    On January 12, 2017, Bornstein participated in a meeting with GE Capital executives where he was informed that the total amount of factoring transactions between the Industrial business and WCS exceeded ***$20 billion*** for the year, which represented a significant increase from GE's 2015 balance of factored receivables with WCS of roughly $16 billion. This increase "***provided $4.2B of Industrial CFOA***" during 2016—***over 40%*** of the total Industrial CFOA reported by GE during 2016 ($9.865 billion, excluding deal taxes and pension funding). Further, Bornstein was told that GE Power alone had generated $3.7 billion of CFOA through factoring transactions with WCS—***over 90%*** of GE Power's total CFOA for 2016. The following graphic was included in the slide deck reviewed during the January 12, 2017 meeting with Bornstein. █████████████████████

569.    The same slide deck presented to Bornstein during the January 12, 2017 meeting also ████████████████████████████████████████████████████ ████████████████████. Indeed, the slide deck indicated that, ██████████████████ ████████████████████████ ████████████████████████████████ ████████████████████████████████████████████.

570.    In addition, during this same period, Bornstein, Immelt, and other senior GE Corporate executives knew that GE Power, in particular, intended to *increase* its reliance on deferred monetization even further in 2017. Indeed, despite knowing that GE Power had to pull forward billions of dollars in future cash flows to achieve its 2016 cash targets, Bornstein and Immelt demanded even more from GE Power in 2017. In late November 2016, GE Power presented Immelt and Bornstein with GE Power's "bottom's up" annual operating plan for 2017. In this plan, Bolze and Calpeter indicated that ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████.

571.    Just a few days after this presentation to Immelt, Bolze wrote to his team that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████.

572.    These discussions were unavailing and by December 2016, GE Power's 2017 target for CFOA ████████████████████████.

573.    Even while GE Power was planning to once again increase its reliance on deferred monetization to meet the aggressive CFOA targets set by Immelt and Bornstein, GE's senior

executives continued to openly question the sustainability of this business plan. An internal presentation in early February 2017 discussed  The presentation showed that

574.    The departing GE Power CFO, Lynn Calpeter noted in an email to her successor, Robert Green, whom Bornstein had handpicked as the new CFO for GE Power:

These discussions also included Puneet Mahajan, Bornstein's right-hand person and the Vice President of Financial Planning and Analysis for all of GE.

**I.      On January 20, 2017, Despite Knowing that Factoring Was a Significant Driver of GE's Industrial CFOA Performance in 2016, Defendants Made Materially False or Misleading Statements to the Market About the Size, Scope, and Impact of GE's Factoring Practices**

575.    On January 20, 2017, GE announced its financial results for the fourth quarter and full year of 2016. During a conference call with analysts and investors, Immelt stated that GE had generated $8.2 billion in Industrial CFOA during the fourth quarter, touting it as "the biggest cash quarter in our history" and a "significant" improvement (of more than 30%) over the Company's Industrial CFOA performance in the fourth quarter of 2015.

576.    Bornstein echoed Immelt's positive statements regarding GE's cash performance. He boasted that GE's Industrial CFOA for the fourth quarter was "up 34% versus last year" and its "Industrial free cash flow was up 39%" versus 2015. Bornstein also stated that GE's free cash flow conversion was 212% in the quarter and 84% for the full year.

577.    A key question for analysts and investors, however, was—as JP Morgan analyst Steve Tusa wrote on January 18, 2017—"the impact [that] factoring receivables to [GE Capital]" had on GE's cash performance. During the January 20, 2017 conference call, Sanford Bernstein analyst Steven Winoker posed that very question to Immelt and Bornstein:

> Since I only have one question I'd love to focus on cash here. And within that, Jeff, is there any factoring this quarter from GE Capital into GE industrial?
>
> And then also while it's the strongest cash flow quarter in a while, still a little bit below what we thought you guys implied when we talked about it before. Then as you think about it progressing through 2017 and beyond maybe just talk a little more about the cash flow initiative comp that really can give investor's confidence that the cash flow part of the story is improving.

578.    **Despite knowing that GE had generated over 36% of its fourth quarter Industrial CFOA—and over 40% of its full year Industrial CFOA —from factoring,** Bornstein attempted to downplay the extent of GE's reliance on factoring in his response, stating:

> So within that accounts receivable performance you asked about factoring. For the total year, factoring with GE Capital was a $1.6 billion change for the year. It was $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit in the year between what we did with GE Capital around factoring. And in the fourth quarter importantly, and you see it because our receivables improved $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit going from this past third quarter to this quarter was $700 million. So it was actually down $1.6 billion year-to-year between third and fourth quarter each of those years. So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring.

579.    Bornstein's statements set forth in ¶ 578 were materially false or misleading when made. In sum, and as described above, at the time these statements were made, **Bornstein knew that GE had generated approximately $4.2 billion in Industrial CFOA in 2016 by factoring receivables to GE Capital, including $3 billion in the fourth quarter of 2016 alone. He also knew that GE Power had vastly expanded its factoring programs in 2016, including multiple expansions to its deferred monetization program that he personally approved, to generate CFOA for GE.**

580.    More specifically, Bornstein's January 20, 2017 statement discussed above was materially false or misleading when made for the reasons set forth in ¶¶ 525-74 including because:

(a)    Contrary to the assertion that GE's cash flow performance in 2016 had "very little to do with GE Capital factoring," that factoring was "$100 million less of a benefit" to GE's CFOA in 2016 than it had in 2015, and that the "benefit going from this past third quarter to this quarter was $700 million," in truth, GE Capital factoring was a significant contributor to GE's 2016 cash flows, and in particular its 4Q16 cash flows, and its factoring programs were significantly expanded in 2016 as compared to 2015. Factoring contributed $4.2 billion to GE's $9.8 billion of Industrial CFOA for 2016 (including $3 billion of Industrial CFOA "benefit" in the fourth quarter alone, not $700 million, as Bornstein claimed), while in 2015, factoring contributed just $2.3 billion to GE's $12.054 billion of Industrial CFOA. In fact, factoring accounted for 36% and 40% of GE's total reported cash flows for the fourth quarter and full year 2016, respectively, and Bornstein had personally approved the expansion of factoring in 2016 including programs to factor $2.1 billion of long-term receivables compared to approximately $155 million of long-term receivables factoring in 2015.

(b)    Bornstein's claim that factoring contributed $1.6 billion to CFOA in 2016 as compared to $1.7 billion in 2015 was materially false or misleading because factoring had actually contributed $4.2 billion to GE's 2016 CFOA and had contributed approximately $2.3 billion to Industrial CFOA in 2015.

(c)    Bornstein's assertion that there was "actually very good underlying performance here" was materially misleading in so far as that it concealed the fact

177

that without factoring, GE would not have meet its CFOA target for 2016, that GE

Power had to pay $563 million in costs to factor these receivables, and that GE was

increasingly relying on factoring long-term receivables to generate CFOA, which

pulled future cash flows forward and created future cash flow headwinds for GE

Power in a declining market for its services.

581.    Analysts and investors were misled by Bornstein's misrepresentations. For

example, on two separate occasions JP Morgan analyst Stephen Tusa cited the factoring figures

provided by Bornstein. First, on January 20, 2017, Tusa issued a report stating that GE had reported

"strong" Industrial CFOA in the fourth quarter and that "receivables factoring helped by $0.7B in

4Q ($1.6B for the full year, similar to last year)." Three days later, Tusa repeated these statements

in a subsequent report, saying once again that "receivables factoring" helped GE's cash

performance by "$0.7B in 4Q ($1.6B for the full year, similar to last year).

582.    However, as discussed above, and as Bornstein knew but failed to disclose to

investors on January 20, 2017, receivables factoring had actually increased GE's Industrial CFOA

to the tune of *$3 billion* and *$4.2 billion* during the fourth quarter and full year 2016, respectively.

583.    Bornstein's statements concealed the truth from investors regarding GE's

unsustainable reliance on factoring to meet its liquidity needs and CFOA targets, which was

ultimately disclosed to investors through a series of corrective disclosures set forth in Section VII

above.

### J.    In an Effort to Conceal the Falsity of Bornstein's Statement, Defendants Altered the Intercompany Factoring Disclosures in GE's 2016 10-K

584.    Immediately following Bornstein's January 20, 2017 misrepresentations regarding

the impact of factoring on GE's 2016 cash flows, high-level GE employees internally signaled

████████████████████████████████ Specifically, after the conference call, GE's incoming

Global Controller, Michael Vitanza, and its Deputy Controller, Marc Mascola, spoke with Corporate Financial Planning and Analysis cash leader Brian Weverman and ███████████ ████████████████████████████████████████████████████

585.    The reason for Vitanza's and Mascola's concern was clear: at the very same time Bornstein was making this misrepresentation to investors, they were preparing a disclosure for GE's 2016 10-K ██████████████████████████████████████████████ ██████████████████████████████████████. Importantly, ██████████████████████ ██████████████████████████████████████████████

586.    Weverman brought Vitanza's and Mascola's concerns to the attention of Mahajan, who worked directly for Bornstein and was his right-hand person as described by GE's employees. After subsequent discussions between Vitanza and Mahajan (who was intimately familiar with the nature and scope of GE's factoring activities), GE attempted to align Vitanza's and Mascola's 10-K disclosure with Bornstein's misstatement by *removing* from the 10-K disclosure the CFOA generated through long-term factoring transactions with GE Capital.

587.    Specifically, prior to the 2016 10-K, the MD&A section (and relevant footnotes) of GE's 10-K and 10-Q disclosures identified the CFOA generated through the factoring of "customer receivables"—i.e., short-term and long-term receivables—to GE Capital. During his post-January 20, 2017 discussions with Vitanza, however, Mahajan asked Vitanza ██████████████████ ████████████████████████████████████████████████████████ ██████████. Vitanza provided that analysis to Mahajan several days later, on January 28, 2017.

588.    After seeing Vitanza's analysis, Mahajan told GE's Disclosure Committee that, ██ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████



589.     Mahajan ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████. But Mahajan, Bornstein, and Immelt knew the opposite to be true. Indeed, at the time Mahajan made these representations to GE's Disclosure Committee, he, Bornstein, and Immelt ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

590.     At Mahajan's behest, the Disclosure Committee approved the requested changes to GE's intercompany factoring disclosure for the 2016 10-K. As a result of this change, GE reported in its 2016 10-K that the CFOA generated by factoring "current receivables" to GE Capital in 2016 was just $2.1 billion and—consistent with Bornstein's misrepresentations a month earlier—remained flat compared to 2015. In truth, the CFOA generated by factoring "customer receivables" to GE Capital in 2016 was over *a billion dollars higher* than it was in 2015.

## XII.   CAUSES OF ACTION

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

591.     Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This claim is brought against Defendants pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

592.     During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiffs; (ii) cause the market price of GE common stock to trade above its true value; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire GE common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period. In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

593.     While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts or trends required to be disclosed or necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for GE common stock, in violation of Section 10(b) and Rule 10b-5. Defendants are alleged as primary participants in the wrongful conduct alleged herein.

594.     Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts, even though such facts were readily available to them, if not known. Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and

effect of concealing the truth regarding GE's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

595.    As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already in the market price of GE common stock during the Class Period. Relying directly or indirectly upon the materially false or misleading statements made by Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants, Plaintiffs and other Class members purchased or otherwise acquired GE common stock during the Class Period at artificially inflated prices. As the previously misrepresented and/or concealed material facts eventually emerged, the price of GE common stock substantially declined, causing losses to Plaintiffs and other Class members. These declines and the preceding disclosures are set forth above in Section VII.

596.    At the time of the material misrepresentations and omissions alleged herein, Plaintiffs and other Class members were not aware of their falsity and believed them to be true. Had Plaintiffs and other Class members known the relevant truth regarding GE's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiffs and other Class members would not have purchased or otherwise acquired GE common stock at artificially inflated prices.

597.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

598.     Plaintiffs incorporate by reference and reallege all preceding paragraphs as if fully set forth herein. This Count is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Plaintiffs and all other member of the Class.

599.     During the Class Period, each of the Individual Defendants was a controlling person of GE within the meaning of Section 20(a) of the Exchange Act. By reason of their high-level positions at GE and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the materially false or misleading statements and omissions of material fact in statements filed by the Company with the SEC and/or disseminated to the investing public, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Plaintiffs contend were materially false or misleading.

600.     Each of the Individual Defendants exercised day-to-day control over the Company and had the power and authority to cause GE to engage in the wrongful conduct complained of herein. In this regard, each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

601.     Each of the Individual Defendants was a direct participant in making, and/or made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions during the Class Period, as alleged here in Sections V.D. and VI.F. Accordingly, each

Individual Defendant was a culpable participant in the underlying violations of Section 10(b) alleged herein.

602.    As set forth above, GE violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of GE and, as a result of their own aforementioned conduct, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as GE is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and other members of the Class who purchased or otherwise acquired GE's common stock during the Class Period at artificially inflated prices.

603.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of GE's common stock during the Class Period.

## XIII.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, including:

1.    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

2.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

3.    Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

4.    Awarding such other and further relief as may be just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: January 19, 2022                     Respectfully submitted,

                                                        **KESSLER TOPAZ**

**MELTZER & CHECK, LLP**

*S/ Sharan Nirmul*
Sharan Nirmul
David Kessler
Gregory M. Castaldo
Darren J. Check
Richard A. Russo, Jr.
Michelle M. Newcomer
Joshua A. Materese
Evan R. Hoey
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
snirmul@ktmc.com
dkessler@ktmc.com
gcastaldo@ktmc.com
dcheck@ktmc.com
rrusso@ktmc.com
mnewcomer@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com

*Counsel for Lead Plaintiff Sjunde AP-Fonden
and Lead Counsel for the Class*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
Jonathan D. Park
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com
jpark@gelaw.com

*Counsel for Additional Plaintiff Cleveland Bakers
and Teamsters Pension Fund and Local Counsel for
the Class*

# APPENDIX A

## DEFENDANT GE'S SEC FILINGS

| SEC Filings | | |
|---|---|---|
| **Term** | **Definition** | **Signed by:** |
| 2012 10-K | Form 10-K for the year-ended December 31, 2012 (filed 02/26/2013) | Keith S. Sherin<br>Jamie Miller<br>Jeffrey R. Immelt |
| 2013 10-K | Form 10-K for the year-ended December 31, 2013 (filed 02/27/2014) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 2014 10-K | Form 10-K for the year-ended December 31, 2014 (filed 02/27/2015) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 2015 10-K | Form 10-K for the year-ended December 31, 2015 (filed 02/26/2016) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 2016 10-K | Form 10-K for the year-ended December 31, 2016 (filed 02/24/2017) | Jeffrey S. Bornstein<br>Jan. R. Hauser<br>Jeffrey R. Immelt |
| 1Q13 10-Q | Form 10-Q for the Period Ending March 31, 2013 (filed 05/08/2013) | Keith S. Sherin |
| 2Q13 10-Q | Form 10-Q for the Period Ending June 30, 2013 (filed 07/26/2013) | Jan R. Hauser |
| 3Q13 10-Q | Form 10-Q for the Period Ending September 30, 2013 (filed 11/01/2013) | Jan R. Hauser |
| 1Q14 10-Q | Form 10-Q for the Period Ending March 31, 2014 (filed 05/12/2014) | Jan R. Hauser |
| 2Q14 10-Q | Form 10-Q for the Period Ending June 30, 2014 (filed 07/31/2014) | Jan R. Hauser |
| 3Q14 10-Q | Form 10-Q for the Period Ending September 30, 2014 (filed 11/04/2014) | Jan R. Hauser |
| 1Q15 10-Q | Form 10-Q for the Period Ending March 31, 2015 (filed 05/04/2015) | Jan R. Hauser |
| 2Q15 10-Q | Form 10-Q for the Period Ending June 30, 2015 (filed 07/30/2015) | Jan R. Hauser |
| 3Q15 10-Q | Form 10-Q for the Period Ending September 30, 2015 (filed 11/02/2015) | Jan R. Hauser |
| 1Q16 10-Q | Form 10-Q for the Period Ending March 31, 2016 (filed 05/04/2016) | Jan R. Hauser |

| SEC Filings | | |
|---|---|---|
| **Term** | **Definition** | **Signed by:** |
| 2Q16 10-Q | Form 10-Q for the Period Ending June 30, 2016 (filed 08/01/2016) | Jan R. Hauser |
| 3Q16 10-Q | Form 10-Q for the Period Ending September 30, 2016 (filed 11/02/2016) | Jan R. Hauser |
| 3Q16 10-QA | Form 10-Q/A for the Period Ending September 30, 2016 (filed 11/09/2016) | Jan R. Hauser |
| 1Q17 10-Q | Form 10-Q for the Period Ending March 31, 2017 (filed 05/05/2017) | Jan R. Hauser |
| 2Q17 10-Q | Form 10-Q for the Period Ending June 30, 2017 (filed 07/28/2017) | Jan R. Hauser |
| 3Q17 10-Q | Form 10-Q for the Period Ending September 30, 2017 (filed 10/30/2017) | Jan R. Hauser |