UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
SJUNDE AP-FONDEN et al., *individually and on behalf* : 
*of all others similarly situated*, :
:
                               Plaintiffs, :          17-CV-8457 (JMF)
:
           -v-                        :         OPINION AND ORDER
:
GENERAL ELECTRIC COMPANY et al., :
:
                               Defendants. :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In this putative class action, Lead Plaintiff Sjunde AP-Fonden and Plaintiff the Cleveland Bakers and Teamsters Pension Fund (together, "Plaintiffs"), two pension funds, bring claims against General Electric Company ("GE") and former GE executive Jeffrey Bornstein ("Defendants") based on their alleged misrepresentations related to GE's accounting and revenue recognition for certain long-term service agreements ("LTSAs") in GE's power division. Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. In two previous Opinions, familiarity with which is assumed, the Court granted in part and denied in part Defendants' motions to dismiss the Fourth and Fifth Amended Complaints. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379 (S.D.N.Y. 2019) (ECF No. 185); *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-CV-8457 (JMF), 2021 WL 311003, at *1 (S.D.N.Y. Jan. 29, 2021) (ECF No. 206). Now Plaintiffs move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for class certification as to their remaining claims. *See* ECF No. 218. Plaintiffs also move for leave to amend their Complaint to replead

one of their previously dismissed claims. *See* ECF No. 278. For the reasons that follow, the Court grants both of Plaintiffs' motions.

## BACKGROUND

The Court assumes familiarity with its prior Opinions and will summarize the relevant background only briefly. Except where otherwise noted, the following background is drawn from the Fifth Amended Complaint. *See* ECF No. 191 ("5AC").

Plaintiffs' remaining claims relate to GE Power's factoring of LTSA revenues to GE Capital to improve its cash flow metrics. *Id.* ¶ 5. In particular, Plaintiffs contend that, as the use of traditional power sources waned in the years following the 2008 financial crisis, GE Power's sales of turbines, and its customers' use of those turbines, decreased, driving down its earnings from LTSAs for the equipment. *Id.* ¶¶ 340, 344-46, 352. To generate revenue during the downturn, GE renegotiated its existing LTSAs to yield a higher average profit margin. *See id.* ¶¶ 22, 336-38. These renegotiated contracts came at a price, generating short-term revenue through catch-up adjustments, but actually cutting into GE's long-term profits. *See id.* ¶¶ 363-64, 366-67. Moreover, because cumulative catch-up adjustments produced revenues in a single reported period, but did not necessarily produce cash, a gulf formed between GE's revenue and its cash on hand. *Id.* ¶¶ 23, 366, 386. To address this cash flow problem and to mask the growing disparity, GE began to "factor[]" the payment streams (or "receivables") — that is, to "monetize" customers' not-yet-due-payments by selling the receivables to outside parties or to GE Capital in exchange for cash. *Id.* ¶¶ 393-95, 398. GE Power's management led a "global" effort to factor "everything," including LTSAs. *Id.* ¶¶ 400, 402-03. Given the finite number of LTSAs and the dwindling number of new LTSAs that GE was signing, however, GE would eventually run out of contracts to factor in exchange for cash. *See id.* ¶ 401. Plaintiffs allege that

a series of corrective disclosures revealing GE's reliance on factoring between April 21, 2017, and January 24, 2018, caused "GE's stock [to] f[a]ll precipitously." *Id.* ¶ 447.

A putative class action against GE and Bornstein (among others) was filed in November 2017. ECF No. 1. Following consolidation and motion practice, Sjunde AP-Fonden was appointed as Lead Plaintiff, with the Cleveland Bakers and Teamsters Pension Fund proceeding individually, and all but two of Plaintiffs' claims were dismissed with prejudice. *See* ECF No. 139; *Sjunde AP-Fonden*, 417 F. Supp. 3d 379; *Sjunde AP-Fonden*, 2021 WL 311003. Plaintiffs' first remaining claim is that, in violation Item 303 of Regulation S-K, GE's financial statements during the alleged Class Period (March 2, 2015, to January 23, 2018) "failed to disclose that GE Power generated cash by monetizing receivables through extensive factoring of LTSAs." 417 F. Supp. 3d at 408 (internal quotation marks omitted) (cleaned up); *see also* 5AC ¶¶ 421-25. Plaintiffs' second claim is that GE's 2016 Form 10-K materially misled investors by stating that, "[i]n order to manage credit exposure, the Company sells additional current receivables to third parties." 5AC ¶¶ 426-28. As the Court previously explained, "a reasonable investor could read" that statement and "conclude that GE factored LTSA receivables *only* to reduce its credit exposure while, in reality . . . GE was also factoring to shore up its dwindling cash flow and mask the growing gap between contract assets and actual cash being generated in the Industrials group, including from LTSAs." 417 F. Supp. 3d at 413.

Plaintiffs now move to certify a class of "all persons and entities that purchased or acquired GE common stock between March 2, 2015 and January 23, 2018, inclusive . . . and were damaged thereby." ECF No. 219 ("Pls.' Cert. Mem."), at 1.[1] After Plaintiffs' certification

---

[1] Excluded from Plaintiffs' proposed class are: "(a) Defendants; (b) GE's subsidiaries and affiliates; (c) any officer, director, or controlling person of GE, and members of the immediate families of such persons; (d) any entity in which any Defendant has a controlling interest; (e)

motion was filed, Kevin Mahar and Mitchell West, the named plaintiffs in a class action pending against GE, Bornstein, other former GE employees, and KPMG LLP in New York state court ("Intervenors"), were granted leave to intervene for the limited purpose of partially opposing Plaintiffs' motion for class certification. *See* ECF No. 256. They ask that their state court claims pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), currently stayed pending resolution of this case, be carved out of the definition of any certified class. *See* ECF No. 247; ECF No. 248-1 ("Intervenors' Mem."), at 3-4.

Finally, after the class certification motion was fully briefed, Plaintiffs filed a motion to amend their complaint and a proposed Sixth Amended Complaint. *See* ECF No. 280 ("Pls.' Amend. Mem."); ECF No. 280-1 ("Proposed 6AC"). Specifically, Plaintiffs seek to replead, based on evidence obtained during discovery, a claim that, during a January 20, 2017 conference call, Bornstein materially misled investors when he stated that:

> For the total year, factoring with GE Capital was a $1.6 billion change for the year. It was $1.7 billion last year, so actually year-to-year it was $100 million less of a benefit in the year between what we did with GE Capital around factoring. And in the fourth quarter importantly, and you see it because our receivables improved $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3 billion, the benefit going from this past third quarter to this quarter was $700 million. So it was actually down $1.6 billion year-to-year between third and fourth quarter each of those years. So there's very good underlying performance here. It's not just about, it's actually very little to do with GE Capital factoring.

Proposed 6AC ¶ 577-8. The Court previously dismissed Plaintiffs' claim that this statement was misleading, concluding that Bornstein's "simultaneous disclosure of the actual factored dollar amounts in 4Q 2015 and 2016 in the very same statement . . . undercuts any inference that he

---

Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors, and assigns of any such excluded party." *See* Pls.' Cert. Mem. 1 n.2.

4

intended to deceive investors or was reckless regarding the risk that they might be misled." *Sjunde AP-Fonden*, 417 F. Supp. 3d at 414; *accord Sjunde AP-Fonden*, 2021 WL 311003, at *12. Plaintiffs now allege that the statement is misleading because "Bornstein knew that GE had generated approximately $4.2 billion in Industrial [cash flow from operating activities] in 2016 by factoring receivables to GE Capital, including $3 billion in the fourth quarter of 2016 alone" and that "GE Power had vastly expanded its factoring programs in 2016." Proposed 6AC ¶ 579.

## MOTION FOR CLASS CERTIFICATION

The Court begins with Plaintiffs' motion for class certification. A party seeking class certification must first show, by a preponderance of the evidence, that the requirements of Rule 23(a) — namely, numerosity, commonality, typicality, and adequacy of representation — are satisfied. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015). If it does so, the moving party must also demonstrate that the proposed class fits within Rule 23(b). *See, e.g., Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Here, Plaintiffs rely on Rule 23(b)(3), *see* Pls.' Cert. Mem. 3, which requires them to show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3). In evaluating whether these requirements are met, a court may consider merits issues. *See, e.g., Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013). Nevertheless, a district judge "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006). In other words, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent — but only to the extent —

that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

In this case, there is no dispute — and rightly so — with respect to most of the applicable Rule 23(a) and (b) requirements. Indeed, Defendants' only argument against class certification is that Plaintiffs cannot represent the class because there are conflicts between Plaintiffs and absent class members who purchased GE securities at different times during the proposed class period. *See* ECF No. 245 ("Defs.' Cert. Opp'n"), at 15-19.[2] Defendants also take issue with the definition of the Class Period, arguing that it should begin later (on February 29, 2016) and end earlier (on April 21, 2017) than Plaintiffs propose. *Id.* at 9-15. Finally, Intervenors — who are pursuing claims against GE and Bornstein (among others) in a New York state court class action — purport to oppose class certification on the ground that their Securities Act claims may be subsumed in Plaintiffs' proposed class definition. Intervenors' Mem. at 1-2. The Court will address each of these issues in turn.

First, Defendants' argument that Plaintiffs cannot represent the class because class members purchased securities at different times, including after one alleged misrepresentation but before another, or after a partial corrective disclosure, Defs.' Cert. Opp'n 15-19, is wholly unpersuasive. "Courts have . . . repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class

---

[2]   Defendants frame this as an issue of adequacy under Rule 23(a)(4), *see* Defs' Cert. Opp'n 15, but it is technically an issue of typicality under Rule 23(a)(3), *see, e.g.*, *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 91 (S.D.N.Y. 2018) (explaining that "[t]ypicality focuses on the lead plaintiff" whereas "adequacy focuses on class counsel").

certification." *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008); *see also In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015) (holding that a "purported conflict" based on the timing of securities purchases was "speculative as to adequacy at this stage and thus not grounds to defeat certification"). The same is true where some plaintiffs purchased securities after the first of several alleged partial corrective disclosures. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (holding that the objection that the plaintiff is atypical because he purchased additional shares after a partial corrective disclosure was "without merit because [the plaintiff's] purchase was before the final corrective disclosure"). Notably, Defendants do not cite a single case in which such a purported conflict precluded class certification. Thus, the argument must be and is rejected.

As noted, Defendants' only other objection relates to the definition of the Class Period. Plaintiffs propose a Class Period beginning on March 2, 2015, the first trading day after GE filed its Form 10-K for 2014. Pls.' Cert. Mem. 1; ECF No. 273 ("Pls.' Cert. Reply"), at 2. Defendants argue that the class period should begin later, Defs.' Cert. Opp'n 9-10, because Plaintiffs' earliest remaining claim is that GE failed to disclose a trend of factoring LTSA receivables "from 2015 on" and, thus, the first omission occurred in GE's 10-K for 2015, *Sjunde AP-Fonden*, 2021 WL 311003, at *11. The Court agrees with Defendants. *See* 5AC ¶ 394 (alleging that GE set up a task force "beginning in 2015"); *id.* ¶ 401 (alleging GE was "monetizing customers' future payments as often as possible in 2016"). Indeed, the Court has already said as much. *See Sjunde AP-Fonden*, 417 F. Supp. 3d at 409 n.22 ("[I]t is doubtful that the Complaint supports such a claim for fraud as to GE's Class Period filings prior to the Form [1]0-K for 2015."). And Plaintiffs offer no justification for beginning the Class Period with

GE's financial reporting for *2014*, as they propose.  *See* Pls.' Cert. Reply 11-12.  Accordingly, the Class Period shall begin on February 29, 2016, the first trading day after GE's Form 10-K for 2015 was filed.  Defs.' Cert. Opp'n 3.[3]

Defendants' argument that the Class Period should end on April 21, 2017, the date on which GE first announced negative $1.6 billion in Industrial cash from operating activities ("CFOA"), Defs.' Cert. Opp'n 12, is less persuasive.  Defendants contend that this first disclosure fully corrected any omission, Defs.' Cert. Opp'n 13-14, and that the Court should ignore the series of later corrective disclosures ending on January 24, 2018, alleged in the Complaint, 5AC ¶ 447.  Defendants argue that Plaintiffs do not "plead anywhere in the 5AC that any alleged corrective disclosure after April 21, 2017 revealed anything new about the widespread factoring of LTSA receivables or otherwise corrected the alleged misstatement or omissions that were already corrected on April 21, 2017."  Defs.' Cert. Opp'n 13.  Not so.  Plaintiffs allege that on January 24, 2018, GE disclosed that "it had 'been notified by the SEC that they are investigating . . . GE's revenue recognition and controls for long term-service agreements." 5AC ¶ 501.  At this stage, no more is required.  *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 100 (S.D.N.Y. 2018) (certifying a class ending on the final corrective disclosure date in the face of dispute over whether earlier disclosures fully corrected the misstatements); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980 at *40 (S.D.N.Y. Oct. 18, 2019) (holding that the decision to shorten a class period "is appropriately left to trial or a motion for summary judgment," barring a "clear, unambiguous disclosure[]" leaving

---

[3]   Defendants further argue that the Class Period should not begin until May 5, 2016, the first trading day after GE filed its Form 10-Q for the first quarter of 2016.  The Court is not persuaded by Defendants' argument because Plaintiffs allege that the trend in factoring began in 2015 and, thus, was omitted from the 2015 Form 10-K.  *See* 5AC ¶¶ 394, 401.

8

"no substantial doubt as to [its] curative effect"), *report and recommendation adopted in part*, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020).

Finally, Intervenors raise an objection to class certification on the ground that their Securities Act claims may be subsumed by Plaintiffs' proposed class definition. Intervenors' Mem. 1-2. But they do not argue that certification is improper; instead, they contend that their state-court claims, which have not been pleaded by Plaintiffs, should be "carve[d]-out [of] the class definition." Intervenors' Mem. 1; *see also id.* at 12. Plaintiffs oppose their request on the ground that it should be raised, if at all, at the settlement stage. ECF No. 273 ("Pls.' Reply"), at 12-13. [4] The Court agrees. Intervenors do not argue that Lead Plaintiff is inadequate to represent their interests as to any Exchange Act claims or that there is any other basis to deny Plaintiffs' motion for class certification. *See* ECF No. 248-2 (Intervenors' proposed order, *granting* class certification). Instead, they ask the Court to speculate about the preclusive effect of a possible future settlement on their separate state-court claims. *See* Intervenors' Mem. 9 ("[D]efendants may later argue that class members who have Securities Act claims are bound by any judgment or settlement."). And they fail to cite to a single case in which a carve-out such as the one they propose was adopted at the certification stage. *See* Intervenors' Mem. 9 (citing cases addressing proposed settlements).[5] Intervenors' request is therefore denied.

---

[4]   Defendants also oppose Intervenors' request on the ground that they seek to recover twice for the same alleged harm — once here and once in the state-court action. *See* ECF No. 264, at 1. Because the Court concludes that Intervenors' request is without merit for other reasons, it need not and does not consider Defendants' argument.

[5]   Intervenors attempt to rely on this Court's decision in *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172 (S.D.N.Y. Aug. 13, 2020), but the situation there was different. In *AXA,* the Court sought to reserve only the rights of absent members of a nationwide class to pursue identical claims under the law of their home state. *Id.* at *4-7.

9

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED, albeit with a modified Class Period of February 29, 2016, through January 23, 2018.

## MOTION FOR LEAVE TO AMEND

As noted, Plaintiffs also move for leave to file a Sixth Amended Complaint. Under Rule 15 of the Federal Rules of Civil Procedure, "the court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). But "[w]here, as here, a scheduling order governs amendments to the complaint, the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). "Whether good cause exists turns on the diligence of the moving party." *Holmes*, 568 F.3d at 335 (internal quotation marks omitted). Specifically, the moving party "must demonstrate that it has been diligent in its efforts to meet the Court's deadlines" and that, "despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05-CV-3749 (KMW) (DF), 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009). "A party fails to show good cause when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline." *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (internal quotation marks omitted).

Moreover, even under Rule 15, leave to amend may be denied "for such reasons as . . . futility of the amendment, and . . . the resulting prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir.2005) (per curiam). The party opposing a motion to amend bears the burden of establishing that an amendment would be futile.

*Ouedraogo v. A–1 Int'l Courier Serv., Inc.*, No. 12–CV–5651 (AJN), 2013 WL 3466810, at *6 (S.D.N.Y. July 8, 2013). An amendment is not "futile" if it could withstand a motion to dismiss under Rule 12(b)(6). *See, e.g.*, *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). Thus, a court must accept the facts alleged by the party seeking amendment as true and construe them in the light most favorable to that party. *Aetna*, 404 F.3d at 604. Finally, leave to amend "may properly be denied for . . . undue prejudice to the opposing party by virtue of allowance of the amendment." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted). "In gauging prejudice," courts should consider "whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Id.* (internal quotation marks omitted).

Applying these standards here, the Court concludes that Plaintiffs should be granted leave to amend. Plaintiffs seek to replead a claim that the Court has twice dismissed, to wit that, on a January 20, 2017 conference call, Bornstein materially misled investors by stating that factoring had provided "less of a benefit" to Industrial in 2015 than in 2016, when "Bornstein knew that GE had generated approximately $4.2 billion in Industrial CFOA in 2016 by factoring receivables to GE Capital, including $3 billion in the fourth quarter of 2016 alone," and that "GE Power had vastly expanded its factoring programs in 2016." Proposed 6AC ¶¶ 577-79. The Court previously dismissed this allegation on the ground that Bornstein's "simultaneous disclosure of the actual factored dollar amounts in 4Q 2015 and 2016 in the very same statement . . . undercut[] any inference that he intended to deceive investors or was reckless regarding the risk that they might be misled." *Sjunde AP-Fonden*, 417 F. Supp. 3d at 414. Relying on information revealed in discovery, Plaintiffs seek to replead the claim, adding that the "actual

11

factored dollar amounts" disclosed by Bornstein were themselves misleading.  Pls.' Amend. Mem. 2; *see* Proposed 6AC ¶ 580.  Defendants oppose Plaintiffs' motion for leave to amend on three grounds: (1) that Plaintiffs fail to demonstrate "good cause" for their untimely amendment; (2) that the proposed amendment is futile; and (3) that the amendment would cause undue prejudice to Defendants.  *See* ECF No. 298 ("Defs.' Amend. Opp'n").  The Court will address each argument in turn.

To begin with, Plaintiffs demonstrate good cause for their belated amendment, as required by Rule 16.  The "primary consideration" in determining whether good cause exists is "whether the moving party can demonstrate diligence," *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007), meaning the moving party "must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met," *Sokol*, 2009 WL 2524611, at *7.  Here, Plaintiffs could not have successfully filed their proposed amendment before receiving the documents they received during fact discovery; indeed, they *tried* to plead the same claim without the benefit of discovery, and it was twice dismissed.  *See Paradigm BioDevices, Inc. v. Centinel Spine, Inc.*, No. 11-CV-3489 (JMF), 2013 WL 1830416, at *4 (S.D.N.Y. May 1, 2013) (finding good cause for an amendment at "the end of discovery" where the relevant claim had already been pleaded and dismissed).  Defendants argue that Plaintiffs should have moved to amend *earlier* in the fact discovery process, but, as Defendants concede, some of the documents Plaintiffs on which rely were *produced* less than five months ago, Defs.' Amend. Opp'n 16.  Given the complexity of Plaintiffs' allegations, the Court concludes that they acted with reasonable diligence in seeking to amend.  *See Ambac Assurance Corp. v. EMC Mortg. Corp.*, No. 08-CV-9464 (RMB) (THK), 2010 WL 11595698, at *6-7 (S.D.N.Y. Dec. 16, 2010) (finding good cause where a securities-fraud plaintiff "waited almost a year in some cases,

and in no case less than six months, after it obtained the relevant discovery" to move for amendment "in light of the enormous amount of discovery . . . , the heightened pleading standard for fraud claims, the evidence secured in discovery that forms the basis for the proposed amendments, and the absence of any tactical advantage obtained as a result of the delay"), *report and recommendation adopted in relevant part*, 2011 WL 566776, at *2 (S.D.N.Y. Feb. 8, 2011); *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 361 (S.D.N.Y. 2014) (finding that plaintiffs acted with a sufficient "modicum of diligence" in moving to amend complaint nearly six months after discovery); *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) (holding that newly "discovered . . . facts underlying [the movant's] new cause of action . . . [are] sufficient to show diligence").

Turning to Rule 15, Defendants fail to show that Plaintiffs' proposed amendment would be futile. *See Ouedraogo*, 2013 WL 3466810, at *6. Defendants advance two arguments, neither of which is persuasive. First, Defendants argue that Plaintiffs are simply mischaracterizing what Bornstein said and falsely claiming that Bornstein stated that the *total* factoring for 2016 was only $1.6 billion — rather than the real number of more than $20 billion — when in fact Bornstein said that the *increased* financial benefit of factoring from Q4 2015 to Q4 2016 was $1.6 billion. Defs.' Amend. Opp'n 6, 10.[6] But that argument misrepresents Plaintiffs' proposed amendment. The proposed amended Complaint alleges that Bornstein misrepresented the *change* in factoring between 2015 and 2016, not the total amount of factoring. "Bornstein's

---

[6] To be sure, Plaintiffs do make some version of that argument in their briefing, although they argue that they are relying on a statement in *Defendants'* memorandum of law. *See* Pls.' Amend. Mem. 7; ECF No. 309 ("Pls.' Amend. Reply"), at 1-2. In any event, that allegation — that Bornstein was misrepresenting the *total* amount of factoring for the year — is plainly an erroneous reading of his statement and does not appear in the proposed Sixth Amended Complaint.

statements," the proposed amended Complaint alleges, "were materially false or misleading when made [because] . . . Bornstein knew that GE had generated approximately $4.2 billion in Industrial CFOA in 2016 by factoring receivables to GE Capital, including $3 billion in the fourth quarter of 2016 alone[, and] . . . that GE Power had vastly expanded its factoring programs in 2016." Proposed 6AC ¶ 579; *see also id.* ¶ 580(b) ("Bornstein's claim that factoring contributed $1.6 billion to CFOA in 2016 as compared to $1.7 billion in 2015 was materially false or misleading because factoring had actually contributed $4.2 billion to GE's 2016 CFOA and had contributed approximately $2.3 billion to Industrial CFOA in 2015."); Pls.' Amend. Mem. 3 (arguing that Bornstein's statement was an attempt to "conceal[] the extent of GE's factoring activity *and its outsized contribution to 2016 Industrial CFOA*" (emphasis added)).

Second, Defendants argue that Bornstein's statement was not fraudulent because Bornstein was relying on numbers given to him by GE employees prior to the call, *see* ECF No. 296-2 at 12,[7] and because GE's Form 10-K for 2015, published shortly after the call, reflected similar numbers, *see* ECF No. 295-5 at 4, Defs.' Amend. Opp'n 9-14. But Plaintiffs rebut both arguments with allegations "'giving rise to a strong inference that the defendant acted with the required state of mind.'" *Sjunde AP-Fonden*, 417 F. Supp. 3d at 390 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). With respect to the first document, Plaintiffs allege that, at a meeting on January 12, 2017 — that is, before the call — Bornstein was also "informed that the total amount of factoring transactions . . . exceeded $20 billion for the year, which represented a significant increase from GE's 2015 balance of factored receivables" and that this factoring provided "over 40% of the total Industrial CFOA reported by

---

[7]   Plaintiffs argue that the Court may not consider this document because it does not appear in the proposed Sixth Amended Complaint. Pls.' Amend. Reply 3. The Court need not and does not address that argument because Plaintiffs prevail either way.

GE during 2016." Proposed 6AC ¶ 568 (quoting and citing ECF No. 296-1 at 4, 10) (emphasis omitted). Moreover, relying on deposition testimony from a former GE employee, Plaintiffs argue that the numbers Bornstein disclosed on the call were reached only by "assign[ing] a $0 balance to one of GE's factoring programs, known as GEAR (or 'GE Accounts Receivable')." ECF No. 309 ("Pls.' Amend Reply"), at 4 & n.5 (citing ECF No. 311-2 at 181-82). Relatedly, Plaintiffs point out that the document on which Bornstein allegedly relied is labeled "*External* factoring report[] plausibly demonstrat[ing] that GE created one set of factoring data for internal use and another substantially different set for external consumption." Pls.' Amend. Reply 2; *see* ECF No. 296-2 at 12. And finally, Plaintiffs point to Bornstein's deposition, in which he stated that, just a few days after his January 20, 2017 statement, he shared a document with GE's corporate executive counsel showing that "the factored balance . . . from '15 to '16, it increase[d] by $4.2 billion" and that "there was more factoring of receivables done in 2016 than there was done in 2015." ECF No. 311-3 at 203, 206; *see also* ECF No. 311-4 at 12. Meanwhile, with respect to the 2016 Form 10-K numbers supposedly confirming Bornstein's statement, Plaintiffs allege that, *after* Bornstein's statement, "GE attempted to align . . . [its] 10-K disclosure with Bornstein's misstatement by *removing* from the 10-K disclosure the CFOA generated through long-term factoring transactions with GE Capital." Proposed 6AC ¶ 586; *see also id.* ¶¶ 587-90 (alleging that GE decided to "change the language of its intercompany factoring disclosure from 'customer receivables' to 'current receivables' — a change that would enable GE to exclude from the disclosure the billions of dollars of CFOA that the Company had generated through deferred monetization transactions with GE Capital in 2016" (emphasis omitted)). In light of these allegations, taken together, the Court cannot say that amendment would be futile.

15

Finally, the Court concludes that Defendants fail to show they would be unduly prejudiced by the proposed amendment. "In gauging prejudice," a court should consider "whether an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Ruotolo*, 514 F.3d at 191 (internal quotation marks omitted). Here, the proposed amended Complaint adds no new defendants, does not lengthen the Class Period, and does not enlarge the class definition. Pls.' Amend. Mem. 14. Defendants have had ample notice of Plaintiffs' claim given that Plaintiffs attempted to plead it two times previously, and it is premised on the same theory as their existing claims. Lastly, Plaintiffs moved "before the close of discovery" when "neither a summary judgment briefing schedule nor a trial date has been set." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454-45 (S.D.N.Y. 2016) (finding no undue prejudice). Put simply, Defendants' contention that this case will "grind to a halt" if the amendment is permitted, Defs.' Amend. Opp'n 20, is hyperbolic.

In short, Plaintiffs' motion to file a Sixth Amended Complaint is also GRANTED.

## CONCLUSION

For the reasons stated above, Plaintiffs' motions for class certification and for leave to file an amended complaint are GRANTED.

One housekeeping matter remains: The parties filed letter-motions to seal portions of their motion papers. *See* ECF Nos. 277, 294, 299, 307, 313. The Court granted these letter-motions temporarily pending its decision on the underlying motions. ECF Nos. 282, 301, 303, 312. It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d

110, 119 (2d Cir. 2006).  Significantly, assessment of whether the presumption in favor of public access is overcome by countervailing factors must be made on a document-by-document basis.  *See, e.g.*, *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019); *Olson v. Major League Baseball*, 29 F.4th 59 (2d Cir. 2022).  Accordingly, **no later than two weeks from the date of this Opinion and Order**, any party that believes any materials currently under seal or in redacted form should remain under seal or in redacted form is ORDERED to show cause in writing, on a document-by-document basis, why doing so would be consistent with the presumption in favor of public access.  Any document for which the parties do not move for the Court to maintain under seal or in redacted form within two weeks of the date of this Opinion and Order shall be unsealed without any further notice to the parties.  To that end, the parties shall, **no later than three weeks of the date of this Opinion and Order**, file a joint letter with the list of the ECF numbers of the filings to be unsealed.

       The Clerk of Court is directed to terminate ECF Nos. 218 and 278.

       SO ORDERED.

Dated: April 11, 2022
      New York, New York

                                               JESSE M. FURMAN
                                               United States District Judge