**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SJUNDE AP-FONDEN and THE CLEVELAND BAKERS AND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL ELECTRIC COMPANY and JEFFREY S. BORNSTEIN, <br><br> Defendants. | 17 Civ. 08457 (JMF) (GWG) <br><br><br> <u>**ORAL ARGUMENT REQUESTED**</u> |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**</u>
<u>**MOTION TO EXCLUDE THE TESTIMONY OF DR. DAVID I. TABAK**</u>

LATHAM & WATKINS LLP

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Blake T. Denton
Jooyoung Yeu
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Sarah A. Tomkowiak (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

*Attorneys for Defendants*

September 6, 2022

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ...................................................................................................................4

    A.    Plaintiffs' Claims ................................................................................................4

    B.    Dr. Tabak's Opinions .........................................................................................6

LEGAL STANDARD.............................................................................................................9

ARGUMENT .....................................................................................................................10

    A.    Dr. Tabak Admits There Is No Causal Link Under His Proffered Loss
        Causation Opinions And Damages Calculations ...................................................10

    B.    Dr. Tabak's Methodology For Disaggregating Losses Is Incomplete And
        Premised On An Unreliable Analysis ..................................................................13

        1.    Dr. Tabak Fails Entirely To Disaggregate Non-Fraud Causes Of
            The LT Factoring "Shortfalls" ..............................................................14

        2.    Dr. Tabak's ERC Study Is Unreliable And Not Robust ............................14

        3.    Dr. Tabak's Disaggregation Methodology Has Other Critical
            Defects .............................................................................................19

        4.    Dr. Tabak's Opinions Ignore That GE's Stock Price Increased
            Following The Last Alleged Corrective Disclosure ..................................22

    C.    The Data Contradicts Dr. Tabak's Constant-Dollar Inflation Theory,
        Rendering His Opinions Unreliable.....................................................................22

        1.    Dr. Tabak Fails To Take Into Account Changes In The Magnitude
            Of The Allegedly Concealed Information .................................................23

        2.    Dr. Tabak Assumes The Certainty Of The Events Later Disclosed
            Could Have Been Disclosed At The Start Of The Class Period...............24

    D.    Dr. Tabak's Materiality Opinions Are Inappropriate Legal Conclusions.............25

CONCLUSION....................................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)............................................................................10

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  477 F. Supp. 3d 88 (S.D.N.Y. 2020), *aff'd*, 2022 WL 151302 (2d Cir. Jan. 18,
  2022) ...............................................................................................................5, 6

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014)..............................................................................13

*City of Providence v. Bats Glob. Mkts., Inc.*,
  2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ............................................10, 13, 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993).........................................................................................1

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  2015 WL 539489 (S.D.N.Y. Feb. 10, 2015).................................................10, 23

*In re Bear Stearns Cos. Sec., Deriv. & Erisa Litig.*,
  2016 WL 4098385 (S.D.N.Y. July 25, 2016) ............................................9, 13, 14

*In re Bear Stearns Cos. Sec., Deriv., & ERISA Litig.*,
  263 F. Supp. 3d 446 (S.D.N.Y. 2017)......................................................16, 18, 24

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ......................................................................18

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010).............................................................................6

*In re Williams Sec. Litig.*,
  558 F.3d 1130 (10th Cir. 2009) .......................................................................13

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
  103 F. Supp. 2d 268 (S.D.N.Y. 2000)...............................................................13

*Macaluso v. Herman Miller, Inc.*,
  2005 WL 563169 (S.D.N.Y. Mar. 10, 2005) .....................................................22

*R.F.M.A.S., Inc. v. So*,
  748 F. Supp. 2d 244 (S.D.N.Y. 2010)..........................................................16, 23

ii

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016)....................16, 17

*S.E.C. v. Snyder*,
  2006 WL 6508273 (S.D. Tex. Aug. 22, 2006) ........................................................................22

*S.E.C. v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013)....................................................................................25

*United States v. Hatfield*,
  2014 WL 7271616 (E.D.N.Y. Dec. 18, 2014) ........................................................................22

**RULES**

Federal Rules of Evidence Rule 702...........................................................................................1, 9

Pursuant to Rule 702 of the Federal Rules of Evidence ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants respectfully submit this Memorandum of Law in Support of Their Motion to Exclude the Testimony of Dr. David I. Tabak.[1]

## **PRELIMINARY STATEMENT**

Plaintiffs' entire theory of loss causation rests on the testimony of Dr. Tabak, a professional expert witness who, when questioned at his deposition: (i) admitted that there is no causal link between the alleged fraudulently concealed information (GE Power's LT factoring during the Class Period) and the Alleged Corrective Disclosures (GE's Industrial CFOA performance in the first three quarters of 2017[2]) under his proffered loss causation opinions and damages calculations; and (ii) defended his statistically insignificant attempts to disaggregate the confounding information released on each of the Alleged Corrective Disclosure dates from "fraud"-related information as "better than nothing." Dr. Tabak's opinions and analyses do not withstand scrutiny and should be excluded in their entirety.

After the completion of fact discovery, Dr. Tabak could no longer avoid the task of determining whether, and to what extent, any portion of the declines in GE's stock price following (now) three Alleged Corrective Disclosures is attributable to information about GE Power's LT factoring that Plaintiffs allege was concealed in connection with their limited surviving claims.[3]

---

[1] Unless otherwise indicated herein, all internal citations and quotations are omitted, emphasis is added, and citations to "Ex. __" refer to exhibits attached to the Declaration of Blake T. Denton, submitted herewith. Capitalized words not defined herein have the same meaning ascribed to them in the Memorandum of Law in Support of Defendants' Motion for Summary Judgment.

[2] Although Plaintiffs pursue a "materialization of risk" theory, Dr. Tabak refers to GE's disclosures of Industrial CFOA performance in these quarters as "corrective disclosures," or as revealing "corrective information." *See, e.g.*, Ex. 111, Tabak Rep. ¶ 2.a-d. For convenience, Defendants adopt his terminology.

[3] Although Plaintiffs previously asserted that there were additional corrective disclosures on November 13, 2017 and January 24, 2018, Dr. Tabak concedes that he lacks sufficient evidence to attribute any portion of GE's stock price declines following those disclosures to the disclosure of any fraud-related news, and thus

Here, unlike in a typical securities fraud action, not one of the remaining Alleged Corrective Disclosures even mentions GE Power's LT factoring (though other disclosures regarding that topic were made on other dates during the Class Period).[4]  To make matters worse for Dr. Tabak, there was substantial confounding information regarding GE's multiple businesses, financial results, operations, and prospects released on each of the Alleged Corrective Disclosure dates, which Plaintiffs themselves claimed caused their losses in connection with now-dismissed claims.  But rather than meaningfully grapple with these challenges, Dr. Tabak chose to ignore or evade them.

*First*, as Dr. Tabak had no choice but to admit at his deposition, there is no causal link between the allegedly concealed prior-period LT factoring and GE's quarterly disclosures of its Industrial CFOA performance in 2017 under his own loss causation opinions and damages calculations.  In his reports, Dr. Tabak merely assumed, contrary to the facts and without any analysis, that alleged shortfalls against GE Power's internal LT factoring targets in 2017 (and the purported impact of that lower-than-anticipated LT factoring on Industrial CFOA) resulted from the "unsustainability" of LT factoring conducted in prior periods.  From that premise, Dr. Tabak purported to (i) calculate the difference between GE Power's actual LT factoring in the first quarter of 2017 and GE Power's mid-quarter target for LT factoring in that quarter, and (ii) identify "stretch" amounts of LT factoring that supposedly contributed to reductions to internal cash flow estimates in the second and third quarters of 2017.  Dr. Tabak then used those "shortfalls" as a proxy to estimate the amount of GE's negative cash flow or revised cash flow guidance that related

---

calculates no change in "inflation" in GE's stock price relating to those disclosures.  Ex. 111, Tabak Rep. ¶¶ 2.e, 2.g, 80, 84.  Dr. Tabak also concedes that another previously alleged corrective disclosure (on January 16, 2018) is unrelated to Plaintiffs' remaining claims.  *Id.* ¶¶ 2.f, 82.

[4] Indeed, GE made specific disclosures in each of the first three quarters of 2017 about the sale of LT receivables from GE Power to GE Capital, but Dr. Tabak testified at his deposition that he was not shown those disclosures, was unaware that they had been made, did nothing to evaluate the market's response to those disclosures, and could not say how those disclosures might impact his opinions.  Ex. 119, Tabak Tr. 205:1-212:16.

to LT factoring, and based on that estimate, the portions of GE's stock price declines he claims were attributable to LT factoring.  But when pressed at his deposition regarding the lack of any evidence that prior-period LT factoring caused any shortfalls in GE Power's forecasted LT factoring for 2017 (which already took into account any impact of prior-period LT factoring, was based on forecasted amounts from new receivables GE Power expected to generate that same year, and was adversely impacted by, among other things, the sudden, severe downturn in the global power market), Dr. Tabak admitted that there was no basis for his untenable assumption.  Without a causal link between allegedly undisclosed prior-period LT factoring and the shortfalls in GE Power's forecasted LT factoring for 2017 that are at the center of his loss causation opinions and damages calculations, Dr. Tabak's opinions do not fit the facts of this case and must be excluded.

*Second*, Dr. Tabak's proposed methodology to disaggregate losses purportedly caused by revelation of the LT factoring "fraud" from losses caused by myriad confounding, non-fraud factors is both incomplete and unreliable.  As an initial matter, even if Dr. Tabak's use of "shortfalls" against internal LT factoring forecasts were apposite, Dr. Tabak assumed (without any basis) that GE Power's LT factoring "shortfalls" in 2017 were attributable *entirely* to Defendants' alleged fraud, and thus made no attempt to disaggregate non-fraud causes of those "shortfalls" (such as the widespread power market downturn) from the alleged impact of prior LT factoring or the alleged "unsustainability" of such factoring.  Moreover, on each of the three remaining Alleged Corrective Disclosure dates, it is undisputed that GE disclosed a wide range of significant information totally unrelated to Industrial CFOA.  In an attempt to calculate and remove the portions of GE's stock price declines attributable to factors *other than* GE's Industrial CFOA announcements, Dr. Tabak primarily employs an earnings response coefficient ("ERC") analysis, which involves performing a regression analysis using 20 prior GE earnings announcements and

subsequent stock price movements to attempt to calculate the impact on GE's stock price of GE's so-called earnings surprises (*i.e.*, disclosures of earnings better or worse than expectations) for each of the Alleged Corrective Disclosure dates. But Dr. Tabak's ERC study is fundamentally unreliable. To start, replicating Dr. Tabak's study to calculate ERCs for each of the historical data points in his underlying sample reveals that his model produces a result that is directionally wrong over 50% of the time. Further, Dr. Tabak's study produces results that are neither robust nor statistically significant, meaning it does not reliably measure the relationship between "earnings surprises" and movements in GE's stock price. At his deposition, Dr. Tabak sought to excuse the model's unreliability by claiming it is conservative or "*better than nothing*" (his words), but that only underscores the unhelpfulness of his opinions in assisting the trier of fact to determine whether or to what extent any damages can be tied to Plaintiffs' claims. And as explained below, the rest of Dr. Tabak's disaggregation analysis suffers from further methodological deficiencies.

*Third*, while the unreliability of Dr. Tabak's causation and disaggregation methodologies alone renders his estimate of alleged artificial inflation throughout the Class Period deficient, Dr. Tabak's "constant-dollar inflation" theory is also flawed because, as Dr. Tabak conceded at his deposition, he has *zero* financial-economics basis to conclude that inflation was "constant."

*Finally*, Dr. Tabak inappropriately offers speculative legal opinions on materiality, which courts have repeatedly excluded under *Daubert* as improper expert testimony.

## **BACKGROUND**

### A.     **Plaintiffs' Claims**

Plaintiffs' Sixth Amended Complaint (Dkt. 280-1) ("6AC"), like its predecessors, repeatedly attributes Plaintiffs' losses to a wide variety of statements challenged in connection with claims that have been dismissed, including about GE's LTC reinsurance business and various aspects of GE Power's LTSA business. *See* Op. (Dkt. 206) at 16, 23-24, 28-29, 32-33. Plaintiffs'

only remaining claims concern the alleged fraudulent concealment of the practice of factoring LT receivables by GE Power Services, a subsidiary of GE Power.  *See id.* at 6, 32-33; Op. (Dkt. 314) at 2, 11; 6AC ¶¶ 386-405, 421-28, 521-90; Ex. 119, Tabak Tr. 22:20-23:1, 23:10-13.

Specifically, Plaintiffs allege Section 10(b) claims based on (i) purported violations of Item 303 of Regulation S-K in GE's quarterly and annual financial reports, starting with its 2015 Form 10-K and ending with its Q3 2017 Form 10-Q (the Item 303 Claim), as well as purported misrepresentations (ii) in GE's 2016 Form 10-K (the 2016 10-K Claim) and (iii) during a January 20, 2017 earnings call (the Earnings Call Claim).  6AC ¶¶ 421-28, 521-90; Op. (Dkt. 314) at 7-8. According to Plaintiffs, investors ultimately learned the "truth" behind Defendants' alleged misstatements when GE reported its earnings for the first three quarters of 2017 and revealed negative news regarding its cash flows, specifically:  (i) on April 21, 2017, that GE's Industrial CFOA came in $1 billion below its target; (ii) on July 21, 2017, that GE was guiding toward the bottom end of its 2017 Industrial CFOA guidance range of $12 billion to $14 billion; and (iii) on October 20, 2017, that GE was reducing its 2017 Industrial CFOA guidance from $12 billion to $7 billion.[5]  6AC ¶¶ 444-74; Ex. 111, Tabak Rep. ¶¶ 2.b-d, 25, 48, 72.

To prevail on their claims, Plaintiffs must prove (among other elements) loss causation, "the causal link between the alleged misconduct and the economic harm ultimately suffered by" Plaintiffs.  *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 109 (S.D.N.Y. 2020) (Furman, J.), *aff'd*, 2022 WL 151302 (2d Cir. Jan. 18, 2022).  Loss causation can be established through a "corrective disclosure" theory or a "materialization of risk"

---

[5] The 6AC alleges three additional corrective disclosures, but Dr. Tabak "attribute[s] no change in inflation" in GE's stock price to any of them:  he opines that the January 16, 2018 "Insurance Update" disclosure does not relate to Plaintiffs' remaining claims; as to the November 13, 2017 disclosure of a dividend cut and the January 24, 2018 disclosure of two SEC investigations, Dr. Tabak was unable to quantify the portions of the stock price declines following these disclosures that related to Plaintiffs' remaining claims.  Ex. 111, Tabak Rep. ¶¶ 2.e-g, 80, 82, 84.

theory, under which a plaintiff must show that "the alleged misstatement[s] conceal[ed] a condition or event which then occur[red] and cause[d] [their] loss," *id.* at 110-11, and that this loss was foreseeable, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010). Under either theory, Plaintiffs must "disaggregate losses caused by disclosures of the truth behind the alleged misstatements from losses caused by other factors." *Atlantica*, 477 F. Supp. 3d at 110.

**B.    Dr. Tabak's Opinions**

In an attempt to meet their loss causation burden, Plaintiffs offer the expert testimony of Dr. Tabak. In reports issued March 11, 2022 (the "Report," Ex. 111) and April 29, 2022 (the "Supplemental Report," Ex. 113),[6] Dr. Tabak opines that each Alleged Corrective Disclosure served as a partial disclosure of the Item 303, 2016 10-K, and Earnings Call Claims, and apportions a certain per-share amount of GE's market-adjusted stock price decline[7] following each Alleged Corrective Disclosure as losses caused by the revelation of the alleged fraud. *See* Ex. 111, Tabak Rep. ¶ 2.b-d; Ex. 113, Tabak Supp. ¶ 3.d. To do so, Dr. Tabak employs a multi-step disaggregation methodology that begins with his ERC analysis, summarized in the below table:

| Summary of Dr. Tabak's Disaggregation Methodology | | | |
|---|---|---|---|
| **Alleged Corrective Disclosure** | **Market-Adjusted Price Movement** | **Amount Attributable to Industrial CFOA Disclosure / Methodology** | **Amount Attributable to Plaintiffs' Remaining Claims / Methodology** |
| **April 21, 2017**: GE's Industrial CFOA came in $1 billion below its Q1 2017 target | Decline of $1.09 per share over two trading days[8] | $1.46 per share<br><br>Using ERC analysis, estimates that stock price would have | $0.71 per share<br><br>Based on internal documents ████████ |

---

[6] Dr. Tabak is not relying on the opinions contained in his 2021 report. *See* Ex. 119, Tabak Tr. 9:12-16:23.

[7] To arrive at the market-adjusted stock price decline, Dr. Tabak first conducts an event study to estimate the total impact on GE's stock price of information released on each Alleged Corrective Disclosure date, net of overall market and industry effects. *See* Ex. 111, Tabak Rep. ¶¶ 26-28, 49, 73-74.

[8] Ex. 111, Tabak Rep. ¶ 28.

| Summary of Dr. Tabak's Disaggregation Methodology | | | |
|---|---|---|---|
| Alleged Corrective Disclosure | Market-Adjusted Price Movement | Amount Attributable to Industrial CFOA Disclosure / Methodology | Amount Attributable to Plaintiffs' Remaining Claims / Methodology |
| | | declined by $1.46 absent impact of "positive earnings surprise"[9] | of $1.46 is attributable to Plaintiffs' allegations[11] |
| **July 21, 2017**: GE guided toward the bottom end of its 2017 Industrial CFOA guidance range of $12 billion to $14 billion | Decline of $1.20 per share over two trading days[12] | $0.59 per share if LTC information is accounted for in July, or $0.87 per share if LTC information is accounted for in October  ———  Using ERC analysis, estimates that $0.33 of $1.20 is attributable to revised guidance to bottom end of 2017 earnings estimate[13]  By dividing the average analyst estimate of the size of a potential future charge (in October and November 2017) by the number of shares outstanding as of July 21, estimates that $0.28 of $1.20 is attributable to disclosure of "adverse claims experience" in LTC reinsurance business (if | $0.47 to $0.59 per share if LTC information is accounted for in July, or $0.70 to $0.87 per share if LTC information is accounted for in October  ———  Based on internal documents from between February and October 2017 |

[9] Ex. 111, Tabak Rep. ¶¶ 29-37.

[10] Dr. Tabak's understanding of "deferred monetization" is that "receivables that were [due] more than one year out" were "restructured to make them factorable and then were factored," *i.e.*, he uses the term synonymously with LT factoring. Ex. 119, Tabak Tr. 21:21-22:1.

[11] Ex. 111, Tabak Rep. ¶ 37.

[12] Ex. 111, Tabak Rep. ¶ 49 & Ex. 4.

[13] Ex. 111, Tabak Rep. ¶¶ 52-55.

| Summary of Dr. Tabak's Disaggregation Methodology | | | |
|---|---|---|---|
| Alleged Corrective Disclosure | Market-Adjusted Price Movement | Amount Attributable to Industrial CFOA Disclosure / Methodology | Amount Attributable to Plaintiffs' Remaining Claims / Methodology |
| | | LTC information is accounted for in July, not October)[14] | ██████████ of $0.59 or $0.87 is attributable to Plaintiffs' allegations[15] |
| **October 20, 2017**:<br><br>GE reduced its 2017 Industrial CFOA guidance from $12 billion to $7 billion | Decline of $1.85 over a three-day period, which includes an increase of $0.10 per share on first trading day[16] | $1.07 per share if LTC information is accounted for in July, or $0.79 per share if LTC information is accounted for in October<br><br>Using ERC analysis, estimates that $0.78 of $1.85 is attributable to "negative earnings surprise" and reduced consensus earnings-per-share estimates for 2017[17] | $0.14 per share if LTC information is accounted for in July, or $0.10 per share if LTC information is accounted for in October<br><br>Based on an internal document ███████████████████████ of $1.07 or $0.79 is attributable to Plaintiffs' allegations[18] |

Finally, under his "'constant-dollar' inflation method," Dr. Tabak assumes that the artificial inflation in GE's stock price on each day of the Class Period "[wa]s equal to the sum of the inflation-related price declines from all subsequent corrective disclosures," at most $1.68 per share. Ex. 111, Tabak Rep. ¶ 86. Dr. Tabak makes no attempt to apportion the artificial inflation he calculates among Plaintiffs' three claims; instead, he opines that the misstatements and omissions alleged in support of the 2016 10-K and Earnings Call Claims maintained the inflation

---

[14] Ex. 111, Tabak Rep. ¶¶ 56-65.

[15] Ex. 111, Tabak Rep. ¶¶ 66-71.

[16] Ex. 111, Tabak Rep. ¶ 73 & Ex. 4.

[17] Ex. 111, Tabak Rep. ¶¶ 75-76.

[18] Ex. 111, Tabak Rep. ¶¶ 77-78.

"that previously existed in GE's common stock price by virtue of the Item 303 Claim." *Id.* ¶ 13; Ex. 113, Tabak Supp. ¶ 3.c. Dr. Tabak understands that "[t]he gravamen of Plaintiffs' allegations is that Defendants violated Item 303 by failing to disclose [(i)] the extent of GE's deferred monetization activities" and (ii) that the practice constituted a "trend" because "GE's reliance on deferred monetization pulled forward future cash flows and thus created a 'drag' on the Company's CFOA in future periods, and because it was unsustainable." Ex. 111, Tabak Rep. ¶ 40.

In addition to opining on loss causation and damages, Dr. Tabak opines that the alleged omission of "GE's reliance on deferred monetization to generate Industrial CFOA, and the reasonably likely impact of this undisclosed information on GE's cash flows" was "economically material" to investors. *Id.* ¶¶ 2(a), 14-24; Ex. 113, Tabak Supp. ¶¶ 3.b, 12.

Professor Daniel R. Fischel issued a rebuttal report on May 20, 2022 (Ex. 115), and Dr. Tabak issued a reply report on June 10, 2022 (the "Reply," Ex. 117). Dr. Tabak was deposed on July 1, 2022, and Professor Fischel on July 14, 2022.

## <u>LEGAL STANDARD</u>

Under Rule 702, an expert may offer opinion testimony only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. "The [Supreme] Court emphasized in *Daubert* that . . . [the] overarching subject [of Rule 702] is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission." *In re Bear Stearns Cos. Sec., Deriv. & Erisa Litig.*, 2016 WL 4098385, at *2-3 (S.D.N.Y. July 25, 2016). The district court has the "gatekeeping role" of "ensuring that an expert's testimony both rests on a reliable foundation and

is relevant to the task at hand," *City of Providence v. Bats Glob. Mkts., Inc.*, 2022 WL 902402, at

*7 (S.D.N.Y. Mar. 28, 2022) (Furman, J.), and it "has broad discretion in determining what method

is appropriate for evaluating reliability under the circumstances of each case," *Amorgianos v. Nat'l*

*R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  Reliability "requires a sufficiently

rigorous analytical connection between [the expert's] methodology and the expert's conclusions."

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, at *4 (S.D.N.Y. Feb. 10,

2015).  Thus, "*Daubert* and Rule 702 mandate the exclusion of" opinion testimony where it "is

based on data, a methodology, or studies that are simply inadequate to support the conclusions

reached," *Amorgianos*, 303 F.3d at 266, or where "it is speculative or conjectural, or if it is based

on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence

an apples and oranges comparison," *Bats Glob.*, 2022 WL 902402, at *8.  The party seeking to

introduce the testimony—here, Plaintiffs—bears the burden of satisfying Rule 702's requirements

by a preponderance of the evidence.[19]  *Bats Glob.*, 2022 WL 902402, at *12.

## ARGUMENT

### A.    Dr. Tabak Admits There Is No Causal Link Under His Proffered Loss Causation Opinions And Damages Calculations

Dr. Tabak's testimony should be excluded because he has admitted there is no causal link

between the allegedly concealed prior-period LT factoring and GE's quarterly Industrial CFOA

results in 2017 under his own loss causation and damages analyses.

Because there was no disclosure by GE regarding LT factoring or its impact on any of the

---

[19] Despite the fact that Plaintiffs bear the burden both of proving loss causation and establishing the admissibility of Dr. Tabak's testimony, Dr. Tabak (wrongly) attempts to foist that burden onto Professor Fischel by requiring him to provide an "alternative analysis" showing the errors in Dr. Tabak's Report are material.  *See* Ex. 117, Tabak Reply ¶¶ 6, 38.

Alleged Corrective Disclosure dates, Ex. 111, Tabak Rep. ¶¶ 2.b-d, 25, 48, 72,[20] Dr. Tabak proffered a loss causation analysis that relies on GE's disclosures of its quarterly Industrial CFOA performance in the first three quarters of 2017 as the alleged "corrective" disclosures, and attempts to calculate what portion, if any, of the stock price declines following those disclosures was attributable, or causally linked, to the allegedly concealed fraud.  Specifically, for the first Alleged Corrective Disclosure date (on April 21, 2017), Dr. Tabak purported to (i) review internal GE Power or Power Services planning documents from the middle of Q1 2017 that discussed the amount of LT factoring targeted for that quarter, (ii) compare the mid-quarter ████████ ████████████████████████████  to GE Power's ████████████ ████ , and (iii) attribute the difference between the actual LT factoring and the mid-quarter target as the portion of the negative cash flow announcement in the quarter that was caused by the alleged failure to disclose prior-period LT factoring.[21]  *Id.* ¶ 37.  For the second and third Alleged Corrective Disclosure dates (on July 21, 2017 and October 20, 2017), Dr. Tabak purported to (i) identify "risk" or "stretch" amounts attributable to LT factoring and included in internal CFOA estimates for 2017 in internal planning documents from throughout 2017, and (ii) attribute those

---

[20] GE made specific disclosures about the sale of LT receivables in the first three quarters of 2017.  Ex. 8, Q1 2017 Form 10-Q, at 43 (filed May 5, 2017); Ex. 9, Q2 2017 Form 10-Q, at 44 (filed July 28, 2017); Ex. 10, Q3 2017 Form 10-Q, at 47 (filed Oct. 30, 2017); *see also* Ex. 120, Kothari Tr. 251:16-253:16, 254:2-257:9.  Dr. Tabak admitted in his deposition that he did not know about those disclosures, and that he could not say without further analysis whether the availability of this additional information to the market would change his opinion in any way.  Ex. 119, Tabak Tr. 205:1-212:16.

[21] This calculation is problematic because Plaintiffs' other expert, Professor S.P. Kothari, acknowledges that a miss in deferred monetization transactions does not equate to the same dollar amount of missed CFOA, contrary to what Dr. Tabak's analysis assumes.  Ex. 110, Kothari Rep. ¶¶ 61-62 & n.79 (recognizing that the "net contribution of Power Services LT factoring to Power Services CFOA" is "obviously less than" "gross LT factoring figures").  Dr. Tabak therefore should have subtracted the amount of cash recorded as CFOA from LT factoring from the amount of cash targeted to be recorded.  In his Reply, Dr. Tabak insists that is what he did, citing Plaintiffs' Exhibit 46 for support.  Ex. 117, Tabak Reply ¶ 66.  But at his deposition, he could not explain how the citation supported his point.  Ex. 119, Tabak Tr. 136:2-139:2.

amounts as the portions of the negative cash flow announcements in Q2 and Q3 2017 that were caused by the alleged failure to disclose prior-period LT factoring. *Id.* ¶¶ 65-71, 77.

Notwithstanding his own opinions and analyses, at his deposition, Dr. Tabak was forced to admit that the LT factoring "shortfalls" in 2017 he calculated, *id.* ¶¶ 37, 65-71, 77, lack any causal link to the allegedly undisclosed prior-period LT factoring, *see* Ex. 119, Tabak Tr. 95:15-20, 108:5-110:16; 122:2-6. Specifically, Dr. Tabak disclaimed that the allegedly concealed prior-period LT factoring caused any later "shortfalls": "I am not saying that the prior deferred monetization caused a miss in deferred monetization in 1Q17."[22] Ex. 119, Tabak Tr. 95:15-20; *cf.* Ex. 117, Tabak Reply at 8 n.8. Indeed, when confronted with one of the very same GE Power planning documents on which he relied, which showed that 100% of the planned LT factoring for 2017 was to come from *new* sales creating new LT receivables, Dr. Tabak admitted that nothing about the prior-period LT factoring would have prevented GE Power from executing new LT factoring transactions as planned. Ex. 119, Tabak Tr. 108:5-110:16; 122:2-6. Dr. Tabak likewise admitted that he did nothing to analyze the transactions planned for 2017 to determine why the LT factoring shortfalls occurred, *id.* at 105:4-10, and that the downturn in the global power market, to the extent it prevented new transactions from completing, would have affected the amount of LT factoring GE Power could complete in 2017, *see id.* at 109:25-110:10, 152:23-153:4.[23]

Without a causal link between GE Power's prior-period (and allegedly undisclosed) LT factoring and the LT factoring "shortfalls" in 2017 that Dr. Tabak used as a proxy in his loss

---

[22] Dr. Tabak went on to testify that, instead, "the prior [LT factoring] obscured the actual organic cash flow, and then when that dropped, the market had a better view of the actual organic cash flow." Ex. 119, Tabak Tr. 94:16-95:20. Dr. Tabak never disclosed this "organic cash flow" theory in either his Report or Reply, let alone articulated any factual basis for it, and it only confirms the infirmities in his analysis.

[23] Dr. Tabak's analyses also fail to recognize that GE Power's LT factoring and cash targets in 2017 already took into account the effects of prior-period LT factoring, so those effects could not have caused GE Power to underperform against its targets. *See, e.g.*, SOF ¶¶ 82, 97.

causation and damages calculations, there is no basis for Dr. Tabak to use those shortfalls as a measure of price inflation that supposedly existed in GE's stock throughout the Class Period. As such, his loss causation opinions should be excluded in their entirety. *See Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 279-80 (S.D.N.Y. 2000) (expert testimony must "be relevant in that it 'fits' the facts of the case"); *Bats Glob.*, 2022 WL 902402, at *1, *8-10 (finding "a clear disconnect" between the theory of liability and expert's "data and the opinions they can reliably support" where plaintiffs alleged a failure "to fully disclose the effects of [three] products" defendants sold to high-frequency trading firms, but expert did not investigate whether the firms included in his analysis of harm to plaintiffs "actually used the at-issue products").

> **B.    Dr. Tabak's Methodology For Disaggregating Losses Is Incomplete And Premised On An Unreliable Analysis**

Even assuming there is any "fraud"-related cause of the LT factoring "shortfalls" in 2017 that underlie his opinions and calculations, Dr. Tabak's opinions must nonetheless be excluded because he makes no attempt to disaggregate the impact of non-fraud-related causes of those shortfalls, and his proposed methods for disaggregating the impact of other significant confounding information on each of the Alleged Corrective Disclosure dates are fatally flawed and unreliable. *See Bear Stearns*, 2016 WL 4098385, at *10 (rejecting methodology that "fail[ed] to adequately account for the impact of non-fraud related information and effects"); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014) (affirming district court's exclusion of expert because he "did not establish any reliable means of addressing" disaggregation of "confounding information"); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1139-43 (10th Cir. 2009) (affirming district court's exclusion of expert due to his "failure to show why the . . . losses should be attributed to the revelation of fraud and not other non-fraud related news").

13

1.    Dr. Tabak Fails Entirely To Disaggregate Non-Fraud Causes Of The LT Factoring "Shortfalls"

Dr. Tabak assumes—but does nothing to demonstrate—that the "shortfalls" in LT factoring in 2017 are entirely attributable to the alleged fraud.  *See* Ex. 111, Tabak Rep. ¶¶ 37, 66-71, 77; Ex. 115, Fischel Rep. ¶ 60; *see also id.* at 19 n.76, ¶ 38.  But as Dr. Tabak admitted at his deposition, he did not "look[] at" whether adverse changes in economic conditions in the global power industry impacted GE Power's ability to conduct LT factoring in 2017 at levels similar to those in 2016. *See* Ex. 119, Tabak Tr. 105:4-10, 152:23-153:4.  In other words, Dr. Tabak failed entirely to consider—let alone disaggregate the impacts of—the sudden, widespread power industry downturn in 2017, which resulted in a decrease in orders (and as a result, fewer new sales and new receivables that GE Power could factor), despite admitting that GE Power's ability to factor LT receivables at forecasted levels depended on its ability to generate new sales and new receivables in 2017.  *Id.* at 108:5-110:16; 122:2-6; *see* SOF ¶¶ 135, 150, 186-216.  Dr. Tabak's failure to disaggregate non-fraud causes of the LT factoring shortfalls in 2017 from the alleged fraud warrants exclusion of his opinions.  *See Bear Stearns*, 2016 WL 4098385, at *10.

2.    Dr. Tabak's ERC Study Is Unreliable And Not Robust

For the information that Dr. Tabak purported to disaggregate, his methodology is built on an ERC analysis,[24] which, generally speaking, constructs an equation that purports to estimate to some degree of certainty the stock price impact of an "earnings surprise" in a given quarter by applying a regression analysis to a sample of historical "earnings surprises" and stock price movements from a fixed number of prior quarters.  *See* Ex. 111, Tabak Rep. ¶¶ 31-33 & n.14.  Dr. Tabak developed an ERC model here to estimate the impact of GE's earnings announcements on

_____

[24] Although Dr. Tabak (half-heartedly) calls the ERC analysis "the standard," Ex. 119, Tabak Tr. 164:7-165:9, Defendants have located no Section 10(b) case in which a court assessed the methodology and accepted it as a reliable means of disaggregating confounding information.

GE's stock price for each Alleged Corrective Disclosure date.  Specifically, Dr. Tabak performed a regression analysis based on observations of GE's earnings announcements and stock price movements from 20 prior quarters; as he moved from one Alleged Corrective Disclosure date to the next, he replaced the oldest observation in his sample of 20 with a more recent observation. *Id.* ¶¶ 31-32, 54.  The end result is an equation for each Alleged Corrective Disclosure date:  the stock price movement attributable to the earnings surprise disclosed that day is estimated to be equal to a "constant" of (0.01), plus the "earnings response coefficient" times the normalized earnings surprise.[25]  *Id.* ¶ 33 & Exs. 5b, 6a, 8a.  The constant means that GE's stock price would be estimated to decline by 1% even if the normalized earnings surprise were zero, while the ERC itself (which changes with each Alleged Corrective Disclosure date) represents the change in stock price associated with a one-unit change in the normalized earnings surprise (so on April 21, 2017, for instance, the calculated ERC is 16.14, meaning GE's stock price is, according to Dr. Tabak, expected to move by about 16.14 times the amount of the earnings surprise).  *Id.* ¶ 33 & Ex. 5b. Dr. Tabak's ERC model is unreliable in numerous respects, rendering all of his loss causation opinions unreliable in their entirety.

*First*, according to an article relied upon by Dr. Tabak, the ERC methodology generally "is not a reliable indicator of market reaction to earnings announcements of a single firm" (as opposed to a portfolio of companies, to which the methodology is typically applied in the academic literature)—and Dr. Tabak agrees.  *See* Ex. 90, Kinney Article, GE_Tabak_0032036 at -039; Ex. 119, Tabak Tr. 167:16-168:1.  That is because, for an individual company, the ERC methodology incorrectly predicts the *direction* of a stock price movement in response to an earnings surprise

---

[25] The "normalized" earnings surprise is calculated by dividing the "EPS [earnings per share] surprise" revealed on the Alleged Corrective Disclosure date by the closing price of GE stock on the previous trading day.  *E.g.*, Ex. 111, Tabak Rep. Ex. 5b.

*nearly 38% of the time*.  Ex. 117, Tabak Reply at 21 n.27 (citing Ex. 90, Kinney Article, GE_Tabak_0032036 at -039).  As applied to GE, that error percentage is even higher:  when GE's economic expert derived an ERC equation for each of the 23 observations in Dr. Tabak's sample—using the same methodology Dr. Tabak employed in his Reports—the equation's predicted abnormal return in GE's stock price was directionally wrong *more than 50% of the time*.  *See* Ex. 123, Fischel Decl., Ex. A.

Asked why he was using "a methodology that is wrong in terms of direction approximately 38[%] of the time," Dr. Tabak responded that the ERC methodology is "better than nothing" and "conservative" in that "not using that analysis at all would have increased [his] [estimate of] inflation" and, therefore, damages.  Ex. 119, Tabak Tr. 165:5-166:18, 167:2-4, 171:22-172:10. That Dr. Tabak *might* be underestimating damages in this case, however, does not save his *admittedly* unreliable ERC analysis.  *See In re Bear Stearns Cos. Sec., Deriv., & ERISA Litig.*, 263 F. Supp. 3d 446, 450 (S.D.N.Y. 2017) (rejecting expert's methodology even though he asserted his assumptions were "conservative in favor of defendants"); *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 402 (S.D.N.Y. 2014) (model was not admissible just because it "would underestimate damages"), *aff'd*, 638 F. App'x 43 (2d Cir. 2016); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 275-77 (S.D.N.Y. 2010) (experts' testimony was "not saved by" the "fact that their estimate of damages may actually understate the true extent of damage").

*Second*, the results and statistical properties of Dr. Tabak's ERC analysis show that the specific ERC equations identified for each Alleged Corrective Disclosure date have no explanatory power:  in other words, they cannot reliably estimate the actual impact of earnings-related information on GE's stock price.  *See, e.g*., Ex. 121, Fischel Tr. 177:7-19, 179:22-180:13, 185:11-186:5.  To start, the results of Dr. Tabak's ERC analysis are not "robust," meaning they change

dramatically when only small changes to the underlying data sample are made.  Ex. 115, Fischel Rep. ¶ 50.  Specifically, with each Alleged Corrective Disclosure date—as Dr. Tabak replaces the oldest observation in his sample with another, later observation—the ERC he calculates decreases: from 16.1 for the first Alleged Corrective Disclosure date to 7.1 for the second, and to 2.5 for the third, an 84% decline from replacing just two observations in the sample.  Ex. 111, Tabak Rep. ¶ 54 & Exs. 5b, 6a, 8a; Ex. 115, Fischel Rep. ¶ 50.  An "insufficiently robust" model cannot "withstand the scrutiny of Rule 702." *Reed Constr.*, 49 F. Supp. 3d at 407.

Next, a standard statistical property—the $R^2$—of Dr. Tabak's ERC analysis similarly reveals his model measures an insufficiently reliable relationship between GE's earnings surprises and movements in its stock price.  The $R^2$ "measure[s] [] the goodness of fit of the regression," Ex. 111, Tabak Rep. ¶ 33, and for the ERC analysis in particular, it quantifies the percentage of the variability of the stock price that is explained by the variability of the earnings surprise, with larger $R^2$ values indicating that more of the variation in stock price is explained by the earnings surprise, rather than other factors.  *See* Ex. 115, Fischel Rep. ¶ 51.  Across all of Dr. Tabak's regressions in his ERC analysis, the stock price variation that is explained by earnings surprises in the underlying data sample is less than 5%—meaning that over 95% of the price variation is explained by factors *other than the earnings surprises*.  *Id.* at 29 n.103; Ex. 111, Tabak Rep. Exs. 5b, 6a, 8a; Ex. 113, Tabak Supp. Ex. 5b.  For his regression for the third Alleged Corrective Disclosure date, the $R^2$ falls to 0.14%, with 99.86% of the price variation explained by other factors.  Ex. 115, Fischel Rep. ¶ 51; Ex. 111, Tabak Rep. Ex. 8a.[26]

---

[26] Further, for all the analyses, "the adjusted $R^2$, which measures the percentage of the variability of the stock price that is explained by the variability of the EPS surprise adjusted for the number of predictors in the model, is negative"—which means "the model fits the data very poorly."  Ex. 115, Fischel Rep. at 29 n.103 (quoting Ex. 104, Brooks Publication, GE_SDNY_FISCHEL00003622 at -628); Ex. 111, Tabak Rep. Exs. 5b, 6a, 8a; Ex. 113, Tabak Supp. Ex. 5b.

Additionally, none of the ERCs that Dr. Tabak calculates is statistically significant, meaning he cannot reject the notion (known in statistics as the "null hypothesis") that the earnings surprises explain *no part* of the stock price movements in his underlying data sample.  Ex. 115, Fischel Rep. ¶ 52 & n.104; Ex. 121, Fischel Tr. 185:11-186:5; Ex. 111, Tabak Rep. Exs. 5b, 6a, 8a; Ex. 113, Tabak Supp. Ex. 5b.  Dr Tabak's decision to rely on his obviously flawed ERC is inconsistent with his conduct of his event study, *see supra* note 7, where he *disregarded* results that were not statistically significant.  Ex. 115, Fischel Rep. ¶ 52; *see* Ex. 111, Tabak Rep. ¶¶ 28, 73; *see also In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (concluding that expert's "internally inconsistent" analysis was "unreliable").  Dr. Tabak does not discard his statistically insignificant ERCs because he recognizes that there must be *some* relationship between earnings and stock price that he needs to account for on each Alleged Corrective Disclosure date, *see* Ex. 111, Tabak Rep. ¶¶ 30, 50-51, 75-76; Ex. 119, Tabak Tr. 165:19-166:18 (explaining that he "wouldn't be comfortable" attributing the entirety of a stock price decline to the alleged fraud in any given case because a disaggregation analysis was not statistically significant)—but his ERC analysis simply does not reliably explain that relationship. Dr. Tabak "was aware of this issue" but nonetheless "relied on the [ERC] analysis because it removed more from the price reactions on the three relevant corrective disclosure dates than it added."  Ex. 117, Tabak Reply ¶ 53.  That answer is unsatisfactory.  *See, e.g.*, *Bear Stearns*, 263 F. Supp. 3d at 450.

*Third*, the economic evidence shows that Dr. Tabak's repeated assertions that his ERC analysis is "conservative" are mere speculation.  In particular, analyst commentary following the second Alleged Corrective Disclosure suggests that the price impact of GE's negative earnings surprise should be *greater*—and the impact of the slightly revised Industrial CFOA guidance (if

18

any) should be *lower*—than Dr. Tabak posits.  Ex. 115, Fischel Rep. ¶ 53.  Analysts wrote that they were "flat out speechless (not easy for us) to hear the commentary on the deteriorating state of [GE's Power] business which was all new news" and "the biggest negative that came out of the call."  Ex. 101, July 24, 2017 J.P. Morgan Rep., GE_Tabak_0000236 at -236, -242; *see also* Ex. 102, July 24, 2017 Morgan Stanley Rep., GE_Tabak_0000256 at -256 ("weak margin trends at Power" were the first "major reason[]" why "GE's stock underperformed post-earnings"); Ex. 111, Tabak Rep. ¶ 52 (earnings announcement "would include . . . weakness in GE's Power business"). They opined that GE's guidance toward the bottom end of its 2017 Industrial CFOA guidance range, on the other hand, "will surprise few."  Ex. 102, July 24, 2017 Morgan Stanley Rep., GE_Tabak_0000256 at -256.  Yet Dr. Tabak attributes only $0.33 (27.5%) of the $1.20 stock price decline he calculates for the July 21, 2017 Alleged Corrective Disclosure to reduced earnings guidance, and $0.59 (49.2%) or $0.87 (72.5%) to the revised Industrial CFOA guidance.  Ex. 111, Tabak Rep. ¶¶ 49, 52-55, 65.[27]

3.    Dr. Tabak's Disaggregation Methodology Has Other Critical Defects

Because Dr. Tabak's ERC analysis—the first step in his disaggregation methodology—is unreliable, his entire disaggregation methodology (and therefore his loss causation opinions) lacks a sound foundation and cannot be relied upon.  Ex. 115, Fischel Rep. ¶¶ 47, 57; Ex. 121, Fischel

---

[27] Similarly, Dr. Tabak's Supplemental Report demonstrates that the ERC analyses in his initial Report may *underestimate* the price impact of negative earnings information on the Alleged Corrective Disclosure dates.  Ex. 115, Fischel Rep. ¶¶ 54-55.  In the Supplemental Report, Dr. Tabak attempts to determine the causes of GE's $1.47 market-adjusted stock price decline following GE's Q4 2016 earnings announcement on January 20, 2017.  Ex. 113, Tabak Supp. ¶¶ 16-17.  To do so, he first applies his ERC analysis and attributes $0.18 of the $1.47 decline to GE's earnings surprise, "leaving a further decline of $1.28." *Id.* ¶ 17.  Noting that analysts attributed GE's stock price decline to "order trends being soft, earnings being of 'low quality' . . . , soft industrial profits, and low revenue," Dr. Tabak concludes that those factors explained the "further decline" of $1.28.  *Id.* ¶ 19.  But this analyst commentary includes negative earnings-related information.  Ex. 115, Fischel Rep. ¶¶ 54-55.  Thus, Dr. Tabak's ERC analysis did not capture the impact of all the earnings-related information released on January 20, 2017, and it is reasonable to infer that the same is true for the Alleged Corrective Disclosure dates.

Tr. 185:20-186:8.  Moreover, the remainder of his disaggregation methodology suffers from other critical defects, including:

**LTC-Related Information**.  Dr. Tabak's disaggregation of insurance information on the July and October 2017 Alleged Corrective Disclosure dates is flawed and unreliable.  Dr. Tabak concedes that he has to disaggregate the price impact of GE's announcements on those dates regarding adverse claims experience in GE Capital's LTC reinsurance portfolio.  But he cannot even opine on the appropriate disaggregation of that information between the two dates.  Ex. 111, Tabak Rep. ¶¶ 64, 78.[28]  Moreover, the methodology Dr. Tabak uses to calculate the total price impact of the  information—averaging analyst estimates of the amount of a potential reserve charge and dividing that amount by GE's shares outstanding—is flawed, because the analyst estimates he relies on are reactions to information issued well after the July 21, 2017 and October 20, 2017 Alleged Corrective Disclosure dates, and that therefore did not exist as of those dates.  *Id.* ¶¶ 57-64 & nn.55-56, 58-61; Ex. 115, Fischel Rep. ¶ 64.[29]

**Additional Confounding Information**.  After purporting to remove the price impact of GE's earnings announcements (and, on the last two Alleged Corrective Disclosure dates, the price impact of insurance-related disclosures) from GE's stock price declines following the Alleged Corrective Disclosures, Dr. Tabak assumes the remainder of each decline is attributable to GE's

---

[28] In his Reply, Dr. Tabak states that if he had to provide an opinion at trial, it would be that the insurance-related information is "more appropriately considered to be absorbed by the market in October" than in July—a convenient choice, given that the maximum amount of artificial inflation in GE's stock price is then calculated to be $1.68 (versus $1.44) per share.  Ex. 117, Tabak Reply ¶ 61.  But ultimately, he continues to equivocate, *id.*, which is unhelpful to the trier of fact.

[29] To justify this method, he resorts to his usual (insufficient) excuse:  that by using later-issued reports that "increased the market's perception of the magnitude of the insurance charge," he "may have conservatively allocated too much of the stock-price decline to confounding information and too little to the allegations and thereby understated the amount of inflation in GE's stock price."  Ex. 117, Tabak Reply ¶ 62.

negative cash flow announcements—*i.e.*, the Alleged Corrective Disclosures.  Ex. 111, Tabak Rep. ¶¶ 37, 65, 76.  In so doing, he ignores, and thus fails to account for the price impact of, numerous other non-fraud disclosures that occurred on each Alleged Corrective Disclosure date.[30]

     *Information "Related To" Plaintiffs' Allegations*.  Once he has (incorrectly) assumed the remainder of each stock price decline is attributable to the Alleged Corrective Disclosures, Dr. Tabak purports to identify how much of that decline "relates to" Plaintiffs' allegations—a step based on incorrect, unsupported assumptions about cherry-picked internal documents.  *Id.* ¶¶ 37, 65-71, 77-78; *see also supra* Section A.  For instance, for the first Alleged Corrective Disclosure, Dr. Tabak's calculation relies on ███████████████████████████████████████ ████████████████████████████.  *E.g.*, Ex. 100, GE_SDNY00633666 at -701, -714.  And to measure the portion of the decline supposedly related to Plaintiffs' allegations for the second Alleged Corrective Disclosure, Dr. Tabak relied on documents ██████ ████████████████████████████████████████████████████████████ ████████████████████████████.  Ex. 111, Tabak Rep. ¶¶ 66, 68-70.  Dr. Tabak then assumed this risk was fully removed from GE Power's CFOA estimate in *Q2 2017*.  *Id.*  Asked if that risk could have encompassed ███████████████████ he used to measure the portion of the decline related to Plaintiffs' allegations for the first Alleged Corrective Disclosure—*i.e.*, if he had double-counted alleged LT factoring risk that had already materialized in Q1 2017 as also

---

[30] Specifically:  (i) after April 21, 2017, analysts expressed concern about the possibility that GE would deliver 450 rather than 500 aircraft engines in 2017, Ex. 115, Fischel Rep. ¶ 59 (citing Ex. 99, Apr. 21, 2017 Reuters Rep., GE_SDNY_FISCHEL00003652 at -652); (ii) after July 21, 2017, analysts discussed "that there will be little news on the 2018 framework and portfolio, until new CEO John Flannery delivers his strategy reset in November," and "a possible delay in closing the Industrial Solutions [a GE business] sale," *id.* ¶ 59 & n.120 (quoting, *e.g.*, Ex. 102, July 24, 2017 Morgan Stanley Rep., GE_Tabak_0000256 at -256; Ex. 107, Tabak 2021 Rep. Ex. 7 at 2); and (iii) after October 20, 2017, analysts noted that "GE's outsized restructuring and headcount reductions are going to contain the company's ability to grow," *id.* ¶ 59 (quoting Ex. 103, Oct. 20, 2017 Deutsche Bank Rep., GE_SDNY00245201 at -201).

materializing in Q2 2017—Dr. Tabak indicated it was possible and agreed that would mean that he should have used only the "remainder" ████████████████████████████ for his analyses of the second and third Alleged Corrective Disclosures, lowering his unreliable estimate of inflation and damages.  Ex. 119, Tabak Tr. 196:2-199:10.   Because it is "based on incorrect factual assumptions," Dr. Tabak's disaggregation methodology should be rejected.  *E.g.*, *Macaluso v. Herman Miller, Inc.*, 2005 WL 563169, at *8 (S.D.N.Y. Mar. 10, 2005).

4.    <u>Dr. Tabak's Opinions Ignore That GE's Stock Price Increased Following The Last Alleged Corrective Disclosure</u>

Dr. Tabak's disaggregation methodology suffers from an additional fatal flaw as to the last Alleged Corrective Disclosure date—it starts from the incorrect premise that there was a stock price decline on October 20, 2017 to disaggregate.  Instead, GE's stock price *increased* on that date, ending the day higher than when it began.  Ex. 111, Tabak Rep. ¶¶ 72-74 & Ex. 4.  Dr. Tabak disregards the increase because it "was the result of unusually high volatility."  *Id.* ¶¶ 73-74.  But the only information he identifies as being disclosed that day was unquestionably negative.  *Id.* ¶ 72.  Dr. Tabak never explains why—in the efficient market in which he opines GE's stock traded, Tabak Class Certification Rep. (Dkt. 220-1) ¶¶ 2, 54—negative information would cause volatility that brings the stock price *above* the prior day's close.  Ex. 115, Fischel Rep. at 23 n.89.[31]

**C.    The Data Contradicts Dr. Tabak's Constant-Dollar Inflation Theory, Rendering His Opinions Unreliable**

Dr. Tabak next opines that the artificial inflation in GE's stock price on each day of the

---

[31] In any event, the few courts to address the issue have been reluctant to permit experts to use a three-day window in event studies—as Dr. Tabak does here to be able to claim there was a "decline" in GE's stock price following the last Alleged Corrective Disclosure.  *United States v. Hatfield*, 2014 WL 7271616, at *12-13 (E.D.N.Y. Dec. 18, 2014) (including May 25, 2006 in event study was inappropriate because it was "unlikely that investors . . . would have taken so long to react to the May 23rd news"); *S.E.C. v. Snyder*, 2006 WL 6508273, at *2-3 (S.D. Tex. Aug. 22, 2006) (expert "testified that the use of a three-day window for an event study concerning a widely traded company . . . would be unusual and unreasonable").

Class Period "[wa]s equal to the sum of the inflation-related price declines from all subsequent corrective disclosures," or as high as $1.68 per share. Ex. 111, Tabak Rep. ¶ 86. This "constant-dollar inflation method" assumes that "had the alleged fraud not occurred, GE's stock price would have fully reflected the negative price impact of" each Alleged Corrective Disclosure "on every day of the Class Period prior to [its] removal from the stock price." Ex. 115, Fischel Rep. ¶ 33. But there is "simply too great an analytical gap between the data" that Dr. Tabak considered (or ignored) and this conclusion for it to be reliable. *Nomura*, 2015 WL 539489, at *4. Indeed, during his deposition, Dr. Tabak conceded that he had no financial-economics basis to conclude that inflation was constant throughout the Class Period; it was merely "conservative" for him to assume it was. Ex. 119, Tabak Tr. 135:3-18. That concession alone is dispositive and requires exclusion of Dr. Tabak's opinion. *See, e.g.*, *R.F.M.A.S.*, 748 F. Supp. 2d at 275-77. But the constant-dollar inflation theory is unreliable for the additional reasons that it (i) does not take into account changes in the magnitude of the allegedly concealed information over the Class Period, and (ii) incorrectly assumes, without analysis or logic, that the certainty of the cash flow miss and guidance reductions disclosed in the Alleged Corrective Disclosures could have been disclosed as of the beginning of the Class Period, to the same price impact.

      1.    <u>Dr. Tabak Fails To Take Into Account Changes In The Magnitude Of The Allegedly Concealed Information</u>

In a report issued in 2021, Dr. Tabak recognized that LT factoring practices increased in 2016, and that the "'[n]ormalization' of factoring in 1Q17 after an undisclosed change could, of course, create a different market reaction than information regarding factoring in 1Q16, before the 'significant[] expan[sion].'" Ex. 115, Fischel Rep. ¶ 44 (quoting Ex. 108, 2021 Tabak Reply at 6 n.12). But under his constant-dollar inflation method, he now opines "that the market reaction prior to the 'significant expansion' of factoring would have been exactly the same as the reaction

afterward." *Id.* That inconsistency renders his estimate of alleged inflation unreliable.[32] *See Bear Stearns*, 263 F. Supp. 3d at 450-51 (granting motion to exclude plaintiffs' loss causation expert because the "expert cannot at the same time opine that Bear Stearns's alleged liquidity problems were bad enough to put it out of business as of December 20, 2007, but not before, and that the drop in Bear Stearns's stock price caused by the corrective disclosures made on March 14 and 17, 2008 would have been exactly the same had the alleged fraud been disclosed in June 2007").

        2.    <u>Dr. Tabak Assumes The Certainty Of The Events Later Disclosed Could Have Been Disclosed At The Start Of The Class Period</u>

Dr. Tabak's theory uses GE's stock price reaction in 2017 to the purported realization of the risks associated with LT factoring as a measure of how the market would have reacted to a disclosure of the risks alone at the outset of the Class Period. But Dr. Tabak has previously recognized that a disclosure of the "realization of th[e] risk . . . will cause a price decline in excess of what would have occurred had the risk alone been disclosed." Ex. 91, Tabak Article at 9. Thus, "[t]o properly calculate the level of artificial inflation in a security's price at earlier points in time, *it is necessary to adjust that price decline to reflect only the information that could have been revealed earlier*." *Id.* Dr. Tabak does no such thing here; instead, he simply assumes that "Defendants somehow could have disclosed the certainty that these [2017 cash flow] expectations would not be met more than a year (and up to one-and-a-half years) earlier." Ex. 115, Fischel Rep. ¶ 42; Ex. 111, Tabak Rep. ¶¶ 36-37, 65-71, 76-78, 86; *see also* Ex. 119, Tabak Tr. 112:9-119:13 (Dr. Tabak was told to assume that deferred monetization was unsustainable and that "ultimately, there would be a miss" at some point in time). But the documents available to Dr. Tabak provide

---

[32] At his deposition, Dr. Tabak abandoned his Reply's (entirely unsupported) defense of the constant-dollar inflation theory—that "the undisclosed deferred monetization in the first three quarters [of 2016] was consistent, after seasonally adjusting, with the increase in deferred monetization in the fourth quarter of 2016." Ex. 117, Tabak Reply ¶¶ 28-30; *see also id.* ¶ 19; Ex. 119, Tabak Tr. 129:5-135:18.

no reasonable basis for that assumption; they support only that "what was disclosed [by GE regarding cash flows] was new information which occurred in that quarter." *E.g.*, Ex. 121, Fischel Tr. 127:15-24, 141:3-9, 142:4-144:3; Ex. 115, Fischel Rep. ¶¶ 41, 43.

The failure to provide any analysis whatsoever to support that Defendants could have disclosed the certainty of the 2017 misses as of the beginning of the Class Period renders Dr. Tabak's theory of constant inflation dating back to the beginning of the Class Period unreliable.[33]

### D.    Dr. Tabak's Materiality Opinions Are Inappropriate Legal Conclusions

Dr. Tabak's opinion that "[t]he information allegedly misstated and omitted from GE's public disclosures was economically material," Ex. 111, Tabak Rep. ¶¶ 2.a, 14-24, should be excluded for the straightforward reason that "an expert cannot testify as to whether the specific information at issue in a case is or is not 'material,'" *see, e.g.*, *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013). Moreover, his opinions on materiality—based largely on a "theoretical discussion" of how LT factoring might impact a company's future cash flows, Ex. 111, Tabak Rep. ¶¶ 15-21, and a guess as to how the market might have reacted to the disclosure of allegedly omitted facts, Ex. 121, Fischel Tr. 78:4-12, 80:17-81:13, 82:18-83:3—are merely "speculative or conjectural," and excludable on that basis alone. *See, e.g.*, *Bats Glob.*, 2022 WL 902402, at *8.

### CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court grant their motion to exclude the testimony of Dr. Tabak.

---

[33] In his Reply, Dr. Tabak points to four documents from the beginning of the Class Period he claims show that ███████████████████████████████████████████████████████████████████████ ███████████. Ex. 117, Tabak Reply ¶¶ 11, 13, 15. None of the four documents provides any support for his position. Shown them at his deposition, Dr. Tabak conceded that they ████████████████████████████████ Ex. 119, Tabak Tr. 41:6-23, 45:25-47:17, 48:5-13, 62:4-14, 67:3-20, 70:8-15, 71:10-72:2.

Dated: New York, New York
        September 6, 2022

Respectfully submitted,

LATHAM & WATKINS LLP

By: _____
    William J. Trach (*pro hac vice*)
    200 Clarendon Street
    Boston, MA 02116
    (617) 948-6000
    william.trach@lw.com

    Sean M. Berkowitz (*pro hac vice*)
    330 North Wabash Avenue, Suite 2800
    Chicago, IL 60611
    (312) 876-7700
    sean.berkowitz@lw.com

    Blake T. Denton
    Jooyoung Yeu
    1271 Avenue of the Americas
    New York, NY 10020
    (212) 906-1200
    blake.denton@lw.com
    jooyoung.yeu@lw.com

    Sarah A. Tomkowiak (*pro hac vice*)
    555 Eleventh Street NW
    Washington, D.C. 20004
    (202) 637-2200
    sarah.tomkowiak@lw.com

    Colleen C. Smith (*pro hac vice*)
    12670 High Bluff Drive
    San Diego, CA 92130
    (858) 523-5450
    colleen.smith@lw.com

    *Attorneys for Defendants General Electric
    Company and Jeffrey S. Bornstein*