**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SJUNDE AP-FONDEN and THE CLEVELAND
BAKERS AND TEAMSTERS PENSION FUND,
individually and on behalf of all others similarly
situated,

                   Plaintiffs,

      v.

GENERAL ELECTRIC COMPANY and
JEFFREY S. BORNSTEIN,

                  Defendants.

17 Civ. 08457 (JMF) (GWG)

**ORAL ARGUMENT REQUESTED**

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY OF DR. DAVID I. TABAK**

LATHAM & WATKINS LLP

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Blake T. Denton
Jooyoung Yeu
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Sarah A. Tomkowiak (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

*Attorneys for Defendants*

December 5, 2022

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ........................................................................................................................2

    A.    There Is No Causal Link Between The Alleged Fraud And The
Methodology Used In Dr. Tabak's Proffered Loss Causation Calculations............2

    B.    Dr. Tabak's Disaggregation Methodology Is Incomplete And Unreliable..............3

        1.    Dr. Tabak Fails To Disaggregate Non-Fraud Causes Of The
"Shortfalls" .....................................................................................................3

        2.    Dr. Tabak's ERC Study Is Unreliable And Not Robust ............................4

        3.    Dr. Tabak's Disaggregation Methodology Has Other Critical
Defects ...........................................................................................................8

        4.    Dr. Tabak Ignores GE's Stock Price Increase After October 20,
2017.................................................................................................................9

    C.    Dr. Tabak's Constant-Dollar Inflation Theory Is Unreliable.................................9

CONCLUSION....................................................................................................................11

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Carpenters Pension Tr. Fund v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................................9

*Castro v. Sanofi Pasteur Inc.*,
134 F. Supp. 3d 820 (D.N.J. 2015) ...................................................................................6

*EEOC v. DHL Express (USA) Inc.*,
2016 WL 5796890 (N.D. Ill. Sept. 30, 2016) ...................................................................6

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
104 F. Supp. 3d 441 (S.D.N.Y. 2015)...............................................................................7

*Fogarazzo v. Lehman Bros., Inc.*,
263 F.R.D. 90 (S.D.N.Y. 2009) ........................................................................................9

*In re Aluminum Warehousing Antitrust Litig.*,
336 F.R.D. 5 (S.D.N.Y. 2020) ..........................................................................................8

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011)..............................................................................................9

*In re Hum. Tissue Prods. Liab. Litig.*,
582 F. Supp. 2d 644 (D.N.J. 2008) ...................................................................................9

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010).............................7

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005)...............................................................................5

*In re Urethane Antitrust Litig.*,
166 F. Supp. 3d 501 (D.N.J. 2016) ...................................................................................7

*In re Vivendi Univ., S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009)...............................................................................9

*In re Xcelera.com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005).............................................................................................9

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ........................................................................................5

*Ramos v. SimplexGrinnell LP*,
   796 F. Supp. 2d 346 (E.D.N.Y. 2011) .......................................................................7

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014).........................................................................6

*Monroe Cty. Emps.' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019)................................................................................9

*Sheet Metal Workers v. CVS Pharmacy, Inc.*,
   540 F. Supp. 3d 182 (D.R.I. 2021)............................................................................7

## PRELIMINARY STATEMENT[1]

The Opposition confirms that Dr. Tabak's testimony should be excluded in its entirety.

*First*, because Dr. Tabak admitted there is no causal link between the allegedly undisclosed LT factoring and the 2017 LT factoring "shortfalls" he used in his loss causation calculations, Plaintiffs now cling to a theory that the "shortfalls" "revealed" the "dwindling organic cash flows" LT factoring had concealed.  But none of Dr. Tabak's reports used the term "organic cash flows," let alone explained what it means or why his use of LT factoring "shortfalls" against 2017 forecasts can serve as a measure of price inflation under this new theory—and it cannot.  Plaintiffs' new theory does not comport with the analysis Dr. Tabak performed.

*Second*, Plaintiffs' defense of Dr. Tabak's disaggregation methodology is that it attributed some—but not necessarily an accurate—portion of GE's stock price declines to non-fraud factors. They offer contradictory arguments to explain his failure to disaggregate the impacts of the power industry downturn, none of which are supported by his actual opinions.  As for Dr. Tabak's ERC analysis, Plaintiffs now concede (as they must) that he failed to measure a statistically significant relationship between GE's earnings announcements and its stock price movements.  Recognizing the unreliability of the analysis, Plaintiffs now encourage the Court to remove the ERC-related adjustments, even though Dr. Tabak testified he "wouldn't be comfortable" with that result.

*Third*, Plaintiffs abandon Dr. Tabak's primary defense of constant-dollar inflation, and assert a contrary theory that the constant-dollar inflation methodology is appropriate because "the magnitude of the concealed truth" held steady at ███ during the Class Period—a claim negated by concessions Dr. Tabak made during his deposition.

---

[1] Unless otherwise noted, internal citations and quotations are omitted, emphasis is added, citations to "PX __" refer to exhibits to the Declaration of Sharan Nirmul (Dkt. 385), and citations to "Ex. __" refer to exhibits to the Declaration of Blake T. Denton (Dkt. 353) and the Supplemental Declaration of Blake T. Denton, submitted herewith.  Capitalized words not defined herein have the meanings used in Defendants' Motion To Exclude the Testimony of Dr. David I. Tabak ("Mot.") (Dkt. 352) and/or in Defendants' Motion for Summary Judgment (the "MSJ") (Dkt. 360).

*Finally*, Dr. Tabak's materiality opinions are nothing but legal conclusions or speculation.

## ARGUMENT

**A.    There Is No Causal Link Between The Alleged Fraud And The Methodology Used In Dr. Tabak's Proffered Loss Causation Calculations**

Plaintiffs make no attempt to support the causal link Dr. Tabak testified he assumed existed—*i.e.*, between the "unsustainability" of the prior-period LT factoring Defendants allegedly concealed and the 2017 LT factoring "shortfalls" he used as a proxy for fraud-related losses.  Ex. 119, Tabak Tr. 112:9-119:13.  Plaintiffs likewise concede, as Dr. Tabak admitted, that he did not verify the extent to which the shortfalls were, in fact, causally related to prior-period LT factoring, and that those shortfalls could have been caused by non-fraud-related factors.  *See* Mot. 12.

Against their expert's admissions and testimony, Plaintiffs now assert that their loss causation theory is "***not***" that the prior-period LT factoring "created" lower-than-expected LT factoring in 2017.  Opp. 9-10.  Instead, they argue that the 2017 LT factoring "shortfalls" must have "revealed" GE's "dwindling organic cash flows," because LT factoring had ***previously*** been used to "conceal [the] ***then-existing***" trend of "dwindling organic cash flows."  *Id.*  But Dr. Tabak did not quantify damages based on the difference between reported cash flows and their allegedly later-revealed "organic" levels; his analysis is based on the amount by which GE Power did (or expected to) fall short of 2017 LT factoring forecasts.  Mot. 11-12.  Nowhere in any of Dr. Tabak's reports does he even use the term "organic cash flows," let alone define it or explain why his use of LT factoring "shortfalls" against internal forecasts in 2017 can serve as a measure of ***price inflation in 2016*** under this "organic cash flows" theory—and it cannot.  *Id.* at 12 n.22.[2]  Plaintiffs'

---

[2] Although Plaintiffs say this theory was previously "expressly articulated," they cite only incomplete snippets of Dr. Tabak's Report, the 2021 report he is not relying on, and a 2021 filing.  *See* Opp. 10-11; Ex. 119, Tabak Tr. 9:12-16:23.  They also claim the Reply "specifically corrected" Defendants' supposed "misconception about [their] theory," but the footnote cited says nothing about "dwindling organic cash flows."  Opp. 11; Ex. 117, Tabak Reply at 8 n.8.

theory that LT factoring masked "organic cash flows" does not comport with the analysis Dr. Tabak actually performed.[3]  Their pivot leaves them worse off than where they started:  with no evidence or expert opinion that the so-called LT factoring shortfalls were connected to the alleged fraud, and a theory that contravenes Dr. Tabak's use of those shortfalls to calculate losses allegedly caused by LT factoring.  There is no basis for Dr. Tabak to use the 2017 "shortfalls" as a measure of inflation beginning in February 2016, and his opinions must be excluded.  *Id.* at 12-13.[4]

### B.    Dr. Tabak's Disaggregation Methodology Is Incomplete And Unreliable

In defense of his disaggregation methodology, Plaintiffs argue that Dr. Tabak need only apportion losses on a "rough" basis.  Opp. 11-12.  But that does not allow Dr. Tabak to disaggregate only ***some*** confounding factors, or offer opinions grounded in ***unreliable*** methodologies.  Plaintiffs also argue that he attributed "more than half" of GE's stock price declines on the Alleged Corrective Disclosure dates to "factors other than the alleged fraud."  *Id.* at 12.  That is unsurprising given GE's massive size and scope and the myriad confounding factors present, but also establishes nothing about the comprehensiveness or reliability of Dr. Tabak's analysis.  Plaintiffs' efforts to rehabilitate his analysis fail, and his flawed and unreliable opinions should be excluded.

### 1.    Dr. Tabak Fails To Disaggregate Non-Fraud Causes Of The "Shortfalls"

Dr. Tabak failed to consider—let alone disaggregate the impacts of—the power industry downturn in 2017.  Mot. 14.  In an effort to remedy that failure, Plaintiffs make contradictory arguments:  first, that the downturn had no impact, then that Dr. Tabak did not need to disaggregate

---

[3] Plaintiffs' new theory also does not work because the alleged "undisclosed" risk—the impact of LT factoring on "then-existing" cash flows, Opp. 9-10—was, in fact, disclosed.  *See* MSJ Reply 7-8.  As Plaintiffs concede, GE ***disclosed*** the CFOA impact of both short-term and LT factoring throughout the vast majority of the Class Period, *see, e.g.*, 6AC ¶ 587, and beginning with the Q1 2017 Form 10-Q, GE separately disclosed the amount of LT factoring between GE Power and GE Capital—disclosures Dr. Tabak admitted he never even looked at, Mot. 11 n.20.

[4] Plaintiffs are also wrong that Prof. Fischel "acknowledged th[e] causal link" under their newfound theory.  Opp. 11.  Prof. Fischel testified that, hypothetically, and "depending on [various] different facts and circumstances," a miss caused by an inability to factor "could ***potentially*** be" corrective, *e.g.*, if caused by prior-period LT factoring.  PX 219, Fischel 2021 Tr. 160:21-161:9.

its effects, and finally that he ***did*** account for them.  Opp. 18-19.  Each argument fails.  *First*, there are no genuine disputes of material fact concerning the downturn and its impact on GE Power's ability to conduct LT factoring at expected levels.  *See* MSJ Reply 10; *see generally* Russo Opp. *Second*, there is no reason to assume that ***any*** failure to conduct expected LT factoring—for ***any*** reason, and at ***any*** time—would necessarily be "fraud-related."  Even crediting Plaintiffs' mistaken claim that "Power would have fallen short of its 2017" LT factoring "targets ***even if*** there had been no downturn," MSJ Opp. (Dkt. 382) at 40-41 (emphasis in original), there is no reason to assume (and Dr. Tabak did nothing to confirm) that GE Power would have fallen short ***by the same amount***.[5]  *Third*, Plaintiffs are wrong that Dr. Tabak's ERC analysis disaggregated the downturn's impact on GE Power's ability to conduct LT factoring.  The ERC analysis does not reliably disaggregate "sales" or "earnings" information, *see infra* Section B.2, and even if it did, Dr. Tabak has made clear that his ERC would not capture the ***cash flow impact*** of the failure to execute planned LT factoring as a result of the downturn, *see, e.g.*, Ex. 111, Tabak Rep. ¶¶ 75-77.

## 2.    Dr. Tabak's ERC Study Is Unreliable And Not Robust

Plaintiffs quibble over whether Dr. Tabak's ERC analysis is "novel," but they identify no case in which a court accepted the methodology as a reliable means of disaggregating confounding information.[6]  *See* Mot. 14 n.24; Opp. 12-13.  The Motion identified multiple disqualifying

---

[5] Indeed, Dr. Tabak's failure to account for the impact of the downturn on GE Power's ability to factor at forecasted levels in 2017 is even more egregious under Plaintiffs' new "organic cash flows" theory.  According to this theory, GE faced an increasing "gap" between (i) reported revenue and (ii) "organic cash" received in the same period due to customers negotiating longer times to pay, and therefore, without LT factoring, cash not flowing in until future periods. *See* Opp. 10; MSJ Opp. (Dkt. 382) at 38.  But Plaintiffs concede that a substantial amount of the LT factoring ***forecasted*** for 2017 was from new transactions expected to occur in 2017, with customers that required financing and payment terms extending beyond 2017.  *See* Opp. 19; SOF ¶¶ 87, 135.  Because, as the record reflects, a substantial amount of the 2017 LT factoring "shortfalls" stemmed from the failure to make sales that would create receivables to monetize, those shortfalls did not reveal ***the existence of a "gap"*** between revenue and cash received because ***no revenue was recognized at all*** on sales that did not occur.

[6] Plaintiffs suggest that the ERC analysis "is simply a linear regression," and that "[l]inear regression models are commonly used in securities litigation."  Opp. 12.  But the "regression model" at issue in the single case they cite was

problems with Dr. Tabak's ERC analysis, and the Opposition offers no meaningful counter to any.

*First*, according to an article on which Dr. Tabak relied, the ERC methodology generally "is not a reliable indicator of market reaction to earnings announcements of a single firm," as it incorrectly predicts the direction of stock price responses to earnings surprises nearly 38% of the time—a percentage that increases to over 50% for Dr. Tabak's ERC analysis. Mot. 15-16. Plaintiffs attempt to argue that these percentages are not evidence of the analysis' unreliability, but rather indicate "that GE's earnings announcements were not driving its stock price movements." Opp. 14 & n.10. However, Plaintiffs have no evidence for that speculative assertion, which is contrary to Dr. Tabak's opinion. Dr. Tabak recognized there is a relationship between earnings and stock price, which is why he attempted to disaggregate the impact of earnings news in the first place. As such, the issue is not a lack of relationship, but that his methodology cannot reliably measure it. Mot. 18; *see In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 407 (S.D.N.Y. 2005) (rejecting attempt to "portray[] as sturdy hypotheses" expert "espoused hesitantly if at all").[7]

*Second*, as its results and statistical properties show, Dr. Tabak's ERC analysis does ***not*** reliably estimate the impact of earnings information on GE's stock price as applied in this case. Mot. 16-18. As an initial matter, Prof. Fischel explained that small changes Dr. Tabak made to the data set (*i.e.*, replacing the oldest observation in his sample with a later one) gave rise to dramatic changes in the ERCs he calculates, illustrating that his model is not robust. *Id.* at 16-17.

---

an event study—which is undisputedly "commonly used," and decidedly not the same as an ERC analysis (to wit, Dr. Tabak performed an event study ***before*** conducting his ERC analysis, Mot. 6 & n.7). *See Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45-47 (S.D.N.Y. 2018) (Furman, J.); *see also* Ex. 124, Kaye & Freedman Art. at 272 ("The frequency with which regression models are used is no guarantee that they are the best choice for any particular problem."). Plaintiffs also argue that the ERC is "part of the accounting paradigm in research literature," but point to nothing that supports using it as Dr. Tabak does here. *See* Opp. 13 n.9; *see also* Mot. 15 (noting the methodology is typically applied to a portfolio of companies, rather than a single company, in the academic literature).

[7] Plaintiffs argue the Motion's ERC-related arguments "should be rejected outright" because they rely on Prof. Fischel's Declaration. Opp. 13. The Declaration is admissible for the reasons set forth in Defendants' Opposition to the Motion to Strike the Declaration, submitted herewith, and in any event, is cited ***only*** as support for the 50% figure referenced in the foregoing argument (as the MSJ Opposition acknowledges, at 44). *See* Mot. 16.

Unable to dispute the results of Dr. Tabak's own analysis, Plaintiffs argue that the small changes were not "arbitrarily selected model parameters" that "entirely alter[ed] the model's conclusions," citing *Reed Construction Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014). Opp. 15-16.  But *Reed* only underscores that Dr. Tabak's ERC analysis is "insufficiently robust": the "arbitrarily selected model parameters" in that case, as here, involved changes in "the end dates for [the] data sets."  49 F. Supp. 3d at 407 (excluding model).  And, Dr. Tabak's adjustments ***did*** "entirely alter" his ERC model's conclusions.  The ERCs he calculates decline 84% from replacing ***just two*** observations in the sample, Mot. 17—twice the "42% decline in GE's price-to-earnings ratio" in 2017 that Plaintiffs point to in defense, Opp. 15-16.  Dr. Tabak supposes that his ERCs might be declining over 2017 because the market placed less weight on GE's earnings as the year progressed.  Ex. 117, Tabak Reply ¶¶ 51-52 & n.31; PX 217, Tabak Tr. 183:18-24; Opp. 15-16. But he has never explained why, if that is the case, his ERC ***increased*** from 10.904 in January 2017 to 16.14 in April 2017.  Ex. 115, Fischel Rep. at 28 n.101; PX 217, Tabak Tr. 184:9-16.

Plaintiffs also suggest the Court should overlook the low $R^2$ values of Dr. Tabak's ERC analysis because "the magnitude of R-squared depends on the characteristics of the data being studied" rather than "the reliability of Dr. Tabak's model."  Opp. 14.  But, as Plaintiffs' cited sources confirm, the "characteristics of the data" determine "[w]hat level of $R^2$, if any, should lead to a conclusion that the model is satisfactory[.]"  Ex. 125, Rubinfeld Art. at 345.[8]  Dr. Tabak has never explained why his model is "satisfactory" despite its low $R^2$ values (and negative adjusted $R^2$ values), even though he acknowledged that $R^2$ measures the model's "goodness of fit," Ex. 111, Tabak Rep. ¶ 33, and Prof. Fischel noted that a negative adjusted $R^2$ shows "the model fits the data

---

[8] Plaintiffs' cited cases declining to exclude expert analysis on the basis of $R^2$ are distinguishable.  *See EEOC v. DHL Express (USA) Inc.*, 2016 WL 5796890, at *4 & n.2 (N.D. Ill. Sept. 30, 2016) (crediting explanation of why, given the data's characteristics, low $R^2$ values were expected); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 835 (D.N.J. 2015) (crediting opposing expert's "admi[ssion] that a low $R^2$ [w]as not outcome determinative" in the case).

very poorly," Ex. 115, Fischel Rep. at 29 n.103.  The $R^2$ values reveal Dr. Tabak's model measures an insufficiently reliable relationship between earnings surprises and stock price.  Mot. 17 & n.26.

Last, Plaintiffs insist that Dr. Tabak's ERCs, even if statistically insignificant, provide the "best estimate" of the impact of GE's earnings announcements on its stock price.  Opp. 14, 17.  But the source Plaintiffs quote explains that a low *t*-statistic for an estimated coefficient (*i.e.*, a statistically insignificant coefficient) indicates there is a wider "range" within which the coefficient's "true" value might lie.  Ex. 125, Rubinfeld Art. at 343.  In other words, the difference between each of Dr. Tabak's estimated ERCs and its actual value is likely quite large, and thus they might substantially overstate alleged damages.[9]  Plaintiffs ignore this possibility, reiterating Dr. Tabak's inadequate refrain of conservatism.[10]  Opp. 17; *see, e.g.*, Mot. 18.  Then, contradicting that refrain (and tacitly recognizing the shaky ground upon which the ERC analysis rests), Plaintiffs finally invite the Court to "remove[]" the "ERC-related adjustments" altogether if it determines the ERC analysis does not pass muster, Opp. 17—even though Dr. Tabak said he "wouldn't be comfortable" with that result,  Mot. 18.  Dr. Tabak's discomfort would be well-founded; Plaintiffs cannot carry their burden by disaggregating "only *some*" confounding information.  *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (emphasis in original), *aff'd*, 597 F.3d 501 (2d Cir. 2010).

*Third*, Plaintiffs offer just one response to the analyst commentary following the July 21, 2017 Alleged Corrective Disclosure that suggests that the price impact of GE's earnings surprise

---

[9] Additionally, *In re Urethane Antitrust Litigation*, 166 F. Supp. 3d 501, 509 (D.N.J. 2016) (cited at Opp. 14) notes that statistical insignificance might be "cause for concern" where (as here) a methodology is otherwise "questionable."

[10] None of Plaintiffs' cited cases (Opp. 17 n.14) suggest that unsupported assurances of conservatism can suffice, but that is all Dr. Tabak offers.  *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 500-01, 505-06 (S.D.N.Y. 2015) (expert "confirmed" model's accuracy "through a series of tests"); *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346, 376 (E.D.N.Y. 2011) (expert made indisputably "conservative assumptions" (such as "bas[ing] his damages computation on the lowest [of multiple] potentially applicable rate[s]")); *Sheet Metal Workers v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182, 215-16 (D.R.I. 2021) (reliability of expert testimony not in dispute).

should be greater than Dr. Tabak posits: that the quotes are "cherry-picked." Mot. 18-19; Opp. 16. That is so, according to Dr. Tabak, because the quotes were from July 24, not July 21. Ex. 117, Tabak Reply ¶ 54 & n.35. But in his 2021 report, Dr. Tabak used the **same** July 24 reports from J.P. Morgan and Morgan Stanley—and did **not** use their July 21 reports—to assess the market's reaction to GE's July 21 earnings announcement. Ex. 107, Tabak 2021 Rep. ¶ 43 & Ex. 7. Further, the contention that Prof. Fischel did not offer "economic analyses demonstrating how this evidence undermines" Dr. Tabak's analysis, Opp. 13, 16-17, misunderstands a rebuttal expert's role, *see, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) ("Rebuttal experts . . . have no burden to produce models or methods of their own . . . .").[11]

### 3.    Dr. Tabak's Disaggregation Methodology Has Other Critical Defects

The Opposition does not salvage the rest of Dr. Tabak's disaggregation methodology. As to his attempt to disaggregate LTC-related disclosures, Plaintiffs offer no justification for the flaws in his analysis. Mot. 20; Opp. 7. Similarly, as to the wealth of other confounding information Defendants identified, such as announcements of "restructuring and headcount reductions," Plaintiffs do not even try to explain Dr. Tabak's failure to disaggregate. Mot. 20-21 & n.30.

And, as to the flaw in Dr. Tabak's methodology that Plaintiffs **do** meaningfully address— his concession that it was possible he double-counted alleged LT factoring risk in Q2 and Q3 of 2017 that had already materialized in Q1 2017, *id.* at 21-22—Plaintiffs have nothing helpful to say. They claim Dr. Tabak's concession was a response to a hypothetical. Opp. 20. It was not. Dr. Tabak was asked about his **own** assumptions about a February 2017 document, on which **he**

---

[11] Dr. Tabak has not "already explained," Opp. 16 n.13, why Defendants are wrong that his Supplemental Report demonstrates that his ERC analysis underestimates the price impact of earnings information. Mot. 19 n.27. Plaintiffs reference a snippet of his testimony that attributes some unspecified portion of the decline in GE's stock price remaining after he applied his ERC analysis to January 20, 2017, to a "cash flow miss" he never mentioned in any of his reports. PX 217, Tabak Tr. 156:9-17. His reports identified only earnings-related information, and he never adequately explained why his ERC analysis did not capture the impact of that information, suggesting instead that the issue is "irrelevant" because "no model is perfect." Ex. 113, Tabak Supp. ¶ 19; Ex. 117, Tabak Reply ¶¶ 32-38.

*relied*, that stated ████████████████████████████████████████████

████. Ex. 119, Tabak Tr. 197:20-198:12.  He agreed that, so long as that number did not "segregate

out anything from the first quarter," the "maximum amount of decreased CFOA throughout 2017

associated with the allegations . . . would be ████████████."  *Id.*  Plaintiffs make no attempt to show

that the ████████████████████████████████████████ that Dr. Tabak claims

materialized in Q1 2017.  Instead, they claim a "disputed factual record," citing to just one internal

document that Dr. Tabak did not rely on, and which Plaintiffs do not even attempt to tie to any LT

factoring "risk."  Opp. 20-21.  That is insufficient.  *See In re Hum. Tissue Prods. Liab. Litig.*, 582

F. Supp. 2d 644, 667 (D.N.J. 2008) ("extrapolations of counsel" are "not sufficient").

4.    Dr. Tabak Ignores GE's Stock Price Increase After October 20, 2017

Plaintiffs cannot dispute that GE's stock price increased after the last Alleged Corrective

Disclosure, or that Dr. Tabak never explained why negative information would cause "volatility"

that brings the stock price *above* the prior day's close.  Mot. 22.  Plaintiffs claim experts "routinely"

use "multi-day event windows."  Opp. 21.  But most of their cited cases did not allow a three-day

window,[12] and in the two that did, the experts gave a detailed justification (lacking here), or the

window was unchallenged.[13]  Dr. Tabak's unexplained, unusual window should be rejected.

**C.    Dr. Tabak's Constant-Dollar Inflation Theory Is Unreliable**

There is too great a gap between the data and Dr. Tabak's constant-dollar inflation

assumption, and the Opposition does nothing to narrow it.  Mot. 22-25.  To support his assumption,

Dr. Tabak never said—as Plaintiffs now claim—that it does not matter "whether the volume of

---

[12] *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2011) (two days); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 & n.11 (1st Cir. 2005) (one day); *Monroe Cty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 390 (N.D. Ga. 2019) (two days); *Carpenters Pension Tr. Fund v. Barclays PLC*, 310 F.R.D. 69, 95-96 (S.D.N.Y. 2015) (two days).

[13] *See Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (three-day window included day before disclosure because "information [wa]s released" to "a select group of investors prior to being released to the public"); *In re Vivendi Univ., S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (three-day window unchallenged).

deferred monetization transactions changed during the Class Period." Opp. 22. To the contrary, his Reply stated that "the real question" is "whether the amount of undisclosed factoring changed over time in a manner that would not be consistent with its expected change." Ex. 117, Tabak Reply ¶¶ 26-28. It further explained that the volume was consistent with the expected change because the "deferred monetization in the first three quarters [of 2016] was consistent, after seasonally adjusting, with the increase in deferred monetization in the fourth quarter of 2016." *Id.* ¶ 29. At his deposition, Dr. Tabak explained his Reply as "point[ing] out that GE is very back-loaded" with respect to LT factoring and CFOA, meaning both increase in the fourth quarter of the year. PX 217, Tabak Tr. 122:14-24. But he changed his mind after reviewing Exhibit 50 (GE_SDNY00241579, a document listed in his "Materials Considered"), concluding that LT factoring was actually "more front-loaded" than CFOA in 2016. *Id.* at 130:3-132:19. That meant that "inflation at the beginning [of the Class Period] would be higher," leaving him with no basis to conclude that inflation was constant. *Id.* at 132:21-135:18; Mot. 23-24 & n.32.

Plaintiffs claim the constant-dollar inflation theory nonetheless fits because GE ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████, such that "the magnitude of the concealed truth" remained unchanged during the Class Period. Opp. 22-23. But Dr. Tabak recognized that only a portion of the supposed 2016 ████████████████████████████████████████████████████████████████████████, negating that "the concealed truth" held steady at ████████. *See* Mot. 24-25 & n.33; Pls.' SOF (Dkt. 383) ¶ 47 (confirming testimony regarding PX 40-43).[14]

---

[14] Finally, Dr. Tabak's materiality opinions should be excluded. His opinion that the allegedly undisclosed information was "economically material" is (at best) a thinly veiled "answer to an ultimate question," and Plaintiffs do not explain otherwise; nor do they explain how his conclusory statement that "deferred monetization affected GE's cash flows as described in the theoretical discussion above" is not "speculative." Ex. 111, Tabak Rep. ¶ 21; Mot. 25; Opp. 25.

## CONCLUSION

The Court should grant Defendants' motion to exclude Dr. Tabak's testimony.

Dated: New York, New York           Respectfully submitted,
       December 5, 2022
                                    LATHAM & WATKINS LLP

                             By:    _____
                                    William J. Trach (*pro hac vice*)
                                    200 Clarendon Street
                                    Boston, MA 02116
                                    (617) 948-6000
                                    william.trach@lw.com

                                    Sean M. Berkowitz (*pro hac vice*)
                                    330 North Wabash Avenue, Suite 2800
                                    Chicago, IL 60611
                                    (312) 876-7700
                                    sean.berkowitz@lw.com

                                    Blake T. Denton
                                    Jooyoung Yeu
                                    1271 Avenue of the Americas
                                    New York, NY 10020
                                    (212) 906-1200
                                    blake.denton@lw.com
                                    jooyoung.yeu@lw.com

                                    Sarah A. Tomkowiak (*pro hac vice*)
                                    555 Eleventh Street NW
                                    Washington, D.C. 20004
                                    (202) 637-2200
                                    sarah.tomkowiak@lw.com

                                    Colleen C. Smith (*pro hac vice*)
                                    12670 High Bluff Drive
                                    San Diego, CA 92130
                                    (858) 523-5450
                                    colleen.smith@lw.com

                                    *Attorneys for Defendants General Electric
                                    Company and Jeffrey S. Bornstein*

11