**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SJUNDE AP-FONDEN and THE CLEVELAND
BAKERS AND TEAMSTERS PENSION FUND,
individually and on behalf of all others similarly
situated,

                 Plaintiffs,

       v.

GENERAL ELECTRIC COMPANY and
JEFFREY S. BORNSTEIN,

                 Defendants.

17 Civ. 08457 (JMF) (GWG)

**ORAL ARGUMENT REQUESTED**

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

LATHAM & WATKINS LLP

William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

Blake T. Denton
Jooyoung Yeu
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Sarah A. Tomkowiak (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

*Attorneys for Defendants*

December 5, 2022

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

I.   PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION ...........................................2

     A.   The Alleged Corrective Disclosures Did Not Reflect The Materialization
          Of Any Risk Concealed By Defendants' Alleged Misrepresentations...................3

          1.   Plaintiffs' "true" or "organic" cash flow theory fails .................................5

          2.   No factual disputes preclude summary judgment on loss causation...........9

     B.   Plaintiffs Have Not Disaggregated Their Losses....................................................11

     C.   Plaintiffs Have Not Established Loss Causation As To Their Claims
          Concerning GE's 2016 Form 10-K And January 20, 2017 Earnings Call.............13

     D.   Plaintiffs Have Not Established Loss Causation As To Disclosures Dr.
          Tabak Did Not Address Or As To The Second Two Alleged Corrective
          Disclosures ............................................................................................................14

II.  PLAINTIFFS CANNOT ESTABLISH SCIENTER ........................................................16

III. PLAINTIFFS CANNOT ESTABLISH THE ELEMENTS OF AN ITEM 303
     CLAIM OR A MATERIAL MISREPRESENTATION.....................................................20

     A.   Plaintiffs Cannot Establish Any Violation Of Item 303 ........................................20

     B.   Plaintiffs Cannot Establish That Defendants' Affirmative Statements Were
          False Or Misleading...............................................................................................23

CONCLUSION................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
   888 F. Supp. 2d 431 (S.D.N.Y. 2012) ........................................................................ 5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................. 18, 25

*Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   477 F. Supp. 3d 88 (S.D.N.Y. 2020) ............................................................ 2, 4, 5, 11

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   2022 WL 151302 (2d Cir. Jan. 18, 2022) ................................................................ 15

*Axar Master Fund, Ltd. v. Bedford*,
   308 F. Supp. 3d 743 (S.D.N.Y. 2018) ..................................................................... 23

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1998) ................................................................................................ 22

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ............................................................................... 22

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
   853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) ................. 8

*Dalberth v. Xerox Corp.*,
   766 F.3d 172 (2d Cir. 2014) .............................................................................. 11, 15

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) .................................................................................................. 4

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ................................................................................................ 16

*Freedman v. Value Health, Inc.*,
   135 F. Supp. 2d 317 (D. Conn. 2001) ..................................................................... 19

*Gebhart v. S.E.C.*,
   595 F.3d 1034 (9th Cir. 2010) ................................................................................ 19

*Gould v. Winstar Commc'ns, Inc.*,
   692 F.3d 148 (2d Cir. 2012) ..................................................................................... 5

*Gross v. GFI Grp., Inc.*,
   310 F. Supp. 3d 384 (S.D.N.Y. 2018) ........................................................................ 17, 18, 24

*Gruber v. Gilbertson*,
   2021 WL 2482109 (S.D.N.Y. June 17, 2021) ...................................................................... 17

*Heck v. Orion Grp. Holdings, Inc.*,
   468 F. Supp. 3d 828 (S.D. Tex. 2020) .................................................................................... 8

*In re AT&T/DirecTV Now Sec. Litig.*,
   480 F. Supp. 3d 507 (S.D.N.Y. 2020) .................................................................................. 24

*In re Celestica Inc. Sec. Litig.*,
   2014 WL 4160216 (S.D.N.Y. Aug. 20, 2014) ...................................................................... 19

*In re Chicago Bridge & Iron Co. Sec. Litig.*,
   2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021) ...................................................................... 19

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006). .................. 24

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) .................................................................................... 9

*In re Moody's Corp. Sec. Litig.*,
   2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) ................................................................... 9, 11

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ................................................................................................. 24

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000) .................................................................................. 16

*In re Nielsen Holdings PLC Sec. Litig.*,
   510 F. Supp. 3d 217 (S.D.N.Y. 2021) .................................................................................. 23

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) .............................................................................................. 8, 15

*In re Retek Inc. Sec. Litig.*,
   621 F. Supp. 2d 690 (D. Minn. 2009) .................................................................................... 9

*In re Vivendi Univ., S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016) ............................ 4

*In re Williams Sec. Litig.*,
   496 F. Supp. 2d 1195 (N.D. Okla. 2007), *aff'd*, 558 F.3d 1130 (10th Cir.
   2009) ................................................................................................................................... 5, 8

*In re Xerox Corp. Sec. Litig.*,
   935 F. Supp. 2d 448 (D. Conn. 2013) ................................................................ 15

*Joffee v. Lehman Bros. Inc.*,
   209 F. App'x 80 (2d Cir. 2006) ............................................................................ 8

*LBBW Luxembourg S.A. v. Wells Fargo Sec. LLC*,
   10 F. Supp. 3d 504 (S.D.N.Y. 2014) .................................................................. 12

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................. 4

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
   589 F. Supp. 3d 302 (S.D.N.Y. 2022) ................................................................ 25

*Litwin v. Blackstone Grp.*,
   634 F.3d 706 (2d Cir. 2011) ............................................................................... 22

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. 2018) .......................................................................... 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................................... 17

*McKowan Lowe & Co., LTD v. Jasmine, LTD*,
   2005 WL 1541062 (D.N.J. June 30, 2005) ........................................................... 8

*Metzler Inv. v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .............................................................................. 9

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ................................................................................ 9

*Nagelberg v. Meli*,
   2022 WL 2078010 (S.D.N.Y. June 9, 2022) ...................................................... 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ........................................................................................... 25

*Patel v. L-C Commc'ns Holdings Inc.*,
   2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) .................................................... 18

*Pearlstein v. Blackberry Ltd.*,
   2022 WL 19792 (S.D.N.Y. Jan. 3, 2022) .......................................................... 25

*S.E.C. v. DiMaria*,
   207 F. Supp. 3d 343 (S.D.N.Y. 2016) ................................................................ 22

*S.E.C. v. Syron*,
    2013 WL 1285572 (S.D.N.Y. Mar. 28, 2013) ..................................................... 20

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    341 F.R.D. 54 (S.D.N.Y. 2022) ......................................................................... 18

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) .......................................................... 16, 21

*Strougo v. Barclays PLC*,
    334 F. Supp. 3d 591 (S.D.N.Y. 2018) ............................................................... 19

## STATUTES

15 U.S.C. § 78j ............................................................................................................... 3, 23

## RULES

Fed. R. Civ. P. 56 ............................................................................................................. 16

## REGULATIONS

17 C.F.R. § 229.303 .................................................................................................. *passim*

## PRELIMINARY STATEMENT[1]

Plaintiffs' few remaining claims all fail for lack of loss causation, scienter, and falsity.

*First*, the Opposition confirms that Plaintiffs do not have a viable theory of loss causation. Unable to establish that the allegedly undisclosed LT factoring caused any of their losses, Plaintiffs now pivot to a theory that LT factoring somehow obscured GE's "true" or "organic" cash flow. Plaintiffs never explain what they mean by "true" or "organic" cash flow—a term that appears zero times in their experts' opening, supplemental, and reply reports—or even how it relates to the LT factoring "shortfall" analysis of their loss causation expert. But any "cash flow" theory cannot be reconciled with the undisputed fact that LT factoring involved one GE entity, GE Power, selling receivables to another, GE Capital, meaning the transactions had ***zero net impact*** on ***total company*** cash flow or liquidity. Plaintiffs likewise cannot salvage Dr. Tabak's incomplete and inadequate attempt to disaggregate the significant confounding factors and information present in this case. Instead, Plaintiffs invite the Court simply to ignore his principal disaggregation methodology, the ERC analysis, which only underscores its lack of reliability. Plaintiffs' last, flailing assertion that they are entitled to damages attributable to a disclosure that their own expert admitted could not reliably be disaggregated, should be rejected out of hand.

*Second*, Plaintiffs do not raise a genuine dispute of material fact as to scienter. Unable to articulate any credible theory of ***motive***, Plaintiffs must demonstrate that, without motive, Defendants acted recklessly. All they can muster, however, is easily refuted conjecture grounded in circumstantial evidence. That does not suffice.

---

[1] Unless otherwise noted, defined terms have the meanings used in Defendants' Summary Judgment Motion (Dkt. 360, "Motion"), internal citations and quotations are omitted, emphasis is added, citations to "PX _" refer to exhibits to the Declaration of Sharan Nirmul (Dkt. 384) filed with Plaintiffs' Opposition (Dkt. 382, "Opposition"), citations to "DX _" refer to exhibits to the Declaration of Blake T. Denton (Dkt. 353) or the Supplemental Declaration of Blake T. Denton submitted herewith, citations to "DSOF ¶ _" refer to Defendants' Statement of Material Facts (Dkt. 359), citations to "PSOF ¶ _" refer to Plaintiffs' Statement of Additional Material Facts (Dkt. 383), and citations to "Reply SOF ¶ _" refer to Defendants' Reply Statement of Material Facts submitted herewith.

*Third*, Plaintiffs fail to proffer evidence of any actionable misstatement or omission. The Opposition confirms they cannot identify any total company liquidity impact from LT factoring that would necessitate an Item 303 disclosure, or muster any evidence in support of their speculative challenges to GE's 2016 10-K or Mr. Bornstein's January 2017 earnings call remarks.

## I.     PLAINTIFFS CANNOT ESTABLISH LOSS CAUSATION

Plaintiffs now abandon the theory they actually pled, *i.e.*, that allegedly undisclosed LT factoring **caused** cash flow headwinds to materialize in 2017.[2] That is because (as the Motion showed) their expert failed to demonstrate any causal connection between his measure of loss causation (2017 LT factoring shortfalls against forecasts) and the prior-period LT factoring Defendants allegedly concealed. Mot. 24-27. Plaintiffs' new theory is that the undisclosed "risks" that "materialized" in 2017 were not **caused by** allegedly undisclosed LT factoring, but rather that LT factoring had purportedly "concealed" what Plaintiffs describe as "an **existing** trend of declining cash flows" or GE's "true" or "organic" cash flow. Opp. 31, 35-38, 41. From that premise, Plaintiffs advance a "true financial condition" theory, under which the Alleged Corrective Disclosures revealed GE's "true" or "organic" cash flows that LT factoring previously "obscured." *Id.* at 1, 35-38, 41. That new theory, however, is even further divorced from the actual facts of LT factoring and their expert's loss causation analysis, and fails for numerous reasons. Under settled law, Plaintiffs cannot recover without proving their losses were caused by the materialization of a risk Defendants allegedly concealed—and not by other factors or developments. A lack of such proof warranted summary judgment in *Atlantica*, and it does here, as well.

Plaintiffs also fail to disaggregate their alleged losses—even "roughly." Dr. Tabak made no attempt to disaggregate non-fraud-related causes of his LT factoring shortfalls, so Plaintiffs can

---

[2] *See, e.g.*, 6AC ¶¶ 421-25, 521-90 (repeatedly alleging that LT factoring was "unsustainable," "expensive," and/or "created large cash holes in future reporting periods").

only argue that no disaggregation was required because *any* LT factoring shortfall, regardless of the cause, should be considered fraud-related.  Likewise, Plaintiffs fail to rehabilitate Dr. Tabak's self-described "better than nothing" attempt at disaggregating the significant confounding news disclosed contemporaneously with the Alleged Corrective Disclosures.  Indeed, Plaintiffs do not dispute that his novel ERC methodology has never been proffered and ruled admissible in any Section 10(b) action, for good reason:  it produces statistically insignificant and unreliable results.

Finally, Defendants are entitled to summary judgment on Plaintiffs' claims regarding GE's 2016 Form 10-K and January 20, 2017 earnings call, the second two Alleged Corrective Disclosures, and any disclosures for which Dr. Tabak did not quantify fraud-related losses.  *First*, Plaintiffs cannot reconcile Dr. Tabak's opinion that Defendants' challenged misstatements merely "maintained" previously existing inflation created by the purported Item 303 omissions with Plaintiffs' simultaneous claims (including in the Opposition) that the misstatements concealed different information.  *Second*, Plaintiffs are wrong that the Court should (i) depart from binding case law, invent an "information bundling" loss causation exception, and award Plaintiffs damages for losses they concede are non-fraud-related, and (ii) conclude that a factual dispute concerning the plain meaning of GE's disclosures precludes partial summary judgment.

### A.     The Alleged Corrective Disclosures Did Not Reflect The Materialization Of Any Risk Concealed By Defendants' Alleged Misrepresentations

Plaintiffs cannot show that GE's Industrial CFOA results for the first three quarters of 2017 (*i.e.*, the Alleged Corrective Disclosures) were caused by anything that allegedly should have been disclosed earlier regarding GE Power's LT factoring transactions with GE Capital.  To establish loss causation, Plaintiffs must prove that their losses were caused by the revelation of the alleged fraud (via the materialization of a previously concealed risk or otherwise)—and *not* by some other factor or development, such as the materialization of some other, non-fraud-related risk.  *See Dura*

*Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174 (2d Cir. 2005) (plaintiffs must show a "causal connection between the content of the alleged misstatements or omissions and the harm actually suffered").[3]

Plaintiffs have all but conceded that they cannot satisfy that standard.  Rather than the alleged impact on GE's 2017 Industrial CFOA performance of allegedly undisclosed prior-period LT factoring,[4] Plaintiffs' loss causation theory is based on amounts by which Dr. Tabak determined GE Power purportedly fell short of ***2017 internal LT factoring forecasts***.  *See* Tabak Rep. ¶¶ 37, 65-70, 77-78; Mot. 24-27.  As Dr. Tabak readily admitted, however, any number of non-fraud-related factors could have impacted GE Power's ability to conduct LT factoring in 2017, such as declines in demand for its products and services.  *E.g.*, Tabak Dep. Tr. 122:2-6.  Yet, Plaintiffs' experts did not analyze the ***cause*** of GE Power's 2017 LT factoring shortfalls, *e.g.*, *id.* at 105:4-14; Kothari Dep. Tr. 240:5-11, and Plaintiffs fail to offer any evidence (or economic theory) that the cause was the prior-period LT factoring Defendants allegedly concealed.  Thus, just as the *Atlantica* plaintiffs lacked evidence that their losses were caused by the materialization of an allegedly concealed risk (*i.e.*, that BTA Bank would become insolvent due to the S-K

---

[3] Plaintiffs suggest that it is ***Defendants*** who bear the burden of "disprov[ing]" causation, *see, e.g.*, Opp. 41, but even the cases they cite confirm that it is ***Plaintiffs*** who bear the burden of proof, including the burden to "show that the[ir] loss was caused by the materialization of the concealed risk ***and not other factors***." *E.g.*, *In re Vivendi Univ., S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011) (cited Opp. 37, 42), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

[4] Plaintiffs claim to have identified the "cash holes" created by the "drag" of prior-period LT factoring, Opp. 13 n.5, but those "holes" are not the basis of Dr. Tabak's analysis or Plaintiffs' alleged damages.  That is because prior-period LT factoring could not have caused any of the 2017 cash flow misses.  Among other issues, GE Power was aware of which receivables had already been factored and the resulting "drag" in future collections, and they were incorporated into its forecasts. Mot. 26.  Thus, prior-period LT factoring and any "drag" could not have caused any LT factoring shortfalls against forecasts.  *Id.*  Nevertheless, Plaintiffs argue that "[Defendants'] evidence does not suggest that the 'drag' created by deferred monetization was incorporated into Power's 2017 cash flow ***targets***," and instead, "simply demonstrates that Power incorporated 'drag' into its internal cash flow ***forecasts*** (which consistently fell short of Power's cash flow target, in part because of monetization drag)."  *See* Opp. 38 n.26 (emphases in original).  But the record confirms that the effects of LT factoring ***were*** incorporated into GE's financial planning.  *See* PX 38, Eshoo Dep. Tr. 64:13-16; PX 85, Donovan Dep. Tr. 76:10-22.  To the extent Plaintiffs maintain that GE Power specifically excluded the impact of prior-period LT factoring from its targets, they offer no evidence as support, and there is none.

Deposit) as opposed to other events or conditions (*i.e.*, "factors other than the S-K Deposit"), Plaintiffs lack evidence that it was the materialization of a risk related to prior-period LT factoring, as opposed to other events or conditions (*e.g.*, a global power market downturn), that caused GE Power to fall short against LT factoring forecasts in 2017. *Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 110-11 (S.D.N.Y. 2020); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1265-66 (N.D. Okla. 2007) (materialization of risk theory "provides no warrant for dispensing with *Dura's* requirement" of a "causal connection between the material misrepresentation and the loss"), *aff'd*, 558 F.3d 1130 (10th Cir. 2009).[5]

Nevertheless, in an effort to keep their deficient claims alive, Plaintiffs have concocted a new "true financial condition" theory by which they argue that *any* shortfalls in LT factoring that occurred in 2017—for *any* reason—should be assumed to reflect the revelation of a risk or condition Defendants concealed. This new theory fails for numerous reasons.

### 1.   Plaintiffs' "true" or "organic" cash flow theory fails

Unable to demonstrate a causal relationship between prior-period LT factoring and their alleged losses, Plaintiffs now argue, under a "true" or "organic" cash flow theory, that GE Power's failure to execute on expected LT factoring in 2017 must have "revealed" GE's "true (dwindling) cash flow position," because (according to Plaintiffs) LT factoring had *previously* been used to "cover up *existing* cash shortfalls and an *existing* trend of declining cash flows." Opp. 34-36. Plaintiffs thus *assume* (just like Dr. Tabak, *see* Mot. 24) that declines in GE's share price resulting from *any* failure by GE Power to execute anticipated LT factoring—for *any* reason—were fraud-

---

[5] Plaintiffs rely on *Abu Dhabi* and *Gould* (Opp. 35, 37, 42), but (unlike here) each involved evidence connecting the alleged fraud to plaintiffs' losses. *See Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 472-73 (S.D.N.Y. 2012) (factual evidence and expert declaration connected losses to fraud); *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 161 (2d Cir. 2012) (expert testimony linked decline to revelation of improper revenue recognition).

related.[6]  Plaintiffs' belated pivot cannot save their deficient claims.

      *First*, Plaintiffs' assertion that LT factoring "cover[ed] up" a decline in "organic" cash flows, "which w[as] revealed to the market in 2017," Opp. 35, is not supported by their expert's analysis.  Dr. Tabak's analysis is based on amounts by which GE Power did (or expected to) fall short of 2017 LT factoring forecasts.  *See* Tabak Rep. ¶¶ 37, 65-70, 77-78; Mot. 27-28 n.18. Plaintiffs unsurprisingly fail to explain how Dr. Tabak's use of LT factoring shortfalls against internal forecasts in 2017 can serve as a measure of Class Period price inflation under their newfound theory, and it cannot.[7]  Dr. Tabak did not even attempt to tie any LT factoring "shortfalls" in 2017 to a supposed 2016 deficit in "organic" cash flow or quantify any damages based on the difference between reported cash flows and their allegedly subsequently revealed "true" or "organic" levels.  Indeed, Plaintiffs fail even to explain how they define "true" or "organic" cash flow, or why cash received for goods or services provided to a customer (which is what occurs when a receivable is factored) is not "true" or "organic."  To the extent Plaintiffs' references to "true" or "organic" cash flows are defined as cash flows ***excluding*** the impact of LT factoring, Dr. Tabak's use of LT factoring shortfalls inexplicably assumes that cash from the LT factoring that ***did*** occur in 2017 was "true" or "organic."  Accordingly, Plaintiffs' theory does not comport either with the nature of LT factoring or the analysis Dr. Tabak performed.

      *Second*, Plaintiffs' new theory cannot be reconciled with their Item 303 claim.  To prove their Item 303 claim, Plaintiffs must show that GE failed to disclose that GE Power engaged in LT

---

[6] Not only were Dr. Tabak's LT factoring shortfalls the product of myriad non-fraud-related factors, but so too was GE's Industrial CFOA performance.  Plaintiffs assert that "the hole [GE] filled with LT factoring in 2016 could not be filled again in 2017," *e.g.*, Opp. 38, but make no effort to demonstrate that the Alleged Corrective Disclosures revealed the supposed pre-existing cash holes that were allegedly concealed through Class Period LT factoring rather than numerous other factors across GE's seven industrial businesses that impacted its Industrial CFOA performance.

[7] Moreover, flaws in Dr. Tabak's analysis make clear that his calculations do not measure GE's "true" or "organic" cash flow.  For example, Dr. Tabak double-counted shortfalls in the second and third quarters of 2017 that had ***already materialized*** in the first quarter of that year.  Dkt. 352, Tabak *Daubert* 21-22.  Likewise, Dr. Tabak incorrectly assumes a miss in LT factoring transactions equates to the same dollar amount of missed CFOA.  *Id.* 11 n. 21.

factoring in 2016, and that this practice was reasonably likely to impact *GE's*—the registrant's—liquidity.  Mot. 43-47; *infra* § III.A.  However, it is undisputed that LT factoring involved intra-company transactions through which one GE entity, GE Power, sold receivables (which are simply an entitlement to be paid in the future for work that has been performed for a customer) to another GE entity, GE Capital, for cash.  Mot. 8-9, 44; Opp. 6, 18-20.  Such intra-company transactions did not (and by definition could not) have *any impact on GE total company liquidity or cash flow*.  Mot. 43-45; Opp. 18-19.  Plaintiffs' new theory cannot be squared with that uncontroverted fact.

Further, given the intra-company nature of LT factoring, Plaintiffs' claim that it "mask[ed] the growing gap" between GE's "revenues and cash flows," *e.g.*, Opp. 26, 38, makes no sense.  At most, LT factoring allowed GE Power to receive cash for work performed for customers sooner than it would have had it waited until the receivable came due.  Mot. 6-9.  By selling a receivable to GE Capital, GE Power accelerated the timing of its receipt of cash, leaving GE Capital to collect from the customer when the receivable came due.  *Id.* at 8-9.  Plaintiffs do not challenge the accuracy of revenue recorded by GE, and the only way GE can record revenue is if it sells goods or services to a customer and the customer has an obligation to pay.  To the extent, as Plaintiffs allege, there was a "gap" between revenue and cash in any period, that simply meant that GE recognized revenue for work it performed, but the customer's corresponding obligation to pay would come after the reporting period.  *Id.* at 4-6.  That does not mean, however, that when GE Power sells a receivable in order to collect cash earlier than the customer is obligated to pay, GE Power is somehow "concealing" the gap between revenue and cash.  Rather, it is eliminating the gap.  By definition, LT factoring—which provided immediate cash in exchange for the right to future payments—converted receivables *into* cash, thereby *reducing* GE Power's deferred balance along with any "gap" between revenues and cash flows.  *See id.* at 6-9; DX 48 ¶¶ 37-40.

*Third*, Plaintiffs' reliance on a "true" or "organic" cash flow theory does not work because

the alleged "undisclosed" risk—the impact of LT factoring on "existing" cash flows, Opp. 34, 38—was, in fact, disclosed.  Under Plaintiffs' new theory, what matters are the "risks" or "conditions" that LT factoring purportedly concealed, rather than any risks of LT factoring itself. Opp. 34-38.  But as Plaintiffs concede, GE *disclosed* the CFOA impact of LT factoring throughout the vast majority of the Class Period.  *E.g.*, 6AC ¶ 587 ("[P]rior to the 2016 10-K, the MD&A section (and relevant footnotes) of GE's 10-K and 10-Q disclosures identified the CFOA generated through the factoring of 'customer receivables'—*i.e.*, short-term *and long-term receivables*—to GE Capital.").  Moreover, beginning with the Q1 2017 Form 10-Q, and in every subsequent Class Period filing, GE separately disclosed the amount of LT factoring between GE Power and GE Capital.  Mot. 12 n.7.  Because these "risks" or "conditions" were previously disclosed, they could not have been revealed through the Alleged Corrective Disclosures.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (alleged corrective disclosures could not have revealed facts already "known to the market"); *Joffee v. Lehman Bros. Inc.*, 209 F. App'x 80, 81 (2d Cir. 2006) (allegedly concealed risks had already been "revealed in various public filings").

*Finally*, and in any event, there is no legal basis for Plaintiffs' "true" or "organic" cash flow theory.  "True financial condition" theories—under which disclosures are alleged to be corrective as revealing a company's "true" financial condition, even though the disclosures are not causally linked to a defendant's fraud—have been routinely rejected by courts,[8] *see, e.g.*, *In re*

---

[8] *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 194 (D. Mass. 2012) ("[P]laintiffs must do more than show that the market reacted to the purported impact of the alleged fraud—the earnings miss."), *aff'd*, 752 F.3d 82 (1st Cir. 2014); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1266 (N.D. Okla. 2007) (Plaintiffs must "pro[ve] that the market recognized a relationship between the event disclosed and the fraud."), *aff'd*, 558 F.3d 1130 (10th Cir. 2009); *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 861 (S.D. Tex. 2020) ("Lead Plaintiff fails to connect the . . . disclosure that revenue shortfalls were expected for the third quarter of 2018 to any of the alleged misrepresentations[.]"); *McKowan Lowe & Co., LTD v. Jasmine, LTD*, 2005 WL 1541062, at *10 (D.N.J. June 30, 2005) ("[P]laintiffs' argument that Jasmine's first quarter 1994 financial results indirectly disclosed the Other Misrepresentations is unpersuasive . . . [and] summary judgment will be granted. . . .").

*Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 699-703 (D. Minn. 2009), and have never been permitted in this Circuit.[9]  Instead, a plaintiff must prove losses caused by the materialization of a risk that a defendant's alleged misrepresentation concealed, and conclusory arguments that a disclosure or event was the inevitable result of a defendant's prior misstatement do not suffice. *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *11 (S.D.N.Y. Aug. 23, 2013) (finding no "evidence demonstrating that Moody's specific alleged misrepresentations caused the materialization of the risk that Moody's rating practices were unsustainable"); *see also, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005) (noting that if "such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud," then plaintiffs could recover "without alleging that a fraudulent scheme was ever disclosed [or] that the disclosure caused their losses").

## 2.   No factual disputes preclude summary judgment on loss causation

Left without evidence of a causal connection, Plaintiffs cite snippets from the voluminous record, hoping to convince the Court that factual disputes preclude summary judgment.  They do not.  For one thing, Plaintiffs transparently mischaracterize the testimony of Defendants' experts. *See, e.g.*, Opp. 35, 39.[10]  Likewise, the documents Plaintiffs claim establish that LT factoring was

---

[9] Even the Ninth Circuit, which first recognized the true financial condition theory, subsequently observed that, after any stock drop, "a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud" and that "[l]oss causation requires more." *See Metzler Inv. v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008); *see also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per curiam).

[10] Plaintiffs contend, for example, that Prof. Fischel "refused to opine that no portion of Plaintiffs' losses was attributable to the alleged fraud."  Opp. 35 (citing PX 219 at 154:3-9).  But he was asked if GE's April 2017 announcement of its first quarter results "had anything to do with ***factoring***," and responded that he "wouldn't say that ***because factoring contributes to CFOA***," such that it would be wrong to say that the disclosure did not have "anything to do with ***factoring***."  *See* PX 219 at 154:3-9.  He was not asked about—and never refused to opine on— whether Plaintiffs losses were attributable to the "alleged fraud."  *See id.*; *see also, e.g.*, *id.* at 156:7-11.  Plaintiffs also take Mr. Russo's testimony out of context, stressing that he testified that the "proximate" cause of the Industrial CFOA misses disclosed in 2017 was LT factoring.  Opp. 39 (citing PX 214 at 275:2-22).  But Mr. Russo explained that the "ultimate" cause of the misses (his report's "focus[]") was "changed market conditions in '17, which resulted . . . in [a] reduction in sales and, therefore, fewer receivables that could be monetized."  PX 214 at 275:2-17.  Finally, Prof.

used in 2016 "to conceal a $2 billion cash flow headwind and a long-term trend of declining cash flows," *see, e.g.*, *id.* at 38 (citing PSOF ¶¶ 89-90), were created or exchanged long before any targets or forecasts for 2017 were set. Even if Plaintiffs were correct about what these documents show (and they are not[11]), that would at most establish only that some additional disclosure should have been made in 2016; it would ***not*** demonstrate a causal connection to GE's 2017 financial results or Dr. Tabak's LT factoring shortfalls (which occurred over a year later).[12]

Nor have Plaintiffs raised a genuine dispute of material fact concerning the global power market downturn. Plaintiffs ***declined*** to offer a power market expert to rebut Mr. Russo, and as discussed in the opposition to Plaintiffs' motion to exclude his testimony submitted herewith, his opinions are not "speculative and unreliable." *See id.* at 40 & n.28. There is no dispute that (i) there was a downturn, (ii) it impacted demand for equipment GE Power planned to sell, and (iii) it limited GE Power's ability to engage in its planned LT factoring, each of which Plaintiffs' experts readily conceded.[13] Accordingly, Plaintiffs can only argue that, even if a "market downturn negatively impacted Power's performance in 2017," Plaintiffs should still recover for

---

Fischel did not testify that ***any*** inability by GE Power to factor further would be corrective. *See* Opp. 39 (citing PX 219 at 160:10-161:9). He said that GE Power's inability to factor further "could ***potentially*** be a corrective disclosure," *e.g.*, if it was caused by prior-period LT factoring. PX 219 at 160:21-161:9.

[11] For example, Plaintiffs repeatedly cite documents concerning deferred balance targets GE Power had set and/or strategies it had developed to mitigate the growth of its deferred balance, claiming they indicate that LT factoring was deployed to mask declining cash flows. *See, e.g.*, Opp. 35 (citing PX 41). But GE's deferred balance merely measures the revenue GE Power recognizes in excess of billings, and thus could grow (and need to be mitigated through any number of various strategies, only one of which was LT factoring) for any number of reasons. Mot. 24-25 n.17.

[12] Plaintiffs suggest that "on at least one of the corrective disclosure dates, analysts ***specifically*** linked GE's disappointing cash flows to the 'normaliz[ation]' of its factoring activities." *See* Opp. 38 (citing Tabak Rep. ¶ 40). But the cited commentary—which observed that "GE[ Capital] factoring ha[d] been bolstering Industrial CFOA by ~$2B per year," adding that the Q1 2017 announcement "show[ed] what happens when this normalizes"—plainly relates to ***short-term*** (and not ***long-term***) factoring. *See* Tabak Rep. ¶ 40 (citing J.P. Morgan, "1Q Wrap: Red Is The New Black" (Apr. 24, 2017)). As disclosed in the Form 10-K GE issued prior to the commentary, "[t]he incremental cash generated in GE CFOA from ***current*** receivables sold to GE Capital, . . . increased GE's CFOA by $2.1 billion, $2.1 billion and $1.6 billion in 2016, 2015 and 2014, respectively." *See* DX 2 at 87. That is why Dr. Tabak ***conceded*** that the analyst "was referring to the short-term factoring." *See* Tabak Dep. Tr. 78:13-79:5.

[13] *See* DSOF ¶¶ 171-85; Reply SOF § I.1-3, 5; *see also* DX 114 ¶¶ 86-120 (expert report of Christopher J. Russo).

the resulting stock price declines because "[e]ven if a market downturn accelerated the timing of **when** th[e] truth was revealed . . . it was the **same** truth." *See id.* at 41.  That argument flies in the face of this Court's decision in *Atlantica*, which Plaintiffs (oddly) cite as support.  *See id.* (citing *Atlantica*, 477 F. Supp. 3d at 109).   The *Atlantica* plaintiffs stressed that the defendants had allegedly misrepresented the risk of BTA Bank's insolvency and that BTA had in fact become insolvent.  *See Atlantica*, 477 F. Supp. 3d at 110.  Yet, there was no evidence that it was actually a risk the defendants had concealed that caused the insolvency; instead, the record suggested that BTA Bank became insolvent as a result of **other** factors.  *Id.* at 110-11.  It was not enough for the *Atlantica* plaintiffs to stress that the "same truth" had been concealed without proof of a causal relationship, and it is not enough for Plaintiffs to do so here.  *Id.*[14]

## B.      Plaintiffs Have Not Disaggregated Their Losses

Plaintiffs' loss causation theory also fails because they have not disaggregated their alleged losses from losses caused by myriad confounding factors and events.  Plaintiffs do not dispute that they must disaggregate losses "resulting from non-fraud-related events."  *See* Opp. 42; *see also* Mot. 28.  Yet, as to non-fraud-related causes of Dr. Tabak's LT factoring shortfalls, and even as to certain non-fraud-related information disclosed contemporaneously with the Alleged Corrective Disclosures, Plaintiffs apparently believe no disaggregation is necessary.  They are wrong.[15]

*First*, it is fatal to Plaintiffs' claims that Dr. Tabak made no attempt to disaggregate the

---

[14] Similarly, and contrary to Plaintiffs' argument, *see* Opp. 41-42, the fact that GE Power did not ultimately generate enough receivables in 2017 to conduct LT factoring at expected levels does not *ipso facto* establish that the "unsustainab[ility]" of LT factoring caused GE to fall short.  *See, e.g., Moody's*, 2013 WL 4516788, at *11.

[15] Plaintiffs also stress that (i) Dr. Tabak attributed more than half of the stock price declines he identified to non-fraud-related causes and that (ii) there are competing loss causation experts.  Opp. 36, 42-43.  First, it is no wonder that Dr. Tabak attributed most of the declines to confounding factors; the Alleged Corrective Disclosures were announcements of Industrial CFOA performance across numerous GE businesses impacted by various factors that had nothing to do with Plaintiffs' allegations.  Second, "an expert's report is not a talisman against summary judgment," *Dalberth v. Xerox Corp.*, 766 F.3d 172, 188-89 (2d Cir. 2014), particularly where, as here, Dr. Tabak's opinions are inapt and unreliable.

impact of non-fraud-related causes of the 2017 LT factoring shortfalls at the center of his analysis, such as the impact of the market downturn on GE Power's ability to generate the receivables it planned to monetize.  *See* Mot. 29.  Unable now to supplement Dr. Tabak's opinions, Plaintiffs argue that the market downturn is fraud-related and "need not be disaggregated."  Opp. 44. Plaintiffs cannot credibly contend—and have supplied no expert or factual evidence suggesting— that an unexpected change in demand limiting GE Power's ability to generate receivables it planned to monetize via LT factoring is somehow related to the alleged concealment of prior-period LT factoring.[16]  And, neither Dr. Tabak's event study (which purports to capture reactions to industry-wide trends) nor his ERC analysis (which purports to capture reactions to surprises in earnings disclosures), *id.*, capture the **separate and additional** impact on GE's Industrial CFOA of an inability to conduct expected LT factoring due to declines in demand.[17]

*Second*, Dr. Tabak also failed adequately to disaggregate the impact of several categories of confounding information.[18]  As discussed in greater detail in Defendants' brief on their motion to exclude Dr. Tabak's testimony, his ERC analysis fails to capture the relationship between GE's earnings announcements and its stock price movements.  Faced with this inescapable flaw, Plaintiffs now argue that there was no relationship between GE's earnings announcements and stock price movements, because earnings was not "the most important financial metric for investors," *id.* at 44-45, and go so far as to suggest that the Court could simply ignore the ERC

---

[16] In the absence of any evidence—or allegation—that Defendants' conduct with respect to LT factoring itself caused the global power market downturn," (his industry index does not even include the foreign firms that primarily compete with GE in the power industry, Mitsubishi and Seimens, *see* Tabak Rep. ¶ 27 (identifying "S&P Industrials Sector GICS Level 1 Index" as the "proxy for industry effects"); DX 130, S&P Dow Jones Indices, at 1, 6 (noting that "[a]ll constituents must be U.S. companies")), as well as that (ii) the ERC analysis reliably captures *any* price reactions, *see infra* § I.B.

[17] Defendants *do* "dispute" (Opp. 44) both that (i) Dr. Tabak's event study captures "market- and industry-wide factors like market downturns" (his industry index does not even include the foreign firms that primarily compete with GE in the power industry, Mitsubishi and Seimens, *see* Tabak Rep. ¶ 27 (identifying "S&P Industrials Sector GICS Level 1 Index" as the "proxy for industry effects"); DX 130, S&P Dow Jones Indices, at 1, 6 (noting that "[a]ll constituents must be U.S. companies")), as well as that (ii) the ERC analysis reliably captures *any* price reactions, *see infra* § I.B.

[18] Plaintiffs are wrong that, as to the first Alleged Corrective Disclosure, "Defendants do not claim that Dr. Tabak failed to consider a single piece of confounding news," Opp. 43.  *See* Mot. 13-14, 31-32; *see, e.g.*, DSOF ¶¶ 187-95.

adjustments Dr. Tabak made.  Dkt. 366, Tabak Opp. 17.  But even Dr. Tabak acknowledges that GE's contemporaneous earnings disclosures had a non-fraud-related impact on GE's stock price and therefore must be disaggregated, testifying that he "wouldn't be comfortable" removing the ERC adjustments.  Tabak Dep. Tr. 165:19-166:18.  Likewise, as to the additional confounding information that Dr. Tabak completely failed to address, *see* Mot. 13-14, Plaintiffs' only defense is that Defendants do not "offer any evidence or competing expert analysis" concerning the impact of that news on GE's share price.  *See* Opp. 46-47.[19]  But disaggregation is ***Plaintiffs***' burden. Defendants need only show how they fail to meet that burden, not supply an alternate loss causation analysis.   Finally, as to Dr. Tabak's "choose-your-own-adventure" attempt to disaggregate GE's LTC insurance-related disclosures, Plaintiffs offer no justification for the flaws in his analysis, other than to call it a "disputed" factual issue.  *Id.*  But Plaintiffs cannot rely on their own expert's inability to offer a firm opinion to manufacture a "genuine issue of material fact," and cite no authority suggesting that Dr. Tabak's ambivalence is sufficient.  Mot. 32-33.

### C.   Plaintiffs Have Not Established Loss Causation As To Their Claims Concerning GE's 2016 Form 10-K And January 20, 2017 Earnings Call

Plaintiffs also assert that Defendants are "wrong" that Dr. Tabak did not independently analyze loss causation as to Plaintiffs' affirmative misstatement claims.  Opp. 47.  But Dr. Tabak expressly ***declined*** to provide any individualized damages calculation for each of those claims, and instead opined that Defendants' alleged misstatements maintained artificial inflation that ***previously existed*** by virtue of the Item 303 claim—notwithstanding that Plaintiffs argue that the statements misrepresented different information.  *See* Tabak Rep. ¶ 13; Tabak Supp. Rep. ¶¶ 3(c), 25; *see also* Mot. 34-35; Opp. 35-37.  Plaintiffs also suggest that, if their Item 303 claim fails, it

---

[19] Plaintiffs suggest that "Defendants do not argue that Dr. Tabak failed to disaggregate any ***specific*** disclosures." Opp. 46.  Not so.  *See, e.g.*, Mot. 13-14, 31-32; Fischel Rep. ¶ 59.  Nor has Prof. Fischel "taken the position" that the ERC analysis "capture[s]," Opp. 47, the information Dr. Tabak did not address.  *See, e.g.*, Fischel Rep. ¶ 55.

would not change the "quantum of inflation" attributable to Defendants' alleged misrepresentations and would instead only impact "when that inflation becomes recoverable." Opp. 48 n.35.  Not so.  There is no basis to assume that Dr. Tabak's opinions regarding artificial inflation that he opines existed starting in *February 2016* could somehow be applied to alleged misstatements on January 20 and February 24 *of 2017*, when Plaintiffs themselves argue that the differing statements concealed different information.  *Id.* at 25, 48.

### D. Plaintiffs Have Not Established Loss Causation As To Disclosures Dr. Tabak Did Not Address Or As To The Second Two Alleged Corrective Disclosures

In addition, the Court should grant Defendants summary judgment with respect to disclosures for which Dr. Tabak has not even attempted to quantify any damages.  Plaintiffs agree, with one exception.  *Compare* Mot. 36, *with* Opp. 50.  Specifically, Plaintiffs maintain that they can demonstrate loss causation as to GE's January 24, 2018 disclosure of an SEC investigation into GE Power.  Opp. 50.  As Plaintiffs are aware, however, that investigation concerned various aspects of GE Power's "revenue recognition and controls for [LTSA]s," not just LT factoring, or even factoring practices generally, and on the same day, GE also disclosed an SEC investigation into its LTC business.  *See, e.g.*, 6AC ¶ 501.  Dr. Tabak speculated that a "*portion* of the disclosure relating to *one of the reasons* for *one of the two* SEC investigations announced, relates to [Plaintiffs'] allegations," but ultimately opined there was insufficient evidence to "disaggregate the effect of the allegation-related portion" and "attribute[d] no change in inflation to th[e] disclosure."  Tabak Rep. ¶ 2(g).  Nevertheless, Plaintiffs now "submit" that they should "recover the full GE-specific stock price" that day, and that "disaggregation should [not] be required" because GE disclosed its two SEC investigations together.  Opp. 50.  Plaintiffs have not demonstrated that *any* of the relevant decline was fraud-related, and there is no legal basis whatsoever for awarding Plaintiffs the *entire* decline even though they concede (like Dr. Tabak)

that it was at least partially ***non***-fraud-related.  Unsurprisingly, Plaintiffs cite no legal authority in support of the "information bundling" exception they have dreamt up; it does not exist.[20]  *Id.* Instead, "loss causation requires that plaintiffs 'disaggregate' [their] losses."  *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022).  Defendants are thus entitled to summary judgment as to GE's January 24, 2018 disclosures, along with any allegedly corrective disclosures made after October 20, 2017.  *See* Mot. 36.

The Court should also grant Defendants summary judgment as to the Second and Third Alleged Corrective Disclosures because before they occurred, on May 5, 2017, GE disclosed detailed information about GE Power's LT factoring transactions.  *See id.* at 37.  Plaintiffs suggest that Defendants' argument "inject[s] a backdoor 'truth on the market' defense," and that the market would not have understood that LT factoring transactions generated CFOA.  Opp. 49.  To be clear, however, Defendants' argument is that Plaintiffs cannot meet their loss causation burden—not a truth on the market defense.  Courts routinely dispose of securities claims where a plaintiff cannot meet that burden because an allegedly corrective disclosure could not have revealed previously disclosed facts.  *See, e.g.*, *Omnicom*, 597 F.3d at 511; *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 495 (D. Conn. 2013), *aff'd sub nom. Dalberth*, 766 F.3d 172.  That is the case here.  Plaintiffs cite subsequent analyst commentary speculating that GE could monetize LTSA revenues and reacting to "enhanced disclosure[s]" GE continued to make concerning LT factoring, Opp. 49, but none of it changes the plain language of the disclosures GE made, from which a reasonable investor would have understood that GE Power sold LT receivables for cash, *see* Mot. 37.  The Court should

---

[20] Plaintiffs' sole reference is to a "Statement Regarding Information Bundling and Corporate Penalties" by SEC Commissioner Caroline A. Crenshaw, Opp. 50, which discusses her "suggest[ion] that the SEC should reconsider its approach to assessing penalties against corporate wrongdoers."  Nothing in the statement purports to change the requirements of establishing loss causation in Section 10(b) actions, and, even if it did, it could not displace the longstanding precedents of this Circuit.

thus grant Defendants summary judgment as to the last two Alleged Corrective Disclosures.

## II.   PLAINTIFFS CANNOT ESTABLISH SCIENTER

No admissible, non-speculative evidence establishes that Defendants acted with "intent to deceive, manipulate or defraud" amounting to scienter.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976).  Plaintiffs' admittedly "circumstantial" evidence, Opp. 27, consists of self-serving misrepresentations and embellishments of the record—a far cry from the FE allegations that this Court found critical in allowing Plaintiffs' limited claims to survive dismissal.[21]  *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 409 (S.D.N.Y. 2019).

As an initial matter, undisputed evidence shows that Defendants had no motive to commit fraud, rendering Plaintiffs' scienter theory incoherent.  Plaintiffs do not contest that Mr. Bornstein suffered significant losses from holding and *increasing* his shares of GE stock during the Class Period.  *See* Mot. 42; DX 86 ¶ 10 (estimated losses of $33 million).[22]  Such behavior is contrary to Plaintiffs' theory.  *See In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462-63 (S.D.N.Y. 2000) (granting summary judgment where defendants "held or increased their holdings" and lost money).  In response, Plaintiffs claim there is evidence of unquantified "financial benefits" accruing to Mr. Bornstein and unnamed "executives."  Opp. 33.  Tellingly, Plaintiffs do not claim that such hypothetical benefits *outweighed* the actual losses suffered,[23] nor do they explain *how* any hypothetical benefits provided sufficient motivation to risk substantial pecuniary losses and

---

[21] Defendants' identification of Plaintiffs' change in posture is neither "puzzling" nor "inappropriate," Opp. 33-34, and does not violate Defendants' agreement not to make an argument "concerning[] a FE," DX 109 ¶ 2.

[22] Plaintiffs have no answer to the fact that Mr. Bornstein held stock beyond executive requirements.  Mot. 42 n.24. Indeed, Plaintiffs have no evidence supporting their case, which is why they resort to baseless evidentiary objections to Defendants' contrary and dispositive evidence.  PSOF 86 (¶ 223).  Contrary to Rule 56(c)(2) of the Federal Rules of Civil Procedure, Plaintiffs fail to establish that Defendants' evidence "cannot be presented" in admissible form.

[23] Plaintiffs assert Mr. Bornstein received "over $30 million in compensation," Opp. 33, but ignore that much of it would have been earned regardless of any LT factoring, and that, in any event, he lost an even larger sum, *see* DX 86 ¶ 10; *see also* PSOF ¶¶ 359-65 ($8.5 million of pension and deferred compensation).

legal liability.  Likewise, Plaintiffs do not bother to explain the relative importance of CFOA targets within GE's Annual Executive Incentive Plan ("AEIP"), and ignore that GE disclosed that cash was part of the AEIP structure, PX 20, which is common to any profit-seeking company and insufficient to establish motive to commit securities fraud, *see* Mot. 42 n.26.

Recognizing that "conclusory allegations or denials" do not create a genuine dispute of material fact, *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 391 (S.D.N.Y. 2018), Plaintiffs stress that "motive is not required."  Opp. 32.[24]  But, where, as here, Plaintiffs' claims make "no economic sense," they must establish scienter with "more persuasive evidence."  *See* Mot. 37-38 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  They cannot.  It is undisputed that GE, which had revenues of over $120 billion in 2016 alone, had an extensive and robust infrastructure of accounting, finance, legal, audit, investor relations, and other professionals whose job it was to ensure full and fair disclosure.[25]  Mot. 3-4, 10-12; DX 2 at 28. That infrastructure included GE's Disclosure Committee, which specifically evaluated LT factoring disclosures.[26]  *See, e.g.*, DSOF ¶¶ 104-19, 163-70; DX 55, 70.  The undisputed facts likewise establish that GE's leadership—including Mr. Bornstein, who marked his tenure as CFO of one of the largest and most complex companies in the world by pushing to make disclosures simpler—relied on GE's extensive controls and processes to ensure they had pertinent information

---

[24] Plaintiffs cite *Gruber v. Gilbertson*, which declined to assess motive because, unlike here, there was extensive, direct evidence of conscious misbehavior or recklessness.  2021 WL 2482109, at *13 (S.D.N.Y. June 17, 2021).

[25] Plaintiffs demand that the factual statement that GE's Disclosure Committee "consisted of various subject matter experts, including from GE's controllership, investor relations, financial planning and analysis, treasury, and legal functions," Mot. 7, be stricken as raising an inappropriate advice-of-counsel defense, Opp. 28 n.17.  No such defense is made in this statement of facts relevant to scienter, and there is no basis to strike these indisputable facts.

[26] Plaintiffs are incorrect that "Defendants never explain" why GE's Disclosure Committee did not include additional information about LT factoring in 2016.  *See* Opp. 29-30 & n.19.  The Disclosure Committee evaluated LT factoring, determined that it related predominantly to the financing of equipment sales, and therefore was distinct from short-term factoring and did not require separate disclosure—and witnesses agreed with the Committee's assessment.  *See* Mot. 12 n.7 (citing DSOF ¶¶ 12-13, 123-29), 40-41 (citing DSOF ¶¶ 118-22); *see also* PX 205, Mahajan Dep. Tr. 90:24-91:9; PX 187, Vitanza Dep. Tr. 40:14-41:2, 219:2-18; DX 21, Mascola Dep. Tr. 187:8-188:8.

and, ultimately, that disclosures adhered to applicable standards.  Mot. 10-12; DSOF ¶¶ 152-70.

In response, Plaintiffs misrepresent the facts and make up new ones.  *See* Opp. 11-12.[27]  But

"speculation or conjecture" cannot defeat summary judgment.  *See Gross*, 310 F. Supp. 3d at 391.

First, Plaintiffs claim "[t]here is evidence" that Defendants "knew facts" regarding

"widespread" LT factoring that demonstrate "at least a reckless disregard of a known or obvious

duty to disclose."  Opp. 28.[28]  In reality, the cited documents and testimony reflect that, far from

being "widespread," LT factoring was just one form of factoring in one of GE's seven industrial

segments, and was monitored by teams of employees across multiple GE segments.[29]  *See* Mot. 9-

14, 39-41.  And, even though those same employees closely scrutinized GE Power's operations,

including LT factoring, not one ever questioned the accuracy of GE's disclosures.  *See* Mot. 39-

40.  Plaintiffs cannot create a factual dispute by claiming "there is evidence" when it does not

support their claims on its face.  *See, e.g.*, *Gross*, 310 F. Supp. 3d at 391.

Next, as to the January 20, 2017 earnings call, it is undisputed that Mr. Bornstein relied on

materials prepared by his subordinates, and conveyed the underlying information to the public as

it appeared.[30]  *See* Mot. 10-12, 40-41.  This is not a case where a speaker "conducted no meaningful

---

[27] Plaintiffs' bickering that deponents could not recall specific details, *see, e.g.*, Opp. 2, 30, is futile; Plaintiffs do not offer any contradictory evidence, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

[28] Plaintiffs also refer the Court to evidence cited in support of the "actual knowledge" element of their Item 303 claim. Opp. 28.  That evidence suffers from the same deficiencies.  *See infra* § III.A.

[29] Plaintiffs claim the "knowledge and participation" of some GE employees in GE Power's LT factoring can be imputed to GE.  Opp. 21, 34.  But they cite motion-to-dismiss cases involving presumed facts that Plaintiffs have not established here.  *See, e.g.*, *Patel v. L-C Commc'ns Holdings Inc.*, 2016 WL 1629325, at *14-15 (S.D.N.Y. Apr. 21, 2016) (company acknowledged "intentional misconduct" by employees whose knowledge was at issue).  Further, Plaintiffs do not contest that imputation requires that employees be sufficiently senior to serve as a "proxy" for the company and have some control over the alleged fraud, *see* Mot. 41 n.22, but make no effort to establish that this standard has been met as to the GE employees listed in their Opposition, *see* Opp. 21, 34, and instead argue that **only** Messrs. Bornstein and Mahajan had the authority to "approve[]" LT factoring, *see id.* at 8, 29-30.

[30] Plaintiffs suggest that the slide Mr. Bornstein relied on was improper because a "GEAR" factoring program was assigned a $0 balance and the slide referred to "external" reporting figures.  *See* Opp. 31-32 & nn.22-23.  Contrary to Plaintiffs' assertion, the Court has not previously "held," *id.* at 32, anything with regard to the interpretation of the slide.  *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 552 n.7 (S.D.N.Y. 2022) (addressing whether Court could consider document in determining whether to grant leave to amend).  In any event, GEAR is totally distinct

independent investigation to confirm the truth of their representations." *See* Opp. 29 (citing *Gebhart v. S.E.C.*, 595 F.3d 1034 (9th Cir. 2010)). Instead, Plaintiffs argue Mr. Bornstein previously saw documents that purportedly contradicted his statements. *See* Opp. at 24, 31-32 (citing PSOF ¶¶ 205-12). They fail, however, to provide any evidence that Mr. Bornstein *actually* saw any such documents,[31] or that those other documents were directly comparable[32] and therefore would have put him on notice of a discrepancy. Moreover, the fact that the CFO of a complex, global company with over 300,000 employees, Mot. 3-4, may have seen a contrary figure at some point or did not appreciate the significance of that figure, does not show an "extreme departure from the standards of ordinary care."[33] *See Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 342 (D. Conn. 2001) (no scienter where speaker had "a reasonable basis for the statement he made," even if contrary "projections" existed at the time).

Finally, Plaintiffs claim Mr. Bornstein and other GE employees conspired to *deliberately*

---

from LT factoring, *see* Mot. 41 n.23, and Plaintiffs offer no proof that this $0 balance was somehow "improper[]." When asked, Mr. Weverman—not Mr. Bornstein—recalled "a change in the reporting methodology for GEAR," and, as a result of "technical accounting and how we did report, that might have stipulated how we report externally." PX 1, Weverman Dep. Tr. 204:7-23. He also explained that "external" meant "outside of GE Industrial," *i.e.*, "external" reporting was on a total company basis, and involved the elimination of certain items (such as intercompany transactions) through the consolidation of results across GE. *See* Mot. 41 n.23; PX 1, Weverman Dep. Tr. 202:10-14.

[31] Although they argue he had contrary information, Plaintiffs tellingly do not cite any documents from or testimony by Mr. Bornstein. *See* PSOF ¶ 205; *see Strougo v. Barclays PLC*, 334 F. Supp. 3d 591 (S.D.N.Y. 2018) (no culpable participation where plaintiffs failed to establish CEO received documents). Plaintiffs' failure to establish Mr. Bornstein's awareness distinguishes their cited cases. *See In re Chicago Bridge & Iron Co. Sec. Litig.*, 2021 WL 3727095, at *9 (S.D.N.Y. Aug. 23, 2021) (representations about progress of "Nuclear Projects" despite "significant delays and logistical issues"); *In re Celestica Inc. Sec. Litig.*, 2014 WL 4160216, at *11 (S.D.N.Y. Aug. 20, 2014) (testimony that contrary information had been provided directly to defendants); *Nagelberg v. Meli*, 2022 WL 2078010, at *2-3 (S.D.N.Y. June 9, 2022) (extensive "undisputed" facts establishing participation in Ponzi scheme).

[32] In claiming that the "true factored balance" in 2016 was $20.4 billion and that factoring with GE Capital provided $4.2 billion in CFOA, Plaintiffs do not cite testimony or documents establishing a link between their "evidence" and the materials Mr. Bornstein relied on. Opp. 31-32. Instead, they ask the Court to blindly accept that the term "WCS" (the acronym for an entire division within GE Capital) means the exact same thing within both documents, and therefore the information must be contradictory. PSOF ¶¶ 205-06 (citing PX 21); *compare* PX 21 at -613 (referring to "WCS Monet." and "WCS CFOA YTD"), *with* DX 67 at -025 (referring to "WCS," "GEAR," and "LT A/R").

[33] These undisputed facts and arguments, Mot. 40-41, put to rest any claim that Defendants have "waived" scienter arguments as to Mr. Bornstein's statements during the January 2017 earnings call, Opp. 31 n.21.

mislead investors, including by misleading GE's Disclosure Committee.  *See* Opp. 29-32.[34]  They

claim Mr. Mahajan, a VP of Corporate Financial Planning & Analysis, "knowingly misled" the

Disclosure Committee in its review of GE's 2016 Form 10-K by "telling [the Committee] GE was

discontinuing deferred monetization."  *Id.* at 29 (citing PSOF ¶ 328).  But Plaintiffs provide no

evidence.  Rather, they cite only the testimony of Mr. Vitanza, who merely recalled a "discussion

on the fact that [LT factoring] was expected to cease" in 2016.  *See* PX 54 at 136:16-21.[35]  That

high-level recollection does not establish that the Disclosure Committee was misled (let alone

knowingly).[36]   And, Plaintiffs' theory is contradicted by their assertion that the Disclosure

Committee was irrelevant because it was Messrs. Bornstein and Mahajan who "made or approved"

changes to GE's 2016 Form 10-K.  Opp. 29-30 (citing PSOF ¶¶ 305-31).[37]  In reality, neither were

responsible for those changes—the Disclosure Committee was.  *See* Mot. 10-12, 40-41.

## III.    PLAINTIFFS CANNOT ESTABLISH THE ELEMENTS OF AN ITEM 303 CLAIM OR A MATERIAL MISREPRESENTATION

### A.    Plaintiffs Cannot Establish Any Violation Of Item 303

The Opposition confirms that Plaintiffs cannot prove an Item 303 violation.  Plaintiffs not

---

[34] In support of their fabricated conspiracy narrative, Plaintiffs contend that "[n]o witness denied engaging in a cover up."  Opp. 30 n.20.  What they fail to tell the Court, however, is that they ***declined*** to ask any witnesses about participation in a "cover up"—likely because they knew they would not receive answers that would help their case.

[35] Plaintiffs overstate the "evidence" of their fanciful account of a conspiracy to alter GE's 2016 Form 10-K, which actually consists of a single email subject line.  *See* Opp. 29.  Plaintiffs' evidence that GE employees questioned Mr. Bornstein's January 20, 2017 statement, PSOF ¶ 305, says nothing of the sort.  *See* Mot. 40 n.21.  It is not Defendants who ask the Court to "credit their say-so" about the evidence, Opp. 30; instead, it is ***Plaintiffs***.

[36] Plaintiffs omit that Mr. Vitanza testified he "did not know" whether Mr. Mahajan knew "that the company was doing and planning to do long-term factoring in 2017," *i.e.*, he had no basis to contend (and did not contend) that Mr. Mahajan spoke "falsely."  PX 187, Vitanza Dep. Tr. 155:14-17.  Mr. Mahajan also confirmed that, at the time, he did not know "how much [LT factoring] we would be doing [] in 2017."  PX 205, Mahajan Dep. Tr. 130:19-131:3.  Plaintiffs' citation, Opp. 29-30, to *S.E.C. v. Syron* is inapt; it involved numerous allegations at the pleading stage that defendants "knew specific" contradictory facts.  2013 WL 1285572, at *22 (S.D.N.Y. Mar. 28, 2013).

[37] In fact, Mr. Bornstein did not "recall having a discussion around this change or whether it was even a significant change" and "relied on our processes, our disclosure committee, all of our reviews, including with the audit committee, to be comfortable that it was appropriate to sign" the Form 10-K.  PX 7, Bornstein Dep. Tr. 239:6-240:1.

only abandon the very theory on which the Court relied in permitting the Item 303 claim to move forward—namely that LT factoring materially impacted "future revenues"[38] (because it does not), *id.* at 44—they also fail to establish:  (i) how the "liquidity" of the "registrant" (GE) could possibly be impacted by intra-company factoring or (ii) how any such amount would have been material.

*First*, the Opposition's concession that an Item 303 trend must have a reasonably likely material impact at the "registrant" level is fatal.  *Id.* at 43-44; Opp. 18-19.  It is undisputed that LT factoring involved the transfer of an asset (a receivable) from one GE entity (GE Power) to another (GE Capital) for cash.  Those transactions had *zero* impact on GE's liquidity or financial condition. Mot. 44.  Absent such an impact, there can be no material trend relating to future liquidity, which is what Item 303 requires.  The Opposition has no cogent reply.  Instead, Plaintiffs make the conclusory (and incorrect) statement that GE employees were "deeply concerned" about factoring's impact on "GE's overall enterprise."[39]  But they fail to explain how, as a matter of arithmetic, intra-company transactions could impact the total company liquidity or financial condition of GE.  Opp. 18.  Further, it is irrelevant if LT factoring impacted (i) metrics that Item 303 does not recognize or (ii) only *certain* of GE's businesses such that the impact is *eliminated* at the registrant (GE) level.  *Id.* (citing PSOF ¶¶ 217-39).

Plaintiffs also stress that investors purportedly "cared about GE's" Industrial CFOA.[40]  *Id.* at 19.  Item 303, however, is not a catch-all for any items about which investors may "care."  Mot.

---

[38] *See Sjunde*, 417 F. Supp. 3d at 409 ("Because factoring trades away future *revenue* for immediate cash, it stands to reason that GE's comprehensive factoring of LTSA receivables would have a material impact on *future revenue*.").

[39] The vast majority of cited documents (i) discuss how factoring might impact *GE Power*, which says nothing about total company liquidity, or (ii) discuss factoring or cash flow generally with no specific reference to LT factoring.

[40] Plaintiffs claim that GE concealed "an existing trend of declining cash flows," Opp. 35, but fail to challenge the accuracy of GE's reported cash metrics, and ignore that, throughout the Class Period, GE warned investors of industrial cash flow risks, including from "worldwide economic conditions, including conditions in . . . power generation," "[s]ervice contract cancellations or customer dynamics," such as "reduced electricity demand" and "declines in orders," which could impact "contract costs and estimated earnings," and "slow growth in the global economy."  *See, e.g.*, PX 122, 2016 Form 10-K, at 123, *see also id.* at 38 (noting uncertainty due to "[e]xcess capacity in developed markets" and "macroeconomic and geopolitical environments").

43-44.  Instead, Item 303 only requires disclosure of trends or uncertainties likely to impact specific aspects of a company (*i.e.*, net sales, revenue, income from continuing operations, or liquidity) at the registrant level.  *See* 17 C.F.R. § 229.303 (2017) (requiring identification of trends that "will result in or that are reasonably likely to result" in changes to registrant's liquidity).  And again, given that these intra-company transactions at most increased Industrial CFOA, while correspondingly decreasing GE Capital cash flows, they left total company CFOA unchanged, so there can be no argument that GE Power's LT factoring had any impact on total company liquidity.

*Second*, the Opposition fails meaningfully to dispute that LT factoring's impact on CFOA was quantitatively immaterial as to GE, which, as the registrant, must be the basis of any materiality analysis.[41]  *See* Mot. 46.  Rather than show that any impact from LT factoring comprised over 5% of GE's CFOA, *see id.* at 45-46, Plaintiffs cite to sub-metrics that GE was not required but voluntarily chose to disclose, such as Industrial CFOA, *see* Opp. 21-22.  Plaintiffs do not and cannot dispute, however, that Industrial CFOA concerns only a ***subset*** of GE's entire operations, *see* Mot. 15 n.9, and the "anticipated magnitude" of an event should be assessed "in light of the totality of the company activity," *see, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1998).[42]  Nor do Plaintiffs identify any qualitative factors of such egregiousness or significance (such as self-dealing or misappropriation) to overcome the fact that LT factoring was quantitatively immaterial to GE—and therefore ***presumptively immaterial*** as a matter of law.  *See* Mot. 46-47.

*Third*, Plaintiffs cannot demonstrate that Defendants ***actually knew*** that any trend was "reasonably likely" to occur and have a "material effect" on GE.  *See* Mot. 37-42, 45; *supra* § II.

---

[41] Plaintiffs' post-hoc criticism of LT factoring—whether in terms of "sustainability," costs, or otherwise, Opp. 12-13, 21-22—is meritless, Mot. 47, but even if credited, irrelevant.  *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) (no liability for "mere instances of corporate mismanagement").

[42] Plaintiffs dispute the presumptive effect of quantitative immateriality, Opp. 23 & n.11, but cite cases in accord. *E.g.*, *Litwin v. Blackstone Grp.*, 634 F.3d 706, 719 (2d Cir. 2011) ("presumptive 5% threshold of materiality"); *S.E.C. v. DiMaria*, 207 F. Supp. 3d 343, 353 (S.D.N.Y. 2016) (same).

Unsurprisingly, Plaintiffs cite no testimony demonstrating actual knowledge, and ignore testimony regarding the advantages of LT factoring, including that it enabled customer equipment purchases. *See, e.g.*, PX 91, Weber Dep. Tr. 245:23-246:9 ("[A] dollar received today is, due to the time value of money, worth more than a dollar received in the future."); *see also id.* at 34:3-5, 59:13-15, 158:3-10, 244:24-245:5.  Instead, Plaintiffs misconstrue the documents they claim show that GE personnel were aware of GE's ***total*** cash flow trends and targets, or LT factoring transactions.  *See* Opp. 20-21 (citing PSOF ¶¶ 50-52, 56, 76-77, 86, 128-41, 148-68).[43]  It is no surprise that GE employees and executives tracked and discussed the cash performance of GE and its businesses, and none of these conversations reflect awareness of an Item 303 trend requiring disclosure (let alone, awareness imputable to either Defendant).  *See id.* at 17-18, 20-21 (citing PSOF ¶¶ 6-7, 10-12, 16, 18, 25-41, 48, 55-87, 89-96, 100-04, 108-14, 119-23, 128-30, 132-33, 135, 137-41, 143, 146, 148-95, 205-12, 222, 252, 256-57, 260-61, 263-68, 270, 280-82, 287, 305-31).[44]

## B.   Plaintiffs Cannot Establish That Defendants' Affirmative Statements Were False Or Misleading

Plaintiffs' remaining Section 10(b) claims—predicated on a statement in GE's 2016 Form 10-K concerning the purpose of ***short-term*** factoring and Mr. Bornstein's response to an analyst

---

[43] Plaintiffs also oversell their "evidence" when they reiterate their conspiracy theories about GE's executives and LT factoring.  *See* Opp. 18, 20.  Plaintiffs rely on insinuation and innuendo rather than evidence—*e.g.*, calling Mr. Mahajan the "architect" of LT factoring but citing nothing that shows his ***actual knowledge*** of anything relevant to Plaintiffs' claims.  *See* Opp. 20 n.9.  Similarly, in claiming that Ms. Calpeter "pushed back when [Mr.] Bornstein demanded still more factoring to meet 2017 cash targets," Plaintiffs do not cite Ms. Calpeter's testimony.  *Id.*  Instead, they cite a second-hand account from Mr. Green, who testified that he was "***not certain***" if GE Corporate was told GE Power could not make its 2017 targets.  PSOF ¶¶ 265-66 (citing PX 9); PX 9, Green Dep. Tr. 26:16-22.

[44] Many of Plaintiffs' citations do not even reference LT factoring.  *E.g.*, PSOF ¶¶ 6-7, 10-12, 16, 18, 25-29.  That distinguishes *In re Nielsen Holdings PLC Sec. Litig.*, where a defendant admitted to having "s[een] these more challenging trends unfolding."  510 F. Supp. 3d 217, 227 (S.D.N.Y. 2021).  Plaintiffs make an unsubstantiated leap from awareness of LT factoring or cash flows to actual knowledge under Item 303.  *See Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758 n.90 (S.D.N.Y. 2018) ("It is not enough that [a company] should have known of the existing trend, event, or uncertainty."); *Martin v. Quartermain*, 732 F. App'x 37, 42 n.3 (2d Cir. 2018) (recklessness and negligence "are insufficient").  Moreover, Plaintiffs do not specify ***when*** any GE employees actually allegedly became aware of any purported trend, and therefore ***which*** of GE's public filings are implicated.  *See* Opp. 20-21; *see also Nielsen*, 510 F. Supp. 3d at 228-29 (no Item 303 claim due to failure to identify when knowledge was obtained).

question during GE's January 20, 2017 earnings call—each fail.  *See* Mot. 47-49.

*First*, Plaintiffs concede that the statements in GE's 2016 Form 10-K concerning the management of "credit exposure" were true as to "current receivables" and unrelated to the LT factoring at issue here.  *See* Opp. 26-27.  These truthful statements about ST factoring cannot support a fraud claim about LT factoring.  Mot. 48; *see, e.g.*, *Gross*, 310 F. Supp. 3d at 391. Plaintiffs nevertheless challenge them because one witness, Ms. Williamson, said the purpose of "factoring in general" was to provide cash.  Opp. 26 (citing PSOF ¶ 55).  Plaintiffs cannot re-write accurate disclosures to discuss points they do not address, particularly where, as here, the allegedly omitted information (that factoring is used to obtain cash) would have been obvious to investors. And in any event, in her testimony, Ms. Williamson was asked a series of questions about "deferred factoring," *i.e.*, LT factoring; her responses do not contradict disclosures about ST factoring.  PX 48 at 27:11-28:6 (deferred factoring "describe[s] the monetization of [LT] receivables").

Plaintiffs' only remaining argument is that GE's 2016 Form 10-K was "misleadingly incomplete" for failing to say more about LT factoring.  Opp. 27.  But as the Motion established, Mot. 48, and Plaintiffs do not dispute, there is no duty to disclose absent an affirmative duty or an existing materially misleading statement.[45]  Plaintiffs also concede that GE's 2016 10-K made other disclosures about the rationale behind factoring.  *See* Mot. 48; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) ("[T]he proper inquiry requires an examination of defendants' representations, taken together and in context.").  Ultimately, Plaintiffs' argument is simply a "tell me more" request, not a cognizable claim.  *See* Mot. 48.

---

[45] *See also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 526, 529 (S.D.N.Y. 2020) ("there is no general duty" to disclose "aggressive or fraudulent sales tactics," and even assuming unsustainability, courts "easily reject[] attempts to impose Rule 10b-5 liability" for failure to disclose the unsustainability); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (rejecting allegation of failure to disclose unsustainable and illegitimate revenue sources), *aff'd*, 165 F. App'x 928 (2d Cir. 2006).

*Second*, Plaintiffs continue to misconstrue Mr. Bornstein's earnings call statements in support of their still-unsubstantiated conspiracy story. *See* Opp. 24-26. Specifically, they challenge the $1.6 and $1.7 billion "change" figures he relayed from the document prepared for him for the call. *Id.* at 11-12, 24-25 (citing PSOF ¶¶ 205-12). Plaintiffs cannot explain, however, how they can prove this theory given the lack of any "smoking gun" document, and that every witness in the case who was asked has denied (i) that Mr. Bornstein said anything inaccurate or (ii) that they believed Mr. Bornstein intended to mislead investors.[46] Mot. 41; *supra* note 35. Plaintiffs may dislike that testimony, but it is insufficient merely to disagree with it when they have the burden of proving their fanciful conspiracy theory. *See Anderson*, 477 U.S. at 256-57.

Plaintiffs' quibbles with the rest of Mr. Bornstein's statement also fail. In the context of GE's "working capital" (totaling $5.2 billion), factoring (a portion of the $0.5 billion in "accounts receivable") did have "very little to do" with GE's "very good underlying performance" in 2016. Mot. 49. And that statement reflected generalized optimism or opinion, *id.* at 48-50, which Plaintiffs agree is inactionable unless the "real facts are otherwise." Opp. 26 n.14.[47] Here, the "real facts" confirm Mr. Bornstein's statement. Mot. 48-50.[48]

## CONCLUSION

The Court should grant Defendants' Motion for Summary Judgment.

---

[46] Plaintiffs have not established Mr. Bornstein's awareness of any contradictory information. *See supra* § II. That means that there are no competing facts to assess, and Plaintiffs' cited cases, Opp. 25, are unavailing. *E.g.*, *Pearlstein v. Blackberry Ltd.*, 2022 WL 19792, at *9 (S.D.N.Y. Jan. 3, 2022) (competing evidence that accountants reported profits "where there were none"); *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 312 (S.D.N.Y. 2022) (two different statements of exact same figure).

[47] Plaintiffs claim that this argument is waived because it was "made without reference to *Omnicare* standards." Opp. 25-26. But the Motion cites *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), Mot. 50 n.29, and Defendants have raised this issue since the pleading stage, *see* Dkt. 208 at 32; Dkt. 339 at 1.

[48] Plaintiffs' control person claim also fails for lack of a primary violation and culpable participation. *See* Mot. 50.

Dated:  New York, New York
            December 5, 2022

Respectfully submitted,

LATHAM & WATKINS LLP

By: _____
William J. Trach (*pro hac vice*)
200 Clarendon Street
Boston, MA 02116
(617) 948-6000
william.trach@lw.com

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
sean.berkowitz@lw.com

Blake T. Denton
Jooyoung Yeu
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
blake.denton@lw.com
jooyoung.yeu@lw.com

Sarah A. Tomkowiak (*pro hac vice*)
555 Eleventh Street NW
Washington, D.C. 20004
(202) 637-2200
sarah.tomkowiak@lw.com

Colleen C. Smith (*pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5450
colleen.smith@lw.com

*Attorneys for Defendants General Electric
Company and Jeffrey S. Bornstein*