UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                       :

SJUNDE AP-FONDEN et al.,                    :

                                         :

                     Plaintiffs,      :

                                         :             17-CV-8457 (JMF)

        -v-                           :

                                         :           OPINION AND ORDER

GENERAL ELECTRIC COMPANY et al.,     :

                                         :

                     Defendants.    :

                                         :
---------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this securities-fraud class action, Lead Plaintiff Sjunde AP-Fonden and Plaintiff the Cleveland Bakers and Teamsters Pension Fund (together, "Plaintiffs"), two pension funds, bring claims against General Electric Co. ("GE") and its former Chief Financial Officer, Jeffrey S. Bornstein (together, "Defendants"). Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), as well as Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. In earlier rulings, familiarity with which is presumed, the Court substantially narrowed Plaintiffs' claims. *See Sjunde AP-Fonden v. Gen. Elec. Co.* ("*Sjunde I*"), 417 F. Supp. 3d 379 (S.D.N.Y. 2019) (ECF No. 185); *Sjunde AP-Fonden v. Gen. Elec. Co.* ("*Sjunde II*"), No. 17-CV-8457 (JMF), 2021 WL 311003 (S.D.N.Y. Jan. 29, 2021). Thereafter, the Court granted Plaintiffs' motions to certify a class and to file a Sixth Amended Complaint (the "Complaint"). *See Sjunde AP-Fonden v. Gen. Elec. Co.* ("*Sjunde Class Certification*"), 341 F.R.D. 542 (S.D.N.Y. 2022) (ECF No. 314). *See* ECF No. 327 ("Compl."). What remains are claims arising from, and relating to, GE's representations regarding the "factoring" of long-term receivables by its power division, GE Power, between February 29, 2016, and January 23, 2018 (the "Class Period").

Defendants now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all remaining claims. Each side also moves to exclude some or all of the testimony of the other side's experts, and Plaintiffs move to strike a declaration of one defense expert. For the reasons that follow, Defendants' motion for summary judgment is GRANTED in part and DENIED in part, the parties' motions to preclude are GRANTED in part and DENIED in part, and Plaintiffs' motion to strike is GRANTED.

## BACKGROUND

The following facts, relevant to Plaintiffs' remaining claims, are drawn from admissible materials submitted by the parties and are either undisputed or viewed in the light most favorable to Plaintiffs. *See, e.g.*, *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

GE is an industrial conglomerate founded in 1892 with a diverse portfolio of business lines, including, as relevant here, power generation and financial services. ECF No. 383 ("Defs.' SOF"), ¶¶ 1, 4-5. Bornstein served as Senior Vice President and Chief Financial Officer of GE for most of the Class Period, until he was replaced by Jamie Miller in late 2017. Compl. ¶¶ 46-47. Plaintiffs' fraud claims relate to long-term service agreements ("LTSAs") for heavy-duty gas-powered turbines sold by GE Power and how GE managed the cash flows from those agreements. A division of GE Power called GE Power Services offered customers LTSAs, typically multi-year or multi-decade contracts, to maintain and service their turbines. Defs.' SOF ¶¶ 28, 36-38. Under these contracts, GE was generally paid either at specific milestones or variably as customers utilized the turbines. *Id.* ¶ 53.

## A. GE's Use of Factoring

"Factoring" involves the sale of accounts receivables to another party in exchange for cash. *Id.* ¶ 63. Factoring can allow a business, such as GE Power, that incurs costs before

receiving the associated cash from a customer to shorten the gap between those two events. *Id.*
¶¶ 90-94, 147.  In the fourth quarter of 2015, GE Power began factoring LTSA accounts
receivable due more than a year later, referred to as long-term or "LT" factoring (or "deferred
monetization"). *Id.* ¶¶ 63, 89.  GE Power conducted these transactions with GE's financial
services division, GE Capital.  *See id.* ¶¶ 65, 70.  In exchange for more immediate cash, GE
Power would factor its receivables to GE Capital at a cost.  *See id.* ¶¶ 74-76.

Factoring was not without risks.  In May 2015, GE "engaged McKinsey & Co., to assess
GE's cash flow performance and to identify opportunities for improving GE's overall free cash
flow [] conversion." ECF No. 404 ("Pls.' 56.1 Statement"), ¶ 20.[1]  On or about September 1,
2015, McKinsey prepared a slide deck titled "Accelerating Free Cash Flow Conversion." which
was sent to Puneet Mahajan, the Vice President of Financial Planning and Analysis for all of GE,
and presented to Bornstein.  *Id.* ¶¶ 28-29.  The slide deck repeatedly discussed factoring,
including one slide that was titled "Recent [Accounts Receivables] performance may be partially
explained by incentives to treat factored receivables differently." ECF No. 385-17, at 10.  The
slide explained that "interviews indicate that businesses are incentivized to treat factored
receivables differently from non-factored receivables" and stated that "'[w]e extend terms if we
are sure we can factor' and that '[f]actoring distorts accountability on receivables.'"  *Id.*
McKinsey provided "[o]ptions to align incentives," including "[i]ncreas[ing] the charge of

---

[1]      ECF No. 404 and other documents cited in this Opinion and Order are currently filed
under seal (although in most, if not all, instances there is a redacted version of the document that
is docketed publicly).  To the extent that this Opinion and Order relies upon or quotes any
materials the parties have filed under seal, the Court finds that the presumption of public access
to judicial documents outweighs any interest in confidentiality with respect to those portions of
the sealed materials. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir.
2006).  As discussed below, the Court reserves judgment on whether the parties' filings may
otherwise remain sealed or redacted.

factoring, "[e]xclud[ing] factoring from all business metrics . . . ," "[l]imit[ing] increases in monetization," and "[s]top[ping] all internal factoring." *Id.*

As GE Power's factoring increased, concerns over the downsides increased. In one colorful exchange in February 2016, for example, Mahajan wrote that "[t]he submission from Power shows the interest cost increasing from 230MM to 390MM. As I said this morning, this is an unbelievable amount. To put it in perspective . . . [i]t is 10% of the CFOA [or cash from operating activities] generated by Power?" ECF No. 385-5, at 2. GE Power's Global Financial Planning and Analysis Leader, Michael Eshoo, responded: "I completely get it. . . . deferred factoring . . . is ridiculously expensive but we all agreed to go do given [the deferred balance] commitment and cash needs. We factored 150MM deferred in 4Q which cost us $15MM. Plan for 2016 is to do $1BN." *Id.* Mahajan responded: "Not sure I like 1B cash at 10% cost to get it . . . Fucking ridiculous . . . ." *Id.* at 1. Eshoo responded: "I completely agree. We have work to do here to understand if this program is a viable solution or not now that we understand the implications on the financials . . . . Doing nothing, would obviously be a drag on cash conversion and also the [deferred balance] commitment we have with the board." *Id.* LT factoring, however, was considered necessary to hit GE Power's CFOA targets. *See* ECF No. 385-7, at 125 ("Q: So Power Services was conveying that it needed to do more deferred monetization in 2017 than it did in 2016 in order to achieve its CFOA target, right? A. Yes.").

Evidence also makes plain that Jeffrey Immelt, GE's CEO at the time, and Bornstein were aware of the increased reliance on factoring. In July 2016, for example, Steve Bolze, the former President and CEO of GE Power, emailed Immelt, providing GE Power's second quarter performance and third quarter goals. ECF No. 395-112, at 1. Immelt, in turn, marked up the materials and circled the cash section, which included a bullet point stating that the "deferred

monetization pipeline [was] challenged." *Id.* at 5.  Additionally, the then-CFO of GE Power,

Lynn Calpeter, testified that Immelt was aware of plans to conduct billions of dollars of

additional LT factoring.  *See* ECF No. 385-23, at 203 ("Q. Okay.  So at least in the discussion

with Mr. Immelt in November of 2016 as with respect to the view for 2017, Power was planning

and disclosed to Mr. Immelt that it would do — or aim to do about 2 and a half billion of

deferred monetization; is that right?  A. Yes."); *see also* ECF No. 385-122, at 1, 20 (containing a

presentation sent in December 2016 from Mahajan to Immelt, Bornstein, and others explaining

plans to achieve GE Power's free cash flow target and containing a bullet point stating "Deferred

. . . $2.5B monetization in plan").  And in a July 2017 email, Robert Green, the new CFO for GE

Power, described a call with Bornstein, in which Bornstein "reminded me of the need to generate

more cash and the 95% conversion next year . . . .  I reminded him with severance and the drag

from monetization this is highly unlikely."  ECF No. 385-107, at 1.

Additionally, internal presentations explained the reasons GE Power engaged in LT

factoring and raised alarms about the growing risks.  For example:

- A presentation sent in February 2017 explained under the heading "Deferred Monetization" that GE Power "[n]eed[s] $3B to hit number," even though "there is $1B risk to this" because of "described drivers (pullins, pipeline getting tougher?)"; and stated that even "[i]f we hit $3B, creates 1.2B hole in '18 . . . need to think through this model." ECF No. 385-101, at 3.[2]

- A "2017 Cash plan" presentation sent by Eshoo stated that there was a "[b]illings gap — 2017 core billings includes ~$480MM of billings pressure due to invoices monetized in prior periods," that "[l]ife to date monetization through 4Q'16 + $3B of 2017 monetization will create billings pressure of $1.2B in 2018 and $1.78 in 2019," and concluded that the "pipeline" was weak as the "'[l]ow hanging fruit' has been picked . . . transactions are getting tougher").  ECF No. 385-118, at 8.

- A presentation sent in September 2017 from Eshoo to Bornstein, Mahajan, Green, and others stated "current business model delivering ~55-60% cash conversion ex def'd

---

[2]      Citations to ECF Nos. 385-101, 385-118, 385-33, 385-90 are to the page numbers automatically generated by the Court's Electronic Case Filing (ECF) system.

monetization" and warned that "[m]onetized $2.0B [contractual service agreement] cash flows in 2016 to deliver 89% conversion . . . [was] not sustainable."  ECF No. 385-97, at 1, 7.

- A presentation sent in January 2017 explained "[w]hy . . . we do deferred monetization," stating that it aided "Wall Street perception of GE earnings quality" and noting "[r]ecent pressure from Wall Street on GE stock price due to perception of poor earnings quality based on" free cash flow as a percent of net income.  ECF No. 385-33, at 8.

In April 2017, Bornstein warned others at GE that "[t]he Cash issue is huge for us.  I am really nervous that we have a structural issue in services that has been building over the last few years.  I am not sure how we are going to explain using cash as a company. . . .  This is an existential issue for the Company."  ECF No. 385-90, at 3.  Green responded that "three key factors" are "coinciding," including "market shift to geographies and customers that are cash constrained (eg. middle east, Africa), long-term service agreements with mix to more deferred revenue, and the use of capital markets factoring / monetization to accelerate cash."  *Id.* at 2.  Matt Cribbins, a Vice President of GE Investor Communications, then responded, referencing an attached analyst note: "Cash is the single biggest issue for our shareholders."  *Id.*

**B.  GE's Disclosures About Factoring**

On February 26, 2016, GE filed its Form 10-K for 2015.  Pls.' 56.1 Statement ¶ 196.  According to Plaintiffs, GE did not disclose in the Form 10-K that GE Power had factored long-term receivables to GE Capital — and, more specifically, did not disclose that it had engaged in LT factoring to "offset its dwindling cash flows and the growing gap between its revenues and cash collections."  *Id.* ¶¶ 197, 200.

On January 20, 2017, GE held an earnings call for the fourth quarter of 2016.  On the call, an analyst asked Bornstein about the cash situation in general and about "factoring this quarter from GE Capital into GE industrial" in particular.  Bornstein responded:

So within that accounts receivable performance you asked about factoring.  For the total year, factoring with GE Capital was a $1.6 billion change for the year.  It

> was $1.7 billion last year, so actually year-to-year it was $100 million less of a
> benefit in the year between what we did with GE Capital around factoring.   And
> in the fourth quarter importantly, and you see it because our receivables improved
> $500 million, is from the third to fourth quarter of 2015, the benefit was $2.3
> billion, the benefit going from this past third quarter to this quarter was $700
> million.   So it was actually down $1.6 billion year-to-year between third and
> fourth quarter each of those years.   So there's very good underlying performance
> here.   It's not just about, it's actually very little to do with GE Capital factoring.

ECF No. 384-19, at 12.   On February 24, 2017, about a month later, GE filed its Form

10-K for 2016.   Pls.' 56.1 Statement ¶ 203.   Plaintiffs allege that this disclosure suffered

from the same deficiencies as GE's Form 10-K for 2015.   *Id.* ¶ 204.

On April 21, 2017, GE announced its results for the first quarter of 2017 and

disclosed a $1 billion shortfall in Industrial CFOA.   *Id.* ¶ 291.   Following this

announcement, GE's stock price "experienced a [c]ompany-specific decline of $1.46 per

share."   *Id.* ¶ 293.   On July 21, 2017, GE reported its results for the second quarter of

2017, including a $1 billion reduction in GE Power's 2017 CFOA target.   *Id.* ¶ 296.

Following this announcement, GE's stock price experienced "a [c]ompany-specific

decline of $1.20 per share."   *Id.* ¶ 297.   On October 2, 2017, Immelt resigned as GE's

Chairman; four days later, Bornstein resigned as GE's CFO.   *Id.* ¶¶ 301-02.   On October

20, 2017, the company announced its third quarter earnings, which revised its 2017

Industrial CFOA guidance downward.   *Id.* ¶ 303.   Following this announcement, its stock

price experienced "a [c]ompany-specific decline of $1.85 per share."   *Id.* ¶ 304.

On January 24, 2018, during GE's fourth quarter 2017 earnings call, new-CEO

John Flannery disclosed that GE "had been notified by the SEC that they are

investigating the process leading to the insurance reserve increase and the fourth-quarter

charge as well as GE's revenue recognition and controls for long-term service

agreements."   *Id.* ¶ 381.   On February 24, 2018, GE filed its 2017 Form 10-K.   *Id.* ¶ 383.

In that form, the company disclosed — for the first time, Plaintiffs allege — that "GE may sell . . . long-term receivables to GE Capital to manage short-term liquidity and fund growth." *Id.* It further explained that "[t]he effect of cash generated from the sale of these long-term receivables with GE Capital increased GE's CFOA by \$0.3 billion, \$1.6 billion and \$ 0.1 billion in 2017, 2016 and 2015, respectively." *Id.*

## C. Plaintiffs Sue

In November 2017, following Immelt and Bornstein's resignations, Plaintiffs filed this class action. *See* ECF No. 1. Four of Plaintiffs' claims remain. First, Plaintiffs allege that Defendants violated Item 303 of Regulation S-K, which requires disclosure of a trend or event "reasonably likely to result" in a material change in GE's liquidity, by failing to disclose GE's factoring. *See Sjunde I*, 417 F. Supp. 3d at 408-09 (quoting 17 C.F.R. § 229.303(a)(1), (a)(3)); *Sjunde II*, 2021 WL 311003, at *11. More specifically, Plaintiffs allege that GE "was factoring 'everything'" in its Power division. *Sjunde I*, 417 F. Supp. 3d at 388, 408-09 (citing ECF No. 179 ("FAC"), ¶¶ 290-94, 297); *see* Compl. ¶¶ 319, 398. "Yet 'the existing number of LTSAs available to monetize was finite,' and due to slackening demand for new turbines (and thus new LTSAs), GE would not be able to continue factoring receivables indefinitely." *Sjunde I*, 417 F. Supp. 3d at 409 (citing FAC ¶ 297). In addition, Plaintiffs allege that (1) GE omitted from its 2016 Form 10-K that one of the reasons it factored GE Power's account receivables was to inflate the division's operating cash flow; (2) Bornstein misrepresented during a January 20, 2017 earnings call the extent of GE's factoring; and (3) Bornstein is liable for GE's misrepresentations as a "controlling person." *See Sjunde II*, 2021 WL 311003 at *14; *Sjunde Class Certification*, 341 F.R.D. at 551-53.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court begins with Defendants' summary judgment motion.  Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Critically, however, in ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits

supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

As noted, Plaintiffs bring claims under Sections 10(b) and 20(a) of the Exchange Act as well as SEC Rule 10b-5. To establish a claim under Section 10(b) and SEC Rule 10b-5, Plaintiffs must prove "(1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015); *see also Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2022 WL 151302, at *2 (2d Cir. Jan. 18, 2022) (summary order); *Gross v. CFI Grp., Inc.*, 784 F. App'x 27, 29 (2d Cir. 2019) (summary order). Relatedly, to prove a claim for controlling-person liability under Rule 20(a), Plaintiffs must, at a minimum, establish a "primary violation" of Section 10(b). *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 100 (S.D.N.Y. 2020), *aff'd*, 2022 WL 151302.

Defendants make four principal arguments for summary judgment. First, they contend that Plaintiffs' Item 303 claim fails because, among other things, the factoring was solely intra-company and had no effect on the overall liquidity of GE. ECF No. 360 ("Defs.' Mem."), at 42-47. Second, they dispute that the 2016 Form 10-K and Bornstein's January 20, 2017 earnings call contained misrepresentations. *Id.* at 47-50. Third, they assert that Plaintiffs cannot prove scienter. *Id.* at 37-42. And finally, they insist that Plaintiffs fail to prove loss causation. *Id.* at 20-37.[3] The Court will address each argument in turn.

---

[3]     Defendants do not separately challenge the "control person" claim against Bornstein under Section 20(a) except to argue in passing that Plaintiffs fail to establish that Bornstein

A.  **Item 303**

Item 303 requires a "registrant" (1) to "[i]dentify any known trends or any known

demands, commitments, events or uncertainties that will result in or that are reasonably likely to

result in the registrant's liquidity increasing or decreasing in any material way"; and (2) to

"[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have

a material favorable or unfavorable impact on . . . revenues . . . from continuing operations."  17

C.F.R. § 229.303(b)(1)-(2).[4]  The regulation provides that "[t]he discussion and analysis must

focus specifically on material events and uncertainties known to management that are reasonably

likely to cause reported financial information not to be necessarily indicative of future operating

results or of future financial condition."  *Id.* § 229.303(a); *see Stratte-McClure v. Morgan

Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (holding that Item 303 requires disclosure "where a

trend, demand, commitment, event or uncertainty is both presently known to management and

reasonably likely to have material effects on the registrant's financial conditions or results of

operations").  Significantly, "registrant" is defined to "mean the registrant and its subsidiaries

consolidated."  17 C.F.R. § 229.303(b), instruction 7; *see also id.* § 229.303(b)(1)(i) (requiring

disclosure of trends or uncertainties that are "likely to result in the *registrant's* liquidity

increasing or decreasing in a material way" (emphasis added)); *id.* § 229.303(b)(2)(ii) (same, but

for revenues); *see also Stratte-McClure*, 776 F.3d at 105 ("Item 303 requires disclosure of a

---

himself participated in any fraud.  *See* Defs.' Mem. 50.  The discussion that follows makes plain
that resolution of that question turns on disputed issues of fact.

[4]     Some courts have read Item 303 to distinguish between the types of information that must
be reported for liquidity-related disclosures and revenues-related disclosures.  But because any
such differences are immaterial for purposes of this case, the Court "declines to parse the
difference between" the different terms.  *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp.
3d 145, 151 n.1 (S.D.N.Y. 2015).  Additionally, and for ease of reading, the Court will refer to
the types of information for which Item 303 mandates disclosure collectively as "trends."

known trend and the manner in which it might reasonably be expected to materially impact *a company's overall financial position*." (internal quotation marks omitted) (emphasis added)).

Defendants contend that Plaintiffs' Item 303 claim falls short of these standards in three principal respects.  First and foremost, Defendants argue that "because the LT factoring transactions were intercompany transactions (*i.e.*, involving sales of LT receivables by GE Power to GE Capital), they ha[d] no net impact on the consolidated liquidity of GE."  Defs.' Mem. 44.  Second, Defendants assert that the factoring was not reasonably likely to have material effects on GE's financial condition.  *Id.* at 45-47.  And third, they contend that Plaintiffs cannot show that otherwise disclosable trends were known to management.  *Id.* at 45.  For the reasons that follow, each of these contentions falls short.

### 1.  Impact at the Registrant Level

GE's first argument is that its factoring had no impact at the registrant level because it was entirely within the company — that is, between one division of GE (GE Power) and another (GE Capital).  That argument has some superficial appeal, but it falls short for at least two reasons.[5]  First, the lack of disclosure here did, in fact, conceal from investors what GE itself recognized: that the reported amount of cash was inflated by unsustainable LT factoring.  *See, e.g.*, ECF No. 385-118, at 3, 8 (a "2017 Cash plan" explaining that there is a "[b]illings gap — 2017 core billings includes ~$480MM of billings pressure due to invoices monetized in prior

---

[5]     Arguably GE's intercompany transactions also were of potential significance to investors because loans and purchases of future receivables can be viewed as an *asset* for a financial arm like GE Capital, and additional cash is *also an asset* for GE Power.  Thus, any decrease in GE Capital's cash from factoring was offset on its books by an asset likely to yield a future return, while the increase in cash received by GE Power appeared entirely positive.  In other words, the positive impression that GE Power's increase in cash from LT factoring gave to investors was *not* fully offset by the impression created by GE Capital's decrease in cash.

periods," and that "[l]ife to date monetization through 4Q'16 + $3B of 2017 monetization will create billings pressure of $1.2B in 2018 and $1.78 in 2019," that this factoring led to costs including "LTAR discounts for 2017 estimated $180MM," and "$200MM Interest expense (below op profit) pressure from monetization," leading to "GE profit eliminated" and that the "pipeline" was weak as the "'[l]ow hanging fruit' has been picked . . . transactions are getting tougher"); *see also* ECF No. 385-10, ECF No. 385-101 (detailing use of LT factoring to solve cash issues).  Notably, "[a]nalyst reports issued after the April 21, 2017 announcement indicate that the market did not know that GE had been monetizing billions of dollars in deferred assets over the previous two years, which, in turn, indicates that the market was not yet fully aware of what GE's 'normalized' cash-flow performance looked like."  ECF No. 355-12 ("Tabak Rep."), ¶ 43.  As one Deutsche Bank report explained: "[W]ouldn't GE also just be trading future cash flows for a near-term (financially engineered) 'stop gap' — arguably detracting from the long term investment thesis?"  *Id.*

As Plaintiffs' expert David Tabak (discussed below) testified, GE's failure to disclose the extent of its deferred monetization "would affect the market's evaluation of GE's future liquidity," ECF No. 355-20 ("Tabak Tr."), at 26, because "the reported industrial CFOA . . . was not known by the market to include substantial amounts of cash flow from future periods.  Thus, when GE gets to those future periods, some of the cash flow has already . . . been accounted for and recorded earlier.  So it's not there in the future.  Therefore, there is less cash flow in the future and less liquidity in the future."  *Id.*  When pushed to explain why "a transaction that has a net neutral impact on the overall company's cash balance reasonably likely to have a material impact on GE's liquidity," Tabak explained that "if cash flows are treated as operating when actually they are not, the market will misunderstand the source of the cash flows and, therefore,

13

can misunderstand what the future cash flow potentials are." *Id.* at 29.[6]  This conclusion is

supported by GE's own internal communications.  *See, e.g.,* ECF No. 385-102, at 2 (text

messages between GE employees explaining that the "official guidance" was to stop factoring

now "to avoid the incremental drag" in future years "and align with economics"); ECF No. 385-

93, at 8 (GE PowerPoint explaining that "[m]onetization of future billings in [Power Services]

creates factoring 'gap' in future years, estimating a $500 million gap in 2017").

Notably, Plaintiffs' theory is not only supported by the evidence, but it is also more

consistent than Defendants' theory with the stated objective of Item 303 that disclosures "must

focus" on trends that are "reasonably likely to cause reported financial information not to be

necessarily indicative of future operating results or of future financial condition" and are

"expected to better allow investors to view the registrant from management's perspective."  *Id.*

§ 229.303(a).  Take, for example, a company whose customers had entirely ceased making new

purchases.  Such a company would have no future, and investors would plainly flee if aware of

the news.  If that information was covered up for a few quarters by pulling cash from already-due

future billings on past purchases through deferred monetization with a financial arm within the

same company that had a reserve of cash, investors might be mollified instead of running for the

exits — at least until the coverup was revealed or the cash hole became too large to hide.  To

hold, as Defendants suggest, that such a company's actions were immune from scrutiny under

---

[6]      In addition, the failure to disclose GE's LT factoring could have misled investors about the company's effectiveness in converting customer contracts into actual cash. *See, e.g.*, ECF No. 385-97, at 1, 7 (a presentation sent in September 2017 from Eshoo to Bornstein, Mahajan, Green, and other, stating: "current business model delivering ~55-60% cash conversion ex def'd monetization" and warning that "[m]onetized $2.0B [contractual service agreement] cash flows in 2016 to deliver 89% conversion . . . [was] not sustainable"); ECF No. 385-107, at 1 (July 2017 email from Green, stating that Bornstein "reminded me of the need to generate more cash and the 95% conversion next year . . . .  I reminded him with severance and the drag from monetization this is highly unlikely").

Item 303 because they involved only intracompany transactions would undermine the goal of giving investors the information needed to make better predictions of a company's future financial condition.

Second, and in any event, GE's LT factoring *did* have a negative effect beyond the misleading picture it painted for investors.  GE Power repeatedly offered discounts to customers to convince them to modify their contracts to facilitate LT factoring, leading to a decrease in overall cash.  *See* ECF No. 385-22, at 66-67 ("Q. If Power agreed with a discount with a customer in order to facilitate deferred factoring, would that discount reduce Power's earnings?  A. Yeah, the net effect of the renegotiation would result in some CMR adjustment.  Q. And would that reduce GE's earnings as well?  A. The impact from CMR adjustments flows through earnings."); ECF No. 385-65, at 31-32 ("[W]e often had to renegotiate some of the contract terms with our customers in order to ensure that the contract cash flows would be eligible for the program. . . . they would owe us less under the new contractual terms than they would have under the old contractual terms."); *id.* at 32 ("Q. So GE would give up some of its — some of the cash flows that it, otherwise, would have been entitled to in order to make the cash flows eligible for its deferred monetization program, correct?  A. Correct.").  These discounts meant that the result of LT factoring was not just more money in GE Power's hands and less in GE Capital's hands — GE as a whole received less cash flow because it was giving discounts to customers in the push to make more contracts eligible for LT factoring.

### 2. Materiality

Next, there is sufficient evidence for a jury to conclude that the extent of GE's factoring was material.  Determining materiality requires a fact-specific inquiry.  *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988).  The materiality of a misstatement depends on whether "'there is a

substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *Id*. at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In other words, a statement is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (cleaned up).

LT factoring and the attendant cashflow issues were critical pieces of financial information that a reasonable investor would consider important, and GE insiders were well aware of that fact. Indeed, insiders repeatedly sounded the alarm. As Bornstein explained in an email in April 2017, "[t]he Cash issue is huge for us. I am really nervous that we have a structural issue in services that has been building over the last few years. I am not sure how we are going to explain using cash as a company. . . . This is an existential issue for the Company." ECF No. 385-90, at 3. In response, Green explicitly pointed the finger in part at factoring, explaining that "three key factors" are "coinciding," including "market shift to geographies and customers that are cash constrained (eg. middle east, Africa), long-term service agreements with mix to more deferred revenue, and the use of capital markets factoring / monetization to accelerate cash." *Id.* at 2. A Vice President of Investor Communications responded to the group and asked that they "[p]lease read the attached [analyst note]. This is what we are up against. Cash is the single biggest issue for our shareholders." *Id.*

Citing authority for the proposition that the "anticipated magnitude" of an event should be assessed "in light of the totality of the company activity," *see, e.g.*, *Basic*, 485 U.S. at 238, Defendants argue that "LT factoring's impact on CFOA was quantitatively immaterial to GE" because Plaintiffs have not demonstrated that it "comprised over 5% of GE's CFOA," ECF No. 406 ("Defs.' Reply"), at 22. But this argument ignores Plaintiffs' theory, supported by the

evidence, that LT factoring was creating an ever-widening cash shortfall.  Defendants calculate a "Net CFOA Impact from LT Factoring" in 2017 of "$0.054 billion" and calculate GE's CFOA as a whole as $11.0 billion.  Defs.' Mem. 46.  In that context, LT factoring was not immaterial, as it hid a substantial cash hole.  *See, e.g.*, ECF No. 385-101, at 3 (describing "$3B" goal for 2017 under deferred monetization and noting that even "[i]f we hit $3B, creates 1.2B hole in '18 . . . need to think through this model); ECF No. 385-118, at 3, 8 (a "2017 Cash plan" explaining that there is a "[b]illings gap — 2017 core billings includes ~$480MM of billings pressure due to invoices monetized in prior periods," and that "[l]ife to date monetization through 4Q'16 + $3B of 2017 monetization will create billings pressure of $1.2B in 2018 and $1.78 in 2019").  The evidence in the record demonstrates that the pressures created by LT factoring built over time into an amount significant even to GE as a whole.

In any event, the Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  Especially relevant qualitative factors include "whether the misstatement masks a change in earnings or other trends" and "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise."  *Id*. at 163.  These factors are especially pertinent here, as LT factoring masked a trend in declining cash flow.  In addition, analyst reactions to the disclosure of LT factoring support a finding of materiality.  *See, e.g.*, ECF No. 384-39, at 1 (analyst report stating that "[r]eceivables factoring, among other instruments, is a key building block . . . the enhanced disclosure around 'long term receivables' factoring was most interesting[.] . . .  All in, adjusting 2016 and 2017 for receivables factoring we now know of, as well as ongoing investing cash flow headwinds, we . . . see a miss on EBITDA guidance").

### 3. Knowledge

Finally, there is sufficient evidence in the record for a jury to find that Defendants knew a trend of declining cash flow was reasonably likely to occur and have a material effect.  In particular, management-level employees of GE repeatedly demonstrated knowledge both that cash was key to the company and its investors and that GE Power's use of factoring to accelerate cash was contributing to a cash problem.  *See, e.g.*, *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.").  The April 2017 exchange discussed above, in which Bornstein described the "Cash issue" as "huge" and Green responded that one of the "key factors" causing the company's cash issue was "factoring / monetization to accelerate cash," ECF No. 385-90, at 2-3, is especially noteworthy.  But there are other examples in the record.  For example, the exchange between Mahajan and Eshoo in February 2016 demonstrates that executives knew of the "unbelievable" costs of factoring (that Mahajan described as "fucking ridiculous"), that "cash was the "key indicator of the health of a business," and that "deferred factoring" was "ridiculously expensive."  ECF No. 385-5, at 3.  Additionally, in July 2016, Immelt circled a "cash" bullet point on a slide about GE Power's goals that explained that the "deferred monetization pipeline [was] challenged."  ECF No. 385-112*, at 6.  And Calpeter testified that Immelt was aware of plans to conduct billions of additional LT factoring.  *See* ECF No. 385-23, at 203 ("Q.  Okay.  So at least in the discussion with Mr. Immelt in November of 2016 as with respect to the view for 2017, Power was planning and disclosed to Mr. Immelt that it would do — or aim to do about 2 and a half billion of deferred monetization; is that right?  A.  Yes.").  Finally, an email from Green in July 2017

described a call with Bornstein, in which Bornstein "reminded [Green] of the need to generate more cash and the 95% conversion next year . . . [Green] reminded him with severance and the drag from monetization this is highly unlikely." ECF No. 385-107, at 1.

Defendants reason that "[i]t is no surprise that GE employees and executives tracked and discussed the cash performance of GE and its businesses, and none of these conversations reflect awareness of an Item 303 trend requiring disclosure." Defs.' Reply 23. But the evidence reveals more than "tracking" and "discussing" the cash performance of GE and its businesses — it demonstrates a clear awareness by management-level employees of the trend of LT factoring and the impact of that business practice on cash flow and the ability to meet liquidity projections.

## B. 2016 Form 10-K and January 20, 2017 Misrepresentations

Next, Defendants briefly argue that GE's Form 10-K for 2016 and Bornstein's January 20, 2017 earnings call remarks were not false or misleading. Defs.' Mem. 47-50. These arguments can be swiftly rejected. The Court has twice rejected Defendants' arguments concerning the 2016 Form 10-K, and Defendants provide no basis to revisit those conclusions. *See Sjunde I*, 417 F. Supp. 3d at 413 ("[A] reasonable investor could read the 2016 Form 10-K and conclude that GE factored LTSA receivables *only* to reduce its credit exposure while, in reality, as Plaintiffs plausibly and specifically allege, GE was also factoring to shore up its dwindling cash flow and mask the growing gap between contract assets and actual cash being generated in the Industrials group, including from LTSAs. By suggesting otherwise, Defendants 'omit[ted] to state a material fact necessary' to make the statements 'not misleading.'" (quoting 17 C.F.R. § 240.10b-5)); *Sjunde II*, 2021 WL 311003 at *13 (explaining that the Court "previously concluded that" the 2016 Form 10-K could have been misleading and that Defendants' arguments "provide no reason for reconsideration"). Meanwhile, there is sufficient

evidence in the record to support Plaintiffs' arguments that (1) Bornstein was aware of contrary

data in his January 20, 2017 statements and (2) that he then attempted to align the 10-K

disclosures with his misstatements.  *See* Pls.' 56.1 Statement ¶¶ 305-56; *see also Sjunde Class*

*Certification*, 341 F.R.D. at 551 (explaining that Defendants' "argument misrepresents Plaintiffs'

. . . alleg[ation] that Bornstein misrepresented the change in factoring between 2015 and 2016"

and noting Bornstein's arguably contradictory deposition testimony).  Defendants' argument that

there is no "'smoking gun' document," Defs.' Reply 25, refutes itself — such a document is not

required because a jury may properly draw sufficient inferences from circumstantial evidence

that, when viewed as a whole, support Plaintiffs' claim.[7]

## C.  Scienter

Next, Defendants contend that Plaintiffs cannot prove scienter.  Defs.' Mem 37-42.

Significantly, "[t]he Second Circuit has been lenient in allowing scienter issues to withstand

summary judgment based on fairly tenuous inferences" because such issues are "appropriate for

resolution by the trier of fact."  *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.

1999); *S.E.C. v. Cole*, No. 12-CV-8167 (RJS), 2015 WL 5737275, at *5 (S.D.N.Y. Sept. 19,

2015) (Sullivan, J.) ("[T]he Second Circuit has left no doubt that scienter issues are seldom

appropriate for resolution at the summary judgment stage.").  On a motion for summary

judgment, "plaintiffs need only offer evidence from which a jury could *infer* scienter — indeed,

it is the rare defendant who admits to having had fraudulent intent."  *Abu Dhabi Com. Bank v.*

*Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 458-59 (S.D.N.Y. 2012) (emphasis in original)

---

[7]     Similarly, because the Court concludes that Bornstein had sufficient knowledge that the
"real facts [were] otherwise," Defs.' Reply 25, Bornstein's statements that "there's very good
underlying performance here" and that "it's actually very little to do with GE Capital factoring,"
ECF No. 384-19, at 12, are also actionable.

(citation omitted).  More specifically, the scienter requirement is met if a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

Here, a reasonable jury could infer that management-level employees whose knowledge is imputable to GE as a whole knew facts or had access to information suggesting that GE's public statements were inaccurate.  As discussed, management-level employees knew that LT factoring was substantial and posed serious future risks.  Yet these critical facts were not reflected in GE's disclosures.  *See* Pls.' 56.1 Statement ¶¶ 196-204.  Additionally, a reasonable jury could find that Bornstein's response to the analyst question about factoring during the January 20, 2017 earnings call was knowingly misleading.  In particular, Plaintiffs marshal evidence from which a jury could infer that Bornstein had access to documents showing that GE's factoring — and its impact on Industrial CFOA — was higher than he disclosed.  ECF No. 382 ("Pls.' Opp'n"), at 31; Pls.' 56.1 Statement ¶¶ 205-212.  Plaintiffs also point to communications among Bornstein, Mahajan, and other GE employees in the aftermath of Bornstein's remarks —and revisions to planned disclosures of GE's LT factoring in GE's 2016 Form 10-K (filed about a month later, on February 24, 2017) — that arguably show that Bornstein attempted to cover up the impact of his misstatement.  *Id.* ¶¶ 305-31.  To be sure, Defendants vigorously dispute those inferences and point to evidence that could reasonably support other conclusions.  Defs.' Mem. 40.  To accept Defendants' position, however, would require the Court to decide disputed issues of fact and improperly draw exculpatory inferences in favor of Defendants based on denials by self-interested witnesses, which it may not do.

The fact that GE's Disclosure Committee was involved in at least some of the disclosures at issue is not dispositive, as Defendants suggest. Defs.' Mem. 40. Defendants cite, and the Court has found, no authority for the proposition that such a committee can cleanse otherwise sufficient evidence management-level executives' knowledge that disclosures were misleading. Moreover, as Plaintiffs' note, whether the Disclosure Committee was provided with — and considered all material facts about — GE's deferred monetization practices and whether Mahajan and others misled the Disclosure Committee through knowingly false statements that GE was discontinuing deferred monetization are disputed factual questions. Pls.' Opp'n 29.

In their reply, Defendants stress that Bornstein had no motive and argue that Plaintiffs' theory therefore makes "no economic sense." Defs.' Reply 16-17. But this argument falls short as a matter of both law and fact. As a matter of law, evidence that a defendant benefitted in a concrete and personal way from a purported fraud is one way to prove scienter, but it "is not required." *Gruber v. Gilbertson*, No. 16-CV-9727 (WHP), 2021 WL 2482109, at *13 (S.D.N.Y. June 17, 2021). Defendants respond by citing a Supreme Court decision from the antitrust context for the proposition that "if the factual context renders respondents' claim implausible — if the claim is one that simply makes no economic sense — respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see* Defs.' Reply 17. But that principle's application in the securities-fraud context — at least where there is other evidence that Defendants "knew facts or had access to information suggesting that their public statements were not accurate," *Novak*, 216 F.3d at 311 — is dubious. And in any event, the evidence of scienter here *is* more persuasive than in the mine-run securities-fraud case.

Second, as a matter of fact, a rational jury could infer that Bornstein and other executives benefitted in a concrete and personal way from the purported fraud because an incentive program tied executive bonuses to cash performance.  Pls.' 56.1 Statement ¶¶ 267-80.  Notably, Defendants all but concede as much.  *See* Defs.' Reply 16 n.23 ("Plaintiffs assert Mr. Bornstein received 'over $30 million in compensation,' but ignore that *much of it* would have been earned regardless of any LT factoring" (emphasis added) (internal citation omitted)).  Nevertheless, they argue that Bornstein lacked a motive because he held a significant number of GE shares and options throughout the Class Period and sold none, thus sustaining losses when the truth came out.  *See id.* at 16.  Plaintiffs dispute the accuracy and admissibility of some of this evidence, Defs.' SOF ¶¶ 218, 221, 223, but even assuming Defendants are correct it does not necessarily negate evidence of Bornstein's (or other executives') motive.  There are plausible reasons why an executive might not sell stock despite knowing that its value is inflated, from a desire to demonstrate belief in the company's future to a desire to avoid criminal liability by trading on material non-public information.  More importantly, the question is not whether Bornstein did everything he could to profit from the alleged fraud, but rather whether the alleged fraud provided him a financial benefit.  The answer is that it did, as Defendants themselves all but concede.

Moreover, Plaintiffs need not show that Bornstein's actual compensation exceeded what it would have been with full disclosure because such a comparison "confuses expected with realized benefits."  *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  That is, Defendants "may have thought that there was a chance that the situation . . . would right itself.  If so, the benefits of concealment might exceed the costs . . . .  The fact that a gamble — concealing bad news in the hope that it will be overtaken by good news — fails is not

inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Id.* Put differently, Defendants here could have been attempting to cover a cash hole with LT factoring in the short-term in the hopes that an uptick in cash inflow from customers would later fix the problem, allowing Bornstein and others to avoid a hit to GE's share price while also benefiting from the additional bonuses they had earned. Instead, the cash hole continued to grow, and the unsustainability of LT factoring became impossible to hide. That Defendants' purported plan failed does not mean that a jury could not properly infer a financial motive from the evidence. *See Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (explaining that "it is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent,' to infer that at the time it filed its 10–K in March 2011, [Defendant] believed it had more time" before the scheme was uncovered and that then the benefits of concealment would have outweighed the costs (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

## D. Loss Causation

Finally, Defendants argue that Plaintiffs cannot prove "loss causation" — i.e., a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (internal quotation marks omitted). A misrepresentation "is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations [or omissions] alleged by a disappointed investor." *Id.* (cleaned up). The loss causation requirement "exists because private securities fraud actions are 'available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that

misrepresentations actually cause.'" *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

To establish loss causation, a plaintiff must prove that the concealed information later reached the market *and* caused a loss.  The Second Circuit has articulated several methods for showing loss causation, the two most common being the "corrective disclosure" theory and the "materialization of the risk" theory.  *See id.* at 511.  Under the former, a plaintiff must show that "the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."  *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007).  Under the latter, the plaintiff must show that "the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss."  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).  Under both theories, plaintiffs must show more than "an inflated purchase price."  *Dura Pharms.*, 544 U.S. at 342.  They must "disaggregate" losses caused by "disclosures of the truth behind the alleged misstatements" from losses caused by other factors, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, [and] other events."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura Pharms.*, 544 U.S. at 342-43).

Here, Defendants challenge Plaintiffs' evidence of loss causation — which comes primarily from their expert, Tabak — on two broadly applicable grounds.  First, they argue that Plaintiffs fail to establish a causal link between disclosure and loss — contending instead that the "undisputed evidence shows . . . that GE Power's failure to meet internal LT factoring targets in 2017 was not a result of allegedly undisclosed prior-period LT factoring, and instead reflected the effects of a massive and unexpected downturn in the global power market."  Defs.' Mem. 22.

Second, they contend that "Plaintiffs fail to advance a viable method of disaggregating the tangle of confounding factors and new information that adversely impacted GE's stock price following each of the Alleged Corrective Disclosures." *Id.* In addition, Defendants challenge loss causation as to particular statements and disclosures — namely, the alleged misrepresentations in the 2016 Form 10-K and the January 20, 2017 earnings call and certain alleged corrective disclosures, including those made on July 21 and October 20, 2017. *Id.* at 34-36.

The Court will address each of these arguments in turn.

### 1. Causal Link

Defendants' first argument is that Plaintiffs have not proved a causal link between any alleged fraud and loss — and more specifically, that any losses are attributable to a global downturn in the power market. Defs.' Mem. 20-29. Defendants' arguments on these fronts are not without force, but they cannot be resolved on summary judgment. Put simply, Plaintiffs' evidence — much of which is discussed above — raises a permissible inference that GE's undisclosed factoring led to a massive gap in cash flow that materialized in 2017. *See, e.g.*, ECF No. 385-10; ECF No. 385-101; ECF No. 385-118; ECF No. 385-28, at GE_SDNY01013921-22; ECF No. 385-64; ECF No. 385-118; ECF No. 384-39. The strength of this evidence distinguishes this case from *Atlantica Holdings*, in which the Court concluded that any risk related to Plaintiffs' allegations would only have potentially "materialize[d] in the long-term" and was therefore too attenuated from the actual losses. 477 F. Supp. 3d at 110. This, as well as other evidence from 2017 cited by Plaintiffs, *see* Pls.' Opp'n 40-41, also casts doubt on Defendants' contention that the power downturn was the cause of cash shortfalls in 2017. So too does the fact that at least some internal discussions of the cash shortfall pointed the finger at factoring and made no mention of the global downturn in the power sector. *See, e.g.*, ECF No.

26

385-90, at 1-2.  Ultimately, whether the decline in share prices was attributable to the materialization of risks identified by Plaintiffs or to some other cause, including the global power sector downturn, is "a matter of proof at trial."  *Emergent Cap. Inv. Mgmt. LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2013).

In a related vein, Defendants also argue that Plaintiffs have "concocted a new 'true financial condition' theory" about "true" or "organic" cash flow that cannot be found in Tabak's report or elsewhere in the evidence.  Defs.' Reply 5; *see also* Defs.' Mem. 27-28 & n.18.  Not so. Tabak's report explains that "[a]nalyst reports issued after the April 21, 2017 announcement indicate that the market did not know that GE had been monetizing billions of dollars in deferred assets over the previous two years, which, in turn, *indicates that the market was not yet fully aware of what GE's 'normalized' cash-flow performance looked like*."  Tabak Rep. ¶¶ 22-24, 35-37, 43, 66, 77 (emphasis added).[8]  Moreover, evidence indicates that analysts and employees alike had a common-sense understanding of the distinction between cash flow generated by financing compared to "organic" cash flow from customers.  *See, e.g.*, ECF No. 384-39 (a J.P. Morgan analyst report stating that "[t]he evidence here now points to the systemic use of GE Capital as the grease for the machine.  Receivables factoring, among other instruments, is a key building block . . . receivables activity inflated cash in 2016 even more than we had previously expected, for which 2017 is beginning to come down, but is far from 'normal'"); ECF No. 385-102, at 2 (text messages between GE employees explaining that the "official guidance" was to

---

[8]     To illustrate the point, Tabak proffers a company that typically receives $100 in cash flow every year from customers.  Tabak Rep. ¶ 15.  If its yearly cash flow falls to $90 each year, but the company factors $10 dollars from the next year to hide the $10 reduction in cash flow from investors, it will need to factor $20 in the following year to plug the hole (because it already took $10 from that year during the prior year).  This trend would continue until the company faces a substantial shortfall.  *See id.* ¶¶ 15-16.  And that scenario does not even include additional losses from, for example, discounts given to customers to enable factoring.

stop factoring now "to avoid the incremental drag" in future years "and align with economics");
ECF No. 385-33, at 8 (January 2017 presentation on deferred monetization including a slide
titled "Why do we do deferred monetization?" and noting "[r]ecent pressure from Wall Street on
GE stock price due to perception of poor earnings quality based on" free cash flow as a percent
of net income).

### 2. Disaggregation

Second, and somewhat relatedly, Defendants argue that Plaintiffs have not disaggregated
their losses.  Defs.' Mem. 28.  To demonstrate loss causation, Plaintiffs must "disaggregate"
losses caused by "disclosures of the truth behind the alleged misstatements" from losses caused
by other factors, including "changed economic circumstances, changed investor expectations,
new industry-specific or firm-specific facts, conditions, and other events."  *In re Flag Telecom
Holdings,* 574 F.3d at 36 (cleaned up).  At the same time, securities-fraud "plaintiffs need not
prove the amount of loss caused by each misstatement with complete mathematical precision."
*In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011), *aff'd sub
nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016); *see also Lattanzio,* 476 F.3d at
158 (requiring plaintiffs to produce sufficient evidence for the fact finder to "ascribe some rough
proportion of the whole loss" to defendant's fraud).

Once again, Defendants' arguments — as forceful as they are — cannot be resolved on
summary judgment.  Tabak's report does disaggregate losses resulting from LT factoring from
other causes — including by using an event study to disaggregate industry- or market-wide
trends; using an earnings-response coefficient ("ERC") analysis to exclude earnings surprise
information; and analyzing analyst reports to help calculate the amount of loss attributable to LT
factoring.  Tabak Rep. ¶¶ 35-37, 50-71, 75-78.  Indeed, as Plaintiffs note, "Tabak not only

conducted a disaggregation analysis for the April, July, and October disclosure dates," but "he

attributed most of GE's total stock price decline on those dates to factors unrelated to the alleged

fraud" and where he "was unable to conduct a reliable disaggregation analysis — as is the case

for GE's November 2017 and January 2018 disclosures — he did not attribute any artificial

inflation to those disclosures."  Pls.' Opp'n. 42.  Defendants' arguments to the contrary, *see, e.g.*,

Defs.' Reply 12 n.17, raise factual disputes for trial.  Moreover, on this record, a jury could

reasonably "ascribe some rough proportion of the whole loss" to GE's LT factoring even if

Plaintiffs were unable to establish complete disaggregation.  *See Lattanzio*, 476 F.3d at 158.

### 3.  Loss Causation with Respect to Particular Statements and Disclosures

Finally, Defendants take more specific issue with loss causation as to particular

statements and disclosures.  Two of those arguments are easily rejected.  First, Tabak opined that

the alleged misrepresentations in the January 20, 2017 earnings call and GE's 2016 Form 10-K

maintained the same inflation that existed as a result of the Item 303 claim.  *See* Tabak Rep.

¶ 13; Tabak Supp. Rep. ¶ 3(c).  The Court concludes that these alleged misrepresentations

concealed the same facts (that is, that GE Power's LT factoring hid a cash shortfall), despite

Defendants' attempts to differentiate the claims.  *See* Defs.' Mem 34-36.  Second, Defendants

argue that GE's Form 10-Q for the first quarter of 2017 contained a disclosure that informed

investors about GE Power's LT factoring transactions.  Defs.' Mem. 37.  The disclosure read:

"GE leverages GE Capital for its expertise in structuring long-term financing arrangements with

certain Power and Renewable Energy customers for the purchase of equipment, upgrades and

long-term service contracts. . . .  In relation to these arrangements, GE Capital had approximately

$1.9 billion of long-term financing receivables outstanding."  ECF No. 384-36, at 43.  Contrary

to Defendants' assertions, however, this statement does not unambiguously disclose GE Power's

29

use of LT factoring to cover a cash shortfall; indeed, it could reasonably be read to disclose GE Capital financing arrangements with *customers* of GE Power, not with GE Power itself.  As Plaintiffs note, "Defendants have cited no evidence indicating that the market understood this vague disclosure to reveal GE's use of deferred factoring to generate CFOA," and analyst reports indicate that analysts did not absorb this as disclosure of factoring with GE Power for that purpose.  Pls.' Opp'n 49.  At best, this is an argument for Defendants to make at trial.

By contrast, Defendants are correct in asserting that Plaintiffs fail altogether to demonstrate loss causation for disclosures between November 2017 and January 2018.  Defs.' Mem 36-37.  For starters, Tabak admitted that he was unable to quantify the fraud-related portions of the stock price declines on the November 13, 2017 and January 24, 2018 corrective disclosure dates.  *Id.* at 36.  It follows that Plaintiffs cannot establish loss causation for those dates — a conclusion that Plaintiffs do not even appear to contest.  Plaintiffs do argue that there is one January disclosure for which "no such disaggregation should be required given the circumstances of this case."  Pls.' Opp'n 50.  Specifically, Plaintiffs point to an SEC statement expressing concern about "information bundling" — i.e., "releasing confounding news along with bad news" to "obfuscate[] what portion of the stock drop resulted from news related to its potential SEC violations versus other significant issues."  *Id.* (quoting Statement Regarding Information Bundling and Corporate Penalties, available at https://www.sec.gov/news/public-statement/crewnshawinformation-bundling-2021-09-03).  But Plaintiffs cite, and the Court has found, no authority for the proposition that this theory waives the loss causation requirement.  Moreover, Plaintiffs cite no evidence to support their conclusory assertion that GE intentionally bundled multiple disclosures together.  Thus, the Court declines to adopt Plaintiffs' novel theory.

*           *           *           *

In sum, Defendants' motion for summary judgment is DENIED, except as to claims arising from the alleged corrective disclosures between November 2017 and January 2018, for which Plaintiffs lack evidence of loss causation.

## MOTIONS TO EXCLUDE EXPERT TESTIMONY AND TO STRIKE

Next, Defendants move to exclude the testimony of plaintiff experts S.P. Kothari and David Tabak, ECF Nos. 346-47, and Plaintiffs move to exclude the testimony of defense experts Christopher Russo and Daniel Fischel, ECF Nos. 369, 373.  In addition, Plaintiffs move to strike a declaration from Fischel submitted by Defendants.  ECF No. 377.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").  "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue." *In re Gen. Motors*

*LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (explaining that because "there are many different kinds of experts, and many different kinds of expertise," a court must be granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

The focus of the Court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.  Ultimately, "expert testimony should be excluded if it is speculative or conjectural . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted).  The Court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Nor should an expert be permitted to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), or be permitted to merely "construct[] a factual narrative based upon record evidence," *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018).  Relatedly, expert testimony regarding "an ultimate determination that [is] exclusively within [the jury's] province," must be precluded, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), as must an expert's testimony "on issues of law," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted); *see McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the

strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Moreover, "[a]lthough a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule." *In re Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted); *see* Fed. R. Evid. 702, advisory committee note (noting that "the rejection of expert testimony is the exception rather than the rule"); *see also, e.g.*, *Nimely*, 414 F.3d at 395 ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ."); *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (observing that courts assessing the reliability of expert testimony should be mindful of the "presumption of admissibility of evidence").

With these principles in mind, the Court will address each of the experts at issue.

## A.  David Tabak

Tabak is an economist with degrees from the Massachusetts Institute of Technology and Harvard who has published on subjects including stock price movements and loss causation. Tabak Rep. ¶ 4. On March 11, 2022, he issued a report describing his primary opinions, including the following:

- The information "allegedly misstated and omitted from GE's public disclosures was economically material. Shareholders would have considered that information in evaluating the price of GE's stock and in deciding whether to purchase or sell shares at a given stock price."

- "[I]f the problem with cash flows is a long-term issue, the drag discussed above will keep increasing until the company eventually decides to stop hiding the new, lower long-term trend in cash flows. At that point, as it reduces its factoring in order to reduce the drag that previous factoring created, its cash flow will decline."

- GE's disclosures on April 21, 2017, July 21, 2017, and October 20, 2017, served as partial disclosures or partial corrective disclosures which triggered share price declines, a portion of which related to LT factoring. Tabak then calculated the loss amount per share caused by these corrective disclosures.

- An earnings-response coefficient ("ERC") analysis can be used to "account for the effect of GE's positive earnings surprise on the stock-price movement" and disaggregate earnings surprises from information related to LT factoring.

- A standard event study can disaggregate the corrective information from broader "industry and market" effects.

Tabak Rep. ¶¶ 2, 17, 28, 30. Tabak also issued a supplemental report after the Court's April 2022 Opinion and Order granting Plaintiffs' motion for class certification. ECF No. 355-14 ("Tabak Supp. Rep."). That supplemental report addressed the change in operative dates in the Class Period — now starting on February 29, 2015, rather than March 2, 2015 — and added an opinion related to the January 20, 2017 alleged misrepresentations. *Id.* at 2.

Defendants make four arguments for exclusion of Tabak's testimony: first, that there is no causal link between the previously undisclosed LT factoring and the 2017 LT factoring shortfalls; second, that Tabak's disaggregation analysis — specifically, his ERC analysis — is flawed; third, that Tabak's constant-dollar inflation methodology is inappropriate; and fourth, that his opinions about materiality are improper legal conclusions. ECF No. 400 ("Defs.' Tabak Reply"), at 1-2.[9] The Court will examine each argument in turn.

First, Tabak establishes a sufficient causal link between the alleged fraud and the disclosed industrial CFOA deficits. Plaintiffs' theory is that LT factoring concealed an ever-widening hole in GE's cash position. Tabak assessed losses by looking to GE's misses in its 2017 goals for LT factoring to cover the Industrial CFOA shortfall. ECF No. 366 ("Pls.' Tabak

---

[9] Some of Defendants' objections rely on Fischel's declaration that, for the reasons explained below, must be stricken. Nevertheless, the Court addresses Defendants' objections as consideration of Fischel's declaration does not affect the Court's conclusions.

Opp'n"), at 10.  Defendants argue that Tabak never proves — and in fact admits — that prior LT factoring did not necessarily cause the 2017 miss in LT factoring.  But Defendants fail to grasp the key thrust of Tabak's theory — that "there was an underlying trend of deferred monetization that was hiding an underlying trend of organic cash flow performance."  Tabak Tr. 97.  GE had to plan for ever more aggressive LT factoring in 2017 to hide this widening cash deficit and, when it was unable to meet those targets — whether because of the global power downturn, as Defendants argue; because prior LT factoring made further factoring unsustainable, as Kothari opines; or because the goals were simply unrealistic — GE could not use LT factoring to hide the cash shortfall and was forced to report it to the market.  Therefore, Tabak's use of the miss in LT factoring effectively captures the gap between what GE's cash flow position looked like when unsustainably inflated by LT factoring and when some of that crutch was removed.

Second, Tabak's disaggregation methodology is sufficient.  The Court has already addressed many of Defendants' objections in discussing loss causation.  Only two therefore warrant discussion here.  In arguing that Tabak's ERC analysis is novel, Defs.' Tabak Reply 4, Defendants fail to meaningfully dispute Plaintiffs' academic citations supporting their argument that "ERC regression models have been used by economists for over 50 years to measure stock price reactions to earnings surprises."  Pls.' Tabak Opp'n 13 n.9.  Defendants also argue that the ERC analysis is statistically weak and incorrectly predicts the direction of stock price responses to earnings surprises.  Defs.' Tabak Reply 5.  But Plaintiffs' point to statements by GE executives and analyst reports supporting their position that cash was critical to stock price moves, not earnings.  Pls.' Tabak Opp'n 15.  Additionally, Tabak's use of a three-day window in part of his event study is not grounds for exclusion as "[a] two-to three-day window is common in event studies," *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96

(S.D.N.Y. 2015).  Defendants are wrong in contending that Tabak's use of a three-day event window for the October 2017 corrective disclosure is unexplained.  *See* Defs.' Tabak Reply 9. Tabak provides a full explanation for that window based on an unusually positive price reaction on the announcement day followed by a statistically significant two-day decline.  Tabak Rep. ¶¶ 73-74.  Defendants' quarrel with that explanation is fodder for cross-examination, not exclusion.

Third, Tabak's constant-dollar inflation methodology is sufficiently reliable.  For starters, courts commonly accept the constant-dollar inflation method.  *See, e.g.*, *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 908 (S.D. Cal. 2019) ("[T]he constant dollar inflation method is commonly used to calculate 10b-5 damages.").  And, as in *Baker*, because "the jury is ultimately responsible for deciding whether [constant-dollar inflation], or another calculation, is a reasonable measurement of damages," Tabak's "decision to use the [constant-dollar inflation] method in this case is sufficiently reliable for purposes of *Daubert*."  *Id.*  Plaintiffs argue that Tabak's analysis is accurate because "the record supports Dr. Tabak's assertion [that] the magnitude of the fraud remained constant throughout the Class Period."  Pls.' Tabak Opp'n 23. To the extent that Defendants contend that there is evidence in the record to the contrary, *see* Defs.' Tabak Reply 10, the remedy is not exclusion, but "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Daubert*, 509 U.S. at 596.

By contrast, Defendants' final contention — that Tabak's opinion that the information at issue was "material" is an impermissible legal conclusion — has merit.  *See, e.g.*, *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) ("No party would doubt — one hopes — that an expert cannot testify as to whether the specific information at issue in a case is or is not

'material.'"); *accord Feinberg v. Katz*, No. 01-CV-2739 (CSH), 2007 WL 4562930, at *8-9

(S.D.N.Y. Dec. 21, 2007).  That Tabak adds the word "economically" before "material" does

"not does not somehow transform what is a legal proposition and a finding of fact into an

admissible opinion." *Tourre*, 950 F. Supp. 2d at 678.[10]  Thus, Tabak may not offer an opinion

that the information at issue was "material" or "economically material."  That said, he may

provide testimony that puts LT factoring into economic context.  At trial, the Court can and will,

through rulings on objections and appropriate curative instructions, ensure that Tabak does not

"usurp the trial judge's function of instructing the jury on the law [or] tell the jury what result to

reach on the facts." *Feinberg*, 2007 WL 4562930, at *8-9.

**B.  Daniel Fischel**

      Fischel is President and Chairman of Compass Lexecon, a consulting firm that

"specializes in the application of economics to a variety of legal and regulatory issues"; he

previously held academic positions at the University of Chicago and Northwestern University.

ECF No. 355-16 ("Fischel Rep."), at 1.  Offered by Defendants as a rebuttal witness, Fischel

offers three primary opinions: first, that "Tabak fails to demonstrate any connection between the

purported corrective disclosures and the remaining claims"; second, that "Tabak's principal

disaggregation method is unreliable, rendering his entire disaggregation analysis unreliable, and

he does not establish that his subsidiary disaggregation methods are reliable"; and third, that

---

[10]    Plaintiffs' reliance on *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086 (JMF), 2013 WL 5658790, at *14 (S.D.N.Y. Oct. 17, 2013), is misplaced.  At issue there was class certification, and the Court explained that "[w]hether the omitted information and misrepresentations were material is an issue for the factfinder at trial, and is not before the Court at this stage of the litigation." *Id.*  Indeed, the Court cautioned that "if [the expert witness] were to testify regarding materiality at trial, the Court might well instruct him to 'recast his testimony by using terminology that does not express legal conclusions.'" *Id.* (quoting *Crown Cork & Seal Co., Inc. Master Ret. Trust v. Credit Suisse First Bos. Corp.*, No. 12-CV-5803 (JLG), 2013 WL 978980, at *8 (S.D.N.Y. Mar. 12, 2013).

"Tabak ignores that the behavior of GE and its officers contradicts Plaintiffs' claims and his conclusion that GE's stock price was artificially inflated during the Class Period." *Id.* at 16-17. On this last score, Fischel offers that "[i]f Defendants and GE's other officers believed that the Company's stock price was artificially inflated during the Class Period due to allegedly fraudulently concealed business practices . . . they would have had a strong economic incentive to dispose of their GE shares . . . .  Instead, they did the opposite." *Id.* at 40.

Plaintiffs' challenges to Fischel's first two opinions require little discussion.  They amount to little more than an argument that Tabak has the better of the experts' disputes and do not come close to providing a reason for exclusion of the two opinions.  *See, e.g.*, ECF No. 375 ("Pls.' Fischel Mem."), at 7 (contending that Fischel cannot effectively offer a definition of certain key terms because "Tabak has thoroughly explained these concepts in his reports").  Fischel's third opinion is a different story.  For one thing, to the extent that it involves testimony about Bornstein and other employees' beliefs, it is improper.  *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("[E]xperts may not offer opinions regarding the intent or motive of parties as part of their analysis."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").[11]  Defendants' response that "[e]conomics involves, at its core, the study of incentives and behavior," sweeps too far.  Fischel may indeed testify about economic incentives generally, such as whether a company's employees have an economic incentive to sell the company's stock if the price is inflated; but he may not go further to offer testimony about the state of mind of Bornstein or any other employee.  *See Scott*, 315 F.R.D. at 46 (holding that

---

[11]     Notably, Defendants explain that Fischel "disavowed at his deposition that he was 'expressing any opinion on [] what belief GE had.'"  ECF No. 405 ("Defs.' Fischel Opp'n"), at 18.

an expert may "not assign [the defendant company's] motivation or intent behind its business

model"). Additionally, to the extent that Fischel proposes to apply his theory to Bornstein and

other employees and opine that their decisions to hold stock was at odds with the requisite state

of mind, *see, e.g.*, Fischel Rep. 40 (introducing his opinions on this question with the title "the

behavior of GE and its officers contradicts Plaintiffs' claims" (cleaned up)), such testimony is

unnecessary and would improperly invade the province of the jury. *See, e.g.*, *Nimely*, 414 F.3d

at 398 (holding that an expert's testimony that "he 'rejected' the possibility that [two officers]

had lied, and explained various reasons why police officers have no incentive to give false

statements in excessive force cases . . . essentially instructed the jury as to an ultimate

determination that was exclusively within its province" and did "not 'assist the trier of fact '" but

"attempt[ed] to substitute the expert's judgment for the jury's" (cleaned up)); *see also United

States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("[A] district court should not admit testimony

that is 'directed solely to lay matters which a jury is capable of understanding and deciding

without the expert's help.'" (quoting *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir.

1991)). A jury does not require expert testimony to assess whether Bornstein's decision not to

sell his stock was consistent with a finding of scienter.

Finally, the Court concludes that Fischel's declaration — disclosed for the first time in

conjunction with Defendants' motion for summary judgment — must be stricken. The deadline

for all expert discovery was July 8, 2022. *See* ECF No. 313. In Tabak's initial report, he

explained, in reference to his ERC analysis, that "the market tends to expect GE to beat analyst

estimates slightly, such that just meeting analyst estimates would be a little disappointing to the

market." Tabak Rep. ¶ 33 n.15. Fischel's report then erroneously reasoned that Tabak

"incorrectly assumes the relationship between earnings per share ('EPS') surprises and stock

price movements is always linear, i.e., a positive (negative) surprise will always beget a GE stock price increase (decrease)." Fischel Rep. 27. At his deposition, Fischel was asked if there was anything in his report that he would like to change, to which he responded: "No. . . . I wouldn't say there's anything I want to add to the report." ECF No. 385-157, at 16-17. He did also note that "work is ongoing as new information becomes available," but when pressed (repeatedly) for when this new work would be finished, he demurred. *Id.* at 17-26. On September 6, 2022, Defendants move for summary judgment. Attached as an exhibit to their motion was a declaration of Fischel, in which he attempted to account for the constant term in Tabak's ERC analysis, the inclusion of which meant that a positive earnings surprise did *not* always cause a stock price increase, as Fischel had previously assumed erroneously. ECF No. 355-24 ("Tabak Decl."), at 4. Defendants did not seek, let alone obtain, leave of Court to disclose an untimely expert report.

In determining whether to exclude evidence or information based on a party's failure to comply with discovery orders, a court must consider "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997). Here, all four factors favor exclusion. First, Defendants' have no persuasive explanation for their failure to produce Fischel's declaration (in the form of a supplemental report) before the close of expert discovery. Second, Fischel is an important witness, but striking his untimely declaration does not preclude him from testifying, as much of his analysis remains intact. Third, the untimely disclosure plainly caused Plaintiffs prejudice because it prevented them from deposing Fischel about the material and because

Defendants were able to prepare for summary judgment knowing they had an undisclosed "ace in the hole."  This prejudice goes to the heart of the "purpose of the rule," which "is to prevent the practice of 'sandbagging' an opposing party with new evidence."  *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004).  The sandbagging here is especially noteworthy given that Defendants' counsel were on notice about Plaintiffs' desire for any new work from Fischel at his deposition.  Fourth, the availability of a continuance cuts against Defendants.  This case has already been pending for six years.  And it would have been difficult in a case of this complexity to re-open expert discovery and resolve the knock-on effects on the motion for summary judgment.  In addition, Defendants had months to request any relief — whether it was an extension of the expert discovery deadlines along with a short extension of the motion for summary judgment deadline — or a continuance.  But Defendants did nothing.

Nor is there any merit to Defendants' assertion that Fischel's untimely declaration is "within the scope" of his prior work.  Defs.' Fischel Opp'n 19-20.  Put simply, the belated declaration materially alters Fischel's prior analysis by fixing a significant error.  Specifically, it changed Fischel's analysis by correcting his prior mistaken assumption that Tabak's model assumed that an earnings report that exceeded analyst expectations had a simple, always positive correlation with an increase in stock price, and then proceeded to test the significant of Tabak's constant term through statistical analysis.  This analysis changed Fischel's approach and findings and thus "exceed[ed] the bounds of [his earlier] report."  *Atlantica Holdings*, 477 F. Supp. 3d at 111 (cleaned up).  And finally, Defendants' contention that the declaration is admissible under Rule 26(e) of the Federal Rules of Civil Procedure "because it completes Prof. Fischel's testimony by providing the final results of an analysis he previewed at his deposition" is unpersuasive.  Defs.' Fischel Opp'n 21 (quoting Fed. R. Civ. P. 26(e)(1)(A), (2)).  Yes, a party is

obligated under Rule 23(e) to "supplement or correct" a disclosure "if the party learns that in some material respect the disclosure or response is incomplete or incorrect" and, in the case of an expert, that duty "extends both to information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(1)(A), (2). But the Rule provides that the supplemental disclosure must itself be "timely," Fed. R. Civ. P. 26(e)(1)(A), and, in the case of an expert, "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due," Fed. R. Civ. P. 26(e)(2). So the duty to supplement is not the escape hatch that Defendants suppose. Moreover, to hold otherwise would introduce a gaping loophole in the deadlines for expert disclosures. An expert could hint at further work in his deposition, refuse to supply the details or timeline of that work, and then invoke the duty to supplement to justify filing a new expert opinion after the close of expert discovery. In short, because Fischel's "declaration was drafted and filed after the close of discovery" *and* "exceeds the bounds of [his] report," it must be and is excluded. *Atlantica Holdings*, 477 F. Supp. 3d at 111 (cleaned up).[12]

## C. S.P. Kothari

Kothari is a Professor of Accounting and Finance at the MIT Sloan School of Management. ECF No. 358-22 ("Kothari Rep."), at 1. His primary opinions are as follows:

- "GE Power used factoring to report substantial financing activity between GE Power and GE Capital as Industrial CFOA for GE. Information regarding the source of CFOA would have been material to investors"; and

- "GE's reliance on GE Power's factoring and deferred monetization practices masked underlying weakness in GE Power's ability to collect cash directly from its customers,

---

[12]     Contrary to Plaintiffs' assertions, *see* Pls.' Fischel Mem. 11, striking Fischel's declaration does not render his original testimony concerning Tabak's ERC analysis so unreliable that it must be excluded. That said, his failure to incorporate a constant term into his analysis is certainly fodder for cross-examination, and he may not rely on his untimely declaration or the statistical analysis contained therein to rebut any such questions.

created a substantial drag on future cash flows, and was unsustainable.  These facts would have been material to investors."

Kothari Rep. 1-3.  Just as Tabak may not opine on the materiality of the information, Kothari may not either.  Nor, as Plaintiffs suggest, *see* ECF No. 368 ("Pls.' Kothari Opp'n"), at 18-19, can he merely substitute the word "important" for "material," *see, e.g.*, *United States v. Tomasetta*, No. 10-CR-1205 (PAC), 2011 WL 6382562, at *2 (S.D.N.Y. Dec. 12, 2011) ("[T]estimony that the misstatements about the options not being in-the-money would not have significantly altered the total mix of information and that truthful disclosures would not have been important to a reasonable investor, is improper because it invades the province of the Court in defining materiality and the province of the jury in determining whether the misstatements were material.").  That said, Kothari may testify about "the concepts of CFOA and [cash flow conversion rate]" and opine "as to why these metrics are important for a company like GE, particularly where it has chosen to report Industrial CFOA (a non-GAAP metric) and GE's cash conversion rates," as well as "the economic importance of LT factoring, how it was used to mask underlying weakness in cash flows and how it was not sustainable, without seeking to offer an opinion as to the materiality of the alleged false statements themselves."  Pls.' Kothari Opp'n 18. The Court can and will police the appropriate line through rulings on objections and curative instructions at trial.

Defendants' other objections to Kothari's testimony are without merit.  First, his testimony is not impermissibly "narrative."  For example, he synthesizes complex financial information from various sources of evidence and applies his academic expertise to conclude why LT factoring was not sustainable.  Kothari Rep. 1-5.  So too, the opinion in his supplemental report that "Bornstein's January 20, 2017 statement indicated that GE's factoring was declining at a time when: (i) factoring was actually increasing as part of GE's plan to generate CFOA and

43

CFCR and to meet cash flow targets, and a primary driver in GE Power's CFOA generation in 2016, and (ii) GE was factoring at unsustainable levels," also relies upon an application of his expert knowledge to the facts.  ECF No. 355-13, at 6.  Second, the mere fact that Kothari's opinion on "monetization drag" relies in part on certain "internal GE documents," ECF No. 398 ("Defs.' Kothari Reply"), at 8, does not mean that it is inadmissible, as Kothari does not simply regurgitate these documents but analyzes them and uses his expert knowledge to opine about monetization drag.  Third, Kothari may testify that LT factoring constituted "financing," not "operating," activities, Defs.' Kothari Reply 9, as he plans to explain a non-accounting distinction between "organic" cash flow from customers and financial cash flow from LT factoring.  Defendants' remaining arguments go to the weight of Kothari's testimony, not its admissibility.

**D.  Christopher Russo**

Finally, Defendants offer Russo as a rebuttal expert to Tabak and Kothari.  He is an industry expert who offers three primary opinions.  First, he opines that "factoring of receivables is a common business practice in the power industry" and that "use of factoring was congruent with GE Power's business goals, and enabled it to manage its working capital, grow its business, and serve its customers."  ECF No. 355-15 ("Russo Rep."), at 4.  Russo next opines that Kothari and Tabak are wrong because they fail to recognize that "GE Power's underperformance was caused by a sudden, unforeseen, and exogenous downturn in the global gas power market, which affected its ability to sell equipment, upgrades, and services."  *Id.* at 5.  Finally, Russo opines that GE Power's LT factoring was sustainable.  *Id.* at 6-7.

Russo's testimony is admissible.  Plaintiffs contend that Russo failed to "analyze GE's actual CFOA and deferred monetization performance in 2017 and identify the factors that

actually drove its failure to hit its CFOA and deferred monetization targets." ECF No. 409 ("Pls.' Russo Reply"), at 4. This may be true — but it does not render Russo's testimony inadmissible. Russo attacked the question of what caused GE's performance from a different angle, examining statements from customers of GE, GE's reports and disclosures, evidence of what happened to GE's competitors, and other sources. Russo Rep. 22-44. The fact that Russo may not have examined GE's internal data does not render his testimony inadmissible, just as Tabak and Kothari's lack of detailed analysis of the global power downturn does not render their testimony inadmissible. All of their testimony provides insights on GE's performance from different sources that a fact-finder could use to better understand the question. Plaintiffs' remaining arguments — for example, that Russo's sustainability evidence should be given less weight because he did not examine certain pieces of evidence, *see* Pls.' Russo Reply 8 — also go to weight, not admissibility.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' claims arising from the alleged corrective disclosures between November 2017 and January 2018 and otherwise DENIED; the parties' *Daubert* motions are GRANTED in part and DENIED in part; and Plaintiffs' motion to strike is GRANTED.

The parties filed a number of letter-motions to seal portions of their motion papers. ECF Nos. 348, 364, 386, 388, 394. The Court granted these letter-motions, in most cases only temporarily, pending its decision on the underlying motions. ECF Nos. 361, 387, 389, 407. It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches. *Lugosch*, 435 F.3d at 119. Significantly, assessment of whether

the presumption in favor of public access is overcome must be made on a document-by-document basis.  *See, e.g.*, *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019).  And the mere fact that information is sealed or redacted by agreement of the parties is not a valid basis to overcome the presumption.  *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015).  In light of this Opinion and Order, and to facilitate the Court's review of the parties' requests, the parties shall **no later than three weeks from the date of this Opinion and Order**, submit a joint letter with a single chart listing each and every document that any party or third party believes should remain under seal or in redacted form (with a hyperlinked reference to the docket number of the document), the party who seeks to keep the document under seal, a *succinct* (i.e., two- or three-word) justification for the request, and a hyperlink reference to any prior letter-motion that addresses the document.  For the sake of completeness, the parties should include in the chart any document that the Court has already determined should be kept under seal permanently and include a hyperlinked reference to the Court's prior ruling in the chart.  To the extent that the parties agree that a document previously filed under seal or in redacted form can or should be filed publicly, the parties should include that in the letter, with a hyperlinked reference to the relevant document.

Finally, unless and until the Court orders otherwise, the parties shall submit a proposed Joint Pretrial Order and associated materials (in accordance with Section 5 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman) **within sixty days of the date of this Opinion and Order**.  The Court will schedule a trial date — or a conference to discuss a trial date — after reviewing the parties' submissions.  In the meantime, the Court is of the view that the parties should try to settle this case without the need for a trial that would be expensive and risky for both sides. To that end, the

Court directs the parties **to confer immediately** about the prospect of settlement and conducting a settlement conference before the assigned Magistrate Judge, a mediator appointed by the Court, or a mediator retained privately.  If the parties agree that a settlement conference would be appropriate, they should promptly advise the Court and, if needed, seek an appropriate referral and extension of the pretrial deadlines.

The Clerk of Court is directed to terminate ECF Nos. 345, 346, 347, 369, 373, and 377.


SO ORDERED.

Dated: September 28, 2023
New York, New York

_____
JESSE M. FURMAN
United States District Judge